KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
Shawn Holley (Cal. Bar No. 136811)
Kate Mangels (Cal. Bar No. 301811)
808 Wilshire Boulevard., 3rd Floor
Santa Monica, CA 90401
Tel:  (310) 566-9800
Fax: (310) 566-9873
sholley@kwikhlaw.com
kmangels@kwihlaw.com

ZUCKERMAN SPAEDER LLP
Blair G. Brown (*pro hac vice* forthcoming)
Jon R. Fetterolf (*pro hac vice* forthcoming)
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax: (202) 882-8106
bbrown@zuckerman.com
jfetterolf@zuckerman.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| TREVOR BAUER,<br><br>          Plaintiff,<br><br>     v.<br><br>LINDSEY C. HILL AND NIRANJAN FRED THIAGARAJAH,<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Trevor Bauer, by his undersigned attorneys, alleges as follows:

## NATURE OF ACTION

1.      Defendant Lindsey Hill fabricated allegations of sexual assault against Plaintiff Trevor Bauer, pursued bogus criminal and civil actions against him, made false and malicious statements about him, and generated a media blitz based on her lies. Ms. Hill's motives for making her false claims and statements are now clear. She wanted to destroy Mr. Bauer's reputation and baseball career, garner attention for herself, and extract millions of dollars from Mr. Bauer.  Ms. Hill was aided in those efforts by her attorney, Defendant Niranjan Fred Thiagarajah.  Although a Los Angeles Superior Court Judge rejected Ms. Hill's false allegations and the District Attorney for Los Angeles County found them unworthy of criminal charges, the damage to Mr. Bauer has been extreme.

2.      Ms. Hill and Mr. Bauer met in person twice at his residence in Pasadena, California for the purpose of having sex.  During their first sexual encounter, after discussing Ms. Hill's sexual preferences, they engaged in consensual rough sex.

3.      After their first sexual encounter, Ms. Hill continued to pursue Mr. Bauer so she could have rough sex with him again, but this time, she told Mr. Bauer she wanted a rougher sexual experience.  Unbeknownst to Mr. Bauer, who believed Ms. Hill was just expressing her sexual preferences, Ms. Hill's goal was to lure Mr. Bauer into having a rougher sexual experience so she could later claim this sexual experience was not what she requested and thereby lay the groundwork for a financial settlement.  To implement her plan, Ms. Hill unequivocally told Mr. Bauer that she was interested in engaging in even rougher sex on a second occasion, communicating in explicit detail the sexual experience she desired.  During their second sexual encounter, the two again engaged in consensual rough sex that involved the rough sexual acts that Ms. Hill requested.

1      4.      Having secured the rough sex she desired, Ms. Hill took the next step

2  in her plan: she texted her close confidants to tell them that Mr. Bauer had taken

3  things too far during consensual sex.

4      5.      Two days later, Ms. Hill filed a false police report in which she

5  accused Mr. Bauer of sexually assaulting her and engaging in sexual activities

6  without her consent.

7      6.      Upon information and belief and based on Ms. Hill's subsequent

8  Petition for a Domestic Violence Restraining Order, Ms. Hill reported to the police

9  that during their first encounter, Mr. Bauer sexually assaulted her by choking her

10  unconscious and anally penetrating her without consent.  She told the police that

11  Mr. Bauer sexually assaulted her during their second sexual encounter by choking

12  her unconscious on two occasions, punching her in the face and vagina repeatedly,

13  and scratching her face.  Ms. Hill's allegations were false.  Mr. Bauer and Ms. Hill

14  engaged in consensual rough sex.  Mr. Bauer did not have anal sex with Ms. Hill;

15  he did not choke Ms. Hill during sex without her consent; and he did not punch Ms.

16  Hill in the face, stomach, or vagina, or scratch Ms. Hill in any way.  At all times

17  during both sexual encounters, Mr. Bauer respected the boundaries established and

18  agreed upon with Ms. Hill.

19      7.      Shortly after her initial report to law enforcement, members of the

20  Pasadena Police Department ("PPD") questioned the veracity of her allegations.

21  Angered by these questions and the District Attorney's failure to take immediate

22  action against Mr. Bauer, Ms. Hill and her attorneys decided to file a Petition for a

23  Domestic Violence Restraining Order ("the DVRO Petition" or "Petition")—

24  knowing that such a filing would garner media attention—under the guise that she

25  needed protection from Mr. Bauer.

26      8.      Ms. Hill's allegations in the DVRO Petition against Mr. Bauer were

27  false and misleading.  She had pursued a relationship with Mr. Bauer.  She travelled

28  2.5 hours each way from her home of her own volition to have sex with Mr. Bauer

on the first occasion. She continued to pursue Mr. Bauer after their first encounter and explicitly requested rougher sex. Her internet search history included Google searches for "set-up." Her contemporaneous communications with Mr. Bauer, as well as those with her friends and family members, were wholly inconsistent with the allegations she submitted in the DVRO Petition. Moreover, she did not need protection from Mr. Bauer, because he had never threatened her, did not know where she lived, had never attempted to visit her, and had not had any contact with her for almost a month. Ms. Hill's Petition was false and misleading in numerous other respects: she omitted material information about her communications with Mr. Bauer and selectively omitted medical reports that were inconsistent with her claimed injuries and the alleged conduct of Mr. Bauer. As groundwork for Ms. Hill's and her counsel's campaign to generate negative media reports about Mr. Bauer, the Petition attached photos of Ms. Hill's alleged injuries that were taken and filtered in a manner to make it appear that she had suffered gruesome injuries when she had not.

9. Ms. Hill's misleading and inflammatory Petition, which had not yet been served on Mr. Bauer, caused the Court to grant Ms. Hill a temporary *ex parte* restraining order against Mr. Bauer.

10. After the Court granted the temporary *ex parte* restraining order, Ms. Hill and her attorneys engaged in a defamatory media campaign to further smear Mr. Bauer's reputation and to ensure that Ms. Hill's fabricated story gained maximum media exposure. During that media campaign, one of Ms. Hill's attorneys violated a Court-issued Protective Order which limited disclosure of certain medical records by sharing photographs obtained from the PPD with *TMZ*.

11. Ms. Hill and her attorneys also failed to preserve material evidence and, as a result, Ms. Hill deliberately deleted scores of text messages, videos, and photographs from her phone, including text messages with her two closest confidants immediately following her second sexual encounter with Mr. Bauer.

Ms. Hill's attorneys misled Mr. Bauer and the Court as to the reason for deletion of that information, providing inconsistent and false explanations for their failure to preserve material data.

12.     Ms. Hill's allegations were revealed to be false during an August 2021 hearing to determine the validity of the temporary *ex parte* restraining order and necessity for granting a permanent restraining order.  Following a four-day hearing and Ms. Hill's lengthy testimony, the Court concluded that Mr. Bauer did not abuse or assault Ms. Hill or engage in non-consensual sex with her.  The Court found that Ms. Hill consented to rough sex and that Mr. Bauer respected the boundaries set by Ms. Hill.    The Court also determined that Ms. Hill's DVRO Petition was "materially misleading."

13.     Evidence uncovered at the hearing revealed that Ms. Hill was motivated by desires to negatively influence Mr. Bauer's baseball performance, destroy his career, garner public attention, and gain a settlement by making false allegations against Mr. Bauer and that she was using her report to the PPD and the DVRO proceeding as vehicles to execute her plan.

14.     On February 8, 2022, the Los Angeles District Attorney's Office announced that it would not prosecute Mr. Bauer in connection with the false and misleading allegations made by Ms. Hill "after a thorough review of all the available evidence including the civil restraining order proceedings, witness statements, and the physical evidence," and specifically noted Ms. Hill's failure to meet the "very low" standard for obtaining a restraining order.

15.     Following the District Attorney's Office's declination, Defendant Niranjan Fred Thiagarajah continued to spread Ms. Hill's false and misleading allegations, telling the news media that Mr. Bauer "just brutalized" Ms. Hill and that the conduct she alleged was established with "100 percent certainty."

16.     Mr. Bauer now brings this action to expose and seek redress for the false and malicious statements and related conduct of Ms. Hill and Mr. Thiagarajah.

**PARTIES**

17.     Plaintiff Trevor Bauer is a citizen of the State of Texas.

18.     Defendant Lindsey C. Hill is a citizen of the State of California residing in San Diego, California.

19.     Defendant Niranjan Fred Thiagarajah is a citizen of the State of California residing in Newport Beach, California.  Defendant Lindsey Hill retained Mr. Thiagarajah as her attorney on approximately May 24, 2021.

**JURISDICTION AND VENUE**

20.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

21.     This Court has personal jurisdiction over Defendants because Defendants are residents of the State of California.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and because Defendant Thiagarajah is a resident of this District and Defendant Hill is a resident of the State of California.

**FACTUAL ALLEGATIONS**

**A.     Ms. Hill Aggressively Pursued a Relationship with Mr. Bauer**

23.     Lindsey Hill is a twenty-seven-year-old woman who resides in San Diego, California.

24.     Ms. Hill was an avid baseball fan and supporter of the San Diego Padres, a team in Major League Baseball (MLB).  She was previously employed as a member of the "Pad Squad,"  a group of brand ambassadors for the Padres.

25.     Ms. Hill frequently used social media applications, including Instagram and Twitter.  She often posted about baseball on these social media applications and tagged certain players using those applications in order to seek their attention.

26.    In February 2021, Mr. Bauer, the 2020 National League Cy Young Award winner, signed a contract to play for the Los Angeles Dodgers baseball team.  That contract made him the highest paid MLB player for the 2021 season.

27.    The Dodgers and Padres are both in the National League West Division of MLB and were considered rivals competing to win the Division in 2021.

28.    Ms. Hill first tweeted about Mr. Bauer in December 2020, soliciting him to play for the Padres by tweeting "Join us."  Her interest in pursuing a relationship with Mr. Bauer began in earnest in February 2021 after she saw him pitch against the Padres during Spring Training.  Ms. Hill searched for Mr. Bauer on the internet in order to learn more about him, and she read a 2019 *Sports Illustrated* profile of Mr. Bauer.

29.    On February 5, 2021, shortly after it was announced that Mr. Bauer intended to sign with the Los Angeles Dodgers, Ms. Hill tweeted from her Twitter account @lindsssalicious: "BAUER."

30.    On March 26, 2021, Ms. Hill tweeted: "@BauerOutage always floods my timeline."  She tagged Mr. Bauer's Twitter account, which would have alerted him to her tweet.

31.    On April 18, 2021, while watching the Los Angeles Dodgers play the San Diego Padres, Ms. Hill tweeted: "Bauer is indeed, hot."  That same day, she tweeted: "Tatis V. Bauer.  Someone check my pulse."  Fernando Tatis is a major league baseball player for the San Diego Padres with whom Ms. Hill had a prior sexual relationship.

32.    On April 18, 2021, Ms. Hill tagged Mr. Bauer in her Instagram story. After the game, Mr. Bauer saw in his message requests folder that Ms. Hill had done so and responded to her message request.

33.    The two began conversing on Instagram Direct Message.  Their conversation quickly became sexual in nature, as they bantered about "tryouts" as a

metaphor for an initial sexual experience and about which "base" they would attain as a metaphor for how far their sexual experience would advance in their first meeting.

34.     Ms. Hill messaged Mr. Bauer: "Tryouts don't scare me Bauer.  Bring it."  Mr. Bauer replied that he was "willing and able whenever" Ms. Hill was ready, to which she told him, "pick a day and I am there."  Ms. Hill indicated that she was willing to drive from San Diego to Los Angeles and the two discussed meeting on Tuesday, April 20th, although they did not make firm plans.

35.     Unbeknownst to Mr. Bauer, Ms. Hill was simultaneously sharing screenshots of their conversation with her close friends and relatives.  After Mr. Bauer replied to her Instagram story, she texted a screenshot of the message to her cousin, stating: "Oh my fuckinf [sic] god . . . [y]ou know imma try and get in there."  She continued to text screenshots of their messages to her cousin, telling him: "Im obsessed with him.  Hes weird as fuck," and later noting "Im 100% gonna get this dick."  After Ms. Hill and Mr. Bauer discussed meeting, she promised her cousin, "[i]f he offers me tix ill bring you."  She also told him that, "OF COURSE" she was going to travel to Los Angeles to meet Mr. Bauer and that she "hope[s] he slaps pine tar on my ass."[1]

36.     After she tagged Mr. Bauer in her Instagram story on April 18, 2021, one of Ms. Hill's friends and fellow San Diego Padres fan replied to her story telling her not to "tag this (clown face emoji)."  In response, Ms. Hill assured him: "I already have my hooks in," telling him that she was going to Mr. Bauer's house on Wednesday.  "You know how I roll," she continued, and she sent screenshots of her messages with Mr. Bauer arranging for a "tryout," which was a metaphor for

---

[1] Pine tar is a tacky substance that is used by hitters in baseball to improve the grip on the handle of the bat, but MLB prohibits pitchers from applying it to baseballs.

sex.  She sent a screenshot to another friend, telling her: "You know [Mr. Bauer's] the love of my life."

37.     On April 20, 2021, Ms. Hill again brought up meeting Mr. Bauer in person, telling him that she "Cant wait 4 tryouts," suggesting the next day to meet in person.  The two arranged to meet on April 21, 2021.  Ms. Hill told Mr. Bauer that she would have her "NDA signed and sealed" and her "feelings button switched off."

**B.     Ms. Hill and Mr. Bauer's First Sexual Encounter**

38.     On April 21, 2021, Ms. Hill drove 2.5 hours from San Diego to Mr. Bauer's Pasadena home, where she arrived at approximately 9:30 p.m. in the evening.

39.     Mr. Bauer and Ms. Hill spent several hours talking in Mr. Bauer's living room after she arrived, discussing a variety of topics.

40.     While at Mr. Bauer's house, and unbeknownst to him, she took pictures of the inside of his house and texted them to her cousin, telling him "she was about to get dodger dogged."

41.     As it grew later in the evening, Mr. Bauer told Ms. Hill that he planned to go to bed.  He offered that she could sleep on the couch, in his guest room or, if she wished, in his bed.  Ms. Hill opted to sleep in Mr. Bauer's bed.

42.     Mr. Bauer and Ms. Hill continued conversing in bed, while cuddling.  After some time, Ms. Hill climbed on top of Mr. Bauer and began kissing him.

43.     Mr. Bauer asked Ms. Hill about the kind of sex she was interested in.  Ms. Hill told Mr. Bauer that he could be a little rough.  To understand what Ms. Hill meant when she expressed that she was interested in rough sex, Mr. Bauer sought greater clarity about what, specifically, Ms. Hill meant by "rough."  Ms. Hill expressed that she enjoyed being slapped in the buttocks and having her hair pulled.  The two also discussed engaging in choking during sex, which involves placing pressure on the neck and is thought by some to heighten sexual pleasure.  Ms. Hill

also told Mr. Bauer that she had experimented with choking in the past and was interested in trying it that night.  Mr. Bauer and Ms. Hill then proceeded to have vaginal sex.  The two engaged in rough sex, which consisted of sexual acts that the two had discussed and that Ms. Hill had specifically requested, including light slapping, hair pulling, and choking.

44.    Throughout intercourse, Mr. Bauer frequently asked Ms. Hill whether she was okay and whether she wished to continue and, each time he did so, she indicated that she wished to continue.  During the entirety of their sexual encounter, Ms. Hill was fully engaged in the sexual activity and communicated with Mr. Bauer to tell him what she enjoyed.

45.    At one point while they were having sex, Mr. Bauer placed two of his fingers in her mouth.  She motioned for him to stop.  Mr. Bauer immediately stopped and removed his fingers from her mouth. The two continued having vaginal sex.

46.    Ms. Hill realized while they were having sex that she was lightly bleeding because of her menstrual cycle.  She became embarrassed and told Mr. Bauer that she needed a minute, and the two ceased sexual intercourse.  After a moment,  Ms. Hill asked Mr. Bauer if he wanted to continue having sex, and he declined. After stopping their sexual activity, Mr. Bauer showered and the two went to sleep.

47.    Mr. Bauer did not at any point have anal sex with Ms. Hill.

48.    The next morning, Ms. Hill awoke early in order to attend a work Zoom meeting and left the bedroom to participate in the meeting.  After the meeting she returned to bed with Mr. Bauer.  They awoke mid-morning and Ms. Hill left shortly thereafter.  The two did not immediately make plans to meet again.

**C.    Ms. Hill Continues to Pursue Mr. Bauer**

49.    While Ms. Hill later alleged in the DVRO Petition that she was sexually   assaulted   by   Mr.   Bauer   in   their   first   sexual   encounter,   her

contemporaneous actions and communications demonstrate such allegations were false.

50.    The following day, Ms. Hill texted with her friends about her encounter with Mr. Bauer, telling one: "[C]ant wait to tell you about that he is an amazing human."

51.    She also texted her cousin to ask him if he wanted to go to the Los Angeles Dodgers game that Saturday night.   He asked, "Did Bauer get you tickets??" and in response, Ms. Hill said, "Imma demand them."  Ms. Hill did not request tickets to the Dodgers game from Mr. Bauer, nor did Mr. Bauer ever offer to provide her with tickets.

52.    Mr. Bauer did not contact Ms. Hill after the first sexual encounter. Instead, on April 23rd Ms. Hill initiated conversation by replying to an Instagram story Mr. Bauer posted of his jersey, stating: "I better get one too."   The two engaged in brief back-and-forth conversation through April 26th.   After Mr. Bauer did not respond to Ms. Hill's message, she again contacted him on April 29th, this time by sending a video message that showed "a very tiny, smaller than a little thumbprint, bruise on the inside of [her] thigh" near her vagina.   Transcript of DVRO Petition Proceedings at 129:25–28, *Hill v. Bauer*, Case No. 21STRO03198 (2021) (hereinafter, "Tr.").   Asked what it was from, Ms. Hill told Mr. Bauer: "HAHAHAHA you got me good. . . . I have no idea probably your thumb lol. Just a bruise in the shape of a fingerprint."  When Mr. Bauer asked where the bruise was located, Ms. Hill sent another video with a message stating, "Right by my prized possession HA," a reference to her vagina.   *Id.* at 134:18–22.   In response, Mr. Bauer stated: "Oh gosh. I don't know if that was me or not but sorry if it was!" Ms. Hill replied: "U Gucci – im into it."

53.    Ms. Hill continued to brag to her friends about her relationship with Mr. Bauer, alluding to his financial wealth and her ability to harm his baseball performance, for the benefit of the Padres, her favorite baseball team. On April

24th, while watching the Padres play against the Dodgers—on a night that Mr. Bauer was pitching—she sent one of her friends a message on Instagram containing an image depicting Fernando Tatis mocking Mr. Bauer's pitching style with a message reading: "Ur welcome for getting in bauers head." The message was followed by the dollar sign emoji, which is a face with two dollar signs as eyes and a dollar bill as the tongue. She told a friend that she was "literally going to get in his head . . . And find pine tar," assuring him, "[t]rust me I know what im doing . . . I can get in his head." She similarly sent a message to her cousin, telling him "Tatis hitting that homerun off Bauer (laughing face emoji) . . . Knew I was gonna get in his head . . . Like do I have superpowers or something." Ms. Hill continued to send her cousin screenshots of her conversation with Mr. Bauer, often mocking him. When Mr. Bauer sent Ms. Hill a message at 1:19 a.m. on May 8th, she sent a screenshot of that message to her cousin with a text stating: "The hooks are in so deep."

54. Ms. Hill also texted her AA sponsor a screenshot of the 1:19 a.m. message sent by Mr. Bauer on May 8th, writing: "Give me 50 million dollars and don't slap my clit and id be great."

55. Mr. Bauer and Ms. Hill conversed over Instagram sporadically until, on May 8th, unsolicited, Ms. Hill gave Mr. Bauer her cell phone number. They continued their conversation over text messages. At that point, Mr. Bauer had not asked Ms. Hill to visit him again.

56. Ms. Hill also texted a friend that they would be able to travel to Europe together in style once she was successful in her plot to destroy Mr. Bauer by tricking him into having rough and rougher sex with her.

57. Desperate to get Mr. Bauer to invite her back to his house so she could try to get Mr. Bauer to engage in a rougher sexual experience than they had during their first encounter, Ms. Hill began to describe to Mr. Bauer over text message the sexual conduct she wished to engage in with him at a subsequent encounter.

58.     On May 9th, Ms. Hill sent Mr. Bauer a text message commenting on pink socks that he had worn for the Dodgers Mother's Day Game.  The two had the following text message exchange:

**Ms. Hill:** & just know pink is so your color Papi

**Mr. Bauer**: Oh yeah? Pink looks good on me huh?

**Ms. Hill**: (image featuring a woman wearing lingerie in a bed with her finger outstretched, gesturing to come toward her) really compliments your vibe yes

**Mr. Bauer:** Oh it hits like that huh? (kissing face emoji)

**Ms. Hill:** The pink socks stay ON while cuddling

**Mr. Bauer:** Yes ma'am. Whatever you want (kissing face emoji)

**Ms. Hill:** Buttttt offffff when its time to choke me out
             Thx you are the best (winking face emoji)

**Mr. Bauer:** You want to go out huh? Mmmm

**Ms. Hill:**  Si. That was a game changer

**Mr. Bauer:** Tell me more

**Ms. Hill:** Never been more turned on in my life.
             Gimme all the pain. Rawr.

**Mr. Bauer:** Really? When you were going out or when you woke up?

**Ms. Hill:** Going outtt
             Now that I know what it feels like to wake up from up [sic] it though itll probably feel just as good to wake up from that

**Mr. Bauer:** God you just turned me on so much

**Ms. Hill:** Mission accomplished then

**Mr. Bauer:** Now I just want my arm around your neck from behind

**Ms. Hill:** Do it
             Harder (kissing face emoji)

**Mr. Bauer:** Yes. Ma'am. What else does mami want?

**Ms. Hill:** Mmm get a couple of slaps in there and then another handprint on my @$$
             Then for Papi to tell me what else he wants

**Mr. Bauer:** Slaps in the face or . . . ?

**Ms. Hill:** Yes yes & yes

59.    Following this conversation, Ms. Hill made several attempts to solicit an invitation from Mr. Bauer to his home.  She informed Mr. Bauer that she would be in Los Angeles on May 11th and 12th, even though she had no plans to be there. Mr. Bauer told her he already had plans.  She then offered to drive from San Diego that same day, on May 10th, notwithstanding that when she made the offer, it was already after 5:00 p.m. in the evening.  Mr. Bauer told her that he had another guest in town and could not meet. On May 12th, Ms. Hill told Mr. Bauer that she would be at the Los Angeles Dodgers game on May 14th.  Mr. Bauer replied that he would invite her over but he was scheduled to pitch the following day.  She assured him, however, that she would be staying in Los Angeles through the weekend, even though she had no plans to do so, telling Mr. Bauer "maybe we can find a time." Contrary to what she told Mr. Bauer, she did not stay in Los Angeles through the weekend.  Finally, Ms. Hill and Mr. Bauer made plans to meet again the night of May 15th.  Ms. Hill again drove 2.5 hours from San Diego to Pasadena to visit Mr. Bauer.

60.    In the hours leading up to her second visit to Mr. Bauer's home, she texted her cousin and a friend screenshots of her messages with Mr. Bauer and told them that she planned to "Touch pine tar" while at Mr. Bauer's home.  In that group text, Ms. Hill also referred to Mr. Bauer's interest in rough sex.

**D.    Ms. Hill and Mr. Bauer's Second Sexual Encounter**

61.    On the night of Saturday, May 15th, Ms. Hill arrived at Mr. Bauer's home after 10:30 p.m.  Mr. Bauer had just pitched and was in the basement performing a treatment on his leg when Ms. Hill arrived.

62.    The two sat on the couch in Mr. Bauer's basement and began conversing.  The conversation turned to sex, and Mr. Bauer asked Ms. Hill why she liked engaging in rough sex.  She told him that she started having rough sex once

she became sober because it gave her a "high." She explained to him that she had, in a sense, replaced alcohol and drugs with rough sex.

63.     After their conversation on the couch ended, they went to Mr. Bauer's bedroom and got into bed. At some point after they began kissing, they discussed their sexual preferences and Mr. Bauer sought to establish clear boundaries to govern the rough sex in which they had agreed to engage. Having earlier learned via text messages the sexual acts Ms. Hill wished to engage in, Mr. Bauer asked her what was "off limits." She asked Mr. Bauer not to stick his fingers in her mouth, as he had done during their first encounter. Ms. Hill did not state that any other action was off limits, and in text messages, she had expressed approval of their first encounter, which included slapping and choking, and expressed in no uncertain terms that she wanted even rougher sex, including slaps on the buttocks and in the face, "choking out," and "all the pain." The two also established a safe word to govern their sexual acts, which, by Ms. Hill's selection, was "Daddy issues."

64.     The two began having vaginal sex. Throughout the sexual encounter, and consistent with their agreed upon boundaries and previous sexual encounter, Mr. Bauer and Ms. Hill engaged in rough sex, which included at times slapping, hair pulling, and choking. As he had done during their previous sexual encounter, Mr. Bauer paused several times to ensure that Ms. Hill was okay and that she wished to continue. Each time, she expressed that she did.

65.     At several points during the sexual encounter, Ms. Hill requested rougher behavior from Mr. Bauer. For example, on at least a few occasions, she requested that Mr. Bauer slap her "harder." Mr. Bauer complied with Ms. Hill's requests for rougher sex and checked with her during the course of sex to make sure that she was okay. Ms. Hill did not give any indication to Mr. Bauer that she was not enjoying herself or that she wished to stop having sex.

66.     At some point Ms. Hill used the safe word, "Daddy." She told Mr. Bauer that she wanted to take a break. Mr. Bauer immediately ceased sexual

intercourse with Ms. Hill.  He laid next to her and stroked her back.  Ms. Hill was not trembling or crying, nor was she visibly distressed or incapacitated in any way. After a few moments, Ms. Hill asked if Mr. Bauer wanted to reinitiate sexual intercourse.  He declined.

67.   At no point did Mr. Bauer punch Ms. Hill in the face.  At no point did Mr. Bauer punch Ms. Hill in the vagina. At no point did Mr. Bauer punch Ms. Hill in the stomach.  And at no point did Mr. Bauer scratch Ms. Hill's face.

68.   With their sexual encounter finished, Ms. Hill and Mr. Bauer each showered separately. Mr. Bauer did not assist Ms. Hill into or in the shower because she did not require assistance.

69.   Mr. Bauer did comment to Ms. Hill that her lip was a tiny bit swollen, believing he had inadvertently slapped her on the side of her lip while they were having sex when she turned her head toward him after asking him to slap her in the face.  Ms. Hill had no other visible bruises, markings, or scratches on her body, as demonstrated by a photograph she took of herself at Mr. Bauer's house that night.

70.   After showering, the two returned to bed, cuddled, spoke briefly, joked around, laughed, and fell asleep.

71.   At 1:57 a.m., unbeknownst to Mr. Bauer, Ms. Hill tweeted, tagging Mr. Bauer: "@BauerOutage Absolute diesel straight down the dick kinda energy."

72.   Upon information and belief, Ms. Hill took more than one surreptitious photograph while she was at Mr. Bauer's home.  At least one of these photographs is exculpatory and was not produced in discovery by Ms. Hill during the subsequent DVRO proceeding, as she had attempted to permanently delete it.

73.   The next morning, Mr. Bauer and Ms. Hill awoke relatively early, because Mr. Bauer had an afternoon baseball game that day and needed to get to the field.  She left shortly after they woke up.  Ms. Hill did not have any visible markings or bruising on her face or body except for a slightly swollen lip.  She did

not appear upset and did not in any way indicate to Mr. Bauer that she did not enjoy their sexual encounter.

**E.**     **Ms. Hill Implements the Next Phase of Her Plan to Destroy Mr. Bauer's Career and Extract Money From Him**

74.     As part of her plan to destroy Mr. Bauer's career and exploit him for money, Ms. Hill began texting her close friends to tell them that Mr. Bauer had physically assaulted her.

75.     On Sunday, May 16th, hours after she left Mr. Bauer's house, she texted her cousin and friend in a group chat: "Huge CODE RED."  She separately texted her cousin that her "face is fucked up" and sent a photograph of herself in a car in which her face appears slightly swollen and she has slight discoloration around her eyes.  Ms. Hill told her cousin that Mr. Bauer "felt so bad" and that "**It was consensual** but like didnt expect two black eyes!? Like he def took it too far dont you think lol."  (emphasis added).

76.     Shortly thereafter, she texted her friend, telling her: "I saw bauer on Thursday Night.  My face is completely fucked up."  Asked what Mr. Bauer did, Ms. Hill replied: "**It was just during sex like it was consensual** but it got so bad idk what even happened I just froze.  I have a busted lip and two black eyes . . ."  (emphasis added).

77.     On Monday, May 17th, Ms. Hill sent a message to her AA sponsor: "Dude.  I need to be honest with you about something and hopefully you don't freak out but im in shock.  Trevor came down to sd last night and we went to my old apartment. I gave him consent for rough sex but he took it too far and my face is super fucked up."

78.      Besides the lies she told her friend and AA sponsor about the nature of her encounter with Mr. Bauer, she also lied about the date and the place where

she and Mr. Bauer met, falsely claiming that he had been to her San Diego apartment.

79.    On the morning of May 17th—despite the serious injuries she claimed to have suffered at the hands of Mr. Bauer—Ms. Hill texted her friend, asking whether she wanted to go to a San Diego Padres baseball game either that night or the following night.

80.    Later than morning, she texted a picture of herself to Mr. Bauer and wrote: "Definitely can't have crazy eyes when they are both black," to which Mr. Bauer expressed shock and surprise.  Besides some minor swelling on her lip, the picture did not reflect what she looked like when she left Mr. Bauer's house the morning of May 16th.

81.    Later the afternoon of May 17th, Ms. Hill reported to the Alvarado Medical Center Emergency Room.  As a precaution, the emergency room professionals ordered CT scans for Ms. Hill's face, head, and neck.  The results of those CT scans were negative, unremarkable, and showed no injuries.

82.    The only injuries reflected in her medical records include ecchymosis, or surface level bruising, and some swelling on the left side of her face.

83.    Ms. Hill was escorted by an officer from the San Diego Police Department for an examination by a Sexual Assault Nurse Examiner ("SANE") at Palomar Hospital.  Ms. Hill reported to the SANE nurse that she had had sex with Mr. Bauer on a previous occasion and knew he was "into rough sex."  She told the SANE nurse that she believed their second sexual encounter "would be like before . . . like the first time, with like a light slap on my face[,] nothing that made me feel uncomfortable."  She did not report to the SANE nurse that Mr. Bauer had anal sex with her without her consent during their first encounter, something she later falsely alleged to police and to the court as part of her DVRO Petition.  She reported that they established a safe word.  Ms. Hill reported that Mr. Bauer choked her unconscious by wrapping her hair around her neck on two occasions and, when she

awoke, he was slapping her in the face, then began punching her in the face with a closed fist.  She further reported that Mr. Bauer punched her in the vagina.

84.    In the hospital, Ms. Hill's conversations with her friends turned to discussions as to how to "fuck over" Mr. Bauer.  While in the hospital, Ms. Hill's AA sponsor told her: "She wants you to FUCK OVER trevor though . . . . Actually – we all do. . . Fuck that sick fucker."  Ms. Hill replied: "FUCK THE DODGERS."  Her AA sponsor further informed Ms. Hill's father that she was in the hospital and subsequently told Ms. Hill that her dad was "super bitter at the situation - - he wants him to go DOWN too."  Her cousin told her: "Say the word and I will break his kneecaps."  Ms. Hill replied that her father "is getting an attorney just in case" and that he "might actually murder [Mr. Bauer]."

**F.    Ms. Hill Files a False Police Report**

85.    After she left Palomar Hospital on the morning of May 18th, representatives of the PPD arrived at her home.  Ms. Hill made a false report to the PPD, telling them that Mr. Bauer sexually assaulted her. Upon information and belief, Ms. Hill reported that Mr. Bauer choked her unconscious and anally penetrated her without her consent during their first sexual encounter.  Ms. Hill reported that during their second sexual encounter, Mr. Bauer choked her unconscious, punched her repeatedly in the face and vagina, and scratched her face without her consent.

86.    Ms. Hill's report to the police was false, misleading, and defamatory.  Ms. Hill's attorney later told the media that Ms. Hill had made a report to the police alleging that Mr. Bauer had sexually assaulted her, and the media widely reported that there was a criminal investigation of Mr. Bauer by law enforcement.

87.    On approximately May 24, 2021, Ms. Hill retained Defendant Thiagarajah as counsel.

88.    After she made her report, the PPD grew suspicious of Ms. Hill's version of the events and began to question her about a number of the details.

89.    While she awaited the PPD's investigation and the District Attorney's filing decision, Ms. Hill's discussions with her friends made clear that she wished to destroy Mr. Bauer's reputation and career and to exploit him for money.

90.    On May 29, 2021, Ms. Hill and her AA sponsor engaged in the following exchange:

**AA Sponsor:** HEY BITCH (laughing face emoji)
                          Pretty soon it'll be like HEY RICH BITCH

**Ms. Hill:** DECEASED
                    EVERY MORNING

**AA Sponsor:** YEP

**Ms. Hill:** hopping in the god damn RANGE ROVER

**AA Sponsor:** You can make it rain daily

91.    Ms. Hill continued plotting with her AA sponsor to carefully craft her image for the purpose of exploiting Mr. Bauer.  On June 3rd, Ms. Hill sent an image of herself to her AA sponsor, telling her that she was planning to post "this last pic before I have to deactivate and my life change[s] forever" with the caption "STRONG GIRL SUMMER."  Her friend advised: "please DON'T POST," and in response, Ms. Hill asked: "OMG IS IT BAD. will they use it against me?"  Her AA sponsor replied: "YOURE SUPPOSED TO BE STRUGGLING MENTALLY NOT POSTING. YES. DO NOT POST ANYTHING. . . . I know you want to but it's terrible for your case. HUNNID. Nothing. Zilch, Zip. Nada."  Her AA sponsor told Ms. Hill: "You're a ghost. He ruined your life. You're basically just trying to not kill yourself and stay out of the mental ward. . . . They will use that shit against you."  Ms. Hill agreed: "ALL SO TRUE. Nothing. GHOST MODE HAS BEEN SOLIDIFIED."  Her AA sponsor instructed: "**SECURE THE BAG**," a reference to getting money.

92.     On June 5, 2021, Ms. Hill met with detectives from the PPD.  She reported to her friend: "The meeting went awful. They basically showed me all of the things the defense will come at me for and are saying how messy this case is and how they dont know if they can press criminal charges. . . . Its SUCH fucking BULLSHIY (sic) . . . . But now I think I just have to go through my attorney and do a civil case instead of criminal because of those dumb ass cops. . . . They basically told me that they will say it looks like a set up to get money."  Ms. Hill told her friend, however, that "[t]his shit aint over."

### G.     Ms. Hill Materially Misleads the Court in Her DVRO Petition

93.     Leading up to the filing of the DVRO Petition, Ms. Hill's communications make clear that in addition to gaining money from Mr. Bauer, she wanted to destroy his reputation and his career.  On June 23rd, she texted her AA sponsor a tweet showing an image of Mr. Bauer on the bench at a Dodgers game, stating: "His last memories (laughing face emojis)."  She then sent a tweet with an insulting remark about Mr. Bauer and wrote: "Pussy ass bitch."  The next day, her AA sponsor told Ms. Hill that she "saw the dodgers LOST last night . . . MENTALLY TWEAKED."  Ms. Hill replied: "DUDE. DEAD. HE GAVE UP 3 HOMEWRUNS. THEY PLAYED LIKE ASS. . . . Internet ripping him apart. And he thinks that's bad (laughing face emoji). . . . PUSSY."  Ms. Hill's AA sponsor replied that Mr. Bauer was "gonna really be crying soon."  Ms. Hill then said: "dude I cant wait to LAUGH MY ASS OFF."

94.     After she received the paperwork for the temporary *ex parte* restraining order, she told her friend that she felt "SO MUCH FUCKING BETTER" because "hes gonna know shits going down and hes fucked."  In telling her friend about filing the DVRO Petition, she said nothing about concern for her own safety.  Instead, she told her friend that "Tuesday the restraining is filed. And it will be picked up by the media. And his life is ~over. THANK YOU GOD."  On June 26th, Ms. Hill explained the sequence of the filing to her friend: "Monday

morning he gets notified. Tuesday morning it gets filed and goes public . . . Tuesday we fucking celebrate." And while watching Mr. Bauer play baseball on television, she again texted her friend that his "life is over on Monday" and that "[t]his is his last MLB start . . . . Hes done." Two days later, she sent a screenshot of the email sent by her attorneys to Mr. Bauer's agent providing notice of the Temporary Domestic Violence Restraining Order with a clapping emoji: "BYEEEE."

95.    On June 26th, just days before filing her Petition, she told her friend: "They think hes gonna try to settle with me offer me major cash then make me sign an nda."  Mr. Bauer never offered to settle with Ms. Hill or to make any financial payment to her.

96.    Ms. Hill filed her DVRO Petition in Los Angeles Superior Court on June 29, 2021, asserting that Mr. Bauer had assaulted Ms. Hill on two distinct occasions, that she feared Mr. Bauer, and that she required protection from him.

97.    Based on Ms. Hill's false allegations and supporting exhibits, which intentionally omitted relevant messages, information, and medical reports, a Los Angeles Superior Court Judge granted Ms. Hill a temporary *ex parte* restraining order.

98.    On July 2, 2021, after news of the DVRO Petition became public, MLB placed Mr. Bauer on administrative leave, which prevented him from playing baseball for the Dodgers and accessing the Dodgers' baseball facilities.

99.    After the temporary *ex parte* restraining order was granted, Ms. Hill celebrated her newfound media attention. On June 29th, she sent a screenshot of a tweet announcing the temporary restraining order to her AA sponsor, telling her the tweet was sent by the "Justice editor for US weekly" and calling it "Insane."  After Mr. Bauer's agent released a statement, Ms. Hill texted her AA sponsor that the "media is freaking out . . . ON MY SIDE (heart emojis)."  She told her that it was the "best thing I could have hoped for," and later wrote that while "[i]t may get

gnarly [ ] the media is ON MY SIDE." She similarly told her friend that "it is so good to have the media on my side." After a *Los Angeles Times* article was posted about the temporary restraining order, Ms. Hill told her AA sponsor: "This is going exactly the way we wanted it to." She later reported that the "[m]edia is destroying them." Ms. Hill shared a tweet with her AA sponsor stating that Mr. Bauer would not be at the White House (where the Dodgers were to be recognized as 2020 MLB World Series winners), exclaiming, "Dead ass THE WHITE HOUSE IS AWARE." She sent similar messages to her friend, praising a *Sports Illustrated* article and telling her that the White House was aware of the allegations. Ms. Hill also closely followed the response to her allegations on Twitter.

100. Ms. Hill made it clear that she wanted to tell her false story to the public. She sent an email to her attorneys on June 30th, with the subject line "Declaration/pictures out," telling them: "it is really my hope that if the media does not put out facts from my declaration or the pictures by this evening, that we do it.. . . . [J]ust wanted to express my need to have it out by the end of the evening if not." She told her AA sponsor "My lawyers need to put that shit fucking out right now," and stated her belief that "[o]nce pics are out its done." When her statement was released, Ms. Hill told her friend: "Im so glad they are out."

101. On July 11th, Ms. Hill shared a screenshot of a message to one of her attorneys in a message to her friend. The screenshot shows Ms. Hill again urging her attorneys to release information and statements to the public in pursuit of media attention. She instructed them "And hopefully the pictures if fred [Defendant Thiagarajah] is okay with that," and further stated, "It also says ESPN contacted you so thatd be awesome too."

102. At Ms. Hill's behest, her attorneys sought to litigate her claim in the media prior to the DVRO hearing. The statements made to the media went beyond advocating their client's claims and were not necessary to further their client's

interest in the underlying restraining order hearing, which was a private dispute between Ms. Hill and Mr. Bauer.

103.  Another of Ms. Hill's attorneys told multiple news outlets that the temporary restraining order was issued as "a result of a recent assault that took place at the hands of Mr. Bauer where Ms. Hill suffered severe physical and emotional pain."  Her attorney also stated: "Our goal is to keep Mr. Bauer from contacting our client in any way possible.  We anticipate there will be criminal action against Mr. Bauer, and it is our hope law enforcement will take our client's allegations and this case seriously."  But Mr. Bauer did not assault Ms. Hill and she did not suffer severe physical or emotional abuse at his hands.  Moreover, Ms. Hill and her attorneys knew that Mr. Bauer had not attempted to contact Ms. Hill since May 30th.

104.  In addition to issuing false and defamatory statements, Ms. Hill's attorneys released to the media the altered and filtered photographs included with her Petition.  Release of the altered photographs served no purpose other than to defame Mr. Bauer by giving the media a false and misleading portrait of Ms. Hill's alleged injuries.

105.  In pursuit of their defamation campaign, one of Ms. Hill's attorneys also violated a Court-issued Protective Order.  On July 23rd, Judge Dianna Gould-Saltman of the Los Angeles Superior Court entered a Protective Order that limited disclosure of Ms. Hill's SART examination records to the parties in the DVRO litigation. The Protective Order allowed the parties to access Ms. Hill's SART examination records, including photographs of Ms. Hill taken by the SANE nurse but required that the parties keep the photographs confidential.  On August 5, 2021, one of Ms. Hill's attorneys released to *TMZ* a photograph included in Ms. Hill's SART examination records and therefore subject to the Protective Order. According to the *TMZ* article, Ms. Hill's attorney "asked TMZ Sports to publish an unredacted photograph showing his client's alleged injuries . . ."  According to the

*TMZ* article, "[t]he alleged victim and her family requested this photo be released." The image was later replaced with one from Ms. Hill's DVRO Petition, but not before the SART photo was widely circulated by other media outlets and across social media.

106.  On August 16, 2021, a hearing to determine whether to grant Ms. Hill's DVRO Petition or deny it and  dissolve the temporary restraining order began in Los Angeles Superior Court before Judge Gould-Saltman.  The hearing, which occurred over 4 days, established that Mr. Bauer had not assaulted or abused Ms. Hill in any manner.  The hearing also revealed that Ms. Hill's Petition had materially misrepresented many important facts by, among other things, omitting her pursuit of the encounters with Mr. Bauer, failing to disclose her expressed desire for and consent to rough sex, exaggerating her alleged injuries, and attempting to support her claims with  doctored photographs of her alleged injuries. The hearing also revealed that Ms. Hill was motivated by her desires to gain a financial settlement, destroy Mr. Bauer's reputation and career, and garner media attention.

107.  Ms. Hill's own testimony contradicted statements in the Petition about their first sexual encounter.  She testified that the two discussed the kind of sex she wished to engage in and that she told Mr. Bauer: "I'm okay with a little bit rough." Tr. 113:24–27.  She further testified that she told Mr. Bauer that she previously had been choked during sex to impress him.  *Id.* 271:3–6.  Ms. Hill acknowledged that she was the first one to bring up rough sex.  *Id.* 271:23–26.

108.  Ms. Hill's Petition falsely stated that after Mr. Bauer choked her to the point of unconsciousness, she "woke up face down" and realized "that he was having sex with me in my anus, which I never communicated that I wanted nor did I consent."  Inconsistencies in Ms. Hill's own testimony, along with the testimony of her friend and the SANE nurse, undermined Ms. Hill's claim that Mr. Bauer anally penetrated her.

109.   Ms. Hill's testimony about anal sex was not credible.  She testified that she was unconscious for a matter of seconds—in contrast to a previous statement made at the hospital that she had been unconscious for 30 minutes—and that in that time, Mr. Bauer flipped her over from her back to her stomach and anally penetrated her without using lubricant.  Tr. 273:6–15.

110.   Ms. Hill further testified that, notwithstanding her allegation that Mr. Bauer had nonconsensual anal sex with her, she continued having vaginal sex with him, Tr. 121:15–19, and voluntarily slept in the same bed with Mr. Bauer, *id.* 124:10-11.  The next morning, Ms. Hill testified that she awoke prior to 7:00 a.m. for a Zoom meeting.  *Id.* 124:16–20.  She testified she then returned to bed with Mr. Bauer and the two awoke around 11:00 a.m.  *Id.*

111.   Ms. Hill testified that she told her friend in person the following morning that Mr. Bauer had anal sex with her while she was unconscious. But her friend's testimony revealed that Ms. Hill did not report that Mr. Bauer anally penetrated her.  Instead, her friend testified that Ms. Hill "told me about the experience and how she had been choked out with her hair.  And how he had stuck his fingers down her throat.  She told him she didn't like that."  Tr. 508:18–23. And her friend further testified that Ms. Hill "told me about wanting to still see him after that." *Id.*

112.   Ms. Hill also did not report to the SANE nurse that Mr. Bauer had anally penetrated her during their first encounter.  Instead, she told the SANE nurse that their first sexual encounter included "a light slap on my face nothing that made me uncomfortable."  Tr. 326:20–21.

113.   Notwithstanding the violent depiction of their first encounter in which she falsely accused Mr. Bauer of anally penetrating her while unconscious, Ms. Hill omitted scores of communications expressing her approval of their first sexual encounter, including messages in which she told Mr. Bauer that she had "never been more turned on" after their first sexual encounter.  Ms. Hill failed to provide

the Court with text messages in which she told Mr. Bauer about the sexual experience she hoped to have during their second encounter—including slaps in the face and "choking out"—testifying that she did not think including those messages would be important to the Court.  Tr. 362:12–17.

114. Ms. Hill admitted during the hearing that she and Mr. Bauer specifically discussed choking during sex while at his home for their second sexual encounter, testifying that when Mr. Bauer asked her what she liked about being "choked," she told him that it was "kind of like an escape." Tr. 151:16–25.

115. Ms. Hill's Petition also misled the Court about the nature of the injuries she allegedly sustained.  Testimony at the hearing from a forensic medical examiner further undermined Ms. Hill's claims to have suffered severe head trauma at the hands of Mr. Bauer.  The medical examiner testified that Ms. Hill's injuries were not what she would have expected based on Ms. Hill's testimony and Petition in which she described multiple, forceful punches with a closed fist to her face, head, and vagina.  According the medical examiner, Ms. Hill sustained only "superficial injuries" including ecchymosis, or surface level bruising, but did not have any broken bones, pattern injuries which would have been expected based on the punching she described, or bruising or bleeding underneath the surface of the skin. Tr. 479:7–20.

116. Ms. Hill's Petition also asserted that Mr. Bauer "scratch[ed] the right side of my face while I was unconscious."  But the hearing revealed that photographs submitted to the Court depicting significant scratching and bruising on Ms. Hill's face were modified to create and exacerbate the appearance of injuries.

117. By her own admission at the hearing, the photographs attached to Ms. Hill's Petition did not accurately depict her appearance.  Specifically, Ms. Hill compared a photograph she had attached to her Petition to a native image of that photograph.  According to Ms. Hill, the native image was more accurate than the photograph attached to her Petition, which she testified made her skin appear

orange and her light blue eyes appear black.  Tr. 383:6–13.  Ms. Hill testified that she provided native images to her attorneys, who were responsible for submitting the photographs to the Court, effectively blaming them for the filtered photos attached to her Petition and circulated to the media. *Id.* 383:23–26.

118.   The SANE nurse—who was trained to take accurate photographs using appropriate lighting and equipment for the sole purpose of documentation—examined the photographs attached to Ms. Hill's Petition and testified that the photographs contained in the SART report provided a more accurate representation of Ms. Hill's appearance at the time, as compared to the saturated and misleading photographs submitted with the Petition. Tr. 315:28–317:7.  In examining the photograph that she took of the right side of Ms. Hill's face—where Ms. Hill was allegedly violently scratched by Mr. Bauer—the SANE nurse testified that the abrasions on Ms. Hill's face were indistinguishable from acne or other skin disturbances and from acne shown on the left side of Ms. Hill's face.  *Id.* 313:28–314:18.

119.   The forensic medical examiner similarly testified that when she reviewed the SART report and photographs, she did not notice any "specific abrasion" on Ms. Hill's face. Tr. 484:15–20.

120.   Ms. Hill's Petition also misled the Court regarding her purported fear of Mr. Bauer.  According to her Petition, the basis of Ms. Hill's fear was that Mr. Bauer "texted and called me *nonstop*" and that a restraining order was necessary because she was "scared and in fear" and suffered "extreme stress and anxiety."  Ms. Hill also reported that she was afraid that Mr. Bauer would "find me and hurt me for going to the hospital."  But the only reason that Mr. Bauer knew Ms. Hill had gone to the hospital was because *she* told him in a text message when she sent Mr. Bauer a photograph of herself in the hospital. There was not a single message from Mr. Bauer that was threatening, angry or upset in any manner, whether in response to Ms. Hill telling him she was in the hospital or otherwise.

121.   The hearing further revealed that Mr. Bauer texted Ms. Hill a handful of times between May 18th and May 30th, largely in response to texts sent by Ms. Hill, spoke to her one time in the hospital, and left her a voicemail on one other occasion.  Mr. Bauer had not attempted to get her to come to his home after the second encounter.  Mr. Bauer did not have, nor had he ever sought, Ms. Hill's home or work address.  Confronted with these facts at the hearing, Ms. Hill changed the basis of her fear and testified that what "scared [her]" was that she had <u>not</u> heard from Mr. Bauer.  Tr. 411:25–412:4.

122.   Moreover, notwithstanding that she claimed she was afraid of Mr. Bauer after their second encounter, evidence at the hearing showed that Ms. Hill frequently sought out opportunities to see Mr. Bauer, including watching him pitch in games on television, proposing that she attend in person a Dodgers game in which Mr. Bauer would be playing, and sharing with her friends memes and images depicting Mr. Bauer.  For example, on June 18th, Ms. Hill texted her friend: "does ur tv have the dodgers game. Bauer is pitching I have to watch that and third eye curse with you. Its worked the past four games (laughing face emojis)." And despite Ms. Hill's testimony at the hearing that she had to "leave town to go to Northern California" on the date that Mr. Bauer travelled with the Dodgers to San Diego to play against the Padres, Tr. 220:12–16, she asked her friend whether they should "go to the pads game incognito on Tuesday lol"—the day that that Dodgers played against the Padres.

123.   Ms. Hill's Petition also falsely stated that she was "unable to work due to my injuries." Text message communications introduced at the hearing showed that it was Ms. Hill who told her boss that it was *she* who resigned and that she had removed herself from the position: "I made that decision to remove myself on my own. . . ."

124.   Following the four-day hearing, Judge Gould-Saltman dissolved the temporary restraining order and denied Ms. Hill's request for a permanent

restraining order.  To find for Ms. Hill, the Court had to find both that Ms. Hill and Mr. Bauer had a "dating relationship," Cal. Fam. Code § 6210, and that there was "reasonable proof of a past act or acts of abuse," Cal. Fam. Code § 6300(a). Notwithstanding that Ms. Hill and Mr. Bauer met on only two occasions for sex, the Court found that, "while a close call," their relationship did constitute a dating relationship under the applicable statute.

125.   Turning to the next statutory element, the Court found that there was no act of abuse, meaning no domestic violence, sexual assault or nonconsensual sexual activity by Mr. Bauer.

126.   The Court concluded that Ms. Hill "had and has the right to engage in any kind of sex as a consenting adult that she wants to with another consenting adult," and that "[s]he was not ambiguous about wanting rough sex in the parties' first encounter and wanting rougher sex in the second encounter."  Tr. 585:18–24. The Court found that "[Ms. Hill] testified that when she set boundaries, [Mr. Bauer] respected them."  *Id.* 583:13–16.

127.   The Court cited Ms. Hill's many text message communications to Mr. Bauer discussing rough sex, including ones in which Ms. Hill told Mr. Bauer that she "wanted all the pain" and that she wished to be choked out.  The Court noted: "We consider that, in the context of a sexual encounter, when a woman says 'no,' she should be believed.  So what about when she says 'Yes'?"  Tr. 584:77–17.  The Court also stated that Ms. Hill's purported injuries "were the potential consequences of the activities" that Ms. Hill consented to.  *Id.* 584:18–23.

128.   In addition to finding that Mr. Bauer did not abuse or assault Ms. Hill, the Court determined that Ms. Hill's Petition, which was the basis on which she obtained her temporary restraining order, was "materially misleading."  Tr. 586:6–7.

129.   The Court discredited Ms. Hill's allegations that Mr. Bauer sodomized Ms. Hill during their first sexual encounter and that he punched her in the face,

stomach, or vagina, and scratched her while unconscious during their second sexual encounter, concluding that "[t]he only evidence of anything which happened while [Ms. Hill] was unconscious was having been hit on the butt in the Parties' first encounter.  Other acts occurred while petitioner was conscious." Tr. 584:24–2

130.   The Court gave no credence to Ms. Hill's claims that she feared Mr. Bauer, instead finding Ms. Hill's fear was not "rational," Tr. 586:16–17, and "had no factual basis," *id.* 25–26.  Ms. Hill claimed in her Petition that Mr. Bauer "was calling and texting non-stop . . . . [w]hen the reality was that [Mr. Bauer] rarely called and texted only when she told him she was in the hospital to make sure that she was still okay." *Id.* 586:7–11.

131.   The Court also identified some of Ms. Hill's motivations in filing the Petition, finding: "Communications to her friends, which are entered into evidence, indicate that she was excited for the attention to her, and, eventually, the damage that attention would have on [Mr. Bauer]." Tr. 585:11–14.

**H.    Ms. Hill and Her Lawyers Fail to Preserve Material Information**

132.   During the hearing, Ms. Hill also admitted that she deleted material information from her Instagram account, her Twitter account, and from her phone. Ms. Hill and her attorneys then gave multiple inconsistent statements to the Court and to Mr. Bauer about the circumstances surrounding deletion of that information.

133.   Mr. Bauer, through counsel, sought information from Ms. Hill and from her close friends related to the allegations against him.  Unable to produce the relevant information because they had failed to preserve relevant evidence, Ms. Hill and her attorneys provided shifting and inconsistent explanations to Mr. Bauer and the Court.

134.   In advance of the hearing, Mr. Bauer requested that Ms. Hill's attorneys provide the two Instagram videos from Mr. Bauer and Ms. Hill's April 29th conversation.    Ms. Hill's attorneys provided multiple, inconsistent explanations for failure to produce these materials, including that "Ms. Hill [had]

deleted everything she had on Instagram DM after the assault, as she didn't want to have to see Mr. Bauer's name on her phone," that the videos were subject to automatic deletion on Instagram, and that Ms. Hill had deleted the videos as of May 17th when she was in the hospital.  Later, Ms. Hill's attorneys claimed that Ms. Hill deleted her Instagram messages with Mr. Bauer on or before April 29th.  Ms. Hill's attorneys then claimed that Ms. Hill "frequently deletes information . . . [as] a function of storage capacity on her phone" and indicated that she deleted messages "at some point prior to April 29, 2021, and again at some point prior to May 4, 2021."  At the hearing, Ms. Hill testified that on April 29th, she "deleted the whole thread" of Instagram messages with Mr. Bauer.  Tr. 130:27–131:3.  This included deleting two videos that she sent Mr. Bauer on April 29th, following their first encounter.  *Id.* 131:17–20.  She testified that the videos depicted "a very tiny, smaller than a little thumbprint, bruise on the inside of [her] thigh" near her vagina.  *Id.* 129:23–28.

135.  Ms. Hill also testified that when she was in the hospital on May 17th: "I deleted everything that I currently had on my phone from Trevor."  Tr. 228:27–229:1.  That was a lie.  Ms. Hill later admitted during the hearing that she had taken screenshots of several Instagram and text messages from Mr. Bauer on May 18th, after she was released from the hospital and met with the PPD.  *Id.* 432:8–433:14.  Only *after* she met with the police did she delete those messages.

136.  Ms. Hill explained during the hearing that she "frequently delete[s] DM's and text messages for matter of storage and privacy so that if someone has my phone they can't look at it."  Tr. 228:8–10.  That was not credible.  Ms. Hill also frequently took screenshots of her messages with Mr. Bauer and shared those widely with her friends, yet she did not delete those screenshots.  *Id.* 230:14–21  Ms. Hill also testified that she maintains a passcode on her phone to prevent unauthorized access to messages and data stored on her phone.  *Id.* 230:7–8.  During the hearing, Ms. Hill reviewed numerous messages with her friends and

cousin throughout the relevant period that she had not deleted from her phone.  In sum, Ms. Hill selectively deleted information that was potentially harmful to her claim against Mr. Bauer.

137.   Mr. Bauer sought Ms. Hill's communications with her AA sponsor and her close friend.   Ms. Hill's attorneys initially refused to produce those communications, citing both "privacy concerns" and claiming that Ms. Hill no longer had some of the messages in question.  When Ms. Hill did produce the messages, those messages were missing communications during the critical period lasting approximately ten days after her second encounter with Mr. Bauer.

138.   Those messages that Mr. Bauer did obtain showed that Ms. Hill texted on a near-daily basis and often multiple times per day with both her friend and her AA sponsor.   In advance of the hearing, Ms. Hill's attorneys again provided shifting and conflicting representations, claiming that Ms. Hill had not communicated with either individual during the relevant period, that Ms. Hill had turned her phone over to the PPD during the relevant period, or that she simply did not have those records.

139.   The deception about missing communications with her two closest confidants during the period immediately following the alleged assault continued during the hearing.  Notwithstanding her attorneys' prior representations that she didn't communicate with those individuals on certain days, Ms. Hill acknowledged that she communicated with both individuals during the periods for which text messages were missing.  Tr. 434:26–434:4.  She had no explanation as to why text messages during those two essential periods were missing, except to blame the PPD: "So I don't know if it has something to do with Pasadena P.D. and how that affected my phone and my data." *Id.* 434:13–18.

140.   Mr. Bauer, through counsel, also sought native images of photographs taken by Ms. Hill in a letter to her counsel dated August 4, 2021, so that Mr. Bauer could determine whether Ms. Hill had altered the photos in any way.  In response,

Ms. Hill's attorneys instead attached PDF images of the photographs and told Mr. Bauer that his request for native images was unduly burdensome.  Only after Mr. Bauer moved to compel the native images did Ms. Hill's attorneys provide such images.  Still, they provided incomplete data, missing approximately 83 photos, including the exculpatory photograph that Ms. Hill surreptitiously took while at Mr. Bauer's home.

141.   Ms. Hill had a duty to preserve evidence relevant to the case and she failed to do so.  Ms. Hill's attorneys similarly failed to instruct Ms. Hill to preserve relevant messages.

142.   Ms. Hill's father contemplated retaining an attorney as early as May 18, 2021 and Ms. Hill testified that she hired Defendant Thiagarajah as her attorney the week of May 21st.  Tr. 133:18.

143.   Ms. Hill subsequently met with an attorney on June 1st.  And on June 5th, Ms. Hill texted her friend that she intended to file a civil case against Mr. Bauer.  But Ms. Hill testified that she was not instructed to preserve her phone data until "we received Jon Fetterolf's letter about preservation."  Tr. 440:18–22.  That letter was sent on July 2nd.  One of Ms. Hill's attorneys told the Court that his law firm did not image content on Ms. Hill's phone relating to Mr. Bauer until June 28th, the day before filing the DVRO Petition.  *Id.* 15:25–16:9.  Ms. Hill's attorneys did not, however, image her entire phone and limited the image to content they deemed related to Mr. Bauer.  *Id.*

**I.     The Los Angeles District Attorney Declines to Bring Criminal Charges, but Defendant Thiagarajah Continues to Falsely Accuse Mr. Bauer of Criminal Conduct**

144.   On February 8, 2022, the Los Angeles District Attorney officially declined to file criminal charges against Mr. Bauer.

145.   District Attorney George Gascon explained that his office had "[a]fter a thorough review of the available evidence, including the civil restraining order

proceedings, witness statements and the physical evidence, the People are unable to prove the relevant charges beyond a reasonable doubt."  Mr. Gascon also explained that the standard of proof in the civil restraining order proceeding was "very low" and even under that low standard, the allegations could not be proven.

146.   Notwithstanding that Ms. Hill's claims had been rejected by both the Superior Court Judge who reviewed her DVRO Petition and the District Attorney's Office, Defendant Thiagarajah continued to spread Ms. Hill's false and misleading narrative to the media.

147.   In response to the declination, Mr. Thiagarajah told *The Washington Post* that the District Attorney's decision not to charge Mr. Bauer was "not a declaration of innocence" but rather "a declaration of 'I don't have enough evidence to prove this beyond a reasonable doubt.'"  Contrary to the conclusions of the District Attorney's Office and Judge Gould-Saltman, Mr. Thiagarajah further told *The Washington Post* that there was "no doubt that Mr. Bauer just brutalized" Ms. Hill.

148.   Mr. Thiagarajah also disparaged Mr. Bauer's decision to rely on his constitutionally protected right to invoke the Fifth Amendment at the DVRO proceeding, stating "It's easy to deny these things occurred when you're not going to have a chance to be cross-examined about it."  He further stated that "the evidence is overwhelming that these things occurred. . . . That was established to 100 percent certainty."

149.   At the time that Mr. Thiagarajah made these statements, he knew that his client had submitted a "materially misleading" Petition to the California Superior Court in order to obtain a restraining order.  He knew that his client had concealed (and deleted) material information which revealed Ms. Hill's true motivations in filing the DVRO Petition—to gain publicity and money and to harm Mr. Bauer.  And he knew that Ms. Hill's testimony at the DVRO proceeding was inconsistent with the information that she provided to the Court in her Petition.  Mr.

Thiagarajah also knew that the evidence against Mr. Bauer was not "overwhelming" and that it had not been "established to 100 percent certainty." He knew that the Court had discredited Ms. Hill and found that Mr. Bauer had not committed any act of abuse against Ms. Hill.

### FIRST CAUSE OF ACTION
### (Defamation Per Se – Defendant Lindsey Hill)

150. Mr. Bauer incorporates by reference all preceding allegations as though fully set forth herein.

151. The statements made by Ms. Hill to the Pasadena Police Department that Mr. Bauer sexually assaulted her were false, defamatory, and published with actual malice.

152. Ms. Hill knew that her statements to the Pasadena Police Department were false.

153. The false statements made by Ms. Hill to the Pasadena Police Department are not privileged, because reports of a crime that are intentionally false or made with reckless disregard for the truth are not privileged.

154. Because Ms. Hill's false statements accused Mr. Bauer of a serious crime and maligned him in his profession, those statements constitute defamation per se and Mr. Bauer's injury is presumed.

155. The false statements by Ms. Hill have severely damaged Mr. Bauer's reputation and caused him anguish, humiliation, embarrassment, and financial loss.

156. In response to Ms. Hill's false allegations of sexual assault, Major League Baseball placed Mr. Bauer on administrative leave, which prevented him from performing his job as a pitcher for the Los Angeles Dodgers. The period of Mr. Bauer's administrative leave was extended due to the pending criminal investigation of Mr. Bauer initiated by Ms. Hill's false statements to the Pasadena Police Department.

1    157.  Mr. Bauer is entitled to punitive damages, because Ms. Hill's

2    defamatory statements were made with hatred, ill will, and spite, with the intent to

3    harm Mr. Bauer or in blatant disregard of the substantial likelihood of causing him

4    harm.

5                    **SECOND CAUSE OF ACTION**

6           **(Defamation Per Se – Defendant Fred Thiagarjah)**

7    158.  Mr. Thiagarajah's statements to *The Washington Post*, in which he

8    stated that there was "no doubt that Mr. Bauer just brutalized" Ms. Hill and further

9    that "[i]t's easy to deny these things occurred when you're not going to have a

10   chance to be cross-examined about it. . . . The evidence is overwhelming that these

11   things occurred. . . . That was established to 100 percent certainty,"  were false

12   statements of fact.

13   159.  Mr. Thiagarajah's statements to *The Washington Post* are not

14   privileged.  They were made after the declination of criminal charges and after a

15   DVRO proceeding in which the Court had unequivocally rejected Ms. Hill's

16   version of events, dissolved the temporary restraining order, and denied her request

17   for a permanent restraining order.

18   160.  Mr. Thiagarajah knew that his statements about Mr. Bauer were false,

19   or exhibited reckless disregard for their falsity, because, among other reasons, Mr.

20   Thiagarajah was present at the DVRO Petition hearing and was aware that his client

21   had misled the Court regarding the alleged sexual assault and he knew that Judge

22   Gould-Saltman had found that Ms. Hill's Petition was materially misleading and

23   that Mr. Bauer did not abuse Ms. Hill.

24   161.  Because Mr. Thiagarajah's false statements accused Mr. Bauer of a

25   serious crime and maligned him in his profession, those statements constitute

26   defamation per se and Mr. Bauer's injury is presumed.

27

28

162.  The false statements by Mr. Thiagarajah have severely damaged Mr. Bauer's reputation and caused him anguish, humiliation, embarrassment, and financial loss.

163.  Mr. Bauer is entitled to punitive damages, because Mr. Thiagarajah's defamatory statements were made with hatred, ill will, and spite, with the intent to harm Mr. Bauer or in blatant disregard of the substantial likelihood of causing him harm.

### THIRD CAUSE OF ACTION

**(Tortious Interference with Contract and Prospective Economic Advantage–Defendant Lindsey Hill)**

164.  Mr. Bauer incorporates by reference all preceding allegations as though fully set forth herein.

165.  Mr. Bauer is a party to a contract of employment with the Los Angeles Dodgers Major League Baseball franchise.  The contract is not a contract at will and includes terms providing Mr. Bauer certain performance-based payments and opportunities to opt-out of the contract in consecutive years.

166.  Ms. Hill was aware that Mr. Bauer had a contract of employment with the Los Angeles Dodgers.

167.  By making a false report to the Pasadena Police Department and conducing a malicious campaign to defame Mr. Bauer and destroy his reputation and career, Ms. Hill intentionally engaged in wrongful acts that were designed, intended, and substantially certain to disrupt or terminate the contractual relationship between the Los Angeles Dodgers and Mr. Bauer.

168.  Due to Ms. Hill's wrongful acts, the contractual relationship between Mr. Bauer and the Los Angeles Dodgers was disrupted.  Mr. Bauer was placed on administrative leave from the Los Angeles Dodgers and prevented from carrying out the duties of his contract.  Mr. Bauer was not permitted to practice or play with

the Los Angeles Dodgers team for the duration of the 2021 MLB season and has remained on  administrative leave since the beginning of the 2022 MLB season.

169.  Due to Ms. Hill's wrongful acts, Mr. Bauer has suffered financial harm by losing opportunities to earn additional income and exercise rights provided by his contract with the Los Angeles Dodgers and suffered other economic damages.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Contract and Prospective Economic Advantage– Defendant Lindsey Hill)

170.  Mr. Bauer incorporates by reference all preceding allegations as though fully set forth herein.

171.  Mr. Bauer is a party to business contracts with sponsors and others due to his reputation and performance as a Major League Baseball Player with the Los Angeles Dodgers.

172.  Ms. Hill is a long-time professional baseball fan, was at one time employed by the San Diego Padres, and had personal relationships with Major League baseball players before she met Mr. Bauer.  For those reasons and others, Ms. Hill was aware that MLB players like Mr. Bauer have business contracts with sponsors and others due to their reputation and performance as MLB players.

173.  By making a false report to the Pasadena Police Department and conducing a malicious campaign to defame Mr. Bauer and destroy his reputation and career, Ms. Hill intentionally engaged in wrongful acts that were designed, intended, and substantially certain to disrupt or terminate the contractual relationships between Mr. Bauer and the sponsors and others.

174.  Due to Ms. Hill's false police report and other wrongful acts, Mr. Bauer has suffered financial harm by losing revenue and opportunities for revenue provided by his contracts and prospective contracts with sponsors and others.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Trevor Bauer demands judgment against Defendants Lindsey Hill and Fred Thiagarajah as follows:

     i.     An award of general and punitive damages in appropriate amounts to be established at trial;

    ii.     Plaintiff's reasonable costs and expenses, including attorneys' fees; and

   iii.     Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

# <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated:     April 25, 2022

Shawn Holley (Cal. Bar No. 136811)
Kate Mangels (Cal. Bar No. 301811)
KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
808 Wilshire Boulevard., 3rd Floor
Santa Monica, CA 90401
Tel: (310) 566-9800
Fax: (310) 566-9873
sholley@kwikhlaw.com
kmangels@kwikhlaw.com

ZUCKERMAN SPAEDER LLP
Blair G. Brown (*pro hac vice* forthcoming)
Jon R. Fetterolf (*pro hac vice* forthcoming)
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 882-8106
bbrown@zuckerman.com
jfetterolf@zuckerman.com