# EXHIBIT A

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF LOS ANGELES

3        HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

4

5
      LINDSEY HILL,                       )
6                                         )
                          PETITIONER,     )
7                                         )
              VS.                         )   NO. 21STRO03198
8                                         )
                                          )
9     TREVOR BAUER,                       )
                                          )
10                                        )
                          RESPONDENT.     )
11    _____)
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                       JULY 23, 2021

13    APPEARANCES:
      FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
14                          BY:  LISA HELFEND MEYER, ESQ.
                                 DOREEN MARIE OLSON, ESQ.
15                               MARC H. GARELICK, ESQ.
                            10100 SANTA MONICA BOULEVARD
16                          SUITE 1425
                            LOS ANGELES, CA 90067
17
                            FREEDMAN + TAITELMAN, LLP
18                          BY:  BRYAN FREEDMAN, ESQ.
                            1801 CENTURY PARK WEST
19                          5TH FLOOR
                            LOS ANGELES, CA 90067
20
                            RIGHT CHOICE LAW
21                          BY:  FRED THIAGARAJAH, ESQ.
                            5015 BIRCH STREET
22                          SUITE 107
                            NEWPORT BEACH, CA 92660
23
      FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
24                          BY:  SHAWN HOLLEY, ESQ.
                                 KATE MANGELS, ESQ.
25                          808 WILSHIRE BOULEVARD
                            3RD FLOOR
26                          SANTA MONICA, CA 90401

27                          (APPEARANCES CONTINUED NEXT PAGE.)

28                          JACQUELINE M. CAIRE, CSR #9599, RPR
                            OFFICIAL REPORTER
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE RESPONDENT:    ZUCKERMAN SPAEDER LLP
                           BY:  JON R. FETTEROLF, ESQ.
 3                              (PRO HAC VICE)
                           1800 M STREET NW
 4                         SUITE 1000
                           WASHINGTON, DC 20036
 5
     FOR THE CUSTODIAN
 6   OF RECORDS:           OFFICE OF THE PASADENA CITY ATTORNEY
                           BY:  JAVAN RAD,
 7                              CHIEF ASSISTANT CITY ATTORNEY
                           100 NORTH GARFIELD AVENUE
 8                         ROOM N210
                           PASADENA, CA 91109
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1   CASE NUMBER:            21STRO03198
 2   CASE NAME:              LINDSEY HILL VS.
 3                           TREVOR BAUER
 4   LOS ANGELES, CALIFORNIA  FRIDAY, JULY 23, 2021
 5   DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE
 6   APPEARANCES:            (AS HERETOFORE NOTED.)
 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR
 8   TIME:                   12:00 P.M.
 9
10        THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.
11        MS. HOLLEY:  GOOD AFTERNOON.
12        THE COURT:  IF I MAY HAVE AN ABBREVIATED VERSION OF
13   APPEARANCES, PLEASE.
14        MS. MEYER:  YES.  GOOD AFTERNOON, YOUR HONOR.  LISA
15   HELFEND MEYER AND MARC GARELICK FOR MEYER, OLSON, LOWY &
16   MEYERS APPEARING ON BEHALF OF PETITIONER, WHO IS PRESENT.
17        THE COURT:  THANK YOU.
18        MR. FREEDMAN:  AND, YOUR HONOR, BRYAN FREEDMAN,
19   FREEDMAN & TAITELMAN, ON BEHALF OF THE PETITIONER, WHO IS
20   PRESENT, ALSO.
21        MR. THIAGARAJAH:  FRED THIAGARAJAH, YOUR HONOR.
22   CO-COUNSEL WITH THE OTHERS FOR MS. HILL.  THANK YOU.
23        THE COURT:  ANYBODY ELSE ON PETITIONER'S SIDE?
24        MS. MEYER:  NO.
25        THE COURT:  OKAY.
26        MS. HOLLEY:  GOOD AFTERNOON.  SHAWN HOLLEY AND KATE
27   MANGELS FROM KINSELLA, WEITZMAN, ISER, KUMP & HOLLEY ON
28   BEHALF OF MR. BAUER.  HE IS PRESENT IN COURT.
```

```
 1        MR. FETTEROLF:  JON FETTEROLF FROM ZUCKERMAN SPAEDER ON
 2   BEHALF OF MR. BAUER.
 3        THE COURT:  ALL RIGHT.  THANKS SO MUCH.  EVERYBODY, WHO
 4   CAN FIND ONE, MAY HAVE A SEAT.  THE FIRST QUESTION, WHAT IS
 5   THE TIME ESTIMATE -- THE COLLECTIVE TIME ESTIMATE?
 6        MS. MEYER:  IT APPEARS THAT IT'S APPROXIMATELY THREE
 7   DAYS.  TWO FOR PETITIONER.  AND ONE FOR RESPONDENT.
 8        THE COURT:  ALL RIGHT.  AND ARE WE READY TO BEGIN TODAY?
 9        MS. MEYER:  YES.
10        MS. HOLLEY:  YES, WE ARE READY TO BEGIN TODAY.  AND WE'D
11   LIKE TO BEGIN TODAY.  WE HAVE A NUMBER OF CONCERNS BASED ON
12   WHAT WE RECEIVED FROM PETITIONER LAST NIGHT AS TO WHAT THEY
13   INTEND TO PRESENT.
14             FROM OUR STANDPOINT, IT IS IRRELEVANT.  VOLUMINOUS.
15   AND WE WOULD LIKE SOME GUIDANCE FROM THE COURT EITHER HERE IN
16   OPEN COURT NOW THIS AFTERNOON OR IN CHAMBERS.  JUST TO GET
17   SOME GUIDANCE AS TO WHAT THE COURT FEELS IS RELEVANT TO THIS
18   PARTICULAR HEARING.  WE BELIEVE THAT WHAT THEY INTEND TO
19   PRESENT IS NOT GERMANE.  WE BELIEVE THAT IT IS INTENDED TO BE
20   DISSEMINATED TO THE MEDIA, MORE THAN PRESENTED TO THIS COURT.
21        THE COURT:  SINCE I DON'T KNOW WHAT IT IS AND I HAVEN'T
22   SEEN IT, WE'LL NEED TO ADDRESS THAT AFTER THE LUNCH HOUR.
23   AND WE'RE ALREADY INTO THAT LUNCH HOUR.  BUT I WANTED TO MAKE
24   SURE WE WERE GOING FORWARD TODAY, IF THAT'S THE INTENTION.
25        MS. MEYER:  YES.
26        THE COURT:  OBVIOUSLY WE DON'T HAVE THREE DAYS.  TODAY
27   WE'VE GOT A HALF A DAY.  SO WE'LL NEED TO SELECT SOME OTHER
28   DAYS TO COMPLETE THE MATTER.
```

1      MS. MEYER:  YOUR HONOR, I HAVE A HOUSEKEEPING NOTE.  MY

2  UNDERSTANDING IS THAT MR. FETTEROLF IS NOT LICENSED TO

3  PRACTICE IN THE STATE OF CALIFORNIA.  AND IF THE COURT COULD

4  INQUIRE BECAUSE WE HAVE CHECKED ON THE CALIFORNIA'S STATE BAR

5  WEBSITE AND WE CANNOT FIND HIS NAME.

6      THE COURT:  ALL RIGHT.  AND, MR. FETTEROLF, ARE YOU

7  ADMITTED PRO HAC VICE IN THE STATE OF CALIFORNIA?

8      MR. FETTEROLF:  I HAVE THE RELEVANT PAPERS HERE.  I'M

9  FROM WASHINGTON, DC.

10      THE COURT:  AS LONG AS MS. HOLLEY IS DOING THE

11  QUESTIONING AND YOU'D LIKE TO PARTICIPATE, YOU'RE WELCOME TO

12  DO SO IN A NON-ASSERTIVE WAY UNLESS AND UNTIL YOU RECEIVE PRO

13  HAC VICE ADMISSION.

14      MR. FETTEROLF:  OKAY.

15      THE COURT:  ALL RIGHT.  I WILL TAKE A LOOK.  I SEE THERE

16  ARE A COUPLE OF MOTIONS TO QUASH.  I'LL TAKE A LOOK AT THOSE

17  OVER THE LUNCH HOUR.  AND WE'LL BE PREPARED TO BEGIN.

18          DOES EITHER SIDE WISH TO MAKE OPENING STATEMENTS?

19      MS. MEYER:  YES, YOUR HONOR.  WE WILL.

20      THE COURT:  OKAY.  WE'LL PREPARE FOR THAT.  I WILL ALSO

21  INSTRUCT THAT IT IS THE COURT'S INTENTION THAT THERE NOT BE

22  ANY LIVE SOCIAL MEDIA PRESENTATION.  NO TWEETING.  NO CAMERAS

23  IN THE COURTROOM.  I DON'T MIND NOTES.  IF THE MEDIA ARE HERE

24  AND WISH TO TAKE NOTES ON LAPTOPS, THAT'S FINE AS LONG AS

25  IT'S NOT BEING TRANSMITTED DURING THE PROCEEDINGS.  IF THERE

26  ARE ATTORNEYS, OTHER THAN THE TWO AT COUNSEL TABLE, I'M GOING

27  SUGGEST THEY USE THE JURY BOX SO THEY CAN -- YOU'LL HAVE SOME

28  SEATS.

1       AND IF THERE ARE MORE THAN 36, WHICH IS THE COUNT

2   OF THE SEATS THAT WE HAVE BEHIND, THEN WE'RE GOING TO CONDUCT

3   A LOTTERY FOR THE PRESS TO HAVE ACCESS TO THOSE SEATS.  ALL

4   RIGHT.

5       ANY OTHER QUESTIONS BEFORE WE ADJOURN FOR LUNCH?

6       MS. MEYER:  NO, YOUR HONOR.

7       MS. HOLLEY:  I DON'T THINK SO.

8       THE COURT:  ALL RIGHT.  SEE YOU AT 1:30.

9       MS. HOLLEY:  THANK YOU, YOUR HONOR.

10      MS. MEYER:  OH, YOUR HONOR, CAN WE HAVE THE WITNESSES

11  ORDERED BACK AFTER LUNCH?  THERE'S MULTIPLE WITNESSES THAT

12  HAVE BEEN SUBPOENAED HERE TODAY.

13      THE COURT:  CERTAINLY.  ARE THEY OUT IN THE HALL?

14      MS. MEYER:  I BELIEVE SO.

15      THE COURT:  ALL RIGHT.  IF I CAN HAVE ONE OF THE

16  BAILIFFS STEP OUTSIDE.  AND ANYBODY WHO HAS BEEN SUBPOENAED

17  WHO WILL APPEAR TODAY, BRING THEM IN.  ALL RIGHT.

18              (PAUSE IN THE PROCEEDINGS.)

19      THE COURT:  WELCOME.  FOR THOSE OF YOU WHO HAVE BEEN

20  SUBPOENAED TO APPEAR AS WITNESSES IN THIS CASE TODAY, WE ARE

21  GOING TO RESUME AT 1:30 THIS AFTERNOON.  SO YOU ARE ORDERED

22  TO RETURN WITHOUT ANY FURTHER SUBPOENA OR NOTICE.  WE'LL SEE

23  YOU AT 1:30.

24      MS. MEYER:  THANK YOU, YOUR HONOR.

25      MS. HOLLEY:  THANK YOU, YOUR HONOR.

26      THE COURT:  WE ARE IN RECESS.

27              (THE NOON RECESS WAS TAKEN UNTIL

28              1:40 P.M. OF THE SAME DAY.)

```
 1   CASE NUMBER:              21STRO03198

 2   CASE NAME:               LINDSEY HILL VS.

 3                            TREVOR BAUER

 4   LOS ANGELES, CALIFORNIA  FRIDAY, JULY 23, 2021

 5   DEPARTMENT 35            HON. DIANNA GOULD-SALTMAN, JUDGE

 6   APPEARANCES:            (AS HERETOFORE NOTED.)

 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR

 8   TIME:                   1:40 P.M.

 9

10        THE COURT:  BACK ON IN HILL AND BAUER.  EVERYBODY READY?

11        MS. MEYER:  YES.

12        THE COURT:  WITH REGARD TO THE THREE MOTIONS TO QUASH

13   THAT ARE BEFORE ME, AS TO THE FIRST, WHICH IS THAT OF THE

14   CUSTODIAN OF RECORDS OF PASADENA POLICE DEPARTMENT --

15        MS. MEYER:  YOUR HONOR, I THINK WE HAVE A STIPULATION ON

16   THOSE MOTIONS.

17        THE COURT:  OKAY.

18        MS. MEYER:  AND MR. GARELICK WILL ADDRESS THOSE

19   MOTIONS.

20        THE COURT:  PERFECT.

21        MR. GARELICK:  GOOD AFTERNOON, YOUR HONOR.  SO WE MET

22   AND CONFERRED WITH THE CITY POLICE ATTORNEY.  AND THEY ARE

23   REQUESTING A PROTECTIVE ORDER ON THE SART EXAM.  WE ARE

24   AGREEABLE.  I DO NOT KNOW IF MS. HOLLEY HAS ANY OBJECTION TO

25   A PROTECTIVE ORDER IN THAT SENSE SO THAT IT WOULD NOT BE

26   RELEASED TO THE MEDIA OR TO THE PUBLIC.

27        THE COURT:  MS. HOLLEY?

28        MS. HOLLEY:  NO OBJECTION.
```

1    THE COURT:  ALL RIGHT.  AND THE REST THEY SOUGHT TO BE

2    QUASHED.  AND THAT'S PURSUANT TO STIPULATION?

3    MR. GARELICK:  SO ESSENTIALLY IT'S JUST THE TESTIMONY OF

4    DETECTIVE JONES.  AND WE WILL NOT BE CALLING DETECTIVE JONES

5    AS A WITNESS.  IT WAS JUST TO SUBPOENA HER HERE FOR THE

6    PURPOSE OF THE SART EXAM.

7    THE COURT:  ALL RIGHT.  THEN THE COURT WILL ACCEPT

8    THAT.

9    MS. MEYER:  MY UNDERSTANDING IS, YOUR HONOR, THAT THE

10   RESPONDENT ALSO WILL NOT BE CALLING DETECTIVE JONES.

11   MS. HOLLEY:  THAT'S RIGHT.

12   THE COURT:  ALL RIGHT.

13   MR. RAD:  YOUR HONOR, JAVAN RAD, FOR CUSTODIAN OF

14   RECORDS.  I GUESS THE THINKING WAS I COULD PREPARE A

15   PROTECTIVE ORDER AND PROVIDE IT TO COUNSEL WHO CAN PROVIDE IT

16   TO THE COURT.  THEN WE CAN FURNISH THE SART EXAM.

17   THE COURT:  THAT'S PERFECT.

18   MR. RAD:  THANK YOU, YOUR HONOR.

19   THE COURT:  THANK YOU.

20   MR. RAD:  CAN I TELL THE WITNESS THAT SHE IS EXCUSED AS

21   WELL?

22   THE COURT:  YOU MAY IF THERE'S NOBODY ELSE TO -- ANY

23   REASON FOR THE CUSTODIAN OF RECORDS TO BE HERE?

24   MS. MEYER:  AND, YOUR HONOR, ONE OTHER POINT THAT I WANT

25   TO MAKE CLEAR BEFORE SHE IS RELEASED.

26   THE COURT:  SURE.

27   MS. MEYER:  THE SART REPORT WILL COME INTO EVIDENCE,

28   THAT WE DON'T NEED TO ESTABLISH ANY KIND OF FOUNDATION FOR

1    IT.

2         MS. HOLLEY:  WELL, I THINK THERE HAS TO BE SOME

3    FOUNDATION LAID FOR ALL EVIDENCE.

4         THE COURT:  THEN YOU NEED THE CUSTODIAN OF RECORDS TO

5    LAY THE FOUNDATION FOR THE DOCUMENT?

6         MS. HOLLEY:  YES.

7         THE COURT:  ALL RIGHT.  SINCE IT'S NOT LIKELY THAT

8    THAT'S -- I ASSUME THE DOCUMENT IS NOT PRESENT TO BE

9    PRESENTED OR IS IT?

10        MR. RAD:  WE HAVE AN ELECTRONIC VERSION, YOUR HONOR.

11        THE COURT:  HOW DO YOU WANT TO DEAL WITH THAT?  DO YOU

12   WANT HIM TO TRANSMIT THE ELECTRONIC VERSION TO YOU AND TO

13   MS. HOLLEY?  YOU CAN REVIEW IT.  SEE IF YOU NEED TO ASK

14   QUESTIONS OF THE CUSTODIAN OF RECORDS TO LAY A FOUNDATION?

15        MS. MEYER:  YES.

16        THE COURT:  ALL RIGHT.  IF YOU WANT TO TRANSMIT THAT.

17        MR. RAD:  I GUESS THE ONLY OTHER ISSUE IS THE CUSTODIAN

18   IS GOING TO BE OUT OF TOWN NEXT WEEK.  SHE IS HERE THIS

19   AFTERNOON.  I'M NOT SURE HOW WE CAN GET THE PROTECTIVE ORDER

20   THAT'S AGREED ON AND GET HER ON THE STAND.  HOW WOULD WE

21   PROCEED IN THAT REGARD?

22        MR. GARELICK:  PERHAPS WE CAN DO A VERBAL PROTECTIVE

23   ORDER?

24        MS. HOLLEY:  I FEEL LIKE IT'S -- IT'S SOMEWHAT PREMATURE

25   FOR ME TO BRING UP THE ISSUES THAT I INTENDED TO BRING UP

26   PREVIOUSLY, BUT IT IS ARISING NOW, WHICH, FROM OUR

27   STANDPOINT, IS A NOTICE DUE PROCESS ISSUE, WHICH IS THAT WE

28   WERE -- I DON'T KNOW IF THE COURT HAD AN OPPORTUNITY TO READ

8

1    THE PETITION.

2         THE COURT:  I HAVE.

3         MS. HOLLEY:  BUT THE EVIDENCE PRESENTED IN THE PETITION

4    IS THE DECLARATION OF MS. HILL, WHICH WE ARE PREPARED TO

5    DEFEND AND RESPOND TO AT GREAT LENGTH.  THE ONLY OTHER

6    EVIDENCE -- AND I'M DOING MY FINGERS IN AIR QUOTES -- THAT IS

7    PRESENTED IS INCOMPLETE MEDICAL REPORTS, WHICH ARE NOT --

8    THERE'S NO FOUNDATION FOR AND THERE'S NO AUTHENTICATION FOR

9    BY VIRTUE OF THEIR INCOMPLETENESS.

10        THE COURT:  RIGHT.  BUT IN REGARD TO THAT, THAT'S

11   BECAUSE THE MEDICAL EXAMINATION WAS DONE OUT IN THE SAN DIEGO

12   AREA.  THE DOCUMENT ITSELF IS SIMPLY PART OF THE RECORDS OF

13   THE PASADENA POLICE DEPARTMENT.  HOWEVER COMPLETE OR

14   INCOMPLETE THEY ARE, THE ONLY FOUNDATION TO BE LAID BY THIS

15   CUSTODIAN OF RECORDS IS AS TO WHAT THE RECORDS ARE OF THE

16   PASADENA POLICE DEPARTMENT.  NOT THE TRUTH OR FALSITY OF

17   THEIR CONTENTS TO THE EXTENT THAT THEY AREN'T CREATED BY THE

18   PASADENA POLICE.

19        MS. HOLLEY:  YES.  AND THE REASON THAT I'M SAYING THAT

20   MY ARGUMENT MAY BE PREMATURE -- I DON'T KNOW -- IS BECAUSE

21   OUR ANNOUNCING READY WITH A CAVEAT, WAS THE CAVEAT THAT WE

22   WERE PREPARED TO GO FORWARD ON THE CROSS EXAMINATION OF

23   MS. HILL.  AND WE ARE NOT PREPARED TO GO FORWARD ON ANYTHING

24   ELSE, BECAUSE WE WEREN'T PROVIDED ANYTHING ELSE UNTIL LAST

25   NIGHT.  SO WE ARE NOW IN A POSITION -- HAVING LEARNED LAST

26   NIGHT THAT THERE ARE A NUMBER OF WITNESSES AND EXHIBITS TO BE

27   PRESENTED AND TO BE CALLED FOR WHICH WE HAVE NO PAPERWORK TO

28   SUPPORT.

1        THE COURT:  ARE YOU SEEKING A CONTINUANCE?

2        MS. HOLLEY:  WELL, UNLESS THE COURT IS PREPARED TO LIMIT

3   PETITIONER'S PRESENTATION TO MS. HILL, I DON'T SEE HOW -- I

4   DON'T BELIEVE THE COURT IS WILLING TO DO THAT.

5        THE COURT:  THE COURT IS UNLIKELY TO DO THAT.

6        MS. HOLLEY:  I DON'T KNOW HOW WE PROCEED WHEN WE HAVE

7   BEEN PROVIDED, FROM OUR STANDPOINT, AT THE ELEVENTH HOUR WITH

8   WITNESSES AND MEDICAL RECORDS THAT WE HAVE NOT SEEN.

9        THE COURT:  YOU'RE ABSOLUTELY ENTITLED TO ONE

10  CONTINUANCE OF RIGHT.

11       MS. HOLLEY:  YES.  SO THAT IS THE PROBLEM.

12       THE COURT:  WELL, A CONTINUANCE WILL ALLOW YOU TO BOTH

13  OBTAIN AND REVIEW THE DOCUMENTS OF THE PASADENA POLICE

14  DEPARTMENT, AS WELL AS ANY OTHER DOCUMENTS YOU MIGHT RECEIVE,

15  WHICH WOULD ASSIST YOU IN EITHER PROSECUTING OR DEFENDING THE

16  CASE.

17       MS. HOLLEY:  YES.  YES.  SO, YOU KNOW, IN LIGHT OF

18  THAT -- I MEAN, IN LIGHT OF THAT, I FEEL THAT THAT'S WHAT WE

19  HAVE TO DO.  WE CAME HERE READY, BUT READY ON WHAT HAD BEEN

20  PRESENTED TO US.

21       THE COURT:  ALL RIGHT.

22       MS. MEYER:  YOUR HONOR, JUDGE RIFF INQUIRED IF EITHER

23  ONE OF US WANTED A CONTINUANCE.  AND WE BOTH REPLIED IN THE

24  NEGATIVE.  THAT'S NUMBER ONE.  NUMBER TWO IS THE COURT IS

25  AWARE THERE IS A CASE THAT SAYS DIRECTLY THAT YOU COULD GO

26  OUTSIDE THE MOVING PAPERS IN CONNECTION WITH A --

27       THE COURT:  SURE.

28       MS. MEYER:  -- DOMESTIC VIOLENCE RESTRAINING ORDER.  WE

1   ALSO PROVIDED MS. HOLLEY WITH THE SUBPOENAS ABOUT A WEEK AGO.

2   SO SHE KNEW EXACTLY WHO WAS BEING SUBPOENAED.  NUMBER FOUR,

3   WE NEVER -- WE, AS OF RIGHT NOW, HAVE NEVER HAD A COPY OF THE

4   SART REPORT, BECAUSE THEY HAVE NOT PRODUCED IT DESPITE OUR

5   MULTIPLE REQUESTS.  SO SHE ESSENTIALLY HAS EVERYTHING THAT WE

6   HAVE IN OUR POSSESSION AND CONTROL.

7          SO I THINK WE'VE GONE THIS FAR.  AND SHE HAS

8   PREVIOUSLY -- MS. HOLLEY HAS NOT REQUESTED A CONTINUANCE.  WE

9   WOULD LIKE TO PROCEED.  IF THE COURT IS INCLINED TO GRANT A

10  CONTINUANCE, THEN WE WOULD ASK THAT THE TEMPORARY RESTRAINING

11  ORDER REMAIN IN FULL FORCE AND EFFECT.

12      THE COURT:  THE TEMPORARY RESTRAINING ORDER WILL REMAIN

13  IN FULL FORCE AND EFFECT UNTIL THE PROCEEDING IS COMPLETED.

14  BUT AS WE DISCUSSED IN THE MORNING SESSION, SINCE THERE IS A

15  THREE DAY ESTIMATE, THERE'S NO WAY IT'S GOING TO BE DONE

16  TODAY.  SO THERE ARE GOING TO BE ADDITIONAL DAYS.  THE COURT

17  DOES NOT SEE A HUGE PREJUDICE TO THE PETITIONER.  THE

18  TEMPORARY RESTRAINING ORDER REMAINS IN PLACE SO THAT WE CAN

19  CONTINUE IT FOR THE PURPOSE OF RESPONDENT BEING FULLY

20  PREPARED.  BOTH PARTIES BEING AS PREPARED AS POSSIBLE TO

21  PRESENT THEIR BEST CASE.

22      MS. HOLLEY:  AND, FOR THE RECORD, WE ARE PREPARED AT

23  THIS POINT TO TURN OVER TO PETITIONER ALL THE EXHIBITS THAT

24  WE INTEND TO USE, INCLUDING TEXT MESSAGES THAT WE RECEIVED

25  JUST THIS MORNING.  AND I'M PROVIDING ALL OF THAT TO

26  PETITIONER'S COUNSEL NOW.  I DON'T BELIEVE THAT EVERYTHING

27  THAT IS IN THE POSSESSION OF PETITIONER HAS BEEN TURNED OVER

28  TO US.

1           I RECOGNIZE THE SART EXAM IS SOMETHING DIFFERENT.

2   BUT THERE ARE A NUMBER OF OTHER MEDICAL RECORDS FOR WHICH

3   THERE ARE TWO PAGES OF SEVEN, AND THAT ARE CUT OFF, AND THAT

4   ARE REDACTED.  AND IT IS THOSE DOCUMENTS THAT WE NEED TO

5   REVIEW.  AND I BELIEVE THAT THIS IS PERHAPS BEING TURNED OVER

6   NOW.

7        MS. MEYER:  WE ARE TURNING OVER OUR ACTUAL EXHIBITS.

8   AND THEN MS. OLSON WOULD LIKE TO ADDRESS ONE OF THE POINTS

9   MS. HOLLEY HAS RAISED.

10        MS. OLSON:  YES, YOUR HONOR.  WE SUBPOENAED A NUMBER OF

11   DOCUMENTS FROM CUSTODIAN OF RECORDS.  ONE OF WHICH I RECEIVED

12   LAST NIGHT ABOUT MIDNIGHT FROM PALOMAR.  I'M MORE THAN HAPPY

13   TO COPY THAT OUT AND GIVE A COPY OF THAT TO MS. HOLLEY.  AND

14   THERE'S A FEW BLANKS IN OUR EXHIBITS FOR DOCUMENTS THAT WE

15   HAD SUBPOENAED HERE TODAY THAT WE INTENDED ON OFFERING AS

16   EXHIBITS.  SO THOSE WON'T BE IN OUR EXHIBIT BOOKS.  SO

17   THEY'LL BE GETTING THEM WHEN WE GET THEM, FOR EXAMPLE, THE

18   SART EXAM RECORDS.

19        MS. HOLLEY:  I APPRECIATE THAT.  ADDITIONALLY, WHAT WE

20   LEARNED LAST NIGHT IS THAT THERE IS A -- AN EXPERT WITNESS

21   PROPOSED TO BE CALLED.  OBVIOUSLY IT'S THE FIRST THAT WE HAVE

22   HEARD OF THAT LAST NIGHT.  SO THAT IS SOMETHING THAT WE WOULD

23   ALSO WISH TO EXPLORE.

24        THE COURT:  ALL RIGHT.  SO LET'S DO THIS, LET ME LET YOU

25   ALL SIT DOWN, TO THE EXTENT THAT THERE ARE SEATS AVAILABLE.

26   ARE THERE STIPULATIONS WITH REGARD TO ANY OF THE OTHER

27   MOTIONS TO QUASH?  I HAD TWO OTHERS.  ONE WITH REGARD TO THE

28   RUSSELL GREENE DOCUMENTS.  ONE WITH REGARD TO FACEBOOK AND

1    TWITTER.

2         MS. OLSON:  SORRY, YOUR HONOR.  I JUST MOVED.

3         THE COURT:  I PREMATURELY ALLOWED YOU TO SIT DOWN.

4         MS. OLSON:  YOU PREMATURELY ALLOWED ME TO SIT.

5         THE COURT:  COME ON UP.

6         MS. OLSON:  WITH RESPECT TO -- WE HAD MET AND CONFERRED

7    WITH RESPECT TO THE SUBPOENA TO A PRIVATE INVESTIGATOR

8    OBTAINED BY MR. BAUER, I BELIEVE, BY THE NAME OF RUSSELL

9    GREENE.  AND AT THIS TIME WE'RE PREPARED TO WITHDRAW THAT

10   SUBPOENA.  WE WILL ALSO WITHDRAW THE SUBPOENAS TO FACEBOOK

11   AND TWITTER.

12        THE COURT:  ALL RIGHT.  THAT TAKES CARE OF THAT.  OTHER

13   THAN SELECTING DATES, WHAT ELSE CAN WE GET DONE TODAY?

14        MS. HOLLEY:  I THINK THAT'S ALL.  THE COURT GRANTED

15   MR. FETTEROLF'S PRO HAC VICE.  AND WE NEED TO PAY THE FEE.

16        THE COURT:  CORRECT.

17        MS. HOLLEY:  THANK YOU VERY MUCH.

18        THE COURT:  SO THE DATES I HAVE NEXT AVAILABLE -- IF YOU

19   WANT TO GRAB YOUR CALENDARS.  THE ONLY TWO CALENDARS I'M

20   REALLY CONCERNED ABOUT ARE THE PARTIES AND MS. HOLLEY AND

21   MS. MEYER.  IF WE CAN'T GET 14 PEOPLE'S CALENDARS TO

22   COORDINATE, THAT IS JUST ANOTHER TUESDAY.

23        MS. HOLLEY:  ALL RIGHT.  SO SHOULD WE TAKE A BRIEF

24   RECESS TO DISCUSS AMONGST OURSELVES OR DO YOU WANT TO --

25        THE COURT:  I'M GOING TO TELL YOU WHAT I HAVE AVAILABLE.

26   THEN YOU MAY DISCUSS THOSE DATES AMONGST YOURSELF.

27        MS. HOLLEY:  THANK YOU.

28        THE COURT:  SO I HAVE AVAILABLE AUGUST 2, AUGUST 3,

13

1   AUGUST 19.  AND THEN WE ARE DOWN TO SEPTEMBER 27TH AND 28TH.

2        MS. HOLLEY:  I CAN TELL THE COURT -- ACTUALLY, WELL, ARE

3   YOU AVAILABLE ALL THOSE DATES?

4        MS. MEYER:  PROBABLY NOT.  BUT LET ME LOOK.

5        MS. OLSON:  THE COURT SAID THE 27TH AND 28TH?

6        THE COURT:  OF SEPTEMBER.  I HAVE AUGUST 2, 3, 19, AND

7   26.  UNLESS SOMEBODY IS ENGAGED IN A CRIMINAL TRIAL THAT IS

8   DAY 30 OF 30, THEN THESE WOULD TAKE PRIORITY.

9        MS. MEYER:  YOUR HONOR, I CAN DO AUGUST 19.

10       MS. HOLLEY:  I CAN ALSO DO AUGUST 19.

11       THE COURT:  OKAY.

12       MS. MEYER:  OF THE REMAINING DAYS, THE ONLY DAY I COULD

13   POSSIBLY DO WOULD BE AUGUST 3RD.

14       THE COURT:  AUGUST 3RD?

15       MS. MEYER:  YES.

16       MS. HOLLEY:  AUGUST 3RD IS NOT GOOD FOR ME.

17       THE COURT:  OKAY.  WHAT DO YOU HAVE ON AUGUST 2ND AND

18   AUGUST 3RD?

19       MS. MEYER:  AUGUST 2ND I HAVE A TRIAL BEFORE JUDGE

20   CONVEY.  SO WHAT I WAS GOING TO DO WAS HAVE ONE OF MY

21   ASSOCIATES HANDLE THE -- I THINK THE 2ND IS THE FIRST DAY.

22   THAT'S WHY I CHOSE THE 3RD.

23       THE COURT:  OKAY.

24       MS. HOLLEY:  I JUST HAVE --

25       MS. MEYER:  BUT IF YOU WANT TO GO FORWARD ON THE 2ND AND

26   YOU'RE ORDERING ME BACK HERE, THAT'S FINE.

27       THE COURT:  I'M KIND OF INCLINED TO ORDER YOU ALL BACK

28   ON THE 2ND AND ON THE 3RD.

```
1        MS. MEYER:  THAT'S FINE.

2        MS. HOLLEY:  OKAY.

3        THE COURT:  CONSIDER IT ORDERED.

4        MS. MEYER:  OKAY.

5        THE COURT:  SO AUGUST 2, 3, AND 19 AT 8:30 ON EACH OF

6    THOSE DAYS.  WE'LL REISSUE ANOTHER DV-116 TO GO THROUGH THAT

7    LAST DAY.  ANYTHING ELSE WE CAN DO FOR YOU?

8        MS. MEYER:  THE ONLY THING WE WOULD ASK IS THAT THE

9    WITNESSES BE ORDERED BACK FOR THOSE DAYS.

10       THE COURT:  WHY DON'T WE BRING THEM IN.  DID YOU WISH TO

11   PUT ON THE CUSTODIAN OF RECORDS FOR THE PASADENA POLICE

12   DEPARTMENT SO THAT SHE DOES NOT NEED TO COME BACK?

13       MS. OLSON:  SURE.

14       THE COURT:  MIGHT YOU WISH TO SPEAK WITH HER SEPARATELY?

15   SHE WOULD JUST BE THE CUSTODIAN OF RECORDS.  IF YOU RECEIVED

16   THE ELECTRONIC VERSIONS AND THEY APPEAR ACCEPTABLE TO YOU,

17   YOU CAN CONFIRM WITH HER THOSE ARE THE VERSIONS SHE JUST HIT

18   THE "SEND" BUTTON FOR.  AND THEN SHE DOESN'T NEED TO COME

19   BACK.

20       MS. HOLLEY:  THAT'S FINE.

21       MR. RAD:  I'M SORRY.  I DIDN'T CATCH THAT.  I WAS TRYING

22   TO WORK OUT WITH THE WITNESS WHETHER THE WITNESS NEEDS TO

23   COME BACK.

24       THE COURT:  WE WERE JUST TRYING TO HELP YOU OUT WITH

25   THAT.

26       MR. RAD:  THERE WE GO.

27               (PAUSE IN THE PROCEEDINGS.)

28       MR. RAD:  THANK YOU, YOUR HONOR.
```

1        THE COURT:  CERTAINLY.

2            AT THIS JUNCTURE DO WE HAVE WITNESS LISTS, EXHIBIT

3   LISTS, AND MARKED AND BOUND EXHIBITS?  IT APPEARS YOU

4   EXCHANGED SOME MARKED AND BOUND EXHIBITS.  DO YOU HAVE ANY

5   EXHIBIT LISTS TO GO WITH THAT?

6        MS. MEYER:  YES, WE DID.

7        THE COURT:  GREAT.  AND DO WE HAVE A WITNESS LIST?

8        MS. OLSON:  YES, THEY WERE EXCHANGED LAST EVENING,

9   YOUR HONOR.

10       MS. HOLLEY:  I JUST WANT TO MAKE SURE WITH THE COURT WE

11  CAN SUPPLEMENT OUR WITNESS AND EXHIBIT LIST.  WE RECEIVED

12  INFORMATION TODAY THAT WE ANTICIPATE USING AS EVIDENCE IN THE

13  CASE.  AND I WANT TO MAKE SURE THE COURT IS OKAY WITH THAT.

14  WHAT WE PRESENTED -- WHAT WE GAVE THEM LAST NIGHT IS NOT

15  COMPLETE, BECAUSE WE LEARNED ADDITIONAL INFORMATION TODAY.

16       THE COURT:  RIGHT.  I UNDERSTAND THAT.

17       MS. MEYER:  WE HAVE THAT NOW.

18       MS. HOLLEY:  I DON'T KNOW THAT YOU DO.

19       MS. OLSON:  YES.

20       MS. HOLLEY:  YES, YOU HAVE THE DOCUMENTS.  THE WITNESS

21  ITSELF IS PROBABLY NOT ON THE WITNESS LIST.

22       THE COURT:  IF YOU'LL PROVIDE THAT INFORMATION TO

23  COUNSEL.

24       MS. HOLLEY:  YES, WE WILL INDEED.

25       MS. MEYER:  WE MAY HAVE AN ADDITIONAL EXHIBIT.  AND IF

26  WE DO, I'LL SEND IT TO YOU BY MONDAY.

27       THE COURT:  ALL RIGHT.  I THINK WE ARE -- I THINK WE ARE

28  DONE HERE.

1    MS. OLSON:  YOUR HONOR, JUST NOT TO BEAT A DEAD HORSE,

2  JUST FOR PURPOSES OF CLARITY, THAT WE'RE STIPULATING ONCE WE

3  RECEIVE THE SART EXAM, ABSENT ANY DEFICIENCIES BY EITHER THAT

4  WERE NOTED, WE'RE STIPULATING TO THE FOUNDATION ON THOSE

5  RECORDS?

6    MS. HOLLEY:  YES.

7    MS. OLSON:  THANK YOU.

8    THE COURT:  AND THEN THE WITNESS FROM PASADENA POLICE

9  DOES NOT NEED TO COME BACK.

10    MS. OLSON:  CORRECT.  WE'LL JUST CONFIRM WITH THE

11  COUNSEL THAT HAS APPEARED THAT THAT'S THE CASE.

12    THE COURT:  OKAY.

13    MS. OLSON:  ONCE WE GET THE SART FILE.

14    THE COURT:  DID YOU WISH TO BRING IN SOME WITNESSES WHO

15  ARE UNDER SUBPOENA TO HAVE THEM ORDERED BACK?

16    MS. MEYER:  YES, WE DO.

17    MS. OLSON:  YES, PLEASE.

18    THE COURT:  ALL RIGHT.  I'LL WAIT UNTIL MY MACHINE

19  ALLOWS US TO BE AUDIBLE.  FOR THOSE OF YOU WHO HAVE BEEN

20  SUBPOENAED TO TESTIFY TODAY, WITH THE EXCEPTION OF THE

21  REPRESENTATIVE OF THE PASADENA POLICE DEPARTMENT, THE MATTER

22  IS BEING CONTINUED TO AUGUST 2ND AT 8:30 A.M. IN THIS

23  DEPARTMENT.  AND I AM ORDERING YOU BACK WITHOUT FURTHER

24  NOTICE OR SUBPOENA.  IS THAT ACCEPTABLE TO YOU, SIR?

25    DETECTIVE GIDDENS:  YES.

26    THE COURT:  SIR?

27    DETECTIVE JIMENEZ:  YES.

28    MS. VALENCIA:  MA'AM, I UNFORTUNATELY WAS LEAVING TOWN

17

```
1   ON THAT DAY.
2        THE REPORTER:  YOUR HONOR, MAY I HAVE THEM STATE THEIR
3   NAMES, PLEASE.
4        THE COURT:  WHY DON'T WE HAVE YOU STATE YOUR NAME
5   STARTING FROM -- TO MY LEFT.
6        DETECTIVE GIDDENS:  DETECTIVE GIDDENS.  LAST NAME IS
7   SPELLED G-I-D-D-E-N-S.
8        THE COURT:  THANK YOU.
9        DETECTIVE JIMENEZ:  DETECTIVE SERGEANT CESAR JIMENEZ,
10  J-I-M-E-N-E-Z.
11       THE COURT:  THANK YOU.
12       MS. VALENCIA:  KELLY VALENCIA.  KELLY IS K-E-L-L-Y.
13  VALENCIA, STANDARD.
14       THE COURT:  ALL RIGHT.  AND MS. VALENCIA'S TESTIMONY IS
15  PART OF THE PETITIONER'S CASE?
16       MS. MEYER:  YES.  SHE WAS THE ONE WHO DID THE SART
17  EXAM.
18       THE COURT:  OKAY.  SO YOU'RE GOING TO NEED HER BACK FOR
19  THAT.  AND ARE YOU GOING TO BE GONE ON THE 2ND, 3RD, AND
20  19TH?  OR WILL YOU BE BACK BY ANY OF THOSE DAYS?
21       MS. VALENCIA:  I BELIEVE I'M GONE THE 2ND THROUGH, LIKE,
22  THE 12TH.  ESSENTIALLY THE 13TH.
23       THE COURT:  OKAY.  AND ARE YOU SOMEWHERE YOU MIGHT BE
24  ABLE TO BE ABLE TO TESTIFY REMOTELY?
25       MS. VALENCIA:  POSSIBLY.  I'M DOING A ROAD TRIP.  SO I
26  WOULD DEFINITELY TRY.
27       THE COURT:  OKAY.
28       MS. MEYER:  IS THERE ANY WAY WE COULD PUT HER ON TODAY,
```

18

```
1   YOUR HONOR?

2        MS. HOLLEY:  FOR WHAT PURPOSE?

3        THE COURT:  SHE DID THE SART EXAM.

4        MS. HOLLEY:  I KNOW.

5        THE COURT:  YOU JUST RECEIVED THE RECORDS OF THAT.  SO I

6   DON'T KNOW THAT YOU WILL HAVE BEEN PREPARED TO ASK QUESTIONS

7   ABOUT IT TODAY.

8        MS. HOLLEY:  CORRECT.

9        THE COURT:  SO I THINK IT MAKES MORE SENSE TO LET HER

10  TESTIFY EITHER REMOTELY ON THE 2ND OR THE 3RD OR HAVE HER

11  COME BACK ON THE 19TH.  I UNDERSTAND THE ANTICIPATION IS THAT

12  PETITIONER'S CASE WILL BE DONE BY THE SECOND DAY OF OUR

13  HEARING.  AND THEN IT WILL BE RESPONDENT'S CASE.  HOWEVER, IF

14  THE WITNESS IS OTHERWISE UNAVAILABLE, I'M NOT SURE THERE'S

15  MUCH WE CAN DO WITH THAT.  THOUGH SHE SOUNDS LIKE SHE IS

16  GOING TO GIVE IT THE COLLEGE TRY TO BE ABLE TO TESTIFY

17  REMOTELY.

18       MS. VALENCIA:  I APOLOGIZE, BUT I HAD THESE PLANS.

19       THE COURT:  UNDERSTAND.  NOT A PROBLEM.  WE'LL -- IF,

20  MS. MEYER, YOU'LL GIVE HER THE INFORMATION ABOUT HOW TO

21  CONNECT THROUGH LACOURTCONNECT TEAMS, THEN WE CAN SEE WHETHER

22  WE CAN'T GET HER ON EARLY AND DONE SO SHE'LL BE ABLE TO ENJOY

23  HER VACATION.

24       MS. MEYER:  I WILL DO SO.

25       THE COURT:  OKAY.

26       MS. HOLLEY:  I DO HAVE A QUESTION.  AS THE COURT IS NOW

27  AWARE, THERE IS A PENDING CRIMINAL INVESTIGATION.  FOR THAT

28  REASON, I AND MR. FETTEROLF HAVE ADVISED MR. BAUER NOT TO
```

```
 1   TESTIFY ABOUT ANY OF THE SUBSTANCE OF THIS MATTER.  MY
 2   QUESTION IS, PROCEDURALLY DOES THE COURT INTEND TO HAVE HIM
 3   TAKE THE STAND AND INVOKE?  BECAUSE I CAN LET THE COURT KNOW
 4   NOW THAT HE IS NOT GOING TO PROVIDE ANY TESTIMONY CONCERNING
 5   THE SUBSTANCE.  AND SO WE WOULD ASK EITHER THAT THAT TAKE
 6   PLACE IN CHAMBERS, OR THAT THE COURT ACCEPT MY REPRESENTATION
 7   AS TO THAT AND PERHAPS ASK HIM AT THE APPROPRIATE TIME
 8   WHETHER OR NOT HE INTENDS TO FOLLOW MY ADVICE.
 9           FROM MY STANDPOINT, HAVING HIM TAKE THE STAND TO
10   INVOKE WITH EACH QUESTION HAS NO PROBATIVE VALUE AT ALL AND
11   IS NOTHING MORE THAN A PREJUDICIAL EXERCISE GIVEN THE MEDIA
12   ATTENTION TO THIS MATTER.
13       THE COURT:  UNDERSTOOD.  MS. MEYER.
14       MS. MEYER:  YES.  MY UNDERSTANDING IS THAT UNDER CIVIL
15   LAW HE DOES HAVE TO TAKE THE STAND AND HE DOES HAVE TO INVOKE
16   HIS RIGHT WITH RESPECT TO EACH QUESTION.  SO WE WOULD ASK
17   THAT HE DO SO.  AND THERE MAY BE SOME QUESTIONS THAT THE
18   ANSWERS MAY NOT TEND TO INCRIMINATE HIM.
19       THE COURT:  I SUSPECT THAT THAT'S CORRECT.  SO TO THE
20   EXTENT THAT HE IS ASKED QUESTIONS, AND IF MS. MEYER ASKS
21   QUESTIONS TO WHICH HE KNOWS THE ANSWER HAS GOT TO BE AN
22   INVOCATION OF THE FIFTH, THEN THAT WILL BE TIME CONSUMED.
23       MS. MEYER:  UNDERSTOOD.
24       MS. HOLLEY:  THANK YOU.
25       THE COURT:  OKAY.  DO WE HAVE THE 116 AVAILABLE YET?
26       THE CLERK:  YES, YOUR HONOR.  THEY'VE ALREADY BEEN
27   DISTRIBUTED.
28       THE COURT:  THEN WE ARE IN RECESS.
```

1      MS. HOLLEY:  THANK YOU.

2      MS. MEYER:  THANK YOU.

3         (THE PROCEEDINGS WERE CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    FOR THE COUNTY OF LOS ANGELES

3      HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

4

5    LINDSEY HILL,                        )
                                          )
6                   PETITIONER,           )
                                          )
7                                         ) SUPERIOR COURT
                    VS.                   ) NO. 21STRO03198
8                                         )
                                          ) REPORTER'S
9    TREVOR BAUER,                        ) CERTIFICATE
                                          )
10                  RESPONDENT,           )
     _____)
11

12

13         I, JACQUELINE M. CAIRE, OFFICIAL COURT REPORTER OF THE

14   SUPERIOR COURT OF THE STATE OF CALIFORNIA; FOR THE COUNTY OF

15   LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING PAGES, 1

16   THROUGH 20, COMPRISE A FULL, TRUE AND CORRECT TRANSCRIPT OF

17   THE PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER

18   JULY 23, 2021.

19

20         DATED THIS 23RD DAY OF JULY, 2021.

21

22

23         Jacqueline M. Caire
           _____
24         JACQUELINE M. CAIRE, CSR #9599, RPR
           OFFICIAL REPORTER
25

26

27

28
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3        HON. DIANNA GOULD-SALTMAN, JUDGE     DEPARTMENT 35

 4


 5
      LINDSEY HILL,                      )
 6                                       )
                         PETITIONER,     )
 7                                       )
                  VS.                    )    NO. 21STRO03198
 8                                       )
                                         )
 9    TREVOR BAUER,                       )
                                         )
10                                       )
                         RESPONDENT.     )
11    _____)

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                        AUGUST 9, 2021

14
      APPEARANCES:
15    FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                            BY:  DOREEN MARIE OLSON, ESQ.
16                          10100 SANTA MONICA BOULEVARD
                            SUITE 1425
17                          LOS ANGELES, CA 90067
                            NEWPORT BEACH, CA 92660
18

19    FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
                            BY:  KATE MANGELS, ESQ.
20                          808 WILSHIRE BOULEVARD
                            3RD FLOOR
21                          SANTA MONICA, CA 90401
                            (VIA LACOURTCONNECT VIDEO)
22

23                          ZUCKERMAN SPAEDER LLP
                            BY:  JON R. FETTEROLF, ESQ.
24                          1800 M STREET NW
                            SUITE 1000
25                          WASHINGTON, DC 20036
                            (VIA LACOURTCONNECT VIDEO)
26

27                          JACQUELINE M. CAIRE, CSR #9599, RPR
                            OFFICIAL REPORTER
28
```

```
 1  CASE NUMBER:            21STRO03198

 2  CASE NAME:              LINDSEY HILL VS.

 3                          TREVOR BAUER

 4  LOS ANGELES, CALIFORNIA  MONDAY, AUGUST 9, 2021

 5  DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE

 6  APPEARANCES:            (AS HERETOFORE NOTED.)

 7  REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR

 8  TIME:                   8:35 A.M.

 9

10      THE COURT:  GOOD MORNING.  THIS IS JUDGE GOULD-SALTMAN.

11  I HAVE MS. OLSON IN FRONT OF ME.  IT APPEARS I HAVE

12  MR. FETTEROLF AND MS. MANGELS ONLINE.  AND, MS. MANGELS, YOU

13  ARE MUTED.

14      MS. OLSON:  GOOD MORNING, YOUR HONOR.

15      THE COURT:  GOOD MORNING.

16      MR. FETTEROLF:  GOOD MORNING, YOUR HONOR.

17      THE COURT:  ALL RIGHT.  I JUST RECEIVED THE OPPOSITION

18  TO THE MOTION.  HAVE YOU SEEN THAT, MR. FETTEROLF?

19      MR. FETTEROLF:  NO.  LET ME LOOK AT MY EMAIL HERE.

20      MS. OLSON:  IT WAS EMAILED THIS MORNING.

21      MR. FETTEROLF:  I DON'T SEE IT IN MY EMAIL.  LET ME

22  CHECK.

23      THE COURT:  SURE.

24      MR. FETTEROLF:  NO.  NO.  UNLESS -- KATE, I DON'T KNOW

25  WHETHER YOU RECEIVED IT.

26      MS. MANGELS:  I HAVE NOT RECEIVED IT EITHER.

27      MR. FETTEROLF:  OKAY.

28      MS. OLSON:  IT WAS SENT AT 8:32 THIS MORNING.
```

```
 1        THE COURT:  IT'S ONLY 8:36 NOW.
 2        MR. FETTEROLF:  YEAH.  I DON'T SEE IT IN MY EMAIL,
 3   YOUR HONOR.
 4        THE COURT:  IF YOU'VE GOT A COPY, DO YOU WANT TO FORWARD
 5   THEM A COPY?
 6        MS. OLSON:  I COULD RESEND WHAT WAS SENT THIS MORNING.
 7   I DON'T KNOW IF THAT --
 8        THE COURT:  IT WAS ONLY SENT A FEW MINUTES AGO.
 9        MS. OLSON:  I CAN RESEND IT, UNLESS YOU WANT TO WAIT ONE
10   MINUTE FOR IT TO TRY TO GET THROUGH.  IT WAS THIS THICK
11   (INDICATING).
12        MR. FETTEROLF:  WE HAD RECEIVED MS. OLSON AND
13   MR. GARELICK'S LETTERS IN RESPONSE TO -- BEFORE WE FILED THE
14   MOTION, WE FILED LETTERS REQUESTING THIS INFORMATION.  WE
15   HAVE THOSE.  SO IF THE ARGUMENTS ARE SIMILAR TO WHAT WAS MADE
16   IN THE LETTERS, I AM PREPARED TO ADDRESS THEM.  BUT I DON'T
17   KNOW WHAT'S IN THE MOTION AT THE PRESENT TIME.
18        THE COURT:  I WANT TO MAKE SURE -- WHY DON'T YOU RESEND.
19   CAN YOU CHECK YOUR JUNK EMAIL BOX AND SEE IF PERHAPS IT ENDED
20   UP THERE?
21        MR. FETTEROLF:  I DON'T SEE IT.  BUT WE HAVE GOT EMAILS
22   FROM THEM IN THE PAST.  BOTH MS. OLSON AND MR. GARELICK.
23        MS. OLSON:  IT WAS SENT FROM MY ASSISTANT JACKIE
24   KAMINSKI AT 8:33.
25        MR. FETTEROLF:  WE HAVE GOTTEN EMAILS FROM MS. KAMINSKI
26   BEFORE.  I GUESS I WOULD BE SURPRISED IF IT'S IN THE JUNK
27   FOLDER, BUT I DON'T SEE IT IN THE JUNK FOLDER.
28        MS. MANGELS:  I AM NOT SEEING IT IN ANY OF MY FOLDERS
```

1   EITHER.

2       MS. OLSON:  IT WAS ADDRESSED TO MS. MANGELS WITH A COPY

3   TO MS. HOLLEY, MR. FETTEROLF, IVAN VENTRESCA AT ZUCKERMAN,

4   JAY COHEN.  AND THEN MY PEOPLE.

5       THE COURT:  WHY DON'T YOU RESEND IT JUST IN CASE.

6       MS. OLSON:  OKAY.  MY RECEPTION IS NOT GREAT.  IT KEEPS

7   TELLING ME IT CAN'T FORWARD THE ATTACHMENT.  I'LL TRY AGAIN.

8   MY OFFICE IS SENDING IT AGAIN.

9       THE COURT:  GIVE US A HEADS UP WHEN YOU HAVE RECEIVED

10  IT.

11      MS. OLSON:  YOU MIGHT HIT REFRESH.

12      MR. FETTEROLF:  I AM.  I HAVEN'T SEEN IT YET.  I

13  ABSOLUTELY WILL.

14

15                  (PAUSE IN THE PROCEEDINGS.)

16

17      MR. FETTEROLF:  STILL NOTHING ON MY END.  YOU MAY WANT

18  TO CHECK THE OUTBOX TO SEE WHETHER IT GOT CAUGHT UP IN

19  YOUR -- IN SENDING IT OUT.

20      THE COURT:  I THINK IT WAS HER STAFF WHO WAS GOING TO

21  SEND IT OUT.

22      MS. OLSON:  YEAH.  MS. KAMINSKI IS RESENDING.

23      THE COURT:  YOU WANT TO CONFIRM, MS. OLSON, WHETHER SHE

24  SENT --

25      MS. OLSON:  SHE SAID SHE RESENT IT AGAIN.

26      THE COURT:  WHAT TIME DID SHE RESEND?

27      MS. OLSON:  LOOKS LIKE 8:43.

28      THE COURT:  OKAY.  SO 8:43 SHOULD BE THE TIME SIGNATURE

4

```
1   WHEN IT WAS SENT.

2       MS. OLSON:  ORIGINAL WAS SENT AT 8:00 --

3       THE COURT:  32.

4       MS. OLSON:  YEAH.  8:33.

5       MR. FETTEROLF:  IT MAY BE THE SIZE OF -- IF THERE'S

6   ATTACHMENTS, THAT'S ALL I CAN THINK OF GETTING CAUGHT UP IN

7   THE OUTBOX.

8       THE COURT:  YOU MIGHT HAVE MS. KAMINSKI CONFIRM IT'S NOT

9   IN HER OUTBOX WAITING TO BE SENT.

10      MR. FETTEROLF:  ALTHOUGH I.T. ADVICE FROM ME IS VERY

11  DUBIOUS.  PLEASE TAKE THAT WITH A GRAIN OF SALT.  I'VE SEEN

12  THAT ON MY OWN COMPUTER BEFORE.

13      MS. OLSON:  I'VE SENT YOU BIGGER DOCUMENTS THAN THIS.

14  I'M CONFUSED WHY YOU HAVEN'T RECEIVED IT.

15      MR. FETTEROLF:  ESPECIALLY SINCE NEITHER KATE NOR I

16  RECEIVED IT, I'M SURMISING THAT IT'S SOMETHING ON YOUR END

17  WHERE IT'S GETTING CAUGHT UP.  BECAUSE I'D BE SURPRISED

18  NEITHER OF US GOT IT.  LIKE I SAID, IF THE ARGUMENTS ARE

19  SIMILAR TO WHAT WAS PUT IN THE LETTERS, I'M PREPARED TO

20  ADDRESS THEM.  BUT I DON'T KNOW WHAT ELSE WAS WRITTEN IN THE

21  MOTION -- OR IN THE OPPOSITION.

22      THE COURT:  MS. OLSON, IS IT?

23      MS. OLSON:  IT'S ESSENTIALLY THE SAME.  I ADDRESSED

24  FURTHER THE ARGUMENTS THAT MS. HOLLEY MADE EARLIER IN OTHER

25  PROCEEDINGS, THAT THEY WERE ONLY WAITING ON DOCUMENTS FROM

26  SPECIFIC SUBPOENAED DUCES TECUM THAT THEY HAD ASKED FOR

27  DOCUMENTS TO BE SENT TO THE COURT.  I OUTLINED FOR THE COURT

28  THE SPECIFIC SUBPOENAS THAT WE WERE AWARE OF.
```

1    SPECIFICALLY THEY HAD SENT SUBPOENAS OUT TO

2    PALOMAR, ALVARADO MEDICAL CENTER, SCRIPPS, AND THE SAN DIEGO

3    POLICE DEPARTMENT.  AS TO THOSE RECORDS, PALOMAR, WE ALL

4    RECEIVED VIA THE CITY ATTORNEY'S OFFICE FROM PASADENA.

5    ALVARADO, I PROVIDED OPPOSING COUNSEL WITH THE DOCUMENTS THAT

6    I RECEIVED PURSUANT TO MY SUBPOENA.

7    I HAVE NOTHING MORE.  NOTHING LESS.  SCRIPPS, I

8    DIDN'T SUBPOENA.  SO I DON'T KNOW WHAT THEY HAVE.  I DID

9    PROVIDE THEM WITH ADDITIONAL RESULTS OF, LIKE, URINALYSIS

10   THEY HAD ASKED FOR.  AND THE SAN DIEGO POLICE DEPARTMENT, ALL

11   I RECEIVED WAS AN OBJECTION.  I DON'T HAVE RECORDS.  THEY'RE

12   NOT PRODUCING ME RECORDS.  I DO HAVE TWO OF THE POLICE

13   DETECTIVES TESTIFYING.

14   THEY ALSO ISSUED FOUR CIVIL SUBPOENAS.  MOST OF

15   WHICH WERE JUST FOR PRODUCTION OF DOCUMENTS AT THE HEARING,

16   NOT PERSONAL APPEARANCES --

17   THE COURT:  RIGHT.

18   MS. OLSON:  -- TO A KYLE, A MELY, AND A TAYLOR.  I'M

19   AWARE THEY HAVE TEXT MESSAGES FROM KYLE.  MELY PRODUCED LAST

20   TIME WE WERE HERE IN COURT.  MS. HOLLEY TOOK PICTURES.  I

21   DON'T KNOW ANYTHING ABOUT A TAYLOR.  AND THEN THEY'RE ASKING

22   THAT MS. HILL PRODUCE HER TEXT MESSAGES WITH MELY FROM FOUR

23   MONTHS AGO.  I RESPONDED IN MY CORRESPONDENCE SHE DOESN'T

24   HAVE THEM.

25   THEY WANT TEXT MESSAGES FROM BETWEEN HER AND HER

26   FATHER.  I'M NOT PRODUCING THOSE.  THEY'RE PRIVATE.  AND TEXT

27   MESSAGES WITH HER AND A MS. JACKSON.  THAT'S HER A.A.

28   SPONSOR.  I'M NOT PRODUCING THOSE.

1    AND, ALSO, THERE'S NO DISCOVERY.  THERE'S NO FORMAL

2  DISCOVERY.  I JUST KEEP GETTING LETTERS TELLING ME TO PRODUCE

3  OR DEMANDING THAT I PRODUCE ALL THESE RECORDS.  I MEAN, I'M

4  DOING WHAT I CAN TO BE COOPERATIVE.  BUT AT SOME POINT, I

5  HAVE NO OBLIGATION TO.

6    MR. FETTEROLF:  IT LOOKS LIKE THE RESPONSE JUST CAME

7  THROUGH.  I DON'T KNOW IF YOU GOT IT, KATE.

8    MS. MANGELS:  I JUST GOT IT AS WELL A MOMENT AGO.

9    THE COURT:  DO YOU WANT TO TAKE A --

10    MR. FETTEROLF:  SURE.  I SEE A DECLARATION AND THEN SOME

11  EXHIBITS.  THEY SEEM CONSISTENT WITH THE ARGUMENTS I WAS

12  PREPARED TO ADDRESS.

13    THE COURT:  OKAY.

14    MR. FETTEROLF:  I DIDN'T SEE AN OPPOSITION.  BUT MAYBE

15  IT WAS JUST THE DECLARATION IN RESPONSE.

16    MS. OLSON:  WELL, THE FACE SHEET SAYS "PETITIONER'S

17  OPPOSITION."

18    MR. FETTEROLF:  OKAY.  I JUST DIDN'T SEE, LIKE, A LEGAL

19  BRIEF OR SOMETHING.  JUST A DECLARATION.  I JUST WANTED TO

20  MAKE SURE WE GOT, DOREEN, WHAT YOU HAD WANTED SENT.

21    MS. OLSON:  UNDERSTOOD.  IT SOUNDS LIKE YOU HAVE IT

22  ALL.

23    THE COURT:  IT DOES.

24    MR. FETTEROLF:  OKAY.

25    THE COURT:  I WAS LOOKING AT THE LETTER TO MR. GARELICK

26  OF AUGUST 3RD.  ON THE SECOND PAGE OF WHICH SEEMS TO BE A

27  LIST OF THINGS THAT WERE NOT YET RECEIVED AS OF AUGUST 3RD.

28  AND --

1        MR. FETTEROLF:  CORRECT.

2        THE COURT:  -- IS THAT AN EXCLUSIVE LIST OF WHAT IS NOT

3    YET RECEIVED THAT'S BEEN REQUESTED?

4        MR. FETTEROLF:  YES, YOUR HONOR.  IF I CAN, I CAN

5    ADDRESS THAT.  SO WE HAD -- I DON'T KNOW IF YOU WANT THE

6    HISTORY HERE, BUT I THINK THE HISTORY IS RELEVANT.  YOU KNOW,

7    WHEN WE CAME TO THE HEARING, ATTACHED TO THE D.V.R.O.

8    PETITION AND AFFIDAVIT WERE CERTAIN MEDICAL RECORDS.  THEY

9    WERE INCOMPLETE.  MEANING A COUPLE OF PAGES, NOT THE FULL

10   PAGES.  WE, AT THE HEARING, SAID WE HAVE INCOMPLETE RECORDS.

11        WE UNDERSTOOD -- MAYBE WE MISUNDERSTOOD -- THAT

12   WHAT THEY HAD HANDED US WERE THE COMPLETE RECORDS.  THEY

13   WEREN'T.  WE RAISED IT IN A MOTION FOR EXTENSION.  WE WERE

14   PROVIDED THE COMPLETE RECORDS OF WHAT WERE ATTACHED AS WELL

15   AS SOME ADDITIONAL INFORMATION.  BUT IN OUR LETTER, WE SAID,

16   LOOK, THERE'S A HOST OF OTHER RECORDS THAT ARE REFERENCED

17   HERE WITHIN THE RECORDS.  AND THEN WHEN WE GOT THE ADDITIONAL

18   RECORDS, THERE WERE MORE.

19        LET ME JUST KIND OF WALK THROUGH WHAT SOME OF THOSE

20   ARE.  WE HAVE RECORDS OF MRI'S THAT ARE REFERENCED IN THE

21   AFFIDAVIT HERSELF.  WE DON'T HAVE THOSE.  WE HAVE RECORDS OF

22   MRI'S THAT WERE TAKEN THAT WERE REFERENCED IN TEXT MESSAGES

23   ON JUNE 21ST WITH HER FRIEND MELY THAT WE DON'T HAVE.  WE

24   HAVE RECORDS OF PSYCHOLOGICAL TESTING THAT WE DON'T HAVE.

25        WE DID SUBPOENA SCRIPPS, ALVARADO, AND PALOMAR

26   HEALTH.  TO DATE, WE HAVE NOT RECEIVED INFORMATION.

27   ALTHOUGH -- AND KATE WILL CORRECT ME IF I'M WRONG HERE --

28   SCRIPPS AND PALOMAR FIRST OBJECTED.  AND THEN THEY REACHED

1   BACK OUT.  AND WE BELIEVE WE WILL BE GETTING SOME RECORDS

2   FROM THEM.  BUT AT THE MOMENT WE DON'T HAVE THEM, AND WE

3   DON'T KNOW WHAT THEY ARE.

4        ALVARADO HAS NOT RESPONDED.  WE ARE GOING TO TRY TO

5   REACH OUT AGAIN AND GET A CONTACT AND SEE WHERE THAT STANDS.

6   PERHAPS WE'LL HAVE TO FILE A MOTION TO COMPEL.  BUT I THINK

7   WHAT'S IMPORTANT HERE IS THAT, YOU KNOW, THESE CURRENT

8   RECORDS SHOW A NUMBER OF OTHER TESTS AND VISITS.  AND SINCE

9   ONE OF THE ISSUES HERE IS CAN PETITIONER SHOW, QUOTE, PAST

10  ACTS OF ABUSE, I THINK IT'S IMPERATIVE WE HAVE ALL RECORDS

11  RELATED TO THIS.

12        AS I SAID BEFORE -- YOU KNOW, AND JUST TO GIVE YOU

13  A SENSE OF THIS.  IN HER AFFIDAVIT IN PARAGRAPH 21, SHE WROTE

14  THAT SHE SUFFERED SIGNIFICANT HEAD AND FACIAL TRAUMA.  AND

15  THAT THERE WERE SIGNS OF A SKULL FRACTURE.  WHEN WE GOT THIS

16  UPDATED PRODUCTION, WE SAW THERE WERE THREE C.T. SCANS OF HER

17  HEAD, FACE, AND NECK THAT WERE NEGATIVE, SHOWED NO FRACTURE,

18  AND SHOWED NO SWELLING.

19        IN PARAGRAPH 28, SHE REFERENCES MRI'S THAT WERE

20  ORDERED AT A JUNE 3RD DOCTOR'S APPOINTMENT.  THAT'S

21  REFERENCED IN THE SCRIPPS MATERIAL.  I DON'T KNOW WHETHER

22  THAT WAS THE SCRIPPS FACILITY OR SOME OTHER FACILITY.  BUT

23  NONE OF THOSE MRI'S OR RESULTS HAVE BEEN PROVIDED.  I

24  MENTIONED SHE ALSO SAID IN TEXT MESSAGES WITH HER FRIEND

25  MELY, THAT WE RECEIVED VIA SUBPOENA, THAT ON JUNE 21ST SHE

26  HAD ANOTHER FACE AND BRAIN MRI.

27        AND THEN, ALSO, THERE'S REFERENCE TO PSYCHOLOGICAL

28  TESTING.  AGAIN, THIS ISN'T PRIOR TO THE INCIDENT ON THE --

```
 1   ON MAY 15TH.  THIS IS AFTER THE INCIDENT.  AND SO ULTIMATELY
 2   WE'VE REQUESTED ALL THESE AT VARIOUS TIMES.  YES, WE HOPED TO
 3   GET SOME VIA SUBPOENA, BUT WE HAVEN'T.  BUT THESE ARE ALL
 4   RELEVANT RECORDS THAT ARE REFERENCED, YOU KNOW, NOT ONLY IN
 5   HER AFFIDAVIT, BUT IN HER TEXT MESSAGES.
 6         SO WE THINK THEY'RE RELEVANT.  WE THINK THEY'RE
 7   IMPORTANT.  AND, YOU KNOW, ULTIMATELY THEY PUT INTO ISSUE HER
 8   INJURIES IN THIS CASE.  SO I THINK IT'S IMPORTANT THAT WE
 9   HAVE ALL MEDICAL RECORDS RELATING TO IT.
10         AS TO THE PSYCHOLOGICAL TESTING, SOME OF THE
11   ADDITIONAL RECORDS WE RECEIVED SHOW THAT SHE HAS A HISTORY OF
12   INTENTIONAL SELF-HARM.  SO THAT'S AN ISSUE PERTAINING ARE
13   THESE INJURIES CAUSED BY MR. BAUER OR COULD SHE HAVE CAUSED
14   SOME OF THEM HERSELF?  NOW, THAT'S AN ISSUE THAT WAS PUT --
15   THAT'S PUT INTO ISSUE BASED ON THE RECORDS THAT WE SAW.
16         LASTLY, WE HAVE -- THESE RECORDS HAVE TO BE
17   REVIEWED BY OUR OWN EXPERT.  AND DEPENDING ON WHAT
18   INFORMATION THEY SAY, WE MAY HAVE TO HAVE PEOPLE DESCRIBE
19   THEM FOR THEMSELVES.  BUT I GUESS AT THE MOMENT WE DON'T KNOW
20   WHAT ELSE IS OUT THERE.  WE HAVE SUBPOENAED THE ENTITIES
21   WE'RE AWARE OF.  WE HAVEN'T GOTTEN STUFF YET.  ALTHOUGH WE
22   MIGHT GET SOME STUFF THIS WEEK.  BUT THAT'S WHERE WE STAND.
23         THEY ARE HER RECORDS.  WE UNDERSTAND THAT THE SART
24   EXAM IS A LITTLE BIT DIFFERENT, BECAUSE THAT'S CONSIDERED NOT
25   NECESSARILY A MEDICAL RECORD.  THAT'S CONSIDERED ESSENTIALLY
26   A RECORD THAT'S PREPARED FOR PROSECUTION.  WE HAD TO JUMP
27   THROUGH SOME HOOPS TO GET THAT, WHICH WE ALL SORT OF DID
28   TOGETHER.  BUT AT THIS MOMENT, WE'RE SIMPLY WITHOUT THOSE
```

1   RECORDS.

2        THE COURT:  ALL RIGHT.  SO THEN GETTING BACK TO THE

3   AUGUST 3RD LETTER AS KIND OF A LAUNDRY LIST OF THE THINGS

4   THAT YOU HAD BEEN REQUESTING, YOU'VE JUST REFERENCED -- AND

5   CORRECT ME IF I'M MISUNDERSTANDING -- SOME OF THOSE THINGS

6   THAT YOU HAVEN'T RECEIVED YOU'RE EXPECTING YOU WILL LIKELY

7   RECEIVE BECAUSE YOU THINK THEY'RE COMING.  IT SEEMS THE LAST

8   TWO ITEMS, THE FACE AND BRAIN MRI'S THAT WERE REFERENCED AND

9   THE PSYCHOLOGICAL TESTING, ARE THE TWO THINGS THAT WOULDN'T

10  BE SOMETHING YOU WOULD EXPECT COMING FROM THE SUBPOENAS

11  YOU'VE GOT OUTSTANDING.

12       MR. FETTEROLF:  I THINK THAT'S RIGHT.  I MEAN, THE

13  REFERENCE IN THE SCRIPPS PROGRESS NOTES, I'M ASSUMING THE

14  ENTITY THAT UNDERTOOK THEM WAS SCRIPPS.  NOW, IF THEY GOT

15  SENT OUT, YOU KNOW, THE WAY MEDICAL RECORDS WORK, THERE'S A

16  HOST OF ENTITIES.  IF IT TURNS OUT THAT WE SUBPOENAED THE

17  WRONG ENTITY BECAUSE ALL -- THE ONLY ENTITY WE'RE AWARE OF IS

18  THIS ONE, MAYBE WE WON'T GET THEM.  BUT WE SORT OF REFERENCE

19  WHERE THEY CAME FROM.

20            I DON'T HAVE ANY REFERENCE TO THE FACE AND BRAIN

21  MRI'S BECAUSE WE JUST SAW THAT IN THE TEXT MESSAGES.  AND I

22  THINK THE URINALYSIS, MS. OLSON CORRECTLY NOTED THAT THEY

23  HAVE PROVIDED US, SO WE HAVE THAT.  THEN THE PSYCHOLOGICAL

24  TESTING, I DON'T KNOW -- I DON'T KNOW WHERE THE ENTITY IS.

25  WE'RE HAPPY TO SUBPOENA THAT ENTITY IF WE KNOW WHAT THE

26  ENTITY IS.  BUT TO DATE, IT'S NOT REFLECTED IN THE MEDICAL

27  RECORDS.  AND, YOU KNOW, THAT'S WHY WE SIMULTANEOUSLY ASKED

28  PETITIONER'S COUNSEL FOR THIS ALL ALONG.

1    THE COURT:  AND, MS. OLSON, DO YOU HAVE THE

2  PSYCHOLOGICAL TESTING?

3    MS. OLSON:  NO.

4    THE COURT:  DO YOU KNOW WHO HAS THE PSYCHOLOGICAL

5  TESTING?

6    MS. OLSON:  NO.  AND I DON'T EVEN KNOW IF IT TOOK PLACE.

7    THE COURT:  WELL, IT'S APPARENTLY REFERENCED IN THE JUNE

8  3RD SCRIPPS PROGRESS NOTES, WHICH YOU HAVE.

9    MS. OLSON:  RIGHT.

10    THE COURT:  CORRECT.

11    MS. OLSON:  CORRECT.  I DON'T HAVE THAT IN FRONT OF ME.

12  I DON'T KNOW IF IT WAS REFERENCED AS BEING RECOMMENDED OR

13  HAVING BEEN UNDERTAKEN WHEN SHE WAS AT THE HOSPITAL THAT

14  NIGHT.

15    THE COURT:  AND IN YOUR LETTER TO MR. GARELICK,

16  MR. FETTEROLF, YOU SEEM TO INDICATE "REFERENCED" AND

17  "RECOMMENDED," WHICH DOESN'T TELL ME WHETHER IT EVER

18  OCCURRED.  DO YOU HAVE SOME REASON TO BELIEVE THAT IT DID?

19    MR. FETTEROLF:  WELL, AGAIN, I MEAN THAT'S WHY WE ASKED

20  BECAUSE IF THE RECORDS -- I MEAN, IT DOESN'T SOUND LIKE I'M

21  GETTING A REPRESENTATION THAT THEY DID OR DID NOT OCCUR.  SO

22  THE ANSWER IS THEY REFERRED HER TO TESTING.  I THOUGHT THE

23  ANSWER, AT LEAST IN THE LETTER THAT WE RECEIVED FROM

24  MS. OLSON, SHE SAID WE'RE NOT ENTITLED TO IT.  SO THAT

25  SUGGESTED TO ME THAT IT DID OCCUR.  AND SHE IS ARGUING WE'RE

26  NOT ENTITLED TO IT.

27    THE COURT:  THAT WAS MY UNDERSTANDING, THAT YOU ARE

28  GOING TO RELY ON PRIVACY.  BUT THEN YOU JUST TOLD ME YOU

```
 1   DON'T EVEN KNOW THAT IT EXISTS.
 2       MS. OLSON:  TO THE EXTENT IT EXISTS, I WOULD RELY ON
 3   PRIVACY GROUNDS OR THE PSYCHOTHERAPIST-PATIENT PRIVILEGE.
 4   BUT AS MY REPRESENTATION TO THE COURT, MY CLIENT DOES NOT
 5   BELIEVE THAT SHE UNDERWENT ANY PSYCHOLOGICAL TESTING WHEN SHE
 6   WAS EXAMINED THAT EVENING.  LATER TESTS SHE DOESN'T BELIEVE
 7   THAT SHE WENT UNDERWENT.  SHE IS NOT REAL CLEAR IF SHE DID OR
 8   SHE DIDN'T.  BUT SHE DOESN'T BELIEVE THAT SHE UNDERWENT ANY
 9   PSYCHOLOGICAL TESTING.
10       MR. FETTEROLF:  I DON'T EVEN -- I'M NOT REALLY SURE I
11   UNDERSTAND WHAT THAT -- I MEAN, SHE EITHER HAD TESTING OR
12   NOT.  SHE EITHER WENT TO SOMEONE OR NOT.
13       MS. OLSON:  SHE DOESN'T KNOW WHAT EXACTLY THE TESTING
14   ENTAILS.  SO SHE IS NOT REALLY CLEAR WHETHER SHE DID OR SHE
15   DIDN'T.  BUT I'M HAPPY TO PROVIDE YOU AND THE COURT WITH A
16   DECLARATION UNDER PENALTY OF PERJURY BY MY CLIENT THAT SHE
17   DOES NOT -- DID NOT UNDERGO PSYCHOLOGICAL TESTING, WHICHEVER
18   WAY THAT LANDS.
19       THE COURT:  SO IT MAY -- WOULD IT BE CORRECT TO SAY THAT
20   IT'S A MATTER OF HER INTERPRETATION WHETHER THERE WAS
21   PSYCHOLOGICAL TESTING?  SO, BY WAY OF EXAMPLE, WHEN ONE IS IN
22   AN EMERGENCY ROOM AND ONE HAS ALLEGED ONE HAS HAD SOME FACIAL
23   OR HEAD INJURIES, THEY MIGHT ASCERTAIN THAT YOU KNOW WHERE
24   YOU ARE, AND WHO YOU ARE, AND WHO THE PRESIDENT IS, OR
25   SOMETHING LIKE THAT.  IS SHE INTERPRETING THAT AS A
26   PSYCHOLOGICAL TEST?
27       MS. OLSON:  SHE DOESN'T KNOW IF THAT WAS WHAT THEY
28   INFERRED OR IF THEY ASKED HER QUESTIONS AND THAT WAS A
```

1    PSYCHOLOGICAL TEST AT ANY OF THE FOLLOW-UPS.

2         THE COURT:  SHE DOESN'T REMEMBER GOING TO A PSYCHOLOGIST

3    OR PSYCHIATRIST FOR THE PURPOSE OF BEING TESTED?

4         MS. OLSON:  NO.  NO.

5         MR. FETTEROLF:  WELL, I GUESS, I'M STILL A LITTLE

6    CONFUSED.  SO IF SHE -- I MEAN, THE WAY WE'RE WRITING THE

7    REQUEST IS SIMPLY THERE'S AN INCIDENT THAT OCCURRED ON THE

8    15TH OR -- 15TH/16TH.  THAT'S AN ISSUE IN THIS HEARING.  IF

9    THERE ARE MEDICAL RECORDS ASSOCIATED WITH THAT, THEN I THINK

10   WE'RE ENTITLED TO THEM.  I DON'T THINK I EVER HEARD -- I

11   MEAN, IF SHE HAS A DOCTOR'S APPOINTMENT BECAUSE SHE SPRAINED

12   HER ANKLE LAST WEEKEND, I DON'T THINK THAT'S RELEVANT.  BUT

13   IF IT'S RELATED TO THIS INCIDENT, I MEAN, SHE MADE REFERENCE

14   TO HAVING PTSD AND OTHER THINGS.

15         SO SHE WENT TO SEE A PSYCHOLOGIST OR WENT OUT AND

16   SAW A DOCTOR THAT RELATES TO THIS, I MEAN, I THINK WE'RE

17   ENTITLED TO LOOK AT IT AND EXAMINE IT.

18        THE COURT:  RIGHT.  MY UNDERSTANDING FROM MS. OLSON IS

19   THE REPRESENTATION IS SHE HAS NOT; IS THAT CORRECT?

20        MS. OLSON:  CORRECT.  AS TO PSYCHOLOGICAL TESTING, SHE

21   DID NOT UNDERGO PSYCHOLOGICAL TESTING.  SHE DIDN'T TAKE AN

22   M.M.P.I.  SHE DIDN'T TAKE A RORSCHACH.  NO.

23        MR. FETTEROLF:  DID SHE SEE A PSYCHOLOGIST BASED ON --

24   PERTAINING TO THIS ENCOUNTER?

25        MS. OLSON:  YOU KNOW, I CAN'T MAKE THAT REPRESENTATION

26   AS I STAND HERE RIGHT NOW.  AND TO THE EXTENT THAT SHE DID, I

27   BELIEVE IT'S PRIVILEGED.

28        THE COURT:  I THINK SHE HAS WAIVED THE ISSUE, IF SHE

```
 1   HAS.  BUT THAT WASN'T WHAT WAS REQUESTED.  IT APPEARS WHAT
 2   WAS REQUESTED WAS TESTING.
 3        MS. OLSON:  CORRECT.
 4        MR. FETTEROLF:  WELL, I THINK, YOUR HONOR, I MEAN, IF WE
 5   GO BACK AND PULL UP THE LETTERS, I THINK WE ASKED FOR --
 6   BECAUSE WE DON'T KNOW WHAT EXISTS THAT'S NOT THERE.  WE
 7   REQUESTED ALL THE MEDICAL RECORDS RELATING TO THE INCIDENT.
 8   WE HAVEN'T REQUESTED ANYTHING PRIOR TO THAT.  AND SO IF SHE
 9   SAW A PSYCHOLOGIST THAT RELATED -- THAT STEMS OUT OF THIS
10   INCIDENT, BECAUSE SHE REFERENCES IN HER OWN AFFIDAVIT PTSD.
11   SHE REFERENCES PSYCHOLOGICAL TESTING AND THE LIKE.  WHETHER
12   IT'S TESTING, OR A MEETING, OR SOMETHING TO DO WITH THIS
13   INCIDENT, I THINK WE'RE ENTITLED TO IT.
14        SO I'M STILL A LITTLE CONFUSED, BECAUSE IT SOUNDS
15   LIKE WHAT I'M HEARING IS THERE WASN'T SOME FORMAL TESTING,
16   BUT THERE WERE VISITS TO MEDICAL PROFESSIONALS PERTAINING TO
17   PSYCHOLOGICAL ISSUES AND THE LIKE.  BUT I'M -- I AM NOT IN
18   POSSESSION OF THAT INFORMATION.  SO I CAN'T REALLY ANSWER THE
19   QUESTION.
20        THE COURT:  RIGHT.  THE PROBLEM IS THIS IS AN EXPEDITED
21   PROCEDURE.  SO TO THE EXTENT THAT YOU'VE ASKED FOR SOMETHING
22   THAT IS REASONABLE TO PRODUCE, I'M NOT SURE WHAT YOU HAVEN'T
23   YET GOTTEN THAT YOU'RE -- THAT YOU SHOULD HAVE IN ORDER TO BE
24   ADEQUATELY PREPARED TO DEFEND.
25        MR. FETTEROLF:  WELL, I GUESS, I'M POINTING OUT FOR --
26   WE DON'T HAVE THE MRI'S YET -- TWO SETS OF MRI'S.  I GUESS
27   I'M NOT AWARE OF -- AND I DON'T THINK WE SHOULD BE PENALIZED
28   FOR NOT BEING AWARE OF MEDICAL FACILITIES THAT SHE VISITED
```

1    RELATED TO HER INJURIES.  SO THAT'S WHY WE ASKED THE

2    PETITIONER IF THERE ARE MEDICAL RECORDS, PROVIDE THEM.  AND

3    SO THAT'S SORT OF WHERE WE ARE.

4         WE'VE IN GOOD FAITH GONE OUT AND SUBPOENAED THE

5    ENTITIES WE'RE AWARE OF.  AND WE -- WE SIMULTANEOUSLY ASKED

6    FOR THEM FROM PETITIONER.  AND YET -- YES, WE MIGHT GET SOME

7    THIS WEEK FROM AT LEAST TWO OF THE ENTITIES.  OBVIOUSLY ONCE

8    WE GET THEM, WE'LL SHARE THEM WITH EVERYONE ELSE.  BUT, YOU

9    KNOW, THAT'S THE ISSUE.  THE RETURN DATE ON THE SUBPOENAS WAS

10   THE 2ND.  WE'VE BEEN FOLLOWING UP AND WORKING WITH THESE

11   PEOPLE.  WE STILL DON'T HAVE THEM.

12        I DON'T KNOW WHAT WE'RE GOING TO GET AND HOW IT

13   COMPARES TO THE INFORMATION THAT THEY'VE REFERENCED IN THE

14   AFFIDAVIT AND THEN IS REFERENCED IN THE MEDICAL RECORDS.  SO

15   THAT'S WHY WE'VE COME TO THE COURT, BECAUSE WE DON'T WANT TO

16   SIT THERE AND WAIT UNTIL THE HEARING AND SAY WE'RE MISSING

17   ALL THIS STUFF.  WE'RE TRYING TO RAISE IT.  BUT, YOU KNOW, IF

18   THEY'RE GOING TO PUT UP A SANE NURSE WHO'S GOING TO TALK

19   ABOUT INJURIES, LIKE, WE HAVE THE RIGHT TO LOOK AT THE OTHER

20   INFORMATION, TO ASK THE SANE NURSE ABOUT THIS INFORMATION.

21   AS WELL AS HAVE OUR OWN PEOPLE EVALUATE THE INFORMATION.  IF

22   THERE'S A NEED, HAVE THEM TESTIFY ABOUT THESE RECORDS.

23        THE COURT:  AND WITH REGARD TO MS. JACKSON, I SAW

24   THAT.

25        MS. OLSON:  MS. JACKSON IS --

26        THE COURT:  IS HER SPONSOR.

27        MS. OLSON:  YES.

28        THE COURT:  BUT SHE'S RAISED THE ISSUE.

```
1        MS. OLSON:  RAISED THE ISSUE OF HER ALCOHOLISM?

2        THE COURT:  OF HER ALCOHOLISM.  OF HER PTSD.  SHE

3   INDICATED THAT MS. JACKSON WAS SOMEBODY WITH WHOM SHE

4   COMMUNICATED AROUND THE TIME OF THE INCIDENTS.  IT IS

5   RELEVANT.  ABSOLUTELY RELEVANT.

6        MS. OLSON:  I'D BE HAPPY -- FIRST OF ALL, THERE WAS NO

7   SUBPOENA SERVED ON MS. JACKSON THAT I'M AWARE OF.  I HAVE NOT

8   BEEN TOLD THAT SHE IS -- I WOULDN'T -- I MEAN, I'M NOT

9   WAIVING ANY PRIVILEGE.  I HAVE NO INFORMATION THAT SHE IS

10  EVADING SERVICE.  SO THERE'S NO OUTSTANDING SUBPOENA TO

11  MS. JACKSON.

12       THE COURT:  WAS MS. JACKSON THE ONE YOU WERE TRYING TO

13  SERVE?

14       MR. FETTEROLF:  YES.  WE TRIED TO SERVE MS. JACKSON AT

15  HER HOME.  SHE LIVES IN A GATED COMMUNITY.  WE'RE TRYING IN

16  OTHER LOCATIONS.  BUT MS. JACKSON IS SPECIFICALLY REFERENCED

17  IN THE AFFIDAVIT.  I MEAN, IT'S NOT LIKE WE SENT OUT

18  SUBPOENAS TO EVERY PERSON UNDER THE SUN.  SHE'S REFERENCED IN

19  THE AFFIDAVIT.  AND I THINK BECAUSE OF THAT, SHE -- THEY HAVE

20  PUT HER INTO EVIDENCE, SO TO SPEAK.  AND, THEREFORE, WAIVED

21  ANY ISSUE PERTAINING TO THE FACT THAT SHE IS AN A.A. SPONSOR.

22            SO IN LIGHT OF THAT, WE CAME TO MS. HILL AND SAID,

23  YOU KNOW, WE'RE STILL TRYING TO SERVE MS. JACKSON.  BUT SINCE

24  YOU HAVE THE MESSAGES, YOU CAN PROVIDE THEM.  AND I THINK HER

25  FATHER, MR. HILL, IS IN THE SAME CIRCUMSTANCE.  HE IS NOT

26  REFERENCED IN THE AFFIDAVIT, BUT HE IS CALLING HER AS A

27  WITNESS -- I'M SORRY.  SHE IS CALLING HIM AS A WITNESS.

28            SO, AGAIN, IF HE IS NOT GOING TO APPEAR AS A
```

```
1    WITNESS, THEN WE DON'T NEED THE INFORMATION.  IF HE IS GOING
2    TO APPEAR AS A WITNESS, I DON'T THINK THERE'S ANY PROTECTION
3    THAT EXISTS IF SHE HAS SORT OF PUT HIM OUT THERE FOR THAT
4    PURPOSE.
5         MS. OLSON:  AS TO MS. JACKSON, I DON'T BELIEVE THERE WAS
6    ANY -- IN HER AFFIDAVIT, THERE WAS ANY REFERENCED
7    CONVERSATIONS.  TO THE EXTENT THERE WERE, I'D BE HAPPY TO
8    PROVIDE ANY TEXT MESSAGES THAT MY CLIENT HAS.  I HAVE NO
9    POWER OR AUTHORITY OVER -- TO MAKE ANY REPRESENTATIONS AS TO
10   MS. JACKSON.  SO I CAN ONLY PRODUCE WHAT MY CLIENT HAS WITH
11   MS. JACKSON.
12        AS TO MR. HILL, I THINK IT'S PRIVACY.  WE DIDN'T
13   MENTION HIM IN THE AFFIDAVIT, YOUR HONOR.
14        THE COURT:  ALL RIGHT.  SO --
15        MR. FETTEROLF:  YOU'RE CALLING HIM AS A WITNESS.
16        THE COURT:  IF YOU'RE CALLING HIM AS A WITNESS, THEN I
17   WOULD HAVE YOU BRING TO COURT ON THE DAY OF HIS TESTIMONY ANY
18   COMMUNICATIONS, TEXTS, OR EMAIL COMMUNICATIONS BETWEEN YOUR
19   CLIENT AND MR. HILL.
20        MS. OLSON:  WILL DO.
21        MR. FETTEROLF:  AND MS. JACKSON IS REFERENCED IN THE
22   AFFIDAVIT.  SHE IS REFERENCED AS LISA M.  THAT'S WHY WE
23   SUBPOENAED HER.
24        MS. OLSON:  OKAY.  I'LL TRY TO GET THOSE TO YOU, AGAIN,
25   TO THE EXTENT THEY EXIST AND MY CLIENT HAS THEM.  AGAIN, I
26   HAVE NO POWER OVER LISA M.  JUST AS TO MY CLIENT.  SO I'D BE
27   HAPPY TO PROVIDE WHATEVER MY CLIENT HAS IN TERMS OF TEXT
28   MESSAGES BETWEEN HER AND HER SPONSOR.
```

```
 1        THE COURT:  ALL RIGHT.  AND CAN YOU GET THOSE TO COUNSEL
 2   BY WEDNESDAY?
 3        MS. OLSON:  TODAY.
 4        THE COURT:  TODAY.  THERE YOU GO.
 5        MS. OLSON:  AS SOON AS I GET BACK TO THE OFFICE.  AS YOU
 6   CAN SEE, I WAS A LITTLE PARANOID ABOUT APPEARING ONLINE
 7   AGAIN.
 8        THE COURT:  I UNDERSTAND.
 9        MS. OLSON:  I HAD ANOTHER ISSUE.
10        THE COURT:  MS. MANGELS NOW APPRECIATES IT'S A
11   DISCONCERTING THING WHEN YOU CAN'T GET THROUGH.
12        MS. MANGELS:  YES.  THANKS FOR ACCOMMODATING AND
13   ALLOWING ME TO DIAL IN ON A DIFFERENT NUMBER.
14        THE COURT:  NO PROBLEM.  ANYTHING ELSE?
15        MR. FETTEROLF:  JUST -- YOUR HONOR, JUST SO I CAN
16   UNDERSTAND.  SO THE LISA JACKSON MESSAGES WE'LL GET TODAY.
17   AND THE FATHER MESSAGES, IF HE IS GOING TO TESTIFY, THEY'LL
18   BE GIVEN TO US PRIOR -- AT SOME POINT PRIOR TO HIS TESTIMONY
19   SO WE CAN REVIEW THEM AND USE THEM AS WE SEE FIT; IS THAT
20   WHAT I UNDERSTAND?
21        THE COURT:  THAT IS CORRECT.
22        MS. OLSON:  AND JUST FOR FULL DISCLOSURE, I JUST ASKED
23   MY CLIENT TO THE EXTENT SHE WAS REFERRED OR HAS THERAPY IN
24   CONNECTION WITH THIS INCIDENT, SHE WAS REFERRED AND HAS MET
25   WITH A THERAPIST THREE TIMES CONCERNING THE PTSD, DEPRESSION
26   SYMPTOMS.
27        THE COURT:  WHO IS THAT?
28        MS. OLSON:  I DIDN'T GET A NAME.  NAME.  WHAT DID WE DO
```

```
1    BEFORE TEXT MESSAGES AND EMAILS?

2         THE COURT:  WE DID THINGS A LOT SLOWER.  HORSES AND

3    BUGGIES WERE INVOLVED.

4         MS. OLSON:  PIGEONS.

5         MR. FETTEROLF:  YOUR HONOR, WHILE WE'RE, I GUESS,

6    WAITING TO FIND OUT THE NAME OF THE PSYCHOLOGIST THAT

7    MS. HILL MET WITH, DO WE WANT TO GO ON TO ANOTHER ISSUE WHILE

8    WE WAIT THAT WE RAISED?  THAT'S UP TO YOU.

9         THE COURT:  SURE.  GO RIGHT AHEAD.

10        MR. FETTEROLF:  I GUESS THE OTHER ISSUE WE RAISED WAS WE

11   REQUESTED THAT MS. HILL PROVIDE TWO VIDEOS THAT SHE SENT TO

12   HIM VIA INSTAGRAM DIRECT MESSAGES WHERE SHE POINTS TO -- AND

13   THESE WERE, I BELIEVE, I SAID APRIL 29TH.  SO BETWEEN THE

14   FIRST ENCOUNTER AND THE SECOND -- WHERE SHE SORT OF REFERS TO

15   BRUISES ON HER BODY AND CLAIMS THEY RESULTED FROM HER FIRST

16   SEXUAL ENCOUNTER WITH MR. BAUER.  NOW, BECAUSE THESE

17   INDIVIDUALS NO LONGER FOLLOW EACH OTHER ON INSTAGRAM,

18   MR. BAUER NO LONGER HAS ACCESS TO THE INSTAGRAM MESSAGES.

19   NOW, WE WERE ABLE TO, AT SOME POINT WHEN WE GOT NOTICE OF

20   THIS, YOU KNOW, PRINT THEM OUT.  BUT THE VIDEOS, WE COULDN'T

21   ACCESS.

22        AND SO THERE'S TWO VIDEOS AT ISSUE.  ONE, 4/29 AT

23   9:38 A.M. SHE REFERS TO THE VIDEO WHEN MR. BAUER ASKED, "I

24   HAVE NO IDEA.  PROBABLY YOUR THUMB.  LOL.  JUST A BRUISE IN

25   THE SHAPE OF A FINGERPRINT."  AND THEN WHEN HE ASKED WHERE,

26   SHE WRITES, YOU KNOW, "RIGHT BY MY PRIZED POSSESSION."  AND

27   AFTER APOLOGIZING FOR -- I THINK IT SAID, "IF THAT WAS ME, I

28   APOLOGIZE."  AND SHE SAID, "THAT'S OKAY."  YOU KNOW, "I'M
```

```
 1   INTO IT."
 2            AND SO I THINK THEY'RE HIGHLY RELEVANT FOR A NUMBER
 3   OF REASONS.  FIRST, IN THE SART EXAMINATION, THERE IS SOME
 4   BRUISING ON THE BUTTOCKS AND VAGINAL AREA.  SO IN THESE
 5   VIDEOS PERTAINING TO THE FIRST ENCOUNTER, SHE IS SENDING
 6   PICTURES THAT LOOK LIKE BRUISES IN A JOKING MANNER.  THEY
 7   LOOK SIMILAR TO THE SECOND ENCOUNTER.  I THINK THAT'S
 8   RELEVANT AND HELPFUL TO THE DEFENSE.
 9            SECOND, IN PROVIDING PATIENT HISTORY TO THE SANE
10   NURSE, WHERE SHE MAKES NO CLAIMS OF ASSAULT IN THE FIRST
11   INCIDENT.  AND WHILE SHE ADMITS TO HAVING ROUGH SEX IN THE
12   FIRST INCIDENT, SHE NOTES THERE WERE NO BRUISES ON HER BODY
13   AT ALL.  THIS SEEMS TO CONTRADICT WHAT SHE TOLD TO THE SANE
14   NURSE, AND, THEREFORE, ARE RELEVANT.  BECAUSE I UNDERSTAND
15   THE RESPONSE FROM MS. OLSON WAS SHE DELETED THE ENTIRE
16   INSTAGRAM CHAIN BECAUSE SHE DIDN'T WANT TO LOOK AT MESSAGES
17   FROM MR. BAUER ANY LONGER.
18            I DON'T THINK, YOU KNOW, THAT'S A REASON TO DELETE
19   RELEVANT INFORMATION -- THE CLAIMS THAT ARE RELEVANT TO
20   CLAIMS AND DEFENSES.  PLUS WE KNOW THAT DELETION DID NOT
21   OCCUR UNTIL WELL AFTER SHE MET WITH THE POLICE, HIRED
22   COUNSEL, AND CONTEMPLATED HER OWN CLAIMS.
23            WE KNOW FROM HER AFFIDAVIT THAT SHE MET WITH THE
24   POLICE ON MAY 18TH.  AND WE KNOW SHE CLAIMS SHE LATER MET
25   WITH THEM AGAIN ON MAY 21ST.  WE KNOW FROM TEXTS WITH KYLE
26   ERICSON ON MAY 18TH THAT SHE SAID HER FATHER IS GETTING HER
27   AN ATTORNEY.  WE ALSO KNOW THAT AFTER THE CRIMINAL
28   INVESTIGATION WAS INITIATED, BUT BEFORE THE D.V.R.O. WAS
```

```
1   FILED, SHE QUOTE -- SHE SAID TO HER FRIEND MELY, QUOTE,
2   "DRIVING TO IRVINE TO GIVE MY LAWYER MY PHONE TO DOWNLOAD
3   TREVOR'S TEXTS."  THAT MESSAGE IS DATED JUNE 28TH.
4           IT APPEARS THEY IMAGED HER PHONE.  WE KNOW AT THE
5   TIME SHE STILL HAD MESSAGES RELATING TO MR. BAUER ON HER
6   PHONE.  WE ALSO KNOW THAT THE PETITION ITSELF INCLUDED
7   SCREENSHOTS OF HER MESSAGES WITH MR. BAUER, WHICH SHE SAID
8   SHE HAD ACCESS TO THOSE IMAGES AT LEAST AT THE TIME OF THE
9   FILING ON JUNE 29TH.
10          SO IT APPEARS WHILE BASED ON WHAT MS. OLSON WROTE,
11  IT'S UNDISPUTED THAT AFTER THERE WERE CONSIDERATION OF
12  POTENTIAL CLAIMS, HAD COUNSEL, THAT RELEVANT INFORMATION WAS
13  DELETED.  AND I THINK THAT PRESENTS A SIGNIFICANT ISSUE.
14      THE COURT:  WELL, IT MAY PRESENT A SIGNIFICANT ISSUE,
15  BUT FOR PURPOSES OF YOUR DISCOVERY REQUEST, HOW DOES IT MAKE
16  IT APPEAR?
17      MR. FETTEROLF:  I LOST THAT.
18      THE COURT:  YES.
19      MR. FETTEROLF:  MAYBE I DIDN'T UNDERSTAND THE
20  QUESTION.
21      THE COURT:  I DON'T DISAGREE.  ASSUMING EVERYTHING
22  YOU'RE SAYING IS TRUE, IT CREATES AN ISSUE FOR ME, AMONG
23  OTHERS.  BUT IT DOESN'T CREATE SOMETHING THAT NO LONGER
24  EXISTS.  DO YOU HAVE A METHOD BY WHICH IT CAN BE RECAPTURED
25  SO THAT IT CAN BE PRODUCED TO YOU?
26      MR. FETTEROLF:  ARE YOU ASKING ME THAT, YOUR HONOR?
27      THE COURT:  I AM.  IF YOU THINK IT'S SOMEWHERE -- IF YOU
28  THINK IT WAS COPIED, I DON'T HAVE A PROBLEM MAKING AN ORDER
```

```
 1   THAT IT BE PRODUCED.  BUT IF SHE SHOULDN'T HAVE, BUT DID
 2   DELETE IT PERMANENTLY, I WOULD NEED TO KNOW WHAT ORDER YOU'RE
 3   ASKING ME TO MAKE TO MAKE IT BE PRODUCED TO YOU,
 4   NOTWITHSTANDING ITS HAVING BEEN DELETED PERMANENTLY.
 5        MR. FETTEROLF:  SO AS TO THE FIRST QUESTION, YOUR HONOR,
 6   I'M JUST GOING BY MS. OLSON'S REPRESENTATION THAT HER CLIENT
 7   DELETED IT.  SO IF THAT IS INACCURATE, THEN, I MEAN, IT
 8   APPEARS LIKE THEY IMAGED HER PHONE, WHICH AS LAWYERS, WHEN
 9   THERE ARE NOTICE OF CLAIMS, THAT'S ONE OF THE THINGS WE DO.
10   SO, I GUESS, THE FIRST THING WOULD BE CHECKING THE PHONE TO
11   SEE IF IT'S STILL THERE.  BUT I DIDN'T REALLY ADDRESS THAT,
12   BECAUSE THE MESSAGE I GOT WAS SHE DELETED IT.  SHE DOESN'T
13   HAVE IT.
14        THE COURT:  MS. OLSON, WAS THE PHONE IMAGED AT ANY POINT
15   FROM THE DATE OF THE INCIDENT -- THE FIRST INCIDENT UNTIL
16   NOW?
17        MS. OLSON:  AND I'M SORRY.  I'M NOT TECHNICALLY SAVVY.
18   CAN YOU EXPLAIN, YOUR HONOR, WHAT YOU MEAN BY "IMAGED"?
19        THE COURT:  YES.  DID SOMEONE GO INTO THE PHONE AND MAKE
20   A DUPLICATE COPY OF THAT WHICH WAS ON THE PHONE OR SOME
21   PORTION OF THAT?  SPECIFICALLY THE PORTION THAT CONTAINED THE
22   TWO VIDEOS BEING REFERENCED.
23        MS. OLSON:  THAT, MY CLIENT GAVE HER PHONE TO THE
24   PASADENA POLICE DEPARTMENT.  THEY REPRESENTED TO HER THAT
25   THEY WERE ONLY TAKING THE MESSAGES BETWEEN HER AND TREVOR.
26   SO THAT'S ALL WE KNOW IN TERMS OF IMAGING.  IF THERE WAS ANY
27   IMAGING DONE, IT MUST HAVE BEEN DONE BY PASADENA POLICE
28   DEPARTMENT.  ALL I'M SAYING, AND AS AN OFFER OF PROOF, IS
```

1    THAT MY CLIENT DELETED THE INSTAGRAM VIDEOS, I GUESS, THEY'RE

2    CALLED.  SHE DOESN'T HAVE THEM.

3           WE CONTACTED INSTAGRAM THROUGH FACEBOOK TO SEE WHAT

4    WAS RECOVERABLE.  WE COULD NOT GET ANYTHING.  AND THEY SHOULD

5    BE RECOVERABLE BY TREVOR AS WELL SINCE HE WAS A RECIPIENT.  I

6    DON'T HAVE ANY GREATER ABILITY TO OBTAIN THEM THAN THEY WOULD

7    HAVE.

8        THE COURT:  WELL, I DON'T THINK THEY RESIDE ON HIS --

9    WHATEVER DEVICE HE RECEIVED THEM ON.  THAT'S THEIR PROBLEM.

10   IF THEY HAD THAT, THEY WOULDN'T BE ASKING FOR IT.  THE

11   PROBLEM IS IT ONLY IS BECAUSE IT WAS ON HER INSTAGRAM PAGE

12   THAT IT WAS VIEWABLE.

13       MS. OLSON:  WELL, SHE SENT IT TO HIM.

14       THE COURT:  SHE SHOWED IT TO HIM.

15       MS. OLSON:  I THINK SHE SENT IT TO HIM VIA INSTAGRAM

16   DM --

17       MR. FETTEROLF:  YOUR HONOR --

18       MS. OLSON:  -- IS WHAT THE CLAIM IS.

19       MR. FETTEROLF:  YOUR HONOR, WE CAN'T ACCESS IT NOW.  NOW

20   HE CAN'T ACCESS HER INSTAGRAM MESSAGE.  WE HAVE THEM PRINTED

21   OUT VIA THE P.D.F., BECAUSE CERTAINLY WHEN WE BECAME AWARE OF

22   THIS, THEY WERE STILL FOLLOWING EACH OTHER.  SO HER BLOCKING

23   HIM VIA INSTAGRAM CAME SOMETIME AFTER THE INVESTIGATION.  BUT

24   THE VIDEOS RESIDE WITH HER.

25           AND AS TO IMAGING, I POINT MS. OLSON OUT TO WHAT

26   SHE WROTE TO HER FRIEND MELY, THAT SHE WAS "DRIVING TO IRVINE

27   TO GIVE MY LAWYER MY PHONE TO DOWNLOAD TREVOR'S TEXTS."  I

28   DON'T KNOW WHETHER THAT IS JUST DOWNLOADING THE MESSAGES.  I

```
 1   DON'T KNOW WHETHER THAT'S IMAGING.

 2            BUT I GO BACK TO THE ISSUE.  THIS IS HIGHLY

 3   RELEVANT AND HELPFUL INFORMATION TO THE DEFENSE THAT IT

 4   APPEARS HAS BEEN, BASED ON MS. OLSON'S REPRESENTATION,

 5   DELETED AFTER SHE HAD KNOWLEDGE OF POTENTIAL CLAIMS.  SO --

 6        MS. OLSON:  AND I --

 7        MR. FETTEROLF:  -- WE MADE THE REQUEST JUST TO GET

 8   THE -- TO GET THE VIDEOS.  BUT IF THE ANSWER IS THE VIDEOS

 9   ARE GONE, I GUESS, WE CAN GO TO THE NEXT QUESTION.  THE FIRST

10   THING WE'D LIKE ARE THE VIDEOS, IF THEY'RE OUT THERE.

11        MS. OLSON:  WE DON'T HAVE VIDEOS.  AND WHAT WE WERE ABLE

12   TO DOWNLOAD WAS VERY LITTLE.  BECAUSE, A, I DON'T KNOW IF SHE

13   GOT A NEW PHONE.  IF SHE -- I DON'T KNOW THAT SPECIFICALLY.

14   SO I KNOW THAT WE DON'T HAVE VIDEOS.  I KNOW WE NEVER

15   DOWNLOADED VIDEOS.  I KNOW THAT THE LIMITED TEXTS WE HAVE --

16   WE ACTUALLY GOT MORE TEXTS FROM MR. FETTEROLF BETWEEN THE

17   PARTIES THAN MY CLIENT.

18        THE COURT:  MS. OLSON, ARE YOU MAKING A REPRESENTATION

19   ON BEHALF OF RIGHT CHOICE LAW, WHICH WOULD BE THE PLACE THAT

20   SHE REFERENCED IN HER TEXT OR EMAIL THAT SHE WAS GOING TO HER

21   LAWYER IN IRVINE -- IT APPEARS RIGHT CHOICE LAW IS ON THE

22   BORDER OF NEWPORT BEACH AND IRVINE.

23        MS. OLSON:  WE ACTUALLY HAVE AN OFFICE IN IRVINE.  I

24   THINK THAT REFERENCE MIGHT HAVE BEEN -- DEPENDING ON THE

25   DATE, MIGHT HAVE BEEN EITHER FOR MR. THIAGARAJAH OR MY

26   OFFICE.  WE DON'T HAVE ANYTHING THAT WAS DOWNLOADED.  WE HAVE

27   VERY LITTLE TEXTS AND NO VIDEOS.  WE ACTUALLY -- LIKE, I'M

28   SAYING, WE GOT MORE TEXTS FROM MR. FETTEROLF THAN WE WERE
```

```
 1   ABLE TO GET FROM OUR OWN CLIENT.  AND ANY TEXTS THAT WERE
 2   ATTACHED WERE PHOTO -- LIKE SHE TOOK A SNAPSHOT OF THE TEXT.
 3   SHE DOESN'T HAVE THE LIVE FILE, I GUESS, YOU WOULD SAY.  SO
 4   WE DON'T HAVE IT.  SHE DOESN'T HAVE IT.
 5        MAYBE THE POLICE DEPARTMENT HAS IT.  I DON'T KNOW.
 6   SINCE THEY WERE THE ONLY ENTITY RIGHT AFTER THE INCIDENT TO
 7   HAVE HER PHONE.  THEY TOOK IT AND HAD IT.  AGAIN, WHAT THEY
 8   DID WITH IT -- BECAUSE I KNOW THAT THEY DOWNLOADED MORE THAN
 9   JUST TEXTS BETWEEN HER AND TREVOR -- I DON'T KNOW.
10        THE COURT:  SO IT SOUNDS LIKE PASADENA POLICE IS THE
11   ENTITY MOST LIKELY TO HAVE A VIDEO IF IT WAS RESIDING ON HER
12   PHONE OR THROUGH HER INSTAGRAM ACCOUNT.
13        MS. OLSON:  THAT WOULD BE MY BEST ESTIMATE, YOUR HONOR,
14   AS TO WHO, IF ANYONE, HAS IT.
15        MR. FETTEROLF:  I GUESS, YOUR HONOR -- I MEAN, WE WERE
16   ABLE TO DOWNLOAD A FULL SET OF THE IMAGES.  OKAY.  WE CAN'T
17   ACCESS THE VIDEO.  SO WE KNOW THAT WAS AFTER THE FACT OF THIS
18   INCIDENT, WHETHER HER REPORT TO THE POLICE AND THE LIKE.  SO
19   I THINK IT GOES BACK TO, SHE HAD THIS INFORMATION.  AND WHAT
20   WE'RE HEARING IS AFTER SHE MADE A REPORT TO THE POLICE, AFTER
21   SHE HIRED A LAWYER, SHE DELETED IT.
22        THE COURT:  YES, THAT'S WHAT YOU'RE HEARING.  EXACTLY.
23   WHAT CAN I DO FOR YOU WITH REGARD TO THAT?  I CAN'T GO BACK
24   AND MAKE HER NOT HAVE DONE SO.
25        MR. FETTEROLF:  WELL, I GUESS, I MEAN, ULTIMATELY I
26   THINK IT'S SPOLIATION ISSUE.  I GUESS WE CAN FILE --
27        THE COURT:  I AGREE.  IT IS A SPOLIATION ISSUE.  YOU
28   HAVE THE STILLS FROM SOMETHING YOU KNOW TO HAVE BEEN A VIDEO.
```

1        MR. FETTEROLF:  SO, I MEAN, I CAN -- I MEAN, GOING BACK

2   TO WHAT OTHER COURTS HAVE DONE IN THESE CIRCUMSTANCES, YOU

3   TAKE AN ADVERSE INFERENCE THAT THIS WAS INFORMATION HELPFUL

4   TO THE DEFENSE THAT WAS DELETED.  THERE ARE LIMITING -- I

5   MEAN, THERE'S A RANGE OF OUTCOMES FROM, YOU KNOW, DISMISSAL

6   OF THE ENTIRE CASE, TO A STIPULATION THAT, YOU KNOW, LIMITING

7   CERTAIN EVIDENCE.

8            SO THIS IS INFORMATION THAT APPEARS TO SHOW

9   BRUISING AROUND HER BUTTOCKS OR VAGINA AREA.  SO THAT PART IS

10  OUT OF THE CASE BECAUSE WE CAN'T USE THIS TO DEFEND THIS

11  GOING FORWARD.  WE ARE HAPPY TO PROVIDE BRIEFING ON THAT TO

12  YOU, IF YOU LIKE, AND CITE THE CASE LAW AND MAKE SOME

13  SUGGESTIONS.  BUT I DON'T KNOW HOW YOU WOULD LIKE TO HANDLE

14  IT.

15       THE COURT:  YOU HAVE GOT THE STILLS OF THE VIDEO;

16  CORRECT?

17       MR. FETTEROLF:  IT JUST SAYS "VIDEO."

18       THE COURT:  I'M SORRY.

19       MR. FETTEROLF:  WE HAVE WHAT SHE DESCRIBED.  IT SAYS

20  "VIDEO."  WE KNOW THERE'S A VIDEO.  WE CAN'T ACCESS IT.  AND

21  WE KNOW HOW SHE DESCRIBES IT.  YOU KNOW, SHE DESCRIBES IT AS

22  A THUMBPRINT ON HER BUTT.  AND THEN SAID "NEAR HER PRIZED

23  POSSESSION."  SO THAT'S WHY I'M INFERRING THAT SHE IS

24  REFERENCING BRUISES ON HER BUTTOCKS AND NEAR HER VAGINAL

25  AREA.

26       THE COURT:  BUT DO YOU HAVE STILL PHOTOS?  WAS THAT NOT

27  WHAT YOU ATTACHED TO YOUR MOTION?

28       MR. FETTEROLF:  NO.  WE DON'T HAVE -- IT JUST SAYS

1  "VIDEO."  AND WE HAVE HER DESCRIPTION.  SO I'M GOING BY, YOU

2  KNOW, WHEN SHE SAYS -- SHE SENDS IT.  MR. BAUER SAYS, "WHAT

3  IS THAT?"  AND SHE SAYS, YOU KNOW, "YOUR THUMBPRINT ON MY" --

4  IT LOOKS -- SOUNDS LIKE HER BUTTOCKS.  AND THEN THERE'S

5  ANOTHER VIDEO -- ANOTHER REFERENCE TO A VIDEO ON THERE AND

6  SAYS "NEAR MY PRIZED POSSESSION."  WE DON'T HAVE THE STILL.

7  WE JUST HAVE A REFERENCE TO A VIDEO BEING THERE, BUT THAT'S

8  NOW SINCE DELETED.

9      THE COURT:  YOU CAN DETERMINE WHEN IT WAS DELETED,

10  CORRECT, MS. OLSON?

11      MS. OLSON:  I MEAN, I'M SURE I CAN HAVE AN I.T. PERSON

12  DETERMINE THAT.  I PERSONALLY CAN'T.

13      THE COURT:  NO, YOU PERSONALLY CAN'T.

14      MS. OLSON:  RIGHT.

15      THE COURT:  LET'S FIND OUT.

16      MS. OLSON:  BY INQUIRY TO MY CLIENT, AS WELL AS TO,

17  PERHAPS, AN I.T. PERSON, I CAN FIGURE OUT WHEN IT WAS

18  DELETED.

19      THE COURT:  I MEAN, IT WOULD BE -- IT WOULD CERTAINLY BE

20  RELEVANT TO KNOW WHEN IT WAS DELETED.  I'M SURE THEY CAN GIVE

21  US DOWN TO THE MINUTE WHEN IT WAS DELETED.

22      MS. OLSON:  AS AN OFFER OF PROOF, SHE BELIEVES THEY WERE

23  GONE ON MAY 17TH WHEN SHE WAS IN THE HOSPITAL.  AND, ALSO,

24  THAT WHEN YOU SEND A VIDEO ON INSTAGRAM, YOU CAN'T RECOVER

25  IT.  IT'S ONE OF THOSE.  I THINK THEY'RE STORIES AND THEY

26  DELETE AFTER A CERTAIN PERIOD OF TIME.

27      THE COURT:  THAT'S NOT MY UNDERSTANDING.  IT MAY BE HER

28  UNDERSTANDING.

1     MS. OLSON:  WELL, THERE'S POSTINGS AND STORIES.

2     THE COURT:  RIGHT.

3     MS. OLSON:  THE STORIES DON'T.  THE POSTINGS DO.  I KNOW

4 THEY DELETE AFTER A PERIOD OF TIME.  NOT STORIES.  THAT'S MY

5 UNDERSTANDING.

6     MR. FETTEROLF:  I MEAN, YOUR HONOR, WE KNOW THAT THEY'RE

7 REFERENCED IN THE INSTAGRAM MESSAGES THAT WE DOWNLOADED WELL

8 AFTER THE 17TH.  SO WE KNOW THEY'RE CONNECTED TO INSTAGRAM

9 WELL AFTER THAT DATE.  I MEAN, IF THAT'S HER STATEMENT THAT

10 SHE DELETED THEM ON THE 17TH, YOU KNOW, WE CAN SHOW

11 INFORMATION TO SHOW THAT IS JUST INCORRECT.  BECAUSE,

12 OTHERWISE, HOW WOULD WE BE ABLE TO PRINT THEM OUT AND SEE

13 THEM?  BECAUSE THEY WOULD BE GONE FROM MR. BAUER.

14     AND, ALSO, I MEAN, YOU KNOW, THE ARGUMENT THAT SHE

15 DELETED THEM BECAUSE SHE COULDN'T STAND TO SEE MR. BAUER ON

16 HER PHONE AND THE LIKE, SHE IS GOING ON THE 29TH TO DOWNLOAD

17 TEXT MESSAGES FROM HIM.  SO I DON'T KNOW WHETHER THEY'RE

18 INSTAGRAM OR TEXT MESSAGES, BUT I GUESS I'M A LITTLE

19 SKEPTICAL OF THE RESPONSE.

20     THE COURT:  WELL, THESE WILL BE YOUR ARGUMENTS AT THE

21 HEARING.  ANY OTHER ITEMS?

22     MR. FETTEROLF:  YES, YOUR HONOR.  THE LAST ISSUE -- LET

23 ME MAKE SURE I HAVEN'T MISSED ONE.  ON THE ISSUE WITH HER

24 FRIEND MELY, WHO IS ALSO REFERENCED IN THERE, WE DID RECEIVE

25 SOME MESSAGES FROM MELY.  MELY TOLD US THAT SHE HAD A

26 FUNCTION ON HER PHONE THAT AUTOMATICALLY DELETED MESSAGES.

27 SO IN LIGHT OF THAT, AND IN LIGHT OF THE FACT THAT SHE IS A

28 WITNESS AND REFERENCED, WE'VE ASKED MS. HILL TO PROVIDE THE

```
1   MESSAGES THAT RELATE TO MR. BAUER -- NOT EVERY SINGLE MESSAGE
2   BETWEEN THEM -- JUST THE ONES RELATED TO MR. BAUER TO US.
3   AND I THINK THE RESPONSE WE GOT, SHE DOESN'T HAVE MESSAGES
4   THAT ARE FOUR MONTHS OLD.  BUT, AGAIN, I GO BACK TO THE SAME
5   ISSUE.  IF IT RELATES TO MR. BAUER, I THINK THEY'RE RELEVANT
6   MESSAGES.  AND I GUESS SHE EITHER DELETED THEM OR HAS THEM TO
7   PRODUCE.
8        THE COURT:  SO WHAT DOES SHE GOT?
9        MS. OLSON:  SHE DOESN'T HAVE MESSAGES FROM FOUR MONTHS
10  AGO.  I CAN GIVE YOU WHAT SHE HAS, BUT THEY'RE NOT FROM FOUR
11  MONTHS AGO.  I THINK THEY'RE DUPLICATIVE OF WHAT MS. -- I
12  FORGOT HER LAST NAME -- MELY.  WHAT MELY PROVIDED.  I LOOKED
13  AT WHAT MS. HOLLEY SENT ME.  I DIDN'T HAVE THEM.  MS. HOLLEY
14  SENT ME THE PHOTOGRAPHS SHE TOOK.
15           SO I DON'T THINK I HAVE ANYTHING OUTSIDE OF WHAT
16  YOU HAVE.  TO THE EXTENT THAT I DO, I'LL PROVIDE YOU WITH
17  WHAT I HAVE.  BUT I KNOW SHE DOESN'T HAVE THINGS GOING BACK
18  FOUR MONTHS.
19       MR. FETTEROLF:  WELL, I GUESS, THAT PRESENTS THE SAME --
20  I MEAN, A SIMILAR ISSUE TO WHAT WE JUST DISCUSSED.  IF
21  THERE'S RELEVANT COMMUNICATIONS WITH HER, YOU KNOW, WHY WERE
22  THEY -- REGARDING MR. BAUER -- WHY WERE THEY DELETED AFTER,
23  IN THIS CASE, WOULD BE AFTER THE ONSET OF CONTEMPLATION OF
24  LITIGATION.
25       THE COURT:  RIGHT.  WELL, WE DON'T KNOW --
26       MR. FETTEROLF:  I GUESS WE'LL SEE.
27       THE COURT:  WE DON'T KNOW, A, WHEN THEY WERE DELETED.
28  B, IF THEY WERE DELETED.  AND, THREE, WHETHER SHE HAD
```

1  ANYTHING TO DO WITH THEIR DELETION.  AS MELY HAD INDICATED,

2  IT'S SIMPLY A MATTER OF THE SETTINGS WHEN THINGS KIND OF FALL

3  OFF ON THE BACK-END TO MAKE ROOM FOR NEW STUFF.

4       MR. FETTEROLF:  BUT, I GUESS, YOUR HONOR -- AND THAT MAY

5  BE TRUE.  MAYBE THE THING WOULD BE IS JUST TO GET THE

6  INFORMATION.  BUT I'M NOT AWARE, FROM AT LEAST IN THE LETTERS

7  THAT WERE PROVIDED, THAT THERE IS -- THAT MS. HILL HAS THAT

8  SETTING ON HER PHONE.  AND ULTIMATELY IT WOULD SEEM TO MAKE

9  SENSE IF THERE'S AN IMAGE OF THE PHONE, THE EASIEST THING TO

10 GO TO DO -- BECAUSE THAT IS IN THE POSSESSION, CUSTODY, AND

11 CONTROL OF MS. HILL -- IS TO GO TO THE IMAGE -- BECAUSE

12 THAT'S THE LATEST DATE OF PRESERVATION.  THAT'S WHY WE IMAGE

13 PHONES -- AND PULL THEM FROM THE IMAGE, NOT NECESSARILY HER

14 PHONE.

15      THE COURT:  IF YOU HAD SOMEBODY IMAGE HER PHONE IN

16 IRVINE WHEN SHE MADE REFERENCE TO GOING THERE FOR THAT

17 PURPOSE, EVEN IF IT WAS ONLY GOING BACK TWO MONTHS, IT WOULD

18 BE TWO MONTHS FROM THAT DATE.

19      MS. OLSON:  I KNOW THE ONLY THING THAT WE COPIED WERE

20 THE TEXTS BETWEEN HER AND TREVOR.

21      THE COURT:  DID YOU HAVE SOMEBODY IMAGE HER PHONE?

22      MS. OLSON:  NO.  RECOVER AND PRINT OUT THE TEXTS BETWEEN

23 HER AND TREVOR.

24      MR. FETTEROLF:  WELL, THAT'S THE REPRESENTATION THAT'S

25 MADE, THEN I GUESS WE'LL PREPARE A MOTION TO DEAL WITH THESE

26 ISSUES.

27      MS. OLSON:  BUT, AGAIN, MY OFFER IS TO THE EXTENT I HAVE

28 TEXT MESSAGES FROM THE INCIDENT TO THE TIME THAT YOUR FIRST

```
 1   TEXT MESSAGE FROM MELY APPEARS, I WILL PROVIDE THAT TO YOU.
 2   YOU HAVE MY REPRESENTATION ON THAT.  WITH THE PROVISO, THAT
 3   RELATE TO TREVOR.
 4        THE COURT:  THEY'RE TALKING ABOUT OTHER THINGS.
 5        MS. OLSON:  RIGHT.
 6        MR. FETTEROLF:  OKAY.  AND, DOREEN, WE'LL GET THAT AT
 7   THE SAME TIMING AS THE LISA M. MESSAGES.
 8        MS. OLSON:  WELL, LET ME BACK IT UP.  LET ME SAY
 9   TOMORROW BY THE CLOSE OF BUSINESS SINCE YOU JUST ADDED TO MY
10   WORKLOAD.
11        MR. FETTEROLF:  THAT'S FINE.  THAT'S FINE.
12        THE COURT:  ALL RIGHT.
13        MS. OLSON:  WE WERE ASKING, YOUR HONOR --
14        MR. FETTEROLF:  THE LAST THING --
15        MS. OLSON:  I'M SORRY.  CAN I JUST INTERRUPT FOR ONE
16   SECOND.  YOU HAD ASKED ABOUT THE THERAPIST THAT SHE SAW
17   AFTER.  SHE WAS REFERRED TO ERIKA MOSES FROM THE SAN DIEGO
18   CENTER FOR TRAUMA RECOVERY.  AND IT'S E-R-I-K-A, I BELIEVE.
19        THE COURT:  ALL RIGHT.  AND THEN, MR. FETTEROLF, YOU HAD
20   ONE OTHER ISSUE?
21        MR. FETTEROLF:  YES.  THE LAST ISSUE -- SORRY.  MY WORK
22   SPACE IS A LITTLE COMPROMISED HERE.  OH.  THE LAST THING WE
23   HAVE WAS THE PHOTOGRAPHS.  SO NOW THAT WE HAVE PHOTOGRAPHS
24   FROM THE SANE NURSE, THEY ARE QUITE DIFFERENT FROM THE
25   PHOTOGRAPHS THAT WERE INCLUDED AS, YOU KNOW, EXHIBITS TO THE
26   D.V.R.O. REQUEST.
27        THE EXHIBITS INCLUDED APPEAR TO BE TAKEN WITH, YOU
28   KNOW, POTENTIALLY FILTERS OR EDITED VIA THIRD PARTY DOCUMENT
```

1  APPS -- AND POTENTIALLY, AGAIN, I AM -- THIS IS OUR

2  SUGGESTION, BUT WE NEED TO CONFIRM IT -- IN ORDER TO

3  ACCENTUATE HER INJURIES.  WE ASKED FOR NATIVE DIGITAL IMAGES

4  OF THOSE PHOTOS, AS WELL AS ANY OTHERS PROVIDED TO THE MEDIA,

5  FOR PURPOSES OF EXAMINING THE METADATA TO DETERMINE THE TIME,

6  PLACE, AND MANNER OF THE PHOTOGRAPH.  AS WELL AS WHETHER THE

7  PICTURES WERE EDITED IN ANY WAY.

8        WHAT I MEAN BY THIS, WHILE IF I TAKE A PICTURE OF

9  MYSELF AS A SELFIE AND SEND IT TO YOU, WE HAVE THE NATIVE

10 IMAGES.  SOMEONE CAN DETERMINE WAS THERE ANYTHING DONE WITH

11 THAT PHOTO.  WHAT FORMAT IT'S IN, THE TIMING, AND THE LIKE.

12 FORENSICS CAN TELL US WHETHER A FILTER IS APPLIED.

13        THE ONLY NATIVE IMAGES WE HAVE ARE THE ONES THAT

14 WERE SENT TO TREVOR, BECAUSE WE DID IMAGE HIS PHONE.  AND WE

15 WERE ABLE TO PULL THOSE IMAGES OUT.  AND WE CAN ALREADY TELL

16 ONE IS NOT A TRADITIONAL SELFIE AND THAT IT HAS BEEN EDITED

17 OR TAKEN WITH A DIFFERENT CAMERA OR SOMETHING.

18        IN RESPONSE, WHAT MS. OLSON SAID WAS, FIRST, THAT

19 MS. HILL HAS PROVIDED NO PHOTOS TO THE MEDIA.  BUT WE KNOW

20 FROM THE TMZ ARTICLE FROM LAST WEEK -- AND I'LL QUOTE -- IT

21 SAYS, "THE ATTORNEY FOR BAUER'S ALLEGED VICTIM, BRYAN

22 FREEDMAN, ASKED TMZ SPORTS TO PUBLISH AN UNREDACTED

23 PHOTOGRAPH SHOWING HIS CLIENT'S INJURIES."  THE ARTICLE

24 FURTHER NOTES, "THE ALLEGED VICTIM AND HER FAMILY REQUESTED

25 THAT THIS PHOTO BE RELEASED THROUGH FREEDMAN."  I'M NOT

26 REALLY SURE WHAT THAT RESPONSE REFERRED TO.  BUT THAT'S

27 DIRECTLY WHAT IS IN THERE.

28        AND WHILE NOT PROVIDED DIRECTLY TO THE MEDIA AS

1  PART OF HER D.V.R.O. FILING, SHE INCLUDED A NUMBER OF IMAGES

2  IN THE FILING.  AND AS THEIR OWN COMMUNICATIONS WITH HER

3  FRIEND MELY SHOW, MS. HILL MADE DEMANDS TO HER LAWYERS.  SHE

4  INCLUDES QUOTES.  BASICALLY SENDS TO MELY WHAT SHE TOLD HER

5  LAWYERS, THAT HER TEAM MAKES SURE THIS INFORMATION IS PUT

6  OUT.  THE MEDIA DOES NOT RUN IT FROM HER FILING.

7          THE PHOTOS WE GOT FROM MS. OLSON VIA EMAIL,

8  FRANKLY, RAISE MORE QUESTIONS.  SOME OF THESE PHOTOS ARE

9  DYNAMIC PHOTOS, WHICH MEANS THAT -- YOU KNOW, THAT'S THE

10  DEFAULT SETTING ON THE IPHONE SUCH IF YOU TOUCH IT, IT SHOWS

11  SORT OF A SECOND BEFORE AND A SECOND AFTERWARDS.  THERE ARE

12  OTHERS WHERE THE FUNCTION IS TURNED OFF.  OTHERS APPEAR TO BE

13  SORT OF A SCREENSHOT OF A SCREENSHOT.

14  I MEAN, THE PHOTO WAS, YOUR KNOW, TAKEN THROUGH THE USE

15  OF A THIRD PARTY APP OR TAKEN BY SOMEONE ELSE.  AND WE CAN

16  ALSO SEE CHANGES IN EYE AND SKIN COLOR FROM THOSE IN THE SAME

17  REPORT.  BECAUSE THESE AREN'T NATIVE IMAGES, WE CAN'T, YOU

18  KNOW, DO -- EXAMINE THE METADATA IN THIS WAY.  SO, AGAIN, MY

19  UNDERSTANDING -- OR AT LEAST THOUGHT WAS THEY WOULD HAVE

20  IMAGED HER PHONE AT SOME POINT IN THIS LITIGATION.

21          SO, I GUESS, RELEVANT EVIDENCE WOULD BE THERE.  I

22  GO BACK TO THE SAME QUESTION, WHICH IS -- YOU KNOW, I DON'T

23  THINK THIS IS A BURDENSOME OR DIFFICULT REQUEST.  THESE

24  SHOULD BE THINGS THAT COULD BE PROVIDED TO US IN NATIVE

25  FORMAT VIA SECURE SHARE.  AND WE CAN HAVE OUR PEOPLE EXAMINE

26  THEM.  AND IF THERE'S A NEED BASED ON WHAT THEY FIND TO

27  TESTIFY, WE'LL LET EVERYONE KNOW.

28  MS. OLSON:  I PROVIDED THE SAME PICTURES THAT WE HAVE IN

```
1   OUR D.V.R.O.  AND THOSE ARE THE PICTURES THAT WE HAD.
2        THE COURT:  ELECTRONICALLY?
3        MS. OLSON:  YES.  AND I PROVIDED THE ONES WITH THE DATE
4   STAMP.
5        THE COURT:  DID YOU PROVIDE THE PHOTOS, INCLUDING THE
6   METADATA, SO THAT IT CAN BE EXAMINED FOR EXACTLY THE THINGS
7   MR. FETTEROLF IS TALKING ABOUT?
8        MS. OLSON:  AGAIN, ABSENT RETAINING A I.T. INDIVIDUAL, I
9   DON'T HAVE A MEANS OF SENDING METADATA.  I GUESS I COULD FIND
10  SOMEONE TO GET THE METADATA.
11       THE COURT:  THAT SEEMS REASONABLE.
12       MS. OLSON:  SO I WILL SEND HIM THE METADATA FOR THE
13  PHOTOS THAT WE'VE ATTACHED TO THE D.V.R.O.
14       THE COURT:  I THINK YOU NEED TO SEND THE NATIVE PHOTOS
15  SO THAT THEY CAN LOOK AT THE METADATA.  NOT TO SEND
16  SEPARATELY THE METADATA.
17       MS. OLSON:  AND, YOUR HONOR, AGAIN PLEADING IGNORANCE, I
18  DON'T KNOW "NATIVE."  I DON'T KNOW "METADATA."  I WILL HAVE
19  TO HAVE SOMEONE, AGAIN, RETAINED AT MR. BAUER'S COST TO
20  PROVIDE THE METADATA AND THE NATIVE PHOTOS.  AM I USING THE
21  VERNACULAR CORRECTLY?
22       MR. FETTEROLF:  YEAH.  I MEAN, I DON'T THINK IT'S VERY
23  DIFFICULT, I MEAN, FROM THE STANDPOINT OF THEIR PULLING THE
24  IMAGES FROM YOUR PHONE AND SENDING THEM VIA SECURE SHARE, THE
25  NATIVE AND DATA FORMATS.  I CAN ASK OUR I.T. PEOPLE -- I
26  THINK YOUR LAW FIRM SHOULD EASILY BE ABLE TO DO THAT.  PULL
27  THE INFORMATION FROM THE PHONE AND SEND IT.
28       MS. OLSON:  IS THAT LIKE A JPEG?
```

1        THE COURT:  IT IS NOT A JPEG.

2        MS. OLSON:  I'LL HAVE TO INQUIRE WITH SOMEONE.

3        MR. FETTEROLF:  I GUESS MY QUESTION IS WHEN CAN WE

4  EXPECT TO RECEIVE THAT?  BECAUSE WE'RE GOING TO HAVE TO TAKE

5  THAT, HAVE FORENSIC CONSULTANTS REVIEW IT FOR PURPOSES OF

6  POTENTIALLY TESTIFYING, I GUESS, ON MONDAY.

7        MS. OLSON:  SURE.  WHY DON'T I GIVE MYSELF THE SAME --

8  TOMORROW, TUESDAY, BY THE CLOSE OF BUSINESS.

9        MR. FETTEROLF:  OKAY.

10       MS. OLSON:  JUST TO BE CLEAR, NATIVE AND METADATA.

11       THE COURT:  THE NATIVE VERSIONS OF THOSE PHOTOS

12  SHOULD -- ELECTRONIC VERSIONS OF THOSE PHOTOS SHOULD CONTAIN

13  THE METADATA.

14       MS. OLSON:  OKAY.  GOT IT.

15       MR. FETTEROLF:  AND SO -- KATE, DID YOU GET THE NAME OF

16  THE PSYCHOLOGIST THAT WAS REFERENCED?

17       MS. MANGELS:  YEAH, I HAVE THAT WRITTEN DOWN.

18       MR. FETTEROLF:  AND, I GUESS, YOUR HONOR, WE'LL -- SINCE

19  IT SOUNDS LIKE THOSE MATERIALS AREN'T GOING TO BE PROVIDED BY

20  PETITIONER, THAT WE WILL NOW SEND OUT A SUBPOENA TO THAT

21  ENTITY.  KATE WILL BE MORE OF THE EXPERT ON THIS FOR

22  CALIFORNIA LAW, BUT I ASSUME WE HAVE TO GIVE THE SAME FIVE

23  DAYS NOTICE AND THE LIKE.  MAKING THEM RETURNABLE 26 DAYS

24  FROM TODAY?  KATE, IS THAT ACCURATE?

25       MS. MANGELS:  DEPENDING ON THE WAY SERVICE IS DONE, I

26  WOULD ASSUME IT WILL BE CONSUMER -- REQUIRING FIVE DAYS

27  NOTICE TO -- PRIOR TO SERVING ON THE ENTITY.

28       MR. FETTEROLF:  AND DO I UNDERSTAND CORRECTLY THAT WE

1  AREN'T GOING TO GET MEDICAL RECORDS DIRECTLY FROM PETITIONER?

2       MS. OLSON:  AGAIN, I PROVIDED YOU COMPLETE COPIES OF

3  WHAT I HAVE.  I HAVE GIVEN YOU COPIES OF WHAT I SUBPOENAED.

4  I HAVE GIVEN YOU THE URINALYSIS.

5       THE COURT:  IS "NO" THE ANSWER?

6       MS. OLSON:  TO THE EXTENT I HAVE ANYTHING, I WILL SHARE

7  IT WITH OPPOSING COUNSEL.  I HAVE ASKED MY CLIENT ABOUT ALL

8  THE REFERENCED -- LIKE THE MRI.  SHE DIDN'T RECEIVE ANYTHING

9  AT THE DAY SHE WAS EXAMINED.

10       THE COURT:  SHE WOULD NOT HAVE.

11       MS. OLSON:  NO.  SO SHE DOESN'T HAVE THOSE.  IF THERE'S

12  A WAY SHE CAN ACCESS THEM, I WILL ASK HER.  AND, AGAIN, I --

13  YOU HAVE MY REPRESENTATION IF I OBTAIN IT, YOU'LL OBTAIN IT.

14       MR. FETTEROLF:  AND THEN THE LAST QUESTION I HAVE IS

15  BESIDES THIS PSYCHOLOGIST THAT WAS REFERENCED, IS THERE ANY

16  OTHER ENTITY THAT WE NEED TO SUBPOENA FOR RECORDS THAT WERE

17  NOT -- THAT SHE SAW THAT WE'RE NOT OTHERWISE AWARE OF?

18  MEANING IF THE MRI IS TAKEN AT A RADIOLOGY INSTITUTE, THAT IF

19  WE SEND THEM TO SCRIPPS, SCRIPPS IS GOING TO SAY WE DON'T

20  HAVE THEM.  THE RADIOLOGY INSTITUTE HAS THEM.

21       MS. OLSON:  I HAVE NO IDEA, BECAUSE I HAVEN'T SEEN

22  M.R.I. RESULTS.  I CAN'T TELL YOU.

23       THE COURT:  YOUR CLIENT WOULD KNOW WHETHER IT WAS DONE

24  AT SCRIPPS OR WHETHER IT WAS DONE AT SOME FACILITY THAT THEY

25  REFERRED HER TO.

26       MS. OLSON:  CORRECT.  AND IF I AM ABLE TO ASCERTAIN THAT

27  INFORMATION AND GET IT FOR YOU AND GET YOU THOSE RESULTS, OF

28  COURSE, I WILL.  LIKE I JUST REPRESENTED TO YOU AND THE

1  COURT, IF I CAN OBTAIN THOSE RECORDS -- AND I CAN INQUIRE OF

2  MY CLIENT -- I WILL GET YOU THAT INFORMATION.  WE'RE NOT

3  TRYING TO HIDE ANYTHING.  WE REALLY AREN'T.

4       THE COURT:  AND IN TERMS OF IMAGING -- MEDICAL IMAGING,

5  IT WOULDN'T NECESSARILY BE THE CASE THAT EVEN IF IT WAS DONE

6  AT SCRIPPS THAT IT WAS DONE BY SCRIPPS.  BUT IT WOULD BE PART

7  OF THE MEDICAL RECORDS FROM SCRIPPS.

8       MS. OLSON:  AND I DIDN'T SUBPOENA SCRIPPS.  SO ALL I

9  HAVE IS WHAT MY CLIENT PROVIDED TO ME.

10      MR. FETTEROLF:  RIGHT.  WE'RE JUST TRYING TO GET THE

11 MEDICAL RECORDS AT THE PLACES SHE VISITED.  SO I GUESS WE'LL

12 SEE WHAT WE GET ON WEDNESDAY.  MAYBE WE'LL HAVE SOME MORE

13 UPDATES FROM OUR SUBPOENA.  AND THEN I GUESS WE'LL INFORM

14 EVERYONE SORT OF WHERE WE ARE AND WHAT WE'VE GOTTEN.

15      THE COURT:  ALL RIGHT.  I THINK THAT SHOULD DO IT, YES,

16 COUNSEL?

17      MR. FETTEROLF:  THAT'S ALL WE HAVE.

18      THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

19      MR. FETTEROLF:  OKAY.  THANK YOU.

20      THE COURT:  SEE YOU ON MONDAY.

21      MS. OLSON:  THANK YOU, YOUR HONOR.

22      MR. FETTEROLF:  ALL RIGHT.  BYE-BYE.  THANK YOU,

23 YOUR HONOR.

24              (THE PROCEEDINGS WERE CONCLUDED.)

25

26

27

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3       HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

 4

 5   LINDSEY HILL,                        )
                                          )
 6                   PETITIONER,          )
                                          )
 7                                        ) SUPERIOR COURT
                    VS.                   ) NO. 21STRO03198
 8                                        )
                                          ) REPORTER'S
 9   TREVOR BAUER,                        ) CERTIFICATE
                                          )
10                   RESPONDENT.          )
     _____)
11

12

13         I, JACQUELINE M. CAIRE, OFFICIAL COURT REPORTER OF THE

14   SUPERIOR COURT OF THE STATE OF CALIFORNIA; FOR THE COUNTY OF

15   LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING PAGES, 1

16   THROUGH 37, COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF

17   THE PROCEEDINGS HELD IN THE ABOVE-ENTITLED CAUSE

18   AUGUST 9, 2021.

19

20         DATED THIS 9TH DAY OF AUGUST, 2021.

21

22

23   _____
     JACQUELINE M. CAIRE, CSR #9599, RPR
24   OFFICIAL REPORTER

25

26

27

28
```

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF LOS ANGELES

3       HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

4


5
     LINDSEY HILL,                      )
6                                       )
                       PETITIONER,      )
7                                       )
            VS.                         )    NO. 21STRO03198
8                                       )
                                        )
9    TREVOR BAUER,                      )
                                        )
10                                      )
                       RESPONDENT.      )
11   _____)
               REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                     AUGUST 16, 2021

13   APPEARANCES:
     FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
14                         BY:  LISA HELFEND MEYER, ESQ.
                                DOREEN MARIE OLSON, ESQ.
15                              MARC H. GARELICK, ESQ.
                           10100 SANTA MONICA BOULEVARD
16                         SUITE 1425
                           LOS ANGELES, CA 90067
17
                           RIGHT CHOICE LAW
18                         BY:  FRED THIAGARAJAH, ESQ.
                           5015 BIRCH STREET
19                         SUITE 107
                           NEWPORT BEACH, CA 92660
20
     FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
21                         BY:  SHAWN HOLLEY, ESQ.
                                KATE MANGELS, ESQ.
22                         808 WILSHIRE BOULEVARD
                           3RD FLOOR
23                         SANTA MONICA, CA 90401

24                         ZUCKERMAN SPAEDER LLP
                           BY:  JON R. FETTEROLF, ESQ.
25                              (PRO HAC VICE)
                           1800 M STREET NW
26                         SUITE 1000
                           WASHINGTON, DC 20036
27
                           JACQUELINE M. CAIRE, CSR #9599, RPR
28                         OFFICIAL REPORTER
```

<u>WITNESSES</u>

<u>PAGE</u>

<u>LINDSEY HILL, CALLED ON HER OWN BEHALF</u>

DIRECT EXAMINATION MS. MEYER      71,88
                                         136

```
 1   CASE NUMBER:            21STRO03198
 2   CASE NAME:              LINDSEY HILL VS.
 3                           TREVOR BAUER
 4   LOS ANGELES, CALIFORNIA  MONDAY, AUGUST 16, 2021
 5   DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE
 6   APPEARANCES:            (AS HERETOFORE NOTED.)
 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR
 8   TIME:                   9:00 A.M.
 9
10        THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.
11        MS. HOLLEY:  GOOD MORNING, YOUR HONOR.
12        MS. MEYER:  GOOD MORNING, YOUR HONOR.
13        MR. FETTEROLF:  GOOD MORNING, YOUR HONOR.
14        THE COURT:  IF I MAY HAVE APPEARANCES, PLEASE.
15        MS. MEYER:  GOOD MORNING, YOUR HONOR.  LISA HELFEND
16   MEYER, DOREEN OLSON, MARC GARELICK, STEPHANIE OBIOHA, AND
17   BRITTENY RODRIGUEZ, APPEARING ON BEHALF OF THE PETITIONER,
18   LINDSEY HILL, WHO IS PRESENT.
19        THE COURT:  WELCOME.
20        MS. MEYER:  THANK YOU.
21        MS. HOLLEY:  GOOD MORNING, YOUR HONOR.  SHAWN HOLLEY AND
22   KATE MANGELS, WHO IS SITTING IN THE JURY BOX, FROM KINSELLA
23   WEITZMAN ISER KUMP & HOLLEY ON BEHALF OF MR. BAUER, WHO IS
24   PRESENT.  I'LL ALLOW MR. FETTEROLF TO MAKE HIS OWN
25   APPEARANCE.
26        MR. FETTEROLF:  GOOD MORNING, YOUR HONOR.  JON FETTEROLF
27   FROM ZUCKERMAN SPAEDER ON BEHALF OF MR. BAUER.
28        THE COURT:  WELCOME.  EVERYONE CAN HAVE A SEAT.  I HAD
```

1    THE GREAT PLEASURE OF REVIEWING YOUR MOTIONS.  AND THE COURT

2    HAS TENTATIVES ON THOSE.

3          THE COURT'S TENTATIVE WITH REGARD TO THE MOTION TO

4    DISMISS IS DENIED.  THE FOUR GROUNDS -- THE TIMING OF THE

5    FILING IS NOT, PER SE, THE BASIS FOR DISMISSAL.  THE

6    DETERMINATION OF WHETHER OR NOT AN ACT WAS CONSENSUAL IS FACT

7    BASED.  THE COURT NEEDS TO HEAR EVIDENCE ON THAT.  THE

8    DETERMINATION OF WHETHER THE PARTIES HAD A DATING

9    RELATIONSHIP IS A LEGAL AND FACT BASED ISSUE.  EVEN IF THE

10   PARTIES AGREED THEY WERE NOT IN A DATING RELATIONSHIP, AS A

11   MATTER OF LAW, THAT'S A SUBJECT FOR THE COURT TO MAKE A

12   DETERMINATION ON.

13         WITH REGARD TO THE ISSUE OF SPOLIATION OF EVIDENCE,

14   THAT ALSO IS A FACT BASED ISSUE.  THE COURT WOULD NEED TO

15   HEAR TESTIMONY WITH REGARD TO THE CIRCUMSTANCES, CUSTOM, AND

16   PRACTICE, AND TIMING OF ANY DELETED MATERIALS.  AND IF THE

17   COURT DETERMINES THERE HAS BEEN SPOLIATION, THE COURT IS

18   LIKELY TO ADDRESS THAT BY WAY OF CREDIBILITY AND WEIGHT OF

19   THE EVIDENCE AND THE TESTIMONY.

20         WITH REGARD TO THE RESPONDENT'S MOTION IN LIMINE

21   WITH REGARD TO DR. STEIN, THE COURT'S TENTATIVE IS TO GRANT.

22   CONSENT IS A FACTUAL ISSUE TO BE DETERMINED BY THE COURT

23   BASED ON LAW AND BASED ON FACT.  A DIDACTIC PSYCHOLOGICAL

24   EXPERT IS NOT LIKELY TO ASSIST THE COURT IN THAT REGARD.

25         DOES ANYBODY WISH TO BE HEARD ON THE TENTATIVES?

26   MS. HOLLEY:  YES.

27   MS. MEYER:  AND, YES, WE DO AS WELL, YOUR HONOR.

28   THE COURT:  I AM UNSURPRISED.  ALL RIGHT.  WHY DON'T WE

1  START WITH THE RESPONDENT SINCE IT IS YOUR MOTION.

2      MR. FETTEROLF:  THE SPOLIATION MOTION OR MOTION TO

3  COMPEL?

4      THE COURT:  WHATEVER YOU'D LIKE TO ADDRESS FIRST.

5      MR. FETTEROLF:  I DID WANT TO ADDRESS THE SPOLIATION

6  MOTION.  BUT I THOUGHT IT ACTUALLY MAY BE EASIER TO SORT OF

7  WALK THROUGH THE MOTION TO COMPEL AND THE DOCUMENTS.  JUST

8  SORT OF LIKE WE DID ON THE PHONE ON MONDAY.

9      THE COURT:  OKAY.

10     MR. FETTEROLF:  KIND OF WALK THROUGH THE HISTORY AND

11  TAKE THEM ONE BY ONE.  IS THAT OKAY WITH YOU, YOUR HONOR?

12     THE COURT:  THAT'S FINE.  YOU DON'T NEED TO REPEAT

13  ANYTHING WHICH IS ALREADY CONTAINED IN YOUR PAPERS SINCE I

14  HAVE REVIEWED ALL THE PAPERS.

15     MR. FETTEROLF:  OKAY.  OKAY.  LET'S START FIRST WITH THE

16  MEDICAL RECORDS.  SO AT THE MOMENT WE HAVE -- WE HAD THREE

17  SUBPOENAS THAT WE SENT OUT.  WE SENT THEM OUT ON THE 7TH OF

18  JULY.  WE HAVE -- FOR SCRIPPS, WE GOT 638 PAGES ON FRIDAY THE

19  13TH.  WE HAD PREVIOUSLY RECEIVED FROM PETITIONER 13 PAGES

20  BEFORE THAT.  SO THAT HAS BEEN RECEIVED, ALBEIT ON FRIDAY.

21  AND WE'RE IN THE PROCESS OF REVIEWING IT AND THE LIKE.

22         PALOMAR THEY REACHED OUT TO US LAST WEEK.  THEY

23  REQUIRED A CONSENT FROM THE PETITIONER.  THEY REQUIRED US TO

24  PUT TOGETHER PROTECTIVE ORDER.  THE PARTIES HAVE DONE THAT.

25  I THINK THE PROTECTIVE ORDER HAS BEEN SIGNED BY EVERYONE.  IT

26  MAYBE IN THE PROCESS OF BEING FILED.  WE DON'T HAVE THE

27  DOCUMENTS YET.  BUT I EXPECT ONCE THAT HAPPENS, WE WILL GET

28  THEM IN THE NEXT FEW DAYS.

1    THE COURT:  I JUST SIGNED ONE THIS MORNING THAT WAS

2   PROVIDED.

3    MR. FETTEROLF:  THAT ONE WAS PROVIDED.  WE'RE JUST

4   AWAITING THE DOCUMENTS.  ALVARADO, AGAIN, SUBPOENAED ON THE

5   7TH.  WE'VE BEEN IN TOUCH WITH THEM.  AS OF FRIDAY ON THE

6   13TH, THEY SAID THEY WE'RE AWARE THAT COURT IS ON MONDAY.

7   THEY HAVE DOCUMENTS TO PRODUCE TO US.  THEY'RE STILL

8   PROCESSING.  WE DON'T HAVE THEM HERE YET.  WE PREVIOUSLY HAD

9   GOTTEN A 100 PAGES FROM THE OTHER SIDE.

10    THE COURT:  DID THEY TELL YOU HOW MUCH THEY HAVE TO

11   PRODUCE?

12    MR. FETTEROLF:  I'M GOING TO -- NO, THEY HAVE NOT TOLD

13   US HOW MUCH THEY HAVE LEFT.

14    THE COURT:  WELL, NOT HOW MUCH THEY HAVE LEFT.  YOU SAID

15   YOU RECEIVED A 100 PAGES FROM PETITIONER.  IF THE TOTAL THEY

16   HAVE TO PRODUCE TO YOU IS A HUNDRED PAGES, YOU GOT IT

17   ALREADY.  IF THEY SAY THEY HAVE 800 PAGES, YOU DON'T.

18    MR. FETTEROLF:  THE ANSWER IS, YOUR HONOR, THEY HAVE NOT

19   TOLD US HOW MANY PAGES THEY HAVE TO PRODUCE.  I WAS TRYING TO

20   SAY SCRIPPS, WE HAD 13 FROM THE PETITIONER.  GOT 638.  FROM

21   PALOMAR, WE DON'T KNOW HOW MANY WE'RE GOING TO GET.  WE

22   HAVE -- DO HAVE THE SART REPORT.  AND BY MY COUNT, 15 OTHER

23   PAGES THAT HAVE BEEN PROVIDED.  FROM ALVARADO WE RECEIVED 102

24   PAGES FROM THE OTHER SIDE.  WE DON'T KNOW HOW MANY WE HAVE

25   LEFT.

26    AGAIN, BECAUSE WE SPOKE OF THIS DETAIL ON MONDAY,

27   WE'VE BEEN CONSISTENTLY MAKING REQUESTS.  WE SET FORTH THE

28   SUBPOENAS.  AND WE'RE STILL WAITING ON DOCUMENTS.  WE HAVE

```
 1   GOTTEN, OF THE DOCUMENTS RECEIVED FROM THE OTHER SIDE, A
 2   DRIBBLING OF DOCUMENTS.  I WANTED TO NOTE THE DIFFERENCE
 3   BETWEEN WHAT WE ASKED FOR AND WHAT WE RECEIVED VIA SUBPOENA.
 4          SO LET ME TURN TO THE NEXT ONE.  I DON'T KNOW IF
 5   THEY WANTED TO ADDRESS THE MEDICAL RECORDS.
 6      THE COURT:  I'LL LET YOU GO STRAIGHT THROUGH.  THEY CAN
 7   ADDRESS IN ORDER.
 8      MR. FETTEROLF:  THE SECOND ONE ARE THE PSYCHOLOGICAL
 9   TESTING.  YOU RECALL FROM THE CALL, WE REQUESTED THE
10   DOCUMENTS.
11      THE COURT:  WELL, WE HADN'T DETERMINED THAT THEY
12   EXISTED.
13      MR. FETTEROLF:  RIGHT.  WE HAD SEEN IT IN THE RECORDS AS
14   OF THE DATE OF THE HEARING.
15      THE COURT:  WELL, THE "IT" THAT YOU'RE REFERRING TO, MY
16   RECOLLECTION IS IT WAS RECOMMENDED AND NOT NECESSARILY
17   DETERMINED THAT IT HAD OCCURRED.
18      MR. FETTEROLF:  CORRECT.  THERE WAS A REFERENCE IN THE
19   SCRIPPS DOCUMENT THAT SHE BE REFERRED TO TESTING.
20      THE COURT:  RIGHT.
21      MR. FETTEROLF:  WE PUT THAT IN OUR MOTION TO COMPEL THAT
22   WE HAD BEFORE YOU.  DURING THE MOTION, MS. OLSON, THROUGH
23   SOME BACK AND FORTH, CONFIRMED THAT SHE HAD SEEN AN
24   INDIVIDUAL PSYCHIATRIST FOR PURPOSES OF THE ALLEGED INCIDENT.
25   ON THE 10TH, WHEN THERE WAS -- THE DATE WE GOT MORE
26   DOCUMENTS, NO ADDITIONAL DOCUMENTS WERE PROVIDED.  SHE HAD
27   SAID -- THE OTHER SIDE HAD SAID THERE WAS NO TESTING.  WE
28   SUBMITTED A LETTER SAYING WE DIDN'T GET ANY INFORMATION.  AND
```

1   IN RESPONSE TO THAT, IN OUR MOTION TO COMPEL, WE GOT EIGHT

2   PAGES OF NOTES.

3           IN THE MEANTIME, WE HAVE SUBPOENAED THE ENTITY THAT

4   THEY REFERENCED.  THAT SUBPOENA REQUIRES NOTICE TO THE OTHER

5   SIDE.  THE NOTICE PERIOD ENDS TODAY.  AND SO WE EXPECT TO GET

6   DOCUMENTS IN 21 DAYS.  SO SOMETIME EARLY SEPTEMBER FROM THEM.

7           SO AT THIS POINT, BASED ON THE FACT THAT THEY

8   PRODUCED US SOME DOCUMENTS THROUGH SUBPOENA, WE'RE JUST

9   WAITING ON THE DOCUMENTS THROUGH THE SUBPOENA.  WE GOT ARE

10  NOTES.  I DON'T KNOW AT THIS POINT WHAT ADDITIONAL RECORDS

11  THEY HAVE FROM THE PSYCHOLOGICAL TESTING.

12          INSTAGRAM VIDEOS.  OBVIOUSLY WE HAD A LONG

13  DISCUSSION ON THE CALL ABOUT THE INSTAGRAM VIDEOS.  SO WE HAD

14  ASKED FOR TWO VIDEOS.  THE TWO VIDEOS REFERRED TO SOME

15  BRUISING IN HER BUTTOCKS AND VAGINAL AREA.  THEY HAVE SOME

16  SUGGESTION THAT SHE WAS, QUOTE, "INTO IT."  THOSE ARE THE

17  WORDS.  WE THOUGHT THAT WAS RELEVANT INFORMATION WE ASKED FOR

18  THEM.  THE FIRST RESPONSE WE GOT WAS SHE DELETED ALL OF HER

19  INSTAGRAM VIDEOS.  AND WE HAD A BACK AND FORTH ON THAT.  YOU

20  KNOW, AT THE HEARING SHE SAID SHE DELETED THEM.  SHE DOESN'T

21  HAVE THEM.

22          THIS IS ALL MS. OLSON.  SHE SAID SHE CONTACTED

23  INSTAGRAM AND FACEBOOK TO SEE WHETHER THEY'RE RECOVERABLE,

24  BUT WE COULDN'T GET ANYTHING.  MS. OLSON TOLD THAT COURT THAT

25  SHE COULD HAVE AN I.T. PERSON FIND OUT ABOUT THEM.  SHE SAID

26  AT THE HEARING HER CLIENT BELIEVED THE VIDEOS WERE GONE ON

27  MAY 17TH.  THEN MS. OLSON SAID THEY THOUGHT THEY WERE

28  DISAPPEARING VIDEOS.  YOUR HONOR, YOU HAD SAID, PLEASE, LET

1   US GO BACK AND FIND OUT WHEN THESE VIDEOS AND INSTAGRAM

2   MESSAGES WERE DELETED.

3         IN RESPONSE TO THE LETTER THAT SHE PROVIDED US ON

4   THE 10TH, WE GOT AN INSTAGRAM F.A.Q. THAT -- REGARDING

5   DISAPPEARING VIDEOS.  AND MS. OLSON NOTED THAT THE TWO VIDEOS

6   THAT WERE SENT TO MR. BAUER VIA INSTAGRAM DIRECT MESSAGE WERE

7   NOT RECOVERED.  AND THAT SHE MADE EFFORTS TO RECOVER THEM.

8   THEY DON'T HAVE THEM.  THEY ALSO NOTED THAT THE INSTAGRAM

9   MESSAGES WERE DELETED BEFORE SHE MET WITH THE POLICE.

10        ALSO, IN THE LETTER, THEY REFERENCED THE FACT THEY

11  WERE DISAPPEARING VIDEOS.  WE FILED THE MOTION -- WROTE A

12  LETTER SAYING, YOU WERE ASKED TO PROVIDE THE DATE THAT THE

13  DELETION OCCURRED.  WE GOT NO RESPONSE TO THAT.  WE FILED A

14  MOTION TO COMPEL, WHICH YOUR HONOR HAD READ.

15        WE THEN GOT A LETTER SAYING THEY COULDN'T DETERMINE

16  WHEN MS. HILL DELETED HER INSTAGRAM MESSAGES.  WE ALSO GOT A

17  RESPONSE TO THE -- OUR MOTION TO COMPEL TODAY.  I READ IT

18  QUICKLY.  SO I -- MY UNDERSTANDING IS THEY NOTED THERE'S SOME

19  REFERENCE TO HISTORICALLY SHE HAS DELETED VIDEOS HERE AND

20  THERE.

21        IT APPEARED -- I LOOKED AT IT QUICKLY.  THERE'S AN

22  AFFIDAVIT ABOUT NOT BEING ABLE TO FIND ANYTHING ON HER PHONE.

23  SUGGESTING THAT THEY WERE DELETED.  WE HAVE REACHED OUT --

24  AGAIN, THIS HAS ALL HAPPENED QUICKLY -- TO PROCURE AN

25  INSTAGRAM EXPERT.  I HAVE ONLY HAD AN OCCASION -- ONE OF MY

26  COLLEAGUES HAD AN OCCASION TO SPEAK WITH THEM BRIEFLY.  THE

27  RESPONSE THEY GOT WAS THEY CAN GO BACK TO INSTAGRAM AND GET

28  THE VIDEOS.  GRANTED WE GAVE THEM THE INFORMATION AND IT'S

```
 1    NOT LIKE I'VE HAD HOURS TO TALK TO THIS PERSON.
 2         THE COURT:  WELL, YOU ALSO HAD ATTACHED SOMETHING FROM
 3    CELLEBRITE.
 4         MR. FETTEROLF:  YEAH.  THERE'S A CELLEBRITE -- SO THAT
 5    WAS AN ISSUE AT THE HEARING, BECAUSE WE HAD ASKED WAS THE
 6    PHONE IMAGED.  MS. OLSON SAID THE PHONE WASN'T IMAGED.
 7    THOUGHT THAT SOME POINTS OF VIDEOS WERE RELEASED.  WHEN WE
 8    WENT BACK AND LOOKED AT THE PHOTOS EARLIER PROVIDED, ATTACHED
 9    TO THAT WAS A CELLEBRITE REPORT.  WE ASKED OUR FORENSIC
10    CONSULTANT, AS WELL AS OUR OWN I.T. PEOPLE AT ZUCKERMAN
11    SPAEDER DOES IT APPEAR THE PHONE WAS IMAGED.
12              THEIR ANSWER WAS THE PHONE WAS IMAGED ON THE 28TH.
13    THAT WAS OBVIOUSLY DAY BEFORE THE PETITION WAS FILED.  SO IT
14    APPEARS TO US THAT THE PHONE, CONTRARY TO REPRESENTATIONS,
15    THE PHONE WAS IMAGED THAT DATE.  SO ULTIMATELY AT THIS POINT
16    WE KNOW THE MESSAGES, AT LEAST ACCORDING TO WHAT THEY'RE
17    TELLING US, THEY DON'T HAVE.  WE KNOW THAT IN MR. BAUER'S
18    INSTAGRAM MESSAGES THAT HE WAS ABLE TO PULL AND COPY, THEY'RE
19    REFERENCED ON THERE.
20              BUT THEY CAN'T ACCESS THEM.  WE ARE TRYING TO GET
21    TO AN ANSWER ABOUT WHETHER THEY CAN BE PROVIDED.  WE WANT THE
22    VIDEOS.  WE'RE MAKING A SPOLIATION MOTION BECAUSE IT APPEARED
23    TO US THAT THEY DELETED A HOST OF RELEVANT MESSAGES,
24    INCLUDING THE VIDEOS AFTER THE TIME TO PRESERVE DOCUMENTS.
25              BUT IF THERE IS A WAY TO GO BACK AND GET THE
26    VIDEOS, WE THINK -- I'M NOT GOING TO GO INTO DETAIL ABOUT WHY
27    I THINK THEY'RE RELEVANT AND THE LIKE.  WE BELIEVE THEY ARE.
28    I GUESS WE'D LIKE TO FIND OUT WHETHER THEY CAN GO BACK AND
```

1  GET THE VIDEOS.  SO AT THIS POINT I DON'T THINK IT'S AN

2  EXCUSE FOR DELETING ALL THIS INFORMATION, IN OUR VIEW.  BUT

3  ULTIMATELY I THINK WE NEED TO FIND OUT AND ACCESS THE VIDEOS.

4  SO THAT'S WHERE IT STANDS ON THE VIDEOS.

5          THE PICTURES, ULTIMATELY I WANT TO HAND UP A COUPLE

6  OF -- WE DID NOT -- SINCE IT'S JUST US HERE.  HAVE LOTS OF

7  TECHNOLOGY.  I WANT TO SHOW YOU -- I THINK THEY'LL HELP US

8  UNDERSTAND THE POINT WE'RE TRYING TO MAKE.  LET ME GIVE ONE

9  TO COUNSEL.  PASS THAT UP TO THE COURT.  SO, YOUR HONOR, IF

10  YOU LOOK AT THIS, THIS WILL JUST HELP US UNDERSTAND THE POINT

11  I WAS TRYING TO MAKE.

12          THE FIRST PICTURE ON THE LEFT THAT WE'VE DONE THIS

13  FOR -- THERE ARE FIVE PHOTO MONTAGES HERE.  AND THESE WERE

14  CREATED BY MR. ROSENTHAL, WHO IS LISTED ON THE WITNESS LIST

15  WHO WOULD BE TESTIFYING AT THE ACTUAL HEARING.  WE HAD SAID

16  WE WANT THE PICTURES THAT WERE LISTED IN THE D.V.R.O.

17  AFFIDAVIT AS WELL AS ANYTHING THAT WAS PROVIDED TO THE MEDIA.

18  SO THE FIRST PICTURE ON THE LEFT IS WHAT WAS ATTACHED AND

19  PROVIDED TO YOU.  IN RESPONSE TO THAT FIRST REQUEST, WE GOT

20  FROM THE OTHER SIDE AN EMAIL THAT ATTACHED A HOST OF

21  SCREENSHOTS.

22          THAT IS THE SECOND PICTURE HERE.  THESE ARE THE

23  IMAGES -- THIS IS THE SAME IMAGE.  IT'S A MIRROR IMAGE.  BUT

24  IT'S THE SAME IMAGE OF WHAT WAS PROVIDED.  YOU SEE AT THE TOP

25  THERE IT'S GOT THE WIDE PHOTO STAMP.  AND IT ALSO HAS THIS

26  REDDISH SHADE.  OKAY.  WE THEN SAID THAT'S NOT A NATIVE

27  IMAGE.  THAT'S NOT WHAT WE'RE ASKING FOR.  WE WANT THE NATIVE

28  AND DIGITAL IMAGES.  WHAT WE GOT TO THE RIGHT WAS THE NATIVE

1  DIGITAL IMAGES.

2       SO THE ISSUE WE HAVE AT THIS POINT -- I WANT TO GET

3  TO THE ADDITIONAL PICTURES THAT WE SAW WHEN THEY PROVIDED THE

4  CELLEBRITE REPORT, BUT IT RELATES TO THESE FIVE.  OUR

5  POSITION IS YOU HAVE A PICTURE THAT IS SHADED HEAVILY IN RED

6  ON THE LEFT THAT WAS PROVIDED IN THE PETITION.  WE HAVE A

7  PICTURE FROM THEIR PHONE HERE THAT ALSO IS HEAVILY SHADED.

8  AND THEN WHAT WE GOT IN THE NATIVE IMAGES ARE PHOTOS WHERE

9  THE SHADING FILTERING ARE GONE.  AND THE LIVE IMAGE PHOTO IS

10 TURNED OFF.

11      WHAT OUR EXPERT IS SAYING IS IT APPEARS WHAT WAS

12 DONE WAS, THE IMAGE ON THE PHONE, THEY REVERTED BACK AND TOOK

13 THE SHADING OFF AND REMOVED THE LIVE FUNCTION.  SO WHEN WE

14 GOT THAT, WE COULDN'T DETERMINE THAT.  IF YOU LOOK THROUGH

15 THIS MONTAGE, YOU SEE THE SAME THING.  REDDISH TINT.  REDDISH

16 TINT.  AND THEN A NATIVE IMAGE.

17      SO NOW THESE PHOTOS ARE -- OUR POSITION IS EACH OF

18 THESE PHOTOS HAVE BEEN DONE IN A WAY, THE EARLIER ONES, TO

19 PUT IN THE PETITION TO MAKE IT SEEM LIKE HER INJURIES LOOKED

20 WORSE THAN THEY ARE.  SO WHAT WE WANTED WERE THE NATIVE

21 IMAGES TO DETERMINE WHAT WAS DONE.  BUT WHAT WE GOT IS THE

22 THIRD IMAGE.  WE DIDN'T GET THIS MIDDLE IMAGE THAT HAS THE

23 REDDISH SHADING.  WHAT WE GOT, IT APPEARS, IS SOMEONE THAT

24 HAS GONE IN, REMOVED THE LIVE PHOTO IMAGE -- BECAUSE YOU SEE

25 IT ON A NUMBER OF THESE PHOTOS -- AND ALSO THEN SOMEHOW

26 REMOVE THE SHADING.

27      OUR EXPERT TELLS US IF WE CAN GET THE ACTUAL NATIVE

28 IMAGE, THEY CAN LOOK AT AND MAKE DETERMINATIONS ON THE

1  FILTERING.  THAT'S WHAT THEY WILL SHOW.  I WANT TO SHOW YOU

2  ONE OTHER EXHIBIT, JUST SO YOU CAN UNDERSTAND WHAT WE'RE

3  ATTEMPTING TO DO HERE.  SO ULTIMATELY, YOUR HONOR, THESE

4  THREE IMAGES ARE TAKEN -- THE FIRST THREE IMAGES WERE DONE --

5  TAKEN BY A CELL PHONE.  HER CELL PHONE SELFIE.  THEY TEND TO

6  PUSH AND ACCENTUATE YOUR FACE.  OUR EXPERT HAD TALKED ABOUT

7  IT IN DETAIL.

8          THE ONE ON THE RIGHT IS A PICTURE FROM THE SART

9  EXAM, WHICH SHOWS, WE THINK, A MORE REALISTIC VIEW OF WHAT

10  SHE LOOKED LIKE.  SO ULTIMATELY WE WOULD LIKE TO GET THE

11  ACTUAL NATIVE IMAGES OF THIS PHOTO HERE WITH THE FILTERING

12  AND THE LIVE PHOTO IN SO WE CAN EXAMINE THE MANNER AND METHOD

13  FOR WHICH THEY SOUGHT TO PUT TOGETHER THIS PHOTO.

14  ULTIMATELY, THAT IS THE PHOTO YOU WERE PROVIDED.  AND THAT IS

15  THE PHOTO THAT HAS, YOU KNOW, BEEN RELEASED IN A NUMBER OF

16  SPOTS.  WE DON'T THINK IT'S AN ACCURATE REPRESENTATION OF

17  WHAT HER ALLEGED INJURIES LOOK LIKE.

18          SECONDLY, WHEN WE GOT THE PHOTOS AND SAW THE

19  CELLEBRITE REPORT, THE PHOTOS ARE LISTED IN NUMERICAL ORDER.

20  AND WE SAW THAT THE FIRST PHOTO IN YOUR LIST IS A PHOTO THAT

21  WAS TAKEN AT 3:17 IN THE MORNING PRESUMABLY AT MR. BAUER'S

22  HOUSE.  THAT WAS NUMBER 3967.  AND THEN THE LAST PHOTO IN

23  THIS ABOUT 42 HOURS LATER IS 4050.  THERE ARE 83 PHOTOS TAKEN

24  IN THAT PERIOD OF TIME BETWEEN WHEN SHE WAS AT HIS HOUSE TO

25  WHEN SHE WAS AT THE HOSPITAL.

26          SO WE ASKED FOR THOSE, BECAUSE WE DIDN'T HAVE THAT

27  INFORMATION.  WE SAW THAT FROM THE CELLEBRITE REPORT.  WE SAW

28  THE NUMERIC NUMBERING.  IN RESPONSE, WE GOT, I BELIEVE, 44

1    PHOTOS.   THERE -- A NUMBER OF THEM ARE PICTURES OF HER.   SOME

2    ARE ADMITTEDLY SCREENSHOTS OF HER TAKING PICTURES OF BASEBALL

3    TICKETS.   THINGS LIKE THAT.   BUT THEY'RE STILL MISSING 19,

4    BECAUSE I THINK WHAT WE'RE TRYING TO SEE IS ULTIMATELY WHAT

5    SHE DID GO IN THAT RELATIVE PERIOD.   OF COURSE, THEY'RE NOT

6    THE NATIVE OR LIVE IMAGE PHOTOS.   JUST SCREENSHOTS.

7         ULTIMATELY, FIRST AND FOREMOST, WE'D LIKE TO GET A

8    COPY OF THE REDDISH PHOTO THAT EXISTED ON HER PHONE IN THE

9    NATIVE FORMAT SO WE CAN DETERMINE WHAT WAS -- WHETHER

10   ANYTHING WAS DONE TO GIVE IT THAT REDDISH SHADING AND THE

11   LIKE COMPARED TO THE NATIVE PHOTO WHERE ALL THESE THINGS WERE

12   TURNED OFF.   TWO, WE CAN LOOK AT THE LIVE IMAGING AND SEE THE

13   MANNER IN WHICH THE PHOTO WAS ACTUALLY TAKEN.   THAT'S WHERE

14   WE STAND ON THE PHOTOS.

15        THEN WE HAVE THE TEXTS WITH TWO OF HER TEXT

16   MESSAGES WITH TWO OF HER FRIENDS, LISA AND MELY.   WE HAD THE

17   BACK AND FORTH.   WE REQUESTED LISA.   THE ANSWER WAS

18   PRIVILEGED.   A.A. SPONSOR.   WE GOT THROUGH THAT.   THEY SAID

19   THEY PRODUCED THEM.   WE ULTIMATELY GOT THE DOCUMENTS.

20        MELY TEXTS, WE HAD GOTTEN SOME FROM.   MELY,

21   PURSUANT TO OUR SUBPOENA, SHE HAD NOTED SHE HAD SOME

22   AUTOMATIC DELETION FUNCTION.   WE ASKED FOR THE FULL ONES.

23   THEY PROVIDED US A BUNCH OF MESSAGES OVER THE COURSE OF A

24   WEEK.   I THINK, BETWEEN THE TWO OF THEM, HUNDREDS OF PAGES OF

25   MESSAGES.   WHEN WE GOT THEM, THERE'S A CONSISTENT PERIOD OF

26   ROUGHLY MAY 17TH, 18TH, 19TH TO MAY 29TH THAT IS MISSING FROM

27   BOTH.   AND SO WE'VE GOTTEN -- AGAIN, I HAVEN'T BEEN ABLE TO

28   LOOK IN DETAIL ABOUT WHAT THEY SAID TODAY.

1          BUT WHEN WE GOT THESE MESSAGES, THEY WERE MISSING.

2    WE FILED A MOTION TO COMPEL, WHICH YOU'VE READ.  AND THE

3    RESPONSE WE GOT VIA LETTER AFTER OUR MOTION TO COMPEL WAS

4    THAT -- AS TO LISA, THEY NOTED THAT THEY SAW EACH OTHER FROM

5    THE 21ST TO THE 23RD.  SO THEY WOULD NOT HAVE TEXTED EACH

6    OTHER.  NOTING THAT LINDSEY DIDN'T HAVE HER PHONE BECAUSE THE

7    PASADENA POLICE TOOK IT FOR A PERIOD OF TWO DAYS.  THE 21ST

8    AND 22ND.  AND NOTED SHE HAD PERFORMED A BACKUP OF HER PHONE.

9    AND WHAT SHE GAVE US WAS THE ENTIRE CONVERSATION.

10          ON AVERAGE, PRIOR TO THE MISSING PERIOD OF 5/18 TO

11   5/29, THEY TEXTED ON AVERAGE OF 15 TIMES A DAY ON A NEAR

12   DAILY BASIS.  NOT EVERY DAY, BUT ALMOST DAILY.  BUT THE

13   AVERAGE WAS 15 TIMES A DAY DURING THAT PERIOD.  AFTER 5/29,

14   THEY TEXTED EVERY DAY FOR THAT PERIOD.

15          SO AT THE MOMENT, WE DON'T UNDERSTAND WHY THERE'S

16   THIS GAP OF MESSAGES.  WE THINK OBVIOUSLY THESE MESSAGES, FOR

17   THE REASONS WE LAID OUT IN THE MOTION TO COMPEL, AS IT

18   RELATES TO LISA ARE HIGHLY RELEVANT.  THERE'S DISCUSSIONS OF

19   COMMUNICATIONS ABOUT MR. BAUER.  THERE'S REFERENCES OF, YOU

20   KNOW, CONSENT.  THERE'S A WHOLE HOST OF INFORMATION THAT'S IN

21   THERE.

22          WE DID NOTE THAT THEY PROVIDED INSTAGRAM MESSAGES

23   BETWEEN THE TWO.  AND THESE SHOW THERE WERE MESSAGES ON 5/19,

24   5/20, 5/22, AND 5/24.  THIS WAS AGAIN -- SOME OF THOSE WERE

25   DURING THE PERIOD OF TIME WHERE THE NOTATION WAS THEY CLAIM

26   THEY WERE TOGETHER.

27          AS TO MELY, SIMILAR CIRCUMSTANCE.  I WENT THROUGH

28   THE BACK AND FORTH WITH YOU BEFORE.  ULTIMATELY WE GOT

1    ROUGHLY THE SAME GAP, 18TH TO THE 29TH PERIOD OF TIME.  WE

2    SUBMITTED A LETTER.  GOT NO RESPONSE.  FILED A MOTION TO

3    COMPEL.  AFTER THAT, WE WERE TOLD THAT -- IN A LETTER FROM

4    MS. OLSON THAT MS. HILL WAS AT MELY'S HOME FOR SEVERAL HOURS.

5    LINDSEY WENT TO THE HOSPITAL ON THE 17TH.  AND MELY WAS THERE

6    AS WELL.  ON THE 21ST, THEY TOOK -- PASADENA POLICE TOOK

7    LINDSEY'S PHONE.

8            SHE SAID IF THERE'S MISSING TEXTS THAT LINDSEY

9    CAN'T RECEIVE AND, IN FACT, EXIST, THE PASADENA POLICE

10   DEPARTMENT MAY HAVE THEM.  AND I KNOW THIS BACKGROUND.  THESE

11   TWO INDIVIDUALS FROM 4/18, WHICH WAS THE FIRST DATE OF OUR

12   REQUEST, TO 5/17, THEY AVERAGED -- THEY TEXTED EVERY SINGLE

13   DAY.  THEY AVERAGE 33 MESSAGES PER DAY.

14           AND THEN FROM 5/29 TO 6/20, AVERAGED 33 MESSAGES A

15   DAY.  TEXTED EVERY DAY.  SO WE HAVE THESE TWO SORT OF SIMILAR

16   GAPS.  THEY ALSO PROVIDED SOME INSTAGRAM MESSAGES.  THESE

17   INCLUDED MESSAGES BETWEEN EACH OTHER DURING THIS PERIOD OF

18   TIME.  SO ULTIMATELY WE REQUESTED THIS RELEVANT INFORMATION.

19   WE HAVE THESE TWO GAPS.

20           IT'S NOT ENTIRELY CLEAR WHAT -- THEY'RE SAYING

21   THERE ARE NO MESSAGES, THAT THESE TWO PEOPLE DIDN'T TEXT AT

22   ALL DURING THAT PERIOD.  OBVIOUSLY THERE'S WAY TO FIGURE THAT

23   OUT.  I THINK PHONE RECORDS WOULD SHOW WHETHER THEY DID OR

24   NOT.  I AM NOT ENTIRELY SURE WHAT THE ANSWER IS AS FAR AS

25   EXPLANATION FOR THESE MISSING TEXTS.  AND I THINK,

26   YOUR HONOR, THAT IS IT.

27         THE COURT:  OKAY.  THANK YOU.

28         MS. MEYER:  YES.  MR. GARELICK IS GOING TO ADDRESS

```
 1    YOU.
 2         THE COURT:  OKAY.
 3         MR. GARELICK:  THANK YOU, YOUR HONOR.  I FIRST WANTED TO
 4    TALK ABOUT THE IMAGES, TEXT MESSAGES, AND INSTAGRAM MESSAGES.
 5    AND THEN WORK BACKWARDS TO THE MEDICAL RECORDS.  AND I WOULD
 6    JUST NOTE THAT THERE WAS NO REFERENCE BY MR. FETTEROLF OF A
 7    REQUEST FOR A CONTINUANCE IN HIS ARGUMENT.  AND I DON'T KNOW
 8    EXACTLY WHAT A MOTION TO COMPEL AT THIS POINT IN TIME WOULD
 9    DO.
10         HE HAS HAD OPPORTUNITIES TO FILE MOTIONS TO COMPEL
11    PRIOR TO THIS DATE, WHICH I FIND TO BE UNUSUAL IN A DOMESTIC
12    VIOLENCE MATTER.  BUT CERTAINLY I DON'T KNOW EXACTLY WHAT HIS
13    REMEDY IS OTHER THAN PRODUCTION OF DOCUMENTS SOMETIME POST
14    TRIAL.
15         THE FIRST POINT -- AND I THINK THERE DOES NEED TO
16    HAVE SOME TYPE OF TIMELINE, WHICH MR. FETTEROLF DID PORTRAY.
17    WE'VE BEEN TOTALLY TRANSPARENT THROUGHOUT THIS PROCESS.  MORE
18    SO THAN I THINK I HAVE EVER BEEN IN MY ENTIRE CAREER.
19         THE COURT:  REALLY?  YOU'RE NOT USUALLY TRANSPARENT IN
20    YOUR CASES?
21         MR. GARELICK:  IT'S RARE THAT WE HAVE METADATA REQUESTS
22    AND NATIVE IMAGES AS TO FILES.  BUT CERTAINLY PRYING THROUGH
23    IMAGES OF PHONES AND TRYING TO GET RECORDS TO SEE IF
24    SOMETHING HAPPENED AS TO WHAT WAS ATTACHED TO AN EXHIBIT IN A
25    HEARING IS UNUSUAL.  BUT THE ESSENTIAL THING THAT WE DID WAS
26    THE SECOND SHE RETAINED US, WE TOOK AN IMAGE OF EVERYTHING
27    RELATED TO MR. BAUER ON HER PHONE.  IT'S NOT AN IMAGE OF HER
28    ENTIRE PHONE.
```

```
1          THE COURT:  WHEN WAS THAT?

2          MR. GARELICK:  THAT WOULD BE JUNE 28TH.

3          THE COURT:  SO YOU WERE RETAINED ON JUNE 28TH?

4          MR. GARELICK:  I BELIEVE SO, YOUR HONOR.  WE MIGHT HAVE

5   BEEN RETAINED ON JUNE 27TH.  AND THE IMAGE TOOK PLACE ON JUNE

6   28TH.  IT WAS RIGHT AROUND THOSE TWO DATES.  THE EVENTS PRIOR

7   TO THAT TIME -- AND MY CLIENT WILL CERTAINLY TESTIFY AS TO

8   THE EXACTLY WHEN AND WHAT AND HOW HER PRACTICE WAS IN KEEPING

9   INFORMATION AND DELETING INFORMATION.

10          BUT SHE HAD, NUMBER ONE, STORAGE ISSUES ON HER

11  PHONE.  SHE WASN'T GOING TO KEEP EVERY SINGLE TEXT CHAIN.  IN

12  FACT, FREQUENTLY WITH OTHER PEOPLE, NOT JUST MR. BAUER, BUT

13  WOULD DELETE ENTIRE TEXT CHAINS, INCLUDING WITH HER FRIENDS,

14  WHEN THEY WOULD CREATE LARGE PICTURES BACK AND FORTH AND USE

15  UP LOTS OF SPACE ON HER PHONE.  IT WAS HER CUSTOM AND

16  PRACTICE TO DO THAT.

17          WHAT WAS MENTIONED IN THE MOTION WAS -- AND I

18  BELIEVE IS THE APPROPRIATE LAW -- IS CONTEMPLATION OF

19  LITIGATION.  AND AT THAT POINT IN TIME, MS. HILL WAS NOT

20  CONTEMPLATING LITIGATION.  NUMBER ONE, RIGHT AFTER THE

21  INCIDENT, SHE WAS IN THE HOSPITAL.  SHE WAS IN A STATE OF

22  SHOCK.  SHE HAD CONCUSSIONS THAT WERE BAD.  SHE HAD BRUISES,

23  INJURIES THAT TOOK TIME TO HEAL.  SHE WAS NOT THINKING OF

24  RUSHING INTO COURT AND ATTACKING MR. BAUER IN A DOMESTIC

25  VIOLENCE HEARING.

26          SHE WAS WORKING WITH THE PASADENA POLICE

27  DEPARTMENT.  AND A FACT I THINK LEFT OUT FROM MR. FETTEROLF'S

28  RECITATION, THEY OBTAINED HER PHONE AND HER LAPTOP.  SHE GAVE
```

1    THEM BOTH OF THEM.  THEY TOOK A FULL IMAGE.  SHE COOPERATED

2    WITH THEM.  THERE WAS NOTHING NEFARIOUS.  THERE WAS

3    NOTHING -- EVIL INTENT, THAT THERE WAS NOTHING THERE TO

4    BETTER HER CASE OR DELETE EVIDENCE TO -- THAT MIGHT HURT HER

5    CASE.  SHE GAVE EVERYTHING TO THEM.

6        THE COURT:  WHEN YOU SAY, "THEM," YOU MEAN PASADENA

7    POLICE?

8        MR. GARELICK:  THAT'S CORRECT.  THE IMAGES THEMSELVES

9    AND WHAT THEY HAVE REQUESTED IN THEIR ARGUMENT, THE COURT HAS

10   TO UNDERSTAND THAT THERE IS A DIFFERENCE BETWEEN A LIVE

11   DIGITAL HIGH RESOLUTION PICTURE AND SOMETHING THAT WAS

12   PRINTED OR SCANNED AND THEN PRINTED AGAIN AND ATTACHED TO A

13   PLEADING.  CERTAINLY A RED OR MORE RED IMAGE WOULD COME UP.

14   AND I DON'T NECESSARILY DISAGREE WITH THE INTERPRETATION OF

15   THE NATIVE IMAGES.

16        AND, FRANKLY, THEY LOOK MORE HORRID, NOT BETTER.

17   HER BRUISES ARE STILL THERE.  THE IMAGES DON'T MAKE A

18   DIFFERENCE IN THE SCHEME OF THIS CASE AT ALL.  AND THE

19   RECORDS WERE PROVIDED.  WE GAVE THEM THE NATIVE IMAGES.  WE

20   GAVE THEM THE METADATA.

21        THE METADATA IS GOING TO SHOW THAT THE PICTURE WAS

22   TAKEN ON A CERTAIN DATE.  AND THEN WHAT OUR EXPERT -- OR OUR

23   REBUTTAL EXPERT, IF NEED BE, TESTIFIED IS THAT THERE ARE TWO

24   FORMATS THAT THE PICTURE MIGHT BE TAKEN IN.  ONE IS AN

25   HEIC -- AND I AM SORRY.  I DON'T KNOW WHAT THAT MEANS -- AND

26   A JPEG.  I ALSO DON'T KNOW WHAT THAT MEANS.

27        BUT WHEN THEY -- THE METADATA SHOWS THAT THE

28   IMAGE -- THOSE TWO IMAGES ARE ON THE SAME DATE.  IT MEANS

```
1    THAT THE IMAGE WAS TAKEN ON THE SAME DAY.  AND WHEN THE
2    METADATA WAS PULLED, IT HAD THE SAME INFORMATION.  SO NOTHING
3    WAS MODIFIED TO THAT IMAGE.  NO FILTER.  NO ANYTHING THAT WAS
4    GOING TO HAPPEN THAT WOULD BE SOME KIND OF NEFARIOUS ATTEMPT
5    TO MAKE HER INJURIES LOOK WORSE.
6          THE TEXT MESSAGES -- MR. FETTEROLF WAS CORRECT IN
7    POINTING OUT THAT CERTAIN PHOTOS THAT WERE NOT GOING TO BE
8    USED IN OUR CASE WERE LOCATED BETWEEN ONE PICTURE THAT WAS
9    TAKEN AND THE NEXT PICTURE THAT WAS TAKEN ON HER PHOTO ROLL.
10   IT WASN'T -- I BELIEVE HE INITIALLY SAID 83.  THE NUMBER HAS
11   CHANGED A COUPLE OF TIMES.  WE LOOKED AND WE REFERENCED HER
12   CAMERA ROLL.  WE FOUND 60 PHOTOS, NOT 44.  WE PRODUCED ALL 60
13   PHOTOS.
14         SOME INCLUDE PHOTOS FOR WORK.  SOME INCLUDE
15   ADDITIONAL PHOTOS OF HER INJURIES.  AGAIN, NOTHING NEFARIOUS.
16   JUST WHAT WE WERE GOING TO USE TO PUT ON OUR CASE VS. THE
17   TOTALITY OF EVERY SINGLE PICTURE IN HER PHONE THAT
18   RESPONDENT'S SIDE SEEMS TO WANT TO SEE.
19         THE TEXT MESSAGES WITH FRIENDS.  THIS IS A
20   27-YEAR-OLD GIRL.  SHE TEXTED HER FRIENDS FREQUENTLY.
21      THE COURT:  SHE IS A WOMAN ACTUALLY WHO IS 27.
22      MR. GARELICK:  I APOLOGIZE.  YOU ARE VERY RIGHT.
23   APPARENTLY I AM JUST A BOY.  THE -- THEY TEXT FREQUENTLY.
24   THEY TEXT OFTEN.  THEY ALSO SEE EACH OTHER.  WHEN THEY SEE
25   EACH OTHER, THEY'RE NOT NECESSARILY TEXTING OR INSTAGRAM
26   MESSAGING OR DOING WHATEVER THEY ARE TO COMMUNICATE.  IT'S
27   OKAY THAT THERE ARE GAPS IN THAT EXCHANGE.
28         IT DOESN'T MEAN, AGAIN, THERE'S SOMETHING NEFARIOUS
```

```
 1    INVOLVED OR THAT THERE IS WITHHOLDING OF EVIDENCE INVOLVED.
 2    IT MAY JUST MEAN THAT THEY WERE TOGETHER AT THAT POINT IN
 3    TIME OR THAT SHE WAS WORKING IN A SHIFT AND UNABLE TO USE HER
 4    PHONE THAT ONE DAY THAT THERE IS MISSING MESSAGES.  IT IS
 5    ALSO UNREASONABLE FOR OUR SIDE TO TRY AND PROVE A NEGATIVE
 6    WHETHER OR NOT MESSAGES EXISTED WHEN WE ARE SAYING THAT THIS
 7    IS EVERYTHING THAT WE HAVE.  I CAN'T PROVE A NEGATIVE.
 8            THE INSTAGRAM VIDEOS, WE HAVE DONE EVERYTHING IN
 9    OUR POWER TO TRY AND RECOVER THOSE INSTAGRAM VIDEOS.
10    CERTAINLY IF MR. FETTEROLF HAS AN EXPERT WHO HAS A
11    RELATIONSHIP WITH THE SOCIAL MEDIA COMPANY AND CAN HELP US
12    OBTAIN ADDITIONAL RECORDS, WE'RE NOT GOING TO SAY NO TO THAT.
13    WE HAVE PRODUCED EVERYTHING THAT WE CAN PRODUCE.  THEY ARE
14    STORIES.  THEY GO AWAY.
15            WHEN THE PETITIONER BLOCKED RESPONDENT ON SOCIAL
16    MEDIA, THEY LOSE THE CHAIN OF WHAT'S HAPPENING.  IT DOESN'T
17    GET SAVED SOMEWHERE.  SO TO THE EXTENT THAT WE COULD, WE HAVE
18    GIVEN THEM EVERYTHING.  AGAIN, COMPLETELY TRANSPARENT.  WE'RE
19    NOT TRYING TO HIDE THE BALL.  THERE IS NOTHING NEFARIOUS
20    GOING ON.  WE JUST WANT TO PRESENT OUR CASE.  PRESENT THE
21    EVIDENCE AS TO WHAT HAPPENED.
22            WE ALSO PROVIDED INFORMATION -- AND ESSENTIALLY
23    IT'S SCREENSHOTS TO SHOW THAT THE LIVE STORIES WERE GONE BY
24    APRIL 29TH.  AND, AGAIN, THAT IS A REFERENCE TO SOMEONE BEING
25    BLOCKED ON INSTAGRAM.  INSTAGRAM IS NO LONGER GOING TO SAVE
26    THEIR CHAIN.  SO TO THE EXTENT THAT MS. HILL HAD SCREENSHOTS
27    OF WHAT THEY WERE SAYING OR HAD SENT MESSAGES TO A THIRD
28    PARTY -- WHICH HER WHOLE LIFE IS OPEN -- AND RESPONDENT'S
```

1   COUNSEL NOW KNOWS THAT, IT'S BEEN GIVEN.

2          HOWEVER, THAT'S THE EXTENT OF IT.  THAT'S THE

3   WORLD.  AND UNLESS INSTAGRAM HAS SAVED IT SOMEWHERE ON THEIR

4   SERVER THAT WE HAVEN'T BEEN ABLE TO GET FROM THEM, THEN WE

5   DON'T HAVE IT.  AND IT'S NOT IN OUR POSSESSION, CUSTODY, AND

6   CONTROL TO PRODUCE.

7          I'M GOING TO LET MS. OLSON ARGUE ON THE SPECIFICS

8   WITH THE MEDICAL RECORDS, YOUR HONOR.

9       THE COURT:  OKAY.

10      MR. GARELICK:  THANK YOU.

11      MS. OLSON:  FIRST, JUST AS A PROCEDURAL MATTER, WE HAD

12  SUBPOENAED THROUGH THE CUSTODIAN OF RECORDS DOCUMENTS FROM

13  ALVARADO.  I WAS JUST WONDERING IF YOU GOT THOSE.

14      THE COURT:  THE DOCUMENTS THAT I RECEIVED ARE FROM

15  MS. MAYA.  I'VE GOT TWO SETS OF DOCUMENTS FROM MS. MAYA.  AND

16  THESE ARE DOCUMENTS FROM COUNSEL.  SO, CHARLOTTE, DO WE HAVE

17  ANY OTHER DOCUMENTS?

18      THE CLERK:  NO.

19      THE COURT:  WE RECEIVED NO OTHERS.

20      MS. OLSON:  THEY MIGHT HAVE ENDED UP IN DEPARTMENT 25.

21  ON BREAK I'LL CHECK THAT OUT.  WITH RESPECT TO

22  MR. FETTEROLF'S CLAIM THAT'S THEY SUBPOENAED RECORDS FROM

23  SCRIPPS AND WHERE THEY ONLY RECEIVED TEN PAGES OF DOCUMENTS

24  FROM US, THEY RECEIVED 368 PAGES FROM SCRIPPS, WELL, THAT'S

25  TRUE.  THEY SUBPOENAED MS. HILL'S MEDICAL RECORDS BACK TO THE

26  MID-2000'S.  SO THEY GOT RECORDS, LIKE, FROM 2010, 2008.  SO

27  I DON'T HAVE THOSE RECORDS.  NOR WOULD THEY SEEM RELEVANT.

28          BUT, NOTWITHSTANDING, THAT'S WHY THERE'S A

1  DIFFERENTIAL.  I KNOW HE IS TRYING TO CREATE A SCENE WHERE WE

2  DIDN'T PRODUCE.  WE PRODUCED EVERYTHING THAT WE HAVE FROM

3  SCRIPPS.  THEY HAVE WHAT WE HAVE THAT WAS RELEVANT.

4          NUMBER TWO, IN TERMS OF ALVARADO MEDICAL CENTER, I

5  SERVED A DEPOSITION SUBPOENA.  I RECEIVED THE RECORDS.  I

6  PROVIDED COUNSEL WITH EVERYTHING I HAVE.  AND MS. HOLLEY

7  CONFIRMED THAT, I BELIEVE, ON ONE OF THEIR REQUESTS FOR

8  CONTINUANCE.  I THINK IT WAS THE FIRST REQUEST FOR

9  CONTINUANCE.  I PROVIDED THEM EVERYTHING THAT WE HAVE FROM

10 THE ALVARADO MEDICAL CENTER.

11         AS TO PALOMAR, THE COURT IS AWARE THAT WE ENTERED

12 INTO A STIPULATED PROTECTIVE ORDER.  THIS COURT, AS WELL AS

13 BOTH SETS OF COUNSEL, HAVE THOSE CONFIDENTIAL SART REPORTS.

14 APPARENTLY, THE OTHER SIDE WAS ASKING FOR ADDITIONAL RECORDS

15 FROM PALOMAR.  COUNSEL FOR PALOMAR ASKED THAT WE ENTER INTO A

16 STIPULATED PROTECTED ORDER.  I TOOK THE LABORING OAR.  I

17 PREPARED THE STIPULATION.  I CIRCULATED IT AND GOT IT SIGNED.

18 THOSE RECORDS ARE STILL WITH PALOMAR.  SO WE HAVE NO CONTROL

19 AS TO WHEN OR HOW THEY'RE BEING PRODUCED.

20         I REPRESENTED TO THE COURT AT THE LAST EX PARTE

21 CONCERNING THE PSYCHOLOGICAL TESTING.  IT WAS RECOMMENDED, AS

22 THE COURT POINTED OUT.  AND SHE DIDN'T HAVE A PSYCHOLOGICAL

23 TESTING.  SHE PROMPTLY CONTACTED HER THERAPIST AND EXECUTED A

24 VALID CONSENT FOR THE THERAPIST TO PROVIDE RECORDS.  I ASKED

25 THE THERAPIST FOR THOSE RECORDS.

26         AND I NOTIFIED MR. FETTEROLF OF THIS.  IT WASN'T

27 LIKE I JUST PRODUCED DOCUMENTS IN RESPONSE TO A MOTION TO

28 COMPEL.  I PROVIDED HIM WITH A COMPLETE LETTER OF ANSWERING

1  EACH ONE OF HIS ISSUES, PROVIDING RECORDS UNTOLD.  AND LET

2  HIM KNOW IN THAT LETTER THAT THE THERAPIST SAID SHE WOULD GET

3  ME RECORDS BUT COULDN'T DO IT UNTIL FRIDAY EVENING.  I TOLD

4  HIM IN THAT LETTER THAT I WOULD GET HIM THE RECORDS AS SOON

5  AS I GOT THEM.  AS SOON AS I GOT THEM, I PRODUCED THEM.  AND

6  IT ACTUALLY ENDED UP BEING FRIDAY AFTERNOON.  WHEN I GOT

7  THEM, I ACTUALLY SENT THEM WITH A FAX COVER SHEET.

8      THE COURT:  THIS IS THE EIGHT PAGES?

9      MS. OLSON:  EIGHT PAGES.  SHE HAD LIKE FOUR OR FIVE

10  VISITS.  AND IT'S THE NOTES FROM THE THERAPIST.  THAT'S ALL

11  WE HAVE.

12      THE COURT:  YOU'VE INDICATED TO COUNSEL THAT NONE OF

13  THAT INCLUDED ANY TESTING.

14      MS. OLSON:  NONE OF IT INCLUDED TESTING.  AND MS. HILL

15  WILL TESTIFY, AS AN OFFER OF PROOF, THAT SHE DIDN'T UNDERGO

16  PSYCHOLOGICAL TESTING.  SO FOR COUNSEL TO COME AND SAY THAT

17  WE'VE EITHER DELETED, FAILED TO PRODUCE, MODIFIED, IT'S NOT

18  ACCURATE.  EVERYTHING WE HAVE -- I HAVE NEVER BEEN MORE

19  TRANSPARENT.  I MEAN, IF SHE WAS GOING TO DELETE --

20      THE COURT:  WHAT'S GOING ON IN YOUR OFFICES THAT

21  EVERYBODY IS LESS TRANSPARENT, EXCEPT IN THIS CASE?

22      MS. OLSON:  I'M ALWAYS TRANSPARENT.  I MEAN, BEYOND

23  TRANSPARENT.  BUT, AGAIN, THERE'S BEEN SUCH AN OVERPRODUCTION

24  WHEN THERE'S BEEN NO ACTUAL DISCOVERY PENDING.  IT'S KIND OF

25  BAFFLING.  NOTWITHSTANDING, THEY HAVE EVERYTHING THAT WE

26  HAVE.  TO THE EXTENT THEY'RE CLAIMING THAT WE DON'T, THEY'RE

27  GOING TO LET YOU KNOW DURING THE TESTIMONY.

28      MR. FETTEROLF:  IF I MAY, YOUR HONOR?

1      THE COURT:  YOU MAY.

2      MR. FETTEROLF:  JUST A COUPLE OF THINGS.  I -- ONE OF

3  THE DIFFICULT PARTS HERE IS TO JUST KEEP UP WITH THE

4  DIFFERENT EXPLANATIONS THAT WE HAVE RECEIVED.  AS TO THE

5  DOCUMENTS, I THINK I NOTED AT THE HEARING IF THEY'RE MEDICAL

6  RECORDS RELATING TO AN EVENT, I THINK WE'RE ENTITLED TO THEM.

7  THAT'S WHAT WE'RE ASKING FOR.

8          IF THERE IS REFERENCE TO PSYCHOLOGICAL TESTING,

9  THERE'S A REFERENCE TO PTSD, SOMEONE HAD TO MAKE THAT

10  DETERMINATION.  WE ASKED FOR IDENTIFY THE PERSON AND ASKED

11  FOR THE RECORDS.  I THINK I JUST HEARD THAT I BELIEVE THE

12  D.V.R.O. PETITION WAS FILED ON THE 29TH.  THE AFFIDAVIT WAS

13  THE 28TH.

14          THERE ARE -- MS. HILL'S REFERENCES ARE REPLETE WITH

15  HIRING ATTORNEYS WELL BEFORE THAT DATE.  THERE'S REFERENCE TO

16  ON 5/18 TO GETTING AN ATTORNEY.  THERE'S REFERENCE ON 6/1 TO

17  HIRING AN ATTORNEY.  THAT MAY HAVE BEEN A DIFFERENT ATTORNEY

18  THAN MS. OLSON'S FIRM.  BUT THERE'S A HOST OF ATTORNEYS.

19  THERE'S -- AS YOU SAW IN OUR MOTION TO DISMISS, THERE'S

20  REFERENCE TO, "I'M GOING TO DO A CIVIL CASE."  I'M GOING TO

21  DO THIS.  X, Y, AND Z.

22          SO I DON'T THINK THE FACT THAT A PHONE WAS IMAGED

23  THE DAY BEFORE A D.V.R.O., WHICH -- AFTER IT WAS FILED, MEANS

24  AN ATTORNEY WAS HIRED ON THAT DAY.  AND THAT'S ONE OF OUR

25  OBLIGATIONS TO PRESERVE EVIDENCE.

26          AS TO THE TEXT MESSAGES, WE ASKED FOR THEM.  AND

27  THE EXPLANATION IS THEY JUST DON'T EXIST.  BASED ON THE BACK

28  AND FORTH, THAT DOESN'T SEEM TO MAKE ANY SENSE TO US.  I

1 THINK THERE'S AN EASY WAY TO FIGURE OUT WHAT'S THERE.

2 BECAUSE PHONE RECORDS WON'T SHOW WHAT'S IN THE TEXT.  BUT IF

3 THAT IS THE ANSWER THAT THESE TWO PEOPLE DID NOT COMMUNICATE

4 DURING THIS PERIOD OF TIME, WE CAN GET AN ANSWER TO THAT

5 QUESTION.  AND THESE MESSAGES OF TWO PEOPLE THAT ARE

6 REFERENCED IN THE AFFIDAVIT, BASED ON THE HOST OF INFORMATION

7 WE ALREADY PROVIDED YOU ABOUT THEIR COMMUNICATIONS, WE THINK

8 IS HIGHLY RELEVANT TO THIS CIRCUMSTANCE.

9       THE INSTAGRAM MESSAGES, I MEAN, I THINK BOTH PEOPLE

10 ARE WORKING TO TRY TO GET AN ANSWER TO THIS.  BUT WE HAD BEEN

11 GIVEN FIVE OR SIX DIFFERENT EXPLANATIONS AS TO WHAT HAPPENED.

12 ONE WAS SHE DELETED THE MESSAGES, BECAUSE SHE DIDN'T WANT TO

13 SEE HIS PHONE NUMBER OR COMMUNICATIONS WITH HIM.  BUT THE

14 INSTAGRAM AND OTHER MESSAGES ARE REPLETE WITH SHARING OF

15 INFORMATION ABOUT MR. BAUER, INCLUDING HIS PICTURES.  THERE'S

16 TEXT MESSAGES THAT I WOULD ASSUME SHE HAD, TOO.  SO I AM JUST

17 A LITTLE BIT FRUSTRATED TRYING TO FIGURE OUT WHAT IS THE

18 ANSWER FOR THOSE.

19       AND AS TO THE MEDICAL RECORDS, I MEAN, AT THE END

20 OF THE DAY WE ARE STILL AWAITING RECORDS.  WE'VE ASKED FOR

21 THEM IN GOOD FAITH.  WE SUBPOENAED.  WE WORKED WITH THESE

22 PEOPLE.  YES, WE'VE ASKED THE OTHER SIDE FOR THEM.  AND THERE

23 WAS A HISTORY OF GETTING DRIPS AND DRABS.  BUT OUR SUBPOENAS

24 ARE OUT AND WE ARE STILL AWAITING INFORMATION.

25       SO, ULTIMATELY, YOU KNOW, FROM OUR STANDPOINT, ONE

26 OF THE THINGS WE TALKED ABOUT, I THOUGHT, ON ONE OF THE EARLY

27 HEARINGS WHEN MS. HOLLEY WAS HERE IS WE WERE GOING TO COME

28 HERE TODAY AND GIVE AN UPDATE ON WHERE WE ARE.  WE ARE

```
 1    STILL -- WE ARE ALL TRYING TO GET THE RELEVANT INFORMATION.
 2    AND SOME OF IT HAS NOT BEEN PROVIDED.  SOME OF IT NEEDS
 3    FURTHER ANSWERS.  THAT'S THE SPOLIATION.
 4         WHAT I WAS GOING TO SUGGEST TODAY WAS WE NEED TO
 5    KNOW WHAT IS THE ANSWER.  AND THEN WE CAN TEST IT.  BECAUSE I
 6    DON'T KNOW IF YOU WANT ME TO GO THROUGH ALL THE VARIETY OF
 7    ANSWERS THAT WE HAVE BEEN GIVEN TO THESE QUESTIONS.  I THINK
 8    IT'S A SIGNIFICANT ISSUE.  I MEAN, THE MESSAGES WITH --
 9    BETWEEN THE PETITIONER AND MR. BAUER WERE DELETED.  WE THINK
10    THEY OCCURRED AFTER THE POINT THAT SHE HAD AN OBLIGATION TO
11    KEEP THEM.  I MEAN, SHE IS MAKING ALLEGATIONS THAT THERE WAS
12    AN ALLEGED ASSAULT ON 4/21 -- APRIL 21ST AND 22ND.
13         THE COURT:  I GUESS ONE OF THE THINGS THAT WOULD BE
14    IMPORTANT FOR ME TO KNOW -- AND I'LL ADDRESS THIS TO COUNSEL
15    FOR PETITIONER -- IS WHEN DID PETITIONER CONSULT AN ATTORNEY
16    FOR THE FIRST TIME AFTER THE ALLEGED ASSAULT.
17         MR. GARELICK:  CERTAINLY, YOUR HONOR.  I THINK I CAN
18    ANSWER THAT QUESTION.  SO PETITIONER SOUGHT OUT SOMETHING
19    CALLED A MARSY LAWYER.  AND THE IDEA BEFORE THE MARSY LAWYER
20    IS ESSENTIALLY A VICTIM'S DEFENSE ATTORNEY TO HELP WHAT WAS
21    THEN BELIEVED TO BE A PROSECUTION CASE.  AND SO I BELIEVE --
22    AND MR. THIAGARAJAH IS ACTUALLY PRESENT HERE TODAY.  HE CAN
23    PROBABLY GIVE US A SPECIFIC ANSWER AS TO WHEN HE FIRST MET
24    WITH MS. HILL.
25         MR. THIAGARAJAH:  YES, YOUR HONOR.  I HAVE TO PULL FROM
26    MY NOTES, BUT MS. HILL DID RETAIN ME SPECIFICALLY FOR THE
27    PURPOSE OF ACTING AS A LIAISON BETWEEN HER AND THE POLICE.
28    THERE WAS NO CONTEMPLATION OF A RESTRAINING ORDER WHEN SHE
```

1  RETAINED ME.  IT WAS SOLELY FOR THAT PURPOSE.  AND THEN

2  ASSUMING THAT THE POLICE FORWARDED THE REPORT TO THE DISTRICT

3  ATTORNEY'S OFFICE, WHICH HASN'T OCCURRED YET, I WOULD BE

4  FOLLOWING UP WITH THEM.

5            AND THEN AT SOME POINT IN TIME WHEN IT -- WE HELD

6  OFF ON -- THERE WAS NO INTENTION OF FOLLOWING THROUGH WITH A

7  RESTRAINING ORDER, BECAUSE WE THOUGHT THE CASE WAS GOING TO

8  GET FILED IN CRIMINAL COURT.  AT SOME POINT IN TIME, IT

9  APPEARED THAT THE INVESTIGATION WAS GOING TO TAKE A LOT

10 LONGER.

11      THE COURT:  RIGHT.  MY ONLY QUESTION IS WHAT'S THE DATE

12 SHE FIRST CONSULTED WITH YOU.

13      MR. THIAGARAJAH:  GIVE ME A FEW MINUTES, YOUR HONOR, AND

14 I'LL PULL THAT UP.

15      THE COURT:  SURE.

16      MR. THIAGARAJAH:  APPROXIMATELY MAY 24TH, YOUR HONOR.

17      THE COURT:  MAY 24.  ALL RIGHT.  ANY OTHER ARGUMENT FROM

18 COUNSEL?

19      MS. MEYER:  YOUR HONOR, I'D LIKE TO ARGUE WITH RESPECT

20 TO DR. STEIN.

21      THE COURT:  SURE.

22      MS. MEYER:  AS THE COURT KNOWS, DR. STEIN IS A CLINICAL

23 AND FORENSIC PSYCHOLOGIST.  SHE INTENDS TO TESTIFY WITH

24 RESPECT TO -- GENERALLY WITH RESPECT TO ISSUES INVOLVING

25 DOMESTIC VIOLENCE.  THE DIFFERENCE BETWEEN DOMESTIC VIOLENCE,

26 ROUGH SEX, BONDAGE, DOMINATION, SADOMASOCHISM.

27            SHE WILL ALSO TESTIFY -- AND I UNDERSTAND THE

28 COURT'S COMMENTS ABOUT CONSENT BEING A FACTUAL AND LEGAL

1    ISSUE.  SHE WILL ALSO TESTIFY ON -- THAT A VICTIM WHO IS

2    RENDERED UNCONSCIOUS AFTER STRANGULATION CANNOT CONSENT.  THE

3    CASE LAW IS CORRECT ON THAT POINT.

4        THE COURT:  BUT I DON'T NEED A PSYCHOLOGIST TO TELL ME

5    THE LAW.

6        MS. MEYER:  THAT IS TRUE.  I WOULD AGREE WITH YOU.

7    HOWEVER, SHE WILL PROVIDE EVIDENCE BEYOND WHAT A NORMAL

8    PERSON KNOWS ABOUT GENERALLY THOSE ISSUES.  AND THIS CASE, AS

9    THE COURT POINTED OUT, IS LARGELY BASED UPON WAS THERE A

10   DATING RELATIONSHIP OR NOT.  THOSE ARE FACTUAL ISSUES.  WAS

11   THE SEX CONSENSUAL OR NOT?  WAS IT CONSENSUAL AND THEN

12   MR. BAUER CROSSED THE LINE AT SOME POINT INTO CONSENT VS.

13   NON-CONSENT?

14            AND SHE CAN TALK ABOUT ALL THOSE ISSUES, BECAUSE

15   THAT'S WHAT SHE DEALS WITH IN HER CLINICAL PRACTICE.  AND

16   THAT'S WHAT SHE DEALS WITH AS A FORENSIC EXPERT.  SO I DO

17   BELIEVE THAT HER TESTIMONY WOULD BE HELPFUL TO THE COURT.  WE

18   DON'T ANTICIPATE THAT IT WILL BE VERY LONG.  AND I UNDERSTAND

19   THE COURT'S CONCERNS AND ADMONITIONS.  CLEARLY WE WILL ONLY

20   ADDUCE TESTIMONY THAT IS RELEVANT.

21            AND, ALSO ONE FINAL POINT.  I THINK IT ALSO GOES TO

22   HER WEIGHT IN TERMS OF THE FACT THAT SHE IS NOT A PERCIPIENT

23   WITNESS.  SHE DID NOT EXAMINE THE VICTIM.  HOWEVER, I THINK

24   HER TESTIMONY WILL BE HELPFUL.  THANK YOU.

25       THE COURT:  THANK YOU.

26       MS. MANGELS:  THANK YOU.  SO AS YOUR HONOR STATED, THE

27   EXPERT SHOULD NOT USURP THE ULTIMATE DECIDER OF FACT.  AND

28   WITH THE ISSUES THAT ARE PRESENTED HERE WITH THE EXPERT, THE

```
1    ULTIMATE DECIDER OF FACT, YOUR HONOR, CAN -- HAS AS MUCH
2    COMMON EXPERIENCE.
3            PETITIONER'S COUNSEL JUST MENTIONED THAT THE EXPERT
4    MAY TESTIFY ON WHETHER OR NOT THERE WAS A DATING RELATIONSHIP
5    OR WHAT A DATING RELATIONSHIP MEANS.  THAT IS PLAINLY WITHIN
6    ANYONE'S COMMON EXPERIENCE.  AN EXPERT WOULDN'T PRODUCE
7    INFORMATION BEYOND WHAT ANY TRIER OF FACT WOULD KNOW.  THAT'S
8    NOT APPROPRIATE EXPERT TESTIMONY.
9            WITH RESPECT TO BONDAGE, DSM RELATIONSHIPS, THAT'S
10   NOT AN ISSUE IN THIS CASE.  THAT HADN'T BEEN PRESENTED AS AN
11   ISSUE.  THAT WOULD BE BEYOND THE SCOPE.  SO BOTH FOR THE
12   REASONS THAT THE SUBJECT MATTER IS NOT SUFFICIENTLY BEYOND
13   THE COMMON EXPERIENCE THAT IT WOULD ASSIST THE TRIER OF FACT.
14   AND, BOTH, BECAUSE THE EVIDENCE IS NOT RELEVANT AND -- OR
15   WITHIN THE SCOPE OF THE HEARING.  I WOULD ASK YOUR HONOR
16   UPHOLD YOUR TENTATIVE AND STRIKE THE EXPERT.
17           ONE OTHER NOTE IS THAT THE -- OUR MOTION WAS
18   DRAFTED BASED ON A ONE SENTENCE REPRESENTATION THAT WE
19   RECEIVED THAT THE EXPERT WOULD BE ON DOMESTIC VIOLENCE,
20   INCLUDING BUT NOT LIMITED TO, CONSENSUAL VS. NONCONSENSUAL
21   SEX, AND ANY OTHER MATTERS RAISED IN PETITIONER'S
22   APPLICATION.  THAT HAS NOW BEEN EXPANDED TO A PARAGRAPH LONG
23   RECITATION OF WHAT THE EXPERT -- MULTIPLE THINGS HAVE BEEN
24   ADDED INCLUDING ASSESSMENT OF RELATIONSHIPS, FORMATION OF
25   RELATIONSHIPS, THINGS OF THAT SORT.  THOSE THINGS ARE EVEN
26   MORE IN THE COMMON EXPERIENCE.
27           SO I WOULD ADD THAT ON TOP OF THE ARGUMENTS THAT
28   ARE IN OUR MOTION.
```

```
 1        THE COURT:  THANK YOU.

 2        MS. MEYER:  YOUR HONOR, MAY I RESPOND BRIEFLY?

 3        THE COURT:  VERY BRIEFLY.

 4        MS. MEYER:  YOUR HONOR, WE HAVE ALWAYS ADDRESSED THE

 5   ISSUE OF ROUGH SEX, BECAUSE THAT'S MR. BAUER'S DEFENSE, THAT

 6   MS. HILL ENJOYED HAVING ROUGH SEX.  AND, THEREFORE, HIS

 7   ACTIONS ARE JUSTIFIED.  SO THAT WAS ALWAYS AN ISSUE.  WITH

 8   RESPECT TO BONDAGE, DOMINATION, AND SADOMASOCHISM, THE EXPERT

 9   WILL TESTIFY THAT IN ORDER TO HAVE THAT TYPE OF RELATIONSHIP,

10   IT REQUIRES ENTERING INTO AN UNDERSTANDING WITH SOMEBODY

11   BEFOREHAND AS TO WHAT THE MENU IS OR WHAT SOMEONE IS

12   PERMITTED TO DO.

13        NATURALLY THE SUBMISSIVE IN THIS CASE, MS. HILL, IS

14   THE ONE WHO SETS THE MENU.  SHE DID NOT SET A MENU THAT SHE

15   WANTED TO BE STRANGLED TO THE POINT OF UNCONSCIOUSNESS AND

16   THEN PUNCHED IN THE VAGINA AND PUNCHED IN THE BUTTOCKS TIME

17   AFTER TIME.  THAT WAS NOT ON THE MENU.

18        THE COURT:  BUT I THINK THAT IS A CONTESTED FACTUAL

19   ISSUE.

20        MS. MEYER:  IT IS A CONTESTED FACTUAL ISSUE.  SOMETIMES.

21        THE COURT:  IN THIS CASE.

22        MS. MEYER:  I'M NOT -- WELL, NO.  I THINK MR. BAUER

23   TESTIFIES INCONSISTENTLY ON THAT POINT, TOO.  IN FACT, WHEN

24   THEY HAD SEX THE SECOND TIME IN MAY, HE TOLD HER, AFTER SHE

25   CAME TO CONSCIOUSNESS THE SECOND TIME AFTER HE STRANGLED HER,

26   HE SAID TO HER, OH, BY THE WAY -- AND I'M PARAPHRASING --

27   YOUR BUTT MAY BE SORE, BECAUSE I HIT YOU IN THE BUTT.  SO TO

28   ME THAT SAYS THAT HE DIDN'T GET HER CONSENT BEFOREHAND,
```

```
 1    BECAUSE WHY WOULD HE NEED TO TELL HER THAT IF THEY HAD THAT
 2    DISCUSSION BEFOREHAND?
 3            I THINK THAT -- I THINK IT'S VERY IMPORTANT TO HEAR
 4    FROM AN EXPERT, BECAUSE NONE OF US HERE -- UNLESS WE DON'T
 5    KNOW SOMETHING.
 6        THE COURT:  WE HAVE NO IDEA.
 7        MS. MEYER:  I THINK THESE ARE THINGS BEYOND COMMON
 8    EXPERIENCE.  THEY CERTAINLY ARE FOR OUR TABLE.  THANK YOU.
 9        MR. FETTEROLF:  IF I CAN MENTION ONE THING TO BE
10    CLEAR.
11        THE COURT:  WE'RE USING THE FUNNEL NOW.  EVERYBODY CAN
12    ONLY TALK ABOUT WHAT THE VERY LAST PERSON SAID.
13        MR. FETTEROLF:  I WANT TO MAKE CLEAR THAT WE HAVE ARGUED
14    THAT THEY HAD A CONSENSUAL RELATIONSHIP.  THAT DOESN'T MEAN
15    WE'VE AGREED TO EVERYTHING THAT MS. HILL HAS PUT IN HER
16    PETITION.  WE VEHEMENTLY DENY THAT.  I WANT TO MAKE THAT
17    CLEAR.
18        THE COURT:  ALL RIGHT.  SO AS I UNDERSTAND IT, DR. STEIN
19    WILL BE A PURELY DIDACTIC EXPERT.  I DON'T THINK SHE IS
20    NECESSARY FOR THE COURT TO UNDERSTAND THE ISSUES INVOLVED IN
21    THE CASE.  AND AS TO ANYTHING ELSE, SINCE SHE IS PURELY
22    DIDACTIC, IT WILL NOT BE OF ASSISTANCE TO THE COURT.  SO THE
23    COURT'S TENTATIVE WITH REGARD TO DR. STEIN STANDS.
24            WITH REGARD TO THE MOTIONS TO DISMISS, ON THE
25    PRIMARY GROUNDS, BEFORE WE GOT TO THE SPOLIATION ISSUE, THE
26    TENTATIVE STANDS.  WITH REGARD TO THE SPOLIATION ISSUE, IT
27    SOUNDS LIKE THERE MAY STILL YET BE THINGS COMING IN.  SINCE
28    WHAT YOU HAVE NOT ASKED FOR, AS MR. GARELICK ACCURATELY
```

| 1 | POINTS OUT, IS A CONTINUANCE, I'LL LET YOU -- I WILL CONSIDER |

1    POINTS OUT, IS A CONTINUANCE, I'LL LET YOU -- I WILL CONSIDER

2    YOUR RENEWAL OF THAT MOTION AFTER WE HEAR ADDITIONAL

3    EVIDENCE.

4         MS. HOLLEY:  THANK YOU.  SO I JUST WANT TO BE CLEAR THAT

5    FROM THE BEGINNING, AS THE COURT IS AWARE, WHEN I WAS ASKED

6    HERE AND AT THE PREVIOUS COURT IF WE WERE READY, I SAID,

7    "YES," WITH A CAVEAT.  I HAVE BEEN CONSISTENT.  WE ARE

8    CONSISTENT.  AND WE DIDN'T COME HERE TO ASK FOR A

9    CONTINUANCE.  THE REALITY, HOWEVER, IS THAT WE ARE PROVIDED A

10   SLIVER OF INFORMATION.  A SLIVER OF EVIDENCE.  AND INITIALLY

11   THE DECLARATION.

12        AND WE SAY WE ARE READY TO PROCEED ON THAT.  WHAT

13   HAPPENS THEREAFTER IS ADDITIONAL INFORMATION AND EVIDENCE

14   COMES IN THAT IS RELEVANT AND IMPORTANT, WHICH CAUSES US TO

15   RECOGNIZE THAT, IN FACT, IF THIS IS WHAT THE COURT IS GOING

16   TO ALLOW, WE NEED ADDITIONAL TIME AND INFORMATION TO PREPARE

17   FOR THAT.  WHEN I WAS HERE THE LAST TIME, WHICH WAS -- I

18   DON'T REMEMBER -- BUT WHAT I SAID THEN -- AND I WAS ASKING

19   FOR A CONTINUANCE -- IS THAT WE HAD RECEIVED EVERYTHING FROM

20   PETITIONER, WHICH WE HAVE.  BUT WE WERE WAITING FOR

21   ADDITIONAL INFORMATION.  THE COURT SAID WE'RE GOING TO COME

22   BACK ON THE 16TH.  I NEED TO KNOW WHERE WE ARE AT THAT TIME.

23        SO THE COURT IS AWARE, PART OF THIS 688 DOCUMENTS

24   WE RECEIVED IS HIGHLY RELEVANT.  BECAUSE THE MEDIA IS HERE

25   AND BECAUSE I AM SENSITIVE TO MS. HILL'S PRIVACY, I DON'T

26   WANT TO SPEAK TO WHAT THOSE THINGS ARE IN OPEN COURT.  AND IF

27   THE COURT IS INCLINED TO HAVE A CONVERSATION IN CHAMBERS, WE

28   CAN DO THAT.  BUT THERE'S A GREAT DEAL OF INFORMATION

1   RECEIVED.  AND, BY THE WAY, WE DIDN'T ASK FOR EVERYTHING FROM

2   THE BEGINNING OF TIME.  THAT'S WHAT THEY SENT US.  WE HAD A

3   NARROW REQUEST.  THEY SENT US EVERYTHING.

4        THE COURT:  I UNDERSTAND.  BUT COUNSEL IS CORRECT.  AND

5   RELEVANCE IS NOT NECESSARILY GOING TO BE THE ISSUE.  BECAUSE

6   IT MAY BE THAT FOR THE LAST TEN YEARS IT SAYS THAT SHE'S THE

7   SAME HEIGHT BECAUSE SHE IS THE SAME HEIGHT.  IT'S STILL

8   RELEVANT, PERHAPS.  BUT NOT NEW INFORMATION THAN WHAT YOU

9   ALREADY HAVE.

10       MS. HOLLEY:  CORRECT.  AND WHAT WE HAVE RECEIVED IS

11  INFORMATION THAT IS RELEVANT TO WHAT HER COMPLAINTS ARE POST

12  HER INTERACTION WITH MR. BAUER.  THEY SPEAK DIRECTLY TO

13  PREEXISTING CONDITIONS THAT SHE HAD THAT ARE HIGHLY RELEVANT.

14  SO OUR CONCERN, AND AS THE COURT IS AWARE, I WAS GOING AWAY

15  MR. FETTEROLF WAS GOING AWAY.  THROUGHOUT THAT ENTIRE TIME OF

16  BOTH OF OUR GOINGS AWAY, WE WORKED ON THIS CASE BECAUSE WE

17  WERE RECEIVING NEW INFORMATION.

18       WE DIDN'T COME HERE TODAY TO ASK FOR A CONTINUANCE.

19  AT THE SAME TIME WE DON'T KNOW WHAT TO DO GIVEN THAT WE KEEP

20  GETTING NEW INFORMATION.  AND SOME OF THE INFORMATION IS

21  STILL OUTSTANDING.  AND BASED ON WHAT WE RECEIVED, IT'S

22  HIGHLY RELEVANT.  SO, YOU KNOW, I APPRECIATE THE ARGUMENTS

23  THAT HAVE BEEN MADE BY COUNSEL FOR PETITIONER.  BUT THE

24  REALITY IS WHAT HAPPENS IS THEY DO GIVE US SCANT EVIDENCE.

25  AND WHEN WE REQUEST MORE OF IT, FIRST THEY SAY, WE DON'T HAVE

26  IT.  WE FILE A MOTION TO COMPEL.  IT APPEARS.  AND IT IS

27  HIGHLY COMPELLING, HIGHLY RELEVANT, INCONSISTENT WITH WHAT'S

28  BEEN PRESENTED BEFORE.

1          AND, ALSO, INCONSISTENT WITH THE ARGUMENTS THAT

2     HAVE BEEN MADE BEFORE.  SO IT PUTS US IN A DIFFICULT

3     POSITION.  AND I KNOW THAT COUNSEL FOR PETITIONER HAS

4     REPEATEDLY SUGGESTED THAT I AM SOMEHOW INCONSISTENT IN WHAT

5     I'M SAYING TO THE COURT.  I WANT TO MAKE CLEAR THAT I AM NOT.

6     THAT WE ARE PREPARED FOR WHAT WE HAVE, AND THEN WE GET MORE.

7          AND IT IS OUR DUTY TO VIGOROUSLY, VEHEMENTLY DEFEND

8     MR. BAUER.  THERE IS A GREAT DEAL OF INFORMATION WITH WHICH

9     TO DO THAT.  AND WE DON'T HAVE IT ALL.  AND WE CONTINUE TO

10    GET IT.  I DON'T KNOW -- YOU KNOW, I DIDN'T WANT TO ASK FOR A

11    CONTINUANCE BECAUSE THAT'S NOT NECESSARILY WHAT WE WANT.  YOU

12    KNOW, HE ALSO STANDS IN A LIMBO POSITION, WHICH IS AFFECTING

13    HIS LIFE AS WELL.  I AM SIMPLY LETTING THE COURT UNDERSTAND,

14    AND HOPEFULLY APPRECIATE, THE POSITION WHICH WE FIND

15    OURSELVES.  AND ASK THE COURT TO HELP US FIGURE OUT HOW TO DO

16    THAT IN A WAY THAT IS FAIR TO ALL OF US AND THE JUDICIAL

17    PROCESS.

18          BECAUSE WE GOT 688 PAGES AND A LOT OF THEM ARE

19    DIRECTLY RELEVANT TO WHAT MS. HILL CLAIMS ARE HER INJURIES.

20        THE COURT:  HAVE YOU -- I KNOW YOU JUST GOT THEM.  HAVE

21    YOU GONE OVER THEM WITH ANY OF THE ATTORNEYS ON PETITIONER'S

22    SIDE?

23        MS. HOLLEY:  NO.  WE PROVIDED THEM TO THEM.  IT WAS OUR

24    SUBPOENA.  WE PROVIDED ALL OF THEM TO THEM.  I HAVE NO IDEA

25    IF THEY LOOKED AT THEM.  AGAIN, WE HAVEN'T LOOKED AT ALL OF

26    THEM.  THEN THERE'S STILL OUTSTANDING INFORMATION.  BASED ON

27    WHAT WE ARE GETTING, EVERYTHING HAS RELEVANCE.

28        THE COURT:  RELEVANCE IS NOT THE ISSUE.  EVERYTHING MAY

1   BE RELEVANT BECAUSE ALL OF IT PERTAINS TO THESE PARTIES.  THE

2   QUESTION IS, IS IT UNIQUE?  IS IT SOMETHING THAT'S RELEVANT,

3   BUT WE ALREADY HAD SOMETHING, AGAIN, THAT SAID THE SAME THING

4   IN THE PAGES THAT WE ALREADY HAD?  IT MAY CONTINUE TO BE

5   RELEVANT, BUT IT'S NOT NEW INFORMATION REQUIRING ANY

6   EXTENSION OF TIME.

7       MS. HOLLEY:  IT IS ALL NEW INFORMATION.

8       THE COURT:  OKAY.  SO I AM GOING TO ASK YOU AND

9   MS. MEYER TO TAKE A LOOK TOGETHER AT THE INFORMATION AND

10  ADDRESS IT TO ME.  AND IF YOU WANT TO DO IT IN CHAMBERS, WE

11  CAN DO THAT.  AND YOU TELL ME WHY THAT REQUIRES A CONTINUANCE

12  OF THIS CASE.

13      MS. HOLLEY:  WE CAN DO THAT.  I CAN ALSO TELL YOU BOTH

14  NOW IN CHAMBERS WHAT WE HAVE COME UPON SO FAR.  AND, AGAIN,

15  WE HAVEN'T SEEN ALL OF IT, BECAUSE WE JUST GOT IT.  AND IT'S

16  A LOT.  WE ARE TRYING TO PREPARE FOR IT TODAY.  BUT WE CAN

17  LET YOU KNOW IN CHAMBERS NOW WHAT WE HAVE SEEN THUS FAR.

18      MS. MEYER:  YOUR HONOR, IF I MAY?  WE RECEIVED THE SIX

19  HUNDRED AND SOMETHING PAGES AFTER THEY RECEIVED IT.  SO WE

20  DIDN'T HAVE IT BEFOREHAND.  EACH SIDE HAS AT LEAST FOUR

21  ATTORNEYS.  WE ARE INUNDATED ON A DAILY BASIS DURING THE WEEK

22  AND ON THE WEEKENDS WITH MOTIONS, WITH PLEADINGS, WITH

23  DECLARATIONS, WITH SUBPOENAS.  SO IF THEY WERE ABLE TO DO ALL

24  THAT, I AM SHOCKED THAT THEY WERE NOT ABLE TO REVIEW 600

25  PAGES BETWEEN SOMETIME ON FRIDAY AND TODAY.

26          I NOTE OUR TEAM SPENT THE ENTIRE WEEKEND, THAT IS,

27  AT LEAST 12 HOURS, IF NOT MORE, ON SATURDAY AND 12 HOURS ON

28  SUNDAY PREPARING.  AND SOME OF THAT INCLUDED REVIEWING THE

```
 1   TEXT MESSAGES, INSTAGRAMS, MEDICAL RECORDS, ET CETERA.  WHAT
 2   THEY WANT TO SHOW YOU, AND WHAT THEY FIND SO IRR- -- SO
 3   RELEVANT -- AND THAT WAS A FREUDIAN SLIP BECAUSE IT REALLY IS
 4   NOT RELEVANT -- IS ABOUT MS. HILL'S HISTORY.
 5           BECAUSE THEY THINK THAT SOMEHOW THE FACT THAT SHE
 6   HAS BEEN AN ALCOHOLIC SINCE SHE WAS A TEENAGER SOMEHOW
 7   JUSTIFIES WHAT THIS MAN DID TO HER.
 8       THE COURT:  I THINK YOU'RE SPECULATING UNTIL YOU'VE HAD
 9   THIS CONVERSATION TOGETHER.
10       MS. HOLLEY:  I CAN REPRESENT TO THE COURT THAT IT HAS
11   NOTHING TO DO WITH THAT.
12       THE COURT:  I'M GOING ASK YOU TO SPEAK OUTSIDE OF MY
13   PRESENCE TOGETHER WITH REGARD TO THE PARTICULAR DOCUMENTS
14   THAT MS. HOLLEY BELIEVES ARE BOTH RELEVANT AND UNIQUE.  AND
15   THEN YOU CAN TAKE A LOOK AT IT AND DISCUSS IT WITH YOUR
16   CLIENT.  LET'S JUST TAKE A TEN MINUTE BREAK FOR THE PURPOSE
17   OF YOU DOING THAT.
18       MS. HOLLEY:  THANK YOU.
19       THE COURT:  WE'LL TAKE 15 BECAUSE MY COURT REPORTER HAS
20   BEEN FURIOUSLY WRITING.
21       MS. MEYER:  SHOULD WE STAY IN HERE, YOUR HONOR?
22       THE COURT:  WHY DON'T WE HAVE YOU USE THE JURY ROOM FOR
23   15 MINUTES.
24               (RECESS TAKEN.)
25       THE COURT:  BACK ON IN HILL AND BAUER.  COUNSEL, YOU HAD
26   AN OPPORTUNITY TO MEET AND CONFER?
27       MS. HOLLEY:  YES.  AS FAR AS WE'RE CONCERNED, IT WAS NOT
28   FRUITFUL.  AT THIS TIME WE ARE ASKING FOR A CONTINUANCE.  AND
```

```
 1    THERE ARE A NUMBER OF REASONS WHY.  SOME OF WHICH HAVE

 2    ALREADY BEEN ALLUDED TO.  AS THE COURT IS AWARE -- AND I

 3    UNDERSTAND THE COURT HAS REVIEWED MUCH OF THE INFORMATION

 4    PROVIDED BY BOTH SIDES.  THE COURT IS AWARE, FOR EXAMPLE,

 5    THAT WHAT WAS INITIALLY PROVIDED WERE A VERY FEW MESSAGES

 6    FROM MS. HILL THAT WERE, AGAIN, VERY SPARSE.  AND AS THE CASE

 7    HAS GONE ON, WE HAVE RECEIVED MUCH, MUCH MORE.

 8         SOME OF WHAT WE RECEIVED, HUNDREDS OF PAGES OF TEXT

 9    COMMUNICATIONS BETWEEN THE A.A. SPONSOR, MS. JACKSON DECKER.

10    AS WELL AS TEXTS WITH CIRAMELY MAYA, WHO -- AS THE COURT MAY

11    RECALL, WE WERE ADVISED DIDN'T EXIST.  ALL OF THAT

12    INFORMATION IS UNIQUE.  SPEAKS DIRECTLY TO THESE ISSUES.

13    SPEAKS DIRECTLY TO WHAT MS. HILL'S INTENTIONS WERE THAT ARE

14    INCONSISTENT WITH WHICH SHE NOW CLAIMS.

15         WE DON'T KNOW WHAT WE DON'T KNOW.  BUT HERE IS WHAT

16    WE DO KNOW.  THAT EVERY TIME WE GET SOMETHING, IT IS NOT JUST

17    RELEVANT BUT UNIQUE.  AND THERE HASN'T BEEN ONE OCCASION WHEN

18    THAT HASN'T HAPPENED.  NOT ONE WHERE WE HAVE GOTTEN SOMETHING

19    THAT WAS UNIMPORTANT, INSIGNIFICANT.  EVERYTHING WE GET IS OF

20    CRITICAL IMPORTANCE.  WE TOO HAVE WORKED NON-STOP.  TWELVE,

21    THIRTEEN, FOURTEEN HOUR DAYS IN PREPARATION FOR TODAY.  BUT

22    THE REALITY IS WE GET THESE THINGS LATE AFTER WE'VE BEEN TOLD

23    THEY DON'T EXIST.  AND THEN THEY DO.  AND THEN THEY CONTAIN

24    CRITICAL INFORMATION CONCERNING THE VERY ISSUES HERE.

25         WITH RESPECT TO SCRIPPS, THEY SPEAK TO, NOT AT ALL

26    TO A.A., BUT TO PHYSICAL CONDITIONS THAT MS. HILL HAD PRIOR

27    TO THIS INCIDENT THAT WE BELIEVE ARE RELEVANT TO WHAT SHE

28    CLAIMS HER INJURIES ARE.  THERE ARE ALSO TWO SETS OF
```

37

```
 1   OUTSTANDING SUBPOENAS WITH RESPECT TO MEDICAL RECORDS.
 2   AGAIN, EVERYTHING WE'VE GOTTEN IS IMPORTANT.  THEIR POSITION
 3   WAS, YOU KNOW, JUST ASK THE QUESTIONS ON CROSS.  AND THAT IS
 4   MAYBE THE WAY THEY DO IT, BUT WE DON'T.  THAT'S NOT HOW WE DO
 5   OUR JOBS WITH SOMETHING THIS IMPORTANT.  SO I IMAGINE THAT
 6   PETITIONER'S COUNSEL WOULD LIKE TO BE HEARD.  AND I HOPEFULLY
 7   WILL BE ALLOWED TO RESPOND THEREAFTER.
 8        THE COURT:  ALL RIGHT.
 9        MS. MEYER:  YOUR HONOR, I HAVE HANDLED 50, A 100
10   DOMESTIC VIOLENCE CASES WHICH USUALLY INVOLVE LONG TERM
11   RELATIONSHIPS OVER A DECADE OR MORE WHEN THERE ARE MULTIPLE
12   INCIDENTS OF ALLEGED DOMESTIC VIOLENCE.  AND WE DO NOT GO
13   THROUGH THE LEVEL OF DISCOVERY THAT HAS BEEN UNDERTAKEN IN
14   THIS CASE.  AND AS MS. OLSON SAID AND MR. GARELICK SAID, WE
15   HAVE LITERALLY OPENED OUR KIMONO.  WHEN WE MET AND CONFERRED,
16   WE SAID LET OUR FORENSIC ACCOUNTANTS (SIC) SPEAK NOW WHILE
17   WE'RE IN TRIAL AND HAVE THEM DO WHAT THEY NEED TO DO TO
18   RESOLVE THE ISSUES OF THE I.T.
19           THEY REJECTED THAT.  THE ISSUES THAT THEY RAISED
20   THEY CLAIM ARE SO UNIQUE AND RELEVANT HAVE TO DO WITH
21   MS. HILL'S SKIN SENSITIVITY -- ALLEGED SKIN SENSITIVITY.
22   SOMETHING TO DO WITH HER EARS, WHICH THEY WERE UNABLE TO
23   ARTICULATE.  AND JAW PAIN.  NUMBER ONE, THE FACT THAT SHE MAY
24   HAVE HAD THOSE CONDITIONS DOESN'T CHANGE ANYTHING ABOUT WHAT
25   OCCURRED BETWEEN MR. HILL AND MR. BAUER.  WE'RE NOT -- I
26   DON'T THINK ANYONE IS REALLY DISPUTING THE PHYSICAL INCIDENTS
27   THAT HAPPENED IN THIS CASE.
28           AND IF THEY'RE TRYING TO SAY, WELL, HE DIDN'T HIT
```

```
1    HER AS HARD AS SHE SAID.  AND THE REASON WHY SHE HAD BLACK
2    AND BLUE UNDER HER EYES OR RACCOON EYES, AS THEY'RE CALLED,
3    IS BECAUSE SHE HAS SENSITIVE SKIN.  THEY HAVE AN EXPERT.  LET
4    THE EXPERT GO THROUGH THE RECORDS NOW WHILE WE'RE PUTTING ON
5    OUR CASE IN CHIEF.  AND LET THEM CROSS-EXAMINE MS. HILL, THE
6    NURSE, NURSE VALENCIA, WHO DID THE SART EXAM.  THEY HAVE SO
7    MANY THINGS AT THEIR DISPOSAL.  I REALLY DON'T UNDERSTAND WHY
8    SEASONED ATTORNEYS WHO ARE PROBABLY SOME OF THE BEST
9    ATTORNEYS THAT WE HAVE IN LOS ANGELES CAN'T PUT ON A CASE.
10          AND I REALLY TAKE UMBRAGE WITH THE COMMENT, WELL,
11   MAYBE THAT'S THE WAY THEY DO THINGS.  THESE ARE TRUNCATED
12   PROCEEDINGS.  WE ALL DO THINGS -- WE ALL WISH WE HAD THAT --
13   THAT WE ALL WISH WE HAD ALL THE TIME IN THE WORLD TO DO WHAT
14   WE WANTED TO DO.  BUT NOBODY HAS THAT LUXURY.  WE ALL WANT TO
15   ASK THAT ONE LAST QUESTION THAT YOUR HONOR SUSTAINS AND WE'RE
16   NOT ALLOWED TO ASK THAT QUESTION.
17          WHAT'S GOING TO HAPPEN?  THEY'RE GOING TO GO BACK
18   AND THEY'RE GOING TO SAY THEN WE NEED MORE RECORDS.  THAT
19   THERE'S RECORDS HERE THAT WE DIDN'T GET REGARDING AN X-RAY
20   SHE HAD WHEN SHE WAS TEN YEARS OLD, OR SHE BROKE A TOOTH, OR
21   SHE HAD TO HAVE HER EAR REPIERCED.
22          AT SOME POINT THE SHOW HAS TO GO ON.  AND IT NEEDS
23   TO GO ON TODAY BECAUSE IT'S NOT FAIR.  YOU KNOW, WE'RE
24   LOOKING AT MR. BAUER AND HIS LIFE IS ON HOLD.  WELL, SO IS
25   MS. HILL'S.  MS. HILL CAN'T GO ON WITH HER LIFE UNTIL THIS IS
26   OVER.  THIS WOULD BE THEIR THIRD CONTINUANCE.  WE WILL DO
27   ANYTHING WITHIN OUR POWER TO HAVE THE I.T. PEOPLE MEET AND
28   CONFER, TO CONTACT SCRIPPS IF THEY STILL THINK THEY NEED
```

```
1   ADDITIONAL DOCUMENTS.  AND, AGAIN, WHEN I ASKED MR. FETTEROLF
2   POINT-BLANK, "WHAT ELSE DO YOU NEED FROM SCRIPPS," HE
3   COULDN'T TELL ME.  HE JUST FLIPPED THROUGH THE SIX HUNDRED
4   SOMETHING PAGES.
5        I THINK THIS IS MUCH ADO ABOUT NOTHING.  I THINK WE
6   NEED TO START WITH OUR OPENING STATEMENTS.  THANK YOU.
7      THE COURT:  MS. HOLLEY.
8      MS. HOLLEY:  WE DON'T KNOW IF IT'S MUCH ADO ABOUT
9   NOTHING.  WE DON'T KNOW WHAT IT IS.  AGAIN, WE DON'T KNOW
10  WHAT WE DON'T KNOW.  YOU KNOW, I DIDN'T HAVE AN OPPORTUNITY
11  TO RESPOND TO THE COURT'S TENTATIVE WITH REGARD TO THE MOTION
12  TO DISMISS.  BUT -- AND I DON'T NECESSARILY INTEND TO DO THAT
13  NOW.  BUT I DO AGREE THAT THIS IS SUPPOSED TO BE A TRUNCATED
14  PROCEDURE.  AND IT DOESN'T APPEAR FROM THE PETITIONER'S SIDE
15  THAT THAT IS WHAT THIS IS.  THERE IS A GIGANTIC BOARD HERE
16  MAKING IT ALSO IMPOSSIBLE FOR THE LAWYERS TO SIT DOWN WHEN
17  THIS IS A COURT TRIAL.  THEY'RE CONTINUING TO MALIGN US AND
18  SAY WE'RE DOING THINGS WITH MEDIA.  WE'RE TRYING TO ADDRESS
19  THE COURT AND THE COURT'S DECISIONS HERE.
20       BUT, YOU KNOW, MS. MEYER AND MS. OLSON HAVE
21  CONTINUED TO STATE -- AND I AGREE WITH THEM -- THAT THERE ARE
22  MANY THINGS HERE THAT ARE NOT IN DISPUTE.  IT IS NOT IN
23  DISPUTE THAT THESE TWO PEOPLE SAW EACH OTHER ON TWO OCCASIONS
24  FOR THE PURPOSE OF SEX.  IT IS ALSO UNDISPUTED THAT THERE WAS
25  ROUGH SEX.  NOW, THE EXTENT TO WHICH IT WAS IS OBVIOUSLY
26  DISPUTED.  BUT MS. HILL HAS ACKNOWLEDGED THAT SHE AGREED TO
27  ROUGH SEX BUT DID NOT BELIEVE IT WAS GOING TO GO AS FAR AS IT
28  DID.
```

1   SO IT IS UNDISPUTED THAT THERE ARE TWO NIGHTS

2 TOGETHER.  CONSENSUAL SEX.  CONSENSUAL ROUGH SEX.  FOR THE

3 PURPOSES OF THIS ARGUMENT, THOUGH, AS MR. FETTEROLF SAID WE

4 WILL ABSOLUTELY DEFEND AGAINST AND DO NOT AGREE WITH THEIR

5 ASSESSMENT OF WHAT OCCURRED.  BUT LET'S JUST SAY FOR PURPOSES

6 OF THIS DISCUSSION, THIS ARGUMENT, THAT IT WENT FURTHER THAN

7 MS. HILL EXPECTED OR WANTED.

8   THAT STILL, FROM MY STANDPOINT, DOESN'T IN ANY WAY

9 SPEAK TO THE ISSUES IN A D.V.R.O. HEARING.  AS THE COURT IS

10 AWARE, THE D.V.P.A., THE PURPOSES -- THE PURPOSE OF ORDERING

11 RESTRAINT IS TO PREVENT A RECURRENCE OF DOMESTIC VIOLENCE AND

12 ENSURING A PERIOD OF SEPARATION OF THE PERSONS INVOLVED UPON

13 REASONABLE PROOF OF THE PAST ACT OR ACTS OF ABUSE.

14   THIS CASE, SPEAKING ONLY TO THE UNDISPUTED FACTS,

15 IS UNIQUE FROM THOSE THAT HAVE BEEN CITED BY COUNSEL IN THEIR

16 PAPERS.  BECAUSE THE ONLY ACTS OF, TO USE THEIR WORD --

17 VIOLENCE -- OCCURRED DURING SEX.  IT IS NOT A SITUATION WHERE

18 THERE WAS SOME BATTERY OR VIOLENCE SEPARATE AND APART FROM

19 WITHIN A SEXUAL CONTEXT.

20   I DON'T BELIEVE THAT ANY OF THESE PEOPLE OR ANYONE

21 IN THE WORLD WOULD BELIEVE THAT THERE IS ANY POSSIBILITY THAT

22 THESE TWO PEOPLE WILL EVER HAVE SEX AGAIN.  SO IT IS -- IT IS

23 IMPORTANT TO PUT IT IN THE CONTEXT HERE, WHICH IS THAT

24 WHATEVER HAPPENED, GIVING THEM THE BENEFIT OF THE DOUBT OF

25 THIS ARGUMENT HERE, WHICH WE DISPUTE, THAT IT WENT FURTHER

26 THAN SHE WANTED, THAT STILL DOESN'T CHANGE THE FACT IT

27 OCCURRED WITHIN THE CONTEXT OF SEX.

28   AND WE CAN'T SEPARATE THAT OUT.  AND SO -- AND SO

```
 1   IF THE PURPOSE FOR A RESTRAINT IS TO PREVENT A RECURRENCE OF
 2   DOMESTIC VIOLENCE, AND THE DOMESTIC VIOLENCE IS ALLEGED TO
 3   HAVE OCCURRED WITHIN A SEXUAL CONTEXT, THAT'S NOT GOING TO
 4   HAPPEN.  SO, YOU KNOW, I AM CONFUSED, AND HAVE BEEN ACTUALLY
 5   FROM THE VERY BEGINNING, AS TO WHY WE ARE IN A DOMESTIC
 6   VIOLENCE COURTROOM.
 7        THE COURT:  IT SOUNDS LIKE YOU'RE DOING YOUR OPENING
 8   STATEMENT, COUNSEL.
 9        MS. MEYER:  YEAH.
10        MS. HOLLEY:  THANK YOU.  SO, YOU KNOW, I MEAN, WE ALL
11   KEEP COMING KIND OF BACK TO IN DIFFERENT WAYS THE SAME POINT,
12   WHICH IS THAT A LOT OF THESE THINGS ARE UNDISPUTED.  HOWEVER,
13   WE CONTINUE TO GET INFORMATION THAT SPEAKS DIRECTLY TO THE
14   ISSUES AT PLAY IF THE HEARING IS, INDEED, GOING TO GO
15   FORWARD.  AND I ASSUME THE COURT'S TENTATIVE WITH RESPECT TO
16   THE MOTION TO DISMISS WILL STAND.
17             BUT HERE WE ARE ON THE EVE OF TRIAL RECEIVING TEXTS
18   THAT SPEAK TO THE ISSUES THAT THEY CLAIM DIDN'T EXIST.  THEN
19   WE GET HUNDREDS AND HUNDREDS OF PAGES OF TEXTS BETWEEN
20   MS. JACKSON.  MS. OLSON TOLD THE COURT WE'RE NOT GIVING THOSE
21   OVER.  AND THEN WE GET THEM.  AND THEY'RE TALKING ABOUT, YOU
22   KNOW, LAWSUITS AND MONEY AND, YOU KNOW.  SO THERE IS A POINT
23   AT WHICH THIS WILL END, BECAUSE I'M HEARING -- CORRECT ME IF
24   I'M WRONG, MR. FETTEROLF -- THERE ARE TWO SETS OF MEDICAL
25   RECORDS THAT ARE OUTSTANDING.
26        MR. FETTEROLF:  THERE ARE TWO SETS OF MEDICAL RECORDS
27   THAT ARE OUTSTANDING VIA SUBPOENA.  AND THERE ALSO IS A OUR
28   SUBPOENA TO THE PSYCHIATRIST WHO WAS IDENTIFIED LAST WEEK.
```

```
1   THERE ARE DATES CERTAIN FOR WHEN THEY'RE DUE.  AND WE WILL
2   MOVE DILIGENTLY.  TO ADD ON TO WHAT MS. HOLLEY SAID,
3   ULTIMATELY, WE FEEL THAT WE ARE MISSING INFORMATION.  AND TO
4   BEGIN WITH MISSING RELEVANT INFORMATION, INCLUDING A HOST OF
5   INFORMATION, EVEN SOME OF THE INFORMATION WE GOT LATE LAST
6   WEEK AFTER REPEATEDLY ASKING FOR IT --
7        THE COURT:  NOW YOU'RE REPEATING YOUR ARGUMENT.
8        MR. FETTEROLF:  I'M DONE.
9        THE COURT:  WHICH I UNDERSTAND.
10       MR. FETTEROLF:  SO THAT'S THE BASIS FOR WHY --
11       THE COURT:  I HEAR YOU.  BOTH COUNSEL HAVE REFERRED TO
12  THIS AS A TRUNCATED PROCEEDING.  I DON'T THINK THAT'S
13  ENTIRELY ACCURATE.  IT'S AN EXPEDITED PROCEEDING.  IT'S NOT
14  REALLY TRUNCATED.  YOU HAVE A FULL PANOPLY OF EVERYTHING ELSE
15  YOU CAN PUT ON IN A TRIAL.  WHAT THERE ISN'T IS THE TYPE OF
16  TIME THAT YOU MIGHT HAVE IN PREPARATION FOR A LONG CIVIL
17  TRIAL OR A LONG CRIMINAL TRIAL AFTER MONTHS OR YEARS OF
18  DISCOVERY.  THAT'S WHAT YOU DON'T HAVE.
19       BUT EVEN ACCOUNTING FOR THE ARGUMENT MS. HOLLEY IS
20  MAKING THAT EACH DISCOVERY LEADS TO SOMETHING THAT'S UNIQUE
21  AND RELEVANT, I GAVE YOU A CONTINUANCE.  AND YOU WERE TO GET
22  MORE STUFF.  AND THAT MORE STUFF LED YOU TO MORE STUFF.  IT
23  CAN GO ON FOREVER.  SINCE THE BURDEN IS ON THE PETITIONER,
24  AND PETITIONER HAS -- CERTAINLY PETITIONER HAD MORE TIME THAN
25  THE RESPONDENT HAD BETWEEN THE TIME OF THE ALLEGED INCIDENT
26  AND THE TIME OF THE FILING OF THE DOMESTIC VIOLENCE
27  RESTRAINING ORDER REQUEST AND TRIAL, THE COURT DOES NOT FEEL
28  THAT ON BALANCE THE RESPONDENT IS SUBSTANTIALLY LIMITED GIVEN
```

1  THAT WE HAD A COUPLE OF CONTINUANCES.  AND SO MUCH ADDITIONAL

2  DOCUMENTATION HAS COME IN, MUCH OF WHICH HAS BEEN INCLUDED IN

3  YOUR MOTIONS.

4        THE COURT BELIEVES THAT IT IS ON BALANCE MOST

5  APPROPRIATE THE MATTER MOVE FORWARD TODAY.

6      MS. HOLLEY:  THANK YOU.

7      THE COURT:  SO MS. MEYER OR ANYBODY ON YOUR TEAM WHO

8  WOULD LIKE TO START, I WILL TAKE OPENING STATEMENTS.

9      MS. MEYER:  THANK YOU.

10      THE COURT:  I ALSO DON'T NECESSARILY THINK WE NEED THIS

11  SINCE I AM YOUR JURY.

12      MS. MEYER:  YOUR HONOR, WITH ALL DUE RESPECT THIS IS

13  PART OF MY OPENING.  SO I AM GOING TO GO THROUGH THE

14  EXHIBITS.  SOME OF THE EXHIBITS THAT WILL BE INTRODUCED AT

15  THE TIME OF THE WITNESSES TESTIFYING.  IF I MAY USE THIS AS A

16  DEMONSTRATIVE ONLY.

17      THE COURT:  I'M GOING SAY NO.  UNTIL THEY ARE ADMITTED

18  INTO EVIDENCE, THE COURT DOES NOT CONSIDER THEM.  SO ONCE

19  THEY ARE ADMITTED IN EVIDENCE, ONCE YOU'VE BEEN TAKING

20  TESTIMONY, THEN THAT'S APPROPRIATE.

21      MS. MEYER:  UNDERSTOOD.  THANK YOU.

22        AS THE COURT IS AWARE, LINDSEY HILL IS SEEKING AN

23  ORDER OF PROTECTION PURSUANT TO THE DOMESTIC VIOLENCE

24  PROTECTION ACT.  PURSUANT TO FAMILY CODE 6220, THE PURPOSE OF

25  THE D.V.P.A. IS, QUOTE, "TO PREVENT ACTS OF DOMESTIC

26  VIOLENCE, ABUSE, AND SEXUAL ABUSE, AND TO PROVIDE FOR A

27  SEPARATION OF THE PERSON INVOLVED IN THE DOMESTIC VIOLENCE

28  FOR A PERIOD SUFFICIENT TO ENABLE THESE PERSONS TO SEEK A

44

1   RESOLUTION OF THE CAUSES OF THE VIOLENCE," END QUOTE.

2          COUNSEL ARGUED A FEW MINUTES AGO THAT THERE NEEDS

3   TO BE -- SHE IMPLIEDLY SUGGESTED THAT THERE NEEDS TO BE A

4   SHOWING OF FUTURE RISK OF ABUSE.  THAT IS INCORRECT UNDER THE

5   NEVAREZ CASE V. TONNA, WHICH IS A 2014 CASE WHICH STANDS FOR

6   THE EXACT PROPOSITION.  AS THE COURT IS UNDOUBTEDLY AWARE,

7   FAMILY CODE SECTION 6203 DEFINES ABUSE IN PART AS TO

8   INTENTIONALLY OR RECKLESSLY CAUSE OR ATTEMPT TO CAUSE BODILY

9   INJURY.  ALSO, SEXUAL ASSAULT.  TO PLACE A PERSON IN

10  REASONABLE APPREHENSION OF IMMINENT SERIOUS BODILY INJURY TO

11  THAT PERSON OR TO ANOTHER.

12         SO THE FACT THAT IN THIS CASE THE EVIDENCE WILL

13  SHOW THAT THE ABUSE OCCURRED DURING THE PARTIES ENGAGING IN

14  INITIALLY CONSENSUAL SEX THAT BECAME NONCONSENSUAL SEX.  THAT

15  IS PROVIDED FOR IN THE DEFINITION OF ABUSE.

16         WITH RESPECT TO THE ISSUE OF A DATING RELATIONSHIP.

17  FAMILY CODE SECTION 6210 DEFINES DATING RELATIONSHIP AS

18  HAVING FREQUENT INTIMATE ASSOCIATIONS PRIMARILY CHARACTERIZED

19  BY THE EXPECTATION OF AFFECTION OR SEXUAL INVOLVEMENT

20  INDEPENDENT OF FINANCIAL CONSIDERATIONS.  IN THE CASE OF

21  PEOPLE VS. RUCKER, WHICH WAS A 2005 CASE, THE COURT FURTHER

22  EXPANDED THE STATUTORY DEFINITION OF DATING RELATIONSHIP AS

23  PROVIDED IN FAMILY CODE SECTION 6210.

24         THE COURT STATED, QUOTE, "THE DEFINITION OF A

25  DATING RELATIONSHIP ADOPTED BY THE LEGISLATURE DOES NOT

26  REQUIRE SERIOUS COURTSHIP, AN INCREASINGLY EXCLUSIVE

27  INTEREST, SHARED EXPECTATION OF GROWTH, OR THAT THE

28  RELATIONSHIP ENDURES FOR A LENGTH OF TIME."  THE COURT STATED

```
 1   THE STATUTORY DEFINITION REQUIRES, QUOTE, "FREQUENT, INTIMATE
 2   ASSOCIATIONS.  A DEFINITION THAT DOES NOT PRECLUDE A
 3   RELATIVELY NEW DATING RELATIONSHIP."
 4        THE APPELLATE COURT FOUND THAT THE LEGISLATURE WAS
 5   ENTITLED TO CONCLUDE THE DOMESTIC VIOLENCE STATUTES SHOULD
 6   APPLY TO A RANGE OF DATING RELATIONSHIPS.  THE COURT FURTHER
 7   STATED THAT THE LEGISLATURE COULD REASONABLY CONCLUDE DATING
 8   RELATIONSHIPS, EVEN WHEN NEW, HAVE UNIQUE, EMOTIONAL, AND
 9   PRIVACY ASPECTS THAT DO NOT EXIST IN OTHER SOCIAL OR BUSINESS
10   RELATIONSHIPS.  AND THOSE ASPECTS MAY LEAD TO DOMESTIC
11   VIOLENCE EARLY IN A RELATIONSHIP.
12        NOW, COUNSEL WAS INCORRECT WHEN SHE ARGUED THAT A
13   NON-DISPUTED ISSUE IS WHEN -- IS THE FACT WHEN THE PARTIES
14   GOT TOGETHER ON TWO OCCASIONS, ONE IN APRIL AND ONE IN MAY OF
15   2021, THAT THEIR INTENTION WAS ONLY TO HAVE SEX.  I'M
16   PARAPHRASING AGAIN WHAT MS. HOLLEY SAID.  THAT WASN'T
17   MS. HILL'S INTENTION.  WHAT LINDSEY'S INTENTION WAS WAS TO
18   CONTINUE TO PURSUE THE BEGINNINGS OF A NEW RELATIONSHIP WITH
19   A MAN THAT SHE FOUND TO BE INTRIGUING.
20        AND EVEN THOUGH THE PARTIES MET IN PERSON ON ONLY
21   TWO OCCASIONS, PRIOR TO THE FIRST OCCASION IN APRIL AND
22   BETWEEN THE TWO OCCASIONS IN APRIL AND MAY, THE PARTIES HAD
23   MULTIPLE INTIMATE AND PRIVATE CONVERSATIONS WHERE THEY
24   REVEALED INTIMATE DETAILS ABOUT ONE ANOTHER FROM THEIR
25   CHILDHOOD FORWARD.
26        THE EVIDENCE WILL SHOW THAT LINDSEY REVEALED TO
27   TREVOR HER PAST HISTORY OF ALCOHOLISM WHEN SHE WAS A YOUNG
28   CHILD.  SHE REVEALED TO HIM THE ROCKY ROAD THAT SHE WAS ON
```

46

1   WHEN SHE WAS A TEEN-AGER UNTIL HER TEENS.  AND HOW SHE CAME

2   OUT OF THAT AND WAS INVOLVED IN THE SUBURB COMMUNITY.

3           TREVOR, ON THE OTHER HAND, OPENED UP TO LINDSEY AND

4   DISCUSSED THE MOST INTIMATE DETAILS OF HIS LIFE, SUCH AS WHEN

5   HE WAS BULLIED AS A CHILD CONSTANTLY.  THE FACT THAT HIS

6   PARENTS SUPPORTED HIM.  THAT HE HAD A SERIOUS RELATIONSHIP AT

7   UCLA WHERE HIS GIRLFRIEND LEFT HIM FOR ANOTHER WOMAN.  THESE

8   WERE PART AND PARCEL.  THIS WAS THE FABRIC THAT WAS CREATING

9   THE RELATIONSHIP BETWEEN LINDSEY AND TREVOR, WHICH WAS A

10  DATING RELATIONSHIP.

11          I WOULD ALSO REFER THE COURT TO THE CASE OF

12  PHILLIPS VS. CAMPBELL, WHICH IS A 2016 CASE.  AND THE COURT

13  ALLUDED TO THIS CASE BEFORE WHERE THE COURT STATED IT DOESN'T

14  MATTER WHAT THE PARTIES CALLED THEIR RELATIONSHIP.  WHETHER

15  IT WAS A FRIENDSHIP OR A PLATONIC RELATIONSHIP.  WHAT MATTERS

16  WAS THE CONDUCT OF THE PARTIES.  AND THE COURT WILL HEAR

17  SIGNIFICANT EVIDENCE FROM LINDSEY AND OTHERS ABOUT THE NATURE

18  AND QUALITY OF THE DATING RELATIONSHIP BETWEEN HER AND

19  TREVOR.

20          ONCE WE GET OVER THE HURDLE OF DATING RELATIONSHIP,

21  THE EVIDENCE WILL SHOW THAT TREVOR PERPETRATED DOMESTIC

22  VIOLENCE, ABUSE, AND SEXUAL ABUSE ON LINDSEY.  THE EVIDENCE

23  WILL SHOW THAT AS A RESULT OF THE DEVELOPMENT OF THE INTIMATE

24  CONNECTION BETWEEN LINDSEY AND TREVOR, SHE WAS LED TO TRUST

25  TREVOR, WHICH RESULTED IN SERIOUS HARM TO HER.

26          LINDSEY IS PRECISELY THE TYPE OF PERSON THAT SHOULD

27  BE PROTECTED UNDER THE D.V.P.A.  NOW, TREVOR ASSERTS THROUGH

28  HIS ATTORNEYS THAT THE PARTIES ENGAGED IN CONSENSUAL SEX,

```
 1    WHICH LINDSEY DOES NOT DENY, ON THE FIRST OCCASION THAT THEY
 2    WERE INTIMATE, WHICH WAS IN APRIL.  HOWEVER, THE LAW IS CLEAR
 3    THAT A PERSON CANNOT CONSENT TO BEING ASSAULTED, PARTICULARLY
 4    WHEN THEY ARE UNCONSCIOUS.  AND I WOULD REFER THE COURT TO
 5    PEOPLE VS. SAMUELS, WHICH IS A 1967 CASE.  IN WHICH THE COURT
 6    STATED "CONSENT OF THE VICTIM IS NOT GENERALLY A DEFENSE TO
 7    ASSAULT OR BATTERY.  EXCEPT IN A SITUATION INVOLVING PHYSICAL
 8    CONTACT OR BLOWS INCIDENT TO SPORTS SUCH AS FOOTBALL, BOXING,
 9    OR WRESTLING."
10         IT IS ALSO THE RULE THAT THE APPARENT CONSENT OF A
11    PERSON WITHOUT LEGAL CAPACITY TO GIVE CONSENT IS IN EFFECT --
12    IS INEFFECTIVE.  IT IS A MATTER OF COMMON KNOWLEDGE THAT A
13    NORMAL PERSON IN FULL POSSESSION OF HIS MENTAL FACULTIES DOES
14    NOT FREELY CONSENT TO THE USE UPON HIMSELF OF FORCE LIKELY TO
15    PRODUCE GREAT BODILY HARM.
16         IN ADDITION TO THAT, THERE IS CASE LAW THAT
17    ESTABLISHES THAT EVEN IF SOMEBODY GIVES PRIOR CONSENT BEFORE
18    BECOMING UNCONSCIOUS, THAT A BATTERY COULD STILL OCCUR WHILE
19    THAT PARTY IS -- OR WHILE THAT INDIVIDUAL IS UNCONSCIOUS
20    BECAUSE THEY HAVE NO ABILITY TO WITHDRAW THEIR CONSENT.
21         WE WILL ESTABLISH THROUGH EVIDENCE, TESTIMONY OF
22    LINDSEY, PHOTOGRAPHS, OTHER DOCUMENTARY EVIDENCE, AND OTHER
23    THIRD PARTIES THAT LINDSEY NEVER CONSENTED TO BEING STRUCK IN
24    THE FACE.  SHE NEVER CONSENTED TO BEING SCRATCHED ON HER
25    FACE.  SHE NEVER CONSENTED TO BEING REPEATEDLY PUNCHED IN HER
26    VAGINA.  SHE NEVER CONSENTED TO BEING CHOKED TWICE WITH HER
27    OWN HAIR AND LEFT UNCONSCIOUS.
28         SHE NEVER CONSENTED TO BEING REPEATEDLY PUNCHED BY
```

1    TREVOR IN THE BUTTOCKS.  SHE NEVER CONSENTED TO HAVING HER

2    LIPS BEING SPLIT OPEN BY TREVOR'S FIST AND LEFT BLEEDING IN

3    HER MOUTH.  AND SHE CERTAINLY, WHEN SHE WAS UNCONSCIOUS IN

4    MAY OF '21, SHE DID NOT CONSENT TO WHATEVER ELSE TREVOR DID

5    TO HER THAT SHE DOESN'T EVEN KNOW OCCURS.

6              IT DOES NOT MATTER WHETHER OR NOT LINDSEY WAS

7    UNCONSCIOUS FOR A FEW SECONDS OR A FEW MINUTES.  WHAT MATTERS

8    IS WHAT TREVOR DID TO HER.  IN TERMS OF A LITTLE BIT OF

9    BACKGROUND ABOUT LINDSEY AND HOW THE PARTIES MET, LINDSEY IS

10   27 YEARS OLD.  AS COURT CORRECTLY POINTED OUT TO

11   MR. GARELICK, SHE IS CERTAINLY NOT A GIRL.

12             SHE IS A YOUNG WOMAN WHO IS A RECOVERING ALCOHOLIC.

13   SHE WAS 17 MONTHS SOBER AT THE TIME THAT SHE FIRST MET

14   TREVOR.  THE EVIDENCE WILL SHOW SHE STRUGGLED DURING HER TEEN

15   YEARS AND IN HER EARLY TWENTIES.  AND WAS JUST BEGINNING TO

16   FIND HER WAY WITH A NEW JOB WORKING IN A SOBER LIVING HOME.

17   LINDSEY IS THE DAUGHTER OF A BASEBALL COACH.  AND HAS BEEN A

18   LIFELONG BASEBALL FAN.

19             THE COURT WILL SEE FROM THE EVIDENCE LINDSEY IS NOT

20   A PERFECT PERSON.  SHE HAS MANY FLAWS, WHICH SHE WILL ADMIT

21   TO.  SHE CAN BE VERY CRUDE, AS THE COURT WILL SEE IN THE TEXT

22   MESSAGES.  LINDSEY IS VERY INSECURE.  SHE HAS A FALSE SENSE

23   OF BRAVADO AND CAN BE VERY BOASTFUL AND IMMATURE.  AND WE

24   WILL SEE THAT TIME AND TIME AGAIN IN HER INSTAGRAM AND TEXT

25   MESSAGES.

26             ON THE OTHER HAND, LINDSEY IS A GOOD LISTENER.  SHE

27   IS KIND, FUNNY, AND VERY SMART.  AND THOSE ARE THE THINGS

28   THAT ATTRACTED TREVOR TO LINDSEY.  BOTH THE GOOD AND THE BAD.

1  LINDSEY IS VULNERABLE, SCARED, AND FRAGILE.  SHE WAS THE

2  PERFECT VICTIM FOR SOMEONE LIKE TREVOR.

3          ON APRIL 18, '21, LINDSEY WAS WATCHING A DODGER

4  GAME THAT WAS OCCURRING IN SAN DIEGO FROM HER OWN HOUSE IN

5  SAN DIEGO WITH HER MOTHER.  WHILE SHE WAS WATCHING THE GAME,

6  SHE TAGGED -- SHE DID AN INSTAGRAM STORY WHERE SHE TAGGED

7  TREVOR.  AND SHE -- AND THE REASON SHE TAGGED HIM IN HER

8  INSTAGRAM STORY WAS NOT WITH THE EXPECTATION THAT HE WOULD

9  CONTACT HER.  EVEN THOUGH SHE KNEW, AND SHE WILL TESTIFY,

10 THAT WHEN A PERSON IS TAGGED ON INSTAGRAM, THAT INDIVIDUAL

11 WILL RECEIVE A NOTIFICATION.  SO LINDSEY KNEW THAT WHEN SHE

12 TAGGED TREVOR THAT NIGHT, THAT HE WOULD RECEIVE A

13 NOTIFICATION.  THIS WAS NOT UNUSUAL FOR LINDSEY, AS LINDSEY

14 IN THE PAST HAD TAGGED A LOT OF BASEBALL PLAYERS AND A LOT OF

15 REALITY PERSONALITIES.

16          SHE NEVER EXPECTED THAT SHE WOULD RECEIVE A

17 RESPONSE FROM TREVOR.  HOWEVER, IMMEDIATELY AFTER THE GAME,

18 TREVOR DID RESPOND TO LINDSEY'S INSTAGRAM STORY.  AND THE

19 EVIDENCE WILL SHOW THAT IMMEDIATELY AFTER THEY BEGAN A

20 PRIVATE INSTAGRAM CHAT WHICH LASTED AN HOUR, IF NOT MORE.

21 AND THEN FINALLY TREVOR INVITED LINDSEY TO HIS HOME.

22          THE EVIDENCE WILL SHOW THAT LINDSEY WENT TO

23 TREVOR'S HOME ON APRIL 21, 2021, THROUGH INVITATION.  AND

24 THEY SPENT APPROXIMATELY THE FIRST FOUR TO FIVE HOURS OF

25 THEIR INITIAL MEETING GETTING TO KNOW ONE ANOTHER.  NO

26 ALCOHOL.  NO FOOD.  NO WATER.  JUST THE TWO OF THEM ON

27 SEPARATE COUCHES GETTING TO KNOW ONE ANOTHER WHERE THEY

28 REVEALED A LOT OF PERSONAL INFORMATION.

```
1          AS THE EVENING PROGRESSED -- AND LINDSEY ARRIVED
2    THERE LATE.  SHE ARRIVED ABOUT 9:30 AT NIGHT.  SO AS THE
3    NIGHT PROGRESSED, WE ARE GETTING INTO THE EARLY MORNING OF
4    THE 22ND.  TREVOR ASKED LINDSEY IF SHE WAS AWARE OF HIS,
5    QUOTE, RULES ON DATING.  AND THEN HE PROCEEDED TO EXPLAIN TO
6    HER WHAT HIS RULES OF DATING WERE.  AND TO SUMMARIZE, HE
7    EXPLAINED TO HER HIS RULES OF DATING ARE YOU CAN'T HAVE ANY
8    FEELINGS.  YOU CAN'T POST ON SOCIAL MEDIA ABOUT ME WHEN WE'RE
9    TOGETHER.  AND, THREE, I SLEEP WITH OTHER PEOPLE.
10         NOW, CONTRARY TO WHAT COUNSEL WILL ARGUE, IF THEY
11   WEREN'T DATING, THEN WHY WAS TREVOR TALKING TO LINDSEY ABOUT
12   HIS RULES ON DATING.  IT DOESN'T MAKE SENSE.  LINDSEY SAID
13   LAUGHINGLY, AFTER SHE HEARD HIS RULES OF DATING, THAT SHE
14   THOUGHT HE HAD ALREADY BROKEN HIS OWN RULES BY SHOWING
15   EMOTION DURING THEIR VERY LENGTHY CONVERSATION.
16         THEREAFTER, AT AROUND 2:00 A.M. IN THE MORNING ON
17   APRIL 22ND TREVOR AND LINDSEY RETIRED TO HIS BEDROOM WHERE
18   THEY CUDDLED.  THEY SPOKE ABOUT ANOTHER 30 MINUTES.  AND
19   TREVOR THEN BEGAN KISSING LINDSEY PASSIONATELY.  NOW, DURING
20   THAT FIRST SEXUAL ENCOUNTER TREVOR BECAME SLIGHTLY AGGRESSIVE
21   DURING SEX.
22         HE STARTED GRABBING HER, MOVING HER BODY, AND
23   PULLING HER HAIR.  TREVOR DID ASK LINDSEY ON THAT OCCASION
24   WHILE THEY WERE INTIMATE, "WHAT DO YOU LIKE?"  LINDSEY
25   NOTICED THAT TREVOR PREFERRED BEING AGGRESSIVE.  AND SHE TOLD
26   HIM IT WAS OKAY TO BE, QUOTE, "A LITTLE ROUGH."  END QUOTE.
27         SHE ASKED TREVOR WHAT HE LIKED.  TO WHICH HE
28   REPLIED, QUOTE, "ROUGHER THAN YOU."  HOWEVER, TREVOR NEVER
```

1   EXPLAINED THE RULES OF ENGAGEMENT.  AT THIS POINT, HOWEVER,

2   LINDSEY ACKNOWLEDGES THAT THEIR ENCOUNTER WAS STILL

3   CONSENSUAL AND WAS NON-THREATENING TO HER.  WHAT PROCEEDED

4   NEXT PROBABLY WAS ON THE BORDER OF CROSSING THE LINE TO A

5   SUBJECTIVE THIRD PERSON.  TREVOR ASKED LINDSEY IF SHE EVER

6   HAD BEEN CHOKED DURING SEX BEFORE.

7            BUT HE DID NOT ASK HER ABOUT BEING CHOKED OUT AND

8   BECOMING UNCONSCIOUS.  LINDSEY SAID "YES."  AND THEN WITHOUT

9   ANOTHER WORD, THE EVIDENCE WILL SHOW TREVOR PUT HIS HANDS ON

10  HER NECK AND APPLIED SLIGHT PRESSURE.  THEY CONTINUED TO HAVE

11  SEX.  IN ACTUALITY, THE EVIDENCE WILL SHOW LINDSEY HAD NEVER

12  BEEN CHOKED OUT BEFORE DURING SEX.  HOWEVER, BECAUSE OF THE

13  NEWNESS OF THEIR RELATIONSHIP, SHE WAS EMBARRASSED TO ADMIT

14  THE TRUTH TO TREVOR.

15           TREVOR STARTED TO AGGRESSIVELY PUT HIS FINGERS DOWN

16  LINDSEY'S THROAT.  LINDSEY ASKED HIM TO STOP, WHICH HE DID.

17  BUT THEN IMMEDIATELY THEREAFTER LINDSEY WILL TESTIFY THAT

18  TREVOR WRAPPED HER HAIR AROUND HER NECK -- AND THE EVIDENCE

19  WILL SHOW HOW LONG HER HAIR WAS -- AND CHOKED HER OUT,

20  MEANING SHE BECAME UNCONSCIOUS, WITHOUT TELLING HER IN

21  ADVANCE OR ASKING HER PERMISSION TO DO SO.

22           LINDSEY DOESN'T KNOW HOW LONG SHE WAS UNCONSCIOUS.

23  HOWEVER, WHEN SHE WOKE UP, SHE WAS FACE DOWN ON THE BED

24  DISORIENTED -- DISORIENTATED.  AT THAT TIME SHE REALIZED THAT

25  TREVOR WAS PLEASING HIMSELF BY HAVING ANAL SEX WITH LINDSEY.

26  THEY NEVER DISCUSSED HAVING ANAL SEX PRIOR TO THE TIME THAT

27  HE BEGAN HAVING ANAL SEX WITH HER.

28           THE ANAL SEX WAS VERY PAINFUL FOR LINDSEY.  AND AS

1  SHE REGAINED CONSCIOUSNESS DURING THE INCIDENT, SHE DID ASK

2  TREVOR TO STOP, WHICH HE DID OBLIGE.  HE HELD LINDSEY TIGHTLY

3  WHILE SHE WAS DISORIENTED AND TRYING TO COME TO.

4  THEREAFTER, TREVOR TRIED TO REINITIATE SEX.  BUT

5  LINDSEY RESISTED BECAUSE SHE FELT NAUSEOUS AND WAS VERY

6  TROUBLED BY WHAT HAPPENED.  SHE KEPT TELLING TREVOR, "I NEED

7  TIME.  I NEED A MINUTE."  TREVOR HAD KEPT ASKING HER IF SHE

8  WAS OKAY.  BUT EVEN THOUGH HE WAS ASKING HER IF SHE WAS OKAY,

9  HE REPEATEDLY TRIED TO INITIATE SEX.

10  WHEN THEY STOPPED HAVING SEX, LINDSEY GOT UP TO USE

11  THE BATHROOM AND NOTICED SHE WAS BLEEDING FROM HER ANUS.

12  SOMETHING THAT HAD NEVER HAPPENED TO HER BEFORE.  SHE WAS

13  BARELY ABLE TO WALK.  SHE WAS SHAKEN UP.  DISORIENTED AND

14  VERY TIRED.

15  SHE DID SPEND THE NIGHT AT TREVOR'S HOUSE AND LEFT

16  IN THE MORNING VERY UNCOMFORTABLE AND VERY EMBARRASSED.  THE

17  EVIDENCE WILL SHOW TEXT MESSAGES AND COMMUNICATIONS WITH HER

18  BEST FRIEND, MELY, WHICH OCCURRED AFTER THE APRIL 21, 22

19  INCIDENT.  AND MANY TEXT MESSAGES WITH HER FRIEND LISA, WHO

20  IS HER A.A. SPONSOR.  AND ANOTHER FRIEND, OR SOMEONE SHE

21  THOUGHT WAS A FRIEND, NAMED DEREK DAWSON, WHOM SHE THOUGHT

22  WOULD NEVER BETRAY HER.  BUT AS THE EVIDENCE WILL SHOW DID.

23  WHAT HAPPENS NEXT LEADS UP TO THE POINT OF

24  NONCONSENSUAL SEX.  FROM THE TIME OF THE INCIDENT ON APRIL

25  21, 22, UNTIL MAY 16, LINDSEY AND TREVOR EXCHANGED MULTIPLE

26  INSTAGRAM DIRECT MESSAGES AND TEXT MESSAGES.  THE COURT WILL

27  SEE THE ACTUAL MESSAGES.  THE COURT WILL SEE THAT THE

28  MESSAGES WERE SEXUAL FLIRTATIONS.  WE'RE GETTING TO KNOW EACH

53

```
 1   OTHER MESSAGES.  WE'RE TALKING ABOUT LIFE MESSAGES.  THEY
 2   BASICALLY RAN THE GAMUT, WHICH IS NOT UNUSUAL WHEN YOU ARE IN
 3   A NEW RELATIONSHIP.
 4         BY THIS TIME, TREVOR HAD DONE A VERY GOOD JOB OF
 5   CONVINCING LINDSEY THAT SHE WAS SPECIAL AND THAT HE CARED
 6   ABOUT HER.  AT THIS POINT HE HAD GAINED LINDSEY'S TRUST.  AND
 7   THERE IS EVIDENCE THAT HE TOLD HER "YOU'RE LIKE NO ONE I EVER
 8   MET BEFORE, YOU'RE DIFFERENT, YOU'RE SPECIAL," WHICH IS A
 9   FORM OF GROOMING.
10         WHEN THEY GOT TOGETHER ON THE NIGHT OF MAY 15,
11   2021, LINDSEY AGAIN DROVE TO TREVOR'S HOUSE LATE AT NIGHT.
12   AND SHE ARRIVED AT HIS HOUSE AROUND 12:00 O'CLOCK A.M.
13   SIMILAR TO WHAT THEY DID THE FIRST EVENING, THEY SAT
14   DOWNSTAIRS IN THE BASEMENT AND SPENT SOME TIME TALKING.  I
15   BELIEVE THAT THEY SPOKE FOR ABOUT TWO HOURS.
16         HE THEN STARTED KISSING LINDSEY AROUND 2:00 A.M.
17   AND HE ASKED IF SHE WANTED TO GO TO HIS ROOM.  AND LINDSEY
18   AGREED.  THEY BEGAN HAVING SEX.  NOW COMES THE INTERESTING
19   PART.  TREVOR ASKED LINDSEY TO AGREE ON A SAFE WORD.  LINDSEY
20   DIDN'T HAVE ANY EXPERIENCE WITH SAFE WORDS AND DIDN'T KNOW IF
21   TREVOR WAS JOKING OR NOT.
22         SO SHE MADE A JOKE BY SAYING HER SAFE WORD WAS
23   "DADDY ISSUES."  AND AS THE EVIDENCE WILL SHOW, A SAFE WORD
24   IS ONE WORD, NOT TWO WORDS.  AND LINDSEY DIDN'T UNDERSTAND
25   THE SIGNIFICANCE OF WHAT A SAFE WORD WAS ENTITLED OR WAS
26   DESIGNED TO PROTECT.  TREVOR DID ASK LINDSEY WHAT WAS OFF
27   LIMITS.  SHE TOLD HIM NOT TO PUT HIS FINGERS IN HER THROAT.
28         AGAIN, THAT NIGHT LINDSEY WILL NOT DENY THAT SHE
```

54

1   HAD WILLINGLY AGREED TO HAVE SEX WITH TREVOR.  HOWEVER, SHE

2   DID NOT AGREE TO WHAT OCCURRED NEXT.  THE EVIDENCE WILL SHOW

3   THAT ON THE MORNING OF MAY 16TH, 2021, TREVOR BAUER CROSSED

4   THE LINE FROM HAVING ROUGH SEX TO ENGAGING IN SEXUAL ASSAULT

5   AND PHYSICAL ABUSE.

6           AFTER ABOUT FIVE MINUTES OF HAVING SEX, TREVOR ONCE

7   AGAIN WRAPPED LINDSEY'S HAIR AROUND HER NECK AND CHOKED HER

8   INTO UNCONSCIOUSNESS.  WHEN SHE WOKE, SHE WAS MORE

9   DISORIENTED THAN SHE WAS WHEN SHE WAS CHOKED TO

10  UNCONSCIOUSNESS ON APRIL 21.  WHEN SHE AWOKE, SHE WILL

11  TESTIFY SHE DIDN'T KNOW WHO SHE WAS HAVING SEX WITH.  SHE DID

12  NOT KNOW WHERE SHE WAS.  SHE WAS UNABLE TO MOVE HER BODY.

13  AND SHE WAS HAVING A HARD TIME BREATHING.

14          SHE WAS LYING FACE DOWN IN TREVOR'S BED.  AS

15  LINDSEY STRUGGLED TO REGAIN HER BREATHING, TREVOR ROLLED HER

16  ON HER BACK AND HE RESUMED HAVING SEX WITH HER AGAIN.  HE

17  BEGAN HITTING HER IN THE FACE REPEATEDLY.  THIS WAS THE FIRST

18  STRIKE THAT LINDSEY FELT, BUT IT'S POSSIBLE THAT TREVOR HAD

19  ALREADY BEEN PUNCHING AND STRIKING LINDSEY WHILE SHE WAS

20  UNCONSCIOUS.  THAT WASN'T ENOUGH FOR TREVOR.  HE THEN PUNCHED

21  LINDSEY HARD WITH A CLOSED FIST TO THE SIDE OF HER JAW.  THE

22  LEFT SIDE OF HER HEAD AND BOTH CHEEKBONES.

23          LINDSEY WAS TERRIFIED.  SHE WAS FROZEN.  SHE

24  COULDN'T SPEAK.  AND SHE COULDN'T MOVE.  AFTER TREVOR PUNCHED

25  LINDSEY SEVERAL MORE TIMES, HE THEN, LIKE SHE WAS A RAG DOLL,

26  FLIPPED LINDSEY BACK ONTO HER STOMACH AND BEGAN CHOKING HER

27  WITH HER HAIR.  SHE LOST CONSCIOUSNESS A SECOND TIME ON MAY

28  16TH.  WHEN SHE REGAINED CONSCIOUSNESS THE SECOND TIME, SHE

1   WAS EVEN MORE DISORIENTED THAN THE FIRST TIME.  SHE FELT A

2   TERRIBLE PAIN BEHIND BOTH OF HER EARS.  AND SHE COULD TASTE

3   BLOOD IN HER MOUTH.

4           LINDSEY THEN REMEMBERS TREVOR PUTTING HER ON HER

5   BACK AND SPREADING HER LEGS TO EXPOSE HER VAGINA.  AND HE

6   BEGAN PUNCHING HER REPEATEDLY IN HER VAGINA.  LINDSEY FELT

7   EXCRUCIATING PAIN, UNIMAGINABLE PAIN BEYOND THE PAIN THAT SHE

8   HAS EVER FELT IN HER LIFE.  SHE BEGAN CRYING AND SHAKING

9   VIOLENTLY.  TREVOR THEN REPEATED, QUOTE, "YOU'RE SAFE.  I'M

10  HERE.  YOU'RE SAFE."

11          LINDSEY COULDN'T STOP CRYING AND SHAKING.  AND SHE

12  COULDN'T SPEAK.  SO TREVOR MOVED LINDSEY'S BODY AGAIN BY

13  FLIPPING HER ONTO HER STOMACH AND MOVING HER ARMS ABOVE HER.

14  HE THEN BEGAN SCRATCHING HER BACK GENTLY.  HE WHISPERED TO

15  HER, "I WOULD NEVER DO THOSE THINGS TO YOU IF IT WASN'T

16  SEXUALLY."  AS IF THAT WAS AN EXCUSE FOR THIS ABHORRENT

17  BEHAVIOR.  HE KEPT REPEATING TO LINDSEY, "TALK TO ME.  CAN

18  YOU JUST TALK TO ME?"  LINDSEY WAS SCARED HE WOULD HURT HER

19  AGAIN.

20          AND THE ONLY THING THAT SHE COULD SUMMON UP WAS THE

21  SENTENCE, "I THINK MY BODY IS HAVING A TRAUMA RESPONSE."

22  TREVOR FINALLY ASKED LINDSEY WHAT HE SHOULD HAVE ASKED HER

23  THE FIRST TIME, IF SHE HAD EVER BEEN HIT BEFORE.  LINDSEY

24  TOLD HIM SHE HADN'T BEEN.  AND THEN HE TOLD HER RATHER MATTER

25  OF FACTLY HE WAS GOING TO TAKE A SHOWER.

26          LINDSEY STAYED ON THE BED AS TREVOR SHOWERED.  SHE

27  WAS SCARED TO GO INTO THE BATHROOM TO LOOK AT HERSELF IN THE

28  MIRROR BECAUSE SHE KNEW SHE HAD BEEN HURT.  AND SO SHE TOOK A

1    PHOTOGRAPH ON HER PHONE.  THE EVIDENCE WILL SHOW THAT LINDSEY

2    NEVER ALTERED OR HAD ANYONE ALTER THIS PHOTOGRAPH.  AFTER

3    TREVOR GOT OUT OF THE SHOWER, HE HELPED LINDSEY INTO THE

4    SHOWER TO RINSE OFF BECAUSE SHE COULD NOT WALK ON HER OWN.

5         SHE WAS NAUSEOUS AND DIZZY.  TREVOR SAID THINGS TO

6    HER THEREAFTER THAT ARE BONE CHILLING.  HE SAID TO HER,

7    QUOTE, "YOU HAVE A COUPLE OF WELTS.  I NEED TO BE MORE

8    CAREFUL WHEN I HIT YOU.  I ALSO PUNCHED YOUR BUTT WHILE YOU

9    WERE UNCONSCIOUS.  YOU MAY HAVE A BRUISE THERE," END QUOTE.

10   LINDSEY DIDN'T RESPOND AND WENT TO SIT DOWN ON THE BED.  SHE

11   WAS FORCING DOWN SOBS.

12        EVENTUALLY LINDSEY DROVE HOME TO SAN DIEGO.  ON THE

13   WAY HOME, LINDSEY WILL TESTIFY THAT SHE CONTACTED HER COUSIN

14   KYLE.  SHE TOOK PHOTOGRAPHS OF HER INJURIES.  SHE CONTACTED

15   HER BEST FRIEND MELY.  AND, IN FACT, SAW MELY.  AND MELY

16   OBSERVED THE BRUISING BEHIND LINDSEY'S EARS, THE BRUISING ON

17   THE INSIDE OF HER GUMS.  AND LINDSEY LOOKED AT HER VAGINAL

18   BLEEDING.  MELY TRIED TO CONVINCE LINDSEY TO GO TO THE

19   HOSPITAL AND LINDSEY REFUSED.

20        ON MONDAY, MAY 17TH, LINDSEY WAS EVEN IN MORE PAIN.

21   SHE TOOK MORE PHOTOGRAPHS OF HERSELF.  SHE CONTINUED TO THROW

22   UP VIOLENTLY THROUGHOUT THE DAY AND HAD SEVERE HEADACHES.

23   SHE HAD DIFFICULTY KEEPING HER EYES OPEN AND STAYING AWAKE.

24   ALTHOUGH SHE HAD LIED TO MELY AND TO HER A.A. SPONSOR, LISA,

25   ABOUT SEEING TREVOR THE NIGHT BEFORE, SHE FINALLY CAME CLEAN

26   AND DISCLOSED TO THEM WHAT HAD HAPPENED.

27        BETWEEN HER TWO FRIENDS THEY CONVINCED HER TO GO TO

28   THE HOSPITAL.  LINDSEY ARRIVED AT URGENT CARE IN MISSION

1  VALLEY.  THEY COULDN'T HELP HER BECAUSE OF THE SEVERITY OF

2  HER INJURIES.  SO SHE WENT TO AN EMERGENCY ROOM AT ALVARADO

3  HOSPITAL MEDICAL CENTER.  WHEN SHE ARRIVED, SHE UNDERWENT

4  RAPID C.T. SCANS OF HER BRAIN, FACE, AND NECK.

5            THERE IS EVIDENCE THAT WILL BE PRESENTED FROM THE

6  ALVARADO REPORT, WHICH SAYS THAT LINDSEY APPEARS TO HAVE

7  SUSTAINED SIGNIFICANT HEAD AND FACIAL TRAUMA.  AND REPORTS A

8  STRANGULATION INJURY AND LOSS OF CONSCIOUSNESS.  PATIENT

9  PRESENTS FOR EVALUATION AFTER SUFFERING A MINOR BLUNT HEAD

10 TRAUMA.  I CONSIDER HIGH RISK DIAGNOSES, SUCH AS INTRACRANIAL

11 HEMORRHAGE, SPINAL CORD INJURY, ACUTE FRACTURE, DISLOCATION,

12 AND OR CONCUSSION.

13           LINDSEY WAS MET AT THE HOSPITAL BY TWO SAN DIEGO

14 POLICE OFFICERS WHO WILL BE TESTIFYING IN THIS CASE.  A

15 DETECTIVE MICHAEL GIDDENS AND DETECTIVE CESAR J. JIMENEZ.

16 LINDSEY WAS TREATED AT ALVARADO HOSPITAL MEDICAL CENTER AND

17 THEN TRANSPORTED BY THE SAN DIEGO POLICE TO PALOMAR HEALTH

18 FOR WHAT IS CALLED A SART EXAM.

19           LINDSEY WAS EXAMINED BY A SKILLED AND VERY

20 EXPERIENCED NURSE BY THE NAME OF KELLY VALENCIA, WHO WILL

21 TESTIFY IN THIS CASE AS TO HER EXAMINATION.  THE SART FILE

22 WILL ALSO BE INTRODUCED INTO EVIDENCE CONSISTENT WITH THE

23 STIPULATION OF COUNSEL, WHICH REQUIRED NO FURTHER FOUNDATION.

24 LINDSEY RETURNED FROM THE HOSPITAL ON TUESDAY MORNING, MAY

25 18.  THREE DAYS LATER ON FRIDAY MAY 21, SHE DROVE TO THE

26 PASADENA POLICE DEPARTMENT AND SHE TURNED OVER HER CELL

27 PHONE.

28           THEY KEPT HER CELL PHONE FOR APPROXIMATELY TWO

1  DAYS.  THE FOLLOWING DAY, WHICH IS NOW MAY 22ND, THE POLICE

2  REQUESTED THAT A COLD CALL BE CONDUCTED.  AND A COLD CALL IS

3  BASICALLY WHEN THEY SET UP A CALL BETWEEN LINDSEY AND TREVOR

4  IN ORDER TO TALK ABOUT WHAT OCCURRED.  THE POLICE TOLD HER

5  EVERYTHING THAT THEY WANTED HER TO SAY TO TREVOR.  AND

6  LINDSEY COMPLIED.  THE TELEPHONE CALL WAS RECORDED.

7       THE PASADENA POLICE ALSO INSTRUCTED LINDSEY TO SEND

8  A TEXT TO TREVOR, WHICH SHE DID.  TREVOR'S RESPONSE WAS,

9  QUOTE, "DO YOU WANT TO TALK ABOUT IT?"  LINDSEY'S RESPONSE

10 WAS, "YEAH, HONESTLY HEARING YOUR VOICE WOULD HELP."  THE

11 POLICE ALSO INSTRUCTED NOT -- ALSO INSTRUCTED LINDSEY NOT TO

12 BLOCK TREVOR ON HER CELL PHONE, WHICH SHE DID NOT.

13      FOR APPROXIMATELY THE NEXT TWO WEEKS TREVOR

14 INCESSANTLY CALLED AND TEXTED LINDSEY.  SHE KEPT HIM UPDATED

15 ABOUT HER HEALTH.  AND SHE ALSO EXPRESSED TO HIM SHE DID NOT

16 KNOW HOW LONG IT WOULD TAKE TO RECOVER.  TREVOR RESPONDED IN

17 WRITING "I FEEL SO BAD THAT THIS HAPPENED.  WISH I COULD BE

18 THERE WITH YOU THROUGH IT."

19      WHEN LINDSEY FAILED TO ANSWER TREVOR'S CALLS, HE

20 LEFT HER VOICEMAILS.  HE LEFT HER A VOICEMAIL ON MAY 17.

21 TOLD HER HE WAS WORRIED ABOUT HER AND WANTED HER TO CALL OR

22 TEXT HIM BECAUSE HE WOULD LIKE TO TALK TO HER.  IN FACT, ON

23 MAY 21 HE TEXTED LINDSEY A SECOND TIME LATE AT NIGHT AT

24 APPROXIMATELY 9:30 IN THE MIDDLE OF HIS GAME INQUIRING ABOUT

25 HOW SHE WAS FEELING.

26      LINDSEY WAITED TO BRING THIS REQUEST FOR A DOMESTIC

27 VIOLENCE RESTRAINING ORDER, AS SHE WILL TESTIFY, BECAUSE SHE

28 THOUGHT THAT THE PASADENA POLICE WOULD INTERVENE SOONER THAN

1  THEY DID.  IT WAS NOT AN EASY TIME FOR LINDSEY.  AND LINDSEY

2  WILL TESTIFY ABOUT THE EMOTIONAL TURMOIL THAT SHE SUFFERED

3  DURING THIS PERIOD OF TIME BETWEEN THE SECOND INCIDENT AND

4  WAITING FOR THE PASADENA POLICE TO TAKE ACTION.

5          ONE OF THE LAST MESSAGES LINDSEY SENT TREVOR WAS,

6  QUOTE, "I APPRECIATE ALL YOUR EFFORTS AND HELP.  BUT THE WAY

7  YOU CAN HELP ME IS TO NEVER DO THAT TO ANYONE ELSE EVER

8  AGAIN."  TO THIS, TREVOR RESPONDED, "I WOULD NEVER DO

9  ANYTHING TO HURT YOU, THAT INCLUDES YOU."  AT THAT POINT

10  LINDSEY NO LONGER BELIEVED A WORD THAT TREVOR SAID TO HER.

11          IN CONCLUSION, THE EVIDENCE WILL SHOW THAT LINDSEY

12  TOLD HER COUSIN KYLE, HER BEST FRIEND MELY, AND LISA, HER

13  A.A. SPONSOR, ABOUT TREVOR.  IT IS ANTICIPATED THAT TREVOR

14  WILL USE THESE TEXTS TO PORTRAY LINDSEY AS VULGAR, CHATTY, AN

15  OPPORTUNIST, A GOLD DIGGER WHO ASKS FOR ROUGH SEX AND GOT

16  WHAT SHE DESERVED.  NO DOUBT THE COURT CAN SEE LINDSEY CAN BE

17  VULGAR.  SHE TALKS TOO MUCH AND TRIES TO ACT LIKE A TOUGH

18  GIRL.

19          WHEN SHE FINALLY EXPRESSED HER ANGER -- AND THE

20  COURT WILL SEE THIS IN HER TEXT MESSAGES SHE COULDN'T STOP.

21  IN ADDITION TO BEING AFRAID AND HUMILIATED, SHE WAS ANGRY

22  BECAUSE HER LIFE WAS FALLING APART AFTER SHE HAD TRIED SO

23  DESPERATELY TO TURN IT AROUND.  SHE WAS NOW LIVING AT HER

24  PARENTS' HOME, SHE WAS PHYSICALLY ILL, CONSTANTLY NAUSEATED,

25  HAD THROBBING HEADACHES AND PAINS ALL OVER HER BODY, WAS

26  UNABLE TO EAT OR SLEEP, AND COULD BARELY KEEP HER EYES OPEN.

27          WHEN SHE TURNED ON THE TV ONE DAY TO SEE TREVOR

28  PITCHING, LAUGHING WITH HIS TEAMMATES, AND GIVING POST-GAME

```
 1   INTERVIEWS IN WHICH HE REGALED THE PRESS WITH HIS FASTBALL --
 2   ABOUT HIS FASTBALL, THAT WAS THE LAST STRAW FOR LINDSEY.
 3   LINDSEY'S NAME AND REPUTATION HAS BEEN DRAGGED THROUGH THE
 4   MUD.  SHE HAS BEEN ACCUSED OF SETTING UP TREVOR, DOCTORING
 5   PHOTOS, SEEKING PUBLICITY, AND TRYING TO GET TREVOR'S MONEY.
 6   ALTHOUGH THERE IS NO EVIDENCE THAT SHE HAS DONE ANY OF THESE
 7   THINGS.
 8         THE SAD TRUTH IS THAT SHE WAS, AND IS, A VERY
 9   DAMAGED AND VULNERABLE YOUNG WOMAN WHO TREVOR INTENTIONALLY
10   TARGETED, DOMINATED, CONTROLLED, AND USED FOR HIS OWN SEXUAL
11   DEVIANT PLEASURE.  IF THERE IS A FALSE NARRATIVE IN THIS
12   CASE, IT COMES FROM TREVOR'S WELL WARNED PLAYBOOK.  THE
13   BOTTOM-LINE IS THE COURT SHOULD NOT BE FOOLED BY TREVOR'S
14   FLIMSY EXCUSES OR THE CONTENT OF LINDSEY'S IMMATURE TEXT
15   MESSAGES.
16         THE COURT SHOULD CONSIDER, AS THE COURT IS REQUIRED
17   TO DO, THE TOTALITY OF THE CIRCUMSTANCES IN ORDER TO
18   DETERMINE BY A PREPONDERANCE OF THE EVIDENCE THAT TREVOR
19   BAUER, THIS MAN THAT SITS BEFORE YOU, HAS COMMITTED ABUSE,
20   DOMESTIC VIOLENCE, AND SEXUAL ASSAULT UPON LINDSEY HILL.  AND
21   THE COURT SHOULD ISSUE A FIVE YEAR RESTRAINING ORDER.
22         THANK YOU.
23      THE COURT:  THANK YOU.  ALL RIGHT.  MS. HOLLEY.
24      MS. HOLLEY:  THANK YOU.
25      MS. HOLLEY:  AS MS. MEYER HAS INDICATED, MS. HILL IS A
26   LONG TIME FAN OF BASEBALL.  SHE KNOWS A LOT ABOUT BASEBALL.
27   HER FATHER IS A BASEBALL COACH.  I BELIEVE HE WAS A
28   PROFESSIONAL BASEBALL PLAYER.  SO SHE GREW UP AROUND
```

```
1  BASEBALL.  SHE IS FROM SAN DIEGO.  SHE IS A SAN DIEGO PADRES
2  FAN, AS I UNDERSTAND IT.  I DON'T KNOW MUCH ABOUT BASEBALL.
3  THERE'S A RIVALRY BETWEEN THE PADRES AND THE DODGERS.
4          SHE DOES, IN FACT, TAG MR. BAUER IN AN INSTAGRAM
5  STORY.  I DON'T DISAGREE WITH MS. MEYER THAT SHE PROBABLY DID
6  NOT KNOW THAT HE WAS GOING TO SEE THAT OR RESPOND TO IT.  BUT
7  HE DID.  THEY THEN ENGAGED IN SOME SORT OF CLEVER BASEBALL
8  BANTER ON INSTAGRAM DM.  AND SHE THEN BEGAN TALKING ABOUT
9  WHEN -- WHETHER OR NOT THERE WAS AN OPPORTUNITY FOR THEM TO
10 GET TOGETHER.
11         THE COURT -- IF THE COURT HASN'T SEEN THEM
12 ALREADY -- WILL SEE THE MESSAGES, AS MR. BAUER PRESERVED
13 THEM, BETWEEN MS. HILL AND MR. BAUER.  IN WHICH SHE IS VERY
14 ANXIOUS TO SEE HIM AND TO DRIVE A 130 MILES FROM HER HOME IN
15 SAN DIEGO TO HIS HOME IN PASADENA.  DURING THE TIME THAT SHE
16 IS ENGAGING IN THESE INSTAGRAM DM'S WITH MR. BAUER, SHE IS
17 TAKING SCREENSHOTS OF THOSE MESSAGES AND SHE IS SENDING THEM
18 TO HER COUSIN AND HER FRIENDS.
19         AND WHAT SHE IS SAYING TO THEM AS SHE IS SENDING
20 THESE MESSAGES IS THAT SHE IS GOING TO GO OVER THERE AND GET
21 HER HOOKS IN HIM.  YOU KNOW, HOW I ROLL.  I AM GOING TO GET
22 IN HIS HEAD.  I AM GOING TO FIND THE PINE TAR.  NOW, AS I
23 SAID, I DON'T KNOW MUCH ABOUT BASEBALL.  SO I DIDN'T KNOW
24 WHAT THE PINE TAR WAS BUT LEARNED THAT THE PINE TAR IS, I
25 GUESS, THE SECRET SUBSTANCE PITCHERS ARE NOT ALLOWED TO HAVE
26 IN THEIR HANDS WHEN PITCHING THE BALL.  THEY ARE SUSPENDED IF
27 THEY USE IT.  I DON'T KNOW THAT MS. HILL WAS INDICATING SHE
28 WAS GOING TO GO TO HIS HOME TO ACTUALLY FIND THE SUBSTANCE
```

1  PINE TAR.

2          I BELIEVE IT WAS A METAPHOR FOR WHAT SHE WAS GOING

3  TO DO TO GET IN HIS HEAD, GET HER HOOKS IN, YOU KNOW HOW I

4  ROLL.  SO SHE IS -- AT THE SAME TIME THAT SHE IS HAVING THESE

5  COMMUNICATIONS WITH MR. BAUER, SHE IS TELLING HER FRIENDS AND

6  HER COUSIN THAT SHE IS GOING TO GET HER HOOKS IN.  SHE IS

7  ALSO TELLING HER COUSIN KYLE SHE IS JUST -- AND PARDON MY

8  LANGUAGE.  I'M SIMPLY QUOTING MS. HILL.  "I'M JUST GOING TO

9  GET THE DICK.  ALL I WANT IS THE DICK.  I JUST WANT A DICK."

10         SHE SAYS THAT REPEATEDLY.  WHICH, OF COURSE, BELIES

11 ANY CLAIMS THAT SHE WAS REALLY GOING THERE TO ESTABLISH A

12 GENUINE EMOTIONAL RELATIONSHIP.  SHE SAYS HERSELF REPEATEDLY

13 SHE IS GOING TO GET THE DICK.  ALSO, AS SHE IS COMMUNICATING

14 WITH TREVOR, AS SHE IS CONTINUING TO TAKE SCREENSHOTS OF HER

15 COMMUNICATIONS AND SHARE THEM WITH HER FRIENDS, SHE IS MAKING

16 FUN OF HIM.  SHE IS -- TO THE EXTENT THAT HE IS OPENING UP.

17 AND, BY THE WAY, HE SPOKE IN MANY INTERVIEWS ABOUT HAVING

18 BEEN BULLIED.  IT IS CERTAINLY IS NOT SOME EMOTIONAL REVEAL

19 TO MS. HILL.  BUT HE SPOKE ABOUT THAT WITH HER.

20         AS HE IS COMMUNICATING WITH HER VIA INSTAGRAM DM,

21 SHE IS TAKING SCREENSHOTS.  SHE IS MAKING FUN OF HIM.  SHE IS

22 LAUGHING AT HIM.  SHE IS CALLING HIM -- SAYING SOB STORY.

23 AGAIN, BEHAVIOR THAT BELIES AN INTEREST IN A GENUINE

24 EMOTIONAL RELATIONSHIP.  RATHER SHE WANTS TO GET THE DICK AND

25 SHE IS MAKING FUN OF HIM REPEATEDLY.

26         SO SHE TELLS HIM AFTER SHE IS ABLE TO WORK OUT A

27 TIME WHEN SHE WILL BE ABLE TO COME THERE, THAT SHE WILL HAVE

28 HER "NDA SIGNED AND SEALED AND MY FEELINGS BUTTON SWITCHED

1  OFF.  DON'T WORRY."  OF COURSE, MR. BAUER HAD NEVER SPOKEN TO

2  HER ABOUT AN NDA.  WHAT SHE IS LETTING HIM KNOW -- I'LL ASK

3  HER -- I'M ASSUMING -- THAT SHE IS GOING TO BE DISCREET, AND

4  THAT SHE DIDN'T HAVE ANY EXPECTATION OF ANY SORT OF EMOTIONAL

5  RELATIONSHIP.  HER FEELINGS BUTTONS WOULD BE SWITCHED OFF.

6          SHE GOES THERE.  THEY DO TALK.  THEY HAVE

7  COMMUNICATION.  THEY HAVE A NICE CONVERSATION.  AT SOME POINT

8  TREVOR SAYS HE IS GOING TO GO TO BED, THAT SHE COULD STAY OR

9  LEAVE.  SHE SAYS SHE IS GOING TO STAY.  HE SAYS, "YOU CAN

10  SLEEP IN THE GUEST ROOM OR YOU CAN SLEEP WITH ME.  IF YOU

11  SLEEP WITH ME, I SLEEP NAKED."  SHE SAYS, "I WANT TO SLEEP

12  WITH YOU."  SHE DECIDES TO IS GOING TO SLEEP WITH HIM.  THAT

13  IS WHAT SHE DOES.

14          NOW, SHE CLAIMS NOW IN HER DECLARATION THAT ALL

15  SORTS OF THINGS HAPPENED DURING THAT ENCOUNTER THAT SHE

16  CONSIDERED TO BE UNPLEASANT, TO SAY THE LEAST.  SHE EXPRESSES

17  TO HER FRIENDS AFTERWARDS THAT TREVOR IS AN AMAZING HUMAN.

18  SHE SAYS NOTHING TO ANYONE ABOUT ANYTHING BAD THAT HAS

19  HAPPENED.  SHE TELLS NO ONE ABOUT ANY SORT OF ANAL SEX.

20          AND WHEN HE ASKS HER, "WHAT DO YOU LIKE," AND SHE

21  SAYS, "I TOLD HIM IT WAS OKAY TO BE A LITTLE ROUGH," AND WHEN

22  HE SAYS, I LIKE IT ROUGHER THAN YOU," SHE DOESN'T SAY AT THAT

23  POINT, YOU KNOW, I WANT IT TO BE THIS WAY AND NOT THAT WAY.

24  AND AS MS. MEYER INDICATED, AND AS IS INDICATED IN THE

25  DECLARATION, ANY TIME SHE ASKED HIM TO STOP ANYTHING, HE

26  IMMEDIATELY STOPPED.

27          SHE SAYS THAT HE CHOKED HER AND THAT SHE LOST

28  CONSCIOUSNESS.  IT IS IMPORTANT -- AND IT WILL BECOME

1  IMPORTANT IN A MOMENT -- THE THINGS SHE SAYS TO TREVOR AS FAR

2  AS THAT'S CONCERNED.  BUT I WANT TO STICK RIGHT NOW WITH THE

3  CHRONOLOGICAL RECITATION.

4        SO EVERY TIME SHE SAYS STOP SOMETHING, HE STOPS.

5  THEREAFTER, SHE ENGAGES IN VAGINAL SEX WITH HIM.  AND SHE

6  SLEEPS IN HIS BED.  SHE DOESN'T SLEEP IN THE GUEST ROOM.  SHE

7  DOESN'T SLEEP ON THE COUCH.  SHE DOESN'T LEAVE.  SHE SLEEPS

8  IN THE BED.  AND SHE STAYS IN BED WITH HIM UNTIL

9  11:00 O'CLOCK THE NEXT MORNING.

10        AGAIN, SHE COMMUNICATES IN WRITING WITH FRIENDS,

11  COUSINS.  TELLS THEM HOW AMAZING HE IS.  NEVER ANY COMPLAINT

12  ABOUT ANYTHING AT ALL THAT HAPPENED.  SO THEY DO COMMUNICATE.

13  I DISAGREE AS TO THE QUANTITY.  TO ME IT DOESN'T SEEM LIKE

14  VERY MUCH COMMUNICATION.  BUT THERE IS COMMUNICATION.  A LOT

15  OF IT IS JUST KIND OF SILLY THINGS.

16        BUT WHAT IS MOST IMPORTANT ARE THE THINGS THAT SHE

17  SAYS TO HIM, WHICH SHE COMPLETELY LEFT OUT OF HER

18  DECLARATION, WHICH IS ALSO IMPORTANT IN MY MIND.  SHE SAYS TO

19  HIM ON MAY 9TH IN WRITING AND DIRECT MESSAGE -- BY THE WAY,

20  THEY DON'T HAVE EACH OTHER'S PHONE NUMBERS.  THE ONLY WAY

21  THEY COMMUNICATE IS VIA INSTAGRAM DIRECT MESSAGE, WHICH I

22  THINK ALSO SPEAKS TO THE TRIVIALITY OF THE RELATIONSHIP.

23        SHE SAYS TO HIM ON MAY 9TH -- SHE SENDS A PICTURE.

24  I CAN'T TELL IF IT'S HER OR ANOTHER WOMAN IN BED

25  PROVOCATIVELY MOTIONING WITH HER FINGER EXTENDED LOOKING INTO

26  THE CAMERA AS IF EXTENDING IT TO THE PERSON LOOKING AT IT.

27  SHE SAYS, "THE PINK SOCKS STAY ON WHILE CUDDLING.  BUTTTT

28  OFFFFFF WHEN IT'S TIME TO CHOKE ME OUT.  THANKS.  YOU ARE THE

65

1  BEST."

2          HE SAYS, "YOU WANT TO GO OUT HUH?"  SHE SAYS, "SI.

3  THAT WAS A GAME CHANGER."  HE SAYS, "TELL ME MORE."  "NEVER

4  BEEN MORE TURNED ON IN MY LIFE.  GIVE ME ALL THE PAIN.

5  RAWR."  HE SAYS, "REALLY?  WHEN YOU WERE GOING OUT OR WHEN

6  YOU WOKE UP?"  "GOING OUT.  NOW THAT I KNOW WHAT IT FEELS

7  LIKE TO WAKE UP FROM IT THO IT WILL PROBABLY FEEL JUST AS

8  GOOD TO WAKE UP FROM THAT."  HE SAYS, "YOU JUST TURNED ME ON

9  SO MUCH."  SHE SAYS "MISSION ACCOMPLISHED."

10          HE SAYS, "NOW I WANT MY ARM AROUND YOUR NECK FROM

11  BEHIND."  "DO IT.  HARDER."  AND SHE SENDS BLOWING KISS

12  EMOJIS.  TREVOR, "WHAT ELSE DOES MAMI WANT?"  "GET A COUPLE

13  OF SLAPS IN THERE.  AND THEN ANOTHER HANDPRINT ON MY ASS.

14  THEN FOR PAPI TO TELL ME WHAT ELSE HE WANTS."  TREVOR, "SLAPS

15  IN THE FACE OR ?"  SHE SAYS, "YES, YES, AND YES."  TREVOR,

16  "DO YOU EVEN KNOW WHAT PAIN IS?"  SHE SAYS, "I DON'T KNOW.

17  TRY ME."

18          SO SHE HAS MADE IT CLEAR TO TREVOR.  I CAN'T SPEAK

19  TO WHAT HER INTENTIONS WERE.  I CAN'T SPEAK TO THAT SHE IS

20  IMMATURE AND PRETENDING TO BE SOMETHING THAT SHE ISN'T.  I

21  DON'T KNOW.  WHAT WE KNOW IS WHAT SHE IS SAYING TO HIM.  AND

22  WHAT SHE IS SAYING TO HIM IS SHE HAS NEVER BEEN MORE TURNED

23  ON IN HER LIFE THAN WHEN SHE WAS CHOKED OUT THE FIRST TIME,

24  THAT SHE WANTS IT HARDER, THAT SHE WANTS IT MORE.

25          AND, ALSO, I THINK IT IS IMPORTANT TO RECOGNIZE IN

26  THIS MOMENT, AGAIN, WHAT SHE SAID TO HER FRIENDS BEFOREHAND.

27  "I AM GOING TO GET IN HIS HEAD.  YOU KNOW HOW I ROLL."  AND

28  THAT SUGGESTS A PLAN.

```
1              I DON'T THINK THAT SHE THOUGHT THAT SHE COULD GET
2     IN HIS HEAD SIMPLY BY HAVING SEX WITH HIM.  THERE'S SOMETHING
3     MORE.  AND SHE IS ENCOURAGING A MORE ROBUST ROUGH SEX
4     RELATIONSHIP WITH THE WORDS THAT SHE IS SAYING TO HIM, WHICH
5     WE HAVE, THAT SHE LEFT OUT TO THIS COURT FOR US TO PAY
6     ATTENTION TO.
7              NOW, THEY THEN MAKE PLANS FOR THEM -- FOR HER TO GO
8     TO HIS HOUSE AGAIN.  YOU KNOW, THIS IS -- SHE LIVES IN SAN
9     DIEGO.  HE IS IN PASADENA.  SO SHE IS DRIVING TO HIS HOUSE.
10    SHE HAS ALREADY EXPERIENCED WITH HIM AN OCCASION WHERE HE WAS
11    ROUGHER THAN SHE.  ROUGHER THAN SHE PERHAPS LIKED.  AND SHE
12    HAS ENCOURAGED IT TO BE MORE AND HARDER THE NEXT TIME.
13             AND SHE IS NOW GOING THERE.  SHE IS CONTINUING TO
14    TEXT, INSTAGRAM WITH HER FRIENDS.  SHE IS VERY EXCITEDLY
15    GOING THERE.  SHE SAID NOTHING BAD ABOUT HIM TO ANYONE.  SHE
16    EXPRESSED NO AFTER PHYSICAL EFFECTS.  NOTHING AT ALL OF THE
17    SORT.
18             AND SHE IS VERY HAPPILY, VERY EXCITEDLY GOING BACK.
19    AND GETS THERE AFTER MIDNIGHT.  SHE HAS INDICATED IN HER
20    DECLARATION, AND HAS BEEN SPOKEN ABOUT BY MS. MEYER, THAT ON
21    THE FIRST OCCASION WHENEVER SHE SAID TO STOP, HE STOPPED.  SO
22    WHEN HE SAYS, "LET'S AGREE ON A SAFE WORD," AND SHE DOESN'T
23    KNOW WHAT THAT IS, HE THEN SAYS "WHAT'S OFF LIMITS?"  THIS IS
24    ALL IN HER DECLARATION.
25             "I TOLD HIM NOT TO PUT HIS FINGERS IN MY THROAT."
26    SHE DOESN'T SAY ANYTHING ELSE.  SHE DOESN'T SAY, DON'T WRAP
27    MY HAIR AROUND MY NECK, DON'T CHOKE ME OUT.  IN FACT, TO THE
28    CONTRARY.  SHE ALREADY SAID, "I'VE NEVER BEEN MORE TURNED ON
```

1  THAN WHEN YOU CHOKED ME OUT THE LAST TIME."  SO WHEN HE DOES

2  THE THING THAT SHE SAID SHE HAS NEVER BEEN MORE TURNED ON BY,

3  SHE NOW COMES TO THIS COURT AND COMPLAINS ABOUT THAT AND ACTS

4  AS IF SOMEHOW THIS IS UNEXPECTED AND TERRIBLE.

5          SHE'S ALSO SAID, WHEN ASKED, "DO YOU WANT TO BE

6  HIT," AND SHE SAYS WHERE, "YES, YES, AND YES."  I MEAN, SHE

7  IS INDICATING YES.  "GIVE ME ALL THE PAIN."  SHE SAYS THAT

8  DIRECTLY.

9          WE DISPUTE THE LEVEL OF VIOLENCE THAT SHE CLAIMS.

10 AND WE CONTEND THAT THE MEDICAL RECORDS ALSO REFUTE WHAT SHE

11 CLAIMS.  SHE DOES NOT HAVE A CONCUSSION.  SHE DOES NOT HAVE A

12 SKULL FRACTURE.  SHE DOES NOT HAVE ANY OF THE NECK TRAUMA.

13 SHE DOES HAVE SOME BLACKENED EYES.  SHE DOES.

14         BUT NONE OF THE THINGS THAT SHE CLAIMS AND THAT SHE

15 INSISTED BE REPORTED TO THE MEDIA ARE PRESENT.  WHEN SHE

16 TEXTS -- I CAN'T REMEMBER IF IT'S TEXT.  AT SOME POINT IT

17 BECOMES TEXTS.  I BELIEVE IT'S STILL INSTAGRAM MESSAGE WHEN

18 SHE IS SHOWING TREVOR HER INJURIES BECAUSE SHE WRITES TO HIM

19 AND SENDS A PICTURE TO HIM.  HE SAYS, "MY GOD.  WHAT

20 HAPPENED?"  AND AS THE COURT WILL SEE, THE PICTURES THAT SHE

21 SENDS TO HER FRIEND AND COUSIN -- BECAUSE RIGHT AFTER THIS

22 HAPPENED, SHE THEN TEXTS VARIOUS PEOPLE.  SHE TELLS THEM IT

23 WAS "ROUGH SEX.  IT WAS CONSENSUAL.  BUT DON'T YOU THINK IT

24 WENT TOO FAR?  LOL."  LAUGH OUT LOUD.  "LOL."

25         SHE SENDS A PICTURE OF HERSELF.  AND IN THAT

26 PICTURE -- I MEAN, THE COURT WILL EVALUATE IT FOR YOURSELF.

27 BUT I DON'T THINK THAT THE INJURIES DEPICTED IN THAT PICTURE

28 ARE NEARLY AS SERIOUS APPEARING AS THE ONES THAT SHE RELEASED

1  TO THE MEDIA.  SHE SAYS SHE WENT TO SLEEP WHEN SHE GOT HOME.

2  THE EVIDENCE WILL SHOW THAT IS NOT TRUE.  SHE'S GOING TO

3  STARBUCKS.  SHE IS GOING TO SOME OTHER PLACES.  SHE IS NOT

4  JUST GOING TO SLEEP.

5          AND WHEN SHE GOES TO THE HOSPITAL, I THINK THAT SHE

6  GIVES A FAIR RECITATION OF WHAT OCCURS WHEN SHE SAYS "WE HUNG

7  OUT.  TALKED JUST AS FRIENDS.  WE HOOKED UP ONCE BEFORE.  I

8  KNOW HE IS INTO ROUGH SEX.  I WAS THINKING IT WOULD BE LIKE

9  BEFORE."  SO THE IDEA THAT SHE BELIEVED THIS WAS SOME GENUINE

10  RELATIONSHIP WHEN SHE RECOGNIZED THAT, IN FACT, IT WAS A

11  HOOKUP WHERE SHE WAS GOING TO GET THE DICK IS JUST THROUGHOUT

12  HER COMMUNICATIONS WITH PEOPLE.

13          MS. MEYER SAID THAT SHE FINALLY COMES CLEAN TO HER

14  SPONSOR AND HER BEST FRIEND.  WELL, THAT'S NOT ENTIRELY TRUE.

15  SHE LIES TO BOTH OF THEM.  SHE LIES TO HER SPONSOR ABOUT WHEN

16  AND WHERE THIS OCCURRED.  AS I UNDERSTAND IT, HER

17  RELATIONSHIP -- THE A.A. RELATIONSHIP IS ONE BASED ON

18  HONESTY.  SHE STARTS OFF SAYING TO HER SPONSOR, LET ME BE

19  HONEST WITH YOU.  AND SHE PROCEEDS TO LIE DIRECTLY TO HER

20  ABOUT WHAT HAPPENED.

21          SHE LIES TO HER BEST FRIEND ABOUT WHAT HAPPENED.

22  AND IT'S -- IT'S -- THIS IS ALL VERY SIGNIFICANT.  AND IT IS

23  ALSO CONSISTENT WITH THE DECLARATION, WHICH SHE FILED, WHICH

24  LEFT OUT RELEVANT INFORMATION FOR THIS COURT AND THE PREVIOUS

25  COURT WHO GRANTED THE TEMPORARY RESTRAINING ORDER, TO

26  EVALUATE THE NATURE OF WHAT OCCURRED.  SHE LEFT OUT THE PART

27  WHERE SHE ASKED FOR ROUGHER SEX AND SAID SHE HAD NEVER BEEN

28  MORE TURNED ON THAN WHEN SHE HAD BEEN CHOKED OUT.

```
1    SO I THINK IT IS IMPORTANT THAT THE COURT TAKE INTO
2    CONSIDERATION WHAT MR. BAUER KNEW.  I HEARD A LOT FROM
3    MS. MEYER ABOUT HOW SHE BEHAVES DIFFERENTLY THAN SHE REALLY
4    IS INSIDE.  WELL, THESE PEOPLE DON'T KNOW EACH OTHER.  SO ALL
5    HE CAN GO ON IS WHAT SHE IS TELLING HIM.  AND WHAT SHE IS
6    TELLING HIM IS, I WANT MORE OF THIS.  I HAVE NEVER BEEN MORE
7    TURNED ON.
8         AND I WOULD SAY THAT IF YOU WERE INTO A ROUGH SEX
9    RELATIONSHIP, IT'S A CONTINUUM.  THAT'S THE DIFFICULTY OF IT.
10   THAT'S WHY YOU SAY "STOP."  THAT'S WHY THERE'S A SAFE WORD.
11   BECAUSE OF THAT VERY THING.  SHE DOESN'T DO ANY OF THOSE
12   THINGS.
13        SHE ALSO, AS THE COURT WILL SEE, SENDS EMOJIS WHEN
14   TALKING ABOUT TREVOR THAT HAVE DOLLAR SIGNS INVOLVED.  DOLLAR
15   SIGNS ON THE TONGUE.  SHE IS TALKING ABOUT WITH HER SPONSOR
16   GETTING A RANGE ROVER.  A PRENUP.  HUNDREDS OF MILLIONS OF
17   DOLLARS.  ALL OF THESE THINGS, WHICH IN MY MIND, RELATE BACK
18   TO HER ORIGINAL COMMUNICATIONS TO HER FRIEND AND TO HER
19   COUSIN.
20        "I'M GOING TO GET MY BEING HOOKS IN HIM.  YOU KNOW
21   HOW I ROLL.  HE IS A WEIRDO.  HE IS A WHACKADOODLE."  THEN
22   CONTINUING TO MAKE FUN OF HIM THROUGHOUT THE TIME PERIOD AS
23   SHE IS TAKING SCREENSHOTS OF THE COMMUNICATIONS, WHICH
24   MS. MEYER CLAIMS IS REALLY EVIDENCE OF HER INTEREST IN A
25   GENUINE RELATIONSHIP.  ABSOLUTELY NOT.
26        THANK YOU.
27      THE COURT:  ALL RIGHT.  MS. MEYER, YOU MAY CALL YOUR
28   FIRST WITNESS.
```

1      MS. MEYER:  YES, YOUR HONOR.  WE WOULD CALL MS. LINDSEY

2  HILL.

3      THE COURT:  ALL RIGHT.  MS. HILL, IF I CAN HAVE YOU COME

4  ON UP.  REMAIN STANDING.  RAISE YOUR RIGHT HAND TO BE

5  AFFIRMED.

6      THE CLERK:  DO YOU SOLEMNLY STATE, UNDER PENALTY OF

7  PERJURY, THAT THE TESTIMONY YOU MAY GIVE IN THE CAUSE NOW

8  PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

9  TRUTH, AND NOTHING BUT THE TRUTH?

10      THE WITNESS:  YES.

11      THE CLERK:  THANK YOU.  YOU CAN BE SEATED.  MA'AM,

12  PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE

13  RECORD.

14      THE WITNESS:  YES.  FIRST NAME IS LINDSEY,

15  L-I-N-D-S-E-Y.  LAST NAME HILL, H-I-L-L.

16      THE CLERK:  THANK YOU.

17      MS. HOLLEY:  YOUR HONOR, I WOULD ASK MS. HILL REMOVE HER

18  MASK.  PARTICULARLY GIVEN THAT THERE ARE -- WHATEVER THOSE

19  ARE CALLED -- SHIELDS IN PLACE SO WE CAN SEE HER.

20      THE COURT:  UNFORTUNATELY THE COURT'S MANDATE DOES NOT

21  ALLOW FOR THAT.

22      MS. HOLLEY:  THANK YOU.

23      MS. MEYER:  YOUR HONOR, ALSO AS A HOUSEKEEPING NOTE, CAN

24  WE BRING UP A BOTTLE OF WATER FOR MS. HILL?

25      THE COURT:  OF COURSE.

26      MS. MEYER:  THANK YOU.

27      THE COURT:  IF YOU WANT TO HAND THAT TO MY BAILIFF, SHE

28  WILL BRING IT UP.

```
1          MS. MEYER:  SURE.

2

3                LINDSEY HILL,

4   CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND

5   TESTIFIED AS FOLLOWS:

6

7                DIRECT EXAMINATION

8   BY MS. MEYER:

9        Q    GOOD MORNING, MS. HILL.

10       A    GOOD MORNING.

11       Q    MS. HILL, HOW OLD ARE YOU?

12       A    I'M 27.

13       Q    IS IT OKAY IF I CALL YOU LINDSEY?

14       A    YES.

15       Q    LINDSEY, WHERE DO YOU LIVE?

16       A    I LIVE IN SAN DIEGO, CALIFORNIA.

17       Q    AND WITH WHOM DO YOU LIVE?

18       A    RIGHT NOW I'M STAYING WITH MY PARENTS.

19       Q    WHAT ARE YOUR PARENTS' NAMES?

20       A    LORI HILL AND RICH HILL.

21       Q    AND IS YOUR MOM HERE TODAY?

22       A    YES.

23       Q    AND WHAT DOES YOUR DAD DO FOR A LIVING?

24       A    HE IS A BASEBALL COACH.  A COLLEGE BASEBALL

25   COACH.

26       Q    WHERE IS HE A COLLEGE BASEBALL COACH?

27       A    HE WAS COACHING FOR THE UNIVERSITY OF SAN DIEGO.

28   BUT HE JUST MOVED TO HAWAII TO COACH AT THE UNIVERSITY OF
```

```
 1   HAWAII.
 2        Q    ARE YOU A BASEBALL FAN?
 3        A    YES.
 4        Q    AND, LINDSEY, FOR HOW LONG HAVE YOU BEEN A FAN OF
 5   BASEBALL?
 6        A    MY ENTIRE LIFE.
 7        Q    AND WHEN YOU DESCRIBE YOURSELF AS BEING A FAN OF
 8   BASEBALL, WHAT DO YOU MEAN BY THAT?
 9        A    SINCE I WAS LITTLE, I'VE BEEN GOING TO MY DAD'S
10   BASEBALL GAMES.  AND HE WOULD TAKE ME TO MAJOR LEAGUE GAMES
11   WHEN I WAS LITTLE.  AND WHEN WE MOVED TO SAN DIEGO, I'VE
12   GROWN UP GOING TO PADRES GAMES.
13        Q    DO YOU WATCH GAMES ON TELEVISION?
14        A    YEAH, ALL THE TIME.
15        Q    HAVE YOU EVER DATED A BASEBALL PLAYER BEFORE
16   TREVOR?
17        A    YES.
18        MS. HOLLEY:  I'M GOING TO OBJECT AS ASSUMING FACTS NOT
19   IN EVIDENCE AS TO DATING TREVOR.
20        THE COURT:  WELL, SUBJECTIVELY SHE CAN ANSWER.  IT
21   DOESN'T MEAN AS A MATTER OF LAW.  IT'S OVERRULED.
22        Q    BY MS. MEYER:  ARE YOU CURRENTLY EMPLOYED?
23        A    YES.  I JUST RETURNED BACK TO MY JOB AT LULULEMON.
24   MY LEAVE OF ABSENCE WAS UP AT THE END OF JULY.
25        Q    BY MS. MEYER:  WHAT DO YOU DO AT LULULEMON?
26        A    I'M WHAT'S CALLED AN EDUCATOR.  SO I JUST DO STUFF
27   ON THE RETAIL FLOOR AND GO TO A LOT OF COMMUNITY EVENTS AND
28   REPRESENT THE COMPANY.
```

```
 1        Q    YOU SAID SOMETHING -- I MISSED THAT.  WHAT YOU DID
 2   SAY AT FIRST?
 3        A    IT'S KIND OF LIKE A RETAIL ASSOCIATE.  SO SALES AND
 4   COMMUNITY EVENTS WITH LOCAL GYMS AND ALL OF THAT.
 5        Q    HOW LONG HAVE YOU WORKED FOR LULULEMON?
 6        A    SINCE 2018.
 7        Q    HAVE YOU HAD ANY OTHER EMPLOYMENT OTHER THAN
 8   LULULEMON IN THE LAST COUPLE OF YEARS?
 9        A    YES, I HAVE.  IN AROUND OCTOBER OF 2020, I STARTED
10   MY FIRST JOB AS A SOBER LIVING HOUSE MANAGER.  AND THEN I WAS
11   HIRED TO START UP A NEW SOBER LIVING ENVIRONMENT HOUSE IN SAN
12   DIEGO.  I WAS GOING TO BE THE RESIDENCE DIRECTOR THERE.
13        Q    DID YOU BECOME THE RESIDENCE DIRECTOR?
14        A    NO.
15        Q    WHAT HAPPENED?
16        A    I WAS THERE FOR TWO WEEKS LIVING AND GETTING
17   EVERYTHING READY FOR THE HOUSE, BUT THEN I WAS HOSPITALIZED.
18   AND I LOST MY JOB THERE BECAUSE OF MY INJURIES AND THE FACT
19   THAT IT TOOK ME A MONTH TO GET BACK ON MY FEET.
20        Q    WHAT WAS THE NAME OF THE SOBER LIVING HOUSE THAT
21   YOU DID WORK AT?
22        A    THE FIRST ONE OR THE SECOND ONE?
23        Q    THE FIRST ONE.
24        A    COAST RECOVERY.
25        Q    AND HOW LONG DID YOU WORK THERE BEFORE?
26        A    I WAS A HOUSE MANAGER THERE FOR FOUR MONTHS BEFORE
27   THEY SOLD THE PROPERTY BECAUSE OF COVID.
28        Q    AND WHAT DID YOU DO AS A HOUSE MANAGER?
```

```
 1        A    I MANAGED BOTH MALE AND FEMALE RESIDENTS.  AND I

 2   DRUG TESTED THEM WEEKLY.  AND I HELPED THEM PICK OUT WHAT

 3   A.A. MEETINGS THEY WERE GOING TO.  AND I LED HOUSE MEETINGS

 4   EVERY SUNDAY.  AND I WAS REALLY JUST THERE TO BE SUPPORT AS

 5   PEOPLE ARE IN THERE FIRST 90 DAYS OF SOBRIETY.

 6        Q    LINDSEY, ARE YOU AN ALCOHOLIC?

 7        A    YES.

 8        Q    AND WHEN DID YOU FIRST BEGIN HAVING A PROBLEM

 9   ABUSING ALCOHOL?

10        A    WHEN I WAS 15.

11        Q    DID THAT CONTINUE FOR A PERIOD OF TIME?

12        A    YES, UNTIL I WAS 25.

13        Q    DURING THAT TEN YEAR SPAN OF TIME, WERE YOU EVER

14   HOSPITALIZED?

15        A    YES, A LOT.

16        Q    AND WHEN YOU SAY A LOT, WHAT DO YOU MEAN BY THAT?

17        A    IN THAT TIME PERIOD, TEN YEARS OF ALCOHOLISM,

18   PROBABLY BETWEEN EIGHT AND TEN TIMES.

19        Q    WHEN WAS THE LAST TIME THAT YOU WERE HOSPITALIZED

20   FOR ALCOHOLISM?

21        A    DECEMBER 31ST, 2019.

22        Q    AND AT SOME POINT AFTER DECEMBER 31, 2019, DID YOU

23   BECOME SOBER?

24        A    YES, I DID.

25        Q    WHEN DID YOU BECOME SOBER?

26        A    2020.  JANUARY 2020 I MOVED INTO SOBER LIVING AFTER

27   30-DAY TREATMENT.

28        Q    WHY DID YOU DECIDE TO BECOME SOBER?
```

75

```
 1        A    IT WAS KIND OF TO THE POINT WHERE IT WAS A LIFE OR
 2   DEATH THING FOR ME.  AND I JUST -- I COULDN'T DO IT ANYMORE.
 3   AND I RAN MYSELF INTO THE GROUND.  BUT I WAS REALLY GOOD, AT
 4   THE SAME TIME, OF, YOU KNOW, HOLDING A JOB AND BEING THE
 5   LINDSEY THAT EVERYONE KNOWS.  AND I JUST COULDN'T -- YEAH.  I
 6   WAS GOING TO DIE IF I DIDN'T GET SOBER.
 7        Q    WHEN YOU SAY YOU WERE GOING TO DIE AND IT WAS A
 8   LIFE OR DEATH SITUATION, WHAT DO YOU MEAN BY THAT?
 9        A    I'VE OVERDOSED AT LEAST THREE TIMES.  AND MY
10   ALCOHOLISM AND MY GENETICS ARE SO ADVANCED THAT IT'S CALLED
11   BINGE USE DISORDER.  AND I JUST HAVE NO OFF BUTTON WITH
12   DRINKING.  AND IT LEADS ME INTO A VERY DARK PLACE.  AND I
13   JUST INGEST SO MUCH ALCOHOL AND I'LL TAKE WHATEVER PILL THAT
14   IS IN FRONT OF ME.  AND SO I HAD TO BE HOSPITALIZED.  IT'S
15   CONSIDERED AN OVERDOSE.
16        Q    HOW DID THOSE TEN YEARS LIVING AS AN ALCOHOLIC
17   AFFECT YOU?
18        A    I HAVE A LOT OF PAST TRAUMA.  AND THAT INCLUDES SEX
19   TRAUMA.  AND I REALLY -- MY SELF-WORTH THROUGH THOSE TEN
20   YEARS WAS EXTREMELY LOW.  AND I DEVELOPED COPING SKILLS THAT
21   I STILL CARRY INTO MY ADULTHOOD, WHICH INCLUDE, YOU KNOW,
22   COPING WITH EXTREMELY EMOTIONAL PAINFUL THINGS WITH HUMOR.
23   AND THAT'S WHAT I HAVE TO DO TO KEEP MY HEAD UP AND NOT PICK
24   UP A DRINK TODAY.  BUT I DEVELOPED, LIKE I SAID, A LOT OF MY
25   FIGHT OR FLIGHT SKILLS IN RESPONSE TO THESE TRAUMATIC
26   INCIDENTS TO PROTECT MYSELF AND KEEP MY HEAD ABOVE WATER.
27        Q    HAVE YOU RELAPSED AT ALL SINCE YOU BECAME SOBER?
28        A    NO.
```

```
1        Q    AND WHAT DO YOU DO TO MAINTAIN YOUR SOBRIETY?

2        A    I ATTEND AT LEAST THREE TO FOUR A.A. MEETINGS

3   WEEKLY.  I HAVE MY SPONSOR LISA, WHO HAS BEEN MENTIONED.  AND

4   I'VE BEEN STAYING WITH HER ON AND OFF, TOO.  AND I'VE REALLY

5   HAD TO GO TO THERAPY AND PROCESS MY TRAUMA AND WORK ON MY

6   SELF-WORTH.  AND I'M ALMOST 21 MONTHS SOBER.  AND I HAVE

7   GROWN A LOT DURING THAT TIME PERIOD AND INCREASED MY

8   SELF-WORTH.  AND TRIED TO DIVE BACK INTO SOME KIND OF

9   TRUSTING A HIGHER POWER.  THAT'S BEEN HUGE FOR ME.  AND JUST

10  THE PEOPLE THAT I SURROUND MYSELF WITH.  AND A.A. IS JUST --

11  A.A. SAVED MY LIFE FOR SURE.

12       Q    HOW WOULD YOU SAY THAT YOU HAVE CHANGED IN THE LAST

13  21 MONTHS?

14       A    I REALLY -- I DON'T NEED TO NUMB OUT ANYMORE.  I

15  HAVE THE TOOLS.  I'VE TRIED TO REWIRE MY BRAIN IN TERMS OF MY

16  EMOTIONS AND REALLY FEELING EVERY FEELING AS THEY COME.  AND

17  I'VE BEEN TRYING REALLY HARD TO WORK ON MY COMMUNICATION

18  SKILLS WITH HOW I TALK TO PEOPLE, AND HOW I PRESENT MYSELF,

19  AND TRY TO LET DOWN THIS TOUGH GIRL FRONT I PUT ON TO THE

20  WORLD.  AND I'VE BEEN REALLY JUST TRYING TO OWN MY PART IN

21  EVERYTHING IN THE PAST 21 MONTHS AND RECOGNIZE WHERE I FAIL,

22  AND TALK ABOUT RESENTMENTS THAT I HAVE, AND THINGS LIKE THAT.

23  SO I'VE REALLY, I THINK, JUST IN GENERAL MY SELF-WORTH IS

24  WHERE I HAVE REALLY, REALLY TRIED TO GROW AND MY

25  COMMUNICATION SKILLS.

26       Q    ARE YOU A TOUGH GIRL?

27       A    NO.

28       Q    DID YOU ATTEND COLLEGE?
```

1      A    YES, I DID.

2      Q    WHERE DID YOU GO TO COLLEGE?

3      A    I SPENT THREE YEARS AT USD.  AND I TRANSFERRED TO

4  CALIFORNIA BAPTIST UNIVERSITY FOR MY LAST THREE SEMESTERS.

5      Q    DID YOU RECEIVE A COLLEGE DEGREE?

6      A    YES.

7      Q    FROM WHAT INSTITUTION?

8      A    CALIFORNIA BAPTIST UNIVERSITY.

9      Q    AND WHAT WAS YOUR DEGREE IN?

10      A    CRIMINAL JUSTICE.

11      Q    LINDSEY, DO YOU -- LET ME DIRECT YOUR ATTENTION TO

12  THE LAST YEAR OR SO.  DO YOU USE INSTAGRAM?

13      A    YES, I DO.

14      Q    AND DO YOU HAVE AN INSTAGRAM ACCOUNT?

15      A    YES.

16      Q    AND WHY DO YOU USE INSTAGRAM?

17      A    I USE INSTAGRAM MOSTLY AS A WAY TO KEEP UP WITH MY

18  FRIENDS' LIVES AND SEE WHAT OTHER PEOPLE ARE DOING.  AND I

19  USED TO USE INSTAGRAM A LOT.  I HAD A MENTAL HEALTH AND

20  RECOVERY BLOG BEFORE ALL THIS HAPPENED.  AND I WOULD USE MY

21  PERSONAL ACCOUNT TO PROMOTE THAT.  I WOULD DO, LIKE, BRAND

22  MODELING JOBS WITH COMPANIES IN SAN DIEGO THAT I WOULD GET TO

23  PROMOTE ON MY PERSONAL PAGE.  AND MOSTLY JUST TO POST FUN

24  PICTURES OF WHAT I'M DOING.  I USE INSTAGRAM STORY.  AND TO

25  KEEP UP WITH OTHER PEOPLE'S LIVES, LIKE I SAID.

26      Q    CAN YOU JUST EXPLAIN IN YOUR OWN WORDS VERY BRIEFLY

27  WHAT IS AN INSTAGRAM POST VS. AN INSTAGRAM STORY?

28      A    YEAH.  SO A REAL INSTAGRAM POST IS GOING TO BE

1    SOMETHING THAT STAYS ON YOUR ACTUAL PROFILE.  SO IF YOU WERE

2    TO CLICK ON LINDSEY HILL, HER PROFILE, THERE WOULD BE

3    PERMANENT PHOTOS IN KIND OF, LIKE, A TIMELINE THAT PEOPLE CAN

4    VIEW.  AND YOU POST A CAPTION.  AND IT STAYS THERE FOREVER.

5            AN INSTAGRAM STORY IS STILL THROUGH MY ACCOUNT.

6    BUT IT'S MORE OF A MOMENTARY 24-HOUR THING.  SO IF I WERE TO

7    POST, LIKE, A PICTURE OF THIS WATER BOTTLE ON MY INSTAGRAM

8    STORY, IT WOULD SHOW UP FOR ALL THE PEOPLE WHO FOLLOW ME TO

9    SEE.  AND THEN IT WOULD DELETE IN 24 HOURS.

10       Q    SO HOW DO YOU DECIDE WHETHER TO POST OR WHETHER TO

11   DO A STORY ON YOUR INSTAGRAM ACCOUNT?

12       A    FOR ME, A STORY IS MORE OF, LIKE, A SILLY OR NOT

13   SOMETHING IMPORTANT THAT I WANT TO STICK ON MY PROFILE

14   FOREVER VS. LIKE MY BROTHER JUST GOT MARRIED.  THAT'S

15   SOMETHING I WANT TO KEEP ON MY PROFILE.  SO I POSTED IT IN A

16   REAL POST THAT WILL STAY ON MY INSTAGRAM PROFILE FOREVER.  AS

17   OPPOSED TO A STORY THAT WILL DISAPPEAR IN 24 HOURS.

18       Q    AND IN YOUR OWN WORDS, WHAT IS "TAGGING"?

19       A    TAGGING, SPECIFICALLY IN A STORY YOU PRESS THE @

20   BUTTON.  BASICALLY YOU CAN TAG ANYONE THAT HAS AN INSTAGRAM

21   ACCOUNT THAT YOU WANT TO ATTACH TO A POST OR A STORY.  SO IF

22   YOU'RE TAGGING SOMEONE IN A STORY, THEY'RE GOING TO GET A

23   NOTIFICATION THAT SAID, "LINDSEY HILL TAGGED YOU IN A STORY."

24   AGAIN, THAT IS SOMETHING THAT ONLY LASTS 24 HOURS.  WHEN YOU

25   TAG ANOTHER ACCOUNT, THAT PERSON DOES GET NOTIFIED.

26       Q    IF YOU TAG SOMEBODY, IS YOUR PROFILE PHOTOGRAPH

27   FROM YOUR INSTAGRAM ACCOUNT GOING TO SHOW UP?

28       A    YES.  THE PROFILE PHOTO WILL SHOW WHEN IT SAYS THAT

79

1  SOMEONE WANTS TO SEND YOU A MESSAGE OR THAT SOMEONE HAS

2  TAGGED YOU IN A STORY.

3      Q    AND I'M GOING TO SHOW YOU A -- WHAT WE HAVE

4  PREMARKED AS -- I THINK IT'S EXHIBIT 3.  DIRECTING YOUR

5  ATTENTION TO EXHIBIT 3, IS THIS A TRUE AND CORRECT COPY OF

6  YOUR CURRENT INSTAGRAM PROFILE PHOTOGRAPH?

7      A    IT'S NOT CURRENT.  BUT IT WAS IN APRIL.

8      Q    SO AS OF APRIL 1, 2021, THIS WAS YOUR PROFILE;

9  CORRECT?

10     A    YES.

11     Q    AND AS OF APRIL 18, 2021, WAS THAT STILL YOUR

12  PROFILE?

13     A    YES.

14     MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 3 BE

15  ADMITTED.

16     THE COURT:  ANY OBJECTION?

17     MS. HOLLEY:  NO.

18     THE COURT:  THAT IS ADMITTED.  COUNSEL, I'M GOING TO ASK

19  YOU NOT TO PUBLISH ANYTHING UNTIL IT'S ADMITTED.

20     MS. MEYER:  I'LL DIRECT EVERYONE TO THE NOTEBOOKS.

21     THE COURT:  THAT'S PERFECT.

22     MS. OLSON:  YOUR HONOR, MAY I APPROACH TO SET UP THE

23  NOTEBOOKS FOR MS. HILL?

24     THE COURT:  YES.

25     Q    BY MS. MEYER:  MS. HILL -- OR, LINDSEY, BEFORE

26  APRIL 18, 2021, DID YOU KNOW WHO TREVOR BAUER WAS?

27     A    YES, I DID.

28     Q    AND HOW DID YOU KNOW WHO HE WAS?

80

```
1         A    I STARTED WATCHING SPRING TRAINING GAMES THAT
2    STARTED IN FEBRUARY.  AND WHEN I WAS WATCHING THE PADRES VS.
3    THE DODGERS GAME, I SAW HIM PITCH.
4         MS. HOLLEY:  I'M SORRY TO INTERRUPT.  IS THERE A COPY OF
5    THE NOTEBOOK FOR RESPONDENT OR NO?
6         MS. OLSON:  WE EMAILED YOU WHEN WE SERVED YOU.
7         MS. HOLLEY:  OKAY.
8         Q    BY MS. MEYER:  WHEN YOU REFER TO FEBRUARY, DID YOU
9    MEAN FEBRUARY OF 2021?
10        A    YES, FEBRUARY OF 2021.
11        Q    WHEN YOU FIRST SAW HIM PITCH IN FEBRUARY OF 2021,
12   WERE YOU INTERESTED IN DATING HIM?
13        A    YES.
14        Q    AND WHY WERE YOU INTERESTED IN DATING TREVOR?
15        A    ONE OF THE FIRST THINGS THAT I NOTICED ABOUT HIM
16   WHILE HE WAS PITCHING IS THAT HE WAS CLOSING ONE EYE.  AND
17   I'M VERY DRAWN TO PEOPLE WHO DON'T CARE WHAT OTHERS THINK OF
18   THEM AND ARE WILLING TO BE UNIQUE REGARDLESS OF OTHER'S
19   OPINIONS.  I JUST THOUGHT THAT HIS DEMEANOR ON THE FIELD WAS
20   VERY DIFFERENT.  AND, LIKE I SAID, THAT IS WHAT I'M DRAWN TO.
21   AND SO I REMEMBER TELLING MY MOM HOW CUTE TREVOR BAUER WAS.
22        Q    WHAT IS UNIQUE ABOUT CLOSING ONE EYE WHEN PITCHING,
23   SINCE I ALSO KNOW NOTHING ABOUT BASEBALL?
24        A    I THINK IT'S JUST SOMETHING THAT I'VE NEVER SEEN
25   ANYONE DO BEFORE EVER.  AND I DIDN'T KNOW IF HE WAS MESSING
26   AROUND OR IT WAS REALLY SOMETHING THAT HELPED HIS PITCHING.
27   SO THAT WAS THE FIRST THING THAT INTRIGUED ME ABOUT HIM.
28        Q    DID YOU FOLLOW TREVOR ON INSTAGRAM BEFORE APRIL 18
```

1  OF 2021?

2      A    YES.

3      Q    AND CAN YOU EXPLAIN, FIRST OF ALL, WHAT IT MEANS BY

4  FOLLOWING SOMEONE ON INSTAGRAM?

5      A    YEAH.  SO FOLLOWING A PROFILE, ESPECIALLY WITH

6  SPORTS OR CELEBRITIES LIKE THAT, YOU JUST HIT THE "FOLLOW"

7  BUTTON.  AND THEN THAT AUTOMATICALLY ALLOWS YOU WHEN YOU LOG

8  ON TO INSTAGRAM TO SEE THEIR POSTS AND THEIR STORIES.  SO

9  THAT'S WHAT IT MEANS WHEN I FOLLOWED HIS ACCOUNT.  I COULD

10 SEE WHAT HE WAS POSTING.

11     Q    AND PRIOR TO APRIL 18, DID YOU EVER TRY TO TAG

12 TREVOR?

13     A    NO.

14     Q    AND FOR HOW LONG HAD YOU BEEN FOLLOWING TREVOR

15 PRIOR TO APRIL OF 2021?

16     A    I WOULD ESTIMATE LIKE THREE MONTHS.  THREE OR FOUR

17 MONTHS.  WHENEVER THE BEGINNING OF THE 20-2021 BASEBALL

18 SEASON STARTED.

19     Q    BEFORE APRIL 18 OF 2021, DID YOU KNOW ANYTHING OR

20 HAD YOU READ ANYTHING ABOUT TREVOR'S SEXUAL PROCLIVITIES?

21     A    NOT SEXUAL.  NO.

22     Q    WHAT DID YOU KNOW ABOUT TREVOR BEFORE APRIL 18,

23 2021, OTHER THAN THE FACT THAT HE CLOSED AN EYE WHEN HE

24 PITCHED?

25     A    I DIDN'T KNOW MUCH.  JUST THE MAIN STUFF THAT USED

26 TO COME UP WHEN YOU GOOGLE HIM, THAT HE IS VERY OUTSPOKEN.

27 HE IS NOT AFRAID TO POKE FUN OF OTHERS AND CAUSE FRIENDLY

28 RIVALRIES WITH OTHER BASEBALL PLAYERS.  AND I DID SEE AN

82

1    ARTICLE THAT HE HAD THREE RULES OF DATING.

2         Q    AND DO YOU RECALL WHAT THOSE THREE RULES WERE?

3         A    NO SOCIAL MEDIA.  NO FEELINGS INVOLVED.  AND THEN

4    SLEEP WITH OTHER PEOPLE.

5         Q    DID THAT CAUSE YOU ANY CONCERN PRIOR TO APRIL 18,

6    2021?

7         A    NO, IT DIDN'T.  I JUST WANTED TO UNDERSTAND MORE

8    ABOUT HIM AND THE REASONING BEHIND WHY SOMEONE WOULD WANT TO

9    MAKE THOSE RULES.

10        Q    NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO APRIL 18,

11   OF 2021.  DO YOU RECALL WHERE YOU WERE IN THE EARLY EVENING

12   OF APRIL 18?

13        A    I WAS VISITING MY PARENTS.  AND I WAS WITH MY MOM

14   AT HOME.

15        Q    AND WHAT WERE YOU DOING WITH YOUR MOM?

16        A    WE WERE WATCHING THE PADRES AND DODGERS GAME.

17        Q    WAS THIS SOMETHING THAT YOU AND YOUR MOM REGULARLY

18   DID TOGETHER?

19        A    YES.  MY MOM GREW UP AS A DODGER FAN.  SHE WATCHES

20   THE DODGERS GAMES.  AND THE PADRES GAMES ARE ALWAYS ON.

21   BASEBALL IS ALWAYS ON WHEN I VISIT MY PARENTS.

22        Q    I ASSUME, FROM WHAT OTHERS HAVE SAID, THAT YOU'RE A

23   PADRES FAN?

24        A    YES.

25        Q    WHILE WATCHING THE GAME, DID YOU CREATE AN

26   INSTAGRAM STORY?

27        A    YES.

28        Q    AND CAN YOU DESCRIBE WHAT YOU CREATED?

83

```
 1        A    YES.  IT WAS A VIDEO WITH A COLORFUL FILTER AND A
 2   SONG.  AND TREVOR WAS ON THE MOUND PITCHING.  AND THE REASON
 3   I WAS CREATING THE STORY WAS AS TO SUPPORT THE PADRES WINNING
 4   AND SAYING, "I HOPE THE PADRES WIN."  I POSTED A PICTURE OF
 5   TREVOR ON THE MOUND.
 6        THE CAPTION WAS, "OPENS THIRD EYE TO RATTLE @" --
 7   AND THEN THAT'S WHERE I TAGGED HIM -- "BAUEROUTAGE."  AND THE
 8   THIRD EYE THING IS JUST KIND OF LIKE MY SPIRITUAL, LIKE,
 9   MEDITATION KIND OF THING.  THAT'S WHY I PUT THAT.  BUT IT WAS
10   IN A POST MEANING TO SUPPORT THE PADRES WINNING BECAUSE HE
11   WAS PITCHING.
12        Q    SO YOU POSTED THIS ON YOUR INSTAGRAM ACCOUNT;
13   CORRECT?
14        A    YES, AS A STORY.
15        Q    DID YOU TAG TREVOR AT THE TIME THAT YOU POSTED THAT
16   VIDEO?
17        A    YES.
18        Q    AND WHEN YOU TAG SOMEONE, DO THEY SEE THE VIDEO?
19   CAN YOU EXPLAIN HOW YOU DO THAT?
20        A    YEAH.  SO BECAUSE HE HAS A LOT OF FOLLOWERS AND HE
21   WASN'T PREVIOUSLY FOLLOWING ME, IT WOULD GO -- HE WOULDN'T
22   GET A NOTIFICATION ON HIS PHONE, LIKE, IT WOULDN'T POP UP FOR
23   HIM TO SEE.  YOU HAVE -- HE WOULD HAVE TO GO ON TO INSTAGRAM,
24   LOG IN, AND CHECK HIS MESSAGE REQUESTS.  BECAUSE ANYONE HE
25   DOESN'T FOLLOW, IT IS GOING TO SHOW UP AS A REQUEST.
26        AND WITH HOW MANY FOLLOWERS HE HAS, I ASSUME HE HAS
27   A LOT OF THE REQUESTS WITH PEOPLE TAGGING HIM AT SPORTING
28   EVENTS AND WHAT NOT.  AND HE HAD JUST PITCHED.  SO THAT'S
```

```
 1   WHERE THAT MESSAGE LANDS.  HE WOULD HAVE HAD TO LOOK IN THE
 2   REQUEST INBOX.
 3        MS. HOLLEY:  I'M GOING TO OBJECT AND MOVE TO STRIKE.
 4   LACK OF FOUNDATION.  AS TO ALL OF THE TESTIMONY SHE JUST GAVE
 5   CONCERNING HOW INSTAGRAM WORKS.  SPECULATION AS TO WHAT
 6   MR. BAUER WOULD HAVE TO DO.  THOSE ARE MY OBJECTIONS.
 7        THE COURT:  SUSTAINED.  AND STRICKEN.
 8        Q   BY MS. MEYER:  HOW MANY FOLLOWERS DID TREVOR
 9   HAVE?
10        A   I CAN'T THINK OFF THE TOP OF MY HEAD.  BUT PROBABLY
11   AROUND --
12        MS. HOLLEY:  OBJECTION.  CALLING FOR SPECULATION.
13        THE COURT:  SUSTAINED.
14        Q   BY MS. MEYER:  DO YOU KNOW HOW MANY FOLLOWERS
15   TREVOR HAD?
16        A   AROUND 400,000 --
17        MS. HOLLEY:  OBJECTION.  VAGUE AS TO TIME.
18        THE COURT:  SUSTAINED.
19        Q   BY MS. MEYER:  AS OF APRIL 18TH, 2021, WITHOUT
20   TELLING ME THE NUMBER, DO YOU KNOW APPROXIMATELY HOW MANY
21   FOLLOWERS TREVOR HAD?
22        A   YES.
23        Q   DID YOU HAVE ANY EXPECTATION ON APRIL 18 THAT IF
24   YOU TAGGED TREVOR THAT HE WOULD RESPOND?
25        A   NO.
26        Q   THEN WHY DID YOU TAG HIM?
27        A   BECAUSE I TAG A LOT OF DIFFERENT SPORTS PEOPLE
28   DURING GAMES.  I TAG CELEBRITIES.  IT'S NOT UNUSUAL FOR ME TO
```

85

1  DO THAT IN SUPPORT OF A BASEBALL TEAM OR A TV SHOW I WATCH.

2  I DO POST A LOT OF INSTAGRAM STORIES.

3      Q    HOW MANY INSTAGRAM -- LET'S SAY OVER THE PAST YEAR,

4  HOW MANY INSTAGRAM STORIES HAVE YOU POSTED?

5      A    HUNDREDS.

6      Q    DID YOU SAY HUNDREDS?

7      A    YEAH.

8      Q    I'D LIKE TO SHOW YOU, WITHOUT PUTTING IT ON THE

9  SCREEN, EXHIBIT 1.  CAN YOU DESCRIBE WHAT EXHIBIT 1 IS?

10      A    YES.  IT'S A SCREENSHOT OF THE VIDEO STORY I POSTED

11  ON APRIL 18TH.

12      Q    AND WHAT IS BAUEROUTAGE?

13      A    THAT IS HIS INSTAGRAM ACCOUNT NAME.

14      Q    THEN IT SAYS, "OPEN THIRD EYE TO RATTLE

15  @BAUEROUTAGE"?

16      A    YES.

17      Q    WHAT DID THAT MEAN?

18      A    LIKE I SAID, MY THIRD EYE IS KIND OF, LIKE, OPEN,

19  YOU KNOW, MEDITATION.  LIKE PRAYERS UP BASICALLY.  SAYING A

20  PRAYER.  THEN "RATTLE" IS KIND OF A BASEBALL TERM THAT MEANS

21  I HOPE HE DOES POORLY SO THAT THE PADRES WIN.

22      MS. MEYER:  YOUR HONOR, REQUEST EXHIBIT 1 BE ADMITTED.

23      THE COURT:  ANY OBJECTION?

24      MS. HOLLEY:  NO OBJECTION.

25      THE COURT:  IT IS ADMITTED.

26      MS. MEYER:  THANK YOU.

27      Q    BY MS. MEYER:  AFTER TAGGING TREVOR ON APRIL 18,

28  DID YOU RECEIVE AN INSTAGRAM MESSAGE FROM HIM?

1      A     YES.

2      Q     AND IS THAT CALLED A DIRECT MESSAGE?

3      A     A DIRECT MESSAGE, YES.

4      Q     AND IS A DIRECT MESSAGE PUBLIC OR PRIVATE?

5      A     IT'S A PRIVATE CONVERSATION.

6      Q     AND IS YOUR INSTAGRAM ACCOUNT A PUBLIC ACCOUNT OR A

7  PRIVATE ACCOUNT?

8      A     IT'S PUBLIC.

9      Q     ABOUT HOW LONG AFTER YOU SENT YOUR -- AFTER YOU

10  TAGGED TREVOR DID YOU RECEIVE A DIRECT MESSAGE FROM HIM?

11      A     THE DIRECT MESSAGE CAME VERY QUICKLY AFTER THE GAME

12  ENDED.  BETWEEN 10 TO 15 MINUTES AFTER THE GAME FINISHED.

13      Q     NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT

14  2, WHICH ARE TEXT MESSAGES -- I'M SORRY -- DIRECT MESSAGES

15  BETWEEN YOU AND TREVOR.

16      A     YES.

17      Q     AND IF YOU CAN IDENTIFY THESE AS DIRECT MESSAGES

18  BETWEEN YOU AND TREVOR?

19      A     YES.

20      Q     AND THEY HAVE BEEN BATES STAMPED 2 THROUGH 102.

21  ARE THESE ALL TEXTS -- STRIKE THAT.  ARE THESE ALL DIRECT

22  MESSAGES BETWEEN YOU AND TREVOR BETWEEN APRIL 18, 2021, AND

23  MAY 31, 2021?

24      A     YES.

25      Q     NOW, THERE WAS DISCUSSION BEFORE YOU TESTIFIED THAT

26  THERE WERE ALSO SOME VIDEOS THAT YOU SENT VIA INSTAGRAM.  ARE

27  THOSE VIDEOS PART OF THIS EXHIBIT?

28      A     I BELIEVE SO.  IF HE GAVE ALL OF THE SCREENSHOTS,

1   IT SHOULD SHOW THAT I SENT A VIDEO.

2        Q    MAYBE WE CAN LOOK AT THAT OVER LUNCH AND YOU CAN

3   IDENTIFY THE EXHIBIT BATES STAMP PAGE.

4        A    YES.

5        MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 2 BE

6   ADMITTED.

7        THE COURT:  ANY OBJECTION?

8        MS. HOLLEY:  NO.

9        THE COURT:  ALL RIGHT.  TWO IS ADMITTED.  IT'S NOW JUST

10  ABOUT NOON.  SO WHY DON'T WE CALL IT.  AND I WILL SEE YOU ALL

11  AT 1:30.

12       MS. MEYER:  THANK YOU.

13       THE COURT:  YOU MAY STEP DOWN.

14                 (THE NOON RECESS WAS TAKEN UNTIL

15                  1:30 P.M. OF THE SAME DAY.)

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1   CASE NUMBER:            21STRO03198
 2   CASE NAME:              LINDSEY HILL VS.
 3                           TREVOR BAUER
 4   LOS ANGELES, CALIFORNIA  MONDAY, AUGUST 16, 2021
 5   DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE
 6   APPEARANCES:            (AS HERETOFORE NOTED.)
 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR
 8   TIME:                   1:32 P.M.
 9
10
11        THE COURT:  ALL RIGHT.  BACK ON IN HILL AND BAUER.  DO
12   YOU WANT TO COME BACK UP?  MS. MEYER, AT YOUR CONVENIENCE.
13        MS. MEYER:  THANK YOU.
14
15                  LINDSEY HILL,
16   CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND
17   TESTIFIED AS FOLLOWS:
18
19                  DIRECT EXAMINATION (RESUMED)
20   BY MS. MEYER:
21        Q    LINDSEY, WHERE WE LEFT OFF PRIOR TO LUNCH WAS YOUR
22   IDENTIFYING THE DIRECT MESSAGES BETWEEN YOU AND TREVOR.  AND
23   I'D LIKE TO REDIRECT YOUR ATTENTION TO EXHIBIT 2.
24        MS. MEYER:  IF WE CAN SHOW THEM BECAUSE THEY HAVE BEEN
25   RECEIVED.  AGAIN, YOUR HONOR, THEY GOT BACK HERE.
26        THE COURT:  WHY DON'T WE LET HER HAVE THE BOOKS.
27        MS. HOLLEY:  YOUR HONOR, AT THIS POINT, I JUST WANT TO
28   QUESTION WHY WE'RE USING A --
```

```
1        THE COURT:  THERE IS NO REASON TO BE USING A PROJECTOR.
2   PLEASE TURN IT OFF.
3        Q    BY MS. MEYER:  DIRECTING YOUR ATTENTION TO EXHIBIT
4   2.  I'M GOING TO REFER TO THE BATES STAMPS, LINDSEY.  AND THE
5   BATES STAMPS ARE ON THE BOTTOM RIGHT HAND OF EACH PAGE.  SO
6   THIS IS BATES STAMP 2.
7             IS THIS THE DIRECT MESSAGE THAT YOU INITIALLY
8   RECEIVED FROM TREVOR ON APRIL 18 AT APPROXIMATELY 4:50 P.M.?
9        A    YES.
10       Q    AND ARE TREVOR'S DIRECT MESSAGES ON THE RIGHT SIDE
11  OF EACH PAGE IN THE BLUE BOX?
12       A    YES.
13       Q    AND WHERE ARE YOURS?
14       A    MINE ARE ON THE LEFT.
15       Q    YOU STATED TOWARDS THE BOTTOM OF THE PAGE ON BATES
16  STAMP 2, "YO 11/10 EXECUTION ON THE, QUOTE, 'SAFE,' END QUOTE
17  CALL WHEN TURNER BIFFED THIRD THO."
18            AND THEN TREVOR RESPONDS, "I AM MORE OF A HUG TYPE
19  OF GUY LOL."
20            WHAT DID YOU MEAN WHEN YOU SAID, YO 11/10, ET
21  CETERA?
22       A    DURING THAT GAME WHEN TREVOR WAS PITCHING, JUSTIN
23  TURNER, WHO PLAYS FOR THE DODGERS, FELL OVER THIRD BASE.  AND
24  HE, FROM THE PITCHER'S MOUND, MADE A SAFE CALL, WHICH IS LIKE
25  A JOKE ON THE FIELD.  SO I WAS ACKNOWLEDGING THAT.
26       Q    WHEN YOU SAID TO HIM -- NOW, I'M REFERRING TO THE
27  THIRD PAGE OF EXHIBIT 2.  "LOVE THIS FOR US, WE CAN AGREE ON
28  THE HUG BEING THE BEST INTRODUCTION METHOD."
```

```
 1              WHAT DID YOU MEAN BY THAT?

 2       A    WHEN HE REFERENCED THAT HE WAS A HUG TYPE OF GUY,

 3  BECAUSE I HAD PREVIOUSLY INTRODUCED MYSELF SAYING, "DIGITAL

 4  HANDSHAKE, NICE TO MEET YOU BAUER.  I'M LINDSEY."  HE SAID,

 5  "I'M MORE OF A HUG GUY."  I WAS AGREEING THAT IF I WERE TO

 6  MEET HIM IN PERSON AND WE WERE IN PERSON, THAT A HUG WOULD BE

 7  THE BEST WAY TO GREET EACH OTHER.

 8       Q    DIRECTING YOUR ATTENTION TO PAGE 5, YOU STATE,

 9  "MAKE SURE TO SWING AT IT LIKE MANNY DID TODAY."  AND

10  TREVOR'S RESPONSE IS, "EH, I USUALLY DON'T MISS."

11              AND THEN YOU SAY, "ROAST YA BOY THOUGH FOR THIS."

12  AND THEN YOU CITE IT LOOKS LIKE HIS WEBSITE.  WHAT DID YOU

13  MEAN IN THOSE DM'S?

14       A    SO HE WAS ACTUALLY THE ONE WHO SENT ME HIS TWITTER

15  WEBSITE THERE.

16       Q    WHILE WE'RE ON EXCHANGING INFORMATION, MS. HOLLEY

17  STATED IN HER OPENING STATEMENT THAT TREVOR NEVER PROVIDED

18  YOU WITH HIS TELEPHONE NUMBER; IS THAT TRUE?

19       A    IT IS TRUE.  INITIALLY I WAS THE ONE WHO SENT HIM

20  MY PHONE NUMBER IN A DM EARLY IN MAY.  HE PROCEEDED TO TEXT

21  ME.

22       Q    DID HE EVER GIVE YOU HIS TELEPHONE NUMBER?

23       A    NO.

24       Q    WHEN YOU WENT TO HIS HOME, DID HE PROVIDE YOU WITH

25  HIS ADDRESS?

26       A    YES.

27       Q    AND THERE WAS ALSO MENTION BY -- IN OPENING ABOUT A

28  NON-DISCLOSURE AGREEMENT OR NDA.  DID TREVOR EVER ASK YOU TO
```

1    SIGN SUCH A DOCUMENT?

2         A    NO.

3         Q    AND THEN ON PAGE 9, YOU STATE -- OR I'M SORRY.

4    TREVOR STATES, "I'M USUALLY NOT A FAN OF THE FEELS LOL."  AND

5    YOU STATE SOMETHING TO THE EFFECT -- AND IT'S HARD TO READ

6    BECAUSE THERE'S A THUMB -- COPY OF A THUMB.  "THAT'S GOING TO

7    GET YA OUT ON" -- AND DO YOU RECALL THE WORDS YOU USED?

8         A    THE BUMP.

9         Q    AND THEN YOU SAY, "NO FEELS EQUALS SUPPRESSED

10   EMOTION EQUAL TENSIONS STORED IN YOUR BODY.  SO MANY THEORIES

11   ON THAT."  AND THEN HE SAYS, "I AM MORE ON THE TOUCHY SIDE OF

12   THE FEELS YA KNOW?  HELPS RELIEVE TENSION STORED IN THE BODY

13   SO IT DOESN'T GET ME ON THE MOUND."

14            "UM DUH YOU ARE TALKING TO THE QUEEN OF PHYSICAL

15   TOUCH.  SUCH A SPICY LOVE LANGUAGE."  I'M READING FROM PAGE

16   10 AS WELL.  WHAT DID YOU MEAN IN THOSE DM'S?

17        A    WELL, WHEN HE SAID, "I'M USUALLY NOT A FAN OF THE

18   FEELS," I WENT ON TO SAY, "NO FEELS EQUALS SUPPRESSED MOTION

19   EQUALS TENSION STORED IN YOUR BODY."  I WAS REFERRING TO HOW

20   WHEN YOU DON'T ACKNOWLEDGE YOUR EMOTIONS OR WHAT YOU'RE

21   DEALING WITH, THAT THEY ARE STORED IN YOUR BODY.  AND THEY

22   AFFECT HOW YOU FEEL PHYSICALLY AND MENTALLY.  AND I

23   REFERENCED PHYSICAL TOUCH, WHICH IS MY LOVE LANGUAGE.  AND

24   WHEN I SAID, "SUCH A SPICY LOVE LANGUAGE," IT WAS JUST A WAY

25   OF FLIRTING.

26        Q    WHY WERE YOU FLIRTING WITH TREVOR AT THIS POINT?

27        A    I FEEL LIKE HE WAS GETTING FLIRTY INITIALLY WITH

28   SOME OF THE THINGS HE SAID.  I WAS PICKING UP ON IT.

1   ESPECIALLY WHEN HE TALKS ABOUT SOMETHING LIKE PHYSICAL TOUCH.

2   I JUST WANTED TO KEEP THE CONVERSATION GOING ON THE TONE IT

3   WAS ON AND FLIRT BACK.

4        Q    ON PAGE 11 OF EXHIBIT 2, TREVOR STATES -- AND THIS

5   IS TOWARDS THE BOTTOM THIRD OF THE PAGE.  "YOU'RE TRYING TO

6   STRETCH IT TO A TRIPLE HUH?  THAT'S BOLD THIS EARLY IN THE

7   GAME."  AND YOU SAY, "MY DADS A BASEBALL COACH, I WAS RAISED

8   TO ALWAYS SCORE AT LEAST A TRIPLE."  WHAT WAS YOUR INTENTION

9   IN SENDING THAT DM TO HIM?

10       A    THE CONTEXT OF THOSE MESSAGES BASICALLY WE'RE

11  TALKING ABOUT THE THINGS WE AGREE ON AND RELATING THEM TO A

12  BASEBALL METAPHOR OF SINGLE, DOUBLE, TRIPLE.  WE HAD

13  PREVIOUSLY AGREED ON TWO THINGS.  AND SO WHEN I SAID, "WHAT

14  ELSE CAN WE AGREE ON," SINCE WE HAD PREVIOUSLY AGREED ON TWO

15  THINGS, HE RESPONDED THAT WE WERE TRYING TO STRETCH IT TO A

16  TRIPLE.  WHEN I SAID MY DAD IS A BASEBALL COACH, I WAS ALWAYS

17  RAISED TO SCORE AT LEAST A TRIPLE, THAT WAS MY WAY OF JUST

18  CONTINUING ON THE BASEBALL BANTER.  AND, AGAIN, JUST

19  CONTINUING THE CONVERSATION GOING.

20       Q    DID YOU FEEL THAT THE DIRECT MESSAGES WERE SEXUAL

21  AT THIS POINT?

22       A    NO, I DID NOT.

23       Q    AND THEN ON PAGE 12, TREVOR SAYS, "AND OH DON'T

24  WORRY.  YOU WON'T REACH HOME PLATE ON DAY ONE.  NEED MORE

25  TIME FOR ROASTS, SARCASM, PICKING YOUR BRAIN BEFORE THAT."

26  WHAT WAS YOUR UNDERSTANDING, IF YOU HAD ONE, AS TO WHAT

27  TREVOR MEANT BY THAT DM?

28       MS. HOLLEY:  I'M SORRY.  ISN'T THAT FROM --

93

```
1         THE COURT:  FROM HIM.
2         THE WITNESS:  THAT TEXT MESSAGE IS FROM ME.
3         MS. MEYER:  OH, I'M SORRY.
4         Q    BY MS. MEYER:  WERE YOU TRYING TO BE SEXUAL IN THAT
5    DM?
6         A    IN THAT WAY, YES, I WAS.  I WAS REFERRING TO SEX
7    AND KIND OF PUTTING IT OUT THERE THAT I'M NOT JUST TRYING TO
8    TALK TO HIM JUST TO SLEEP WITH HIM, WHICH IS WHY I
9    ACKNOWLEDGED I WANTED TO PICK HIS BRAIN MORE.  AND THEN HOW I
10   COMMUNICATE MOSTLY IS WHAT I REFERENCED, ROAST AND SARCASM.
11   SO THAT INITIALLY WAS ME SENDING HIM THE MESSAGE THAT I
12   WANTED TO GET TO KNOW HIM.
13        Q    AND THEN TREVOR GOES ON TO SAY, "IF A TRIPLE IS
14   YOUR BASELINE I MIGHT HAVE TO ADD YOU TO THE TEAM.  THAT
15   SEEMS PRETTY VALUABLE."  AND THEN YOU SAY "PUT ME IN COACH."
16   WHAT DID YOU MEAN WHEN YOU SAID "PUT ME IN COACH"?
17        A    I TOOK HIS MESSAGE AS HIM COMMUNICATING TO ME THAT,
18   OH, YOU MIGHT BE COOL ENOUGH TO HANG OUT WITH ME, OR
19   SOMETHING ALONG THOSE LINES.  ADD YOU TO THE TEAM.  BEING
20   FRIENDS WITH HIM.  PURSUING ANYTHING WITH HIM.  AND SO "PUT
21   ME IN COACH" WAS SAYING, YEAH, I CAN, YOU KNOW, RISE TO YOUR
22   LEVEL AND COMMUNICATE WITH YOU ABOUT BASEBALL AND ALL THESE
23   THINGS.
24        Q    APPROXIMATELY HOW LONG DID YOU DIRECT MESSAGE WITH
25   TREVOR ON THAT NIGHT?
26        A    MY BEST ESTIMATE WOULD BE MAYBE TWO AND A HALF
27   HOURS OF CONTINUAL MESSAGING THREAD.
28        Q    AT THE CONCLUSION OF YOUR DM EXCHANGE, DID YOU WANT
```

1    TO FURTHER EXPLORE DATING HIM?

2         A    YES.

3         Q    AND WHY WAS THAT?

4         A    I WAS VERY INTRIGUED, LIKE I SAID, FOR MY INITIAL

5    REASONS OF BEING INTRIGUED.  IT SEEMED TO ME THAT WE WERE

6    CONNECTING VERY WELL.  AND WE COMMUNICATED SIMILARLY WITH

7    SARCASM, AND BASEBALL BANTER, AND ROASTING, AND ALL OF THOSE

8    THINGS.  SO IT SEEMED THAT WE HAD A GOOD FLOW OF CONNECTION

9    GOING THERE.

10        Q    AND THEN ON PAGE -- BATES STAMP 13 OF EXHIBIT 2,

11   YOU STATE AT THE TOP, AFTER TREVOR STATES, "IF A TRIPLE IS

12   YOUR BASELINE I MIGHT HAVE TO ADD YOU TO THE TEAM.  THAT

13   SEEMS PRETTY VALUABLE."  AND THEN YOU SAY "PUT ME IN COACH."

14   AND THEN TREVOR SAYS A LITTLE AFTER THAT, "WELL, ALL THAT'S

15   LEFT IS THE OFFICIAL" -- AND DO YOU KNOW THE WORD HE USED?

16        A    TRYOUT.

17        Q    AND THEN YOU SAY, "YOU DON'T SCARE ME BAUER.  BRING

18   IT."  WHAT DID YOU UNDERSTAND TREVOR TO SAY WHEN HE SAID,

19   "WELL, ALL THAT'S LEFT IS THE OFFICIAL TRYOUT"?

20        MS. HOLLEY:  I'M SORRY.  I'M GOING TO OBJECT JUST

21   BECAUSE MS. MEYER HAS MISQUOTED WHAT IS STATED THERE.

22        THE COURT:  WHERE?

23        MS. HOLLEY:  I BELIEVE "IT'S TRYOUTS DON'T SCARE ME."

24        THE COURT:  IT DOES SAY "TRYOUTS DON'T SCARE ME."  THE

25   THUMB IS ON THE FIRST HALF OF THE WORD.

26        MS. MEYER:  YES, THAT IS CORRECT.  I APOLOGIZE.

27        Q    BY MS. MEYER:  YOU CAN GO AHEAD.

28        A    WHEN I SAID "TRYOUTS DON'T SCARE ME BAUER, BRING

1   IT," I JUST MEANT THAT I THOUGHT THAT I COULD HANDLE HANGING

2   OUT WITH SOMEONE LIKE HIM WHO IS MORE HIGH PROFILE.  AND WHEN

3   HE MENTIONED TRYOUTS, IN THE BACK OF MY HEAD I DIDN'T KNOW IF

4   IT WAS SEXUAL, NOT KNOWING ANYTHING ABOUT HIS SEXUAL HISTORY

5   OR ANYTHING LIKE THAT.  I DIDN'T KNOW IF IT WAS A SEXUAL

6   INNUENDO, OR IF IT WAS JUST OFFICIAL TRYOUT MEANS A DATE OR

7   GETTING TO KNOW EACH OTHER.  SO THAT'S WHY I KIND OF JUST

8   MADE A SIMPLE STATEMENT, "TRYOUTS DON'T SCARE ME."  THAT I

9   WAS WILLING TO SPEND TIME WITH HIM OR GO ON A DATE WITH HIM.

10      Q    AND THEN YOU STATE, "PICK A DAY AND I'M THERE."

11   AND THEN TREVOR RESPONDS, "NO PROBLEM DRIVING TO L.A. HUH?"

12   WERE YOU WILLING TO SEE HIM IN LOS ANGELES?

13      A    YES.

14      Q    NOW, AFTER APRIL 18, DID YOU CONTINUE TO

15   COMMUNICATE WITH TREVOR VIA INSTAGRAM?

16      A    YES.

17      Q    AND IN WHAT METHOD DID YOU COMMUNICATE?

18      A    WHAT DO YOU MEAN BY "METHOD"?

19      Q    HOW DID YOU COMMUNICATE?

20      A    INSTAGRAM DM.

21      Q    AT SOME POINT DID YOU MAKE A PLAN TO MEET ONE

22   ANOTHER?

23      A    YES.

24      Q    AND DO YOU RECALL THE DATE YOU AGREED TO MAKE THE

25   PLAN?  AND IF YOU ARE LOOKING AT SOMETHING TO REFRESH YOUR

26   MEMORY, COULD YOU IDENTIFY WHAT YOU'RE LOOKING AT?

27      A    YES.  I BELIEVE IT WAS APRIL 21ST THROUGH 22ND THAT

28   WE MADE THE PLAN TO SEE EACH OTHER.

96

```
1      Q    IS THAT REFLECTED IN EXHIBIT 2?

2      A    APRIL 21ST.

3      Q    WHAT BATES STAMP IS THAT?

4      A    THIRTY-SEVEN.

5      Q    SO YOU STATE BEFORE APRIL 21 ON PAGE 37, "PERFECT,

6   PLAY BALL BAUER."  AND THEN HE SAYS, "CAN'T WAIT TO SEE YOUR

7   SKILLSET."  AND THEN YOU SAY, "I'LL HAVE MY NDA SIGNED AND

8   SEALED, AND MY FEELINGS BUTTON SWITCHED OFF.  DON'T WORRY."

9   THEN HE SAYS, "YOU'RE SUCH A PRO.  THANK YOU."  AND THEN YOU

10  SAY, "I GOTCHU."  WHAT DID YOU MEAN WHEN YOU SAID, "MY

11  FEELINGS BUTTON SWITCHED OFF.  DON'T WORRY"?

12     A    I HAD READ ABOUT HIS THREE DATING RULES ONLINE,

13  WHICH ONE HE SPECIFICALLY STATES IF YOU'RE GOING TO DATE ME,

14  THERE'S NO FEELINGS INVOLVED.  SO I REFERENCED THAT TO LET

15  HIM KNOW WE WERE GOING TO BE ON THE SAME PAGE ABOUT DATING.

16     Q    ON APRIL 21, WAS IT TREVOR THAT INITIATED A

17  CONVERSATION ABOUT YOU SEEING HIM ON THAT OCCASION?

18     A    YES.

19     Q    AND DID YOU AGREE TO MEET WITH HIM?

20     A    YES.

21     Q    AND WHAT WAS THE PLAN?

22     A    THAT I WAS GOING TO DRIVE TO HIS RESIDENCE.

23     Q    AND DID HE GIVE YOU HIS ADDRESS?

24     A    YES.

25     Q    WHAT TIME -- STRIKE THAT.  IN WHAT CITY WERE YOU IN

26  WHEN YOU LEFT FOR HIS HOUSE?

27     A    SAN DIEGO.

28     Q    AND APPROXIMATELY WHAT TIME OF NIGHT WAS IT?
```

1       A    I LEFT MY HOUSE AROUND 7:00 P.M. APPROXIMATELY AND

2   GOT TO PASADENA ABOUT 9:30 P.M.

3       Q    DID YOU TELL ANYBODY YOU WERE GOING TO HIS HOUSE?

4       A    YES, I DID.  I TOLD MY BEST FRIEND MELY AND MY

5   COUSIN.

6       Q    AND YOUR COUSIN'S NAME IS KYLE?

7       A    YES.

8       Q    AND WHAT DID YOU TELL MELY?

9       A    I BELIEVE I SENT HER A TEXT THAT I WAS GOING TO

10  BAUER'S HOUSE.

11      Q    DID YOU TELL HER WHAT YOU WERE GOING TO DO AT

12  BAUER'S HOUSE?

13      A    NO.

14      Q    AND WHAT DID YOU TELL COUSIN KYLE?

15      A    THAT I ALSO WAS HEADING TO TREVOR'S HOUSE.

16      Q    HOW WERE YOU FEELING ON YOUR DRIVE TO TREVOR'S

17  HOUSE?

18      A    I WAS OBVIOUSLY VERY NERVOUS.  LIKE I SAID, I COME

19  OFF IN THESE MESSAGES LIKE THE TOUGH GIRL.  BUT I DO STRUGGLE

20  A LOT WITH INSECURITY.  AND THE WHOLE WAY THERE I WAS JUST

21  THINKING ABOUT HOW I WAS GOING TO ACT, WHAT I WAS GOING TO

22  SAY.  BECAUSE I KNOW HE IS A VERY POLARIZING AND POWERFUL

23  PERSON.  SO I WAS VERY INTIMIDATED AND NERVOUS.

24      Q    WHY WERE YOU NERVOUS?

25      A    EVER SINCE I GOT SOBER, I DON'T DATE A LOT.  AND I

26  HONESTLY DON'T KNOW -- I THINK THAT THE ROOT OF THE NERVOUS

27  FEELINGS WERE JUST INSECURITY AND, LIKE, WAS I GOING TO BE

28  ENOUGH TO IMPRESS HIM AND KEEP HIS ATTENTION.

```
1        Q    DID YOU HAVE ANY DISCUSSION VIA INSTAGRAM OR ANY

2   OTHER METHOD BEFORE YOU WENT TO HIS HOUSE THAT YOU WERE JUST

3   GOING THERE FOR SEX?

4        A    NO.

5        Q    DID HE TELL YOU THAT HE WAS INTO ROUGH SEX BEFORE

6   GOING TO HIS HOME?

7        A    NO.

8        Q    DID YOU HAVE AN EXPECTATION THAT YOU WERE GOING TO

9   HAVE SEX WITH HIM THAT NIGHT?

10       A    I DID NOT HAVE A SET EXPECTATION THAT WE WERE GOING

11  TO HAVE SEX.  I JUST WANTED TO GET TO KNOW HIM.  THAT'S WHY I

12  WENT OVER.  I WASN'T DEMANDING OR EXPECTING ANYTHING.

13       Q    DID YOU HAVE ANY EXPECTATION THAT YOU WOULD SPEND

14  THE NIGHT AT HIS HOME?

15       A    YES.

16       Q    AND WHAT WAS THAT EXPECTATION BASED UPON?

17       A    IN ONE OF THE MESSAGES PREVIOUS, I MADE A JOKE

18  ABOUT IF I WAS GOING TO DRIVE OUT THERE, THAT I WOULD CRASH

19  ON HIS COUCH SO I DID NOT HAVE TO DRIVE BACK TO SAN DIEGO.

20       Q    WHAT WAS HIS RESPONSE TO THAT?

21       A    HE SAID "WORKS FOR ME."

22       Q    WHEN YOU ARRIVED AT HIS HOUSE, DID HE LET YOU

23  INSIDE THE HOUSE?

24       A    YES.

25       Q    AND WHAT DID YOU DO AFTER YOU ARRIVED?

26       A    HE LET ME IN THE HOUSE.  HE ANSWERED THE DOOR AND

27  HE HUGGED ME, BUT HE WAS ON A BUSINESS CALL.  SO HE HAD TO GO

28  FINISH HIS BUSINESS CALL.  SO I SAT ON HIS COUCH FOR
```

```
 1   APPROXIMATELY 15 TO 20 MINUTES TO WAIT FOR HIM TO BE DONE.
 2       Q    AND WHAT WERE YOU DOING WHILE YOU WERE WAITING FOR
 3   HIM TO COMPLETE HIS BUSINESS CALL?
 4       A    I WAS ON MY PHONE TEXTING MY FRIENDS.
 5       Q    AND WHO DID YOU TEXT?
 6       A    MY COUSIN KYLE.
 7       Q    WHAT WAS THE SUM AND SUBSTANCE OF WHAT YOU SAID TO
 8   YOUR COUSIN KYLE?
 9       A    I SENT HIM A PICTURE, WHILE I WAS WAITING FOR
10   TREVOR, OF ME -- FOR TREVOR OF A PICTURE OF ME IN HIS HOUSE
11   SAYING I WAS THERE.
12       Q    AND WHY DID YOU DO THAT, LINDSEY?
13       A    TO -- I THINK A HUGE PART OF MY PROBLEM IS EGO AND
14   WANTING ATTENTION.  BUT I WAS SPENDING TIME WITH TREVOR.  AND
15   THAT PEOPLE WOULD THINK I WAS IMPRESSIVE IF I WAS THERE.  AND
16   SO THAT'S WHY I SENT IT TO MY COUSIN.  I AM VERY CLOSE WITH
17   HIM AND KEEP HIM UPDATED ON A LOT OF WHAT I DO.  BUT ANYONE I
18   TEXTED OR TOLD, IT'S MY OWN EGO PROBLEM IN TRYING TO GET
19   ATTENTION.
20       Q    AFTER TREVOR FINISHED THE PHONE CALL, WHAT DID YOU
21   DO NEXT?
22       A    HE CAME BACK IN AND HE OFFERED TO SHOW ME AROUND
23   HIS HOUSE.  AND HE WAS TELLING ME HOW HE HAD JUST BARELY EVEN
24   MOVED IN.  AND HE SHOWED ME THE BACKYARD.  HE TOOK ME
25   DOWNSTAIRS TO HIS BASEMENT.  AND HE SHOWED ME AROUND
26   UPSTAIRS.  AND IT WAS AT THAT POINT WE WENT AND SAT ON
27   SEPARATE COUCHES IN HIS LIVING ROOM.  AND THAT'S WHEN WE
28   TALKED FOR APPROXIMATELY FOUR TO FIVE HOURS.
```

1      Q    NOW, WHEN YOU INITIALLY SAW TREVOR THAT NIGHT, OR

2    AT ANY TIME BEFORE YOU SAT ON THE LIVING ROOM COUCHES, DID

3    YOU EXCHANGE ANY AFFECTION BETWEEN ONE ANOTHER?

4      A    NO.

5      Q    AND WHEN HE GREETED YOU, WHAT, IF ANYTHING, DID HE

6    SAY?

7      A    HE JUST ONE ARM HUGGED ME WHEN HE WAS ON THE PHONE.

8    AND HE JUST TOLD ME TO WAIT A MINUTE (INDICATING) BECAUSE HE

9    WAS ON A CALL.

10     Q    SO YOU'RE POINTING YOUR LEFT INDEX FINGER IN THE

11   AIR?

12     A    JUST BASICALLY SAYING ONE MINUTE (INDICATING).

13     Q    WHAT DID YOU AND TREVOR DISCUSS WHEN YOU WERE IN

14   THE LIVING ROOM FOR THOSE FOUR TO FIVE HOURS?

15     A    WE DISCUSSED A LOT.  I -- HE WAS REALLY THE FIRST

16   ONE TO START BEING EXTREMELY VULNERABLE.  WE TALKED INITIALLY

17   ABOUT SOME OF THE STUFF WE HAD TALKED IN THE DIRECT MESSAGES,

18   INCLUDING CONSPIRACY THEORIES.  I REALLY DID WANT TO JUST

19   PICK HIS BRAIN AND UNDERSTAND WHY HE PRESENTS HIMSELF THIS

20   WAY TO THE MEDIA AND IN BASEBALL WHERE I REALLY HAD A GENUINE

21   WANT TO UNDERSTAND, YOU KNOW, WHO HE REALLY WAS, BECAUSE I

22   FOUND HIM SO INTRIGUING.

23          HE STARTED OPENING UP WITH ME ABOUT HIS CHILDHOOD

24   AND THE FACT THAT HE WAS AGGRESSIVELY BULLIED.  AND WAS

25   TALKING ABOUT HIS PARENTS AND HOW THEY STOOD BY HIM AND GOT

26   ANGRY FOR HIM.  STUFF, YOU KNOW, WE HAD PREVIOUSLY TALKED

27   ABOUT IN OUR MESSAGES.  IT REALLY STARTED THIS DEEPLY

28   EMOTIONAL INTIMATE CONVERSATION IN WHICH HE DID TALK FOR MOST

```
 1   OF IT.

 2             BUT HE DID MAKE A COMMENT ABOUT HOW I SPOKE TO HIM,

 3   EVEN IN THE DM'S, ABOUT HOW I WAS -- SPOKE DIFFERENTLY THAN

 4   OTHER GIRLS.  AND HE HAD MENTIONED TO ME THAT HE HAD LOOKED

 5   ALL OVER MY INSTAGRAM.  THE PHRASE HE USED WAS "FROM THE

 6   LITTLE INSTAGRAM STALKING I'VE DONE, YOU HAVE QUITE A STORY."

 7   AND SO I WAS THEN KIND OF -- I ACCESSED MY DEFAULT SKILL OF

 8   BEING VULNERABLE.  I'M A VERY OPEN PERSON.  AND I LOVE TO

 9   SHARE MY STORY.  AND THAT'S ENOUGH -- ME AND TREVOR HAD THAT

10   IN COMMON.

11             I OPENED UP ABOUT MY STRUGGLES WITH ALCOHOLISM WHEN

12   I WAS VERY YOUNG.  ABOUT MY RELATIONSHIP WITH MY FAMILY.  AND

13   MY STRUGGLES WITH MY DAD.  AND HE WAS VERY SUPPORTIVE AND

14   KIND.  HE WAS VERY KIND.

15             AND I WAS VERY DRAWN INTO THIS KIND OF OPPOSITE

16   SIDE THAT YOU SEE THAT HE PROJECTS HIMSELF AS PUBLICLY.  I

17   MEAN, THE CONVERSATION EVEN LED TO, LIKE, WHAT WE THOUGHT

18   ABOUT LOVE IN GENERAL.  AND HOW, YOU KNOW, HE ASKED ME, "DO

19   YOU THINK THERE'S REALLY JUST LIKE THAT ONE PERSON?"  AND I

20   SAID THAT I DO BELIEVE THAT.  AND I WANT THAT.  BUT HE WAS

21   KIND OF TELLING ME -- AND WHERE HE STRUGGLES IS, LIKE, HE

22   WANTS TO ULTIMATELY -- IN TERMS OF MARRIAGE, HE WANTS TO FIND

23   SOMEONE THAT HE LIKES TO SPEND TIME WITH AT THE END OF THE

24   DAY.  BUT, YOU KNOW, ON A WEEKEND, HE CAN WALK OUT AND STILL

25   DO WHATEVER HE WANTS.

26             AND IT WAS JUST -- I HAVEN'T HAD THAT WITH SOMEONE

27   I'VE BEEN ON A DATE WITH BEFORE IN A REALLY LONG TIME.  SO IT

28   WAS A LOT FOR ME.  I WOULDN'T HAVE OPENED UP AND BEEN SO
```

```
 1   VULNERABLE IF HE HADN'T REALLY PUT SO MUCH OUT THERE ABOUT
 2   WHAT HE THINKS IN HIS BASEBALL CAREER AND HIS BULLYING.  I
 3   LOVE -- WHEN PEOPLE ARE VULNERABLE WITH ME, LIKE, THAT'S MY
 4   ULTIMATE LOVE LANGUAGE.  SO I WAS VERY DRAWN IN.
 5            AND I THINK THAT THIS WHOLE STORY THAT'S BEEN
 6   EVERYWHERE HAS BEEN ALL ABOUT SEX.  BUT WHEN I THINK ABOUT
 7   EVERYTHING, BETWEEN CALENDARS AND EVERYTHING IN BETWEEN,
 8   LIKE, 90 PERCENT OF EVERYTHING WAS SPENT EMOTIONAL --
 9       Q    LINDSEY, LET ME STOP YOU THERE.  DID TREVOR TELL
10   YOU ANYTHING ON THAT NIGHT ABOUT ANY OF HIS PAST
11   RELATIONSHIPS?
12       A    NO, NOT UNTIL THE SECOND NIGHT.
13       Q    AND HOW WOULD YOU DESCRIBE TREVOR'S DEMEANOR WHEN
14   HE WAS DISCUSSING WITH YOU BEING AGGRESSIVELY BULLIED AS A
15   CHILD?
16       A    I CAN DEFINITELY TELL HOW MUCH IT AFFECTS HIM OR
17   DOES AFFECT HIM.
18       Q    HOW SO?
19       A    WHAT?
20       Q    HOW SO?
21       A    HE OPENED UP -- HE JUST SEEMED A LITTLE BIT MORE IN
22   LOOKING DOWN, KIND OF LIKE THAT (INDICATING), HE OPENED UP
23   ABOUT HOW THAT'S WHY ONE OF HIS MAIN TRIGGERS IS, YOU KNOW,
24   HE SCROLLS THROUGH EVERY SINGLE THING EVERYONE SAYS ABOUT HIM
25   ON TWITTER.  AND HE HAS AN EMOTIONAL REACTIVITY TO REPLYING
26   AND COMING BACK AT SOMEONE WHO DEGRADES HIM OR IS -- YOU
27   KNOW, ATTACKS HIM ON SOCIAL MEDIA.  THAT'S HOW HE GETS HIS
28   HIGH IS GOING BACK AND ATTACKING BECAUSE OF THIS PAST OF
```

1   BULLYING AND SUCH.

2       Q    WHAT WAS GOING THROUGH YOUR MIND WHEN YOU AND

3   TREVOR WERE TOGETHER TALKING FOR THOSE FOUR TO FIVE HOURS?

4       A    I JUST WAS REALLY APPRECIATIVE.  HE ALSO TOLD ME

5   THAT HE DOESN'T DRINK OR USE DRUGS.  AND I WAS SO

6   APPRECIATIVE TO, YOU KNOW, BE SITTING WITH SOMEONE WHO COULD

7   PAY ATTENTION TO ME AND BE VULNERABLE WITH ME.  AND IT WASN'T

8   ABOUT PARTYING OR SEX AT THAT POINT.  AND I WAS JUST REALLY

9   APPRECIATIVE OF HIM OPENING UP TO ME AND LETTING ME GET TO

10  KNOW HIM AND LISTENING TO ME.

11      Q    HOW DID YOU BELIEVE THAT HE WAS PAYING ATTENTION TO

12  YOU?

13      A    HE WASN'T ON HIS PHONE.  AND HE WAS VERY PRESENT

14  AND IN THE MOMENT.  AND WHEN I SPOKE ESSENTIALLY ABOUT

15  ALCOHOLISM AND THINGS LIKE THAT, I BROUGHT UP THE NEW HOUSE I

16  WAS SUPPOSED TO BE WORKING FOR.  AND HE WAS VERY EMPATHETIC,

17  AND KIND, AND NON-JUDGMENTAL.

18      Q    AT SOME POINT IN TIME DID THE CONVERSATION TURN TO

19  TREVOR'S THREE RULES OF DATING?

20      A    YES.

21      Q    AND WHAT DID HE SAY ABOUT THAT?

22      A    HE JUST TOLD ME THAT -- HE BROUGHT UP -- HAS THREE

23  RULES OF DATING.  HE STATED THEM TO ME.  HE REPEATED THEM.

24  NO FEELINGS.  NO SOCIAL MEDIA.  AND GOING TO SLEEP WITH OTHER

25  PEOPLE.  AND I ACKNOWLEDGED THOSE RULES AND SAID I WAS

26  TOTALLY OKAY WITH THAT IN TERMS OF US DATING.

27      Q    OPPOSING COUNSEL MADE A REFERENCE TO EITHER A TEXT

28  MESSAGE OR AN INSTAGRAM MESSAGE THAT YOU HAD SENT TO SOMEBODY

1  WHERE YOU REFERENCED TREVOR BEING A WHACKADOODLE.  DID YOU,

2  IN FACT, DO THAT?

3      A    YES.

4      Q    WHAT DID YOU MEAN BY THAT?

5      A    I MEANT HE WAS UNIQUE AND INTRIGUING.  I WOULD CALL

6  MYSELF A WHACKADOODLE.  TO ME THAT'S -- THAT DOESN'T COME OFF

7  AS A COMPLIMENT, BUT I APPRECIATE WHEN SOMEONE CAN BE TRULY

8  THEMSELVES AND NOT CARE WHAT OTHERS THINK OF THEM.  AND ALL

9  THE THINGS I HAD SEEN HIM DO WHILE HE IS PITCHING AND WITH

10 HIS YOUTUBE.  AND THAT'S WHEN I MEANT BY WHACKADOODLE.  LIKE

11 I SAID, I WOULD CALL MYSELF A WHACKADOODLE.

12     Q    I'M GOING TO DIVERT YOUR ATTENTION FOR A MOMENT TO

13 EXHIBIT 20.  AND IT'S BATES STAMP PAGE 440.

14     MS. HOLLEY:  YOU SAID 20?

15     MS. MEYER:  YES, EXHIBIT 20.  STARTING AT PAGE 440.

16 LET'S START BEFORE THAT.

17     Q    BY MS. MEYER:  ARE THESE DIRECT MESSAGES BETWEEN

18 YOU AND SOMEBODY BY THE NAME OF DEREK DAWSON?

19     A    YES.

20     Q    AND WHO IS DEREK DAWSON?

21     A    HE IS SOMEONE THAT I'VE KNOWN THROUGH WORK IN THE

22 FITNESS COMMUNITY DOWN IN SAN DIEGO FOR ABOUT TWO YEARS.

23     Q    AND IS HE A FRIEND?

24     A    NO.

25     Q    WAS HE A FRIEND?

26     A    YES.

27     Q    AND DID YOU EVER HAVE ANY SEXUAL RELATIONSHIP WITH

28 HIM?

```
1        A     NO.

2        Q     AND DID HE EVER TRY TO HAVE A SEXUAL RELATIONSHIP

3    WITH YOU?

4        A     YES.

5        Q     AND WHAT WAS YOUR REACTION OR RESPONSE TO THAT?

6        A     I ALWAYS KEPT MY DISTANCE FROM HIM AND KEPT IT A

7    FRIENDLY TONE WITH HIM.  I SET MY BOUNDARIES AROUND THAT.

8        Q     SO DIRECTING YOUR ATTENTION TO THE VERY, VERY SMALL

9    BATES STAMP NUMBERS --

10       THE COURT:  I DO NOT HAVE BATES STAMPS ON THESE.

11       MS. MEYER:  THEY'RE AT THE VERY BOTTOM, YOUR HONOR.

12   IT'S HARD TO SEE.  ON THE RIGHT HAND SIDE OF THE PAGE.

13       THE COURT:  OH, I DO SEE IT.

14       MS. MEYER:  I DIDN'T SEE THEM EITHER.

15       Q     BY MS. MEYER:  SO STARTING AT 440 --

16       THE COURT:  ON THE DARK ONES, I CAN'T SEE.

17       MS. MEYER:  YEAH.  I SEE THAT, TOO.  THEY SHOULD BE ON

18   THE SIDE.

19       Q     BY MS. MEYER:  LET'S COUNT FROM 432.

20       THE COURT:  IS THIS A TEXT, APRIL 19 AT 12:22 P.M.?

21       MS. MEYER:  YES.  THAT IS CORRECT, YOUR HONOR.

22       Q     BY MS. MEYER:  AND DEREK'S MESSAGES -- TEXT

23   MESSAGES ARE ON WHAT SIDE OF THE PAGE?

24       A     THE RIGHT SIDE.

25       Q     AND YOURS ARE ON THE LEFT SIDE?

26       A     YES.

27       Q     ON APRIL 19TH, TWO NIGHTS BEFORE YOU MET TREVOR IN

28   PERSON, YOU STATE, "I'M GOING TO HIS HOUSE WEDNESDAY.  I
```

1  ALREADY HAVE MY HOOKS IN."  WHAT DID YOU MEAN BY "I ALREADY

2  HAVE MY HOOKS IN"?

3      A    I REALLY SIMPLY MEANT THAT I HAVE HIS ATTENTION.

4  AND THAT I HAVE SPOKEN WITH HIM ENOUGH TO GET HIM TO INVITE

5  ME TO HIS RESIDENCE.  AND I ALREADY HAVE MY HOOKS IN IS A

6  VERY, YOU KNOW, GENERAL PHRASE THAT I WOULD USE ABOUT ANYBODY

7  THAT I'M DATING.  OR I'M TRYING TO GET MY HOOKS IN OR I HAVE

8  MY HOOKS IN.  TO ME, THAT WAS JUST VALIDATING, WOW, HE ENJOYS

9  TALKING TO ME ENOUGH THAT HE WANTS ME TO COME TO HIS HOUSE.

10  AND, AGAIN, IT'S SAID IN A VERY SARCASTIC TONE.  AND IT

11  REFLECTS A LOT OF MY EGO AND ATTENTION PROBLEMS IN HAVING TO

12  SEND THAT.  BUT THE PHRASE, "I ALREADY HAVE MY HOOKS IN," IS

13  SAYING I GOT HIS ATTENTION AND I'M EXCITED TO GO SEE HIM.

14      Q    THEN THERE IS A SHOT OF A TEXT -- OF TEXT MESSAGES.

15  ARE THESE TEXT MESSAGES BETWEEN YOU AND TREVOR?

16      MS. HOLLEY:  I'M GOING TO JUST ASK MS. MEYER TO CORRECT

17  THESE ARE INSTAGRAM DM'S.

18      Q    BY MS. MEYER:  ARE THESE INSTAGRAM MESSAGES BETWEEN

19  YOU AND TREVOR?

20      A    YES.

21      Q    WHY DID YOU COPY DEREK?

22      A    CAN YOU SAY THAT AGAIN?

23      Q    YES.  WHY DID YOU SEND A COPY OF THE TEXT MESSAGES

24  TO DEREK?

25      A    BECAUSE HE INITIATED -- HE INITIATED THE

26  CONVERSATION BY REPLYING TO MY STORY ABOUT TREVOR, THE

27  ORIGINAL STORY THAT WE DISCUSSED.  THEN HE SAID, "DON'T TAG

28  THIS," CLOWN EMOJI.  SO SINCE HE REACHED OUT TO ME IN SAYING

1    NOT TAG HIM, I WAS JUST RESPONDING THAT I AM GOING TO GO

2    SPEND TIME WITH HIM.  I'M GOING TO GO ON A DATE WITH HIM.

3    AND I SAID, "I ALREADY HAVE MY HOOKS IN."  IT MEANT I GOT HIS

4    ATTENTION.  I'M EXCITED ABOUT IT.

5        Q    AND THEN YOU STATE AFTER THE SCREENSHOT OF THE

6    INSTAGRAM MESSAGES, "YOU KNOW HOW I ROLL."  WHAT DID YOU MEAN

7    BY "YOU KNOW HOW I ROLL"?

8        A    I THINK THAT IT'S PRETTY CLEAR SOMETIMES WHEN I

9    TYPE IN TEXT, I DON'T THINK CLEARLY.  BUT WHEN I LOOK AT

10   THAT, I BELIEVE THAT I WAS REFERENCING THAT HE KNOWS MY PAST

11   HISTORY WITH MEN I'VE DATED.  AND THE FACT THAT I DO LIKE

12   SPENDING TIME WITH BASEBALL PLAYERS, GOING ON DATES WITH

13   BASEBALL PLAYERS.  THAT'S WHAT I WAS REFERENCING.

14       Q    AND THEN TWO PAGES LATER, BATES STAMP 442, WHICH

15   DOESN'T SHOW THROUGH ON THE BLACK BACKGROUND.  YOU STATE,

16   "I'M LITERALLY GOING TO GET IN HIS HEAD AND FIND PINE TAR.

17   TRUST ME I KNOW WHAT I'M DOING.  I CAN GET IN HIS HEAD."  SO

18   FIRST EXPLAIN TO THE COURT WHAT YOU MEANT BY "I AM LITERALLY

19   GOING TO GET IN HIS HEAD"?

20       A    YEAH.  I THINK RIGHT OFF THE BAT IT'S IMPORTANT TO

21   ACKNOWLEDGE THAT DEREK IS AN EXTREMELY HUGE PADRES FAN TO

22   JUST AN ULTIMATE EXTENT.  AND WE HAVE TALKED A LOT ABOUT --

23   MOST OF OUR MESSAGES ACTUALLY ARE REFERRING TO THE PADRES

24   DODGERS RIVALRY.  AND SINCE HE MADE A JOKE ABOUT ME

25   PREVIOUSLY BEING INVOLVED WITH FERNANDO TATIS IN SAYING, "IF

26   YOU DON'T TELL HIM TATIS WAS BETTER AFTER YOU'RE DONE, THAT'S

27   AN ULTIMATE FAIL."  SO TO ME HE WAS PUTTING OUT A JOKE AND

28   MAKING A JOKE OF THE SITUATION.  SO I IN TURN, WITH MY

1  SARCASTIC TONE OF COMMUNICATION, ALSO MADE A JOKE AND SAID,

2  "I AM LITERALLY GOING TO GET IN HIS HEAD.  AND FIND PINE TAR.

3  AND TRUST ME.  I KNOW WHAT I'M DOING.  I CAN GET IN HIS

4  HEAD."

5          THOSE WERE A JOKE REPLYING TO A JOKE THAT DEREK HAD

6  MADE FIRST.  AND THE PINE TAR THING IS A BIG TOPIC IN

7  BASEBALL.  AT THE TIME IT WAS.  AND I WAS JUST REFERENCING

8  PADRES DODGERS RIVALRY.  I SAY, "I'M GOING TO GET IN HIS

9  HEAD," THAT REFERS TO SOMETHING LIKE, OH, I'M GOING TO

10  DISTRACT HIS ATTENTION AND THEN THE PADRES WILL BE BETTER,

11  KIND OF THING LIKE THAT.  THAT'S A LOT WITH THESE MESSAGES.

12  THAT'S WHAT I MEANT.  IT WAS 100 PERCENT A JOKE IN RESPONSE

13  TO A JOKE.

14      Q    SO COUNSEL IN HER OPENING -- OPPOSING COUNSEL IN

15  HER OPENING MADE REFERENCE TO MESSAGES THAT YOU SENT SOMEONE

16  ABOUT SAYING, "ALL I WANT IS THE DICK," OR SOMETHING AWFUL

17  LIKE THAT.  DID YOU SEND A MESSAGE OF AT THAT TYPE?

18      A    YES.

19      Q    AND WHO DID YOU SEND IT TO?

20      A    I BELIEVE IT WAS SENT TO KYLE, BUT I DON'T HAVE IT

21  IN FRONT OF ME.

22      Q    WHY DID YOU SEND THAT, LINDSEY?

23      A    I GREW UP WITH MY COUSIN KYLE.  WE'VE KNOWN EACH

24  OTHER OUR ENTIRE LIVES.  THE WAY I COMMUNICATE WITH HIM IS

25  VERY VULGAR.  HE IS ALSO THE BIGGEST DODGERS FAN IN THE

26  WORLD.  AND I CAN SPEAK -- I'M ALSO VERY SEXUALLY OPEN.  AND

27  I WILL OWN THAT TEXT MESSAGE, ALONG WITH MY OTHER TEXT

28  MESSAGES.  BUT WHEN I SAY, "I WANT TO GET THAT DICK," IT'S

```
1   MEANING, YOU KNOW, I'M GOING TO TREVOR BAUER'S.  I DON'T KNOW
2   WHAT'S GOING TO HAPPEN.  I HAVE NO EXPECTATION.  IT'S JUST
3   THIS FRONT I PUT ON OF THE TOUGH GIRL OR THE GIRL WHO IS
4   GOING TO GET WHAT SHE WANTS.
5           BUT I REALLY HAD NO IDEA WHAT IT WAS GOING TO BE
6   LIKE WITH TREVOR.  BUT AS A 27-YEAR-OLD WOMAN, YOU KNOW, I'VE
7   THROWN OFF THAT PHRASE A LOT.  LIKE I SAID, THAT'S HOW I
8   COMMUNICATE.  I CAN BE VULGAR AND SEXUALLY OPEN.
9       Q   NEXT, I'M GOING BACK TO EXHIBIT 20.  AND IT'S BATES
10  STAMP 442.  YOU STATE, "UGH.  HE IS SO INTRIGUING TO ME THO."
11  WHAT DID YOU MEAN BY THAT?
12      A   I MEANT THAT I REALLY, LIKE I SAID, HAVE A DEEP
13  DESIRE TO GET TO KNOW WHY HE IS THE WAY THAT HE IS BEHIND
14  WHAT HE PUTS OUT ON SOCIAL MEDIA AND ALL OF THAT.  AGAIN,
15  NOTING HOW UNIQUE HE WAS.  I WANTED TO KNOW THE STORY BEHIND
16  THAT AND WHY HE IS THAT WAY.
17      Q   AND THEN YOU GO ON TO SAY, "HE IS A WHACKADOODLE
18  LIKE CLEV OR CLEV."  WHAT DID YOU MEAN HE IS A
19  WHACKADOODLE?
20      A   THAT HE IS -- DOES NOT CARE WHAT ANYONE THINKS OF
21  HIM.  AND HE IS COMPETENT AND QUIRKY AND FUNNY.  AND, LIKE I
22  SAID, THAT WORD WASN'T MEANT TO BE AN INSULT.  IT'S FUNNY,
23  WEIRD, QUIRKY, WILD.
24      Q   SO NOW I'M GOING BACK TO THE NIGHT OF APRIL 21.
25  AND YOU WERE EXPLAINING THE THREE RULES OF DATING.  DURING
26  THE FOUR TO FIVE HOURS THAT YOU TESTIFIED THAT YOU AND TREVOR
27  SPOKE, DID YOU EAT ANYTHING?
28      A   NO.
```

```
1        Q    DID YOU DRINK ANYTHING?

2        A    NO.

3        Q    HOW WERE YOU FEELING AT THE CONCLUSION OF YOUR

4   CONVERSATION WITH TREVOR ON THAT EVENING?

5        A    I FELT LIKE I SAID VERY LISTENED TO.  AND I WAS

6   JUST REALLY IN SHOCK THAT HE WAS SO EMOTIONALLY OPEN AND

7   COMFORTABLE WITH ME TO TELL ME ALL OF THOSE DEEP THINGS TO

8   THE EXTENT ABOUT LOVE AND MARRIAGE.  AND LET ME OPEN UP ABOUT

9   MY ALCOHOLISM AND WHAT I'M CURRENTLY GOING THROUGH AND

10  WORKING TOWARDS.  BUT I FELT VERY SAFE.  AND WHAT RAN THROUGH

11  MY HEAD, YOU KNOW, AT THE END OF THE CONVERSATION WAS, WOW, I

12  DON'T THINK WE'RE EVEN GOING TO HAVE SEX TONIGHT BECAUSE IT

13  WAS SO EMOTIONALLY INTENSE.

14        IT WAS ALMOST LIKE WE DIDN'T NEED TO HAVE INTENSE,

15  BECAUSE IT WAS SUCH A GREAT, LIKE, FIRST DATE CONVERSATION

16  CONNECTION.  IT WENT SO SMOOTHLY.  SO I WAS FEELING VERY SAFE

17  AND APPRECIATIVE THAT HE WOULD TAKE THAT MUCH TIME TO TALK TO

18  ME.

19        Q    APPROXIMATELY HOW FAR WERE YOU SITTING FROM ONE

20  ANOTHER IN THE LIVING ROOM?

21        A    PRETTY FAR.  LIKE OVER SIX FEET.

22        Q    AND WAS THERE ANY PHYSICAL CONTACT BETWEEN THE TWO

23  OF YOU WHATSOEVER WHEN YOU WERE IN THE LIVING ROOM?

24        A    NO.

25        Q    AND AT SOME POINT IN TIME, DID THE CONVERSATION

26  END?

27        A    SAY THAT AGAIN?

28        Q    DID THE CONVERSATION END WHEN YOU WERE IN THE
```

```
 1   LIVING ROOM?

 2        A    YES.

 3        Q    AND ONE OTHER QUESTION, OTHER THAN TALKING ABOUT

 4   TREVOR'S THREE RULES OF DATING, DID YOU HAVE ANY CONVERSATION

 5   WHATSOEVER ABOUT SEX?

 6        A    NO.

 7        Q    DID YOU HAVE ANY CONVERSATION ABOUT ROUGH SEX?

 8        A    NO.

 9        Q    DID TREVOR SHARE WITH YOU THE TYPE OF SEX THAT HE

10   ENJOYED PARTAKING IN?

11        A    NO.

12        Q    DID YOU DISCUSS WITH HIM THE KIND OF SEX YOU

13   LIKED?

14        A    NO.

15        Q    DID HE ASK YOU ABOUT ANYTHING TO DO WITH SEX?

16        A    NO.

17        Q    WHAT HAPPENED AFTER YOUR CONVERSATION WAS OVER?

18        A    HE SAID IT WAS GETTING LATE.  HE THOUGHT WE SHOULD

19   GO TO BED.  AND WE STARTED WALKING UPSTAIRS.  AND I MADE A

20   JOKE ABOUT WHERE I SHOULD SLEEP.  AND IF I SHOULD SLEEP

21   OUTSIDE.  AND HE SAID, "YOU CAN SLEEP IN THE GUEST ROOM OR

22   YOU CAN SLEEP WITH ME IN MY BED."  AND AT THAT POINT I FELT

23   SAFE AND COMFORTABLE WITH HIM.  AND SO I SAID, "I CAN SLEEP

24   WITH YOU IN YOUR BED.  THAT'S TOTALLY FINE."

25             AND THEN WE GOT IN BED.  AND HE SAID THAT HE HAD

26   TWO QUESTIONS.  AND ASKED ME IF I WAS A CUDDLER.  AND IF HE

27   CARED THAT I SLEPT NAKED -- OR THAT HE SLEPT NAKED.  I SAID,

28   "THAT'S DOABLE."  SO HE TOOK HIS CLOTHES OFF.  I KEPT MINE
```

1  ON.  AND HE STARTED CUDDLING ME.  AND THEN WE, AT THIS POINT,

2  HADN'T EVEN KISSED.  AND WE TALKED FOR ABOUT 30 MINUTES MORE

3  ABOUT STUFF WE HAD PREVIOUSLY TALKED ABOUT.

4       AND --

5       Q    WAS THERE ANYTHING IN PARTICULAR THAT YOU TALKED

6  ABOUT FOR THOSE APPROXIMATE 30 MINUTES?

7       A    ALL I CAN REMEMBER IT WAS ALONG THE SAME LINES OF,

8  YOU KNOW, CHILDHOOD.  ALL OF THOSE SAME THINGS.

9       Q    AND AT SOME POINT DID TREVOR BECOME AFFECTIONATE

10  WITH YOU?

11      A    YES.

12      Q    AND DESCRIBE WHAT YOU MEAN BY GETTING AFFECTIONATE

13  WITH YOU?

14      A    HE STARTED CUDDLING ME.  AND HE WAS LAYING BEHIND

15  ME AND HAD HIS ARMS AROUND ME.  AND THEN AT ONE POINT I

16  TURNED OVER TO FACE HIM, AND THAT'S WHEN HE KISSED ME FOR THE

17  FIRST TIME.  AND THAT'S WHEN WE STARTED MAKING OUT.  AND I AT

18  THAT POINT KNEW WE WERE GOING TO HAVE SEX.

19      Q    ON WHAT PART OR PARTS OF YOUR BODY DID HE KISS

20  YOU?

21      A    ON MY NOSE, ON MY NECK.  THAT'S ALL I CAN REMEMBER

22  FOR THE FIRST TIME.

23      Q    AND DID YOU RETURN THE KISSES?

24      A    YES.

25      Q    AND WHEN DID YOU KISS HIM ON HIS NOSE?

26      A    I KISSED HIM ON HIS NOSE ACTUALLY FIRST WHEN WE

27  WERE CUDDLING.  AND HE SAID -- HE SAID, "HEY, YOU CAN'T KISS

28  MY NOSE.  THAT'S MY THING."  I SAID, "NO, THAT'S MY THING."

```
 1   AND HE SAID TO ME, "OKAY.  WE CAN PUT IT IN THE PRENUP THAT
 2   WE CAN BOTH HAVE IT."
 3        Q    WHO SAID WE COULD "PUT IT IN THE PRENUP"?
 4        A    TREVOR SAID THAT.
 5        Q    AND WHEN YOU WERE CUDDLING WITH ONE ANOTHER AND YOU
 6   WERE KISSING, HOW WERE YOU FEELING AT THAT TIME?
 7        A    I FELT STILL REALLY EXCITED -- I MEAN, EXCITED.
 8   AND I FELT VERY SAFE WITH HIM, BECAUSE AT THAT POINT HE WAS
 9   BEING GENTLE.  AND HE SEEMED JUST, LIKE, VERY GENUINELY,
10   LIKE, HAPPY TO BE WITH ME.
11        Q    LINDSEY, AT SOME POINT DID YOU NOTICE A CHANGE IN
12   HIS BEHAVIOR TOWARDS YOU?
13        A    YES.
14        Q    AND APPROXIMATELY HOW LONG AFTER YOU STARTED
15   KISSING DID YOU NOTICE A CHANGE IN HIS BEHAVIOR?
16        A    PROBABLY AROUND LIKE TWO MINUTES.
17        Q    AND WHAT DID YOU OBSERVE?
18        A    HE WAS BECOMING A LITTLE BIT MORE AGGRESSIVE.
19   PULLING MY HAIR.  GRABBING ME A LITTLE BIT HARDER.  AND HE
20   JUST SEEMED TO GET A BIT MORE AGGRESSIVE THAN HE HAD BEEN
21   WHEN HE FIRST STARTED KISSING ME.
22        Q    AND WHAT WAS YOUR REACTION TO HIM GETTING MORE
23   AGGRESSIVE?
24        A    I WAS OKAY WITH IT.  AND IT WAS AT THAT POINT THAT
25   HE ASKED ME, "WHAT DO YOU LIKE," IN TERMS OF SEX.  AND
26   NOTICING THAT HE WAS MORE ON THE AGGRESSIVE SIDE, I SAID,
27   "I'M OKAY WITH A LITTLE BIT ROUGH."
28        Q    AND WHAT DID YOU MEAN WHEN YOU TOLD HIM, "I'M OKAY
```

```
1    WITH A LITTLE BIT ROUGH"?

2         A    I MEANT THAT -- IT'S COMPLICATED, BECAUSE I DON'T

3    KNOW ROUGH SEX WELL.  I DON'T -- SINCE I'VE GOTTEN SOBER, I

4    HAVEN'T HAD A TON OF SEX.  SO I DON'T REALLY -- I'M STILL

5    TRYING TO FIGURE IT OUT.  SO IN THAT MOMENT, I WAS JUST

6    TRYING TO KIND OF TELL HIM, LIKE, YOU KNOW, I'M SENSING THAT

7    YOU'RE INTO ROUGH SEX.  WHAT I KNOW OF ROUGH SEX IS, LIKE,

8    SLAPPING OR, LIKE, CHOKING, YOU KNOW, KIND OF LIKE THAT.

9              BUT I WAS JUST TRYING TO IMPRESS HIM AND GIVE HIM

10   WHAT HE WANTS -- HE WANTED TO DO BECAUSE HE IS STRONG AND

11   POLARIZING AND CHARMING.

12        Q    WHEN YOU JUST TESTIFIED THAT YOU KNEW ABOUT

13   SLAPPING -- OR LIGHT SLAPPING, HAD YOU EVER BEEN SLAPPED

14   WHILE HAVING SEX BEFORE?

15        A    YES, LIGHTLY TO WHERE IT DOESN'T LEAVE A MARK.

16        Q    ON WHAT PART OR PARTS OF YOUR BODY?

17        A    JUST ON MY FACE AND ON MY BUTT.

18        Q    AND WHEN YOU TESTIFIED ABOUT LIGHT CHOKING, HAD

19   SOMEONE EVER CHOKED YOU LIGHTLY WHILE HAVING SEX BEFORE?

20        A    YES.

21        Q    AND DID EITHER OF THOSE THINGS, PRIOR TO THE NIGHT

22   YOU WERE WITH TREVOR, DID THOSE AROUSE YOU AT ALL?

23        A    NO.  LIKE I SAID, I'M STILL TRYING TO FIGURE OUT

24   SEX IN SOBRIETY, BECAUSE FOR SUCH A LONG TIME I DIDN'T

25   REMEMBER HAVING IT.  SO REALLY, SINCE I DON'T KNOW WHAT I'M

26   DOING, I USUALLY JUST GO ALONG WITH WHAT THE OTHER PERSON

27   LIKES BECAUSE I DON'T KNOW WHAT I LIKE.

28        Q    DID TREVOR AT ALL ASK YOU AT THAT POINT IN TIME
```

115

```
1    WHAT YOU WANTED SPECIFICALLY?
2         A    NO.
3         Q    DID HE ASK YOU ABOUT WHETHER OR NOT YOU ENJOYED
4    ANAL SEX?
5         A    NO.
6         Q    DID HE TALK TO YOU ABOUT ORAL SEX?
7         A    NO.
8         Q    DID HE TALK TO YOU ABOUT CHOKING YOU TO THE POINT
9    OF UNCONSCIOUSNESS?
10        A    NO.
11        Q    HAD YOU EVER BEEN CHOKED TO THE POINT OF
12   UNCONSCIOUSNESS BEFORE THAT NIGHT?
13        A    NO.
14        Q    AT SOME POINT DID TREVOR TRY TO PLACE HIS HANDS OR
15   HIS FINGERS DOWN YOUR THROAT?
16        A    YES.
17        Q    AND CAN YOU DESCRIBE WHAT HE DID?
18        A    HE STUCK TWO OF HIS FINGERS LIKE THIS (INDICATING)
19   AND STUCK THEM DOWN MY THROAT (INDICATING).  AND IT HURT.
20   AND I WAS GAGGING.  AND SO BECAUSE HIS FINGERS WERE DOWN MY
21   THROAT, I COULDN'T TALK.  I WENT LIKE THIS WITH MY HANDS
22   (INDICATING) TO STOP HIM.  AND HE DID.
23        Q    AND HOW LONG WERE HIS FINGERS DOWN HIS THROAT --
24   YOUR THROAT?  I'M SORRY.
25        A    MAYBE LIKE THREE OR FOUR SECONDS.
26        MS. HOLLEY:  I'M SORRY.  I DIDN'T HEAR THE ANSWER.
27        THE WITNESS:  THREE OR FOUR SECONDS.
28        MS. HOLLEY:  THANK YOU.
```

```
1        Q    BY MS. MEYER:  WHAT HAPPENED AFTER TREVOR REMOVED
2   HIS TWO FINGERS FROM YOUR THROAT?
3        A    HE CONTINUED HAVING SEX WITH ME.
4        Q    WHAT DO YOU MEAN BY THAT?
5        A    VAGINALLY.  AND WITH KISSING ME.  AND THEN THAT'S
6   WHEN HE WRAPPED MY HAIR AROUND MY NECK TO CHOKE ME.
7        Q    SO CAN YOU DESCRIBE WITH YOUR HAIR HOW HE WRAPPED
8   YOUR HAIR AROUND YOUR OWN NECK AND CHOKED YOU?
9        A    YEAH.  I WAS LAYING -- HE FLIPPED ME ON TO MY
10  STOMACH AND STOPPED HAVING SEX WITH ME.  AND HE TOOK MY HAIR,
11  WHICH WAS 22 INCHES LONG AT THE TIME.  AND HE WAS ON HIS
12  KNEES BEHIND ME.  AND HE TOOK MY HAIR AND DID IT LIKE THIS
13  (INDICATING).  AND HE DID IT SO TIGHT.  AND I JUST ASSUMED
14  THAT HE WAS CHOKING ME IN THAT WAY.
15            BUT I HAD NO IDEA I WAS GOING TO GO UNCONSCIOUS.
16       Q    NOW, YOU JUST SHOWED US THAT HE TOOK YOUR HAIR.
17  DID HE HOLD YOUR HAIR WITH ONE HAND OR TWO?
18       A    I COULDN'T SEE.  BECAUSE HE WAS BEHIND ME.
19       Q    AND HE WRAPPED YOUR HAIR AROUND THE FRONT OF YOUR
20  NECK?
21       A    YES.
22       Q    AND DID HE APPLY PRESSURE?
23       A    YES.
24       Q    I'M GOING TO SHOW YOU EXHIBIT SEVEN.  LINDSEY WHAT
25  IS EXHIBIT SEVEN?
26       A    THIS IS A PICTURE OF ME WITH MY HAIR EXTENSIONS IN,
27  WHICH WERE HOW LONG MY HAIR WAS WHEN I SAW TREVOR.
28       Q    WHEN WAS THIS PHOTOGRAPH TAKEN?
```

1      A    IT WAS IN, I THINK, FEBRUARY OF 2021.

2      Q    AND DOES THIS PHOTOGRAPH ACCURATELY DEPICT HOW LONG

3  YOUR HAIR WAS WHEN TREVOR GRABBED YOUR HAIR AND PULLED IT

4  FROM THE BACK TO THE FRONT OF YOUR NECK AND APPLIED

5  PRESSURE?

6      A    YES.

7      Q    AND WHAT DID YOU DO WHEN TREVOR DID THAT?

8      A    I WASN'T SURE WHAT WAS HAPPENING, BECAUSE HE DIDN'T

9  TELL ME THAT HE WAS GOING TO CHOKE ME WITH MY HAIR OR THAT I

10 WAS GOING TO GO UNCONSCIOUS.  SO I JUST REMEMBER FEELING

11 SUPER LIGHTHEADED.  AND THEN THAT'S -- AND THEN I WOKE UP.

12     Q    DID YOU ENJOY THAT FEELING LINDSEY?

13     A    NO.

14     Q    WHY NOT?

15     A    I GUESS IT'S SO UNKNOWN FOR ME.  SO I HAD NO --

16     THE REPORTER:  I'M SORRY.  CAN YOU REPEAT THE LAST PART

17 OF YOUR ANSWER?

18     THE WITNESS:  YES.  I SAID IT'S VERY UNKNOWN FOR ME.  SO

19 I JUST HAD NO IDEA WHAT WAS HAPPENING.  AND IT HAPPENED

20 REALLY QUICKLY.

21     Q    BY MS. MEYER:  AND HOW LONG DO YOU BELIEVE, IF YOU

22 KNOW, THAT YOU WERE UNCONSCIOUS FOR?

23     A    I HAVE NO IDEA.  BUT AFTER THAT INSTANCE WHEN I

24 ASKED TREVOR, HE TOLD ME THAT I WAS ONLY UNCONSCIOUS FOR

25 THREE TO FOUR SECONDS.

26     MS. MEYER:  THEN, YOUR HONOR, BEFORE I GO ANY FURTHER, I

27 WOULD REQUEST THAT EXHIBIT 7 BE ADMITTED.

28     THE COURT:  ANY OBJECTION?

118

```
1          MS. HOLLEY:  NO OBJECTION.

2          THE COURT:  SEVEN IS ADMITTED.

3     Q    BY MS. MEYER:  AT SOME POINT DID YOU FIND YOURSELF

4  WAKING UP?

5     A    YES.

6     Q    AND HOW WERE YOU FEELING WHEN YOU WERE WAKING UP?

7     A    WELL, I WAS SUPER CONFUSED.  I HAVE NEVER FAINTED

8  OR I'VE NEVER GONE UNCONSCIOUS BEFORE.  BUT I WAS KIND OF IN

9  A TRAUMA RESPONSE BECAUSE WAKING UP THAT CONFUSED, A LOT OF

10 TIME, YOU KNOW, FROM LIKE WAKING UP IN A HOSPITAL OR

11 SOMETHING LIKE THAT.  SO I KIND OF DESCRIBE IT AS THAT'S HOW

12 IT FELT TO WAKE UP.  AND I --

13    Q    WHAT, IF ANYTHING, WAS TREVOR DOING WHEN YOU

14 STARTED TO WAKE UP?

15    A    HE WAS HAVING ANAL SEX WITH ME.

16    Q    AND HAD YOU EVER GIVEN HIM PERMISSION TO DO THAT?

17    A    NO.

18    Q    HAD YOU EVER HAD ANAL SEX BEFORE?

19    A    NO.

20    Q    AND DESCRIBE THE FORCE OF WHICH HE WAS INSERTING

21 HIS PENIS INTO YOUR ANUS WHEN HE WAS PERFORMING ANAL SEX ON

22 YOU?

23    A    IT WAS VERY FORCEFUL AND VERY PAINFUL.

24    Q    DID YOU -- LINDSEY, DID YOU TELL HIM TO STOP?

25    A    YES.

26    Q    AND DID HE STOP?

27    A    YES.

28    Q    WHAT HAPPENED AFTER HE -- STRIKE THAT.
```

```
1              DID HE EJACULATE IN YOUR ANUS?

2        A    NOT THAT I KNOW OF.

3        Q    AND WHAT HAPPENED AFTER HE STOPPED HAVING ANAL SEX

4   WITH YOU?

5        A    I SAID, "CAN WE STOP?"  AND HE DID.  AND I WAS

6   REALLY EMBARRASSED.

7        Q    WHY WERE YOU EMBARRASSED?

8        A    BECAUSE I HAD TO TELL HIM TO STOP BECAUSE I WAS SO

9   SICK FROM BEING UNCONSCIOUS AND I COULDN'T REALLY FORM A

10  SENTENCE.  I COULDN'T REALLY MOVE MY BODY.  AND I COULDN'T

11  GET IT TOGETHER.  I FELT LIKE I WAS, YOU KNOW -- I ALSO

12  REALLY STRUGGLE WITH PEOPLE PLEASING -- BUT I WAS RUINING HIS

13  SEXUAL EXPERIENCE BY HAVING TO STOP.  AND SO HE KIND OF

14  ROLLED ME OVER.  HE WAS HOLDING ONTO ME REALLY TIGHT ASKING

15  ME IF I WAS OKAY.

16             AND THAT'S WHEN I ASKED HIM HOW LONG DID I GO

17  UNCONSCIOUS FOR?  HE SAID, "THREE TO FOUR SECONDS."  AND I

18  ASKED HIM, I SAID, "DO PEOPLE NORMALLY REACT AND RESPOND LIKE

19  THAT WHEN YOU DO THAT?"  BECAUSE I WAS EMBARRASSED.  AND HE

20  SAID, "WELL, IT'S JUST THE FIRST TIME WITH YOU."

21       Q    YOU TESTIFIED THAT YOU FELT SICK.  HOW DID YOU FEEL

22  SICK?

23       A    NAUSEA.  JUST I FELT SO SICK TO MY STOMACH LIKE I

24  WAS GOING TO VOMIT, WHICH IS ANOTHER REASON I WAS SO

25  EMBARRASSED.  JUST DIZZINESS.  AND NOT -- YOU KNOW, I WAS SO

26  NAUSEOUS THAT WHEN I WAS TRYING TO TALK, I COULDN'T.  AND IT

27  TOOK ME TEN MINUTES AT LEAST.  AND HE WATCHED ME.  HE KNEW IT

28  TOOK ME TEN MINUTES TO FULLY BE BACK TO MY NORMAL SELF TO BE
```

```
 1  ABLE TO TALK, COMMUNICATE, AND MOVE MY BODY.  AND THEN HE
 2  JUST KEPT ASKING ME IF I WAS OKAY.  AND HE WAS STROKING MY
 3  HAIR.  AND --
 4      Q    LINDSEY, WERE YOU OKAY?
 5      A    NO.
 6      Q    AND DID YOU HAVE PAIN ELSEWHERE IN YOUR BODY?
 7      A    YES, IN MY BEHIND.
 8      Q    AND WHEN YOU SAY YOU HAD PAIN IN YOUR BEHIND, YOU
 9  WERE REFERRING TO YOUR ANUS?
10      A    YES.
11      Q    AND WHAT KIND OF PAIN WERE YOU FEELING?
12      A    IT WAS LIKE ANY TIME I SLIGHTLY MOVED, IT WAS JUST
13  SHOOTING PAIN.  AND I FELT THAT IT MIGHT BE -- I MIGHT BE
14  BLEEDING.  BUT IT WAS JUST HARD TO MOVE THE LOWER HALF OF MY
15  BODY, BECAUSE IT WAS -- LIKE I SAID, I NEVER HAD ANAL SEX
16  BEFORE.  SO EVERYTHING WAS TORN AND LIKE -- YEAH.
17      Q    DID HE STRIKE YOU AT ALL AFTER HAVING ANAL SEX?
18      A    CAN YOU SAY THAT AGAIN?
19      Q    DID HE HIT YOU IN THE FACE AFTER ANAL SEX?
20      A    NO.
21      Q    DID TREVOR ATTEMPT TO HAVE SEX WITH YOU AGAIN AFTER
22  HAVING ANAL SEX WITH YOU?
23      A    YES.
24      Q    AND WHAT, IF ANYTHING, DID -- WHAT DID HE DO?
25      A    TO TRY TO REINITIATE IT, HE WOULD JUST KISS MY NECK
26  AND, YOU KNOW, ASK ME IF I WAS OKAY.  AND HE WAS TOUCHING ME
27  ALL OVER MY BODY.  PLAYING WITH MY HAIR.  SO I GOT THE
28  MESSAGE, YOU KNOW, THAT HE WANTED TO RESUME.  AND, LIKE I
```

1    SAID, I WAS EMBARRASSED.  I FELT LIKE I COULDN'T PHYSICALLY

2    CONTINUE HAVING SEX.  AND THAT I NEEDED TO KEEP TELLING HIM

3    TO WAIT.  BUT I KNEW BY THE WAY HE WAS TOUCHING ME AND TRYING

4    TO KISS ME THAT HE WANTED TO RESUME IT.

5         Q    DID YOU SPECIFICALLY ASK HIM TO WAIT WHEN HE WAS --

6    WHEN HE WAS TRYING TO REINITIATE SEX?

7         A    YES, I KEPT REPEATING I NEEDED A MINUTE.

8         Q    DID HE WAIT?

9         A    YES.

10        Q    AND AFTER HE WAITED, DID HE THEN TRY TO REINITIATE

11   SEX AGAIN?

12        A    YES.  ABOUT TEN MINUTES LATER ONCE I WAS FINALLY

13   ABLE TO BE BACK IN MY BODY AND MOVE MY BODY AND MAKE FULL

14   SENTENCES.

15        Q    DID YOU AND TREVOR HAVE SEX AFTER THAT ON THAT

16   NIGHT?

17        A    YES.

18        Q    AND WHAT KIND OF SEX DID YOU HAVE?

19        A    IT WAS NORMAL NON-ROUGH REGULAR VAGINAL SEX.

20        Q    AND DID TREVOR KISS YOU DURING THE TIME YOU WERE

21   HAVING SEX?

22        A    YES.

23        Q    DO YOU RECALL HIM SAYING ANYTHING TO YOU?

24        A    NO.

25        Q    AND AT SOME POINT DID YOU AND TREVOR STOP HAVING

26   SEX?

27        A    YES.

28        Q    AND WHAT DID HE DO AFTER YOU STOPPED HAVING SEX?

```
 1        A     HE EJACULATED.

 2        Q     AND THEN WHAT DID HE DO?

 3        A     AND THEN HE GRABBED ME A TOWEL SO I COULD CLEAN

 4   MYSELF OFF.

 5        Q     AND DID HE STAY IN BED WITH YOU?

 6        A     YES.

 7        Q     AND WHAT DID YOU DO?

 8        A     I GOT UP AND I WENT TO USE THE BATHROOM.  AND WHEN

 9   I USED THE BATHROOM, I WAS BLEEDING SO MUCH OUT OF MY ANUS.

10   AND IT WAS JUST SO HORRIFYING.  EMBARRASSED.  SO I JUST TRIED

11   TO, LIKE, COVER UP THE BLEEDING AS MUCH AS I COULD.  AND,

12   LIKE I SAID, I WAS SO EMBARRASSED THAT, YOU KNOW, I HAD

13   LIKE -- COULDN'T LIVE UP TO HIS, LIKE, STANDARD OF WHATEVER

14   SEX WAS OR WHAT HE WANTED.

15             AND SO I JUST WAS SO TIRED AND EMBARRASSED.  AND I

16   JUST WANTED, YOU KNOW, TO MAKE IT -- TAKE A LITTLE POWER BACK

17   IN THE SITUATION AND NOT THINK ABOUT WHAT HAD JUST HAPPENED.

18   BECAUSE THE EMOTIONAL FIRST PART OF THE NIGHT WAS SO GOOD.

19   AND I DIDN'T WANT TO JUST COMPLETELY THROW IT AWAY BECAUSE OF

20   THAT.  LIKE I SAID, I'M NOT SUPER EXPERIENCED IN SOBER SEX

21   AND WHAT'S RIGHT, WHAT'S NORMAL, WHAT'S NOT.  AND SO I DIDN'T

22   THINK HE WAS GOING TO BE A THREAT TO ME FOR THE REST OF THE

23   NIGHT.

24             AND SO I JUST WANTED TO PRETEND LIKE NOTHING

25   HAPPENED.  AND I DIDN'T WANT TO FURTHER EMBARRASS MYSELF

26   UNTIL I GOT BACK IN BED WITH HIM.

27        Q     WHEN YOU WERE WALKING TO THE BATHROOM, WERE YOU

28   WALKING UNASSISTED?
```

```
 1        A    YES.

 2        Q    DID YOU HAVE ANY DIFFICULTY WALKING TO THE

 3   BATHROOM?

 4        A    YES.

 5        Q    AND HOW WAS IT HARD OR DIFFICULT TO WALK TO THE

 6   BATHROOM?

 7        A    EVERY STEP I TOOK, IT JUST -- IT WAS LIKE SHOOTING

 8   PAIN.

 9        Q    FROM WHAT AREA OR AREAS OF YOUR BODY?

10        A    MY HEAD WAS STILL -- I JUST FELT LIGHTHEADED FROM

11   GOING UNCONSCIOUS.  I WAS IN PAIN.  I HAD A LITTLE BIT OF A

12   HEADACHE.  AND JUST, LIKE, WALKING, LIKE, MY ANUS HURT

13   OBVIOUSLY WITH EVERY STEP I TOOK.  AND --

14        Q    HOW DID YOU REALIZE YOU WERE BLEEDING?

15        A    WHEN I SAT ON THE TOILET.  I KNEW I WAS IN A LOT OF

16   PAIN.  I WIPED AFTER PEEING AND THERE WAS BLOOD EVERYWHERE.

17        Q    WHEN YOU SAY THERE WAS BLOOD EVERYWHERE, WAS THERE

18   BLOOD IN THE TOILET?

19        A    YEAH.

20        Q    AND DID YOU TELL TREVOR THAT YOU WERE BLEEDING FROM

21   THE ANUS?

22        A    NO.

23        Q    WHY DIDN'T YOU TELL HIM?

24        A    I WAS VERY EMBARRASSED.

25        Q    DID YOU END UP SPENDING THE NIGHT AT TREVOR'S?

26        A    YES.

27        Q    AND WHY DID YOU STAY OVERNIGHT?

28        A    LIKE I SAID, I JUST KIND OF WANTED TO TAKE A LITTLE
```

124

```
 1   POWER BACK IN THE SITUATION AND IMPRESS HIM AND MAKE HIM
 2   THINK THAT I WAS FINE.  AND THAT I HANDLED, YOU KNOW, WHAT HE
 3   DID TO ME.  I DIDN'T WANT TO THINK ABOUT IT.  I JUST WANTED
 4   TO GO BACK TO HOW IT WAS WHEN WE WERE CUDDLING AND BEING
 5   EMOTIONAL AND OPEN WITH EACH OTHER.  AND I DIDN'T THINK HE
 6   WAS A THREAT.  I DIDN'T ASSUME WE WERE GOING TO HAVE SEX
 7   AGAIN.  AND I KNEW IN THE MORNING I COULD ADDRESS THE ANAL
 8   SEX THING, BUT I WAS JUST SO TIRED I JUST WANTED TO GO TO
 9   BED.
10        Q    DID YOU SLEEP IN THE SAME BED WITH TREVOR?
11        A    YES.
12        Q    AND DO YOU KNOW APPROXIMATELY WHAT TIME YOU FELL
13   ASLEEP THAT NIGHT?
14        A    IT WAS REALLY LATE.  PROBABLY SOMEWHERE AROUND
15   3:00 A.M.
16        Q    WHAT TIME DID YOU AWAKE THE NEXT MORNING?
17        A    I HAD TO DO A STAFF MEETING VIA ZOOM.  SO I HAD TO
18   GET UP AT 7:00 A.M. TO DO A STAFF MEETING DOWNSTAIRS.  AND
19   THEN I GOT BACK INTO BED.  TREVOR WAS STILL SLEEPING.  AND WE
20   LAID THERE AND WE WOKE UP AT 11:00 A.M.
21        Q    AND WHEN YOU WOKE UP, DID YOU TALK TO TREVOR ABOUT
22   THE NIGHT BEFORE?
23        A    YES.  WE KIND OF SAT ON OUR PHONES AND WERE BEING
24   NORMAL.  AND THEN HE WENT TO GO GET READY.  AND I WAS ON HIS
25   BED.  HE WAS GETTING READY AT HIS MIRROR.  AND HE SAID, "ARE
26   YOU FEELING A LITTLE SORE THIS MORNING?"  AND THAT'S WHEN
27   I -- IT'S HARD FOR ME TO, YOU KNOW, SPEAK UP BECAUSE I WAS SO
28   EMBARRASSED.  AND I JUST WANTED TO IMPRESS HIM AND MAKE HIM
```

125

1    THINK I COULD, YOU KNOW, MATCH UP WITH HOW I TALK.  BUT I

2    JUST ADDRESSED IT WHEN HE ASKED ME HOW SORE I WAS.  I SAID,

3    "YES, I AM SORE.  AND ANAL SEX IS NOT MY THING.  THAT'S NOT

4    REALLY MY THING."  HE DIDN'T RESPOND TO IT.

5        Q    WHAT TIME DID YOU LEAVE TREVOR'S HOUSE THAT

6    MORNING?

7        A    AROUND NOON.

8        Q    AND WHEN YOU LEFT HIS HOUSE, WERE YOU AFFECTIONATE

9    WITH ONE ANOTHER?

10       A    YES.  HE KISSED ME GOOD-BYE.

11       Q    AND AFTER YOU LEFT HIS HOUSE, WHERE DID YOU GO?

12       A    I WENT BACK HOME TO SAN DIEGO.  I HAD PLANS TO SEE

13   OTHER FRIENDS OUT IN L.A., BUT I WAS EXTREMELY EXHAUSTED FROM

14   NOT SLEEPING.  AND I JUST WAS FEELING, LIKE, WHEN I LEFT, I

15   DIDN'T KNOW IF HE WAS GOING TO, YOU KNOW, WANT TO CONTINUE

16   SEEING ME AND DATING AND ALL OF THAT.  SO I WASN'T FEELING

17   THE GREATEST ABOUT MYSELF.  AND SO I DROVE BACK HOME TO SAN

18   DIEGO TO JUST TRY TO SLEEP AND GET IT TOGETHER.

19       Q    LINDSEY, AT THAT TIME, WHAT WERE YOUR FEELINGS

20   TOWARDS TREVOR?

21       A    YOU KNOW, I TEXTED MY FRIEND MELY ABOUT IT.  AND I

22   SAID HE IS AN AMAZING HUMAN.  AND BUT, LIKE, I'M --

23       THE REPORTER:  I CAN'T UNDERSTAND.  I'M SORRY.

24       THE WITNESS:  WHEN I SENT A TEXT SAYING HE IS AN AMAZING

25   HUMAN, I DID MEAN IT WHEN I SENT IT.

26       Q    BY MS. MEYER:  YOU DID MEAN IT?

27       A    I DID, YEAH.  AND, YOU KNOW, HE OPENED UP SO MUCH

28   AND LISTENED TO ME AND WAS REALLY KIND TO ME.  I DIDN'T TELL

1    ANYONE AT FIRST ABOUT THE ANAL SEX THING.  I DIDN'T KNOW --

2    OR THE UNCONSCIOUS THING.  I DIDN'T KNOW IF IT WAS NORMAL OR

3    WHAT.  BUT I STILL -- I JUST -- I STRUGGLE WITH WHAT'S CALLED

4    "DISASSOCIATION."  I AM REALLY GOOD AT JUST NOT THINKING

5    ABOUT PAINFUL EMOTIONAL THINGS.

6         Q    LINDSEY, LET ME STOP YOU THERE.  WHEN YOU TOLD MELY

7    AFTER YOU LEFT HIS HOUSE THAT MORNING THAT YOU THOUGHT HE WAS

8    AMAZING, WHAT DID YOU MEAN BY THAT?

9         A    YOU KNOW, THAT I REALLY DID HAVE A GOOD TIME WITH

10   HIM THAT NIGHT.  AND I FELT LIKE I COMMUNICATED WHAT I DIDN'T

11   WANT, YOU KNOW.  I STOPPED HIM FROM PUTTING HIS FINGERS DOWN

12   MY THROAT.  I SAID SOMETHING THAT I DIDN'T LIKE ANAL SEX.

13   AND I WAS PROUD OF MYSELF FOR, YOU KNOW, SAYING THAT.

14   DESPITE HOW HARD IT IS FOR ME AND HOW MUCH I STRUGGLE WITH

15   WANTING TO IMPRESS AND BE THE TOUGH GIRL.

16        BUT I MEANT THAT HE WAS AN AMAZING HUMAN, BECAUSE

17   HE IS SO -- YOU KNOW, HE LET ME SEE A LOT OF DIFFERENT PARTS

18   ABOUT HIM AND, YOU KNOW, THE BASEBALL WORLD OR SOMEONE NOT

19   CLOSE TO HIM WOULD GET TO SEE.  AND I JUST REALLY WANTED TO

20   FOCUS ON THE GOOD PARTS OF THAT FIRST NIGHT INSTEAD OF

21   ANYTHING BAD.

22        Q    DID YOU WANT TO SEE HIM AGAIN?

23        A    YES.

24        Q    AND WHY DIDN'T YOU TELL MELY ABOUT THE ANAL SEX OR

25   THE FACT HE CHOKED YOU UNTIL YOU WERE UNCONSCIOUS?

26        A    MELY WAS HESITANT ABOUT ME SPENDING TIME WITH HIM

27   IN THE FIRST PLACE BECAUSE OF HIS REPUTATION AND THINGS LIKE

28   THAT.  SHE KNOWS I'VE BEEN THROUGH A LOT WITH OTHER PEOPLE

```
1    I'VE DATED.  SHE WAS JUST HESITANT ABOUT ME GETTING HURT.

2    AND SO I DIDN'T WANT TO TEXT HER IN THAT MOMENT AND TELL HER

3    THAT I WAS STRUGGLING WITH THIS.  LIKE, I SEE HER IN PERSON

4    ALMOST EVERY DAY.  SO I WAS GOING TO TELL HER IN PERSON.

5            I DIDN'T TELL MY SPONSOR THAT I WENT TO SEE HIM.

6       Q    DID YOU SPEAK TO LISA THE MORNING AFTER YOU LEFT

7    TREVOR'S HOUSE?

8       A    NO.  I DIDN'T SPEAK TO HER ABOUT ANY OF IT UNTIL A

9    COUPLE OF DAYS LATER WHEN WE WENT TO LUNCH.

10      Q    WHAT DID YOU SAY TO LISA WHEN YOU WENT TO LUNCH

11   WITH HER A COUPLE OF DAYS LATER?

12      A    I TOLD HER -- SHE IS SOMEONE THAT I TELL EVERYTHING

13   TO.  AND THAT SHE WON'T JUDGE ME.  SHE HAS ALSO BEEN THROUGH

14   A LOT.  AND I TOLD HER I -- THAT, YOU KNOW, HE CHOKED ME

15   UNCONSCIOUS.  AND I WOKE UP AND HE WAS HAVING ANAL SEX WITH

16   ME.  I ASKED HER, "IS THAT NORMAL?  LIKE, DO YOU GUYS DO

17   THAT?"  I DON'T KNOW.  AND SHE BASICALLY SAID, YOU KNOW, NO

18   IT'S NOT NORMAL.  BUT SOME PEOPLE HAVE THEIR THINGS.  AND YOU

19   JUST NEED TO BE REALLY CLEAR ON YOUR BOUNDARIES.

20           AND WITH MELY, I TOLD HER THE NEXT MORNING WHEN I

21   SAW HER AT WORK.  AND SHE WAS CONCERNED.  AND SO AT THAT

22   POINT I KIND OF BECAME MORE SECRETIVE WITH HER TALKING ABOUT

23   TREVOR.  I KNEW SHE DIDN'T THINK IT WAS A GOOD IDEA TO BE

24   DATING HIM.

25      Q    DID YOU TELL LISA WHEN YOU MET WITH HER FOR LUNCH

26   HOW YOU FELT ABOUT TREVOR?

27      A    YES.

28      Q    AND WHAT DID YOU TELL HER?
```

```
1        A    I TOLD HER THAT I WAS EXCITED BECAUSE HE DOESN'T
2   DRINK.  AND IT WAS REALLY NICE TO SPEND TIME WITH SOMEONE WHO
3   CAN HAVE A CONVERSATION.  IT'S NOT ALL ABOUT PARTYING.  AND
4   HE IS SUPER INTELLIGENT AND CHALLENGED ME TO THINK HARDER ON
5   TOPICS WE TALKED ABOUT.  AND JUST THAT HE WAS AN OPEN BOOK.
6   AND WASN'T JUDGMENTAL ABOUT ME AND MY STUFF AT ALL.  AND THAT
7   I REALLY ENJOYED SPENDING TIME WITH HIM THE FIRST TIME.
8        Q    SO AFTER YOUR -- THE FIRST TIME TOGETHER ON APRIL
9   21ST, DID YOU -- WHEN NEXT DID YOU COMMUNICATE WITH TREVOR?
10       A    I THINK IT WAS A COUPLE OF DAYS LATER.  I REPLIED
11  TO ONE OF HIS INSTAGRAM STORIES.
12       Q    AND WAS THIS AN INSTAGRAM STORY THAT HE HAD SENT
13  OUT ON HIS PUBLIC INSTAGRAM?
14       A    YEAH.
15       Q    AND WHAT DID YOU REPLY TO HIM?
16       A    IT WAS A PICTURE OF HIS JERSEY.  AND I REPLIED
17  SOMETHING ALONG THE LINES OF, "HEY, I WANT ONE," AS A JOKE.
18  BUT JUST KIND OF AS A WAY TO, LIKE, GET HIS ATTENTION.  AND
19  REALLY I JUST WANTED TO SEE WHERE HE WAS AT, BECAUSE I WAS
20  STILL EMBARRASSED FEELING LIKE I LET HIM DOWN LIKE SEXUALLY.
21  AND IT WAS MY WAY OF FEELING OUT WHERE HE WAS AT.
22       Q    SO IF YOU COULD GO BACK PLEASE TO EXHIBIT 2.  THOSE
23  ARE THE INSTAGRAM DM'S BETWEEN YOU AND TREVOR.  CAN YOU
24  IDENTIFY BY BATES STAMP THE DATE THAT YOU RESPONDED TO
25  TREVOR'S STORY?
26       A    YES.  LET ME LOOK.  BATES STAMP IS 42.  AND I
27  REPLIED ON --
28       Q    YOU'RE REFERRING TO THE PHOTOGRAPH OF HIS JERSEY?
```

1    A    YEAH.  SO IT WAS APRIL 23RD AT 4:45.

2    Q    AFTER YOU SENT HIM A RESPONSE TO HIS STORY ON

3 INSTAGRAM, DID YOU BEGIN COMMUNICATING WITH HIM STILL ON

4 INSTAGRAM?

5    A    CAN YOU ASK ME THAT AGAIN?

6    Q    SURE.  DID YOU CONTINUE TO SEND MESSAGES TO TREVOR,

7 AND HE TO YOU, ON INSTAGRAM AFTER YOU SENT HIM A COPY OF HIS

8 JERSEY?

9    A    YES.

10    Q    AND THOSE TEXT MESSAGES ARE REFLECTED ON EXHIBIT

11 2?

12    MS. HOLLEY:  JUST TO CORRECT, INSTAGRAM DIRECT

13 MESSAGES.

14    MS. MEYER:  INSTAGRAM.

15    MS. HOLLEY:  THANK YOU.

16    Q    BY MS. MEYER:  THOSE INSTAGRAM MESSAGES ARE

17 REFLECTED IN PART ON EXHIBIT 2; CORRECT?

18    A    YES.

19    Q    AT SOME POINT IN TIME WHEN YOU WERE DIRECT

20 MESSAGING WITH TREVOR, DID YOU TAKE TWO VIDEOS OF A PORTION

21 OF YOUR BODY?

22    A    YES.

23    Q    AND, FIRST OF ALL, WHAT PORTION OF YOUR BODY DID

24 YOU TAKE A PHOTOGRAPH OF?

25    A    YES.  SO I SENT A VIDEO.  THERE WAS A VERY TINY,

26 SMALLER THAN A LITTLE THUMBPRINT, BRUISE ON THE INSIDE OF MY

27 THIGH.  PROBABLY ABOUT, YOU KNOW, THREE, FOUR INCHES AWAY

28 FROM MY VAGINA AREA.  AND I SENT A VIDEO TO HIM BASICALLY

```
1   SAYING, "IS THIS YOUR THUMBPRINT?"  I WASN'T TRYING TO ACCUSE

2   HIM OF ANYTHING.  I THOUGHT IT WAS FUNNY.  AGAIN, JUST TRYING

3   TO GET HIS ATTENTION.

4          SO I SENT HIM THAT OF THE INSIDE OF MY THIGH.  AND

5   HE ASKED ME WHERE THAT WAS.  AND LET ME GET THE MESSAGE.

6      Q    CAN YOU SHOW US ON WHAT BATES STAMP PAGE YOU'RE

7   REFERRING?

8      A    FORTY-FIVE.  I THE SENT VIDEO.  HE SAID, "WHAT ON

9   EARTH WAS THAT FROM?"  I SAID, "HAHAHAHA YOU GOT ME GOOD."

10  THAT WAS MY WAY OF ASKING DID YOU DO THIS TO ME.  I WAS

11  ASKING HIM IF IT WAS FROM HIM WHEN I SAW IT.  AND I SAID, "I

12  HAVE NO IDEA.  PROBABLY YOUR THUMB."  THAT WAS MY WAY ASKING

13  IF THAT WAS FROM HIM.

14     Q    ARE YOU ABLE TO SEE ON THESE PAGES WHEN YOU SENT

15  THE VIDEO TO HIM?

16     A    IT'S APRIL 29TH.

17     Q    AND WHAT BATES STAMP PAGE IS THAT?

18     A    FORTY-FIVE.

19     Q    AND WHAT DO YOU SEE ON THIS PAGE THAT WOULD REFLECT

20  THE FACT THAT YOU SENT HIM THAT VIDEO ON APRIL 29TH?

21     A    IT'S KIND OF HARD TO SEE.  BUT IN THE MIDDLE OF THE

22  PAGE THERE'S -- RIGHT UNDERNEATH THAT LOOKS LIKE NINE -- I

23  CAN'T REALLY READ THAT.  BUT IN THE MIDDLE OF THE PAGE, IT

24  SAYS "VIDEO SENT."

25     Q    IT'S RIGHT ABOVE SOMEBODY'S THUMB?

26     A    YES.

27     Q    OKAY.  DID YOU DELETE THAT VIDEO?

28     A    YES, I DID.  I DELETED THE WHOLE MESSAGE THREAD.
```

```
1        Q    WHEN DID YOU DO THAT, LINDSEY?

2        A    I BELIEVE IT WAS THAT NIGHT, BECAUSE I DO HAVE A

3   SCREENSHOT FROM APRIL 29TH WITH A NEW THREAD.  I DELETE A LOT

4   OF THINGS ON MY PHONE.  I DON'T WANT PEOPLE LOOKING AND

5   READING MY CONVERSATIONS, ESPECIALLY IF IT'S A PRIVATE ONE.

6   SO I'M NOT SURE IF -- MAYBE I HAVE THAT SCREENSHOT IN AN

7   EXHIBIT.  BUT, YEAH, I DID.  I DELETED THE WHOLE THREAD, LIKE

8   I SAID, BECAUSE I DON'T WANT PEOPLE ON MY PHONE.

9        Q    WHEN YOU SAY YOU DELETED THE WHOLE THREAD, WHAT DO

10  YOU MEAN BY THAT?

11       A    YEAH.  IN AN INSTAGRAM DM, LIKE THE PLACE WHERE ALL

12  OF YOUR INSTAGRAM DM'S POP UP, THERE'S A LIST OF ALL THE

13  PEOPLE YOU'VE BEEN MESSAGING.  WHEN YOU SWIPE RIGHT ON IT, IT

14  DELETES IT.  IT DELETES ANY MESSAGE YOU HAVE WITH THAT

15  PERSON.  IF SOMEONE WERE TO LOOK, THEIR NAME WOULD BE GONE

16  AND YOU WOULDN'T HAVE ACCESS TO THEIR MESSAGES.

17       Q    SO YOU SAID YOU DELETED A THREAD.  SO IN ADDITION

18  TO THE VIDEO THAT YOU HAD SENT TREVOR, WHAT ELSE WAS

19  DELETED?

20       A    ALL OF THE PREVIOUS MESSAGES BEFORE THAT.

21       Q    SO HOW ARE WE LOOKING AT THESE MESSAGES?

22       A    SO THESE ARE FROM TREVOR'S PHONE.  AND WHAT HAPPENS

23  IF ONE PERSON -- SO IF I DELETED MY MESSAGES FROM MY ACCOUNT,

24  THEY JUST DELETE FROM MY PERSONAL VIEWING.  TREVOR IS NOT

25  AFFECTED.  HIS PHONE IS NOT AFFECTED.  THE MESSAGES ARE NOT

26  AFFECTED BECAUSE I DELETE THEM ON MINE.  HE STILL HAS

27  EVERYTHING FOREVER.

28       Q    SO WHEN WAS THE FIRST TIME THAT YOU SAW THESE
```

1    DIRECT MESSAGES, WHICH ARE PART OF EXHIBIT 2?

2        A    I HADN'T SEEN, LIKE, ESPECIALLY ANY OF THESE, SINCE

3    I DELETED THEM.  LIKE, RIGHT -- WE HAVE THE SCREENSHOTS OF

4    APRIL 29TH.  I HADN'T REREAD THE CONVERSATION IN A REALLY

5    LONG TIME BECAUSE I CONSISTENTLY DELETED.  HOWEVER, I DID --

6    FOR EXAMPLE, WHEN I WAS WRITING THE DECLARATION, I DID HAVE

7    CERTAIN SCREENSHOTS THAT I HAD SENT TO MY FRIENDS AND WHICH I

8    USED.  BUT THOSE SCREENSHOTS WERE TAKEN IN THE MOMENT.

9    AND --

10       Q    WHAT DO YOU MEAN THEY WERE TAKEN IN THE MOMENT?

11   THEY WERE TAKING AT THE TIME --

12       A    YEAH.  IF I SCREENSHOTTED A MESSAGE WHEN I WAS

13   ORIGINALLY GOING TO TREVOR'S HOUSE ON THE 21ST, I'M GOING TO

14   SCREENSHOT THAT.  AND I HAVE IT FOREVER.  I HAVE THAT INITIAL

15   SCREENSHOT.  BUT IF I DELETE EVERYTHING ON INSTAGRAM, I CAN

16   NO LONGER GO BACK AND LOOK.  I JUST RIGHT THE SCREENSHOT THAT

17   I WAS SENDING TO MY FRIENDS.

18       Q    WERE YOU NAKED IN THE VIDEO THAT YOU SENT TO

19   TREVOR?

20       A    NO.

21       Q    WHAT WERE YOU WEARING?

22       A    I HAD SHORTS ON.

23       Q    AND COULD YOU SEE ANY OF YOUR VAGINA OR YOUR

24   BUTTOCKS OR ANYTHING LIKE THAT?

25       A    NO.

26       Q    WERE THERE ANY OTHER REASONS WHY YOU DIDN'T -- YOU

27   DELETED THAT VIDEO AND THOSE DIRECT MESSAGES?

28       A    NO.  LIKE I SAID, I JUST -- SOMETIMES I LIKE --

```
1    LIKE, I WAS HAVING ANXIETY, LIKE OBVIOUSLY -- LIKE I SAID.
2    AND YOU CAN SEE ON INSTAGRAM WHEN SOMEONE'S SEEN A MESSAGE
3    AND DOESN'T REPLY.  SO SOMETIMES I DELETED THEM BECAUSE I
4    DIDN'T WANT TO GO LOOK AND BE, LIKE, HAS HE OPENED IT YET?
5    DID HE OPEN IT AND NOT REPLY?  SOMETIMES I DELETE FOR THAT
6    REASON.  OTHER TIMES I JUST DON'T WANT PEOPLE -- IF I LEAVE
7    MY PHONE AT WORK, I DON'T WANT PEOPLE TO BE ABLE TO GO IN AND
8    READ MY MESSAGES.
9            SO THAT'S SOMETHING THAT'S CONSTANT FOR ME.  I
10   DELETE CONSTANTLY BECAUSE OF STORAGE OR NOT WANTING PEOPLE TO
11   SEE.  BUT IT IS IMPORTANT TO NOTE THAT THE SECOND I HIRED
12   LITIGATION ATTORNEYS, I DID PRESERVE EVERYTHING.
13       Q    OKAY.  SO WHO WAS THE FIRST ATTORNEY THAT YOU HIRED
14   IN CONNECTION WITH THIS CASE?
15       A    FRED THIAGARAJAH.
16       Q    AND FRED STATED IN COURT TODAY THAT YOU HIRED HIM
17   AROUND -- I THINK HE SAID WAS IT MAY 24TH?
18       A    YEAH, IT WAS THE WEEK OF MAY 21ST.
19       Q    AND WAS THAT AN ACCURATE STATEMENT THAT HE MADE?
20       A    YES.
21       Q    BEFORE THAT TIME, HAD YOU CONSULTED ANY OTHER
22   ATTORNEYS ABOUT WHAT HAD OCCURRED BETWEEN YOU AND TREVOR?
23       A    NO.
24       Q    IF YOU COULD GO TO 47 -- BATES STAMP 47.  YOU STATE
25   AT THE TOP OF THE PAGE, "U GUCCI.  I'M INTO IT.  HAPPY BAUER
26   DAY GO LIGHT SOME BREWERS ON FIRE FOR ME."  AND YOU HAVE AN
27   EMOJI WITH A HEART; IS THAT RIGHT?
28       A    YES.
```

134

1    Q    AND WHAT DID YOU MEAN BY THAT DM?

2    A    I ESSENTIALLY JUST MEANT -- YOU KNOW, WHEN HE

3    ADDRESSED, "I DON'T KNOW IF THAT WAS ME.  BUT SORRY IF I

4    DID," AND WHEN I SAID, "U GUCCI.  I'M INTO IT," I JUST MEANT

5    I'M INTO THE SEX.  I'M INTO THAT KIND OF THING.  JUST THE

6    SEXUAL NATURE OF IT IN GENERAL.  NOT SAYING THAT I'M INTO

7    BRUISING OR ANYTHING LIKE THAT.  OTHERWISE I WOULD HAVE

8    SPECIFICALLY STATED THAT.

9         BUT, AGAIN, A FORM OF PEOPLE PLEASING TRYING TO

10   CONTINUE TO ROPE HIM IN TO PAY ATTENTION TO ME SO THAT WE

11   COULD CONTINUE GOING ON DATES OR EMOTIONALLY CONNECTING LIKE

12   WE HAD.

13   Q    AND BY -- WHAT WAS THE DATE OF THIS DM?

14   A    APRIL 29TH.  IT'S ON 45.

15   Q    DURING THIS PERIOD OF TIME, TREVOR WAS

16   COMMUNICATING WITH YOU BY DM AS WELL; CORRECT?

17   A    YES.

18   Q    THEN I MISSED SOMETHING ON THE PRIOR PAGE, ON 46.

19   YOU REFER TO -- YOU STATE -- WHEN HE SAYS, "WHERE AT,"  I'M

20   REFERRING TO THE BRUISE.  YOU STATE, "RIGHT BY MY PRIZED

21   POSSESSION.  HA."  WERE YOU REFERRING TO YOUR VAGINA?

22   A    YES.

23   Q    AND WERE YOU SERIOUS IN THAT MESSAGE?

24   A    NO.  I WAS TRYING TO SWITCH IT TO A JOKING MANNER

25   BY REFERRING TO IT AS A PRIZED POSSESSION.

26   Q    NEXT, I'D LIKE YOU TO GO TO A DIRECT MESSAGE DATED

27   MAY 4.  AND IF YOU CAN IDENTIFY THE BATES STAMP PAGE.

28   A    ARE YOU ASKING ME TO FIND THE MAY 4 ONE?

135

1       Q    YES.  YOU KNOW WHAT?  I'LL FIND IT FOR YOU.

2       A    I'M SORRY.  I'M LOOKING THROUGH.

3       Q    LET'S START AT THE BOTTOM OF PAGE 52.  YOU SENT A

4  DM TO TREVOR IN WHICH YOU STATE, "THE HOLISTIC PSYCHOLOGIST.

5  OUR EMOTIONAL HEALTH HAS MAJOR IMPACT ON HOW WE" -- AND THEN

6  THERE'S TWO LINES.  AND THEN IT SAYS, "ALL GOES BACK TO OUR

7  CHILDHOOD."  AND THEN TREVOR RESPONDS -- OH, I'M SORRY.  YOU

8  SAY, "ALL GOES BACK TO OUR CHILDHOOD DEVELOPMENT OF OUR

9  COPING SKILL.  PAPI."  WHO ARE YOU REFERRING TO?

10      A    MAKING A JOKE OUT OF -- IT'S LIKE A PET NAME.

11      Q    AND WHO WERE YOU REFERRING TO WHEN YOU REFERRED TO

12  PAPI?

13      A    TREVOR.

14      Q    HAD YOU REFERRED TO TREVOR BY THE NICKNAME OF PAPI

15  BEFORE?

16      A    I CAN'T SAY FOR SURE.  I'M GOING THROUGH ALL OF THE

17  MESSAGES.  I BELIEVE THAT'S ONE OF THE FIRST TIMES I CALLED

18  HIM THAT.  YES.

19      Q    DID HE CALL YOU A NICKNAME AROUND THAT PERIOD OF

20  TIME?

21      A    HE DID SAY ONE THING.  HE CALLED ME MAMI AT ONE

22  POINT WHEN WE WERE TALKING DURING THE FIRST NIGHT.

23      Q    AND BY THIS TIME DID HE REFER TO YOU AS LINDSEY?

24      A    HE STARTED CALLING ME LINDS.

25      Q    WHEN DID TREVOR START CALLING YOU LINDS?  WHEN?

26      A    ABOUT AFTER THE FIRST NIGHT I SPENT AT HIS HOUSE.

27  I DON'T KNOW A SPECIFIC MESSAGE YET IS WHERE IT STARTED.  I

28  KNOW IT WAS AFTER THE FIRST ENCOUNTER.

1    Q    AFTER YOU MADE THE COMMENT ABOUT GOING BACK TO OUR

2   CHILDHOOD DEVELOPMENT OF OUR COPING SKILLS, PAPI, TREVOR

3   RESPONDS, "ANALYZE ME PLEASE LOL."  AND THEN YOU RESPOND TO

4   THAT.  WHAT WERE YOU THINKING ABOUT IN TERMS OF YOUR

5   RELATIONSHIP AT THIS TIME?

6    A    I THOUGHT THAT IT WAS A REALLY GOOD SIGN.  AND THAT

7   WE WERE PROGRESSING IN THE EMOTIONAL PART OF THE DATING BY

8   HIM ASKING ME "ANALYZE ME."  THAT MEANT THAT HE VALUED WHAT I

9   HAD TO SAY.  AND THAT FELT REALLY GOOD.  THAT HE WANTED AND

10   VALUED MY OPINION.  SO AT THIS POINT I WAS FEELING A LITTLE

11   LESS EMBARRASSED ABOUT THE FIRST TIME IN THAT WE WERE

12   PROGRESSING FURTHER IN THE EMOTIONAL PART OF THE DATING

13   RELATIONSHIP.

14    Q    AND WHEN WERE THESE DIRECT MESSAGES THAT WE WERE

15   JUST DISCUSSING EXCHANGED?

16    A    I CAN'T SEE THE DATE.  I THINK IT'S AT THE END OF

17   APRIL.  YEAH, APRIL 29TH STILL.

18    Q    NOW, I'D LIKE YOU TO GO TO BATES STAMP 73.

19    THE COURT:  IT IS NOW AFTER 3:00.  SO WHY DON'T WE TAKE

20   OUR AFTERNOON BREAK.

21    MS. MEYER:  SOUNDS GOOD.

22    THE COURT:  THEN WE WILL RESUME AT QUARTER AFTER.  YOU

23   MAY STEP DOWN.

24         (RECESS TAKEN.)

25

26    THE COURT:  WHENEVER YOU'RE READY.

27    MS. MEYER:  THANK YOU.

28   //

```
1              LINDSEY HILL,
2  CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND
3  TESTIFIED AS FOLLOWS:
4
5              DIRECT EXAMINATION (RESUMED)
6  BY MS. MEYER:
7     Q    LINDSEY, I'D LIKE TO DIRECT YOUR ATTENTION BACK TO
8  EXHIBIT 2.  BATES STAMP PAGE 73.  WHEN WERE THESE DIRECT
9  MESSAGES EXCHANGED BETWEEN YOU AND TREVOR?
10    A    I BELIEVE THE BEGINNING OF MAY.
11    Q    OKAY.  SO I'M GOING TO DIRECT YOUR ATTENTION TO A
12 COUPLE OF PAGES EARLIER.  PAGE 71.  BATES STAMP 71.  TREVOR
13 STATES IN HIS DM TO YOU, "YEAH KEEP THAT SHIT UNDER WRAPS
14 WOULDN'T WANT PEOPLE TO THINK I'M ACTUALLY A GOOD PERSON."
15 AND THEN YOU GO ON TO SAY, "HONORED TO GET TO SEE THE REAL
16 TB."  THEN TREVOR SAYS, "EVERYONE DOES, NOT MANY DO.  DOES
17 THAT MAKE ANY SENSE?  HAHA."
18         AND YOU GO ON TO SAY SOMETHING ABOUT A SENSITIVE
19 SIDE.  AND THEN YOU GO ON TO SAY, "DON'T WORRY HAVEN'T TOLD
20 ANYONE YOU ARE EMPATHIC AND CUTE, DON'T" -- I CAN'T READ WHAT
21 YOU SAID.  "CAN'T RUIN YOUR TWITTER IMAGE."
22         WHAT WERE YOU THINKING WHEN YOU WERE EXCHANGING
23 THESE DM'S?
24    A    THAT IT JUST FELT GOOD THAT HE FELT COMFORTABLE
25 ENOUGH WITH ME TO SHOW HIS SWEET AND CARING SIDE.
26    Q    AND THEN DIRECTING YOUR ATTENTION TO BATES STAMP
27 74.  ON MAY 8 AT 1:19 A.M.  TREVOR SENT YOU A DM IN WHICH HE
28 SAYS, "THOUGHT ABOUT YOU TONIGHT.  FIGURED I'D CHECK IN AND
```

```
 1   SEE HOW YOU'RE DOIN."  AND THEN YOU RESPOND, "TB, I THINK OF
 2   YOU OFTEN.  I'M ACTUALLY SUPER GOOD, OUR NEW BUSINESS FOR THE
 3   RECOVERY HOUSE JUST OPENED AND THE PROPERTY IS UNREAL.
 4   LIVING MY DREAM OUT FOR REAL.  BUT OTHER THAN THAT, STILL
 5   JUST TRYING TO FIGURE OUT THE UNIVERSE AND MY EXISTENCE 24/7.
 6   YOU KNOW HOW IT GOES.  AND TURNING 27 ON MONDAY FTW."
 7            AROUND THAT TIME, WERE YOU AND TREVOR DISCUSSING
 8   GOING OUT AGAIN?
 9        A    I DON'T THINK AT THAT POINT THAT EITHER OF US HAD
10   BROUGHT UP SEEING EACH OTHER AGAIN.  I THINK LATER IN THAT --
11   LATER IN THAT CONVERSATION, I MENTIONED SOMETHING ABOUT
12   CELEBRATING MY BIRTHDAY WITH ME.
13        Q    AND DID HE RESPOND TO THAT?
14        A    HE DIDN'T RESPOND TO THAT DIRECT QUESTION BECAUSE I
15   SENT HIM MY PHONE NUMBER.  AND THAT'S WHEN WE SWITCHED TOPICS
16   WHEN HE TEXTED ME.
17        Q    WHEN DID YOU SEND HIM YOUR PHONE NUMBER?
18        A    IN THAT SAME CONVERSATION ON MAY 8TH.
19        Q    AND WHY DID YOU SEND HIM YOUR PHONE NUMBER?
20        A    WHEN I LEFT THE FIRST TIME, I MADE A JOKE.  I THINK
21   I SAID THIS, BUT I JUST SAID, "OH, I'LL GOOGLE YOUR PHONE
22   NUMBER."  HE TOLD ME SOMEONE HAD LEAKED HIS PHONE NUMBER.
23   AND WE JUST NEVER GOT AROUND TO GETTING EACH OTHER'S PHONE
24   NUMBER.  SO I JUST FELT IT WAS EASIER TO TEXT THAN CONTINUE
25   THIS ON INSTAGRAM DM.
26        Q    AND THEN ON BATES STAMP 78, IT LOOKS LIKE SATURDAY
27   MAY 8 AT 12:58.  IS THAT P.M.?
28        A    YEAH.
```

```
 1        Q    HE SAYS, "HEY LINDS.  IT'S TREVOR."  HOW OFTEN WERE
 2   YOU CORRESPONDING WITH TREVOR AT THE BEGINNING OF MAY?
 3        A    IT BECAME INCREASINGLY MORE AND MORE THROUGHOUT
 4   MAY.
 5        Q    DO YOU KNOW WHETHER OR NOT TREVOR WAS OUT OF TOWN
 6   IN MAY OF 2021?
 7        A    I KNOW THAT ALMOST, YEAH, EVERY OTHER WEEK OR SO HE
 8   WAS GONE AND TRAVELING WITH THE DODGERS.
 9        Q    I'D LIKE TO DIRECT YOUR ATTENTION TO BATES STAMP
10   80.  AND THIS LOOKS LIKE IT'S SUNDAY, MAY 9, AT -- IS THAT
11   4:59 P.M.?
12        A    YES.
13        Q    AND YOU STATE TO TREVOR, "HERE IS 100 NOSE KISSES
14   TO MAKE YOU FEEL BETTER.  AND JUST KNOW PINK IS SO YOUR COLOR
15   PAPI."  WHY DID YOU SEND THAT?
16        A    DID YOU ASK WHY?
17        Q    WHY?
18        A    I SENT THAT BECAUSE THEY HAD LOST THEIR GAME.  SO
19   THAT'S WHY I REFERENCED MAKING HIM FEEL BETTER.  AND HE WAS
20   WEARING PINK SOCKS FOR MOTHER'S DAY DURING THAT GAME.
21        Q    AND WHAT DID YOU MEAN BY THE 100 NOSE KISSES?
22        A    BECAUSE WE HAD PREVIOUSLY DISCUSSED THE NOSE
23   KISSING ISSUE.  AND THEN WHICH ELICITED THE PRENUP JOKE.
24   THAT'S WHY I USED IT THERE BECAUSE IT WAS KIND OF THE INSIDE
25   JOKE.
26        Q    AND THEN YOU STATE LATER ON ON THAT SAME PAGE, "THE
27   PINK SOCKS STAY ON WHILE CUDDLING."  AND THEN HE SAYS, "YES,
28   MA'AM.  WHATEVER YOU WANT."  AND THEN YOU GO ON -- AND THIS
```

1    IS ON BATES STAMP 81.  "BUTTTTT OFFFFFF WHEN IT'S TIME TO

2    CHOKE ME OUT.  THANKS.  YOU ARE THE BEST."  AND THEN THERE'S

3    AN EMOJI.  LINDSEY, WHY DID YOU WRITE THAT?

4         A    AT THAT POINT I REALLY BECAME FIXATED ON SEEING

5    TREVOR AGAIN, BECAUSE I WANTED TO CREATE A BETTER EXPERIENCE

6    THAN THE FIRST TIME BECAUSE I WAS STILL DEALING WITH THAT

7    EMBARRASSMENT.  I REALLY JUST WANTED TO TELL HIM WHAT HE

8    WANTED TO HEAR SO THAT HE COULD STAY INTERESTED IN ME.  AND I

9    WANTED TO KEEP HIS ATTENTION.

10        Q    LINDSEY, DID YOU BLAME YOURSELF FOR ANYTHING THAT

11   OCCURRED ON THAT OCCASION ON APRIL 21 TO APRIL 22?

12        A    YES.

13        Q    AND HOW DID YOU BLAME YOURSELF?

14        A    I FELT LIKE IT WAS MY FAULT SOMETIMES THAT I HADN'T

15   SPOKEN UP MORE OR TOLD HIM HOW UNCOMFORTABLE I WAS WITH BEING

16   CHOKED UNCONSCIOUS.  AND I JUST FELT, LIKE, BECAUSE HE WAS SO

17   NONCHALANT ABOUT ALL OF IT, THAT I HAD DONE SOMETHING TO MAKE

18   HIM THINK THAT IT WAS OKAY TO DO THAT.

19        Q    LINDSEY, WHY DID YOU ALLOW TREVOR TO CHOKE YOU OUT

20   THAT FIRST NIGHT?

21        A    THE FIRST ENCOUNTER?

22        Q    YES.

23        A    LIKE I SAID, I DON'T -- I'M STILL TRYING TO FIGURE

24   OUT SEX AND SOBRIETY.  I WAS JUST GOING WITH THE FLOW WHAT HE

25   WANTED TO DO.  AND I DIDN'T KNOW I WAS GOING TO GO

26   UNCONSCIOUS.  I LET HIM CHOKE ME.  AND I SAID IT WAS OKAY TO

27   BE A LITTLE ROUGH.

28        Q    SO, LINDSEY, I'M GOING BACK TO EXHIBIT 2.  BATES

```
1    STAMP 81 AND THE STRING OF DM'S BETWEEN YOU AND TREVOR.
2    AFTER YOU SAY, "THANKS.  YOU ARE THE BEST," AND THEN THERE'S
3    AN EMOJI, TREVOR SAYS, YOU WANT TO GO OUT HUH?  MMMM."  YOU
4    SAY, SI.  THAT WAS A GAME CHANGER."  WHAT DO YOU MEAN BY THAT
5    WAS A GAME CHANGER?
6         A    I WAS HIGHLIGHTING THAT IT HAD NEVER HAPPENED TO ME
7    BEFORE.  I WAS INSINUATING TO HIM THAT I, YOU KNOW -- CLEARLY
8    WHAT I WAS COMMUNICATING TO HIM WAS NOT HOW I ACTUALLY FELT.
9    BUT I WAS TELLING HIM WHAT HE WANTED TO HEAR.
10        Q    WHY DID YOU DO THAT?
11        A    BECAUSE I WAS FIXATED ON GETTING HIM TO WANT TO SEE
12   ME AGAIN SO I COULD TRY TO TAKE SOME POWER BACK AND CREATE A
13   BETTER EXPERIENCE SO I COULD FORGET ABOUT THE FIRST.
14        Q    SO THEN TREVOR SAYS TO YOU IN RESPONSE TO YOUR
15   STATEMENT THAT WAS A GAME CHANGER, HE SAID, "TELL ME MORE."
16   AND YOU SAY, "NEVER BEEN MORE TURNED ON IN MY LIFE.  GIMME
17   ALL THE PAIN.  RAWR."  LINDSEY, WERE YOU REALLY FEELING THAT
18   WAY?
19        A    NO.
20        Q    WHY WOULD YOU WRITE SOMETHING LIKE THAT TO SOMEBODY
21   THAT YOU HAD FEELINGS FOR IF YOU DIDN'T FEEL THAT WAY?
22        A    I WAS JUST GOING WITH THE FLOW.  I COULD TELL THAT
23   CHOKING IS SOMETHING THAT HE REALLY LIKES.  WHEN HE SAID,
24   "TELL ME MORE," I DIDN'T KNOW WHAT TO SAY BESIDES THAT I HAD
25   NEVER BEEN TURNED ON IN MY LIFE.  I TRIED TO LIGHTEN THE MOOD
26   AT THE END BY SAYING "RAWR,"  WHICH IS A WORD I SAY A LOT.
27   BUT REALLY I WAS JUST GOING WITH THE FLOW TELLING HIM WHAT HE
28   WANTED TO HEAR BECAUSE I KNEW HE WAS INTO ROUGH SEX.
```

142

```
1        Q    HE SAYS TO YOU, "REALLY?  WHEN YOU WERE GOING OUT
2   OR WHEN YOU WOKE UP?"  DID YOU UNDERSTAND HIM REFERRING TO
3   WHEN HE CHOKED YOU INTO UNCONSCIOUSNESS?
4        A    YES.
5        Q    AND THEN YOU SAID, "GOING OUT.  NOW THAT I KNOW
6   WHAT IT FEELS LIKE TO WAKE UP FROM IT THOUGH IT PROBABLY FELT
7   JUST AS GOOD TO WAKE UP FROM THAT."  AND THEN HE SAID, GOD
8   YOU JUST TURN ME ON SO MUCH."  AND THEN YOU SAY, "MISSION
9   ACCOMPLISHED THEN."
10            AND THEN HE SAYS, "NOW I JUST WANT MY ARM AROUND
11  YOUR NECK FROM BEHIND."  AND THEN YOU SAY, "DO IT.  HARDER."
12  AND THEN YOU HAVE AN EMOJI WITH A HEART.  AND THEN HE SAYS,
13  "YES, MA'AM.  WHAT ELSE DOES MAMI WANT?"  AND YOU SAY "MMM
14  GET A COUPLE OF SLAPS IN THERE AND THEN ANOTHER HANDPRINT ON
15  MY @" -- AND THEN YOU HAVE TWO DOLLAR SIGNS.  "THEN FOR PAPI
16  TO TELL ME WHAT ELSE HE WANTS.
17            WHAT DID YOU MEAN WHEN YOU SAID, "AND THEN ANOTHER
18  HANDPRINT ON MY @ AND THEN YOU HAVE TWO DOLLAR SIGNS?
19       A    THAT REFERENCE THERE IS IN -- REFERENCE TO THE
20  FIRST NIGHT WE SLEPT TOGETHER HE HAD SLAPPED ME ON THE BUTT.
21  AND IT LEFT ALMOST LIKE A FIVE STAR HANDPRINT.  AND WHEN I
22  POINTED IT OUT, WE WERE LAUGHING ABOUT IT AFTER THE FACT.
23  AND SO THAT WAS SENT -- ESPECIALLY IN THE WAY I SPELLED IT
24  WITH THE @ AND THE MONEY SYMBOL TO SPELL "ASS" -- WAS MORE ON
25  THE LIGHTER SIDE, BECAUSE I NOTICED THAT HE WANTED TO
26  CONTINUE THIS SEXTING.  SO THAT WAS MY ATTEMPT, ESPECIALLY
27  WITH THE KISSING EMOJI THERE, WAS TO KEEP IT ON A LIGHTER
28  MORE FUNNY TONE.
```

1    Q    SO ON THE NEXT PAGE, BATES STAMP 83, ON SUNDAY, MAY

2    9TH.  IT LOOKS LIKE IT'S AROUND 8:56 P.M.  HE SAYS, "SLAPS IN

3    THE FACE OR?"  AND THEN YOU SAY, "YES, YES, AND YES."  AND

4    THEN HE SAYS, "MMMM.  DO YOU EVEN KNOW WHAT PAIN IS?"  AND

5    THEN THERE IS A PHOTOGRAPH OF YOU.  AND YOU SAY "IDK."  WHY

6    WERE YOU CONTINUING TO TEXT HIM IN THIS MANNER?

7    A    I THINK THAT I WAS JUST -- I COULD TELL HE WAS

8    WANTING TO CONTINUE TO TALK ABOUT IT.  I WAS GETTING SHORTER

9    IN MY REPLIES.  I WAS ACTUALLY AT MY BIRTHDAY PARTY MY

10   FRIENDS HAD THROWN ME.  HE MENTIONED SLAPS IN THE FACE.  I

11   WAS REFERRING TO THE KIND OF LIGHT SLAP HE DID TO ME THE

12   FIRST TIME THAT DIDN'T MAKE A MARK.  AND I SENT A PICTURE OF

13   MYSELF THAT I WAS AT MY BIRTHDAY PARTY TRYING TO JUST LIGHTEN

14   THE MOOD AND JUST STOP THE CONVERSATION, BECAUSE THERE WERE

15   SO MANY PEOPLE AROUND ME.

16        AND WHEN I SAID "IDK," THAT WAS REALLY MY RESPONSE.

17   I DON'T KNOW WHAT HE THINKS PAIN IS.  I DON'T KNOW WHAT PAIN

18   IS.

19   Q    LINDSEY, WHERE WERE YOU WHEN YOU WERE SENDING HIM

20   THESE DM'S?

21   A    I WAS AT MY BIRTHDAY PARTY THAT MY FRIEND THREW

22   ME.

23   Q    WERE YOU SHARING ANY OF THESE DM'S WITH YOUR

24   FRIENDS?

25   A    YES, THE TEXT MESSAGES I WAS SHOWING.  AND I WAS

26   ASKING MY FRIEND WHAT I SHOULD SAY BACK.

27   Q    WHY WOULD YOU SHARE THESE TYPE OF PERSONAL TEXT

28   MESSAGES WITH YOUR FRIENDS?

```
1        A    BECAUSE I DON'T KNOW HOW TO RESPOND.  I DON'T KNOW
2   A LOT ABOUT ROUGH SEX OR WHAT TO SAY.  SO I WAS ASKING ADVICE
3   ON HOW TO PRETEND LIKE I KNEW WHAT I WAS TALKING ABOUT.
4        Q    WERE YOU DOING IT TO MAKE FUN OF TREVOR?
5        A    NO.
6        Q    DID YOU MAKE FUN OF TREVOR TO YOUR FRIENDS?
7        A    I DID.  I WASN'T ATTEMPTING TO MAKE FUN OF HIM.
8        Q    WHY DID YOU DO THAT?
9        A    BECAUSE WITH MY COUSIN, I'M VERY REAL AND OPEN AND
10  HONEST.  AND I WAS NOTING A LOT ABOUT HOW TREVOR TALKS ABOUT
11  HIMSELF MOSTLY.  AND MOST OF THOSE CONVERSATIONS HE DID ASK A
12  LITTLE BIT ABOUT ME, BUT THEY WERE MOSTLY ABOUT HIM.  AND
13  THAT'S WHY I MEANT WHEN I SAID THAT I WASN'T MAKING FUN OF
14  HIM, IT WAS MORE OF A FRUSTRATION THAT HE TALKS A LOT ABOUT
15  HIMSELF.
16       Q    ON BATES STAMP 84 OF EXHIBIT 2, TREVOR SAYS, "WELL,
17  YOU HAVE TO BE HERE FOR ME TO SHOW YOU."  AND YOU SAID, "I'LL
18  BE IN L.A. TUESDAY AND WEDNESDAY."  AND THEN YOU HAVE A HAPPY
19  FACE WITH A HEART EMOJI.  AND THEN HE SAYS, UGH.  I HAVE
20  PLANS ALREADY.  F" -- AND THEN IT'S THE INITIALS "FMLL."  AND
21  YOU SAY, NO BUENO."  AND THEN HE SAID ON MAY 10TH -- I'M
22  SORRY.  YOU SAY, "WOULD TONIGHT BE A NO GO FOR YOU AS WELL?"
23  HE SAYS, "YEAH UNFORTUNATELY.  HAVE SOMEONE IN TOWN."
24            AT SOME POINT DID YOU ARRANGE TO MEET AGAIN?
25       A    YES.
26       Q    AND WHEN WAS THAT?
27       A    MAY 15TH.
28       Q    AND IS THAT REFLECTED IN THESE DM'S?
```

```
1          A    TEXT MESSAGES.  YES.

2          Q    SO -- AND LET ME MAKE THIS CLEAR BECAUSE I'M NOT A

3     TECHIE, AS YOU CAN SEE.  AT SOME POINT IN TIME DID YOU AND

4     TREVOR SWITCH FROM EXCHANGING COMMUNICATIONS VIA DIRECT

5     MESSAGE TO TEXT?

6          A    YES.

7          Q    AND WHEN WAS THAT?

8          A    THE FIRST TIME HE TEXTED ME WAS MAY 8TH.

9          Q    AND HE TEXTED YOU FIRST?

10         A    YES.

11         Q    AND THAT'S BECAUSE YOU HAD GIVEN HIM YOUR PHONE

12    NUMBER?

13         A    YES.

14         Q    AND WHEN HE WOULD TEXT YOU BACK, DID YOU HAVE HIS

15    PHONE NUMBER?

16         A    SAY THAT AGAIN?

17         Q    WHEN HE WOULD TEXT YOU BACK, DID IT SHOW WHAT HIS

18    PHONE NUMBER WAS?

19         A    YES.

20         Q    SO YOU KNEW HIS PHONE NUMBER?

21         A    OH.  NO, NOT PREVIOUSLY.  NO, I'M SAYING THE NUMBER

22    SHOWED UP.  I DID NOT HAVE HIS NUMBER PREVIOUSLY TO THAT.

23         Q    BUT WHEN THE NUMBER SHOWED UP, DID YOU UNDERSTAND

24    IT TO BE HIS NUMBER?

25         A    YES.

26         Q    AND WHY DID YOU START EXCHANGING MESSAGES BY TEXT

27    AS OPPOSED TO DM?

28         A    I THINK THAT IT WAS JUST GETTING MORE PERSONAL AND
```

```
1   CLEAR THAT WE MAY BE SEEING EACH OTHER AGAIN.  AND THE
2   CONVERSATION WAS INCREASING, THE AMOUNT OF CONVERSATION WAS.
3        Q    AND HOW DID IT COME ABOUT THAT YOU MADE PLANS ON
4   MAY 15?
5        A    I SENT HIM A GOOD LUCK MESSAGE SAYING, "WRECK EM
6   TONIGHT, TREV."  AND THEN HE MADE THE COMMENT, AM I WRECKING
7   YOU AFTER THE GAME?"  SO I TOOK THAT AS HIM INVITING ME TO
8   COME OVER AFTER THAT.
9        Q    AND THEN IF YOU COULD TURN TO BATES STAMP 87.  THIS
10  IS FRIDAY, MAY 14TH.  IT LOOKS LIKE IT'S 1:57 P.M.  AND
11  THERE'S A TEXT EXCHANGE BETWEEN YOU.  AND THEN YOU SAY ON MAY
12  15, "WRECK EM TONIGHT, TREV."  AND THEN HE SAYS, AM I
13  WRECKING YOU AFTER THE GAME OR?  LOL.  THANKS."  AND THEN YOU
14  SAY -- I'M REFERRING TO PAGE 88.  HAHAHAHHAA ABSOLUTELY YOU
15  ARE."  AND THEN WHAT EMOJIS ARE YOU USING?
16       A    THEY ARE TWO EXCLAMATION POINTS.
17       Q    THEN HE SAYS, "IF YOU'RE LUCKY."  AND HE SHOWS A
18  HEART EMOJI.  DO YOU SEE THAT?
19       A    YES.
20       Q    AND WHAT WERE YOUR FEELINGS WHEN HE SENT YOU A TEXT
21  WITH A SMILEY FACE WITH A HEART EMOJI ON IT?
22       A    THAT HE WAS BEING FLIRTATIOUS.  AND IT FELT GOOD TO
23  RECEIVE THAT.
24       Q    AND HOW WERE YOU FEELING IN TERMS OF YOUR
25  RELATIONSHIP ON MAY 15TH?
26       A    I FELT LIKE WE WERE AT A REALLY GOOD POINT.  AND IT
27  WAS GOING TO CONTINUE.  AND I WASN'T THINKING SO MUCH ABOUT
28  THE FIRST NIGHT.  I WAS EXCITED TO CREATE THIS BETTER
```

```
 1    EXPERIENCE FOR MYSELF SEEING HIM AGAIN.

 2        Q    WHEN YOU SAY BETTER EXPERIENCE, WHAT DO YOU MEAN BY

 3    THAT?

 4        A    I MEAN, LIKE I SAID, SOMETHING THAT I AM IN CONTROL

 5    OF.  AND THAT I COULD NOT HAVE ANYTHING TO BE EMBARRASSED

 6    ABOUT OR FEEL ASHAMED OF.  AND THAT HE WAS GENUINELY

 7    INTERESTED IN ME FOR ME AND NOT JUST SEX.  AND I FELT LIKE I

 8    REALLY TRUSTED HIM AT THIS POINT AFTER WE HAD TALKED SO MUCH

 9    THAT HE WOULDN'T, YOU KNOW, TAKE IT TOO FAR AGAIN OR DO

10    ANYTHING LIKE THAT.  I WANTED TO CREATE THE BETTER EXPERIENCE

11    WHERE WE WERE BOTH ON THE SAME PAGE.

12        Q    LINDSEY, ON MAY 15, DID YOU FEEL THAT TREVOR WAS

13    JUST INTO YOU FOR SEX?

14        A    NO.

15        Q    WERE YOU JUST INTO HIM FOR SEX?

16        A    NO.

17        Q    SO ON PAGE 88 AFTER TREVOR SAYS, "IF YOU'RE LUCKY,"

18    AND THEN HE HAS A SMILEY FACE WITH A HEART.  YOU STATE, "SHUT

19    UP.  BITE ME."  AND THEN IT SAYS, "IDIOM."  AND HE SAYS "YES,

20    MA'AM."  AND YOU SAY, "CAN'T WAIT PAPI."

21             AFTER THAT EXCHANGE, WHEN DID YOU AND TREVOR

22    CONFIRM THE SECOND MEETING THAT YOU HAD?

23        A    YEAH.  I WAS ALREADY UP IN THE L.A. AREA

24    CELEBRATING MY COUSIN'S BIRTHDAY.  SO I WAS CLOSE TO WHERE HE

25    WAS.  AND AROUND 10:17 ON 89, IT SHOWS THAT I SAID I WAS

26    TWENTY MINUTES FROM HIM.  AND THAT HE SAID THAT I COULD COME

27    OVER.

28        Q    AND THEN REFERRING TO BATES STAMP 89, HE SAYS,
```

1    "WHERE ARE YOU?"  AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

2         A    WHERE I WAS.  YOU KNOW, I WAS IN THE L.A. AREA THAT

3    I WAS GOING BACK AND FORTH FROM SAN DIEGO TO L.A.

4         Q    AND THEN TREVOR SAYS TO YOU, "OKAY.  I'M JUST GOING

5    TO BE EATING ON SOCIAL MEDIA" -- LET ME START AGAIN.  OKAY.

6    "I'M JUST GOING TO BE EATING AND ON SOCIAL MEDIA DOWNSTAIRS

7    IN THE BASEMENT.  I'LL LEAVE THE FRONT DOOR UNLOCKED FOR

8    YOU."

9              AND THEN YOU SAY, "OKAY.  YOU ARE THE BEST.  WE CAN

10   SLEEP AT A DECENT HOUR.  I PROMISE LOLS.  WON'T KEEP YOU UP."

11   HE SAYS, "YEAH.  DAY GAME TOMORROW.  SO WE WILL HAVE TO LOL.

12   AND YOU SAY, "JUST A CASUAL MODEST EVENING.  SEE YOU SOON."

13   THEN YOU ENDED WITH A SMILEY EMOJI WITH A HEART.  AND HIS

14   RESPONSE IS A SMILE EMOJI WITH A HEART.  DO YOU SEE THAT?

15        A    YEAH.

16        Q    DID YOU GO TO HIS HOUSE ON THE NIGHT OF MAY 15?

17        A    YES.

18        Q    THAT WAS A SATURDAY NIGHT?

19        A    YES.

20        Q    WHAT TIME DID YOU ARRIVE?

21        A    I GOT THERE AROUND MIDNIGHT.  A LITTLE BIT LATER

22   THAN MIDNIGHT.

23        Q    DID YOU THINK IT WAS UNUSUAL TO GO TO A MAN'S HOUSE

24   THAT LATE AT NIGHT?

25        A    NO, NOT -- BECAUSE THE BASEBALL SCHEDULE, HIS WORK

26   SCHEDULE.  THEY HAD A GAME LATE THAT NIGHT.  SO I DIDN'T

27   THINK IT WAS UNUSUAL.

28        Q    WHAT HAPPENED WHEN YOU ARRIVED AT HIS HOUSE?

1       A    HE LEFT THE DOOR OPEN FOR ME.  I WENT IN THROUGH

2    HIS FRONT DOOR.  AND I MET HIM DOWNSTAIRS IN HIS BASEMENT.

3    AND HE WAS WORKING ON SOCIAL MEDIA AND DOING SOME KIND OF

4    TREATMENT ON HIS LEG.  SO HE WAS SITTING IN ONE CHAIR AND I

5    JUST WENT AND SAT ON THE OPPOSITE COUCH.  AND WE STARTED

6    TALKING.

7       Q    AND WHAT PART OF THE HOUSE WERE YOU IN?

8       A    THE DOWNSTAIRS BASEMENT AREA.

9       Q    AND WHERE WERE YOU SITTING IN RELATION TO TREVOR?

10      A    TREVOR WAS SITTING CLOSEST TO WHERE YOU GO UP TO

11   THE MAIN LEVEL OF THE HOUSE.  AND I WAS SITTING ACROSS FROM

12   HIM ON THE COUCH.  YEAH.  THAT WAY.  I WAS SITTING RIGHT HERE

13   (INDICATING).  AND HE WAS OVER HERE (INDICATING).

14      Q    WHEN YOU ARRIVED THAT NIGHT, WAS THERE ANY

15   AFFECTION EXCHANGED BETWEEN THE TWO OF YOU?

16      A    NO.  HE WAS DOING SOME KIND OF TREATMENT ON HIS

17   LEGS.  SO HE HAD STUFF COVERING HIS LEGS.  SO HE DIDN'T -- HE

18   WASN'T ABLE TO GET UP OR ANYTHING WHEN I GOT THERE.  I JUST

19   WENT AND SAT DOWN ON THE OPPOSITE COUCH.

20      Q    SO OTHER THAN THE MESSAGE EXCHANGES THAT ARE IN

21   EVIDENCE AS PART OF EXHIBIT 2, DID YOU HAVE ANY OTHER

22   DISCUSSIONS ABOUT WHAT TYPE OF SEX TREVOR WANTED TO HAVE ON

23   THE NIGHT OF MAY 15?

24      A    NO.

25      Q    DID YOU THINK THAT YOU WERE GOING TO HAVE SEX ON

26   THAT NIGHT?

27      A    I ASSUMED SO.  BUT ALSO WHEN HE TALKED ABOUT HAVING

28   A DAY GAME, THAT'S WHY I SAID, "JUST A CASUAL MODEST

150

```
1   EVENING."  EITHER WAY I WAS GOING TO BE FINE, BUT I ASSUMED
2   THAT HE WANTED TO.
3        Q    DID TREVOR DISCUSS WITH YOU BEFORE WHAT TYPE OF SEX
4   YOU WANTED THAT NIGHT?
5        A    NO.
6        Q    DID HE TELL YOU WHAT KIND OF SEX HE WANTED?
7        A    NO.
8        Q    WHAT DID YOU AND TREVOR TALK ABOUT WHEN YOU WERE IN
9   THE BASEMENT?
10       A    WE CONTINUED TO TALK A LOT MORE ABOUT EMOTIONAL
11  THINGS.  HE WAS IN A VERY AMPED UP EXCITED STATE BECAUSE HE
12  HAD JUST PITCHED.  AND SO WE STARTED TALKING ABOUT BASEBALL.
13  AND HE WAS TALKING ABOUT HOW -- I ASKED HIM -- YOU KNOW, I
14  BROUGHT UP THE STICKY SUBSTANCE DEBACLE IN BASEBALL.  HE WAS
15  TELLING ME ALL ABOUT HOW HE USES SPIDER TACK.
16            AND HE WAS GOOGLING ALL OF THESE IMAGES ABOUT
17  SPIDER TACK AND TELLING ME HOW IT WAS USED IN THE WORLD'S
18  STRONGEST MAN COMPETITION.  HE WAS TELLING ME A LOT ABOUT
19  THAT IN TERMS OF BASEBALL.  AND THEN WE KIND OF WENT BACK
20  MORE INTO EMOTIONAL THINGS.  AND WE STARTED TALKING ABOUT
21  BOTH OF OUR PAST RELATIONSHIPS.
22            AND HE WAS TELLING ME ABOUT HIS RELATIONSHIP IN
23  COLLEGE.  AND HE TALKED ABOUT IT FOR A WHILE AND THE FACT
24  THAT, YOU KNOW, HIS GIRLFRIEND AT THE TIME LEFT HIM TO GO BE
25  WITH ANOTHER WOMAN.  AND HOW HARD THAT WAS FOR HIM AND HIS
26  INNER CIRCLE.  I OPENED UP ABOUT MY PAST RELATIONSHIP.  AND I
27  ONLY HAD ONE BOYFRIEND IN THE PAST.
28            I TOLD HIM HE WAS VERY RELIGIOUS.  I TOLD HIM WE
```

1   DIDN'T EVEN HAVE SEX.  WE DATED FOR ALMOST A YEAR.  AND I WAS

2   JUST KIND OF TALKING TO HIM ABOUT HOW -- I ASKED HIM ABOUT

3   HOW -- IS IT HARD, YOU KNOW, CHOOSING WHICH WOMEN YOU'RE

4   ASSOCIATED WITH BECAUSE OF WHO YOU ARE?  AND HE TOLD ME THAT

5   IT IS.  AND HE BROUGHT UP AN EXAMPLE OF ONE TIME THAT HE HAD

6   GOTTEN INTIMATE AND HURT A GIRL'S NOSE.  WHEN SHE GOT IN HER

7   CAR, SHE SENT HIM A PICTURE SAID, "LOOK, WHAT YOU DID TO ME."

8   AND IT BECAME THIS BIG MESS.

9            AND WE TALKED A LITTLE BIT MORE ABOUT MY DAD.  AND

10  THAT'S WHY HE BROUGHT UP THE TOPIC OF DADDY ISSUES.  AND, YOU

11  KNOW, LIKE, SO MUCH MORE TALK ABOUT HOW HE WAS OPENING UP TO

12  ME AND VENTING TO ME ABOUT HOW HE HAS ONE REALLY GOOD FRIEND.

13  AND HE IS IN A REALLY TOUGH SPOT WITH HER.  AND HE WANTS TO

14  KNOW, YOU KNOW, HOW TO TELL HER HE JUST WANTS TO BE FRIENDS

15  WITH HER BECAUSE SHE HAS FEELINGS FOR HIM.

16           I TRIED TO OPEN UP AND GIVE HIM ADVICE ON THAT.  SO

17  IT REALLY TURNED INTO A DEEP EMOTIONAL KIND OF CONVERSATION.

18  AND THEN HE ASKED ME THE LAST -- HE ASKED ME AGAIN ABOUT

19  CHOKING.  AND HE ASKED ME WHAT I LIKED ABOUT CHOKING AND

20  GETTING CHOKED.

21           AND I SAID TO HIM -- I DIDN'T KNOW WHAT TO SAY AT

22  THE TIME.  AND I STARTED GETTING NERVOUS ABOUT IT AGAIN.  AND

23  I SAID THE FIRST THING THAT CAME TO MY HEAD.  I SAID, "I

24  DON'T KNOW.  I GUESS IT'S KIND OF LIKE AN ESCAPE."  AND

25  THAT'S WHAT I SAID.  I ASKED HIM SPECIFICALLY -- BECAUSE I

26  WAS NERVOUS, I SAID, "HOW DO YOU KNOW YOU'RE NOT GOING TO

27  HURT SOMEONE WHEN YOU CHOKE THEM OUT?"

28           AND HE HAD A WHOLE RECITED DEFINITION.  HE TOLD ME

1    THAT IF YOU DO IT, YOU KNOW, HERE, IT'S OKAY (INDICATING)

2    BECAUSE YOU'RE CUTTING OFF AN AIRWAY.  BUT HE SAID IF YOU DO

3    IT THIS WAY (INDICATING), YOU CAN REALLY HURT SOMEONE.

4         SO I ASKED, BECAUSE I ASSUMED HE WAS GOING TO DO IT

5    TO ME.  AND I WANTED TO KNOW THAT HE WASN'T GOING TO HURT ME.

6    AND, LIKE -- YEAH.  IT WAS A VERY EMOTIONAL CONVERSATION.

7    AND THEN THAT WAS THE ONLY TIME SEX WAS BROUGHT UP WAS AT THE

8    END.

9         Q    IF YOU WERE NERVOUS, LINDSEY, WHY DIDN'T YOU JUST

10   TELL HIM THAT YOU ARE NOT INTO BEING CHOKED AND YOU DIDN'T

11   WANT HIM TO DO THOSE THINGS TO YOU?

12        A    HE IS VERY POLARIZING AND POWERFUL IN PERSON.  AND

13   I JUST REALLY, LIKE I SAID, WANTED TO CREATE THIS BETTER

14   EXPERIENCE WHERE I COULD LIVE UP TO WHAT HE WANTED.  AND I

15   JUST WANTED TO BE ABLE TO GIVE HIM WHAT HE WANTED.

16        Q    SO OTHER THAN -- STRIKE THAT.  HOW LONG DID YOU

17   HAVE THIS DISCUSSION ABOUT CHOKING?

18        A    IT WAS LESS THAN TWO MINUTES.  IT WAS VERY BRIEF.

19        Q    HOW LONG DID YOU SPEND TALKING TO HIM ABOUT

20   EVERYTHING IN THE BASEMENT ON MAY 15?

21        A    ABOUT TWO HOURS.

22        Q    AND OTHER THAN THE COUPLE OF MINUTES THAT WAS

23   DEVOTED TO CHOKING, DID YOU HAVE ANY OTHER CONVERSATION WITH

24   TREVOR ABOUT WHAT YOU WANTED HIM TO DO SEXUALLY THAT NIGHT?

25        A    NO.

26        Q    AND DID HE TELL YOU WHAT HE WANTED TO DO TO YOU?

27        A    NO.

28        Q    DID YOU HAVE ANY KIND OF AGREEMENT THAT HE COULD

1    PUNCH YOUR VAGINA?

2         A    NO.

3         Q    DID YOU EVER DISCUSS THAT WITH HIM BEFORE?

4         A    NO.

5         Q    HAVE YOU EVER BEEN PUNCHED IN THE VAGINA?

6         A    NO.

7         Q    YOU TESTIFIED A FEW MINUTES AGO THAT AT SOME POINT

8    TREVOR HAD STARTED TO CALL YOU LINDS.  WERE YOU CALLING HIM

9    BY A NICKNAME AROUND THIS TIME?

10        A    YEAH.  I CALLED HIM TREV OR TB.

11        Q    AFTER YOU SPOKE, WHAT HAPPENED NEXT?

12        A    I CAME AND I SAT WITH HIM ON HIS CHAIR ONCE HE WAS

13   DONE WITH HIS LEG TREATMENT.  AND --

14        Q    IS THIS IN THE BASEMENT?

15        A    YEAH.  AND HE OUT OF NOWHERE STARTED TALKING ABOUT

16   SNAPCHAT.  AND HE ASKED ME, "DO YOU KNOW HOW TO PERMANENTLY

17   SAVE SOMETHING ON YOUR SNAPCHAT THREAD?"  I SAID, "NO.  I

18   DON'T REALLY USE SNAPCHAT THAT MUCH TO BE HONEST."  HE SAID,

19   HERE I'LL SHOW YOU.  ADD ME ON SNAPCHAT."  HE MADE ME ADD HIM

20   ON SNAPCHAT.

21        HE TOOK A PICTURE -- A SELFIE OF US WHEN I WAS

22   LAYING ON HIM ON THE CHAIR.  AND HE TOOK A SELFIE.  I WAS

23   REALLY SURPRISED WHEN HE DID THAT, BECAUSE ONE OF HIS DATING

24   RULES IS NOT -- NO SOCIAL MEDIA.  HE SENT IT TO ME FROM HIS

25   PROFILE.  AND HE SAID, "HERE THIS IS HOW YOU PERMANENTLY SAVE

26   THIS PHOTO."  AND SO IT SHOWED TREVOR BAUER.  AND THEN THE

27   PICTURE.  AND HE SHOWED ME HOW TO SAVE IT.

28        I WAS KIND OF CONFUSED WHY HE WANTED TO TAKE THAT

```
 1   PICTURE, BUT IT MADE ME FEEL GOOD THAT HE WANTED A PICTURE
 2   WITH ME.
 3        Q    WHY DID IT MAKE YOU FEEL GOOD?
 4        A    LIKE I SAID, HE IS VERY VOCAL ABOUT HIS RULE OF NO
 5   SOCIAL MEDIA.  NO PICTURES.  AND NO POSTING.  SO IT MADE ME
 6   FEEL SPECIAL THAT HE WOULD TRUST ME TO HAVE, YOU KNOW, A
 7   PICTURE WITH HIM.
 8        Q    I'M GOING TO SHOW YOU WHAT HAS BEEN PREMARKED AS
 9   EXHIBIT 23, WHICH IS A ONE-PAGE COLORED PHOTOGRAPH.  IS
10   THIS -- I'LL WAIT UNTIL YOU GET THERE.  LINDSEY, IS THIS THE
11   PHOTOGRAPH THAT TREVOR TOOK ON THE NIGHT OF MAY 15, MAY 16?
12        A    YES.
13        Q    AND APPROXIMATELY WHAT TIME WAS THIS PHOTOGRAPH
14   TAKEN?
15        A    PROBABLY AROUND 2:00 A.M.
16        Q    AND YOU'RE STILL DOWNSTAIRS?
17        A    YES.
18        Q    AND HOW WERE YOU FEELING AT THAT TIME?
19        A    I WAS JUST FEELING -- I WAS SO HAPPY TO SEE HIM
20   AGAIN AND START CREATING -- GET -- MOVE PAST FROM THIS
21   EMBARRASSMENT I FELT FROM THE FIRST TIME.  AND IT SEEMED LIKE
22   IT WAS GOING REALLY GOOD.  AND IT WAS GETTING EMOTIONAL AND
23   INTIMATE.  I JUST FELT VERY SAFE WITH HIM.  AND HE WAS KIND.
24   HE WASN'T AGGRESSIVE IN ANY WAY.  I FELT REALLY GOOD IN THAT
25   MOMENT.
26        Q    AND OTHER THAN YOU CUDDLING ON HIS CHAIR, WAS THERE
27   ANY OTHER AFFECTION EXCHANGED BETWEEN THE TWO OF YOU AS OF
28   THIS PHOTOGRAPH?
```

155

1      A    NO.  IT WAS SHORTLY AFTER THAT HE STARTED KISSING

2    ME.  BUT, NO.  UP UNTIL THEN, NO.

3      Q    SO HOLD THAT THOUGHT FOR A SECOND.

4      MS. MEYER:  YOUR HONOR, I WOULD REQUEST THAT EXHIBIT 23,

5    BATES STAMP 478, BE ADMITTED.

6      THE COURT:  ANY OBJECTION?

7      MS. HOLLEY:  NO OBJECTION.

8      THE COURT:  ALL RIGHT.  THAT IS ADMITTED.

9      Q    BY MS. MEYER:  AFTER TREVOR TOOK THIS SNAPCHAT

10   PHOTO, WHAT HAPPENED NEXT?

11     A    THEN HE ASKED ME IF I WANTED TO GO UPSTAIRS TO GO

12   TO BED.  AND, LIKE I SAID, I DIDN'T -- I DIDN'T HAVE THIS

13   HUGE EXPECTATION WE WERE GOING TO HAVE SEX.  I WAS REALLY

14   TIRED.  I COULD TELL HE WAS REALLY TIRED AND HAD TO WAKE UP

15   EARLY.  SO WE WENT UPSTAIRS.  AND WE STARTED CUDDLING AGAIN

16   SIMILAR TO HOW WE DID THE FIRST NIGHT.  AND --

17     Q    WHAT ROOM WERE YOU?

18     A    WE WERE IN HIS ROOM.

19     Q    AND WHEN YOU -- YOU MEAN HIS BEDROOM?

20     A    YES.

21     Q    AND WHEN YOU SAY CUDDLING, WERE YOU ON HIS BED?

22     A    YES.

23     Q    AND HOW WERE YOU CUDDLING?

24     A    I THINK IN A RANGE OF DIFFERENT WAYS.  I CAN TELL

25   YOU ONE SPECIFIC ONE, BUT MOSTLY IT WAS, YOU KNOW, LEANING ON

26   MY SIDE AND HIM BEHIND ME WITH HIS ARMS AROUND ME.

27     Q    LIKE SPOONING?

28     A    YEAH.

```
 1        Q    AND WAS HE KISSING YOU AT THAT TIME?

 2        A    YEAH, WE WERE KISSING EACH OTHER ON THE NECK.

 3        Q    AND WHAT HAPPENED AFTER YOU BEGAN CUDDLING ONE

 4   ANOTHER?

 5        A    WE TALKED FOR A LITTLE BIT LONGER.  AND HE OPENED

 6   UP TO ME ABOUT HOW HE WAS OVERWHELMED WHERE HE WAS IN HIS

 7   LIFE CURRENTLY.  AND HOW HE FEELS LIKE THERE'S ALWAYS OFFERS

 8   AND OPPORTUNITIES BEING THROWN AT HIM.  AND I JUST KIND OF

 9   GAVE HIM THIS ADVICE THAT MEANS A LOT TO ME.  AND I SAID --

10   THIS IS THE LAST THING I SAID TO HIM BEFORE WE STARTED HAVING

11   SEX WAS THAT THE ONLY ADVICE I COULD OFFER HIM IS THAT ALL OF

12   MAN'S PROBLEMS STEM FROM THE INABILITY TO SIT QUIETLY ALONE

13   IN A ROOM.  AND THAT I THOUGHT IT WOULD BE GOOD FOR HIM TO

14   TAKE TIME FOR HIMSELF AND LOOK INWARD AND ALL THOSE THINGS.

15   AND THEN THE CONVERSATION WAS OVER.  AND HE STARTED KISSING

16   ME AND INITIATING SEX.

17        Q    ARE YOU GUYS DOWNSTAIRS ON THE CHAIR OR --

18        A    THIS IS UPSTAIRS.

19        Q    AND HOW WOULD YOU DESCRIBE HIS KISSES INITIALLY?

20        A    THEY WERE NOT AGGRESSIVE AT ALL.  IT STARTED GENTLE

21   AND SIMPLE.  AND HE WAS ON TOP OF ME KISSING ME.  AND THAT'S

22   WHEN HE ASKED ME WHAT'S OFF LIMITS.  AND I KNEW THAT THIS

23   CONVERSATION ABOUT ROUGH SEX WAS GOING TO COME UP.  I KNEW I

24   DIDN'T KNOW WHAT TO SAY OR HOW TO ACT LIKE I KNEW WHAT I WAS

25   DOING.  SO I SAID, "DON'T STICK YOUR FINGERS DOWN MY THROAT."

26   AND BECAUSE I HAD PREVIOUSLY COMMUNICATED TO HIM THAT I

27   DIDN'T LIKE ANAL SEX, I ASSUMED THAT HE WOULD HAVE KNOWN

28   THAT'S OFF LIMITS, TOO.  BUT WHEN HE WAS ASKING ME THAT, HE
```

```
 1    WAS CONTINUOUSLY KISSING ME.  IT WAS, LIKE, HARD TO GET A

 2    WORD IN.  AND THAT'S WHEN HE ASKED ME, "WHAT'S THE SAFE

 3    WORD?"

 4         Q    WHAT DID YOU SAY TO HIM?

 5         A    I PAUSED FOR A LONG TIME.  AND I SAID "DADDY

 6    ISSUES."  AND I LAUGHED.

 7         Q    DID YOU KNOW WHAT A SAFE WORD WAS, LINDSEY?

 8         A    I DID.

 9         Q    AND DID YOU KNOW WHAT THE PURPOSE OF A SAFE WORD

10    WAS?

11         A    YEAH.

12         Q    WHAT DID YOU UNDERSTAND AT THAT TIME WHAT IT MEANT

13    TO USE A SAFE WORD DURING SEX?

14         A    THAT I WAS SUPPOSED TO SAY IT IF I WAS GETTING HURT

15    OR IT WAS TOO MUCH FOR ME.

16         Q    AND DID YOU HAVE ANY UNDERSTANDING HOW LONG THE

17    WORD WAS?  WAS IT MORE THAN ONE WORD?  MORE THAN TWO WORDS?

18    ANYTHING LIKE THAT?

19         A    NO, I DIDN'T KNOW.

20         Q    AND DID YOU KNOW WHAT TYPE OF WORD WAS TO BE USED

21    AS A SAFE WORD?

22         A    NO.

23         Q    DID YOU KNOW THE SAFE WORD WAS SUPPOSED TO BE

24    RELATED TO SEX, NOT RELATED TO SEX?

25         A    NO.

26         Q    HAD YOU EVER USED A SAFE WORD BEFORE?

27         A    NO.

28         Q    HOW DID YOU HEAR ABOUT THE TERM "SAFE WORD" BEFORE
```

158

```
1   THAT NIGHT?
2        A    I THINK THAT I JUST HAD SEEN IT ON TV SHOWS OR IN A
3   MOVIE.  SOMETHING LIKE THAT.  OR PEOPLE TALKING ABOUT ROUGH
4   SEX, I'VE HEARD THE TERM "SAFE WORD."  I JUST DID NOT KNOW
5   ANYTHING ABOUT WHAT IT'S SUPPOSED TO BE OR HOW YOU WOULD USE
6   IT.
7        Q    HAD YOU EVER HEARD THE WORDS BONDAGE, DOMINATION,
8   SADOMASOCHISM BEFORE THAT NIGHT?
9        MS. HOLLEY:  OBJECTION.  LEADING.  IRRELEVANT.
10       THE COURT:  SUSTAINED ON LEADING.
11       Q    BY MS. MEYER:  TREVOR HAD ALREADY INITIATED SEX
12  WHEN HE ASKED YOU ABOUT THE SAFE WORD; CORRECT?
13       A    YES.
14       Q    AND WHY DID YOU MAKE A JOKE OUT OF IT AND SAY THE
15  WORDS "DADDY ISSUES"?
16       A    BECAUSE IN MY MIND, I DIDN'T KNOW WHAT HIS
17  DEFINITION OF ROUGH SEX WAS.  AND I HAVE NEVER USED A SAFE
18  WORD BEFORE.  SO I DIDN'T KNOW IF IT WAS A JOKE OR IF I WOULD
19  ACTUALLY HAVE TO USE IT.  AND I WAS UNCOMFORTABLE, BECAUSE I
20  DIDN'T KNOW WHAT I WAS TALKING ABOUT.  AND THAT'S WHY I JUST
21  MADE A JOKE.
22       Q    NOW, LINDSEY, YOU HAD SAID EARLIER IN YOUR
23  TESTIMONY ABOUT THAT EVENING WHEN YOU WERE REFERENCING
24  HAVING -- AND I CAN'T REMEMBER THE EXACT WORD -- A CASUAL
25  EVENING.  AN INFORMAL EVENING.  YOU THOUGHT YOU MAY NOT HAVE
26  SEX.  BUT THEN YOU SAID LATER ON THAT YOU THEN UNDERSTOOD
27  THAT YOU PROBABLY WOULD HAVE ROUGH SEX.
28            AT SOME POINT DID YOU REALIZE THAT YOU WERE GOING
```

1  TO HAVE SEX THAT NIGHT?

2      A    YES, WHEN HE SPOKE TO ME ABOUT THE CHOKING.

3      Q    AND WHAT DID -- WHAT HAPPENED AFTER YOU DISCUSSED

4  THE SAFE WORD WITH TREVOR?

5      A    HE LAUGHED A LITTLE BIT BACK IN RESPONSE TO THE

6  DADDY ISSUES.  BUT WAS CONTINUING TO KISS ME AND STARTING TO

7  HAVE SEX WITH ME AT THAT POINT.  AND HE SLAPPED IN THE

8  FACE.

9      Q    I'M SORRY.  I DIDN'T HEAR THAT.

10     A    HE SLAPPED ME IN THE FACE.  NOT SUPER HARD.  THAT'S

11 WHEN THE SEX FELT NORMAL AND NOT THREATENING INITIALLY.  AND

12 I FELT THAT IT WAS CONSENSUAL UP UNTIL HE FLIPPED ME OVER

13 ONTO MY STOMACH, WHICH I KNEW WHAT WAS COMING BECAUSE THAT'S

14 WHAT HE DID TO ME THE FIRST NIGHT.  AND HE TOOK MY HAIR AND

15 WRAPPED IT AROUND MY NECK.  AND I KNEW WHAT HE WAS DOING.

16 AND AT THAT POINT I KNEW WHAT TO EXPECT.

17         AND SO HE WAS CONTINUING TO HAVE SEX WITH ME AND

18 WRAPPED MY HAIR AROUND MY NECK.  AND I BECAME UNCONSCIOUS.

19     Q    LINDSEY, STOP FOR ONE SECOND.  YOU SAID HE

20 CONTINUED TO HAVE SEX WITH YOU WHEN HE WAS WRAPPING YOUR HAIR

21 AROUND YOUR NECK.  WHAT DO YOU MEAN BY "HE WAS CONTINUING TO

22 HAVE SEX"?  WHAT TYPE OF SEX?

23     A    VAGINAL SEX.

24     Q    WHEN HE WAS WRAPPING YOUR HAIR AROUND YOUR NECK,

25 DID HE GRAB YOUR HAIR FROM BEHIND AND THEN PUT IT AROUND THE

26 FRONT OF YOUR NECK?

27     A    YES, HE WAS BEHIND ME.

28     Q    WHAT KIND OF PRESSURE WAS HE APPLYING TO YOUR

```
1   NECK?

2       A    IT WAS VERY TIGHT.

3       Q    AND WHEN YOU SAY VERY TIGHT, WHAT DO YOU MEAN?

4       A    I COULDN'T BREATHE.  IT ALMOST FELT LIKE I WAS

5   GOING TO GAG.  LIKE I WAS GAGGING FOR AIR.  AND THEN I WENT

6   UNCONSCIOUS.

7       Q    AND AT SOME POINT DID YOU REGAIN CONSCIOUSNESS?

8       A    YES.  THIS TIME --

9       Q    LET ME ASK YOU, WAS IT DIFFERENT WHEN YOU BEGAN TO

10  REGAIN CONSCIOUSNESS THIS TIME?

11      A    YEAH.

12      Q    HOW WAS IT DIFFERENT?

13      A    IT WAS DIFFERENT THAN THE FIRST TIME WE HAD SEX AND

14  HE DID IT TO ME.  I WAS SO SEVERELY DISORIENTED THAT -- I WAS

15  LAYING FACE DOWN AND I COULDN'T MOVE.  AND IT TOOK ME A WHILE

16  TO EVEN REMEMBER WHO WAS HAVING SEX WITH ME, OR WHERE I WAS,

17  OR WHAT I WAS DOING BEFORE.  AND I HAD TO, YOU KNOW, FIGURE

18  OUT, OKAY.  THAT'S TREVOR BAUER HAVING SEX WITH ME.  I WAS SO

19  MUCH MORE DISORIENTED THIS TIME.

20           AND IT WAS MORE SCARY BECAUSE OF THAT.  THAT'S WHEN

21  HE, YOU KNOW, MAY HAVE SEEN MY BODY MOVE A LITTLE BIT.  I WAS

22  TRYING TO MOVE MYSELF.  THAT'S WHEN HE FLIPPED ME BACK OVER

23  ONTO MY BACK WHEN I WAS TRYING TO REGAIN CONSCIOUSNESS.  AND

24  MY BODY WAS LIMP.  AND I WAS ON MY BACK.  AND I REMEMBER MY

25  EYES TRYING TO OPEN.  I COULDN'T TALK.  AS HE HAD SEEN FROM

26  THE FIRST TIME I WAS UNCONSCIOUS, IT TOOK ME ALMOST TEN

27  MINUTES TO COME TO.  IT WAS WITHIN 30 SECONDS OF COMING BACK

28  FROM THIS LAST TIME -- COMING BACK TO CONSCIOUSNESS THAT I
```

1    WAS FLIPPED OVER ON MY BACK.  HE WAS THEN HAVING SEX WITH ME

2    VAGINALLY.  AND THAT'S WHEN HE STARTED CLOSED FIST PUNCHING

3    MY FACE.

4        Q    LINDSEY, I HATE TO STOP YOU THERE.  LET'S GO BACK

5    ONE SECOND.  OKAY.  ARE YOU OKAY?

6        A    YEAH.

7        Q    SO WHEN HE CHOKED -- HE STARTED CHOKING YOU THAT

8    TIME, WHY DIDN'T YOU JUST SAY, I'M NOT INTO THIS EITHER?  YOU

9    KNOW, THIS IS IN THE CATEGORY OF ANAL SEX OR FINGERS DOWN THE

10   THROAT.

11       A    I THINK THAT I WAS TRYING TO JUST DO WHAT HE

12   WANTED.  IN MY MIND, THE PREVIOUS TIME HE HAD TOLD ME I WAS

13   ONLY UNCONSCIOUS FOR THREE TO FOUR SECONDS.  I WAS JUST

14   TELLING MYSELF IT'S NOT THAT BIG OF A DEAL.  HE LIKES IT.

15   JUST DO IT.  YOU'RE ONLY OUT FOR ONE, TWO, THREE, FOUR.  AND

16   THEN YOU'RE BACK.  SO I DIDN'T FULLY UNDERSTAND THE SEVERITY

17   OF HOW LONG SOMEONE CAN STAY UNCONSCIOUS WHEN THEY'RE CHOKED

18   OUT.  I JUST WANTED TO GET THROUGH IT IF IT WAS SOMETHING HE

19   WANTED TO DO.

20       Q    WHEN YOU STARTED REGAINING CONSCIOUSNESS THIS FIRST

21   TIME ON THE SECOND OCCASION, YOU SAID YOU FELT SICK.  HOW DID

22   YOU FEEL SICK?

23       A    I FELT THE SAME AS I DID BEFORE BUT EVEN MORE

24   NAUSEOUS.  DIZZY.  IT WAS HARD FOR ME TO OPEN MY EYES.  BUT

25   MOSTLY IT WAS JUST THE NAUSEA.  THAT FAMILIAR FEELING I FELT

26   LAST TIME BUT MORE INTENSE.

27       Q    AND YOU TESTIFIED A FEW MINUTES AGO AFTER HE CHOKED

28   YOU OUT THIS FIRST TIME ON MAY 15 OR 16, HE THEN FLIPPED YOUR

```
 1   BODY OVER AND YOU WERE ON YOUR BACK?

 2        A    YES.

 3        Q    AND WHAT HAPPENED AT THAT TIME?

 4        A    I COULD BARELY MOVE MY BODY.  I COULD NOT -- I

 5   DON'T KNOW WHAT WAS GOING ON AS I WAS, YOU KNOW, ONE MINUTE

 6   IN TO TRYING TO REGAIN CONSCIOUSNESS.  AND THAT'S WHEN HE

 7   STARTED CLOSED FIST PUNCHING MY FACE.  AND HE HIT ME FIRST IN

 8   THE LEFT SIDE OF THE JAW.  AND I SAW HIS HANDS GO UP AND DOWN

 9   LIKE HE WAS PUNCHING ME.  AND HE PUNCHED ME -- MY EYES WERE

10   OPENING AND CLOSING.  WHEN HE WOULD HIT MY FACE, THEY WOULD

11   CLOSE.  HE HIT ME ON BOTH CHEEKBONES.  AND THEN I FELT ONE ON

12   THE LEFT SIDE OF MY HEAD.  AND I COULDN'T -- I HAD NEVER BEEN

13   PUNCHED IN THE FACE EVER.

14           AND SO I WENT INTO SHOCK NOT ONLY AS I WAS TRYING

15   TO REGAIN CONSCIOUSNESS, I FELT LIKE MY SOUL LEFT MY BODY.

16   AND I WAS TERRIFIED.  AND I COULDN'T -- I COULDN'T SPEAK.

17   AND I COULDN'T FIGHT BACK.  AND IT FELT SO QUICK FROM THE

18   MOMENT I DO REMEMBER BEING CONSCIOUS.  AND THAT'S WHAT I

19   REMEMBER OF HIM PUNCHING ME.

20           AND THEN THE NEXT THING I REMEMBER WAS HE WAS

21   CONTINUING TO HAVE VAGINAL SEX WITH ME.  AND HE FLIPPED ME

22   OVER ONTO MY STOMACH AGAIN IN THE SAME POSITION.  AND MY BODY

23   WAS SO LIMP.  AND THAT'S WHEN I FELT HIM TAKE MY HAIR AGAIN.

24   AND THAT TIME OF HIM PUTTING ME OUT FELT QUICKER.  AND HE

25   DIDN'T SAY ANYTHING TO ME.  I DIDN'T SAY ANYTHING TO HIM.

26   AND IT WAS LIKE I WAS JUST A RAG DOLL.

27        Q    LINDSEY, WHY DIDN'T YOU SAY -- WHY DIDN'T YOU USE

28   YOUR SAFE WORD, OR TELL HIM TO STOP, OR DO SOMETHING?
```

1    A    I COULDN'T PHYSICALLY GET A WORD OUT.  I

2  COULDN'T -- I WAS TRYING TO REGAIN CONSCIOUSNESS.  AND TRYING

3  TO -- JUST TRYING TO BE ABLE TO BREATHE.  AND HE MADE ME -- I

4  COULDN'T GET A WORD OUT.  I WAS IN SHOCK.  I FROZE.  AND IT

5  WAS SO QUICK FROM THE PUNCHING AND GETTING FLIPPED OVER

6  AGAIN.  IT WAS LIKE HE WAS TREATING ME LIKE I WAS NOT EVEN A

7  HUMAN BEING.

8    Q    LINDSEY, HOW MANY TIMES DID HE PUNCH YOU IN THE

9  FACE IN THE AREAS YOU DESCRIBED?

10    A    I JUST REMEMBER ONE ON MY JAW.  ONE ON EACH

11  CHEEKBONE.  AND ONE ON LEFT SIDE OF MY HEAD.

12    Q    DESCRIBE THE FORCE THAT TREVOR HIT YOU IN THE

13  FACE?

14    A    WHEN HE HIT ME IN THE JAW, IT WAS SO FORCEFUL THAT

15  IT TURNED MY HEAD TO THE SIDE.  AND IT WAS SO STARTLING AND

16  IT WAS -- THEY WERE SUCH HARD PUNCHES.  HE IS VERY STRONG TO

17  THE POINT WHERE MY LIP SPLIT OPEN AND MY GUMS TURNED BLACK.

18    Q    HOW DID YOU KNOW YOUR LIP HAD BEEN SPLIT OPEN?

19    A    I DIDN'T REALIZE THAT UNTIL I WOKE UP AFTER HE

20  CHOKED ME THE SECOND TIME.  I WOKE UP AND THERE WAS BLOOD IN

21  MY MOUTH.

22    Q    YOU DIDN'T KNOW THAT WHEN HE WAS HITTING YOUR

23  FACE?

24    A    I DIDN'T.  EVERYTHING WAS HAPPENING SO FAST.  I

25  DIDN'T TASTE THE BLOOD.

26    Q    LINDSEY, WHEN HE WAS PUNCHING YOU IN THE FACE, WAS

27  HE PUNCHING YOU WITH HIS FIST?

28    A    YES.

```
 1        Q    AND WERE -- DID HIS KNUCKLES LAND ON YOUR FACE OR
 2   DID HE PUNCH YOU WITH THE SIDE OF HIS FIST?
 3        A    I FELT KNUCKLES ON MY JAW.
 4        Q    AND WHAT ABOUT THE REST OF YOUR FACE?
 5        A    ALL I KNOW IS THAT I FELT KNUCKLES.  IT WAS --
 6        Q    LINDSEY, DID YOU EVER HAVE A DISCUSSION WITH TREVOR
 7   UP UNTIL THAT POINT ABOUT HIM LITERALLY PUNCHING YOU IN THE
 8   FACE?
 9        A    NO.
10        Q    DID ANY OF HIS PHYSICALITY THAT HE EXERCISED
11   TOWARDS YOU BEFORE, DID IT EVER RISE TO THE LEVEL IT DID THAT
12   NIGHT WHEN HE PUNCHED YOU IN THE FACE?
13        A    NO.
14        Q    HOW LONG AFTER HE GAVE YOU PUNCHES TO YOUR FACE DID
15   HE THEN WRAP YOUR HAIR AROUND YOUR NECK AND CHOKE YOU?
16        A    IT WAS VERY QUICK.  MAYBE WITHIN LIKE ONE MINUTE.
17   NOT EVEN A MINUTE.
18        Q    LINDSEY, DID YOU PASS OUT AGAIN?
19        A    YES.  WHEN HE CHOKED ME THE SECOND TIME, I DID GO
20   UNCONSCIOUS AGAIN.
21        Q    AND WHAT HAPPENED WHEN YOU AWOKE?
22        A    THAT TIME I WAS EVEN MORE DISORIENTED.  MY WHOLE
23   BODY HURT.  THAT'S WHEN I TASTED BLOOD IN MY MOUTH.  MY
24   JAW -- I FELT LIKE I COULDN'T OPEN MY JAW.  MY BODY WAS ON
25   FIRE.  MY BUTT HURT.  NOT FROM ANAL SEX BUT FROM GETTING --
26   YOU KNOW, THERE WAS JUST A PAIN IN ONE OF MY BUTT CHEEKS.
27   AND I HAD THIS HORRIBLE BURNING FEELING RIGHT BEHIND MY EARS
28   RIGHT HERE.  AND I AGAIN HAD TO TRY TO REMEMBER WHERE I WAS.
```

```
 1   AND AT THAT POINT MY WHOLE BODY JUST FELT SO NUMB THAT I -- I
 2   HAVE NO IDEA IF HE WAS HAVING SEX WITH ME WHEN I WOKE UP FROM
 3   THAT TIME.
 4        Q    SO WHEN YOU WOKE UP THE SECOND TIME AFTER HE CHOKED
 5   YOU, WAS HE HAVING SEX WITH YOU AGAIN?
 6        A    I CAN'T REMEMBER BECAUSE MY WHOLE BODY WAS NUMB.  I
 7   JUST REMEMBER -- THE ONLY THING WAKING UP FROM THAT ONE WAS I
 8   GOT ROLLED ONTO MY BACK AGAIN.  AND HE --
 9        THE REPORTER:  I'M SORRY.  HE WAS OR WASN'T --
10        THE WITNESS:  HE WAS NOT HAVING SEX WITH ME WHEN HE
11   FLIPPED ME ON MY BACK AND OPENED MY KNEES TO EXPOSE MY
12   VAGINA.
13        Q    WERE YOUR KNEES UP?
14        A    NO.  I WAS LAYING FLAT BEFORE HE ROLLED ME OVER ON
15   MY STOMACH.  SO HE HELPED MOVE MY BODY.  I THINK WHEN HE
16   MOVED MY BODY, MY KNEES WERE TOGETHER LIKE THIS AND HE OPENED
17   THEM (INDICATING).
18        Q    WERE YOUR LEGS ON THE BED OR WERE YOUR KNEES UP
19   TOWARDS THE CEILING?
20        A    MY LEGS WERE ON THE BED.
21        Q    AND WHAT HAPPENED WHEN HE SPREAD YOUR KNEES?
22        A    I WAS STILL TRYING TO REGAIN CONSCIOUSNESS.  AND I
23   FELT MY LEGS BEING OPENED.  AND THEN THAT'S WHEN HE STARTED
24   PUNCHING CLOSED FIST MY VAGINA RIGHT ON THE TOP OF IT.  AND
25   THE PAIN WAS SO EXCRUCIATING ON TOP OF ALL THE OTHER PAIN I
26   WAS EXPERIENCING, THAT IT WAS LIKE IT BROUGHT MYSELF BACK
27   INTO MY BODY.  AND I WAS TRYING TO SPEAK EVEN THOUGH IT FELT
28   LIKE MY MOUTH WAS CLOSED SHUT.
```

```
1          AND IT WAS SO PAINFUL THAT, LIKE, MY BODY WAS
2   PHYSICALLY TRYING TO RISE UP.  AND I WAS ABLE TO, UNDER MY
3   BREATH, TRY TO SAY THE SAFE WORD.  I WAS ONLY ABLE TO GET OUT
4   "DADDY" BECAUSE I COULDN'T SPEAK LOUD ENOUGH OR ENUNCIATE THE
5   FULL PHRASE.  THAT'S WHEN HE STOPPED WHEN HE HEARD ME SAY
6   THAT.  AND HE CAME RIGHT ON TOP OF ME AND LAID ON TOP OF ME.
7   AND STARTED PLAYING WITH MY HAIR.  AND KEPT TELLING ME THAT,
8   "YOU'RE SAFE.  I'M HERE.  YOU'RE SAFE."  AND THAT HE WOULD
9   NEVER DO THESE THINGS TO ME IF IT WASN'T SEXUALLY.
10       Q    DID YOU FEEL SAFE ANYMORE?
11       A    NO.
12       Q    LINDSEY, HOW MANY TIMES DID HE PUNCH YOU IN YOUR
13   VAGINA?
14       A    AT LEAST THREE.
15       Q    DID YOU EVER GIVE HIM PERMISSION TO DO THAT?
16       A    NO.
17       Q    DID YOU EVER DISCUSS THAT?
18       A    NO.
19       Q    HAD YOU EVER BEEN PUNCHED IN THE VAGINA EVER?
20       A    NO.
21       Q    WHAT HAPPENED AFTER HE LAID ON TOP OF YOU AND TRIED
22   TO SOOTHE YOU?
23       A    YOU KNOW, HE KNEW I WAS CRYING AND SHAKING.  AND I
24   JUST COULD NOT STOP THE TEARS FROM COMING OUT.  MY ARMS WERE
25   LIKE THIS AND SHAKING (INDICATING).  SO HE FLIPPED ME OVER
26   AGAIN, BECAUSE HE KNEW I WAS IN DISTRESS.  AND I WASN'T ABLE
27   TO TALK OR SAY ANYTHING TO HIM.  HE FLIPPED ME OVER FROM HIM
28   BEING ON TOP OF ME.  AND HE LAID ME ON MY STOMACH.  HE MOVED
```

1  MY ARMS AND -- FROM MY HEAD LIKE THIS (INDICATING).  AND THEN

2  HE SAT ON MY BACK AND STRADDLED MY BACK.  AND HE STARTED

3  SCRATCHING MY BACK AND ASKING ME TO JUST -- HE KEPT SAYING,

4  "CAN YOU JUST TALK TO ME?  CAN YOU TALK TO ME?  LIKE, WHAT'S

5  GOING ON?"

6          AND AT THAT POINT, ALL I COULD -- I WAS SCARED OF

7  HIM.  I WAS IN SO MUCH PAIN.  I DIDN'T KNOW WHAT TO SAY.  I

8  WAS EMBARRASSED BECAUSE I WAS CRYING.  AND HE WAS MAKING ME

9  FEEL LIKE IT WAS MY FAULT THAT THIS HAD HAPPENED TO ME OR

10  THAT I HAD ASKED FOR IT.  AND I JUST -- ALL I COULD THINK OF

11  TO SAY WAS, "I THINK MY BODY IS HAVING A TRAUMA RESPONSE,"

12  BECAUSE IT WAS.

13          AND THEN HE LAID WITH ME AND TRIED TO CUDDLE ME FOR

14  A LITTLE BIT LONGER.  AND I JUST WAS TRYING TO STOP CRYING.

15  AND HE ASKED ME IF I HAD EVER BEEN HIT BEFORE.  AND I SAID,

16  "NO."

17     Q    DID HE EVER ASK YOU THAT BEFORE THAT MOMENT IN

18  TIME?

19     A    NO.

20     Q    LINDSEY, WHEN DID YOU FIRST START CRYING?

21     A    I THINK TEARS STARTED COMING OUT WHEN HE WAS

22  PUNCHING MY VAGINA.

23     Q    DID HE SAY ANYTHING ABOUT WHAT HE HAD DONE TO YOU

24  WHEN YOU WERE UNCONSCIOUS THE SECOND TIME?

25     A    HE DID PROCEED TO TELL ME THAT AFTER HE TOOK A

26  SHOWER AND HE SAID -- HE HELPED ME GET IN THE SHOWER.  AND HE

27  STOOD WITH ME AND HELD MY HAIR IN THE SHOWER.  AND WHEN WE

28  GOT OUT, HE LOOKED AT MY FACE AND HE GRABBED IT.  AND HE

```
 1    SAID, "YOU HAVE A COUPLE OF WELTS.  I NEED TO BE MORE CAREFUL
 2    WHERE I HIT YOU.  AND I ALSO PUNCHED YOU IN YOUR BUTT WHEN
 3    YOU WERE UNCONSCIOUS.  YOU MIGHT HAVE A BRUISE THERE."
 4        Q    WHEN YOU SAID YOUR BODY WAS SHAKING, WHAT DO YOU
 5    MEAN BY THAT?
 6        A    IT WAS -- I MEAN, PHYSICALLY IT WAS SHAKING.  EVERY
 7    PART OF MY BODY WAS SHAKING.  ESPECIALLY MY HANDS AND MY
 8    LEGS.  AND I WAS DIZZY AND NAUSEOUS.  THAT WAS THE MOST
 9    NAUSEOUS I HAD EVER BEEN ASSOCIATED WITH ALL THAT CHOKING AND
10    TRYING TO GET UP AND WALK TO THE SHOWER.  HE KNEW I WAS
11    STRUGGLING.  HE COULD SEE THAT.  WHEN HE GOT IN THE SHOWER
12    WITH ME, I WAS TRYING TO FOCUS ON NOT THROWING UP IN THE
13    SHOWER.
14        Q    WAS TREVOR IN THE SHOWER WITH YOU?
15        A    YES.
16        Q    WHY DID YOU TAKE A SHOWER WITH HIM?
17        A    HE ASKED ME IF I WANTED TO GET IN THE SHOWER.  AND
18    I THINK I WAS JUST -- AT THAT POINT I WAS JUST FREAKED OUT
19    AND SCARED.  I WOULD DO WHATEVER HE SAYS, YOU KNOW.  HE GOT
20    IN THERE AND HELD MY HAIR WHILE I SHOWERED.
21        Q    DID YOU SAY HE HELD YOUR HAIR?
22        A    YES.
23        Q    AND HOW WERE YOU FEELING AT THAT TIME?
24        A    EVERYTHING HURT SO BAD.  MY LIP WAS BLEEDING.  AND
25    LIKE I SAID, I WAS JUST TRYING NOT TO THROW UP IN THE SHOWER.
26    AND I WAS SO SCARED AND I WAS TRYING TO THINK OF WHAT I
27    SHOULD DO.  IT WAS, YOU KNOW, PAST 3:00 IN THE MORNING.  AND
28    I LIVE -- YOU KNOW, MY COUSIN WHO I WAS JUST WITH, THEY'RE
```

1   ASLEEP.  I DIDN'T KNOW IF I SHOULD DRIVE BACK HOME TO SAN

2   DIEGO.  BUT I WAS SO PHYSICALLY ILL AND STILL JUST

3   DISORIENTED THAT I KNEW I COULDN'T DRIVE HOME.

4           SO I GOT BACK IN THE BED.

5       Q    WHY DID YOU GET BACK INTO BED WITH HIM?

6       A    I BELIEVE THE MAIN THING WAS I WAS JUST -- I KNEW

7   SOMETHING WAS WRONG WITH HOW I WAS FEELING.  IT WAS SO LATE.

8   AND, YOU KNOW, I LIVE TWO HOURS AWAY.  AND I COULDN'T -- NONE

9   OF MY FRIENDS THAT LIVE IN L.A. WERE AWAKE.  IT WAS EITHER

10  STAY WITH TREVOR AND LEAVE AS SOON AS, YOU KNOW, HE FALLS

11  ASLEEP AND I CAN GET OUT IN THE MORNING WHEN I FEEL

12  PHYSICALLY OKAY TO GET OUT.  OR I LEAVE AND GO SLEEP IN MY

13  CAR SOMEWHERE IN L.A.

14          I WAS JUST SO TIRED AND SICK THAT I JUST DECIDED

15  THAT IF I JUST LAY HERE AND GO TO BED, I CAN LEAVE IN THE

16  MORNING BEFORE HE WAKES UP.  AND I CAN SEE HOW I'M -- IF

17  I'M -- BECAUSE I KNEW I COULDN'T DRIVE IN THAT MOMENT.

18      Q    LINDSEY, DID YOU TAKE A PHOTOGRAPH OF YOURSELF?

19      A    YES.

20      Q    AND WHY DID YOU DO THAT?

21      A    TREVOR -- AFTER EVERYTHING, WHEN HE ASKED ME IF I

22  EVER GOT HIT BEFORE AND I SAID, "NO," HE SAID HE WOULD TAKE A

23  SHOWER.  SO HE WENT IN THE SHOWER.  HOW HIS ROOM IS SET UP

24  HIS SHOWER IS HERE (INDICATING).  AND IT'S THIS CLEAR GLASS

25  DOOR.  THEN HIS MIRROR IS RIGHT HERE.  AND HIS BED IS OVER

26  HERE (INDICATING).  AND WHEN HE WENT IN THE SHOWER, I KNEW

27  THAT MY FACE WAS MESSED UP.

28          I COULD FEEL EVERY INCH OF IT BURNING.  AS WELL A

1   LOT OF OTHER PARTS OF MY BODY.  I WANTED TO SEE WHAT MY FACE

2   LOOKED LIKE.  I DIDN'T WANT TO GET UP AND FOR HIM TO SEE ME

3   LOOKING AT MYSELF IN THE MIRROR.  HE WOULD HAVE SEEN MYSELF

4   LOOKING IN THE MIRROR WHEN HE WAS IN THE SHOWER.  SO I TOOK A

5   PICTURE TO SEE WHAT MY FACE LOOKED LIKE.

6       Q    WHY DIDN'T YOU WANT HIM SEE YOU LOOKING IN THE

7   MIRROR?

8       A    I WAS SCARED OF -- I WAS SCARED.  HE MADE ME FEEL

9   LIKE IT WAS MY FAULT.  I DIDN'T KNOW HOW TO ADDRESS IT WITH

10  HIM AT ALL.

11      Q    HOW DID HE MAKE YOU FEEL LIKE IT WAS YOUR FAULT?

12      A    BY SAYING THINGS LIKE, "I WOULD NEVER DO THIS TO

13  YOU IF IT WASN'T SEXUALLY."  AND BY SAYING, YOU KNOW, "YOU'RE

14  SAFE.  YOU'RE HERE."  LIKE, JUST ALL OF THE MANIPULATIVE

15  THINGS HE SAID AFTER.  AND THE FACT, YOU KNOW, THAT I SENT

16  THOSE TEXT MESSAGES SAYING, YEAH, I WANT TO BE CHOKED AND

17  SLAPPED.  NOWHERE IN THERE DO I SAY PUNCHED TO THE POINT I

18  HAVE TO BE HOSPITALIZED.  BUT HE JUST MADE ME FEEL LIKE

19  BECAUSE I HAD INDICATED THAT MAYBE I WAS OPEN TO ROUGH SEX,

20  THAT I GOT WHAT I DESERVED.

21      Q    LINDSEY, DID YOU FEEL THAT SOMEHOW YOU WERE

22  PARTIALLY RESPONSIBLE FOR WHAT HAPPENED THAT NIGHT?

23      A    I DID FEEL LIKE THAT FOR A WHILE.  YEAH.

24      Q    DO YOU FEEL THAT NOW?

25      A    NO.

26      Q    LINDSEY, I'M GOING TO SHOW YOU EXHIBIT 8.  AND IT'S

27  BATES STAMP 195.  DIRECTING YOUR ATTENTION TO PAGE 195, WHICH

28  IS THE FIRST PAGE OF EXHIBIT 8.  IS THIS THE PHOTOGRAPH OF

```
1    YOURSELF THAT YOU TOOK AT TREVOR'S AFTER THE INCIDENT?
2         A    YEAH.
3         Q    AND HOW LONG AFTER THE INCIDENT DID YOU TAKE THIS
4    PHOTOGRAPH?
5         A    PROBABLY TEN MINUTES.
6         Q    AND HAVE YOU SINCE THEN ALTERED THIS IMAGE IN ANY
7    WAY, SHAPE, OR FORM?
8         A    NO.
9         Q    DID YOU CAUSE ANYONE TO ALTER THIS IMAGE IN ANY
10   WAY, SHAPE, OR FORM?
11        A    NO.
12        Q    DO YOU HAVE BRUISES UNDER YOUR EYES?
13        A    NOT YET IN THIS PHOTO.  NO.
14        Q    DID YOU PUT ANY KIND OF FILTER ON THIS BEFORE YOU
15   TOOK IT?
16        A    NO.
17        MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 8, PAGE
18   195, BE ADMITTED.
19        THE COURT:  ANY OBJECTION?
20        MS. HOLLEY:  NO.
21        THE COURT:  ALL RIGHT.  EIGHT IS ADMITTED.  AND WHY
22   DON'T WE STOP HERE TO GIVE EVERYBODY TIME TO GATHER THEIR
23   THINGS.  WE'LL SEE YOU TOMORROW MORNING AT 8:30.
24        MS. MEYER:  THANK YOU, YOUR HONOR.
25        MS. HOLLEY:  THANK YOU, YOUR HONOR.
26        MR. FETTEROLF:  THANK YOU, YOUR HONOR.
27             (AT 4:23 P.M., AND ADJOURNMENT WAS TAKEN UNTIL
28              TUESDAY, AUGUST 17, 2021, AT 8:30 A.M.)
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3       HON. DIANNA GOULD-SALTMAN, JUDGE        DEPARTMENT 35

 4

 5    LINDSEY HILL,                        )
                                           )
 6                                         )
                          PETITIONER,      )  NO. 21STRO03198
 7                                         )
                   VS.                     )
 8                                         )  REPORTER'S
                                           )  CERTIFICATE
 9    TREVOR BAUER,                        )
                                           )
10                                         )
                          RESPONDENT.      )
11    _____)

12

13            I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14    REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15    FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16    FOREGOING PAGES, 1 THROUGH 171, INCLUSIVE, COMPRISE A FULL,

17    TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18    MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 16, 2021.

19            DATED THIS 16TH DAY OF AUGUST, 2021.

20

21

22    _____
      JACQUELINE M. CAIRE, CSR #9599, RPR
23    OFFICIAL REPORTER

24

25

26

27

28
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF LOS ANGELES

 3       HON. DIANNA GOULD-SALTMAN, JUDGE     DEPARTMENT 35

 4

 5
         LINDSEY HILL,                    )
 6                                        )
                          PETITIONER,     )
 7                                        )
                    VS.                   )   NO. 21STRO03198
 8                                        )
                                          )
 9       TREVOR BAUER,                    )
                                          )
10                                        )
                          RESPONDENT.     )
11       _____)
                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                        AUGUST 17, 2021
                          A.M. SESSION
13
         APPEARANCES:
14       FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                               BY:  LISA HELFEND MEYER, ESQ.
15                                  DOREEN MARIE OLSON, ESQ.
                                    MARC H. GARELICK, ESQ.
16                             10100 SANTA MONICA BOULEVARD
                               SUITE 1425
17                             LOS ANGELES, CA 90067

18                             RIGHT CHOICE LAW
                               BY:  FRED THIAGARAJAH, ESQ.
19                             5015 BIRCH STREET
                               SUITE 107
20                             NEWPORT BEACH, CA 92660

21       FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
                               BY:  SHAWN HOLLEY, ESQ.
22                                  KATE MANGELS, ESQ.
                               808 WILSHIRE BOULEVARD
23                             3RD FLOOR
                               SANTA MONICA, CA 90401
24
                               ZUCKERMAN SPAEDER
25                             BY:  JON R. FETTEROLF, ESQ.
                                    (PRO HAC VICE)
26                             1800 M STREET NW
                               SUITE 1000
27                             WASHINGTON, DC 20036

28                             JACQUELINE M. CAIRE, CSR #9599, RPR
                               OFFICIAL REPORTER
```

```
1                          WITNESSES

2
                                                    PAGE
3
     LINDSEY HILL, CALLED ON HER OWN BEHALF
4
          DIRECT EXAMINATION MS. MEYER              174,
5                                                   217

6         CROSS EXAMINATION BY MS. HOLLEY           222

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1  CASE NUMBER:            21STRO03198

 2  CASE NAME:             LINDSEY HILL VS.

 3                         TREVOR BAUER

 4  LOS ANGELES, CALIFORNIA  TUESDAY, AUGUST 17, 2021

 5  DEPARTMENT 35          HON. DIANNA GOULD-SALTMAN, JUDGE

 6  APPEARANCES:           (AS HERETOFORE NOTED.)

 7  REPORTER:              JACQUELINE CAIRE, CSR NO. 9599, RPR

 8  TIME:                  8:41 A.M.

 9

10      THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.  HAVE

11  THERE BEEN ANY DISCUSSIONS SINCE WE WERE LAST HERE?

12      MS. HOLLEY:  CONCERNING?

13      THE COURT:  CONCERNING ANYTHING THAT MIGHT --

14      MS. MEYER:  NO.

15      THE COURT:  -- AFFECT THE COURSE OF THIS PROCEEDING.

16      MS. HOLLEY:  WELL, THERE WAS ACTUALLY ONE DISCUSSION.  I

17  THINK THERE'S NOTHING TO BE A WITNESS OUT OF ORDER.

18      MS. MEYER:  YES, I SHOULD SAY.  WE ARE CALLING NURSE

19  VALENCIA -- I APOLOGIZE.  I FORGOT HER FIRST NAME -- THIS

20  AFTERNOON AT 1:30.  MS. HOLLEY HAD REQUESTED BY TEXT AND

21  EMAIL THAT WE TRY TO REARRANGE AND HAVE HER COME THIS

22  MORNING.  WE ATTEMPTED TO, THROUGH HER ATTORNEY.  AND SHE WAS

23  NOT ABLE TO.

24      THE COURT:  OKAY.  AND WILL SHE BE APPEARING THROUGH

25  COURTCONNECT OR PERSONALLY?

26      MS. OLSON:  PERSONALLY YOUR HONOR.

27      THE COURT:  OKAY.  ALL RIGHT.  ANY OTHER WITNESSES WE

28  SHOULD EXPECT TODAY OTHER THAN THE PARTIES?
```

1      MS. MEYER:  I DON'T THINK SO.

2      THE COURT:  OKAY.  ALL RIGHT.  ARE WE READY TO RESUME?

3      MS. MEYER:  YES.

4      THE COURT:  MA'AM, IF YOU WANT TO COME BACK UP.

5      MS. OLSON:  ACTUALLY, NOT ON OUR SIDE.  BUT I KNOW THAT

6  THE RESPONDENT CALLED A WITNESS TODAY.  AND I BELIEVE HE IS

7  HERE.  KYLE ERICKSON.

8      MS. HOLLEY:  IS HE IN THE COURTROOM?

9      MS. MEYER:  YOUR HONOR, THIS IS A HOUSEKEEPING POINT.  I

10  DON'T THINK EITHER SIDE MADE A REQUEST FOR EXCLUSION OF

11  WITNESSES UNDER EVIDENCE CODE SECTION 777.  I THINK THAT WAS

12  OUR INTENTION.  I WANTED TO STATE IT FOR THE RECORD.

13      THE COURT:  SURE.

14      MR. FETTEROLF:  YOUR HONOR, OUR MEDICAL FORENSIC IS IN

15  THE COURTROOM LISTENING TO TESTIMONY.

16      THE COURT:  I DON'T HAVE A PROBLEM WITH THE EXPERTS

17  LISTENING TO EACH OTHER'S TESTIMONY.

18      MR. FETTEROLF:  WANTED TO MAKE THAT CLEAR.

19      MS. MEYER:  WHO IS THAT, YOUR HONOR?

20      MR. FETTEROLF:  DR. JENNIFER HAMMERS.

21      THE COURT:  SO ARE WE READY TO RESUME WITH PETITIONER?

22      MS. MEYER:  YES.

23      THE COURT:  COME ON UP THEN, PLEASE.  WHENEVER YOU'RE

24  READY.

25      MS. MEYER:  THANK YOU, YOUR HONOR.

26  //

27  //

28  //

```
 1              LINDSEY HILL,
 2  CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND
 3  TESTIFIED AS FOLLOWS:
 4
 5              DIRECT EXAMINATION (RESUMED)
 6  BY MS. MEYER:
 7       Q    LINDSEY, WE LEFT OFF LATE YESTERDAY AFTERNOON WITH
 8  YOU DESCRIBING THE INCIDENT THAT OCCURRED ON MAY 15, MAY 16.
 9  DO YOU RECALL THE TIME THAT YOU LEFT TREVOR'S HOUSE ON MAY
10  16?
11       A    AROUND 8:30 A.M.
12       Q    THIS WAS A MONDAY; CORRECT?
13       A    A SUNDAY.
14       Q    AT THE TIME YOU LEFT TREVOR'S HOUSE, DID YOU SAY
15  ANYTHING TO ONE ANOTHER?
16       A    HE WOKE UP WHEN I WAS GETTING READY TO LEAVE.  AND
17  HE ASKED ME HOW I WAS FEELING THAT MORNING.  AND I SAID THAT
18  I WAS FINE.  AND HE WAS STILL BASICALLY ASLEEP.  SO THAT'S
19  WHEN I LEFT.
20       Q    WERE YOU ACTUALITY FINE?
21       A    NO.
22       Q    WHY DIDN'T YOU TELL HIM THE TRUTH?
23       A    I WAS FOCUSED ON LEAVING.  GETTING BACK IN MY CAR.
24  TRYING TO FIGURE OUT WHAT TO DO.  MAKING SURE I WAS OKAY TO
25  DRIVE.  I JUST WANTED TO GET OUT OF HIS HOUSE.
26       Q    WHEN YOU LEFT HIS HOUSE AT APPROXIMATELY 8:30 A.M.,
27  WHERE DID YOU GO?
28       A    I WENT TO A NEARBY STARBUCKS, AND I SAT IN THE
```

1  PARKING LOT TRYING TO FIGURE OUT WHAT TO DO.  I GOT COFFEE,

2  BECAUSE I HAD NOT -- BARELY SLEPT THE NIGHT BEFORE.  AND I

3  NEEDED CAFFEINE TO GO HOME.  I SAT IN MY CAR.  I TOOK PHOTOS

4  OF MY FACE.  AND I WAS DETERMINING WHETHER I WAS ABLE TO

5  DRIVE HOME.  AND AFTER SITTING IN THAT PARKING LOT, THAT'S

6  WHEN I LEFT TO DRIVE HOME FOR SAN DIEGO.

7      Q    WHEN YOU JUST TESTIFIED THAT YOU WERE TRYING TO

8  FIND OUT WHAT TO DO, WHAT WERE YOU TRYING TO FIND OUT?

9      A    IF I WAS EMOTIONALLY AND PHYSICALLY STABLE ENOUGH

10  TO DRIVE ALMOST TWO HOURS HOME.

11      Q    HOW DID YOU FEEL EMOTIONALLY AT THAT TIME?

12      A    I WAS IN SHOCK.  I REALLY HADN'T UNDERSTOOD WHAT

13  HAD HAPPENED TO ME, BECAUSE I WAS MISSING SO MANY PARTS WHEN

14  I WAS UNCONSCIOUS.  SO I WAS COMPLETELY IN SHOCK.  AND I WAS

15  TRYING TO PROCESS AND PUT TOGETHER THE PIECES OF WHAT

16  HAPPENED.  AND I JUST FELT VERY ASHAMED AND PANICKED.

17      Q    WHY DID YOU FEEL PANICKED?

18      A    I JUST DIDN'T KNOW WHAT TO DO OR WHO TO TELL --

19  WHAT TO TELL PEOPLE.  AND I WAS PANICKED ABOUT DRIVING HOME

20  SAFELY.

21      Q    WHY DID YOU TAKE PHOTOGRAPHS OF YOUR FACE AT THAT

22  TIME?

23      A    MY COUSIN KYLE HAD TEXTED ME IN THE MORNING ASKING

24  HOW I WAS DOING.  AND I WAS REALLY IN SHOCK WHEN I LOOKED AT

25  MY FACE AND I SAW THE SCRATCHES ON THE RIGHT SIDE OF MY FACE.

26  I SAW THE TWO BLACK EYES WERE DEVELOPING.  AND THAT MY LIP

27  WAS SWOLLEN.  MY JAW WAS SWOLLEN.  AND I WAS IN SHOCK.  AND

28  SO I TOOK THOSE PICTURES.  I TOOK ONE IN PARTICULAR TO SHOW

```
 1    MY COUSIN WHAT HAD HAPPENED, BECAUSE I NEEDED TO TALK TO
 2    SOMEBODY ABOUT IT.
 3         Q    WHY DID YOU FEEL YOU NEEDED TO TALK TO SOMEBODY
 4    ABOUT WHAT HAPPENED BETWEEN YOU AND TREVOR?
 5         A    IN THOSE MOMENTS IN SOBRIETY WHEN I FEEL LIKE I'M
 6    SLIPPING EMOTIONALLY OR MIGHT DO SOMETHING STUPID, I KNOW
 7    THAT I HAVE TO TALK ABOUT IT AS OPPOSED TO SHUTTING IT DOWN
 8    AND NOT DISCUSSING IT BECAUSE THAT'S WHERE I FALL ON MY FACE.
 9    SO MY COUSIN IS SOMEONE THAT I'VE BEEN CLOSE WITH MY ENTIRE
10    LIFE.  HE ASKED ME HOW IT WAS WITH TREVOR.  AND THAT'S WHY I
11    FELT SAFE TO TALK ABOUT WHAT HAD HAPPENED EVEN THOUGH I TRIED
12    TO DOWNPLAY IT.
13         Q    DID YOU CALL YOUR COUSIN AFTER YOU TOOK THE
14    PHOTOGRAPHS?
15         A    NO, WE JUST TEXTED.
16         Q    OKAY.  DID YOU TEXT BEFORE YOU TOOK THE
17    PHOTOGRAPHS?
18         A    YES.
19         Q    I'M GOING TO SHOW YOU EXHIBIT 8.  CAN YOU IDENTIFY
20    ON EXHIBIT 8, WHICH WERE THE PHOTOGRAPHS THAT YOU TOOK THAT
21    MORNING IN THE PARKING LOT WHILE YOU WERE IN YOUR CAR?  IF
22    YOU CAN JUST HOLD ON A SECOND.  I THINK THE JUDGE IS TRYING
23    TO LOCATE THE EXHIBIT.
24         THE COURT:  I DON'T LOOK AT THE EXHIBITS UNTIL THEY'RE
25    IN EVIDENCE.  SO GO RIGHT AHEAD.
26         MS. MEYER:  OKAY.
27         Q    BY MS. MEYER:  GO AHEAD.
28         A    IN MY CAR WHEN I WAS IN THAT PARKING LOT I TOOK
```

1    NUMBER 96, 97, AND 98.

2        Q    AND ARE EXHIBIT 8, BATES STAMPS 196, 197, AND 198

3    TRUE AND CORRECT COPIES OF THE PHOTOGRAPHS THAT YOU TOOK ON

4    THAT MORNING?

5        A    YES.

6        Q    AND DO THEY ACCURATELY DEPICT HOW YOU LOOKED THAT

7    MORNING?

8        A    YES.

9        Q    DID YOU DO ANYTHING TO YOUR FACE OR BODY PRIOR TO

10   TAKING THESE PHOTOGRAPHS?

11       A    NO.

12       Q    DID YOU SCRATCH YOURSELF?

13       A    NO.

14       Q    DID YOU HIT YOURSELF?

15       A    NO.

16       Q    WHEN YOU TOOK THE PHOTOGRAPHS, DID YOU TAKE IT FROM

17   YOUR CELL PHONE?

18       A    YES.

19       Q    AND DID YOU ALTER ANY OF THE SETTINGS ON THE CELL

20   PHONE WHEN YOU TOOK THESE PHOTOGRAPHS?

21       A    NO.

22       Q    DID YOU USE ANY FILTERS?

23       A    NO.

24       MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 8, 197,

25   198, AND 199 BE ADMITTED.

26       THE COURT:  ANY OBJECTIONS?

27       MS. HOLLEY:  NO.

28       MS. MEYER:  I'M SORRY IT WILL BE 196, -97, AND -98.

```
1        MS. HOLLEY:  NO OBJECTION.

2        THE COURT:  ALL RIGHT.  THEY ARE ADMITTED.

3        Q    BY MS. MEYER:  DURING THE INCIDENT, DO YOU RECALL

4   TREVOR SCRATCHING THE RIGHT SIDE OF YOUR FACE?

5        A    NO.

6        Q    DO YOU RECALL HIM SCRATCHING YOUR FACE AT ALL?

7        A    NO.

8        Q    AT APPROXIMATELY WHAT TIME DID YOU CONTACT

9   TREVOR -- I'M SORRY -- YOUR COUSIN KYLE?

10       A    I BELIEVE IT WAS -- I HAD SENT HIM THAT PICTURE

11  AROUND 10:00 TO 10:30 IS WHEN I SENT IT.

12       Q    AND WHEN YOU SAY YOU SENT HIM THAT PICTURE, WHAT

13  PICTURE ARE YOU REFERRING TO?

14       A    I SENT HIM THE PICTURE BATES STAMPED 196.

15       Q    I AM GOING TO SHOW YOU TEXT MESSAGES BETWEEN YOU

16  AND KYLE, WHICH ARE EXHIBIT 31.  IS EXHIBIT 31 TRUE AND

17  CORRECT COPIES OF TEXT MESSAGE EXCHANGES BETWEEN YOU AND YOUR

18  COUSIN KYLE?

19       A    YES.

20       Q    BEFORE ASKING YOU ABOUT THESE TEXT MESSAGES, HOW

21  WERE YOU FEELING PHYSICALLY WHEN YOU WERE IN THE CAR?

22       A    I WAS DISORIENTED.  I WAS IN SHOCK TRYING TO

23  PROCESS WHAT HAD HAPPENED TO ME.  AND I WAS SO SICK TO MY

24  STOMACH.  AND I HAD SO MUCH ANXIETY.  IT WAS HARD FOR ME TO

25  EVEN GET A THOUGHT OUT WHILE TEXTING.  I HAD THROWN UP ONCE

26  THAT MORNING IN MY CAR WHEN I WAS IN THE PARKING LOT.  MY

27  HEAD HURT REALLY BAD.

28            AND I WASN'T THINKING WHEN I WAS TEXTING.
```

```
1        Q    WHEN YOU SAY YOU VOMITED, DID YOU VOMIT IN THE CAR

2   OR OUTSIDE OF THE CAR?

3        A    IN A BAG INSIDE MY CAR.

4        Q    NOW, SHOWING YOU EXHIBIT 31, CAN YOU DIRECT US TO

5   THE BATES STAMP PAGE WHERE YOU SENT YOUR FIRST TEXT TO

6   KYLE?

7        A    YES, BATES STAMP 936.

8        Q    AND THE TEXT MESSAGE EXCHANGE ACTUALLY STARTS ON

9   WHAT PAGE?

10        A    YOU'RE REFERRING TO THE MORNING WHEN I LEFT

11   TREVOR'S HOUSE?

12        Q    YES.

13        A    936 IS WHEN IT STARTS.  AND HE SENDS THE FIRST TEXT

14   MESSAGE TO ME.

15        Q    AND HIS TEXTS ARE ON THE RIGHT SIDE OF THE PAGE IN

16   THE BLUE BOXES?

17        A    YES.

18        Q    AND YOURS ARE ON THE LEFT SIDE OF THE PAGE?

19        A    YES.

20        Q    SO HE SAYS TO YOU, "HOW ARE YOU DOING THERE DUDE?"

21        THE COURT:  I'LL STOP YOU COUNSEL.  IT'S NOT IN

22   EVIDENCE.  PLEASE DON'T READ FROM IT.

23        MS. MEYER:  OKAY.  APOLOGIZE.  YOUR HONOR, REQUEST THAT

24   EXHIBIT 31 BE ADMITTED INTO EVIDENCE.

25        THE COURT:  ANY OBJECTION?

26        MS. HOLLEY:  THIS IS JUST THE TEXT EXCHANGE THAT

27   MORNING?

28        MR. FETTEROLF:  ONE OF THOSE PAGES -- MAYBE IT'S A --
```

```
 1    YOU CAN'T REALLY READ IT.  I JUST WANT TO KNOW WHAT IT IS.
 2         MS. MEYER:  936.
 3         MS. HOLLEY:  NO OBJECTION.
 4         THE COURT:  IT IS RECEIVED.
 5         Q    BY MS. MEYER:  DIRECTING YOUR ATTENTION TO 936.  HE
 6    SAYS, "HOW ARE YOU DOING THERE DUDE?"  YOU SAY, "DUDE NOT
 7    GOOD."  HE SAYS, "WHAT HAPPENED?"  YOU SAID, "MY FACE IS
 8    PUFFED UP."  THEN HE SAYS, "WHAT THE FUCK LINDS?  I'LL KILL
 9    HIM."  THEN YOU SAY, "PLEASE DON'T SHOW ANYONE BUT LIKE HOLY
10    SHIT."  WHY DID YOU SAY TO HIM PLEASE DON'T SHOW THIS TO
11    ANYONE?
12         A    KYLE'S VERY CLOSE WITH MY FAMILY.  HE IS VERY CLOSE
13    WITH MY MOM, MY BROTHER.  AND I DIDN'T WANT HIM TO CONTACT
14    THEM AS I WAS JUST, YOU KNOW, SIX HOURS OUT OF GETTING BEAT
15    UP.  I WANTED TO BE ABLE TO PROCESS BEFORE I SAID ANYTHING TO
16    MY FAMILY.  AND THAT'S WHY I ASKED HIM NOT TO SAY ANYTHING.
17         Q    AT THIS POINT YOU HAD NOT SHARED WHAT HAD HAPPENED
18    WITH YOUR FAMILY?
19         A    NO.
20         Q    AND THEN A LITTLE DOWN THE LINE, YOU STATE -- WHEN
21    HE SAID, "WHAT THE FUCK IS HE THINKING," YOU SAID, "HE FELT
22    SO BAD.  I LITERALLY HAD NO IDEA IT WAS GOING TO BE THAT BAD.
23    LIKE I'M OKAY.  BUT HOLY SHIT."  WHEN YOU SAID HE FELT SO
24    BAD, WHO WERE YOU REFERRING TO?
25         A    TREVOR.
26         Q    AND DID YOU MEAN WHAT YOU SAID WHEN YOU TOLD KYLE
27    THAT TREVOR FELT BAD?
28         A    YES.
```

1    Q    AND DID YOU FEEL HE FELT BAD?

2    A    AT THE TIME, YES.

3    Q    AND DO YOU FEEL DIFFERENTLY NOW?

4    A    YES.

5    Q    WHY DO YOU FEEL DIFFERENTLY NOW?

6    A    I BELIEVE THAT HE WAS MANIPULATIVE DURING THAT

7    INITIAL ENCOUNTER.  AND IN HIS TEXTS AFTER I BELIEVED HE WAS

8    JUST TRYING TO GET ME TO NOT SAY ANYTHING.  BUT AT THE TIME I

9    WAS VERY CONFUSED AND TRYING TO PROCESS.  I DIDN'T KNOW WHAT

10   HAD HAPPENED TO ME.  SO AT THE TIME I FELT HE FELT BAD BASED

11   ON THE WAY HE ACTED AFTER WE STOPPED HAVING SEX.

12   Q    MEANING THE SECOND TIME THAT YOU WERE TOGETHER ON

13   MAY 15, 16?

14   A    YES.

15   Q    AND THEN KYLE SAYS, "OKAY.  OKAY.  I THOUGHT HE

16   ACTUALLY" -- STRIKE THAT.  "OKAY.  OKAY.  I THOUGHT HE LIKE

17   ACTUALLY GOT VIOLENT.  AS LONG AS IT WAS CONSENSUAL, I DON'T

18   HAVE TO KILL HIM."  AND THEN YOU STATE, "IT WAS CONSENSUAL.

19   BUT LIKE DIDN'T EXPECT TWO BLACK EYES.  LIKE HE DEF TOOK IT

20   TOO FAR DON'T YOU THINK.  LOL."

21       AT THE TIME DID YOU FEEL THAT THE ENTIRE -- WHAT

22   OCCURRED ON THE NIGHT OF MAY 15, MORNING OF MAY 16 WAS

23   CONSENSUAL?

24   A    NO.

25   Q    WHY DID YOU SAY THAT TO KYLE?

26   A    LIKE I SAID, I WAS IN SHOCK WHEN I WAS TEXTING.

27   AND WHAT I WAS TRYING TO COMMUNICATE TO HIM WAS IT BEGAN AS

28   CONSENSUAL SEX.  AND IT WAS TAKEN TOO FAR.

```
 1        Q    AND AT WHAT POINT DO YOU THINK IT WAS TAKEN TOO
 2   FAR?
 3        A    I LOST ANY CHANCE GIVING CONSENT AFTER THE FIRST
 4   TIME HE CHOKED ME.  CHOKED ME INTO UNCONSCIOUSNESS.
 5        Q    AFTER YOU EXCHANGED TEXT MESSAGES WITH KYLE, WHAT
 6   DID YOU DO NEXT?
 7        A    I CONTINUED DRIVING HOME TO SAN DIEGO.
 8        Q    AND DID YOU HAVE TO STOP AT ANY POINT IN TIME WHEN
 9   YOU WERE DRIVING HOME?
10        A    YES.  I HAD TO PULL OVER ON THE ROAD BECAUSE I --
11   MY EYES WERE CLOSING AND I COULD BARELY STAY AWAKE.  AND
12   BECAUSE MY ANXIETY AND MY HEADACHE.  WHEN I PULLED OVER THAT
13   ONE TIME I THREW UP AGAIN.  AND I HAD TO TRY TO REST MY EYES
14   AND TRY TO POWER THROUGH THE REST OF THE DRIVE HOME.
15        Q    LINDSEY, DO YOU RECALL APPROXIMATELY WHAT TIME YOU
16   STARTED TO DRIVE HOME WHEN YOU WERE IN THE PARKING LOT --
17   FROM WHEN YOU WERE IN THE PARKING LOT?
18        A    I'M GOING TO ESTIMATE AROUND 10:00 OR 10:30.
19        Q    DID YOU GO STRAIGHT HOME FROM THE TIME YOU DROVE
20   HOME FROM THE PARKING LOT?
21        A    YES.  I STOPPED BY MY HOUSE FOR A MINUTE AND
22   DROPPED MY STUFF OFF BEFORE GOING TO GET COFFEE AND GO TO MY
23   FRIEND MELY'S HOUSE.
24        Q    AND WHAT STUFF DID YOU DROP OFF AT YOUR HOUSE?
25        A    STUFF I HAD IN MY CAR, LIKE, CLOTHES.  AND I NEEDED
26   TO DO A COUPLE OF THINGS THERE FOR WORK AT THE OHANA HOUSE --
27   SOBER LIVING HOUSE.  I HAD TO CLEAN IT UP A LITTLE BIT.
28   THERE WAS A MEETING THERE LATER.  SO THAT'S WHAT I DID BEFORE
```

```
1    GOING TO GET COFFEE.

2         Q    WHERE DID YOU GET COFFEE?

3         A    AT BETTER BUZZ.

4         Q    HAD YOU COMMUNICATED WITH MELY PRIOR TO THE TIME

5    YOU WENT TO HER HOUSE?

6         A    YES, I HAD.  I HAD TEXTED HER THAT I SAW TREVOR AND

7    THAT MY FACE WAS MESSED UP.  AND THAT I WANTED TO COME OVER

8    SO I COULD PROCESS WITH HER.

9         Q    I AM GOING TO SHOW YOU AN EXHIBIT, WHICH ARE YOUR

10   TEXT MESSAGES WITH MELY.  AND THAT IS EXHIBIT 29.  DIRECTING

11   YOUR ATTENTION TO EXHIBIT 29, ARE THESE TRUE AND CORRECT

12   COPIES OF TEXT MESSAGES BETWEEN YOU AND MELY?

13        A    YES.

14        Q    CAN YOU IDENTIFY BY BATES STAMP WHICH TEXT MESSAGE

15   YOU WERE REFERRING TO WHEN YOU TEXTED HER ON MAY 16?

16        A    IT BEGINS ON BATES STAMP 567.

17        Q    UNTIL WHEN?

18        A    THAT CONVERSATION OF JUST SPECIFICALLY THAT DAY

19   ENDS ON 569.

20        Q    DO THOSE TEXT MESSAGES OR COPIES OF THOSE TEXT

21   MESSAGES ON PAGES 5, BATES STAMP 567 THROUGH 569 ACCURATELY

22   REFLECT ALL OF YOUR TEXT MESSAGES BETWEEN YOU AND MELY ON MAY

23   16?

24        A    YES.

25        Q    AND DID YOU DELETE ANY TEXT MESSAGES?

26        A    NO.

27        MS. MEYER:  YOUR HONOR, REQUEST EXHIBIT 29, BATES STAMP

28   567 THROUGH 569, BE ADMITTED.
```

```
 1        THE COURT:  ANY OBJECTION?

 2        MS. HOLLEY:  NO.

 3        THE COURT:  THEY ARE ADMITTED.

 4        Q    BY MS. MEYER:  AT 10:48 A.M. ON BATES STAMP 567,

 5   THERE IS A TEXT THAT SAYS, "NO CLUE.  CAN I FTU IN LIKE AN

 6   HOUR?"  IS THAT FACETIME?

 7        A    YES.

 8        Q    "I NEED TO PROCESS AND EXPLAIN WHY I HAVE BEEN SO

 9   SICK THE LAST THREE DAYS.  LIKE FUCK."  IS THAT A TEXT

10   MESSAGE FROM YOU TO MELY?

11        A    YES.

12        Q    SO YOURS ARE ON THE RIGHT HAND SIDE OF THE PAGE AND

13   MELY'S ARE ON THE LEFT?

14        A    YES.

15        Q    AND IS THAT THE FIRST TEXT MESSAGE THAT YOU SENT TO

16   MELY ON MAY 16?

17        A    YES.

18        Q    AND THEN YOU SAID I -- ON THE NEXT PAGE -- "I SAW

19   BAUER ON THURSDAY NIGHT.  MY FACE IS COMPLETELY FUCKED UP.

20   YOU ARE GOING TO BE THE FIRST PERSON I TELL SO IT HAS TO STAY

21   IN THE VAULT.  I JUST NEED TO PROCESS."  WHAT DID YOU MEAN BY

22   THAT?

23        A    WHICH TEXT MESSAGE ARE YOU REFERRING TO?  ALL OF

24   THEM.

25        Q    NO.  THE SECOND ONE.  THE SECOND ONE ON PAGE 568

26   WHEN YOU STATE --

27        A    OH, YEAH.  SO I WAS REFERRING TO WHEN I SAID,

28   "YOU'RE GOING TO BE THE FIRST PERSON I TELL," I WAS REFERRING
```

```
 1   TO -- KIND OF OUR CIRCLE.  OUR GROUP OF FRIENDS IN THE SAN
 2   DIEGO COMMUNITY.  SHE IS ONE OF MY BOSSES AT WORK.  SO WE
 3   HAVE A CIRCLE.  SO I WANTED TO COMMUNICATE TO HER THAT SHE
 4   WAS GOING BE TO ONE OF THE FIRST PEOPLE I TELL.  AND I AT
 5   THAT POINT STILL, LIKE I SAID, WAS PROCESSING.  AND I DIDN'T
 6   WANT HER TO SAY ANYTHING TO ANYONE.
 7        Q    SO THEN THERE ARE A COUPLE OF OTHER TEXT MESSAGES
 8   BETWEEN YOU.  AND THEN YOU SAY, "IT WAS JUST DURING SEX.
 9   LIKE IT WAS CONSENSUAL.  BUT IT GOT SO BAD IDK" -- WHICH IS I
10   DON'T KNOW; CORRECT?
11        A    YES.
12        Q    "WHAT EVEN HAPPENED.  I JUST FROZE.  I HAVE A
13   BUSTED LIP AND TWO BLACK EYES."  AND THEN SHE SAYS, WHAT?
14   OMG.  CALL ME AS SOON AS YOU CAN."  AGAIN, YOU'RE TELLING
15   SOMEBODY THAT IS CLOSE TO YOU THAT IT WAS CONSENSUAL.  DID
16   YOU FEEL IT WAS CONSENSUAL WHEN YOU WROTE THAT TO MELY?
17        A    NO.
18        Q    THEN WHY DID YOU TELL HER IT WAS CONSENSUAL?
19        A    I WANTED TO EXPLAIN, AGAIN, THAT IT HAPPENED DURING
20   SEX.  IT WAS INITIALLY CONSENSUAL.  AND THEN IT GOT BAD AND
21   WAS TAKEN TOO FAR.
22        Q    SO WHEN YOU SAID, "BUT IT GOT SO BAD I DON'T KNOW,"
23   WHAT DID YOU MEAN BY THAT?
24        A    THAT I WAS TRYING TO PROCESS WHAT EVEN HAD JUST
25   HAPPENED TO ME.  I DIDN'T UNDERSTAND WHERE CERTAIN INJURIES
26   CAME FROM.  THAT'S WHAT I MEAN BY "GOT SO BAD."  AND
27   REFERRING TO WHERE I SAY I FROZE AND I FELT LIKE MY SOUL LEFT
28   MY BODY AND COULDN'T FIGHT BACK.
```

```
1       Q    AFTER YOU AND MELY EXCHANGED THESE TEXT MESSAGES,
2   DID YOU THEN CALL MELY?
3       A    YES, I DID.
4       Q    AND WHAT DID YOU SAY TO MELY DURING THAT
5   CONVERSATION?
6       A    I SHOWED HER MY FACE ON FACETIME.  AND I HAD
7   INITIALLY TOLD HER THAT IT HAPPENED ON THURSDAY.  AND I LIED
8   TO HER BECAUSE SHE IS ONE OF MY BOSSES AT WORK.  AND I HAD
9   CALLED OUT OF WORK TO BE GOING TO AND FROM L.A. THAT WEEKEND.
10  AND I WAS GOING TO WAIT UNTIL I HAD GOT THERE IN PERSON TO
11  TELL HER THAT.  I SHOWED HER MY FACE.  AND I SAID THAT I HAD
12  NO IDEA WHAT HAPPENED.  AND SHE SAID TO COME OVER SO SHE
13  COULD LOOK AT MY BODY AND TRY TO HELP ME FIGURE OUT WHAT HAD
14  HAPPENED TO ME.
15      Q    AND WHAT TIME DID YOU ACTUALLY ARRIVE AT HER
16  HOUSE?
17      A    AROUND 1:00 P.M.
18      Q    AND WHAT TIME DID YOU ARRIVE AT YOUR HOME THAT
19  MORNING AT THE OHANA HOUSE?
20      A    AROUND NOON.
21      Q    SO BETWEEN NOON AND 1:00 O'CLOCK YOU WERE DOING
22  THINGS AT THE OHANA HOUSE.  YOU WENT TO GET COFFEE.  AND THEN
23  YOU WENT TO MELY'S?
24      A    YES.
25      Q    DID YOU DO ANYTHING ELSE DURING THAT TIME?
26      A    THE ONLY OTHER THING THAT I DID WAS GET GAS BY THE
27  STARBUCKS.
28      Q    YOU SAID STARBUCKS.  IS IT STARBUCKS?
```

187

1     A    I'M SORRY.  BETTER BUZZ.

2     Q    AND WHEN YOU WERE AT THE OHANA HOUSE BEFORE YOU

3  WENT TO MELY'S, DID YOU TAKE ANYMORE PHOTOGRAPHS OF

4  YOURSELF?

5     A    I WOULD NEED TO LOOK AT THE PHOTOS TO REMEMBER WHEN

6  EXACTLY I TOOK THEM.  THAT SECTION OF TIME IS A LITTLE BIT

7  BLURRY.

8     Q    LET'S GO ON.  AND THEN WE'LL SEE IF YOU DID.  SO

9  WHAT HAPPENED WHEN YOU ARRIVED -- STRIKE THAT.

10         HOW FAR WAS MELY LIVING FROM YOU AT THE TIME?

11     A    SHE LIVED ONE STREET DOWN FROM ME.  SO IT WAS LESS

12  THAN A FIVE MINUTE WALK.

13     Q    SO YOU WALKED TO HER HOUSE?

14     A    NO, I DROVE.  BUT JUST EXPLAINING HOW CLOSE IT WAS.

15     Q    AND WHEN YOU ARRIVED AT HER HOUSE, WHAT DID YOU

16  DO?

17     A    I WAS VERY EMOTIONAL.  AND SHE GOT EMOTIONAL.  AND

18  I WAS VERY DISORIENTED AT THAT POINT.  MY HEAD WAS THROBBING.

19  I COULDN'T REALLY GET OUT WHAT I WAS TRYING TO SAY.  BUT SHE

20  TOLD ME THAT SHE WANTED TO LOOK AT MY BODY.  AND THAT'S WHEN

21  SHE TOLD ME I HAD BRUISES BEHIND MY EARS.  I SHOWED HER MY

22  VAGINA.  THAT'S THE FIRST TIME I LOOKED AT MY VAGINA AND SHE

23  WAS HORRIFIED.  AND TOLD ME THAT I NEEDED TO GET MEDICAL

24  TREATMENT AND REPORT IT.

25     Q    WHEN YOU SAID THAT YOU GOT EMOTIONAL, HOW DID YOU

26  GET EMOTIONAL?

27     A    I WAS TEARING UP.  BECAUSE I JUST KEPT REPEATING

28  THAT I DIDN'T KNOW WHAT HAD HAPPENED TO ME.

```
 1        Q    AT ANY POINT IN TIME WHEN YOU WERE AT MELY'S HOUSE,
 2   DID YOU TELL HER IT WAS CONSENSUAL?
 3        A    NO.
 4        Q    DID YOU TELL HER THAT TREVOR HAD DONE ANYTHING THAT
 5   WAS NOT CONSENSUAL?
 6        A    YES.
 7        Q    WHAT DID YOU TELL HER HE DID?
 8        A    I TOLD HER THE WHOLE STORY THAT I PREVIOUSLY
 9   TESTIFIED THAT IT BEGAN WITH A CONSENSUAL SEX AGREEMENT --
10        MS. HOLLEY:  YOUR HONOR, I'LL OBJECT AS HEARSAY.  AND
11   CUMULATIVE.
12        THE COURT:  IT IS CUMULATIVE.
13        Q    BY MS. MEYER:  WHEN YOU SAID YOU WERE DISORIENTED,
14   CAN YOU DESCRIBE WHAT YOU WERE FEELING?
15        A    YES.  I WAS JUST REALLY NAUSEOUS AND OUT OF IT.  I
16   COULDN'T FOCUS ON WHAT SHE WAS SAYING TO ME.  IT WAS VERY
17   HARD TO KEEP MY EYES OPEN.  A PART OF THAT WAS THAT, YOU
18   KNOW, I HADN'T SLEPT.  BUT I JUST COULD BARELY GET SENTENCES
19   OUT ABOUT WHAT HAD HAPPENED.
20        Q    LINDSEY, DID YOU LOOK AT YOURSELF IN THE MIRROR AT
21   MELY'S HOUSE?
22        A    YES.
23        Q    AND DID YOU LOOK AT YOUR FACE?
24        A    YES.
25        Q    AND WHAT DID YOU SEE?
26        A    THAT THE BLACK EYES WERE GETTING INCREASINGLY
27   DARKER.  AND THAT THE SCRATCHES ON MY FACE WERE EXTREMELY
28   IRRITATED AND RED.  AND THAT MY JAW WAS JUTTING OUT ON THE
```

```
1    LEFT SIDE OF MY FACE.  AND THAT IT WAS SO SWOLLEN I DIDN'T
2    EVEN LOOK LIKE MYSELF.  MY WHOLE FACE.
3         Q    WERE YOUR EYES BLACK AND BLUE AROUND YOUR ENTIRE
4    EYE OR A CERTAIN PLACE ON YOUR -- AROUND YOUR EYE?
5         A    AT THAT POINT THEY WERE JUST STARTING TO GET BLACK
6    AND BLUE, ALMOST REDDISH, JUST RIGHT UNDERNEATH MY EYES.
7         Q    DID YOU LOOK AT ANY OTHER PART OF YOUR BODY IN A
8    MIRROR?
9         A    YES.  I LOOKED AT MY BUTT CHEEK, AND MY VAGINA, AND
10   THE BRUISES BEHIND MY EARS.
11        Q    LET'S START WITH THE BRUISES BEHIND YOUR EARS.
12   WHAT DID YOU OBSERVE?
13        A    THAT THERE WAS A REALLY -- THERE WAS DARK SPOTS
14   RIGHT KIND OF AT THE BASE OF MY SKULL (INDICATING).  AND THAT
15   THEY WERE THE SIZE MAYBE OF A THUMB OR A QUARTER.  WHAT WAS
16   THE QUESTION?  SORRY.
17        Q    DESCRIBE THE BRUISES BEHIND YOUR EAR.
18        A    THAT'S JUST WHAT I NOTICED.
19        Q    AND DID YOU LOOK -- AND WHEN YOU LOOKED AT YOUR
20   BUTTOCKS IN THE MIRROR, WHAT DID YOU SEE?
21        A    I SAW A BUNCH OF LITTLE SPORADICALLY PLACED TINY
22   DARK BRUISES ALL OVER MY BUTT.  ABOUT TEN DIFFERENT LITTLE
23   ONES.  AND THEN ON THE OPPOSITE BUTT CHEEK THERE WAS ONE
24   LITTLE TINY ONE.  AND ALMOST CLOSE TO MY HIP THERE WAS
25   ANOTHER BRUISE.
26        Q    AND DID YOU LOOK AT YOUR VAGINA OR THE AREA AROUND
27   YOUR VAGINA AT MELY'S HOUSE?
28        A    YES.
```

```
1        Q     WHAT DID YOU SEE?

2        A     THAT BRUISE WAS BLACK.

3        Q     I'M SORRY.  I DIDN'T HEAR WHAT YOU SAID.

4        A     I SAID THAT BRUISE WAS BLACK.  AND IT STRETCHED

5   FROM THE TOP OF MY VAGINA PRETTY MUCH ALL THE WAY DOWN.

6   YEAH.

7        Q     WAS YOUR VAGINA BLACK ON THE OUTSIDE?

8        A     YES.

9        Q     DID YOU HAPPEN TO LOOK IN THE INSIDE OF YOUR

10  VAGINA?

11       A     NO.

12       Q     DID YOU LOOK AT YOUR MOUTH INSIDE AT ALL?

13       A     YES, I DID.

14       Q     AND WHAT DID THAT LOOK LIKE?

15       A     WHEN I PULLED DOWN MY LIP, THE SIDE WHERE MY JAW

16  GOT PUNCHED, MY GUMS WERE BLACK, ALSO, IN ONE VERY BIG SPOT.

17       Q     HOW WERE YOU FEELING WHEN YOU SAW THE INJURIES ON

18  YOUR BODY?

19       A     I WAS JUST, ONE, GRATEFUL I MADE IT OUT OF THERE.

20  AND THAT I WAS OKAY.  AND I WAS SO ASHAMED WAS THE BIGGEST

21  ONE.  AND I WAS WORRIED ABOUT MY HEAD, BECAUSE I WAS

22  INCREASINGLY MORE DISORIENTED AND OUT OF IT.  BUT OVERALL I

23  WAS JUST IN SHOCK, BECAUSE I HAD A LOT OF THINGS THAT HAD

24  SHOWN UP ON MY BODY THAT I HAD NO IDEA HOW THEY GOT THERE.

25       Q     WHY DIDN'T YOU SEEK MEDICAL ATTENTION BEFORE GOING

26  TO MELY'S?

27       A     I WAS ONE HUNDRED PERCENT CONVINCED AT THAT POINT

28  THAT I WAS NOT GOING TO TELL ANYONE.  AND MY SYMPTOMS WERE
```

```
 1   THERE.  BUT ESPECIALLY WHEN I WAS DRIVING HOME.  I HADN'T
 2   SEEN MY VAGINA, MY GUMS, MY BUTT.  SO I DIDN'T KNOW THE
 3   SEVERITY OF THE INJURIES WHEN I WAS DRIVING HOME.  I DIDN'T
 4   WANT TO TELL ANYONE BECAUSE I WAS EMBARRASSED.  AND IT WASN'T
 5   UNTIL LATER THAT I REALLY KNEW I NEEDED MEDICAL HELP.
 6        Q    AND AT SOME POINT DID YOU LEAVE MELY'S HOUSE?
 7        A    YES, I DID.
 8        Q    AND DO YOU REMEMBER APPROXIMATELY WHAT TIME YOU
 9   LEFT MELY'S?
10        A    I BELIEVE IT WAS AROUND -- IT WAS EARLY EVENING.
11   5:00 P.M. I WENT BACK TO MY HOUSE AND WENT TO SLEEP.
12        Q    AND WHAT, IF ANYTHING, DID YOU AND MELY DO WHEN YOU
13   WERE THERE THOSE APPROXIMATE FOUR HOURS?
14        A    SHE WAS JUST THERE TO SUPPORT ME.  AND I TOLD HER
15   THE WHOLE STORY.  WE WATCHED TV.  AND IT WAS EXACTLY WHAT I
16   NEEDED IN THAT MOMENT, FOR SOMEONE TO JUST BE WITH ME.  AS I
17   MENTIONED, I JUST -- I KNOW MYSELF.  AND IF I DON'T TALK TO
18   ANYONE ABOUT SOMETHING PAINFUL LIKE THAT, I FALL ON MY FACE.
19   AND I KNEW I HAD TO BE WITH MELY.  AS MUCH AS I WANTED TO
20   JUST CURL UP AND SLEEP, I NEEDED TO BE ABLE TO PROCESS AND
21   LOOK AT MY BODY WITH SOMEONE ELSE SO I DIDN'T HAVE TO DO IT
22   ALONE.  AND SHE WAS JUST THERE TO SIT IN BED WITH ME AND
23   SUPPORT ME.
24        Q    YOU STATED THAT WHEN YOU WENT HOME YOU WENT TO
25   SLEEP.  WHAT TIME DID YOU GO TO SLEEP?
26        A    THAT'S REALLY WHEN I -- I MEAN, PROBABLY -- I WAS
27   TRYING TO DO SOME WORK FOR SOCIAL MEDIA AT THAT POINT.  SO
28   MAYBE 6:30, 7:00 I FELL ASLEEP.
```

```
1        Q    AND WHEN YOU WOKE UP THE NEXT MORNING, DID YOU --
2   STRIKE THAT.  WHAT DID YOU DO?
3        A    I WOKE UP AND I LOOKED AT MYSELF IN THE MIRROR.  MY
4   FACE WAS MORE SWOLLEN.  MY INJURIES WERE DARKER.  THE BRUISE
5   GOT WORSE.
6        Q    AND WHAT DID YOU DO AFTER YOU OBSERVED THAT YOUR
7   INJURIES HAD GOTTEN WORSE?
8        A    I TEXTED TREVOR A PICTURE OF MY FACE, BECAUSE I
9   WANTED HIM TO SEE WHAT HE DID TO ME.  AND I -- THAT'S WHEN I
10  TEXTED MY SPONSOR THAT NEXT DAY.  I NEEDED TO TELL HER, LISA.
11  AND THAT'S WHEN I WAS THROWING UP IN THE MORNING.  AND I KNEW
12  THAT I NEEDED TO GO GET CHECKED, BECAUSE I THOUGHT I HAD SOME
13  KIND OF CONCUSSION.
14       Q    WHAT WAS THE REASON WHY YOU TEXTED TREVOR A
15  PHOTOGRAPH OF YOUR FACE?
16       A    HE DIDN'T REACH OUT THAT WHOLE DAY AFTER I LEFT THE
17  PREVIOUS DAY.  AND I COULD NOT BELIEVE WHAT MY FACE LOOKED
18  LIKE.  I WAS CONFUSED HOW IT HAD GOTTEN THAT BAD.  I JUST
19  WANTED HIM TO ACKNOWLEDGE THAT HE HAD DONE THAT TO ME.
20       Q    AND WHY DID YOU WANT TREVOR TO ACKNOWLEDGE THAT HE
21  HAD DONE THAT TO YOU?
22       A    BECAUSE I WANTED TO KNOW WHAT HAPPENED.
23       Q    DID YOUR INJURIES LOOK WORSE WHEN YOU WOKE UP THAT
24  MORNING?
25       A    YES.
26       Q    AND WHAT WAS THE DATE?
27       A    MAY 17TH.
28       Q    NOW, DIRECTING YOUR ATTENTION TO EXHIBIT 2, BATES
```

1   STAMP 90.  IS THIS THE TEXT MESSAGE WITH THE PHOTOGRAPH THAT

2   YOU SENT TO TREVOR THAT MORNING?

3        A    YES.

4        MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 2, BATES

5   STAMP 90 BE ADMITTED, IF THAT HASN'T BEEN MOVED IN YET.

6        THE COURT:  I THINK 2 IS --

7        MS. OLSON:  ADMITTED.

8        THE COURT:  TWO HAS BEEN ADMITTED.

9        THE CLERK:  YES, TWO HAS.

10       Q    BY MS. MEYER:  AND YOU STATE UNDER THE PHOTOGRAPH

11  ON BATES STAMP 90, "DEFINITELY CAN'T HAVE CRAZY EYES WHEN

12  THEY ARE BOTH BLACK."  WHAT DID YOU MEAN BY THAT?

13       A    THE PREVIOUS NIGHT TREVOR HAD MADE KIND OF A

14  DEGRADING JOKING COMMENT ABOUT ME HAVING CRAZY EYES.  SO I

15  SENT THAT TEXT IN A PASSIVE AGGRESSIVE MANNER.

16       Q    AND THEN TREVOR SAYS IN THE BLUE BOX, "DAMN, GIRL.

17  U OKAY," HOW DID YOU FEEL WHEN HE SENT YOU THAT TEXT

18  MESSAGE?

19       A    I GOT REALLY ANGRY WHEN HE SENT ME THAT TEXT.

20       Q    WHY?

21       A    BECAUSE IT WASN'T HIM ACKNOWLEDGING ANYTHING THAT

22  HE DID TO ME.  AND IT REMINDED ME OF THE STORY THAT HE TOLD

23  ME OF THE GIRL WHO SENT HIM A PICTURE --

24       MS. HOLLEY:  OBJECTION.  NONRESPONSIVE.

25       THE COURT:  OVERRULED.  IT IS RESPONSIVE.  YOU MAY

26  COMPLETE YOUR ANSWER.

27       THE WITNESS:  IT REMINDED ME OF THE TIME HE SAID A GIRL

28  SENT HIM A PICTURE SAYING, "LOOK, WHAT YOU DID TO ME."  AND

```
 1    HE PLAYED IT OFF LIKE HE HAD DONE NOTHING.  IT REMINDED ME
 2    EXACTLY OF THAT.  AND HE WASN'T CARING OR KIND.
 3         Q    BY MS. MEYER:  THE NEXT TEXT MESSAGE ON BATES STAMP
 4    91, YOU STATE, "NO, I'M NOT.  I HAD TO GO TO URGENT CARE FOR
 5    A CONCUSSION.  AND THEN THEY MADE ME GET THREE CT'S."  SO DID
 6    YOU SEND HIM THIS TEXT MESSAGE AFTER YOU WENT TO URGENT
 7    CARE?
 8         A    YES, I FIRST WENT TO URGENT CARE.  AND THEN I WENT
 9    TO THE HOSPITAL BECAUSE URGENT CARE TOLD ME THEY COULD NOT
10    DEAL WITH THE KIND OF TRAUMA THAT WAS ON MY BODY.
11         Q    APPROXIMATELY WHAT TIME ON MAY 17 DID YOU GO TO
12    URGENT CARE?
13         A    I THINK AROUND 3:30, 4:00 P.M.
14         Q    AND WHY DID YOU DECIDE TO GO TO URGENT CARE AT THAT
15    TIME?
16         A    IT WAS AT THAT POINT THAT I HAD REALLY FELT LIKE
17    SOMETHING WAS REALLY WRONG WITH ME.  SO I WANTED TO GO TO
18    URGENT CARE, BECAUSE I DIDN'T THINK I WOULD HAVE TO TELL A
19    WHOLE LOT OF PEOPLE MORE SO THAN JUST GOING STRAIGHT TO THE
20    HOSPITAL.  THE HOSPITAL WOULD HAVE BEEN A BIGGER SCENE.  SO I
21    WAS TRYING TO BE DISCREET AND GO TO URGENT CARE FIRST, BUT
22    THEY SENT ME AWAY TO GO TO THE E.R.
23         Q    WHAT WAS THE NAME OF THE URGENT CARE FACILITY THAT
24    YOU WENT TO?
25         A    AMERICAN FAMILY CARE IN MISSION VALLEY.
26         Q    AND WHAT TIME -- STRIKE THAT.  WHERE DID YOU GO
27    FROM THE URGENT CARE FACILITY?
28         A    I DROVE MYSELF TO ALVARADO MEDICAL CENTER BECAUSE
```

1   THEY TOLD ME TO GO TO THE E.R.

2        Q    AND HOW FAR AWAY WAS ALVARADO MEDICAL CENTER FROM

3   THE URGENT CARE?

4        A    ABOUT A TEN, FIFTEEN MINUTE DRIVE.

5        Q    WERE YOU HAVING DIFFICULTY DRIVING THAT DAY?

6        A    YES.

7        Q    AND EXPLAIN HOW DRIVING WAS DIFFICULT FOR YOU?

8        A    I WAS -- THE MOST CONCERNING PART WAS I WAS HAVING

9   TROUBLE STAYING AWAKE AND BEING RESPONSIVE.  I PROBABLY

10  SHOULDN'T HAVE DRIVEN, BUT MELY WAS AT WORK AND MY SPONSOR

11  WAS IN ORANGE COUNTY.  AND I JUST THOUGHT I COULD HANDLE IT.

12  I WASN'T THINKING CLEARLY OBVIOUSLY.

13       Q    SO WHAT HAPPENED WHEN YOU GOT TO ALVARADO EMERGENCY

14  ROOM?

15       A    THEY CHECKED ME IN.  DURING INTAKE, I BELIEVE, I

16  WROTE DOWN I HAD POSSIBLE CONCUSSION AND BLACK EYES.  THEY

17  IMMEDIATELY CHECKED ME IN.  AND THEY SAID BECAUSE OF WHAT

18  THEY OBSERVED, THEY WANTED TO RUN THREE CT'S.  ONE ON MY

19  NECK.  ONE ON MY FACE.  AND ONE ON MY BRAIN.

20       Q    YOU'RE NOT A MEDICAL DOCTOR OR ANYTHING TO DO WITH

21  THE MEDICAL PROCESSION; CORRECT?

22       A    NO.

23       Q    DID YOU DIAGNOSE YOURSELF AT THAT POINT AS HAVING A

24  CONCUSSION?

25       A    NO.

26       Q    DID YOU KNOW WHAT THE SYMPTOMS OF A CONCUSSION

27  WERE?

28       A    YES.

```
 1        Q    AND HOW DID YOU KNOW THAT?
 2        A    I GOT A CONCUSSION WHEN I WAS 12.  AND IT WAS
 3   SIMILAR TO WHAT I EXPERIENCED THEN.
 4        Q    AND AFTER YOU HAD THE C.T. SCANS, DID YOU SPEAK TO
 5   LAW ENFORCEMENT AT ALVARADO HOSPITAL?
 6        A    YES.  I DIDN'T WANT TO, BUT A SOCIAL WORKER CAME IN
 7   BETWEEN THE CT'S.  AND SHE WAS ABLE TO GET ME TO TELL HER
 8   WHAT HAPPENED.  EVEN THOUGH I WAS DOWNPLAYING IT AT FIRST, I
 9   WAS TERRIFIED.  I SAID I DIDN'T WANT TO TALK TO THE POLICE.
10   I DIDN'T WANT TO PRESS CHARGES.  BUT SHE TOLD ME IT'S THE
11   HOSPITAL'S POLICY THAT BECAUSE OF THE INJURIES THEY OBSERVED
12   THAT THEY HAD TO CALL THE POLICE.  SO I DIDN'T REALLY HAVE A
13   CHOICE BUT TO TALK TO THEM.
14        Q    DID YOU DISCLOSE WHO ASSAULTED YOU?
15        A    AT FIRST I REFUSED TO SAY HIS NAME.  I SAID HE WAS
16   A BASEBALL PLAYER.  AT THAT POINT I WAS SO STRESSED AND
17   ANXIOUS, BUT I DID -- THEY EVENTUALLY GOT ME TO SAY IT WAS
18   TREVOR BAUER.
19        Q    LINDSEY, WHY WERE YOU RELUCTANT TO DISCLOSE HIS
20   NAME TO THE SOCIAL WORKER?
21        A    BECAUSE I KNEW HOW IT WAS GOING TO GO.  I KNEW HOW
22   THAT WORKS.  IT'S PUBLICITY.  THE SITUATION, YOU KNOW.
23   IMMEDIATELY PUTS ME -- PAINTS ME AS A SLUT.  AND I DIDN'T
24   WANT THIS STORY ANYWHERE.  I DIDN'T -- I WAS SO EMBARRASSED
25   ABOUT ALL OF IT.
26        Q    WHAT HAPPENED WHEN THE POLICE ARRIVED?
27        A    THEY CAME IN.  AND THEY QUESTIONED ME A LOT ABOUT
28   WHAT HAD HAPPENED.  IT'S HARD FOR ME -- THAT'S REALLY WHEN I
```

```
1  WAS JUST OUT OF IT AND SO STRESSED.  I HAD MY PARENTS, MY
2  SPONSOR, MY FRIEND COMING IN AND OUT OF MY ROOM ONE PERSON AT
3  A TIME.  AND THEN THE POLICE CAME IN.  BUT I FELT LIKE I HAD
4  NO CHOICE BUT TO EXPLAIN WHAT HAPPENED AS BEST I COULD IN THE
5  MENTAL STATE I WAS IN.
6       Q    LINDSEY, WHY DID YOU FEEL LIKE A SLUT?
7       A    BECAUSE OF THE SEXUAL NATURE OF THE STORY.  I
8  REMEMBER THINKING, YOU KNOW, ANYONE THAT I WOULD TELL THIS TO
9  IS GOING TO SAY SHE ASKED FOR IT.
10      Q    DID YOU ASK FOR IT?
11      A    NO.
12      Q    AT WHAT POINT DID YOU CONTACT YOUR PARENTS?
13      A    I DIDN'T CONTACT MY PARENTS.  MY SPONSOR GOT IN
14 TOUCH WITH THEM.  I'M NOT SURE WHO CALLED MY DAD FIRST.  BUT
15 SOMEONE CALLED MY DAD.
16      Q    AND WHEN DID YOU FIRST SEE YOUR PARENTS?
17      A    ABOUT AN HOUR AFTER I GOT TO THE HOSPITAL.
18      Q    AND DID THEY BOTH COME IN AT THE SAME TIME?
19      A    NO.  BECAUSE OF COVID, ONLY ONE PERSON WAS ALLOWED
20 IN AT A TIME TO THE ROOM.
21      Q    WHO DID YOU SEE FIRST?
22      A    MY DAD.
23      Q    WHAT WAS YOUR REACTION WHEN YOU SAW YOUR DAD?
24      A    HE WAS VERY EMOTIONAL.  AND I WAS APOLOGIZING TO
25 HIM, BECAUSE I KNEW THAT THIS AFFECTS HIS CAREER.  HOW PEOPLE
26 VIEW HIM.  BUT HE WAS VERY SUPPORTIVE.
27      Q    HOW LONG WERE YOU AT ALVARADO HOSPITAL FOR?
28      A    I WAS THERE UNTIL ABOUT 4:00 P.M. -- OR 4:00 A.M.
```

```
 1   SORRY.

 2        Q    SO IT WOULD HAVE BEEN MAY 18TH AT THIS POINT?

 3        A    YES.

 4        Q    AND WHERE DID YOU GO FROM ALVARADO HOSPITAL?

 5        A    I WAS TRANSPORTED BY A SAN DIEGO POLICE OFFICER TO

 6   PALOMAR -- I DON'T KNOW THE NAME OF THE ACTUAL HOSPITAL.  BUT

 7   I DON'T KNOW IF IT'S SCRIPPS PALOMAR.  BUT THE SART FACILITY.

 8        Q    AND THE SART FACILITY WAS AT PALOMAR?

 9        A    YES.

10        Q    AND THE POLICE OFFICERS DROVE YOU THERE?

11        A    YES.  THEY ALSO MADE ME STOP AT MY RESIDENCE ON THE

12   WAY TO GET THE CLOTHES I WAS WEARING THE NIGHT I WAS WITH

13   TREVOR.

14        Q    DID YOU TURN OVER THE CLOTHES?

15        A    YES.

16        Q    AT THIS POINT HAD YOU SPOKEN AT ALL EITHER BY

17   TELEPHONE OR IN WRITING WITH TREVOR?

18        A    YES.

19        Q    AND HOW DID YOU COMMUNICATE WITH HIM?

20        A    HE -- ONCE I SAID I WAS IN THE HOSPITAL, HE

21   IMMEDIATELY REQUESTED THAT I CALL HIM.  AND HE WAS TEXTING

22   ME.  AND I WAS TEXTING, BACK BECAUSE I WAS TRYING TO

23   DE-ESCALATE THE SITUATION.  AND I WAS TERRIFIED.  THE COPS

24   WERE INVOLVED.  I WAS NERVOUS.  I WAS PANICKING.  SO I

25   REPLIED TO WHAT HE WAS SAYING.  HE CALLED AND LEFT ME A

26   VOICEMAIL.

27        Q    WHAT HOSPITAL WERE YOU IN WHEN YOU TEXTED TREVOR?

28        A    ALVARADO.
```

```
1        Q    AND WAS THIS STILL MAY 17 WHEN YOU TEXTED HIM?

2        A    YES.

3        Q    SO I'D LIKE TO SHOW YOU EXHIBIT 2, BATES STAMP

4   STARTING AT 91.  STARTING ON BATES STAMP 91, ARE THESE THE

5   TEXT MESSAGES THAT YOU EXCHANGED WITH TREVOR WHEN YOU WERE AT

6   THE ALVARADO HOSPITAL?

7        A    YES.

8        Q    YOU STATE ON BATES STAMP 91, "YES, HOW DID IT GET

9   THIS BAD?  LIKE WHAT HAPPENED?"  AND THEN HE SAYS, "DO YOU

10  NOT REMEMBER ANYTHING?"  AND THEN YOU SAY, "NO OF COURSE I

11  DO.  JUST NOT WHEN I WENT UNCONSCIOUS."  AND DID HE EVER

12  EXPLAIN TO YOU WHAT HAPPENED WHEN YOU WERE UNCONSCIOUS?

13       A    NO.  ALL HE TOLD ME WAS HE PUNCHED ME IN THE

14  BUTT.

15       Q    NOW, ON BATES STAMP 92, YOU STATE, "SORRY.  JUST

16  SAW YOU CALLED.  BUT YES THEY ARE STILL IN HERE.  I WILL TRY

17  TO CALL SOON."  WHO WAS THE "THEY" THAT YOU WERE REFERRING

18  TO?

19       A    THE SOCIAL WORKER AND THE DOCTORS.

20       Q    SO YOU HAD TOLD TREVOR THAT YOU WERE BEING SEEN BY

21  SOCIAL WORKERS AND DOCTORS; CORRECT?

22       A    NOT A SOCIAL WORKER.  JUST I HAD MENTIONED THE

23  DOCTORS.

24       Q    DID TREVOR ASK YOU WHETHER YOU HAD DISCLOSED HIS

25  NAME TO ANYONE AT THE HOSPITAL?

26       A    NO.

27       Q    AND DID YOU VOLUNTEER THAT YOU HAD?

28       A    NO.
```

1      Q    AND THEN HE SAYS, "OH OKAY.  PLEASE DO," WITH A

2   HEART EMOJI.  AND THEN NEXT TWO HEART EMOJIS.  HE SAYS, "WISH

3   I COULD HOLD YOU RIGHT NOW AND PLAY WITH YOUR HAIR."  AND

4   THEN YOU SENT HIM A PHOTOGRAPH OF YOURSELF FROM THE HOSPITAL

5   BED?

6      A    YES.

7      Q    LINDSEY, WHY DID YOU DO THAT?

8      A    I WAS CONFUSED ON IF HE REALLY CARED OR NOT OR HE

9   WAS TRYING TO GET ME TO NOT SAY ANYTHING.  AND I SENT THAT

10  PICTURE -- ONE, I WANTED HIM TO SEE ME LAYING IN A HOSPITAL

11  BED FOR HIMSELF.  AND, TWO, I WANTED TO DE-ESCALATE THE

12  SITUATION BECAUSE HE WAS CALLING ME.  AND, YOU KNOW, I HAD A

13  LOT GOING ON AROUND ME.  I JUST WANTED TO DE-ESCALATE THE

14  SITUATION AND STOP THE CONVERSATION SO HE WOULD JUST LEAVE IT

15  ALONE.

16     Q    I DIDN'T HEAR YOUR LAST --

17     A    I JUST SAID I WANTED TO DE-ESCALATE THE SITUATION.

18  YOU KNOW, PRETEND IT'S FINE.  AND JUST GET HIM TO SEE THAT I

19  WAS FINE SO HE WOULDN'T -- WOULD STOP TEXTING AND CALLING.

20     Q    WHEN YOU ARRIVED AT ALVARADO HOSPITAL, WHAT

21  HAPPENED?

22     A    WHEN I ARRIVED?

23     Q    YES.  OH, PALOMAR.  SORRY.

24     A    YEAH.  AT THAT POINT IT WAS 4:00 A.M.  I HAD BEEN

25  UP ALL NIGHT.  AND I -- MY HEAD WAS HURTING.  I HAD BARELY

26  EATEN THE DAY BEFORE.  I WAS -- I FELT LIFELESS.  AND, LIKE,

27  I COULD NOT TALK.  AND I HAD ALREADY TOLD THE STORY AT

28  ALVARADO, TO S.D.P.D. AND THEN SVU FROM SAN DIEGO POLICE.

1    AND I WAS SO TIRED OF TELLING THE STORY.

2          BUT THEY TOLD ME THEY HAD TO ASK ME A COUPLE OF

3    QUESTIONS FOR AN INTAKE FORM.  AND IT WAS REALLY HARD TO GET

4    THROUGH IT, BECAUSE I WAS OUT OF IT AND EXHAUSTED.  AND THEN

5    SHE TOLD ME THAT SHE HAD TO TAKE FLASH PHOTOGRAPHY OF EVERY

6    INCH OF MY BODY.  SO I HAD TO TAKE OFF ALL MY CLOTHES AND

7    PHOTOGRAPHED EVERY SINGLE INJURY.

8          EVEN TO THE POINT WHERE THEY HAD TO TAKE PICTURES

9    ON THE INSIDE OF MY VAGINA.  AND THEY WERE TRYING TO DO A

10   CERVIX SWAB AND THE PAIN WAS SO GREAT.  I COULDN'T HANDLE IT.

11   I COULDN'T DO IT.  AND THEY MADE ME TAKE A PREGNANCY TEST.

12   AND GAVE ME AN STD MEDICATION.  AND THEN I WAS PICKED UP BY

13   MY DAD AT 7:00 A.M.

14        Q    AND DID YOU UNDERSTAND THE EXAMINATION THAT YOU

15   UNDERWENT AT PALOMAR TO BE THE SART EXAM?

16        A    YES.

17        Q    DO YOU RECALL THE NAME OF THE WOMAN WHO EXAMINED

18   YOU?

19        A    KELLY VALENCIA.

20        Q    AND HOW LONG DID THE EXAMINATION LAST FROM START TO

21   FINISH?

22        A    TWO AND A HALF TO THREE HOURS.

23        Q    DID YOU ACCURATELY REPORT TO MS. VALENCIA

24   EVERYTHING THAT HAD OCCURRED ON THE NIGHT OF MAY 16 -- I'M

25   SORRY.  THE NIGHT OF MAY 15, MORNING OF MAY 16?

26        A    I TRIED TO EXPLAIN THE BEST I COULD IN THE MENTAL

27   STATE I WAS IN.

28        Q    DID YOU HAVE ANY RECOLLECTION AS TO HOW LONG YOU

```
 1   WERE UNCONSCIOUS ON BOTH OCCASIONS THAT TREVOR STRANGLED YOU
 2   ON MAY 16TH?
 3        A    I HAVE NO RECOLLECTION I WAS VERY CONFUSED ABOUT IT
 4   ONLY TREVOR KNOWS THE ANSWER TO THAT.
 5        Q    HOW WERE YOU FEELING WHEN PHOTOGRAPHS WERE -- FLASH
 6   PHOTOGRAPHS WERE TAKEN OF YOUR ENTIRE BODY, INCLUDING YOUR
 7   VAGINAL AREA?
 8        A    IT WAS HORRIFYING.
 9        Q    WHY, LINDSEY?
10        A    I WAS JUST SO ASHAMED OF MYSELF.  AND IT'S ONE OF
11   THE MOST VULNERABLE SITUATIONS YOU CAN BE IN WHEN YOUR ENTIRE
12   BODY IS BEING PHOTOGRAPHED AND KNOWING IT'S GOING TO BE SEEN
13   BY PEOPLE LIKE JON FETTEROLF.
14        Q    I'M SORRY.  GO AHEAD.
15        A    AND IT'S, LIKE, NO PRIVACY.  AND GET ASSAULTED AND
16   EVERYONE TO SEE.
17        Q    LINDSEY, DID YOU GO TO THE HOSPITAL TO SEEK
18   PUBLICITY?
19        A    NO.
20        Q    WERE YOU TRYING TO SET TREVOR UP IN ANY WAY, SHAPE,
21   OR FORM?
22        A    NO.
23        Q    WERE YOU TRYING TO DESTROY HIS CAREER?
24        A    NO.
25        Q    WERE YOU THINKING THAT MAYBE IF YOU TOLD YOUR STORY
26   YOU WOULD GET A LOT OF MONEY FROM TREVOR?
27        A    NO.  I JUST WANTED IT TO GO AWAY.
28        Q    WHAT DID YOU WANT TO GO AWAY, LINDSEY?
```

203

```
 1        A    THE INJURIES AND EVERYTHING.  I DIDN'T WANT TO TALK
 2   TO HIM.  I DIDN'T WANT TO THINK ABOUT HIM.  I JUST WANTED TO
 3   CURL UP AND NEVER TALK ABOUT IT AGAIN TO ANYONE.
 4        Q    WHY SPECIFICALLY DID YOU NOT WANT TO SPEAK TO
 5   TREVOR AT THAT POINT?
 6        A    I WAS EMBARRASSED AND I WAS SO CONFUSED IF IT WAS
 7   MY FAULT OR NOT.  AND I DON'T KNOW.  I WAS TORN BETWEEN NOT
 8   WANTING TO TALK TO HIM AND TRYING TO REPLY BECAUSE I WAS
 9   SCARED OF WHAT HE WOULD SAY OR DO BECAUSE I WENT TO THE
10   HOSPITAL.
11        Q    DID TREVOR CONTINUE TO COMMUNICATE WITH YOU AFTER
12   YOU WERE RELEASED FROM PALOMAR?
13        A    YES.
14        Q    AND WHO INITIATED THE COMMUNICATION AT THAT TIME?
15        A    TREVOR.
16        Q    DID YOU INITIATE ANY COMMUNICATION WITH HIM ONCE
17   YOU WERE AT PALOMAR?  IF YOU WANT TO LOOK AT EXHIBIT 2 --
18        A    THE ONLY TIME I INITIATED WAS REPLYING TO HIS TEXTS
19   FROM THAT MORNING AND SAID, "NO.  I'M AT THE HOSPITAL."
20        Q    WHAT TIME WERE YOU RELEASED FROM PALOMAR?
21        A    7:00 A.M.
22        Q    WHAT WAS THE DATE?
23        A    MAY 18TH.
24        Q    AND WHAT DID YOU DO AFTER YOU WERE RELEASED FROM
25   PALOMAR?
26        A    I WAS SO EXHAUSTED.  I WENT TO STAY AT MY PARENTS'
27   HOUSE TO REST, BECAUSE IT WAS CLOSE TO PALOMAR.  AND I GOT
28   HOME AT 7:30.  AND AT 8:00 A.M. TWO SPECIAL VICTIMS UNIT
```

```
 1   PASADENA POLICE OFFICERS KNOCKED ON MY PARENTS' DOOR AND
 2   WANTED TO TALK TO ME.  MY DAD HAD SAID SHE NEEDS TO REST, SHE
 3   WAS UP ALL NIGHT, BEFORE YOU TALK TO HER.  THEY CAME BACK TO
 4   INTERVIEW ME AT 10:00 A.M.
 5        Q    FROM WHAT POLICE DEPARTMENT WERE THESE OFFICERS
 6   FROM?
 7        A    PASADENA POLICE DEPARTMENT.
 8        Q    AND DID YOU -- WERE YOU INTERVIEWED BY THEM AT THAT
 9   TIME?
10        A    YES.
11        Q    HOW LONG WERE YOU INTERVIEWED BY THEM?
12        A    PROBABLY ABOUT 45 MINUTES TO AN HOUR.
13        Q    NOW, IN ONE OF THE TEXT MESSAGES THAT I SAW THAT
14   YOU WROTE TO EITHER YOUR COUSIN OR ONE OF YOUR FRIENDS, YOU
15   REFER TO THE PASADENA POLICE DEPARTMENT AS "CORRUPT FUCKERS."
16   WHY DID YOU USE THAT LANGUAGE?
17        A    LIKE I SAID, I CAN BE VERY VULGAR WHEN I'M ANGRY.
18   I OWN THAT PART OF MYSELF.  I SAID THAT BECAUSE THE SPECIFIC
19   DETECTIVE THAT WAS WORKING WITH ME WAS VERY DEGRADING AND SHE
20   SLUT SHAMED ME.  AND SHE WAS ONE OF THE MOST TRAUMATIC PARTS
21   OF THIS WHOLE SCENARIO.  AND SHE ALSO LIED TO ME TWO
22   DIFFERENT TIMES ABOUT WHEN TREVOR WAS GETTING ARRESTED.
23        Q    WHAT DID SHE SAY TO YOU THAT YOU FELT DEGRADED
24   YOU?
25        MS. HOLLEY:  I'M GOING TO OBJECT AS IRRELEVANT.
26        MS. MEYER:  IT GOES TO HER STATE OF MIND.
27        THE COURT:  SUSTAINED.
28        Q    BY MS. MEYER:  NOW, I'D LIKE TO REDIRECT YOUR
```

1    ATTENTION TO EXHIBIT 2, BATES STAMP 93.  STARTING ON BATES

2    STAMP 93, EXHIBIT 2, ARE THESE TEXT MESSAGES THAT TREVOR

3    INITIATED TO YOU ON TUESDAY, MAY 18?

4         A    YES.

5         Q    NOW, HE SENT YOU A FEW TEXT MESSAGES BEFORE YOU

6    RESPONDED TO HIM; CORRECT?

7         A    YES.

8         Q    AND IN THE FIRST TEXT MESSAGE AT 2:30 A.M. ON

9    TUESDAY, TREVOR SAYS, "HAPPY TO HEAR YOUR VOICE.  AND I HATE

10   SEEING YOU IN BED LIKE THAT.  COME SEE ME AGAIN SOON PLEASE.

11   AND LET'S HAVE A BETTER VISIT."  DID YOU AT THAT POINT WANT

12   TO SEE HIM AGAIN?

13        A    NO.

14        Q    NOW, AT IT LOOKS LIKE AT 4:01 P.M. ON TUESDAY,

15   MAY 18TH -- NOW I'M REFERRING TO 94 -- YOU DID RESPOND.  WHAT

16   DID YOU RESPOND?

17        A    I HADN'T REPLIED TO HIM THE NIGHT BEFORE.  AND HE

18   SENT ME ANOTHER TEXT MESSAGE LATER IN THAT DAY.  I WAS

19   OVERWHELMED.  I WAS SCARED THAT I HAD TOLD THE POLICE WHAT I

20   TOLD THEM.  I DIDN'T KNOW IF THEY WERE GOING TO TALK TO HIM.

21   AND SO I JUST REPLIED TO KEEP AN EVEN FLOW TO DE-ESCALATE

22   THINGS BECAUSE THE THOUGHT OF NOT REPLYING TO HIM SCARED ME

23   EVEN MORE.

24        Q    WHY?

25        A    BECAUSE I DIDN'T KNOW WHAT HE WOULD DO KNOWING I

26   TALKED TO THE POLICE OR ANYTHING LIKE THAT.  SO I REPLIED TO

27   TRY TO JUST DE-ESCALATE THE SITUATION.

28        Q    SO AS OF MAY 18 AT 4:01 P.M., HAD YOU TOLD HIM THAT

```
1    YOU HAD SPOKEN TO THE POLICE AT ALL?

2         A    NO.

3         Q    AND THEN TREVOR SAYS AT 5:44 P.M., "DAMN LINDS, CAN

4    I HELP IN ANY WAY?  I'M SO SORRY THIS HAPPENED."  WHEN YOU

5    RECEIVED THAT TEXT MESSAGE FROM TREVOR, DID YOU FEEL HE WAS

6    SINCERE?

7         A    AT THAT TIME I BELIEVE I DID SORT OF BELIEVE HIM.

8    AND WHEN HE CALLED ME IN THE HOSPITAL AND WE SPOKE BRIEFLY,

9    HE SAID "I'M SORRY.  AND THAT IT WOULD NEVER HAPPEN AGAIN."

10   SO THIS WAS THE SECOND TIME HE WAS ACKNOWLEDGING WHAT HE DID

11   TO ME AND APOLOGIZING.  SO IT FELT GOOD TO HEAR HIM SAY

12   THAT.

13        Q    WHEN DID HE APOLOGIZE FOR WHAT HE DID?

14        A    HE CALLED ME BRIEFLY IN THE HOSPITAL.  AND --

15        Q    WHAT HOSPITAL WERE YOU IN?

16        A    I WAS IN ALVARADO.  AND HE LEFT ME THAT VOICEMAIL.

17   AND I WAITED UNTIL THE DOCTORS AND PEOPLE WERE OUT OF MY

18   HOSPITAL ROOM.  AND I WAS SCARED THAT HE LEFT ME THE

19   VOICEMAIL.  AND I WANTED TO JUST -- I DON'T KNOW.  I WAS

20   FREAKING OUT THAT HE WAS FREAKING OUT.  I CALLED HIM BACK.

21   IT WAS A VERY QUICK CONVERSATION BECAUSE DOCTORS WERE COMING

22   IN AND OUT.  I LET HIM KNOW THAT I HAD THREE CT'S.  AND HE

23   SAID, "I'M SO SORRY.  AND HE SAID THAT IT WOULD NEVER HAPPEN

24   AGAIN."

25        Q    AND THIS IS THE MESSAGE THAT HE LEFT YOU ON YOUR

26   VOICEMAIL?

27        A    YES.  HE LEFT ME THAT VOICEMAIL.  THEN I CALLED HIM

28   BACK BRIEFLY.
```

1      Q    AND THAT WAS ON MAY 17?

2      A    YES.

3      MS. MEYER:  YOUR HONOR, WE WOULD LIKE TO PLAY THE

4  VOICEMAIL RECORDING AT THIS TIME.  WE PROVIDED COUNSEL BOTH A

5  COPY OF THE AUDIO AS WELL AS A TRANSCRIPTION.

6      THE COURT:  COUNSEL?

7      MS. HOLLEY:  MAY WE HAVE A MOMENT?

8      MS. MEYER:  APPARENTLY, YOUR HONOR, IT HAS BEEN SAVED ON

9  MS. HILL'S PHONE.  SO IF WE COULD GIVE HER HER PHONE AND SHE

10  CAN PLAY IT FROM HER PHONE.

11      MR. FETTEROLF:  I DON'T THINK WE RECEIVED THE AUDIO.  I

12  THINK WE RECEIVED THE TRANSCRIPTION.

13      MS. HOLLEY:  SO PERHAPS WE CAN TAKE A BRIEF RECESS AND

14  LISTEN TO IT.

15      THE COURT:  SURE.

16      MS. HOLLEY:  THANK YOU.

17      MR. FETTEROLF:  WE DON'T HAVE THE AUDIO.

18      THE COURT:  MR. FETTEROLF WANTED TO KNOW IF YOU COULD

19  SEND IT TO HIM.

20      MS. MEYER:  APPARENTLY, YOUR HONOR, WE HAVE IT ON A

21  U.S.B. DRIVE.  SO WE WILL PROVIDE THEM WITH A U.S.B. DRIVE.

22      THE COURT:  OKAY.

23      MS. MEYER:  CAN WE ALL RETIRE --

24      THE COURT:  YES.  HOW ABOUT ONE ATTORNEY ON EACH SIDE GO

25  INTO THE JURY ROOM AND NOBODY ELSE.

26      MS. MEYER:  I WAS ASKING IF SHE CAN USE THE RESTROOM.

27      THE COURT:  SHE MAY.

28             (RECESS TAKEN.)

```
 1        THE COURT:  ALL RIGHT.  WHY DON'T WE MARK THIS?  WHAT
 2   ARE WE MARKING THIS AS?
 3        MS. MEYER:  WE ARE GOING TO MARK THIS AS EXHIBIT 5.  LET
 4   ME FIRST CLEAR UP THE CONFUSION.
 5        Q    BY MS. MEYER:  LINDSEY, IF YOU CAN GO TO EXHIBIT 5.
 6   DOES EXHIBIT 5 REFLECT TWO VOICEMAIL MESSAGES THAT TREVOR
 7   LEFT FOR YOU?
 8        A    JUST ONE VOICEMAIL.
 9        Q    OKAY.  AND THAT'S FROM MAY 17, 2021, AT 11:18?
10        A    YES.
11        MS. MEYER:  AND, YOUR HONOR, WE'D LIKE TO PLAY -- HOLD
12   ON ONE SECOND.
13        Q    BY MS. MEYER:  HAVE YOU LISTENED TO THE VOICEMAIL
14   RECORDING?
15        A    YES.
16        Q    AND DOES IT ACCURATELY REFLECT WHAT TREVOR SAID TO
17   YOU IN THE VOICEMAIL MESSAGE THAT HE LEFT?
18        A    YES.
19        MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 5,
20   INCLUDING THE ONE-PAGE AND THE VIDEO BE ADMITTED.
21        THE COURT:  ANY OBJECTION?
22        MS. HOLLEY:  NO.  I'M ASSUMING YOU MEAN AUDIO?
23        MS. MEYER:  AUDIO.
24        MS. HOLLEY:  YES.  NO OBJECTION.
25        THE COURT:  ALL RIGHT.  IT IS ADMITTED.  I CAN'T HEAR.
26   PULL THE MIC UP TO THE COMPUTER.  PULL THE MICROPHONE OFF THE
27   STAND AND PUT IT UP TO THE OUTPUT ON THE COMPUTER.
28        MR. GARELICK:  IF IT GETS LOUD, I'M SORRY.  SORRY.
```

1    START IT AT THE BEGINNING.

2    //

3              (WHEREUPON, THE AUDIO WAS PLAYED IN OPEN COURT,

4               AND NOT TRANSCRIBED HEREIN.)

5         Q    BY MS. MEYER:  LINDSEY, YOU HAD REFERENCED ANOTHER

6    VOICEMAIL MESSAGE THAT TREVOR HAD LEFT YOU IN WHICH HE

7    APOLOGIZED.  THAT WAS NOT THIS?

8         A    THAT WAS ON THE PHONE AFTER I CALLED HIM BACK.

9    WHEN I SAW THIS VOICEMAIL, I CALLED HIM BACK.

10        Q    UNDERSTOOD.  SO DIRECTING YOUR ATTENTION NOW TO --

11   BACK TO EXHIBIT 2, DOES TREVOR CONTINUE TO TEXT YOU AFTER

12   TUESDAY?

13        A    WHAT BATES STAMP ARE WE ON?

14        Q    95.

15        A    YES.

16        Q    SO ON WEDNESDAY AT APPROXIMATELY 11:34 A.M. TREVOR

17   WRITES, WE'LL TALK -- "WELL, TALK TO ME MORE THEN.  I'M HERE

18   FOR YOU.  I'M DOING OKAY."  AND THEN HE GOES ON.  AND THEN HE

19   TEXTS YOU AT 7:08 P.M. ON WEDNESDAY SAYING, "ARE THINGS

20   GETTING BETTER TODAY?"  AND THEN YOU RESPOND TO HIM.

21             HOW ARE YOU FEELING ABOUT TREVOR AT THAT POINT?

22        A    I JUST -- EVERY DAY WHEN HE WAS TEXTING ME, I GOT

23   MORE SCARED BECAUSE THE DETECTIVE TOLD ME WHEN SHE

24   INTERVIEWED ME ON MAY 18TH THAT SHE HAD ENOUGH EVIDENCE TO GO

25   ARREST HIM RIGHT THEN.  AND WHEN HE WAS TEXTING ME THOSE

26   THINGS, I DIDN'T KNOW IF THE POLICE HAD TALKED TO HIM, WHICH

27   IS WHY I JUST KEPT TEXTING BACK.  I WAS TRYING NOT TO REPLY,

28   BUT THEN HE SENT ME ANOTHER MESSAGE.  SO I FELT LIKE I HAD TO

210

```
1    REPLY.
2         Q    AND THEN ON WEDNESDAY -- AND I'M REFERRING TO BATES
3    STAMP 96 -- AT 9:50 P.M., YOU RESPOND TO HIM.  AND THEN HE
4    SENDS YOU A TEXT WHICH SAYS, "WORRIED ABOUT YOU LINDS," WITH
5    A HEART EMOJI.  DO YOU SEE THAT?
6         A    YES.
7         Q    AND THEN YOU STATE IN RESPONSE TO HIM AT 8:40 A.M.
8    ON THURSDAY, "YOU KNOW I'M TOUGH.  IT'S JUST WHAT LIFE HAS
9    BEEN ABOUT.  SITTING IN A ROOM ALONE WITH JUST MYSELF LOOKING
10   INWARD DIGGING DEEP AND GROWING FROM IT.  MAKING CHANGES.
11   JUST LIKE WE TALKED ABOUT."  WHAT DID YOU MEAN BY THAT
12   MESSAGE?
13        A    LIKE I HAD TESTIFIED, THE LAST THING I TOLD HIM
14   BEFORE WE STARTED HAVING SEX ON THE SECOND NIGHT WAS THAT MY
15   FAVORITE QUOTE WAS, "ALL OF MAN'S PROBLEMS STEM FROM THE
16   INCAPABILITY TO SIT IN A ROOM QUIETLY ALONE WITH THEMSELF."
17   THAT IS WHAT I WAS REFERENCING THERE THAT I WAS NOW IN A
18   POSITION, DUE TO THE CIRCUMSTANCES, WHERE I WAS STUCK IN BED
19   BY MYSELF THINKING ABOUT THE SITUATION AND OWNING MY PART IN
20   IT.  AND REALIZING CHANGES I NEED TO MAKE IN MY OWN LIFE.
21        Q    WHAT CHANGES DID YOU FEEL THAT YOU NEEDED TO MAKE
22   IN YOUR OWN LIFE?
23        A    THAT I HAVE TO STOP MY CHASE FOR ATTENTION AND
24   CHASING APPROVAL IN MEN.  AND THAT I HAVE TO SEARCH FOR MY
25   SELF-WORTH IN A PLACE OTHER THAN DATING AND MEN.
26        Q    NOW, DIRECTING YOUR ATTENTION TO BATES STAMPS 97.
27   EXHIBIT 2.  TREVOR SAYS, "HERE FOR YOU.  IF YOU WANT TO TALK
28   OR IF I CAN HELP IN ANY WAY.  ARE YOU BACK HOME AND RESTING?"
```

211

```
 1    DID YOU CALL HIM AFTER YOU RECEIVED THIS TEXT MESSAGE?
 2         A    NO.
 3         Q    WHY NOT?
 4         A    I DIDN'T WANT TO HEAR HIS VOICE.
 5         Q    AND THEN HE SAYS, "DID THEY GIVE YOU AN IDEA OF
 6    WHEN IT WOULD ALL GO AWAY?"  AND THEN YOU RESPOND TO HIM.  DO
 7    YOU SEE THAT?
 8         A    YES.
 9         Q    AND THEN ON BATES STAMP 98, HE SAYS, "I FEEL SO BAD
10    THAT THIS HAPPENED.  WISH I COULD BE THERE WITH YOU."  AND
11    THEN YOU SAY, "JUST GRATEFUL THAT YOU ARE SHOWING THAT YOU
12    CARE."  AND THEN HE SAYS, "I DO.  I ABSOLUTELY DO.  NEVER
13    WANT TO SEE YOU HURTING."  AND THEN TWO LOVE EMOJIS.  AND
14    THEN UNDER THAT -- I THINK THIS IS CALLED A MEME.  AND THEN
15    HE SAYS, "ME TRYING TO USE THE FORCE TO HEAL YOU."  HOW WERE
16    YOU FEELING WHEN HE WAS SENDING YOU THESE TEXT MESSAGES?
17         A    IT FELT GOOD TO HEAR HIM SAY THAT HE FELT BAD THAT
18    IT HAPPENED.  I AM STILL SCARED OF HIM.  SCARED OF HIM
19    FINDING OUT THAT I TOLD THE POLICE.  HOW HE WOULD REACT TO
20    THAT.  AND THAT LAST TEXT AT 12:47 P.M. IS WHEN I WAS DRIVING
21    UP TO PASADENA TO GIVE THEM MY PHONE AND DO THE COLD CALL,
22    WHICH IS WHY I DIDN'T REPLY TO THAT ONE EITHER, BECAUSE I WAS
23    VERY NERVOUS AND WORKED UP KNOWING I HAD TO TALK TO HIM ON
24    THE PHONE.
25         Q    WHAT BATES STAMP PAGE ARE YOU REFERRING TO?
26         A    BOTTOM OF 98.  IT SAYS YESTERDAY AT 12:47.
27         Q    YES, I SEE THAT.  THEN IF YOU COULD GO TO PAGE 101.
28    BATES STAMP 101.  TREVOR TEXTS YOU, "I CARE ABOUT YOU LINDS.
```

```
 1   WANT TO SEE YOU HAPPY AND HEALTHY AND VIBRANT ABOUT LIFE.  SO
 2   JUST TRYING TO MAKE -- TRYING TO DO WHATEVER I CAN TO MAKE
 3   THAT HAPPEN," WITH A HEART EMOJI.  AND THEN HE SAYS AGAIN ON
 4   SUNDAY, MAY 23, AT 11:57 A.M., "HEY YOU.  HOPING YOU SLEPT
 5   WELL AND ARE FEELING BETTER.  I KNOW YOU SAID YOU WOULD BE
 6   STAYING HOME AND YOU HAVEN'T BEEN ABLE TO DO MUCH.  WAS
 7   WONDERING IF IT WILL BE HELPFUL IF I COULD SEND YOU SOME
 8   STUFF LIKE GROCERIES OR DESSERTS OR SOMETHING.  JUST TRYING
 9   TO THINK OF WAYS I CAN HELP."
10           AND THEN YOUR RESPONSE IS ON SATURDAY, MAY 29, AT
11   3:36 P.M.  "WHILE I DO APPRECIATE THAT, ALL I REALLY HAVE AND
12   NEED TO SAY IS THAT THE BEST THING YOU CAN DO TO HELP ME IS
13   TO NEVER DO THIS TO ANYONE ELSE EVER AGAIN."
14           WHY DID YOU SEND THAT EMAIL -- OR TEXT MESSAGE?
15      A   I WAS AT A POINT WHEN HE SAID -- WHEN HE OFFERED TO
16   SEND ME GROCERIES OR DESSERTS, THE FIRST THING I THOUGHT OF
17   WITH THAT IS I DON'T WANT TO GIVE HIM MY ADDRESS.  AND I
18   COULDN'T GET MYSELF TO REPLY FOR A LONG TIME THERE, BECAUSE
19   IT WAS AT THAT POINT THAT I STARTED FEELING LIKE HE WAS
20   SAYING THESE THINGS SO I WOULD SHUT UP AND NOT SAY ANYTHING.
21   AND THAT HE WAS GROOMING ME AND TRYING TO MANIPULATE ME.  AND
22   I DIDN'T REPLY FOR A COUPLE OF DAYS THERE BECAUSE I JUST
23   COULDN'T DO IT ANYMORE.
24           BUT IN THOSE COUPLE OF DAYS THAT PASSED BETWEEN
25   THAT TEXT, I, YOU KNOW, KNEW HE WAS TRAVELING AND NOT HOME
26   AND DOING WHATEVER HE WANTED.  AND ALL I COULD THINK ABOUT
27   WAS HIM DOING IT TO SOMEONE ELSE.  AND THE WAY IT ALL
28   HAPPENED, IT WAS SO REHEARSED.  AND I KNEW IT WASN'T THE
```

```
1   FIRST TIME HE HAD DONE IT.
2        MS. HOLLEY:  I'M GOING TO OBJECT.  MOVE TO STRIKE.
3   SPECULATION.  LACK OF FOUNDATION.
4        THE COURT:  WELL, SHE ALREADY TESTIFIED ABOUT A PARTY
5   ADMISSION.  SO OVERRULED.
6        Q    BY MS. MEYER:  YOU COULD FINISH.
7        A    THAT IT WAS GOING TO HAPPEN AGAIN.  AND THAT WAS MY
8   MAIN FEAR.  THAT'S WHAT I KEPT TELLING THE POLICE.  SO I KNEW
9   I HAD NOTHING LEFT TO SAY.  AND THAT'S WHY I SAID THAT.  I
10  DIDN'T WANT HIM TO HELP ME FINANCIALLY WITH GROCERIES.  I
11  DIDN'T WANT ANY OF THAT.  I JUST WANTED HIM TO NOT DO IT TO
12  ANYONE ELSE.
13       Q    LINDSEY, YOU TESTIFIED A FEW MINUTES AGO THAT YOU
14  WERE DRIVING FROM SAN DIEGO TO HAVE A MEETING WITH THE
15  PASADENA POLICE DEPARTMENT?
16       A    YES.
17       Q    WHAT DATE WAS THAT?
18       A    IT WAS FRIDAY, MAY 21ST.  I ARRIVED AT PASADENA
19  P.D. AND MET WITH THE DETECTIVE AND SOMEONE FROM THE D.A.'S
20  OFFICE.  I STAYED THE NIGHT.  THE NEXT DAY I DID THE COLD
21  CALL.
22       Q    AND DID YOU LEAVE THE PASADENA POLICE DEPARTMENT
23  WITH YOUR PHONE?
24       A    NO.
25       Q    DID YOU EVER GIVE THEM YOUR PHONE?
26       A    YES.  AND MY COMPUTER.
27       Q    WHAT DATES?
28       A    I GAVE THEM MY PHONE AND MY COMPUTER ON FRIDAY, MAY
```

1  21ST.  AND I TOLD THEM THAT THEY COULD TAKE WHATEVER HELPED

2  BECAUSE I HAD NOTHING TO HIDE.

3      Q    WHAT WAS YOUR UNDERSTANDING OF WHAT A COLD CALL

4  WAS?

5      A    THAT I WAS TO CALL TREVOR.  AND THEY SAID I COULD

6  LIE AND SAY WHATEVER TO GET HIM TO ACKNOWLEDGE WHAT HE DID TO

7  ME.

8      Q    AND DID YOU CALL TREVOR FROM THE POLICE

9  DEPARTMENT?

10     A    YES.

11     Q    AND WAS THE CALL BEING RECORDED?

12     A    YES.

13     Q    AND WHAT DID HE -- WHAT DID YOU SAY TO HIM?

14     A    AS I TRIED TO THINK THROUGH IT, I WAS OBVIOUSLY IN

15  A HIGHLY EMOTIONAL STATE.  BUT THE THINGS I DO REMEMBER WERE

16  WE -- I STARTED THE CONVERSATION.  I WAS TRYING TO BE MY

17  NORMAL FUNNY SARCASTIC SELF TO SET A FOUNDATION THAT IT WAS

18  NOTHING FISHY.  AND I ASKED HIM ABOUT HIS BASEBALL GAME THE

19  NIGHT BEFORE.  AND HE SAID THAT HE HAD A LOT OF FUN AT THE

20  GAME.  AND HE HAD FUN WITH IT.  THAT HE SAID IT WAS NOTHING

21  COMPARED TO WHAT WAS GOING ON BETWEEN ME AND HIM.

22          AND ALL THE TIME HE KEPT ASKING WHAT WAS WRONG AND

23  HOW CAN I HELP.  THE POLICE WERE WRITING OUT EVERYTHING THEY

24  WANTED ME TO SAY.  I WENT WITH THEIR SCRIPT.  THEY HAD ME

25  ASKING HIM WHAT HE DID TO ME WHEN I WAS UNCONSCIOUS.  AND

26  THEY HAD ME SAY, "I DIDN'T ASK TO BE PUNCHED.  AND IT WASN'T

27  A FREE FOR ALL WHEN I WAS UNCONSCIOUS."  AND EVERY TIME I

28  TALKED ABOUT GETTING PUNCHED, HE WOULD DIVERT.  THE ATTENTION

215

```
1   AND TURN IT BACK ON ME AND SAYING THAT HE WAS TRYING TO

2   FOLLOW MY LEAD, WHICH REALLY FRUSTRATED ME.  I CAN'T WHEN I'M

3   UNCONSCIOUS.

4           AND AT THE END OF THE CALL, HE -- SHE SAID THAT I

5   HAD TO SAY "THANK YOU FOR ACKNOWLEDGING WHAT YOU DID TO ME."

6   SO I SAID THANK YOU FOR ACKNOWLEDGING, TREVOR, WHAT YOU DID

7   TO ME.  AND HE ACKNOWLEDGED IT.

8       Q    WHAT DID HE SAY?

9       A    HE SAID -- I DON'T WANT TO MISQUOTE IT, BUT HE

10  DIDN'T DISPUTE IT.  HE DIDN'T SAY, I DIDN'T DO THAT TO YOU.

11      MS. HOLLEY:  I'LL OBJECT AS NONRESPONSIVE TO THE

12  QUESTION.

13      THE COURT:  SUSTAINED.  AND STRICKEN.

14      MS. HOLLEY:  THANK YOU.

15      Q    BY MS. MEYER:  AT ANY POINT DURING THAT CALL DID

16  TREVOR BAUER TELL YOU OR DENY THAT HE DID WHAT YOU SAID HE

17  DID TO YOU?

18      A    SAY THAT AGAIN.

19      Q    DID TREVOR TELL YOU AT ALL -- DURING THAT TELEPHONE

20  CALL, DID TREVOR DENY THAT HE DID WHAT YOU CLAIMED HE DID TO

21  YOU DURING THAT CALL?

22      A    HE DIDN'T DENY --

23      MS. HOLLEY:  OBJECTION.  VAGUE.

24      THE COURT:  DID HE ACKNOWLEDGE THAT HE DID DO SOMETHING

25  THAT YOU ALLEGED IN THAT CALL?

26      THE WITNESS:  YES.  HE SAID, AGAIN, THAT HE WAS SORRY.

27  AND HE ASKED HOW WE COULD MOVE FORWARD FROM IT.  AND HE ASKED

28  ME IF HE COULD COME VISIT ME IN SAN DIEGO.
```

```
 1        THE COURT:  I'M NOT HEARING THAT IN YOUR ANSWER.  DID HE
 2   SAY I DID -- YOU'RE RIGHT, I DID IT.  OR SOMETHING THAT WAS
 3   LIKE, YOU'RE RIGHT.  I DID THAT.
 4        THE WITNESS:  HE DIDN'T SAY THOSE WORDS.
 5        THE COURT:  ANYTHING LIKE THOSE WORDS?
 6        THE WITNESS:  I JUST DON'T WANT TO SAY SOMETHING THAT'S
 7   NOT IN THAT COLD CALL.  SO WHAT MY ANSWER TO THAT IS HE JUST
 8   WAS ASKING HOW WE COULD MOVE FORWARD.  AND THAT'S WHAT HE
 9   SAID.  AND HE ASKED ME IF HE COULD COME VISIT ME IN SAN
10   DIEGO.  AND IF HE COULD STILL REACH OUT TO ME.
11        Q    BY MS. MEYER:  DID -- WHEN YOU ASKED HIM WHAT HE
12   DID TO YOU WHEN YOU WERE UNCONSCIOUS, DID -- WHAT DID HE SAY
13   IN RESPONSE TO THAT?
14        A    HE JUST SAID THAT HE PUNCHED MY BUTT.
15        THE COURT:  WHY DON'T WE TAKE OUR MORNING BREAK FOR THE
16   COURT REPORTER.
17        MS. MEYER:  I'M GOING TO REVIEW MY NOTES.  I'M PROBABLY
18   FINISHED, IF NOT CLOSE TO BEING FINISHED.
19        THE COURT:  ALL RIGHT.  WE'LL RESUME AT 25 AFTER.
20                  (RECESS TAKEN.)
21        THE COURT:  ALL RIGHT.  MS. MEYER, AT YOUR
22   CONVENIENCE.
23        MS. MEYER:  THANK YOU.
24
25                  LINDSEY HILL,
26   CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND
27   TESTIFIED AS FOLLOWS:
28   //
```

```
 1              DIRECT EXAMINATION(RESUMED)
 2  BY MS. MEYER:
 3      Q    LINDSEY, I'D LIKE YOU TO RETURN TO EXHIBIT 8.
 4  STARTING AT BATES STAMP 200.  STARTING AT EXHIBIT 200, DID
 5  YOU TAKE THIS PHOTOGRAPH?
 6      A    YES.
 7      Q    AND WHERE DID YOU TAKE THIS PHOTOGRAPH?
 8      A    AT MY OLD RESIDENCE.
 9      MS. HOLLEY:  I'M SORRY.  I DIDN'T HEAR THE ANSWER.
10      THE WITNESS:  AT MY OLD RESIDENCE.
11      Q    BY MS. MEYER:  DID YOU TAKE THIS PHOTOGRAPH ON MAY
12  16?
13      A    YES.
14      Q    AND WAS THAT BEFORE YOU WENT TO MELY'S HOUSE?
15      A    YES, IT WAS.
16      Q    AND THEN DIRECTING YOUR ATTENTION TO THE NEXT ONE,
17  201, DID YOU TAKE THIS PHOTOGRAPH?
18      A    YES.
19      Q    WHERE DID YOU TAKE THIS PHOTOGRAPH?
20      A    AT MY OLD RESIDENCE.
21      Q    AND DID YOU TAKE IT AT THE SAME TIME THAT YOU TOOK
22  BATES STAMP 200?
23      A    YES.
24      Q    AND THEN DIRECTING YOUR ATTENTION TO 202, DID YOU
25  TAKE THIS PHOTOGRAPH?
26      A    YES, I DID.
27      Q    AND DID YOU TAKE IT AT YOUR HOME?
28      A    YES.
```

```
1        Q    AND WAS THIS AFTER YOU WENT TO THE HOSPITAL?

2        A    NO.

3        Q    WAS IT BEFORE?

4        A    YES.

5        Q    AND THEN DIRECTING YOUR ATTENTION TO BATES STAMP

6   203, DID YOU TAKE THIS PHOTOGRAPH?

7        A    YES, IT'S A SCREENSHOT OF A SNAPCHAT VIDEO.

8        Q    AND WHERE WERE YOU WHEN YOU TOOK THIS PHOTOGRAPH?

9        A    AT MELY'S HOUSE.

10       Q    AND THEN DIRECTING YOUR ATTENTION TO 204, DID YOU

11  TAKE THIS PHOTOGRAPH?

12       A    YES.

13       Q    AND WHERE DID YOU TAKE THIS PHOTOGRAPH?

14       A    AT MY OLD RESIDENCE.

15       Q    AND WAS THAT BEFORE OR AFTER YOU WENT TO MELY'S?

16       A    THIS WAS THE NEXT DAY AFTER I WENT TO MELY'S.

17       Q    AND THEN BATES STAMP 205, WHEN DID YOU TAKE THIS

18  PHOTOGRAPH?

19       A    THAT SAME DAY RIGHT BEFORE I WENT TO THE

20  HOSPITAL.

21       Q    AND THEN -- LET ME SEE IF THERE'S A BATES STAMP ON

22  IT.  IT DOESN'T LOOK LIKE THERE IS A BATES STAMP OR I CAN'T

23  SEE THE BATES STAMP.

24       THE COURT:  ON THE NEXT PAGE YOU'RE TALKING ABOUT?

25       Q    BY MS. MEYER:  YES.  YOUR HAIR IS UP IN A BUN?

26       THE COURT:  THAT'S NOT THE NEXT PAGE I HAVE.  I DO HAVE

27  206, WHICH IS CLEAR ON THE WHITE.

28       MS. MEYER:  RIGHT.
```

```
 1        Q    BY MS. MEYER:  SO 206, DID YOU TAKE THIS
 2   PHOTOGRAPH?
 3        A    YES.
 4        Q    AND WHEN WAS THIS PHOTOGRAPH TAKEN?
 5        A    THE DAY AFTER THE HOSPITAL AROUND 10:00 P.M.
 6        Q    AND DO ALL THESE PHOTOGRAPHS THAT I HAVE JUST
 7   IDENTIFIED, BATES STAMP 200 THROUGH 206 OF EXHIBIT 8
 8   ACCURATELY DEPICT HOW YOUR FACE LOOKED ON THE DATES THAT THE
 9   PHOTOGRAPHS WERE TAKEN?
10        A    YES.
11        MS. MEYER:  YOUR HONOR, REQUEST THAT EXHIBIT 8, 200
12   THROUGH 206 BE ADMITTED.
13        THE COURT:  ACTUALLY THEY WERE -- ALL OF EIGHT WAS
14   ADMITTED YESTERDAY.
15        MS. MEYER:  OH.  OKAY.
16        Q    BY MS. MEYER:  LINDSEY, AT THIS TIME ARE YOU
17   SEEKING A RESTRAINING ORDER?
18        A    AT THIS TIME?  WHAT DO YOU MEAN?
19        Q    DO YOU WANT A RESTRAINING ORDER AGAINST TREVOR?
20        A    YES.
21        Q    AND WHY DO YOU WANT A RESTRAINING ORDER AGAINST
22   TREVOR?
23        A    I AM TERRIFIED OF HIM AND WHAT HE CAN DO TO ME
24   SINCE I REPORTED THIS.  AND WHAT HE'S CAPABLE OF.  AND I FEAR
25   SO MUCH THAT EITHER HIM, YOU KNOW, CONTACTING ME, THREATENING
26   ME, ANYTHING LIKE THAT.  I NEVER WANT TO HAVE TO SEE HIS NAME
27   ON MY PHONE.  I NEVER WANT TO HAVE TO FEAR HE IS GOING TO
28   COME AFTER ME IN SAN DIEGO.  AND THE LAST GIRL WHO TRIED TO
```

```
1    GET A PROTECTION ORDER AGAINST HIM --
2         MS. HOLLEY:  OBJECTION.
3         THE COURT:  SUSTAINED.
4         Q    BY MS. MEYER:  LINDSEY, WHEN YOU TESTIFIED EARLIER
5    THAT TREVOR HAD ASKED IF HE COULD COME VISIT YOU IN SAN
6    DIEGO, HOW DID YOU FEEL WHEN HE ASKED YOU THAT?
7         A    SICK TO MY STOMACH.
8         Q    WHY?
9         A    BECAUSE OF EVERYTHING THAT I EXPERIENCED THAT
10   HAPPENED TO MY BODY.  HE IS CAPABLE OF DOING THAT AND MORE.
11   NOW THAT HIS CAREER IS AFFECTED, HE IS GOING TO BLAME ME FOR
12   THAT.  AND I JUST CAN'T -- I LIVE IN FEAR OF THAT.  WHEN HE
13   CAME TO SAN DIEGO IN LATE JUNE AND I DIDN'T HAVE THE
14   RESTRAINING ORDER, I HAD TO LEAVE TOWN TO GO TO NORTHERN
15   CALIFORNIA BECAUSE I DIDN'T WANT TO BE IN THE SAME CITY AS
16   HIM.  HIS SILENCE AFTER I SENT THAT LAST TEXT WAS EVEN MORE
17   SCARY TO ME.
18        Q    WHY?
19        A    BECAUSE I DIDN'T KNOW IF THE POLICE HAD CONTACTED
20   HIM, INTERVIEWED HIM.  AND I REALLY WAS TERRIFIED OF HIM.  HE
21   HAD TWO OPTIONS -- EITHER CONTACTING ME TO COME SEE HIM
22   AGAIN, ASKING AGAIN IF HE COULD COME SEE ME, OR HURTING ME
23   AGAIN FOR GOING TO THE HOSPITAL AND REPORTING THIS.
24        Q    LINDSEY, WHY DID YOU WAIT APPROXIMATELY 45 DAYS TO
25   GET A RESTRAINING ORDER?
26        A    I WAS TOLD BY THE PASADENA POLICE TWO DIFFERENT
27   TIMES THAT THEY WERE GOING TO ARREST HIM.  THE DETECTIVE --
28   AND I REALLY TRUSTED THEM, THAT THAT WAS GOING TO HAPPEN.
```

```
 1   AND THEY TOLD ME WHEN HE WAS ARRESTED I WOULD GET AN
 2   AUTOMATIC ORDER OF PROTECTION.  SO I WAS WAITING TO SEE.  I
 3   WAS WAITING ON THE POLICE DEPARTMENT TO PROVIDE ME WITH THE
 4   PROTECTION I NEEDED.  AND I WAITED AS LONG AS I COULD.  AND
 5   I -- WHEN I HIT THE POINT OF KNOWING THAT THEY WERE GOING TO
 6   TAKE A WHILE WITH THIS INVESTIGATION, I HAD TO GET PROTECTION
 7   FOR MYSELF IN THE MEANTIME.
 8        Q    HAS ANYTHING IN YOUR LIFE CHANGED SINCE MAY 16,
 9   2021?
10        A    YES.
11        Q    WHAT HAS CHANGED IN YOUR LIFE?
12        MS. HOLLEY:  OBJECTION.  RELEVANCE.  ASKED AND ANSWERED.
13        THE COURT:  ANYTHING THAT YOU HAVEN'T ALREADY TOLD US?
14        THE WITNESS:  I LOST MY JOB.  I LOST MY PLACE OF
15   RESIDENCE.  I HAVE NOWHERE TO LIVE, BECAUSE I COULDN'T DO MY
16   JOB BECAUSE I HAD AN ACUTE HEAD INJURY.  I HAD TO MOVE BACK
17   IN WITH MY PARENTS.  I HAD TO TAKE A LEAVE OF ABSENCE FROM MY
18   OTHER JOB.  I HAVE NO SOURCE OF INCOME.
19             I MEAN, MY DAY-TO-DAY LIFE, AS MUCH AS I TRY TO
20   TAKE CARE OF MYSELF, INITIALLY IT WAS -- I MEAN, IT'S STILL
21   HARD TO SLEEP.  I WAKE UP IN THE MIDDLE OF THE NIGHT.  I LOST
22   OVER TEN POUNDS.  AND THE SADNESS HAVING TO DEAL WITH EVERY
23   DAY.  AND LIVING IN FEAR OF TREVOR BAUER IS BRUTAL.
24        MS. MEYER:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS AT
25   THIS TIME.  THANK YOU VERY MUCH, LINDSEY.
26        THE COURT:  ALL RIGHT.  CROSS.
27        MS. HOLLEY:  THANK YOU.  YOUR HONOR, PERHAPS WE CAN
28   SWITCH EXHIBIT BOOKS.  SOME OF THE EXHIBITS ARE THE SAME.
```

1   BUT THEY'RE NUMBERED DIFFERENTLY.

2        THE COURT:  OKAY.

3        MS. HOLLEY:  SO I GUESS WE'LL FIGURE OUT HOW BEST TO DO

4   THAT IN TERMS OF ADMITTING THEM SINCE THEY'VE ALREADY BEEN

5   ADMITTED WITH DIFFERENT NUMBERS.

6        THE COURT:  IF SOMETHING IS ADMITTED AS PETITIONER'S

7   EXHIBIT, YOU CAN SHOW IT.  REFERENCE IT AS PETITIONER'S

8   EXHIBIT.  HAND ANY DOCUMENTS YOU WENT BROUGHT TO THE WITNESS

9   STAND TO MY BAILIFF AND SHE'LL BRING THEM UP.

10        MS. HOLLEY:  I'M GOING TO GIVE HER AN EXHIBIT BOOK.

11        THE COURT:  IF YOU WANT TO GIVE IT TO MY BAILIFF.

12        MS. HOLLEY:  YES, THAT'S WHAT I MEAN.

13        THE COURT:  SHE'LL BRING IT ON UP.  WHY DON'T WE PUT

14   EVERYTHING, OTHER THAN ONE, BEHIND THE WITNESS.  DON'T HAVE

15   FOUR BOOKS UP THERE.  HAVE ONE BOOK UP THERE.  AND PUT THEM

16   DIRECTLY BEHIND HER.  OFFICER, NOT THERE.  DIRECTLY BEHIND

17   HER.  SO IF SHE JUST NEEDS TO TURN AROUND AND PICK UP BOOK

18   NUMBER TWO, IT'S THERE.  THANKS.

19        MS. HOLLEY:  MAY I?

20        THE COURT:  YOU MAY.

21

22                CROSS EXAMINATION

23   BY MS. HOLLEY:

24        Q    GOOD MORNING, MS. HILL.

25        A    GOOD MORNING.

26        Q    DO YOU KNOW WHAT A LIE OF OMISSION IS?

27        A    NO.

28        MS. MEYER:  OBJECTION.  RELEVANCE.

```
 1        THE COURT:  OVERRULED.

 2        THE WITNESS:  NO, I DO NOT.

 3        Q    BY MS. HOLLEY:  WOULD YOU ACCEPT A REPRESENTATION

 4   FROM ME -- PERHAPS YOU WILL NOT -- AS TO THE DEFINITION AS AN

 5   INTENTIONAL FAILURE TO TELL THE TRUTH IN A SITUATION

 6   REQUIRING DISCLOSURE?  CAN YOU ACCEPT THAT REPRESENTATION

 7   FROM ME THAT THAT IS WHAT A LIE OF OMISSION IS DEFINED AS?

 8        A    YES.

 9        Q    THANK YOU.  SO GIVEN THAT DEFINITION, WITH THAT

10   DEFINITION IN MIND, WOULD YOU AGREE WITH ME THAT A LIE OF

11   OMISSION IS AN ACT OF DECEPTION?

12        A    YES.

13        Q    IT'S A LIE; RIGHT?

14        A    YES.

15        Q    ALL RIGHT.  NOW, YOU UNDERSTAND THAT WE ARE HERE IN

16   THIS PROCEEDING BECAUSE YOU FILED A REQUEST FOR A DOMESTIC

17   VIOLENCE RESTRAINING ORDER?

18        A    YES.

19        Q    AND IN ORDER TO OBTAIN A DOMESTIC VIOLENCE

20   RESTRAINING ORDER YOU UNDERSTOOD THAT YOU HAD TO PROVIDE A

21   DECLARATION UNDER PENALTY OF PERJURY AS TO WHAT HAPPENED

22   BETWEEN YOU AND TREVOR BAUER; CORRECT?

23        A    YES.

24        Q    ALL RIGHT.  AND YOU UNDERSTOOD THAT JUDGES OF THE

25   LOS ANGELES SUPERIOR COURT WOULD READ AND RELY ON WHAT YOU

26   STATED UNDER PENALTY OF PERJURY TO MAKE CRITICAL DECISIONS IN

27   THIS CASE ABOUT WHETHER OR NOT YOU NEEDED A RESTRAINING

28   ORDER; CORRECT?
```

224

```
1         A    YES.
2         Q    AND YOU ALSO UNDERSTOOD THAT YOUR FILING AND YOUR
3    DECLARATION WOULD BE REPORTED ON BY THE MEDIA; CORRECT?
4         MS. MEYER:  OBJECTION.  RELEVANCE.  352.
5         THE COURT:  OVERRULED.  GOES TO MOTIVE.
6         THE WITNESS:  YES.
7         Q    BY MS. HOLLEY:  THANK YOU.  IN FACT, IT WAS
8    IMPORTANT TO YOU THAT IT BE REPORTED BY THE MEDIA; CORRECT?
9         A    NO.
10        Q    AT SOME POINT IT BECAME VERY IMPORTANT TO YOU THAT
11   IT BE REPORTED BY THE MEDIA; CORRECT?
12        A    YES, AFTER MR. FETTEROLF PUT OUT A STATEMENT.
13        Q    ALL RIGHT.  MY QUESTION IS AT SOME POINT IT WAS
14   VERY IMPORTANT THAT IT BE REPORTED ON BY THE MEDIA; CORRECT?
15   CORRECT?
16        THE COURT:  SHE ANSWERED YES.
17        MS. HOLLEY:  THANK YOU.
18        Q    BY MS. HOLLEY:  IN LIGHT OF ALL THAT, DID YOU THINK
19   IT WAS IMPORTANT TO BE HONEST AND THOROUGH IN WHAT YOU
20   PRESENTED TO THE COURT IN YOUR DECLARATION?
21        A    YES.
22        Q    DID YOU THINK IT WAS IMPORTANT TO TELL THE TRUTH,
23   THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, OR DID YOU THINK
24   IT WAS MORE IMPORTANT TO JUST TELL YOUR NARRATIVE, THINGS
25   THAT WERE GOING FOR YOU AND LEAVE OUT THINGS THAT WERE GOOD
26   FOR MR. BAUER?
27        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.  COMPOUND.
28        THE COURT:  SUSTAINED.
```

225

```
1        Q    BY MS. HOLLEY:  WOULD YOU AGREE WITH ME THAT YOU
2   OMITTED DOZENS OF KEY FACTS IN WHAT YOU PRESENTED TO THE
3   LOS ANGELES SUPERIOR COURT IN YOUR REQUEST FOR A DOMESTIC
4   VIOLENCE RESTRAINING ORDER?
5        MS. MEYER:  OBJECTION.
6        THE WITNESS:  I DON'T KNOW.
7        MS. MEYER:  VAGUE.  ARGUMENTATIVE.
8        THE COURT:  OVERRULED.  YOU MAY ANSWER.
9        THE WITNESS:  I DON'T KNOW.
10       Q    BY MS. HOLLEY:  YOU DON'T KNOW IF YOU LEFT OUT KEY
11  FACTS?
12       A    NO.
13       Q    DID YOU READ YOUR DECLARATION BEFORE YOU SIGNED
14  IT?
15       A    YES.
16       Q    DID YOU LOOK AT THE EXHIBITS BEFORE YOUR PETITION
17  WAS SUBMITTED?
18       A    YES.
19       Q    ALL RIGHT.  WOULD YOU AGREE WITH ME THAT YOU
20  INCLUDED MISLEADING INFORMATION IN YOUR REQUEST FOR DOMESTIC
21  VIOLENCE RESTRAINING ORDER?
22       MS. MEYER:  OBJECTION.  ARGUMENTATIVE.  ASSUMES FACTS.
23       THE COURT:  OVERRULED.  YOU MAY ANSWER.
24       THE WITNESS:  NO.
25       Q    BY MS. HOLLEY:  YOU DON'T AGREE WITH THAT?
26       A    CAN YOU REPEAT?
27       MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.
28       THE COURT:  OVERRULED.
```

```
 1        THE WITNESS:  CAN YOU REPEAT YOUR QUESTION, PLEASE?

 2        Q    BY MS. HOLLEY:  WOULD YOU AGREE WITH ME THAT YOU

 3   INCLUDED MISLEADING INFORMATION IN YOUR REQUEST FOR A

 4   DOMESTIC VIOLENCE RESTRAINING ORDER?

 5        A    NO.

 6        Q    OKAY.  BUT YOU DO AGREE THAT YOU LEFT A LOT OUT OF

 7   YOUR PETITION, DIDN'T YOU?

 8        A    I DON'T KNOW.

 9        Q    OKAY.  AND WHY DON'T YOU KNOW?

10        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.

11        THE COURT:  SUSTAINED.

12        Q    BY MS. HOLLEY:  YOU HAVE BEFORE YOU A BINDER.

13   RESPONDENT'S EXHIBIT A IS THE ENTIRE FILING BY THE

14   PETITIONER.  AND ON THE BOTTOM OF THE PAGES ARE NUMBERS.  LH

15   1 THROUGH 84.

16        MS. HOLLEY:  I BELIEVE THAT'S ALREADY BEEN RECEIVED.  IF

17   IT HASN'T, I WOULD ASK THAT IT BE MARKED AS RECEIVED.

18        THE COURT:  IT HAS NOT PREVIOUSLY BEEN.  BUT I WILL HAVE

19   IT MARKED.  AND ANY OBJECTION TO ITS BEING RECEIVED INTO

20   EVIDENCE?

21        MS. MEYER:  NO, YOUR HONOR.

22        THE COURT:  ALL RIGHT.  RESPONDENT'S A IS ADMITTED.

23        MS. HOLLEY:  AND RESPONDENT'S EXHIBIT B I WOULD

24   REPRESENT IS THE ENTIRE COPY OF ALL WRITTEN COMMUNICATION

25   BETWEEN MS. HILL AND MR. BAUER.  AND HAS TB AT THE BOTTOM OF

26   THE PAGES.  PAGE NUMBERS 1 THROUGH 101.  I BELIEVE THAT WAS

27   ADMITTED AS PETITIONER'S EXHIBIT 2?

28        THE COURT:  IT IS.
```

```
 1        MS. HOLLEY:  SO I WOULD ASK IT BE MARKED AND RECEIVED,
 2   IF WE NEED TO DO THAT?
 3        THE COURT:  DON'T NEED TO DO THAT.  YOU CAN SIMPLY
 4   REFERENCE PETITIONER'S 2 AS THE SAME DOCUMENT.
 5        MS. HOLLEY:  OKAY.
 6        Q    BY MS. HOLLEY:  MS. HILL, WOULD YOU TAKE A LOOK AT
 7   RESPONDENT'S EXHIBIT B, WHICH I'M REPRESENTING IS THE SAME AS
 8   PETITIONER'S EXHIBIT 2.  HAVE YOU TAKEN A LOOK AT THAT?
 9        A    YES.
10        Q    WOULD YOU AGREE THAT RESPONDENT'S EXHIBIT B
11   CONTAINS THE ENTIRE HISTORY OF WRITTEN COMMUNICATION BETWEEN
12   YOU AND TREVOR?
13        MS. MEYER:  OBJECTION.  LACKS FOUNDATION.
14        THE COURT:  ASSUMING THAT IT IS THE SAME AS PETITIONER'S
15   2.
16        THE WITNESS:  YES.
17        MS. HOLLEY:  THANK YOU.
18        Q    BY MS. HOLLEY:  NOW, I BELIEVE YOU TESTIFIED AND
19   ACKNOWLEDGED ON DIRECT EXAMINATION THAT ALL OF THE WRITTEN
20   COMMUNICATION BETWEEN YOU AND TREVOR WAS PROVIDED TO YOU AND
21   YOUR TEAM BY TREVOR; CORRECT?
22        A    YES.
23        Q    AND THAT'S BECAUSE YOU DELETED MOST OF IT; RIGHT?
24        A    YES, I DID.
25        MS. MEYER:  OBJECTION -- I'LL WITHDRAW.
26        Q    BY MS. HOLLEY:  SO YOU WOULD AGREE WITH ME IT'S A
27   GOOD THING TREVOR SAVED IT SINCE YOU DELETED IT; RIGHT?
28        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.  352.
```

```
1         THE COURT:  SUSTAINED ON ARGUMENTATIVE.

2         Q     BY MS. HOLLEY:  ALL RIGHT.  YOU WOULD AGREE THAT IF

3    YOU DID NOT HAVE TREVOR'S COMMUNICATIONS WE WOULD HAVE TO

4    RELY UPON WHAT YOU PRESENTED IN YOUR PETITION; RIGHT?

5         A     YES.

6         Q     NOW, WHY DID YOU DELETE ALL OF THE INSTAGRAM

7    MESSAGES AND TEXTS BETWEEN YOU AND TREVOR?

8         A     SO I FREQUENTLY DELETE DM'S AND TEXT MESSAGES FOR

9    MATTER OF STORAGE AND PRIVACY SO THAT IF SOMEONE HAS MY PHONE

10   THEY CAN'T LOOK AT IT.

11        Q     AND WHEN DID YOU DELETE IT?

12        A     WHICH MESSAGES ARE YOU REFERRING TO?

13        Q     WERE THERE VARIOUS PERIODS THAT YOU DELETED THE

14   INSTAGRAM MESSAGES AND TEXTS?

15        A     YES.

16        Q     DO YOU KNOW WHEN YOU DELETED THEM, EACH OF THE

17   DATES?

18        A     I DON'T KNOW SPECIFIC DATES.  BUT WE DID PROVIDE A

19   SCREENSHOT THAT I HAD DELETED ALL OF MY MESSAGES PREVIOUS TO

20   APRIL 29TH WHEN A NEW THREAD WAS STARTED.

21        Q     A NEW WHAT WAS STARTED?

22        A     A NEW MESSAGE WAS STARTED.

23        Q     YOUR LAWYER, MS. OLSON, REPRESENTED THAT YOU

24   DELETED YOUR INSTAGRAM MESSAGES WITH TREVOR BECAUSE YOU DID

25   NOT WANT TO SEE HIS NAME ON YOUR PHONE; IS THAT ACCURATE OR

26   IS IT WHAT YOU JUST SAID?

27        A     THAT'S ACCURATE IN TERMS OF WHEN I WAS IN THE

28   HOSPITAL.  I DELETED EVERYTHING THAT I CURRENTLY HAD ON MY
```

```
 1   PHONE FROM TREVOR.
 2        Q    NOW, WE'LL SEE LATER AS WE GO THROUGH YOUR TEXTS
 3   AND INSTAGRAM MESSAGES WITH YOUR FRIENDS, AFTER MAY 16TH YOU
 4   SPEND A LOT OF TIME SHARING MEMES OF TREVOR, WATCHING
 5   BASEBALL GAMES IN WHICH HE IS PITCHING; IS THAT TRUE?
 6        MS. MEYER:  OBJECTION.  COMPOUND.  ASSUMES FACTS.
 7        THE COURT:  IT IS COMPOUND.  I'LL LET YOU BREAK IT
 8   DOWN.
 9        Q    BY MS. HOLLEY:  WE'LL SEE LATER AS YOU GO THROUGH
10   YOUR TEXTS AND INSTAGRAM MESSAGES YOU SPEND A LOT OF TIME,
11   EVEN AFTER MAY 16, SHARING MEMES OF TREVOR WITH YOUR FRIENDS;
12   RIGHT?
13        A    YES.
14        Q    AND YOU HAVE COMMUNICATIONS WHERE YOU ARE PICTURED
15   WATCHING BASEBALL GAMES IN WHICH HE IS PITCHING; RIGHT?
16        A    ARE YOU ASKING AFTER MAY 16TH?
17        Q    CORRECT.
18        A    I DON'T KNOW.
19        Q    BUT IF THERE ARE SUCH PICTURES, YOU WOULD AGREE
20   THAT THEY EXIST; RIGHT?
21        MS. MEYER:  OBJECTION.  CALLS FOR SPECULATION.
22        THE COURT:  SUSTAINED.
23        Q    BY MS. HOLLEY:  WELL, LET'S JUST TALK ABOUT THE
24   MEMES.  BECAUSE YOU HAVE ACKNOWLEDGED THAT IT WAS POSSIBLE
25   FOR YOU TO SHARE MEMES ABOUT TREVOR, BUT YOU COULD NOT BEAR
26   TO SEE HIS NAME ON YOUR PHONE; IS THAT RIGHT?
27        A    ARE YOU REFERRING TO AFTER MAY 16TH?  AFTER THE
28   ASSAULT?
```

```
 1        Q    YES.  AFTER MAY 16TH.

 2        A    YES.

 3        Q    OKAY.  NOW, I THINK YOU JUST TESTIFIED THAT YOU

 4   DELETE INSTAGRAM MESSAGES BECAUSE YOU DON'T WANT PEOPLE TO BE

 5   ABLE TO GO INTO YOUR PHONE TO SEE YOUR MESSAGES?

 6        A    YES.

 7        Q    DO YOU HAVE A PASSCODE ON YOUR PHONE?

 8        A    YES, I DO.

 9        Q    IN THE PAST, HAVE RANDOM PEOPLE BEEN ABLE TO GO

10   INTO YOUR PHONE TO SEE YOUR MESSAGES?

11        A    YES.

12        Q    THAT'S HAPPENED BEFORE?

13        A    YES, IT HAS.

14        Q    OKAY.  NOW, SOME OF THE INSTAGRAM -- ACTUALLY MANY

15   OF THE INSTAGRAM MESSAGES AND TEXTS WITH TREVOR, YOU TOOK

16   SCREENSHOTS OF TO SHARE WITH YOUR FRIENDS AND FAMILY;

17   RIGHT?

18        A    YES.

19        Q    AND THOSE SCREENSHOTS WOULD BE STORED IN YOUR PHOTO

20   LIBRARY; RIGHT?

21        A    YES.

22        Q    YOU DELETED THOSE TOO?

23        A    NO, I DID NOT.

24        Q    IF SOMEBODY GOT YOUR PASSCODE AND WENT IN YOUR

25   PHONE, THEY COULD STILL SEE IT IN YOUR PHOTO LIBRARY;

26   RIGHT?

27        A    YES.

28        Q    BUT YOU WEREN'T CONCERNED ABOUT THAT?
```

```
1        MS. MEYER:  OBJECTION.  VAGUE.

2        THE COURT:  OVERRULED.  YOU MAY ANSWER.

3        THE WITNESS:  I -- NO, BECAUSE I DIDN'T THINK OF THAT.

4        Q    BY MS. HOLLEY:  BECAUSE YOU DIDN'T THINK OF THAT?

5        A    YES.

6        Q    NOW, BEFORE WE START TALKING ABOUT OMISSIONS AND

7   MISREPRESENTATIONS, I WANT TO ASK YOU SOME QUESTIONS ABOUT

8   THE FIRST PAGE OF YOUR DECLARATION, WHICH IS ON LH 7,

9   RESPONDENT'S EXHIBIT A.  LET ME KNOW WHEN YOU HAVE THAT.

10       A    DID YOU SAY EXHIBIT A?

11       THE COURT:  LH 1.

12       Q    BY MS. HOLLEY:  LH 7 IN EXHIBIT A.  IT'S YOUR

13  DECLARATION.

14       A    PERFECT.  YES, I HAVE IT IN FRONT OF ME.

15       Q    THANK YOU.  IN PARAGRAPH FOUR, YOU ARE TALKING

16  ABOUT YOUR VERY FIRST COMMUNICATION WITH TREVOR; RIGHT?

17       A    YES.

18       Q    AND THAT COMMUNICATION WAS VIA INSTAGRAM DIRECT

19  MESSAGE; RIGHT?

20       A    YES.

21       Q    ON SUNDAY, APRIL 18TH?

22       A    YES.

23       Q    AND SO THE VERY FIRST TIME YOU EVER COMMUNICATED

24  WITH HIM WAS JUST THREE DAYS BEFORE THE FIRST TIME YOU HAD

25  SEX WITH HIM; RIGHT?

26       A    YES.

27       Q    AND THE ONLY WAY YOU COMMUNICATED WITH TREVOR FROM

28  APRIL 18TH TO MAY 8TH WAS THROUGH DIRECT MESSAGE ON THE
```

```
 1   SOCIAL MEDIA APP INSTAGRAM?

 2        A    YES.

 3        Q    AND THAT'S BECAUSE UP UNTIL MAY 8TH YOU DIDN'T HAVE

 4   HIS PHONE NUMBER; RIGHT?

 5        A    YES.

 6        Q    AND HE DIDN'T HAVE YOUR PHONE NUMBER?

 7        A    YES.

 8        Q    OKAY.  NOW, IN PARAGRAPH FOUR YOU SAY, "ON APRIL

 9   18TH TREVOR INVITED ME TO VISIT HIM AT HIS HOME IN PASADENA

10   AFTER THE DODGERS' ROAD TRIP CONCLUDED.  I AGREED TO VISIT.

11   THE INSTAGRAM MESSAGES BETWEEN TREVOR AND I ARE ATTACHED AS

12   EXHIBIT 1."  DO YOU SEE THAT?

13        A    YES.

14        Q    OKAY.  NOW, IF YOU LOOK AT THE INSTAGRAM

15   COMMUNICATION BETWEEN YOU AND MR. BAUER ON APRIL 18TH -- AND

16   BY THAT, YOU NEED TO LOOK IN THE OTHER EXHIBIT, B.  IF YOU

17   START AT TB 1 AND GO THROUGH TB 12 -- JUST KIND OF SKIM

18   THOSE.  READ THEM TO YOURSELF.  NOW, A LOT OF THAT IS JUST

19   BANTER ABOUT BASEBALL AND GOLF.  THINGS THAT AREN'T

20   PARTICULARLY IMPORTANT TO THE CASE; RIGHT?

21        A    YES.

22        Q    OKAY.  BUT IF WE LOOK AT TB PAGE 12 AND 13

23   TOGETHER -- AND I'LL READ IT OUT LOUD.  YOU CAN FOLLOW ALONG.

24   AND MS. MEYER WENT OVER PART OF THIS WITH YOU.  I WANT TO ASK

25   YOU QUESTIONS FOR A DIFFERENT REASON.

26             YOU, "PUT ME IN COACH.  I'LL EVEN DROP KICK CARLOS

27   CORREA ON MY WAY TO THIRD FOR YOU."  TREVOR, "WELL, ALL

28   THAT'S LEFT IS THE OFFICIAL TRYOUT."  YOU, "TRYOUTS DON'T
```

1    SCARE ME BAUER.  BRING IT."  TREVOR, "I'M WILLING AND ABLE

2    WHENEVER YOU'RE READY."  YOU, "PICK A DAY AND I'M THERE."

3    TREVOR, "NO PROBLEM DRIVING TO L.A. HUH?"  YOU, "OH I'M A PRO

4    AT THAT DRIVE."  THEN KISSING FACE EMOJI.  "LOVE ME SOME

5    L.A."  TREVOR, "WELL, TRYOUTS AS SOON AS WE GET BACK HOME ON

6    TUESDAY."  YOU, "TACO TUESDAY, GREAT CHOICE.  SOUNDS LIKE A

7    PLAN TO ME."

8              THEN IF YOU GO DOWN TO TB 14, YOU SAY -- ARE YOU

9    THERE?

10        A    YES.

11        Q    OKAY.  "AND OOOO YES I'M DOWN FOR TUESDAY OR

12   WEDNESDAY.  WHATEVA WORKS."  NOW, CAN YOU LOOK AT LH 24 BACK

13   IN THE OTHER EXHIBIT, YOUR EXHIBIT.  THAT'S WHERE YOU END THE

14   COMMUNICATION; RIGHT?  THAT'S THE END OF YOUR EXHIBIT.  YOU

15   DON'T KEEP GOING FROM THERE; RIGHT?

16        A    YES.

17        Q    OKAY.  SO IN YOUR DECLARATION WHEN YOU SAID, "THE

18   INSTAGRAM MESSAGES BETWEEN TREVOR AND I ARE ATTACHED AS

19   EXHIBIT 1," FIRST OF ALL, IT WILL BE MORE ACCURATE TO SAY

20   SOME OF THE INSTAGRAM MESSAGES BETWEEN YOU AND TREVOR ARE IN

21   EXHIBIT 1; THAT WILL BE MORE ACCURATE?

22        MS. MEYER:  OBJECTION.  RELEVANCE.

23        THE COURT:  SUSTAINED.

24        Q    BY MS. HOLLEY:  OKAY.  NOW, IF WE LOOK BACK AT

25   EXHIBIT B, WHICH WE HAVE AGREED IS THE COMPLETE COPY.  AND

26   YOU LOOK AT TB 14, WHICH IS THE SAME PLACE YOU END YOUR

27   EXHIBIT 1; RIGHT?

28        A    YES.

234

1    Q    AND NOW LET'S GO OVER TO TB 34 AT THE BOTTOM.  READ

2  ALONG WITH ME.  IT IS NOW APRIL 20TH.  SO THIS IS THE DAY

3  BEFORE YOU GO OVER.

4    A    WHAT NUMBER DID YOU SAY?

5    Q    THIRTY-FOUR.  TB 34.

6  MS. MEYER:  YOUR HONOR, WHAT EXHIBIT ARE WE ON?

7  THE COURT:  WE'RE ON HER EXHIBIT B OR YOUR EXHIBIT 2.

8    Q    BY MS. HOLLEY:  READY?

9    A    YES.

10   Q    YOU, "CAN'T WAIT FOR TRYOUTS."  TREVOR, "WHEN DO

11  YOU WANT TO TRY OUT?"  YOU, "THIS IS EQUAL TRYOUT.  NEED TO

12  SEE YOUR TRIPLE ABILITY TOO RIGHT?  TOMORROW?"  TREVOR, "YEAH

13  I'M ALWAYS PREPARED FOR THAT.  TOMORROW COULD WORK."  YOU,

14  "PERFECT.  PLAY BALL, BAUER."  TREVOR, "CAN'T WAIT TO SEE

15  YOUR SKILLSET."  YOU, "I'LL HAVE MY NDA SIGNED AND SEALED,

16  AND MY FEELINGS BUTTON SWITCHED OFF.  DON'T WORRY"  TREVOR,

17  "YOU'RE SUCH A PRO.  THANK YOU."  YOU, "I GOTCHU."  WITH THE

18  BLOWING HEART KISS EMOJI.

19        NOW, SKIP OVER A LITTLE BIT TO TB 36, WHICH IS NOW

20  A COMMUNICATION ON APRIL 21ST AT 5:10.  DO YOU SEE THAT?

21   A    YES.

22   Q    TREVOR, "WHAT'S THE PLAN?"  YOU, "I CAN LEAVE SD IN

23  A BIT IF YOU ARE STILL FREE TONIGHT.  JUST LEMME KNOW WHERE

24  TO MEET YOU.  EXCLAMATION MARK."  TREVOR, "I'M STILL FREE,

25  YES.  YOU'RE ABOUT 2.5 HOURS FROM MY PLACE.  SURE YOU WANT TO

26  DRIVE AT THAT FAR JUST FOR A TRYOUT?"  AND THEN THE KISSING

27  HEART FACE EMOJI.  YOU, HAHAHA YES IT WORKS OUT.  I'M GOING

28  TO GO SEE MY L.A. GIRLS TOMORROW TO MAKE A LITTLE TRIP OUT OF

```
1    IT.  AS LONG AS I CAN CRASH ON YOUR COUCH."  WINKING EYE
2    EMOJI.  TREVOR, "HAHA SURE.  WORKS FOR ME WHAT TIME DO YOU
3    THINK YOU COULD BE HERE?  9ISH?"  YOU, "THAT IS PERFECTOOOO,
4    EXCLAMATION MARK."  HE GIVES YOU HIS ADDRESS.  YOU SAY YOU'RE
5    ON YOUR WAY; RIGHT?
6         A    YES.
7         Q    FIRST OF ALL, I WANT TO ASK YOU ABOUT ALL THAT.  ON
8    PAGE 4 OF YOUR DECLARATION WHEN YOU SAY, "ON APRIL 18TH,
9    2021, TREVOR INVITED ME TO VISIT HIM AT HIS HOME IN PASADENA
10   AFTER THE DODGERS' ROAD TRIP CONCLUDED.  I AGREED TO VISIT."
11   WOULDN'T YOU AGREE, AFTER READING ALL OF THOSE MESSAGES, THE
12   MESSAGES WE WENT THROUGH, IT WAS SOMEWHAT MISLEADING TO
13   CHARACTERIZE THAT AS TREVOR INVITED ME AND I AGREED?
14        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.
15        THE COURT:  THAT IS ARGUMENTATIVE.
16        Q    BY MS. HOLLEY:  DO YOU BELIEVE THAT IT WAS
17   MISLEADING TO HAVE WRITTEN PARAGRAPH FOUR AS YOU DID
18   SUGGESTING THAT THERE WAS A SIMPLE INVITATION THAT YOU
19   ACCEPTED?
20        A    NO.
21        MS. MEYER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.
22        THE COURT:  THE ANSWER IS IN.
23        Q    BY MS. HOLLEY:  WOULD YOU AGREE THAT YOU WERE MORE
24   ASSERTIVE THAN TREVOR IN YOUR GOING TO HIS HOME ON THAT
25   DAY?
26        A    WHAT DO YOU MEAN BY "ASSERTIVE"?
27        Q    DIDN'T YOU EXPRESS A GREATER INTEREST IN GOING
28   THERE THAN HE IN HAVING YOU COME?
```

```
1          A    I DON'T KNOW.

2          Q    NOW, LET'S DISCUSS SOME OF THE NUMEROUS MESSAGES

3    YOU LEFT OUT OF YOUR FILING SINCE YOU SAID YOU DON'T

4    REALIZE --

5          MS. MEYER:  OBJECTION.  ARGUMENTATIVE.

6          THE COURT:  THERE'S NOT A QUESTION, MS. MEYER.

7          MS. MEYER:  I'M ANTICIPATING.

8          THE COURT:  YOU DON'T GET TO TO ANTICIPATORY

9    QUESTIONS.

10         Q    BY MS. HOLLEY:  GOING BACK TO TB 36, WHEN YOU SAY,

11   "I HAVE MY NDA SIGNED AND SEALED, AND MY FEELINGS BUTTON

12   SWITCHED OFF DON'T WORRY," TREVOR SAYS, "YOU'RE SUCH A PRO.

13   THANK YOU."  AND YOU SAY, "I GOTCHU."  WITH A KISSING HEART

14   EMOJI.  NOW, WHY DID YOU PURPOSELY LEAVE THAT OUT OF THE

15   COMMUNICATION YOU PROVIDED TO THE COURT?

16         MS. MEYER:  OBJECTION, YOUR HONOR.  POTENTIALLY VIOLATES

17   THE ATTORNEY-CLIENT PRIVILEGE.  ALSO ARGUMENTATIVE AS

18   PHRASED.

19         THE COURT:  OVERRULED.  YOU MAY ANSWER.

20         THE WITNESS:  I PROVIDED EVERYTHING THAT I HAD ON MY

21   PHONE.  I DIDN'T HAVE ACCESS TO ANYTHING ELSE.

22         Q    BY MS. HOLLEY:  OKAY.  WELL, YOU WOULD AGREE THAT

23   THOSE WORDS ARE IMPORTANT; RIGHT?

24         MS. MEYER:  OBJECTION.  VAGUE.

25         THE COURT:  OVERRULED.  YOU MAY ANSWER.

26         THE WITNESS:  I DON'T KNOW.  I DIDN'T HAVE THE MESSAGES.

27         Q    BY MS. HOLLEY:  I'M SORRY?

28         A    I DID NOT HAVE THE MESSAGES TO READ THEM.
```

237

```
1        Q    OKAY.  BUT GIVEN THAT YOU HAVE PRESENTED A PETITION
2   WITH YOUR DECLARATION TO THE COURT IN WHICH THE NATURE OF
3   YOUR RELATIONSHIP WITH MR. BAUER IS OF CRITICAL IMPORTANCE,
4   DON'T YOU AGREE THAT IT WOULD BE IMPORTANT FOR YOU TO TELL
5   THE JUDGE THAT YOU ARE LETTING MR. BAUER KNOW THAT YOU ARE
6   GOING TO HAVE YOUR FEELINGS BUTTONS SWITCHED OFF?
7        MS. MEYER:  OBJECTION.
8        Q    BY MS. HOLLEY:  ISN'T THAT IMPORTANT INFORMATION?
9        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.  352.
10       THE COURT:  SUSTAINED.
11       Q    BY MS. HOLLEY:  DID YOU -- WITHDRAWN.
12            I RECOGNIZE, AS YOU'VE TESTIFIED, THAT YOU DELETED
13  ALL OF THESE MESSAGES.  BUT YOU MIGHT HAVE INCLUDED IN YOUR
14  DECLARATION THAT THIS IS WHAT WAS SAID; RIGHT?
15       MS. MEYER:  OBJECTION.  VAGUE.  ARGUMENTATIVE.
16       THE COURT:  IT IS STILL ARGUMENTATIVE.  SAVE IT FOR YOUR
17  CLOSING, COUNSEL.
18       Q    BY MS. HOLLEY:  WHEN YOU SAID, "I'LL HAVE MY NDA
19  SIGNED AND SEALED," WHAT'S AN NDA?
20       A    NONDISCLOSURE AGREEMENT.
21       Q    NOW, TREVOR DIDN'T ASK YOU TO SIGN A NONDISCLOSURE
22  AGREEMENT?
23       A    NO.
24       Q    HE NEVER MENTIONED ANYTHING TO YOU ABOUT A
25  NONDISCLOSURE AGREEMENT; RIGHT?
26       A    NO.
27       Q    SO WHEN YOU SAID THAT, WERE YOU SUGGESTING TO HIM
28  THAT YOU WERE GOING TO BE DISCREET?
```

```
1        A    YES, IN THE FORM OF A SARCASTIC JOKE.

2        Q    OKAY.  WAS IT YOUR INTENTION TO BE DISCREET ABOUT

3   THE FACT YOU WERE GOING TO HIS HOUSE ON APRIL 21ST?

4        A    I DON'T KNOW WHAT YOU MEAN BY THAT QUESTION.

5        Q    OKAY.  FAIR ENOUGH.  WHEN YOU WERE GOING TO HIS

6   HOUSE, DID YOU HAVE ANY IDEA AS TO WHETHER OR NOT IT WAS

7   SOMETHING THAT YOU WERE GOING TO KEEP PRIVATE OR HAD YOU NOT

8   THOUGHT ABOUT THAT?

9        A    I HAD NOT THOUGHT ABOUT THAT.

10       Q    OKAY.  WHEN YOU SAID TO TREVOR, "I'LL HAVE MY NDA

11  SIGNED," DID YOU HAVE ANY INTENTION OF HAVING HIM BELIEVE YOU

12  WERE GOING TO BE DISCREET AND KEEP THE INFORMATION PRIVATE?

13       A    I DON'T UNDERSTAND THAT QUESTION.

14       Q    ALL RIGHT.  YOU SAID THAT YOU SAID "I'LL HAVE MY

15  NDA SIGNED AND SEALED" TO BE SARCASTIC?

16       A    YES.

17       Q    AND WHAT DO YOU MEAN BY THAT?

18       A    ARE YOU ASKING ME WHAT I MEAN ABOUT BEING SARCASTIC

19  ABOUT AN NDA?

20       Q    YES.

21       A    I'M STILL NOT CLEAR ON WHAT YOU'RE ASKING ME.  BUT

22  BECAUSE HE IS A HIGH PROFILE PERSON, THAT'S WHY I MADE THAT

23  SARCASTIC JOKE.

24       Q    SO YOU UNDERSTOOD THAT HE WAS A HIGH PROFILE

25  PERSON?

26       A    YES.

27       Q    AND YOU UNDERSTOOD, BECAUSE YOU KNEW -- WHAT YOU'RE

28  CALLING HIS DATING RULES -- THAT HE DIDN'T WANT THINGS POSTED
```

1   ON SOCIAL MEDIA?

2       A    YES.

3       Q    CORRECT.   OKAY.   SO WAS WHAT YOU WERE SAYING

4   SARCASTICALLY SOMEWHAT IN RELATION TO THAT?

5       A    HIS THREE RULES OF DATING?

6       Q    CORRECT.   AND HE WAS A HIGH PROFILE PERSON?

7       A    YES.

8       Q    OKAY.   SO TO A CERTAIN EXTENT YOU WERE ASSURING HIM

9   THAT YOU APPRECIATED THAT HE WAS A HIGH PROFILE PERSON, AND

10  THAT YOU WOULD EXERCISE DISCRETION; IS THAT FAIR TO SAY OR

11  NO?

12      A    NO.

13      Q    OKAY.   SO THAT WAS NOT YOUR INTENTION THEN AT

14  ALL?

15      A    WHAT INTENTION ARE YOU REFERRING TO?

16      Q    YOUR INTENTION TO LET MR. BAUER UNDERSTAND THAT YOU

17  RECOGNIZED THAT HE WAS A HIGH PROFILE PERSON, AND THAT YOU

18  WOULD TAKE THAT INTO CONSIDERATION AS YOU CONTINUED WHATEVER

19  RELATIONSHIP YOU WERE GOING TO HAVE WITH HIM?

20      A    I'M REALLY CONFUSED.   BUT ALL I CAN SAY THAT IT WAS

21  A SARCASTIC JOKE.

22      Q    NOW, IN REALITY YOU WERE AT THE SAME TIME TAKING

23  SCREENSHOTS OF YOUR COMMUNICATIONS WITH TREVOR AND SHARING

24  THEM WITH DEREK DAWSON AND YOUR COUSIN KYLE ERICKSON?

25      A    YES.

26      Q    ALL RIGHT.   DID YOU TELL MR. BAUER THAT YOU WERE

27  TAKING SCREENSHOTS OF YOUR COMMUNICATIONS AND SHARING THEM

28  WITH OTHER PEOPLE?

1          A    NO.

2          Q    AND IN ADDITION TO MR. DAWSON AND MR. ERICKSON, WHO

3   ELSE DID YOU SEND YOUR EARLY COMMUNICATIONS WITH MR. BAUER?

4          A    MY SPONSOR, LISA.  AND MY BEST FRIEND, MELY.

5          Q    OKAY.  YOU ALSO SAID YOU WERE GOING TO HAVE YOUR

6   FEELINGS BUTTON SWITCHED OFF.  DON'T WORRY.  WHAT DID YOU

7   MEAN BY THAT?

8          A    THAT WAS A REFERENCE TO HIS THREE RULES OF DATING.

9   AND, ALSO, HOW HE HAD PREVIOUSLY COMMUNICATED TO ME THAT HE

10  IS NOT A BIG FEELS GUY, OR WHATEVER THAT TEXT MESSAGE WAS.  I

11  WAS REFERENCING BACK TO WHAT HE SAID.

12         Q    SO YOU WERE SUGGESTING TO HIM THAT HE NEED NOT

13  WORRY ABOUT YOU BECOMING EMOTIONALLY INVOLVED WITH HIM;

14  RIGHT?

15         A    NO.

16         Q    WELL, WHAT WERE YOU SAYING?  WHY WERE YOU TELLING

17  HIM THAT?

18         A    AGAIN, I AM VERY SARCASTIC.  OUR ENTIRE

19  CONVERSATION WAS SARCASTIC BEFORE.  AND IT WAS ALMOST A PLAY

20  OFF OF HIS RULE OF DATING.

21         Q    AND HIS RULE OF DATING IS THAT THERE WOULD BE NO

22  EMOTIONAL ATTACHMENT; YOU UNDERSTOOD THAT?

23         A    HIS RULE IS NO FEELINGS.  AND THAT HE IS

24  EMOTIONALLY UNAVAILABLE.  SO THAT'S WHY I REFERENCED FEELINGS

25  INSTEAD OF EMOTIONAL AVAILABILITY.

26         Q    AND YOU WOULD AGREE THAT EMOTIONAL AVAILABILITY AND

27  FEELINGS ARE SIMILAR CONCEPTS?

28         A    I DON'T KNOW.

```
 1        Q    OKAY.  HAD YOU SEEN THOSE -- WHAT WE'RE CALLING THE
 2   RULES OF DATING -- IN SPORTS ILLUSTRATED OR SOME OTHER
 3   PUBLICATION?
 4        A    YES.
 5        Q    AND DID YOU ALSO HAVE A CONVERSATION WITH HIM ABOUT
 6   THOSE RULES?
 7        A    YES, DURING THE FIRST NIGHT I SPENT WITH HIM.
 8   YES.
 9        Q    AND HE HAS NEVER DISAVOWED THOSE RULES TO YOU, HAS
10   HE?
11        A    WHAT DO YOU MEAN BY "DISAVOWED"?
12        Q    HE HAS NEVER SAID TO YOU, I AM TAKING BACK THAT
13   RULE.  I DON'T MEAN IT ANYMORE, OR ANYTHING LIKE THAT?
14        A    NO.
15        Q    OKAY.  SO YOU UNDERSTOOD THAT THAT RULE, WE'RE
16   CALLING IT, REMAINED IN EFFECT THROUGHOUT THE ENTIRE TIME
17   THAT YOU KNEW HIM; RIGHT?
18        A    NO.
19        Q    BECAUSE HE NEVER TOOK IT BACK?
20        A    NO.
21        Q    NO, YOU DIDN'T KNOW THAT?
22        A    CAN YOU REPEAT WHAT YOU'RE ASKING ME?
23        Q    YES, I WILL.  YOU JUST ACKNOWLEDGED THAT HE NEVER
24   TOLD YOU THAT THAT RULE WAS NO LONGER IN EFFECT; CORRECT?
25        A    YOUR REFERRING TO EMOTIONAL AVAILABILITY; CORRECT?
26        Q    YES.
27        A    NO.  HE NEVER SPOKE A SENTENCE.  BUT BECAUSE HE WAS
28   SO EMOTIONALLY VULNERABLE WITH ME THE FIRST NIGHT, I FELT HE
```

242

1  BROKE THAT RULE.

2      Q    YOU FELT THAT?

3      A    YES, I DID.

4      Q    AND YOU FELT THAT BASED ON MEETING SOMEONE FOR THE

5  FIRST TIME AFTER HAVING SPOKEN WITH THEM ON A SOCIAL MEDIA

6  APP FOR TWO DAYS BEFORE THAT; CORRECT?

7      A    YES.

8      Q    ALL RIGHT.  AND SO IT WAS YOUR ASSESSMENT THAT THAT

9  RULE NO LONGER APPLIED, FROM HIS STANDPOINT, BASED ON THE

10 COMMUNICATION YOU HAD WITH HIM THAT NIGHT?

11     A    YES.

12     Q    ALL RIGHT.  NOW, IT SEEMS THAT YOU HAVE FOLLOWED

13 MR. BAUER IN THE PAST.  YOU SAID YOU WERE INTRIGUED BY HIM;

14 IS THAT FAIR?

15     A    YES.

16     Q    AND ISN'T IT SO THAT HE SPEAKS A LOT IN A LOT OF

17 DIFFERENT WAYS ABOUT HIS FEELINGS AND THINGS THAT HAVE

18 HAPPENED TO HIM, FOR EXAMPLE, BULLYING?

19     MS. MEYER:  OBJECTION.  COMPOUND.  VAGUE AS TO TIME.

20     THE COURT:  OVERRULED.  YOU MAY ANSWER.

21     THE WITNESS:  I DIDN'T KNOW MUCH ABOUT HIM.  I DIDN'T

22 KNOW WHAT HE TELLS OTHER PEOPLE.

23     Q    BY MS. HOLLEY:  I UNDERSTAND THAT.  BUT HAVE YOU

24 READ ARTICLES IN WHICH HE IS INTERVIEWED AND SPEAKS, FOR

25 EXAMPLE, ABOUT BULLYING?

26     MS. MEYER:  OBJECTION.  VAGUE AS TO TIME.

27     THE COURT:  OVERRULED.  YOU MAY ANSWER.

28     THE WITNESS:  AT THAT TIME I HAD ONLY READ THE ARTICLE

```
1    ABOUT THE THREE RULES OF DATING.
2         Q    BY MS. HOLLEY:  OKAY.  SO YOUR BASIS FOR BELIEVING
3    THAT HE WAS BEING VULNERABLE TO YOU WAS REALLY BASED UPON
4    YOUR EXPERIENCE WITH HIM THAT NIGHT; RIGHT?
5         A    YES.
6         Q    SO YOU HAD NOTHING TO COMPARE IT TO?
7         A    NO.
8         Q    ALL RIGHT.  AND SO YOU FELT THAT BECAUSE HE WAS
9    BEING WHAT YOU CONSIDERED TO BE VULNERABLE TO YOU, THAT,
10   THEREFORE, THE EMOTIONAL INVOLVEMENT COMPONENT WAS NO LONGER
11   APPLICABLE TO HIM; IS THAT A FAIR WAY TO ASSESS YOUR STATE OF
12   MIND?
13        A    I THINK THAT'S A VERY COMPLICATED SPECULATION.  I
14   DON'T KNOW.
15        Q    WELL, IT'S NOT SPECULATION FOR YOU.  IT'S
16   SPECULATION FOR ME.  I'M ASKING YOU WHAT WAS GOING ON IN YOUR
17   HEAD.  BECAUSE YOU SAID THAT YOU BELIEVED THAT THIS RULE THAT
18   HE SET FORTH IN A PUBLICATION, WHICH HE SPOKE ABOUT WITH YOU,
19   WAS NO LONGER APPLICABLE BASED UPON YOUR EXPERIENCE WITH HIM
20   THE NIGHT YOU WENT OVER TO HIS HOUSE ON APRIL 21ST;
21   CORRECT?
22        MS. MEYER:  OBJECTION.  VAGUE.  ARGUMENTATIVE.
23        THE COURT:  OVERRULED.  YOU MAY ANSWER.
24        THE WITNESS:  I NEVER USED THE PHRASE "IT'S NOT
25   APPLICABLE TO ME."  I WAS GETTING TO KNOW HIM.  AND I MADE AN
26   OBSERVATION THAT HE WAS BEING EXTREMELY EMOTIONAL AND
27   VULNERABLE, WHICH SEEMED TO CONTRADICT ONE OF HIS RULES.
28   THAT'S ALL I FELT AT THE TIME.
```

```
 1      Q   BY MS. HOLLEY:  OKAY.  IF -- WITHDRAWN.  SINCE

 2   THEN, HAVE YOU LEARNED THAT MANY OF THE THINGS HE SPOKE ABOUT

 3   WITH YOU THAT NIGHT HE HAS SPOKEN ABOUT IN INTERVIEWS WITH

 4   PUBLICATIONS?

 5      MS. MEYER:  OBJECTION.  ASSUMES FACTS.

 6      MS. HOLLEY:  I'M ASKING.

 7      THE COURT:  RIGHT.  OVERRULED.  YOU MAY ANSWER.

 8      THE WITNESS:  NO.  I HAVE ONLY SEEN IN THE MEDIA THAT HE

 9   SPEAKS ON BULLYING.

10      Q   BY MS. HOLLEY:  OKAY.  NOW, LET'S SEE.  WHEN YOU

11   SAID TO HIM, "DON'T WORRY," YOU WERE LETTING HIM KNOW,

12   THOUGH, THAT HE -- THIS IS OBVIOUSLY BEFORE YOU GET TO HIS

13   HOUSE.  YOU'RE LETTING HIM KNOW THAT YOU'RE OKAY WITH THE

14   LACK OF EMOTIONAL AVAILABILITY; RIGHT?

15      A   I DON'T KNOW.  I WAS MAKING A SARCASTIC JOKE.  I

16   DON'T KNOW HOW I FELT.

17      Q   WHY DIDN'T YOU KNOW HOW YOU FELT WHEN HE MADE IT

18   CLEAR NOT JUST TO YOU, BUT ALSO IN A NATIONAL PUBLICATION,

19   WHAT HIS EMOTIONAL AVAILABILITY WAS?  AND, ALSO, THAT HE WAS

20   GOING TO SEE OTHER PEOPLE.  WHY DIDN'T YOU KNOW WHAT YOU

21   THOUGHT WHEN IT SEEMS THAT IT WAS VERY CLEAR?

22      A   ARE YOU ASKING ME ABOUT --

23      MS. MEYER:  OBJECTION.  WAIT.  EXCUSE ME.  OBJECTION.

24   RELEVANCE.  AND ARGUMENTATIVE.

25      THE COURT:  IT IS ARGUMENTATIVE.

26      Q   BY MS. HOLLEY:  YOU SAID YOU DIDN'T KNOW WHAT YOU

27   FELT; RIGHT?

28      A   YES.
```

```
 1        Q    DID YOU KNOW WHAT YOU THOUGHT?

 2        A    I DON'T KNOW WHAT YOU'RE ASKING ME.

 3        Q    OKAY.  YOU ARE CONTENDING THAT THERE WAS SOME SORT

 4   OF RELATIONSHIP BETWEEN YOU AND MR. BAUER FOR US TO BE HERE

 5   IN THIS COURTROOM RIGHT NOW; DO YOU UNDERSTAND THAT?

 6        A    YES.

 7        Q    SO THE FACTS CONCERNING WHAT YOU THOUGHT IN THAT

 8   REGARD ARE OF CRITICAL IMPORTANCE; DO YOU UNDERSTAND THAT?

 9        A    YES.

10        Q    ALL RIGHT.  SO WHEN MR. BAUER TELLS YOU THAT HE IS

11   NOT EMOTIONALLY AVAILABLE, AND YOU SAY, "DON'T WORRY.  I'LL

12   HAVE MY FEELINGS BUTTON SWITCHED OFF," DON'T YOU THINK THAT'S

13   IMPORTANT RIGHT NOW?

14        MS. MEYER:  OBJECTION.  RELEVANCE.  VAGUE.  AMBIGUOUS.

15        THE COURT:  IT IS ABSOLUTELY RELEVANT.  IT'S THE

16   DIFFERENCE BETWEEN A CIVIL HARASSMENT RESTRAINING ORDER AND A

17   DOMESTIC VIOLENCE RESTRAINING ORDER.  YOU MAY ANSWER.

18        THE WITNESS:  I THINK IT'S RELEVANT TO NOTE THAT YOU'RE

19   ASKING ME ABOUT MESSAGES BEFORE I MET HIM IN PERSON.  SO I

20   GUESS WHAT I WAS THINKING WAS I WONDER IF THOSE RULES ARE

21   REALLY WHAT HE FEELS AND THINKS.  HE CAN PUT SOMETHING OUT TO

22   THE MEDIA.  WHY I SAID I WAS INTRIGUED ABOUT GETTING TO KNOW

23   HIM WAS TO SEE IF THESE RULES WERE REALLY WHAT HE FELT AND

24   WHAT HE WANTED.  THIS IS ALL BEFORE I MET HIM IN PERSON.  MY

25   FEELINGS AND THOUGHTS CHANGED WHEN I MET HIM IN PERSON.

26        Q    BY MS. HOLLEY:  OKAY.  WE'RE TALKING ABOUT A POINT

27   IN TIME BEFORE YOU MEET HIM.  OKAY.

28        A    OKAY.
```

```
 1        Q    ALL RIGHT.  BEFORE YOU MEET HIM, WHAT YOU KNOW IS
 2   THAT HE HAS TOLD YOU THAT HE IS EMOTIONALLY UNAVAILABLE.  AND
 3   HE HAS TOLD SPORTS ILLUSTRATED IN AN ARTICLE THAT YOU READ
 4   THAT HE HAS RULES THAT THERE'S NO EMOTIONAL ATTACHMENT AND
 5   THAT HE IS GOING TO SEE OTHER PEOPLE; RIGHT?
 6        MS. MEYER:  OBJECTION.  MISSTATES HER TESTIMONY.
 7        THE COURT:  SHE CAN SAY NO.  THIS IS CROSS EXAMINATION.
 8   YOU MAY ANSWER.
 9        THE WITNESS:  NO.  BECAUSE HE DID NOT TELL ME THOSE
10   THREE RULES AT THE TIME YOU ARE REFERENCING THESE MESSAGES.
11   HE HAD PERSONALLY NOT TOLD ME THOSE RULES.
12        Q    BY MS. HOLLEY:  OKAY.  SO THE ONLY THING THAT YOU
13   WERE AWARE OF AT THE TIME THAT YOU SAID YOU'RE GOING TO HAVE
14   YOUR FEELINGS BUTTONS SWITCHED OFF IS WHAT HE SAID IN THE
15   SPORTS ILLUSTRATED ARTICLE?
16        A    YES, IN THE MEDIA.
17        Q    AND WHAT HE SAID IN THAT ARTICLE IS -- TELL ME WHAT
18   IT WAS; WHAT YOU REMEMBER?
19        A    WHAT I REMEMBER FROM HIS RULES OF DATING ARE NO
20   FEELINGS.  HE IS EMOTIONALLY UNAVAILABLE.  NO SOCIAL MEDIA
21   POSTS TOGETHER.  AND THAT HE IS GOING TO SLEEP WITH OTHER
22   PEOPLE.
23        Q    OKAY.  AND YOU HAD NO REASON UPON READING THAT AT
24   THAT TIME TO DISBELIEVE THAT; RIGHT?
25        A    NO.
26        Q    OKAY.  AND WHEN YOU TOLD HIM PRIOR TO YOUR GOING TO
27   HIS HOUSE YOU WERE GOING TO HAVE YOUR FEELINGS BUTTON
28   SWITCHED OFF, YOU WERE LETTING HIM KNOW YOU WERE OKAY WITH
```

```
 1   THAT; RIGHT?
 2        A    I WAS MAKING A SARCASTIC JOKE.  I WANTED TO WAIT TO
 3   GET TO KNOW HIM TO SEE IF THOSE RULES REALLY WERE WHAT HE
 4   OFFERED TO WOMEN.
 5        Q    NOW, WHEN YOU WENT TO HIS HOUSE THREE DAYS AFTER
 6   FIRST TALKING TO HIM ON A SOCIAL MEDIA APP, YOU CERTAINLY
 7   KNEW THAT YOU WEREN'T DATING HIM; RIGHT?
 8        A    ARE YOU ASKING ME THE FACT -- THE STATE OF MIND I
 9   WAS IN WHEN I GOT TO HIS HOUSE THE FIRST TIME?
10        Q    YES.
11        A    I BELIEVED THAT THAT WAS OUR FIRST DATE.
12        Q    YOU BELIEVED THAT GOING TO HIS HOUSE -- AT WHAT
13   TIME DID YOU GET THERE?
14        A    9:30.
15        Q    AND YOU BELIEVE GOING TO HIS HOUSE AT 9:30, HAVING
16   DRIVEN -- WHAT -- TWO AND A HALF HOURS TO GET THERE --
17        A    YES.
18        Q    -- WAS YOUR FIRST DATE?
19        A    YES.
20        Q    AND YOU BELIEVED THAT NOTWITHSTANDING WHAT YOU READ
21   IN SPORTS ILLUSTRATED THAT HE SET FORTH?
22        A    I DON'T KNOW WHAT YOU'RE ASKING ME.  CAN YOU REPEAT
23   IT?
24        Q    YES.  YOU BELIEVED THAT THAT WAS YOUR FIRST DATE
25   EVEN THOUGH YOU HAD READ WHAT HIS RULES WERE IN SPORTS
26   ILLUSTRATED?
27        A    YES.  AND I WAS GOING TO WAIT TO SEE IF HE BROUGHT
28   UP HIS THREE RULES OF DATING ON OUR FIRST DATE.
```

```
 1        Q    OKAY.  BUT IT CERTAINLY WASN'T YOUR EXPECTATION,

 2   RIGHT, THAT HE WAS GOING TO CHANGE EVERYTHING FOR YOU?

 3        A    NO.  I WAS JUST INTRIGUED.  I WANTED TO FIND OUT

 4   MORE.

 5        Q    YOU DIDN'T KNOW ONE WAY OR ANOTHER; RIGHT?

 6        A    WHAT DO YOU MEAN BY THAT?

 7        Q    YOU DIDN'T KNOW ONE WAY OR THE OTHER IF HE WAS

 8   GOING TO CHANGE HIS RULES FOR YOU OR NOT?

 9        A    I DIDN'T EXPECT HIM TO CHANGE THE RULES.

10        Q    CORRECT.  YOU DIDN'T EXPECT HIM -- THAT WAS MY

11   FIRST QUESTION.  YOU DIDN'T EXPECT HIM TO CHANGE THE RULES

12   FOR YOU; RIGHT?

13        A    NO.

14        Q    OKAY.  SO WHEN YOU SAID THAT YOU HAD YOUR FEELINGS

15   BUTTON SWITCHED OFF, HE THANKED YOU FOR THAT; RIGHT?

16        A    YES.

17        Q    SO HE POSITIVELY ACKNOWLEDGED YOUR SAYING THAT YOU

18   HAD YOUR FEELINGS BUTTON SWITCHED OFF; CORRECT?

19        A    YES.

20        Q    WHY DID YOU LEAVE THAT OUT OF YOUR DECLARATION TO

21   THE COURT WHEN YOU WERE ASKING FOR THE DOMESTIC VIOLENCE

22   RESTRAINING ORDER WHEN YOU KNEW THAT THE RELATIONSHIP BETWEEN

23   YOU AND TREVOR WAS OF CRITICAL IMPORTANCE?

24        MS. MEYER:  OBJECTION.  RELEVANCE.

25        THE COURT:  OVERRULED.

26        MS. MEYER:  ARGUMENTATIVE.

27        THE COURT:  YOU MAY ANSWER.

28        THE WITNESS:  LIKE I SAID BEFORE, I DID NOT HAVE ACCESS
```

```
1    TO THOSE PART OF THE MESSAGES.  I ONLY HAD THE SCREENSHOTS

2    THAT I HAD SAVED ON MY PHONE TO PROVIDE FOR THE DECLARATION.

3         Q    BY MS. HOLLEY:  DID YOU UNDERSTAND, LIKE YOU DID

4    THROUGH MOST OF YOUR DECLARATION, THAT YOU COULD STATE UNDER

5    PENALTY OF PERJURY THINGS THAT HAPPENED EVEN IF YOU DIDN'T

6    HAVE THE SCREENSHOTS?

7         A    THEY WERE FROM MONTHS AGO.  I DIDN'T REMEMBER EVERY

8    SINGLE WORD.  I DIDN'T EVEN REMEMBER SAYING THAT.

9         THE COURT:  WHAT IS THE "THAT" THAT YOU'RE REFERRING TO?

10        THE WITNESS:  THE MESSAGES MS. HOLLEY IS REFERRING TO

11   ABOUT THE FEELINGS BUTTON SWITCHED OFF.  I HAD NO ACCESS TO

12   THOSE MESSAGES.  SO I COULDN'T POSSIBLY REMEMBER WORD FOR

13   WORD MESSAGES I DIDN'T HAVE.

14        THE COURT:  YOU DON'T REMEMBER SAYING ANYTHING ABOUT

15   HAVING YOUR FEELINGS BUTTON SWITCHED OFF WHEN YOU WROTE THE

16   DECLARATION?

17        THE WITNESS:  WE HAD A LOT OF MESSAGES.  NO.  IT WAS A

18   STRESSFUL TIME.  AND I PROVIDED MY LAWYERS WHAT I HAD IN MY

19   PHONE.

20        THE COURT:  I'M NOT ASKING ABOUT THE MESSAGES.  I'M

21   ASKING ABOUT WHAT YOU REMEMBERED WHEN YOU WERE PREPARING YOUR

22   DECLARATION.  YOU DIDN'T REMEMBER SAYING ANYTHING ABOUT A

23   FEELINGS BUTTON AT ALL?

24        THE WITNESS:  NO.

25        THE COURT:  DID YOU REMEMBER SAYING ANYTHING ABOUT AN

26   NDA?

27        THE WITNESS:  NO.

28        THE COURT:  OKAY.
```

```
1        MS. HOLLEY:  THANK YOU.

2        Q    BY MS. HOLLEY:  LET'S LOOK NOW AT EXHIBIT C, WHICH

3   ARE THE INSTAGRAM MESSAGES BETWEEN YOU AND DEREK DAWSON.

4        MS. HOLLEY:  I BELIEVE THOSE HAVE ALREADY BEEN ADMITTED

5   AS SOMETHING ELSE YOUR HONOR.

6        THE COURT:  I'M NOT SURE.  WHAT WOULD THEY HAVE BEEN?

7        MS. HOLLEY:  EXHIBIT 20.

8        THE COURT:  I SHOW 20 AS HAVING BEEN INTRODUCED BUT NOT

9   ADMITTED.

10        MS. HOLLEY:  OKAY.

11        Q    BY MS. HOLLEY:  WOULD YOU TAKE A LOOK AT EXHIBIT

12   C?

13        A    YES.

14        Q    AND DO THOSE APPEAR TO YOU TO BE INSTAGRAM MESSAGES

15   BETWEEN YOU AND DEREK DAWSON?

16        A    YES.

17        MS. HOLLEY:  ALL RIGHT.  I WOULD ASK THAT THOSE

18   INSTAGRAM MESSAGES BE MARKED AND ADMITTED.

19        THE COURT:  ANY OBJECTION?

20        MS. MEYER:  OBJECTION TO THE HEARSAY PORTION BY

21   MR. DAWSON.

22        THE COURT:  SO JUST HER STATEMENTS TO HIM?

23        MS. MEYER:  THEN THEY WOULDN'T BE RELEVANT.

24        MS. HOLLEY:  WELL, I --

25        THE COURT:  WELL TO THE EXTENT THAT THEY ARE

26   STATEMENTS -- DECLARATIVE STATEMENTS BY MR. DAWSON FOR THE

27   TRUTH OF THE CONTENTS.

28        MS. HOLLEY:  I DON'T BELIEVE THERE'S ANY HEARSAY.  I
```

```
 1  DON'T THINK ANY OF IT IS OFFERED FOR THE TRUTH.  IT'S HER
 2  STATE OF MIND.  BUT I --
 3       THE COURT:  UNLESS THERE'S A STATEMENT MADE BY
 4  MR. DAWSON FOR THE TRUTH OF THE MATTER ASSERTED BY
 5  MR. DAWSON, IT'S NOT HEARSAY.  SO IT IS ADMITTED.
 6       MS. HOLLEY:  THANK YOU.
 7       Q   BY MS. HOLLEY:  I'D LIKE FOR YOU, MS. HILL, TO LOOK
 8  AT -- THIS HAS ALREADY BEEN TESTIFIED TO PREVIOUSLY.  PAGE 5.
 9  NOW, YOU SAID PREVIOUSLY THAT DEREK DAWSON WAS A FRIEND OF
10  YOURS FROM SAN DIEGO; IS THAT RIGHT?
11       A   YES.
12       Q   WHY DON'T YOU CONSIDER HIM A FRIEND ANYMORE?
13       A   HE INSERTED HIMSELF INTO THIS SITUATION TO GET
14  ATTENTION WITH SARCASTIC JOKING MESSAGES.  AND HE GOT
15  INVOLVED IN THIS WHEN HE HAD NO RIGHT TO.  AND HANDED OVER
16  MESSAGES FROM 2019 THAT SLUT SHAMED ME AND WERE NOT RELEVANT.
17       Q   DO YOU THINK THAT THE MESSAGES THAT HE PROVIDED
18  STARTING ON PAGE 5, I THINK YOU'RE LOOKING AT NOW, DID YOU
19  THINK THOSE WERE RELEVANT?
20       A   NO, I DON'T.
21       Q   OKAY.  AND I JUST WANT YOU TO HOPEFULLY APPRECIATE
22  THAT I'M NOT ASKING YOU ABOUT PAGES 1 THROUGH 4.  BECAUSE AT
23  THIS POINT I AGREE WITH YOU, THEY'RE NOT RELEVANT.  BUT I DO
24  THINK THAT WE CAN TALK ABOUT WHAT'S STARTING ON PAGE 5.  AND
25  YOUR LAWYER ASKED YOU THOSE QUESTIONS ON DIRECT.
26       A   YES.
27       Q   NOW, YOU CONSIDERED MR. DAWSON TO BE DISLOYAL BY
28  CONTACTING MR. FETTEROLF'S OFFICE TO SHARE THE DM'S THAT YOU
```

1    SENT TO HIM ABOUT TREVOR; IS THAT RIGHT?

2         A    YES, HE ALSO LIED TO ME ABOUT REACHING OUT.

3         Q    OKAY.  NOW, YOU WOULD NOT HAVE SHARED THESE

4    MESSAGES; RIGHT?

5         A    WITH WHO?

6         Q    WITH ANYONE INVOLVED IN THE PROCEEDING?

7         MS. MEYER:  OBJECTION.  VAGUE.

8         THE COURT:  SUSTAINED.

9         Q    BY MS. HOLLEY:  I MEAN, WOULD YOU HAVE PROVIDED THE

10   MESSAGES BETWEEN YOU AND MR. DAWSON TO ANYONE IN CONNECTION

11   WITH THIS CASE?

12        A    NO.

13        MS. MEYER:  OBJECTION -- I'LL WITHDRAW.

14        Q    BY MS. HOLLEY:  DID YOU DELETE THESE MESSAGES?

15        A    NO.

16        Q    SO YOU STILL HAVE THEM?

17        A    YES.

18        Q    OKAY.  NOW, THE VERY FIRST COMMUNICATION ON PAGE 5

19   IS DEREK SAYING "DON'T TAG THIS" -- AND HE HAS THE CLOWN

20   EMOJI; RIGHT?

21        A    YES.

22        Q    AND THAT WAS IN RESPONSE TO YOUR STORY IN WHICH

23   TREVOR WAS TAGGED; IS THAT RIGHT?

24        A    YES.

25        Q    OKAY.  AND YOU SAID, "I'M GOING TO HIS HOUSE

26   WEDNESDAY.  I ALREADY HAVE MY HOOKS IN."  AND YOU THEN SENT

27   HIM A SCREENSHOT OF YOUR CONVERSATION WITH TREVOR; CORRECT?

28        A    YES.

```
 1        Q    NOW, JUST SO WE'RE CLEAR, IF YOU LOOK OVER ON
 2   PAGE 6, THE NEXT PAGE, WOULD YOU AGREE THAT PAGE IS JUST A
 3   CLOSER UP SCREENSHOT OF WHAT YOU PROVIDED TO MR. DAWSON THAT
 4   IS SET FORTH ON PAGE 5?
 5        A    YES.
 6        Q    OKAY.  THANK YOU.  YOU TESTIFIED PREVIOUSLY THAT
 7   WHAT YOU MEANT BY, "I ALREADY HAVE MY HOOKS IN," AGAIN, THIS
 8   WAS -- YOU WERE BEING SARCASTIC?
 9        A    YES.
10        Q    SO EVERYTHING -- MANY OF THE THINGS THAT YOU SAY
11   ARE SARCASTIC; RIGHT?
12        A    YES.
13        Q    WHAT YOU SAID THAT YOU MEANT ON DIRECT WAS "I HAVE
14   MY HOOKS IN" IS THAT YOU HAVE TREVOR'S ATTENTION?
15        A    YES.
16        Q    ALL RIGHT.  YOU SAY THAT THAT'S WHAT I HAVE MY
17   HOOKS IN MEANT?
18        A    YES.
19        Q    THEN YOU SAY AFTER THE SCREENSHOT, "YOU KNOW, HOW I
20   ROLL"; RIGHT?
21        A    YES.
22        Q    DID YOU TESTIFY PREVIOUSLY THAT WHAT YOU MEANT BY
23   THAT IS THAT YOU DATE BASEBALL PLAYERS?
24        A    YES.
25        Q    ALL RIGHT.  OKAY.  AND THEN HE SAYS, "DUDE, I KNEW
26   IT BEFORE I SENT THE MESSAGE.  EWWWWWWWE.  IF YOU DON'T TELL
27   HIM TATIS IS BETTER AFTER YOU ARE DONE VIA DM, THIS IS AN
28   ULTIMATE FAIL."  YOU, "I'M LITERALLY GOING TO GET IN HIS
```

1  HEAD.  AND FIND PINE TAR."  WITH THE WINKING EMOJI.  "TRUST

2  ME.  I KNOW WHAT I'M DOING.  I CAN GET IN HIS HEAD."  THEN HE

3  SAYS, UGH.  LINDS.  YOU'RE WORTH MORE THAN THIS NONSENSE."

4  AND THEN YOU SAY, "UGH.  HE IS SO INTRIGUING TO ME, THO."

5  "DEREK.  SURE, IN AN I WANT TO PUNCH HIM IN THE FACE KIND OF

6  WAY."  YOU, HE IS A WHACKADOODLE.  LIKE CLEV.  NO WONDER

7  THEY'RE BEST FRIENDS"; RIGHT?

8       A    YES.

9       Q    OKAY.  SO LET'S GO THROUGH THIS EXCHANGE, BECAUSE I

10  REALLY DO WANT TO UNDERSTAND IT.  WHY ARE YOU SENDING THIS TO

11  DEREK?

12       A    WHAT ARE YOU REFERRING TO THAT I'M SENDING HIM?

13       Q    THE SCREENSHOT.

14       A    SO YOU'RE ASKING ME WHY I'M SENDING ALL OF THOSE

15  MESSAGES?

16       Q    WELL, I FIRST WANT TO KNOW WHY YOU ARE

17  COMMUNICATING WITH DEREK THAT YOU'RE GOING TO TREVOR'S AND

18  SHARING THE SCREENSHOT OF YOUR PRIVATE CONVERSATION?

19       MS. MEYER:  OBJECTION.  COMPOUND.

20       THE COURT:  PICK ONE OF THOSE TWO.

21       Q    BY MS. HOLLEY:  WHY ARE YOU SHARING A SCREENSHOT ON

22  OF YOUR PRIVATE CONVERSATION WITH TREVOR TO DEREK?

23       A    BECAUSE DEREK INITIATED THE CONVERSATION ON THE DM

24  BY SAYING "DON'T TAG THIS CLOWN."  AND SO THAT'S WHAT I

25  RESPONDED TO HIS MESSAGE.

26       Q    OKAY.  NOW, I NOTICE THAT HE CALLS YOU LINDS; IS

27  THAT RIGHT?

28       A    YES.

```
1        Q    AND THAT'S SOMETHING A LOT OF PEOPLE CALL YOU;
2   DON'T THEY?
3        A    YES.
4        Q    OKAY.  SO WHEN YOU YESTERDAY SUGGESTED THAT TREVOR
5   CALLING YOU LINDS WAS SOMEHOW A TERM OF AFFECTION, WHY DID
6   YOU THINK THAT?
7        A    PEOPLE WHO ARE CLOSE TO ME AND ARE COMFORTABLE WITH
8   ME CALL ME LINDS.  AT THIS TIME, DEREK AND I WERE -- HE
9   CONSIDERED OUR RELATIONSHIP AS CLOSE FRIENDS.  THAT'S ALL
10  WE'VE EVER BEEN.  SO PEOPLE WHO ARE CLOSE TO ME AND KNOW ME
11  REALLY WELL CALL ME LINDS.
12       Q    OKAY.  ISN'T ONE OF YOUR SOCIAL MEDIA ACCOUNTS
13  LINDS SOMETHING?
14       A    LINDSEY HILL?
15       Q    YOU DON'T HAVE ANY SOCIAL MEDIA?
16       A    I USED TO HAVE AN ACCOUNT THAT WAS CALLED
17  LINZILICIOUS (PHONETIC).  IS THAT WHAT YOU'RE REFERRING TO?
18       Q    YES.
19       A    YES.
20       Q    DEREK IS FROM SAN DIEGO?
21       A    YES.
22       Q    YOU'RE BOTH SAN DIEGO PADRES FANS?
23       A    YES, HE IS AN EXTREME PADRES FAN.
24       Q    YOU ARE TOO?
25       A    YES.
26       Q    ALL RIGHT.  SO IS IT FAIR TO SAY THAT DEREK CALLING
27  TREVOR A "CLOWN" IS KIND OF TRASH TALKING FROM A PADRES FAN
28  ABOUT A DODGERS PLAYER?
```

1    A    YES.  THIS WHOLE CONVERSATION IS REFERENCING THE

2    RIVALRY BETWEEN THE PADRES AND THE DODGERS.

3    Q    OKAY.  I REALLY -- I REALLY AM TRYING TO GET AN

4    ANSWER FROM YOU ON THIS.  AND IT MAY BE DIFFICULT.  I'M

5    REALLY TRYING TO UNDERSTAND HOW THE WORDS, "I'M GOING TO HIS

6    HOUSE ON WEDNESDAY.  I ALREADY HAVE MY HOOKS IN HIM," WITH A

7    SCREENSHOT OF THIS MESSAGE HAS A SARCASTIC TONE.  I'M TRYING

8    TO UNDERSTAND THAT.  IS THERE ANY WAY YOU CAN EXPLAIN THAT?

9    IT MAY NOT BE POSSIBLE.  BUT I WANT YOU TO TRY.

10    MS. MEYER:  OBJECTION.  ARGUMENTATIVE.

11    THE COURT:  NO.  YOU CAN ANSWER.  HOW IS IT SARCASTIC?

12    THE WITNESS:  YOU'RE ASKING ME ABOUT I'M GOING TO HIS

13    HOUSE WEDNESDAY, I ALREADY HAVE MY HOOKS IN, YOU KNOW HOW I

14    ROLL?

15    Q    BY MS. HOLLEY:  YES.

16    THE COURT:  AND THE SCREENSHOT IN BETWEEN.

17    THE WITNESS:  IT'S SARCASTIC IN THE WAY I'M REFERENCING,

18    "YOU KNOW HOW I ROLL," I HAVE A PREVIOUS HISTORY OF DATING

19    BASEBALL PLAYERS.  SO THAT'S A SARCASTIC TONE.  THE SENTENCE

20    IN ITSELF IS SARCASTIC.  "YOU KNOW HOW I ROLL."  IT'S NOT A

21    COMMON PHRASE.  WHEN I SAY "I ALREADY HAVE MY HOOKS IN," IT'S

22    AN EGOTISTICAL THING.  AND IT'S AN ATTENTION -- LIKE I

23    TESTIFIED BEFORE, I WANT ATTENTION.  AND I THINK PEOPLE WILL

24    THINK MORE OF ME MAYBE ON THESE THINGS.  SO ME SENDING A

25    SCREENSHOT AND TALKING LIKE THAT AND PUTTING ON THIS FRONT IS

26    REALLY AN EGO PROBLEM.

27    Q    BY MS. HOLLEY:  OKAY.  AND I APPRECIATE YOUR

28    TESTIFYING ABOUT THAT ON DIRECT.  I APPRECIATE YOUR SAYING

1  THAT NOW.  BECAUSE YOU HAVE -- YOU TESTIFIED A GREAT DEAL

2  ABOUT HOW THERE REALLY ARE ALMOST TWO SIDES TO YOU?

3      A    YES.

4      Q    THERE ARE -- AT LEAST PREVIOUSLY -- AND MAYBE THIS

5  HAS CHANGED NOW BECAUSE OF THIS.  I DON'T KNOW.  BUT AT LEAST

6  PREVIOUSLY YOU WOULD PORTRAY YOURSELF AS ONE WAY, WHEN, IN

7  FACT, THAT ISN'T REALLY WHAT WAS GOING ON INSIDE; IS THAT

8  FAIR TO SAY?

9      A    YES.

10     Q    ALL RIGHT.  AND YOU DID THAT TO A NUMBER OF PEOPLE,

11 EVEN PEOPLE VERY CLOSE TO YOU; RIGHT?

12     A    YES.

13     Q    OKAY.  AND I DO APPRECIATE THAT.  AND I ALSO WANT

14 TO SAY TO YOU, BECAUSE I HAVE A COUPLE OF QUESTIONS THAT I

15 THINK ARE RELEVANT.  AND IF THE COURT DISAGREES, SHE'LL LET

16 ME KNOW.  BUT I WANT YOU TO UNDERSTAND THAT I'M NOT ASKING

17 THIS QUESTION BECAUSE I'M SLUT SHAMING YOU.  I AM NOT AT ALL.

18 I HAVE NO JUDGMENT ABOUT THAT ASPECT OF THIS CASE.  OKAY.

19          BUT I WANT TO ASK YOU THAT WHEN DEREK SAYS, "IF YOU

20 DON'T TELL HIM THAT TATIS WAS BETTER," HE IS REFERRING TO A

21 SEXUAL RELATIONSHIP YOU HAD WITH FERNANDO TATIS; IS THAT

22 RIGHT?

23     MS. MEYER:  OBJECTION.  RELEVANCE.  352.

24     THE COURT:  OVERRULED.  YOU MAY ANSWER.

25     THE WITNESS:  YES.

26     Q    BY MS. HOLLEY:  AND FERNANDO TATIS, IS HE THE

27 SHORTSTOP FOR THE PADRES?

28     A    YES.

```
1          Q    AND DID YOU USED TO HAVE A -- I DON'T KNOW IF IT
2    WAS A JOB OR POSITION -- WITH SOMETHING CALLED THE POD SQAUD?
3    WAS THAT AN AMBASSADOR GROUP FOR THE SAN DIEGO PADRES?
4          A    YES.
5          Q    AND YOU WERE PART OF THAT GROUP; RIGHT?
6          A    YES.
7          Q    AND YOU GOT FIRED OR RESIGNED BECAUSE IT WAS
8    DISCOVERED THAT YOU WERE HAVING SEXUAL RELATIONSHIP WITH
9    FERNANDO TATIS; IS THAT RIGHT?
10         A    YES.
11         Q    AND THAT'S WHAT DEREK IS REFERRING TO WHEN HE SAYS
12   THAT TO YOU; IS THAT HOW YOU INTERPRETED THAT?
13         A    I DON'T KNOW HOW ME GETTING FIRED IS RELEVANT IN
14   THAT TEXT THREAD.  BUT, YES, HE IS REFERRING TO MY PAST WITH
15   FERNANDO TATIS.
16         Q    I DIDN'T HEAR WHAT YOU SAID.
17         A    I SAID I DON'T KNOW HOW ME GETTING FIRED AND GOING
18   THROUGH THAT PART OF MY HISTORY IS RELEVANT.  AND THAT'S NOT
19   JUST WITH THE DEREK THING.  YES, HE IS REFERRING TO MY PAST
20   WITH FERNANDO TATIS.
21         Q    OKAY.  THANK YOU.  OBVIOUSLY HE KNEW ABOUT YOUR
22   RELATIONSHIP WITH FERNANDO TATIS?
23         A    YES.
24         Q    NOW, DID YOU CONSIDER YOUR RELATIONSHIP WITH
25   FERNANDO TATIS TO BE A DATING RELATIONSHIP?
26         MS. MEYER:  OBJECTION.  RELEVANCE TO THIS CASE.
27         THE COURT:  WHAT'S THE RELEVANCE?
28         MS. HOLLEY:  I AM TRYING TO UNDERSTAND HOW SHE DEFINES
```

1  DATING.

2      MS. MEYER:  YOUR HONOR, SHE CAN JUST ASK THE QUESTION

3  HOW SHE DEFINES DATING.

4      THE COURT:  GO RIGHT AHEAD AND ASK THAT.

5      Q    BY MS. HOLLEY:  DOES YOUR DEFINITION OF DATING

6  APPLY TO THE RELATIONSHIP WITH FERNANDO TATIS?

7      MS. MEYER:  OBJECTION.  RELEVANCE.

8      THE COURT:  OVERRULED.  MAY ANSWER.

9      THE WITNESS:  NO.

10     Q    BY MS. HOLLEY:  NOW, WHEN WAS THAT RELATIONSHIP?

11     A    IT WAS IN 2019.

12     Q    AND WAS THAT BEFORE OR AFTER YOU GOT SOBER?

13     A    BEFORE.

14     Q    THANK YOU.  WHEN YOU SAID, "I'M LITERALLY GOING TO

15  GET IN HIS HEAD," ARE YOU SAYING THAT WAS ALSO SARCASTIC?

16     A    YES, ABOUT THE PADRES DODGERS RIVALRY.

17     Q    AND WHAT DID YOU MEAN WHEN YOU SAID THAT YOU WERE

18  GOING TO FIND THE PINE TAR?

19     A    IT WAS A JOKE ABOUT -- AT THE TIME IT WAS VERY

20  RELEVANT IN THE MLB ABOUT PITCHERS USING STICKY SUBSTANCES.

21  LIKE I SAID, DEREK IS A BASEBALL FAN.  HE THREW A JOKE OUT

22  ABOUT FERNANDO TATIS.  AND I REPLIED WITH A JOKE ABOUT PINE

23  TAR.

24     Q    NOW, YOU MENTIONED THAT TREVOR IS A WHACKADOODLE

25  LIKE CLEV.  WHO IS CLEV?

26     A    I'M NOT BRINGING HIM INTO THIS.

27     Q    WELL, IS IT MICHAEL CLEVINGER, THE PITCHER FOR THE

28  SAN DIEGO PADRES?

```
1        A    I DON'T WANT TO ANSWER THAT.  HE DOESN'T NEED TO BE
2   BROUGHT INTO THIS.
3        THE COURT:  WELL, THIS HAS NOW BROUGHT HIM INTO IT.  SO
4   YOU ARE INSTRUCTED TO ANSWER.
5        THE WITNESS:  YES.
6        Q    BY MS. HOLLEY:  AND THAT IS SOMEONE WITH WHOM YOU
7   HAD A SEXUAL RELATIONSHIP; CORRECT?
8        A    YES.
9        Q    AND WHEN WAS THAT?
10       A    IN OCTOBER OF 2020.
11       Q    AND SO THAT WAS AFTER YOU GOT SOBER; CORRECT?
12       A    YES.
13       Q    AND JUST SO YOU UNDERSTAND, BECAUSE IT IS IMPORTANT
14  TO ME THAT YOU RECOGNIZE THAT I'M DOING MY JOB AND NOT TRYING
15  TO EMBARRASS YOU.  I'M NOT.  BUT YOU SPOKE A LOT ABOUT NOT
16  KNOWING HOW TO DO SOBER SEX.  SO THAT'S WHY I'M ASKING THESE
17  QUESTIONS ABOUT THE DATES.  OKAY.
18       MS. MEYER:  YOUR HONOR, OBJECTION.  THERE'S NO QUESTION
19  PENDING.  AND IT'S NOT RELEVANT.
20       THE COURT:  THEN THERE'S NOTHING TO OBJECT TO,
21  MS. MEYER.
22       Q    BY MS. HOLLEY:  NOW, IF YOU LOOK OVER ON PAGE 7,
23  YOU HAVE A PICTURE THERE.  AND I HAVEN'T BEEN ABLE TO FIGURE
24  OUT WHAT THAT PICTURE IS.  CAN YOU TELL US WHAT IT IS?
25       A    ARE YOU REFERRING TO THE ONE AT THE TOP?
26       Q    YES, PLEASE.
27       A    YEAH.  IT IS ACTUALLY -- THAT IS A STORY DEREK
28  POSTED.  AND IT'S LIKE A ART MUSEUM.  THERE'S A PICTURE OF
```

```
1   FERNANDO TATIS WITH HIS HAND OVER HIS EYE LIKE THIS
2   (INDICATING), WHICH IS MOCKING TREVOR'S ONE EYE PITCHING.
3   AND IT'S REFERENCING A GAME THAT TOOK PLACE WHERE FERNANDO
4   TATIS HIT A HOMERUN OFF OF TREVOR.  AND SO THAT'S THE PICTURE
5   OF WHAT IT IS.  AND MY RESPONSE IS, AGAIN, A SARCASTIC JOKE
6   BECAUSE THE PADRES WON THAT DAY.
7        Q    RIGHT.  IT WAS THAT VERY DAY; RIGHT?
8        A    WHAT VERY DAY?
9        Q    APRIL 24TH.  I MEAN, THERE'S NO DATE HERE, BUT I'M
10  JUST ASKING YOU IF --
11       A    OKAY.
12       Q    WHAT YOU SAID IN RESPONSE TO THAT IS, "YOU'RE
13  WELCOME FOR GETTING IN BAUER'S HEAD."  AND THEN YOU HAVE THE
14  EMOJI THAT HAS TWO DOLLAR SIGNS AS EYES AND THEN THE GREEN
15  TONGUE STICKING OUT WITH A DOLLAR SIGN ON THE TONGUE.  CAN
16  YOU EXPLAIN HOW THAT MONEY SIGN EMOJI RELATED TO WHAT YOU
17  WERE SAYING?
18       A    THAT IS A EMOJI I USE A LOT WHEN I THINK IT RELATES
19  TO THE TERM, LIKE, "MONEY."  PEOPLE SAY WHEN, YOU KNOW, LIKE
20  GOT 'EM.  ALL GOOD.  AND THERE WAS REALLY NO ILL INTENT BY
21  PUTTING THAT EMOJI.  I USE IT.
22       Q    SO AS I THINK YOU KNOW, WE HAVE A NUMBER OF YOUR
23  TEXTS AND INSTAGRAM MESSAGES.  SO ARE YOU SAYING THAT WE'LL
24  FIND THAT EMOJI USED FREQUENTLY BY YOU?
25       MS. MEYER:  OBJECTION.
26       Q    BY MS. HOLLEY:  IS THAT YOUR TESTIMONY?
27       MS. MEYER:  RELEVANCE.
28       THE COURT:  OVERRULED.  YOU MAY ANSWER.
```

1      THE WITNESS:  I HAVE NO IDEA.  I HAVE SENT A LOT OF TEXT

2  MESSAGES AND I SENT A LOT OF EMOJIS.  SO I DON'T KNOW.

3      Q    BY MS. HOLLEY:  BUT YOU JUST SAID YOU USE THIS

4  EMOJI A LOT TO SAY "MONEY."  AND SO WE WOULD EXPECT TO FIND

5  THAT EMOJI IN YOUR HUNDREDS OF, IF NOT THOUSANDS OF, TEXTS

6  AND INSTAGRAM MESSAGES THAT WE HAVE; RIGHT?  YOU USE IT A

7  LOT?

8      MS. MEYER:  OBJECTION.  COMPOUND.  ASSUMES FACTS.

9      THE COURT:  OVERRULED.  SHE MADE A STATEMENT SHE USES IT

10  A LOT.  WOULD WE FIND IT IN THE HUNDREDS OF TEXTS WE HAVE A

11  LOT?

12      THE WITNESS:  I'M NOT SURE, BECAUSE YOU HAVE A LOT OF

13  TEXTS AFTER THE ASSAULT.  AND I SWITCHED INTO AN ANGRIER TONE

14  OF TEXTING.  SO MY WAY OF COMMUNICATION TURNED ANGRY AND

15  VULGAR AS OPPOSED TO HOW I NORMALLY TALKED BEFORE THE

16  ASSAULT.

17      Q    BY MS. HOLLEY:  OKAY.  NOW, ON THAT SAME PAGE WITH

18  THE MONEY EMOJI ON APRIL 25TH, THIS IS NOW AFTER YOU SPENT

19  THE NIGHT AT TREVOR'S HOUSE.  AND THERE'S A MEME THERE.  A

20  PICTURE.  CAN YOU EXPLAIN WHAT THAT IS?

21      A    YES.  IT'S A BASEBALL MEME.  OFTEN IN BASEBALL IF,

22  YOU KNOW, SOMEONE GETS A HOMERUN OFF OF ANOTHER PITCHER,

23  THEY'LL REFER TO THAT PERSON AS THEIR CHILD.  SO IT'S A

24  PICTURE, AFTER FERNANDO TATIS HAD HIT HOMERUNS OFF OF TREVOR,

25  AS THE DAD.  AND THEN TREVOR'S FACE IS LIKE THE KID.

26      Q    DEREK SENT THAT?

27      A    YES.  HE POSTED THAT ON HIS STORY.

28      Q    OKAY.  YOU JUST LAUGHED AT IT; RIGHT?

1       A    YES.

2       Q    NOW, WHAT YOU SAY IN CONNECTION WITH THE PICTURE --

3  THE ART PICTURE AND THE MONEY EMOJI IS, "YOU'RE WELCOME FOR

4  GETTING IN BAUER'S HEAD.  NOW, YOU JUST EXPLAINED THAT THERE

5  HAD JUST BEEN A GAME.  I MAY BE USING THE TERMINOLOGY WRONG.

6  A GAME WHERE TATIS SCORED WHEN TREVOR WAS PITCHING; IS THAT

7  RIGHT?

8       A    YES.

9       Q    OKAY.  SO WHEN YOU'RE SAYING, "YOU'RE WELCOME FOR

10 GETTING IN BAUER'S HEAD," ARE YOU SAYING -- AND WE KNOW IT'S

11 SAID SARCASTICALLY -- THAT YOU SHOULD BE THANKED FOR DOING

12 SOMETHING WHICH CAUSED TREVOR TO DO POORLY?

13      A    NOT TO BE THANKED.  IT'S JUST AN ULTIMATELY

14 SARCASTIC JOKE ABOUT THE PADRES WINNING AS A PADRES FAN.

15      Q    SO AND YOU WOULD AGREE THAT ALL OF THESE MESSAGES

16 BETWEEN YOU AND DEREK ARE LIGHT AND JOVIAL?

17      A    WHAT DOES JOVIAL MEAN?

18      THE COURT:  JOKING.

19      Q    BY MS. HOLLEY:  FUNNY.

20      A    YES, ABSOLUTELY.

21      Q    AND YOU CERTAINLY DON'T SAY TO HIM AFTER APRIL 21ST

22 THAT THERE WAS ANYTHING UNPLEASANT THAT OCCURRED AT TREVOR'S

23 HOUSE ON THE 21ST; RIGHT?

24      A    NO.

25      Q    OKAY.  ALL RIGHT.  LET'S NOW LOOK AT EXHIBIT D,

26 WHICH ARE YOUR TEXTS WITH KYLE ERICKSON.

27      MS. HOLLEY:  WHAT EXHIBIT WAS THAT, MS. MANGELS?

28      MS. MANGELS:  THIRTY-ONE.

1          MS. HOLLEY:  WAS 31 ADMITTED, YOUR HONOR?

2          THE COURT:  THIRTY-ONE BEGINNING AT 936.

3          Q    BY MS. HOLLEY:  ALL RIGHT.  I'M GOING TO ASK YOU,

4   IF YOU WOULD, TO LOOK THROUGH THE TEXTS.  THESE ARE TEXTS;

5   RIGHT?  YEAH.  BETWEEN YOU AND KYLE.  WHICH AT THE BOTTOM HAS

6   KE 1 THROUGH KE 30.  THESE ALL APPEAR TO BE TEXTS BETWEEN YOU

7   AND KYLE; RIGHT?

8          A    YES.

9          Q    NOW, I AM GOING TO ASK YOU ABOUT SOME, BUT NOT ALL

10  OF THESE.  LET'S FIRST START WITH KE 1 THROUGH --

11         MS. HOLLEY:  CAN I HAVE A MOMENT, YOUR HONOR?

12         THE COURT:  YES.

13         MS. HOLLEY:  THANK YOU.

14         Q    BY MS. HOLLEY:  LET'S FIRST START WITH YOUR TEXTS

15  THAT HAVE TO DO WITH APRIL 18 THROUGH APRIL 23RD, WHICH GOES

16  THROUGH KE 14.  IF YOU LOOK AT KE 1 THROUGH 14, THERE MAY BE

17  SOME MORE OF THESE.  BUT LET'S TAKE THESE IN CHUNKS.  ARE

18  THOSE TEXT COMMUNICATIONS BETWEEN YOU AND KYLE ON THOSE

19  DATES?

20         A    YES.

21         MS. HOLLEY:  OKAY.  SO I WOULD ASK TO MARK THOSE AND ASK

22  THAT THEY BE ADMITTED.

23         THE COURT:  ARE THESE NOT ALREADY ADMITTED AS 31?

24         MS. HOLLEY:  I'M JUST ASKING.

25         MR. FETTEROLF:  I THINK ONLY A PAGE OF THE MESSAGES WERE

26  ADMITTED.

27         MS. HOLLEY:  MAY I?

28         THE COURT:  YOU MAY.

```
1        Q    BY MS. HOLLEY:  NOW, THE FIRST TEXT ON KE 1 IS FROM
2   APRIL 18, WHICH IS THE VERY FIRST DAY YOU AND TREVOR MADE
3   CONTACT ON INSTAGRAM DM; RIGHT?
4        A    YES.
5        Q    OKAY.  AND THERE AT THE BOTTOM OF THE PAGE YOU SENT
6   A SCREENSHOT TO KYLE OF YOUR INSTAGRAM MESSAGES WITH TREVOR;
7   RIGHT?
8        A    YES.
9        Q    AND THE WORDS THERE BY YOU ARE -- I THINK YOU MAYBE
10  SAID IT.  "OH MY FUCKING GOD."  BUT IT REALLY SAYS OH MY --
11  OKAY.
12       A    I SPELLED IT WRONG.
13       Q    ALL RIGHT.  AND THEN HE SAYS, "HAHAHAHAHA HOLY
14  FUCK."  I NEVER GET TO SAY THESE WORDS IN COURT.  SO THANK
15  YOU.
16       THE COURT:  WELCOME TO MY COURTROOM.
17       Q    BY MS. HOLLEY:  OKAY.  SO YOU THEN SAY, "YOU KNOW
18  IMMA TRY AND GET IN THERE."  AND KYLE SAYS, HAHAHAHAHA.
19  YOU'RE A FUCKING LEGEND."  YOU, "HOW THE LITERAL FUCK DID HE
20  SEE THAT?"  NOW, I'M ASSUMING THAT'S IN REFERENCE TO THE
21  STORY YOU POSTED THAT YOU TAGGED TREVOR IN; RIGHT?
22       A    YES.
23       Q    AND YOU SAY, "CAN YOU TELL MY MOM.  SHE KNOWS I
24  LOVE HIM."  KYLE SAYS, "WHO KNOWS BUT I AM HERE FOR IT."  SO
25  THEN YOU TEXT MORE SCREENSHOTS OF YOUR INSTAGRAM MESSAGES
26  WITH TREVOR; RIGHT?
27       A    YES.
28       Q    NOW, IF YOU CAN RECALL, WITHOUT HAVING TO GO BACK
```

```
1   AND FORTH, LOOKING AT TIME STAMPS, IS THIS HAPPENING IN

2   REALTIME; IN OTHER WORDS, YOU'RE DM'ING WITH TREVOR, TAKING

3   SCREENSHOTS, AND HAVING KIND OF A REALTIME CONVERSATION WITH

4   KYLE?

5        A    I BELIEVE SO, YES.

6        Q    OKAY.  THANK YOU.  SO THEN KYLE -- SO THEN KYLE

7   SAYS, "OH MY GOD YOU'RE IN."  AND YOU SAY, "I'M OBSESSED WITH

8   HIM.  HE IS WEIRD AS FUCK LIKE ME."  AND YOU SHARE MORE

9   SCREENSHOTS OF THE INSTAGRAM CONVERSATION.

10            AND THEN YOU SAY, "THIS IS ESCALATING SO HARD.  I

11  AM 100 PERCENT DOWN TO GET THIS DICK."  AND YOU SHOW MORE

12  SCREENSHOTS.  AND YOU SAY, "BLOWING YOU UP RIGHT NOW."

13  RIGHT?  "BUT I HOPE YOU'RE PROUD."

14            NOW, AM I CORRECT IN INTERPRETING THAT AS YOU ARE

15  SAYING, I'M SENDING YOU A LOT OF TEXTS RIGHT NOW.  BUT

16  HOPEFULLY, KYLE, YOU'RE PROUD OF WHAT I'M DOING IS

17  COMMUNICATING WITH TREVOR?

18       A    YES, BECAUSE HE IS A HUGE DODGERS FAN.  THAT'S WHY

19  I SAID, "I HOPE YOU'RE PROUD."

20       Q    KYLE SAYS, "HOLY FUCK.  I'M SO FUCKING PROUD."  YOU

21  SAY IN ALL CAPS, "HE JUST ASKED ME TO COME TO L.A."  KYLE

22  SAYS, "YOU'VE MADE IT."  YOU, "ON FUCKING TUESDAY."  KYLE,

23  "YOU'RE A ROCKSTAR."  YOU, "I HAVE TO GO."  NOW, I'M ASSUMING

24  YOU'RE GOING TO TREVOR'S HOUSE.  I HAVE TO GO; RIGHT?

25       A    YES.

26       Q    THEN YOU SAY, "IF HE OFFERS TIX, I'LL BRING YOU."

27  THAT'S TICKETS; RIGHT?

28       A    YES.
```

```
1          Q    YOU'RE REFERRING TO TICKETS TO A GAME; RIGHT?

2          A    YES.

3          Q    OKAY.  AND KYLE SAYS, "HOLY FUCK."  AND YOU SAY,

4     "WE DEAD ASS HAVE BEEN TALKING ALL NIGHT."  I'M ASSUMING

5     YOU'RE TALKING MEANS DM'ING?

6          A    YES.

7          Q    AND THEN KYLE SAYS, "WHAT ARE THE FUCKING ODDS?"

8     YOU, "WE ARE NOW DEBATING OUR FAVORITE CONSPIRACY THEORIES."

9     KYLE, "OH MAN.  YOU'RE IN DEEP."  YOU THEN SENT MORE

10    SCREENSHOTS OF MESSAGES WITH TREVOR.  YOU SAY, "OH FUCK.  I'M

11    SO LOST.  I JUST WANTED DICK."  CRYING EMOJI.  KYLE LAUGHS AT

12    THAT.  KYLE SAYS, "UHM EXCUSE ME SIR.  WHAT THE FUCK TREVOR."

13    YOU SAY, "HE IS WHACK.  LIKE IS HE OKAY."  KYLE, "DUDE SEEMS

14    LIKE HE'S ON ANOTHER PLANET.  YOU, "HE ASKED ME WHERE I STAND

15    ON THE ILLUMINATI.  STILL GONNA FUCK HIM THO."  KYLE LAUGHS

16    AT THAT.

17              NOW, I WANT TO STOP THIS HERE FOR JUST A MOMENT.

18    IS IT FAIR TO SAY THAT YOU AND KYLE ARE MAKING FUN OF TREVOR

19    HERE?

20         A    NO.

21         Q    YOU DON'T THINK SO?

22         A    I DON'T THINK SO.

23         Q    AND THAT'S BECAUSE YOU'RE BEING SARCASTIC?

24         A    YES.

25         Q    UH-HUH.  AND YOU HAVE MADE CLEAR TO KYLE IN THESE

26    COMMUNICATIONS THAT YOU JUST WANT A DICK.  YOU SAY THAT

27    REPEATEDLY; RIGHT?

28         A    YES, THAT WAS BEFORE I MET HIM IN PERSON.
```

268

1    Q   OKAY.  SO WHEN WE WERE TALKING BEFORE ABOUT --

2  BEFORE GOING OVER THERE, YOUR EXPECTATION AT THAT TIME WAS

3  JUST WANTING DICK; RIGHT?

4    A   I HAD NO EXPECTATIONS AT ALL.  I DIDN'T KNOW WHAT

5  TO EXPECT.

6    Q   OKAY.  BUT WHAT YOU WANTED WAS TO HAVE SEX WITH

7  HIM?

8    A   NO.  THAT WAS STILL MY VULGAR WAY OF MAKING A JOKE

9  WITH MY COUSIN, WHO WE HAVE GROWN UP TOGETHER.  THAT'S HOW WE

10  HAVE ALWAYS TALKED TO EACH OTHER.

11    Q   OKAY.  ON PAGE 8, THE TEXTS WITH KYLE CONTINUE ON

12  APRIL 20TH AT 12:33 P.M.  THAT'S THE DAY BEFORE YOU GO TO

13  TREVOR'S HOUSE; RIGHT?

14    A   YES.

15    Q   YOU SAY, "BAUER WANTS IN HE TO COME TO L.A.

16  TOMORROW."  KYLE, HAHAHA.  ARE YOU GOING TO DO IT?"  YOU, ALL

17  CAPS, "OF COURSE."  KYLE, "HOLY FUCK.  LEGEND."  YOU, "HOPE

18  HE SLAPS PINE TAR ON MY ASS.  HAHAHAHA."  NOW, THIS IS

19  ANOTHER SARCASTIC JOKE; RIGHT?

20    A   YES.

21    Q   BUT IT IS A JOKE ABOUT YOUR ASS BEING SLAPPED;

22  RIGHT?

23    A   YES.

24    Q   AND KYLE LAUGHS AT WHAT YOU SAID AND WRITES, "LORD

25  KNOWS HE HAS GOT SOME"; RIGHT?

26    A   YES.

27    Q   NOW, GOING OVER TO PAGE -- BY THE WAY, YOU STILL

28  HAVE THESE TEXTS IN YOUR PHONE?

1      A    I DON'T KNOW.

2      Q    NOW, THIS CONVERSATION IS WEDNESDAY APRIL 21ST.

3   5:38 P.M.  AND THAT'S ABOUT THE SAME TIME YOU'RE MESSAGING

4   WITH TREVOR ABOUT HEADING OUT TO DRIVE TO HIS HOUSE IN

5   PASADENA; RIGHT?

6      A    YES.

7      Q    YOU SAY, "LEAVING FOR BAUER'S SOON.  HOW IS THAT

8   REAL."  KYLE, "HAHAHAHAHAHA.  OH MY GOD.  GOOD LUCK.  PLEASE

9   LIVE TWEET."  YOU, "LIKE STAYING THE NIGHT.  WHAT THE FUCK AM

10  I DOING."  TONGUE OUT EMOJI.  KYLE, "LIVING YOUR LIFE THAT'S

11  WHAT.  DON'T LET ANYBODY TELL YOU OTHERWISE."

12           AND THEN YOU NEXT TEXT HIM ON APRIL 21ST AT 9:29 A

13  PICTURE OF YOURSELF AT TREVOR'S HOUSE.  AND YOU SAY, "BOUTTA

14  GET DODGER DOGGED."  NOW, I'M ASSUMING TREVOR DIDN'T REALIZE

15  THAT YOU TOOK THAT PICTURE; RIGHT?

16     A    NO.

17     Q    HE DIDN'T KNOW; RIGHT?

18     A    NO.

19     Q    AND THAT'S A SELFIE; RIGHT?

20     A    YES.

21     Q    OKAY.  AND THEN KYLE SAYS, "HAHAHAHA HOLY FUCK.

22  TBH" -- TO BE HONEST -- "I'M SURPRISED HE HAS PLANTS."  YOU,

23  "ME TOO.  I WONDER IF THEY'RE FAKE."  THEN KYLE SAYS, "HE

24  NEVER CEASES TO AMAZE ME -- NEVER CEASES TO AMAZE."

25           NOW, YOU DON'T KNOW WHETHER OR NOT YOU DELETED YOU

26  DELETED THESE TEXTS; IS THAT RIGHT?

27     A    I DON'T KNOW.

28     Q    IN YOUR DECLARATION, YOU SAID THAT WHEN YOU GOT TO

```
 1    TREVOR'S HOUSE ON THE NIGHT OF THE 21ST, HAVING DRIVEN FROM
 2    SAN DIEGO -- THAT'S ABOUT 130 MILES; DOES THAT SOUND ABOUT
 3    RIGHT?
 4         A    I HAVE NO IDEA.
 5         Q    OKAY.  THAT YOU AND HE TALKED FOR A COUPLE OF HOURS
 6    AND HAD A NICE CONVERSATION; RIGHT?
 7         A    YES.
 8         Q    AND YOU SAID THAT TREVOR WAS NICE AND SUPPORTIVE?
 9         A    YES.
10         Q    AND HE ASKED IF YOU WANTED TO SPEND THE NIGHT AND
11    GAVE YOU THE OPTION OF SLEEPING IN THE GUEST ROOM.  AND YOU
12    SAID YOU WANTED TO SLEEP IN THE ROOM WITH HIM?
13         A    YES.
14         Q    AND WHEN YOU AND TREVOR GOT UP TO HIS ROOM AND WERE
15    CUDDLING, WEREN'T YOU THE ONE WHO FIRST GOT ON TOP OF HIM?
16         A    I HAVE NO IDEA.  ALL I KNOW HE KISSED ME FIRST.
17         Q    AND YOU SAY WHEN TREVOR ASKED WHAT DO YOU LIKE, YOU
18    SAID, "IT'S OKAY TO BE A LITTLE ROUGH."
19         A    YES.
20         Q    ALL RIGHT.  NOW, CORRECT ME IF I'M WRONG, I THINK
21    YOU TESTIFIED ON DIRECT THAT YOU SAID THAT IN PART BECAUSE
22    YOU WANTED TO SEEM TOUGH AND COOL.  YOU WANTED TO IMPRESS
23    HIM?
24         A    YES.
25         Q    AND AS WE DISCUSSED, THERE'S THE INNER YOU AND THE
26    OUTER YOU, RIGHT, AT LEAST AT THIS TIME?
27         A    YES.
28         Q    SO THE OUTER YOU IS TRYING TO IMPRESS HIM.  AND SO
```

```
 1   YOU SAY TO HIM, "I LIKE IT A LITTLE ROUGH."  RIGHT?
 2        A    YES.
 3        Q    AND YOU SAID THAT YOU NOTICED THAT TREVOR SEEMED TO
 4   LIKE IT ROUGH.  SO TO IMPRESS HIM, YOU SAID YOU HAVE BEEN
 5   CHOKED BEFORE; RIGHT?
 6        A    YES.
 7        Q    AND I -- HAD YOU BEEN CHOKED BEFORE; YES OR NO?
 8        A    LIGHTLY WHEN I DON'T LOSE CONSCIOUSNESS.  YES.
 9        Q    NOW, YOU JUST MET TREVOR FOR THE FIRST TIME THIS
10   NIGHT; RIGHT?
11        A    YES.
12        Q    OKAY.  SO HE DOESN'T KNOW, DOES HE, THAT YOU'RE
13   JUST SAYING THIS TO IMPRESS HIM; RIGHT?
14        A    NO.
15        Q    OKAY.  AND YOU GUYS HAVE FLIRTED WITH SEXUAL BANTER
16   ON INSTAGRAM DM'S; RIGHT?
17        A    YES.
18        Q    AND YOU HAVE NOW DRIVEN MANY MILES TO COME SPEND
19   THE NIGHT AT HIS HOUSE; RIGHT?
20        A    YES.
21        Q    TOLD HIM YOU WANT TO SLEEP IN THE BED WITH HIM?
22        A    YES.
23        Q    AND YOU ARE THE FIRST ONE TO BRING UP THE WORD
24   "ROUGH" IN RELATION TO THE SEX YOU WERE HAVING OR ABOUT TO
25   HAVE; RIGHT?
26        A    YES.
27        Q    AND WHEN YOU ASKED HIM WHAT HE LIKED, AND HE SAID,
28   ACCORDING TO YOUR DECLARATION, "ROUGHER THAN YOU," YOU DIDN'T
```

```
1   SAY, WELL, I DON'T WANT IT TO BE ROUGH; CORRECT?

2        A    YES.

3        Q    AND YOU DIDN'T SAY, I DON'T FEEL COMFORTABLE WITH

4   IT BEING MORE ROUGH THAN I LIKE IT; RIGHT?

5        A    YES, I DON'T KNOW WHAT ROUGH SEX IS.

6        Q    OKAY.  YOU DON'T KNOW WHAT ROUGH SEX IS, BUT YOU

7   SAID IN ORDER TO IMPRESS TREVOR "I LIKE IT A LITTLE ROUGH"?

8        A    YES.

9        Q    OKAY.  AND YOU DIDN'T SAY ANYTHING IN RESPONSE TO

10  HIS SAYING "I LIKE IT ROUGHER THAN YOU"?

11       A    NO.

12       Q    AND WHEN HE ASKED YOU IF YOU HAD EVER BEEN CHOKED

13  AND YOU SAID "YES," YOU DIDN'T SAY, BUT I DON'T LIKE IT AND I

14  DON'T WANT YOU TO DO THAT, DID YOU?

15       A    NO, I DID NOT.

16       Q    NOW, WHEN HE PUT HIS FINGERS DOWN YOUR THROAT,

17  THOUGH, YOU SAID -- I THINK YOU DID MOTIONS WITH YOUR

18  HANDS?

19       A    YES.

20       Q    AND HE STOPPED?

21       A    YES.

22       Q    OKAY.  SO DESPITE YOUR COOL TOUGH GIRL EXTERIOR,

23  YOU WERE CAPABLE OF TELLING TREVOR SOMETHING THAT YOU DIDN'T

24  WANT TO HAVE HAPPEN; RIGHT?

25       A    I DON'T KNOW.

26       Q    WELL, YOU DID; RIGHT?

27       A    I DID WHAT?

28       Q    YOU MOTIONED TO HIM THAT HE WAS DOING SOMETHING
```

1   THAT YOU DIDN'T WANT HIM TO DO?

2        A    YES.

3        Q    OKAY.  SO THEN YOU WERE CAPABLE OF DOING THAT

4   BECAUSE YOU DID IT?

5        A    YES.

6        Q    OKAY.  NOW, YOU SAY YOU WERE UNCONSCIOUS FOR A FEW

7   SECONDS.  AND WHEN YOU CAME TO, HE WAS HAVING ANAL SEX WITH

8   YOU; IS THAT CORRECT?

9        A    YES.

10       Q    NOW, I DON'T KNOW IF YOU -- YOU ALSO SAID YOU HAD

11  NEVER HAD ANAL SEX BEFORE?

12       A    NO.

13       Q    DO YOU KNOW WHETHER OR NOT THERE WAS ANY SORT OF

14  LUBRICANT ON YOUR BOTTOM?

15       A    THERE WAS NOT.

16       Q    AND YOU SAY YOU ASKED HIM TO STOP AND HE STOPPED;

17  IS THAT RIGHT?

18       A    YES.

19       Q    AND THEN HE HELD YOU WHEN YOU APPEARED TO BE SHAKEN

20  UP; RIGHT?

21       A    YES.

22       Q    AND THEN AFTER THAT, YOU HAD VAGINAL SEX WITH

23  HIM?

24       A    YES.

25       Q    OKAY.  LET ME ASK YOU, DID YOU, IF YOU REMEMBER,

26  HAVE YOUR PERIOD AT THAT TIME?

27       A    NO.

28       Q    OKAY.  AND EVEN THOUGH YOU SAY THAT AFTERWARDS YOU

274

1    WERE SICK YOU COULD BARELY WALK, YOU HAD ANAL PAIN AND YOU

2    WERE BLEEDING, YOU DECIDED TO GET BACK IN BED WITH HIM TO GO

3    TO SLEEP; RIGHT?

4         A    YES.

5         Q    WHY DIDN'T YOU GO SLEEP IN THE GUEST ROOM?

6         A    BECAUSE WE HAD SPENT SO MUCH TIME DEVELOPING AN

7    EMOTIONAL CONNECTION, I CHOSE IN THAT MOMENT TO FOCUS ON

8    THAT.  I DIDN'T WANT TO THINK ABOUT WHAT HAD JUST HAPPENED.

9    SO I WANTED TO JUST NOT HAVE TO THINK ABOUT THAT AND GO BACK

10   TO THE WAY IT WAS BEFORE WE HAD SEX.

11        Q    NOW, WHEN YOU SAY THAT YOU HAD FORMED AN EMOTIONAL

12   CONNECTION, YOU CAN ONLY SPEAK FROM YOUR STANDPOINT; RIGHT?

13        A    YES.

14        Q    OKAY.  YOU FELT AN EMOTIONAL CONNECTION WITH HIM?

15        A    YES.

16        Q    OKAY.  YOU HAVE NO IDEA IF HE HAD AN EMOTIONAL

17   CONNECTION WITH YOU; CORRECT?

18        A    CORRECT.

19        Q    OKAY.  AND SO I'M ASSUMING IT'S THE SAME ANSWER TO

20   WHY YOU DIDN'T SLEEP ON THE COUCH.  YOU WANTED THINGS TO GO

21   BACK TO THE WAY THEY WERE BEFORE THE SEXUAL EXPERIENCE?

22        A    YES.

23        Q    AND THEN, PER YOUR DECLARATION, YOU SLEPT UNTIL

24   11:00 AND STAYED AT HIS HOUSE FOR ANOTHER HOUR; RIGHT?

25        A    YES.

26        Q    AND HE SEEMED TO BE UNDERSTANDING WHEN YOU TOLD HIM

27   YOU DIDN'T ENJOY ANAL SEX?

28        A    YES.

```
 1        Q    AS YOU TESTIFIED PREVIOUSLY, HE DIDN'T TRY TO DO
 2   THAT ON YOUR SECOND ENCOUNTER; IS THAT CORRECT?
 3        A    YES.
 4        Q    ALL RIGHT.
 5        THE COURT:  YES, THAT IS CORRECT?  OR, YES, HE DID
 6   TRY.
 7        THE WITNESS:  IT'S CORRECT THAT HE DID NOT TRY.  TO MY
 8   KNOWLEDGE, WHEN I WAS CONSCIOUS HE DIDN'T TRY.
 9        Q    BY MS. HOLLEY:  YOU HAVE NO REASON TO BELIEVE, DO
10   YOU, THAT HE HAD ANAL SEX WITH YOU?
11        A    NO.
12        Q    ALL RIGHT.  THANK YOU.
13        A    THE SECOND TIME YOU'RE ASKING?
14        Q    YES.
15        A    YES.  NO.
16        MS. HOLLEY:  ALL RIGHT.  I'M GOING TO START A NEW
17   SECTION.  CAN WE --
18        THE COURT:  WHY DON'T WE BREAK HERE THEN AND START AGAIN
19   AT 1:30.
20        MS. HOLLEY:  THANK YOU.
21                   (AT 11:57 A.M., THE NOON RECESS WAS TAKEN
22                    UNTIL 1:35 P.M. OF THE SAME DAY.)
23
24
25
26
27
28
```

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  FOR THE COUNTY OF LOS ANGELES

3     HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

4

5     LINDSEY HILL,                    )
                                       )
6                                      )
                          PETITIONER,  )  NO. 21STRO03198
7                                      )
                VS.                    )
8                                      )  REPORTER'S
                                       )  CERTIFICATE
9     TREVOR BAUER,                    )
                                       )
10                                     )
                          RESPONDENT.  )
11    _____ )

12

13          I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14    REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15    FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16    FOREGOING PAGES, 172 THROUGH 275, INCLUSIVE, COMPRISE A FULL,

17    TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18    MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 17, 2021.

19          DATED THIS 17TH DAY OF AUGUST, 2021.

20

21

22    _____
      JACQUELINE M. CAIRE, CSR #9599, RPR
23    OFFICIAL REPORTER

24

25

26

27

28
```

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3     HON. DIANNA GOULD-SALTMAN, JUDGE    DEPARTMENT 35

4

5

    LINDSEY HILL,                  )

6                           )

               PETITIONER,   )

7                           )

         VS.              )   NO. 21STRO03198

8                           )

                           )

9    TREVOR BAUER,                )

                           )

10                         )

               RESPONDENT.   )

11   _____)

         REPORTER'S TRANSCRIPT OF PROCEEDINGS

12              AUGUST 17, 2021

                P.M. SESSION

13

    APPEARANCES:

14   FOR THE PETITIONER:  MEYER, OLSON, LOWY & MEYERS, LLP

                     BY:  LISA HELFEND MEYER, ESQ.

15                        DOREEN MARIE OLSON, ESQ.

                        MARC H. GARELICK, ESQ.

16                 10100 SANTA MONICA BOULEVARD

                 SUITE 1425

17                 LOS ANGELES, CA 90067

18                 RIGHT CHOICE LAW

                 BY:  FRED THIAGARAJAH, ESQ.

19                 5015 BIRCH STREET

                 SUITE 107

20                 NEWPORT BEACH, CA 92660

21   FOR THE RESPONDENT:  KINSELLA WEITZMAN ISER KUMP HOLLEY

                     BY:  SHAWN HOLLEY, ESQ.

22                        KATE MANGELS, ESQ.

                 808 WILSHIRE BOULEVARD

23                 3RD FLOOR

                 SANTA MONICA, CA 90401

24

                 ZUCKERMAN SPAEDER

25                 BY:  JON R. FETTEROLF, ESQ.

                     (PRO HAC VICE)

26                 1800 M STREET NW

                 SUITE 1000

27                 WASHINGTON, DC 20036

28                 JACQUELINE M. CAIRE, CSR #9599, RPR

                 OFFICIAL REPORTER

<u>WITNESSES</u>

<u>PAGE</u>

<u>KELLY Y. VALENCIA, CALLED BY THE PETITIONER</u>

    DIRECT EXAMINATION BY MS. MEYER          277
    CROSS EXAMINATION BY MR. FETTEROLF     298,
                                           328
    REDIRECT EXAMINATION BY MS. MEYER   329
    RECROSS EXAMINATION BY MR. FETTEROLF  335

<u>LINDSEY HILL, CALLED ON HER OWN BEHALF</u>

    CROSS EXAMINATION BY MS. HOLLEY     336

```
 1   CASE NUMBER:            21STRO03198
 2   CASE NAME:              LINDSEY HILL VS.
 3                           TREVOR BAUER
 4   LOS ANGELES, CALIFORNIA  TUESDAY, AUGUST 17, 2021
 5   DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE
 6   APPEARANCES:            (AS HERETOFORE NOTED.)
 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR
 8   TIME:                   1:35 P.M.
 9
10       THE COURT:  ALL RIGHT.  BACK ON IN HILL AND BAUER.  AND
11   DO WE HAVE OUR WITNESS WHO WE'RE CALLING AT 1:30?
12       MS. MEYER:  YES, YOUR HONOR.  WE ARE CALLING OUT OF
13   ORDER KELLY VALENCIA.
14       THE COURT:  ALL RIGHT.  WILL SOMEONE GET HER FROM
15   OUTSIDE.
16       MS. MEYER:  AND, YOUR HONOR, MS. VALENCIA HAS COUNSEL.
17   I DIDN'T KNOW IF COUNSEL WANTED TO --
18       THE COURT:  I'LL HAVE YOU REMAIN STANDING JUST A MINUTE
19   RAISING YOUR RIGHT HAND TO BE AFFIRMED.
20       THE CLERK:  DO YOU SOLEMNLY STATE, UNDER PENALTY OF
21   PERJURY, THAT THE TESTIMONY YOU MAY GIVE IN THE CAUSE NOW
22   PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE
23   TRUTH, AND NOTHING BUT THE TRUTH?
24       THE WITNESS:  I DO.
25       THE CLERK:  THANK YOU.  BE SEATED.
26       MS. OLSON:  YOUR HONOR, MAY I APPROACH JUST TO SWITCH
27   THE BOOKS OUT?
28       THE COURT:  SURE.
```

```
 1        THE CLERK:  MA'AM, PLEASE STATE AND SPELL YOUR FIRST AND
 2   LAST NAME FOR THE RECORD.
 3        THE WITNESS:  FIRST NAME IS K-E-L-L-Y.  MIDDLE NAME,
 4   Y-E-A-T-T-S.  LAST NAME, VALENCIA.  V-A-L-E-N-C-I-A.
 5        THE CLERK:  THANK YOU.
 6        MS. MEYER:  THANK YOU, YOUR HONOR.
 7
 8                  KELLY YEATTS VALENCIA,
 9   CALLED AS A WITNESS ON BEHALF OF THE PETITIONER, WAS SWORN
10   AND TESTIFIED AS FOLLOWS:
11
12                  DIRECT EXAMINATION
13   BY MS. MEYER:
14        Q    GOOD AFTERNOON, MS. VALENCIA.
15        A    GOOD AFTERNOON.
16        Q    MY NAME IS LISA HELFEND MEYER.  I REPRESENT THE
17   PETITIONER IN THIS MATTER, LINDSEY HILL.  AND I WILL BE
18   EXAMINING YOU TODAY FOLLOWED BY THE RESPONDENT'S COUNSEL.
19        A    OKAY.
20        Q    COULD YOU TELL THE COURT WHAT IS YOUR PROFESSION OR
21   OCCUPATION?
22        A    I'M A FORENSIC NURSE EXAMINER.  A REGISTERED
23   NURSE.
24        Q    WHAT IS A FORENSIC NURSE EXAMINER?
25        A    WE DO MEDICAL EVIDENTIARY EXAMS.
26        Q    FOR WHAT REASONS?
27        A    FOR VICTIMS OF SEXUAL ASSAULT, DOMESTIC VIOLENCE.
28   WE DO ADULTS AND PEDIATRIC VICTIMS.
```

```
 1        Q    AND FOR HOW LONG HAVE YOU BEEN A FORENSIC NURSE
 2   EXAMINER?
 3        A    I STARTED MY TRAINING FOR FORENSIC NURSING IN 2016.
 4   I HAVE WORKED AS A EXAMINER FOR APPROXIMATELY THREE YEARS.
 5   MAY I INTERJECT THAT I'VE BEEN A NURSE FOR -- SINCE 1979.
 6        Q    THAT WAS MY NEXT QUESTION.  HAVE YOU BEEN A
 7   REGISTERED NURSE SINCE 1979?
 8        A    NO.  I STARTED AS A LICENSED VOCATIONAL NURSE IN
 9   1979.  I GOT MY NURSING LICENSE IN 1983.
10        Q    PRIOR TO BECOMING A FORENSIC NURSE EXAMINER -- AND
11   I'M DIRECTING YOUR ATTENTION TO THE FIVE YEAR PRIOR -- CAN
12   YOU BRIEFLY DESCRIBE WHAT YOU DID IN TERMS OF YOUR
13   EMPLOYMENT?
14        A    YES.  REALLY I CAN GO BACK TO 1979.  I STARTED
15   WORKING AT THE SAN DIEGO VA MEDICAL CENTER.  AND THE FIVE
16   YEARS PRIOR TO DOING FORENSIC NURSING, I WAS A CHARGE NURSE
17   IN OUR INTENSIVE CARE UNIT AT THE VA MEDICAL CENTER.  I ALSO
18   ACTED AS A HOUSE SUPERVISOR -- A NURSING HOUSE SUPERVISOR FOR
19   PROBABLY 15 YEARS OF THAT TIME AS WELL AS NEEDED.
20        Q    DO YOU HAVE TO RECEIVE ANY TRAINING TO BECOME A
21   FORENSIC NURSE EXAMINER?
22        A    YES.
23        Q    WHAT TYPE OF TRAINING?
24        A    YOU -- WELL, THE WAY I DID IT -- PRECOVID TIME --
25   WAS I WENT TO SACRAMENTO AND TOOK A ONE-WEEK COURSE FROM THE
26   CALIFORNIA STATE WHERE WE GET OUR TRAINING.  FORGIVE ME.
27   IT'S A VERY LONG NAME.  I DON'T REMEMBER THE WHOLE NAME OF
28   THAT.  AND I DID -- AND PRIOR TO GOING FOR THAT WEEK, YOU
```

```
1   HAVE TO DO A LOT OF PREONLINE FOR ABOUT MAYBE 30 TO 40 HOURS
2   BEFORE YOU GO.
3        Q    DO YOU HAVE TO TAKE ANY KIND OF TEST OR
4   EXAMINATION?
5        A    NO.
6        Q    AND DO YOU RECEIVE A CERTIFICATE AS A RESULT OF
7   YOUR TRAINING?
8        A    YOU DO RECEIVE A CERTIFICATE FROM THE CALIFORNIA
9   STATE.
10       Q    AND HAVE YOU BEEN A FORENSIC NURSE EXAMINER SINCE
11  APPROXIMATELY 2016?
12       A    APPROXIMATELY.  I WAS DOING IT IN CONJUNCTION WITH
13  STILL WORKING IN THE ICU AT THE VA MEDICAL CENTER.  IT WAS MY
14  RETIREMENT PLAN.
15       Q    WHAT IS YOUR EDUCATIONAL BACKGROUND, JUST VERY
16  BRIEFLY?
17       A    A ASSOCIATE DEGREE IN NURSING.
18       Q    FROM WHAT INSTITUTION?
19       A    ROSEMONT COLLEGE IN SAN DIEGO -- THE COUNTY OF SAN
20  DIEGO.
21       Q    AND ARE YOU CURRENTLY EMPLOYED?
22       A    YES.
23       Q    WHERE ARE YOU EMPLOYED?
24       A    PALOMAR HEALTH.
25       Q    AND IS THAT A HOSPITAL?
26       A    YES.
27       Q    FOR HOW LONG HAVE YOU BEEN EMPLOYED BY PALOMAR
28  HEALTH?
```

```
1        A    APPROXIMATELY THREE AND A HALF YEARS.  I HAD A GAP
2   IN EMPLOYMENT FOR A PERSONAL REASON FOR A WHILE.  BUT
3   TOTALING THREE AND A HALF YEARS.
4        Q    AND HAVE YOU DONE FORENSIC NURSING AT PALOMAR
5   HEALTH SINCE YOU BECAME EMPLOYED THERE?
6        A    YES.
7        Q    AND CAN YOU PLEASE BRIEFLY DESCRIBE WHAT YOU DO AS
8   A FORENSIC NURSE EXAMINER?
9        A    OKAY.  SO WE ARE ON CALL NURSES.  WHEN YOU'RE ON
10  CALL, YOU WILL GET A CALL FROM OUR DISPATCH, WHICH THEN PUTS
11  US IN TOUCH WITH A LAW ENFORCEMENT AGENCY THAT'S REQUESTING
12  THE EXAM.  WE SET UP A TIME AND PLACE WHERE WE'RE GOING TO
13  MEET AND DO THE EXAM.  AND THEN GENERALLY LAW ENFORCEMENT
14  WILL BRING THE PATIENT TO US.  AND WE START OUR EXAM.  DO YOU
15  WANT ME TO GO THROUGH --
16       Q    YES.
17       A    OKAY.  SO WHEN THE PATIENT COMES TO US WE -- WELL,
18  COVID -- WE HAD TO DO A COVID SCREENING BEFORE THEY CAME INTO
19  OUR FACILITY.  WHEN THEY CAME IN, WE DO -- I DO -- MOST OF US
20  DO KIND OF A MENTAL QUICK ASSESSMENT OF THE PATIENT TO MAKE
21  SURE THAT THEY'RE, ONE, ABLE TO GIVE CONSENT.  TWO, MEDICALLY
22  STABLE.  BECAUSE IF THEY'RE NOT, WE WOULD SEND THEM ON TO AN
23  EMERGENCY ROOM OR SOME SORT OF MEDICAL FACILITY.  DO A QUICK
24  ASSESSMENT OF ANY VISIBLE INJURIES.  HOW THEY APPEAR.
25            FROM THERE, WE CONTACT OUR ADVOCACY AND LET THE
26  PATIENT SPEAK TO AN ADVOCATE.  ONCE THEY'RE FINISHED WITH
27  SPEAKING TO THE ADVOCATE, IF THAT'S WHAT THEY CHOOSE TO DO,
28  AND THEN WE START OUR EXAM.  AND BY THAT, WE BRING THEM IN.
```

```
 1  WE ASK THEM QUESTIONS.  SOME MEDICAL HISTORY.  WHAT BROUGHT
 2  THEM TO -- I ALWAYS ASK THEM WHAT BROUGHT THEM TO ME TODAY.
 3          I'M SORRY.  I HAVE TO BACK UP.  PRIOR TO THAT, WE
 4  HAVE TO GET CONSENT FOR EVERYTHING.  WE HAVE TO GET -- JUST
 5  LIKE YOU WOULD BE ADMITTED TO A HOSPITAL.  WE GET CONSENT FOR
 6  THAT.
 7      Q    SO YOU WERE TESTIFYING THAT WHEN YOU START THE EXAM
 8  YOU ASK QUESTIONS.  YOU OBTAIN A MEDICAL HISTORY.  YOU ASK
 9  THEM WHAT BROUGHT THEM IN.  WHAT FOLLOWS THAT?
10      A    AND THEN AFTER THE MEDICAL INTAKE, JUST SOME BASICS
11  ABOUT THEIR MEDICAL HISTORY.  EXCUSE ME.  I NEED SOME WATER.
12  AND THEN WE START THE EXAMINATION, WHICH INCLUDES EXAMINING
13  THE PATIENT, TAKING ANY PHOTOGRAPHS OF INJURIES.  WE GUIDE
14  OUR EXAM ON WHAT THE PATIENT TOLD US HAPPENED DURING THE
15  ASSAULT.
16          ONCE THE EXAM IS FINISHED, THEN IF -- WE CAN GIVE
17  THEM MEDICATION, IF MEDICALLY -- DEEMED MEDICALLY NECESSARY.
18  BUT THAT'S THE PATIENT'S CHOICE.  WE GIVE THEM DISCHARGE
19  INSTRUCTIONS.  AND EITHER LAW ENFORCEMENT, FAMILY, OR
20  SOMEBODY WILL THEN TAKE THEM HOME.  WE ALSO MAKE SURE THAT
21  THEY ARE -- HAVE HOUSING THAT THEY CAN GO TO TO MAKE SURE
22  THAT THEY'RE SAFE.
23      Q    DO YOU MAKE ANY DIAGNOSES AFTER YOU EXAM THE
24  PATIENT?
25      A    CAN YOU EXPLAIN WHAT YOU MEAN BY "DIAGNOSES"?
26      Q    YES.  DO YOU DETERMINE WHAT'S WRONG WITH THE
27  PATIENT?
28      A    NO.
```

```
 1        Q    DO YOU RULE OUT ANY POSSIBLE DIAGNOSES?
 2        A    NO.
 3        Q    AND WHAT IS THE PURPOSE IN DOING THIS
 4   EXAMINATION?
 5        A    IT'S REQUESTED BY LAW ENFORCEMENT.  AND IT'S
 6   DOCUMENTING INJURIES.  IT'S GATHERING EVIDENCE.
 7        Q    AND WHAT IS THE PURPOSE OF GATHERING EVIDENCE?
 8        A    WE WILL TAKE SWABS BASED ON THE HISTORY OF WHAT THE
 9   PATIENT TOLD US HAPPENED.  AND WE PACKAGE THOSE.  PUT THEM
10   IN OUR -- WITH ALL OF OUR EVIDENCE AND GIVE THEM TO LAW
11   ENFORCEMENT.
12        Q    IS THAT FOR THE PURPOSE OF POSSIBLE PROSECUTION?
13        A    THAT'S REALLY NOT IN MY SCOPE TO DISCUSS.
14        Q    DO YOU FORM OPINIONS -- MEDICAL OPINIONS DURING THE
15   COURSE OF YOUR EXAMINATION?
16        A    NO.
17        Q    DIRECTING YOUR ATTENTION TO MAY 18, 2021, WERE YOU
18   WORKING AT THAT TIME AT PALOMAR HOSPITAL?
19        A    YES.
20        Q    AND AT SOME POINT IN TIME, DID MS. HILL COME INTO
21   PALOMAR HOSPITAL?
22        A    YES.
23        Q    AND DID YOU RECEIVE ANY PHONE CALLS PRIOR TO HER
24   ARRIVAL?
25        A    LIKE -- YES.  LIKE I EXPLAINED EARLIER, OUR
26   DISPATCH CONTACTS US.  PUTS US IN CONTACT WITH LAW
27   ENFORCEMENT.  THEN WE SET UP WHERE WE'RE GOING TO MEET,
28   BECAUSE WE HAVE A FEW DIFFERENT EXAM PLACES THROUGHOUT THE
```

 1  COUNTY WE CAN MEET AND TIMING.

 2      Q    AND WHO DID YOU INITIALLY RECEIVE A CALL FROM?

 3      A    OUR DISPATCH.  I WOULD NOT KNOW THE NAME OF THAT

 4  PERSON.

 5      Q    WAS THAT THROUGH THE SAN DIEGO POLICE DEPARTMENT?

 6      A    IT'S PALOMAR DISPATCH.  THE LAW ENFORCEMENT

 7  AGENCIES CONTACT OUR DISPATCH.

 8      Q    APPROXIMATELY WHAT TIME DID YOU INITIALLY SEE

 9  MS. HILL?

10      A    I DON'T RECALL -- ABOUT 2:00 O'CLOCK IN THE MORNING

11  IS MY BEST GUESS.

12      Q    AND THAT WAS ON MAY 18?

13      A    I BELIEVE SO, YES.

14      Q    TAKING A STEP BACK, THE EXAMINATION PROTOCOL THAT

15  YOU JUST DESCRIBED, IS THERE A NAME FOR THAT EXAMINATION?

16      A    YOU'LL SOMETIMES HEAR SART, SEXUAL ASSAULT RESPONSE

17  TEAM.  OR SART EXAM.

18      Q    SO IF I REFER TO THE EXAMINATION THAT YOU CONDUCTED

19  AS A SART EXAMINATION, CAN WE AGREE THAT THAT MEANS SEXUALLY

20  ASSAULT?

21      A    YES.

22      Q    OKAY.  AND YOU DID PERFORM A SART EXAM ON MS. HILL;

23  CORRECT?

24      A    CORRECT.

25      MS. MEYER:  YOUR HONOR, I WOULD LIKE TO MARK AS EXHIBIT

26  26 -- AND THIS WAS SENT TO THE COURT UNDER SEAL PURSUANT TO A

27  PROTECTIVE ORDER.

28      THE COURT:  YES.

1    MS. MEYER: -- THE SART EXAMINATION. AND -- LET ME ASK

2  IT FIRST. DOES THE COURT WISH ME TO CONDUCT THE INQUIRY WITH

3  THE PUBLIC IN HERE GIVEN THE PROTECTIVE ORDER?

4    THE COURT: HAVE YOU DISCUSSED THAT WITH COUNSEL?

5    MS. MEYER: WE HAVE NOT DISCUSSED THAT.

6    THE COURT: DO YOU WANT TO DISCUSS THAT FIRST?

7    MS. HOLLEY: SURE. OKAY.

8    MS. MEYER: IF WE CAN HAVE A MOMENT.

9            (PAUSE IN THE PROCEEDINGS.)

10   MS. MEYER: WE HAVE MET AND CONFERRED, YOUR HONOR. BOTH

11  SIDES HAVE AGREED TO JUST CONTINUE WITH THE EXAMINATION AS

12  THE SITUATION IS CURRENTLY.

13   THE COURT: OKAY.

14   Q   BY MS. MEYER: IT LOOKS LIKE YOU HAVE A MANILA

15  ENVELOPE TO YOUR RIGHT. IF YOU CAN OPEN THAT AND IDENTIFY

16  WHAT IS INSIDE THAT ENVELOPE?

17   THE COURT: ARE WE IDENTIFYING THIS AS PETITIONER'S 26?

18   MS. MEYER: YES. THANK YOU.

19   THE WITNESS: MAY I HAVE A COUPLE OF MINUTES TO LOOK AT

20  ALL THE PAGES.

21   MS. MEYER: FOR THE RECORD, WE HAVE BATES STAMPED THIS

22  MOLM 1 THROUGH 97.

23   Q   BY MS. MEYER: DOES THIS APPEAR TO BE A TRUE AND

24  CORRECT COPY OF THE SART REPORT THAT YOU PREPARED IN

25  CONNECTION WITH MS. LINDSEY HILL?

26   A   CORRECT.

27   MS. MEYER: YOUR HONOR, REQUEST EXHIBIT 26 BE

28  ADMITTED.

```
1       THE COURT:  ANY OBJECTION?

2       MR. FETTEROLF:  NO OBJECTION.

3       THE COURT:  THAT IS ADMITTED.

4       MS. MEYER:  THANK YOU.

5       Q    BY MS. MEYER:  WHEN YOU -- STRIKE THAT.  WHERE IN

6  THE HOSPITAL DID YOU INITIALLY MEET WITH LINDSEY?

7       A    SO PALOMAR HEALTH AND POMERADO HEALTH ARE ONE AND

8  THE SAME.  I MET HER AT POMERADO HOSPITAL.

9       Q    CAN YOU SPELL THAT FOR THE RECORD, PLEASE?

10       THE COURT:  OR TRY.

11       THE WITNESS:  P-O-M-E-R-A-D-O.

12       Q    BY MS. MEYER:  DID YOU INITIALLY MEET WITH HER IN

13  AN EXAMINING ROOM?

14       A    I SAID EARLIER BECAUSE OF COVID, WENT OUTSIDE AND

15  MET WITH HER AND THE LAW ENFORCEMENT THAT BROUGHT HER.  DID

16  MY COVID SCREENING.  AND THEN BROUGHT HER INTO OUR

17  OFFICE/EXAM ROOMS.  WE HAVE A LOBBY AREA.  AND THAT'S WHEN I,

18  YOU KNOW, FIRST STARTED SPEAKING WITH HER.  INTRODUCED

19  MYSELF.  AND THEN WE HAVE EXAM ROOMS WITHIN THAT OFFICE SPACE

20  WE HAVE.

21       Q    CAN YOU DESCRIBE LINDSEY'S APPEARANCE WHEN YOU

22  FIRST SAW HER?

23       A    MAY I REFER TO PICTURES?

24       Q    SURE.  IF YOU CAN LET US KNOW WHAT BATES STAMP PAGE

25  YOU'RE REFERRING TO.  THE BATES STAMPS ARE ON THE BOTTOM

26  RIGHT HAND SIDE.

27       A    CAN I MOVE THIS?

28       Q    SURE.
```

1    A    SO WHEN SHE WALKED IN, I NOTICED VISIBLE FACIAL

2  INJURIES.

3    Q    AND CAN YOU DESCRIBE THOSE FACIAL INJURIES?

4    A    IN REFERRING TO MY PICTURES HERE, I COULD SEE SOME

5  BRUISING UNDER HER EYES, A BRUISED LIP.  AND WHEN SHE FIRST

6  WALKED IN, THAT'S ALL I NOTICED.

7    Q    STEPPING BACK A SECOND, HOW MANY SART EXAMINATIONS

8  DO YOU DO APPROXIMATELY EACH YEAR?

9    A    I'M PART-TIME.  SO IT'S HARD TO REALLY ANSWER THAT.

10  I'VE DONE, IN MY CAREER, APPROXIMATELY 75 EXAMS.  ADULT AND

11  PEDIATRIC.  ADOLESCENT AND PEDIATRIC.

12    Q    DID YOU INITIALLY TAKE INFORMATION OR GATHER

13  INFORMATION FROM MS. HILL?

14    A    YES.  ONCE -- AFTER SHE HAD SPOKEN TO THE ADVOCATE

15  AND THEN I BRING HER INTO THE EXAM ROOM, AND WE BEGAN

16  TALKING.  AND I AM ASKING HER -- FIRST, AGAIN GETTING CONSENT

17  FOR THE EXAM.  AND THEN START ASKING HER MEDICAL QUESTIONS.

18  AND THEN TELLING ME WHAT HAPPENED AND WHY SHE WAS THERE.

19    Q    NOW, DIRECTING YOUR ATTENTION TO YOUR SART EXAM,

20  ARE THE MEDICAL QUESTIONS THAT YOU ASKED OF MS. HILL SET

21  FORTH ON OR IN THE REPORT?

22    A    NO, I DON'T SEE THOSE.  LET ME JUST DOUBLE CHECK.

23    Q    AND JUST FOR EXPEDIENCY, I WOULD REFER YOU TO BATES

24  STAMP PAGE 2.

25    A    OKAY.

26    Q    IS THIS THE PATIENT HISTORY THAT YOU OBTAINED FROM

27  MS. HILL?

28    A    YES.

1    Q    DIRECTING YOUR ATTENTION TO BATES STAMP 3.  ON THE

2    RIGHT HAND SIDE, IN THE MIDDLE OF THE PAGE, THERE IS A

3    QUESTION.  "DID THE PATIENT EXPERIENCE ANY BODY NON-GENITAL

4    PAIN DURING OR IMMEDIATELY AFTER THE ASSAULT?"  AND THE

5    ANSWER IS "YES."  DID MS. HILL RESPOND IN THE AFFIRMATIVE TO

6    THAT QUESTION?

7    A    SHE DID.

8    Q    AND THEN THE NEXT PART OF THE QUESTION ASKS WHERE

9    SHE IS EXPERIENCING THE PAIN?

10   A    YES.

11   Q    AND MS. HILL TOLD YOU THAT PAIN WAS STILL PRESENT.

12   YES.  AND THEN IT REFERS TO HER EXTERNAL GENITALIA?

13   A    CORRECT.

14   Q    AND THEN PAIN WAS STILL PRESENT IN HER BUTTOCKS?

15   A    CORRECT.

16   Q    DIRECTING YOUR ATTENTION TO BATES STAMP 4.  UNDER

17   THE HEADING "ASSAILANT 1"?

18   A    YES.

19   Q    IT SAYS, "GENDER:  MALE.  RELATIONSHIP TO PATIENT."

20   WHAT DID LINDSEY -- OR MS. HILL TELL YOU ABOUT HER -- THE

21   ASSAILANT'S RELATIONSHIP TO HER?

22   A    THAT SHE HAD MET WITH HIM TWICE.

23   Q    DID SHE GIVE YOU HIS NAME?

24   A    YES.

25   Q    DID SHE SEEM HESITANT TO GIVE YOU HIS NAME?

26   A    I DON'T RECALL.

27   Q    WHAT IS THE PURPOSE OF SPEAKING TO THE ADVOCATE

28   BEFORE MEETING WITH YOU?

288

```
1        A    THE ADVOCATES EXPLAIN TO THE PATIENT WHAT THE EXAM
2   PROCESS IS.  AND THEY ALSO TELL THEM OR GIVE -- EXCUSE ME --
3   GIVES THEM RESOURCES POST-EXAM.
4        Q    AND THEN UNDER THE SECTION -- TWO SECTIONS LATER --
5   "WAS A WEAPON INVOLVED IN ANY OF THE FOLLOWING WAYS?"  THERE
6   IS A QUESTION, "WERE THERE ANY PHYSICAL BLOWS?"  AND THE
7   RESPONSE IS "YES."  WHAT DID MS. HILL TELL YOU ABOUT WHETHER
8   OR NOT THERE WERE ANY PHYSICAL BLOWS?
9        MR. FETTEROLF:  I'M NOT SURE WHAT PAGE WE'RE ON HERE.
10       MS. MEYER:  WE'RE ON BATES STAMP 4.  I'M SORRY.
11       MR. FETTEROLF:  OKAY.
12       THE WITNESS:  SHE DID CONFIRM THERE WERE PHYSICAL BLOWS.
13       Q    BY MS. MEYER:  AND DID SHE DESCRIBE WHERE ON HER
14  BODY WERE THE PHYSICAL BLOWS INFLICTED?
15       A    YES.
16       Q    WHAT DID SHE TELL YOU?
17       A    I DON'T RECALL EXACTLY.  BUT FROM MY FORM -- WOULD
18  YOU LIKE ME TO --
19       Q    YES.
20       A    FACE, EXTERNAL GENITALIA, AND BUTTOCKS.
21       Q    SO WHERE THERE IS THE WORD "PUNCH" ABOVE THAT AND
22  THEN THERE'S A CIRCLE THAT IS DARKENED, DOES THAT DENOTE THE
23  FACT SHE ANSWERED IN THE AFFIRMATIVE TO THE FACT SHE WAS
24  PUNCHED BY MR. BAUER?
25       A    CORRECT.
26       Q    AND SO THEN UNDERNEATH THE WORD "PUNCHED," IT SAYS,
27  "FACE, EXTERNAL GENITALIA, AND BUTTOCKS."  ARE THOSE THE
28  AREAS SHE DESCRIBED AS WHERE SHE WAS PUNCHED?
```

1       A    YES.

2       Q    AND THEN UNDER THAT, IT SAID -- IT SAYS THE WORD

3    "SLAPPED."  AND SHE TOLD YOU THAT SHE WAS SLAPPED ON THE FACE

4    AND BUTTOCKS?

5       A    CORRECT.

6       Q    AND THEN SHE RECEIVED AN OPEN HANDED BLOW ON THE

7    FACE AND BUTTOCKS; CORRECT?

8       A    CORRECT.

9       MR. FETTEROLF:  OBJECTION.  LEADING.

10      THE COURT:  IT IS LEADING.  BUT WE'RE ALL READING THE

11   SAME DOCUMENT, COUNSEL.

12      MR. FETTEROLF:  I UNDERSTAND.

13      Q    BY MS. MEYER:  AND THEN UNDER THAT, IT SAYS, "WAS

14   THE PATIENT STRANGLED?"  WHAT WAS MS. HILL'S RESPONSE?

15      THE COURT:  WELL, THE DOCUMENT IS IN EVIDENCE.  YES?

16      MS. MEYER:  YES.

17      THE COURT:  IT SPEAKS FOR ITSELF.

18      Q    BY MS. MEYER:  DID MS. HILL DESCRIBE HOW SHE WAS

19   STRANGLED?

20      A    SHE DID.

21      Q    WHAT DID SHE TELL YOU?

22      A    THAT HE STRANGLED HER WITH HER HAIR.  HER OWN

23   HAIR.

24      Q    DID SHE DESCRIBE ON HOW MANY OCCASIONS HE STRANGLED

25   HER WITH HER OWN HAIR?

26      A    I DON'T RECALL.

27      Q    ON PAGE 5 OF THE SART REPORT UNDER THE HEADING OF

28   "EYE, HEAD, NECK, AND ORAL EXAM," AFTER YOU DID THE ORAL

```
1    INTAKE OF MS. HILL, DID YOU THEN CONDUCT A HEAD, NECK, AND
2    ORAL EXAMINATION?
3         A    YES.
4         Q    AND PLEASE DESCRIBE WHAT YOU DID IN THAT REGARD?
5         A    WELL, MY COPY IS VERY BLURRED.  BUT I KNOW THAT I
6    TOOK SWABS AROUND HER MOUTH AND HER NECK.  AND I KNOW I
7    DOCUMENTED SOME INJURIES ON HER MOUTH AND HER FACE.  BUT,
8    AGAIN, MY COPY IS VERY BLURRED.
9         Q    ARE YOU ABLE TO TELL FROM THE REPORT -- AND WOULD
10   IT ASSIST YOU IN REFRESHING YOUR RECOLLECTION WHAT INJURIES
11   YOU OBSERVED TO HER MOUTH AND FACE?
12        A    I'M SORRY.  COULD YOU REPEAT THAT?
13        Q    YES.  COULD YOU LOOK AT YOUR REPORT, AND WOULD THAT
14   HELP YOU REFRESH YOUR RECOLLECTION IN TERMS OF WHAT INJURIES
15   MS. HILL SUSTAINED TO HER MOUTH AND FACE?
16        A    OKAY.  UNDER A1, RIGHT EYE.  I HAVE ECCHYMOSIS,
17   BRUISE.  A2, LEFT EYE.  ECCHYMOSIS, BRUISE.  A3, LEFT LOWER
18   LIP.  ECCHYMOSIS, BRUISE.  A4, LEFT CHEEK.  ECCHYMOSIS
19   BRUISE.  A4 LEFT CHEEK, SWELLING AND TENDERNESS.
20        Q    AND THAT IS WHAT YOU OBSERVED AFTER PERFORMING YOUR
21   EXAMINATION ON MS. HILL; CORRECT?
22        A    CORRECT.
23        Q    SO WHEN THE RESPONSE IS "TENDER," IS THAT SOMETHING
24   THAT MS. HILL IS TELLING YOU OR IS THAT SOMETHING THAT YOU
25   OBSERVED AFTER TOUCHING THE AREA?
26        A    I DON'T RECALL EXACTLY.  BUT I WOULD SAY BOTH.
27   YOU'RE SPEAKING WITH THE PATIENT.  YOU'RE ASKING THEM
28   QUESTIONS.  THEY'RE TELLING YOU INFORMATION.
```

```
 1        Q   ARE YOU ABLE TO DESCRIBE THE SWELLING TO MS. HILL'S
 2   LEFT CHEEK?
 3        A   ON MY REPORT I HAVE A SIZE DOCUMENTATION.
 4        THE COURT:  OTHER THAN WHAT'S CONTAINED IN YOUR REPORT,
 5   DO YOU HAVE ADDITIONAL INFORMATION?
 6        THE WITNESS:  I WOULD HAVE TO REFER TO MY PICTURES.  BUT
 7   FROM MEMORY, NO.
 8        MR. FETTEROLF:  YOUR HONOR, WE'LL STIPULATE TO WHAT SHE
 9   HAS GOT IN THE REPORT.
10        THE COURT:  SHE DOES NOT NEED TO REPEAT THAT WHICH IS
11   CONTAINED IN THE REPORT.
12        MS. MEYER:  SURE.
13        Q   BY MS. MEYER:  AND THEN ON THE SECOND PAGE --
14        A   PAGE 6?
15        Q   YES.  UNDER, "BODY EXAMINATION."
16        A   UH-HUH.  YES.
17        Q   IT HAS H1 AND H2, RIGHT NIPPLE AND LEFT NIPPLE.
18   WERE HER NIPPLES DISCOLORED AT ALL?
19        A   H1, RIGHT NIPPLE, I HAVE NO COMMENT THAT IT WAS
20   DISCOLORED -- EXCUSE ME.  I'M SORRY.  THERE'S TWO THINGS
21   MARKED.  H1 IS FOR POTENTIAL CONTACT D.N.A.  AND, ALSO, RIGHT
22   NIPPLE.  ECCHYMOSIS, BRUISE.
23        Q   SO LET ME SAY THIS DELICATELY.  DID YOU OBSERVE
24   BRUISES ON HER NIPPLES?
25        A   CORRECT.
26        Q   AND THEN DIRECTING YOUR ATTENTION TO BATES STAMP 7.
27   YOU ALSO PERFORMED AN EXAMINATION ON HER BUTTOCKS?
28        A   CORRECT.
```

292

1      Q    AND YOU OBSERVED BRUISING ON BOTH BUTTOCKS;

2   CORRECT?

3      A    CORRECT.

4      Q    AND THEN WHAT IS AN ANOGENITAL EXAMINATION?

5      A    THAT WOULD BE PUTTING A SPECULUM, IF YOU WILL,

6   INSIDE -- LET ME BACKTRACK.  YOU WOULD TAKE A LOOK EXTERNALLY

7   AT THE ANUS AND SEE IF THERE'S ANY INJURY.  DEPENDENT ON

8   HISTORY, YOU WOULD PUT IN, WHICH IS LIKE A SPECULUM, TAKE

9   SAMPLES AND PICTURES.

10     Q    AND DID YOU -- GO AHEAD.

11     A    I DID NOT.  IT WAS TOO UNCOMFORTABLE FOR HER.

12     Q    AND DID YOU DO THAT VAGINALLY TO HER?

13     A    I DID.

14     Q    AFTER HER EXAMINATION, DID YOU TAKE PHOTOGRAPHS?

15     A    YES.

16     Q    ARE THE PHOTOGRAPHS REFLECTED IN THE SART REPORT?

17     A    YES.

18     Q    AND DID YOU TAKE EACH AND EVERY ONE OF THESE

19   PHOTOGRAPHS?

20     A    I DID.

21     Q    AND YOU TOOK -- DID YOU TAKE THE PHOTOGRAPHS OF ALL

22   BODY PARTS THAT YOU EXAMINED?

23     A    I DID.

24     Q    ON PAGE 11 OF THE REPORT, IS EVERYTHING THAT

25   LINDSEY HILL TOLD YOU ABOUT HER RELATIONSHIP WITH MR. BAUER

26   SET FORTH ON PAGE 11?

27     A    YES.

28     Q    AND WHY DO YOU TAKE DOWN THAT INFORMATION?

1      A    WE -- AS I SAID EARLIER, WE GUIDE OUR EXAM ON WHAT

2   THE PATIENT TELLS US HAPPENED.

3      Q    AND IS IT YOUR JOB TO DETERMINE WHETHER WHAT THE

4   PATIENT TELLS YOU IS TRUE OR FALSE?

5      A    IT IS NOT.

6      Q    DID LINDSEY HAVE ANY SIGNS OF -- STRIKE THAT.

7           DO YOU KNOW THE TERM RACCOON EYES?

8      A    YES.

9      Q    DID LINDSEY HAVE RACCOON EYES?

10     A    YES.

11     Q    WHAT IS THE SIGNIFICANCE OF RACCOON EYES?

12     A    THAT CAN BE CAUSED BY STRANGULATION.

13     Q    AND CAN YOU EXPLAIN TO US MEDICALLY HOW RACCOON

14  EYES ARE CAUSED BY STRANGULATION?

15     A    SO STRANGULATION IS EXTERNAL PRESSURE, WHICH CAUSES

16  LACK OF BLOOD FLOW OR OXYGEN.  AND THAT PRESSURE THEN CAN

17  CAUSE THE BRUISING UNDER THE EYES.

18     Q    SO SOMEBODY DOESN'T NEED TO BE HIT OR SOCKED IN THE

19  EYE IN ORDER TO HAVE RACCOON EYES; IS THAT CORRECT?

20     A    CORRECT.

21     Q    AND THEY COULD BE STRANGLED AROUND THE NECK?

22     A    CORRECT.

23     Q    SO LINDSEY'S ACCOUNT OF HOW SHE WAS STRANGLED BY

24  MR. BAUER WAS CONSISTENT WITH HER RACCOON EYES; CORRECT?

25     MR. FETTEROLF:  THAT CALLS FOR SPECULATION.

26     THE WITNESS:  BEYOND MY SCOPE.

27     MS. MEYER:  OKAY.

28     Q    BY MS. MEYER:  IS THERE A -- IS THERE ANOTHER NAME

1    FOR RACCOON EYES?

2        A    NOT THAT I'M AWARE OF.

3        Q    WHAT ABOUT THE WORD -- HAVE YOU EVER HEARD THE

4    TERMINOLOGY "BATTLE SIGNS"?

5        A    NOT THAT I RECALL.

6        Q    WAS THERE ANYTHING IN LINDSEY'S HISTORY THAT SHE

7    PROVIDED TO YOU THAT WAS NOTABLE OR CAUSED YOU ANY CONCERN?

8        A    NO.

9        Q    COULD YOU DESCRIBE THE INJURIES TO LINDSEY'S

10   GENITALIA OTHER THAN WHAT IS SET FORTH IN THE REPORT?

11       A    I AM NOT SURE WHAT YOU'RE ASKING ME.

12       Q    WHAT WERE THE INJURIES THAT YOU OBSERVED AFTER

13   EXAMINING HER WITH RESPECT TO HER VAGINAL AREA?

14       THE COURT:  OTHER THAN WHAT'S IN THE REPORT?

15       MS. MEYER:  YES.

16       THE WITNESS:  I REALLY CAN'T SPEAK TO ANYTHING OTHER

17   THAN WHAT'S IN MY REPORT.  I'VE GOT THE DOCUMENTATION

18   EXPLAINING THE BRUISING.  MEASURING THE BRUISING.  I DON'T

19   KNOW WHAT ELSE YOU ARE ASKING ABOUT.

20       Q    BY MS. MEYER:  WHAT WAS THE COLOR OF THE

21   BRUISING?

22       A    MAY I GO BACK TO THIS?

23       Q    SURE.

24       A    THAT WAS PAGE 7.  I HAVE ON HERE RED, PURPLE.

25       Q    ARE YOU ABLE TO ASCERTAIN THE SEVERITY OF THE BLOWS

26   TO MS. HILL'S VAGINA BASED UPON THE COLOR OF THE BRUISING?

27       A    I AM NOT.

28       Q    AND WHAT WAS THE COLOR OF THE BRUISING TO HER

```
1   BUTTOCKS AREA?

2       A    LEFT BUTTOCK:  PURPLE, GREEN, YELLOW.  RIGHT

3   BUTTOCK:  PURPLE, GREEN, YELLOW.

4       Q    WAS THERE BRUISING INSIDE LINDSEY'S MOUTH?

5       A    AS I RECALL, YES.

6       Q    WAS THERE ANYTHING -- LET ME WITHDRAW THAT.

7       MS. MEYER:  YOUR HONOR, IF I COULD JUST HAVE A MINUTE.

8       THE COURT:  OF COURSE.

9       Q    BY MS. MEYER:  DID YOU HAVE ANY DISCUSSIONS WITH

10  MS. HILL ABOUT THE INJURIES THAT YOU OBSERVED WITH RESPECT TO

11  HER GENITALIA?

12      A    SHE TOLD ME WHAT HAPPENED.

13      Q    DID YOU SAY ANYTHING TO HER IN RESPONSE TO WHAT SHE

14  TOLD YOU?

15      A    I DON'T RECALL.

16      Q    DID YOU TELL LINDSEY THAT YOU HAD NEVER SEEN SUCH

17  SEVERE INJURIES TO SOMEBODY'S VAGINAL AREA BASED UPON THE

18  PREVIOUS SART EXAMS YOU HAD CONDUCTED?

19      A    I DID.

20      Q    AND WHY DID YOU SAY THAT TO HER?

21      A    I HAD NEVER SEEN THAT TYPE OF BRUISING IN THAT AREA

22  IN MY PAST EXPERIENCE.

23      Q    AND WHAT WAS IT ABOUT THE BRUISING TO LINDSEY'S

24  VAGINAL AREA WHICH CAUSED YOU TO SAY THAT?

25      A    AS I STATED, I HAD NEVER SEEN THAT BEFORE.

26      Q    WHAT DID YOU SEE THAT WAS UNIQUE?

27      A    BRUISING TO HER EXTERNAL GENITALIA.

28      Q    MEANING THE OUTSIDE OF HER VAGINAL AREA?
```

```
1        A    CORRECT.

2        Q    AND DID THAT CAUSE YOU CONCERN AS A MEDICAL

3   PROVIDER?

4        MR. FETTEROLF:  CALLS FOR SPECULATION.

5        THE COURT:  NO.  IT DOESN'T CALL FOR SPECULATION AS TO

6   WHETHER OR NOT IT CAUSED THIS WITNESS CONCERN.  YOU MAY

7   ANSWER.

8        MR. FETTEROLF:  OUTSIDE THE SCOPE OF THE PURPOSE OF THE

9   TESTIMONY.

10       THE COURT:  YOU MAY ANSWER.

11       THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

12       Q    BY MS. MEYER:  DID IT CAUSE YOU CONCERN AS A

13  MEDICAL PROVIDER?

14       A    YES.

15       Q    WHY DID IT CAUSE YOU CONCERN?

16       A    AGAIN, JUST THAT I HAD NEVER SEEN THAT BEFORE.  IT

17  WAS, FRANKLY, ALARMING.

18       Q    AND WHAT WAS ALARMING ABOUT IT?

19       A    HAVING NEVER SEEN BRUISING THERE BEFORE AND THE

20  SIGNIFICANT AMOUNT OF BRUISING.

21       Q    WAS THE BRUISING SIGNIFICANT IN TERMS OF THE COLOR

22  OF THE BRUISING OR WAS IT SIGNIFICANT IN TERMS OF THE SIZE OF

23  THE BRUISING ON HER VAGINAL AREA?

24       A    BOTH.

25       Q    AND DID YOU MAKE NOTE OF THAT IN YOUR REPORT?

26       A    IN WHAT REGARD?  I'VE NOTED THE COLOR, WHERE, AND

27  THE SIZE.

28       Q    DID YOU DISCLOSE TO ANYBODY -- TO ANYBODY AT THE
```

```
 1   HOSPITAL OR LAW ENFORCEMENT YOUR CONCERNS ABOUT THE
 2   SIGNIFICANT BRUISING YOU OBSERVED TO HER VAGINAL AREA?
 3        A    I DON'T RECALL.  NO.
 4        Q    WHY NOT?
 5        A    IT WAS ALARMING TO SEE, BUT NOT SOMETHING THAT I
 6   FELT SHE NEEDED FURTHER MEDICAL ATTENTION.
 7        Q    AND BEFORE YOU COMPLETED YOUR EXAMINATION -- OR AT
 8   THE TIME YOU COMPLETED YOUR EXAMINATION, DID YOU GIVE HER ANY
 9   INSTRUCTIONS IN TERMS OF FURTHER MEDICAL ATTENTION?
10        A    YES.  I GAVE HER DISCHARGE INSTRUCTIONS.
11        Q    BRIEFLY, WHAT WERE THOSE DISCHARGE INSTRUCTIONS?
12        A    I'M NOT SURE IF THEY'RE IN HERE, BUT WE HAVE
13   STANDARD DISCHARGE INSTRUCTIONS WE GIVE TO OUR PATIENTS AND
14   DISCUSS WITH THEM.  IF THEY'RE SORE, DO WARM HOT BATHS --
15   EXCUSE ME -- WARM BATHS.  SOAKS.
16        Q    DID YOU REVIEW ANY OF LINDSEY'S MEDICAL RECORDS
17   FROM ALVARADO HOSPITAL?
18        A    NO, I DIDN'T HAVE ACCESS TO THAT.
19        Q    DID YOU HAVE ACCESS TO ANY OF HER -- THE CT SCANS
20   SHE HAD TAKEN PREVIOUSLY?
21        A    I DID NOT.
22        Q    AND DID YOU HAVE ANY OF LINDSEY'S PRIOR MEDICAL
23   HISTORY OTHER THAN WHAT SHE GAVE YOU ORALLY?
24        A    I DID NOT.
25        MS. MEYER:  I HAVE NO FURTHER QUESTIONS AT THIS TIME.
26        THE COURT:  ALL RIGHT.  CROSS.
27        MR. FETTEROLF:  JUST GIVE ME ONE MINUTE.  WE JUST GOT
28   SOME RECENT RECORDS FROM PALOMAR.  I'M STRUGGLING WITH THE
```

1   GLASSES AND THE MASK.

2        THE WITNESS:  ME TOO.

3

4               CROSS EXAMINATION

5   BY MR. FETTEROLF:

6        Q    GOOD AFTERNOON, NURSE VALENCIA.  I'M ONE OF THE

7   LAWYERS FOR RESPONDENT TREVOR BAUER.  I ASSUME AS PART OF

8   BEING CERTIFIED -- YOU TELL ME WHAT THE RIGHT WORD IS.  IS IT

9   SART NURSE?  SANE NURSE?  DOES IT MATTER?

10       A    YOU HEAR BOTH.  SANE, SEXUAL ASSAULT NURSE

11  EXAMINER.  YOU SOMETIMES SEEMS SEE FNE, FORENSIC NURSE

12  EXAMINER.

13       Q    IS THERE ONE YOU PREFER?

14       A    PROBABLY SANE I THINK IS THE MORE SPECIFIC.

15       Q    OKAY.  GOOD.  THAT'S THE ONE I'M MORE ACCUSTOMED

16  TO.  SO I ASSUME GETTING CERTIFIED AS A SANE NURSE YOU'RE

17  AWARE OF THE NATIONAL PROTOCOLS FOR SEXUAL ASSAULT MEDICAL

18  FORENSIC EXAMINERS THAT WERE PUBLISHED BY DOJ?

19       A    I DON'T RECALL.

20       Q    IS THAT SOMETHING YOU REMEMBER, YOU KNOW -- AND

21  WHEN YOU GOT CERTIFIED, A DOCUMENT THAT YOU REVIEWED AS PART

22  OF YOUR TRAINING?

23       A    I AM SORRY.  I DON'T RECALL.  YOU'RE TALKING ABOUT,

24  LIKE, FIVE OR SIX YEARS AGO.

25       Q    THAT'S FINE.  AND IS IT FAIR TO SAY THAT ONE OF THE

26  MAIN PURPOSES OF THE SANE EXAM IS TO DOCUMENT FINDINGS AND

27  COLLECT EVIDENCE FOR POTENTIAL USE IN THE CRIMINAL JUSTICE

28  SYSTEM?

```
 1        A    YES.
 2        Q    IN SHORT, THE REPORT -- SANE REPORT, SART REPORT --
 3   WHATEVER YOU REFER TO IT -- IS A DOCUMENT THAT'S PRINCIPALLY
 4   USED BY LAW ENFORCEMENT?
 5        A    CORRECT.
 6        Q    SO IT'S DIFFERENT THAN WHEN A PATIENT VISITS THE
 7   E.R. AND SEES A DOCTOR OR SEES THEIR PRIMARY DOCTOR WHEN THE
 8   PURPOSE IS SOLELY FOR MEDICAL REVIEW OR ADVICE?
 9        A    CORRECT.
10        Q    OKAY.  AND, FOR EXAMPLE, WHEN MS. HILL CAME TO SEE
11   YOU AND TO GET EXAMINED, SHE CAME WITH SOMEONE FROM LAW
12   ENFORCEMENT?
13        A    YES.
14        Q    OKAY.  AND ON THE REPORT, YOU HAVE TO ACKNOWLEDGE
15   THAT THE REPORT IS TO BE GIVEN TO LAW ENFORCEMENT OR OTHER
16   APPROPRIATE INVESTIGATIVE AGENCIES?
17        A    CORRECT.
18        Q    AND DO YOU UNDERSTAND THE REPORT WAS GIVEN TO LAW
19   ENFORCEMENT?
20        A    YES.
21        Q    OKAY.  AND THAT'S INITIALLY THE SAN DIEGO POLICE
22   DEPARTMENT AND THEN THE PASADENA POLICE DEPARTMENT?
23        A    I DON'T KNOW THAT SAN DIEGO P.D. GOT THE REPORT.
24        Q    OKAY.  SO YOU THINK IT WENT RIGHT TO PASADENA?
25        A    I BELIEVE SO.
26        Q    OKAY.  DID YOU HAVE CONVERSATIONS WITH
27   REPRESENTATIVES FROM THE PASADENA POLICE DEPARTMENT?
28        A    I DID MEET THEM THAT MORNING.  THEY CAME TO COLLECT
```

```
1    THE EVIDENCE.
2         Q    SO BEYOND JUST HANDING THEM THE REPORT, DID YOU
3    DISCUSS ANY INFORMATION OR ANYTHING LIKE THAT?
4         A    NOT THAT I RECALL.
5         Q    OKAY.  AND IT'S ON -- WE HAVE THE -- YOUR REPORT AS
6    EXHIBIT G.  CAN WE PUT -- BECAUSE THAT'S THE NUMBER YOU WILL
7    NOT HAVE.  CAN YOU PUT THAT IN FRONT OF HER.  I THINK IT'S
8    EXHIBIT 26 OF PETITIONER.
9         THE COURT:  IT IS.
10        Q    BY MR. FETTEROLF:  NOW, WE CAN LOOK AT THE
11   DOCUMENT.  BUT ON THE DOCUMENT IT SAYS YOU STARTED TO EXAMINE
12   MS. HILL ON MAY 18TH BEGINNING AT 3:55 A.M.  YOU HAD SAID
13   2:00.  AND IT'S ON PAGE 9.
14        A    PAGE 9 --
15        Q    OF THE INTERNAL PAGE NUMBERING OF THE REPORT.
16        A    YES.
17        Q    AND AFTER YOUR EXAMINATION, DID YOU HAVE ANY
18   FURTHER FOLLOW-UP MEETINGS WITH MS. HILL?
19        A    I DID NOT.
20        Q    DO YOU -- DID YOU RECOMMEND ONE?
21        A    I DID.
22        Q    OKAY.  AND SHE DIDN'T COME SEE YOU?
23        A    WE SCHEDULED ONE WHERE I COULD MEET WITH HER AND DO
24   A FOLLOW-UP EXAM.  SHE WAS NOT ABLE TO ATTEND.
25        Q    WHY DO YOU -- WHY DID YOU SUGGEST A FOLLOW-UP
26   VISIT?
27        A    I WANTED TO SEE THE PROGRESSION OF HER INJURIES.
28        Q    OKAY.  BUT THAT VISIT NEVER OCCURRED?
```

1      A    I DID NOT DO A FOLLOW-UP EXAM.

2      Q    OKAY.  AND DID YOU EVER HAVE OCCASION TO MEET OR

3    SPEAK WITH HER LAWYERS BEFORE TODAY?

4      A    NO.

5      Q    OKAY.  DID THEY EVER COME TO YOUR HOUSE OR WHERE

6    YOU WORK?

7      A    HER ATTORNEYS?

8      Q    YES.

9      A    THEY DID NOT.

10     Q    OKAY.  NOW, IF YOU TURN TO SECTIONS I THROUGH K OF

11   YOUR REPORT, YOU WERE ASKED ABOUT THESE EARLIER.  THESE ARE

12   ON PAGES 5 THROUGH 7.  AND THESE LIST THE FINDINGS THAT WE

13   SPOKE ABOUT.  AND AM I CORRECT THAT WHEN WE LOOK AT ALL THESE

14   VARIOUS FINDINGS, ALL OF THEM WERE REFERRED TO AS -- AND I

15   ACTUALLY WOULD LIKE YOU TO PRONOUNCE THIS WORD BECAUSE I --

16   ECCHYMOSIS?

17     A    ECCHYMOSIS.

18     Q    I GOT PRETTY CLOSE.  ECCHYMOSIS.  OR CAN WE JUST

19   CALL IT BRUISING SO I DON'T GET IT WRONG?

20     A    YES.

21     Q    SO WITH THE EXCEPTION OF ONE FINDING OF SWELLING ON

22   THE CHEEK AND ONE FINDING OF ABRASION ON THE RIGHT CHEEK, ALL

23   OF THE OTHER FINDINGS ARE A BRUISE; RIGHT?

24     A    I WOULD HAVE TO -- I WOULD HAVE TO LOOK AT EVERY

25   ONE OF THESE TO --

26     Q    THERE AREN'T THAT MANY.  JUST TAKE A FLIP THROUGH

27   AND TELL ME IF I'M CORRECT.

28     A    SO -- BRUISE -- BRUISE.  I HAVE AN ABRASION ON

 1  RIGHT CHEEK.

 2      Q    RIGHT.  ONE SWELLING ON LEFT CHEEK.  ONE ABRASION

 3  ON RIGHT CHEEK.  EVERYTHING ELSE IS A BRUISE.  THAT'S MY

 4  QUESTION.

 5      A    CORRECT.  YOU ARE CORRECT.

 6      Q    OKAY.  FOR EACH OF THE BRUISES LISTED THERE, YOU

 7  DIDN'T INDEPENDENTLY REFERENCE ANY SWELLING ASSOCIATED WITH

 8  THE BRUISE ON YOUR REPORT?

 9      A    AGAIN, I WOULD HAVE TO LOOK AT THIS A LITTLE -- I

10  KNOW THERE WAS SWELLING ON ONE OF THESE INJURIES.

11      Q    WELL, THE ONE AREA OF SWELLING -- I'M ASKING YOU

12  WHERE YOU WRITE "BRUISE" OR "ECCHYMOSIS," SINCE I NOW KNOW

13  HOW TO PRONOUNCE IT, DO YOU EVER WRITE ANYTHING ABOUT

14  SWELLING ASSOCIATED WITH THE BRUISE?

15      MS. MEYER:  OBJECTION, YOUR HONOR.  352.  THE DOCUMENT

16  SPEAKS FOR ITSELF.

17      THE COURT:  RIGHT.  AND I'M NOT SURE THE QUESTION OF

18  WHETHER SHE EVER DOES SO HAS RELEVANCE.

19      MR. FETTEROLF:  WELL, I'M JUST ASKING IF THAT'S

20  CORRECT.

21      THE COURT:  WHATEVER THE DOCUMENT SAYS, IT SAYS.

22      MR. FETTEROLF:  ALL RIGHT.

23      Q    BY MR. FETTEROLF:  AND I ALSO WANT TO CONFIRM THAT

24  IN YOUR REPORT YOU FOUND NO BRUISING ON THE NECK; CORRECT?

25      A    AGAIN, I'D HAVE TO LOOK AT ALL THIS.  AS I RECALL,

26  NO.

27      THE COURT:  IF YOU HAD, WOULD IT BE IN SECTION I?

28      THE WITNESS:  YES.  AND I DON'T SEE THAT.

303

```
1        MR. FETTEROLF:  OKAY.  THANK YOU.
2        Q    BY MR. FETTEROLF:  AND YOU UNDERSTAND -- OR DO YOU
3   UNDERSTAND PRIOR TO COMING TO YOUR EXAMINATION THAT MS. HILL
4   WAS SEEN BY DOCTORS IN THE EMERGENCY ROOM DEPARTMENT AT
5   ALVARADO HOSPITAL?
6        A    I'M AWARE OF THAT.  YES.
7        Q    YOU ARE AWARE OF THAT.  I ASSUME YOU'RE TRAINED
8   TO AND ABLE TO REVIEW MEDICAL REPORTS?  COULD YOU REVIEW CT
9   SCANS?
10        A    NO, I AM NOT A RADIOLOGIST.
11        Q    SO, I GUESS, MY QUESTION IS YOU DID NOT REVIEW ANY
12   OF THE C.T. SCANS CONDUCTED BY ALVARADO HOSPITAL BEFORE SHE
13   GOT TO YOUR EXAMINATION?
14        A    THAT'S CORRECT.
15        Q    SO YOU WEREN'T AWARE OF A CT HEAD, A CT
16   MAXILLOFACIAL BONES, OR A CT NECK ANGIOGRAM?
17        A    I AM AWARE THAT THOSE DID TAKE PLACE AT ALVARADO.
18        Q    OKAY.  WERE YOU AWARE OF THE RESULTS?
19        A    JUST WHAT MS. HILL TOLD ME.
20        Q    AND DID SHE TELL YOU THAT ALL THE RESULTS OF THOSE
21   CAME BACK NEGATIVE?
22        A    AS I RECALL, YES.
23        Q    OKAY.  SO NO FRACTURE.  NO SWELLING.  NOTHING OF
24   THAT SORT?
25        A    AS PART OF OUR STRANGULATION PROTOCOL, IF A PATIENT
26   HAS NOT ALREADY HAD THE CT ANGIOGRAM, WE MAKE SURE THEY HAVE
27   THAT DONE BECAUSE THAT'S SOMETHING WE WANT TO KNOW.
28        Q    OKAY.  I WANT TO MAKE SURE --
```

304

1        A     I DON'T RECALL TALKING TO HER ABOUT FACIAL X-RAYS.

2   I DO RECALL TALKING ABOUT THE CT ANGIOGRAM IN RELATION TO OUR

3   STRANGULATION PROTOCOL.

4        Q     LET ME ASK IT A DIFFERENT WAY.  BEFORE YOU BEGAN

5   YOUR EXAM, YOU WERE TOLD THAT THERE WAS SOME CT SCANS THAT

6   WERE TAKEN?

7        MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.

8        MR. FETTEROLF:  I'M TRYING TO GET AN UNDERSTANDING.

9        THE COURT:  WERE YOU TOLD THAT BY THE PETITIONER WHEN

10  SHE CAME TO SEE YOU?

11       THE WITNESS:  YES.  BECAUSE WE ASK THAT QUESTION

12  SPECIFICALLY TO STRANGULATION.

13       THE COURT:  WERE YOU TOLD THAT BY ANYBODY OTHER THAN THE

14  PETITIONER?

15       THE WITNESS:  NOT THAT I RECALL.

16       THE COURT:  PRIOR TO YOUR DOING YOUR EXAM, DID YOU HAVE

17  ANY INFORMATION WITH REGARD TO ANY EXAMINATION THAT HAD

18  OCCURRED OF PETITIONER BY ANYBODY ELSE?

19       THE WITNESS:  NO.

20       Q     BY MR. FETTEROLF:  OKAY.  SO YOU WEREN'T AWARE THAT

21  ALL THE CT SCANS CAME BACK NEGATIVE?

22       A     I CAN'T --

23       MS. MEYER:  OBJECTION.  ASSUMES FACTS.

24       THE WITNESS:  I DON'T RECALL.

25       MS. MEYER:  MOTION -- I'LL WITHDRAW.

26       Q     BY MR. FETTEROLF:  I WANT TO TURN TO YOUR REPORT,

27  SECTION E.  AND IT'S UNDER "PATIENT HISTORY, SECTION TWO," AT

28  THE BOTTOM OF PAGE 2.

```
1        A    PAGE 2 YOU SAID?

2        Q    YES.

3        A    OKAY.

4        Q    AND IT SAYS, "DOES THE PATIENT TAKE ANY OF THE

5   FOLLOWING MEDICATIONS."  DO YOU SEE THAT PART?

6        A    I KNOW IT'S IN HERE.  YES.  OKAY.

7        Q    OKAY.  WE'RE GOING TO TEST MY EYES IF I HAVE TO

8   LOOK AT THIS WITHOUT MY GLASSES.

9        A    AGAIN, YOU AND I BOTH.

10       Q    THEN IT LISTS BLOOD THINNER, STEROIDS, PRESCRIPTION

11  PAIN MEDICATION, OVER THE COUNTER MEDICATION, ET CETERA.  DO

12  YOU SEE THAT?

13       A    I DO.

14       Q    AND WHY IS IT IMPORTANT TO NOTE THIS ON A SANE

15  REPORT, SART REPORT?

16       A    AS --

17       Q    WHY ARE YOU ASKING THE QUESTION?

18       A    YOU JUST WANT TO KNOW A BRIEF HISTORY OF YOUR

19  PATIENT.

20       Q    IS ONE OF THE REASONS WHETHER ANY OF THE

21  MEDICATIONS COULD HAVE AFFECTED YOUR OBSERVATIONS?

22       A    COULD YOU REPEAT THAT, PLEASE?

23       Q    YEAH.  IS ONE OF THE REASONS YOU'RE ASKING THIS

24  QUESTION IN YOUR REPORT IS TO DETERMINE WHETHER ANY OF THE

25  MEDICATIONS THAT A PERSON THAT SEES YOU IS TAKING COULD

26  AFFECT THE OBSERVATIONS IN YOUR REPORT?

27       A    CORRECT.  YES.

28       Q    YES.  OKAY.  TO DETERMINE WHAT, IF ANY, OF THOSE
```

1 MEDICATIONS COULD HAVE EXACERBATED OR CHANGED ANY OF YOUR

2 FINDINGS?

3     A   CORRECT.

4     Q   FOR EXAMPLE, IF A PATIENT WERE TAKING DRUGS OR

5 MEDICATION THAT WERE INCREASE OR EXACERBATE BRUISING, IT

6 WOULD IMPORTANT TO KNOW THAT; RIGHT?

7     A   CORRECT.

8     Q   YOU WOULD WANT TO NOTE THAT, ALSO?

9     A   CORRECT.

10    Q   FOR EXAMPLE, IF THE PATIENT WERE TAKING IBUPROFEN,

11 WHICH CAN LEAD TO BRUISING, IT WOULD BE IMPORTANT TO NOTE

12 THAT HERE?

13    A   CORRECT.

14    Q   UNDER OTHER MEDICATIONS, YOU SEE IT LISTS

15 "TYLENOL"?

16    A   YES.

17    Q   NOW, IF WE TURN TO PAGE 3.  IN THE MIDDLE OF THE

18 PAGE THERE IT TALKS ABOUT ANY OTHER VOLUNTARY PRESCRIPTION

19 MEDICATION.  DO YOU SEE THAT?

20    A   I DO.

21    Q   AND IT LISTS LEXAPRO, GABAPENTIN -- I THINK THAT'S

22 PRONOUNCED -- AND TRAZADONE?

23    A   YES.

24    Q   ARE THOSE ALL THREE ANTI-ANXIETY MEDICATIONS?

25 MS. MEYER:  OBJECTION.  BEYOND THE SCOPE.

26 THE COURT:  IF YOU KNOW.

27 MS. MEYER:  LACKS FOUNDATION.

28 THE WITNESS:  WELL, GABAPENTIN CAN BE USED FOR MANY,

1   MANY REASONS.

2       Q    BY MR. FETTEROLF:  LET ME ASK IT ANOTHER WAY.

3            JUST VERY, VERY BRIEFLY, WHAT ARE THOSE THREE

4   MEDICATIONS?

5       A    LEXAPRO IS FOR ANXIETY.  GABAPENTIN CAN BE USED FOR

6   PERIPHERAL NERVE PAIN.  AND TRAZADONE, I KNOW IT

7   TRADITIONALLY FOR SLEEP.

8       Q    AND DID YOU -- WERE YOU TOLD -- DID YOU REQUEST

9   WHAT THE DOSAGE OF ANY OF THOSE MEDICATIONS WERE?

10      A    I DIDN'T ASK.  I MAY HAVE BEEN TOLD.  BUT I DIDN'T

11  WRITE IT IN MY REPORT.

12      Q    OKAY.  I WANT YOU TO TAKE A LOOK AT -- IT IS OUR

13  EXHIBIT H.

14      MR. FETTEROLF:  THIS IS -- I'LL NOTE FOR THE COURT, THIS

15  IS MEDICAL RECORDS THAT WE'VE BEEN PROVIDED BY PETITIONER

16  PURSUANT TO THEIR SUBPOENA TO ALVARADO MEDICAL CENTER.

17      Q    BY MR. FETTEROLF:  I'D LIKE YOU TO TURN TO PAGE 51.

18      MS. MEYER:  YOUR HONOR, WE DON'T HAVE COPIES OF THIS

19  EXHIBIT.

20      THE COURT:  OF EXHIBIT H?

21      MS. MEYER:  CORRECT.

22      MR. FETTEROLF:  THIS IS THE DOCUMENT PURSUANT TO YOUR

23  LETTER OF JULY 27, 2021.  IT'S EXHIBIT H IN OUR RECORDS --

24  OUR EXHIBITS THAT HAVE BEEN PROVIDED.

25      THE COURT:  IT APPEARS TO BE A SUBPOENA FROM YOUR

26  OFFICE, MS. MEYER.  AND THE RESPONSE TO IT.

27      MS. MEYER:  I DON'T HAVE THAT EXHIBIT.

28      THE COURT:  IT'S GOT MS. OLSON'S NAME AT THE TOP.  MAYBE

308

```
 1   MS. OLSON CAN FIND IT.  A SUBPOENA ISSUED JUNE 2ND, 2021, TO
 2   ALVARADO HOSPITAL.
 3        MR. FETTEROLF:  THEY WERE SENT TO US IN JULY.
 4        MS. MEYER:  IF WE COULD HAVE A MOMENT TO GET IT.
 5        THE COURT:  OF COURSE.
 6        MR. FETTEROLF:  I HAVE VERY BRIEF QUESTIONS.
 7        Q    BY MR. FETTEROLF:  WE DON'T NEED TO -- HAVE TO SAY
 8   THOSE DOSES OUT LOUD.  BUT DO YOU SEE ON THIS PAGE, PAGE 51,
 9   IT LISTS LEXAPRO, GABAPENTIN, AND TRAZADONE.  AND IT LISTS
10   THE DOSAGE AMOUNT?
11        A    YES.
12        Q    AND YOU ALSO SEE ABOVE HERE IN THIS DESCRIPTION, IT
13   TALKS ABOUT HOW MS. HILL TOOK IBUPROFEN 400 MILLIGRAMS
14   MID-DAY TODAY?
15        A    IS THAT -- I SEE THAT.  YES.
16        Q    THAT'S ON PAGE 51.  SO THIS REPORT IS DATED
17   5/17/2021.  YOU STARTED EXAMINING MS. HILL -- I THINK YOUR
18   REPORT SAID, I THINK, 3:55 A.M.  YOU SAID 2:00 A.M.  BUT
19   EARLY IN THE MORNING?
20        A    CORRECT, YES.
21        Q    NOW, WHILE YOUR REPORT DOES LIST LEXAPRO,
22   GABAPENTIN, AND TRAZODONE, IT DIDN'T REFERENCE IBUPROFEN,
23   THAT MS. HILL TOOK IBUPROFEN?
24        MS. MEYER:  MISTAKES THE DOCUMENT.
25        Q    BY MR. FETTEROLF:  WHEN YOU GO BACK TO WHERE WE
26   LOOKED AND WE SAW TYLENOL.  YOU DIDN'T SEE REFERENCE TO
27   IBUPROFEN.  THAT'S MY QUESTION.
28        A    CORRECT.
```

1      Q    OKAY.  AND SO YOU WEREN'T AWARE, BASED ON SPEAKING

2  TO MS. HILL, THAT SHE HAD TOOK IBUPROFEN?

3      A    I DON'T RECALL TALKING ABOUT IBUPROFEN.

4      Q    IF SHE TOLD YOU SHE TOOK IBUPROFEN LIKE SHE TOLD

5  YOU SHE TOOK TYLENOL, YOU WOULD HAVE PUT IT IN YOUR REPORT;

6  RIGHT?

7      A    YES.

8      Q    AND YOU SAID BEFORE THAT IBUPROFEN CAN EXACERBATE

9  BRUISING; CORRECT?

10     A    I BELIEVE YOU SAID THAT.  I DON'T KNOW THAT I SAID

11 THAT.

12     Q    WELL, DO YOU AGREE WITH THAT?

13     MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.

14     THE COURT:  WELL, OVERRULED.

15     MR. FETTEROLF:  I BELIEVE SHE DID SAY YES TO THAT

16 QUESTION.

17     THE COURT:  LET'S PRETEND YOU'RE ANSWERING THE QUESTION

18 NOW, BECAUSE YOU ARE ANSWERING THE QUESTION NOW.  DO YOU

19 AGREE WITH THE STATEMENT?

20     THE WITNESS:  PLEASE REPEAT IT.

21     Q    BY MR. FETTEROLF:  DO YOU AGREE THAT TAKING

22 IBUPROFEN CAN MAKE BRUISING WORSE OR EXACERBATE BRUISING IN

23 SOME CIRCUMSTANCES?

24     A    IT'S POSSIBLE.

25     Q    IT'S POSSIBLE.  OKAY.  AND SO THEN A PICTURE OF A

26 BRUISE MAY LOOK WORSE TO SOMEONE THAT'S TAKING IBUPROFEN THAN

27 SOMEONE WHO IS NOT TAKING IBUPROFEN?

28     A    IT'S POSSIBLE.

```
 1        Q    AND SINCE MS. HILL DIDN'T TELL YOU SHE TOOK
 2   IBUPROFEN, YOU WEREN'T ABLE TO ASSESS THAT AT ALL?
 3        MS. MEYER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.
 4        THE COURT:  DID SHE TELL YOU SHE WAS TAKING IBUPROFEN?
 5        THE WITNESS:  I DON'T RECALL.
 6        Q    BY MR. FETTEROLF:  WELL, YOU DIDN'T PUT -- YOU
 7   DIDN'T LIST IT AS A MEDICATION IN THE REPORT; RIGHT?
 8        MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.
 9        THE COURT:  THAT IS ASKED AND ANSWERED.
10        MR. FETTEROLF:  OKAY.
11        Q    BY MR. FETTEROLF:  ARE YOU AWARE THAT TAKING
12   LEXAPRO CAN CAUSE A PERSON TO BRUISE MORE EASILY?
13        MS. MEYER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.
14        MR. FETTEROLF:  HOLD ON A SECOND.  THE REPORT SAYS SHE
15   TOOK LEXAPRO.
16        THE COURT:  IT DOES.
17        MR. FETTEROLF:  I SAID DO YOU KNOW WHETHER A PERSON --
18        THE COURT:  DO YOU KNOW IS NOT THE QUESTION YOU ASKED.
19   IF YOU'D LIKE TO REPLACE THAT WITH THIS QUESTION, GO AHEAD
20   AND DO THAT.
21        MR. FETTEROLF:  I AM HAPPY TO REPLACE THE QUESTION.
22        Q    BY MR. FETTEROLF:  DO YOU KNOW IF TAKING LEXAPRO
23   CAN CAUSE A PERSON TO BRUISE MORE EASILY?
24        A    I HAVE NO KNOWLEDGE OF THAT.
25        Q    YOU DON'T KNOW ONE WAY OR THE OTHER?
26        A    I DO NOT.
27        Q    OKAY.  DO YOU KNOW WHETHER A PERSON TAKING
28   GABAPENTIN CAN CAUSE A PERSON TO BRUISE MORE EASILY?
```

311

```
1        A     AGAIN, I'M NOT AWARE OF THAT ONE WAY OR THE
2   OTHER.
3        Q     AND I WOULD ASK THE SAME QUESTION FOR -- WE NEED TO
4   GO BACK INTO ANOTHER RECORD -- BUT ANTABUSE.  DO YOU KNOW
5   WHAT ANTABUSE IS?
6        A     I DO.
7        Q     DO YOU KNOW WHETHER TAKING ANTABUSE COULD CAUSE A
8   PERSON TO BRUISE MORE EASILY?
9        A     I DON'T KNOW ONE WAY OR THE OTHER.
10       Q     OKAY.  DO YOU KNOW WHETHER A COMBINATION OF TAKING
11  LEXAPRO AND IBUPROFEN TOGETHER CAN CAUSE A PERSON TO BRUISE
12  MORE EASILY?
13       A     I DO NOT KNOW.
14       Q     OKAY.  NOW, IS IT -- WHEN YOU TAKE DOWN THE MEDICAL
15  HISTORY -- PERTINENT MEDICAL HISTORY, DO YOU KNOW WHETHER
16  MS. HILL TOLD YOU THAT SHE ENGAGED IN -- I'M JUST GOING TO
17  QUOTE THIS FROM ANOTHER MEDICAL REPORT -- INTENTIONAL
18  SELF-HARM?
19       MS. MEYER:  OBJECTION.  RELEVANCE.  ASSUMES FACTS.
20       THE COURT:  OVERRULED.
21       MR. FETTEROLF:  I'M HAPPY TO PULL THE REPORT AND SHOW
22  HER.  I'M JUST TRYING TO --
23       THE COURT:  YOU MAY ANSWER.
24       THE WITNESS:  PLEASE REPEAT THAT.
25       Q     BY MR. FETTEROLF:  YEAH.  DO YOU KNOW WHETHER, IN
26  TAKING DOWN THE MEDICAL HISTORY OF MS. HILL, WHEN SHE SAW YOU
27  THAT SHE HAD TOLD YOU WHETHER SHE ENGAGED IN, QUOTE,
28  "INTENTIONAL SELF-HARM"?
```

312

```
1        A     SHE DID NOT.

2        Q     SHE DID NOT.

3        A     NO.

4        Q     DO YOU -- IN YOUR PRACTICE AS A NURSE, DO YOU --

5   WHEN YOU HEAR THE WORD "INTENTIONAL SELF-HARM," DOES THAT

6   HAVE A MEANING TO YOU?

7        A     DOES THAT HAVE A MEANING TO ME?

8        Q     RIGHT.  IF SOMEONE SAID THAT AN INDIVIDUAL YOU WERE

9   SEEING ENGAGED IN INTENTIONAL SELF-HARM, DOES THAT MEAN

10  SOMETHING TO YOU?

11       A     IT DOES.

12       Q     WHAT DOES IT MEAN?

13       A     IT MEANS I'M CONCERNED FOR THAT PATIENT.  AND THAT

14  PATIENT MAY NEED SOME FOLLOW-UP OR THERAPY.

15       Q     AND FROM A HISTORICAL STANDPOINT IF SOMEONE TELLS

16  YOU THAT IN A MEDICAL HISTORY, DOES THAT IMPACT WHAT YOU'RE

17  DOING FOR PURPOSES OF YOUR EXAMINATION?

18       A     FOR MY FORENSIC EXAMINATION?

19       Q     YEAH.

20       A     IT WOULD NOT ALTER MY EXAM.

21       Q     OKAY.  BUT IF YOU WERE DOING -- IF SOMEONE TOLD YOU

22  THAT, IT'S SOMETHING YOU WOULD PUT IN THE MEDICAL HISTORY?

23       A     PROBABLY.  PROBABLY.

24       Q     AND IT'S -- I'LL REPRESENT TO YOU -- YOU'RE HAPPY

25  TO LOOK -- THAT'S NOT IN THE MEDICAL HISTORY?

26       A     WHAT'S YOUR QUESTION?  I'M SORRY.

27       Q     I'M REPRESENTING TO YOU IT'S NOT IN -- THERE'S NO

28  REFERENCE TO INTENTIONAL SELF-HARM.  I'M ASSUMING THAT'S NOT
```

313

```
1    SOMETHING YOU WERE TOLD?
2         A    CORRECT.
3         Q    OKAY.  AND YOU SAID BEFORE THAT GENERALLY YOU TAKE
4    A HISTORY, AND BASED ON WHAT YOU'RE TOLD, YOU CAN CONDUCT
5    YOUR EXAMINATION CONSISTENT WITH WHAT THE PATIENT TELLS
6    YOU?
7         A    YES.
8         Q    OKAY.  DID YOU INQUIRE AT ALL AS TO ANY OF THE
9    BRUISING, ABRASIONS, SWELLING, WHETHER ANY OF THEM WERE
10   CAUSED BY MS. HILL?
11        A    REPEAT THAT, PLEASE.
12        Q    I SAID, DID YOU, DURING THE COURSE OF THE
13   EXAMINATION, ASK MS. HILL WHETHER, FOR EXAMPLE, THE ABRASION
14   WAS CAUSED BY HER OR MR. BAUER?
15        A    I DID NOT ASK HER THAT.
16        Q    NOW, I WANT YOU TO TURN TO LH SART, EXHIBIT G.  AND
17   THE PICTURES ARE REFERENCED BY PAGE NUMBERS.  SO --
18        A    BACK TO THE --
19        Q    YES.  I'M SORRY.  EXHIBIT G.
20        A    WHAT TAB IS IT?
21        Q    G, PLEASE.
22        A    WHAT PAGE DID YOU SAY?
23        Q    THERE'S THE PAGE NUMBERS.  AND THEN THE PICTURES
24   ARE NUMBERED SEPARATELY.  GO TO PICTURE NUMBER 20.
25        A    TWENTY YOU SAID?
26        Q    YES.
27        A    OKAY.
28        Q    SO, ACCORDING TO YOUR REPORT, ON THE RIGHT SIDE --
```

314

```
1   YOU'RE WELCOME TO REFER BACK TO IT -- THIS IS WHERE YOU FOUND

2   REFERENCE TO AN ABRASION?

3        A    YES.

4        Q    OKAY.  SO IS ALL OF THIS, IN YOUR VIEW, AN ABRASION

5   OR IS SOME OF THIS ACNE?

6        A    FROM THE PICTURE, YOU CANNOT REALLY DISTINGUISH

7   BETWEEN THE TWO.  AND I PERSONALLY DON'T RECALL AT THE TIME.

8        Q    OKAY.  SO YOU CAN'T TELL WHAT IS ACNE AND WHAT IS

9   AN ABRASION FROM THE PICTURE?

10       A    I CANNOT.

11       Q    OKAY.  AND SO IF YOU TURN TO LH SART, PAGE 17, THIS

12   IS A PHOTO YOU TOOK OF THE LEFT SIDE OF THE FACE.  AND I'LL

13   REPRESENT TO YOU -- YOU'RE WELCOME TO CHECK -- YOU DID NOT

14   FIND ANY ABRASION ON THE LEFT SIDE OF THE FACE?

15       A    CORRECT.

16       Q    OKAY.  AND SO THIS ISN'T AN ABRASION, THIS IS JUST

17   ACNE OR OTHER DISTURBANCE?

18       A    I BELIEVE SO.

19       Q    NOW, I WANT TO -- LET ME MAKE SURE I HAVE THIS

20   DOCUMENT.

21       MR. FETTEROLF:  GIVE ME ONE SECOND, YOUR HONOR.

22       THE COURT:  SURE.

23       Q    BY MR. FETTEROLF:  ARE YOU EXPECTED AS A SANE NURSE

24   TO FOLLOW CERTAIN PROTOCOLS IN TAKING PHOTOGRAPHS?

25       A    YES.

26       Q    OKAY.  AND CAN YOU JUST SORT OF GENERALLY TELL US

27   WHAT THOSE ARE?

28       A    WE'RE TAKING PICTURES AND DOCUMENTING INJURIES.
```

315

1    Q    BUT IS THERE -- ARE YOU TRAINED ON HOW TO TAKE A

2    PICTURE, CERTAIN TYPES OF CAMERAS AND THINGS, TO GET AN

3    ACCURATE REPRESENTATION?

4    A    YES, WE ARE.

5    Q    OKAY.  AND PART OF THAT IS TO MAKE SURE THAT THESE

6    PICTURES PROVIDE ACCURATE REPRESENTATION OF WHAT YOU'RE

7    SEEING AT THE TIME?

8    A    CORRECT.

9    Q    OKAY.  AND DO YOU USE IPHONES TO TAKE PHOTOS?

10   A    NO.  WE HAVE A SPECIAL CAMERA WITH -- YEAH.

11   Q    OKAY.  SO I WANT TO SHOW YOU -- IF YOU TURN TO

12   EXHIBIT A.  EXHIBIT A IS THE -- GETTING A WORK OUT TODAY?

13   A    I COULD USE IT.

14   Q    I THINK WE ALL COULD.  AND THAT IS LH 47.  I'LL

15   REPRESENT TO THE COURT THIS IS ONE OF THE PICTURES ATTACHED

16   TO EXHIBIT 5 TO MS. HILL'S AFFIDAVIT.  HAVE YOU SEEN THIS

17   PHOTO BEFORE?

18   A    NO, I DON'T BELIEVE THIS IS ONE OF MY PHOTOS.

19   MR. FETTEROLF:  OKAY.  HOLD ON ONE SECOND.  GIVE ME ONE

20   SECOND, YOUR HONOR?

21   THE COURT:  SURE.

22   MR. FETTEROLF:  OKAY.  YOUR HONOR, I'D LIKE TO APPROACH

23   AND PROVIDE A DEMONSTRATIVE THAT'S GOING TO SHOW A COPY OF

24   THAT PHOTO VERSUS SOMETHING THAT WAS IN NURSE VALENCIA'S

25   REPORT.  IF I CAN HAND THIS UP.

26   THE COURT:  DO YOU WANT TO HAND IT TO MY BAILIFF.

27   SHE'LL BRING IT UP.

28   Q    BY MR. FETTEROLF:  TAKING A LOOK AT WHAT WE JUST

1    SHOWED YOU, THIS SHOWS -- THE ONE ON THE LEFT IS PETITIONER'S

2    EXHIBIT 5 TO THE D.V.R.O. AFFIDAVIT.  I'LL REPRESENT TO YOU

3    THIS WAS TAKEN AT 3:55 P.M.  SO BEFORE HER EXAMINATION WITH

4    YOU.  AND THEN IF YOU LOOK AT THE OTHER ONE, THIS IS A PHOTO

5    FROM YOUR SART EXAMINATION.  WE LOOKED AT IT EARLIER.  IT'S

6    LH 20, WHICH WAS TAKEN AT 4:26 A.M. ON THE 18TH.  OKAY.

7              SO WHEN YOU LOOK AT THIS PHOTO, IN THIS PHOTO, HER

8    FACE LOOKS ORANGE.  AS SOMEONE TRAINED IN HOW TO TAKE PHOTOS

9    AS A SANE NURSE, DO YOU UNDERSTAND WHY THE PHOTO HERE IS

10   ORANGE?

11        MS. MEYER:  OBJECTION.  RELEVANCE.  352.  LACKS

12   FOUNDATION.

13        THE COURT:  OVERRULED.  SHE MAY ANSWER YES OR NO.

14        THE WITNESS:  REPEAT THE QUESTION, PLEASE.

15        Q    BY MR. FETTEROLF:  WE TALKED ABOUT YOUR TRAINING ON

16   HOW TO TAKE PHOTOS AS A SANE NURSE?

17        A    YES.

18        Q    AND WHAT I'M ASKING HERE, THIS IS A PHOTO I

19   REPRESENT SHE SUBMITTED WITH THE PETITION.  AND IN IT HER

20   FACE LOOKS ORANGE.  AS SOMEONE TRAINED IN HOW TO TAKE PHOTOS

21   AS A SANE NURSE, DO YOU HAVE AN UNDERSTANDING AS TO WHY?

22        A    NO.

23        Q    YOU DON'T.  AND THEN ON THE RIGHT, THERE'S ALSO A

24   PHOTO OF THE LEFT SIDE OF HER FACE THE ONE YOU TOOK VS. THE

25   ONE THAT'S OVER HERE ATTACHED TO HER PETITION.  DO YOU SEE

26   BOTH OF THEM?

27        A    YES.

28        Q    IN COMPARING PHOTOS OF THESE TWO, IS THERE ONE THAT

```
1    YOU VIEW AS MORE ACCURATE THAN THE OTHER?

2         A    WELL, I'D LIKE TO THINK MINE IS THE MORE ACCURATE.

3    BUT YES.

4         Q    YOU THINK YOURS IS THE MORE ACCURATE ONE?

5         A    WE HAVE SPECIALIZED CAMERAS.  WE HAVE THE

6    BACKGROUND YOU TAKE PATIENTS' PICTURES AGAINST.  IT HELPS

7    WITH THE LIGHTING.

8         Q    OKAY.  THANK YOU.  NOW, IN -- UNDER THE ASSAULT

9    RELATED HISTORY IN YOUR REPORT -- DO YOU WANT TO TURN BACK TO

10   YOUR REPORT, THE WRITTEN PORTION.

11        A    OF THE NARRATIVE?

12        Q    NOT THE NARRATIVE.  NOT PAGE 11.  BUT JUST --

13        A    TELL ME THE TAB AND PAGE AND I'LL FIND IT.

14   THE COURT:  G.

15        Q    BY MR. FETTEROLF:  TAB G.  IT'S AT PAGE 3.

16        A    ALL RIGHT.

17        Q    OKAY.  AND NOW WHERE IT SAYS UNDER ASSAULT RELATED

18   HISTORY, MS. HILL STATED "YES" AS TO WHETHER THERE'S A PERIOD

19   OF TIME WHICH ACTS OCCURRED WHICH PATIENT MAY NOT BE AWARE.

20   DO YOU SEE THAT?

21        A    I DO.

22        Q    AND THEN BELOW, YOUR FORM ASKS, "WHICH BEST

23   DESCRIBES THE PATIENT'S LOSS OF AWARENESS DURING THE PERIOD

24   OF TIME."  THAT WAS UNCLEAR.  AND THEN NOTES, "CHOOSE ANSWER

25   WHICH BEST APPLIES."  DO YOU SEE THAT?

26        A    I DO.

27        Q    IT LISTS TWO ANSWERS.  MULTIPLE BLOCKS OF TIMES

28   WITH MEMORY LOSS.  AND REMEMBERS MOST EVENTS BUT DETAILS
```

318

 1    UNCLEAR.  DO YOU SEE THAT?

 2         A    I DO.

 3         Q    THOSE SEEM LIKE DIFFERENT ANSWERS.  DID YOU -- DID

 4    MS. HILL TELL YOU BOTH?

 5         MS. MEYER:  OBJECTION.  ARGUMENTATIVE.  ASSUMES FACTS.

 6         THE COURT:  OVERRULED.  YOU MAY ANSWER.

 7         THE WITNESS:  REPEAT, PLEASE.

 8         Q    BY MR. FETTEROLF:  YES.  I SAID THOSE APPEAR TO ME

 9    TO LOOK LIKE DIFFERENT ANSWERS.  I'M ASSUMING IF YOU PUT THEM

10    BOTH THEY WERE BASED ON WHAT MS. HILL TOLD YOU?

11         A    CORRECT.

12         Q    GOING FURTHER DOWN THE PAGE, THE FORM ASKS, "WAS

13    THERE A LOSS OF AWARENESS DUE TO HEAD INJURY?"  AND YOU SEE

14    MS. HILL ANSWERED "NO."  DO YOU SEE THAT?  RIGHT AT THE

15    BOTTOM OF THE PAGE.

16         A    I KNOW THE QUESTION.  I'M JUST NOT FINDING IT ON

17    HERE.

18         Q    IF YOU LOOK AT THE PAGE, GO TO THE LEFT.  IT'S THE

19    LAST QUESTION ON THE BOTTOM.

20         A    YEAH.  OKAY.

21         Q    I CAN ALMOST SEE WITHOUT MY GLASSES.

22         A    IT'S BURIED IN THERE.

23         Q    IT'S IN THERE.  YES.  AND THAT'S BASED ON WHAT

24    MS. HILL TOLD YOU?

25         A    CORRECT.

26         Q    AND AT THE TOP, IT SAYS -- AT THE TOP OF THE FORM,

27    IT SAYS, "WAS THERE A LOSS OF AWARENESS DUE TO

28    STRANGULATION?"  AND THE ANSWER YOU PUT IS "YES"?

319

```
1          A    CORRECT.

2          Q    THAT'S BASED ON WHAT MS. HILL TOLD YOU?

3          A    CORRECT.

4          Q    OKAY.  AND SO -- AND THEN IT SAYS -- SO THE

5     REFERENCE -- AND THIS IS BELOW -- "WAS THE PATIENT MEDICALLY

6     EVALUATED FOR STRANGULATION."  DO YOU SEE THAT?

7          A    YES.

8          Q    AND SO IS YOUR UNDERSTANDING THAT THE LOSS OF

9     AWARENESS THAT YOU SPOKE OF WAS DUE TO THE STRANGULATION WITH

10    HER HAIR?

11         A    YES.

12         Q    OKAY.  NOW, DID MS. HILL TELL YOU THE AMOUNT OF

13    TIME THAT SHE CLAIMS SHE LOST CONSCIOUSNESS?

14         A    YES.

15         Q    HOW LONG WAS THAT?

16         A    I DON'T RECALL.

17         Q    OKAY.  NOW, IF SOMEONE WERE TO LOSE CONSCIOUSNESS

18    BECAUSE OF CHOKING, THAT HAPPENS BECAUSE THERE'S A LACK OF

19    OXYGEN TO THE BRAIN?

20         A    ARE YOU SPEAKING OF CHOKING OR STRANGULATION?

21         Q    WELL, LET'S TALK ABOUT WHAT WAS -- WHAT WAS --

22         A    STRANGULATION.

23         Q    -- REFERENCED IN THE REPORT, WHICH IS STRANGULATION

24    WITH THE HAIR?

25         A    YES.

26         Q    OKAY.  AND SO IF SOMEONE LOSSES CONSCIOUSNESS,

27    THAT'S DUE TO A LACK OF OXYGEN TO THE BRAIN?

28         A    CORRECT.
```

320

```
 1        Q    OKAY.  ASPHYXIA, IS THAT THE CORRECT WORD FOR
 2   THAT?
 3        A    STRANGULATION IS THE CORRECT WORD FOR THAT.
 4        Q    WE'LL USE THAT.  SO ONCE THE CHOKING OR
 5   STRANGULATION STOPPED, THE OXYGEN FLOW WOULD RETURN TO THE
 6   BRAIN AND THE PERSON WOULD REGAIN CONSCIOUSNESS?
 7        A    POSSIBLY.
 8        Q    WELL, IF A PERSON REMAINED CONSCIOUS, THE
 9   PRESSURE -- FOR A STRANGULATION, THE PRESSURE WOULD NEED TO
10   BE APPLIED; CORRECT?
11        A    REPEAT THAT.
12        Q    FOR A PERSON TO REMAIN CONSCIOUS -- UNCONSCIOUS
13   BASED ON STRANGULATION WITH THE HAIR, THE PRESSURE WOULD NEED
14   TO BE APPLIED -- WOULD HAVE TO BE APPLIED?
15        A    CORRECT.
16        Q    BECAUSE ONCE THE PRESSURE IS TAKEN OFF, IT GIVES
17   THE OXYGEN FLOW A CHANCE TO RETURN TO THE BRAIN?
18        A    CORRECT.
19        Q    OKAY.  AND I'M ASKING YOU THIS AGAIN, BECAUSE I
20   DON'T REMEMBER YOUR ANSWER.  BUT DID MS. HILL TELL YOU HOW
21   LONG SHE WAS UNCONSCIOUS?  I THINK YOU SAID YOU DIDN'T
22   REMEMBER.
23        A    SHE DID.  I DON'T RECALL THE TIME SHE GAVE ME.
24        Q    ARE YOU AWARE THAT SHE TOLD THE EMERGENCY
25   DEPARTMENT DOCTORS THAT SHE WAS UNCONSCIOUS FOR 30 MINUTES?
26        A    I HAVE NO KNOWLEDGE OF WHAT HAPPENED IN THERE.
27        Q    WHAT WOULD HAPPEN IF THERE WAS STRANGULATION, IF
28   THERE WAS PULLING AROUND THE NECK, TO CAUSE UNCONSCIOUSNESS?
```

```
1    WHAT WOULD HAPPEN TO SOMEONE THAT WAS UNCONSCIOUS FOR 30

2    MINUTES?

3         A    IT'S BEYOND MY SCOPE.

4         Q    IT'S BEYOND YOUR SCOPE?

5         A    YES.

6         Q    IN YOUR REPORT, DID YOU NOTE ANY SIGNS OF PETECHIAL

7    HEMORRHAGES?  I DIDN'T SEE ANY, BUT I JUST WANTED TO MAKE

8    SURE THAT I'M CORRECT.

9         A    I WOULD HAVE TO LOOK AT THIS.  THERE WAS -- I

10   BELIEVE I PUT BRUISING BEHIND THE EARS.

11        Q    RIGHT.  BUT DID YOU WRITE "PETECHIAL HEMORRHAGES"

12   IN YOUR REPORT?

13        A    I DID NOT.

14        Q    DID NOT.  OKAY.  AND I -- AND, AGAIN, IF YOU COULD

15   LOOK ON YOUR REPORT HEAD AND NECK, YOU NOTED -- IT'S TRUE, IS

16   IT NOT, THAT THERE ARE NO BRUISING OR INJURIES REFERENCED

17   AROUND THE NECK; CORRECT?

18        MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.

19        THE COURT:  SUSTAINED.

20        MS. MEYER:  THE DOCUMENT SPEAKS FOR ITSELF.

21        Q    BY MR. FETTEROLF:  NOW, IF YOU GO DOWN TO PAGE 3 OF

22   YOUR REPORT, YOUR REPORT NOTES THAT THE PATIENT DID NOT

23   EXPERIENCE ANY PAIN IN THE ANAL/RECTAL AREA IMMEDIATELY AFTER

24   THE ALLEGED ASSAULT.  AND THAT IS IN --

25        A    LET ME FIND THAT HERE.

26        Q    SURE.

27        A    CORRECT.  THAT SAID NO.

28        Q    AND THAT WAS BASED ON MS. HILL'S RESPONSE?
```

1    A    YES.

2    Q    OKAY.  AND IN THE FORM, MS. HILL FURTHER NOTED SHE

3 WAS NOT CURRENTLY EXPERIENCING ANY ANAL/RECTAL PAIN?

4    A    THAT IS CORRECT.

5    Q    AND SHE DID NOT -- IN THIS REPORT, SHE DID NOT SAY

6 THAT THERE WAS ANAL OR RECTAL PENETRATION FROM THE ALLEGED

7 ASSAULT?

8    A    I'D HAVE TO FIND IT.  AS I RECALL, YOU ARE CORRECT.

9    Q    OKAY.  AND I'LL REPRESENT TO YOU -- YOU'RE HAPPY TO

10 LOOK -- THERE WAS NO REFERENCE TO ANY INJURIES IN THE ANAL OR

11 RECTAL AREA; CORRECT?

12    A    CORRECT.

13    Q    GOT IT.  NOW, IF YOU TURN TO PAGE 3 -- I'M GOING TO

14 HAVE TO TRY TO USE THESE GLASSES.  SORRY.  PAGE 4.  YOU SEE

15 WHERE IT SAYS "ASSAILANTS"?

16    A    YES.

17    Q    AND IT SAYS "GENDER."  IT SAYS "MALE."  DO YOU SEE

18 THAT?

19    A    I DO.

20    Q    AND THIS IS WHERE MR. BAUER'S NAME IS MENTIONED?

21    A    YES.

22    Q    CORRECT.  AND THEN IT SAYS RELATIONSHIP TO PATIENT;

23 DO YOU SEE THAT?

24    A    I DO.

25    Q    IS THAT A DROP-DOWN MENU WHERE YOU PICK DIFFERENT

26 THINGS?

27    A    YES, IT IS.

28    Q    WHAT ARE THE DIFFERENT THINGS YOU CAN CHOOSE FROM

```
 1   THE DROP-DOWN MENU?
 2        MS. MEYER:  OBJECTION, YOUR HONOR.  352.
 3        THE COURT:  THE DOCUMENT SPEAKS FOR ITSELF.
 4        MR. FETTEROLF:  EXCUSE ME?
 5        THE COURT:  THE DOCUMENT SPEAKS FOR ITSELF.
 6        MR. FETTEROLF:  NO.  WHAT I'M ASKING, YOUR HONOR, IS NOT
 7   WHAT WAS IN THERE, IS WHAT WAS THE OTHER CHOICES?
 8        THE COURT:  OH, OTHER THAN "KNOWN-OTHER"?
 9        Q    BY MR. FETTEROLF:  OTHER THAN KNOWN-OTHER, ARE
10   THERE OTHER CHOICES, LIKE, FOR EXAMPLE, COULD YOU PUT
11   SPOUSE?
12        A    YES.
13        Q    COULD YOU PUT BOYFRIEND OR GIRLFRIEND?
14        A    YES.
15        Q    AND WHAT ARE -- JUST CAN YOU TELL US WHAT THE OTHER
16   CHOICES ARE BESIDES SPOUSE, BOYFRIEND, OR GIRLFRIEND, AND
17   KNOWN-OTHER?
18        A    I CAN'T.  AS YOU SAID, IT'S A DROP-DOWN WITH
19   MULTIPLE CHOICES.
20        Q    OKAY.  SO BASED ON WHAT MS. HILL TOLD YOU, YOU PUT
21   "KNOWN-OTHER.  I.E. RECENT ACQUAINTANCE, MET ONLINE, JUST MET
22   AT A PARTY/BAR, GARDENER, PERSON SEEN AT APARTMENT COMPLEX,
23   BARTENDER"; CORRECT?
24        A    CORRECT.
25        Q    NOW, IF WE GO DOWN, RIGHT BELOW THAT IT SAYS, "WAS
26   THE PATIENT THREATENED IN ANY OF THE FOLLOWING WAYS?"  DO YOU
27   SEE THAT?
28        A    I DO.
```

324

1       Q    AND IT SAYS, "WAS THERE A THREAT OF FUTURE HARM."

2  DO YOU SEE THAT?

3       A    I DO.

4       Q    AND THE ANSWER MS. HILL GAVE YOU WAS "NO"?

5       A    CORRECT.

6       Q    AND THEN IF YOU TURN TO PAGE 5 IN SECTION H, BUT ON

7  THE TOP RIGHT HAND PART OF THE PAGE --

8       A    YES.

9       Q    -- BEFORE YOU GET TO YOUR SORT OF FINDINGS AND

10 EXAMINATION, IT SAYS, "ALERT, QUIET, COOPERATIVE, OBVIOUS

11 VISIBLE INJURIES."  DO YOU SEE THAT?

12      A    I DO.

13      Q    AND, AGAIN, IS THIS A LIST, "FACE, HEAD, NECK,

14 EXTREMITIES NOT COVERED BY CLOTHING," IS THIS JUST A

15 DROP-DOWN MENU?

16      A    IT IS.

17      Q    THAT DOESN'T REFLECT THAT THERE WERE INJURIES IN

18 ALL THOSE AREAS; RIGHT?  INJURIES YOU NOTE BELOW --

19      A    IT SAYS, "OBVIOUS VISIBLE INJURIES:  FACE, HEAD,

20 NECK."  BUT YOU SAID OTHER THAN THAT?

21      Q    NO.  WHAT I'M SAYING IS WHEN YOU SAY, "OBVIOUS

22 VISIBLE INJURIES," IT LISTS THINGS LIKE FACE, HEAD, NECK,

23 WHICH YOU'VE TESTIFIED THERE WERE NO INJURIES.  IS THAT JUST

24 A DROP-DOWN POINT?

25      A    IT IS.

26      Q    OKAY.  THAT WAS MY QUESTION.  NOW, IF YOU TURN TO

27 PAGE 11, THERE'S A NARRATIVE.  DO YOU SEE THAT?

28      A    I DO.

```
1        Q    AND IT SAYS, "AS TOLD TO ME BY LINDSEY HILL," AND
2   HAS A PARAGRAPH IN QUOTES?
3        A    YES.
4        Q    IS THIS A VERBATIM -- IS THIS A VERBATIM
5   STATEMENT?
6        A    YES.
7        Q    OKAY.  WAS IT RECORDED?
8        A    NO.
9        Q    NOW, WAS ANYONE FROM LAW ENFORCEMENT PRESENT WHEN
10  THIS STATEMENT WAS TAKEN?
11       A    NO.
12       Q    OKAY.  AND DO YOU KNOW BY THIS TIME WHEN THIS
13  STATEMENT WAS TAKEN, WHETHER MS. HILL HAD MADE A REPORT TO
14  THE POLICE?
15       A    COULD YOU REPEAT THAT, PLEASE?
16       Q    I SAID, DO YOU KNOW BY THE TIME THIS STATEMENT WAS
17  GIVEN TO YOU BY MS. HILL, WHETHER MS. HILL HAD MADE A REPORT
18  TO -- I GUESS IT WILL BE THE SAN DIEGO POLICE DEPARTMENT?
19       A    YES, BECAUSE SAN DIEGO P.D. BROUGHT HER TO ME.
20       Q    OKAY.  SO IN ORDER FOR SOMEONE TO COME TO YOU,
21  SOMEONE HAS TO AT LEAST MAKE AN INITIAL REPORT?
22       A    CORRECT.
23       Q    AND IN HER STATEMENT, SHE REFERENCES A PRIOR
24  ENCOUNTER WITH MR. BAUER WHERE, IN HER WORDS, THEY, QUOTE,
25  "HOOKED UP."  DO YOU SEE THAT?
26       A    YES.
27       Q    AND I THINK YOU SAID ON DIRECT EXAMINATION THESE
28  TWO PEOPLE HAD TWO SEXUAL ENCOUNTERS; CORRECT?
```

```
1        A    YES.
2        Q    AND YOU UNDERSTAND WHAT SHE IS REFERRING TO THERE
3   AS HER FIRST SEXUAL ENCOUNTER WITH MR. BAUER?
4        A    YES.
5        Q    OKAY.  AND DID MS. HILL -- BESIDES WHAT'S IN HERE,
6   DO YOU UNDERSTAND FROM YOUR EXAMINATION -- OR WHAT'S IN --
7   WHAT'S WRITTEN HERE, THAT MS. HILL HAD ANY ISSUE OR PROBLEM
8   WITH THEIR FIRST -- THE FIRST SEXUAL ENCOUNTER WITH
9   MR. BAUER?
10       A    COULD YOU REPEAT THAT?
11       Q    LET ME ASK IT A DIFFERENT WAY.  DO YOU UNDERSTAND
12  FROM SPEAKING WITH MS. HILL THAT NIGHT THAT SHE IS CLAIMING
13  SHE WAS ASSAULTED DURING HER FIRST SEXUAL ENCOUNTER WITH
14  MR. BAUER?
15       A    YES.
16       Q    YOU UNDERSTOOD SHE WAS?
17       A    THIS -- IN READING WHAT I WROTE, YES.
18       Q    LET ME JUST MAKE SURE THAT'S THE CASE.  SO SHE
19  WRITES, "WE STARTED HAVING SEX.  IT WAS LIKE THE FIRST TIME
20  WITH A LIGHT SLAP ON MY FACE AND NOTHING THAT MADE ME FEEL
21  UNCOMFORTABLE."  AND THEN SHE TALKS ABOUT WE HAD HOOKED UP
22  ONCE BEFORE; DO YOU SEE THAT?
23       A    YES.
24       Q    DO YOU UNDERSTAND THAT TO BE THE FIRST SEXUAL
25  ENCOUNTER THAT MS. HILL HAD WITH MR. BAUER?
26       A    YES.
27       Q    OKAY.  SO I WANT TO ASK YOU ABOUT THAT ENCOUNTER.
28       A    OKAY.
```

327

1      Q    DO YOU UNDERSTAND THAT IN THAT ENCOUNTER THAT

2  MS. HILL, AT THAT MOMENT THAT SHE MET YOU, WAS MAKING ANY

3  CLAIMS ABOUT AN ASSAULT OR ANY UNCONSENTED TO SEXUAL

4  ACTIVITY?  OR WAS SHE TALKING TO YOU ABOUT THE SECOND SEXUAL

5  ENCOUNTER?

6      MS. MEYER:  OBJECTION.  COMPOUND.  VAGUE.  AMBIGUOUS.

7      THE COURT:  IT'S COMPOUND.  HOLD ON.  IT IS COMPOUND.

8  REASK IT.

9      Q    BY MR. FETTEROLF:  OKAY.  WHEN SHE WRITES, "WE HAD

10 HOOKED UP ONCE BEFORE.  AND I KNOW HE IS INTO ROUGH SEX,"

11 WHAT I'M ASKING YOU IS DID MS. HILL, WHEN SHE MET WITH YOU,

12 MAKE ANY CLAIMS ABOUT ASSAULT IN THAT FIRST SEXUAL ENCOUNTER?

13 IF YOU NEED TO READ THE STATEMENT, TAKE YOUR TIME.

14     A    YES.  AS I RECALL THAT -- SHE SAID HE HAD DONE THIS

15 ON THE PREVIOUS ENCOUNTER BUT NOT TO THE EXTENT AS THIS

16 ENCOUNTER.

17     Q    WHERE ARE YOU READING FROM?

18     A    "I WAS THINKING THIS WOULD BE LIKE BEFORE.  I

19 DIDN'T HAVE MARKS ON MY BODY LAST TIME."

20     Q    YOU'RE SAYING -- SO "THINKING THIS WOULD BE LIKE

21 BEFORE.  I DIDN'T HAVE MARKS ON MY BODY LAST TIME," YOU'RE

22 SAYING FROM THAT STATEMENT THAT MS. HILL WAS MAKING A CLAIM

23 OF ASSAULT FOR THE FIRST SEXUAL ENCOUNTER, OR DO YOU NOT

24 REMEMBER?

25     A    SHE WAS TELLING ME WHAT HAPPENED.  WHETHER SHE --

26 THAT'S AN ASSAULT -- IT'S BEYOND MY SCOPE.

27     Q    OKAY.  SHE WAS TELLING YOU THAT AT LEAST AS TO THE

28 FIRST SEXUAL ENCOUNTER, THERE WASN'T ANY MARKS OR BRUISING ON

```
 1    HER BODY?
 2         A    THAT'S WHAT I WROTE.
 3         Q    THAT'S WHAT YOU WROTE.  AND YOU WROTE WHAT SHE TOLD
 4    YOU?
 5         A    YES.
 6         THE COURT:  IT IS 3:00 O'CLOCK.  WHY DON'T WE TAKE OUR
 7    AFTERNOON BREAK.  AND WE'LL RESUME AT 3:15.
 8         MR. FETTEROLF:  OKAY.
 9         THE COURT:  IF YOU'D LIKE YOU CAN STEP DOWN.
10              (RECESS TAKEN.)
11         THE COURT:  ALL RIGHT.  READY TO RESUME.
12         MR. FETTEROLF:  OKAY.
13
14              KELLY YEATTS VALENCIA,
15    CALLED AS A WITNESS ON BEHALF OF THE PETITIONER, WAS SWORN
16    AND TESTIFIED AS FOLLOWS:
17
18              CROSS EXAMINATION
19    BY MR. FETTEROLF:
20         Q    NURSE VALENCIA, TURN BACK TO THE NARRATIVE WE WERE
21    LOOKING AT PAGE 11 OF OUR EXHIBIT G.  AND I WANT TO POINT YOU
22    TO THE "WE HAD HOOKED UP ONCE BEFORE.  I KNOW HE IS INTO
23    ROUGH SEX."  DO YOU SEE THAT PART?
24         A    I DO.
25         Q    OKAY.  WHEN SHE GAVE YOU THE STATEMENT AND TALKED
26    TO YOU ABOUT HOOKING UP ONCE BEFORE, DID SHE SAY ANYTHING AT
27    ALL ABOUT HAVING ANAL SEX ON THE FIRST ENCOUNTER?
28         A    SHE DID NOT.
```

```
 1        Q    AND I THINK AT THE -- ON YOUR DIRECT TESTIMONY, YOU
 2   SAID YOU DON'T FORM MEDICAL OPINIONS; CORRECT?
 3        A    CORRECT.
 4        Q    OKAY.  YOUR JOB IS TO DOCUMENT THE FINDINGS, GO
 5   THROUGH THE FORM, AND TAKE PICTURES, AND THEN PROVIDE THE
 6   REPORT?
 7        A    CORRECT.
 8        Q    OKAY.  AND SO YOU'RE NOT MAKING A DETERMINATION OF
 9   WHETHER A BRUISE IS DUE TO ROUGH SEX OR A BRUISE IS DUE TO
10   SEXUAL ASSAULT; CORRECT?
11        A    CORRECT.
12        MR. FETTEROLF:  NO FURTHER QUESTIONS.
13        THE COURT:  ALL RIGHT.  MS. MEYER.
14        MS. MEYER:  JUST A COUPLE.  THANK YOU.
15
16                  REDIRECT EXAMINATION
17   BY MS. MEYER:
18        Q    MS. VALENCIA, WAS MS. HILL COOPERATIVE DURING THE
19   SART EXAMINATION?
20        A    SHE WAS.
21        Q    DID YOU FEEL THAT SHE WAS TRANSPARENT?
22        A    YES.
23        Q    DID SHE REFUSE TO ANSWER ANY OF YOUR QUESTIONS?
24        A    I DON'T RECALL.
25        Q    CAN YOU RECALL ANYTHING?
26        A    NOTHING THAT STANDS OUT THAT SHE DIDN'T ANSWER.
27        Q    GENERALLY WHAT IS IBUPROFEN PRESCRIBED FOR?
28        A    PAIN.
```

```
 1       Q    SO IF SOMEBODY WAS ASSAULTED, WOULD IT BE COMMON
 2   FOR A MEDICAL PRACTITIONER TO PRESCRIBE IBUPROFEN?
 3       A    YES.
 4       Q    AND IN DOING YOUR SART EXAMS AND BEING A NURSE
 5   SINCE 1979, IS IT UNUSUAL IF A PATIENT DOESN'T KNOW THE
 6   DIFFERENCE BETWEEN TYLENOL AND ADVIL?
 7       A    IS IT UNUSUAL?  NO, IT IS NOT UNUSUAL.
 8       Q    THERE ARE OTHER NURSES AT PALOMAR WHO DO SART
 9   EXAMS; CORRECT?
10       A    YES.
11       Q    AND IF LINDSEY WAS NOT ABLE TO MAKE HER FOLLOW-UP
12   APPOINTMENT WITH YOU, COULD SHE HAVE BEEN SEEN BY ANOTHER
13   NURSE?
14       A    YES.
15       Q    AND DO YOU KNOW WHETHER OR NOT SHE WAS?
16       A    YES.
17       Q    AND WAS SHE?
18       A    SHE WAS.
19       Q    AND DO YOU KNOW WHO SHE WAS SEEN BY?
20       A    I DO.
21       Q    AND WHO WAS SHE SEEN BY?
22       A    PATTY RANKEL (PHONETIC).
23       Q    DO YOU KNOW THE DATE THAT MS. HILL WAS SEEN BY
24   PATTY?
25       A    I DO NOT.
26       MR. FETTEROLF:  YOUR HONOR, I WOULD JUST SAY THIS IS A
27   MEDICAL RECORD WE ASKED FOR AND WERE NEVER PROVIDED.  SO I
28   WOULD STRIKE THE WHOLE ENTIRETY OF THE TESTIMONY BASED ON
```

```
 1   THIS IS THE FIRST WE'RE LEARNING OF IT.  AND IT WASN'T
 2   PROVIDED TO US.
 3       THE COURT:  OVERRULED.  OTHER THAN THE FACT OF HER
 4   SEEING PATTY RANKEL AFTERWARDS, I DON'T KNOW THAT THIS HAS
 5   MUCH RELEVANCE TO YOUR RECORDS.
 6       MR. FETTEROLF:  HAD TO TRY.
 7       Q    BY MS. MEYER:  SPECIFICALLY WHO REFERRED MS. HILL
 8   TO YOU OR TO PALOMAR?
 9       A    I'M SORRY.  REPEAT THAT AGAIN.
10       Q    WHO REFERRED MS. HILL TO YOU?
11       A    SAN DIEGO P.D.
12       Q    SO IF SOMEBODY WAS ASSAULTED BY SOMEONE OR ALLEGED
13   TO BE ASSAULTED, SHE COULDN'T JUST WALK INTO YOUR OFFICE TO
14   SEE YOU; CORRECT?
15       A    CORRECT.
16       Q    IS THERE A DIFFERENCE BETWEEN STRANGULATION AND
17   CHOKING?
18       A    YES.
19       Q    WHAT IS THE DIFFERENCE?
20       A    CHOKING WOULD BE AN INTERNAL, LIKE, YOU'RE CHOKING
21   ON A PIECE OF MEAT.  STRANGULATION IS AN EXTERNAL PRESSURE ON
22   THE NECK THAT CAUSES DECREASED BLOOD FLOW AND OR OXYGEN.
23       Q    I KNOW THIS IS A SILLY QUESTION.  IF SOMEONE IS
24   RENDERED UNCONSCIOUS BY STRANGULATION, DOES THAT PERSON
25   COMMONLY KNOW HOW LONG THEY'RE UNCONSCIOUS FOR?
26       A    NO.
27       Q    ISN'T IT TRUE IBUPROFEN WOULD ONLY CAUSE BRUISING
28   TO BE EXACERBATED IF THE IBUPROFEN WAS TAKEN BEFORE THE
```

```
1    INJURY WHICH CAUSED THE BRUISING WAS SUSTAINED?

2         A    BEYOND MY SCOPE.  I DON'T KNOW.

3         Q    LEXAPRO IS ALSO USED NOT ONLY FOR ANXIETY BUT

4    DEPRESSION AS WELL?

5         A    YES.

6         Q    DID YOU SEE ANY EVIDENCE THAT ANY OF THE BRUISING

7    OR INJURIES THAT YOU DOCUMENTED IN YOUR SART REPORT WERE

8    SELF-INFLICTED BY MS. HILL?

9         A    REPEAT PLEASE.

10        Q    DID YOU SEE ANY EVIDENCE EITHER IN THE HISTORY YOU

11   TOOK, YOUR EXAMINATION OF MS. HILL, ANYTHING SHE SAID TO YOU

12   WHICH LED YOU TO BELIEVE THAT THE INJURIES THAT YOU OBSERVED

13   AND THAT YOU EXAMINED WERE INTENTIONALLY SELF-INFLICTED BY

14   MS. HILL?

15        A    NO.

16        Q    AND IF YOU HAD FORMED THAT BELIEF, WOULD THAT HAVE

17   BEEN IN YOUR RECORDS?

18        A    NO.

19        Q    AS AN ICU NURSE FOR ALL THOSE YEARS --

20        A    EVER.

21        Q    SINCE I GRADUATED COLLEGE.

22        A    DON'T RUB IT IN.

23        Q    SAME HERE.  BUT IN ALL THOSE YEARS, HAVE YOU EVER

24   SEEN SOMEONE SELF INFLICT AN INJURY TO THE OUTSIDE OF THEIR

25   VAGINAL AREA WHICH CAUSED THE BRUISING THAT YOU OBSERVED?

26        A    WELL, I WORKED AT THE VA MEDICAL CENTER.  SO I

27   RARELY SAW A FEMALE.

28        THE COURT:  THAT WOULD LIMIT YOUR OPPORTUNITY.
```

```
 1        THE WITNESS:  SO NO.
 2        Q    BY MS. MEYER:  WHAT ARE THE POSSIBLE REASONS THAT A
 3   PATIENT COULD HAVE BRUISING BEHIND THE EARS IF THEY WERE
 4   ASSAULTED?
 5        A    IT COULD BE FROM STRANGULATION.  IT COULD BE FROM
 6   BLOWS.
 7        Q    WHAT TYPE OF CAMERA DID YOU USE?
 8        A    I BELIEVE WE HAVE CANON CAMERAS.  AND THEY HAVE A
 9   MAGNIFIER.
10        Q    IS THERE A FLASH USED?
11        A    YES.
12        Q    ALL THE PHOTOGRAPHS THAT ARE IN YOUR SART REPORT,
13   DO THEY ACCURATELY REFLECT HOW YOU OBSERVED LINDSEY HILL TO
14   LOOK ON VARIOUS PARTS OF HER BODY ON THE DAY YOU PERFORMED
15   THE EXAMINATION?
16        A    YES.
17        Q    YOU SAID THERE WAS NO BRUISING TO HER NECK.  I'D
18   LIKE TO SHOW YOU -- AND I'M GOING TO ASK YOU TO GO BACK TO
19   OUR EXHIBIT --
20        A    UH-HUH.
21        Q    -- BATES STAMP 43.  IN THIS PHOTOGRAPH IS BRUISING
22   ON MS. HILL'S NECK -- IS THERE BRUISING ON MS. HILL'S NECK?
23        A    IT'S HARD TO REALLY SEE IN THIS PRINT.  BUT IT'S
24   POSSIBLE.
25        Q    AND THERE WAS CLEARLY BRUISING TO HER LEFT JAW;
26   CORRECT?
27        A    CORRECT.
28        Q    AND ALL THE -- THE ASSAULT MS. HILL DESCRIBED TO
```

1  YOU THAT MR. BAUER INFLICTED UPON HER WAS CONSISTENT WITH THE

2  PHOTOGRAPHS THAT YOU TOOK, WHAT YOU OBSERVED, AND WHAT SHE

3  TOLD YOU; CORRECT?

4       A    I'M SORRY.  WOULD YOU REPEAT THAT?

5       Q    SURE.  THE SEXUAL ASSAULT THAT MS. HILL DESCRIBED

6  TO YOU THAT WAS INFLICTED UPON HER BY MR. BAUER WAS

7  CONSISTENT WITH YOUR EXAMINATION OF HER; TRUE?

8       A    TRUE.

9       Q    AND THEN I JUST WANTED TO ASK YOU ABOUT A COUPLE OF

10 YOUR PHOTOGRAPHS.  IF YOU COULD LOOK AT, FOR EXAMPLE, BATES

11 STAMP 25, 26, AND 27.  IT LOOKS LIKE THESE PHOTOGRAPHS ARE A

12 LITTLE RED.  DO YOU SEE THAT?

13      A    I DO.

14      MR. FETTEROLF:  YOUR HONOR, LET ME JUST MAKE AN

15 OBJECTION, BECAUSE OUR PRINTED OUT SART REPORT IS NOT RED.

16 AND THEIR VERSION OF THE SART REPORT IS.  THERE'S A REDDISH

17 TINT TO THEIRS AND NOT TO OURS.  SO I WOULD NOTE IF YOU

18 COMPARE THE TWO, I'M NOT REALLY SURE WHAT THE SCOPE OF THE

19 QUESTION IS.

20      MS. MEYER:  I WOULD OBJECT TO SPEAKING OBJECTIONS.

21      THE COURT:  WE DON'T DO SPEAKING OBJECTIONS IN HERE.

22      MR. FETTEROLF:  I'M SORRY.

23      THE COURT:  JUST THE WORD "OBJECT."  AND A ONE OR TWO

24 WORD LEGAL OBJECTION.

25      MR. FETTEROLF:  I DON'T KNOW HOW TO QUITE MAKE THAT

26 OBJECTION.

27      THE COURT:  WOULD YOU PREFER THAT WE USE YOUR COPY?

28      MR. FETTEROLF:  THAT WILL BE GREAT.

```
 1        THE COURT:  OKAY.  AND WHICH CORRESPONDING PAGES?

 2        THE WITNESS:  IS THAT G?

 3        THE COURT:  IT IS.

 4        MS. MEYER:  CAN I SEE YOUR COPY?  SO I CAN MAKE SURE

 5   WE'RE ON THE SAME PAGE.

 6        Q    BY MS. MEYER:  LET ME ASK IT TO YOU THIS WAY, IS

 7   THERE A RED TINT TO ANY OF THE PHOTOGRAPHS THAT ARE ATTACHED

 8   TO THE SART REPORT?

 9        A    YES.

10        Q    AND YOU DIDN'T ALTER ANY OF THOSE PHOTOGRAPHS, DID

11   YOU?

12        A    NO.

13        Q    WHEN MS. HILL TOLD YOU OR ANSWERED IN THE NEGATIVE,

14   THAT THERE WAS NO THREAT TO FUTURE HARM, DID SHE ELABORATE ON

15   WHAT SHE MEANT BY THAT?

16        A    I DON'T RECALL.

17        MS. MEYER:  I HAVE NO FURTHER QUESTIONS.

18        MR. FETTEROLF:  ONE QUICK CLEAN UP QUESTION,

19   YOUR HONOR.

20        THE COURT:  OKAY.

21

22                   RECROSS EXAMINATION

23   BY MR. FETTEROLF:

24        Q    I THOUGHT I HEARD MS. MEYER ASK YOU A QUESTION

25   ABOUT WHETHER YOU SAW BRUISING ON THE NECK; CORRECT?

26        A    YES.

27        Q    WHEN WE WALK THROUGH YOUR FINDINGS, YOU DON'T LIST

28   A SINGLE FINDING OF ANY BRUISING, SWELLING, ANYTHING ON THE
```

```
1   NECK; CORRECT?
2        A    CORRECT.
3        MR. FETTEROLF:  THANK YOU.
4        THE COURT:  ANYTHING ELSE?
5        MS. MEYER:  NO.
6        THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.  THANK YOU SO
7   MUCH.  ARE WE RESUMING WITH MS. HILL?
8        MS. HOLLEY:  YES.
9        THE COURT:  YOU ARE CLEAR TO GO.  YOU CAN BEAT THE
10  TRAFFIC IF YOU TRY.  MS. HOLLEY I'M GOING TO ASK AN UNFAIR
11  QUESTION.  WHAT'S YOUR ESTIMATE FOR CROSS?
12       MS. HOLLEY:  I'D LIKE TO SAY AN HOUR.
13       THE COURT:  OKAY.  ALL RIGHT.  WHENEVER YOU'RE READY.
14
15                 LINDSEY HILL,
16  CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND
17  TESTIFIED FURTHER AS FOLLOWS:
18
19                 CROSS EXAMINATION (RESUMED)
20  BY MR. HOLLEY:
21       Q    GOOD AFTERNOON, MS. HILL.
22       A    GOOD AFTERNOON.
23       Q    LET'S GO BACK TO RESPONDENT'S EXHIBIT D.  YOUR
24  TEXTS WITH KYLE.  PAGE 10 APPEARS TO START ON THURSDAY, APRIL
25  22ND, AT 9:58 A.M.; CORRECT?
26       A    YES.
27       Q    SO THAT IS THE VERY NEXT MORNING AFTER YOUR FIRST
28  NIGHT WITH TREVOR?
```

```
1        MS. MEYER:  YOUR HONOR, IF WE COULD HAVE A MOMENT.
2   APPARENTLY OUR EXHIBIT D FROM THEIR BOOK IS NOT THE SAME.  SO
3   WE NEED TO USE OUR COPY.  IF WE CAN HAVE A MOMENT TO LOCATE
4   IT.
5        THE COURT:  SURE.  IT SHOULD BE THE SAME AS PETITIONER'S
6   31.
7        MS. MEYER:  SO, YOUR HONOR, WHEN -- I WOULD ASK THAT
8   WHEN COUNSEL REFERS TO THEM, THAT IF SHE CAN JUST REFER TO A
9   DATE SO -- BECAUSE IT'S HARD TO FIND THEM.
10       THE COURT:  OKAY.
11       MS. MEYER:  THANK YOU.
12       Q    BY MS. HOLLEY:  PAGE 10 APPEARS TO START ON
13  THURSDAY, APRIL 22ND, 9:58 A.M.; CORRECT?
14       A    YES.
15       Q    SO THAT'S THE VERY NEXT MORNING AFTER YOUR FIRST
16  NIGHT WITH TREVOR; CORRECT?
17       A    YES.
18       Q    ALL RIGHT.  AND YOU SAY, "WANT TO GO TO THE DODGERS
19  GAME SATURDAY NIGHT?"  KYLE, "WAIT.  YES.  1000 PERCENT YES.
20  DID BAUER GET YOU TICKETS?"  YOU SEE THAT, YES?
21       A    YES.
22       Q    AND THEN CONTINUING ON, APRIL 22ND AT 12:22 P.M.
23  YOU, "IMMA DEMAND THEM."  AND THEN IN ALL CAPS.  "JUST LEFT
24  HIS HOUSE."  KYLE, "HAHAHAHAHA HOLY FUCK.  YOU'RE LEGENDARY.
25  IF HE DOES HOOK US UP YOU THINK WE CAN GRAB A THIRD FOR OLD
26  ROOMMATE TONY?"  YOU, "YES.  AND IF NOT, LETS BUY CHEAP ONES
27  AND SNEAK IN BETTER SEATS.  HE'S PITCHING.  IT'LL BE A GREAT
28  GAME."  KYLE, "FUCK YES."
```

338

```
 1          NOW, AGAIN THERE'S NOTHING IN THIS COMMUNICATION
 2   WITH KYLE IN WHICH YOU SAY ANYTHING BAD OR UNPLEASANT
 3   HAPPENED THE NIGHT BEFORE; CORRECT?
 4       A    CORRECT.
 5       Q    CONTINUING ON PAGE 11.  FRIDAY, APRIL 23RD, AT
 6   11:54 A.M.  YOU, "OKAY.  BAUER HAS NO TIX."  THAT'S
 7   TICKETS?
 8       A    WHAT WAS THAT?
 9       Q    TIX IS TICKETS?
10       A    YEAH.
11       MS. MEYER:  YOUR HONOR, I APOLOGIZE.  WE DON'T HAVE THE
12   SAME TEXT MESSAGES.  AND SO IT'S REALLY HARD TO DO THIS.
13       MR. FETTEROLF:  I THINK YOURS GO IN REVERSE DIRECTION.
14   SO YOURS START AT THE END AND GO BACKWARDS.
15       MS. MEYER:  I KNOW, BUT THEY'RE NOT IN THERE.
16       THE COURT:  IT LOOKS LIKE YOU GOT AN ELECTRONIC
17   VERSION.
18       MS. HOLLEY:  MAY I?
19       THE COURT:  YES.
20       Q    BY MS. HOLLEY:  YOU, "OKAY.  BAUER HAS NO TIX.
21   SHALL WE TRY TO FIND CHEAP ONES?"  BY THE WAY, DID YOU WRITE
22   TO TREVOR SOMEWHERE ABOUT ASKING HIM TO GET TICKETS?
23       A    NO.
24       Q    OKAY.  AND, IN FACT, YOU DIDN'T ASK TREVOR TO GET
25   TICKETS; RIGHT?
26       A    NO.
27       Q    SO WAS THAT A LIE TO KYLE WHEN YOU SAID BAUER HAS
28   NO TICKETS?
```

```
1        A    NO.

2        Q    WHAT IS IT?

3        A    IT JUST MEANS I DID NOT ASK FOR THEM FROM HIM.

4        Q    THAT'S NOT WHAT YOU SAID, THOUGH; RIGHT?  YOU SAID

5   HE HAS NO TICKETS?

6        MS. MEYER:  OBJECTION.  ARGUMENTATIVE.

7        THE COURT:  SUSTAINED.

8        Q    BY MS. HOLLEY:  THEN YOU HAVE A BRIEF EXCHANGE WITH

9   KYLE ABOUT SEEING HIS NEW PLACE; RIGHT?

10       A    YES.

11       Q    ALL RIGHT.  NOW, GOING BACK TO APRIL 23RD.  YOU AND

12  TREVOR RESUME YOUR WRITTEN COMMUNICATIONS.  SO I NEED TO GO

13  BACK TO RESPONDENT'S B.  TB 42.

14       THE COURT:  IS THAT E?

15       MS. HOLLEY:  IT'S B.

16       THE COURT:  B AS IN BOY?

17       MS. HOLLEY:  YES.  B AS IN BOY.

18       MS. MEYER:  IT'S BATES STAMP 32?

19       MS. HOLLEY:  42.

20       THE COURT:  GOT IT.

21       Q    BY MS. HOLLEY:  DO YOU HAVE THAT BEFORE YOU,

22  MS. HILL?

23       A    YES.

24       Q    ON APRIL 23RD YOU AND TREVOR RESUME YOUR WRITTEN

25  COMMUNICATION ON INSTAGRAM DIRECT MESSAGE; RIGHT?

26       A    YES.

27       Q    AND YOU CAN SEE ON TB 42 THAT YOU REACH OUT TO HIM

28  ON APRIL 23RD AT 4:44 P.M.; RIGHT?
```

```
 1        A    YES.

 2        Q    AND HE DIDN'T REACH OUT TO YOU; CORRECT?

 3        A    CORRECT.

 4        Q    YOU REACHED OUT TO HIM?

 5        A    CORRECT.

 6        Q    AND, AGAIN, YOU REACHED OUT TO HIM ON INSTAGRAM

 7   BECAUSE AT THAT TIME YOU DID NOT HAVE HIS PHONE NUMBER;

 8   CORRECT?

 9        A    CORRECT.

10        Q    AND THAT WAS THE ONLY WAY YOU COULD COMMUNICATE

11   WITH HIM WAS THROUGH INSTAGRAM AT THAT TIME; CORRECT?

12        A    CORRECT.

13        Q    AND HE DIDN'T HAVE YOUR PHONE NUMBER.  YOU DIDN'T

14   HAVE HIS PHONE NUMBER; CORRECT?

15        A    CORRECT.

16        Q    OKAY.  AND YOU WOULD AGREE THAT YOUR CONVERSATION

17   WITH HIM ON THAT DAY WAS -- I WON'T SAY JOVIAL -- LIGHT AND

18   FUN; CORRECT?

19        A    CORRECT.

20        Q    YOU DIDN'T EXPRESS ANY ANGER OR DISPLEASURE WITH

21   HIM; CORRECT?

22        A    CORRECT.

23        Q    AND YOU AND HE WRITE BACK AND FORTH BRIEFLY ON

24   APRIL 26TH AT 2:11 P.M.; CORRECT?

25        A    CORRECT.

26        Q    AND YOU SEND HIM A NOSE KISS, WHICH IS AT THE

27   BOTTOM OF TB 43?

28        A    YES.
```

```
 1        Q    NOW, THIS IS -- I APOLOGIZE TO YOU FOR HAVING TO GO
 2   BACK AND FORTH.  BUT I'M TRYING TO KEEP THINGS IN
 3   CHRONOLOGICAL ORDER.  YOU'RE HAVING CONVERSATIONS WITH OTHER
 4   PEOPLE.  I APOLOGIZE.  LET'S GO BACK NOW AND LOOK AT
 5   RESPONDENT'S EXHIBIT D, YOUR TEXTS WITH YOUR COUSIN KYLE.
 6             NOW, YOU REACH OUT TO KYLE -- I'M LOOKING AT PAGE
 7   11.  YOU REACH OUT TO KYLE ON APRIL 24TH AT 6:25 P.M.;
 8   RIGHT?
 9        A    YES.
10        Q    AND YOU SAY, "TATIS HITTING THAT HOMERUN OFF BAUER,
11   THEN YOU HAVE THE LAUGHING EMOJI; RIGHT?
12        A    YES.
13        Q    NOW, YOU'RE REFERRING THERE TO THE GAME.  I THINK
14   YOU MENTIONED BEFORE WHERE THE GAME IS BETWEEN THE SAN DIEGO
15   PADRES AND THE DODGERS WHERE FERNANDO TATIS HITS TWO HOMERUNS
16   WITH TREVOR PITCHING?
17        A    YES.
18        Q    YOU THEN YOU SAY, "I KNEW I WOULD GOING TO IN HIS
19   HEAD"?  THAT'S ON PAGE 11.
20        A    YES.
21        Q    AND I AM PREDICTING YOU'RE GOING TO SAY THAT YOU
22   WERE BEING SARCASTIC THERE; IS THAT RIGHT?
23        A    YES.
24        Q    ALL RIGHT.  NOW, YOU HAD TOLD DEREK DAWSON BEFORE
25   YOU WENT TO TREVOR'S HOUSE YOU WERE GOING TO GET IN HIS HEAD.
26   AND HERE YOU'RE SAYING YOU KNEW YOU WERE GOING TO GET IN HIS
27   HEAD?
28        A    YES.
```

342

1    Q    AND YOU SEEM TO BE TAKING CREDIT FOR CAUSING TREVOR

2    TO PUT IN A LESS THAN STELLAR PERFORMANCE ON THE GAME ON THE

3    24TH; RIGHT?

4    A    YES.

5    Q    SO THEN CONTINUING ON WITH THIS CONVERSATION WITH

6    KYLE, KYLE SAYS, "GOD DAMN IT LINDSEY.  HAHAHAHA.  I NEED THE

7    DODGERS TO WIN TODAY."  YOU SAID KYLE IS A DODGERS FAN

8    RIGHT?

9    A    YES, HE IS.

10   Q    YOU, "I PUBLICLY APOLOGIZE TO DODGERS NATION."

11   KYLE, "NEED THE OFFENSE TO WAKE THE FUCK UP TONIGHT."  YOU,

12   "I FUCKING LOVE BASEBALL."  KYLE, "I LOVE IT SO MUCH."  YOU,

13   "HE IS BLOWING IT.  GREAT GAME THO."  KYLE, "STOP IT."  YOU,

14   SO SORRY I RUINED THIS FOR YOU."  KYLE, "DON'T DO THIS TO ME

15   LINDSEY."  YOU, "DO I HAVE SUPERPOWERS OR SOMETHING?"  KYLE,

16   "LINDSEY THE DODGERS ARE WINNING TONIGHT."  YOU, "I CAN'T

17   HAVE THAT HAPPEN.  NEED A PADRES WIN."  KYLE, "STOP IT."

18        THEN YOU SENT A PICTURE OF YOURSELF WATCHING THE

19   GAME.  "SORRY TO REPORT I'M ACTIVELY USING MY THIRD EYE

20   CURSES"; RIGHT?

21   A    YES.

22   Q    "SNELL IS FALLING APART."  SNELL IS THE PITCHER FOR

23   THE PADRES; IS THAT RIGHT?

24   A    CORRECT.

25   Q    KYLE, "HE SURE IS.  I HOPE HE CONTINUES TO DO SO."

26   YOU, "I'M STRESSED."  KYLE, "YOU AND ME BOTH."  YOU, "THANK

27   GOD."  AND I'M ASKING YOU, MS. HILL, DID THE PADRES DO

28   SOMETHING GOOD AT THAT POINT?

343

```
 1        A    I BELIEVE SO.

 2        Q    KYLE, "FUCK ME SIDEWAYS."  AND THEN YOU SAY, "TATIS

 3   BETTER IN BED AND THE FIELD.  COOKIE IS ROASTING BAUER.

 4   FUCK."  THEN YOU SEND THE SAME PHOTO YOU SENT TO DEREK

 5   DAWSON, WHICH WE TALKED ABOUT BEFORE?

 6        A    YES.

 7        Q    OKAY.  SO AT THIS POINT YOU HAVE NOW WRITTEN TO

 8   KYLE WHERE YOU HAVEN'T MENTIONED ANY ISSUE OR PROBLEM WITH

 9   WHAT HAPPENED THAT NIGHT WITH TREVOR; RIGHT?

10        A    YES.

11        Q    OKAY.  NOW, LET'S LOOK AT PAGE TB 44, WHICH IS

12   EXHIBIT B.  HALFWAY DOWN THE PAGE, IT APPEARS ON APRIL 29TH

13   AT 9:38 A.M. YOU SENT TREVOR A VIDEO.  DO YOU SEE THAT?

14        A    YES.

15        Q    NOW, I THINK WE SPENT SOME TIME TALKING ABOUT THIS.

16   WHERE IS THAT VIDEO?

17        A    I HAD DELETED IT BY THE END OF THAT NIGHT.  THE

18   WHOLE THREAD.

19        Q    I'M SORRY.  I DIDN'T HEAR YOU.

20        A    I HAD DELETED THE WHOLE THREAD BY THE END OF THAT

21   NIGHT AS WE HAD THAT SCREENSHOT.

22        Q    BY "THAT NIGHT" YOU MEAN THE NIGHT OF APRIL 29TH?

23        A    I BELIEVE SO.

24        Q    OKAY.  AND AS BEST YOU CAN RECALL, WHAT WAS THAT

25   VIDEO OF?

26        A    YES.  I HAVE A VERY, VERY TINY LITTLE BRUISE ON THE

27   INSIDE OF MY THIGH.  AND I SENT HIM A VIDEO ASKING IF IT WAS

28   FROM HIM.
```

344

```
1        Q    WELL, YOU SEE TREVOR'S RESPONSE AT 11:24
2   APPROXIMATELY TWO HOURS LATER.  AND HE SAYS, "WHAT ON EARTH
3   WAS THAT FROM?"  YOU SAY, HAHAHAHAHA.  YOU GOT ME GOOD."
4   TREVOR, "WHAT WAS IT?"  YOU, "I HAVE NO IDEA.  PROBABLY YOUR
5   THUMB LOL.  JUST A BRUISE IN THE SHAPE OF A FINGERPRINT.
6   DEAD."  NOW WHEN YOU SAY "DEAD" IN THAT KIND OF CONTEXT,
7   YOU'RE BASICALLY IT'S LIKE LAUGHING?
8        A    YES.
9        Q    TREVOR SAYS, "WHERE AT?"  THEN YOU SENT ANOTHER
10  VIDEO.  AND THEN THAT VIDEO YOU ALSO DELETED; CORRECT?
11       A    YES.
12       Q    AND WHAT WAS THAT VIDEO OF?
13       A    IT WAS OF THE SAME -- ESSENTIALLY THE SAME VIDEO
14  JUST SHOWING HIM WHERE IT WAS.  I WAS WEARING SHORTS.  AND IT
15  WAS ON THE INSIDE OF MY THIGH.  SO I JUST SHOWED HIM WHERE IT
16  WAS.
17       Q    AND YOU SAY "RIGHT BY MY PRIZED POSSESSION HA."
18  AND ARE YOU SAYING YOUR PRIZED POSSESSION IS YOUR VAGINA IN
19  THIS?
20       A    YES.
21       Q    OKAY.  THANK YOU.  AND THEN TREVOR SAYS, "OH GOSH.
22  I DON'T KNOW IF THAT WAS ME OR NOT.  BUT SORRY IF IT WAS."
23  AND THEN IF YOU TURN THE PAGE, YOU CAN SEE YOUR RESPONSE WAS,
24  U GUCCI.  I'M INTO IT.  HAPPY BAUER DAY.  GO LIGHT SOME
25  BREWERS ON FIRE FOR ME," WITH A KISSY EMOJI.
26            NOW, YOU DID NOT INCLUDE ANY OF THESE MESSAGES IN
27  YOUR FILING TO THE COURT; CORRECT?
28       A    CORRECT.
```

```
1        Q    AND YOU LEFT THOSE OUT BECAUSE YOU DELETED THEM?
2        A    YES.
3        Q    CORRECT.  AND I AM ASSUMING THAT YOU DIDN'T TAKE A
4   SCREENSHOT OF ANY OF THOSE; CORRECT?
5        A    CORRECT.
6        Q    AND DID YOU THINK THAT IT WOULD BE IMPORTANT FOR
7   THE JUDGE TO KNOW THAT THE ONLY INJURY YOU BROUGHT TO
8   TREVOR'S ATTENTION AFTER YOUR NIGHT WITH HIM ON THE 21ST WAS
9   A THUMBPRINT BRUISE?
10       A    CAN YOU REPEAT THAT ONE MORE TIME?
11       Q    DID YOU THINK IT WAS IMPORTANT FOR THE JUDGE TO
12  KNOW WHEN YOU WERE FILING YOUR PETITION THAT THE ONLY INJURY
13  YOU DIRECTED TREVOR'S ATTENTION TO AFTER YOUR NIGHT WITH HIM
14  ON APRIL 21ST WAS A THUMBPRINT BRUISE?
15       MS. MEYER:  OBJECTION.  ARGUMENTATIVE AS PHRASED.
16       THE COURT:  OVERRULED.  YOU MAY ANSWER.
17       THE WITNESS:  I'M A LITTLE BIT CONFUSED.  BUT I DIDN'T
18  HAVE THOSE MESSAGES.  SO I WASN'T THINKING ABOUT INCLUDING
19  THEM.
20       Q    BY MS. HOLLEY:  DID YOU THINK IT WOULD BE IMPORTANT
21  FOR THE JUDGE TO SEE THE LIGHT AND FRIENDLY TONE IN WHICH YOU
22  ARE DISCUSSING THIS BRUISE WITH TREVOR IN GENERAL?
23       A    NO.
24       Q    DID YOU THINK IT WAS IMPORTANT FOR THE JUDGE TO SEE
25  THAT YOU WERE LAUGHING ABOUT THAT -- ABOUT WHAT YOU WERE
26  DISCUSSING WITH TREVOR, THAT YOU WERE LAUGHING ABOUT IT?
27       A    NO.
28       Q    AND DID YOU THINK IT WOULD BE IMPORTANT FOR THE
```

```
 1   JUDGE TO SEE THAT TREVOR, AT LEAST IN HIS WORDS, DIDN'T SEEM
 2   TO KNOW WHAT IT WAS AND WASN'T EVEN SURE THAT HE CAUSED IT;
 3   DID THAT SEEM IMPORTANT OR NO?
 4        A    I DON'T KNOW.
 5        Q    DID YOU THINK IT WOULD BE IMPORTANT FOR THE JUDGE
 6   TO KNOW THAT HE APOLOGIZED, EITHER WAY WHETHER HE DID IT OR
 7   NOT, THAT HE WAS APOLOGIZING TO YOU?
 8        A    I DON'T KNOW.
 9        Q    WHAT ABOUT WHEN YOU SAID, "U GUCCI.  I'M INTO IT,"
10   IN RESPONSE TO HIS APOLOGY?  AREN'T YOU SAYING THERE, NO
11   PROBLEM.  I LIKED IT?
12        A    NO.
13        Q    WHAT IS, "U GUCCI.  I'M INTO IT"?
14        A    I WAS JUST REFERRING TO SEX.
15        Q    YOU WERE REFERRING TO SEX EVEN THOUGH YOU HAVE SENT
16   HIM TWO VIDEOS OF A BRUISE; CORRECT?
17        A    YES.
18        Q    YOU AND HE ARE DISCUSSING THAT BRUISE IN THIS
19   EXCHANGE; CORRECT?
20        A    YES.
21        Q    AND HE'S EXPRESSING TO YOU THAT HE DOESN'T KNOW IF
22   HE CAUSED THAT BRUISE, BUT HE IS SORRY EITHER WAY; CORRECT?
23        A    YES.
24        Q    AND YOU'RE NOW SAYING THAT YOUR RESPONSE, "U GUCCI.
25   I'M INTO IT," WAS NOT ABOUT THIS CONVERSATION ABOUT A BRUISE
26   BUT JUST ABOUT SEX IN GENERAL?
27        A    SINCE HE SAID HE DIDN'T KNOW IF IT WAS HIM OR NOT,
28   THAT'S WHY I REFERRED IT BACK TO SEX.
```

1    Q    BECAUSE HE SAID HE DIDN'T KNOW IF IT WAS HIM OR

2  NOT, YOU JUST REFERRED IT BACK TO SEX?

3    A    YES, TO CHANGE THE SUBJECT.  BECAUSE HE SAID THAT

4  HE DIDN'T KNOW IF IT WAS FROM HIM.

5    Q    NOW, I UNDERSTAND THAT YOU DELETED ALL OF THESE

6  MESSAGES.  BUT THE EVENTS STILL LIVED IN YOUR MEMORY AND

7  EXPERIENCE.  SO DO YOU AGREE WITH ME THAT YOU COULD HAVE, IF

8  YOU CHOSE TO, WRITTEN IN YOUR DECLARATION THAT THIS EXCHANGE

9  OCCURRED EVEN THOUGH YOU DIDN'T HAVE THE INSTAGRAM

10  MESSAGES?

11    MS. MEYER:  VAGUE.  CALLS FOR SPECULATION.

12  ARGUMENTATIVE.

13    THE COURT:  OVERRULED ON ALL COUNTS.  YOU MAY ANSWER.

14    THE WITNESS:  CAN YOU ASK ME ONE MORE TIME, PLEASE.

15    Q    BY MS. HOLLEY:  SURE.  I UNDERSTAND THAT YOU NO

16  LONGER HAVE THE WRITTEN COMMUNICATION BECAUSE YOU DELETED IT;

17  RIGHT?  BUT THE EXPERIENCE STILL HAPPENED.  AND IF YOU WANTED

18  TO, YOU COULD HAVE SAID IN YOUR DECLARATION THIS CONVERSATION

19  HAPPENED BETWEEN ME AND TREVOR.  YOU COULD HAVE DONE THAT,

20  RIGHT, IF YOU WANTED TO?

21    A    POSSIBLY.

22    Q    WELL, WHAT WOULD HAVE PREVENTED YOU FROM DOING THAT

23  SINCE IT'S JUST A POSSIBILITY?

24    A    BECAUSE HE DID NOT CONFIRM THAT THE BRUISE WAS FROM

25  HIM.  SO I WAS NOT GOING TO INCLUDE IT.

26    Q    WELL, IN YOUR DECLARATION, YOU SPEAK ABOUT THIS

27  FIRST NIGHT WITH TREVOR IN TERMS OF THE PHYSICAL SEX AS BEING

28  VERY DRAMATIC AND PHYSICAL, IF NOT TRAUMATIC; CORRECT?

1          A    CORRECT.

2          Q    SO WHAT YOU HAVE PRESENTED TO THE COURT BY WRITING

3     THOSE THINGS IN YOUR DECLARATION, WOULDN'T YOU AGREE, PAINTS

4     A PICTURE OF A SOMEWHAT VIOLENT ENCOUNTER WITH TREVOR ON

5     APRIL 21ST?

6          A    YES.

7          Q    BASED ON WHAT YOU WROTE?

8          A    YES.

9          Q    AND SO YOU WANTED THE JUDGE WHO READ IT TO CARE

10    ABOUT, READ ABOUT AN EXPERIENCE IN WHICH TREVOR HAS DONE

11    THINGS TO YOU THAT ARE BAD; RIGHT?

12         A    YES.

13         Q    AND WOULDN'T IT BE MUCH MORE FAIR AND ACCURATE TO

14    INCLUDE, IF YOU ARE TALKING ABOUT THAT, THAT YOU BROUGHT TO

15    HIS ATTENTION A VERY SMALL BRUISE.  AND THAT HE EXPRESSED, "I

16    DON'T KNOW IF I DID THIS, BUT I'M SORRY IF I DID."  WOULDN'T

17    THAT CREATE A MUCH MORE FAIR AND ACCURATE NARRATIVE FOR THE

18    COURT TO CONSIDER?

19         MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.

20         THE COURT:  SUSTAINED.

21         Q    BY MS. HOLLEY:  GIVEN ALL OF THE THINGS THAT YOU

22    SAY THAT HAPPENED ON APRIL 21ST, DO YOU FIND IT SIGNIFICANT

23    THAT THE THING THAT YOU ARE CALLING ATTENTION TO IN THESE

24    VIDEOS ARE A SMALL BRUISE ON YOUR, I GUESS, YOU SAID YOUR

25    INNER THIGH?

26         MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.  CUMULATIVE.

27         THE COURT:  SUSTAINED.

28         Q    BY MS. HOLLEY:  TB 52.  THAT IS IN B.  NOW, YOU AND

```
 1    TREVOR ARE MESSAGING EACH OTHER LATER THAT NIGHT ON APRIL

 2    29TH AT 9:09 P.M.; IS THAT RIGHT?

 3        A    YES.

 4        Q    AND AT THE TOP OF TB 53 HE SAYS, "ANALYZE ME,

 5    PLEASE"; RIGHT?

 6        A    YES.

 7        Q    AND YOU REPLY WITH A SUPER LONG ANALYSIS?

 8        A    YES.

 9        Q    NOW, SORRY TO MAKE YOU DO THIS.  PLEASE GO BACK TO

10    RESPONDENT'S EXHIBIT D, WHICH IS YOUR TEXT WITH KYLE.  AND I

11    THINK THAT I ONLY WENT UP TO -- I CAN'T REMEMBER WHAT PAGE I

12    WENT UP TO, YOUR HONOR, ON EXHIBIT D.  BUT I NEED TO GO A

13    LITTLE BIT FURTHER NOW.  LOOKING AT PAGE 16, MS. HILL.  DOES

14    THAT CONTINUE TO BE AN ACCURATE REFLECTION OF YOUR TEXT

15    COMMUNICATION WITH KYLE?

16        A    YES.

17        Q    OKAY.  SO I'D ASK FOR PAGE 16.  AND WHY DON'T YOU

18    ALSO LOOK AT 17 AND 18.  AND LET ME KNOW IF THOSE ALSO

19    REFLECT THE COMMUNICATION WITH KYLE?

20        A    YES.

21        MS. HOLLEY:  THANK YOU.  I'D ASK THOSE PAGES BE

22    ADMITTED.

23        MS. MEYER:  I THOUGHT EVERYTHING WAS ADMITTED WITH

24    KYLE.

25        MS. HOLLEY:  WELL, I DON'T THINK IT WAS.  I WAS DOING IT

26    PIECEMEAL.

27        THE COURT:  WELL, 31, WHICH WILL BE THE EQUIVALENT OF B,

28    31 -- EVERYTHING BEGINNING AT PETITIONER'S BATES STAMP 936 ON
```

```
1  WAS ADMITTED.  SO IF YOU WANT SOMETHING BEFORE HER 936, IT'S
2  NOT YET IN EVIDENCE.  BUT EVERYTHING AFTER IS.
3       MS. HOLLEY:  WELL, I GUESS, I'M ASKING IF THE PAGES THAT
4  I'M REFERENCING NOW HAVE BEEN ADMITTED.  AND I APOLOGIZE THAT
5  I'M NOT CROSS REFERENCING BETWEEN THE PREVIOUS EXHIBITS.
6       THE COURT:  AS TO THE OTHER -- D IS 31.
7       MS. HOLLEY:  YES.
8       THE COURT:  SO YOU HAVE MY ANSWER ON THAT ONE.  AND B IS
9  2.  AND THE ENTIRETY IS ADMITTED.
10      MS. HOLLEY:  I'M SORRY.
11      THE COURT:  YOUR B IS PETITIONER'S 2.  AND THE ENTIRETY
12 IS ADMITTED.
13      MS. HOLLEY:  BUT WE'RE ON D.
14      THE COURT:  RIGHT.  D IS 31.  SO IF YOU TAKE A LOOK AT
15 PETITIONER'S PAGE 936, EVERYTHING FROM 936 ON IS ADMITTED.
16      MS. HOLLEY:  OKAY.  AND I AM LOOKING AT PAGES I THINK
17 BEFORE THAT.  SO WE HAD USED MY EXHIBITS, I BELIEVE, STARTING
18 AT PERHAPS 9 OR 10 PREVIOUSLY BEFORE THE BREAK.  AND NOW
19 WE'RE AT --
20      THE COURT:  I'LL LET YOU MEET AND CONFER WITH COUNSEL.
21 THEN YOU CAN TELL ME WHAT'S MISSING.  WE CAN ADD THAT AS
22 YOURS.
23      MS. HOLLEY:  WOULD YOU LIKE ME TO DO THAT NOW?
24      THE COURT:  I'D LIKE YOU TO DO IT AT THE END OF THE
25 DAY.
26      MS. HOLLEY:  OKAY.  PERFECT.  MAY I CONTINUE?
27      THE COURT:  YOU MAY.
28      MS. HOLLEY:  THANK YOU VERY MUCH.
```

```
1         Q    BY MS. HOLLEY:  OKAY.  RESPONDENT'S EXHIBIT D, PAGE
2    16.  NOW YOU'RE SENDING A SCREENSHOT OF A PORTION OF THE
3    MESSAGES YOU HAD WITH TREVOR TWENTY MINUTES EARLIER STARTING
4    WITH TREVOR SAYING, "ANALYZE ME, PLEASE."  DO YOU SEE THAT?
5         A    YES.
6         Q    YOU THEN SAY, "THE MLB WILL BE NOTHING WITHOUT ME."
7    KYLE SAYS, "YOU ARE SINGLE HANDEDLY KEEPING THE LEAGUE
8    TOGETHER."  YOU THEN SHARE MORE OF YOUR PRIVATE CONVERSATION
9    WITH TREVOR?
10        A    CORRECT.
11        Q    YOU SAY, "CONSIDER THIS A SERVICE TO YOU AND THE
12   DODGERS."  NOW, AGAIN YOU'RE BEING SARCASTIC HERE; IS THAT
13   CORRECT?  YOU'RE CLAIMING CREDIT FOR THAT?
14        A    YES.
15        Q    SO NOW THAT LONG ANALYSIS YOU SENT TO TREVOR IN
16   RESPONSE TO HIS REQUEST TO ANALYZE HIM, YOU WROTE THAT ON
17   APRIL 29TH; CORRECT?
18        A    CORRECT.
19        Q    AND HE DIDN'T REPLY BACK UNTIL MAY 4TH AT 9:48;
20   CORRECT?  THAT'S THE TB 66.
21        A    I'M SORRY.  WHAT PAGE?  TB --
22        Q    66.
23        A    YES, THAT'S CORRECT.
24        Q    AND YOU TWO HAVE A NICE BACK AND FORTH
25   COMMUNICATION; CORRECT?
26        A    CORRECT.
27        Q    AND YOU THEN ARE AT THE SAME TIME COMMUNICATING
28   WITH KYLE TEXTING WITH HIM ABOUT TREVOR THAT SAME NIGHT.  MAY
```

```
1   4TH.  CORRECT?  RIGHT?  MAY 4TH.  AND KYLE SAYS -- WE'RE ON

2   EXHIBIT D, PAGE 17.  AGAIN, I APOLOGIZE.  BUT YOU -- CORRECT

3   ME IF I'M WRONG -- ARE COMMUNICATING WITH TREVOR AND WITH

4   KYLE AT THE SAME TIME?  IN THAT EXCHANGE --

5        A    IT LOOKS LIKE I WAS TALKING TO KYLE AT 6:00 P.M.

6   BEFORE TREVOR HAD REPLIED TO ME AROUND 10:00 P.M.

7        Q    OKAY.  AND YOU AND KYLE ARE TALKING ABOUT THE FACT

8   THAT TREVOR HAS DONE POORLY IN HIS GAME; CORRECT?

9        A    CORRECT.

10       Q    AND YOU ARE BASICALLY MAKING FUN OF THAT AS A

11  PADRES FAN; CORRECT?

12       A    YES, AS A PADRES FAN.

13       Q    OKAY.  AND THEN YOU TEXT KYLE AGAIN ON MAY 4TH AT

14  8:32.  THAT'S THE BOTTOM OF PAGE 17 AND 18.  AND YOU SAY,

15  "BAUER JUST DM'D ME.  SCARED TO OPEN IT.  LOL."  AND THEN YOU

16  TEXT KYLE AGAIN THE NEXT MORNING, MAY 5TH, AT 8:53.  AND YOU

17  SHARE ONE OF TREVOR'S TWEETS TO WHICH KYLE REPLIES, "LMAO,"

18  RIGHT?  LAUGH MY ASS OFF; RIGHT?

19       A    HE ACTUALLY SENT THAT TO ME.

20       Q    HE WHO?  WHO SENT --

21       A    KYLE SENT THAT TO ME.

22       Q    GOT IT.  THANK YOU.  AND THEN YOU SAY, "I AM DEAD."

23  ANOTHER WAY OF SAYING FUNNY; RIGHT?

24       A    YES.

25       Q    AND THEN YOU SAY, "HE WAS TELLING ME ANOTHER SOB

26  STORY LAST NIGHT."  AT WHICH POINT YOU SHARE A SCREENSHOT OF

27  THE LONG DM CONVERSATION YOU HAD WITH TREVOR ON APRIL 29TH

28  AND MAY 4TH; RIGHT?
```

```
1        A    I'M NOT SURE WHICH DATE THAT SCREENSHOT IS FROM.
2    BUT, YES, I DID SEND IT.
3        Q    AND YOU SAID HE WAS TELLING ME ANOTHER SOB STORY?
4        A    YES.
5        Q    IN THIS COMMUNICATION, THIS LONG COMMUNICATION
6    BETWEEN YOU AND TREVOR WHERE YOU ARE ANALYZING HIM AND
7    TALKING ABOUT ALL OF WHAT I THINK YOU FEEL ARE IMPORTANT
8    THINGS, AND TREVOR, AS YOU WOULD SAY, I GUESS, IS OPENING UP
9    TO YOU, YOU'RE MAKING FUN OF HIM TO KYLE, RIGHT, BY CALLING
10   IT A SOB STORY?
11       A    NO.
12       Q    NO.  WHEN YOU SAID, "IT'S A SOB STORY," YOU WERE
13   BEING SARCASTIC?
14       A    I DON'T KNOW WHAT I WAS BEING, BUT I WAS NOT MAKING
15   FUN OF HIM.
16       Q    WELL, IS SOB STORY A NICE THING TO SAY ABOUT
17   SOMEBODY WHO IS SHARING THINGS WITH YOU?  A SOB STORY IS NOT
18   NICE, IS IT?
19       A    NO, BUT I WAS ALSO FRUSTRATED.
20       Q    WHAT WERE YOU FRUSTRATED WITH?
21       A    THAT HE MOSTLY TALKS ABOUT HIMSELF AND DOESN'T ASK
22   ME A LOT OF QUESTIONS.
23       Q    AND ARE YOU BASING THAT ON HIM SAYING "ANALYZE
24   ME"?
25       A    NOT JUST THAT.
26       Q    AND WHEN YOU'RE TALKING ABOUT WHEN HE TALKS ABOUT
27   HIMSELF, ARE YOU TALKING ABOUT AN INSTAGRAM DM, BECAUSE
28   THAT'S THE ONLY WAY YOU'RE COMMUNICATING AT THAT POINT;
```

354

1    RIGHT?

2        A    I'M REFERRING TO ALL OF THE INTERACTIONS I'VE HAD

3    WITH HIM.

4        Q    OKAY.  WELL, UP TO THAT POINT, THE INTERACTION YOU

5    HAD WITH HIM WAS BEING AT HIS HOUSE THE NIGHT OF APRIL 21ST,

6    AND HAVING INSTAGRAM DM COMMUNICATIONS WITH HIM?

7        A    YES.

8        Q    AND THAT'S IT; RIGHT?

9        A    YES.

10       Q    OKAY.  SO YOU ARE SAYING THAT THE INSTAGRAM DM'S,

11   AND THE TIME THAT YOU WERE WITH HIM ON THE 21ST, HE TALKED

12   ABOUT HIMSELF; CORRECT?

13       A    YES.

14       Q    AND YOU FOUND THAT TO BE FRUSTRATING?

15       A    YES.

16       Q    AND THAT'S THE REASON WHY YOU CALLED IT A SOB STORY

17   BECAUSE YOU WERE FRUSTRATED BY THAT; CORRECT?

18       A    YES.

19       Q    KYLE SAYS -- CONTINUING ON -- "HOLY SHIT.  YOU'RE

20   PRACTICALLY HIS THERAPIST."  AND YOU SAY, "THIS HAPPENS TO ME

21   EVERY TIME," WITH A SMILEY FACE.  WHAT DID YOU MEAN BY THAT,

22   "THIS HAPPENS TO ME EVERY TIME"?  WHAT HAPPENS TO YOU EVER

23   TIME?

24       A    STRICTLY TALKING ABOUT DATING AND SOBRIETY AND

25   GETTING TO KNOW MEN.  I CHOOSE TO BE MORE OF THE LISTENER,

26   BECAUSE IT'S SOMETHING I GENUINELY LIKE TO DO.  BUT I DON'T

27   SHARE A TON ABOUT MYSELF, BECAUSE I DON'T GET ASKED A TON

28   ABOUT MYSELF BECAUSE I TEND TO LISTEN MORE.

```
1        Q    DIDN'T YOU SAY PREVIOUSLY THAT YOU FOUND TREVOR TO
2    BE A GOOD LISTENER?
3        A    YES.
4        Q    SO WAS HE A GOOD LISTENER, OR DID HE ONLY TALK
5    ABOUT HIMSELF?
6        A    ON THE THINGS THAT I DID SHARE ABOUT MYSELF, HE WAS
7    A GOOD LISTENER.  YES.
8        Q    OKAY.  SO THEN HE DIDN'T JUST TALK ABOUT HIMSELF;
9    RIGHT?
10       A    HE MOSTLY TALKED ABOUT HIMSELF.  AND WHEN I SPOKE
11   ABOUT MYSELF, HE DID LISTEN TO ME VERY WELL.
12       Q    BUT AT THIS POINT NOW ON MAY 4TH YOU'RE GETTING
13   FRUSTRATED AND YOU'RE CALLING IT A SOB STORY?
14       MS. MEYER:  OBJECTION.  ASKED AND ANSWERED.
15       THE COURT:  JUST TRYING TO GET A CLARIFICATION.  YOU MAY
16   ANSWER.
17       THE WITNESS:  CAN YOU REPEAT IT, PLEASE?
18       MS. HOLLEY:  YES.
19       Q    BY MS. HOLLEY:  ON MAY 4TH YOU WERE GROWING
20   FRUSTRATED, WHICH IS THE REASON WHY YOU CALLED IT A SOB
21   STORY; CORRECT?
22       A    YES.
23       Q    OKAY.  NOW, AT THE BOTTOM OF TB 71, WHICH YOU'LL
24   ALSO SEE IS ON TB 72, THIS NOW CONTINUES OVER.  THAT IS ON
25   MAY 8TH AT 1:19 A.M.; CORRECT?
26       A    YES.
27       Q    HE SAYS HE THOUGH ABOUT YOU TONIGHT AND FIGURED HE
28   WOULD CHECK IN TO SEE HOW YOU WERE DOING; RIGHT?
```

1        A    YES.

2        Q    NOW, DO YOU RECALL -- IF YOU DON'T, WE CAN GO BACK

3   AND LOOK AT IT -- THAT YOU SENT A SCREENSHOT OF IT AND SENT

4   IT TO KYLE WITH A MESSAGE?"  DO YOU REMEMBER THAT OR SHOULD

5   WE LOOK BACK AT IT?

6        A    I DO RECALL SENDING THAT INITIALLY, YES.

7        Q    AND WHAT DID YOU MEAN BY THAT, "THE HOOKS ARE IN SO

8   DEEP," WITH THE SCREENSHOT OF TREVOR REACHING OUT TO YOU AT

9   1:19 A.M.?

10        A    WHAT I MEANT BY THAT WAS THAT BY HIM REACHING OUT,

11   THAT HE WAS STILL INTERESTED IN COMMUNICATING WITH ME AND

12   PROGRESSING THINGS FURTHER.

13        Q    NOW, DIDN'T YOU ASK -- LET ME JUST -- KYLE SAYS,

14   "OH FUCK.  1:00 A.M. LOOK AT YOU."

15        MS. MEYER:  WHAT PAGE ARE YOU ON?

16        MS. HOLLEY:  TB 72.

17        THE COURT:  ARE YOU TALKING ABOUT --

18        MS. HOLLEY:  AM I NOT --

19        THE COURT:  NO.  I THINK YOU'RE REFERENCING KYLE, WHICH

20   WOULD BE IN D, NOT B.

21        MS. HOLLEY:  YES.  ALL RIGHT.  SO RESPONDENT'S D.  I WAS

22   TRYING TO MAKE HER NOT GO BACK TO THAT.  IT IS IN

23   RESPONDENT'S D.

24        THE COURT:  I THINK YOU'RE ON 19.

25        MS. HOLLEY:  THAT'S RIGHT.  PAGE 19.

26        Q    BY MS. HOLLEY:  DO YOU SEE THAT?

27        A    YES, I DO.

28        Q    OKAY.  AND SO KYLE SEEMS TO NOTICE THAT HIS DM TO

1   YOU WAS AT 1:19 AND SAYS, "OH FUCK. 1:00 A.M. LOOK AT YOU";

2   RIGHT?

3      A   YES.

4      Q   AND YOU SAY, "IF IT WASN'T A BOOTY CALL, THEN WHAT

5   DOES A 1:00 A.M. MESSAGE MEAN IN BOY BRAIN?" KYLE SAYS,

6   "HE'S GENUINELY THINKING ABOUT YOU. BOY BRAINS ARE SO DUMB."

7   YOU SAY, HAHAHAHAHAHA. THANK YOU FOR DECODING." AND KYLE

8   SAYS, "THAT'S WHAT I'M HERE FOR." RIGHT?

9         SO YOU AT LEAST HAD IN YOUR MIND THE QUESTION OF

10   WHETHER OR NOT HIM REACHING OUT TO YOU AT 1:00 O'CLOCK IN THE

11   MORNING WAS A BOOTY CALL; CORRECT?

12      A   CAN YOU SAY THAT QUESTION ONE MORE TIME?

13      Q   YES. YOU BROUGHT UP TO KYLE THE IDEA OF A BOOTY

14   CALL SINCE IT CAME IN AFTER 1:00 O'CLOCK IN THE MORNING. SO

15   YOU ARE QUESTIONING KYLE -- AND I'M ASKING IF YOU'RE

16   QUESTIONING YOURSELF -- WHETHER OR NOT A MESSAGE TO YOU AT

17   1:00 O'CLOCK IN THE MORNING WAS A BOOTY CALL?

18      A   NO.

19      Q   NO. WHY DID YOU BRING UP BOOTY CALL?

20      A   I WAS RULING OUT THAT POSSIBILITY, BECAUSE I

21   BELIEVED HE WAS TRAVELING AT THAT TIME. SO IT WASN'T -- HE

22   WASN'T MESSAGING ME TO COME OVER. SO THAT'S WHY I BELIEVE I

23   ELIMINATED THE FACT OF A BOOTY CALL.

24      Q   WAS IT THIS COMMUNICATION -- IT MAY HAVE BEEN

25   ANOTHER ONE THAT WAS 1:00 IN THE MORNING -- WHEN YOU HAD A

26   CONVERSATION WITH LISA, YOUR SPONSOR, WHERE YOU ALSO SPOKE

27   ABOUT HIM MESSAGING YOU AT THIS HOUR. AND THERE WAS A

28   CONCERN THAT SHE HAD FOR YOU ABOUT THE FACT THAT HE WAS

358

```
1    MESSAGING YOU THAT EARLY IN THE MORNING; DO YOU REMEMBER THAT
2    COMMUNICATION?
3         A    YES, I DO.
4         Q    OKAY.  WAS IT THIS OR WAS IT ANOTHER COMMUNICATION
5    WITH TREVOR?  WAS IT THIS VERY ONE?
6         A    I BELIEVE IT WAS THE SAME ONE.
7         Q    SO YOUR SPONSOR WAS ALERTING YOU TO -- THAT YOU
8    SHOULD BE CAREFUL SINCE HE WAS REACHING OUT TO YOU AT THAT
9    LATE HOUR, CORRECT, AND TELLING YOU TO BE CAREFUL?
10        A    I'M NOT SURE.
11        Q    OKAY.  AND WHEN WE GET TO HER, WE'LL LOOK MORE
12   SPECIFICALLY EXACTLY WHAT SHE SAID TO YOU ABOUT THAT AND WHAT
13   YOU SAID IN RESPONSE.  ALL RIGHT.  YOU INDICATED THAT YOU
14   FINALLY GAVE TREVOR YOUR CELL PHONE NUMBER ON MAY 8.  AND HE
15   THEN TEXTED YOU; CORRECT?
16        A    CORRECT.
17        Q    AND YOU TESTIFIED PREVIOUSLY THAT YOU BELIEVED THAT
18   THAT MEANT THAT YOUR RELATIONSHIP WAS GOING TO THE NEXT
19   LEVEL; CORRECT?
20        A    CORRECT.
21        Q    AND THAT WAS BASED ON THE FACT THAT YOU GAVE HIM
22   YOUR CELL PHONE NUMBER, AND HE TEXTED YOU INSTEAD OF SENDING
23   YOU AN INSTAGRAM DIRECT MESSAGE; CORRECT?
24        A    CORRECT.
25        Q    TURNING BACK TO EXHIBIT D, YOUR TEXTING
26   COMMUNICATION WITH KYLE.  AT THE BOTTOM OF PAGE 19 YOU SENT A
27   SCREENSHOT OF TREVOR'S TEXT, WHICH WAS, "HEY LINDS, IT'S
28   TREVOR," TO KYLE?
```

1       A    YES.

2       Q    YOU WROTE, "DEAD," WHICH IN THIS CONTEXT IS KIND OF

3  LIKE, OH MY GOD; RIGHT?

4       A    YES.

5       Q    AND THEN KYLE SAYS, "OH FUCK IT'S REAL NOW."  SO IS

6  KYLE THE ONE WHO WAS CAUSING YOU TO BELIEVE THAT THIS MEANS

7  SOMETHING?

8       A    NO.

9       Q    ON YOUR OWN YOU ARE THINKING THAT THIS MEANS

10 SOMETHING?

11      A    YES.

12      Q    AND YOU'RE JUST TRYING TO CONFIRM WITH KYLE, WHO

13 WAS A MALE, THAT IT MUST MEAN SOMETHING?

14      A    NO.

15      Q    OKAY.  NOW, YOU DON'T KNOW WHETHER IT MEANS

16 ANYTHING AT ALL TO TREVOR; RIGHT?

17      A    CORRECT.

18      Q    YOU ONLY KNOW WHAT YOU BELIEVE IT MEANS TO YOU;

19 CORRECT?

20      A    CORRECT.

21      Q    OKAY.  ALL RIGHT.  NOW, WE NEED TO LOOK AT TB 77.

22 EXHIBIT B.  AND AFTER YOU GET THERE, YOU CAN SEE TEXTING BACK

23 AND FORTH ABOUT BASEBALL AND SLEEPING PATTERNS; RIGHT?

24      A    YES.

25      Q    AND THEN IF YOU LOOK AT PAGES 79 TO 83 -- I'M GOING

26 TO READ THIS ENTIRE TEXT EXCHANGE AND ASK FOR YOU TO READ

27 ALONG.

28           AND THIS IS ON SUNDAY MAY 9TH AT 4:59 P.M.  YOU,

360

```
 1    "HERE IS 100 NOSE KISSES TO MAKE YOU FEEL BETTER.  AND JUST
 2    KNOW PINK IS SO YOUR COLOR PAPI."  TREVOR, "OH YEAH?  PINK
 3    LOOKS GOOD ON ME HUH?"  AND YOU SEND A PICTURE OF A WOMAN IN
 4    BED.  THAT'S NOT YOU; RIGHT?
 5         A    NO.
 6         Q    OKAY.  AND IS SHE KIND OF MOTIONING WITH HER FINGER
 7    ON THE BED LIKE "COME TO ME" (INDICATING)?
 8         A    YES.
 9         Q    OKAY.  YOU, REALLY COMPLIMENTS YOUR VIBE YES."
10    TREVOR, "OH IT HITS LIKE THAT HUH?"  AND BLOWING KISS EMOJI.
11    THEN YOU, "THE PINK SOCKS STAY ON WHILE CUDDLING."  TREVOR
12    "YES, MA'AM.  WHATEVER YOU WANT."  BLOWING KISS EMOJI.  YOU,
13    BUTTTTT OFFFFFFF," WHEN YOU'RE TALKING ABOUT THE PINK SOCKS;
14    RIGHT?
15         A    YES.
16         Q    "BUTTTTT OFFFFFF WHEN IT'S TIME TO CHOKE ME OUT.
17    THANKS.  YOU ARE THE BEST."  WITH THE WINKING EMOJI.  TREVOR,
18    "YOU WANT TO GO OUT HUH?  MMMM."  YOU, "SI."  THAT'S "YES"
19    IN SPANISH; RIGHT?
20         A    YES.
21         Q    "THAT WAS A GAME CHANGER."  TREVOR, "TELL ME MORE."
22    YOU, "NEVER BEEN MORE TURNED ON IN MY LIFE.  GIMME ME ALL THE
23    PAIN.  RAWR."  TREVOR, "REALLY?  WHEN YOU WERE GOING OUT OR
24    WHEN YOU WOKE UP?"  YOU, "GOING OUTTTT.  NOW THAT I KNOW WHAT
25    IT FEELS LIKE TO WAKE UP FROM IT THOUGH IT'LL PROBABLY FEEL
26    JUST AS GOOD TO WAKE UP FROM THAT."  TREVOR, "GOD YOU JUST
27    TURNED ME ON SO MUCH."  YOU, "MISSION ACCOMPLISHED THEN."
28              TREVOR, "NOW I JUST WANT MY ARM AROUND YOUR NECK
```

361

```
 1  FROM BEHIND."  YOU, "DO IT HARDER."  BLOWING KISS EMOJI.
 2  TREVOR, "YES, MA'AM.  WHAT ELSE DOES MAMI WANT?"  YOU, "MMM
 3  GET A COUPLE OF SLAPS IN THERE AND THEN" -- I CAN'T READ
 4  THAT -- "ANOTHER HANDPRINT ON MY ASS.  THEN FOR PAPI TO TELL
 5  ME WHAT ELSE HE WANTS."
 6         TREVOR, "SLAPS IN THE FACE OR...?"  YOU, "YES YES
 7  AND YES."  TREVOR, "MMMMM.  DO YOU EVEN KNOW WHAT PAIN IS?"
 8  THEN YOU SEND A PICTURE OF YOURSELF.  AND YOU WRITE, "IDK,"
 9  WHICH IS I DON'T KNOW; RIGHT?
10     A   YES.
11     Q   "I DON'T KNOW.  TRY ME.  TREVOR, "WELL YOU'D HAVE
12  TO BE HERE FOR ME TO SHOW YOU."  YOU, "I'LL BE IN L.A.
13  TUESDAY AND WEDNESDAY."  BLOWING KISS EMOJI.  TREVOR, "I HAVE
14  PLANS ALREADY.  FMLLL."  THAT'S FUCK MY LIFE; RIGHT?
15     A   YES.
16     Q   YOU, "NO BUENO.  WOULD TONIGHT BE A NO GO FOR YOU
17  AS WELL?"  TREVOR, YEAH UNFORTUNATELY.  HAVE SOMEONE IN
18  TOWN."  LET'S STOP THERE FOR A MINUTE.  WHY DID YOU LEAVE
19  THIS OUT OF YOUR PETITION?
20     A   I CAN'T RECALL IF I DIDN'T HAVE THE SCREENSHOTS.
21  AND IT HAPPENED BEFORE THE SECOND ENCOUNTER.  AND I WAS
22  POSTING -- GIVING INFORMATION TO MY ATTORNEYS THAT I THOUGHT
23  WAS RELEVANT AS TO WHY I NEEDED PROTECTION AFTER THE SECOND
24  INCIDENT.
25     Q   AND IN LIGHT OF THE FACT THAT YOU WERE PROVIDING TO
26  THE COURT IN YOUR DECLARATION A NARRATIVE ABOUT ROUGH SEX
27  PERFORMED ON YOU BY TREVOR, DID YOU NOT THINK THAT IT WAS OF
28  CRITICAL IMPORTANCE TO TELL THE JUDGE THAT YOU ASKED FOR
```

1   IT?

2       MS. MEYER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.

3   ARGUMENTATIVE.

4       THE COURT:  OVERRULED.  YOU MAY ANSWER.

5       THE WITNESS:  I DIDN'T ASK TO BE PUNCHED ALL OVER MY

6   BODY TO THE POINT WHERE I HAD TO BE HOSPITALIZED.

7       MS. HOLLEY:  OBJECTION.  MOTION TO STRIKE.

8   NONRESPONSIVE.

9       THE COURT:  THE ANSWER IS STRICKEN AS NOT RESPONDING TO

10  THE QUESTION.

11      MS. HOLLEY:  I'LL ASK IT AGAIN.

12      Q   BY MS. HOLLEY:  DID YOU NOT THINK THAT IT WAS OF

13  CRITICAL IMPORTANCE TO LET THE COURT KNOW THAT YOU ASKED FOR

14  SEX TO BE ROUGHER AND HARDER, AND THAT YOU HAD NEVER BEEN

15  MORE TURNED ON; DID YOU NOT THINK IT WAS IMPORTANT TO LET THE

16  COURT KNOW THAT?

17      A   NO.

18      THE COURT:  IT IS NOW 4:15.  I'LL GIVE YOU TIME TO

19  GATHER YOUR THINGS.  WE WILL RESUME AT 8:30 TOMORROW

20  MORNING.

21      MS. MEYER:  YOUR HONOR, BEFORE YOU DO, THERE'S SOME

22  HOUSEKEEPING ISSUES I CAN ADDRESS WITH THE COURT.

23      THE COURT:  YOU CAN STEP DOWN.  SURE.

24      MS. MEYER:  YOUR HONOR, TOMORROW WE HAVE SEVERAL THIRD

25  PARTY WITNESSES COMING.  AND I THINK WE'RE GOING TO BE LIKELY

26  TAKING THEM OUT OF ORDER.

27      THE COURT:  WHO HAVE YOU GOT COMING IN AND WHEN?

28      MS. OLSON:  THE TWO SAN DIEGO PLEASE DETECTIVES.

```
1   DETECTIVE GIDDENS AND DETECTIVE JIMENEZ.

2        THE COURT:  WHEN ARE THEY COMING?

3        MS. OLSON:  I BELIEVE AT 8:30.  AND THEN THE NEXT ONE IS

4   DETECTIVE -- I'M SORRY.  IS MELY MAYA -- OR CIRAMELY MAYA.

5        THE COURT:  IS SHE ALSO GOING TO BE HERE IN THE MORNING?

6        MS. OLSON:  YES, YOUR HONOR.

7        THE COURT:  OKAY.

8        MS. MEYER:  YOUR HONOR, ONE OTHER THING.  I HAVE A

9   SCHEDULED HEARING TOMORROW IN ANOTHER MATTER.  AN EVIDENTIARY

10  HEARING.  SO I AM NOT GOING TO BE HERE.  AND IF MS. HOLLEY

11  COMPLETES THE EXAMINATION OF MS. HILL, MAY ONE OF MY PARTNERS

12  REDIRECT HER?

13       THE COURT:  YES.

14       MS. MEYER:  OKAY.

15       MS. HOLLEY:  WOULD IT BE INAPPROPRIATE TO ASK FOR AN

16  OFFER OF PROOF WITH RESPECT TO THE SAN DIEGO POLICE

17  DEPARTMENT OFFICERS?

18       THE COURT:  WHY BOTH?

19       MR. GARELICK:  YOUR HONOR, ONE WROTE THE REPORT.  AND

20  ONE WAS THE FIRST TO RESPOND AND BE THERE ON THE SCENE.  SO

21  THERE'S NOT THAT MUCH DIFFERENCE.  AND IF THE COURT BELIEVES

22  THEY'RE CUMULATIVE, I WILL BE HAPPY TO JUST REQUEST THAT ONE

23  COME TOMORROW MORNING.

24       THE COURT:  MS. HOLLEY?

25       MS. MANGELS:  WE OBJECT TO ANY SAN DIEGO POLICE

26  DEPARTMENT OFFICERS TESTIFYING.  WE SERVED A SUBPOENA ON THE

27  SAN DIEGO POLICE DEPARTMENT AND RECEIVED A RESPONSE THAT THEY

28  WERE OBJECTING BASED ON THE OFFICIAL INFORMATION PRIVILEGE,
```

1   BECAUSE THEY'RE RECORDS PERTAIN TO AN ONGOING CRIMINAL

2   INVESTIGATION.  AND WHICH THE NECESSITY FOR PRESERVING THE

3   CONFIDENTIALITY OUTWEIGHS THE NEED FOR DISCLOSURE.  BECAUSE

4   OF THAT, WE HAVEN'T BEEN PROVIDED ANY DOCUMENTS BY THE SAN

5   DIEGO POLICE DEPARTMENT.  AND, THEREFORE, WOULD NOT BE ABLE

6   TO MEANINGFULLY CROSS THEM.

7        IN ADDITION, ANYTHING THAT THEY TESTIFY ABOUT WOULD

8   ALSO FALL UNDER SOMETHING ABOUT AN ONGOING CRIMINAL

9   INVESTIGATION.  WE BELIEVE THE TESTIMONY WOULD BE CUMULATIVE.

10  MS. HILL HAS ALREADY TESTIFIED EXTENSIVELY ON DIRECT AS TO

11  HER CONVERSATIONS WITH THE POLICE OFFICERS.  AND, FINALLY,

12  ANYTHING THAT SHE STATED TO THEM WOULD BE HEARSAY AS IT WILL

13  BE REPEATED STATEMENTS.

14     THE COURT:  COUNSEL?

15     MR. GARELICK:  THEY HAVE NOT -- THEY ARE NOT PRODUCING

16  THE REPORT.  SO THERE IS NO PHYSICAL REPORT THAT WE HAVE IN

17  OUR POSSESSION.  AND THEY WOULD BE TESTIFYING AS TO THEIR

18  EXPERIENCES.  THEY ARE THE FIRST PEOPLE ON THE SCENE

19  ESSENTIALLY THAT WOULD BE TESTIFYING AS TO MS. HILL'S

20  INJURIES, HER STATE OF MIND AT THE TIME, WHICH WE BELIEVE ARE

21  STILL RELEVANT FOR THIS COURT.

22     MS. MANGELS:  YOUR HONOR, JUST TO BRIEFLY RESPOND, WE

23  HAVE, AS WE JUST SAW WITH THE SART EXAMINER, WE HAVE

24  EXTENSIVE RECORDS OF MS. HILL'S INJURIES AS THEY APPEARED AT

25  THE TIME.  WE ALREADY HAVE TESTIMONY FROM ONE INDIVIDUAL WHO

26  SAW HER THAT SAME EVENING.

27     MR. GARELICK:  I WOULD DISAGREE.  I THINK THEY STILL

28  HOLD A RELEVANCE TO THIS COURT.  HOWEVER, YOU ARE THE TRIER

1  OF FACT SO IF YOU WERE TO TELL US, NO, THAT IT'S CUMULATIVE,

2  I UNDERSTAND.  BUT I BELIEVE THAT THEY CERTAINLY ARE

3  PERCIPIENT WITNESSES TO THE INCIDENTS RIGHT AFTER THEY

4  OCCURRED AS FAR AS HER INJURIES AND HER STATE OF MIND.

5          THERE HAS BEEN MUCH CROSS AS TO HER STATE OF MIND.

6  THERE ARE CLAIMS THAT SHE SOMEHOW SET UP MR. BAUER.  SO I DO

7  BELIEVE HER CREDIBILITY TO THAT AND HAVING THIRD PARTIES

8  CONFIRM THAT STATE OF MIND ARE IMPORTANT TO THIS COURT, OR AT

9  LEAST IMPORTANT TO ADDRESS THOSE ISSUES.

10     THE COURT:  THEY'RE NOT PRODUCING THE RECORDS THEY'VE

11  BEEN REQUESTED, WHICH MAY OR MAY NOT BE CONSISTENT WITH WHAT

12  THEY WOULD TESTIFY?  BUT WE'LL NEVER KNOW BECAUSE THEY REFUSE

13  TO PRODUCE.  AND IT IS LIKELY CUMULATIVE.  THE COURT WILL

14  GRANT THE REQUEST OF THE MOTION IN LIMINE.  THEY MAY NOT

15  TESTIFY.

16     MS. OLSON:  YOUR HONOR, IF WE CAN MENTION ONE ADDITIONAL

17  POINT ON THAT.  PURSUANT TO THE CHAIN OF CUSTODY EVIDENCE

18  THAT WE RECEIVED FROM PALOMAR TODAY, AND OPPOSING COUNSEL HAS

19  IT, IT BASICALLY SAYS -- ABOUT THE SAN DIEGO POLICE

20  DEPARTMENT -- THAT THIS CASE FALLS UNDER THEIR JURISDICTION,

21  REFERRING TO PASADENA.  AND THEIR DETECTIVES WILL NEED THAT

22  EVIDENCE.  S.D.P.D. ANTICIPATES NO FURTHER INVESTIGATIVE ROLE

23  IN THIS CASE.

24     THE COURT:  WELL, THEN THEY SHOULD HAVE PRODUCED, BUT

25  THEY DIDN'T.  SO THEY DON'T TESTIFY.  ALL RIGHT.  WE'LL SEE

26  YOU TOMORROW.

27     MR. GARELICK:  THANK YOU, YOUR HONOR.

28     MR. FETTEROLF:  THANK YOU, YOUR HONOR.



1           (AT 4:20 P.M., AN ADJOURNMENT WAS TAKEN UNTIL

2       WEDNESDAY, AUGUST 18, 2021, AT 8:30 A.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

LINDSEY HILL,                        )
                                     )
                                     )
                    PETITIONER,      ) NO. 21STRO03198
                                     )
          VS.                        )
                                     ) REPORTER'S
                                     ) CERTIFICATE
TREVOR BAUER,                        )
                                     )
                                     )
                    RESPONDENT.      )
_____)

          I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

FOREGOING PAGES, 276 THROUGH 366, INCLUSIVE, COMPRISE A FULL,

TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 17, 2021.

          DATED THIS 18TH DAY OF AUGUST, 2021.


                    _____
                    JACQUELINE M. CAIRE, CSR #9599, RPR
                    OFFICIAL REPORTER

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3        HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

 4

 5
        LINDSEY HILL,                     )
 6                                        )
                        PETITIONER,       )
 7                                        )
                 VS.                      )      NO. 21STRO03198
 8                                        )
                                          )
 9      TREVOR BAUER,                     )
                                          )
10                                        )
                        RESPONDENT.       )
11      _____)
                   REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                         AUGUST 18, 2021
                            A.M. SESSION
13
        APPEARANCES:
14      FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                              BY:  DOREEN MARIE OLSON, ESQ.
15                                 MARC H. GARELICK, ESQ.
                              10100 SANTA MONICA BOULEVARD
16                            SUITE 1425
                              LOS ANGELES, CA 90067
17
                              RIGHT CHOICE LAW
18                            BY:  FRED THIAGARAJAH, ESQ.
                              5015 BIRCH STREET
19                            SUITE 107
                              NEWPORT BEACH, CA 92660
20
        FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
21                            BY:  SHAWN HOLLEY, ESQ.
                                   KATE MANGELS, ESQ.
22                            808 WILSHIRE BOULEVARD
                              3RD FLOOR
23                            SANTA MONICA, CA 90401

24                            ZUCKERMAN SPAEDER
                              BY:  JON R. FETTEROLF, ESQ.
25                                 (PRO HAC VICE)
                              1800 M STREET NW
26                            SUITE 1000
                              WASHINGTON, DC 20036
27
                              JACQUELINE M. CAIRE, CSR #9599, RPR
28                            OFFICIAL REPORTER
```

<u>WITNESSES</u>

<u>PAGE</u>

<u>LINDSEY HILL, CALLED ON HER OWN BEHALF</u>

    CROSS EXAMINATION BY MS. HOLLEY     368,
                                                     418
    REDIRECT EXAMINTION BY MS. OLSON     435
    RECROSS EXAMINATION BY MS. HOLLEY    456

<u>DR. JENNIFER HAMMERS, CALLED BY THE RESPONDENT</u>

    DIRECT EXAMINATION BY MR. FETTEROLF   463,
                                                 471
    VOIR DIRE EXAMINATION BY MR. GARELICK  468

```
 1   CASE NUMBER:              21STRO03198

 2   CASE NAME:                LINDSEY HILL VS.

 3                             TREVOR BAUER

 4   LOS ANGELES, CALIFORNIA  WEDNESDAY, AUGUST 18, 2021

 5   DEPARTMENT 35             HON. DIANNA GOULD-SALTMAN, JUDGE

 6   APPEARANCES:              (AS HERETOFORE NOTED.)

 7   REPORTER:                 JACQUELINE CAIRE, CSR NO. 9599, RPR

 8   TIME:                     8:40 A.M.

 9

10        THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

11   GENTLEMEN.  ARE WE READY TO RESUME?

12        MS. HOLLEY:  YES.

13        THE COURT:  ARE WE GOING TO BE TAKING A WITNESS OUT OF

14   ORDER THIS MORNING?

15        MS. OLSON:  I BELIEVE WE HAD A DISCUSSION WITH MS. MAYA.

16   WE LET HER KNOW THAT THERE IS A WITNESS.  BUT WE'RE FINE TO

17   HAVE HER WAIT.

18        THE COURT:  OKAY.  DO YOU WANT TO COMPLETE THE CROSS OF

19   PETITIONER?

20        MS. HOLLEY:  YES.

21        THE COURT:  ALL RIGHT.  MA'AM, WHY DON'T YOU COME ON

22   BACK UP.

23        MS. HOLLEY:  MAY I?

24        THE COURT:  GO RIGHT AHEAD.

25

26                  LINDSEY HILL,

27   CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND

28   TESTIFIED AS FOLLOWS:
```

368

```
 1              CROSS EXAMINATION (RESUMED)
 2   BY MS. HOLLEY:
 3        Q    GOOD MORNING.
 4        A    GOOD MORNING.
 5        Q    WHEN WE LEFT OFF YESTERDAY YOU WERE TESTIFYING
 6   ABOUT THE TEXT EXCHANGE BETWEEN YOU AND TREVOR LEADING UP TO
 7   YOUR GOING TO SEE HIM FOR THE SECOND TIME; DO YOU REMEMBER
 8   THAT?
 9        A    YES.
10        Q    AND THAT WAS ON MAY 9TH, 8:56 P.M.  AND THAT'S TB
11   83.  I DON'T THINK SHE HAS THE BOOK THERE IN FRONT OF HER.
12        A    WHAT WAS THE NUMBER?
13        Q    TB 83.
14        A    ALL RIGHT.  I GOT IT.
15        Q    THANK YOU.  THAT WAS ON MAY 9TH AT 8:56 P.M.;
16   CORRECT?
17        A    YES.
18        Q    THANK YOU.  AND YOU TEXTED THAT YOU WOULD BE IN
19   L.A. ON TUESDAY AND WEDNESDAY, WHICH WOULD HAVE BEEN MAY 11TH
20   AND 12TH; CORRECT?
21        A    YES.
22        Q    TREVOR TOLD YOU HE ALREADY HAD PLANS ON THOSE DAYS;
23   RIGHT?
24        A    YES.
25        Q    AND THEN YOU SUGGESTED GETTING -- AND THEN YOU
26   SUGGESTED GETTING TOGETHER THAT VERY NIGHT.  AND HE SAID HE
27   HAD SOMEONE IN TOWN; CORRECT?
28        A    YES.
```

369

```
1        Q    AND THEN YOU SAID YOU WOULD BE AT THE DODGERS GAME
2    IN L.A. ON FRIDAY NIGHT, WHICH WOULD HAVE BEEN MAY 14TH?
3        A    YES.
4        Q    BUT TREVOR SAID THAT HE COULDN'T HAVE YOU COME OVER
5    ON THAT FRIDAY NIGHT BECAUSE HE WAS PITCHING ON SATURDAY;
6    RIGHT?
7        A    YES.
8        Q    SO BASICALLY AFTER HE HAD SAID NO TO SUNDAY MAY
9    9TH, TUESDAY MAY 11TH, WEDNESDAY MAY 12TH, AND FRIDAY MAY
10   14TH, YOU TOLD HIM THAT YOU WOULD BE IN L.A. UNTIL SUNDAY MAY
11   16TH.  SO MAYBE YOU GUYS COULD FIND A TIME?
12       A    CORRECT.
13       Q    AND EVEN THOUGH YOU MADE THAT SUGGESTION TO HIM ON
14   MAY 12TH AT 6:55 P.M., HE DIDN'T EVEN WRITE BACK TO YOU UNTIL
15   THE AFTERNOON OF MAY 14; CORRECT?
16       A    CORRECT.
17       Q    AND WHEN HE FINALLY WROTE BACK TO YOU ON MAY 14, HE
18   DIDN'T EVEN BRING UP SEEING YOU DURING THAT INITIAL TEXTING
19   CONVERSATION; CORRECT?
20       A    CORRECT.
21       Q    OKAY.  SO THEN YOU WRITE HIM ON SATURDAY, MAY 15TH,
22   AT 2:45 P.M.  THAT'S AT THE BOTTOM OF TB 86; RIGHT?
23       A    YES.
24       Q    YOU, "WRECK EMM TONIGHT, TREV."  TREVOR, "AM I
25   WRECKING YOU AFTER THE GAME ORRRR.  LOL.  THANKS."  YOU,
26   "HAHAHAHAHA ABSOLUTELY YOU ARE."  AND THEN TWO RED
27   EXCLAMATION MARKS.  TREVOR, "IF YOU'RE LUCKY," WITH THE
28   BLOWING HEART KISS EMOJI.  YOU, "OH SHUT UP.  BITE ME.
```

```
 1    IDIOM."  TREVOR, "YES, MA'AM."  YOU, "CAN'T WAIT PAPI."

 2           AND THEN LATER THAT NIGHT AT 10:17 P.M. YOU SAID,

 3    "ONE WRECK DOWN, ONE TO GO.  LET ME KNOW WHEN SUPERSTAR."

 4    AND THEN TREVOR SAYS, "WHERE ARE YOU?"  AND YOU SAY, "LIKE 20

 5    MINUTES FROM YOU."  RIGHT?  I GOT THAT RIGHT; RIGHT?

 6        A    YES.

 7        Q    SO RIGHT UP TO THE TIME YOU AND TREVOR ARE DUE TO

 8    SEE EACH OTHER, YOU'RE HYPING HIM UP ABOUT ROUGH SEX;

 9    RIGHT?

10        MS. OLSON:  OBJECTION.  MISSTATES THE TESTIMONY.

11    ARGUMENTATIVE.

12        THE COURT:  OVERRULED.  YOU MAY ANSWER.

13        THE WITNESS:  YES, TO THE BEST OF MY KNOWLEDGE AND

14    UNDERSTANDING OF WHAT ROUGH SEX WAS FOR ME.

15        Q    BY MS. HOLLEY:  OKAY.  NOW, YOU TESTIFIED ON DIRECT

16    EXAMINATION THAT YOU THOUGHT THE SECOND TIME WOULD BE A

17    BETTER EXPERIENCE.  ONE YOU WOULD BE IN CONTROL OF.  DO YOU

18    REMEMBER TESTIFYING TO THAT?

19        A    YES, I DO.

20        Q    SO THE CONTROL YOU WERE EXERCISING LEADING UP TO

21    THE SECOND TIME WAS ONE IN WHICH ROUGH SEX WOULD BE ON THE

22    AGENDA; RIGHT?

23        A    YES.  AGAIN, TO MY UNDERSTANDING OF WHAT I THOUGHT

24    ROUGH SEX WAS.

25        Q    OKAY.  AND GIVEN THE THINGS YOU HAD SAID TO TREVOR

26    LEADING UP TO THE SECOND NIGHT, WOULD YOU AGREE WITH ME THAT

27    IT WOULD NOT HAVE BEEN UNREASONABLE FOR HIM TO EXPECT THAT

28    YOU AND HE WERE GOING TO ENGAGE IN ROUGH SEX?
```

1      A      YES.

2      Q      OKAY.  THANK YOU.  NOW, YOU GOT TO HIS HOUSE AROUND

3  MIDNIGHT; IS THAT RIGHT?

4      A      YES.

5      Q      NOW, WOULD YOU CONSIDER GOING TO A MAN'S HOUSE AT

6  MIDNIGHT AFTER TELLING HIM A FEW HOURS BEFORE THAT THAT YOU

7  WANT HIM TO WRECK YOU A BOOTY CALL?

8      A      NO.

9      Q      NOW, BY THE WAY, I ASKED YOU YESTERDAY IF YOU

10 THOUGHT TREVOR REACHING OUT TO YOU ON 1:19 A.M. ON MAY 8TH

11 WAS A BOOTY CALL.  YOU SAID "NO" BECAUSE HE WAS TRAVELING AT

12 THE TIME; DO YOU REMEMBER THAT?

13     A      YES.

14     Q      NOW, ISN'T IT TRUE THAT TRAVELING WAS THE DODGERS

15 PLAYING THE ANGELS IN ANAHEIM ON MAY 8TH?

16     A      I WAS NOT AWARE OF THE SCHEDULE.  I DON'T RECALL.

17     Q      BUT YOU GENERALLY FOLLOW THE SCHEDULE, DON'T YOU?

18     MS. OLSON:  OBJECTION.  ARGUMENTATIVE.

19     THE COURT:  OVERRULED.  YOU MAY ANSWER.

20     THE WITNESS:  ARE YOU ASKING ME IF I FOLLOW THE DODGERS'

21 SCHEDULE?

22     Q      BY MS. HOLLEY:  YES.

23     A      NOT TYPICALLY.

24     Q      SO YOU WEREN'T FOLLOWING TREVOR'S SCHEDULE AT THAT

25 TIME?

26     A      I DON'T RECALL.

27     Q      BUT YOU KNEW THAT HE WAS TRAVELING, THAT THE

28 DODGERS WERE TRAVELING; CORRECT?  I MEAN, YOU TESTIFIED TO

372

1    THAT.

2         A    SAY THAT AGAIN, PLEASE.

3         Q    YOU TESTIFIED YESTERDAY THAT PART OF THE REASON YOU

4    DIDN'T CONSIDER IT A BOOTY CALL WHEN HE CALLED AT 1:19, YOU

5    DIDN'T CONSIDER THAT TO BE A BOOTY CALL BECAUSE YOU KNEW HE

6    WAS TRAVELING?

7         A    I ASSUMED HE WAS TRAVELING.  I DON'T REMEMBER THAT

8    SPECIFIC TIME OF MESSAGING.

9         Q    ALL RIGHT.  NOW, BACK TO THE NIGHT OF MAY 15, THE

10   EARLY MORNING OF MAY 16, YOU GOT TO TREVOR'S HOUSE, AS WE

11   SAID, ABOUT MIDNIGHT; CORRECT?

12        A    YES.

13        Q    AND YOU TESTIFIED ON DIRECT EXAMINATION THAT AFTER

14   YOU GOT THERE THERE WAS NO AFFECTION BETWEEN YOU?

15        A    YES.

16        Q    YOU ALSO TESTIFIED THAT YOU ASSUMED THAT YOU WOULD

17   HAVE SEX WITH HIM THAT NIGHT?

18        A    YES.

19        Q    AND YOU ALSO TESTIFIED ON DIRECT EXAMINATION THAT

20   YOU WANTED TO GIVE HIM WHAT HE WANTED; CORRECT?

21        A    YES.

22        Q    AND YOU TESTIFIED THAT THE THINGS YOU WERE SAYING

23   WERE NOT NECESSARILY THE THINGS THAT YOU FELT, BUT THAT YOU

24   WANTED TO SAY THE THINGS THAT HE WANTED TO HEAR; DO YOU

25   REMEMBER THAT?

26        A    YES.

27        Q    ALL RIGHT.  YOU SAID THAT YOU AND TREVOR STARTED

28   KISSING AROUND 2:00 A.M.; IS THAT RIGHT?

```
1        A    YES.

2        Q    ALL RIGHT.

3        MS. HOLLEY:  MAY WE MARK EXHIBIT F 5?

4        THE COURT:  IT'S IDENTIFIED.

5        MS. HOLLEY:  IT IS A TWEET FROM MS. HILL, I BELIEVE.

6        Q    BY MS. HOLLEY:  IS THAT A TWEET FROM YOU,

7   MS. HILL?

8        A    YES.

9        Q    ALL RIGHT.

10       MS. HOLLEY:  I ASK IT BE ACCEPTED INTO EVIDENCE.

11       THE COURT:  ANY OBJECTION?

12       MS. OLSON:  LACK OF FOUNDATION.

13       THE COURT:  HOW SO?

14       MS. OLSON:  I DON'T KNOW WHAT IT IS.

15       THE COURT:  SHE SAYS IT'S A TWEET FROM HER.

16       MS. OLSON:  I DIDN'T HEAR MS. HILL SAY THAT.

17       THE COURT:  SHE SAID YES WHEN IT WAS ASKED.

18       MS. OLSON:  OKAY.

19       THE COURT:  IT IS ADMITTED.

20       MS. OLSON:  NO OBJECTION.

21       MS. HOLLEY:  THANK YOU.

22       Q    BY MS. HOLLEY:  WOULD YOU PLEASE READ THAT TWEET?

23       A    YES.  @BAUEROUTAGE, ABSOLUTE DIESEL STRAIGHT DOWN

24   THE DICK KIND OF ENERGY.

25       Q    YOU SENT THAT TWEET ON MAY 16 AT 1:57 A.M.;

26   CORRECT?

27       A    YES.

28       Q    SO THIS IS RIGHT AROUND THE TIME THAT YOU SAY YOU
```

```
 1   AND TREVOR ARE KISSING AND MAKING OUT; IS THAT RIGHT?

 2        A    YES.

 3        Q    DID YOU TWEET THAT WHILE YOU WERE KISSING AND

 4   MAKING OUT WITH HIM?

 5        A    NO.

 6        Q    WHEN YOU TWEET @BAUEROUTAGE, THAT'S A WAY OF

 7   TAGGING HIM AS WELL; RIGHT?

 8        A    YES.

 9        Q    AND THIS WASN'T THE FIRST TIME YOU HAD TAGGED HIM

10   IN A TWEET; CORRECT?

11        A    YES.

12        Q    I AM CORRECT?

13        A    YES, YOU ARE CORRECT.  YEAH.

14        Q    THANK YOU.  SO WHILE YOU HAD NEVER TAGGED HIM IN AN

15   INSTAGRAM STORY, AS YOU TESTIFIED UNTIL APRIL 18, YOU HAD

16   TAGGED HIM ON TWITTER BEFORE; CORRECT?

17        A    I'M JUST NOW SEEING THESE.  YES.

18        Q    OKAY.  THANK YOU.  AND DO YOU KNOW HOW -- OVER WHAT

19   PERIOD OF TIME YOU HAD TAGGED HIM IN TWEETS GOING BACK?

20        A    I DON'T RECALL EXACTLY.  BUT I BELIEVE SOMEWHERE

21   WHEN SPRING TRAINING STARTED IS WHEN I FIRST SAW HIM ON TV.

22   SO PROBABLY FEBRUARY 2021.

23        Q    SO SHORTLY AFTER YOU TWEETED WHAT YOU'RE LOOKING AT

24   IN F 5 YOU -- I DON'T KNOW WHAT THE RIGHT WORD IS -- BUT SHUT

25   DOWN YOUR TWITTER ACCOUNT; IS THAT RIGHT?

26        A    YES, I DID.

27        Q    AND WAS THAT AROUND THE SAME TIME THAT YOU STARTED

28   DELETING YOUR INSTAGRAM COMMUNICATIONS BETWEEN YOU AND
```

```
1   TREVOR?

2        MS. OLSON:  OBJECTION.  MISSTATES THE TESTIMONY IN TERMS

3   OF DELETING TEXTS.

4        THE COURT:  OVERRULED.  YOU MAY ANSWER.

5        THE WITNESS:  CAN YOU ASK ONE MORE TIME, PLEASE?

6        Q   BY MS. HOLLEY:  I'LL ASK IT MORE GENERALLY.  WHEN

7   DID YOU START DELETING YOUR TWITTER ACCOUNT?

8        A   I DELETED MOST OF MY SOCIAL MEDIA AFTER THE

9   HOSPITAL AND WHEN I REALIZED THAT MY NAME WAS IN A POLICE

10  REPORT.  AND I DIDN'T KNOW IF IT WAS GOING TO GET LEAKED

11  ANYWHERE.  I DID NOT WANT PEOPLE TO BE ABLE TO FIND OUT WHO I

12  WAS.

13       Q   OKAY.  AND DID YOU -- DID YOU LEARN SHORTLY AFTER

14  YOUR PETITION WAS FILED THAT YOUR NAME WAS LEFT IN THE

15  PETITION FOR ALL TO SEE?

16       A   CAN YOU ASK THAT ONE MORE TIME?

17       Q   SURE.  DID YOU EVER LEARN THAT AFTER YOU FILED YOUR

18  PETITION FOR DOMESTIC VIOLENCE RESTRAINING ORDER THAT YOUR

19  NAME WAS LEFT IN THE PLEADING SO THAT PEOPLE WOULD SEE YOUR

20  NAME; DID YOU BECOME AWARE OF THAT?

21       A   I DID, YES.

22       Q   WHAT DOES ABSOLUTE DIESEL STRAIGHT DOWN THE DICK

23  KINDA OF ENERGY MEAN?

24       A   YES.  I WAS EXPLAINING TO TREVOR IT IS AN ACRONYM

25  AND A PITCHING REFERENCE FOR THE PERFECT PITCH.  SO ABSOLUTE

26  DIESEL, LIKE, GAS STRAIGHT DOWN SOMEONE'S CROTCH AREA RIGHT

27  INTO THE CATCHER'S MITT.  IT'S REFERENCING THE PERFECT

28  PITCH.
```

1      Q    SO YOU WERE EXPLAINING TO TREVOR BAUER, THE WINNER

2    OF THE CY YOUNG AWARD WHAT THE PERFECT PITCH LOOKED LIKE?

3         MS. OLSON:  OBJECTION.  ARGUMENTATIVE.

4         THE COURT:  OVERRULED.  YOU MAY ANSWER.

5         THE WITNESS:  IT WAS IN A FUN WAY.  NOT MEANT TO BE

6    EXPLAINING WHAT A PERFECT PITCH IS.  I'M AWARE HE KNOWS WHAT

7    THAT IS.  BUT I JOKINGLY SAID THAT'S WHAT ME AND MY COUSIN

8    USE, THIS PHRASE.

9      Q    BY MS. HOLLEY:  AND HE WAS RIGHT NEXT TO YOU;

10   RIGHT?

11     A    YES.

12     Q    SO WAS THERE A REASON THAT YOU DIDN'T SAY THIS TO

13   HIM AS OPPOSED TO TWEETING IT?

14     A    YES.  I CAN TELL YOU THE STORY.  HE WAS SHOWING ME

15   HOW HE VIEWS WHAT EVERYONE SAYS ABOUT HIM ON TWITTER.  AND HE

16   SHOWED ME THAT YOU GO ON TWITTER, YOU GO TO THE LATEST TAB.

17   YOU TYPE IN "TREVOR BAUER."  HE WAS SHOWING ME ALL OF THIS.

18   AND THEN WHAT POPS UP IS EVERY TWEET MADE ABOUT HIM.  AND I

19   SAID, "OH MY GOSH, LET ME TRY ONE."  AND I TWEETED IT.  AND

20   THEN HE SHOWED ME HOW IT POPPED UP ON THE FEED.

21     Q    OKAY.  AND SO WHEN YOU DID THAT, HE SAW YOU TAGGING

22   HIM AS HE WAS SITTING NEXT TO YOU THERE AT 2:00 A.M.?

23     A    YES.

24     Q    AND WHEN DID THAT HAPPEN IN RELATION TO WHEN YOU

25   WERE KISSING?

26     A    IT WAS BEFORE WE STARTED KISSING.

27     Q    OKAY.  NOW, WHEN YOU WENT TO HIS ROOM, YOU

28   TESTIFIED THAT YOU AND HE STARTED HAVING SEX AND THEN HE

```
 1   ASKED YOU TO AGREE ON A SAFE WORD; RIGHT?

 2        A    YES.

 3        Q    AND YOU TESTIFIED THAT YOU KNEW WHAT A SAFE WORD

 4   WAS?

 5        A    YES.

 6        Q    AND YOU CHOSE DADDY ISSUES; RIGHT?

 7        A    YES.

 8        Q    NOW, IN YOUR DECLARATION YOU SAID DADDY ISSUES --

 9   THAT YOU CHOSE DADDY ISSUES TO LIGHTEN THE SITUATION;

10   CORRECT?

11        A    YES.

12        Q    HOW DOES DADDY ISSUES LIGHTEN THE SITUATION?  WHAT

13   IS IT ABOUT DADDY ISSUES THAT LIGHTENS THE SITUATION?

14        A    BECAUSE TREVOR HAD MADE KIND OF A DEGRADING COMMENT

15   TO ME PREVIOUS TO GOING UPSTAIRS ABOUT HAVING DADDY ISSUES

16   AND SAYING IT'S A GREAT NIGHT FOR DADDY ISSUES THAT HE HAD

17   SAID TO ONE OF HIS OTHER TEAMMATES.  AND I GOT OFFENDED BUT

18   WE ENDED UP LAUGHING ABOUT.  I CAN ACKNOWLEDGE, YOU KNOW, MY

19   RELATIONSHIP WITH MY DAD.  AND THAT'S WHY WHEN HE ASKED ME ON

20   THE SAFE WORD, I DIDN'T KNOW WHAT TO SAY.

21             SO I MADE THAT JOKE -- NOT A JOKE.  BUT I CHOSE

22   THAT PHRASE BECAUSE IT WAS SOMETHING WE HAD PREVIOUSLY TALKED

23   ABOUT AND LAUGHED ABOUT.

24        Q    IT WAS SOMEWHAT SARCASTIC?

25        A    YES.

26        Q    AND THEN HE ASKED YOU, "SERIOUSLY.  WHAT'S OFF

27   LIMITS?"

28        A    YES.
```

```
 1       Q    AND YOU SAID, "DON'T PUT YOUR FINGERS DOWN MY
 2   THROAT"?
 3       A    YES.
 4       Q    THAT'S THE ONLY THING YOU TOLD HIM THAT WAS OFF
 5   LIMITS; RIGHT?
 6       A    YES.
 7       Q    AND YOU SAID THAT YOU PRESUMED THAT HE KNEW THAT
 8   ANAL SEX WAS OFF LIMITS SINCE YOU HAD TOLD HIM THAT YOU
 9   DIDN'T LIKE THAT ON YOUR FIRST ENCOUNTER?
10       A    CORRECT.
11       Q    OTHER THAN PUTTING HIS FINGERS DOWN YOUR THROAT AND
12   ANAL SEX, THERE WAS NOTHING ELSE THAT YOU TOLD TREVOR THAT
13   WAS OFF LIMITS?
14       A    NO.
15       Q    I'M RIGHT?
16       A    YES, YOU ARE.
17       Q    OKAY.  THANK YOU.  I'M NOT TRYING TO --
18       A    I GOT YOU.
19       Q    ALL RIGHT.  NOW, SERIOUSLY, YOU SAID THAT TREVOR
20   PUNCHED YOU IN YOUR FACE AND VAGINA AND CHOKED YOU WITH YOUR
21   HAIR; RIGHT?
22       A    YES.
23       Q    NOW, HE HAD CHOKED YOU WITH YOUR HAIR ON APRIL 24TH
24   AND YOU LOST CONSCIOUSNESS YOU TESTIFIED; RIGHT?
25       A    YES.
26       Q    AND ON MAY 9TH, WHICH WAS EXACTLY A WEEK BEFORE
27   THIS NIGHT, YOU HAD TOLD HIM IN A TEXT THAT YOU HAD NEVER
28   BEEN MORE TURNED ON IN YOUR LIFE THAN WHEN TREVOR HAD CHOKED
```

1    YOU WITH YOUR HAIR; CORRECT?

2        A    CORRECT.

3        Q    AND THAT NIGHT WHEN HE ASKED YOU WHAT WAS OFF

4    LIMITS, YOU DIDN'T SAY, DON'T CHOKE ME WITH MY HAIR; RIGHT?

5        A    RIGHT.

6        Q    AND YOU NEVER SAID, DON'T CHOKE ME OUT; RIGHT?

7        A    CORRECT.

8        Q    BUT YOU KNEW FROM APRIL 24TH THAT WHEN YOU SAID

9    "STOP," HE STOPPED; RIGHT?

10       A    YES.

11       Q    AND YOU KNEW THAT, EVEN THOUGH IT WAS FUNNY, THAT

12   THERE WAS A SAFE WORD THAT YOU HAD DISCUSSED; RIGHT?

13       A    YES.

14       Q    AND, IN FACT, AT SOME POINT YOU SAID "DADDY" AND HE

15   STOPPED; RIGHT?

16       A    YES.

17       Q    AND WHEN HE SAW THAT YOU WERE SHAKEN UP, AS YOU

18   TESTIFIED, HE KEPT TELLING YOU THAT YOU WERE SAFE.  AND THAT

19   HE WOULD NEVER DO ANY OF THOSE THINGS IF IT WASN'T DURING

20   SEX; RIGHT?

21       A    YES.

22       Q    AND YOU TESTIFIED THAT HE CUDDLED WITH YOU AND YOU

23   WERE SHAKING; RIGHT?

24       A    YES.

25       Q    OKAY.  AND YOU TOOK THE PHOTO THAT IS IN EXHIBIT 4

26   TO YOUR PETITION, WHICH IS RESPONDENT'S A.  I THINK YOU KNOW

27   THE PICTURE.  BUT IF YOU NEED TO LOOK TO EXHIBIT 4 --

28       A    I BELIEVE I KNOW WHICH ONE YOU'RE TALKING ABOUT.

380

```
 1        Q    IT IS --
 2        MS. OLSON:  CAN WE HAVE A MINUTE, YOUR HONOR, TO FIND
 3   OUR EXHIBIT BOOKS.
 4        THE COURT:  LH 44.
 5        MS. HOLLEY:  YES.  THANK YOU.
 6        THE COURT:  I ALSO JUST RECEIVED SOME SUBPOENAED RECORDS
 7   IT APPEARS FROM ALVARADO HOSPITAL.
 8        MS. OLSON:  GREAT.
 9        THE COURT:  AT THE BREAK I'LL GIVE IT TO COUNSEL.  YOU
10   CAN GO THROUGH IT THEN.
11        MS. OLSON:  THANK YOU.
12        Q    BY MS. HOLLEY:  SO YOU TESTIFIED THAT YOU TOOK THAT
13   PHOTO, THE ONE IN EXHIBIT 4; RIGHT?
14        A    YES.
15        Q    AND YOU TOOK THAT WHEN IN RELATION TO WHEN HE WAS
16   IN THE SHOWER?
17        A    YES, CORRECT.
18        Q    BEFORE OR AFTER?
19        A    WHEN HE WAS IN THE SHOWER.
20        Q    OKAY.  AND AT SOME POINT YOU WERE IN THE SHOWER
21   TOGETHER, BECAUSE YOU SAID THAT HE HELD YOUR HAIR IN THE
22   SHOWER; RIGHT?
23        A    YES.
24        Q    OKAY.  NOW, I'D LIKE TO SHOW YOU --
25        MS. HOLLEY:  AND I DON'T KNOW EXACTLY, YOUR HONOR.  I'M
26   SEEKING GUIDANCE FROM THE COURT AS TO HOW I SHOULD MARK THIS.
27   BECAUSE, THOUGH, WE DISCUSSED IT, IT'S NOT PREVIOUSLY MARKED.
28   AND I THINK THAT ALL OF OUR LETTERS ARE TAKEN.  SO I DON'T
```

```
1    KNOW WHAT THIS SHOULD BE.
2         THE COURT:  IF YOU WANT TO NAME IT YOUR NEXT IN ORDER.
3    SO IF YOU HAVE GONE THROUGH Z, THEN IT WILL BE AA.
4         MS. HOLLEY:  OKAY.  I'LL ASK WE MARK IT NEXT IN ORDER.
5    OH, WE HAVE AN AA.
6         THE COURT:  WHAT DON'T YOU HAVE?
7         MS. MANGELS:  THAT'S THE LAST WE HAVE.
8         THE COURT:  BB IT IS.
9         MS. HOLLEY:  I AM WRITING BB IN THE RIGHT-HAND CORNER OF
10   THIS PIECE OF PAPER, WHICH HAS THREE PICTURES THAT I THINK
11   ARE THE SAME PICTURE BUT LOOK DIFFERENT FROM ONE ANOTHER.
12   AND I WOULD LIKE TO ASK MS. HILL A COUPLE OF QUESTIONS.
13        MR. GARELICK:  DO YOU HAVE A COPY?
14        MS. HOLLEY:  DOES THE COURT HAVE ONE?
15        THE COURT:  I DO.
16        Q    BY MS. HOLLEY:  ALL RIGHT.  DO YOU SEE THOSE THREE
17   PICTURES BEFORE YOU, MS. HILL?
18        A    YES, I DO.
19        Q    AND YOU SEE THAT THE -- BELOW THE FIRST ONE IT
20   SAYS, "PETITIONER'S EXHIBIT 4 TO D.V.R.O. AFFIDAVIT"?
21        A    YES.
22        Q    AND IS THAT THE PICTURE THAT IS ALSO EXHIBIT 4 TO
23   YOUR PETITION, THE SMALLER VERSION OF THAT PICTURE?
24        A    I DON'T HAVE IT IN FRONT OF ME, BUT I BELIEVE SO.
25        Q    OKAY.  DO YOU WANT TO LOOK AT IT?
26        A    YEAH.
27        Q    OKAY.
28        A    WHICH EXHIBIT IS IT?
```

```
1       Q    LH 44.  YOU WERE JUST LOOKING AT IT.  I THINK THE
2   PICTURE YOU TOOK WHILE HE WAS IN THE SHOWER.
3       A    I DON'T KNOW WHERE THAT IS IN HERE.
4       MS. MANGELS:  EXHIBIT A, PAGE 44.
5       THE WITNESS:  THANK YOU.
6       THE COURT:  IT WOULD APPEAR OF THESE THREE PHOTOS EITHER
7   TWO OF THEM OR ONE OF THEM IS REVERSED.
8       MS. HOLLEY:  YES.
9       THE COURT:  WHICH ONE OF THE ONES ARE REVERSED?
10      THE WITNESS:  THAT'S WHAT I WAS GOING TO TESTIFY ON.
11  WHEN I HAD THE ORIGINAL PHOTOS TAKEN, I THINK THAT I HAD
12  REVERSED ONE.  I'M NOT SURE WHY.  IT'S THE SAME PHOTO.  IT'S
13  NOT FILTERED.  I THINK I WAS JUST LOOKING AT IT FROM A
14  DIFFERENT ANGLE.
15      THE COURT:  I'M JUST ASKING -- YOU HAVE A NOSE PIERCING.
16  IT IS ON THE LEFT OR RIGHT?
17      THE WITNESS:  IT'S ON THE RIGHT.
18      THE COURT:  THANK YOU.
19      Q    BY MS. HOLLEY:  SO THE PICTURE ALL THE WAY ON THE
20  LEFT IS THE ONE THAT'S ATTACHED TO YOUR AFFIDAVIT; CORRECT?
21      A    CORRECT.
22      Q    OKAY.  AND YOU SEE THE ONE ALL THE WAY ON THE
23  RIGHT, IT INDICATES THAT IT WAS TAKEN ON 5/16/21 AT
24  3:17:30 A.M.  AND THAT IT IS THE NATIVE PHOTOGRAPH PROVIDED
25  BY YOUR COUNSEL, MS. OLSON; DO YOU SEE THAT?
26      A    YES, I DO.
27      Q    OKAY.  NOW, IN REAL LIFE YOUR EYES ARE BLUE;
28  CORRECT?
```

```
1        A    YES.

2        Q    AND I'M TRYING TO THINK OF A GOOD WAY TO DESCRIBE

3   YOUR SKIN COLOR WITHOUT SOUNDING OFFENSIVE.  IT'S WHITISH;

4   RIGHT?

5        A    YES, AND REDDISH.  IT'S WHITE.

6        Q    ALL RIGHT.  AND WOULD YOU AGREE WITH ME THAT THE

7   PHOTOGRAPH -- THE TWO MIDDLE PHOTOGRAPHS, YOUR SKIN IS ORANGE

8   AND YOUR EYES ARE BLACK -- THE IRIS IS WHAT I THINK --

9        A    YES.

10       Q    SO WOULD YOU AGREE THAT THE PICTURE ALL THE WAY ON

11  THE RIGHT IS A MORE ACCURATE DEPICTION OF WHAT YOU LOOK

12  LIKE?

13       A    YES, I DO.

14       Q    OKAY.  SO MY -- WELL, LET ME ASK THIS.  AND I DON'T

15  KNOW WHAT YOUR ANSWER IS GOING TO BE.  DO YOU THINK THAT YOU

16  LOOK BETTER OR WORSE, AS THE EYE DOCTOR MIGHT, SAY IN IMAGE

17  ONE OR IN IMAGE THREE?

18       MS. OLSON:  OBJECTION.  RELEVANCE.

19       THE COURT:  SUSTAINED.

20       Q    BY MS. HOLLEY:  DO YOU KNOW WHY YOU CHOSE IMAGE ONE

21  AS AN ATTACHMENT TO YOUR DECLARATION AS OPPOSED TO IMAGE

22  THREE?

23       A    I REALLY HAD NOTHING TO DO WITH CHOOSING THAT

24  IMAGE.  I PROVIDED MY ATTORNEYS WITH PICTURES FROM MY PHONE.

25  I BELIEVE IT'S FROM THE WAY IT WAS SCANNED.  THAT'S WHAT I'VE

26  BEEN TOLD.  I'M NOT REALLY SURE.

27       MS. HOLLEY:  I DON'T KNOW IF WE INTRODUCED THIS.  BUT I

28  WOULD ASK TO.
```

384

1    THE COURT:  IT WAS INTRODUCED.  DO YOU WANT IT ADMITTED?

2    MS. HOLLEY:  ADMITTED.  I'M SORRY.

3    THE COURT:  ANY OBJECTION?

4    MS. OLSON:  LACK OF FOUNDATION AS TO THE OTHER TWO

5  PHOTOS.

6    THE COURT:  THEY WERE RECEIVED FROM YOUR OFFICE.

7    MS. OLSON:  NOT THE MIRROR IMAGE PHOTOS.

8    THE COURT:  THE MIRROR IMAGE IS THE VERSION ATTACHED TO

9  THE D.V.R.O. AFFIDAVIT.

10    MS. OLSON:  JUST THE ONE, YOUR HONOR.

11    THE COURT:  EXHIBIT N IS FROM YOUR OFFICE.  AND THE

12  THIRD ONE IS THE NATIVE PHOTO SUPPLIED BY YOUR OFFICE.

13    MS. OLSON:  RIGHT.  AS TO THIS ONE.

14    THE COURT:  AS TO THE SECOND ONE THAT WAS ATTACHED TO

15  MR. GARELICK'S LETTER OF AUGUST 16 PROVIDED BY YOUR OFFICE.

16    MS. OLSON:  OKAY.  THEN WITHDRAWN.

17    THE COURT:  ALL RIGHT.  SO ADMITTED.

18    MS. HOLLEY:  THANK YOU.

19    Q   BY MS. HOLLEY:  OKAY.  THANK YOU, MS. HILL.  NOW,

20  YOU LEFT TREVOR'S HOUSE AT 8:30 ON THE MORNING OF MAY 16.

21  AND I THINK YOU TESTIFIED THAT YOU SAT IN THE STARBUCKS

22  PARKING LOT AND TOOK SOME PICTURES OF YOUR FACE; CORRECT?

23    A   YES.

24    Q   AND KYLE TEXTED YOU DURING THAT TIME; RIGHT?

25    A   YES, HE DID.

26    Q   NOW, LET'S LOOK AT PAGE 22 OF EXHIBIT D, WHICH IS

27  HOPEFULLY YOUR TEXTS WITH KYLE.  YES?

28    A   GOT IT.

385

```
 1      Q    OKAY.  KYLE, "HOW YOU DOING THERE DUDE?"  YOU,
 2   "DUDE.  NOT GOOD."  KYLE, "WHAT HAPPENED?"  YOU, "MY FACE IS
 3   FUCKED UP."  KYLE, "WHAT THE FUCK LINDS.  I'LL KILL HIM."
 4   YOU, "PLEASE DON'T SHOW ANYONE BUT LIKE HOLY SHIT."  KYLE,
 5   "NO OF COURSE NOT."
 6           AND THEN YOU SENT THE PICTURE ON PAGE 23; RIGHT?
 7      A    YES.
 8      Q    KYLE, JESUS CHRIST LINDS."  YOU, IN ALL CAPS, LIKE
 9   WHAAAAAT," WITH EXCLAMATION MARKS.  KYLE, "WHAT THE FUCK IS
10   HE THINKING?"  YOU, "HE FELT SO BAD.  I LITERALLY HAD NO IDEA
11   IT WAS GONNA BE THAT BAD.  LIKE I'M OKAY BUT HOLY SHIT."
12   KYLE, "OKAY OKAY.  I THOUGHT HE LIKE ACTUALLY GOT VIOLENT.
13   AS LONG AS IT WAS CONSENSUAL I DON'T HAVE TO KILL HIM."  YOU,
14   "IT WAS CONSENSUAL.  BUT LIKE DIDN'T EXPECT TWO BLACK EYES.
15   LIKE HE DEFINITELY, DEF, TOOK IT TOO FAR DON'T YOU THINK
16   LOL."
17           I READ THAT ACCURATELY; CORRECT?
18      A    YES.
19      Q    NOW, YOU TESTIFIED ON DIRECT EXAMINATION YESTERDAY
20   THAT WHEN YOU TOLD KYLE THAT TREVOR FELT BAD, YOU BELIEVED
21   THAT; RIGHT?
22      A    YES.
23      Q    AND AT SOME POINT YOU CHANGED YOUR MIND AND NOW
24   BELIEVE THAT IT WAS A MANIPULATION; RIGHT?
25      A    ARE YOU REFERRING TO HE FELT BAD IN THE MOMENT
26   AFTER HAVING SEX OR FELT BAD IN GENERAL MOVING FORWARD?
27      Q    WELL, I AM ASKING YOU WHAT YOU MEANT WHEN YOU SAID
28   HE FELT SO BAD.  AND YOU TESTIFIED YESTERDAY, I BELIEVE, THAT
```

```
 1    YOU THOUGHT THAT TREVOR MEANT THAT OR APPEARED TO FEEL BAD?

 2         A    INITIALLY, YES.

 3         Q    AND THEN AT SOME POINT THEREAFTER, AT SOME POINT IN

 4    THE FUTURE, YOU CHANGED YOUR VIEW AND YOU NO LONGER THOUGHT

 5    THAT HE FELT BAD.  YOU THOUGHT IT WAS JUST MANIPULATION;

 6    RIGHT?

 7         A    YES.

 8         Q    NOW, TREVOR NEVER TOLD YOU THAT IT WAS

 9    MANIPULATION; RIGHT?

10         A    NO.

11         Q    OKAY.  SO THAT'S JUST WHAT YOU THINK; RIGHT?

12         A    YES.

13         Q    OKAY.  NOW, ON MONDAY MAY 17TH AT 10:54 A.M. YOU

14    TEXTED TREVOR A PICTURE OF YOUR FACE.  AND LET'S NOW GO TO TB

15    89.  AND YOU TESTIFIED THAT YOU WERE UPSET THAT HE HADN'T

16    REACHED OUT TO YOU; RIGHT?

17         A    YES.

18         Q    AND SO YOU REACHED OUT TO HIM?

19         A    YES.

20         Q    AND YOU WANTED HIM TO SEE WHAT HE HAD DONE TO YOU;

21    RIGHT?

22         A    YES.

23         Q    LET ME ASK YOU, YOU SENT HIM TWO PICTURES; RIGHT?

24         A    ONE SNAPCHAT VIDEO.  AND ONE PICTURE.

25         Q    OKAY.  AND IF YOU WANTED HIM TO SEE WHAT HE HAD

26    DONE TO YOU, WHY DON'T EITHER OF THE PICTURES YOU SENT SHOW

27    ANY SCRATCHES TO YOUR FACE?

28         MS. OLSON:  OBJECTION.  LACK OF FOUNDATION.
```

```
 1        THE COURT:  OVERRULED.  YOU MAY ANSWER.
 2        THE WITNESS:  WELL, I THINK IT'S BECAUSE OF THE ANGLE.
 3   THAT FIRST ANGLE IS NOT GOING TO SHOW SCRATCHES FROM THAT.
 4   AND I'M IN A ROOM THAT DOESN'T HAVE GREAT LIGHTING.  SO I
 5   CAN'T TAKE A PICTURE THAT ENCOMPASSES ALL MY INJURIES.
 6        Q    BY MS. HOLLEY:  UNDERSTOOD.  BUT YOU TOOK THE
 7   PICTURE; RIGHT?
 8        A    YES, I DID.
 9        Q    YOU TOOK OTHER PICTURES AS WELL WHERE YOU SHOWED
10   SCRATCHES.  BECAUSE ALL THAT WOULD MEAN IS TURNING YOUR FACE
11   AND PUTTING THE CAMERA ON THE SIDE OF YOUR FACE; RIGHT?
12        A    YES.
13        Q    OKAY.  AND YOU CERTAINLY COULD HAVE DONE THAT IF
14   YOU WANTED TO, RIGHT, TAKE A PICTURE OF THE SIDE OF YOUR
15   FACE?
16        A    IF I WANTED TO?
17        Q    SURE.
18        A    OH, YES.
19        Q    OKAY.  SO YOU DECIDED NOT TO DO THAT; RIGHT?
20        A    I'M A LITTLE UNCLEAR.  I DECIDED NOT TO SEND TREVOR
21   A PICTURE OF MY SCRATCHES?
22        Q    CORRECT.
23        A    YES, I STUCK WITH ONE PICTURE.
24        Q    BUT THE POINT OF YOU SENDING THE PICTURES WAS TO
25   SHOW HIM WHAT HE HAD DONE TO YOU?
26        A    YES.
27        Q    AND THEN YOU SAID, "DEFINITELY CAN'T HAVE CRAZY
28   EYES.  THEY ARE BOTH BLACK."  TREVOR SAID, "DAMN GIRL.  ARE
```

1    YOU OKAY?"  YOU EXPLAINED THIS ON DIRECT EXAM YESTERDAY;

2    RIGHT?

3         A    CAN YOU REPEAT THAT?

4         Q    YOU EXPLAINED THAT AND YOU TALKED ABOUT THAT.  AND

5    YOU TALKED ABOUT THAT WITH YOUR COUNSEL YESTERDAY ON DIRECT

6    EXAMINATION, THAT EXCHANGE?

7         A    YES.

8         Q    NOW, LET'S GO OVER TO TB 91.  AND THAT SHOWS THE

9    OTHER PICTURE THAT YOU SENT TO TREVOR?

10        A    YES.

11        Q    THAT PICTURE ALSO DOESN'T SHOW THE SIDE OF YOUR

12   FACE; CORRECT?

13        A    CORRECT.

14        Q    AND IN THAT PICTURE YOU'RE SMILING INTO THE CAMERA;

15   RIGHT?

16        A    YES, I AM.

17        Q    AND WITH THAT PICTURE YOU SAID, "THE HAIR NEEDS TO

18   BE PLAYED WITH YES.  IT'S LOOKING A TWO OUT OF TEN RIGHT NOW.

19   GLAD I GOT TO CALL YOU, TREV"; RIGHT?

20        A    CORRECT.

21        Q    LOOKING AT YOUR DECLARATION, WHICH IS IN EXHIBIT A.

22   AND IT IS ON -- IT STARTS ON PAGE LH 7.  WE'RE GOING TO GO

23   OVER TO PARAGRAPH 20, WHICH IS ON LH 12.  THE FIRST SENTENCE

24   OF PARAGRAPH 20 SAYS, "I THREW UP VIOLENTLY THROUGHOUT THE

25   DAY AND HAD SEVERE HEADACHES."

26             NOW, IN YOUR MANY WRITTEN COMMUNICATIONS WITH MELY,

27   LISA, AND OTHERS, YOU WRITE FREQUENTLY ABOUT THROWING UP AND

28   HAVING HEADACHES, DON'T YOU?

1       A     YES.

2       Q     SO THAT'S SOMETHING -- DO YOU THROW UP AND HAVE

3   HEADACHES IN GENERAL FREQUENTLY IN YOUR LIFE?

4       A     NO, ONLY WHEN I HAVE AN ACUTE HEAD INJURY.

5       Q     OKAY.  SO IN ALL OF YOUR COMMUNICATIONS PRIOR TO

6   MAY 16 WHEN YOU'RE TALKING ABOUT THROWING UP, PRIOR TO

7   ANYTHING HAVING TO DO WITH TREVOR, WHAT IS THE REASON FOR

8   YOUR SPEAKING OF THROWING UP THEN?

9       MS. OLSON:  OBJECTION.  VAGUE.

10      THE COURT:  I'M NOT SURE I AM UNDERSTANDING.

11      MS. HOLLEY:  OKAY.  WITHDRAWN.

12      Q     BY MS. HOLLEY:  LET ME ASK YOU, PRIOR TO ANY

13  INCIDENT WITH TREVOR, DO YOU TEXT WITH YOUR FRIENDS ABOUT

14  HAVING HEADACHES AND THROWING UP WITH SOME DEGREE OF

15  FREQUENCY?

16      MS. OLSON:  OBJECTION.  VAGUE AS TO TIME.

17      THE COURT:  ARE YOU TALKING ABOUT PRIOR TO APRIL 18?

18      Q     BY MS. HOLLEY:  YES, PRIOR TO APRIL 21ST.

19      A     I AM NOT SURE WHAT YOU'RE ASKING ME.  BUT, YES, I

20  DO GET HEADACHES.

21      Q     AND DO YOU THROW UP ON OCCASIONS, OTHER THAN AN

22  INCIDENT WITH TREVOR BAUER, WITH SOME DEGREE OF FREQUENCY?

23      MS. OLSON:  OBJECTION.  RELEVANCE.

24      THE COURT:  OVERRULED.  YOU MAY ANSWER.

25      THE WITNESS:  I -- SO YOU'RE ASKING BEFORE APRIL 18

26  BEFORE I KNEW TREVOR BAUER, IF I THREW UP.

27      Q     BY MS. HOLLEY:  FREQUENTLY OR SPOKE OF IT.  WHETHER

28  YOU DID OR DIDN'T.  IF IT'S SOMETHING YOU TEXTED WITH YOUR

1  FRIENDS ABOUT YOU ARE THROWING UP OR HAVING HEADACHES

2  SEPARATE FROM TREVOR BAUER?

3       A    I'M SURE THERE ARE TEXTS THAT EXIST, BUT I WOULD

4  NOT SAY FREQUENTLY, THOUGH.

5       Q    OKAY.  FAIR ENOUGH.  I'M GETTING SOME CLARIFICATION

6  FROM MS. MANGELS.  BEFORE MAY 16TH, ARE YOU TALKING ABOUT

7  THROWING UP AND HAVING HEADACHES PRIOR TO MAY 16?

8       A    I WOULD HAVE TO HAVE TEXT MESSAGES IN FRONT OF ME

9  THAT SAY THAT.

10      Q    OKAY.  YOU DON'T HAVE AN INDEPENDENT RECOLLECTION

11 OF --

12      A    NO.

13      Q    -- TEXTING ABOUT THROWING UP PRIOR TO MAY 16?

14      A    NO, NOT OFF THE TOP OF MY HEAD.

15      Q    OKAY.  NOW, I UNDERSTAND THAT ON MAY 17TH YOU WERE

16 CONCERNED ABOUT THROWING UP AND HAVING HEADACHES BECAUSE YOU

17 THOUGHT YOU MIGHT HAVE A CONCUSSION?

18      A    YES.

19      Q    YOU THOUGHT YOU MIGHT HAVE OTHER PROBLEMS AND IT

20 WAS BEST FOR YOU TO GO SEE A DOCTOR; RIGHT?

21      A    YES.

22      Q    YOU WROTE IN PARAGRAPH 21 OF YOUR DECLARATION,

23 WHICH IS LH 12, YOU WERE AFRAID THAT TREVOR MIGHT HURT YOU

24 FOR GOING TO THE HOSPITAL; RIGHT?

25      A    YES.

26      Q    IF YOU WERE AFRAID THAT TREVOR MIGHT HURT YOU FOR

27 GOING TO THE HOSPITAL, WHY DID YOU SEND THE PICTURE OF

28 YOURSELF TO HIM FROM THE HOSPITAL?

```
 1        A    EXACTLY FOR THAT REASON.  TO DE-ESCALATE THE
 2   SITUATION SO HE WOULDN'T GET ANGRY WITH ME.
 3        Q    WELL, DID YOU BELIEVE AT THAT TIME THAT THERE WAS
 4   SOMEWAY HE WOULD FIND OUT YOU WERE AT THE HOSPITAL IF YOU
 5   DIDN'T TELL HIM?
 6        A    I'M NOT SURE.
 7        Q    OKAY.  I'M JUST TRYING TO UNDERSTAND HOW YOU CAN
 8   SAY THAT YOU WERE AFRAID OF SOMETHING THAT YOU YOURSELF
 9   CREATED?
10        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
11        THE COURT:  IT IS ARGUMENTATIVE.
12        Q    BY MS. HOLLEY:  ALL RIGHT.  SO WHEN YOU SAID YOU
13   WERE AFRAID OF WHAT HE WOULD DO, YOU ACTUALLY KNEW WHAT HE
14   WOULD DO BECAUSE IT ALL HAPPENED AND IT WAS NOTHING; RIGHT?
15        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
16        THE COURT:  IT IS ARGUMENTATIVE.
17        Q    BY MS. HOLLEY:  NOW, AFTER YOU SENT THE PICTURES TO
18   TREVOR, HE EXPRESSED CONCERN ABOUT YOU, DIDN'T HE?
19        A    YES, HE DID.
20        Q    AND HE OFFERED TO SEND YOU GROCERIES AND DESSERT?
21        A    YES, HE DID.
22        Q    AND HE SPOKE WITH YOU ON THE PHONE?
23        A    YES.
24        Q    AND DURING THE TIMES THAT HE SPOKE WITH YOU AND
25   TEXTED WITH YOU, HE NEVER ASKED YOU IF YOU HAD TOLD ANYONE
26   ABOUT WHAT HAPPENED, DID HE?
27        A    NO.
28        Q    AND HE NEVER ASKED YOU IF YOU HAD MENTIONED HIS
```

1    NAME TO ANYONE, DID HE?

2         A    NO.

3         Q    ALL RIGHT.  NOW, AT THE HOSPITAL YOU HAD A NUMBER

4    OF TESTS; CORRECT?

5         A    CORRECT.

6         Q    AND DID YOU LATER LEARN THAT YOU DID NOT HAVE A

7    CONCUSSION?

8         A    NO.

9         Q    THAT WAS INCONCLUSIVE?

10        A    THEY TOLD ME I WAS DIAGNOSED WITH AN ACUTE HEAD

11   INJURY.

12        Q    OKAY.  DID YOU LATER LEARN THAT YOU HAD NO SWELLING

13   IN YOUR NECK AND NO VASCULAR INJURY?

14        A    YES.

15        Q    AND DID YOU LATER LEARN THAT YOUR EARS, NOSE, AND

16   THROAT WERE NORMAL AND UNREMARKABLE?

17        A    I WOULD HAVE TO HAVE THE REPORT IN FRONT OF ME.  I

18   CAN'T RECALL EVERY SINGLE RESULT.

19        Q    OKAY.

20        MS. HOLLEY:  WHICH EXHIBIT IS THAT?  EXHIBIT H.  IS THAT

21   IN THAT BOOK?

22        THE WITNESS:  PERFECT.  I HAVE IT IN FRONT OF ME.

23        Q    BY MS. HOLLEY:  OKAY.  SO I BELIEVE THAT THESE ARE

24   AT 63 AND 65.  THESE ARE ALVARADO HOSPITAL MEDICAL RECORDS.

25   AND I GUESS I WILL JUST FIRST ASK YOU IF LOOKING AT THAT AT

26   ALL REFRESHES YOUR RECOLLECTION ABOUT WHAT YOU WERE ADVISED

27   ABOUT THE RESULTS OF YOUR TESTS?

28        A    I ACTUALLY HAVE NOT SEEN THESE RESULTS BEFORE.

393

```
 1        Q    WELL, YOU WERE ADVISED THAT YOU HAD NO BASILAR
 2   SKULL FRACTURE; CORRECT?
 3        A    I READ THAT IN THE REPORT THEY GAVE ME.  YES.
 4        Q    NOW, IN YOUR DECLARATION YOU WROTE THERE WERE SIGNS
 5   OF A BASILAR SKULL FRACTURE?
 6        A    YES.
 7        Q    BUT AT THE TIME YOU WROTE THAT AND SIGNED THAT
 8   DECLARATION ON JUNE 28, YOU ALREADY KNEW THAT YOU ACTUALLY
 9   DIDN'T HAVE A BASILAR SKULL FRACTURE; RIGHT?
10        A    YES.
11        Q    AND DIDN'T YOU FIND IT MISLEADING TO TELL THE JUDGE
12   THAT THERE WERE SIGNS OF A SKULL FRACTURE WHEN YOU KNEW, IN
13   FACT, THAT THERE WAS NO SKULL FRACTURE?
14        A    NO.
15        Q    SO YOU DIDN'T CONSIDER THAT TO BE AN IMPORTANT
16   FACT?
17        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
18        THE COURT:  SUSTAINED.
19        Q    BY MS. HOLLEY:  WOULD IT HAVE BEEN MORE ACCURATE TO
20   SAY THAT YOU BELIEVED YOU HAD A SKULL FRACTURE AND LATER
21   LEARNED YOU DID NOT; WOULD THAT HAVE BEEN MORE ACCURATE?
22        MS. OLSON:  OBJECTION.  SPECULATION.
23        THE COURT:  OVERRULED.  YOU MAY ANSWER.
24        THE WITNESS:  CAN YOU REPEAT ONE MORE TIME?
25        Q    BY MS. HOLLEY:  WOULD IT HAVE BEEN MORE ACCURATE TO
26   SAY IN YOUR DECLARATION, I BELIEVED I HAD A SKULL FRACTURE
27   BUT LATER LEARNED THAT I DID NOT?
28        A    NO.  BECAUSE IT WAS IN REFERENCE TO WHY I WAS
```

```
 1   PUSHED INTO THREE CT'S BECAUSE OF THOSE SIGNS.  THAT'S WHY I
 2   WORDED IT THAT WAY.
 3       Q   WELL, IS THERE A REASON THAT ALL OF THAT
 4   INFORMATION COULDN'T HAVE BEEN PRESENTED SINCE YOU HAVE SAID
 5   YOU WANTED TO GIVE THE COURT THE FULL EXPLANATION OF
 6   EVERYTHING?  WOULDN'T THAT HAVE BEEN A MUCH MORE FULL
 7   EXPLANATION THAT YOU HAD TO HAVE THREE CT'S.  YOU THOUGHT YOU
 8   HAD A SKULL FRACTURE.  AND, THANKFULLY, YOU LEARNED LATER YOU
 9   DID NOT.
10           WOULDN'T THAT HAVE BEEN A MORE COMPLETE PICTURE FOR
11   THE JUDGE TO CONSIDER?
12       MS. OLSON:  ARGUMENTATIVE.
13       THE COURT:  IT IS ARGUMENTATIVE.
14       Q   BY MS. HOLLEY:  AND, AGAIN, YOU ONLY INCLUDED SOME
15   OF THE PAGES OF THE MEDICAL RECORDS AS PART OF THE EXHIBITS
16   TO YOUR PETITION?
17       A   YES, I DID.
18       Q   AND, AGAIN, AS YOU SAID IN YOUR DECLARATION, "I
19   HAVE WEIGHED WHETHER TO INCLUDE MEDICAL NOTES IN THESE
20   PLEADINGS, BUT HAVE DECIDED TO IN ORDER TO FULLY EXPLAIN THE
21   SERIOUSNESS OF WHAT OCCURRED."  THAT'S WHAT YOU WROTE?
22       A   YES.
23       Q   BUT THAT'S NOT TRUE, IS IT?
24       A   IT IS TRUE.
25       Q   ALL RIGHT.  LET'S LOOK AT EXHIBIT J, WHICH I WILL
26   REPRESENT ARE TEXTS BETWEEN YOU AND CIRAMELY MAYA.
27       A   YOU SAID "J"?
28       Q   I DID.
```

1      A    PERFECT.  THANK YOU.

2      Q    OKAY.  DO YOU HAVE THAT BEFORE YOU?

3      A    YES, I DO.  THANKS.

4      Q    AND THANK YOU.  ARE THOSE -- THOSE ARE TEXTS

5   BETWEEN YOU AND CIRAMELY MAYA?

6      A    YES.

7      MS. HOLLEY:  OKAY.  THOSE ARE PREVIOUSLY MARKED AS

8   EXHIBIT J.  IS THERE ANY OBJECTION TO THOSE BEING ADMITTED

9   INTO EVIDENCE?

10     MS. OLSON:  NO OBJECTION.

11     THE COURT:  ALL RIGHT.  THEY ARE ADMITTED.

12     Q    BY MS. HOLLEY:  NOW, DID YOU PROVIDE THESE TEXTS TO

13  YOUR COUNSEL?

14     A    YES.

15     MS. OLSON:  OBJECTION.  ATTORNEY-CLIENT.

16     THE COURT:  OVERRULED.

17     Q    BY MS. HOLLEY:  DID YOU SAY YES?

18     A    CAN YOU REPEAT WHAT YOU ASKED ME?

19     Q    OKAY.  DID YOU PROVIDE THOSE TEXTS TO YOUR

20  COUNSEL?

21     A    YES, I DID.

22     Q    ALL RIGHT.  AND WERE YOU AWARE THAT YOUR LAWYER,

23  MS. OLSON, INDICATED THAT YOU DIDN'T HAVE ANY OF THESE

24  TEXTS?

25     A    IT'S CORRECT IN SAYING SHE DIDN'T.  I HAD TO DO A

26  RESTORATIVE BACKUP ON MY PHONE IN ORDER TO PROVIDE YOU WITH

27  THIS.

28     Q    OKAY.  THANK YOU.  SO YOU HAD DELETED THEM;

```
1   CORRECT?
2       A    YES.
3       Q    AND THEN YOU WERE ABLE TO RETRIEVE THEM; IS THAT
4   RIGHT?
5       A    YES.
6       Q    OKAY.  AND DO YOU REMEMBER WHEN YOU DELETED THEM?
7       A    I HAD -- NO, I DON'T.  NO, I DON'T.
8       Q    WAS IT YOUR HABIT TO DELETE YOUR TEXTS WITH HER
9   OVER TIME?
10      A    YES, BECAUSE THERE ARE SO MANY.
11      Q    BECAUSE YOU AND SHE TEXT A LOT; CORRECT?
12      A    CORRECT.
13      Q    MANY TIMES A DAY EVERY DAY?
14      A    YES.
15      Q    OKAY.  NOW, THOSE TEXTS APPEAR TO START FROM APRIL
16  18 WHEN TREVOR FIRST COMMUNICATED WITH YOU ON DM.  I THINK
17  THAT'S PAGE ONE; RIGHT?
18      A    CORRECT.
19      Q    OKAY.  AND LIKE YOU DID WITH DEREK AND KYLE, YOU
20  TOOK SCREENSHOTS OF YOUR COMMUNICATIONS WITH TREVOR AND
21  SHARED THEM WITH MELY; RIGHT?
22      A    YES.
23      Q    OKAY.  ON CM 2, PARENTHETICAL 2, PAGE 5.  DO YOU
24  SEE THAT?
25      A    YES, I DO.
26      Q    ON APRIL 18TH AT 9:57 P.M. YOU WROTE TO MELY THAT
27  BAUER OFFERED ME TIX ON THURSDAY NIGHT.  BUT THAT WASN'T
28  TRUE; RIGHT?
```

```
 1        A    HE HAD MADE A COMMENT ABOUT IF I WANTED A DODGER
 2   DOG I WOULD HAVE TO COME ON THURSDAY.  I TRANSLATED THAT INTO
 3   HE MIGHT BE ABLE TO GET ME TICKETS.
 4        Q    ON APRIL 18TH --
 5        A    YES.
 6        Q    -- YOU INTERPRETED THAT AS HIM OFFERING TO GET YOU
 7   TICKETS?
 8        A    YES, I DID.  AND I WAS GOING TO ASK.
 9        Q    OKAY.  SO YOU DIDN'T CONSIDER THAT TO BE A LIE?
10        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
11        THE COURT:  SUSTAINED.
12        Q    BY MS. HOLLEY:  TURNING TO PAGE 10.  YOU, "LEAVING
13   FOR BAUER'S SOON.  I DESERVE THIS."  WELL, FIRST LET ME ASK
14   YOU, WHAT DID YOU DESERVE?
15        A    A GOOD NIGHT.  A GOOD DATE.  SINCE I DON'T DATE
16   THAT OFTEN.
17        Q    AND MELY SAYS, "YES GIRL.  JUST BE CAREFUL."  AND
18   THEN YOU SAY, "ALWAYS.  NO STRINGS ATTACHED.  THANK GOD HE
19   LIVES IN L.A. NOT SD.  LITERALLY JUST WANT SEX HAHAHA."
20             SO AM I CORRECT THAT YOU WERE TELLING YOUR BEST
21   FRIEND THAT YOU WERE GOING THERE FOR SEX WITH NO STRINGS
22   ATTACHED?
23        A    INITIALLY, YES.
24        Q    AND SO WHEN YOU SAID, "I DESERVE THIS," AND SINCE
25   YOU WERE GOING THERE INITIALLY JUST FOR SEX -- AND YOU SAID
26   YOU WERE LOOKING FOR A GOOD DATE, WHAT YOU WERE SAYING WHEN
27   YOU PUT THESE TOGETHER IS YOU DESERVE TO GET SOME GOOD SEX
28   THAT NIGHT?
```

398

```
1        A    NO.

2        Q    ALL RIGHT.  PAGE 11.  APRIL 22ND AT 3:13 P.M.  THIS

3   IS THE NEXT DAY AFTER YOUR NIGHT WITH TREVOR; RIGHT?

4        A    YES, IT IS.

5        Q    YOU, "I RESCHEDULED THE INTERVIEW BECAUSE I WAS TOO

6   STRESSED TO DO IT AT BAUER'S OMG.  AND CAN'T WAIT TO TELL YOU

7   ABOUT THAT HE IS AN AMAZING HUMAN"?

8        A    YES.

9        Q    THAT IS WHAT YOU THOUGHT ON APRIL 22ND AT 3:13

10  P.M.; RIGHT?

11       A    YES, I DID.

12       Q    PAGE 65.  MAY 16TH AT 10:48 A.M.  SO THIS IS THE

13  MORNING AFTER YOUR NIGHT -- YOUR SECOND NIGHT WITH TREVOR;

14  RIGHT?

15       A    YES.

16       Q    ARE YOU SITTING IN YOUR CAR AT THIS TIME, IF YOU

17  RECALL?

18       A    BORDERLINE MAYBE SITTING IN THE CAR.  MAYBE ALREADY

19  DRIVING HOME AND TEXTING WHILE I DRIVE.

20       Q    YOU, " I NEED TO PROCESS AND EXPLAIN WHY I HAVE

21  BEEN SO SICK THE LAST THREE DAYS LIKE FUCK.  I SAW BAUER ON

22  THURSDAY NIGHT.  MY FACE IS COMPLETELY FUCKED UP.  YOU ARE

23  GOING TO BE THE FIRST PERSON I TELL SO IT HAS TO STAY IN THE

24  VAULT.  I JUST NEED TO PROCESS."

25            NOW, IN FACT YOU HAD ALREADY TOLD KYLE THE EXACT

26  SAME THING 30 MINUTES BEFORE THIS AT 10:17 A.M.; CORRECT?

27       A    YES.

28       MR. GARELICK:  SORRY.  WHAT PAGE?
```

```
1       Q    BY MS. HOLLEY:  65.  SO WHEN YOU SAID, "YOU'RE
2    GOING TO BE THE FIRST PERSON I TELL THIS," THAT WASN'T TRUE
3    BECAUSE YOU HAD ALREADY TOLD SOMEBODY?
4       A    I HAD PREVIOUSLY TESTIFIED ON MY REASONING FOR
5    THAT.
6       Q    OKAY.  AND WHAT IS YOUR REASONING FOR SAYING, "I
7    SAW BAUER ON THURSDAY NIGHT," WHICH IS ALSO NOT TRUE?
8       A    YES, THAT WAS NOT TRUE.  I WAS GOING THROUGH A LOT
9    DEALING WITH A LOT OF STUFF WITH MY ROOMMATE THAT WHOLE WEEK.
10   I WAS NOT FEELING THE GREATEST.  AND I HAD CALLED OUT OF WORK
11   THAT WEEKEND, BECAUSE I WAS DEALING WITH A LOT.  AND I WAS
12   GOING TO AND FROM L.A.
13       MELY IS ONE OF MY BOSSES AT WORK.  AND SO I DID LIE
14   TO HER THAT IT HAD BEEN PREVIOUS, BECAUSE I FELT BAD THAT I
15   HAD CALLED OUT OF WORK AND I WAS IN SHOCK.  AND I WAS
16   PANICKING WHEN I WAS SENDING THOSE TEXTS.
17       Q    AND THAT'S YOUR BEST FRIEND; RIGHT?
18       A    YES, IT IS.
19       Q    SO YOU'RE TELLING HER THAT YOU SAW HIM ON THURSDAY
20   NIGHT WHEN, IN FACT, YOU HAD LEFT HIS HOUSE THAT VERY MORNING
21   A FEW HOURS BEFORE; RIGHT?
22       A    YES.
23       Q    NOW, WHEN YOU WENT TO HER HOUSE LATER THAT DAY, DID
24   YOU KEEP UP THAT LIE OR SOMETHING ELSE?
25       A    SHE DIDN'T ASK ME ABOUT IT.  I WAS STRUGGLING A
26   LOT.  AND I WAS ABLE TO TELL HER WITHIN TWO OR THREE DAYS THE
27   TRUTH.
28       Q    ALL RIGHT.  MELY, "WAIT.  WHAT.  WHAT DID HE DO TO?
```

```
 1    YOU.  YES OF COURSE."  YOU, "IT WAS JUST DURING SEX.  LIKE IT
 2    WAS CONSENSUAL BUT IT GOT SO BAD.  I DON'T KNOW WHAT EVEN
 3    HAPPENED.  I JUST FROZE.  I HAVE A BUSTED LIP AND TWO BLACK
 4    EYES."  YOU WROTE THAT; RIGHT?
 5         A    YES.
 6         Q    AND YOU ALSO DIDN'T MENTION ANYTHING TO HER ABOUT
 7    HAVING SCRATCHES ON YOUR FACE; RIGHT?
 8         A    NO.
 9         Q    PAGE 121, WHICH IS -- WAIT.  HOLD ON.  BACK TO THE
10    PAGE WE WERE ON WHERE YOU SAID "I HAVE A BUSTED LIP AND TWO
11    BLACK EYES."  AND THEN SHE SAYS, "WHAT.  OMG.  CALL ME AS
12    SOON AS YOU CAN."  AND THEN YOU SAY, "I HAVE BEEN SO SICK
13    ABOUT I BARELY GOTTEN OUT OF BED.  BUT IT'S GETTING BETTER
14    AND I JUST NEED TO PROCESS."
15              SO THAT WAS ALSO NOT TRUE; RIGHT?
16         A    THERE IS TRUTH IN THAT ACTUALLY.
17         Q    BY THE WAY, DO YOU KNOW WHY ON MAY 29TH -- THIS IS
18    ON PAGE 74 -- MELY WAS ASKING YOU TO DEACTIVATE -- HOW TO
19    DEACTIVATE HER INSTAGRAM?
20         A    CAN YOU REPEAT THE PAGE NUMBER AGAIN?
21         Q    74.
22         A    OH.  YES.  WE WERE TALKING ABOUT THAT.  I HAD
23    DEACTIVATED MY INSTAGRAM, BECAUSE I NEEDED A BREAK.  AND I
24    DIDN'T KNOW HOW -- YOU KNOW, IF MY NAME WAS GOING TO GET OUT
25    BECAUSE OF A POLICE REPORT.  SO I DEACTIVATED MINE.  I WAS
26    TELLING HER HOW NICE IT WAS TO TAKE A BREAK FROM SOCIAL
27    MEDIA.  SHE SAID SHE WOULD DO IT WITH ME, BECAUSE SHE ALSO
28    WANTED A BREAK FROM SOCIAL MEDIA.
```

```
1        Q    OKAY.  PAGE 121.  JUNE 18TH.

2        A    121?

3        Q    YES.

4        A    PERFECT.

5        Q    YOU, "LORD HELP ME AND MY FUCKED UP JAW STILL.

6   DOES YOUR TV HAVE THE DODGERS GAME.  BAUER IS PITCHING.  I

7   HAVE TO WATCH THAT AND THIRD EYE CURSE WITH YOU.  IT'S WORKED

8   THE PAST FOUR GAMES."  AND THREE LAUGHING EMOJIS.  "HOPE HE

9   GETS DESTROYED."  SO YOU'RE STILL WATCHING TREVOR PITCH ON

10  JUNE 18TH; RIGHT?

11       A    I DON'T RECALL IF SHE ACTUALLY HAD THE DODGERS GAME

12  ON THAT NIGHT.  THAT'S WHY I ASKED HER.

13       Q    WELL, YOU SAID "BAUER IS PITCHING.  I HAVE TO WATCH

14  THAT."  RIGHT?

15       A    YES.

16       Q    AND YOU HAD TESTIFIED PREVIOUSLY THAT YOU HAD TO

17  DELETE ALL OF YOUR COMMUNICATIONS WITH HIM, BUT YOU STILL

18  WANTED TO WATCH HIM PITCH; RIGHT?

19       A    POSSIBLY.

20       Q    WHO'S -- IS IT LEWIS OR LOUIS?

21       A    LOUIS.

22       Q    LOUIS.  NOW, YOU WRITE A LOT TO MELY DURING THIS

23  TIME ABOUT BEING IN LOVE WITH LOUIS; RIGHT?

24       A    YES, BUT IT'S --

25       Q    SARCASTIC?

26       A    YES, AND HE ALSO HAS A GIRLFRIEND.  SO IT'S LIKE A

27  WORK HUSBAND KIND OF THING.

28       Q    ON APRIL 28TH YOU TEXTED MELY -- I'M GOING ASK
```

1  YOU -- IF YOU DON'T REMEMBER THIS, WE CAN FIND THE PAGE FOR

2  YOU.  "OMG.  LOUIS JUST SENT ME A PIC IN MY DM.  I CAN'T OPEN

3  IT.  WHY CAN'T HE BE SINGLE?"  AND THEN ON MAY 4TH YOU TEXTED

4  TO MELY, "LOUIS DM'D THIS MORNING.  UGH.  I'M SO IN LOVE."

5  DOES THAT SOUND LIKE THINGS THAT YOU TEXTED TO MELY

6  SARCASTICALLY?

7      A    YES, BECAUSE WE ARE JUST FRIENDS.

8      Q    BUT YOU DID EXPRESS SOME EXCITEMENT ABOUT LOUIS

9  DURING THIS TIME THAT YOU SAID THAT YOU HAD AN EMOTIONAL

10 CONNECTION TO TREVOR?

11     A    I WOULD HAVE TO HAVE THOSE TEXTS IN FRONT OF ME,

12 BECAUSE I DON'T KNOW WHAT DATES YOU'RE REFERRING TO.

13     Q    OKAY.  APRIL 27, 28.  DID YOU SEE THOSE?

14     A    I'M SORRY.  CAN YOU REPEAT THAT.

15     Q    APRIL 28TH IS ON PAGE 28 CONVENIENTLY.

16     A    OKAY.  YES, I HAVE THAT IN FRONT OF ME.

17     Q    OKAY.  AND THEN WE'RE GOING TO FIND THE ONE ON MAY

18 4TH WHERE -- RE LOUIS.  "HE DM'D THIS MORNING.  UGH.  I'M SO

19 IN LOVE."  THAT'S ON PAGE 51.

20     A    OKAY.  YES.  I TOTALLY KNOW WHAT YOU MEAN NOW ABOUT

21 THE TIMELINE.

22     Q    OKAY.  SO THOSE ARE -- THOSE ARE THINGS THAT YOU

23 ARE TEXTING TO MELY DURING THAT TIME?

24     A    YES.

25     Q    NOW, LET'S LOOK AT EXHIBIT K.  IS THAT IN THAT

26 BOOK?

27     A    I THINK IT'S IN THE NEXT BOOK.

28     Q    DO YOU HAVE THAT THERE?

```
1          A    THANK YOU.  PAGE 4.

2          Q    WELL, FIRST, LET ME ASK YOU, ARE THESE TEXTS

3     BETWEEN YOU AND LISA -- IS IT JACKSON OR DECKER?

4          A    SHE GOES BY LISA DECKER.

5          Q    LISA DECKER.  ARE THESE TEXTS BETWEEN YOU AND LISA

6     DECKER?

7          A    YES.

8          MS. HOLLEY:  ASK THEY BE RECEIVED INTO EVIDENCE.

9          THE COURT:  ANY OBJECTION?

10         MS. OLSON:  NO OBJECTION.

11         THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

12         Q    BY MS. HOLLEY:  SO LISA IS YOUR SPONSOR?

13         A    YES, SHE IS.

14         Q    YOU GUYS ARE ALSO VERY CLOSE FRIENDS; RIGHT?

15         A    YES.

16         Q    YOU GUYS TEXT A LOT; CORRECT?

17         A    AND TALK ON THE PHONE AS WELL.  SHE HAS ME CALL HER

18    EVERY DAY.

19         Q    OKAY.  ON PAGE 4 ON APRIL 19TH YOU TEXTED, "DUDE MY

20    ULTIMATE BASEBALL CRUSH ON THE DODGERS JUST SLID IN MY DMS.

21    GOD IS TESTING ME."  AND THEN YOU SENT A PICTURE OF TREVOR

22    FROM HIS INSTAGRAM PAGE; RIGHT?

23         A    YES.

24         Q    OKAY.  NOW, LET'S TURN TO PAGE 29 AND 30, WHICH IS

25    MAY 8.  YOU SAID, "ALSO CHOKE OUT PLAYER SAID," AND THEN YOU

26    SENT HER A SCREENSHOT OF ONE OF YOUR CONVERSATIONS WITH

27    TREVOR; RIGHT?

28         A    YES.
```

1    Q    AND I'M ASSUMING CHOKE OUT PLAYER YOU'RE REFERRING
2  TO TREVOR?
3    A    YES.
4    Q    AND AFTER THAT YOU WROTE, "GIVE ME 50 MILLION
5  DOLLARS AND DON'T SLAP MY CLIT AND I'D BE GREAT," WITH THREE
6  LAUGHING EMOJIS; DO YOU SEE THAT?
7    A    YES, I DO.
8    Q    SO YOU HAD TOLD TREVOR -- LISA THAT TREVOR HAD
9  CHOKED YOU OUT; RIGHT?
10    A    YES, I DID.
11    Q    AND THAT, I'M ASSUMING, HE SLAPPED YOUR CLIT; IS
12  THAT SOMETHING YOU TOLD HER?
13    A    YES.
14    Q    AND THAT IT WOULD ALL BE OKAY IF HE GAVE YOU $50
15  MILLION; RIGHT?  THAT'S THE IMPLICATION THERE?
16    A    NOT NECESSARILY.
17    Q    OKAY.  PAGE 30.  DO YOU HAVE THAT BOOK?
18    A    PAGE 30?
19    Q    YES, PLEASE.
20    A    YES.
21    Q    LISA, "HAHAHA BOOTIE CALL."  YOU, "SO AWFUL.
22  1:19 A.M."  LISA, "UM WHEN YOU ARE CHECKING ON SOMEONE YOU
23  CALL AT 11:00 A.M., NOT 1:30 A.M.  LOL.  WHATEVER.  THE
24  ATTENTION FEELS GOOD.  JUST KEEP IT IN PERSPECTIVE."  YOU,
25  "AMEN.  I LOVE YOU THANK YOU."
26         SO WHEN YOU TESTIFIED YESTERDAY THAT YOU NEVER EVEN
27  CONSIDERED THAT THE 1:19 TEXT WAS A BOOTY CALL, THAT WASN'T
28  TRUE, WAS IT?

```
 1         A    IT WAS TRUE.

 2         Q    HOW WAS IT TRUE WHEN YOU'RE THE ONE SAYING, "1:19,

 3    SO AWFUL"?

 4         A    I WAS NOT THE ONE THAT USED THE PHRASE BOOTY CALL.

 5    SO I WAS JUST RESPONDING TO HER IN THAT WAY SAYING "SO AWFUL,

 6    1:19 A.M."

 7         Q    WELL, WHY WOULD IT BE AWFUL FOR HIM TO TEXT YOU AT

 8    ANY TIME IF HE'S --

 9         A    IT WAS JUST A LATE NIGHT MESSAGE THAT I DIDN'T

10    REFER TO AS A BOOTY CALL.  I WAS JUST REFERENCING THAT IT WAS

11    VERY LATE.  I'M NOT USED TO GETTING MESSAGES THAT LATE.  AND

12    I GUESS THAT MIGHT -- I WASN'T REALLY THINKING WHEN I TYPED

13    THAT, I GUESS, IS MY ANSWER.

14         Q    WELL, I GUESS I'M JUST TRYING TO UNDERSTAND WHAT

15    WOULD BE AWFUL ABOUT RECEIVING A TEXT OR MESSAGE FROM A GUY

16    YOU LIKE AT WHATEVER TIME.  AS YOU TEXTED WITH KYLE AND KYLE

17    SAID THAT SHOWS HE IS THINKING ABOUT YOU.  WHY IS THAT -- WHY

18    IS THAT AWFUL?

19         A    I THINK I WAS JUST REFERENCING THE LATE TIME.

20    THERE WAS NO ILL INTENT BY ME SAYING "SO AWFUL."  I THINK I

21    JUST REALLY TYPED IT WITHOUT THINKING.

22         Q    PAGE 45.  MONDAY, MAY 17.  AND IT'S PAGE 44 THAT

23    SHOWS YOU THE DATE AND TIME.  MAY 17, 11:36.  WE'RE GOING TO

24    TALK ABOUT WHAT'S WRITTEN ON PAGE 45.

25              YOU, "DUDE.  I NEED TO BE HONEST WITH YOU ABOUT

26    SOMETHING AND HOPEFULLY YOU DON'T FREAK OUT BUT I'M IN SHOCK.

27    TREVOR CAME DOWN TO SD LAST NIGHT AND WE WENT TO MY OLD

28    APARTMENT.  I GAVE HIM CONSENT FOR ROUGH SEX BUT HE TOOK IT
```

```
 1   TOO FAR AND MY FACE IS SUPER FUCKED UP."

 2           NOW, TREVOR DIDN'T COME DOWN TO SD ON MAY 16, DID

 3   HE?

 4      A    NO, HE DIDN'T.

 5      Q    AND YOU AND TREVOR DIDN'T GO TO YOUR OLD APARTMENT,

 6   DID YOU?

 7      A    NO.

 8      Q    SO -- AND ALSO WHEN YOU PREFACED WHAT YOU WERE

 9   ABOUT TO SAY TO HER BY SAYING, "I NEED TO BE HONEST WITH YOU

10   ABOUT SOMETHING," EVEN THAT WAS A LIE; RIGHT?

11      A    YES.

12      Q    BECAUSE YOU SAID, "I WANT TO BE HONEST ABOUT

13   SOMETHING," AND THEN IT WAS A LIE?

14      A    YES.

15      Q    RIGHT.  OKAY.  YOU SAID LISA IS YOUR A.A. SPONSOR;

16   RIGHT?

17      A    SHE IS.

18      Q    AND A VERY GOOD FRIEND OF YOURS?

19      A    YES.

20      Q    HONESTY IS THE CORNERSTONE OF A.A., ISN'T IT?

21      A    YES, IT IS.

22      Q    SO NOW YOU LIED TO YOUR BEST FRIEND MELY.  AND HERE

23   YOU'RE LYING TO YOUR SPONSOR?

24      A    YES.

25      Q    PAGE 47.  "I AM OKAY HONESTLY I'M JUST LIKE WHAT IN

26   THE FUCK.  RUDE FUCKING AWAKENING FOR ME TO CUT THIS SHIT OUT

27   ONCE AND FOR ALL."  WHAT SHIT ARE YOU TALKING ABOUT CUTTING

28   OUT THERE?
```

```
 1        A    I THINK THAT I AM REFERRING TO CHASING ATTENTION
 2   AND CHASING SELF-WORTH OUT OF MEN.
 3        Q    AND IS THAT SOMETHING THAT YOU HAD PREVIOUSLY
 4   DISCUSSED WITH LISA?
 5        A    YES, IT IS.
 6        Q    SO YOU BELIEVED THAT SHE UNDERSTOOD THAT THAT'S
 7   WHAT YOU WERE TALKING ABOUT WHEN YOU SAID "CUT THE SHIT OUT
 8   ONCE AND FOR ALL"?
 9        A    YES.
10        Q    YOU, "I LITERALLY HAVE NOT SPOKEN ONE WORD TO HIM.
11   AND I NEVER EVER FUCKING WILL AGAIN."  NOW, YOU HAD LITERALLY
12   TEXTED TREVOR ONE HOUR BEFORE YOU'RE TEXTING THAT TO LISA;
13   RIGHT?  IF YOU LOOK AT TB 89.
14        A    I WAS TO GOING TO SAY --
15        Q    YEAH.  YOU CAN LOOK AT TB 89 AND LOOK AT THE TIME
16   THERE AND THE TIME YOU'RE TELLING HIM -- EXCUSE ME -- TELLING
17   LISA THAT YOU HAVE NOT SPOKEN ONE WORD TO HIM.
18        A    I DO REMEMBER WHAT YOU'RE REFERENCING.
19        Q    OKAY.
20        A    YES, I DID SAY THAT.  I WAS IN A HIGHLY EMOTIONAL
21   ANGRY STATE.  AND I HAVE -- I HAD INJURY SYMPTOMS SO I REALLY
22   WASN'T -- I WILL OWN THAT.
23        Q    OKAY.  AND YOU ALSO CALLED HIM; RIGHT?
24        A    WHAT DID YOU SAY?
25        Q    YOU ALSO CALLED HIM WHEN YOU SAID, "YOU'RE NEVER
26   GOING TO TALK TO HIM AGAIN.  YOU HAVEN'T TALKED TO HIM.
27   YOU'RE NEVER GOING TO TALK TO HIM."  BUT YOU HAD TEXTED HIM
28   AND CALLED HIM JUST AT THE TIME THAT YOU'RE SAYING THIS?
```

```
 1        A    I HADN'T CALLED HIM BEFORE THAT TEXT MESSAGE YOU'RE
 2   REFERENCING.
 3        Q    I'M SORRY?
 4        A    I HADN'T CALLED HIM BEFORE THAT TEXT MESSAGE THAT
 5   YOU ARE REFERENCING.
 6        Q    BUT YOU DID CALL HIM, DIDN'T YOU, AFTER YOU SAID
 7   YOU ARE NEVER GOING TO CALL HIM AGAIN?
 8        A    YES, I DID RETURN HIS CALL.
 9        Q    NOW, ISN'T LISA SOMEBODY WHO YOU CAN BE OPEN AND
10   HONEST WITH YOU?
11        A    YES, SHE IS.
12        Q    OKAY.  SO -- AND YOU TESTIFIED A GREAT DEAL ABOUT
13   NEEDING TO TALK AND OWN YOUR FEELINGS AND -- I MEAN, IS THERE
14   A REASON THAT YOU COULDN'T SAY TO HER, I JUST TALKED TO HIM.
15   I'M GOING TO TRY NOT TO TALK TO HIM AGAIN.  I JUST TEXTED
16   WITH HIM.
17             WHY WOULD YOU SAY, HAVING JUST TEXTED WITH HIM, I
18   HAVEN'T -- I HAVEN'T?
19        A    THE REASON BEHIND THAT IS THAT SHE WAS THE ONE THAT
20   TOLD ME NOT TO GO SEE HIM IN L.A.  SHE SAID, "YOU ARE NOT
21   GOING TO DRIVE THERE.  IF HE WANTS TO SEE YOU, HE IS GOING TO
22   COME DOWN."  I WAS EMBARRASSED I WENT TO L.A.  SHE WAS NOT A
23   FAN OF ME COMMUNICATING OR BEING INVOLVED WITH HIM.  AND SO
24   THAT IS WHY.  AND, LIKE I SAID, I WILL OWN IT IN MY HIGHLY
25   EMOTIONAL STATE.  BUT THAT IS WHY I RESPONDED IN THAT WAY
26   BECAUSE I WAS EMBARRASSED AND INSECURE.
27        Q    OKAY.  PAGE 61, SATURDAY MAY 29.  YOU AND LISA ARE
28   TEXTING STARTING AT 4:02 P.M.  CAN YOU SEE THAT?
```

1      A    YES, I DO.

2      Q    PAGE 62 AND 63.  LISA, "HEY BITCH.  PRETTY SOON IT

3  WILL BE LIKE HEY RICH BITCH."  YOU, "DECEASED.  EVERY

4  MORNING.  HOPPING IN THE GOD DAMN RANGE ROVER."  LISA, "YOU

5  CAN MAKE IT RAIN DAILY."  YOU, "ON THE WAY TO OUR BEAUTY

6  SALON."

7      WHY ARE YOU AND LISA JOKING ABOUT HOW YOU'RE GOING

8  TO BE A RICH BITCH SOON?

9      A    THAT CONVERSATION STARTS BECAUSE WHEN I STAY OVER

10  AT HER HOUSE, EVERY MORNING WE SAY "HEY BITCH" WHEN WE WAKE

11  UP.  SO THAT'S WHERE THAT JOKE STEMS FROM.  SHE WAS THE ONE

12  THAT BROUGHT UP THIS MONEY TOPIC.  AND I WAS REALLY JUST

13  PLAYING ALONG WITH IT LIKE I DO WITH HOW I COMMUNICATE.  IT'S

14  VERY CLEAR HOW I COMMUNICATE.  THERE WAS NO ILL INTENT BEHIND

15  THAT AT ALL.

16      Q    MAY 31ST ON PAGE 66.  "WATCHING THE DODGERS GAME."

17  IT LOOKS LIKE YOU SAY, "BAUER GETTING RIPPED TONIGHT.  THREE

18  BATTERS HIT HOMERUNS OFF HIM," WITH A LAUGHING EMOJI.  AGAIN,

19  YOU'RE ABLE TO WATCH TREVOR PLAY BASEBALL; RIGHT?

20      A    YES.

21      Q    OKAY.  PAGE 76, 77.  YOU SENT LISA A BLACK AND

22  WHITE PHOTO OF YOURSELF IN A CHAIR AND WROTE, "I THINK I'M

23  POSTING THIS LAST PIC BEFORE I HAVE TO DEACTIVATE AND MY LIFE

24  CHANGED FOREVER.  STRONG GIRL SUMMER.  THEN BYE LOL.  USING

25  MY TIME WHILE I DON'T HAVE TO HIDE.  BAD ASS PICK TOO."

26  LISA, "I REALLY LOVE THIS PIC.  BUT PLEASE DON'T POST."  YOU,

27  OMG IS IT BAD.  WILL THEY USE IT AGAINST ME."

28      LISA, "YOU'RE SUPPOSED TO BE STRUGGLING MENTALLY

```
1  NOT POSTING.  YES.  DO NOT POST ANYTHING."  YOU, "OMG.  YES."
2  LISA, "I'M SORRY.  BUT JUST NO."  YOU, "NO IT MAKES SENSE.
3  THANK YOU FOR CATCHING THAT.  OMG."  LISA, "THAT WOULD BE A
4  TERRIBLE MISTAKE."  YOU, "THANK GOD I ASKED YOU.  ONE
5  HUNNID."
6         LISA, "I KNOW YOU WANT TO BUT IT'S TERRIBLE FOR
7  YOUR CASE.  HUNNID.  NOTHING.  ZILCH.  ZIP.  NADA.  YOU'RE A
8  GHOST.  HE RUINED YOUR LIFE.  YOU'RE BASICALLY JUST TRYING TO
9  NOT KILL YOURSELF AND STAY OUT OF THE MENTAL WARD.  YOU'RE IT
10 A HAPPY SUMMER BEACH BABE POSTING ON IG.  NOT.  THEY WILL USE
11 THAT SHIT AGAINST YOU."  YOU, "ALL SO TRUE.  NOTHING.  GHOST
12 MODE HAS BEEN SOLIDIFIED.  LISA, "SECURE THE BAG."
13        WHAT DOES SECURE THE BAG MEAN?
14     A   SO IF YOU LOOK UNDER THOSE TEXT MESSAGES, IT SAYS,
15 "OMG DAKOTA.  I MISS HIM."  DAKOTA IS HER SON.  AND THE
16 PHRASE THAT DAKOTA USES CONSTANTLY IS "SECURE THE BAG."  SO
17 ME AND LISA EXCHANGED THAT AS DO WHAT YOU NEED TO DO.  SECURE
18 THE BAG.
19     Q   SECURE THE BAG DOESN'T MEAN GET THE MONEY?
20     A   IT CAN BE INTERPRETED THAT WAY.  YES.
21     Q   WELL, ISN'T THAT ITS GENERAL MEANING, SECURE THE
22 BAG?
23     MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
24     THE COURT:  OVERRULED.  YOU MAY ANSWER.
25     MS. OLSON:  AND LACK OF FOUNDATION.
26     THE COURT:  YOU MAY ANSWER.
27     THE WITNESS:  CAN YOU ASK ONE MORE TIME?
28     Q   BY MS. HOLLEY:  ISN'T THE GENERAL MEANING OF SECURE
```

```
1    THE BAG GET THE MONEY?
2         A    I AM NOT SURE.
3         Q    ALL RIGHT.  PAGE 170.  YOU SAY TO LISA, "BAUER'S
4    ATTORNEY SENT A LETTER TO MINE THIS MORNING SAYING I DON'T
5    NEED PROTECTION.  AND I AM DOING THIS TO RUIN HIS PUBLIC
6    IMAGE.  AND THEY WILL PURSUE ALL LEGAL ACTION FOR DEFAMATION
7    OF CHARACTER.  LIKE, OKAY, YES I DO NEED PROTECTION YOU
8    MOTHERFUCKERS.  IT'S CALLED HIM HAVING A MENTAL BREAKDOWN
9    WHEN IT GOES PUBLIC AND HIM COMING AFTER ME."  DO YOU SEE
10   THAT?
11        A    YES, I DO.
12        Q    OKAY.  SO WHAT YOU'RE SAYING HERE IS THAT YOU NEED
13   PROTECTION FROM TREVOR BECAUSE OF WHAT HE MIGHT DO ONCE HE
14   FINDS OUT YOU FILED A RESTRAINING ORDER; RIGHT?
15        A    YES.
16        Q    SO SIMILAR TO WHAT HAPPENED WITH THE HOSPITAL,
17   WHICH WAS HE MAY DO SOMETHING TO ME IF HE LEARNS I'M IN THE
18   HOSPITAL.  AND THEN YOU SENT A PICTURE OF YOURSELF FROM THE
19   HOSPITAL.  THIS IS KIND OF SIMILAR TO THAT, WHICH IS YOU
20   FILED FOR A RESTRAINING ORDER.  AND THEN YOU SAY, I NEED
21   PROTECTION BECAUSE IS HE GOING TO FIND OUT I FILED FOR A
22   RESTRAINING ORDER; RIGHT?
23        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
24        THE COURT:  SUSTAINED.  IT IS ARGUMENTATIVE.
25        Q    BY MS. HOLLEY:  PAGE 173.  "RESTRAINING ORDER
26   GRANTED.  HE CAN'T TOUCH ME NOW.  THE PEACE I HAVE BEEN
27   WAITING FOR."  NOW, THAT'S ON JUNE 29TH.  YOU HADN'T HEARD
28   FROM TREVOR AT ALL SINCE YOU LAST TEXTED HIM ON MAY 31ST;
```

1    RIGHT?

2         A    YES, AND THAT'S WHAT SCARED ME.

3         Q    SO IT SCARED YOU THAT YOU HADN'T HEARD FROM HIM?

4         A    YES.

5         Q    SO HE WAS DISTURBING YOUR PEACE BY NOT CONTACTING

6    YOU?

7         A    NO.  THAT'S NOT HOW I WOULD PUT IT.

8         Q    YOU ALSO SAY, "THE MEDIA IS FREAKING OUT.  ON MY

9    SIDE.  IT'S THE BEST THING I COULD HAVE HOPED FOR."

10        A    YES.

11        Q    WHAT DOES THE MEDIA FREAKING OUT HAVE TO DO WITH

12   YOUR NEEDING PROTECTION?

13        A    I WAS REFERRING TO -- I KNEW IT WAS GOING TO GO

14   PUBLIC.  AND I WAS TRYING TO LOOK FOR THE POSITIVES IN THE

15   PUBLIC HAVING ACCESS TO THIS INFORMATION.  AND IT FELT GOOD

16   TO NOT SEE ME SLUT SHAMED AND DEGRADED RIGHT OFF THE BAT.

17        Q    YOU SAY, "EVERYONE TWEETING ROUGH SEX DOESN'T MEAN

18   A CONCUSSION."  WHAT DOES EVERYONE TWEETING HAVE TO DO WITH

19   YOUR NEED FOR PROTECTION?

20        MS. OLSON:  OBJECTION.  ASSUMES FACTS.

21        THE COURT:  OVERRULED.  YOU MAY ANSWER.

22        THE WITNESS:  I'M SORRY.  WHAT PAGE ARE YOU ON?

23        Q    BY MS. HOLLEY:  I THINK IT COMES RIGHT AFTER WHAT

24   WE WERE LOOKING AT.  174.

25        A    I'M ON 174.  I DON'T SEE THE TEXT YOU'RE REFERRING

26   TO.

27        Q    175.

28        A    OKAY.  AND YOUR QUESTION WAS AGAIN?  I'M SORRY.

1    Q    YOU SAY, "EVERYONE IS TWEETING ROUGH SEX DOESN'T

2  MEAN A CONCUSSION."  MY QUESTION IS WHAT DOES EVERYONE'S

3  TWEETING HAVE TO DO WITH A COURT CASE YOU BROUGHT IN

4  LOS ANGELES SUPERIOR COURT ASKING FOR PROTECTION.  WHAT DOES

5  EVERYONE TWEETING HAVE TO DO WITH THAT?

6    A    IT DOESN'T.  LIKE I SAID, I WAS SIMPLY JUST STATING

7  IT FELT GOOD TO INITIALLY SEE THAT I WASN'T GETTING SLUT

8  SHAMED RIGHT OFF THE BAT.  AND THAT PEOPLE COULD SEE IT FOR

9  WHAT IT WAS.

10    Q    OKAY.  PAGE 175.  YOU, "SO MY DECLARATION AND PICS

11  WILL MOST LIKELY BE OUT TOMORROW WHEN THE PUBLIC FINDS IT AND

12  THEN IT'S GAME OVER."  YOU WROTE THAT; RIGHT?

13    A    YES.

14    Q    AND THEN ON 176.  YOU, "IT MAY GNARLY BUT THE MEDIA

15  IS ON MY SIDE."  DO YOU SEE THAT?

16    A    YES, I DO.

17    Q    OKAY.  AND THEN -- GIVE ME ONE SECOND -- YOU WROTE

18  ON -- HOLD ON ONE SECOND.

19    MS. HOLLEY:  MAY I HAVE A MOMENT?

20    THE COURT:  SURE.

21    Q    BY MS. HOLLEY:  PAGE 178.  "DUDE MY SIDE OF THE

22  STORY NEEDS TO COME OUT.  I SENT THIS TO MY TEAM THIS

23  MORNING."

24        IT LOOKS LIKE YOU SENT THIS TO DOREEN, FRED, MARC,

25  AND MEREDITH.  "HI ALL.  I JUST WANTED TO THANK YOU SO MUCH

26  FOR THE HARD WORK YOU HAVE ALL DONE FOR ME.  THIS IS

27  DEFINITELY THE FIRST STEP IN HIS ACCOUNTABILITY PROCESS.  I

28  JUST WANTED TO REACH OUT AND CONFIRM WITH YOU THAT IT IS

```
1    REALLY MY HOPE THAT IF THE MEDIA DOES NOT PUT OUT FACTS FROM
2    MY DECLARATION OR THE PICTURES BY THIS EVENING, THAT WE DO
3    IT.  I AM TRYING TO STAY OUT OF THE MEDIA STUFF AS MUCH AS I
4    CAN, BUT THE WAY HIS AGENT SPOKE ABOUT ME CREATES A
5    RIDICULOUS STORY.  I JUST WANT TO FEEL AHEAD OF THIS BEFORE
6    THEY ALL START BASHING ME FURTHER.  AS WELL AS COMMUNICATING
7    TO THE P.D. THAT PEOPLE ACTUALLY UNDERSTAND THE REALITY OF
8    WHAT HAPPENED SO THEY CAN'T SHIELD HIM.  YOU GUYS KNOW BETTER
9    THAN I DO IN TERMS OF WHEN THE MEDIA CAN ACTUALLY GET AHOLD
10   OF THE FULL RO REPORT, SO I COMPLETELY TRUST YOU WITH THAT.
11   HOWEVER, JUST WANTED TO EXPRESS MY NEED TO HAVE IT OUT BY THE
12   END OF THE EVENING IF NOT.  THANK YOU SO MUCH AND I WILL TALK
13   TO YOU GUYS SOON."
14            SO YOU WERE INTERESTED IN THE FIRST STEP OF
15   TREVOR'S ACCOUNTABILITY PROCESS; RIGHT?
16        A    YES.
17        Q    AND YOU WANTED HIM TO HAVE CONSEQUENCES; CORRECT?
18        A    YES, I DID.
19        Q    ALL RIGHT.  PAGE 184.  "OMG I'M GOOD.  THIS IS
20   GOING EXACTLY THE WAY WE WANTED IT TO."
21            HOW IS THE WAY YOU WANTED IT?  WITH EVERYBODY
22   TWEETING AND THE MEDIA HAVING IT AND WRITING ABOUT IT?
23        A    YES.  AFTER MR. FETTEROLF'S SLUT SHAMING STATEMENT,
24   IT IS THE WAY I WANTED TO GO FORWARD WITH THE MEDIA.
25        Q    AND YOU THOUGHT MR. FETTEROLF'S STATEMENT
26   INDICATING THAT THERE WAS CONSENSUAL SEX WAS SLUT SHAMING?
27        A    ABSOLUTELY.
28        Q    PAGE 188.  YOU, "THE WHITE HOUSE IS AWARE."
```

1       A    YES.

2       Q    SO YOU WERE EXCITED THAT THE MEDIA, THE

3  TWITTERSPHERE, THE WHITE HOUSE WAS ALL AWARE OF THIS;

4  RIGHT?

5       A    THE WHITE HOUSE WAS MORE OF A SARCASTIC JOKE.

6       Q    AND THIS IS AROUND THE TIME THAT LISA SHOWED YOU

7  THAT YOUR LAWYERS DIDN'T REDACT YOUR NAME OR TAKE YOUR NAME

8  OFF THE PAPERWORK THAT WAS FILED FOR THE MEDIA?

9       A    CAN YOU REPEAT THAT?

10      Q    LISA IS THE ONE WHO POINTED OUT TO YOU THAT YOUR

11 LAWYERS DID NOT REDACT YOUR NAME -- AND "REDACT" IS

12 OBLITERATE OUT.

13      A    YES.  I SEE WHAT TEXT MESSAGE YOU'RE REFERRING

14 TO.

15      Q    OKAY.  SHE IS THE ONE WHO SHOWED YOU THAT HAPPENED;

16 RIGHT?

17      A    YES.

18      Q    OKAY.  NOW, LET'S GO BACK -- LET'S GO TO EXHIBIT E,

19 WHICH ARE TEXTS BETWEEN YOU AND MELY.  AND THESE ARE

20 DIFFERENT BECAUSE THEY WERE PRODUCED BY MELY, WHICH IS WHY IT

21 SEEMS KIND OF CRAZY AND OUT OF ORDER.  BUT WE GOT THOSE

22 FIRST.  AND THOSE WERE MARKED AS EXHIBIT E.  HAVE YOU SEEN

23 THOSE BEFORE?

24      A    ALL OF THESE TEXT MESSAGES?

25      Q    YES.

26      A    YES.

27      Q    WHERE THERE'S, LIKE, A PICTURE TAKEN; RIGHT?

28      A    YES, I HAVE.

```
1        Q    OKAY.  SO THOSE ARE COMMUNICATIONS BETWEEN YOU AND
2   MELY; CORRECT?
3        A    YES.
4        MS. HOLLEY:  I ASK THOSE BE ADMITTED INTO EVIDENCE.
5        THE COURT:  ANY OBJECTION?
6        MS. OLSON:  NO OBJECTION.
7        THE COURT:  THEY ARE ADMITTED.
8        Q    BY MS. HOLLEY:  THANK YOU.  NOW, ON THE FIRST PAGE
9   SHE INDICATES THAT SHE ONLY HAS ACCESS TO SOME OF THESE,
10  BECAUSE SHE HAS A FUNCTION ON HER PHONE THAT DELETES AFTER 30
11  DAYS; RIGHT?
12       A    YES.
13       Q    OKAY.  SO THESE ARE REALLY FROM JUNE FORWARD?
14  THERE'S NOT -- OBVIOUSLY DIFFERENT THAN WHAT WE'VE BEEN
15  LOOKING AT.
16       A    YEAH, IT'S CONFUSING.
17       Q    BUT YOU CAN KIND OF GLEAN WHERE IT'S FROM?
18       A    YES.
19       Q    YOU, "GOT ALL THE PAPERWORK FOR THE RESTRAINING
20  ORDER."  WITH CLAPPING HANDS.  MELY, "AMAZING.  DOES THAT
21  MAKE YOU FEEL BETTER?"  YOU, "YES.  SO MUCH FUCKING BETTER.
22  THAT MEANS HE'S GONNA TO KNOW SHITS GOING DOWN AND HE'S
23  FUCKED."  OKAY.  THAT'S ACCURATE; RIGHT?  I READ THAT
24  ACCURATELY?
25       A    YES.
26       Q    NOW, ON PAGE 11, THIS CONCERNS THE INSTAGRAM
27  MESSAGES THAT DEREK PROVIDED; RIGHT?
28       A    YES.
```

417

1      Q    YOU SAY, "DEREK.  FUCKING PIECE OF FUCKING LYING

2   SHIT."  NOW, WHAT DID DEREK LIE ABOUT?

3      A    I WOULD HAVE TO HAVE HIS FULL STATEMENTS IN FRONT

4   OF ME.  HE LIED ABOUT A LOT.  FIRST OF ALL, HE LIED TO ME

5   SAYING THAT TREVOR'S PRIVATE INVESTIGATOR HAD REACHED OUT TO

6   HIM.  AND WE FOUND OUT LATER THAT THAT WAS NOT TRUE.  HE LIED

7   ABOUT ME MAKING A SEXUAL ASSAULT CLAIM THAT I NEVER MADE.  I

8   WOULD NEED TO HAVE HIS STATEMENTS IN FRONT OF ME TO CONTINUE

9   THE LIST, BUT THERE'S A LOT HE LIED ABOUT.

10     Q    SO YOU'RE NOT SAYING THAT HE WAS LYING BY PROVIDING

11  THE MESSAGES BETWEEN YOU AND HIM, BECAUSE THOSE WERE JUST --

12  I MEAN, I UNDERSTAND YOU CONSIDERED THAT DISLOYAL?

13     A    TOTALLY.

14     Q    BUT IT WASN'T LYING?

15     A    YES.  HE HANDED THAT OVER BUT THE INFORMATION HE

16  GAVE, HE LIED A LOT.

17     Q    THANK YOU.  UNDERSTOOD.  PAGE 12.  THEY THINK HE IS

18  GONNA TRY TO SETTLE WITH ME.  OFFER ME MAJOR CASH THEN MAKE

19  ME SIGN AN NDA."  WHO IS THE "THEY"?

20     A    I WAS REFERRING TO MY LAWYERS AT THAT POINT.

21     Q    OKAY.  NOW, NONE OF THAT HAS HAPPENED; RIGHT?

22     A    NO, IT HASN'T.  THEY WERE EXPLAINING TO ME HOW --

23  THE DIFFERENT OPTIONS OF HOW A RESTRAINING ORDER CAN GO.

24     Q    PAGE 13, JUNE 26 AT 11:16.  MELY, "BUT YOU'RE STILL

25  SERVING HIM RIGHT?"  YOU, "YUP.  MONDAY MORNING HE GETS

26  NOTIFIED.  TUESDAY MORNING IT GETS FILED AND GOES PUBLIC.

27  SCARY BUT GOOD.  TUESDAY WE FUCKING CELEBRATE."  YOU WROTE

28  THAT; RIGHT?

1        A    YES, I DID.

2        THE COURT:  IT IS 10:00 O'CLOCK NOW.  WHY DON'T WE TAKE

3    OUR MORNING BREAK.  WE'LL RESUME AT 10:15.

4        MS. HOLLEY:  THANK YOU.

5                   (RECESS TAKEN.)

6        THE COURT:  WHENEVER YOU'RE READY.

7

8                   LINDSEY HILL,

9    CALLED AS A WITNESS ON HER OWN BEHALF, WAS SWORN AND

10   TESTIFIED AS FOLLOWS:

11

12                  CROSS EXAMINATION (RESUMED)

13   BY MS. HOLLEY:

14       Q    PAGE 23.

15       A    ALL RIGHT.  I'M ON 23.

16       Q    OKAY.  "SO MONDAY" -- THIS IS YOU -- "MY ATTORNEYS

17   NOTIFY TREVOR, HIS AGENT, AND THE DODGERS MANAGER WE ARE

18   FILING A CIVIL RESTRAINING ORDER.  THEN TUESDAY THE

19   RESTRAINING ORDER IS FILED.  IT WILL BE PICKED UP BY THE

20   MEDIA.  AND HIS LIFE IS OVER.  THANK YOU GOD.  FINALLY."

21   MELY, "FUCK YES.  FINALLY."  YOU, "LET'S FUCKING DO THIS

22   SHIT.  SO I MIGHT LITERALLY HIDE AT YOUR HOUSE LOL."  MELY --

23       MS. OLSON:  OBJECTION, YOUR HONOR.  THIS LINE OF

24   QUESTIONING, THE DOCUMENT SPEAKS FOR ITSELF.

25       THE COURT:  IT DOES.  BUT SHE IS INQUIRING IT DISCRETELY

26   WITH REGARD TO DIFFERENT SECTIONS, WHICH IS PERFECTLY

27   ALLOWED.

28       Q    BY MS. HOLLEY:  MELY, "OMG.  SO SORRY I DIDN'T

```
 1    RESPOND.  I READ IT AND FORGOT LOL.  LET'S HE TIK TOK FAMOUS.
 2    ALSO, ARE YOU WATCHING THE GAME?"  YOU, "OMG I AM IN
 3    BREATHWORK.  BUT I SAW BAUER IS GETTING FUCKED.  I HAVE
 4    UPDATES ON THAT.  HIS LIFE IS OVER ON MONDAY.  HE'S DONE.
 5    I'LL CALL YOU AT LIKE 9."  MELY, "OMFG.  I NEED ALL THE
 6    DEETS."  YOU, LOL TWO HOMERS IN INNING ONE.  I'M DEAD.
 7    FUCKER.  THIS IS HIS LAST MLB START."
 8            THAT IS AN EXCHANGE BETWEEN YOU AND YOUR BEST
 9    FRIEND MELY; RIGHT?
10        A    YES.
11        Q    AND YOU WERE VERY EXCITED ABOUT THE FACT THAT
12    TREVOR WAS GOING TO BE, AS YOU SAY, "FUCKED," AND NOT BE ABLE
13    TO START AS A PITCHER IN THE MLB IF EVERYTHING GOES ACCORDING
14    TO YOUR PLAN; RIGHT?
15        A    YES.
16        Q    NOW, IN ALL OF THESE TEXTS BETWEEN YOU AND MELY,
17    YOU DON'T SAY ONE WORD ABOUT FEELING RELIEVED ABOUT THE
18    RESTRAINING ORDER IS FILED SO YOU CAN FEEL SAFE.  IT'S ALL
19    ABOUT BEING PICKED UP BY THE MEDIA, HIS ACCOUNTABILITY,
20    ENDING HIS LIFE, DESTROYING HIS CAREER.  I MEAN, THAT'S WHAT
21    YOUR FOCUS IS IN THESE COMMUNICATIONS WITH MELY; RIGHT?
22        A    NO.  THERE IS A TEXT THREAD THAT TALKS ABOUT HAVING
23    PEACE AND SAFETY.
24        Q    WE TALKED ABOUT THAT, RIGHT, ABOUT HAVING PEACE AND
25    THAT HIS NOT CALLING YOU WAS NOT PEACEFUL; RIGHT?
26        A    THAT'S NOT WHAT I'M REFERRING TO.
27        Q    OKAY.  WERE YOU GIVEN INFORMATION FROM THE SAN
28    DIEGO POLICE ON MAY 17 AND 18TH ABOUT HOW TO GO ABOUT GETTING
```

1  A RESTRAINING ORDER?

2      A    NO.

3      Q    DO YOU REMEMBER RECEIVING A PAMPHLET FROM THEM,

4  WHICH HAD INFORMATION ABOUT HOW TO GET AN EMERGENCY

5  PROTECTIVE ORDER?

6      A    I DO NOT.

7      Q    OKAY.  ON -- WELL, LET ME ASK YOU THIS.  YOU SAID

8  THAT WHEN TREVOR -- WHEN THE DODGERS WERE COMING TO SAN DIEGO

9  YOU HAD TO LEAVE TOWN BECAUSE YOU KNEW HE WAS COMING TO SAN

10 DIEGO; RIGHT?

11     A    YES.

12     Q    ON EXHIBIT J, PAGE 123.  SUNDAY, JUNE 20TH.  "OMG.

13 I HUNG OUT WITH MY DAD THIS MORNING.  NOW I'M RESTING.  WE

14 ARE GOING TO CHILI'S FOR DINNER.  SHOULD WE GOT TO THE PADS

15 GAME INCOGNITO ON TUESDAY LOL."

16          SO YOU WERE SUGGESTING TO MELY THAT YOU GUYS GO TO

17 THE SAN DIEGO PADRES DODGERS GAME, WHICH WAS THE GAME THAT

18 WAS ON THAT TUESDAY; RIGHT?

19     A    YES, BEFORE ME AND MY DAD SOLIDIFIED DATES TO GO TO

20 NORTHERN CALIFORNIA.

21     Q    BUT MY QUESTION HAS TO DO WITH THE FACT THAT YOU

22 SAID YOU HAD TO LEAVE TOWN -- LEAVE SAN DIEGO WHEN THE

23 DODGERS WERE COMING TO TOWN.  AND YET YOU ARE DISCUSSING

24 ACTUALLY GOING TO THE DODGERS PADRES GAME INCOGNITO?

25     A    I'M SORRY.  I KNOW WHAT YOU MEAN NOW.  YES, I

26 BELIEVE THAT I MEANT THAT AS A WITTY KIND OF JOKE.  I WOULD

27 NEVER GO TO THE PADRES DODGERS GAME.

28     Q    ON MAY 21ST YOU MADE A CALL TO TREVOR FROM THE

1  PASADENA POLICE DEPARTMENT; RIGHT?

2      A    YES, I DID.

3      Q    AT THE END OF THAT CALL, ISN'T IT TRUE THAT TREVOR

4  ASKED YOU IF YOU WOULD PREFER THAT HE NOT CALL YOU ANYMORE?

5      A    YES.  HE USED THE PHRASE "REACH OUT TO YOU AND

6  CHECK ON YOU."

7      Q    I THINK YOU TESTIFIED YOU WANTED TO LEAVE THE LINES

8  OF COMMUNICATION OPEN IN CASE THE PASADENA POLICE WANTED YOU

9  TO FURTHER ENGAGE WITH HIM; CORRECT?

10     MS. OLSON:  OBJECTION.  MISSTATES THE TESTIMONY.

11     THE COURT:  SHE CAN SAY NO.  THAT'S WHAT CROSS

12 EXAMINATION IS FOR.

13     MS. HOLLEY:  I THINK SHE WAS NODDING HER HEAD YES.

14     THE WITNESS:  CAN YOU REPEAT IT ONE MORE TIME.

15     Q    BY MS. HOLLEY:  I THINK YOU TESTIFIED YOU DIDN'T

16 TELL HIM NOT TO CONTACT YOU BECAUSE YOU WANTED TO LEAVE THE

17 LINES OF COMMUNICATION OPEN IN CASE THE PASADENA POLICE

18 DEPARTMENT WANTED YOU TO TALK WITH HIM AGAIN FOR THEIR

19 PURPOSES?  AM I WRONG ABOUT THIS?

20     A    I'M JUST LITTLE CONFUSED.  THE PHRASING WAS -- I

21 BELIEVE THAT I TESTIFIED THAT I SAID, YES, HE COULD CONTACT

22 ME BECAUSE I WAS TOLD NOT TO BLOCK HIS PHONE NUMBER.

23     Q    OKAY.  ALL RIGHT.  AND I UNDERSTAND THAT.  MY

24 QUESTION REALLY HAS MORE TO DO WITH WHAT TREVOR SAID TO YOU,

25 WHICH IS THAT HE EXPRESSED TO YOU A WILLINGNESS TO NOT REACH

26 OUT TO YOU IF THAT IS WHAT YOU WANT.  AND I UNDERSTAND THAT

27 YOU HAD A REASON WHY YOU SAID WHAT YOU SAID.  BUT FOCUSING ON

28 WHAT HE SAID, HE SAID THAT IF YOU DIDN'T WANT HIM TO REACH

```
1    OUT TO YOU, YOU SHOULD LET HIM KNOW THAT; RIGHT?
2         A    HE DIDN'T PHRASE IT LIKE THAT.  THAT'S WHY I'M
3    CONFUSED ON YOUR QUESTION.
4         Q    HE LET YOU KNOW THAT HE WAS WILLING TO ABIDE BY
5    YOUR WISHES WITH RESPECT TO CONTACTING YOU OR NOT?
6         MS. OLSON:  OBJECTION.  ASSUMES FACTS.
7         THE COURT:  OVERRULED.  YOU MAY ANSWER.
8         Q    BY MS. HOLLEY:  CORRECT?
9         A    IN A WAY, YES, THAT IS CORRECT.
10        Q    NOW, ON MAY 21ST IS WHEN YOU DID WHAT YOU ARE
11   CALLING A COLD CALL WITH THE PASADENA POLICE DEPARTMENT;
12   RIGHT?
13        A    YES.
14        Q    AND YOU -- TO THE JUDGE'S QUESTION YESTERDAY, YOU
15   ADMITTED HE DID NOT ACKNOWLEDGE HAVING ASSAULTED YOU, BUT
16   WHAT HE SAID WAS THAT HE WAS JUST TRYING TO FOLLOW YOUR LEAD;
17   RIGHT?
18        MS. OLSON:  OBJECTION.  MISSTATES THE TESTIMONY.
19        THE COURT:  SHE CAN SAY NO.  SHE CAN SAY YES.  OR SHE
20   CAN SAY I DON'T REMEMBER.  THAT'S UP TO HER.  YOU MAY
21   ANSWER.
22        THE WITNESS:  I'M A LITTLE CONFUSED ON THE QUESTION.
23   CAN YOU SAY IT AGAIN?
24        Q    BY MS. HOLLEY:  DID TREVOR SAY TO YOU IN THAT CALL
25   THAT HE WAS JUST TRYING TO FOLLOW YOUR LEAD?
26        A    YES, HE DID SAY THAT.
27        Q    IN PARAGRAPH 26 OF YOUR DECLARATION, WHICH IS LH
28   14, YOU SAY THAT TREVOR TEXTED AND CALLED YOU NON-STOP FOR
```

423

1  TWO WEEKS?

2      A    YES, I DID SAY THAT.

3      Q    OKAY.  NOW, IF YOU LOOK AT EXHIBIT B, WHICH SHOWS

4  ALL THE TEXT COMMUNICATIONS BETWEEN YOU AND TREVOR FROM MAY

5  16 TO MAY 31ST --

6      A    WHICH PAGES ARE YOU REFERRING TO IN B?

7      Q    91 TO 101.

8      A    YES, I HAVE THEM HERE.

9      Q    OKAY.  COULD YOU TAKE A LOOK AT THOSE PAGES.

10  BECAUSE I WANT TO ASK YOU IF YOU STAND BY YOUR STATEMENT THAT

11  HE TEXTED YOU NON-STOP.  PAYING ATTENTION TO THE TIME FRAME.

12      A    YES.  I TOTALLY UNDERSTAND WHAT YOU MEAN.  I THINK

13  WHEN I WROTE THE DECLARATION I WAS GIVING MY BEST ESTIMATE AS

14  TO WHEN THE FIRST TEXT AND THE LAST TEXT WAS SENT AS A

15  CONVERSATION AS A WHOLE.

16      Q    DO YOU HAVE ANY PHONE RECORDS THAT SHOW HE WAS

17  CALLING YOU NON-STOP?

18      A    HE CALLED ME IN THE HOSPITAL.  AND I DID RECEIVE

19  ONE MORE MISSED CALL FROM HIM WHEN HE WAS TRYING TO REACH ME

20  AFTER THAT.

21      Q    AND YOU CONSIDERED THAT CALLING YOU NON-STOP?

22      MS. OLSON:  OBJECTION.  MISSTATES THE TESTIMONY.

23      THE COURT:  OVERRULED.  YOU MAY ANSWER YES OR NO.

24      THE WITNESS:  YES, I DID.  WITH THE AMOUNT OF TEXTING

25  AND THE CALLS INCLUDED, I FELT -- THAT'S THE WAY I FELT.

26      Q    BY MS. HOLLEY:  IN PARAGRAPH 27 OF YOUR

27  DECLARATION, YOU SAID, "TREVOR OFFERED TO HELP ME FINANCIALLY

28  BECAUSE I WAS UNABLE TO WORK DUE TO MY INJURIES.  HE EVEN

```
 1   OFFERED TO SEND GROCERIES TO MY HOME."  DO YOU SEE THAT IN

 2   YOUR DECLARATION?

 3        A    IN WHAT PARAGRAPH?

 4        Q    PARAGRAPH 27.

 5        A    YES, I DO.

 6        Q    BUT, IN FACT, TREVOR'S TEXT WAS -- AND IF YOU WANT

 7   TO LOOK AT IT, IT'S ON TB 100.  "HEY YOU.  HOPING YOU SLEPT

 8   WELL AND ARE FEELING BETTER.  I KNOW YOU SAID YOU'D BEEN

 9   STAYING HOME AND HAVEN'T BEEN ABLE TO DO MUCH.  WAS WONDERING

10   IF IT WILL BE HELPFUL IF I SENT YOU SOME STUFF?  LIKE

11   GROCERIES OR DESSERTS OR SOMETHING?  JUST TRYING TO THINK OF

12   WAYS I CAN HELP."

13             IS THAT WHAT YOU'RE REFERRING TO WHEN HE IS

14   OFFERING TO HELP YOU FINANCIALLY?

15        A    NO, THAT'S NOT.

16        Q    PARAGRAPH 29 OF YOUR DECLARATION.  "I FEEL ISOLATED

17   HAVING TO RESPOND TO TREVOR'S TEXTS.  AND I SUFFER EXTREME

18   STRESS AND ANXIETY WHEN HE SENDS ME MESSAGES."

19        A    YES.

20        Q    YOU SAID THAT ON JUNE 28, WHICH WAS ALMOST A MONTH

21   AFTER YOUR LAST COMMUNICATION WITH HIM.  SO ON JUNE 28TH YOU

22   HADN'T EXPERIENCED EXTREME STRESS AND ANXIETY WHEN HE SENDS

23   YOU MESSAGES BECAUSE HE HADN'T SENT YOU ANY MESSAGES;

24   RIGHT?

25        MS. OLSON:  OBJECTION.  ARGUMENTATIVE.

26        THE COURT:  OVERRULED.  YOU MAY ANSWER.

27        THE WITNESS:  CAN YOU ASK ME ONE MORE TIME?

28        Q    BY MS. HOLLEY:  YEAH.  TREVOR HAD NOT SENT YOU A
```

```
1   MESSAGE SINCE, I BELIEVE, MAY 30TH; RIGHT?  AND ON JUNE 28TH,
2   ALMOST A MONTH LATER, YOU SAY, "I SUFFER EXTREME STRESS AND
3   ANXIETY WHEN HE SENDS ME MESSAGES."  BUT HE HADN'T SENT YOU A
4   MESSAGE IN ALMOST 30 DAYS; RIGHT?
5        A    YES, THAT'S CORRECT.
6        Q    ALL RIGHT.  SO YOU HAD NOT SUFFERED EXTREME STRESS
7   AND ANXIETY SIMPLY FROM HIM SENDING YOU MESSAGES SINCE HE
8   HADN'T SENT YOU ANY MESSAGES; RIGHT?
9        A    THAT'S NOT CORRECT.
10       Q    OKAY.  WELL, IF HE -- WELL, WITHDRAWN.
11            YOU TESTIFIED PREVIOUSLY THAT YOU SUFFERED EXTREME
12  STRESS AND ANXIETY WHEN HE DIDN'T REACH OUT TO YOU; RIGHT?
13       A    YES, ALL OF IT.
14       Q    ALL RIGHT.  SO YOU SUFFER ANXIETY WHETHER HE DOES
15  OR HE DOESN'T?
16       A    CORRECT.
17       Q    SO WOULD IT HAVE BEEN MORE ACCURATE TO SAY, I
18  SUFFER EXTREME STRESS AND ANXIETY AT ALL TIMES?
19       A    YES.
20       Q    BECAUSE YOU SEE THAT TYING IT TO HIM SENDING YOU
21  MESSAGES MIGHT SUGGEST THAT HE IS SENDING YOU MESSAGES;
22  RIGHT?
23       MS. OLSON:  OBJECTION.  ARGUMENTATIVE.
24       THE COURT:  SUSTAINED.
25       Q    BY MS. HOLLEY:  PARAGRAPH 29, ALSO.  "I HAVE NOT
26  ASKED HIM TO STOP CONTACTING ME BECAUSE I FEAR WHAT HE WILL
27  DO."
28            NOW, AGAIN HE STOPPED CONTACTING YOU ON MAY 30TH;
```

1  CORRECT?

2      A    YES.

3      Q    YOU DIDN'T HAVE TO ASK HIM TO STOP CONTACTING YOU,

4  BECAUSE HE HAD ALREADY STOPPED CONTACTING YOU; RIGHT?

5      A    I DON'T AGREE WITH THAT.

6      Q    BUT YOU DO AGREE WITH ME THAT HE HAD NOT CONTACTED

7  YOU SINCE MAY 30TH?

8      A    YES.  FOR THAT BRIEF PERIOD OF TIME, YOU'RE

9  CORRECT.  HE DID NOT.

10     Q    OKAY.  PARAGRAPH 30, WHICH IS LH 15.  "I AM

11  TERRIFIED THAT HE WILL AGAIN INVITE ME TO HIS HOME."

12          AGAIN, MR. BAUER HAD NOT SPOKEN OR WRITTEN TO YOU

13  IN A MONTH AT THE TIME YOU WROTE THAT; CORRECT?

14     A    CORRECT.

15     Q    PARAGRAPH 30, ALSO.  "I WANT TREVOR TO CEASE

16  CONTACTING ME ENTIRELY."

17          AND HADN'T HE ALREADY CEASED CONTACTING YOU

18  ENTIRELY AT THE TIME YOU WROTE THIS?

19     MS. OLSON:  OBJECTION.  ASKED AND ANSWERED.

20     THE COURT:  OVERRULED.  YOU MAY ANSWER.

21     THE WITNESS:  CAN YOU ASK ME, AGAIN, PLEASE.

22     Q    BY MS. HOLLEY:  YOU WROTE, "I WANT TREVOR TO CEASE

23  CONTACTING ME ENTIRELY."  MY QUESTION IS, HADN'T HE ALREADY

24  CEASED CONTACTING YOU ENTIRELY AT THE TIME YOU WROTE THIS?

25     A    I DON'T KNOW HOW I'M SUPPOSED TO KNOW THAT HE WAS

26  GOING TO CEASE ENTIRELY.

27     Q    WELL, YOU WROTE THIS ON JUNE 28TH.  AND HE HAD NOT

28  CONTACTED YOU SINCE MAY 30TH.  SO AT LEAST AT THAT TIME HE

427

```
 1  HAD CEASED CONTACTING YOU ENTIRELY; IS THAT FAIR TO SAY?
 2      A    THAT IS FAIR TO SAY FOR THAT BRIEF AMOUNT OF TIME.
 3  YES.
 4      Q    "I MUST ENSURE THAT HE DOES NOT COME TO MY HOME OR
 5  ANYWHERE NEAR ME."
 6          NOW, TREVOR DIDN'T KNOW WHERE YOU LIVED?  HE DIDN'T
 7  HAVE YOUR ADDRESS, DID HE?
 8      A    MY ADDRESS WAS PUBLIC ON MY INSTAGRAM BECAUSE OF
 9  WHAT I POSTED ABOUT MY SOBER LIVING HOUSE.  YES.
10      Q    AND YOU -- DID YOU HAVE SOME REASON TO BELIEVE HE
11  WAS GOING TO COME TO YOUR HOUSE A 130 MILES AWAY AND COME TO
12  YOUR HOUSE?
13      A    YES, I DID.
14      Q    YOU HAD SOME REASON TO BELIEVE THAT?
15      A    YES.
16      Q    "I AM UNABLE TO SLEEP OR EAT."  WOULD YOU AGREE
17  WITH ME, BASED ON YOUR MANY COMMUNICATIONS WITH MELY AND
18  LISA, THAT YOU GUYS GO OUT TO EAT A LOT DURING THIS TIME
19  PERIOD OR NO?
20      MS. OLSON:  OBJECTION.  VAGUE.  VAGUE AS TO TIME.
21      THE COURT:  SUSTAINED.
22      Q    BY MS. HOLLEY:  AT SOME POINT YOU EITHER BLOCKED OR
23  UNFOLLOWED TREVOR ON YOUR INSTAGRAM; CORRECT?
24      A    I UNFOLLOWED HIM.  I NEVER BLOCKED HIM.
25      Q    OKAY.  NOW, HE NEVER FOLLOWED YOU ON INSTAGRAM; DID
26  HE?
27      A    NO.  BUT HE TOLD ME THAT HE, QUOTE, "INSTAGRAM
28  STALKED" ME BEFORE.
```

```
1        Q    OKAY.  MY QUESTION WAS --

2        MS. HOLLEY:  AND I WILL MOVE TO STRIKE THAT ANSWER AS

3   NONRESPONSIVE.

4        THE COURT:  SUSTAINED.  AND STRICKEN.

5        Q    BY MS. HOLLEY:  HE -- WHEN YOU FOLLOW SOMEBODY, YOU

6   CLICK A BUTTON THAT SAYS I'M GOING TO FOLLOW THAT PERSON AND

7   YOU ARE GOING TO GET THEIR FEED; CORRECT?

8        A    YES.

9        Q    HE NEVER DID THAT?

10       A    RIGHT.

11       Q    I'M RIGHT?

12       A    YES, YOU ARE.

13       Q    THANK YOU.  NOW, YOU INDICATED YESTERDAY THAT YOU

14  WERE FIRED FROM YOUR JOB AT THE OHANA HOUSE?

15       A    YES.

16       Q    AND YOU SAID THAT YOU WERE FIRED BECAUSE YOU WERE

17  HOSPITALIZED?

18       A    BECAUSE OF THE INJURIES.  YES.

19       Q    OKAY.  NOW, THAT'S NOT TRUE, IS IT?

20       A    YES, IT IS TRUE.

21       Q    DIDN'T YOUR BOSS AT THE OHANA HOUSE DISQUALIFY YOU

22  FROM THE POSITION BECAUSE SHE FELT YOUR INTERACTION WITH

23  TREVOR WAS A, QUOTE, "RELAPSE OF ANOTHER KIND."  AND THAT

24  WILL BE ON LISA DECKER PAGE 82, K.

25       A    I BELIEVE I KNOW WHAT MESSAGE YOU'RE REFERENCING.

26  CAN YOU ASK THAT QUESTION ONE MORE TIME?

27       Q    YES.  DIDN'T YOUR BOSS AT THE OHANA HOUSE

28  DISQUALIFY YOU -- I BELIEVE THAT'S THE WORD THAT SHE USES --
```

```
1   FROM YOUR POSITION BECAUSE SHE FELT YOUR INTERACTION WITH

2   TREVOR WAS, QUOTE, "A RELAPSE OF ANOTHER KIND"?

3        A    SHE DID STATE THAT AFTER.  BUT MY INITIAL

4   CONVERSATION WITH HER WAS THAT I COULD NOT PHYSICALLY DO MY

5   JOB.  MY CONVERSATION IN PERSON WITH HER WAS I COULD NOT

6   PHYSICALLY DO MY JOB -- AT MY JOB.  SO THAT WAS THE

7   CONVERSATION I HAD WITH MY OWN BOSS.  AND THEN THERE WAS

8   THINGS THAT WERE SAID AFTER.  CORRECT.

9        Q    DIDN'T YOU RESPOND TO THAT BY TELLING HER THAT YOU

10  REMOVED YOURSELF FROM THE POSITION BEFORE SHE COULD

11  DISQUALIFY YOU?

12       A    YES.  THAT'S THE ORIGINAL CONVERSATION I'M

13  REFERRING TO.

14       Q    OKAY.  NOW, YOU HAD A NUMBER OF CONVERSATIONS WITH

15  LISA ABOUT HOW ANGRY YOU WERE THAT SHE WAS CONSIDERING IT A

16  RELAPSE?

17       A    YES.

18       Q    WHAT HAPPENED WITH YOU AND TREVOR?

19       A    YES.

20       Q    RIGHT.  OKAY.  BECAUSE, AS YOU SAID, IT'S NOT THAT

21  YOU RELAPSED WITH ALCOHOL OR DRUGS.  YOU DIDN'T CONSIDER IT A

22  RELAPSE?

23       A    YES.

24       Q    NOW, LET ME ASK YOU.  DIDN'T YOU TELL TREVOR DURING

25  ONE OF YOUR TWO VISITS THAT YOU HAD SUBSTITUTED ROUGH SEX FOR

26  DRUGS AND ALCOHOL AFTER YOU GOT SOBER?

27       A    I DON'T RECALL SAYING THAT EVER.

28       Q    DID YOU SAY THAT PAIN IS YOUR ESCAPE AND YOUR HIGH
```

```
 1  AFTER SOBRIETY?

 2        A    NO.

 3        Q    YOU DID NOT SAY THAT?

 4        A    I DID NOT SAY THAT.

 5        Q    BUT YOU DON'T RECALL WHETHER OR NOT YOU SAID THAT

 6  YOU SUBSTITUTED ROUGH SEX FOR DRUGS AND ALCOHOL AFTER

 7  SOBRIETY?

 8        A    NO.

 9        Q    I THINK I JUST KIND OF HAVE SOME QUESTIONS THAT

10  HAVE TO DO WITH HOW VARIOUS MESSAGES HAVE BEEN DESTROYED IN

11  THIS CASE.  OKAY.  AFTER YOU MET WITH THE PASADENA POLICE,

12  WEREN'T YOU SCREENSHOTTING YOUR INSTAGRAM?

13        A    CAN YOU ASK ME THAT AGAIN?

14        MS. OLSON:  OBJECTION.

15        Q    BY MS. HOLLEY:  YES.

16        MS. OLSON:  WITHDRAWN.

17        Q    BY MS. HOLLEY:  AFTER YOU MET WITH THE PASADENA

18  POLICE, ISN'T IT TRUE THAT YOU WERE SCREENSHOTTING SOME OF

19  YOUR INSTAGRAMS?

20        MS. OLSON:  OBJECTION.  VAGUE.

21        THE COURT:  SPECIFIC INSTAGRAM MESSAGES.

22        THE WITNESS:  I WOULD HAVE TO LOOK AT THEM.

23        Q    BY MS. HOLLEY:  WE'RE GOING TO GET THEM.

24        A    OKAY.

25        Q    MAY 18TH WAS BEFORE OR AFTER YOU MET WITH THE

26  PASADENA POLICE?

27        A    I MET WITH THE PASADENA POLICE ON THE MORNING OF

28  THE 18TH.
```

```
 1        MS. HOLLEY:  MS. MANGELS IS GOING TO PASS AROUND SOME
 2   NEW EXHIBITS THAT ARE NOW CALLED --
 3        THE COURT:  DOUBLE C.
 4        MS. HOLLEY:  THIS IS AA.
 5        THE COURT:  THIS IS AA.  OKAY.
 6        Q    BY MS. HOLLEY:  SO AA IS FOUR PAGES -- RIGHT -- ALL
 7   RIGHT.  I AM APPARENTLY -- I'M BEING TOLD THAT I'M ONLY GOING
 8   TO BE ASKING TO INTRODUCE AA 14, 15, 16, AND 17.  AND I WILL
 9   REPRESENT THAT THE MESSAGES THEMSELVES HAVE ALREADY BEEN
10   INTRODUCED, WHICH IS A COMMUNICATION BETWEEN SHE AND TREVOR.
11   BUT WHAT MAKES THIS DIFFERENT IS THAT THIS WAS PRODUCED TO US
12   LATER BY MS. HILL'S COUNSEL.  SO IT IS SOMEWHAT DIFFERENT IN
13   TERMS OF THE TOP PORTION, WHICH HAS THE DATE, BUT THE
14   SUBSTANCE OF THE COMMUNICATION IS THE SAME AS WAS PREVIOUSLY
15   ACCEPTED INTO EVIDENCE IN A NUMBER OF WAYS.
16        THE COURT:  OKAY.  ANY OBJECTION?
17        MS. OLSON:  I JUST RECEIVED IT, YOUR HONOR.  SO IF I
18   COULD TAKE A MINUTE?
19        THE COURT:  OF COURSE.
20        MS. OLSON:  YOUR HONOR, FIRST OF ALL, IT LOOKS LIKE IT
21   IT'S CUMULATIVE.  MOST OF THESE HAVE ALREADY BEEN --
22        MS. HOLLEY:  AND I WILL REPRESENT TO THE COURT AND
23   COUNSEL THAT IT DOESN'T HAVE TO DO WITH THE SUBSTANCE OF THE
24   MESSAGES, WHICH I'M NOT GOING TO BE GOING OVER, BUT THE
25   MANNER IN WHICH THESE HAVE BEEN PRODUCED.  I'M NOT GOING TO
26   SPEAK TO THE SUBSTANCE AT ALL.
27        THE COURT:  OKAY.
28        MS. OLSON:  IF I COULD RESERVE MY OBJECTION THEN,
```

```
1   YOUR HONOR.
2       THE COURT:  YOU MAY.  SO CONDITIONALLY IT'S ACCEPTED
3   INTO EVIDENCE SUBJECT TO A LATER OBJECTION BEING SUSTAINED.
4       MS. HOLLEY:  FAIR ENOUGH.
5       Q   BY MS. HOLLEY:  HAVE YOU HAD A CHANCE TO LOOK AT
6   THOSE PAGES, MS. HILL.  AA 14 THROUGH AA 17?
7       A   YES.
8       Q   OKAY.  YOU PREVIOUSLY TESTIFIED THAT YOU DELETED
9   ALL CONVERSATIONS WITH TREVOR WHEN YOU WERE IN THE HOSPITAL;
10  IS THAT CORRECT?
11      A   YES.
12      Q   AND YOU LEFT THE HOSPITAL ON THE MORNING OF
13  MAY 18TH; IS THAT CORRECT?
14      A   YES.
15      Q   AND THEN YOU WENT HOME?
16      A   YES, I DID.
17      Q   OKAY.  AND THEN YOU TESTIFIED THAT AT AROUND
18  10:00 A.M. ON MAY 18TH YOU MET WITH DETECTIVES FROM THE
19  PASADENA POLICE DEPARTMENT?
20      A   YES.
21      Q   AND YOU TESTIFIED THAT THAT MEETING LASTED ABOUT 30
22  TO 45 MINUTES?
23      A   YES, THAT WAS MY BEST ESTIMATE.
24      Q   OKAY.  NOW, WHEN YOU TAKE A SCREENSHOT OF A
25  MESSAGE, DOES THE TIME THAT THE SCREENSHOT IS TAKEN SHOW UP
26  ON THE SCREENSHOT?
27      A   YES, IT DOES.
28      Q   NOW, IF WE'RE LOOKING AT PAGES 14 THROUGH 17 OF NEW
```

433

```
 1   EXHIBIT AA AND YOU LOOK AT THE TOP, IT SHOWS THAT THESE
 2   MESSAGES WERE SCREENSHOT ON MAY 18TH AT 11:56 A.M.
 3        A    YES, I SEE WHAT YOU MEAN.
 4        Q    OKAY.  SO DOES THAT MEAN THAT THEY WERE ACTUALLY
 5   DELETED AFTER THAT SINCE THERE'S A SCREENSHOT OF THEM?
 6        A    YES.  I TOTALLY UNDERSTAND WHAT YOU'RE ASKING.  IT
 7   MEANS THAT IT WAS DELETED AFTER I MET WITH THE PASADENA
 8   POLICE ON MAY 18TH.  MY TIMELINE MAY HAVE BEEN OFF.  BUT,
 9   AGAIN, MAY 18 -- AND I HAVE THE STORY BEHIND THAT.  I DON'T
10   KNOW IF I NEED TO PROVIDE THAT.  BUT THEY WANTED ME TO SEND
11   ANY COMMUNICATION I STILL HAD WITH TREVOR.  SO THESE FOUR
12   SCREENSHOTS WERE THE ONLY ONES I HAD ACCESS TO IN MY THREAD.
13   YOU CAN SEE IT'S A NEW THREAD.  AND THESE WERE GIVEN TO
14   PASADENA POLICE.
15        Q    OKAY.  THANK YOU FOR HELPING ME WITH THAT.
16        A    IT'S CONFUSING.  I KNOW.
17        Q    AND JUST SO YOU UNDERSTAND, I'M GOING TO ASK YOU
18   SOME QUESTIONS ABOUT A NUMBER OF COMMUNICATIONS THAT ARE
19   MISSING, FROM OUR STANDPOINT, BETWEEN YOU AND MELY.  AS YOU
20   PREVIOUSLY TESTIFIED, YOU COMMUNICATE WITH THEM A LOT
21   PRIMARILY BY TEXT, BUT ALSO BY DIRECT MESSAGE AND
22   INSTAGRAM?
23        A    CORRECT.
24        Q    AND THERE ARE TIME PERIODS THAT ARE IMPORTANT WITH
25   RESPECT TO THIS CASE WHERE THERE ARE MISSING -- THERE'S NO
26   COMMUNICATION PROVIDED WITH YOU AND MELY FROM MAY 18TH TO MAY
27   28?
28        A    YES.
```

```
 1        Q    AND MY QUESTION TO YOU IS, DO YOU HAVE AN
 2   EXPLANATION AS TO WHY THERE IS NO COMMUNICATION AT ALL
 3   PROVIDED BETWEEN MAY 18 AND MAY 28 WITH MELY?
 4        MS. OLSON:  OBJECTION.  RELEVANCE.
 5        THE COURT:  OVERRULED.  YOU MAY ANSWER.
 6        THE WITNESS:  I CAN GIVE YOU MY BEST EXPLANATION.  I DID
 7   NOT PERSONALLY DELETE ANYTHING.  I DID A WHOLE BACKUP RESTORE
 8   OF MY PHONE.  AND IT SEEMS THAT BOTH OF THOSE TIME PERIODS
 9   WERE MISSING FROM BOTH OF THE CONVERSATIONS.  AND THE ONLY
10   OTHER INFORMATION I CAN OFFER IS THAT THAT WEEK THAT'S
11   MISSING, THAT FRIDAY, SATURDAY IS WHEN I GAVE THE PASADENA
12   POLICE DEPARTMENT MY PHONE AND MY COMPUTER.
13             WE RAN INTO A PROBLEM WHEN WE WERE TRYING TO
14   FORENSIC PULL-UP.  WE COULDN'T PULL SOMETHING UP.  SO I DON'T
15   KNOW IF IT HAS SOMETHING TO DO WITH PASADENA P.D. AND HOW
16   THAT AFFECTED MY PHONE AND MY DATA.  BUT I DID DO EVERYTHING
17   THAT I COULD TO RESTORE ALL OF THOSE MESSAGES.  AND DID NOT
18   PERSONALLY DELETE ANY.
19        Q    BY MS. HOLLEY:  AND THAT'S THE SAME FOR LISA AS
20   WELL, IS THAT TIME PERIOD, MAY 18 TO MAY 28 FOR BOTH, THAT
21   DESPITE YOUR BEST EFFORTS, ARE NOT RECOVERABLE?
22        A    YES.
23        MS. OLSON:  OBJECTION.  ASSUMES --
24        THE COURT:  SHE ANSWERED THE QUESTION.
25        MS. OLSON:  LITTLE SLOW THERE.
26        Q    BY MS. HOLLEY:  SO IT'S FAIR TO ASSUME THAT YOU HAD
27   WRITTEN COMMUNICATIONS WITH BOTH OF THOSE PEOPLE DURING THAT
28   TIME PERIOD BUT YOU'RE UNABLE TO RECOVER THEM?
```

435

```
1        MS. MEYER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.

2        THE COURT:  OVERRULED.  YOU MAY ANSWER.

3        THE WITNESS:  YES.  IF ANYONE HAS THEM, IT IS THE

4   PASADENA POLICE DEPARTMENT.

5        MS. OLSON:  YOUR HONOR, CAN I RENEW MY OBJECTION TO --

6   ON AA?

7        THE COURT:  WHAT IS THE OBJECTION?

8        MS. OLSON:  RELEVANCE.

9        THE COURT:  IT'S RELEVANT.

10       MS. OLSON:  AND CUMULATIVE.

11       THE COURT:  OVERRULED.

12       MS. HOLLEY:  CAN I HAVE ONE MOMENT?

13       THE COURT:  I OVERRULED THE OBJECTION.

14       MS. HOLLEY:  YES.  MAY I HAVE ONE MOMENT?

15       THE COURT:  YOU MAY.

16       MS. HOLLEY:  THANK YOU.  NOTHING FURTHER.  THANK YOU.

17       THE WITNESS:  THANK YOU, MS. HOLLEY.

18       THE COURT:  MS. OLSON, REDIRECT.

19       MS. OLSON:  THANK YOU, YOUR HONOR.

20

21                REDIRECT EXAMINATION

22   BY MS. OLSON:

23       Q   LINDSEY, WOULD YOU AGREE WITH ME THE TEXTS

24   MS. HOLLEY JUST WENT OVER WITH YOU WITH YOUR FRIEND MELY WERE

25   VERY IMMATURE AND CHILDISH TEXTS THAT YOU WROTE?

26       MS. HOLLEY:  OBJECTION.  LEADING.

27       THE COURT:  SUSTAINED.

28       Q   BY MS. OLSON:  HOW WOULD YOU DESCRIBE, LINDSEY, THE
```

436

```
1   TEXTS YOU WENT OVER WITH MS. HOLLEY THAT YOU SENT TO YOUR
2   FRIEND MELY?
3        THE COURT:  YOU JUST GAVE HER THE ANSWER.  YOU DON'T GET
4   TO LEAD AND THEN ASK THE QUESTION AGAIN.
5        Q    BY MS. OLSON:  LET ME ASK YOU THIS, HOW WOULD YOU
6   DESCRIBE ANY OF THE TEXTS THAT YOU HAD SENT TO YOUR FRIENDS
7   AFTER THE EVENTS THAT TRANSPIRED WITH TREVOR ON THE 18TH OF
8   MAY?
9        A    VULGAR, ANGRY, AND INSECURE.
10       Q    WHY WERE YOU SENDING VULGAR, ANGRY, AND INSECURE
11  TEXT MESSAGES TO YOUR FRIENDS AFTER A VERY TRAUMATIC, BY YOUR
12  DESCRIPTION, EVENT THAT OCCURRED ON MAY 18?
13       A    IT WAS A WAY TO COPE FOR ME AND TO TRY TO MAKE
14  MYSELF FEEL A LITTLE BIT BETTER, EVEN THOUGH IT WAS IMMATURE,
15  AS I WAS TRYING TO KEEP MY HEAD ABOVE WATER AND NOT PICK UP A
16  DRINK.
17       Q    DURING THAT TIME, DID YOU FEEL LIKE YOU MIGHT PICK
18  UP A DRINK?
19       A    I DID GO TO A PRETTY LOW PLACE.  YEAH.
20       Q    WERE YOU ANGRY AT ALL ABOUT THE SITUATION THAT YOU
21  FOUND YOURSELF IN AFTER MAY 18?
22       MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
23       THE COURT:  SUSTAINED.
24       Q    BY MS. OLSON:  WHEN YOU -- WHEN YOU SENT THE EMAILS
25  WITH MELY -- AND I BELIEVE ONE OF THEM SAID THAT YOU WERE SO
26  EXCITED ABOUT THE RESTRAINING ORDER.  WHY WERE YOU EXCITED?
27       MS. HOLLEY:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE
28  WITH RESPECT TO EMAILS.
```

1     MS. OLSON:  I'M SORRY.  I MEANT TEXT MESSAGES.

2     THE COURT:  YOU MAY ANSWER.

3     THE WITNESS:  CAN YOU SAY IT AGAIN FOR ME.

4     Q   BY MS. OLSON:  SURE.  MS. HOLLEY WENT THROUGH SOME

5  TEXT MESSAGES WITH YOU THAT YOU HAD SENT TO YOUR FRIEND MELY.

6  DO YOU RECALL THAT?

7     A   YES.

8     Q   AND ONE OF THEM WAS A TEXT MESSAGE WHEREIN YOU SAID

9  YOU WERE SO EXCITED THAT THE RESTRAINING ORDER HAD BEEN

10  GRANTED.  CAN YOU TELL US WHY YOU WERE SO EXCITED?

11     A   I MEAN, I SAID IT TO MELY IN ANOTHER TEXT.  HE

12  CAN'T TOUCH ME.  HE WAS GOING TO START TO BE HELD

13  ACCOUNTABLE.  AND HE COULDN'T DO IT TO ANYONE ELSE.  BUT

14  MOSTLY BECAUSE I KNEW HE COULDN'T CONTACT ME.  AND I DIDN'T

15  HAVE TO FEAR SEEING HIS NAME POP UP ON MY PHONE ANYMORE EVER

16  AGAIN FOR THIS TIME PERIOD.  SO IT WAS -- HE COULDN'T TOUCH

17  ME.  THAT'S MY ANSWER.

18     Q   AND EVEN THOUGH HE HADN'T CONTACTED YOU FOR A

19  PERIOD OF TIME, DID YOU THINK HE WOULD CONTACT YOU?

20     A   YES.

21     MS. HOLLEY:  OBJECTION.  CALLS FOR SPECULATION.

22     THE COURT:  NO.  THE QUESTION IS WHAT SHE THOUGHT.  NOT

23  WHETHER, IN FACT, IT WAS TRUE.  YOU MAY ANSWER.

24     THE WITNESS:  YES, I DID.  I MEAN, HIS BASEBALL SCHEDULE

25  IS VERY BUSY.  HE IS GONE.  HE IS HOME.  I DON'T KNOW WHEN HE

26  IS GOING TO CONTACT ME.  I KNEW HE WAS COMING TO SAN DIEGO.

27  THAT IS WHAT I WAS MOST SCARED FOR.

28     Q   BY MS. OLSON:  NOW, YOU HAD TESTIFIED THAT YOU WERE

```
1    CONCERNED FOR YOUR SAFETY WHEN MR. BAUER WAS PLAYING IN SAN

2    DIEGO; CORRECT?

3         A    YES.

4         Q    WHAT DID YOU DO AS A RESULT OF YOUR CONCERN FOR

5    YOUR SAFETY?

6         MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.

7         THE COURT:  SUSTAINED.

8         Q    BY MS. OLSON:  WHERE DID YOU GO, LINDSEY?

9         A    MY DAD AND I HAD PLANNED TO LEAVE SAN DIEGO,

10   BECAUSE I HAD SPOKEN A LOT TO HIM ABOUT MY CONCERN.

11        MS. HOLLEY:  OBJECTION.  NONRESPONSIVE.

12        THE COURT:  SUSTAINED.  AND STRICKEN.

13        Q    BY MS. OLSON:  LINDSEY, JUST TELL ME WHERE DID YOU

14   GO WITH YOUR DAD?

15        A    NORTHERN CALIFORNIA.  WATSONVILLE.

16        Q    WHOSE IDEA WAS IT TO GO TO NORTHERN CALIFORNIA?

17        A    MY DAD'S.

18        Q    AND DID YOU TELL YOUR DAD THAT YOU WANTED TO GO

19   TO -- UP TO NORTHERN CALIFORNIA?

20        A    YES.

21        MS. HOLLEY:  OBJECTION.  LEADING.

22        THE COURT:  SUSTAINED.  AND STRICKEN.

23        Q    BY MS. OLSON:  DID YOU HAVE A DISCUSSION WITH YOUR

24   DAD WHEREBY YOU DISCUSSED LEAVING TOWN?

25        MS. HOLLEY:  OBJECTION.  LEADING.

26        THE COURT:  SUSTAINED.  AND STRICKEN.  COUNSEL --

27        MS. OLSON:  I'LL START AGAIN, YOUR HONOR.

28        Q    BY MS. OLSON:  LINDSEY --
```

```
1        THE COURT:  -- YOU MIGHT WANT TO CHANGE TOPICS SINCE YOU

2   TOLD HER WHAT YOUR EXPECTING HER ANSWER TO BE.  AND WON'T GET

3   A CHANCE TO ASK IT AGAIN.

4        Q    BY MS. OLSON:  NOW YOU TESTIFIED THAT WHILE IN THE

5   HOSPITAL ON MAY 17TH YOU DELETED SOME TEXTS OR DM MESSAGES

6   THAT HAD TAKEN PLACE BEFORE APRIL 29; CORRECT?

7        A    YES.

8        Q    AND DID YOU HAVE ANY PRACTICE -- SPECIFIC PRACTICE

9   AS TO HOW OR WHY YOU DELETED YOUR TEXT MESSAGES?

10       MS. HOLLEY:  OBJECTION.  VAGUE AND COMPOUND.

11       THE COURT:  IT IS COMPOUND.  I'LL LET YOU REASK THAT.

12       Q    BY MS. OLSON:  SURE.  DID YOU HAVE ANY PRACTICE --

13  A SPECIFIC PRACTICE THAT YOU EMPLOY AS TO WHEN YOU WOULD

14  DELETE YOUR TEXT MESSAGES?

15       A    YES.  I DELETE VERY OFTEN.  USUALLY WITH THE PEOPLE

16  I TEXT THE MOST THAT TAKE UP THE MOST STORAGE ON MY PHONE

17  PROBABLY ABOUT EVERY 30 DAYS.  AS WELL AS I DELETE MESSAGES

18  THAT I DON'T WANT PEOPLE TO READ IF THEY GET AHOLD OF MY

19  PHONE.

20       Q    DID YOU DELETE ANY TEXTS OR DM MESSAGES BETWEEN

21  APRIL 18 AND THE DATE THAT YOU WERE IN THE HOSPITAL?

22       A    YES.

23       Q    WHY?

24       A    LIKE I SAID, I THINK I'M A LITTLE CONFUSED ON THE

25  QUESTION.  ARE YOU REFERRING TO DM'S WITH SOMEONE IN

26  PARTICULAR?

27       Q    YES.  WITH TREVOR.

28       A    YES.  SO THROUGHOUT THAT TIME FROM APRIL 18 TO WHEN
```

```
 1    I WAS IN THE HOSPITAL, I WOULD JUST DELETE, LIKE I SAID,
 2    BECAUSE I DIDN'T KNOW IF SOMEONE GETS INTO MY PHONE AND READS
 3    SOMETHING, I DON'T WANT THAT.  THAT'S A PRIVATE THING FOR ME.
 4    I ALSO -- WITH DM'S, YOU CAN SEE WHEN SOMEONE PHYSICALLY SEES
 5    YOUR MESSAGE.  IT SAYS "SEEN."  SO I DON'T LIKE HAVING THE
 6    ANXIETY OF SEEING, OH, LIKE, DID HE SEE MY MESSAGE AND NOT
 7    REPLY?  SO DELETING THEM AS TO A WAY TO NOT HAVE THAT ANXIETY
 8    AND FREAK OUT OVER THAT.
 9         Q    LINDSEY, DID YOU DELETE ANY TEXTS OR DM MESSAGES
10    AFTER YOU WERE RELEASED FROM THE HOSPITAL?
11         A    YES.
12         Q    WHY?
13         A    MOSTLY TO WHAT I SAID BEFORE.  THE STORAGE ISSUES.
14    NOTHING EVER OF ILL INTENT.  ANYTHING WITH TREVOR I DELETED
15    BECAUSE I DIDN'T WANT TO BE REMINDED OF COMMUNICATIONS OF
16    HIM.  AND ANYTHING ELSE IS STRICTLY MORE OF A STORAGE ISSUE.
17    OR IF SOMETHING IS TRIGGERING ON A THREAD, I WILL DELETE IT.
18         Q    WERE YOU TOLD BY ANYONE, EXCEPTING COUNSEL, TO NOT
19    DELETE TEXTS FROM YOUR PHONE?
20         A    NOT UNTIL WE RECEIVED JON FETTEROLF'S LETTER ABOUT
21    PRESERVATION.  SO AROUND THE TIME THE ORDER WAS -- WE WERE
22    FILING THE RESTRAINING ORDER.
23         Q    DID THE POLICE DEPARTMENT -- THE PASADENA POLICE
24    DEPARTMENT INSTRUCT YOU NOT TO DELETE ANYTHING FROM YOUR
25    PHONE?
26         A    NO.
27         Q    AND YOU -- DID YOU HAND OVER YOUR COMPLETE PHONE
28    AND COMPUTER TO THE POLICE DEPARTMENT?
```

```
 1        A    YES.

 2        Q    DID YOU DELETE ANYTHING FROM YOUR PHONE BEFORE

 3   GIVING IT TO THE POLICE DEPARTMENT?

 4        A    NO, BECAUSE THEY WERE PULLING THINGS BACK UP.

 5        MS. HOLLEY:  OBJECTION.  MOTION TO STRIKE.  LACK OF

 6   FOUNDATION AS TO WHAT THE POLICE DEPARTMENT WAS DOING.

 7        THE COURT:  EVERYTHING AFTER THE WORD "NO" IS STRICKEN.

 8        Q    BY MS. OLSON:  WHY WERE YOU TALKING ABOUT TREVOR AT

 9   ALL IF YOU WERE HORRIFIED ABOUT SEEING HIS NAME AFTER THE

10   ASSAULT ON MAY 18?

11        A    IT WAS AN IMMATURE WAY FOR ME TO COPE BY DEGRADING

12   HIM BECAUSE I WAS REALLY ANGRY.

13        Q    WERE YOU REFERRED TO A THERAPIST FROM EITHER

14   ALVARADO MEDICAL CENTER OR PALOMAR?

15        A    BY SCRIPPS CLINIC I WAS, YES.

16        Q    SCRIPPS?

17        A    YES.

18        Q    AND WERE -- DID YOU SEEK OUT THERAPY?

19        A    YES, I DID.

20        Q    AND WHO'S THE THERAPIST THAT YOU SOUGHT OUT?

21        A    DR. ERIKA MOSES.

22        Q    DO YOU KNOW IF DR. ERIKA MOSES HAS ANY TYPE OF

23   SPECIALTY?

24        A    I BELIEVE THAT SHE IS A TRAUMA SPECIALIST.

25        Q    AND HOW OFTEN HAVE YOU SEEN DR. MOSES?

26        A    I BELIEVE I'VE SEEN HER THREE OR FOUR TIMES.

27        Q    AND YOU VOLUNTARILY SIGNED A CONSENT FOR DR. MOSES

28   TO RELEASE HER RECORDS.  DO YOU RECALL SIGNING SUCH A
```

```
1    CONSENT?

2         A    YES, I DO.

3         Q    DO YOU KNOW IF DR. MOSES PROVIDED THE RECORDS?

4         A    I BELIEVE SHE DID.  YES.

5         Q    HAVE YOU BEEN DIAGNOSED AS HAVING ANY TYPE OF

6    DISORDER AT THIS TIME, DO YOU KNOW?

7         A    IN 2018 I WAS DIAGNOSED WITH ANXIETY AND

8    DEPRESSION.  THAT'S ALL I'VE BEEN DIAGNOSED WITH.

9         Q    SINCE YOU'VE BEEN SEEING DR. MOSES, DO YOU KNOW IF

10   YOUR BEEN DIAGNOSED WITH ANY KIND OF DISORDER?

11        MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.

12        THE COURT:  SUSTAINED.

13        Q    BY MS. OLSON:  ARE YOU CURRENTLY SUFFERING FROM

14   PTSD?

15        MS. HOLLEY:  OBJECTION.  LACK OF FOUNDATION.

16        THE COURT:  SUSTAINED.

17        Q    BY MS. OLSON:  LINDSEY, WHEN YOU LOST YOUR JOB

18   IN -- AFTER THE ASSAULT ON MAY 18, HOW DID THAT MAKE YOU FEEL

19   THAT YOU HAD YOUR DREAM JOB THAT YOU HAD LOST?

20        MS. HOLLEY:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.

21        THE COURT:  SUSTAINED.

22        Q    BY MS. OLSON:  WAS WORKING AT OHANA HOUSE YOUR

23   DREAM JOB?

24        MS. HOLLEY:  OBJECTION.  LEADING.

25        THE COURT:  SUSTAINED.

26        Q    BY MS. OLSON:  TELL ME WHAT YOU THOUGHT ABOUT

27   WORKING AT OHANA HOUSE?

28        THE COURT:  I'M GUESSING SHE IS GOING TO SAY IT'S HER
```

```
1    DREAM JOB, BECAUSE YOU TOLD HER.  STOP DOING IT.
2         MS. OLSON:  I'M SORRY, YOUR HONOR.
3         Q    BY MS. OLSON:  HOW LONG HAVE YOU WORKED AT OHANA
4    HOUSE?
5         A    WE HAD BEEN GETTING THE PROPERTY SET UP AND GETTING
6    EVERYTHING READY FOR ABOUT A MONTH PRIOR TO THAT.  SO I WAS
7    EMPLOYED FOR A MONTH AS IT STARTED UP.
8         Q    SO YOU WORKED THERE FOR ABOUT A MONTH PRIOR TO
9    LEAVING OHANA HOUSE.  AND AFTER YOU LEFT OHANA HOUSE, DID YOU
10   APPLY FOR ANY OTHER JOB?
11        A    NO.
12        Q    WHAT DID YOU DO FOR EMPLOYMENT AFTER MAY 18?
13        A    I WASN'T EMPLOYED.  I HAD TO TAKE A ANOTHER LEAVE
14   OF ABSENCE AT MY OTHER JOB.
15        Q    WHAT WAS YOUR OTHER JOB?
16        A    WORKING AT LULULEMON ATHLETICA.
17        Q    WHY DID YOU APPLY FOR A LEAVE OF ABSENCE FROM
18   LULULEMON?
19        A    PHYSICALLY I COULD NOT WORK.  IT WAS RECOMMENDED BY
20   MY DOCTORS.  SHE CONFIRMED IT WAS A GOOD IDEA TO TAKE A LEAVE
21   OF ABSENCE UNTIL JULY 31ST.
22        MS. HOLLEY:  OBJECTION.  MOTION TO STRIKE.  HEARSAY.
23        THE COURT:  OVERRULED.
24        Q    BY MS. OLSON:  ARE YOU CURRENTLY EMPLOYED RIGHT
25   NOW?
26        A    YES.  I JUST RETURNED TO WORK THIS LAST WEEK AT
27   LULULEMON.
28        Q    HAVE YOU MADE ANY ATTEMPTS TO GET -- TO MOVE OUT OF
```

1    YOUR PARENTS' HOME?

2         A    YES.

3         Q    WHAT HAVE YOU DONE?

4         A    I AM STAYING WITH MELY, AS MY MOM IS MOVING TO

5    HAWAII.  MY PARENTS ARE MOVING.  SO I'M GOING TO TRY TO

6    FIGURE IT OUT AND HOPEFULLY FIND A PLACE TO STAY FOR GOOD

7    PRETTY SOON.

8         Q    NOW GOING BACK A BIT.  DID TREVOR EVER ASK YOU THAT

9    HE WANTED YOU TO SIGN AN NDA?

10        A    NO.

11        Q    DID TREVOR EVER ASK YOU TO KEEP ANY OF YOUR

12   MESSAGES OR COMMUNICATIONS WITH HIM DISCREET?

13        A    NO.

14        Q    DID YOU EVER POST ANYTHING ON SOCIAL MEDIA RELATING

15   TO TREVOR FROM APRIL 18 UNTIL THE PRESENT?

16        A    NO.

17        Q    SO DID YOU ONLY DISCUSS YOUR RELATIONSHIP WITH

18   TREVOR WITH YOUR CLOSE CIRCLE OF FRIENDS?

19        A    YES.

20        Q    AND CAN YOU TELL ME WHO THAT CLOSE CIRCLE OF

21   FRIENDS WAS?

22        A    INITIALLY IT WAS DEREK, KYLE, MELY, LISA, AND MY

23   MOM AND DAD -- OR ACTUALLY -- I'M SORRY.  JUST MY MOM.

24        Q    IS THERE A REASON WHY YOU DIDN'T DISCUSS IT WITH

25   YOUR DAD?

26        MS. HOLLEY:  OBJECTION.  RELEVANCE.

27        THE COURT:  SUSTAINED.

28        Q    BY MS. OLSON:  DO YOU HAVE A CLOSE RELATIONSHIP

```
1   WITH YOUR DAD?

2        MS. HOLLEY:  OBJECTION.  RELEVANCE.

3        THE COURT:  SUSTAINED.

4        Q    BY MS. OLSON:  WHEN YOU WERE TESTIFYING ON DIRECT

5   AND YOU WERE ASKED A QUESTION ABOUT YOUR DAD COMING TO SEE

6   YOU AT THE HOSPITAL, YOU BEGAN CRYING VERY HARD.  WHY DID YOU

7   GET SO EMOTIONAL?

8        MS. HOLLEY:  OBJECTION.  RELEVANCE.  ASKED AND

9   ANSWERED.

10       THE COURT:  SUSTAINED.  AND BEYOND THE SCOPE OF CROSS,

11  WHICH IS WHAT YOU'RE ADDRESSING.

12       MS. OLSON:  OKAY.

13       Q    BY MS. OLSON:  WHY DID YOU SHARE SCREENSHOTS OF

14  YOUR DM'S AND YOUR TEXT MESSAGES BETWEEN YOU AND TREVOR WITH

15  YOUR FRIENDS AND FAMILY?

16       A    I WOULD SAY IT'S AN EGOTISTICAL WAY OF BRAGGING TO

17  GET ATTENTION, WHICH WAS IMMATURE.

18       Q    DID YOU CONSIDER THIS A VIOLATION OF TREVOR'S

19  PRIVACY?

20       A    NO.

21       Q    DID YOU BELIEVE THAT IT WAS IMPORTANT TO KEEP YOUR

22  RELATIONSHIP WITH TREVOR PRIVATE?

23       A    I WAS NOT THINKING THAT AT THE TIME.  NO.

24       Q    WHY THEN DID YOU NOT KEEP YOUR RELATIONSHIP

25  PRIVATE?

26       A    LIKE I SAID, I THINK THAT I'VE ACKNOWLEDGED THAT I

27  WAS TRYING TO GET ATTENTION.  AND I STRUGGLE WITH SELF-WORTH.

28  AND I THOUGHT BY SHARING THOSE THINGS IT WOULD MAKE PEOPLE
```

```
 1    ACCEPT ME OR THINK HIGHER OF ME.

 2         Q    IN RETROSPECT, DO YOU BELIEVE THAT WAS

 3    APPROPRIATE?

 4         A    NO.

 5         Q    WHEN MS. HOLLEY WAS ASKING YOU ABOUT A TEXT MESSAGE

 6    THAT YOU HAD SENT TO KYLE ABOUT A SOB STORY, DO YOU THINK

 7    THAT TEXT WAS APPROPRIATE THAT YOU SENT THAT?

 8         A    NO, I WORDED IT WRONG.

 9         Q    AND THE SOB STORY THAT WAS BEING REFERRED TO, I

10    BELIEVE, YOU AND TREVOR WERE HAVING DISCUSSIONS ABOUT

11    DIFFERENT TOPICS SUCH AS CHILDHOOD EXPERIENCES; DO YOU RECALL

12    THAT?

13         A    YES.

14         Q    DID YOU TRULY FEEL COMPASSION FOR WHAT TREVOR WAS

15    TELLING YOU IN THOSE TEXT MESSAGES?

16         A    YEAH, I DID.

17         Q    AND DO YOU SEE THAT THE TEXTS YOU SENT TO KYLE CAN

18    SOMEHOW SHOW THAT MAYBE YOU DIDN'T HAVE COMPASSION FOR HIM?

19         A    YES, I CAN SEE THAT.

20         Q    NOW, YOU TESTIFIED YESTERDAY THAT TREVOR NEVER

21    DISAVOWED HIS RULES OF DATING.  DID HE EVER SPECIFICALLY TELL

22    YOU, I'M TAKING BACK ANY OF MY RULES OF DATING?

23         A    NO.

24         Q    DID YOU BELIEVE THAT HE VIOLATED HIS OWN RULES OF

25    DATING?

26         MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.

27         THE COURT:  SUSTAINED.

28         Q    BY MS. OLSON:  CAN YOU LIST FOR ME ANY WAYS IN
```

```
1   WHICH YOU CAN THINK OF THAT YOU BELIEVE HE VIOLATED HIS OWN
2   RULES OF DATING?
3        MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
4        THE COURT:  SUSTAINED.
5        Q   BY MS. OLSON:  LINDSEY, WHEN YOU PUT IN THE
6   DECLARATION THAT YOU PROVIDED FOR THE COURT IN SUPPORT OF
7   YOUR D.V. THE SEXUAL ENCOUNTER THAT YOU HAD WITH TREVOR ON
8   APRIL 21ST, DID YOU CONSIDER THAT TO BE CONSENSUAL SEXUAL
9   ACTIVITY?
10       A   NO.
11       Q   ON APRIL 21ST?
12       A   IT BEGAN AS CONSENSUAL.  THEN IT WAS NOT.
13       Q   AND DID YOU DELINEATE THE REASONS WHY YOU BELIEVED
14  IT WAS NOT CONSENSUAL -- IT BEGAN CONSENSUAL AND ENDED WITH
15  NOT BEING CONSENSUAL FOR THE COURT?
16       A   CAN YOU EXPLAIN THAT IN A DIFFERENT WAY?
17       Q   SURE.  DID YOU DELINEATE FOR THE COURT THE REASONS
18  THAT YOU BELIEVE IT BECAME NONCONSENSUAL?
19       MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
20       THE COURT:  SUSTAINED.
21       Q   BY MS. OLSON:  CAN YOU EXPLAIN FOR ME WHY YOU
22  BELIEVE IT BECAME NONCONSENSUAL?
23       MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
24       THE COURT:  THAT WAS ESSENTIALLY ALL THE DIRECT.
25       Q   BY MS. OLSON:  WERE YOU ANGRY WITH TREVOR AFTER MAY
26  18?
27       MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
28       THE COURT:  SUSTAINED.
```

```
 1      Q    BY MS. OLSON:  DO YOU FEEL THAT YOU DISPLAYED YOUR
 2  ANGER APPROPRIATELY AT TREVOR AFTER MAY 18?
 3      A    NO.
 4      Q    HOW?
 5      MS. HOLLEY:  OBJECTION.  VAGUE.
 6      THE COURT:  I'M NOT SURE WHAT "HOW" MEANS IN THIS
 7  CONTEXT?
 8      MS. OLSON:  SURE.
 9      Q    BY MS. OLSON:  HOW DID YOU DISPLAY YOUR ANGER
10  INAPPROPRIATELY AT TREVOR AFTER MAY 18?
11      A    BECAUSE IT'S, LIKE, BEHIND CLOSED DOORS I WAS
12  BULLYING THE BULLY AND BEING VULGAR AND CRUDE.  AND IT WASN'T
13  THE CORRECT WAY TO DEAL WITH IT.  INSTEAD OF TAKING CARE OF
14  MYSELF, I FOCUSED ON DEGRADING HIM, WHICH WASN'T RIGHT OR
15  CORRECT.  BUT IT WAS THE BEST I COULD DO AT THAT TIME.
16      Q    DID YOU TELL KYLE THAT YOU WERE DEVELOPING FEELINGS
17  FOR TREVOR?
18      A    YES.
19      Q    WHAT KIND OF FEELINGS AT THAT TIME WERE YOU
20  DEVELOPING?
21      MS. HOLLEY:  OBJECTION.  VAGUE AS TO TIME.
22      THE COURT:  SUSTAINED.
23      Q    BY MS. OLSON:  DO YOU RECALL SPECIFICALLY, OR
24  GENERALLY, WHEN YOU HAD TOLD KYLE THAT YOU WERE DEVELOPING
25  FEELINGS FOR TREVOR?
26      A    I WOULD ESTIMATE I THINK IT WAS WHEN WE WERE
27  TOGETHER RIGHT BEFORE I WENT OVER TO TREVOR'S HOUSE THE
28  SECOND ENCOUNTER.
```

```
 1        Q    AND DO YOU RECALL WHY AT THAT TIME YOU BELIEVED YOU
 2   WERE DEVELOPING FEELINGS FOR TREVOR?
 3        A    BECAUSE OF -- YOU KNOW, I TESTIFIED TO THIS IDEA OF
 4   OBSESSING ON SEEING HIM AGAIN TO CREATE THIS BETTER
 5   EXPERIENCE.  AND THERE WERE SO MANY THINGS THAT -- THAT
 6   SEEMED REALLY AMAZING TO ME ABOUT TREVOR.  AND I THINK THAT
 7   THERE IS A LOT OF GOOD.  AND IT'S HARD.  THOSE ARE THE THINGS
 8   I WAS FOCUSING ON THEN.
 9        Q    CAN YOU TELL ME A FEW THINGS?  WHAT ARE A FEW
10   THINGS THAT YOU FOUND AMAZING ABOUT HIM?
11        MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
12        THE COURT:  SUSTAINED.
13        Q    BY MS. OLSON:  AFTER MAY 16TH, WERE YOU SURPRISED
14   AT THE LEVEL OF ATTENTION THAT TREVOR WAS SHOWING TO YOU?
15        A    YES.
16        Q    HE WAS CALLING YOU; CORRECT?
17        MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.  AND
18   LEADING.
19        THE COURT:  SUSTAINED.
20        Q    BY MS. OLSON:  AFTER MAY 16TH, DID TREVOR ADVISE
21   YOU HE WANTED TO SEE YOU IN SAN DIEGO?
22        A    YES, HE DID.
23        Q    DO YOU RECALL WHEN?
24        A    ON THE COLD CALL WITH THE PASADENA POLICE.
25        Q    DO YOU RECALL WHAT HE SAID?
26        A    HE SAID, "I WOULD LOVE TO COME AND VISIT YOU IN SAN
27   DIEGO IF THAT'S SOMETHING YOU'RE OPEN TO."
28        Q    DID YOU TELL HIM IT WAS SOMETHING YOU WERE OPEN
```

1  TO?

2      A    I DIDN'T REALLY ACKNOWLEDGE IT WHEN HE SAID IT.  I

3  JUST KIND OF CHANGED THE SUBJECT, I BELIEVE, TO THE BEST OF

4  MY MEMORY.

5      Q    LINDSEY, IF TREVOR HAD NOT CAUSED THE HARM AND

6  ASSAULT THAT YOU TESTIFIED TO THAT HE CAUSED TO YOU THAT

7  NIGHT IN MAY, WOULD YOU HAVE SEEN HIM AGAIN?

8      MS. HOLLEY:  OBJECTION.  RELEVANCE.

9      THE COURT:  SUSTAINED.

10     Q    BY MS. OLSON:  DID YOU TAKE THE DRUG BY THE NAME OF

11  ANTABUSE?

12     A    YES.

13     Q    WHEN DID YOU STOP TAKING ANTABUSE?

14     A    AROUND FEBRUARY, MARCH OF THIS YEAR.

15     Q    WHEN NURSE VALENCIA WAS TESTIFYING ABOUT THE

16  MEDICATIONS YOU HAD ADVISED HER ABOUT, DID YOU HONESTLY TELL

17  HER ABOUT ALL THE MEDICATIONS YOU WERE TAKING AT THE TIME?

18     A    TO THE BEST OF MY ABILITY, YES.

19     Q    AT THE TIME YOU DISCLOSED YOUR MEDICATION, I

20  BELIEVE SHE TESTIFIED THAT YOU HAD TOLD HER YOU HAD TAKEN

21  TYLENOL.  DO YOU KNOW IF YOU HAD TAKEN TYLENOL?

22     A    I DON'T REMEMBER IF IT WAS IBUPROFEN OR TYLENOL.

23  SOMETIMES I TAKE MOTRIN.  SO I KIND OF GET ALL OF THOSE

24  CONFUSED.  AND I WAS IN A LOOPY STATE WHEN I TALKED TO NURSE

25  VALENCIA.  I DON'T REMEMBER WHICH ONE IT WAS.

26     Q    DID YOU TRY TO MISLEAD NURSE VALENCIA IN ANY WAY,

27  SHAPE, OR FORM?

28     A    NO, NOT AT ALL.

451

1        Q    NOW, YESTERDAY YOU TESTIFIED THAT YOU ACCEPTED

2   MS. HOLLEY'S DEFINITION THAT A LIE OF OMISSION MEANS TO

3   INTENTIONALLY FAIL TO TELL THE TRUTH IN A SITUATION REGARDING

4   DISCLOSURE.  HAVE YOU INTENTIONALLY FAILED TO TELL THE TRUTH

5   REGARDING THE RELATIONSHIP WITH TREVOR?

6        A    NO, NOT INTENTIONALLY.

7        Q    HAVE YOU INTENTIONALLY FAILED TO TELL THE TRUTH

8   REGARDING WHAT OCCURRED ON APRIL 21ST?

9        A    NO.

10        Q    HAVE YOU INTENTIONALLY FAILED TO TELL THE TRUTH

11   REGARDING WHAT OCCURRED ON MAY 15, 16?

12        A    NO.

13        Q    DID YOU INTENTIONALLY FAIL TO INCLUDE YOUR WITTY

14   BANTER WITH KYLE BEFORE AND AFTER YOUR MEETING WITH TREVOR?

15        A    IN THE D.V.R.O.?

16        Q    CORRECT.

17        A    NO.

18        Q    DID YOU INTENTIONALLY FAIL TO INCLUDE YOUR WITTY

19   BANTER WITH DEREK DAWSON BEFORE AND AFTER YOUR MEETING WITH

20   TREVOR?

21        A    NO.

22        Q    WHY DIDN'T YOU INCLUDE IT?

23        A    I DIDN'T THINK IT WAS RELEVANT TO NEEDING

24   PROTECTION AFTER AN ASSAULT.  AND I WAS TRYING TO PROVIDE THE

25   THINGS THAT PROVED WHY I NEEDED PROTECTION, INCLUDING THE

26   HOSPITAL REPORTS.  X, Y, Z, AFTER.  I WAS JUST TRYING TO,

27   NUMBER ONE, PROVIDE ALL THE EVIDENCE, SCREENSHOTS THAT I HAD

28   FROM TREVOR, EVEN THOUGH THEY WERE LIMITED.  AND I WAS TRYING

```
1    TO PROVIDE THE COURT WITH THE PROOF THAT I CONSIDERED, HAVING
2    NEVER DONE THIS BEFORE OR KNOWING HOW IT WORKS, WHY I NEEDED
3    PROTECTION.  AND I DID NOT INTENTIONALLY LEAVE OUT ANYTHING
4    OR THINK BACK TO MESSAGES FROM A LONG TIME AGO THAT I DIDN'T
5    HAVE.  NOTHING WAS INTENTIONALLY LEFT OUT TO MAKE A SITUATION
6    LOOK BETTER OR LEAN ONE WAY.  I REALLY DID THE BEST I COULD
7    TO BE INTENTIONAL WITH WHAT WAS NEEDED TO BE PUT IN.
8        Q    LET ME ASK YOU ABOUT YOUR SPONSOR, LISA.  WHY DID
9    YOU NOT TELL THE TRUTH TO LISA, YOUR SPONSOR?
10       A    LISA, THE NIGHT BEFORE --
11       MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.
12       THE COURT:  THAT WAS ANSWERED.  COUNSEL ASKED.  SHE
13   EXPLAINED SHE WAS EMBARRASSED BECAUSE LISA WASN'T IN FAVOR OF
14   THE RELATIONSHIP AND TOLD HER NOT TO DO IT.  AND SHE DID IT.
15   AND SHE ALSO DIDN'T TELL HER BECAUSE -- SHE TOLD US THIS
16   TODAY.
17       MS. OLSON:  I WAS UNDER THE UNDERSTANDING I THOUGHT THAT
18   WAS MELY.
19       THE COURT:  WELL, YOU CAN CLARIFY.  I MAY BE
20   MISRECOLLECTING.
21       THE WITNESS:  IT WAS LISA.
22       MS. OLSON:  I'M INCORRECT.
23       THE COURT:  I TRY TO PAY ATTENTION.
24       MS. OLSON:  I'M ABSOLUTELY DOING MY BEST.
25       Q    BY MS. OLSON:  NOW, YOU HAD CLAIMED THAT YOU WERE
26   CONCERNED ABOUT A STATEMENT THAT WAS PUT IN THE MEDIA BY
27   MR. FETTEROLF.  AND YOU DESCRIBED IT AS SLUT SHAMING.  DO YOU
28   RECALL WHAT THAT STATEMENT WAS?
```

1      A     YES.

2      Q     CAN YOU TELL THE COURT WHAT YOU RECALL IT BEING?

3      A     I REMEMBER HOW IT FELT TO READ IT FOR THE FIRST

4  TIME.  AND THE WORDS ARE BURNED INTO MY BRAIN.  IT SAYS THAT

5  THE INTERACTIONS BETWEEN THIS WOMAN WERE WHOLLY CONSENSUAL.

6  AND WE HAVE TEXT MESSAGES SAYING THAT SHE REPEATEDLY ASKED

7  FOR ROUGH SEX LIKE BEING CHOKED OUT AND SLAPPED IN THE FACE.

8      Q     AND WHY WAS THAT SO UPSETTING TO YOU TO READ

9  THAT?

10     A     BECAUSE TO ME TEXT MESSAGES DON'T MEAN CONSENT.

11 AND I DID NOT CONSENT TO BRUISING ALL OVER MY BODY, AND BEING

12 PUT IN THE HOSPITAL, AND HAVING THINGS DONE TO ME WHILE I WAS

13 UNCONSCIOUS.  IT'S NOT CONSENSUAL.

14     Q     LINDSEY --

15     MS. HOLLEY:  I'M SORRY.  I'M GOING TO MOVE TO STRIKE A

16 PORTION OF THE ANSWER AS NONRESPONSIVE WITH RESPECT TO --

17     THE COURT:  NO.  THE LAST QUESTION WAS WHY WAS IT SO

18 UPSETTING TO HER TO READ.  THIS DID ANSWER THAT.

19     MS. HOLLEY:  UNDERSTOOD.

20     Q     BY MS. OLSON:  WHAT DID YOU -- IF ANYTHING, DID YOU

21 THINK YOU COULD DO TO MAKE A DIFFERENCE IN TERMS OF THE

22 STATEMENT THAT MR. FETTEROLF PUT OUT THERE?

23     A     I THINK THAT HIS STATEMENT SPECIFICALLY HIGHLIGHTED

24 CHOKING AND SLAPPING.  AND FOR ME, IF THEY WERE GOING TO PUT

25 OUT THEIR SIDE OF THE STORY, IT WAS FAIR FOR ME TO HAVE A

26 CHANCE TO SAY MY EXPERIENCE AND SAY IT WENT FAR BEYOND

27 CHOKING AND SLAPPING IN A TEXT MESSAGE.  LIKE I SAID BEFORE,

28 I KNEW HOW THIS WAS GOING TO GO.  I KNEW THAT I WAS GOING TO

```
1    GET SLUT SHAMED.  AND THAT WAS WORTH IT FOR ME TO GET
2    PROTECTION FROM TREVOR BAUER.  DID I ANSWER THE QUESTION?
3        Q    YES.  DO YOU KNOW IF ANYTHING WAS PUT OUT IN THE
4    MEDIA BY MR. FETTEROLF OR MR. BAUER THAT YOU WERE PUNCHED
5    REPEATEDLY IN THE VAGINA?
6        A    CAN YOU SAY THAT AGAIN?
7        MS. HOLLEY:  OBJECTION.  ARGUMENTATIVE.
8        THE COURT:  IT IS ARGUMENTATIVE.
9        Q    BY MS. OLSON:  LINDSEY, HAVE YOU GONE TO ANY
10   BASEBALL GAMES SINCE MAY 18TH WHERE THE DODGERS WERE
11   PLAYING?
12       A    NO.
13       Q    YOU HAD MENTIONED THAT BECAUSE OF THE PAIN IN YOUR
14   JAW YOU HAD PROBLEMS EATING.  HOW LONG DID THAT LAST FOR?
15       MS. HOLLEY:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.
16       THE COURT:  I DON'T THINK SHE DID SAY THAT.
17       MS. OLSON:  I CAN ASK HER.
18       THE COURT:  YOU MAY.
19       Q    BY MS. OLSON:  LINDSEY, AS A RESULT OF YOUR BEING
20   PUNCHED IN YOUR JAW, WHAT KIND OF EFFECTS DID THAT HAVE ON
21   YOU?
22       A    THE FIRST WEEK I COULD BARELY OPEN IT OR TALK IN A
23   NORMAL WAY.  AND IT LASTED FOR ABOUT THREE WEEKS WHERE IF I
24   TRIED TO EAT SOMETHING LIKE A SANDWICH OR IN-N-OUT BURGER, I
25   COULDN'T BECAUSE MY JAW WOULD NOT OPEN ALL THE WAY ON THE
26   LEFT SIDE OF MY FACE.
27       Q    WHAT EFFECTS DID YOU HAVE, IF ANY, AFTER MAY 18TH
28   AS A RESULT OF YOUR BEING STRUCK IN THE HEAD?
```

1      MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.

2      THE COURT:  THAT WAS ANSWERED ON DIRECT.

3      Q  BY MS. OLSON:  AS YOU SIT HERE TODAY, DO YOU HAVE

4  ANY EFFECTS OF BEING -- CONTINUING EFFECTS OF BEING HIT IN

5  THE HEAD?

6      A  AS I SIT HERE TODAY --

7      MS. HOLLEY:  OBJECTION.  ASKED AND ANSWERED.

8      THE COURT:  I DON'T THINK IT WAS.  WHAT EFFECTS DO YOU

9  HAVE TODAY?

10      THE WITNESS:  SPECIFICALLY FROM GETTING HIT IN THE HEAD?

11      Q  BY MS. OLSON:  YES.

12      A  I'M NOT SURE.  EVERY DAY IS DIFFERENT FOR ME,

13  ESPECIALLY THROUGH THIS TRIAL AND EVERYTHING THE PAST COUPLE

14  OF MONTHS.  I'M STILL TRYING TO UNDERSTAND SYMPTOMS.  I WOULD

15  SAY I'M DOING A LOT BETTER THAN I WAS ORIGINALLY, AS I SIT

16  HERE TODAY, YOU KNOW.  I CAN FOCUS.  I CAN STAY AWAKE.  YES.

17      Q  ARE YOU CURRENTLY HAVING TROUBLE SLEEPING?

18      A  YES.

19      Q  ARE YOU CONTINUING TO SEE THE THERAPIST, ERIKA

20  MOSES?

21      A  YES, I WILL BE CONTINUING.

22      MS. OLSON:  IF I CAN JUST LOOK AT MY NOTES FOR ONE

23  SECOND, YOUR HONOR.

24      THE COURT:  OF COURSE.

25      MS. OLSON:  I DON'T BELIEVE I HAVE ANYTHING FURTHER,

26  YOUR HONOR.

27      THE COURT:  ALL RIGHT.  ANYTHING ON RECROSS?

28      MS. HOLLEY:  YES.

```
1                      RECROSS EXAMINATION
2    BY MS. HOLLEY:
3         Q    LOOKING BACK AT EXHIBIT E, PAGE 23.  DO YOU HAVE
4    THAT BEFORE YOU?
5         A    YES, I DO.
6         Q    AND THAT'S A TEXT THAT WE TALKED ABOUT BEFORE
7    BETWEEN YOU AND MELY; RIGHT?
8         A    WHICH PAGE ARE YOU ON?
9         Q    TWENTY-THREE.
10        A    YES, I HAVE THAT IN FRONT OF ME.
11        Q    AND, AGAIN, YOU SAY, "OKAY.  SO MONDAY MY ATTORNEYS
12   NOTIFY TREVOR, HIS AGENT, AND THE DODGERS MANAGER THAT WE ARE
13   FILING A CIVIL RESTRAINING ORDER.  THEN TUESDAY THE
14   RESTRAINING ORDER IS FILED AND WILL BE PICKED UP BY THE
15   MEDIA.  AND HIS LIFE IS OVER.  THANK YOU GOD.  FINALLY"?
16        A    YES.
17        Q    YOU SAID THAT; RIGHT?
18        A    YES.
19        Q    YOU DO KNOW THAT WAS BEFORE MR. FETTEROLF'S
20   STATEMENT; RIGHT?
21        A    YES, I DO.
22        Q    SO YOUR TESTIMONY THAT YOU FELT YOU NEEDED THIS TO
23   GO OUT TO THE MEDIA IN ORDER TO RESPOND TO MR. FETTEROLF'S
24   STATEMENT, THAT'S NOT TRUE; RIGHT?
25        A    THAT'S INCORRECT.
26        Q    WELL, YOU ARE SPEAKING ABOUT THIS GOING OUT TO THE
27   MEDIA BEFORE MR. FETTEROLF MADE ANY STATEMENT AT ALL;
28   CORRECT?
```

```
1        MS. OLSON:  OBJECTION.

2        THE WITNESS:  WHAT YOU REFERENCED -- YEAH.  WHAT YOU

3   REFERENCED BEFORE WAS AN EMAIL I SENT TO MY LAWYERS SAYING

4   THAT I WANTED IT TO GO OUT TO THE MEDIA BECAUSE OF

5   MR. FETTEROLF'S STATEMENT.  I WANTED TO PUT MY SIDE OUT.

6   THIS IS JUST ME MENTALLY PREPARING THAT IT WILL BE PICKED UP

7   BY THE MEDIA.

8        Q    BY MS. HOLLEY:  "AND HIS LIFE IS OVER.  THANK YOU

9   GOD.  FINALLY"?

10        A    YES.

11        MS. HOLLEY:  THANK YOU.  NOTHING FURTHER.

12        THE COURT:  ANYTHING FURTHER, MS. OLSON?

13        MS. OLSON:  NO.

14        THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

15        THE WITNESS:  THANK YOU.

16        THE COURT:  MS. OLSON, YOUR NEXT WITNESS.

17        MS. OLSON:  I BELIEVE WE'RE CALLING --

18        MR. GARELICK:  YOUR HONOR, WE'RE CALLING MS. MAYA.  BUT

19   GIVEN MY CONVERSATIONS WITH OPPOSING COUNSEL, WE HAD TOLD

20   THEM TO COME BACK AT 1:30.  I KNOW THAT THEY HAVE WITNESSES

21   HERE TODAY AS WELL.  IF THEY'D LIKE TO START WITH THAT AND

22   RESUME MS. MAYA AT 1:30.  HOWEVER, SHE IS ONLY AVAILABLE

23   TODAY.

24        THE COURT:  OKAY.

25        MR. FETTEROLF:  YOUR HONOR, WE HAVE ONE DR. JENNIFER

26   HAMMERS.  SHE HAS TO LEAVE TODAY.  SHE IS AVAILABLE ALL DAY.

27   BUT --

28        THE COURT:  LET'S CALL HER NOW.
```

```
 1        MR. FETTEROLF:  WE CAN DO THAT.  THE ONLY THING I WANTED

 2   IS A MINUTE OR TWO.  SHE JUST LISTENED TO THE TESTIMONY.

 3        THE COURT:  SURE.  WANT TO TAKE A COUPLE OF MINUTES?

 4        MR. FETTEROLF:  IF THAT'S OKAY WITH YOU.

 5        THE COURT:  NO PROBLEM.  HOW ABOUT FIVE?  FIVE ENOUGH?

 6        MR. FETTEROLF:  FIVE WILL BE FINE.

 7        THE COURT:  ALL RIGHT.

 8             (RECESS TAKEN.)

 9        MR. FETTEROLF:  YOUR HONOR, A QUESTION.  SO DR. HAMMERS

10   IS GOING TO TALK ABOUT SOME OF THESE MEDICAL RECORDS.  I

11   DON'T KNOW IF WE HAVE MOVED IN SOME OF THE

12   SELF-AUTHENTICATING RECORDS.  WE CAN DO THAT AT THE END FOR

13   HOUSEKEEPING OR DO IT BEFOREHAND.  I DON'T KNOW WHAT YOU

14   PREFER.

15        THE COURT:  WHICH RECORDS ARE YOU CONCERNED ABOUT NOT

16   BEING IN?  I CAN TELL YOU WHAT'S PRESENTLY IN EVIDENCE.

17        MS. OLSON:  I KNOW WE BOTH SUBPOENAED ALVARADO MEDICAL

18   CENTER.

19        MR. FETTEROLF:  I THINK THERE'S HOSPITAL RECORDS FROM

20   ALVARADO, WHICH ARE OUR EXHIBIT H.

21        THE COURT:  WE'VE BEEN REFERENCING H ALREADY.  SO SOME

22   OF THAT IS CERTAINLY IN.  I SHOW OF THE ONES OF YOURS THAT

23   ARE PRESENTLY IN ARE E, K, J, BB, AND AA.

24        MR. FETTEROLF:  SO I THINK THEN THE ONLY ONES WOULD BE

25   THE HOSPITAL RECORDS FROM ALVARADO AS OUR EXHIBIT H.  AND THE

26   RECORDS FROM SCRIPPS MEDICAL AS EXHIBIT Q AS THEY'VE BEEN

27   PROVIDED SELF-AUTHENTICATED THROUGH AN AFFIDAVIT WE RECEIVED

28   IN RESPONSE TO OUR SUBPOENA.
```

```
1        MS. OLSON:  OURS WILL BE ALVARADO MEDICAL CENTER.
2        THE COURT:  ARE THEY CORRESPONDING?  I HAVE YOUR EXHIBIT
3   LIST.
4        MR. FETTEROLF:  WE JUST ATTACHED WHAT WE GOT FROM
5   PURSUANT TO THE SUBPOENA.  I THINK WE GOT SOME ADDITIONAL
6   ALVARADO RECORDS.  WE JUST GOT SOME ADDITIONAL RECORDS?
7        THE COURT:  I JUST HANDED THOSE OVER.
8        MS. OLSON:  I HAVEN'T SEEN THOSE.
9        MR. FETTEROLF:  I THINK YOU RECEIVED THEM FROM US.
10       MS. OLSON:  THEY JUST CAME TODAY.
11       THE COURT:  I JUST RECEIVED THEM.  I DIDN'T OPEN THEM.
12  I GAVE THEM TO MY J.A. TO HAND TO COUNSEL TO OPEN THEM
13  TOGETHER.
14       MR. FETTEROLF:  SO WE'RE NOT OBVIOUSLY GOING TO TALK
15  ABOUT THOSE.  WE HAVEN'T SEEN THEM.  I HAVEN'T LOOKED AT THEM
16  EITHER.
17       MS. OLSON:  THEN WHAT RECORDS ARE YOU TALKING ABOUT?
18       MR. FETTEROLF:  THE ONES ATTACHED TO OUR EXHIBITS.
19       MS. OLSON:  THOSE WERE ISSUED PURSUANT TO SUBPOENA,
20  ALSO.
21       MR. FETTEROLF:  YES.  ALVARADO I BELIEVE ARE THE ONES
22  YOU SENT TO US.
23       MS. OLSON:  CORRECT.
24       MR. FETTEROLF:  I BELIEVE H IS IN FROM YESTERDAY.  FROM
25  A HOUSEKEEPING STANDPOINT, I WANT TO MAKE SURE.
26       THE CLERK:  H IS NOT IN.
27       THE COURT:  H IS NOT IN.  ARE THERE ANY OF RESPONDENT'S
28  EXHIBITS IN OTHER THAN THE ONES WHICH I DID NOT MENTION.
```

460

1      THE CLERK:  A AND C.

2      THE COURT:  OKAY.  SO RESPONDENT'S A, C, E, J, K, AA,

3  AND BB ARE IN.  OF PETITIONER'S, THE ONES I SHOW AS HAVING

4  BEEN ADMITTED ARE 1, 2, 3, 5, 7, 8, 20, 23, 26, 29 CERTAIN

5  PAGES, 31 CERTAIN PAGES.

6      MS. OLSON:  I KNOW THAT WE -- HER D.V. APPLICATION

7  DECLARATION WAS OFFERED.  THAT'S THEIR EXHIBIT.

8      THE COURT:  A.

9      MS. OLSON:  A.

10     MR. FETTEROLF:  SO, YOUR HONOR, I'LL POINT OUT EXHIBIT H

11  IS THE RECORDS PRODUCED PURSUANT TO THEIR DEPOSITION

12  SUBPOENA.

13     THE COURT:  RIGHT.  IS THERE ANY OBJECTION TO H COMING

14  INTO EVIDENCE?

15     MR. GARELICK:  NO, YOUR HONOR.

16     THE COURT:  OKAY.  H IS ADMITTED.

17     MR. FETTEROLF:  AND EXHIBIT Q ARE THE RECORDS THAT WERE

18  RECEIVED PURSUANT TO OUR SUBPOENA FROM SCRIPPS MEDICAL.

19  THAT'S EXHIBIT Q.

20     THE COURT:  ANY OBJECTION TO Q?

21     MR. GARELICK:  NO, YOUR HONOR.

22     MS. OLSON:  WELL, ON Q, YOUR HONOR, THEY SUBPOENAED

23  RECORDS DATING BACK TO LIKE 2008, 9.  I WOULD SAY RELEVANCE

24  AS TO THOSE.

25     THE COURT:  ARE YOU SEEKING TO INTRODUCE ALL 650 PAGES

26  OF Q?

27     MR. FETTEROLF:  DR. HAMMERS JUST REVIEWED THE RECORDS.

28  THESE WERE THE RECORDS WE GOT PURSUANT TO THE SUBPOENA.  I

1  DON'T ACTUALLY THINK WE -- I HAVE TO ASK MS. MANGELS.  SHE

2  REVIEWED THE RECORDS.  I THINK THERE MIGHT BE ONE REFERENCE

3  TO SOMETHING SHE REVIEWED.  BUT --

4       THE COURT:  IF YOU ARE QUALIFYING HER AS AN EXPERT UNDER

5  EVIDENCE CODE SECTION 800, IT WILL BE THE SAME IN THE FEDERAL

6  RULES.  SHE MAY CONSIDER THINGS THAT WOULD OTHERWISE BE

7  HEARSAY WITHOUT US HAVING TO INTRODUCE THEM INTO EVIDENCE.

8  IF YOU WANT THEM IN EVIDENCE, THEN WE CAN ADDRESS THEM ITEM

9  BY ITEM.

10      MR. FETTEROLF:  THAT'S FINE.  THAT'S FINE.

11      MR. GARELICK:  YOUR HONOR, BEFORE WE GET STARTED.  WE

12  WOULD REQUEST AN OFFER OF PROOF AS TO THE RELEVANCE OF

13  MS. HAMMER'S TESTIMONY.

14      MR. FETTEROLF:  DR. HAMMERS IS GOING TO TESTIFY ABOUT

15  REVIEWING THE C.T. SCANS AND M.R.I. RESULTS I ASKED THE SANE

16  NURSE ABOUT THAT.  SHE SAID SHE COULDN'T DO IT.  SHE WILL

17  DISCUSS THAT VERY BRIEFLY.  SHE IS GOING TO DISCUSS -- HAVING

18  LISTENED TO MS. HILL'S TESTIMONY ABOUT WHAT OCCURRED, SHE IS

19  GOING TO ADDRESS WHAT WAS FOUND IN THE RECORDS CONSISTENT

20  WITH WHAT SHE DESCRIBED, ARE THERE ANY INCONSISTENCIES AND

21  THE LIKE.  SHE IS GOING TO DISCUSS SOME OF THE QUESTIONS I

22  ASKED THE SANE NURSE ABOUT MEDICATIONS.  SHE IS GOING TO

23  ADDRESS SOME OF THOSE AND HOW THEY IMPACT BRUISING.

24           THEN SHE IS GOING TO ADDRESS SOME OF THE PICTURES

25  IN THE SART REPORT AND GIVE HER MEDICAL OPINION AS TO WHAT

26  SHE SEES IN THEM.

27      THE COURT:  ALL OF THOSE SOUND RELEVANT.

28      MR. GARELICK:  WELL, YOUR HONOR, I DON'T QUITE GET THE

1  RELEVANCE OF THIS.  THE EXTENT OF HER INJURIES, WHETHER OR

2  NOT SHE WAS INJURED OR WAS NOT IS THE RELEVANCE.  TO THE

3  EXTENT OF THEM IS NOT RELEVANT TO DOMESTIC VIOLENCE.  THE

4  ABUSE OCCURRED -- SHE IS NOT TESTIFYING --

5      THE COURT:  IT ALL GOES TO THE CREDIBILITY OF YOUR

6  CLIENT.

7      MR. GARELICK:  I UNDERSTAND.

8      THE COURT:  ALL RIGHT.  DR. HAMMERS.  IF I COULD HAVE

9  YOU REMAIN STANDING FOR JUST A MINUTE.

10      THE CLERK:  DO YOU SOLEMNLY STATE, UNDER PENALTY OF

11  PERJURY, THAT THE TESTIMONY YOU MAY GIVE IN THE CAUSE NOW

12  PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

13  TRUTH, AND NOTHING BUT THE TRUTH?

14      THE WITNESS:  I DO.

15      THE CLERK:  THANK YOU.  BE SEATED.  PLEASE STATE AND

16  SPELL YOUR FIRST AND LAST NAME FOR THE RECORD.

17      THE WITNESS:  SURE.  JENNIFER HAMMERS.  J-E-N-N-I-F-E-R.

18  H-A-M-M-E-R-S.

19      THE CLERK:  THANK YOU.

20      THE WITNESS:  YOU'RE WELCOME.

21      THE COURT:  GO AHEAD, COUNSEL.

22

23                  JENNIFER HAMMERS,

24  CALLED AS A WITNESS ON BEHALF OF THE RESPONDENT, WAS SWORN

25  AND TESTIFIED AS FOLLOWS:

26  //

27  //

28  //

DIRECT EXAMINATION

BY MR. FETTEROLF:

Q    DR. HAMMERS, CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND, PLEASE?

A    SURE.  SO I WENT TO COLLEGE AT GENEVA COLLEGE IN BEAVER FALLS, PENNSYLVANIA.  THEN AFTER COLLEGE WENT TO LAKE ERIE COLLEGE OF OSTEOPATHIC MEDICINE.  THAT'S WHERE I BECAME A PHYSICIAN.  I FINISHED THERE IN 2004.  I THEN DID A RESIDENCY IN ANATOMIC AND CLINICAL PATHOLOGY AT ALLEGHENY GENERAL HOSPITAL IN PITTSBURGH, PENNSYLVANIA.

WHEN I FINISHED WITH MY RESIDENCY, I MOVED TO NEW YORK CITY AND DID A FORENSIC PATHOLOGY FELLOWSHIP AT THE MEDICAL EXAMINER'S OFFICE FOR ONE YEAR.  I STAYED THERE FOR A SECOND YEAR OF FELLOWSHIP SPECIALIZING IN BRAIN AND HEART PATHOLOGY IN FORENSIC CASES.  WHENEVER I FINISHED THAT YEAR, THAT WAS 2013, I WAS DONE WITH ALL OF MY TRAINING.  AND I GOT MY FIRST JOB.

Q    AND COULD YOU DESCRIBE FOR THE COURT YOUR PROFESSIONAL EXPERIENCE?

A    SURE.  SO I WORKED FOR THE MEDICAL EXAMINER'S OFFICE IN MASSACHUSETTS OUT OF THE BOSTON OFFICE FOR THREE YEARS.  AFTER THAT, I WENT BACK TO NEW YORK CITY AND WORKED FOR FOUR YEARS TOTAL FOR THE MEDICAL EXAMINER IN NEW YORK CITY.  THE FIRST TWO YEARS I WORKED IN THEIR MANHATTAN OFFICE WHERE I WORKED AS A MEDICAL EXAMINER BUT, ALSO, WAS THE FELLOWSHIP PROGRAM COORDINATOR.  SO I WAS IN CHARGE OF THE TRAINING PROGRAMS, WHICH I HAD ACTUALLY PARTICIPATED IN PREVIOUSLY.

1      AFTER THE FIRST TWO YEARS I THEN WENT TO THE

2  BROOKLYN OFFICE WHERE I WAS THE DEPUTY CHIEF MEDICAL

3  EXAMINER.  WHAT THAT MEANT WAS THAT I WAS IN CHARGE OF THE

4  DAY-TO-DAY OPERATIONS OF THE OFFICE.  SO THERE WERE SEVEN

5  OTHER MEDICAL EXAMINERS WORKING THERE AND ABOUT A STAFF OF 40

6  PEOPLE.  SO I RAN THE DAY-TO-DAY OPERATIONS OF THAT OFFICE,

7  AND COMMUNICATED, AND WAS PART OF THE EXECUTIVE TEAM FOR THE

8  ENTIRE CITY AGENCY IN ADDITION TO RUNNING THAT OFFICE.

9      AFTER FOUR YEARS AT THAT OFFICE, I THEN TOOK A JOB

10 IN PRIVATE PRACTICE WITH CYRIL H. WECHT AND PATHOLOGY

11 ASSOCIATES IN PITTSBURGH, PENNSYLVANIA.  THAT'S WHERE I

12 CURRENTLY PRACTICE FOR THE LAST JUST OVER FOUR YEARS.

13     Q    DR. HAMMERS, COULD YOU TURN TO OUR EXHIBIT NUMBER R

14 IN ONE OF THE BINDERS IN FRONT OF YOU.

15     A    YES.

16     Q    IS THAT A TRUE AND CORRECT COPY OF YOUR C.V.?

17     A    YES, IT IS.

18     MR. FETTEROLF:  I ASK THAT BE ADMITTED INTO EVIDENCE.

19     THE COURT:  ANY OBJECTION?

20     MR. GARELICK:  NO OBJECTION.

21     THE COURT:  THAT IS ADMITTED.

22     MS. OLSON:  NO OBJECTION.

23     Q    BY MS. HOLLEY:  DR. HAMMERS, AS A FORENSIC

24 PATHOLOGIST, WHAT DO YOU DO?

25     A    SO I BASICALLY DO TWO MAIN JOBS.  ONE IS I PERFORM

26 AUTOPSIES FOR A LIVING ON PEOPLE WHO DIE SUDDENLY,

27 UNEXPECTEDLY, OR FROM UNNATURAL CAUSES.  AND THEN IN

28 ADDITION, PERFORM AUTOPSIES ON PEOPLE WHO A FAMILY OR

465

```
1    ATTORNEY WOULD LIKE TO HAVE AN AUTOPSY DONE.
2            THE SECOND MAIN PART OF WHAT I DO IS MEDICAL-LEGAL
3    CONSULTATION.  SO I AM HIRED BY A FAMILY OR AN ATTORNEY TO
4    REVIEW A CASE, REVIEW RECORDS, PHOTOS, AND FORMULATE OPINIONS
5    ABOUT THINGS LIKE INJURIES, HOW THEY OCCURRED, WHY SOMEBODY
6    DIED.  VARIOUS ASPECTS OF FORENSIC MEDICINE.
7            THE MORE MINOR PART OF WHAT I DO IS TEACHING.  SO
8    TEACHING AT DIFFERENT UNIVERSITIES OR FOR DIFFERENT
9    ORGANIZATIONS ABOUT DIFFERENT FORENSIC TOPICS.
10       Q    WERE YOU A MEDICAL EXAMINER FOR A NUMBER OF
11   YEARS?
12       A    YES.  I DID HAVE THE TITLE OF MEDICAL EXAMINER BOTH
13   WHEN I WORKED IN NEW YORK CITY AND IN MASSACHUSETTS.
14       Q    AND COULD YOU JUST TELL THE COURT WHAT A MEDICAL
15   EXAMINER DOES.  THE TYPES OF THINGS THAT YOU TYPICALLY DO.
16       A    SURE.  A MEDICAL EXAMINER IS SOMEONE WHO CAN
17   PERFORM AUTOPSIES, LIKE WHAT I CAN DO.  BUT, ALSO, THROUGH
18   THE LEGAL AUTHORITY, THROUGH WHICH THEY'RE HIRED, USUALLY FOR
19   A GOVERNMENTAL -- EITHER COUNTY OR STATE OR CITY -- THEY HAVE
20   THE LEGAL JURISDICTION TO INVESTIGATE DEATHS THAT FALL UNDER
21   THEIR JURISDICTION.  SO, AGAIN, THE SUDDEN UNEXPECTED,
22   UNNATURAL DEATHS.
23           THEY CAN GO TO THE SCENE.  THEY CAN TALK TO
24   FAMILIES.  THEY CAN SUBPOENA RECORDS.  WORK WITH THE POLICE
25   TO FIGURE OUT WHY SOMEBODY DIED.  AND TO PRODUCE THAT INTO A
26   DEATH CERTIFICATE THAT EXPLAINS THE CAUSE AND MANNER OF
27   DEATH.
28       Q    DURING YOUR COURSE OF YOUR CAREER, HAVE YOU
```

1  EXAMINED BOTH DEAD AND LIVING INDIVIDUALS?

2      A    YES, I HAVE.

3      Q    OKAY.  AND TOTAL EXAMINATIONS YOU'VE CONDUCTED OVER

4  YOUR CAREER, BOTH LIVING AND DEAD INDIVIDUALS, HOW MANY HAS

5  THAT BEEN?

6      A    PROBABLY -- I'VE DONE ABOUT 4,000 AUTOPSIES.  AND I

7  WOULD SAY LIVING CONSULTATIONS ARE A SMALLER NUMBER OF THAT.

8  PROBABLY 50 TO A 100 FOR EITHER A -- YOU KNOW, LOOKING AT

9  PHOTOS AND RECORDS AND THINGS LIKE THAT.

10     Q    OKAY.  SO JUST THE TOTAL -- SO WHEN YOU SAID THE

11  4,000, YOU SAID 4,000 AUTOPSIES.

12     THE REPORTER:  I'M SORRY.  I DIDN'T HEAR THE END OF YOUR

13  QUESTIONS.

14     Q    BY MR. FETTEROLF:  YOU SAID 4,000 AUTOPSIES.  AND

15  THEN FOR THE NUMBER OF EXAMINATIONS YOU HAVE DONE OF THOSE

16  PEOPLE WHO ARE LIVING, I'M NOT SURE I QUITE UNDERSTAND YOUR

17  ANSWER.

18     A    YES.  SO THAT WOULD BE ABOVE AND BEYOND THE

19  AUTOPSIES THAT I PERFORMED.

20     Q    OKAY.  DID YOU REVIEW ANY MATERIALS IN PREPARATION

21  FOR TODAY'S TESTIMONY?

22     A    YES, I DID.

23     Q    OKAY.  DO YOU RECALL WHAT MATERIALS YOU REVIEWED?

24     A    I REVIEWED THE AFFIDAVIT.  I REVIEWED VARIOUS

25  MEDICAL RECORDS.  THE SART REPORT.  ALONG WITH THE

26  PHOTOGRAPHS.  AND VARIOUS PHOTOGRAPHS AND TEXT MESSAGES THAT

27  WERE PROVIDED TO ME.

28     Q    OKAY.  I WANT TO MAKE SURE YOU REVIEWED THE SART

1   REPORT?

2       A   YES.

3       Q   AND DID YOU REVIEW HOSPITAL RECORDS FROM THE

4   ALVARADO HOSPITAL?

5       A   YES, I DID.

6       Q   OKAY.  AND DO YOU RECALL REVIEWING HOSPITAL RECORDS

7   FROM SCRIPPS MEDICAL?

8       A   YES.

9       Q   OKAY.  AND DO YOU RECALL REVIEWING C.T. SCANS?

10      A   YES.

11      Q   OKAY.  AND WHAT ABOUT M.R.I.S?

12      A   YES.

13      Q   AND DID YOU REVIEW THE D.V.R.O. AFFIDAVIT THAT

14  MS. HILL SUBMITTED?

15      A   YES, I DID.

16      Q   OKAY.  AND DID YOU REVIEW THE PHOTOGRAPHS THAT WE

17  SENT?

18      A   YES.

19      Q   DID YOU LISTEN TO THE TESTIMONY OF KELLY VALENCIA,

20  THE SANE NURSE?

21      A   YES, I DID.

22      Q   OKAY.  DID YOU LISTEN TO THE TESTIMONY OF

23  PETITIONER, LINDSEY HILL?

24      A   YES, I DID.

25      Q   DID MS. HILL HAVE C.T. SCANS DONE?

26      A   YES, SHE DID.

27      Q   OKAY.

28      MR. GARELICK:  YOUR HONOR, BEFORE WE GETS INTO

```
 1    QUESTIONING, AM I GOING TO HAVE AN OPPORTUNITY TO VOIR DIRE
 2    THIS EXPERT OR --
 3         THE COURT:  DO YOU WANT TO PROFFER HER AS AN EXPERT?
 4         MR. FETTEROLF:  YES.
 5         THE COURT:  DO YOU WISH TO VOIR DIRE?
 6         MR. GARELICK:  YES, I WILL.
 7         THE COURT:  GO RIGHT AHEAD.
 8
 9              VOIR DIRE EXAMINATION
10    BY MR. GARELICK:
11         Q    DR. HAMMERS, YOU SAID THAT YOU HAD A DOCTOR OF
12    MEDICINE; IS THAT CORRECT?
13         A    DOCTOR OF OSTEOPATHIC MEDICINE.  I'M A D.O.
14         Q    THAT'S DIFFERENT FROM AN M.D. OR MEDICAL DOCTOR?
15         A    IT'S A DIFFERENT SCHOOL OF MEDICINE, BUT BOTH ARE
16    FULLY TRAINED AND LICENSED PHYSICIANS.
17         Q    WHAT DO YOU MEAN BY A DIFFERENT SCHOOL OF
18    MEDICINE?
19         A    SO A LONG, LONG TIME AGO A DOCTOR NAMED A.T. STILL
20    BROKE OFF FROM TRADITIONAL MEDICINE, WHICH IS M.D. OR
21    ALLOPATHIC MEDICINE.  HE BECAME UNHAPPY WITH THE WAY
22    TREATMENTS WERE GOING.  AND HE STARTED HIS OWN SCHOOL OF
23    MEDICINE.  SO THOSE SCHOOLS HAVE BEEN AROUND FOR MANY, MANY
24    YEARS.  AND BASICALLY THE END RESULT IS THAT YOU EITHER HAVE
25    AN M.D. OR A D.O. TITLE.  BUT, AGAIN, M.D.S AND D.O.S BOTH
26    PRACTICE, ARE FULLY LICENSED, AND CAN PRACTICE IN ANY
27    SPECIALTY OF MEDICINE.
28         Q    YOU HAVE THE ABILITY TO WRITE PRESCRIPTIONS?
```

```
1          A     IF I WANTED TO, YES.
2          Q     DO YOU HAVE ANY LICENSES IN THE STATE OF
3    CALIFORNIA?
4          A     I DO.
5          Q     WHAT LICENSES DO YOU HAVE IN THE STATE OF
6    CALIFORNIA?
7          A     DOCTOR OF OSTEOPATHIC MEDICINE.
8          Q     DID YOU HAVE TO TAKE A SPECIFIC TEST TO HAVE A
9    LICENSE IN CALIFORNIA FOR A DOCTOR OF OSTEOPATHIC MEDICINE?
10         A     SO MEDICAL LICENSES DON'T REQUIRE EXAMINATIONS.
11   THEY REQUIRE APPLYING FOR THE LICENSE AND THEN MAINTAINING
12   YOUR LICENSE.  SPECIFICALLY IN CALIFORNIA, IT REQUIRES
13   EFFORT -- IT JUST CHANGED -- BUT IT'S 100 AND SOME HOURS
14   EVERY COUPLE OF YEARS OF CONTINUING MEDICAL EDUCATION IN
15   OSTEOPATHIC MEDICINE.  A CERTAIN PORTION OF IT TO MAINTAIN
16   THAT LICENSE.
17         Q     AND ARE YOU CURRENT WITH YOUR LICENSE IN THE STATE
18   OF CALIFORNIA?
19         A     YES.
20         Q     HOW LONG HAVE YOU BEEN LICENSED IN THE STATE OF
21   CALIFORNIA IN OSTEOPATHIC MEDICINE?
22         A     SINCE 2010.  EARLY IN 2010.
23         Q     HAVE YOU PERFORMED ANY MEDICAL EXAMINATIONS IN THE
24   STATE OF CALIFORNIA?
25         A     YES, I HAVE.
26         Q     AND ABOUT HOW MANY OF YOUR, I BELIEVE, YOU HAD SAID
27   4,000 AUTOPSIES WERE IN THE STATE OF CALIFORNIA?
28         A     I PROBABLY DID MAYBE 40 OR 50 AUTOPSIES.
```

1    Q    HOW ABOUT OF YOUR -- I DON'T WANT TO BE CRUDE --

2    BUT YOUR LIVING EXAMINATIONS?

3    A    I DON'T KNOW IF I'VE DONE LIKE MEDICAL-LEGAL

4    CONSULTATIONS FROM CALIFORNIA.  I DON'T KEEP THAT CAREFUL

5    TRACK OF WHERE THEY'RE FROM IN THE COUNTRY.  I HAVEN'T SEEN

6    ANY LIVING PATIENTS IN CALIFORNIA SPECIFICALLY.

7    Q    OKAY.  AND IS THERE A DIFFERENCE BETWEEN A

8    EXAMINATION IN-PERSON VERSUS, I THINK, WHAT YOU WERE

9    DESCRIBING WAS A MEDICAL EXAMINATION OF THE LIVING VIA

10   PHOTOS?

11   A    ARE YOU ASKING ME IS THERE A DIFFERENCE BETWEEN AN

12   AUTOPSY AND AN EXAM ON A LIVING PATIENT?

13   Q    NO.  SO I'M JUST TRYING TO BE A LITTLE CLEARER.  I

14   THINK YOU SAID LOOKING AT PHOTOS WAS YOUR 50 TO 100

15   EXAMINATIONS.  IS THERE A DIFFERENCE, OR HAVE YOU DONE -- IS

16   THAT A COMBINATION -- STRIKE THAT.

17        DO YOU HAVE A COMBINATION OF EXAMINATIONS IN PERSON

18   OF A LIVE PERSON VS. EXAMINATIONS OF A LIVE PERSON FROM

19   PHOTOGRAPHS?

20   A    SO TYPICALLY IT'S DONE THROUGH EXAMINATION OF A

21   LIVING PERSON THROUGH PHOTOGRAPHS AND MEDICAL RECORDS.  NOT

22   IN-PERSON EXAMS.

23   Q    HAVE YOU DONE ANY MEDICAL EXAMINATIONS OF LIVE

24   PERSON IN-PERSON?

25   A    A COUPLE.  MAYBE LESS THAN A HANDFUL PROBABLY.

26   Q    HAVE YOU EVER PERFORMED A SART EXAM?

27   A    NOT ON A LIVING PATIENT, BUT ON DECEDENTS.

28   Q    ABOUT HOW MANY SART EXAMS -- AND WHEN I SAY THE

```
1   WORD "SART," I'M TALKING ABOUT A SEXUAL ASSAULT -- AND I
2   THINK IT'S RAPE TEAM.  THEY ALSO CALL IT A SANE EXAM.  HOW
3   MANY HAVE YOU DONE ON DECEASED PEOPLE?
4        A    I WOULD SAY PROBABLY BETWEEN A 100 TO A 150.
5   AGAIN, I DON'T KEEP SPECIFIC TRACK OF WHICH CASES THAT I DO
6   THOSE EXAMINATIONS ON.
7        Q    HOW MANY TIMES HAVE YOU TESTIFIED IN COURT?
8        A    PROBABLY LIKE A 100, 120 TIMES OR MORE.
9        Q    HAVE YOU TESTIFIED IN COURT IN THE STATE OF
10  CALIFORNIA?
11       A    NOT THAT I CAN RECALL.
12       Q    HAS CALIFORNIA EVER DESIGNATED YOU AS AN EXPERT ON
13  FORENSIC PATHOLOGY?
14       A    NOT THAT I RECALL.
15       Q    YOU HAVE NOT MET MY CLIENT IN PERSON?
16       A    NO, I HAVE NOT.
17       MR. GARELICK:  NO FURTHER QUESTIONS ON VOIR DIRE.
18       THE COURT:  OKAY.
19       MR. FETTEROLF:  OKAY.
20
21                DIRECT EXAMINATION (RESUMED)
22  BY MR. FETTEROLF:
23       Q    DR. HAMMERS, CAN YOU TURN TO PAGE 63 OF EXHIBIT H
24  FOR ME.
25       A    WHICH EXHIBIT?  I'M SORRY.  I COULDN'T HEAR YOU.
26       Q    EXHIBIT H.
27       A    OH.  OKAY.
28       THE COURT:  YOU ARE SEEKING TO HAVE HER QUALIFIED?
```

```
1          MR. FETTEROLF:  YES.  SORRY.

2          THE COURT:  ANY FURTHER OBJECTIONS AFTER VOIR DIRE?

3          MR. GARELICK:  I THINK I WOULD STILL HAVE MY SAME

4    OBJECTIONS.  RELEVANCE AS TO SOMEONE WHO IS A DOCTOR OF

5    OSTEOPATHIC MEDICINE WHO PERFORMS AUTOPSIES AS BEING RELEVANT

6    TO THIS CASE AND THESE SET OF FACTS OF AN EXAMINATION OF

7    SOMEONE -- A LIVE PERSON UNDER A SART EXAM.

8          THE COURT:  ALL RIGHT.  WELL, THAT OBJECTION IS NOT WELL

9    FOUNDED.  THE COURT WILL QUALIFY THE WITNESS AS AN EXPERT ON

10   THE AREA OF FORENSIC EVALUATION.

11         MR. FETTEROLF:  THANK YOU, YOUR HONOR.

12         Q    BY MR. FETTEROLF:  TURN TO PAGE 63 OF EXHIBIT H.

13         THE COURT:  I'LL LET YOU GO RIGHT TO THE CLOCK.

14         MR. FETTEROLF:  THAT'S FINE.

15         THE WITNESS:  WHICH PAGE OF H?

16         Q    BY MR. FETTEROLF:  YES.  EXHIBIT H, PAGE 63.

17         A    OKAY.

18         Q    I'M TOLD I'M NOT LOUD WITH THIS MASK ON.  I

19   APOLOGIZE.

20         THE COURT:  FEEL FREE TO PROJECT.

21         THE WITNESS:  OKAY.  I'M THERE.

22         Q    BY MR. FETTEROLF:  WHAT IS THIS?

23         A    THIS IS A PAGE OF THE MEDICAL RECORD THAT IS A

24   REPORT OF A C.T. SCAN OF THE HEAD WITHOUT CONTRAST.  THAT WAS

25   PERFORMED ON MAY 17TH, 2021, ON MS. HILL.

26         Q    WHAT IS THE PURPOSE OF A C.T. HEAD WITHOUT

27   CONTRAST?

28         A    SO A C.T. HEAD WITHOUT CONTRAST IS DONE IN ORDER TO
```

```
 1   EVALUATE THE STRUCTURES INSIDE AND AROUND THE HEAD.  SO IT
 2   LOOKS AT THE SCALP, WHICH IS THE PART WHERE YOUR HAIR IS
 3   CONNECTED.  IT LOOKS AT THE UNDERLYING BONE, WHICH IS THE
 4   HARD PART OF YOUR HEAD.  AND IT LOOKS AT THE SPACES BETWEEN
 5   YOUR BONE AND BETWEEN YOUR BRAIN INSIDE OF YOUR SKULL.  AS
 6   WELL AS THE ACTUAL BRAIN STRUCTURES THEMSELVES.
 7          AND IT LOOKS FOR THINGS LIKE TUMORS, ANY DISEASE
 8   PROCESSES, ANY KIND OF INJURIES, ANY BLEEDING IN OR AROUND
 9   THE BRAIN, BLEEDING UNDER THE SCALP, AND ALSO ANY KIND OF
10   INJURY TO THE BRAIN ITSELF.
11      Q    WHY WOULD A DOCTOR ORDER A C.T. HEAD WITHOUT
12   CONTRAST?
13      A    SO A DOCTOR COULD ORDER IT FOR A VARIETY OF
14   REASONS.  IN A CASE WHERE THERE IS REPORTED OR SUSPECTED
15   TRAUMA, THEY WOULD BE LOOKING FOR ANY KIND OF SIGNS OF
16   INJURIES.  SO BLEEDING, FRACTURES, OR BREAKS TO THE BONE, AND
17   SWELLING.
18      Q    CAN YOU PLEASE DESCRIBE FOR THE COURT THE FINDINGS
19   OF THE C.T. SCAN?
20      A    SURE.  SO THIS C.T. SCAN WAS ESSENTIALLY
21   UNREMARKABLE.  THERE WERE NO SIGNS OF INJURIES.  NO SIGNS OF
22   FRACTURES.  NO SIGNS OF SWELLING TO THE BRAIN OR BLEEDING
23   AROUND OR IN THE BRAIN.
24      Q    ACCORDING TO THIS C.T. SCAN, DID MS. HILL HAVE A
25   SKULL FRACTURE?
26      A    NO, SHE DID NOT.
27      THE COURT:  ALSO, H IS IN EVIDENCE.  THE DOCUMENT SPEAKS
28   FOR ITSELF.  SO NOTHING IS NECESSARY TO HAVE THE WITNESS READ
```

```
1   FROM THE REPORT.  IF THERE'S SOMETHING SHE NEEDS TO COMMENT
2   ON WITHIN THE REPORT, PLEASE ELICIT THOSE ANSWERS.
3        Q    BY MR. FETTEROLF:  DID THE C.T. SCAN SHOW INTERNAL
4   SWELLING?
5        A    IT DID NOT.
6        Q    DID THE C.D. SCAN SHOW ANY FRACTURES?
7        A    NO, IT DID NOT.
8        Q    DID THE C.T. SCAN SHOW ANY INJURIES?
9        A    NO, IT DID NOT.
10       Q    LET'S TURN TO PAGE 64 OF EXHIBIT H.  CAN YOU TELL
11  US WHAT THIS DOCUMENT IS?
12       A    SURE.  SO THIS IS A C.T. SCAN OF THE MAXILLOFACIAL
13  BONES WITHOUT CONTRAST PERFORMED ON MAY 17TH, 2021, ON
14  MS. HILL.
15       Q    CAN YOU TELL THE COURT WHAT THE DATE THE C.T. SCAN
16  IS --
17       THE COURT:  IT'S ON THE DOCUMENT, WHICH SPEAKS FOR
18  ITSELF AND IS IN EVIDENCE, COUNSEL.
19       Q    BY MR. FETTEROLF:  WHAT IS THE PURPOSE OF A C.T.
20  MAXILLOFACIAL BONES WITHOUT CONTRAST?
21       A    YEAH.  SO MAXILLOFACIAL C.T.S ARE DONE TO TAKE A
22  CLOSER LOOK AT THE BONES OF THE FACE, WHICH A C.T. OF THE
23  HEAD MAY NOT PICK UP ON IF THERE'S ANY KIND OF TRAUMA.  SO
24  THAT'S ORDERED SEPARATELY IN ORDER TO LOOK AT THE SMALL MORE
25  DELICATE BONES ON THE FACE AROUND THE EYES, NOSE, CHEEKS,
26  JAW.  THOSE AREAS.  TO LOOK FOR ANY BREAKS IN THE BONES, ANY
27  SWELLING, ANY BLEEDING UNDER THE SURFACE OF THE SKIN.  ANY
28  KIND OF PATHOLOGIC PROCESS THAT MAY BE GOING ON.
```

475

1        Q    WHY WOULD A DOCTOR ORDER THIS TYPE OF C.T. SCAN?

2        A    SO, AGAIN, SIMILAR TO A HEAD C.T., IT COULD BE FOR

3   A VARIETY OF PRESENTATIONS.  BUT PERTINENT TO THE CASE THAT

4   WE'RE DISCUSSING TODAY, IT WOULD BE IF SOMEBODY REPORTS OR

5   HAS VISIBLE TRAUMA.  THEN THEY -- A DOCTOR WOULD ORDER THE

6   C.T. SCAN IN ORDER TO LOOK FOR ANY ADDITIONAL TRAUMA THAT

7   CAN'T BE SEEN FROM JUST LOOKING AT THE PERSON DIRECTLY.

8        Q    CAN YOU GENERALLY JUST DESCRIBE THE FINDINGS OF

9   THIS C.T. SCAN?

10       THE COURT:  OTHER THAN THAT WHICH IS CONTAINED IN THE

11  DOCUMENT?

12       MR. FETTEROLF:  YOUR HONOR, THE REASON I'M ASKING IS

13  BECAUSE WHEN I ASKED THE SANE NURSE YESTERDAY, SHE SAID SHE

14  COULDN'T DESCRIBE THE FINDINGS.

15       THE COURT:  WELL, SHE MAY NOT.  BUT SINCE WE'VE NOW GOT

16  THIS DOCUMENT IN EVIDENCE, IT SPEAKS FOR ITSELF.  AND I CAN

17  READ IT.  IF THERE'S SOMETHING ABOUT IT THAT IS SO IDIOMATIC

18  IN THE MEDICAL JARGON THAT I WOULD NOT UNDERSTAND IT, YOU MAY

19  CERTAINLY INQUIRE ABOUT THAT.  BUT IF YOU'RE ASKING IF THERE

20  WERE NO ACUTE PROCESSES, I CAN SEE THAT IN THE DOCUMENT.

21       MR. FETTEROLF:  OKAY.  LET ME TRY ANOTHER QUESTION.

22       THE COURT:  I'LL LET YOU DO THAT AT 1:30.

23       MR. FETTEROLF:  OKAY.  SOUNDS GOOD.

24       THE COURT:  OKAY.

25       MR. FETTEROLF:  THANK YOU.

26                 (AT 12:00 P.M., THE NOON RECESS WAS TAKEN

27                  UNTIL 1:35 P.M. OF THE SAME DAY.)

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3       HON. DIANNA GOULD-SALTMAN, JUDGE        DEPARTMENT 35

 4

 5   LINDSEY HILL,                        )
                                          )
 6                                        )
                        PETITIONER,       ) NO. 21STRO03198
 7                                        )
                  VS.                     )
 8                                        ) REPORTER'S
                                          ) CERTIFICATE
 9   TREVOR BAUER,                        )
                                          )
10                                        )
                        RESPONDENT.       )
11   _____)

12

13          I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14   REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15   FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16   FOREGOING PAGES, 367 THROUGH 475, INCLUSIVE, COMPRISE A FULL,

17   TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18   MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 18, 2021.

19          DATED THIS 18TH DAY OF AUGUST, 2021.

20

21

22   _____
     JACQUELINE M. CAIRE, CSR #9599, RPR
23   OFFICIAL REPORTER

24

25

26

27

28
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF LOS ANGELES

 3       HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

 4

 5
     LINDSEY HILL,                        )
 6                                        )
                        PETITIONER,       )
 7                                        )
              VS.                         )    NO. 21STRO03198
 8                                        )
                                          )
 9   TREVOR BAUER,                        )
                                          )
10                                        )
                        RESPONDENT.       )
11   _____)
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                     AUGUST 18, 2021
                        P.M. SESSION
13
     APPEARANCES:
14   FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                           BY:  DOREEN MARIE OLSON, ESQ.
15                              MARC H. GARELICK, ESQ.
                           10100 SANTA MONICA BOULEVARD
16                         SUITE 1425
                           LOS ANGELES, CA 90067
17
                           RIGHT CHOICE LAW
18                         BY:  FRED THIAGARAJAH, ESQ.
                           5015 BIRCH STREET
19                         SUITE 107
                           NEWPORT BEACH, CA 92660
20
     FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
21                         BY:  SHAWN HOLLEY, ESQ.
                                KATE MANGELS, ESQ.
22                         808 WILSHIRE BOULEVARD
                           3RD FLOOR
23                         SANTA MONICA, CA 90401

24                         ZUCKERMAN SPAEDER
                           BY:  JON R. FETTEROLF, ESQ.
25                              (PRO HAC VICE)
                           1800 M STREET NW
26                         SUITE 1000
                           WASHINGTON, DC 20036

27

28                         JACQUELINE M. CAIRE, CSR #9599, RPR
                           OFFICIAL REPORTER
```

```
 1                          WITNESSES

 2
                                                      PAGE
 3
    JENFFIER HAMMERS, CALLED BY THE RESPONDENT
 4
         DIRECT EXAMINATION MR. FETTEROLF          475
 5       CROSS EXAMINATION BY MR. GARELICK         482

 6

 7  CIRAMELY MAYA, CALLED BY THE PETITIONER

 8       DIRECT EXAMINATION BY MR. GARELICK        502

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1    CASE NUMBER:              21STRO03198

 2    CASE NAME:               LINDSEY HILL VS.

 3                             TREVOR BAUER

 4    LOS ANGELES, CALIFORNIA  WEDNESDAY, AUGUST 18, 2021

 5    DEPARTMENT 35            HON. DIANNA GOULD-SALTMAN, JUDGE

 6    APPEARANCES:             (AS HERETOFORE NOTED.)

 7    REPORTER:                JACQUELINE CAIRE, CSR NO. 9599, RPR

 8    TIME:                    1:35 P.M.

 9

10        THE COURT:  ALL RIGHT.  BACK ON IN HILL AND BAUER.  AND

11    DR. HAMMERS BACK.  HOPE YOU ALL HAD A GOOD LUNCH.  ANYONE?

12        MS. OLSON:  IT WAS THE CAFETERIA.  WHAT CAN WE SAY?

13        THE COURT:  SURE.  COME ON UP.

14

15                    JENNIFER HAMMERS,

16    CALLED AS A WITNESS ON BEHALF OF THE PETITIONER, WAS SWORN

17    AND TESTIFIED AS FOLLOWS:

18

19                    DIRECT EXAMINATION (RESUMED)

20    BY MR. FETTEROLF:

21        Q    DR. HAMMERS, IS THERE AREA OF TESTIMONY YOU

22    PROVIDED EARLIER YOU WOULD LIKE TO CORRECT?

23        A    YES.  MY APOLOGIES.  I HAD NEGLECTED TO REMEMBER

24    THAT I HAVE BEEN DESIGNATED AS AN EXPERT TESTIFYING IN TRIALS

25    TWICE IN CALIFORNIA.

26        Q    SO YOU LEARNED THAT WALKING THROUGH THE HALLWAY?

27        THE COURT:  THAT HAPPENS.

28        Q    BY MR. FETTEROLF:  CAN YOU TURN TO PAGE 65 OF
```

1   EXHIBIT H?

2        A    SURE.

3        Q    CAN YOU JUST TELL US WHAT THAT RECORD IS?

4        A    THIS IS A C.T. ANGIOGRAM OF THE NECK WITH CONTRAST

5   FROM MAY 17TH, 2021.

6        Q    CAN YOU TELL US THE PURPOSE OF WHAT THE C.T.

7   ANGIOGRAM IS FOR AND WHY A DOCTOR WOULD HAVE ORDERED IT?

8        A    SURE.  SO A C.T. ANGIOGRAM IS A C.T. SCAN, AGAIN,

9   LOOKING AT BONES AND SOFT TISSUE AND MUSCLE LIKE THE PREVIOUS

10  TWO SCANS.  BUT IN ADDITION, A DYE IS INJECTED INTO THE BLOOD

11  SYSTEM -- INTO THE CARDIOVASCULAR SYSTEM.  THE PURPOSE IS IN

12  REPORTED OR SUSPECTED NECK TRAUMA, SUCH AS STRANGULATION, TO

13  EVALUATE THOSE BLOOD VESSELS, TO LOOK FOR ANY SIGN BLOOD IS

14  LEAKING OUT OF THEM, WHICH WOULD INDICATE THERE WAS DAMAGE TO

15  THOSE BLOOD VESSELS, WHICH CAN CONSTITUTE A MEDICAL EMERGENCY

16  OR A MEDICAL ISSUE DOWN THE LINE.  IT'S ALSO TO EVALUATE THE

17  STRUCTURES OF THE NECK, INCLUDING THE BONES AND CARTILAGES OF

18  THE NECK, TO BE SURE THAT THERE'S NO INJURIES TO THOSE AREAS

19  AS WELL.  THE C.T. SCAN WITH THE ANGIOGRAM WITH THE CONTRAST

20  WAS NEGATIVE.

21       Q    OKAY.  AND COULD YOU -- WERE ANY M.R.I.S TAKEN IN

22  THIS MATTER?

23       A    YES, THEY WERE.

24       Q    CAN YOU TURN TO PAGE 134 OF EXHIBIT Q, I THINK IT

25  IS.

26       A    YOU SAID 134?

27       Q    PAGE 134 OF EXHIBIT Q.  JUST LET US KNOW WHEN

28  YOU'RE THERE, DR. HAMMERS?

1       A    YES, I AM HERE.

2       Q    CAN YOU EXPLAIN WHAT THAT DOCUMENT IS AND WHY A

3   DOCTOR WOULD ORDER IT IN THIS MATTER?

4       A    SURE.  SO THIS IS AN M.R.I. OF THE FACE WITHOUT

5   CONTRAST AND M.R.I. OF THE BRAIN WITHOUT CONTRAST FROM JUNE

6   21ST, 2021.  AN M.R.I. IS SIMILAR TO A C.T. SCAN IN EFFECT

7   THAT -- IN THE EFFECT THAT -- OR IN THE WAY THAT IT CAN LOOK

8   AT SOFT TISSUES, BONY STRUCTURES, MUSCLES JUST LIKE THE C.T.

9   SCAN DOES.  IT IS TYPICALLY USED TO LOOK MORE AT SOFT

10  TISSUES, JOINTS, TENDONS, THOSE KIND OF THINGS.

11          AND BASED OFF MY REVIEW OF THE MEDICAL RECORD,

12  MS. HILL HAD COMPLAINED OF JAW PAIN AND TROUBLE WHEN CHEWING,

13  OR MASTICATING IS THE WORD IN THE RECORD.  AND SO AN

14  M.R.I. WOULD BE USED TO EVALUATE SPECIFICALLY FOR THAT.  THE

15  M.R.I. OF THE HEAD WOULD BE USED TO AGAIN LOOK AND SEE IF

16  THERE ARE ANY TYPES OF INJURIES LIKE BLEEDING, SWELLING, ANY

17  KIND OF RESIDUAL INJURY THAT MAY BE THERE.

18          IN THE CASE OF HER M.R.I.S, THERE WAS NO SIGNS OF

19  ANY OF THOSE INJURIES LIKE I DESCRIBED.  THEY DID FIND SOME

20  DEGENERATIVE CHANGES, WHICH ARE RELATED TO AGING, IN SOME OF

21  HER CERVICAL SPINE AREAS.

22      Q    OKAY.  NOW, I THINK EARLIER YOU HAD A CHANCE TO SIT

23  IN THE COURTROOM AND LISTEN TO MS. HILL TESTIFY?

24      A    YES, I DID.

25      Q    AND DID YOU HAVE A CHANCE TO REVIEW THE AFFIDAVIT

26  MS. HILL SUBMITTED BEFORE TESTIFYING TODAY?

27      A    YES.

28      Q    OKAY.  SO BASED ON THE TESTIMONY THAT YOU SAW IN

```
1    THE COURTROOM AND THAT SHE PROVIDED IN HER AFFIDAVIT, ARE THE
2    INJURIES THAT YOU REVIEWED IN THE MEDICAL REPORTS AND THE
3    SANE REPORTS WHAT YOU WOULD HAVE EXPECTED TO SEE AS A
4    FORENSIC?
5         A    NO, THEY ARE NOT.
6         Q    CAN YOU EXPLAIN?
7         A    SURE.  WELL, FIRST TALKING ABOUT THE HEAD.  SO THE
8    INJURIES TO THE FACE WERE BRUISING TYPE OF INJURIES THAT WERE
9    SUPERFICIAL INJURIES, MEANING ON THE SURFACE OF THE SKIN.
10   THERE WERE NO DEEPER INJURIES, INCLUDING BLEEDING OR
11   SWELLING, UNDER THE SURFACE OF THE SKIN.  AND THERE WEREN'T
12   ANY FRACTURES OVER THE BONY AREAS.
13        MS. HILL DESCRIBED FORCEFUL PUNCHES WITH A CLOSED
14   FIST, PARTICULARLY USING THE KNUCKLE REGIONS TO THOSE AREAS
15   OF HER FACE.  MY EXPECTATION WOULD HAVE BEEN THAT I WOULD
16   HAVE SEEN, AND THE OTHER PEOPLE WHO EXAMINED HER WOULD HAVE
17   SEEN, EITHER PATTERNED INJURIES ON THE SURFACE OF THE SKIN,
18   MORE EXTENSIVE INJURIES ON THE SURFACE OF THE SKIN, AND
19   INJURIES UNDER THE SURFACE OF THE SKIN THAT WOULD HAVE BEEN
20   IDENTIFIED BY THE C.T. SCANS OR THE M.R.I. SCANS.
21        AND IN THIS CASE, THOSE THINGS WERE NOT SEEN.
22        Q    OKAY.  WERE THERE ANY OTHER OBSERVATIONS THAT YOU
23   WANTED TO PROVIDE?
24        A    YES.  MS. HILL ALSO DESCRIBED SIMILAR VERY FORCEFUL
25   PUNCHING IN HER GENITAL REGION.  AGAIN, WITH A CLOSED FIST
26   AND MORE THAN ONE PUNCH IN THAT REGION.  BASED OFF OF MY
27   REVIEW OF THE MATERIALS, WHAT I SAW WAS A BRUISE HIGH UP IN
28   THE PUBIC REGION, WHICH IS ACTUALLY ABOVE THE GENITALIA.
```

480

```
 1   THERE IS NO PATTERN TO THAT INJURY.  IT'S SOMEWHAT LIMITED
 2   AND DIFFUSED OVER THAT UPPER AREA.  AND THEN THERE'S BLEEDING
 3   IN THE LABIA, WHICH IS PART OF THE GENITAL REGION RIGHT
 4   BENEATH THAT.  THAT IS CAUSED FROM THE BLEEDING HIGHER UP
 5   MOVING OR SHIFTING UNDER THE SURFACE OF THE SKIN DOWN INTO
 6   THE LABIA REGION AND CAUSING THAT DISCOLORATION.
 7        Q    IS THERE ANYTHING THAT YOU HEARD DURING MS. HILL'S
 8   TESTIMONY OR IN HER AFFIDAVIT THAT YOU THINK COULD HAVE
 9   CAUSED THE INJURIES THAT YOU SAW IN THE GENITAL REGION?
10        A    YES.
11        MR. GARELICK:  OBJECTION.  SPECULATION.
12        THE COURT:  OVERRULED.  YOU CAN CROSS-EXAMINE.
13        Q    BY MR. FETTEROLF:  CAN YOU EXPLAIN WHAT THAT IS?
14        A    SURE.  THE INJURY OVER -- HIGH ABOVE HER GENITAL
15   REGION IN THE PUBIC AREA IS A BLUNT INJURY CAUSED BY AN
16   IMPACT, SOME KIND OF FORCE THAT'S CAUSING BLEEDING UNDER THE
17   SURFACE OF THE SKIN.  SO BASED OFF OF THE TESTIMONY, THERE
18   WERE TWO POSSIBLE WAYS THAT SHE COULD HAVE HAD TRAUMA TO THAT
19   AREA.
20            ONE IS THE IMPACTS FROM A PUNCHING INCIDENT, WHICH
21   I HAD PREVIOUSLY DESCRIBED, TO ME, WERE NOT CONSISTENT BASED
22   OFF OF THE PICTURES THAT I SAW.  SHE ALSO TALKED ABOUT HAVING
23   ROUGH SEX.  AND IN TWO PEOPLE WHO ARE THIN, HEALTHY, THAT --
24   THOSE IMPACTS CAN CAUSE BLUNT INJURIES IN THAT AREA.
25        Q    IN YOUR REVIEW OF THE MEDICAL RECORDS, DID YOU NOTE
26   ANY OF THE MEDICATIONS THAT MS. HILL WAS TAKING ON OR ABOUT
27   THE TIME OF HER ENCOUNTER WITH MR. BAUER OR WHEN SHE WENT TO
28   VISIT THE SART NURSE?
```

1      A     YES, I DID.

2      Q     OKAY.  WERE ANY OF THE MEDICATIONS SHE WAS TAKING,

3   COULD ANY OF THOSE CAUSE A PERSON TO BRUISE MORE EASILY?

4      A     YES.

5      Q     AND WHICH ONES ARE THEY?

6      A     THE LEXAPRO, THE ADVIL, AND THE TRAZODONE.

7      Q     CAN YOU EXPLAIN FOR THE COURT HOW LEXAPRO CAN CAUSE

8   INCREASED BRUISING IN AN INDIVIDUAL?

9      A     LEXAPRO AFFECTS THE SEROTONIN RECEPTOR.  THERE'S A

10  SEROTONIN RECEPTOR ALSO ON PLATELETS.  PLATELETS ARE WHAT

11  CAUSE YOU TO CLOT.  AND SO IN ADDITION TO THE SEROTONIN

12  MEDICATION BLOCKING CERTAIN RECEPTORS IN THE BRAIN, IT ALSO

13  AFFECTS THE PLATELETS.  THAT EFFECT ON THE PLATELETS CAN

14  CAUSE SOMEONE TO BLEED OR BRUISE MORE EASILY.

15     Q     CAN YOU EXPLAIN HOW TAKING TRAZODONE CAN CAUSE ONE

16  TO BRUISE MORE EASILY?

17     A     SO TRAZODONE ALSO AFFECTS THE SEROTONIN RECEPTOR.

18  IT WORKS A LITTLE BIT DIFFERENTLY ON THE BODY, BUT IT AFFECTS

19  THE PLATELET IN A SIMILAR WAY.  SO THAT EFFECT ON THE

20  PLATELET COULD LEAD TO EITHER INCREASED BRUISING OR

21  BLEEDING.

22     Q     CAN YOU EXPLAIN HOW TAKING ADVIL COULD CAUSE

23  INCREASED BRUISING?

24     A     SO ADVIL HAS A DIFFERENT MECHANISM ON THE LIVER,

25  BUT MOST OF YOUR CLOTTING FACTORS ARE MADE IN THE LIVER.  AND

26  SO IT CAN CAUSE PROLONGED BLEEDING OR INCREASED BLEEDING.

27     Q     CAN THE COMBINATION OF ANY OF THESE THREE

28  MEDICATIONS YOU JUST DISCUSSED IN COMBINATION ALSO CAUSE

```
1   INCREASED BRUISING?
2       A    YES.  SO TWO OF THE MEDICATIONS AFFECT THE SAME
3   RECEPTOR ON THE PLATELET.  AND SO IT CAN HAVE A COMPOUNDING
4   EFFECT ON THE PLATELET.  AND ADDING IN THE ADVIL WITH THE
5   EFFECT ON THE LIVER COULD CAUSE, IN COMBINATION, MORE
6   BLEEDING OR EXACERBATED BRUISING.
7       Q    JUST SO WE'RE CLEAR, WHEN YOU SAY TWO CAUSE THE
8   SAME EFFECT, WHICH WERE THE TWO?
9       A    TRAZODONE AND LEXAPRO.
10      Q    OKAY.  AND CAN YOU LOOK AT ANY OF THE BRUISING THAT
11  IS IN THE MEDICAL RECORDS AND DETERMINE WHAT PERCENTAGE IS
12  CAUSED POTENTIALLY BY TAKING THESE MEDICATIONS VS. WHAT IS
13  CAUSED BY SOME FORM OF TRAUMA?
14      A    I'M NOT ABLE TO SAY WHAT SPECIFIC PERCENTAGE OR
15  DEGREE IS CAUSED OR IS EXACERBATED BY THE MEDICATIONS.  JUST
16  THAT BRUISES CAN BE EXACERBATED BY THOSE MEDICATIONS.
17      MR. FETTEROLF:  THAT'S ALL WE HAVE, YOUR HONOR.
18      THE COURT:  CROSS.
19
20              CROSS EXAMINATION
21  BY MR. GARELICK:
22      Q    HI, DR. HAMMERS.
23      A    HELLO.
24      Q    GOOD AFTERNOON.  CAN YOU LET ME KNOW WHEN YOU WERE
25  RETAINED IN THIS MATTER?
26      A    I BELIEVE MAYBE A MONTH AGO.  A LITTLE OVER A MONTH
27  AGO.
28      Q    OKAY.  AND I ASSUME YOU WERE PAID A RETAINER?
```

483

```
1        A    I AM PAID HOURLY.

2        Q    GOT IT.  AND WHO IS PAYING YOU HOURLY?

3        A    THE LAW FIRM IS PAYING ME HOURLY.

4        Q    AND WHEN YOU SAY THE "LAW FIRM," I ASSUME YOU MEAN

5   EITHER MS. HOLLEY OR MR. FETTEROLF?

6        A    YES, I BELIEVE SO.

7        Q    AND HOW MUCH HAVE THEY PAID YOU TO DATE?

8        A    I HAVE NOT RECEIVED ANY PAYMENT AS OF TODAY.

9        Q    HOW MUCH ARE YOU OWED?

10       A    I BELIEVE JUST UNDER $4,000.

11       Q    SO YOU'VE REVIEWED A LOT OF DOCUMENTS IN THIS

12  CASE?

13       A    I HAVE.

14       Q    OKAY.  DID YOU REVIEW THE SART EXAM?

15       A    YES, I DID.

16       Q    OKAY.  AND WAS THERE ANYTHING INCONSISTENT IN THE

17  SART EXAM THAT WAS IN THE MEDICAL RECORDS FROM ALVARADO AND

18  SCRIPPS?

19       THE COURT:  I'M NOT SURE I'M UNDERSTANDING YOUR

20  QUESTION.  DO YOU MEAN SOMETHING IN ONE THAT WAS NOT IN THE

21  OTHER?

22       MR. GARELICK:  CORRECT.

23       THE WITNESS:  SO THERE WERE MULTIPLE DIFFERENCES BETWEEN

24  THE RECORDS AND THE REPORTS OF DIFFERENT TIMES, AND INJURIES,

25  AND THINGS LIKE THAT.  I -- YOU KNOW, MY OPINION, WHEN I

26  LOOKED AT THE RECORD, WAS TO LOOK AT ALL OF IT.  BUT ALSO TO

27  FOCUS SPECIFICALLY INJURYWISE ON WHAT THE SART NURSE HAD

28  DETAILED, WHICH ALSO HAD PHOTOGRAPHS THAT WERE TAKEN THAT I
```

484

1   COULD EXAMINE.

2       Q    BY MR. GARELICK:  I UNDERSTAND.  FROM MY

3   UNDERSTANDING OF NURSE VALENCIA, WHO TESTIFIED YESTERDAY, THE

4   PURPOSE OF THAT SART EXAM IS TO DOCUMENT SO THAT SOMEONE LIKE

5   YOURSELF COULD REVIEW; IS THAT RIGHT?

6       A    YEAH, THAT IS ONE OF THE PURPOSES.  SO THAT SOMEONE

7   CAN INDEPENDENTLY REVIEW WHAT SHE HAS SEEN.

8       Q    OKAY.  NORMALLY IN THOSE SITUATIONS, WOULD YOU

9   SPEAK WITH THAT NURSE AS TO WHAT SHE SAW?

10      A    NO.

11      Q    OKAY.  DID YOU SPEAK WITH NURSE VALENCIA?

12      A    NO, I DID NOT.

13      Q    OKAY.  AND DID YOU DISAGREE WITH ANYTHING THAT

14  MS. VALENCIA PUT IN HER SART EXAM?

15      A    THE ONLY THING THAT I NOTICED WAS ON THE FACE SHE

16  HAD DOCUMENTED SOME ABRASION, WHICH WHEN I LOOKED AT THE

17  PHOTOGRAPH FROM HER DOCUMENTATION, I DID NOT SEE A SPECIFIC

18  ABRASION.  AND DURING HER TESTIMONY, SHE ALSO TESTIFIED THAT

19  SHE REALLY WASN'T ABLE TO DIFFERENTIATE BETWEEN THE BUMPS ON

20  THE FACE, WHICH WERE LIKELY RELATED TO ACNE VS. ABRASION.

21      Q    OKAY.  SO LET'S START WITH THE BUMPS ON THE FACE

22  AND THE ACNE.  IN THE SART EXAM IT USED THE WORD "SCRATCHES";

23  IS THAT RIGHT?

24      A    I DON'T REMEMBER IF THAT'S THE SPECIFIC WORD SHE

25  USED.  I HAVE TO LOOK AT THE REPORT.

26      Q    SURE.  LET'S GET TO THAT EXHIBIT.  DO YOU HAVE OUR

27  EXHIBIT NOTEBOOK UP THERE?

28      A    SO I HAVE FOUR NOTEBOOKS.  I'M NOT SURE WHICH IS

1  WHICH.

2       Q   IT IS EXHIBIT 26 OF OUR NOTEBOOK.

3       MR. FETTEROLF:  YOUR HONOR, WHILE WE'RE LOOKING FOR THIS

4  DOCUMENT, I JUST WANT TO NOTE THAT THIS IS NOT AN AREA WE

5  SPECIFICALLY ASKED ABOUT.  I WOULD JUST OBJECT ON THAT BASIS.

6       THE COURT:  WELL, IN A GENERAL SENSE, YOU ASKED.  SHE

7  INDICATED THAT'S WHAT SHE FOCUSED ON.  SO IT'S FAIR FOR

8  CROSS.

9       Q   BY MR. GARELICK:  YOU'RE GOING TO LOOK AT WHAT'S IN

10  THE MANILA ENVELOPE.

11       THE COURT:  TWENTY-SIX.

12       Q   BY MR. GARELICK:  IT SHOULD BE --

13       A   WOULD YOU LIKE ME TO PULL EVERYTHING OUT OF HERE?

14       Q   YES.  I THINK WE'RE GOING TO NEED TO --

15       A   OKAY.

16       Q   SO IT IS NOW --

17       MS. OLSON:  LET US FIND THE BATES STAMP COPY.

18  APOLOGIES, YOUR HONOR.

19       MR. GARELICK:  PERHAPS I CAN DO THIS THE OLD-FASHIONED

20  WAY AND SHOW IT MYSELF.

21       THE COURT:  YOU CAN HAND IT TO THE BAILIFF.  WHICH PAGE

22  ARE YOU HANDING HER?

23       MR. GARELICK:  UNFORTUNATELY I DON'T HAVE THE BATES

24  STAMP.  IT IS THE PICTURE OF HER RIGHT CHEEK.  ABOUT HALFWAY

25  THROUGH THE REPORT.

26       Q   BY MR. GARELICK:  SO IS THAT THE PICTURE THAT YOU

27  HAVE REFERENCED COULD BE ACNE?

28       A   YOU'RE TELLING ME THIS IS THE PICTURE THAT THE SART

```
1   NURSE TOOK, NURSE VALENCIA?

2        Q    YES.

3        A    YES.  ALTHOUGH I VIEWED THIS PICTURE AS A DIGITAL

4   COPY, NOT AS A PRINTED COPY.

5        Q    THAT'S ACTUALLY A GOOD QUESTION.  IS THERE A

6   DIFFERENCE IN YOU REVIEWING A DIGITAL VS. A PRINTED COPY OF A

7   PICTURE?

8        A    YES.

9        Q    AND WHY IS THAT?

10        A    ON THE DIGITAL COPY IT'S MUCH CLEARER.  THERE ARE

11   NO POTENTIAL CHANGES IN COLORATION FROM PRINTING.  AND I CAN

12   ZOOM IN ON SPECIFIC AREAS TO LOOK AT A HIGHER MAGNIFICATION

13   AS TO WHAT IS THERE.

14        Q    WHEN YOU REVIEWED THESE PICTURES, WERE THEY A HIGH

15   MAGNITUDE?

16        A    YES.  I WAS ABLE TO ZOOM IN WITH THE QUALITY

17   REMAINING HIGH.

18        THE COURT:  THIS SEEMS TO BE A CLOSE-UP OF WHAT I SHOW

19   AS PAGE 31 BATES STAMP.

20        MR. GARELICK:  THANK YOU, YOUR HONOR.

21        Q    BY MR. GARELICK:  OKAY.  YOU HAD COMMENTED BEFORE

22   ABOUT NO BROKEN BONES IN THE FACE; DO YOU RECALL THAT?

23        A    YES.

24        Q    OKAY.  AND YOU STATED THAT YOU WOULD -- OR YOU

25   WOULD BELIEVE TO HAVE EXPECTED SOME BROKEN BONES IN THE FACE

26   BASED OFF OF THE DESCRIPTION BY MS. HILL; DO YOU RECALL

27   THAT?

28        MR. FETTEROLF:  OBJECTION.  I'M NOT SURE THAT'S EXACTLY
```

```
 1  WHAT SHE SAID.
 2       THE COURT:  WELL, "FRACTURE" WAS THE WORD.
 3       MR. GARELICK:  OH, I APOLOGIZE.  I USED THE WORD
 4  "BROKEN."
 5       THE COURT:  YOU DID.
 6       Q   BY MR. GARELICK:  I THINK THE MEDICAL TERM IS
 7  INFARCTION; IS NOT THAT RIGHT?
 8       A   NO, IT'S FRACTURE.
 9       Q   I'M WRONG.  I'LL LEAVE IT TO THE EXPERT.  IS IT
10  POSSIBLE THAT SOMEONE COULD PUNCH SOMEONE'S FACE AND NOT
11  FRACTURE A BONE?
12       A   SO WHAT MY TESTIMONY WAS, TO THE BEST OF MY
13  RECOLLECTION, IS THAT I DESCRIBED MULTIPLE FINDINGS THAT I
14  WOULD EXPECT TO HAVE SEEN.  AND FRACTURES WERE ONE OF THE
15  POSSIBLE THINGS THAT I WOULD HAVE EXPECTED TO HAVE SEEN.  NOT
16  THE ONLY THING.  BUT TO ANSWER YOUR QUESTION MORE
17  SPECIFICALLY, YOU MAY OR MAY NOT SEE FRACTURES FROM A PUNCH
18  TYPE OF INJURY.  HOWEVER, OVER THE BONY PROMINENCES AND THE
19  BONES OF THE FACE THAT ARE VERY DELICATE, THE LIKELIHOOD OF
20  HAVING FRACTURES IS HIGHER THAN IF IT WAS ON A BONE THAT WAS
21  THICKER, MORE SOLID, LARGER.
22       Q   CERTAINLY.  SO, LIKE, IF SOMEONE WERE TO PUNCH
23  SOMEBODY IN THE NOSE, IT'S MORE LIKELY THAT BONE MIGHT
24  BREAK?
25       A   THAN WHAT?  WHAT ARE YOU COMPARING IT TO?
26       Q   THAN LET'S JUST SAY A JAW BONE, WHICH IS A LARGER,
27  THICKER BONE?
28       A   POSSIBLY.  IT DEPENDS ON THE BONE.  IT DEPENDS ON
```

488

```
 1   THE TYPE OF FORCE THAT'S -- AND THE DIRECTION OF THE FORCE.
 2   THERE'S A LOT OF FACTORS THAT GO INTO ANSWERING THAT QUESTION
 3   FOR YOU.
 4        Q    OKAY.  SO IN THIS CASE -- AND WHAT I'M GLEANING
 5   FROM YOUR TESTIMONY IS -- IT'S POSSIBLE THAT THE INJURIES OF
 6   BRUISING BY A PUNCH ARE -- IN THIS CASE, IT'S POSSIBLE THAT
 7   THOSE -- LET ME CLEAN THAT UP, YOUR HONOR.
 8             IT'S POSSIBLE THAT THE INJURIES SUFFERED BY
 9   MS. HILL WERE AS A RESULT OF PUNCHING?
10        A    I WOULD SAY ALMOST ANYTHING IS POSSIBLE.  MY
11   OPINION IS THAT IT'S UNLIKELY.
12        Q    OKAY.  YOU SAY UNLIKELY.  WHY IS IT UNLIKELY?
13        A    THE COMBINATION OF THE INJURIES AND THE LACK OF
14   INJURIES BASED OFF THE TESTIMONY DESCRIBING THE FORCE, THE
15   NUMBER, AND THE LOCATION, AND THE OBJECT USED, IN MY OPINION,
16   MAKES IT UNLIKELY AND NOT WHAT I WOULD EXPECT, WHICH IS HOW I
17   TESTIFIED.  NOT WHAT I WOULD EXPECT TO HAVE FOUND IN MY
18   REVIEW OF THE RECORDS, PHOTOS, AND THE DOCUMENTS.
19        Q    IS IT POSSIBLE THAT THE INJURIES SUFFERED IN
20   MS. HILL'S VAGINA WERE AS A RESULT OF PUNCHING TO THAT
21   REGION?
22        A    SO I BELIEVE I DESCRIBED THAT THAT WAS ONE OF THE
23   POSSIBILITIES.  BUT BASED OFF OF THE SPECIFIC DESCRIPTION
24   THAT SHE GAVE DURING HER TESTIMONY, AGAIN, IT'S -- ANYTHING
25   IS POSSIBLE.  BUT IT IS LESS LIKELY OR UNLIKELY THAT THAT IS
26   WHAT OCCURRED, IN MY OPINION.
27        Q    IS THERE ANY RESEARCH THAT YOU CAN REFERENCE AS TO
28   WHY THAT'S THE CASE?
```

489

1       A    WELL, JUST IN GENERAL FROM MY TRAINING, EXPERIENCE,

2   AND THE PUBLISHED LITERATURE THAT IS OUT THERE, THE -- YOU

3   KNOW, TRAUMA CAN OCCUR TO THAT AREA.  BUT I AM LOOKING NOT

4   JUST AT THE TRAUMA, BUT AT THE PATTERN OF WHAT I AM SEEING

5   AND CORRELATING THAT WITH THE INFORMATION THAT WAS GIVEN AS

6   TO HOW THE INJURY SUPPOSEDLY OCCURRED.

7       Q    SO I THINK YOU WOULD AGREE THAT A INJURY TO THAT

8   AREA IS RATHER UNUSUAL; IS THAT RIGHT?

9       A    I WOULDN'T SAY THAT AN INJURY TO THE PUBIC AREA IS

10  UNUSUAL.  IT HAPPENS FROM LOTS OF DIFFERENT TYPES OF BLUNT

11  TRAUMA.  FROM GYNECOLOGIC ISSUES, ESPECIALLY DURING DELIVERY,

12  AND FROM INTERCOURSE, WHETHER CONSENSUAL OR NOT CONSENSUAL.

13      Q    HAVE YOU EVER EXAMINED A -- OR ANOTHER LIVE REPORT

14  THAT HAD AN INJURY TO THAT AREA?  AND WHEN I SAY "LIVE," I

15  MEANT A LIVE PERSON VS. AN AUTOPSY?

16      A    SO I HAVE ACTUALLY BOTH SEEN AND PERSONALLY KNOWN

17  PEOPLE WHO HAVE HAD INJURIES TO THAT AREA.  SO YES.  AND

18  THINKING FROM AN AUTOPSY PERSPECTIVE, I'VE DEFINITELY SEEN

19  INJURIES TO THE PUBIC AREA, WHICH IS PART OF THE PELVIS.

20      Q    LET ME TALK ABOUT THE INJURIES TO MS. HILL'S EYES.

21      A    OKAY.

22      Q    ARE YOU FAMILIAR WITH THE TERM "RACCOON EYES"?

23      A    YES.

24      Q    WHAT DOES THAT MEAN TO YOU?

25      A    SO THE TERM "RACCOON EYES" BASICALLY MEANS BLEEDING

26  AROUND THE EYE.  IN THAT SKIN AROUND THE EYE BASICALLY.  AND

27  IT KIND OF MIMICS WHAT A RACCOON LOOKS LIKE, WHICH IS WHY

28  IT'S CALLED RACCOON EYES.  THE MEDICAL TERM FOR IT IS

490

```
1    PERIORBITAL HEMORRHAGE IS THE MORE MEDICAL TERM FOR IT.  BUT
2    BASICALLY THAT CAN HAPPEN FOR A VARIETY OF REASONS.
3         Q    WE HAVEN'T GOT TO THAT PART YET.
4         A    I'M SORRY.
5         Q    IT'S OKAY.  HAVE YOU HEARD OF SOMETHING CALLED
6    "BATTLE SIGNS"?
7         A    YES.
8         Q    WHAT IS THAT?
9         A    BATTLE SIGNS IS WHEN YOU HAVE A BASE OF THE SKULL
10   FRACTURE.  YOU SEE BLEEDING IN THE MASTOID REGION, WHICH IS
11   BACK HERE (INDICATING) BEHIND THE SKULL.
12        Q    WHAT'S GENERALLY THE CAUSE OF BATTLE SIGNS?
13        A    A BASE OF THE SKULL FRACTURE.
14        Q    IN YOUR REVIEW OF YOUR -- OF THE SART EXAM PHOTOS,
15   ARE THERE -- OR IS THERE EVIDENCE OF BATTLE SIGNS?
16        A    NO, THERE IS NOT.
17        Q    OKAY.  I'D LIKE TO SHOW YOU ANOTHER PICTURE FROM
18   THE SART REPORT.  THIS IS A PICTURE OF MS. HILL WITH HER EAR
19   BENT.
20        A    OKAY.
21        Q    DID YOU REVIEW THIS PHOTO?
22        A    YES, I DID.
23        Q    ARE THERE BRUISES BEHIND THE EAR?
24        A    YEAH.  I SEE SOME PURPLISH TO PINK DISCOLORATION
25   BEHIND THE EAR.
26        Q    IS THAT CONSISTENT WITH WHAT YOU WOULD NORMALLY
27   FIND WITH SOMEONE WHO HAS BATTLE SIGNS?
28        A    NO, IT IS NOT.
```

```
 1        Q    OKAY.  WHAT COULD AN INJURY LIKE THAT BE FROM?

 2        A    SO TYPICALLY IT'S FROM A TRAUMA TO THAT AREA BEHIND

 3   THE EAR.

 4        Q    POSSIBLY LIKE A PUNCH?

 5        A    I WOULD SAY FOR A PUNCH, TO HAVE IT ONLY BEHIND THE

 6   EAR, THE EAR WOULD HAVE TO BE PLACED FORWARD WHERE YOU ARE

 7   DIRECTLY IMPACTING THE EAR.  IF IT WAS A PUNCH TO THE EAR ON

 8   THE OUTER SURFACE OF IT, I WOULD EXPECT TO SEE AN INJURY ON

 9   THAT SURFACE OR WITHIN THE EAR ITSELF.

10        Q    OKAY.  IS IT POSSIBLE THAT IT COULD ALSO BE FROM

11   SEVERE STRANGULATION?

12        A    I HAVE NEVER READ THAT, LEARNED ABOUT THAT, OR HAD

13   THAT AS PART OF MY TRAINING OR EXPERIENCE THAT YOU CAN GET

14   THAT FROM STRANGULATION.

15        Q    CERTAINLY.  SO IT'S MORE LIKELY THAT THAT IS FROM,

16   I THINK YOU SAID, A BLUNT FORCE TRAUMA, THE CORRECT TERM?

17        MR. FETTEROLF:  OBJECTION.  MISSTATES THE TESTIMONY

18        MR. GARELICK:  I GOT THE TERM WRONG.

19        THE COURT:  IT DOES MISSTATE THE TESTIMONY.  YOU CAN ASK

20   HER WHAT WOULD YOU EXPECT SOME INJURY LIKE THIS TO BE FROM.

21        Q    BY MR. GARELICK:  WHAT WOULD YOU EXPECT SOME INJURY

22   LIKE THIS TO BE FROM?

23        A    WHAT I HAVE SEEN THIS INJURY FROM IS TYPICALLY A

24   TWISTING OR A PULLING MOTION ON THE EAR ITSELF.

25        THE COURT:  FOR THE RECORD, THIS APPEARS TO BE PAGE --

26   BATES STAMP PAGE 44.

27        MR. GARELICK:  THANK YOU, YOUR HONOR.

28        Q    BY MR. GARELICK:  HAVE YOU HAD ANY CONVERSATIONS
```

```
1    WITH MR. BAUER PRIOR TO TODAY?
2         A    NO, I ACTUALLY HAVE HAD NO CONVERSATIONS WITH
3    HIM.
4         Q    DO YOU -- OR WOULD YOU THINK IT WAS IMPORTANT TO
5    HAVE CONVERSATIONS WITH MR. BAUER BASED ON HIM BEING PRESENT
6    WHEN THE INJURIES OCCURRED?
7         A    THAT'S NOT SOMETHING THAT I WAS ASKED TO DO OR TO
8    EVALUATE AS PART OF MY REVIEW AND TESTIMONY.
9         Q    OKAY.  I CERTAINLY UNDERSTAND THAT.  BUT AS AN
10   EXPERT SITTING UP THERE, DO YOU THINK THAT WOULD HAVE BEEN
11   VALUABLE INFORMATION?
12        A    AS AN EXPERT, I REVIEW THE INFORMATION THAT'S
13   PROVIDED TO ME AND BASE MY OPINIONS OFF OF THAT MATERIAL.  IF
14   I'M GIVEN ADDITIONAL INFORMATION, I TAKE IT INTO
15   CONSIDERATION TO FORM EITHER ADDITIONAL OR NEW OPINIONS.  BUT
16   I DON'T QUESTION WHAT INFORMATION I'M BEING ASKED TO REVIEW.
17        Q    I'M NOT SURE IF THAT WAS A YES OR NO.
18        THE COURT:  I THINK IT WAS A COMPLETE ANSWER TO THE
19   QUESTION.
20        MR. GARELICK:  OKAY.
21        Q    BY MR. GARELICK:  IF WE CAN GO BACK TO THE ALVARADO
22   MEDICAL REPORT --
23        A    CAN I PUT THIS BACK INTO THE ENVELOPE?
24        Q    YOU CAN.  YES.
25        A    NO.  THAT'S OKAY.
26        Q    YOU CAN PUT THAT BACK IN THE ENVELOPE.
27        A    WOULD YOU LIKE YOUR PICTURES BACK AS WELL?
28        Q    YES.  I'M GOING TO HAVE YOU LOOK AT EXHIBIT 12 IN
```

1   THE NOTEBOOK.

2        A    OKAY.

3        THE COURT:   THAT IS THE DEPOSITION SUBPOENA FOR

4   PRODUCTION OF RECORDS FROM ALVARADO.  IS THAT THE SAME AS H

5   FOR THE RESPONDENT?  MR. GARELICK, IS IT THE SAME AS H FOR

6   THE RECORD OR IS IT DIFFERENT?

7        MR. GARELICK:  IT IS THE SAME AS H FOR RESPONDENT.

8        THE COURT:  THEN I'M JUST GOING TO CROSS REFERENCE IT.

9        MR. GARELICK:  OKAY.  THAT'S FINE.

10        Q    BY MR. GARELICK:  I BELIEVE THE FIRST C.T. SCAN

11   THAT YOU LOOKED AT IS ON -- I SHOULD SAY BATES STAMP 352 AT

12   THE BOTTOM OF THE PAGE.

13        MR. GARELICK:  FOR REFERENCE FOR THE COURT, I BELIEVE

14   THAT'S EXHIBIT H, BATES STAMP 65.

15        THE WITNESS:  UNLESS I'M DOING THIS WRONG, IS IT 11 YOU

16   SAID?

17        THE COURT:  TWELVE.

18        THE WITNESS:  WHAT WAS THE PAGE NUMBER AGAIN?

19        Q    BY MR. GARELICK:  352.  BOTTOM RIGHT CORNER OF THE

20   PAGE.

21        A    OKAY.

22        Q    SO I JUST WANT TO ASK YOU ABOUT THE WORD

23   "UNREMARKABLE."  WHAT DOES THAT MEAN IN CONTEXT OF A C.T.

24   SCAN?

25        A    SO ARE YOU POINTING TO A SPECIFIC WORD

26   "UNREMARKABLE" OR DO YOU WANT ME TO COMMENT IN GENERAL ABOUT

27   THE WORD "UNREMARKABLE"?

28        Q    LET'S START WITH IN GENERAL.

494

```
1        A    OKAY.  SO THE WORD "UNREMARKABLE" USED MEDICALLY OR
2   FORENSICALLY TYPICALLY MEANS THAT SOMETHING IS NORMAL OR
3   DOESN'T HAVE ANY SIGNS OF DISEASE OR INJURY PROCESS.
4        Q    OKAY.  SO WHEN SOMETHING IS UNREMARKABLE IN A
5   MEDICAL REPORT SUCH AS A C.T. SCAN, DOES THAT MEAN THAT THERE
6   ARE NO -- OR POTENTIALLY NO OTHER INJURIES LIKE A BRUISE TO
7   THAT AREA?
8        A    IF THEY ONLY COMMENT THAT SOMETHING IS
9   UNREMARKABLE, THEN THAT MEANS THAT IT'S ENTIRELY
10  UNREMARKABLE.  SO IF THEY'RE REFERENCING A SPECIFIC LOCATION
11  OF THE SCAN, RIGHT, OR SPECIFIC ASPECT OF THE SCAN AS
12  UNREMARKABLE, THEY WOULD SAY JUST "UNREMARKABLE."  IT MEANS
13  THERE'S NOTHING.  OTHERWISE, THEY WOULD QUALIFY IT AND SAY
14  "UNREMARKABLE EXCEPT."
15       Q    RIGHT.  SO NOW I'M LITTLE CONFUSED.  I THINK YOU
16  WOULD AGREE WITH ME THAT THERE ARE OR WAS BRUISING TO THE
17  FACE.  AND I THINK WE MAYBE DISAGREE ABOUT THE EXTENT OF
18  THAT.  THERE IS BRUISING TO THE FACE; IS THAT CORRECT?
19       A    ARE YOU ASKING ME IF THE CT SCAN FOUND --
20       Q    I'M ASKING IF YOU REVIEWED ANY DOCUMENTS THAT HAVE
21  SHOWN THERE WAS BRUISING TO THE FACE?
22       A    OH.  I HAVE ALREADY SAID THAT I SAW THAT THERE WAS
23  BRUISING ON THE FACE.
24       Q    I'M NOT TRYING TO TRICK YOU.  SO WHY IS THAT NOT
25  ANY DIFFERENT THAN THE WORD -- OR WHY IS THAT NOT MENTIONED
26  HERE AND JUST THE WORD "UNREMARKABLE" IS MENTIONED?
27       A    I CAN'T ANSWER WHY THE RADIOLOGIST SAID THAT.
28  THEY'RE THE ONES REVIEWING THE REPORT.  MY EXPERIENCE,
```

1  HOWEVER, TELLS ME THAT TYPICALLY INJURIES THAT ARE IN THE

2  SURFACES OF THE SKIN AREN'T SOMETHING THAT SHOWS UP ON A C.T.

3  SCAN UNLESS THEY FORM WHAT'S CALLED A HEMATOMA OR COLLECTION

4  OF BLOOD THAT'S LARGER THAN JUST WHAT KIND OF STRETCHES

5  THROUGH THE SURFACE OF THE SKIN.

6      Q    UNDERSTOOD.  SO IF SOMEBODY HAD AN INJURY ON, LET'S

7  SAY, THE INSIDE OF THEIR MOUTH, WOULD THAT SHOW UP ON A C.T.

8  SCAN SINCE IT'S NOT ON THE SURFACE OF THE FACE?

9      A    IT'S NOT ON THE SURFACE OF THE FACE, BUT IT'S ON

10 THE SURFACE OF THE ORAL MUCOSA.  AGAIN, LIKE, ON THE SKIN, IT

11 MAY NOT SHOW UP UNLESS IT'S CAUSING AN ACTUAL COLLECTION OF

12 BLOOD.

13     Q    GOT IT.  UNLESS THERE WAS A COLLECTION OF BLOOD ON

14 A BRUISE -- I THINK THAT'S THE WORD THAT WAS USED BEFORE --

15 IT WOULD NOT SHOW UP ON A C.T. SCAN AND THE C.T. SCAN WOULD

16 THEN COME BACK AS UNREMARKABLE?

17     A    I NEED YOU TO SAY THAT AGAIN TO MAKE SURE.

18     Q    I DON'T KNOW IF I CAN.  YEAH.  WITHOUT A COLLECTION

19 OF BLOOD ON A SURFACE INJURY, THERE WOULD BE NO SIGNS IN A

20 C.T. SCAN; IS THAT RIGHT?

21     A    IN MY EXPERIENCE, THAT'S WHAT I HAVE OBSERVED.

22 YES.

23     Q    AND, LIKEWISE, IN THIS SITUATION, WE HAVE THE WORDS

24 "UNREMARKABLE," WHICH MEANS THE RADIOLOGIST DIDN'T FIND THE

25 BLOOD COLLECTION FOR IT TO BE SHOWN UP IN THE EXAM?

26     A    WELL, THERE ARE MULTIPLE PLACES WHERE IT SAYS

27 "UNREMARKABLE."  AGAIN, I WOULD ASK IF THERE'S A SPECIFIC

28 LOCATION YOU'RE ASKING ME TO SPEAK TO OR JUST IN GENERAL?

```
 1        Q    OKAY.  LET ME SEE IF I CAN BE SPECIFIC.  I DON'T
 2   THINK I KNOW ANY OF THESE MEDICAL TERMS SO I'M NOT GOING TO
 3   TRY TO BE SPECIFIC.  LET'S TRY THE GENERAL.
 4        A    I CAN HELP YOU.
 5        Q    WELL, LET'S START -- WHERE IS THE RIGHT COMMON
 6   CAROTID ARTERY?
 7        A    SO THE RIGHT COMMON CAROTID ARTERY IS ON THE RIGHT
 8   SIDE OF THE NECK APPROXIMATELY RIGHT HERE.
 9        Q    IS IT POSSIBLE TO HAVE A STRANGULATION INJURY
10   WITHOUT HAVING -- OR WITH HAVING UNREMARKABLE FINDINGS IN A
11   C.T. SCAN?
12        A    YES.
13        Q    IN YOUR EXPERIENCE AS AN EXPERT, IS IT POSSIBLE TO
14   NOT HAVE BRUISING ON THE NECK DUE TO STRANGULATION BY HAIR?
15        A    YES.
16        Q    I WOULD LIKE TO CLEAR THIS UP.  I THINK YOU MAY
17   HAVE THE ANSWERED MY QUESTION IN A DIFFERENT WAY.  BUT IF
18   SOMEONE WERE TO PUNCH SOMEBODY IN A FACE, AND I THINK YOUR
19   TESTIMONY WAS THAT IF THE BONE WAS -- OR MORE FRAGILE BONE IS
20   MORE LIKELY TO FRACTURE; IS THAT RIGHT?
21        A    YES.
22        Q    OKAY.  IF SOMEONE WERE TO USE LESS FORCE PUNCHING
23   SOMEONE IN THE FACE -- AND LET'S BE SPECIFIC -- PUNCHING
24   SOMEBODY ON THE LEFT JAW, IT'S POSSIBLE THAT IT WOULD JUST
25   CREATE BRUISING?
26        THE COURT:  YOU MEAN MAXILLIARY OR MANDIBLE?  DO YOU
27   KNOW WHAT I'M ASKING?
28        MR. GARELICK:  I DO KNOW.  I WOULD SAY MAXILLIARY, WHICH
```

1   I THINK MEANS YOUR JAW.

2        THE WITNESS:  YOUR MAXILLIARY AREA IS YOUR UPPER JAW.

3        MR. GARELICK:  I DON'T.

4        THE COURT:  50-50 SHOT.  YOU BLEW THAT.

5        Q    BY MR. GARELICK:  YES, YOUR MANDIBULAR.  I KNOW

6   TMJ.  IF SOMEONE WERE TO PUNCH YOU IN YOUR TMJ JOINT AND NOT

7   USE FULL FORCE THAT WOULD CAUSE A FRACTURE, WOULD IT CAUSE

8   BRUISING?

9        A    IT MAY OR MAY NOT.  BUT, AGAIN, MY TESTIMONY

10  REGARDING THE INJURIES IN THIS CASE SPECIFICALLY WERE BASED

11  OFF OF THE DESCRIPTION THAT WAS MADE ABOUT THOSE INJURIES,

12  THE FORCE OF THE INJURY, THE OBJECT THAT WAS USED, AND THEN

13  THE REVIEW OF THE MEDICAL RECORDS FOLLOWING THAT REPORTED

14  INJURY.

15       Q    SO YOU TESTIFIED EARLIER THAT MEDICATION THAT

16  SPECIFICALLY MS. HILL WAS TAKING WOULD LEAD TO OR COULD LEAD

17  TO BRUISING; IS THAT RIGHT?

18       A    I BELIEVE THAT I SAID THAT IT MAY LEAD TO OR COULD

19  LEAD TO EITHER BLEEDING OR EXACERBATED OR INCREASED

20  BRUISING.

21       Q    SO LET ME ASK YOU, THE TRAUMA STILL NEEDS TO OCCUR

22  FOR THAT BRUISING TO HAPPEN; ISN'T THAT RIGHT?

23       A    I WOULD SAY IN THE SITUATION WITH THESE

24  MEDICATIONS, YES.  YOU WOULD HAVE A TRAUMA THAT WOULD CAUSE

25  AN INJURY.  MAY CAUSE EITHER VERY LITTLE INJURY THAT MAY NOT

26  BE VISIBLE, OR MAY BE VISIBLE AND THEN COULD POTENTIALLY

27  EXACERBATE THAT INJURY.

28       Q    GOT IT.  IT'S NOT THAT THE TRAUMA DID NOT OCCUR,

1  IT'S JUST THIS MEDICINE COULD MAKE THOSE INJURIES LOOK
2  WORSE?
3      A    I BELIEVE, YEAH, WE -- I TESTIFIED THAT THEY COULD
4  BE EXACERBATED BY THE MEDICATIONS.
5      Q    WELL, LET ME JUST THEN ASK YOU, WHAT DOES
6  "EXACERBATE" MEAN TO YOU?
7      A    IT WOULD EITHER MEAN ENLARGED OR MORE ENLARGED IN
8  SIZE OR IN QUANTITY OF THE AMOUNT OF BLEEDING.
9      Q    SO BASED OFF OF SOMEONE TAKING THAT MEDICATION WHO
10  RECEIVED THE TRAUMA AND THEIR INJURY WAS EXACERBATED, WOULD
11  IT ALSO TAKE LONGER FOR THAT INJURY TO HEAL?
12      A    NOT NECESSARILY.
13      Q    SO POSSIBLY?
14      A    I WOULD SAY THAT IT MAY, THAT -- THAT -- TO MY
15  KNOWLEDGE, THE CORRELATION IS NOT THERE FOR THE TIME OF
16  HEALING WHEN IT COMES TO THE BLEEDING.  UNLESS IT ACTUALLY
17  INCREASES THE AMOUNT OF BLOOD THAT WOULD NEED TO BE RESOLVED,
18  THEN POTENTIALLY.  BUT NOT BECAUSE OF THE MEDICATION
19  ITSELF.
20      Q    I THINK I UNDERSTAND.  SO LET ME NOW ASK YOU, DID
21  YOU REVIEW ANY PICTURES OF MS. HILL'S BUTTOCKS IN THE SART
22  REPORT?
23      A    YES, I DID.
24      Q    OKAY.  AND DO YOU RECALL WHAT THOSE INJURIES LOOKED
25  LIKE?
26      A    YES, I DO.
27      Q    OKAY.  AND COULD THOSE INJURIES BE THE RESULT OF A
28  PUNCH TO THAT AREA?

```
1        A    SO FROM MY REVIEW, I DIDN'T SEE A SPECIFIC PATTERN
2   TO THE INJURIES THAT WOULD NECESSARILY INDICATE THAT IT WAS A
3   PUNCHING MOTION OR THERE WAS EITHER AN IMPACT WITH A FLAT
4   SURFACE OF THE HAND OR FROM THE INDIVIDUAL KNUCKLES.  I
5   DIDN'T SEE ANY PATTERN THAT LET ME KNOW SPECIFICALLY THAT
6   THAT'S WHAT IT WAS FROM.
7        Q    WELL, LET ME ASK YOU, WHAT DOES A PATTERN LOOK
8   LIKE?
9        A    SO A PATTERN INJURY WOULD BE INJURIES THAT HAVE A
10  SPECIFIC EITHER SIZE, DISTRIBUTION, LOCATION TO THEM THAT YOU
11  COULD ACTUALLY TAKE A POTENTIAL OBJECT AND THEN LINE IT UP
12  WITH THOSE INJURIES.  AND SAY, OKAY, THE DISTRIBUTION OF THIS
13  MEANS THAT IT COULD OR COULD NOT HAVE OCCURRED FROM THAT
14  OBJECT.
15       Q    AND SO IN THIS CASE, YOU WOULD WANT TO SEE KNUCKLES
16  LINED UP TO CREATE A PATTERN OF A PUNCH WITH A CLOSED FIST;
17  IS THAT RIGHT?
18       A    I'M NOT SAYING I WOULD WANT TO SAY THAT.  I'M
19  SAYING THAT IF YOU ARE ASKING ME TO EXAMINE IT AND GIVE AN
20  OPINION, MY OBSERVATION WAS THAT I DIDN'T SEE ANYTHING ABOUT
21  THOSE INJURIES THAT LOOKED LIKE A SPECIFIC PATTERN THAT WOULD
22  GO BACK TO A PUNCHING TYPE OF MOTION.
23       Q    IF AN M.R.I. WAS TAKEN, LET'S JUST SAY, FOUR WEEKS
24  AFTER AN INJURY OCCURRED, WOULD THE M.R.I. POTENTIALLY NOT
25  ACCURATELY REFLECT WHAT INJURIES HAPPENED ON THAT DAY?
26       A    SO ANYTHING THAT'S HEALED AND COMPLETELY RESOLVED,
27  THE M.R.I. WOULDN'T SHOW.  BUT IN THIS CASE, THE INDICATION
28  WAS BECAUSE MS. HILL REPORTED THAT SHE WAS STILL SYMPTOMATIC.
```

500

```
1    SO THE REASON FOR THE M.R.I. WAS TO EITHER RULE IN OR RULE

2    OUT SOME ABNORMALITY WITH THAT REGION THAT WAS CAUSING HER TO

3    STILL REPORT THE DIFFICULTY THAT SHE WAS HAVING WITH HER

4    JAW.

5         Q    SO THERE'S A POTENTIAL, THOUGH, THAT THE -- OR I

6    SHOULD SAY THERE'S A POSSIBILITY THAT THE INJURIES MAY HAVE

7    PARTIALLY HEALED BY THAT POINT IN TIME WHEN THE M.R.I. WAS

8    TAKEN?

9         A    WELL, THE C.T. SCAN DIDN'T SHOW AN INJURY IN THAT

10   AREA.  THE SAME AREA WAS SCANNED AND DIDN'T SHOW AN ACUTE

11   INJURY, YOU KNOW, UNTIL APPROXIMATELY TWO DAYS AFTER WHEN SHE

12   REPORTED TO THE HOSPITAL.  AND THE M.R.I., AGAIN, DIDN'T SHOW

13   ANY EVIDENCE OF ANY LINGERING OR ANY INJURY AT ALL.

14        Q    AND THEN JUST A FINAL QUESTION.  OTHER THAN THE

15   REVIEW OF THE DOCUMENTS THAT YOU HAD DONE, YOU DIDN'T SPEAK

16   WITH ANYBODY ELSE; IS THAT RIGHT?

17        A    WHAT DO YOU MEAN BY "ANYBODY ELSE"?

18        MR. FETTEROLF:  OBJECTION.  VAGUE.

19        Q    BY MR. GARELICK:  OTHER THAN THE DOCUMENTS THAT YOU

20   TESTIFIED THAT YOU REVIEWED, DID YOU TALK TO ANY THIRD

21   PARTIES -- YOU ALREADY TESTIFIED THAT YOU HAD NOT TALKED TO

22   MR. BAUER -- ABOUT THE DOCUMENTS THAT YOU REVIEWED?

23        A    NO, I DO NOT BELIEVE SO.

24        MR. GARELICK:  I DON'T HAVE ANY FURTHER QUESTIONS AT

25   THIS TIME, YOUR HONOR.

26        THE COURT:  ANY REDIRECT?

27        MR. FETTEROLF:  NO QUESTIONS, YOUR HONOR.

28        THE COURT:  ALL RIGHT.  THANK YOU, DR. HAMMERS.  YOU'RE
```

```
 1  EXCUSED.
 2        THE WITNESS:  THANK YOU.
 3        THE COURT:  DID WE HAVE THEN ONE ADDITIONAL WITNESS --
 4  THIRD PARTY WITNESS?
 5        MR. GARELICK:  WE DO, YOUR HONOR.  IT IS MS. MAYA.
 6        MS. HOLLEY:  YOUR HONOR, I WOULD ASK FOR AN OFFER OF
 7  PROOF WITH RESPECT TO MS. MAYA'S TESTIMONY.
 8        MR. GARELICK:  SHE'S A FRIEND.  PERCIPIENT WITNESS.  SAW
 9  MS. HILL AFTERWARDS.  SHE CAN ALSO ATTEST TO MS. HILL'S
10  PERSONALITY.  TESTIMONY ABOUT BEING SARCASTIC.  AND I THINK
11  THAT IT IS ALL RELEVANT.
12        THE COURT:  I'LL LET HER TESTIFY AS TO THAT.
13             IF I CAN HAVE YOU REMAIN STANDING FOR JUST A MOMENT
14  RAISING YOUR RIGHT HAND TO BE AFFIRMED.
15        THE CLERK:  DO YOU SOLEMNLY STATE, UNDER PENALTY OF
16  PERJURY, THAT THE TESTIMONY YOU MAY GIVE IN THE CAUSE NOW
17  PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE
18  TRUTH, AND NOTHING BUT THE TRUTH?
19        THE WITNESS:  I DO.
20        THE CLERK:  THANK YOU.  YOU CAN BE SEATED.
21        MR. GARELICK:  HI.  HOW ARE YOU?
22        THE CLERK:  EXCUSE ME.  MA'AM, PLEASE STATE AND SPELL
23  YOUR FIRST AND LAST NAME FOR THE RECORD.
24        THE WITNESS:  CIRAMELY MAYA.  C-I-R-A-M-E-L-Y.  M-A-Y-A.
25        THE CLERK:  THANK YOU.
26        THE COURT:  NOW, YOU MAY INQUIRE.
27        MR. GARELICK:  THANK YOU, YOUR HONOR.
28  //
```

502

```
1                    CIRAMELY MAYA,
2    CALLED AS A WITNESS BY THE PETITIONER, WAS SWORN AND
3    TESTIFIED AS FOLLOWS:
4
5                    DIRECT EXAMINATION
6    BY MR. GARELICK:
7         Q    HI.  I AM MARC GARELICK.  I AM MS. HILL'S ATTORNEY.
8    DO YOU GO BY ANY NICKNAMES?
9         A    I GO BY MELY.
10        Q    IS IT OKAY IF WE CALL YOU MELY TODAY?
11        A    (THE WITNESS NODDED HEAD.)
12        Q    DO YOU KNOW MS. HILL?
13        A    I DO.
14        Q    HOW LONG HAVE YOU KNOWN MS. HILL?
15        A    I HAVE KNOWN HER FOR ABOUT A YEAR.
16        Q    HOW WOULD YOU DESCRIBE YOUR RELATIONSHIP WITH
17   MS. HILL?
18        A    WE ARE BEST FRIENDS.  WE HAVE BEEN BEST FRIENDS
19   EVER SINCE WE MET.  WE BECAME CLOSE VERY QUICKLY.  HANG OUT
20   OFTEN.  MOSTLY MOST OF THE TIME AT MY HOUSE.
21        MS. HOLLEY:  I'M SORRY.  DID SHE SAY ONE YEAR?
22        THE COURT:  SHE DID.
23        THE WITNESS:  YES.
24        MS. HOLLEY:  THANK YOU.
25        Q    BY MR. GARELICK:  WHERE DO YOU WORK?
26        A    AT LULULEMON.
27        Q    DO YOU WORK WITH MS. HILL AT LULULEMON?
28        A    I DO.
```

```
1        Q    AND WHAT IS YOUR ROLE AT LULULEMON?

2        A    I AM A KEY LEADER, WHICH IS A MANAGER.

3        Q    DO YOU KNOW MS. HILL'S ROLE AT LULULEMON?

4        A    SHE IS AN EDUCATOR, WHICH IS AN ENTRY LEVEL

5   POSITION.

6        Q    DO YOU WORK TOGETHER WITH MS. HILL AT LULULEMON IN

7   THOSE TWO POSITIONS?

8        A    YES.

9        Q    ARE YOU HER SUPERIOR?

10       A    I AM.

11       Q    HOW WOULD YOU DESCRIBE MS. HILL'S PERSONALITY?

12       A    SHE IS VERY BUBBLY, LOVING, KIND.  SHE ALWAYS LOOKS

13  OUT FOR OTHERS.  SHE IS FUNNY.  SHE HAS BEEN ONE OF THE BEST

14  PEOPLE IN MY LIFE SINCE I MET HER.  HAS BEEN THERE FOR ME

15  THROUGH A LOT OF HARD THINGS AS WELL.  WE HAVE A LOT OF FUN

16  WHEN WE'RE TOGETHER.  SHE IS KIND.

17       Q    DO YOU COMMUNICATE WITH MS. HILL VIA TEXT

18  MESSAGE?

19       A    CORRECT.

20       Q    DO YOU COMMUNICATE WITH HER IN OTHER WAYS?

21       A    ON THE PHONE.

22       Q    DID YOU TALK TO MS. HILL IN THE YEAR THAT YOU'VE

23  KNOWN HER ABOUT DATING?

24       A    YES.

25       Q    DID YOU DISCUSS PEOPLE THAT YOU DATE WITH?

26       A    I DO.

27       Q    DID YOU DISCUSS PEOPLE THAT MS. HILL DATED WITH?

28       A    YES.
```

504

```
 1        Q    DO YOU BELIEVE THAT MS. HILL CONFIDES IN YOU
 2   REGARDING HER DAILY LIFE?
 3        A    I DO.
 4        Q    HAVE YOU EVER MET TREVOR BAUER?
 5        A    NO.
 6        THE COURT:  I'M GOING TO ASK YOU TO LEAN INTO THE
 7   MICROPHONE AND PULL IT UP TOWARD YOU A LITTLE BIT MORE.
 8        Q    BY MR. GARELICK:  JUST REMEMBER THE COURT REPORTER
 9   IS TAKING DOWN EVERYTHING.  SO WE ALL NEED TO HEAR.
10        A    GOT YOU.  IS THIS BETTER?
11        THE COURT:  IT IS.  THANK YOU.
12        Q    BY MR. GARELICK:  YES.  DO YOU KNOW WHO MR. BAUER
13   IS?
14        A    I DO.
15        Q    WHO IS HE?
16        A    HE IS A BASEBALL PLAYER FOR THE DODGERS.
17        Q    ARE YOU A BASEBALL FAN?
18        A    I AM.
19        Q    IS THERE ANY PARTICULAR TEAM THAT YOU FAVOR?
20        A    THE PADRES.
21        Q    PRIOR TO APRIL OF 2021, DID YOU HAVE AN OPINION OF
22   MR. BAUER?
23        A    I DIDN'T KNOW WHO HE WAS PRIOR.
24        Q    HOW DID YOU LEARN ABOUT WHO TREVOR BAUER WAS?
25        MS. HOLLEY:  OBJECTION.  RELEVANCE.
26        THE COURT:  SUSTAINED.
27        Q    BY MR. GARELICK:  WHEN DID MS. HILL -- DID MS. HILL
28   TALK TO YOU ABOUT MR. BAUER?
```

505

1          A    YES.

2          Q    WHEN WAS THE FIRST TIME?

3          MS. HOLLEY:  OBJECTION.  RELEVANCE.

4          THE COURT:  OVERRULED.  YOU MAY ANSWER.

5          THE WITNESS:  WHEN SHE -- THE FIRST TIME I LEARNED ABOUT

6    HIM WAS WHEN SHE TOLD ME THAT HE HAD COMMUNICATED THROUGH

7    HER -- WITH HER THROUGH INSTAGRAM.

8          Q    BY MR. GARELICK:  DO YOU RECALL ABOUT WHEN THAT

9    WAS?

10         A    IN APRIL.  I DON'T KNOW THE EXACT DATE BUT BEFORE

11   THE FIRST ENCOUNTER MAYBE.

12         Q    DID YOU HAVE CONVERSATIONS WITH MS. HILL ABOUT

13   MR. BAUER CONTACTING HER ON INSTAGRAM?

14         A    YES.

15         Q    WHAT DID SHE TALK ABOUT?

16         MS. HOLLEY:  OBJECTION.  RELEVANCE.

17         THE COURT:  SUSTAINED.

18         MR. GARELICK:  YOUR HONOR, IF I MAY?  THIS PARTICULARLY

19   GOES TO HER IMPRESSIONS OF MS. HILL'S STATE OF MIND.

20         THE COURT:  I DON'T NEED THE WHOLE LIST OF EVERYTHING

21   SHE TALKED ABOUT, ESPECIALLY IF SHE CONSIDERS THEM BEST

22   FRIENDS.  I NEED YOU TO GET TO THE HEART OF THE MATTER.

23         MR. GARELICK:  I DIDN'T HEAR --

24         THE COURT:  I SAID I DON'T NEED TO KNOW EVERYTHING THEY

25   TALKED ABOUT.  I ONLY -- SHE DESCRIBED THEM AS BEST FRIENDS.

26   THEY TALKED ABOUT LOTS OF THINGS.  YOU MAY ASK QUESTIONS

27   ABOUT THE RELEVANT THINGS.

28         Q    BY MR. GARELICK:  DID MS. HILL TELL YOU THAT SHE

```
 1   WAS GOING TO SEE MR. BAUER IN PERSON?

 2        A    YES.

 3        Q    HOW DID SHE TELL YOU THAT?

 4        A    I DON'T RECALL.

 5        Q    DID SHE TEXT WITH YOU ABOUT IT?

 6        A    YES.

 7        Q    I AM GOING TO NOW REFERENCE EXHIBIT 29.  I'M GOING

 8   TO START ON BATES STAMP PAGE 5.

 9        THE COURT:  THAT WILL BE IN FRONT OF YOU IN THE BOOK

10   CALLED VOLUME ONE.  DO YOU SEE THAT, MA'AM?

11        THE WITNESS:  I'M SORRY.  WHAT AM I LOOKING AT?

12        Q    BY MR. GARELICK:  YOU'RE GOING TO LOOK AT EXHIBIT

13   29 IN THERE.  THERE ARE GOING TO BE NUMBERS ON THE BOTTOM

14   RIGHT HAND CORNER ONCE YOU GET THERE.

15        A    I'M SORRY?

16        Q    FLIP TO THE NUMBER 500 AT THE BOTTOM OF THE PAGE.

17   I ACTUALLY WILL HAVE YOU FLIP A FEW MORE PAGES.  504.  IT

18   SAYS ON THE BOTTOM OF THE PAGE, "HOW IS THAT REAL?  YOU KNOW

19   HE IS THE LOVE OF MY LIFE.  I MANIFEST HIM."  DO YOU SEE

20   THAT?

21        A    YES.

22        Q    IS THAT BY MS. HILL?

23        A    YES.

24        Q    IS YOUR RESPONSE ON THE LEFT HAND SIDE WHERE YOU

25   SAY, "OMG LOL."  DID YOU REPLY?

26        THE COURT:  THESE ARE NOT IN EVIDENCE.  THE PART THAT'S

27   IN EVIDENCE IS JUST PAGES 567 TO 569.  PLEASE DON'T HAVE

28   ANYBODY READ FROM ANYTHING UNTIL IT'S IN EVIDENCE.
```

```
 1        Q    BY MR. GARELICK:  CAN YOU LOOK THROUGH PAGES 504
 2   AND 505?
 3        A    YES.
 4        Q    NOW, I'LL HAVE YOU GO IT 506 AND 507.
 5        A    YES.
 6        Q    IS THIS A TRUE AND CORRECT COPY OF THE INSTAGRAM --
 7   I'M SORRY -- TEXT MESSAGE EXCHANGE BETWEEN YOU AND MS. HILL
 8   ON APRIL 29TH?
 9        A    I'M SORRY.  SAY THAT ONE MORE TIME?
10        Q    IS THIS A TRUE AND CORRECT COPY OF YOUR TEXT
11   EXCHANGE WITH MS. HILL?
12        A    YES.
13        MR. GARELICK:  I'D LIKE TO MOVE TO ADMIT PAGES 504, 505,
14   506, AND 507.
15        THE COURT:  ANY OBJECTION?
16        MS. HOLLEY:  NO.
17        THE COURT:  THEY ARE ADMITTED.
18        Q    BY MR. GARELICK:  DID YOU KNOW WHAT MS. HILL MEANT
19   BY, "YOU KNOW HE IS THE LOVE OF MY LIFE"?
20        MS. HOLLEY:  OBJECTION.  CALLS FOR SPECULATION.
21        THE COURT:  SUSTAINED.
22        Q    BY MR. GARELICK:  WHAT DO YOU BELIEVE -- LET ME ASK
23   YOU, DO YOU BELIEVE -- OR WERE YOU EXCITED THAT MS. HILL WAS
24   COMMUNICATING WITH MR. BAUER?
25        MS. HOLLEY:  OBJECTION.  RELEVANCE.
26        THE COURT:  SUSTAINED.
27        Q    BY MR. GARELICK:  DO YOU KNOW IF MS. HILL MET
28   MR. BAUER IN PERSON IN APRIL OF 2021?
```

```
 1        A    YES, SHE DID.

 2        Q    HOW DO YOU KNOW THAT?

 3        A    SHE TOLD ME HOW EXCITED SHE WAS TO GO UP AND MEET

 4   HIM.

 5        Q    DID YOU TALK TO MS. HILL AFTER THAT TIME?

 6        A    I DID.

 7        Q    DID YOU DISCUSS HER ENCOUNTER WITH MR. BAUER?

 8        A    WE DID.

 9        Q    WHAT DID YOU DISCUSS?

10   MS. HOLLEY:  OBJECTION.  RELEVANCE.  CUMULATIVE.

11   THE COURT:  IT IS OVERBROAD.

12   MS. HOLLEY:  AND OVERBROAD.

13   THE COURT:  INTERPRETED WHAT YOU ASKED TO BE.

14        Q    BY MR. GARELICK:  DID YOU DISCUSS WITH MS. HILL

15   AFTER THE FIRST ENCOUNTER WHETHER OR NOT SHE HAD SEX WITH

16   MR. BAUER?

17        A    YES.

18        Q    WHAT DID YOU DISCUSS ABOUT MS. HILL HAVING SEX WITH

19   MR. BAUER DURING THAT FIRST ENCOUNTER?

20        A    SHE TOLD ME ABOUT THE EXPERIENCE AND HOW SHE HAD

21   BEEN CHOKED OUT WITH HER HAIR.  AND HOW HE HAD STUCK HIS

22   FINGERS DOWN HER THROAT.  SHE TOLD HIM SHE DIDN'T LIKE THAT.

23   AND SHE TOLD ME ABOUT WANTING TO STILL SEE HIM AFTER THAT.

24        Q    LET ME ASK YOU, DID YOU HAVE THIS CONVERSATION --

25   HOW DID YOU HAVE THIS CONVERSATION WITH MS. HILL?

26        A    IT WAS IN-PERSON.

27        Q    AND DID YOU OBSERVE HER DEMEANOR WHEN TALKING ABOUT

28   THE FIRST ENCOUNTER?
```

```
 1        A    I DID.
 2        MS. HOLLEY:  OBJECTION.  RELEVANCE.
 3        THE COURT:  WELL, THE ANSWER IS SIMPLY YES.  SO
 4   OVERRULED.
 5        Q    BY MR. GARELICK:  CAN YOU DESCRIBE HER DEMEANOR
 6   WHEN YOU SPOKE WITH HER AFTER THE FIRST ENCOUNTER?
 7        MS. HOLLEY:  OBJECTION.  RELEVANCE.
 8        THE COURT:  OVERRULED.  YOU MAY ANSWER.  I SAID SHE MAY
 9   ANSWER.
10        THE WITNESS:  CAN YOU SAY THE QUESTION ONE MORE TIME?
11        Q    BY MS. OLSON:  CAN YOU DESCRIBE MS. HILL'S DEMEANOR
12   WHEN YOU WERE TALKING WITH HER ABOUT THE FIRST ENCOUNTER?
13        A    SHE DESCRIBED WHAT HAD HAPPENED.  SHE WASN'T SURE
14   IF IT WAS NORMAL.
15        THE COURT:  THE QUESTION IS ABOUT HER DEMEANOR.  DO YOU
16   KNOW WHAT HE MEANS BY THAT?
17        MS. HOLLEY:  THANK YOU.  MOTION TO STRIKE.
18        THE WITNESS:  YEAH.  SO SHE WAS -- SHE HAD BEEN EXCITED
19   TO HANG OUT WITH HIM THE FIRST TIME.
20        Q    BY MR. GARELICK:  DO YOU KNOW IF MS. HILL AND
21   MR. BAUER SAW EACH OTHER A SECOND TIME?
22        A    YES.
23        Q    HOW DO YOU KNOW THAT?
24        A    SHE TOLD ME ABOUT IT.  SHE CAME TO MY HOUSE AFTER
25   THE SECOND TIME.
26        Q    LET'S BACKTRACK.  WHEN DID YOU FIRST FIND OUT THAT
27   MS. HILL WAS SEEING MR. BAUER A SECOND TIME?
28        A    THE MORNING AFTER IT HAPPENED.
```

510

```
1        Q    WHAT DO YOU MEAN "AFTER IT HAPPENED"?
2        A    THE MORNING AFTER SHE WAS ASSAULTED.
3        Q    DO YOU RECALL WHAT METHOD SHE FIRST TOLD YOU WHAT
4   HAPPENED AT THAT ENCOUNTER?
5        A    HOW SHE TOLD ME WHAT HAPPENED?
6        Q    THE METHOD.  WAS IT OVER TEXT MESSAGE?  WAS IT IN
7   PERSON?  WAS IT OVER A PHONE CALL?
8        A    IT WAS OVER TEXT MESSAGE.
9        Q    DID YOU TALK WITH HER OVER THE PHONE, TOO?
10        A    YES.
11        Q    WHAT DID YOU TALK ABOUT DURING THAT FIRST TIME
12   AFTER THE SECOND ENCOUNTER?
13        A    SHE --
14        MS. HOLLEY:  OBJECTION.  CALLS FOR HEARSAY.
15        THE COURT:  SUSTAINED AS ASKED.
16        Q    BY MR. GARELICK:  WHAT WAS YOUR UNDERSTANDING FROM
17   THE PHONE CALL THAT YOU HAD WITH MS. HILL AS TO WHAT
18   HAPPENED?
19        MS. HOLLEY:  OBJECTION.  RELEVANCE.
20        THE COURT:  SUSTAINED.
21        Q    BY MR. GARELICK:  HOW DID MS. HILL SOUND DURING
22   YOUR FIRST PHONE CALL?
23        MS. HOLLEY:  OBJECTION.  VAGUE AS TO TIME.
24        THE COURT:  SUSTAINED.
25        Q    BY MR. GARELICK:  YOU TESTIFIED THAT YOU HAD A
26   PHONE CALL WITH -- LET ME JUST STRIKE THAT.
27             AFTER MS. HILL'S SECOND ENCOUNTER WITH MR. BAUER,
28   SHE CONTACTED YOU ON THE PHONE; IS THAT RIGHT?
```

511

```
 1        A    CORRECT.

 2        Q    AND WHAT DID SHE SOUND LIKE DURING THE CALL?

 3        A    SHE WAS VERY SHAKEN UP.

 4        Q    WHAT DO YOU MEAN BY THAT?

 5        A    SHE SOUNDED LIKE SHE COULDN'T REALLY PIECE

 6   TOGETHER.  SHE SOUNDED VERY SHAKY.  VERY SCARED.

 7        Q    DID -- WHEN IS THE NEXT TIME YOU SAW MS. HILL IN

 8   PERSON?

 9        A    AFTER SHE CALLED ME, SHE CAME OVER TO MY HOUSE

10   ABOUT AN HOUR LATER.

11        Q    AND WHAT DID YOU OBSERVE OF MS. HILL WHEN YOU SAW

12   HER AN HOUR LATER?

13        A    SHE HAD TWO BLACK EYES.  THERE WERE SCRATCHES TO

14   THE SIDE OF HER FACE.  SHE WAS VERY -- SHE WAS IN SHOCK.  SHE

15   WAS SCARED.  SHE DIDN'T KNOW HOW TO EXPRESS WHAT HAD

16   HAPPENED.  AND ALL SHE WANTED TO DO WAS LAY IN BED, BECAUSE

17   SHE FELT SAFE AT MY HOUSE AFTER HAVING BEEN THROUGH WHAT SHE

18   HAD BEEN THROUGH.  SHE JUST WANTED TO LAY AND NOT MOVE.  SHE

19   HAD BEEN CRYING AND SHE TOLD ME SHE HAD BEEN THROWING UP,

20   THAT HER HEAD HURT.  HER JAW -- SHE COULDN'T OPEN HER JAW.

21   SHE COULD BARELY TALK.

22        Q    DID YOU WITNESS MS. HILL VOMIT?

23        A    I DIDN'T WITNESS HER VOMIT.

24        Q    YOU TESTIFIED YOU SAW SCRATCHES ON HER FACE.  DO

25   YOU KNOW IF MS. HILL HAS ANY ISSUES WITH ACNE?

26        A    WITH ACNE?

27        Q    YES.

28        A    I BELIEVE SHE DOES.  YES.
```

512

```
1        Q    AND COULD THOSE SCRATCHES HAVE BEEN FROM ACNE?

2        A    NO.

3        MS. HOLLEY:  OBJECTION.  CALLS FOR SPECULATION.

4        THE COURT:  OVERRULED.

5        Q    BY MR. GARELICK:  DID YOU DISCUSS WITH MS. HILL

6   WHAT HAPPENED DURING THE ENCOUNTER?

7        A    YES.

8        Q    DID SHE DESCRIBE THE EVENTS TO YOU?

9        A    SHE DID.

10       Q    WHAT IS YOUR UNDERSTANDING OF WHAT HAPPENED?

11       MS. HOLLEY:  OBJECTION.  IRRELEVANT.  CALLS FOR HEARSAY.

12  CUMULATIVE.

13       THE COURT:  SUSTAINED ON IRRELEVANT AS TO HER

14  UNDERSTANDING.

15       Q    BY MR. GARELICK:  WHAT ELSE DID YOU OBSERVE OF

16  MS. HILL WHEN SHE FIRST CAME TO YOUR HOUSE?

17       A    SHE HAD BRUISES ON OTHER PARTS OF HER BODY THAT WE

18  LOOKED AT TOGETHER, BECAUSE I NOTICED THAT THERE WERE BRUISES

19  BEHIND HER EARS.  AND FROM THERE, SHE TOLD ME HOW MUCH PAIN

20  SHE WAS IN.  THAT HER JAW HURT, HER HEAD HURT, HER VAGINA

21  HURT.  SHE WAS SORE.  AND WE LOOKED AT THE BRUISES ON HER

22  BUTT AND ON HER VAGINA.

23       Q    CAN YOU DESCRIBE WHAT YOU SAW IN HER GENITAL

24  REGION?

25       A    SHE HAD A VERY LARGE BRUISE AT THE TOP OF HER

26  VAGINA STRETCHING TO THE BACK.  IT WAS DARK PURPLE.

27       Q    HOW LONG DID MS. HILL STAY AT YOUR HOUSE?

28       A    SHE STAYED FOR A COUPLE OF HOURS.
```

513

```
1          Q    DO YOU KNOW WHERE SHE WENT?

2          MS. HOLLEY:  OBJECTION.  CALLS FOR SPECULATION.

3          THE COURT:  SUSTAINED.

4          Q    BY MR. GARELICK:  WHEN IS THE NEXT TIME YOU SAW

5     MS. HILL?

6          A    I SAW HER THE NEXT NIGHT WHEN I WENT TO THE

7     HOSPITAL WITH HER.

8          Q    WHAT DID YOU OBSERVE WHEN YOU SAW HER AT THE

9     HOSPITAL?

10         A    SHE WAS SCARED BECAUSE SHE KNEW THAT SHE --

11         MS. HOLLEY:  OBJECTION.  AFTER STARTING WITH "BECAUSE."

12         THE COURT:  SUSTAINED.  AND STRICKEN.

13         Q    BY MR. GARELICK:  OTHER THAN OBSERVING THAT SHE WAS

14    SCARED, WHAT ELSE DID YOU OBSERVE?

15         A    SHE DIDN'T WANT TO TELL ANYBODY.  AND SHE WAS

16    NERVOUS, BECAUSE SHE KNEW THAT SHE WOULD NEED TO REPORT IT.

17    BECAUSE THEY -- HER SPONSOR WAS CALLED AND HER PARENTS WERE

18    CALLED.  AND PRIOR TO THAT, SHE DIDN'T WANT ANYBODY TO KNOW

19    BUT ME.  AND I HAD TO CONVINCE HER TO CALL SOMEBODY AND ASK

20    FOR HELP.

21         Q    WHO ELSE WAS AT THE HOSPITAL WITH YOU?

22         A    IT WAS ME, HER SPONSOR, AND I LEFT BEFORE HER DAD

23    GOT THERE.

24         Q    HER SPONSOR'S NAME IS LISA?

25         A    CORRECT.

26         Q    DID YOU TALK TO MS. HILL ABOUT FILING A RESTRAINING

27    ORDER?

28         A    I DID.
```

514

```
 1        Q    WHAT DID YOU TALK ABOUT?

 2        MS. HOLLEY:  OBJECTION.  CALLS FOR HEARSAY.

 3        THE COURT:  SUSTAINED.

 4        MR. GARELICK:  YOUR HONOR, IS BATES STAMP STARTING AT

 5   623 ENTERED INTO EVIDENCE.

 6        THE COURT:  IT IS NOT.  THE ONLY PAGES ENTERED INTO

 7   EVIDENCE ARE 504 THROUGH 507.  AND 567 THROUGH 569.

 8        Q    BY MR. GARELICK:  PLEASE FLIP TO PAGE 623.  DO YOU

 9   RECALL THIS TEXT EXCHANGE IN THE MIDDLE OF THE PAGE?

10        A    YES.

11        Q    IS THIS A TRUE AND CORRECT COPY OF YOUR TEXT

12   EXCHANGE ON JUNE 18, 2021?

13        A    YES.

14        MR. GARELICK:  YOUR HONOR, I'D LIKE TO MOVE TO HAVE

15   PAGE 623 ENTERED INTO EVIDENCE.

16        THE COURT:  ANY OBJECTION?

17        MS. HOLLEY:  NO.

18        THE COURT:  PAGE 623 IS ADMITTED.

19        Q    BY MR. GARELICK:  BETWEEN THAT SECOND INCIDENT AND

20   TODAY, HAVE YOU GONE TO ANY MAJOR LEAGUE BASEBALL GAMES WITH

21   MS. HILL?

22        A    NO.

23        Q    DID YOU SEE MS. HILL -- DID YOU SEE MS. HILL AROUND

24   JUNE 29TH, 2021?

25        A    PROBABLY.

26        Q    DO YOU RECALL ANYTHING SPECIFIC ABOUT SEEING HER

27   AROUND JUNE 29TH?

28        A    I DON'T REMEMBER THE EXACT DATES.
```

515

```
1        Q    IF CAN YOU FLIP TO PAGE 633.

2        A    OKAY.

3        Q    ONE SECOND.  DID YOU TALK TO LINDSEY IN PERSON

4   PRIOR TO HER FILING A RESTRAINING ORDER?

5        A    YES.

6        Q    CAN YOU DESCRIBE MS. HILL'S DEMEANOR WHEN YOU SAW

7   HER PRIOR TO FILING THE RESTRAINING ORDER?

8        MS. HOLLEY:  OBJECTION.  VAGUE AS TO TIME.  OVERBROAD.

9        THE COURT:  DO YOU MEAN IMMEDIATELY THAT DAY PRIOR?

10       MR. GARELICK:  YES.  I BELIEVE JUNE 29.

11       THE COURT:  OKAY.  WITH THAT CLARIFICATION, YOU MAY

12  ANSWER.

13       THE WITNESS:  SO REFERRING TO THE DAY THAT -- PRIOR TO

14  IT BEING FILED ON THAT DAY?

15       Q    BY MR. GARELICK:  YES.

16       A    SHE WAS ANXIOUS.  AND SHE WAS OVERWHELMED WITH

17  EVERYTHING THAT WAS HAPPENING BECAUSE SHE JUST WANTED SOME

18  PROTECTION FOR HERSELF.

19       MS. HOLLEY:  OBJECTION.  MOTION TO STRIKE AFTER

20  "BECAUSE."

21       THE COURT:  OVERRULED.

22       Q    BY MR. GARELICK:  DID YOU SEE MS. HILL IN PERSON ON

23  JUNE 30TH?

24       A    I DON'T REMEMBER.

25       Q    DO YOU RECALL IF YOU SAW MS. HILL THE WEEK AFTER

26  JUNE 29TH?

27       A    YES.

28       Q    AND CAN YOU DESCRIBE HER DEMEANOR AT THAT TIME?
```

516

```
1          A    SHE WAS RELIEVED BECAUSE --

2          MS. HOLLEY:  OBJECTION.

3          THE COURT:  EVERYTHING AFTER "RELIEVED" IS STRICKEN.

4          MS. HOLLEY:  THANK YOU.

5          MR. GARELICK:  I COULDN'T HEAR YOU, YOUR HONOR.

6          THE COURT:  EVERYTHING AFTER "RELIEVED" IS STRICKEN.

7   THAT ANSWERED THE QUESTION.  EVERYTHING ELSE --

8          MR. GARELICK:  I MEAN NO DISRESPECT.  I DON'T KNOW WHY I

9   CAN'T JUST HEAR.

10         THE COURT:  I AM NOT DISRESPECTED IF YOU CAN'T HEAR.  I

11  INVITE YOU TO ASK ME TO SPEAK UP OR CLARIFY IF YOU DON'T

12  HEAR.

13         MR. GARELICK:  THANK YOU.

14         Q    BY MR. GARELICK:  I'D LIKE TO BRIEFLY GO BACK TO

15  WHEN YOU SAW MS. HILL FOR THE FIRST TIME AFTER THE SECOND

16  ENCOUNTER.  ARE YOU ABLE TO DESCRIBE HER INJURIES TO HER

17  FACE?

18         A    SHE HAD TWO BLACK EYES.  HER LIPS WERE SWOLLEN.

19  HER CHEEKBONES WERE SWOLLEN.  SHE COULD BARELY MOVE HER JAW

20  EVEN TO SPEAK.  SHE HAD SCRATCHES ALONG THE SIDE OF HER FACE.

21  AND SHE HAD THE BRUISES BEHIND THE EARS RIGHT HERE.

22         Q    ARE YOU ABLE TO DESCRIBE IN THAT VISIT ANY INJURIES

23  TO HER BUTTOCKS?

24         A    YES, SHE HAD BRUISES ON HER BUTT CHEEKS.

25         Q    ARE YOU ABLE TO DESCRIBE WHAT THOSE BRUISES LOOKED

26  LIKE?

27         A    THEY WERE -- THEY WERE GREEN.  THEY WERE ON THE

28  SMALLER SIDE.  THE DAY AFTER, THEY GOT BIGGER.  AND THEY WERE
```

517

```
 1   DARKER.
 2        Q    DID -- OTHER THAN HER VAGINA, HER BUTTOCKS, AND HER
 3   FACE, DID YOU NOTICE ANY OTHER INJURIES ON MS. HILL?
 4        A    HER GUMLINE WAS PURPLE.
 5        Q    WHAT DO YOU MEAN BY HER "GUMLINE WAS PURPLE"?
 6        A    THE INSIDE OF HER -- UNDERNEATH HER LIPS WHERE HER
 7   LIP WERE SWOLLEN AND BRUISED, THE GUMLINE ON THE INSIDE WAS
 8   ALSO BRUISED.  DARK PURPLE.
 9        MR. GARELICK:  YOUR HONOR, IF I MAY JUST HAVE A MOMENT?
10        THE COURT:  YES.
11        MR. GARELICK:  THAT'S ALL MY QUESTIONS.
12        THE COURT:  WHY DON'T WE BREAK HERE.
13        MS. HOLLEY:  I HAVE NO QUESTIONS, YOUR HONOR.
14        THE COURT:  YOU HAVE NO QUESTIONS?
15        MS. HOLLEY:  YOU CAN DISMISS HER.
16        THE COURT:  ALL RIGHT.  THEN YOU ARE FREE TO GO.  I
17   STILL THINK WE SHOULD BREAK HERE AND TAKE OUR 15 MINUTES.
18   I'LL SEE YOU AT 3:15.
19        MS. HOLLEY:  THANK YOU.
20             (RECESS TAKEN.)
21        THE COURT:  ALL RIGHT.
22        MR. GARELICK:  YOUR HONOR, I HAD AN OPPORTUNITY TO MEET
23   AND CONFER WITH RESPONDENT'S COUNSEL.  WE HAVE ONE MORE
24   WITNESS LEFT, WHICH IS JUST MR. BAUER HIMSELF.  AND THEN
25   CLOSING.  MY UNDERSTANDING IS THAT RESPONDENT HAS -- ALL HIS
26   WITNESSES HAVE BEEN HEARD AT THIS POINT IN TIME.  OUR SIDE
27   WOULD REQUEST, BASED ON -- MS. MEYER, HER REQUEST IS -- SHE
28   IS UNABLE TO BE HERE TODAY.  SHE WAS INTENDING TO DO
```

518

```
1   MR. BAUER'S DIRECT EXAMINATION.  IF WE COULD ADJOURN FOR
2   TODAY, START TOMORROW, AND HOPEFULLY BE FINISHED BY LUNCH.
3       MS. HOLLEY:  THANK YOU.  I WOULD LIKE TO RESTATE WHAT I
4   INDICATED TO THE COURT PREVIOUSLY, WHICH IS THAT MR. BAUER IS
5   GOING TO TAKE THE FIFTH AMENDMENT.  WE HAVE FOUND A NUMBER OF
6   CASES, WHICH I ASK THE COURT TO READ -- IF YOU HAVE NOT
7   ALREADY -- WHICH PERMIT THE COURT TO ALLOW A BLANKET
8   ASSERTION OF THE PRIVILEGE, IF THE COURT CONCLUDES BASED ON
9   CIRCUMSTANCES IN THIS PARTICULAR CASE THAT MR. BAUER DOES, IN
10  FACT, HAVE A LEGITIMATE BASIS FOR ASSERTING THE FIFTH
11  AMENDMENT.  I THINK IT'S CLEAR THAT HE DOES, GIVEN THAT THERE
12  IS A -- STILL A PENDING CRIMINAL INVESTIGATION.
13      HE DOES INTEND TO TAKE THE FIFTH AMENDMENT BEYOND
14  ANYTHING THAN HIS NAME AND WHAT HE DOES FOR A LIVING.
15      THE COURT:  OKAY.
16      MS. HOLLEY:  SO BASED ON THE CASES, WHICH I'M HAPPY TO
17  PROVIDE THE COURT THE CITES FOR, I THINK THE COURT CAN ALLOW
18  HIM TO MAKE A BLANKET ASSERTION.  THAT IS OUR REQUEST.
19      THE COURT:  ALL RIGHT.  I WILL TAKE YOUR CITATIONS.  IF
20  YOU WANT TO --
21      MS. HOLLEY:  DO YOU WANT ME TO WRITE THEM DOWN?
22      THE COURT:  IF YOU HAVE THEM WRITTEN IN ONE PLACE
23  WITHOUT SUPER SECRET NOTES ON THEM, MY J.A. CAN MAKE A COPY
24  OF THAT PAGE.
25      MS. OLSON:  YOUR HONOR, IF WE CAN BRIEF THAT ISSUE AND
26  DISCUSS IT IN THE MORNING.  AND THEN BASED UPON YOUR
27  DETERMINATION, WE COULD COMMENCE WITH MR. BAUER AND THEN GO
28  INTO CLOSING.
```

```
 1        THE COURT:  IS THAT ACCEPTABLE?

 2        MS. HOLLEY:  WELL, WE WOULD PREFER TO HAVE THIS ISSUE

 3   RESOLVED NOW.

 4        THE COURT:  OR YOU PREFER THAT I WILL HAVE READ CASES

 5   YOU'RE JUST ABOUT TO HAND ME THE NAMES OF?  THAT'S NOT LIKELY

 6   TO OCCUR TODAY.

 7        MS. HOLLEY:  OKAY.  ALL RIGHT.  THEN I DEFER TO THE

 8   COURT IN THAT INSTANCE.

 9        THE COURT:  OKAY.  THERE ARE NO OTHER WITNESSES BESIDES

10   MR. BAUER?

11        MS. HOLLEY:  CORRECT.

12        THE COURT:  ALL RIGHT.  LET'S ADJOURN TODAY.  AS SOON AS

13   WE GET YOU BACK YOUR PIECE OF PAPER --

14        MS. OLSON:  CAN I, LIKEWISE, GET A COPY OF THE PIECE OF

15   PAPER?

16        MR. FETTEROLF:  HOLD ON.  LET ME SEE IF THE PIECE OF

17   PAPER IS AN INTERNAL LEGAL MEMO.  OUR WORK PRODUCT.  MAYBE WE

18   OUGHT TO JUST WRITE THEM DOWN.

19        THE COURT:  FAIR ENOUGH.  GO RIGHT AHEAD.

20        MS. HOLLEY:  I HAVE NOTHING TO HIDE.

21        THE COURT:  VERY OPEN.  IF YOU WANT TO JUST PUT THEM ON

22   THE RECORD.

23        MS. HOLLEY:  ALL RIGHT.  UNITED STATES VS. TSUI,

24   646 F.2D 365.  U.S. VS. GOODWIN, 625 F.2D 693.  PEOPLE VS.

25   TRUJEQUE, 61 CAL.4TH 227.  IT'S A 2015 CASE.  WARFORD VS.

26   MEDEIROS, 160 CAL.APP.3D 1035.

27        THE COURT:  OKAY.

28        MR. GARELICK:  THANK YOU, YOUR HONOR.
```

```
1         THE COURT:  SEE YOU TOMORROW.
2                     (AT 3:20 P.M., AN ADJOURNMENT WAS TAKEN UNTIL
3                      THURSDAY, AUGUST 19, 2021, AT 8:42 A.M.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF LOS ANGELES

3     HON. DIANNA GOULD-SALTMAN, JUDGE        DEPARTMENT 35

4

5     LINDSEY HILL,                     )
                                        )
6                                       )
                         PETITIONER,    ) NO. 21STRO03198
7                                       )
                   VS.                  )
8                                       ) REPORTER'S
                                        ) CERTIFICATE
9     TREVOR BAUER,                     )
                                        )
10                                      )
                         RESPONDENT.    )
11    _____)

12

13         I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14    REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15    FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16    FOREGOING PAGES, 476 THROUGH 520, INCLUSIVE, COMPRISE A FULL,

17    TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18    MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 18, 2021.

19         DATED THIS 22ND DAY OF AUGUST, 2021.

20

21

22         _____
           JACQUELINE M. CAIRE, CSR #9599, RPR
23         OFFICIAL REPORTER

24

25

26

27

28
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF LOS ANGELES

 3        HON. DIANNA GOULD-SALTMAN, JUDGE     DEPARTMENT 35

 4

 5
      LINDSEY HILL,                      )
 6                                       )
                        PETITIONER,      )
 7            VS.                        )    NO. 21STRO03198
                                         )
 8                                       )
      TREVOR BAUER,                      )
 9                                       )
                        RESPONDENT.      )
10    _____)

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                         AUGUST 19, 2021
12
      APPEARANCES:
13    FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                            BY:  LISA HELFEND MEYER, ESQ.
14                               DOREEN MARIE OLSON, ESQ.
                                 MARC H. GARELICK, ESQ.
15                            10100 SANTA MONICA BOULEVARD
                              SUITE 1425
16                            LOS ANGELES, CA 90067

17                            RIGHT CHOICE LAW
                              BY:  FRED THIAGARAJAH, ESQ.
18                            5015 BIRCH STREET
                              SUITE 107
19                            NEWPORT BEACH, CA 92660

20    FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
                            BY:  SHAWN HOLLEY, ESQ.
21                               KATE MANGELS, ESQ.
                              808 WILSHIRE BOULEVARD
22                            3RD FLOOR
                              SANTA MONICA, CA 90401
23
                              ZUCKERMAN SPAEDER
24                            BY:  JON R. FETTEROLF, ESQ.
                                   (PRO HAC VICE)
25                            1800 M STREET NW
                              SUITE 1000
26                            WASHINGTON, DC 20036

27                            JACQUELINE M. CAIRE, CSR #9599, RPR
28                            OFFICIAL REPORTER
```

```
 1   CASE NUMBER:            21STRO03198
 2   CASE NAME:              LINDSEY HILL VS.
 3                           TREVOR BAUER
 4   LOS ANGELES, CALIFORNIA  THURSDAY, AUGUST 19, 2021
 5   DEPARTMENT 35           HON. DIANNA GOULD-SALTMAN, JUDGE
 6   APPEARANCES:            (AS HERETOFORE NOTED.)
 7   REPORTER:               JACQUELINE CAIRE, CSR NO. 9599, RPR
 8   TIME:                   8:42 A.M.
 9
10        THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.  ALL
11   RIGHT.  LET'S BEGIN WITH THE ISSUE OF MR. BAUER TESTIFYING.
12   I REVIEWED THE CASES THAT WERE CITED BY THE RESPONDENT.  AND
13   IT IS THE COURT'S TENTATIVE TO INQUIRE OF MS. MEYER WHAT
14   QUESTIONS SHE WOULD ASK MR. BAUER WHICH ARE BOTH RELEVANT TO
15   THE ISSUES BEFORE THIS COURT AND NOT LIKELY TO LEAD TO ANY
16   ANSWER THAT MIGHT INCRIMINATE HIM.
17        MS. MEYER:  OKAY.  YOUR HONOR, FIRST LET ME START BY
18   SAYING THAT I THINK THAT THE TWO CRITICAL ISSUES THAT THE
19   COURT HAS TO DECIDE IS WHETHER OR NOT THERE IS OR WAS A
20   DATING RELATIONSHIP UNDER THE FAMILY CODE.  AND, NUMBER TWO,
21   WHETHER OR NOT THE SEX OR THE SEXUAL ASSAULT WAS CONSENSUAL
22   OR NOT.  I THINK THOSE ARE THE TWO GENERAL AREAS THAT I
23   INTEND TO ASK HIM ABOUT.
24             SO WITHIN -- DO YOU WANT ME TO TELL YOU
25   SPECIFICALLY WHAT THOSE QUESTIONS ARE?
26        THE COURT:  THOSE TWO AREAS ARE ISSUES WHICH ARE
27   RELEVANT.  I CANNOT IMAGINE A QUESTION YOU COULD ASK HIM
28   WHICH -- TO WHICH HE WOULD NOT BE ADVISED TO TAKE THE
```

1   FIFTH.

2        MS. MEYER:  SO, FOR EXAMPLE, IF I ASKED HIM WHETHER OR

3   NOT HE USES INSTAGRAM TO MEET WOMEN SO HE COULD DATE THEM, I

4   DON'T SEE HOW THAT'S INCRIMINATING.  IF HE SAID IT IN AN

5   ARTICLE TO SPORTS ILLUSTRATED THAT HE HAS THESE THREE RULES

6   OF DATING AND HE PROVIDES THEM TO ANY WOMAN WHO HE IS

7   BEGINNING TO DATE, I THINK THAT'S RELEVANT.

8             ALSO, I THINK THAT'S A WAIVER IF HE HAS SAID IT IN

9   THE PAST TO SOMEBODY.

10       THE COURT:  I'M NOT SEEING THAT.

11       MS. MEYER:  WHAT AREN'T YOU SEEING?

12       THE COURT:  I'M NOT SEEING THAT THERE'S A WAIVER.  I'M

13  NOT SEEING THAT THOSE QUESTIONS WOULD BE ONES WHICH COULD NOT

14  INCRIMINATE HIM.

15       MS. MEYER:  WELL, I THINK IT'S HOW YOU VIEW IT.  I MEAN,

16  THERE'S SOME ATTORNEYS THAT TAKE THE POSITION THAT ANYTHING

17  OTHER THAN, AS MS. HOLLEY SAID YESTERDAY, WHAT IS YOUR NAME

18  AND WHAT IS YOUR OCCUPATION, ANYTHING BEYOND THAT CAN

19  INCRIMINATE YOU.  AND IN SOME INSTANCES, THOSE TWO QUESTIONS

20  COULD INCRIMINATE YOU.  SO IF THE COURT IS GOING TO ADOPT THE

21  BROAD VIEW OF ASSERTING THE FIFTH, THEN I GUESS ANYTHING IN

22  THE WORLD THAT I ASK HIM CAN BE USED TO INCRIMINATE HIM.

23       THE COURT:  ANYTHING THAT WOULD BE RELEVANT TO THIS CASE

24  WOULD BE RELEVANT TO A CRIMINAL INVESTIGATION OF THE SAME

25  FACTS AS THIS CASE.

26       MS. MEYER:  UNDER THE COURT'S INTERPRETATION -- BROAD

27  INTERPRETATION, YOU ARE CORRECT.

28       THE COURT:  SO I AM -- WELL, I GUESS I WOULD NEED TO ASK

523

```
1   MR. BAUER.
2          MR. BAUER, IF YOUR ATTORNEY ADVISES YOU TO TAKE THE
3   FIFTH, NOT ANSWERING QUESTIONS OTHER THAN YOUR NAME AND YOUR
4   OCCUPATION, IS IT YOUR INTENTION TO FOLLOW THAT ADVICE?
5          THE RESPONDENT:  YES, YOUR HONOR.
6          THE COURT:  THEN I DON'T THINK IT IS PRODUCTIVE TO HAVE
7   HIM EXAMINED UNDER 776 WHERE I SEE THERE TO BE A COMPLETE
8   CONFLUENCE OF THE RELEVANT ISSUES IN THIS CASE AND ANY
9   POTENTIAL INCRIMINATION IN A CRIMINAL CASE, WHICH THE COURT
10  IS INFORMED IS PRESENTLY UNDER INVESTIGATION.
11         MS. MEYER:  I UNDERSTAND THE COURT'S RULING.  HOWEVER,
12  FROM THE CASE LAW, IT APPEARS THAT IN A CIVIL CASE, AGAIN,
13  YOU HAVE TO DO IT QUESTION BY QUESTION.
14         THE COURT:  YOU DON'T HAVE TO DO IT QUESTION BY
15  QUESTION.  IT IS CERTAINLY -- IT IS CERTAINLY ACCEPTABLE TO
16  DO THAT.  BUT IT'S ALSO NOT REQUIRED TO DO THAT IF IT WOULD
17  BE AN EXERCISE IN FUTILITY, WHICH THE COURT IS CONVINCED IT
18  WOULD BE UNDER THESE CIRCUMSTANCES.
19         MS. MEYER:  AS LONG AS THE COURT MAKES THAT FINDING,
20  THEN WE WOULD SUBMIT.
21         THE COURT:  ALL RIGHT.  DOES THE PETITIONER HAVE ANY
22  ADDITIONAL WITNESSES?
23         MS. MEYER:  NO.
24         THE COURT:  ALL RIGHT.  DOES THE RESPONDENT HAVE ANY
25  ADDITIONAL WITNESSES?
26         MR. FETTEROLF:  NO, YOUR HONOR.
27         THE COURT:  ALL RIGHT.  PETITIONER RESTS --
28         MS. MEYER:  PETITIONER --
```

524

```
1         THE COURT:  -- OTHER THAN ARGUMENT?

2         MS. MEYER:  YES.

3         THE COURT:  RESPONDENT RESTS OTHER THAN ARGUMENT?

4         MS. HOLLEY:  YES.

5         THE COURT:  ARE COUNSEL PREPARED TO ARGUE?

6         MS. MEYER:  YES, YOUR HONOR.

7         THE COURT:  ALL RIGHT.  MS. MEYER.

8         MR. FETTEROLF:  YOUR HONOR, CAN I JUST ASK ONE

9   PROCEDURAL QUESTION?

10        THE COURT:  SURE.

11        MR. FETTEROLF:  ON THE ISSUE OF SPOLIATION, YOU HAD

12  MENTIONED YOU WERE RESERVING AND WE COULD RE-RAISE IT.  I

13  DON'T KNOW WHETHER YOU'D LIKE US TO DO THAT, WHICH WILL BE

14  ME.  AND MS. HOLLEY IS DOING OUR CLOSING.  WOULD YOU LIKE ME

15  TO DO THAT NOW OR AFTER THE CLOSING?

16        THE COURT:  I'LL LET YOU DO THAT AFTER.

17        MR. FETTEROLF:  AFTER THE CLOSING?

18        THE COURT:  YES.

19        MR. FETTEROLF:  OKAY.  THANK YOU.

20        THE COURT:  WHENEVER YOU'RE READY.

21        MS. MEYER:  THANK YOU, YOUR HONOR.

22            AS THE COURT IS AWARE, FINAL ARGUMENT IS THE LAST

23  OPPORTUNITY AN ATTORNEY HAS TO SET FORTH AND ARGUE THE

24  EVIDENCE AND THE LAW IN ORDER TO PERSUADE THE TRIER OF FACT

25  BY A PREPONDERANCE OF THE EVIDENCE THAT ABUSE AS DEFINED IN

26  THE D.V.P.A. WAS COMMITTED.  IT IS A RESPONSIBILITY THAT IS

27  NOT TAKEN LIGHTLY BY ME OR ANYONE ELSE.  AS ATTORNEYS, WE

28  WANT TO DO EVERYTHING WITHIN OUR LEGAL ABILITIES TO
```

1  DEMONSTRATE TO THE COURT WHY OUR CLIENT IS DESERVING OF

2  PROTECTION UNDER THE D.V.P.A.

3           I AM PROUDLY ONE OF THE ATTORNEYS FOR LINDSEY HILL.

4  I HAVE BEEN PRACTICING LAW FOR ALMOST 40 YEARS.  I HAVE HAD

5  CASES AGAINST YOUR HONOR.  AND I HAVE PRACTICED EXCLUSIVELY

6  IN THE AREA OF FAMILY LAW.  I HANDLE COMPLEX, DIFFICULT,

7  ACRIMONIOUS, AND HEART-WRENCHING CASES.  I ROUTINELY

8  PROSECUTE AND DEFEND D.V. CASES.

9           I AM ALSO A DAUGHTER, A SISTER, A WIFE, A MOTHER,

10 AND GRANDMOTHER.  I HAVE FOUR BEAUTIFUL GRANDCHILDREN.  I AM

11 THE MOTHER OF A BEAUTIFUL ADULT DAUGHTER WITH SPECIAL NEEDS

12 WHO I PROTECT WITH EVERY OUNCE OF MY BEING.  IF SOMEONE DID

13 TO MY DAUGHTER WHAT TREVOR BAUER, THAT MAN, HAD DONE TO MY

14 DAUGHTER, I DON'T KNOW WHAT I WOULD HAVE BEEN CAPABLE OF

15 DOING TO HIM.

16          I AM ALSO FORTUNATE TO BE THE MOTHER OF AN ADULT

17 SON.  AND, HONESTLY, I COULD NOT SIT THROUGH A TRIAL WHERE MY

18 SON WAS ACCUSED OF SUCH HEINOUS AND ATROCIOUS BEHAVIOR.  I

19 DECIDED IN PREPARING THIS ARGUMENT LATE LAST NIGHT TO LAY IT

20 OUT ON THE LINE TODAY.  NO-HOLDS-BARRED WAS MY MANTRA.  AND

21 THAT'S WHAT I TOLD MY HUSBAND.  I WILL NOT HOLD BACK ON

22 DISCUSSING THE EVIDENCE OR HOW I PERCEIVE THE EVIDENCE THAT

23 WAS PRESENTED IN THIS CASE BY NOT ONLY OUR SIDE, BUT BY THE

24 OTHER SIDE AS WELL.

25          IT IS MY OBLIGATION AS AN ATTORNEY TO LINDSEY AND

26 TO THE OATH THAT I TOOK AS AN ATTORNEY ALMOST FOUR DECADES

27 AGO.  IN THE SIMPLEST TERMS -- AND I WILL LAY IT OUT FOR THE

28 COURT NOW -- TREVOR BAUER IS A MONSTER.  HE WAS AGGRESSIVELY

```
 1   ABUSED AS A CHILD.  AS AN ADULT HE BECAME THE ABUSER.

 2        MS. HOLLEY:  OBJECTION.

 3        THE COURT:  THERE IS NO EVIDENCE OF THAT, COUNSEL.

 4        MS. MEYER:  HE STALKS HIS VICTIMS THROUGH THE

 5   INTERNET.

 6        MS. HOLLEY:  OBJECTION.

 7        THE COURT:  COUNSEL, THAT WAS -- THAT'S NUMBER TWO,

 8   ADDRESSING SOMETHING WHICH IS NOT IN EVIDENCE.  IF I HEAR A

 9   THIRD, YOUR ARGUMENT IS OVER.

10        MS. MEYER:  THIS IS ARGUMENT, YOUR HONOR.

11        THE COURT:  YOUR ARGUMENT IS LIMITED TO THE EVIDENCE

12   BEFORE THE COURT.  YOU HAVE NOW RAISED TWO ISSUES FOR WHICH

13   THERE WAS NO EVIDENCE BEFORE THE COURT.  IF I HEAR A THIRD

14   REFERENCE TO EVIDENCE WHICH WAS NOT BEFORE THE COURT, YOUR

15   OPPORTUNITY TO ARGUE THE CASE IS OVER.

16        MS. MEYER:  THEN LET ME PROCEED.

17             BY NOW WE KNOW OF LINDSEY'S HISTORY.  SEVERE

18   ALCOHOL ABUSE SINCE HER MID-TEENS.  MULTIPLE

19   HOSPITALIZATIONS.  POSSIBLE SELF-INJURIOUS BEHAVIOR.

20   EXTREMELY LOW-SELF ESTEEM COUPLED WITH TRANSPARENT EFFORTS TO

21   APPEAR CONFIDENT AND IN CONTROL.  A PEOPLE PLEASER.  AND

22   EXTREMELY EMOTIONALLY INSECURE.

23             SOBER, YES.  EMOTIONALLY STABLE, NO.  I WILL NEVER

24   FORGET HER HAUNTING WORDS SHE REPEATED TO HERSELF BEFORE SHE

25   WAS STRANGLED BY TREVOR ON MAY 15.  SHE SAID TO HERSELF --

26   AND I AM NOT QUOTING.  I'M PARAPHRASING -- IT'S NOT THAT BAD

27   BEING STRANGLED.  IF I COUNT TO THREE OR FOUR, THEN IT WILL

28   BE OVER AND I WILL BECOME CONSCIOUS AGAIN.  AND THEN SHE
```

1    COUNTED ON HER HANDS ONE, TWO, THREE, FOUR.

2            TREVOR FOUND LINDSEY ON INSTAGRAM.  AFTER SEEING

3    HER PROFILE, HE CALLED HER WITHIN TEN MINUTES AFTER THE GAME.

4    HE ADMITTED TO HER THAT HE RESEARCHED HER ON THE INTERNET.

5    AND BASED UPON LINDSEY'S ACCOUNT, HER DISTURBING AND SAD

6    HISTORY WAS AVAILABLE FOR ANYBODY TO READ.

7            TREVOR'S ATTORNEYS TRIED TO MAKE IT APPEAR AS IF

8    LINDSEY TOOK ADVANTAGE OF TREVOR.  THAT SHE TARGETED HIM FOR

9    PUBLICITY, TO SET HIM UP, GET HIS MONEY, OR RUIN HIS CAREER

10   FOR THE SAKE OF THE RIVALRY BETWEEN THE DODGERS AND THE

11   PADRES.  THEY CONFRONTED HER AND INTRODUCED INTO EVIDENCE

12   MULTIPLE TEXTS TO PORTRAY HER AS THE INSTIGATOR AND

13   MANIPULATOR WHO PRETENDED SHE WANTED A RELATIONSHIP WITH

14   TREVOR WHEN SHE REALLY HAD A COMPLETELY DIFFERENT AGENDA TO

15   EMBARRASS, RIDICULE, AND HUMILIATE TREVOR FOR HER OWN SELF

16   GAIN.

17           DOES TREVOR REALLY THINK ANY OF US ARE BUYING THIS

18   ARGUMENT?  FOR ALL OF LINDSEY'S BRAVADO AND BIG TALK, IN

19   REALITY, LINDSEY WAS, AND STILL IS, A YOUNG AND IMMATURE

20   WOMAN WHO WANTED DESPERATELY TO HAVE A RELATIONSHIP WITH

21   TREVOR BAUER, A BASEBALL STAR.

22           SHE PORTRAYED IT ONE WAY TO HER FRIENDS AND FAMILY

23   AND FELT VERY DIFFERENTLY INSIDE.  AND SHE TOLD US THAT OVER

24   AND OVER AGAIN.  SHE TESTIFIED THAT SHE WAS INTRIGUED BY HIM.

25   SHE THOUGHT HE WAS DIFFERENT LIKE HER, THAT HE WAS

26   MISUNDERSTOOD AND UNDERNEATH WANTED TO HAVE AN EMOTIONAL

27   CONNECTION DESPITE HIS WORDS TO THE CONTRARY.

28           HE LED LINDSEY TO BELIEVE HE WOULD ABANDON HIS

1   THREE RULES OF DATING FOR HER, THAT HE WOULD CHANGE INTO HER

2   PRINCE CHARMING LIKE ALL THE ROMANCE NOVELS WE ALL LIKE TO

3   READ AS GIRLS IN HIGH SCHOOL.  ON THEIR, QUOTE, "FIRST DATE,"

4   END QUOTE, THEY SPOKE FOR FOUR TO FIVE HOURS OF PERSONAL AND

5   INTIMATE DETAILS OF THEIR LIVES.  ALTHOUGH TREVOR SPOKE

6   MOSTLY ABOUT HIMSELF, ACCORDING TO LINDSEY, WHEN LINDSEY

7   SPOKE, HE WAS A GOOD LISTENER.

8           SHE LIKED THAT HE WAS TRANSPARENT, DIDN'T DO DRUGS

9   OR DRINK, WAS INTERESTED IN TALKING TO HER -- TALKING TO HER

10  WITHOUT PRESSURE OF SEX.  ALL THE WHILE, TREVOR KNEW EXACTLY

11  WHAT HE WAS DOING.  HE WAS CAUSING LINDSEY TO LET DOWN HER

12  GUARD TO TRUST HIM AND FEEL SAFE.  AND THAT'S WHAT LINDSEY

13  TOLD US.  HE TOLD LINDSEY THAT SHE WAS DIFFERENT THAN OTHER

14  WOMEN AND LINDSEY BELIEVED HIM.

15          THEY DISCUSSED ON THEIR FIRST DATE THE THREE RULES

16  OF DATING.  HIS DEFINITION OF DATING.  CLEARLY HE WOULDN'T

17  HAVE DISCUSSED IT WITH HER IF HE DIDN'T HAVE AN INTENTION TO

18  PURSUE DATING HER.  THAT FIRST NIGHT, WHICH WAS APRIL 21, HE

19  PROBABLY DID CROSS THE LINE, BASED UPON THE EVIDENCE THAT WE

20  HEARD, AND BASED UPON WHAT AN OBJECTIVE PERSON WOULD HAVE

21  FELT.  BUT SOMEONE WITH LINDSEY'S LOW SELF-ESTEEM DIDN'T SEE

22  IT THAT WAY.

23          WITHOUT HESITATION, LINDSEY ADMITTED UNDER OATH

24  THAT THE FIRST NIGHT WAS CONSENSUAL.  IN ORDER FOR LINDSEY TO

25  PROVE HER STRIPES TO TREVOR, SHE PUT UP WITH HIM STRANGLING

26  HER WITH HER OWN HAIR.  SHE PUT UP WITH HIM PUTTING HIS

27  FINGERS DOWN HER THROAT.  SHE PUT UP WITH ANAL SEX.  AND SHE

28  PUT UP WITH ROUGH SEX BECAUSE SHE THOUGHT THIS IS WHAT HE

1  LIKES, AND, THEREFORE, THIS IS WHAT SHE HAS TO DO.

2         SHE SWALLOWS THAT BITTER PILL -- SHE SWALLOWED THAT

3  BITTER PILL WHEN MOST WOMEN WOULD HAVE RUN FOR THE HILLS.  HE

4  NEVER EXPRESSED TO LINDSEY ANYTHING ABOUT HIS RULES OF ROUGH

5  SEX.  WHAT SHE WANTED.  WHAT HE LIKED.  NO EXPRESSED

6  DISCUSSION OF THOSE PERTINENT IMPORTANT FACTS.  EXCEPT TO SAY

7  THAT HE LIKES SEX ROUGHER THAN HER.  THAT IS NOT INFORMED

8  CONSENT.

9         INSTEAD OF LINDSEY GETTING ANGRY FOR ABUSING HER

10  WITHOUT HER EXPRESS CONSENT, SHE FELT EMBARRASSED.  YES, SHE

11  FELT EMBARRASSED FOR NOT BEING AS EXPERIENCED AS HE WAS IN

12  HAVING ROUGH SEX.  LIKE ALL OTHERS BEFORE HIM, TREVOR WAS NOT

13  EVIL.  HE WAS NOT ALL BAD.  AND NOBODY IS ALL BAD OR ALL

14  GOOD.  THERE WERE TIMES ON THAT FIRST OCCASION WHEN HE KISSED

15  HER LOVINGLY, STROKED HER HAIR, HER SKIN, CUDDLED HER,

16  WHISPERED SWEET AND SENTIMENTAL THINGS TO HER.

17         WE WILL NEVER KNOW, BECAUSE WE DIDN'T HEAR FROM

18  TREVOR, WHETHER OR NOT HE SAID THOSE THINGS AND DID THOSE

19  THINGS BECAUSE HE CARES.  OR WAS HE TRYING TO MANIPULATE HER

20  INTO BELIEVING THAT HE WAS SOMEONE THAT HE IS NOT?

21         IN ANY EVENT, IT DOESN'T MATTER WHAT HIS INTENTIONS

22  WERE.  WHAT MATTERS IS THE EFFECT ON LINDSEY.  AND THE EFFECT

23  WAS SHE THOUGHT HE THOUGHT SHE -- SHE THOUGHT HE THOUGHT SHE

24  WAS SPECIAL.  LINDSEY RUMINATED OVER THAT FIRST NIGHT AND

25  APPEARS TO BLAME HERSELF FOR NOT BEING GOOD ENOUGH.  SHE

26  PROMISED HERSELF THE NEXT TIME SHE WILL MAKE IT BETTER FOR

27  TREVOR.

28         LINDSEY DID REACH OUT TO HIM.  AND THEY BEGAN TO

1    SPEAK AGAIN THROUGH DM ON INSTAGRAM.  COUNSEL MADE A POINT OF

2    THAT IN HER EXAMINATION OF LINDSEY.  IT WAS LINDSEY WHO DID

3    REACH OUT AFTER THE FIRST TIME.  I THINK THE EVIDENCE SHOWS

4    IT WAS A COUPLE OF DAYS LATER.

5            THEIR MESSAGES BETWEEN THEM AT THAT POINT ARE A

6    MIXTURE OF FLIRTATIONS, LOTS OF SEXUAL INNUENDO, AND DOUBLE

7    ENTENDRES, AND BASICALLY DOWN AND DIRTY SEXTING.  LINDSEY

8    TESTIFIED SHE DID IT BECAUSE SHE WANTED HIM TO KNOW SHE WAS

9    INTO IT.  SHE COULD HANG WITH THE BIG BOYS.  AND I'M

10   PARAPHRASING WHAT SHE SAID.

11           AS TOM HANKS SAID IN THE VERY FAMOUS MOVIE, A

12   LEAGUE OF THEIR OWN, "THERE IS NO CRYING IN BASEBALL."  AND

13   IT APPEARS THAT THAT'S WHAT LINDSEY WANTED TO SHOW TREVOR.

14   TREVOR HAS ACCUSED LINDSEY OF ASKING FOR IT.  THERE WAS A

15   QUESTION POSED TO LINDSEY ON CROSS EXAMINATION, DIDN'T SHE

16   GET ON TOP OF TREVOR FIRST?  SHE DENIED IT.

17           WE NEVER HEARD FROM TREVOR.  SO WE DON'T KNOW WHAT

18   HIS VERSION IS.  HOWEVER, THE BOTTOM-LINE IS TREVOR'S

19   POSITION IS THAT LINDSEY, 27-YEAR-OLD DAMAGED LINDSEY, WAS

20   THE AGGRESSOR WHO DUPED TREVOR BAUER AND SHE GOT WHAT SHE

21   DESERVED.  I DON'T UNDERSTAND IN THE YEAR 2021 HOW ANYONE CAN

22   MAKE THOSE KIND OF STATEMENTS AND USE THAT AS A DEFENSE WITH

23   A STRAIGHT FACE.

24           AFTER ME TOO AND ALL THE SCANDALS WHERE THERE WAS A

25   CLEAR IMBALANCE OF POWER BETWEEN CERTAIN MEN AND WOMEN, HOW

26   IS IT SOMEONE CAN BLAME A WOMAN IN LINDSEY'S SHOES?  DOES

27   ANYONE IN THIS ROOM REALLY THINK THAT LINDSEY TOOK ADVANTAGE

28   OF TREVOR AND TOOK HIM FOR A RIDE, THAT SHE PLAYED HIM?

1  ISN'T BLAMING THE VICTIM OLD NEWS FROM MANY PEOPLE'S WORN OUT

2  AND OUTDATED PLAYBOOKS?

3         AFTER THE INCIDENT -- OR AFTER THE DATE ON APRIL

4  21, LINDSEY IS REELED IN AGAIN BY TREVOR BY HIS MIXTURE OF

5  CHARM, FALSE PROMISE, AND THE HOPE THAT SHE IS DIFFERENT.  IN

6  THE TEXT MESSAGES WE SEE BETWEEN THEM, HE NOW REFERS TO HER

7  AS "LINDS," "MAMI," AND SENDS HER LOTS OF HEART EMOJIS.

8         HE INITIATES DM.  AND THEN TEXT MESSAGES AT SOME

9  POINT TO HER IN WHICH HE SAYS HE IS THINKING OF HER.  HE SAYS

10  HE WANTS TO SEE HER AGAIN.  HE TAKES HER PHONE NUMBER.  THEY

11  CONTINUE TO DEVELOP AN EMOTIONAL CONNECTION.

12         THERE IS NO DOUBT THERE IS PROMISE AND EXPECTATION

13  OF FUTURE AFFECTION AND MORE.  AND THEN WE COME TO MAY 15,

14  2021, THE NIGHT OF THE ASSAULT.  IN HER HEART OF HEARTS,

15  LINDSEY MUST HAVE KNOWN THAT WHAT SHE WAS DOING THAT NIGHT

16  WAS WRONG, THAT SHE SHOULD NOT HAVE GONE TO TREVOR'S AFTER

17  WHAT HAPPENED THE FIRST NIGHT.  EVEN THOUGH LINDSEY WAS SOBER

18  AND NOT CONSUMING ALCOHOL, SHE WAS GOING DOWN A DANGEROUS

19  PATH.  SHE WAS EXHIBITING BEHAVIOR THAT SHE SHOULD NOT BE

20  DOING.

21         SHE LIED TO HER FRIENDS ABOUT SEEING TREVOR, BUT

22  YET SOMETHING PROPELLED HER TO GO TO HIS HOUSE AGAIN ON THAT

23  NIGHT.  MAYBE IT WAS HER HOPE THAT IT WOULD BE DIFFERENT THAT

24  NIGHT, THAT TREVOR WAS DEVELOPING REAL FEELINGS FOR HER

25  BECAUSE THEY WERE KINDRED SOULS AND BOTH BROKEN IN THEIR OWN

26  WAYS.  OR MAYBE BECAUSE SHE FELT THAT TREVOR AND WHAT HE DID

27  TO HER IS ALL SHE DESERVES AS A HUMAN BEING.

28         IN THE END, IT DOESN'T MATTER.  BECAUSE NO MATTER

```
1    WHAT LINDSEY'S INTENTIONS WERE, TREVOR HAD ABSOLUTELY NO
2    RIGHT TO ASSAULT AND ATTACK HER ON THAT NIGHT.  TO TREAT HER
3    LIKE, IN HER OWN WORDS, SHE WASN'T HUMAN ANYMORE.  SHE WASN'T
4    A HUMAN BEING.
5              WHEN LINDSEY ON DIRECT DESCRIBED WHAT HAPPENED THAT
6    NIGHT, THE WAY IN WHICH SHE TESTIFIED WAS VERY AUTHENTIC AND
7    VERY COMPELLING.  IF NOT, LINDSEY DESERVES AN ACADEMY AWARD
8    BECAUSE WHAT SHE SAID WAS HEARTFELT AND SINCERE AND PAIN FROM
9    DEEP WITHIN HER SOUL.  LINDSEY TESTIFIED THAT SHE FELT HER
10   SOUL HAD LEFT HER BODY.  SHE WAS SEVERELY DISORIENTED,
11   NAUSEATED, STRUGGLING TO BREATHE, HAD SEARING PAIN BEHIND HER
12   EARS, HER HEAD, AND AROUND HER VAGINAL AREA.
13             WHEN TREVOR PUNCHED HER IN THE VAGINA, HER BODY WAS
14   JERKED INTO THE AIR.  NOW, TREVOR'S EXPERT TESTIFIED THAT HER
15   INJURIES WERE NOT CONSISTENT WITH LINDSEY'S DESCRIPTION OF
16   WHAT HAPPENED.  SHE OFFERED ALL KINDS OF REALLY SILLY EXCUSES
17   THAT WERE NOT BASED ON MEDICAL REALITY.  WELL, SOMETIMES WHEN
18   THIN PEOPLE HAVE SEX, THEY GET BRUISED.  THAT'S A SILLY
19   COMMENT.  AND THERE WERE NO RESEARCH OR STUDIES TO SHOW THAT.
20             SHE TESTIFIED THAT LINDSEY'S INJURIES WERE NOT
21   CONSISTENT WITH LINDSEY'S DESCRIPTION OF WHAT HAPPENED.  BUT
22   HOW DOES SHE KNOW THAT?  REALLY WHAT SHE DOES IS SHE DISSECTS
23   BODIES FOR A LIVING, NOT HUMAN BEINGS.  SHE ALSO DIDN'T
24   EXPERIENCE WHAT LINDSEY EXPERIENCED THAT NIGHT.
25             DOES ANYONE BELIEVE THAT LINDSEY'S INJURIES WERE
26   SELF-INFLICTED BECAUSE IN THE PAST SHE MAY HAVE HAD
27   SELF-INJURIOUS BEHAVIOR?  AS WAS IMPLIED WHEN NURSE VALENCIA
28   WAS CROSS EXAMINED.  OR SOMEHOW WAS EXACERBATED BY HER USE OF
```

533

```
 1   IBUPROFEN OR OTHER MEDICATIONS?  ALSO, ANOTHER LUDICROUS
 2   IMPLICATION.
 3            OR PERHAPS SHE SOMEHOW DOCTORED PHOTOS AND MADE HER
 4   INJURIES LOOK WORSE BECAUSE HER PHOTOS WERE RED AND OTHERS
 5   HAD A WHITER BACKGROUND.  WELL, APPARENTLY THEY DROPPED THAT
 6   DEFENSE BECAUSE WE NEVER HEARD FROM THE EXPERT THAT THEY
 7   INTENDED TO CALL.  THE ONLY PERSON THAT WE HEARD FROM ABOUT
 8   WHAT HAPPENED ON THE NIGHT OF MAY 15 WAS LINDSEY, BECAUSE WE
 9   DIDN'T HEAR TREVOR'S VERSION OF WHAT HAPPENED.
10            LINDSEY WAS CREDIBLE, AS I INDICATED, ABOUT --
11   TESTIFYING ABOUT THE ASSAULT.  HER DEMEANOR, WHICH THE COURT
12   IS ENTITLED TO TAKE INTO ACCOUNT, WAS CONSISTENT WITH A
13   DISTRAUGHT WOMAN WHO HAD SUFFERED AT THE HANDS OF HER
14   ATTACKER.  NURSE VALENCIA, SOMEONE WHO HAS NO SKIN IN THE
15   GAME OR DOG IN THE FIGHT, TESTIFIED IT WAS THE WORSE BRUISING
16   SHE HAD EVER SEEN.
17            IN CONTRAST, WE HAVE NO IDEA ABOUT TREVOR'S VERSION
18   OF THAT NIGHT.  BASED UPON THE EVIDENCE THAT THE COURT HAS
19   HEARD FROM LINDSEY AND OTHERS, THE EVIDENCE HAS SHOWN THAT
20   LINDSEY WAS PHYSICALLY AND SEXUALLY ASSAULTED BY TREVOR
21   BAUER, THAT THIS WAS NOT CONSENSUAL ROUGH SEX BETWEEN TWO
22   CONSENTING ADULTS.  A PERSON IN HER RIGHT MIND WOULD NEVER
23   HAVE CONSENTED TO WHAT TREVOR HAD DONE TO HER.
24            ALSO, AS A SIDE NOTE, WE WENT DOWN A WHOLE
25   DIVERSION OF INANE TEXTING THAT LINDSEY DID WITH FRIENDS AND
26   FAMILY.  AND COUNSEL'S QUIP TO THE COURT, WELL, I'M GLAD
27   LINDSEY WROTE THESE COMMENTS OR THESE TEXT MESSAGES, BECAUSE
28   I GET TO SAY -- I GET TO DROP THE "F" BOMB IN COURT.  WELL,
```

```
 1   THE FACT THAT SHE ENGAGED IN THAT KIND OF TEXTING WITH HER
 2   FRIENDS AND FAMILY, NUMBER ONE, SHE NEVER THOUGHT THEY WOULD
 3   HIT THE LIGHT OF DAY.  THEY WERE CONFIDENTIAL AND PRIVATE
 4   COMMUNICATIONS.  AND, NUMBER TWO, AND MOST IMPORTANTLY, THEY
 5   DO NOT NEGATE THE TRUTH.  THEY DON'T NEGATE THE FACT THAT
 6   THEY HAD A, QUOTE, "DATING RELATIONSHIP" AS DEFINED BY THE
 7   FAMILY CODE.
 8            NOR DOES IT NEGATE THE FACT THAT HE SEXUALLY
 9   ASSAULTED HER.  SO NO MATTER WHAT COUNSEL IS GOING TO ARGUE,
10   AND NO MATTER HOW DISGUSTING THE WORDS WERE OR THE COMMENTS
11   THAT SHE MADE TO HER FRIENDS WERE, IT DOESN'T CHANGE THE
12   ULTIMATE FACTS IN THIS CASE.  ACTIONS SPEAK LOUDER THAN
13   WORDS.  AND THE ACTIONS OF LINDSEY AND THE ACTIONS OF TREVOR
14   THAT ARE BEFORE THIS COURT AS EVIDENCE IS ALL THE COURT
15   REALLY NEEDS TO KNOW IN ORDER TO MAKE ITS DETERMINATION.
16            AS I STATED IN MY OPENING, A PERSON WHO IS
17   UNCONSCIOUS CANNOT GIVE CONSENT.  AND MORE IMPORTANTLY, EVEN
18   IF GIVEN BEFOREHAND, CANNOT BE WITHDRAWN BECAUSE THEY'RE
19   UNCONSCIOUS.  THERE IS NO DOUBT THAT SEX WHEN SOMEONE IS
20   UNCONSCIOUS IS NOT CONSENSUAL -- IS NOT CONSENSUAL.  AND EVEN
21   IF A PERSON CANNOT CONSENT, AND EVEN IF IT WAS, A PERSON
22   CANNOT CONSENT TO BEING ASSAULTED.
23            I CITED THE CASE OF PEOPLE VS. SAMUEL.  IN MY
24   CLOSING, I WILL CITE THE CASE OF PEOPLE VS. MIRANDA, WHICH IS
25   A 2021 CASE AT 62 CAL.APP.5TH 162.  THE COURT ADDRESSED
26   SEXUAL CRIMES THAT INVOLVED AN ACT OF TOUCHING WHEN THE
27   VICTIM WAS UNCONSCIOUS.  THE COURT STATED THAT, QUOTE,
28   "FORMER SECTION 288A(F), NOW SECTION 287, CRIMINALIZES ORAL
```

COPULATION WHEN A, QUOTE, 'VICTIM' IS AT THE TIME UNCONSCIOUS

OF THE NATURE OF THE ACT AND THE PERPETRATOR IS AWARE OF THE

UNCONSCIOUSNESS."  SECTION 261(A)(4) DEFINES RAPE TO MEAN

SEXUAL INTERCOURSE UNDER THE SAME CIRCUMSTANCES.  AND SECTION

289(B) CRIMINALIZES SEXUAL PENETRATION UNDER THESE

CIRCUMSTANCES AS WELL.

THE COURT IN PEOPLE VS. MIRANDA EXPLAINED THAT,

QUOTE, "ORAL COPULATION OF AN UNCONSCIOUS PERSON REQUIRES

THAT THE VICTIM BE, QUOTE, 'UNCONSCIOUS' OF THE NATURE OF THE

ACT," END QUOTE.  THIS MEANS THAT THE VICTIM MUST BE

INCAPABLE OF RESISTING BECAUSE HE OR SHE WAS UNCONSCIOUS OR

ASLEEP, OR WAS NOT AWARE, KNOWING, PERCEIVING, OR COGNIZANT

THAT THE ACT OCCURRED, AMONG OTHERS.

THE COURT FURTHER STATED IT IS SETTLED THAT A

VICTIM NEED NOT BE TOTALLY PHYSICALLY UNCONSCIOUS.  MOREOVER,

THE COURT NOTED THAT ADVANCE CONSENT, WHEN A PERSON CONSENTS

IN ADVANCE TO BEING SEXUALLY VIOLATED WHILE UNCONSCIOUS,

WOULD STILL BE A BATTERY.  CONSENT OF THE VICTIM IS NOT

GENERALLY A DEFENSE TO ASSAULT OR BATTERY, EXCEPT IN A

SITUATION INVOLVING ORDINARY PHYSICAL CONDUCT OR BLOWS

INCIDENT TO SPORTS, SUCH AS FOOTBALL, BOXING, OR WRESTLING.

UNDER CALIFORNIA LAW, ADVANCE CONSENT TO RAPE DOES

NOT CONSTITUTE VALID LEGAL CONSENT, BECAUSE SUCH AN ADVANCE

DECISION ELIMINATES THE VICTIM'S ABILITY TO WITHDRAW FROM THE

SEXUAL ACTIVITY WHILE IT OCCURS.  AND THE COURT IN PEOPLE VS.

MIRANDA CITED A CASE BY THE NAME OF PEOPLE VS. DANCY, WHICH

IS A 2002 CASE AT 102 CAL.APP.4TH 21.

NOW, NOTABLY, MR. BAUER DOES NOT DENY THAT THE

1  CONDUCT, OR WHAT WE CALL ABUSE, TOOK PLACE.  THROUGHOUT ALL

2  THE WRITTEN COMMUNICATION, THE DIRECT MESSAGES, THE TEXTS, OR

3  THE VOICEMAIL MESSAGES THAT MR. BAUER LEFT HER, WHICH IS

4  EXHIBIT 5, DOES HE EVER DENY COMMITTING THE HEINOUS ACTS THAT

5  HE INFLICTED UPON LINDSEY ON THE NIGHT OF MAY 15.

6          HE RATIONALIZES HIS BEHAVIOR BY CLAIMING THAT

7  LINDSEY AGREED TO ENGAGE IN ROUGH SEX NOT ONLY THE FIRST

8  TIME, BUT THE SECOND TIME AS WELL.  HE THOUGHT IT WAS FINE TO

9  STRANGLE LINDSEY WITH HER OWN HAIR UNTIL THE POINT OF

10  UNCONSCIOUSNESS NOT ONCE, BUT TWO TIMES.  PUNCH HER IN THE

11  JAW WITH A CLOSED FIST CAUSING HER LIP TO BE SPLIT OPEN.

12  PUNCHING HER IN THE CHEEK AND IN HER HEAD.

13          SCRATCHING THE SIDE OF HER FACE.  THAT WAS NOT

14  ACNE.  PUNCHING HER IN THE BUTTOCKS.  AND BRUTALLY PUNCHING

15  HER IN THE VAGINA NUMEROUS TIMES CAUSING DARK PURPLE AND BLUE

16  BRUISING ON THE INSIDE AND OUTSIDE AREAS OF HER VAGINA.  I

17  WOULD ASK THE COURT TO LOOK CAREFULLY AT THE SART PHOTOGRAPHS

18  OF HER VAGINA DEPICTING THE BRUISING.  THAT IS NOT FROM

19  SKINNY PEOPLE HAVING SEX.

20          DESPITE MS. HILL'S TESTIMONY EXPLAINING HOW SHE

21  AWOKE EXTREMELY DISORIENTED -- DISORIENTATED, THEN WAS UNABLE

22  TO SPEAK OR MOVE HER BODY, TREVOR CONTINUED TO TRY TO HAVE

23  SEX WITH LINDSEY.  LINDSEY TOLD HIM SHE NEEDED A MOMENT, BUT

24  HE CONTINUED TO TRY TO REINSTITUTE SEX.

25          IN FACT, NOT ONLY DID TREVOR NOT DENY THAT THE

26  ABUSE TOOK PLACE, HE ADMITTED IT.  HE ADMITTED TO LINDSEY

27  THAT HE HIT HER ON THE BUTT AFTER THE SECOND INCIDENT ON MAY

28  15.  SHE TESTIFIED TO THAT.  AND LINDSEY TESTIFIED THAT

1     DURING THE COLD CALL THAT WAS RECORDED BY THE POLICE, HE ALSO

2     ADMITTED TO HITTING HER IN THE BUTT DURING THAT PHONE CALL.

3     AND THERE IS NO EVIDENCE TO CONTRADICT THAT.

4           I'D LIKE TO GO OVER FOR A SECOND THE QUANTITY OF

5     THE COMMUNICATIONS BETWEEN THE PARTIES, WHICH WE BELIEVE

6     FORMED PART OF THE BASIS FOR THE DATING RELATIONSHIP AS

7     DEFINED BY THE FAMILY CODE.  INTERESTINGLY, LINDSEY AND

8     TREVOR EXCHANGED A MINIMUM OF APPROXIMATELY 180 INSTAGRAM

9     DIRECT MESSAGES; WHEREAS, THE COURT CAN SEE IN EXHIBIT 2 THEY

10    DISCUSSED INTIMATE DETAILS ABOUT THEIR FAMILIES, THEIR

11    PERSONAL INTERESTS, CONSPIRACY THEORIES, HIS PROFESSIONAL

12    CAREER, AND LINDSEY'S SOBRIETY.

13          COUNSEL TRIED TO IMPLY THAT TREVOR TALKS TO PEOPLE

14    ALL THE TIME ABOUT THE FACT THAT HE WAS AGGRESSIVELY BULLIED

15    AT THE TIME.  AND WASN'T THAT, IN FACT, IN AN ARTICLE ABOUT

16    HIM THAT YOU HAD READ, WAS THE QUESTION POSED TO LINDSEY.  HE

17    WENT MUCH DEEPER THAN THAT.  AND I DON'T NEED TO BORE THE

18    COURT WITH ALL THE DETAILS ABOUT WHAT THEY DISCUSSED.  BUT IT

19    WASN'T JUST A CASUAL CONVERSATION OVER A CUP OF COFFEE AT

20    STARBUCKS.  TREVOR GAVE -- STRIKE THAT.

21          LINDSEY GAVE TREVOR HER CELL PHONE NUMBER ON MAY 8,

22    2021, WHEN THEY EXCHANGED APPROXIMATELY 163 TEXT MESSAGES,

23    INCLUDING SEVERAL PHOTOGRAPHS OF LINDSEY -- AND THIS IS ON A

24    GIF IMAGE OR FORMAT, WHICH I HAVE NO IDEA WHAT THAT MEANS.

25    BUT I WILL LET THE COURT KNOW THAT.  THEY EXCHANGED NUMEROUS

26    HEART EMOJIS, AT LEAST 12, AND KISSING FACE EMOJIS AT LEAST

27    30 TIMES.

28          LINDSEY TESTIFIED THAT ON AUGUST 29 BEFORE SHE MET

1    HIM IN PERSON FOR THE FIRST TIME, SHE WAS NERVOUS AND EXCITED

2    FOR THE TIME THAT SHE WAS GOING TO SPEND WITH TREVOR.  AND,

3    IN FACT, HAD POSSIBLY PLANNED ON SPENDING THE NIGHT THERE.

4    THAT IS BEHAVIOR THAT IS CONSISTENT WITH SEEING SOMEONE

5    BEFORE A FIRST DATE.

6             FROM APRIL 21 THROUGH MAY 15 THE PARTIES CONTINUED

7    COMMUNICATING FREQUENTLY THROUGH SOCIAL MEDIA AND TEXT

8    MESSAGING DESPITE THE FACT THAT TREVOR WAS NOT EVEN IN

9    LOS ANGELES.  DURING THAT PERIOD, THEY EXCHANGED

10   APPROXIMATELY 29 INSTAGRAM MESSAGES AND 99 TEXT MESSAGES.

11   AND THIS IS DURING A THREE WEEK TIME FRAME.

12            ON MAY 15, 2021, WE KNOW THAT TREVOR INVITED

13   LINDSEY TO HIS HOUSE AGAIN.  HE TOOK A SNAPCHAT PHOTO OF

14   LINDSEY.  SHOWED HER HOW TO SAVE IT, WHICH LINDSEY COMMENTED

15   UPON IN HER TESTIMONY THAT SHE FELT IT VIOLATED HIS VERY OWN

16   RULES OF DATING.  AND THAT SPECIFICALLY REFERRED TO THE ONE

17   ABOUT SOCIAL MEDIA AND NOT BEING ON SOCIAL MEDIA WITH HIM

18   WHEN THEY WERE DATING.

19            INTERESTINGLY, IT WAS TREVOR THAT FIRST -- THAT

20   FIRST GAVE THAT EXHIBIT TO THE COURT.  BUT THAT EXHIBIT --

21   THAT PHOTOGRAPH SUPPORTS OUR CASE, THAT IS, THAT THEY DID

22   HAVE A RELATIONSHIP.  MAYBE NOT THE RELATIONSHIP THAT I WOULD

23   WANT TO HAVE OR THAT I WOULD WANT MY CHILDREN OR

24   GRANDCHILDREN TO HAVE, BUT THAT WAS THE UNIQUENESS OF THEIR

25   RELATIONSHIP.

26            IN FACT, WHEN WE TALK ABOUT WHAT THEY SPOKE ABOUT

27   ON THAT SECOND OCCASION, THEY SPOKE -- TREVOR TOLD HER THE

28   STORY ABOUT HIS GIRLFRIEND AT UCLA WHO WAS A BASEBALL

1  PLAYER -- OR SOFTBALL PLAYER -- I APOLOGIZE -- WHO LEFT HIM

2  FOR ANOTHER WOMAN AND HOW DISTURBING THAT WAS TO HIM.

3  THERE'S NO EVIDENCE THAT HE REGULARLY GIVES INTERVIEWS WHERE

4  HE DISCLOSES OR REVEALS SUCH PRIVATE DETAILS OF HIS PERSONAL

5  LIFE.

6       HE ALSO TOLD LINDSEY THE STORY ABOUT HOW HE BROKE

7  THIS WOMAN'S NOSE.  AND, AGAIN, THERE'S NO EVIDENCE THAT HE

8  WALKS AROUND TALKING TO INTERVIEWERS OR ESPN ABOUT THOSE KIND

9  OF THINGS.  GOING BACK TO THE QUANTITY OF CONTACT AFTER THE

10 MAY 15 ASSAULT, TREVOR CALLED LINDSEY AT LEAST TWO TIMES TO

11 CHECK IN ON HER.  ON ONE OF THE TELEPHONE CONVERSATIONS THAT

12 TOOK PLACE WHILE LINDSEY WAS IN THE HOSPITAL, HE LEFT HER A

13 VOICEMAIL MESSAGE CHECKING IN ON HER AND ASKING HER TO CALL

14 HIM BACK.

15      AFTER MAY 15, TREVOR SENT LINDSEY APPROXIMATELY --

16 STRIKE THAT.  AFTER MAY 15, TREVOR TEXTED LINDSEY ON A DAILY

17 BASIS.  AND YOU CAN LOOK AT EXHIBIT 2 AND YOU CAN SEE DAY

18 AFTER DAY AFTER DAY HE IS REACHING OUT TO SEE HOW LINDSEY IS

19 DOING.  IF THIS IS NOT EVIDENCE OF THE EXISTENCE OF A

20 RELATIONSHIP, THEN I DON'T KNOW WHAT IS.

21      HE SAYS THINGS LIKE, "WORRIED ABOUT YOU LINDS.

22 THINKING OF YOU LINDS.  I NEVER WANT TO SEE YOU HURTING.

23 CHECKING ON YOU.  WHEN WILL THE INJURIES GO AWAY?  WISH I

24 COULD HOLD YOU."  TREVOR ALSO OFFERED TO SEND LINDSEY

25 GROCERIES AND DESSERT TO COMFORT HER.  AS IF FOOD COULD

26 COMFORT HER AT THAT TIME.

27      DURING THE COLD CALL, HE TOLD LINDSEY HE WANTED TO

28 SEE HER AGAIN.  HE TOLD LINDSEY THAT THINGS WOULD BE BETTER

1    NEXT TIME.  THE VOLUMINOUS DIRECT MESSAGES, TEXT MESSAGES,

2    ARE THE WAY IN WHICH INDIVIDUALS COMMUNICATE IN TODAY'S

3    WORLD.  WE KNOW FROM SEEING OUR CHILDREN AND GRANDCHILDREN,

4    AND EVEN THE PEOPLE AROUND US IN THE COURTROOM, PEOPLE ARE

5    CONSTANTLY ON THEIR PHONES.

6           THAT'S HOW WE CONNECT WITH PEOPLE TODAY.  AND WE'RE

7    NOT DISCUSSING TRIVIAL THINGS.  WE'RE DISCUSSING PERSONAL

8    THINGS BY TEXT, BY EMAIL, BY INSTAGRAM.  ALL THOSE METHODS.

9    THIS IS THE 21ST CENTURY.

10          IT DOESN'T MATTER, AS I SAID BEFORE, WHAT LINDSEY

11   SAID IN PRIVATE TEXT MESSAGES WITH HER COUSIN AND HER

12   FRIENDS.  THOSE TEXT MESSAGES WERE INTRODUCED TO TRY TO SHOW

13   THAT LINDSEY WAS NOT INTERESTED IN HAVING A RELATIONSHIP WITH

14   TREVOR BUT WAS PLOTTING TO GET IN HIS HEAD, DESTROY HIS

15   CAREER, AND GET MONEY FROM HIM.

16          HOW SAD.  WHEN LINDSEY TESTIFIED ABOUT WHAT

17   HAPPENED AFTER THE ASSAULT, FOR ME CEMENTED TO ME SOMETHING

18   THAT I ALWAYS INTUITIVELY KNEW.  THIS WAS A MODERN DAY DATING

19   RELATIONSHIP.  MAYBE NOT THE WAY THE REST OF US UNDERSTAND

20   IT, BUT IT WAS THE WAY IN WHICH TREVOR ROLLS.  NO EMOTIONS.

21   NO SOCIAL MEDIA.  AND HE IS NOT MONOGAMOUS AND WILL SLEEP

22   WITH OTHERS.  THOSE ARE TREVOR'S OWN RULES OF DATING FROM HIS

23   OWN MOUTH.

24          FOR WHATEVER REASON, LINDSEY WENT ALONG WITH IT.

25   WHEN TREVOR REALIZED THAT LINDSEY WAS HOSPITALIZED, HE

26   REPEATEDLY CALLED AND TEXTED HER, AS I JUST STATED.  WE WILL

27   NEVER KNOW THE REASON WHY HE WAS DOING THIS.  WERE HIS

28   FEELINGS FOR HER GENUINE AND HE HAD FELT BADLY ABOUT WHAT HE

1    DID?  OR WAS HE FEIGNING CONCERN BECAUSE HE WAS AFRAID

2    LINDSEY WAS GOING TO SPEAK TO THE AUTHORITIES AND HE WAS

3    GOING TO BE CAUGHT?

4         YOUR HONOR, WITH RESPECT TO THE LAW ON DOMESTIC

5    VIOLENCE, AS THE COURT IS AWARE, ONE OF THE SEMINAL CASES,

6    MARRIAGE OF NADKARNI, WHICH IS A 2009 CASE, AT 173

7    CAL.APP.4TH 1483, STATES THAT "THE TRIAL COURT IS AUTHORIZED

8    TO ISSUE A RESTRAINING ORDER FOR THE PURPOSE OF PREVENTING A

9    RECURRENCE OF DOMESTIC VIOLENCE AND ENSURING A PERIOD OF

10   SEPARATION OF THE PERSONS INVOLVED IF AN AFFIDAVIT SHOWS TO

11   THE SATISFACTION OF THE COURT REASONABLE PROOF OF A PAST ACT

12   OR ACTS OF ABUSE.  THIS STATUTE SHOULD BE BROADLY CONSTRUED

13   IN ORDER TO ACCOMPLISH ITS PURPOSE OF PREVENTING ACTS OF

14   DOMESTIC VIOLENCE."

15        AND THAT'S THE RECENT CASE OF MARRIAGE OF F.M. AND

16   M.M., WHICH IS A 2021 CASE, AT 65 CAL.APP.5TH 106.  "UNDER

17   THE D.V.P.A., THE FOCUS IS PLACED ON A FINDING OF REASONABLE

18   PROOF OF A PAST ACT OR ACTS OF ABUSE."  AND THAT'S FAMILY

19   CODE 6300.  I DON'T THINK THAT THERE IS ANY DOUBT THAT THERE

20   WAS SEXUAL ASSAULT COMMITTED BY TREVOR UPON LINDSEY AS

21   DEFINED BY THE D.V.P.A.

22        I'D LIKE TO SPEND A FEW MINUTES GOING THROUGH THE

23   LEGISLATIVE HISTORY AND THE D.V.P.A. AND HOW IT HAS CHANGED

24   ITS DEFINITION OF WHAT CONSTITUTES A DATING RELATIONSHIP OVER

25   TIME.  LIKELY BECAUSE IT NEEDED TO KEEP UP WITH MODERN TIMES.

26   THE D.V.P.A. EXTENDED PROTECTIONS TO PERSONS IN A DATING

27   RELATIONSHIP TO PROVIDE A REMEDY FOR VICTIMS OF DOMESTIC

28   VIOLENCE.  AS NOTED IN THE CASE OF PEOPLE VS. HOOVER, WHICH

1    IS A 2000 CASE, AT 77 CAL.APP.4TH 1020.  THERE IS A GREAT

2    LIKELIHOOD THAT ANYONE -- THAT ONE BATTERING EPISODE IS PART

3    OF A LARGER SCHEME OF DOMINANCE AND CONTROL.  THAT SCHEME

4    USUALLY ESCALATES IN FREQUENCY AND SEVERITY.

5          THE D.V.P.A. WAS ORIGINALLY ENACTED IN 1979.  AND

6    AT THAT TIME, WHEN INITIALLY ENACTED, PROVIDED PROTECTION

7    UNDER THE FAMILY LAW ACT.  HOWEVER, IT WAS INEFFECTIVE IN

8    DEALING WITH ALL SITUATIONS.  AND THERE WAS A CASE BY THE

9    NAME OF ORIOLA, ORIOLA VS. THALER, WHICH IS A 2000 CASE, AT

10   84 CAL.APP.4TH 397.  AND BECAUSE THAT CASE SO NARROWLY

11   CONSTRUED THE DEFINITION OF A DATING RELATIONSHIP, THE

12   LEGISLATURE TOOK IMMEDIATE ACTION AND CHANGED THE DEFINITION.

13   AND THAT WAS IN 1990.  THE STATUTE WAS AMENDED TO INCLUDE THE

14   PRESENT LANGUAGE OF, QUOTE, "DATING OR ENGAGEMENT

15   RELATIONSHIP" LANGUAGE.

16          AND THE INTENT BEHIND THE EXPANSION OF THE LANGUAGE

17   WAS INTENDED TO PROVIDE MORE PROTECTIONS TO A BROADER CLASS

18   OF VICTIMS OF DOMESTIC VIOLENCE, WHICH IS THE SITUATION IN

19   THIS CASE.  AND I'D LIKE TO CITE THE COURT TO A FEW RELEVANT

20   CASES ON THE COURT'S INTERPRETATION OF THE DEFINITION OF

21   DATING RELATIONSHIP, WHICH IS NOW PART OF OUR STATUTE.

22          THERE IS A CASE CALLED PEOPLE VS. RUCKER.  THAT'S A

23   2005 CASE, AT 126 CAL.APP.4TH 1107 -- IN WHICH THE COURT HELD

24   THAT THE DATING -- OR STATED "THE DEFINITION OF A DATING

25   RELATIONSHIP ADOPTED BY THE LEGISLATURE DOES NOT REQUIRE,

26   QUOTE, SERIOUS COURTSHIP, OR AN INCREASINGLY EXCLUSIVE

27   INTEREST, SHARED EXPECTATION OF GROWTH, OR THAT THE

28   RELATIONSHIP ENDURES FOR A LENGTH OF TIME."

1    THE COURT STATED THAT THE STATUTORY DEFINITION

2  REQUIRES, QUOTE, "FREQUENT, INTIMATE ASSOCIATIONS," A

3  DEFINITION THAT DOES NOT PRECLUDE A NEW DATING RELATIONSHIP,

4  WHICH THIS ONE WAS.  THE APPELLATE COURT FOUND THAT THE

5  LEGISLATURE WAS ENTITLED TO CONCLUDE THAT DOMESTIC VIOLENCE

6  STATUTES SHOULD APPLY TO A RANGE OF DATING RELATIONSHIPS.

7  THE COURT FURTHER STATED THE LEGISLATURE COULD REASONABLY

8  CONCLUDE DATING RELATIONSHIPS, EVEN WHEN NEW, HAVE UNIQUE

9  EMOTIONAL AND PRIVACY ASPECTS THAT DO NOT EXIST IN ANY OTHER

10  SOCIAL OR BUSINESS RELATIONSHIPS.  AND THOSE ASPECTS MAY LEAD

11  TO DOMESTIC VIOLENCE EARLY IN A RELATIONSHIP.

12    NOW, BEFORE I GO ON TO PHILLIPS VS. CAMPBELL, I

13  WANT TO INTERJECT WHEN I WAS DRIVING TO COURT THIS MORNING

14  AND I WAS SPEAKING WITH MY BRILLIANT PARTNER, MS. OLSON, I

15  ANALOGIZED THE EXPANSION OF THE INTERPRETATION OF WHAT

16  CONSTITUTES A DATING RELATIONSHIP FOR PROTECTION UNDER THE

17  D.V.P.A. TO THE DIFFERENT KINDS OF RELATIONSHIPS THAT WE SEE

18  IN THE FAMILY LAW COURT.  AND WHEN I FIRST STARTED, SOMEBODY

19  NON-BIOLOGICALLY OR NOT RELATED BY MARRIAGE TO SOMEBODY COULD

20  RAISE A CHILD FROM BIRTH, AND THEN WHEN THEY SPLIT UP WITH

21  THEIR PARTNER, BECAUSE THEY HAD NO LEGAL RELATIONSHIP WITH

22  THAT CHILD, THEY COULD BE BANISHED FROM THAT CHILD'S LIFE.

23    AND BACK IN 1982 WHEN I WOULD TRY THOSE KIND OF

24  CASES, I WOULD THINK HOW SAD THAT SOMEBODY -- FOR BOTH THE

25  CHILD AND THE PARENTS THAT THEY HAD COME TO KNOW -- THAT THEY

26  COULD NO LONGER HAVE A RELATIONSHIP BECAUSE THEIR PARENTS HAD

27  SPLIT UP.  WELL, THE LAW HAS CHANGED GREATLY SINCE 1982, AS

28  WE KNOW.  NOW, THERE'S ALL KINDS OF RELATIONSHIPS THAT ARE

1   PROTECTED UNDER THE FAMILY CODE.  IT JUST DOESN'T HAVE TO BE

2   A HETEROSEXUAL RELATIONSHIP.  IT CAN BE A SAME SEX

3   RELATIONSHIP.

4        IT COULD BE SOMEBODY WHERE THERE'S NOT EVEN A

5   SEXUAL RELATIONSHIP WHO RAISES THE CHILD ALONG WITH THAT

6   CHILD'S PARENT.  IT COULD BE THREE PEOPLE INVOLVED SOMEHOW IN

7   A RELATIONSHIP.  AND I THINK THAT'S EXACTLY WHAT HAPPENED

8   WITH THE DEFINITION OF A DATING RELATIONSHIP.  THE OLD

9   DEFINITION DOESN'T APPLY TO OUR MODERN DAY, WHICH LEADS ME TO

10  THE CASE OF PHILLIPS VS. CAMPBELL.

11       AND THAT'S A 2016 CASE AT 2 CAL.APP.5TH 844.  AND I

12  DON'T LIKE TO READ A BUNCH OF LAW.  I FIND IT BORING.  BUT I

13  FOUND THIS CASE VERY INTERESTING, BECAUSE IN THIS CASE THE

14  MAN AND WOMAN HAD ONLY A PLATONIC RELATIONSHIP.  SHE WAS A

15  BICYCLIST, I THINK, FROM NEW ZEALAND.  AND HE WAS SOME GUY.

16  THEY MET EACH OTHER THROUGH BICYCLING AND NEVER HAD SEX.  I

17  THINK THEY STAYED AT EACH OTHER'S HOMES OR ONE OF THEIR HOMES

18  A COUPLE OF OCCASIONS.

19       SHE WAS VERY CLEAR WITH HIM THAT SHE WAS NOT

20  INTERESTED IN DATING THEM -- IN DATING HIM.  AND BOTH OF THEM

21  TESTIFIED AT TRIAL THAT THEY DID NOT HAVE A DATING

22  RELATIONSHIP.  SO WHAT WAS INTERESTING ABOUT THAT CASE IS THE

23  TRIAL COURT SAID TO THEM, I DON'T CARE HOW YOU DEFINE IT.

24  YOU GUYS HAD A DATING RELATIONSHIP.

25       THE COURT OF APPEAL, IN UPHOLDING THE TRIAL COURT'S

26  DECISION, FOUND THAT THE TRIAL COURT HAD THE POWER TO

27  FACTUALLY DETERMINE WHETHER A DATING RELATIONSHIP EXISTED

28  WITHIN THE MEANING OF THE D.V.P.A. EVEN WHERE THE PARTIES

```
 1   CHARACTERIZE THEIR RELATIONSHIP AS A FRIENDSHIP AND DOES NOT
 2   INVOLVE DATING AS THAT TERM IS COMMONLY UNDERSTOOD.  THE
 3   COURT FOUND THAT A DATING RELATIONSHIP CAN BE ESTABLISHED
 4   WHERE, QUOTE, "ALL OF THE EVIDENCE SHOWS THERE WAS AN
 5   EXPECTATION OF AFFECTION OR DESIRE TO HAVE AFFECTION."
 6        IT DID NOT MATTER WHAT THE PARTIES CALLED IT.
 7   THERE ARE SEVERAL LAW REVIEW ARTICLES THAT I WOULD JUST LIKE
 8   TO BRIEFLY ADDRESS WITH THE COURT THAT TALKS ABOUT --
 9        THE COURT:  YOU'RE GOING TO HAVE ME READ LAW REVIEW
10   ARTICLES AFTER ARGUMENT?
11        MS. MEYER:  I'M SORRY?
12        THE COURT:  ARE YOU GOING TO HAVE ME READ LAW REVIEW
13   ARTICLES AFTER ARGUMENT?
14        MS. MEYER:  NOT UNLESS YOU DON'T WANT TO.  YOU DON'T
15   HAVE TO.  YOU PROBABLY HAVE NOTHING TO DO TODAY.  BUT
16   THERE'S -- SUFFICE IT TO SAY, THERE ARE LAW REVIEW ARTICLES
17   THAT TALK ABOUT THE EXPANSION OF THE DATING RELATIONSHIP IN
18   MODERN DAY TIMES.
19        THE BOTTOM-LINE IS, AND AT THE END OF THE DAY, NO
20   MATTER HOW LINDSEY CHARACTERIZED IT, OR HOW SHE CHARACTERIZED
21   IT TO HER FRIENDS AND TO HER COUSIN, THE EVIDENCE SHOWED THAT
22   NO MATTER HOW SHORT, HOW -- NO MATTER HOW TUMULTUOUS, NO
23   MATTER HOW EMOTIONAL, TREVOR AND LINDSEY HAD A MODERN DAY
24   RELATIONSHIP.
25        SO AT THE END OF THE DAY, I WANT TO SAY THAT I AM
26   GLAD I LIVE IN AMERICA AND NOT A COUNTRY LIKE AFGHANISTAN
27   WHERE WOMEN ARE BEING BEATEN SIMPLY BECAUSE THEY ARE WOMEN.
28   I AM GLAD MY DAD FORCED ME TO GO TO LAW SCHOOL WHEN I WOULD
```

```
 1  HAVE PREFERRED PARTYING WITH MY FRIENDS.  I AM GLAD TO HAVE
 2  THE SELF-CONFIDENCE AND CLARITY NOT TO DO WHAT LINDSEY
 3  ALLOWED TREVOR TO DO TO HER.
 4          HOWEVER, WITH THAT SAID, I APPLAUD LINDSEY THAT SHE
 5  WAS ABLE TO STAND UP TO THIS MONSTER AND TO DO THE RIGHT
 6  THING.  SHE DESERVES TO BE TREATED LIKE A HUMAN BEING AND
 7  DESERVES TO BE PROTECTED UNDER THE D.V.P.A. FOR HERSELF AND
 8  FOR OTHERS.  WHATEVER HAPPENS, LINDSEY HAS REVEALED WHO
 9  TREVOR BAUER REALLY IS FOR ALL THE WORLD TO SEE.  HOPEFULLY
10  HE WILL GET HELP AND NOT DO THIS IN THE FUTURE UNDER THE
11  GUISE OF CONSENSUAL ROUGH SEX.
12          AS LINDSEY SAID IN HER LAST TEXT TO TREVOR,
13  "ALTHOUGH I APPRECIATE YOUR LAST MESSAGE, THE BEST THING YOU
14  CAN DO IS TO HELP ME TO NEVER DO WHAT YOU DID TO ME TO ANYONE
15  ELSE EVER AGAIN."  I THINK THAT THOSE WORDS WERE THE MOST
16  MATURE WORDS THAT WE READ OF ALL LINDSEY'S WRITTEN
17  COMMUNICATIONS.  AND DO I THINK SHE MEANT IT?  I THINK SHE
18  MEANT EVERY WORD OF IT.
19          THIS WAS NOT CONSENSUAL SEX BY ANY STRETCH OF THE
20  IMAGINATION.  IT WAS BRUTAL, INHUMANE, DISGUSTING, AND
21  VIOLENT.  BASED UPON THE EVIDENCE, WE WOULD ASK THAT THE
22  COURT ISSUE A FIVE YEAR RESTRAINING ORDER.  ALSO, ORDER
23  TREVOR INTO A 52 WEEK BATTERERS' PROGRAM.  AND ALSO MAKE
24  WHATEVER ORDERS THE COURT THINKS IS NECESSARY TO PROTECT
25  LINDSEY AND TO PROTECT OTHERS FROM FUTURE HARM.
26          ONE MORE POINT, YOUR HONOR -- AND I DON'T THINK
27  THIS IS A LARGE ONE -- BUT I JUST WANTED TO ADDRESS THE
28  COURT.  AS THE COURT IS AWARE, THERE IS NO NEED TO SHOW
```

1   FUTURE ABUSE.  AND THAT'S THE NEVAREZ VS. TONNA CASE, 227

2   CAL.APP.4TH 774.  THE FACT THAT LINDSEY WAITED FOR DAYS TO

3   FILE HER RESTRAINING ORDER, I THINK THE EVIDENCE SHOWED

4   LINDSEY WAS TRYING TO DO EVERYTHING THAT SHE COULD DO TO GET

5   THE POLICE'S ATTENTION.  SHE WENT TO HER SART EXAM.  SHE DID

6   HER FOLLOW-UP EXAM.  SHE COOPERATED WITH THE NURSE.

7           SHE COOPERATED WITH THE AUTHORITIES.  AND SHE

8   WASN'T GETTING WHAT SHE NEEDED FROM THE -- FROM LAW

9   ENFORCEMENT.  SO SHE DID WHAT SHE NEEDED TO DO.  AND, THAT

10  IS, SHE SOUGHT OUT A DOMESTIC VIOLENCE RESTRAINING ORDER

11  AFTER 45 DAYS.  IN OUR WORLD, I HAVE SEEN PEOPLE GET

12  RESTRAINING ORDERS AFTER SIX MONTHS OR LONGER.  SO IN MY

13  WORLD, I THINK 45 DAYS IS A VERY REASONABLE PERIOD OF TIME

14  GIVEN EVERYTHING THAT LINDSEY WAS TRYING TO DO DURING THAT

15  PERIOD OF TIME.

16          ALSO, IN TERMS OF LINDSEY'S HIDDEN AGENDA, SO TO

17  SPEAK, IN THIS CASE, LINDSEY INITIALLY DIDN'T WANT TO GO TO

18  THE HOSPITAL.  SHE DIDN'T WANT TO SEEK OUT ATTENTION.  WHEN

19  HER FRIEND MELY TOLD HER TO GO TO THE HOSPITAL, LINDSEY WAS

20  HESITANT AND DIDN'T GO TO THE HOSPITAL UNTIL THE NEXT

21  MORNING.  AND I WOULD REFER THE COURT TO EXHIBIT 12.

22          AND WHEN LINDSEY WENT TO THE HOSPITAL, SHE HAD TO

23  FIRST SPEAK TO A SOCIAL WORKER.  AND THAT SOCIAL WORKER HAD

24  TO CAJOLE HER INTO NAMING HER ABUSER, WHO SHE DID NOT WANT TO

25  NAME.  SO HER CONDUCT AGAIN IS NOT CONSISTENT WITH NEFARIOUS

26  CONDUCT.

27          AND WITH THAT, YOUR HONOR, I THANK YOU FOR YOUR

28  PATIENCE.  I THANK YOU FOR YOUR TIME.  AND I WOULD SUBMIT ON

```
 1   THAT.
 2        THE COURT:  THANK YOU.
 3        MS. MEYER:  OH, YOUR HONOR, ONE OTHER THING.  WE
 4   SUBMITTED A BRIEF.
 5        THE COURT:  I READ THAT THIS MORNING.
 6        MS. MEYER:  OKAY.  THANK YOU.
 7        THE COURT:  MS. HOLLEY, IT'S A QUARTER UNTIL 10:00.  AND
 8   I AM HAPPY TO HAVE YOU START.  I JUST WANT TO LET YOU KNOW
 9   I'M GOING TO GIVE MY COURT REPORTER A BREAK FOR TEN OR
10   FIFTEEN MINUTES.  IF YOU'D LIKE TO BEGIN NOW AND THEN RESUME
11   AT 10:15 --
12        MS. HOLLEY:  CAN WE TAKE THE BREAK NOW?
13        THE COURT:  IF I DO, SHE'LL NEED ONE BEFORE NOON AGAIN.
14   I WANT TO MAKE SURE THAT SHE IS TAKEN CARE OF.
15        MS. HOLLEY:  WE'LL BE FINISHED BEFORE NOON FROM MY
16   STANDPOINT IF THAT'S --
17        THE COURT:  RIGHT.  BUT I GIVE HER A BREAK SOMETIME
18   BETWEEN 10:00 AND 10:30.  IF SHE TAKES ONE EARLY, SHE'LL NEED
19   ANOTHER ONE IN THE MIDDLE OF YOUR CLOSING.
20        MS. HOLLEY:  OKAY.  SO YOU WANT ME TO GO NOW?
21        THE COURT:  I SUGGEST YOU DO.
22        MS. HOLLEY:  SAY NO MORE.  GOOD MORNING.
23        THE COURT:  GOOD MORNING.
24        MS. HOLLEY:  LINDSEY HILL TOLD US OVER 12 HOURS OF
25   TESTIMONY, HUNDREDS OF TEXTS, DOZENS OF INSTAGRAM MESSAGES,
26   AND AT LEAST ONE TWEET WHO SHE IS.  SHE IS A 27-YEAR-OLD
27   BASEBALL FAN.  SHE IS A RECOVERING ALCOHOLIC.  SHE IS A
28   DAUGHTER, A COUSIN, A FRIEND.  SHE VERY OPENLY TOLD US THAT
```

1   SHE HAS PAST TRAUMA, LOW SELF-WORTH, CRIPPLING INSECURITY,

2   AND A NEED FOR ATTENTION, WHICH TENDS TO GET HER IN TROUBLE.

3           SHE SAYS THINGS THAT SHE DOESN'T MEAN.  AND SHE

4   PRETENDS TO BE SOMEONE THAT SHE IS NOT.  SHE TELLS LIES TO

5   IMPORTANT PEOPLE.  HER BEST FRIEND.  HER BOSS.  HER A.A.

6   SPONSOR.  AND WE'RE HERE TODAY BECAUSE OF THE LIES SHE TOLD

7   THE COURT IN HER PETITION -- DECLARATION, BECAUSE OF THE LIES

8   SHE TOLD TREVOR, AND ULTIMATELY BECAUSE OF THE LIES SHE TOLD

9   HERSELF.

10          LINDSEY LOVES BASEBALL AND SHE LOVES BASEBALL

11  PLAYERS.  SHE WAS INTRIGUED BY TREVOR.  SHE TOLD US THAT.

12  SHE TOLD HER FRIENDS THAT HE WAS HER CRUSH.  SHE TOLD HER MOM

13  THAT SHE LOVED HIM.  AND SHE STARTED TWEETING ABOUT HIM,

14  TAGGING HIM IN TWEETS.  SHE STARTED FOLLOWING HIM ON SOCIAL

15  MEDIA.  WATCHING HIS BASEBALL GAMES ON TV.

16          AND SO ON APRIL 18 WHEN SHE TAGGED HIM ON AN

17  INSTAGRAM STORY AND HE REPLIED, SHE WAS UNDERSTANDABLY VERY

18  EXCITED.  SO SHE TOLD HER FRIENDS ABOUT IT.  SHE TOOK

19  SCREENSHOTS OF THOSE DM'S -- DIRECT MESSAGES -- THAT SHE HAD

20  WITH TREVOR.  AND SHE SENT THOSE PRIVATE MESSAGES TO HER

21  FRIENDS OUT OF HER EXCITEMENT.

22          NOW, AS THE COURT WILL SEE, THE INSTAGRAM DM'S IN

23  THOSE EARLY DAYS BETWEEN THEM ARE REALLY VERY FUN TO READ.

24  LINDSEY HAS A GREAT KNOWLEDGE OF BASEBALL BY VIRTUE OF HER

25  GROWING UP WITH A DAD WHO IS A BASEBALL PLAYER AND COACH.

26  AND SO SHE IS ABLE TO, IN A VERY CLEVER WAY, MIX BASEBALL

27  BANTER WITH SORT OF SEXUAL INNUENDO AND FLIRTY IN A FUN WAY.

28  AND IN THOSE EARLY DM'S AND REALLY THROUGHOUT, SHE COMES

1  ACROSS AS EXTREMELY CONFIDENT, VERY SELF-ASSURED.

2          WITHIN TWO DAYS, SHE HAS MADE IT CLEAR IN

3  SELF-ASSURED CONFIDENT INSTAGRAM DM'S THAT SHE IS READY,

4  WILLING, AND ABLE TO DRIVE A 130 MILES FROM SAN DIEGO TO

5  PASADENA ON THE NIGHT OF APRIL 21ST TO SEE TREVOR AND SPEND

6  THE NIGHT AT HIS HOUSE.

7          SHE IS AWARE OF HIS DATING RULES.  NO FEELINGS.  NO

8  SOCIAL MEDIA.  AND HE IS GOING TO SLEEP WITH OTHER PEOPLE.

9  SO SHE TOLD US THAT TO REASSURE HIM THAT SHE UNDERSTOOD THESE

10  RULES.  SHE LET HIM KNOW THAT SHE WOULD HAVE HER NDA SIGNED

11  AND SEALED AND HER FEELINGS BUTTON SWITCHED OFF.  SHE TOLD

12  HIM NOT TO WORRY.

13          HE SAID, "YOU'RE SUCH A PRO.  THANK YOU."  BECAUSE

14  THAT'S WHAT SHE PORTRAYED HERSELF AS, A PRO.  SHE TOLD US

15  THAT, THAT THERE'S TWO SIDES.  THERE'S THE SIDE THAT SHE

16  PRESENTS TO THE WORLD, TO HER FRIENDS, EVEN HER CLOSE

17  FRIENDS, EVEN HER SPONSOR, CERTAINLY TO TREVOR, THAT SHE IS

18  THIS PRO.  THAT SHE IS TOUGH, SELF-ASSURED, AND CONFIDENT.

19  BUT SHE ALSO TOLD US THAT INSIDE SHE IS NONE OF THOSE THINGS.

20  SHE IS SCARED AND INSECURE AND SEEKING ATTENTION BUT SHE PUTS

21  ON A FRONT.  SHE PRETENDS.

22          IN CONTRAST, TREVOR IS EXACTLY WHO HE SAYS HE IS.

23  HE HAS STATED HIS RULES CLEARLY FOR THE ENTIRE WORLD TO SEE

24  IN SPORTS ILLUSTRATED, TO ALL THE READERS OF SPORTS

25  ILLUSTRATED.  AND APPARENTLY MS. HILL IS ONE OF THOSE

26  READERS.  SHE LET US KNOW SHE KNEW EXACTLY ABOUT THOSE RULES.

27  WHAT THEY WERE.

28          SO HE HAS MADE IT CLEAR TO THE WORLD, AND HE ALSO

1   MADE IT CLEAR TO HER.  SHE TESTIFIED THAT THEY TALKED ABOUT

2   IT.  SO SHE GOES TO HIS HOUSE THAT NIGHT, THE NIGHT OF APRIL

3   21ST, KNOWING WHO HE HAS HELD HIMSELF OUT TO BE.  WHO HE

4   TURNS OUT TO BE EXACTLY THAT.  SHE SAYS THAT SHE IS NERVOUS.

5   SHE WANTS TO IMPRESS HIM.  SHE IS INTIMIDATED.  SHE IS

6   SCARED, BECAUSE SHE KNOWS THERE'S THIS DUALITY.  SHE KNOWS

7   THAT INSIDE SHE IS NERVOUS AND SCARED, BUT OUTSIDE SHE SAID,

8   AND LET HIM KNOW, THAT SHE IS A PRO.

9        WHEN SHE GETS TO HIS HOUSE, HE IS VERY DIFFERENT

10  THAN SHE THOUGHT.  HE IS ON THE PHONE WHEN SHE COMES IN.  AND

11  HE KIND OF GIVES HER A ONE ARM GREETING.  AND THEN HE

12  CONTINUES ON THE PHONE CALL.  SHE'S TAKING A PICTURE OF

13  HERSELF THERE.  AND WHEN THEY SIT DOWN TO TALK, HE IS TALKING

14  ABOUT HIS CHILDHOOD, HIS PARENTS, ABOUT BEING BULLIED.

15  THINGS THAT HE HAS TALKED ABOUT IN SPORTS ILLUSTRATED HE IS

16  TALKING ABOUT TO HER.  HE IS NOT LOOKING AT HIS PHONE.  HE

17  DOESN'T DO DRUGS.  HE DOESN'T DRINK.

18       SHE SAYS HE IS KIND AND HE IS NOT JUDGMENTAL.  HE

19  IS A NICE GUY.  SHE WASN'T EXPECTING THAT.  SHE INTERPRETED

20  ALL OF THAT AS VULNERABILITY.  A VULNERABILITY SHE BELIEVED

21  WAS UNIQUE TO HER, THAT THIS INDICATED SOMETHING SPECIAL

22  ABOUT HER AND THIS RELATIONSHIP.  THE FACT THAT HE WAS

23  SHARING THESE THINGS WITH HER, SHE ATTACHED SIGNIFICANCE TO

24  THAT.  AND SHE BELIEVED THIS DEMONSTRATES THAT THERE IS AN

25  EMOTIONAL CONNECTION BETWEEN US.

26       SHE SAID SHE FELT AN EMOTIONAL CONNECTION FOR HIM.

27  NOW, SHE HAD TO ACKNOWLEDGE ON CROSS EXAMINATION THAT SHE

28  COULD NOT KNOW IF HE FELT AN EMOTIONAL CONNECTION TO HER.

1  BUT SHE BELIEVED THAT.  SHE EITHER BELIEVED IT OR WANTED TO

2  BELIEVE IT, OR PERCEIVED IT, OR CONCOCTED IT.  BUT THERE IS

3  NOTHING THAT TREVOR HAS DONE, WHICH SHOULD CAUSE HER TO

4  BELIEVE THAT.  HE SIMPLY HAD A CONVERSATION WITH HER IN A WAY

5  THAT SHE WAS NOT EXPECTING, THAT SHE HAS NOW ATTACHED

6  SIGNIFICANCE TO AND CREATED AN EMOTIONAL CONNECTION THAT THEY

7  BOTH SHARE THAT WAS NOT THERE.

8          SHE ADMITTED THAT DURING THAT TIME OF TALKING HE

9  WAS NOT AFFECTIONATE WITH HER AT ALL.  THEY SAT SIX FEET AWAY

10 FROM EACH OTHER ON THE COUCH.  AND AFTER TALKING FOR SEVERAL

11 HOURS, IT'S 2:00 O'CLOCK IN THE MORNING.  HE SAID, "I'M TIRED

12 AND I'M GOING TO BED.  YOU'RE WELCOME TO STAY YOU CAN STAY IN

13 THE GUEST ROOM."  SHE SAID, "I'D LIKE TO STAY IN THE

14 BEDROOM."

15         HE SAID, "THAT'S FINE.  BUT I SLEEP NAKED."  SHE

16 SAID, "THAT'S FINE WITH ME."  AGAIN, PRESENTING HERSELF AS

17 THE PRO.  THE TOUGH GIRL.  LET'S GO.  THEY'RE CUDDLING.  THEY

18 BEGIN CONSENSUAL SEX.  SHE NOTICES THAT HE GETS SLIGHTLY

19 AGGRESSIVE.  SHE SEES THAT -- THIS IS EXACTLY WHAT SHE SAID.

20 "SLIGHTLY AGGRESSIVE."  SHE SEES THAT HE APPEARS TO LIKE IT

21 ROUGH.  AGGRESSIVE.

22         SO WHEN HE ASKED HER, "WHAT DO YOU LIKE?  WHAT DO

23 YOU LIKE?" SHE TOLD HIM WHAT SHE THOUGHT HE LIKED.  SHE TOLD

24 HIM WHAT SHE THOUGHT HE WANTED TO HEAR.  SHE SAYS THAT

25 HERSELF ON THE STAND REPEATEDLY.  "I TOLD HIM WHAT I THOUGHT

26 HE WANTED TO HEAR."  SO SHE SAYS, "I LIKE IT A LITTLE ROUGH."

27 THAT'S NOT WHAT SHE MEANS.  ON DIRECT EXAMINATION SHE SAYS,

28 "THAT'S NOT WHAT I MEANT, BUT I WANTED HIM TO THINK THAT."

1   HE DOESN'T KNOW HER.  SHE IS A 27-YEAR-OLD WOMAN.  HE IS A

2   30-YEAR-OLD MAN.  HE PRESUMES THAT SHE MEANS WHAT SHE SAYS.

3         SO WHEN SHE SAYS, "I LIKE IT A LITTLE ROUGH," HE

4   ACCEPTS THAT.  HE DOESN'T KNOW THERE'S SOME OTHER PERSON

5   HIDING INSIDE OF HER.  SO THEN SHE ASKED HIM WHAT HE LIKED,

6   BECAUSE THAT'S REALLY WHAT SHE CARES ABOUT.  WHAT HE LIKES.

7         AND HE TOLD HER, "I LIKE IT ROUGHER THAN YOU."

8   NOW, AT THAT POINT SHE DOESN'T SAY, WELL, I DON'T WANT IT

9   ROUGHER THAN I LIKE IT; OR I DON'T WANT IT TO BE ROUGH AT

10  ALL; OR I AM NOT COMFORTABLE WITH THAT; OR WHAT DO YOU MEAN?

11  SHE DOESN'T SAY ANY OF THOSE THINGS.

12        HE ASKS HER IF SHE HAD BEEN CHOKED DURING SEX.

13  NOW, SHE TELLS US THAT WHAT IN HER MIND SHE IS THINKING THAT

14  IN THE PAST SOMEBODY HAS LIGHTLY PUT THEIR HANDS ON HER NECK.

15  THAT'S WHAT SHE IS THINKING INSIDE.  SHE DOESN'T SAY THAT.

16  SHE DOESN'T SAY, I DON'T KNOW.  THIS HAPPENED BEFORE.  SHE

17  SAYS, "YES."  AND SHE SAYS "YES" BECAUSE SHE THINKS THAT'S

18  WHAT HE WOULD WANT TO HEAR.

19        SO SHE SAYS YES, BECAUSE SHE IS TRYING TO IMPRESS

20  HIM.  SHE SAYS SO REPEATEDLY ON DIRECT EXAMINATION.  THAT'S

21  WHY SHE IS SAYING THINGS SHE DOESN'T MEAN.  AGAIN, HE DOESN'T

22  KNOW HER.  SO WHY WOULD HE EXPECT THAT SHE SAID ANYTHING

23  OTHER THAN WHAT SHE MEANS WHEN HE IS ASKING HER DIRECTLY.

24        SHE DOESN'T QUALIFY IT.  SHE SAYS, "YES, I HAVE

25  BEEN CHOKED DURING SEX."  SHE DIDN'T SAY, I DON'T LIKE IT.  I

26  DIDN'T LIKE IT.  PLEASE DON'T DO IT.  I'M NOT INTO IT.  NONE

27  OF THAT.  SO AS THE SEX PROGRESSES, HE PUTS HIS FINGERS DOWN

28  HER THROAT.  SHE MOTIONS FOR HIM TO STOP.  AND HE IMMEDIATELY

554

1   STOPS.  IMMEDIATELY.

2           SO SHE NOW UNDERSTANDS THAT IF SHE SAYS OR MOTIONS

3   TO STOP, THAT'S APPARENTLY WHAT HE IS GOING TO DO.  HE IS

4   LISTENING TO HER.  HE IS DOING WHAT SHE ASKS OF HIM.  HE IS

5   STOPPING WHEN SHE WANTS HIM TO STOP.

6           HE WRAPS HER HAIR AROUND HER NECK AND SHE GOES

7   UNCONSCIOUS, SHE SAYS, FOR SEVERAL SECONDS.  NOW, AGAIN, HE

8   HAS ASKED HER BEFOREHAND, "WHAT DO YOU LIKE?  HAVE YOU BEEN

9   CHOKED?"  HE HAS GIVEN HER AN OPPORTUNITY TO TELL HIM WHAT

10  SHE DOES AND DOES NOT WANT.  SHE DOES NOT TAKE IT, BECAUSE

11  SHE WANTS TO SAY WHAT HE WANTS TO HEAR.

12          NOW, SHE SAYS THAT WHEN SHE COMES TO SECONDS LATER,

13  THAT HE IS HAVING ANAL SEX WITH HER WITHOUT LUBRICANT.  NOW,

14  THAT IS NOT BELIEVABLE TO ME.  IT IS NOT BELIEVABLE TO ME FOR

15  A COUPLE OF REASONS.  ONE, THAT LINDSEY HAS ADMITTED TO BEING

16  DISHONEST AND HAS DEMONSTRATED HER DISHONESTY ON MANY

17  OCCASIONS.  BUT THERE'S ALSO NO PHYSICAL CORROBORATION OF

18  THAT.  THERE'S NO CORROBORATION FROM ANYONE ELSE OF THAT.  IT

19  SEEMS IMPOSSIBLE.

20          SHE HAS A ZOOM CONVERSATION THERE IN THE MORNING.

21  IT DEFIES CREDULITY, IN MY VIEW.  LET'S TAKE HER AT HER WORD,

22  THAT HE WAS HAVING ANAL SEX WITH HER WHEN SHE CAME TO.  SHE

23  SAYS SHE SAID "STOP" AND HE STOPPED.  SO NOW IN HER

24  EXPERIENCE, A 100 PERCENT OF THE TIME THAT SHE SAYS DON'T DO

25  SOMETHING, STOP THAT, HE DOES IT.  HE STOPS IT.

26          SHE SAYS THAT SHE IS SHAKEN UP.  HE HOLDS HER.

27  ASKS HER IF SHE IS OKAY.  SHE SAYS SHE NEEDS A MINUTE.  SHE

28  SAYS HE GIVES HER TEN OR FIFTEEN MINUTES AND STARTS TO

```
 1  REINITIATE SEX WITH HER, WHICH SHE AGREES TO.  NORMAL VAGINAL
 2  SEX.  THEY RESUME.  AND THAT OCCURS.
 3         SHE SAYS SHE WAS EMBARRASSED THAT SHE COULD NOT
 4  LIVE UP TO WHAT HE WANTED AND DID NOT WANT TO THROW AWAY WHAT
 5  HAD HAPPENED IN THE EARLIER PART OF THE EVENING.  SO SHE
 6  PRETENDED THAT EVERYTHING WAS OKAY.  PRETENDING IS A LIE.
 7  PRETENDING TO BE SOMETHING THAT YOU ARE NOT TO THIS PERSON
 8  WHO DOES NOT KNOW YOU, AND ONLY KNOWS WHAT YOU ARE
 9  PRESENTING, IS A LIE.
10         SHE WANTS TO IMPRESS HIM.  SHE STILL WANTS TO
11  IMPRESS HIM.  WHEN SHE LEAVES, SHE TELLS HER BEST FRIEND HE
12  IS AN AMAZING HUMAN.  AND SHE MEANT IT.  SHE SAID SHE MEANT
13  IT.  SHE FELT THAT.
14         NOW, PRIOR TO GOING TO HIS HOUSE ON APRIL 21ST, SHE
15  HAD TOLD DEREK DAWSON AND HER COUSIN KYLE SHE WOULD GET IN
16  HIS HEAD, THAT SHE JUST WANTS THE DICK.  AND, BY THE WAY,
17  JUST FOR MS. MEYER'S SAKE, I DON'T HAVE ANY JUDGMENT AT ALL
18  ABOUT ANY OF THE WORDS.  AND MY POINT IN SAYING I GET TO SAY
19  THEM WAS NOT I WAS SAYING ANYTHING JUDGMENTAL ABOUT LINDSEY'S
20  USE OF THOSE WORDS AT ALL.  SO PLEASE UNDERSTAND THAT.
21         SHE IS GOING TO GET IN HIS HEAD.  SHE JUST WANTS
22  THE DICK.  SHE KNOWS WHAT SHE IS DOING.  SHE IS GOING TO GET
23  HER HOOKS IN.  YOU KNOW HOW I ROLL.
24         NOW, WE HAVE ALL THIS COMMUNICATION BECAUSE DEREK
25  BROUGHT IT FORTH.  AND WHEN WE'RE READING IT, WE DON'T KNOW
26  WHAT IT MEANS.  IT LOOKS NEFARIOUS.  IT LOOKS SINISTER.  SHE
27  IS GOING TO GET IN HIS HEAD.  YOU KNOW HOW I ROLL.  I KNOW
28  WHAT I'M DOING.  I READ THAT, AND THAT SEEMS TO ME TO BE A
```

1   PLOT AND A PLAN.  I DON'T KNOW.

2          I DON'T GET TO KNOW UNTIL I QUESTION HER OR HEAR

3   WHAT SHE SAYS ABOUT THAT.  SO I -- AND, YOU KNOW, I STILL

4   DON'T KNOW.  I DON'T KNOW IF MS. HILL KNOWS EXACTLY WHAT SHE

5   WAS DOING.  SHE WAS DOING A LOT OF THINGS.  BUT I CANNOT

6   STAND HERE TODAY BEFORE THIS COURT AND SAY THAT I BELIEVE

7   THAT SHE HAD CONCOCTED SOME NEFARIOUS PLAN.  I DIDN'T KNOW.

8   I JUST KNOW THAT SHE IS SAYING TO HER FRIENDS AND TO HER

9   COUSIN, "I'M GOING TO GET IN HIS HEAD.  YOU KNOW HOW I ROLL.

10  I JUST WANT THE DICK."

11         IT'S ALSO HARD TO KNOW BECAUSE WHILE SHE IS HAVING

12  THIS COMMUNICATION WITH TREVOR ON DM, SHE IS MAKING FUN OF

13  HIM TO HER FRIENDS BEHIND HIS BACK.  SHE IS LAUGHING AT THE

14  FACT THAT HE HAS GOT A PLANT IN THE BACKGROUND OF THE SELFIE

15  SHE HAS TAKEN.  SHE IS CALLING IT AT SOME POINT A SOB STORY

16  WHEN HE IS SAYING THINGS TO HER.  SO IT'S HARD TO KNOW

17  EXACTLY WHAT SHE IS DOING.

18         BUT HERE IS WHAT WE DO KNOW -- BECAUSE SHE TOLD US

19  THIS ON THE STAND REPEATEDLY ON DIRECT, ON CROSS, THROUGHOUT

20  ALL OF THESE INSTAGRAMS AND TEXTS WITH TREVOR -- WE KNOW SHE

21  STILL WANTS TO BE WITH TREVOR AND SHE STILL WANTS TO IMPRESS

22  HIM.  SHE WANTS TO DATE HIM.  SHE WANTS TO FORGET THE SEX

23  PART, WHICH SHE CALLS DISASSOCIATION.  SHE STILL BELIEVES

24  THEY HAVE AN EMOTIONAL CONNECTION, EVEN THOUGH WHAT HAPPENED

25  IN BED WAS ANYTHING BUT.

26         SHE SAYS SHE CONSIDERED THAT A DATE.  THOUGH, THEY

27  ATE NO FOOD, HAD NOTHING TO DRINK, NO AFFECTION, NO EXCHANGE

28  OF PHONE NUMBERS.  SEX WAS ANYTHING OTHER THAN ROMANTIC.  BUT

```
1    BECAUSE SHE HAS, IN HER OWN MIND, DETERMINED THAT HIS
2    WILLINGNESS TO SPEAK ABOUT THINGS THAT SHE DIDN'T EXPECT HIM
3    TO SPEAK ABOUT MEANS THAT THERE IS AN EMOTIONAL CONNECTION
4    BETWEEN THEM.  AND THIS MUST BE A DATE.  AND THIS MUST MEAN
5    SOMETHING TO HIM, TOO.  EVEN THOUGH HE HAS MADE IT CLEAR, NO
6    FEELINGS.
7            I SAID, "DID HE EVER DISAVOW THAT?  DID HE EVER SAY
8    TO YOU THAT ONE IS NO LONGER APPLICABLE TO US?"  AND SHE
9    SAYS, "NO.  BUT I COULD TELL THAT IT WAS BECAUSE THE FACT
10   THAT HE OPENED UP AND WAS VULNERABLE.  SO I REALIZED THAT THE
11   NO FEELINGS DIDN'T APPLY TO ME.  DIDN'T APPLY TO US."
12        THE COURT:  OKAY.  IT'S ABOUT FIVE AFTER.  LET'S TAKE
13   OUR BREAK.  LET'S START BACK IN AT 20 AFTER.
14        MS. HOLLEY:  THANK YOU.
15        THE COURT:  THANK YOU.
16               (RECESS TAKEN.)
17        THE COURT:  ALL RIGHT.  MS. HOLLEY, YOU MAY RESUME.
18        MS. HOLLEY:  THANK YOU.
19            I THINK IT'S PROBABLY CLEAR, BUT I JUST WANT TO
20   MAKE IT CLEAR IN CASE IT ISN'T, THAT THE THREE RULES -- WE'LL
21   CALL IT THE THREE DATING RULES BY SPORTS ILLUSTRATED --
22   CERTAINLY WAS NOT TREVOR CHARACTERIZING HIS THREE RULES.
23        MS. MEYER:  OBJECTION, YOUR HONOR.  THERE'S NO
24   TESTIMONY.
25        THE COURT:  THAT IS NOT EVIDENCE, OF COURSE.
26        MS. HOLLEY:  SO I WAS TALKING ABOUT THAT IT'S UNCLEAR
27   EXACTLY WHAT LINDSEY IS DOING, BECAUSE SHE IS POKING FUN
28   BEHIND TREVOR'S BACK.  YET SHE IS SAYING NICE THINGS TO HIM.
```

1  SHE IS TELLING HIM WHAT HE WANTS TO HEAR.  SO I DON'T KNOW.

2  BUT AFTER THAT FIRST NIGHT TOGETHER, HE DOESN'T REACH OUT TO

3  HER.  BUT SHE REACHES OUT TO HIM.  I THINK THAT MS. MEYER

4  MISSPOKE WHEN SHE SAID THERE WERE CALLS BECAUSE THERE WERE

5  NOT.

6         THIS IS ALL TAKING PLACE ON INSTAGRAM DIRECT

7  MESSAGE.  AND LINDSEY SENDS TREVOR VIDEOS, WHICH WE DON'T

8  HAVE, OF WHAT SHE SAYS WERE SMALL BRUISES ON HER BOTTOM.  AND

9  HE SAYS IN RESPONSE TO THAT, "WHAT ON EARTH WAS THAT FROM?"

10  SHE LAUGHS "HAHAHAHA" IN WRITING.  "YOU GOT ME GOOD."

11  TREVOR, "WHAT IS IT?"  SHE SAYS, "I HAVE NO IDEA.  PROBABLY

12  YOUR THUMB.  LOL.  JUST A BRUISE IN THE SHAPE OF A

13  FINGERPRINT."  "WHERE AT?"  SHE SAYS, "RIGHT BUT MY PRIZED

14  POSSESSION."  HE SAYS, "OH GOSH.  I DON'T KNOW IF THAT WAS ME

15  OR NOT, BUT SORRY IF IT WAS."  SHE SAYS, "U GUCCI.  I'M INTO

16  IT."

17         NOW, THERE IS NO OTHER INTERPRETATION WITHIN THE

18  CONTEXT OF THAT BACK AND FORTH BESIDES I LIKED WHAT YOU DID

19  THAT CAUSED THAT.  NOW, SHE TRIED TO SAY, "U GUCCI.  I'M INTO

20  IT," MEANT SOMETHING ELSE.  BUT WHEN HE IS SAYING, "IF I DID

21  THAT, I AM SORRY," AND SHE SAYS, "U GUCCI, I'M INTO IT," THAT

22  IS AN EXPRESSION OF PLEASURE, ENCOURAGEMENT, POSITIVE

23  REINFORCEMENT.  NO OTHER INTERPRETATION.

24         THERE'S NO DISCUSSION ABOUT SEEING EACH OTHER

25  DURING THAT TIME.  AND AT SOME POINT SHE GIVES HIM HER CELL

26  PHONE NUMBER.  HE DOESN'T ASK FOR IT.  SHE GIVES IT TO HIM.

27  AND WHEN HE USES IT TO TEXT HER, SIMPLY CHANGING ONE FORM OF

28  COMMUNICATION TO ANOTHER WRITTEN FORM OF COMMUNICATION TO

1   ANOTHER, SHE INTERPRETS THAT AS THE RELATIONSHIP IS NOW GOING

2   TO THE NEXT LEVEL.

3           AGAIN, THIS IS IN HER HEAD.  EITHER HER PERCEPTION,

4   HER BELIEF, HER WISHES.  THAT'S HOW SHE INTERPRETS THAT.

5   NOW, ON MAY 9TH SHE SAYS IT WAS A GAME CHANGER WHEN SHE WAS

6   CHOKED OUT.  SHE WANTS TO BE CHOKED OUT.  SHE HAS NEVER BEEN

7   MORE TURNED ON IN HER LIFE THAN WHEN SHE WAS CHOKED OUT.

8           "GIMME ALL THE PAIN.  GET A COUPLE OF SLAPS IN

9   THERE.  ANOTHER HANDPRINT ON MY ASS.  AND THEN PAPI TELL ME

10  WHAT ELSE HE WANTS."  "SLAPS IN THE FACE OR?"  "YES YES AND

11  YES."  DO YOU EVEN KNOW WHAT PAIN IS?"  "I DON'T KNOW.  TRY

12  ME."  "WELL, YOU HAVE TO BE HERE."

13          AT WHICH POINT SHE THEN STARTS TRYING TO GET THERE.

14  SHE MAKES SEVERAL SUGGESTIONS.  ALL OF WHICH HE DECLINES.

15  WHAT ABOUT THIS NIGHT?  NO.  SOMEONE ELSE IS COMING OVER THAT

16  NIGHT.  WHAT ABOUT THIS NIGHT?  SOMEBODY IS COMING FROM OUT

17  OF TOWN.  WHAT ABOUT THIS NIGHT?  NO, THAT DOESN'T WORK.  I

18  PITCH THE NEXT DAY.

19          SO FINALLY THEY AGREE ON MAY 15.  THAT DAY, THE DAY

20  THAT THEY AGREE SHE IS GOING TO COME OVER THAT NIGHT, ON TEXT

21  HE SAYS, "AM I GOING TO WRECK YOU," BASED ON THE NUMEROUS

22  INDICATIONS THAT THAT'S WHAT SHE WANTS GIVEN THAT SHE SAID

23  REPEATEDLY THAT'S WHAT SHE WANTS.  SHE SAYS, "ABSOLUTELY YOU

24  ARE."

25          NOW, MS. MEYER ASKED HER ON DIRECT EXAMINATION WHY

26  SHE SAID ALL OF THOSE THINGS TO HIM.  SHE SAID, "I WAS

27  COMMUNICATING TO HIM NOT HOW I ACTUALLY FELT, BUT I WAS

28  TELLING HIM WHAT HE WANTED TO HEAR."  SHE ASKED, "WHY DID YOU

1  DO THAT?"  "BECAUSE I WAS FIXATED ON GETTING HIM TO WANT TO

2  SEE ME AGAIN."  WHY -- MS. MEYER, "WHY WOULD YOU WRITE

3  SOMETHING LIKE THAT TO SOMEBODY WHO YOU HAD FEELINGS FOR IF

4  YOU DIDN'T FEEL THAT WAY?"

5          "I WAS JUST GOING WITH THE FLOW.  I COULD TELL THAT

6  CHOKING IS SOMETHING THAT HE REALLY LIKES.  WHEN HE SAID TELL

7  ME MORE, I DIDN'T KNOW WHAT TO SAY BESIDES THAT I HAD NEVER

8  BEEN MORE TURNED ON IN MY LIFE.  I TRIED TO LIGHTEN THE MOOD

9  AT THE END BY SAY THE WORD, RAWR, WHICH IS A WORD I SAY A

10  LOT.  BUT REALLY I WAS JUST GOING WITH THE FLOW TELLING HIM

11  WHAT HE WANTED TO HEAR BECAUSE I KNEW HE WAS INTO ROUGH SEX."

12          NOW, SHE HAS TOLD US REPEATEDLY THAT THERE'S TWO

13  PEOPLE.  SO THE AMBASSADOR IS THE ONE WHO IS PRESENTING

14  HERSELF TO TREVOR AS THE TOUGH CHICK.  THE SCARED LITTLE GIRL

15  IS INSIDE.  BUT, AGAIN, THEY DON'T EVEN KNOW EACH OTHER.  SO

16  HE DOESN'T KNOW THAT.  OKAY.  SHE -- BECAUSE THEY ARE ADULTS,

17  HE IS TAKING HER AT HER WORD.

18          SO SHE GETS THERE AT MIDNIGHT.  THEY TALK FOR A

19  COUPLE OF HOURS.  AND HE ASKS HER IF SHE WANTED TO GO TO HIS

20  ROOM.  SHE SAYS "YES."  THEY BEGIN HAVING SEX.  HE SAYS,

21  "LET'S AGREE ON A SAFE WORD."  SHE TELLS US SHE KNOWS WHAT

22  THAT MEANS.  SO BY ASKING THAT QUESTION, PARAMETERS ARE BEING

23  SET.  LET ME KNOW SINCE WE ARE ENGAGING IN ROUGH SEX WHAT

24  SAFE WORD YOU WANT TO USE TO LET ME KNOW WHAT IS NOT OKAY.

25          SHE GIVES HIM A SAFE WORD.  IN FACT, SHE ULTIMATELY

26  USES THE SAFE WORD.  SHE UNDERSTANDS THE CONCEPT OF IT, AND

27  IT WORKS.  ALSO, IT HAS ALREADY BEEN DEMONSTRATED WHEN SHE

28  SAYS "STOP," HE STOPS.  WHEN SHE MOTIONS "STOP," HE STOPS.

561

1    AND NOW THERE'S A SAFE WORD.  YET ANOTHER PLAN, PARAMETER,

2    BOUNDARY.  "STOP."  HE ALSO ASKS, "WHAT'S OFF LIMITS?"  HE IS

3    A GROWN-UP.  HE IS AN ADULT.  AS IS SHE.  AND SHE HAS

4    PRESENTED HERSELF AS A TOUGH PRO GROWN-UP.

5            SO WHEN HE SAYS TO HER, "WHAT'S OFF LIMITS," HE IS

6    ASKING HER, WHAT DO YOU NOT WANT ME TO DO?  AND THE ONLY

7    THING SHE SAYS IS "DON'T PUT YOUR FINGERS DOWN MY THROAT."

8    SHE PRESUMES THAT HE ALREADY KNOWS THAT SHE WASN'T INTO THE

9    ANAL SEX.  AND HE DOESN'T TRY TO HAVE ANAL SEX WITH HER.

10           WHAT SHE DOESN'T SAY IS, DON'T CHOKE ME.  DON'T HIT

11   ME.  DON'T SLAP ME.  DON'T CAUSE ME PAIN.  DON'T PUT A

12   HANDPRINT ON MY ASS.  AND GUESS WHAT?  SHE SAID SHE WANTED

13   ALL THOSE THINGS.

14           NOT ONLY DID SHE NOT SAY, DON'T DO THIS, SHE

15   ALREADY SAID, DO THIS.  I WANT THIS.  I WANT YOU TO DO THESE

16   THINGS TO ME.  I WANT YOU TO DO THEM MORE THAN YOU DID THEM

17   THE LAST TIME.  AND THE LAST TIME YOU WRAPPED YOUR HAIR -- MY

18   HAIR AROUND MY NECK AND CHOKED ME OUT.  I'VE NEVER BEEN MORE

19   TURNED ON.

20           NEVER BEEN MORE TURNED ON.  AND WHY IS SHE SAYING

21   THAT?  BECAUSE SHE WANTS HIM TO LIKE HER.  AND SHE WANTS TO

22   MAKE UP FOR -- SHE SAID THIS -- WHAT SHE THOUGHT WAS AN

23   EMBARRASSING AND LESS THAN SATISFYING PRIOR EXPERIENCE.

24   AGAIN, HOW DID HE KNOW THAT?  HE IS TAKING HER AT HER WORD.

25   HE IS ASKING HER WHAT HE SHOULD NOT DO.

26           SO SHE SAYS HE PUNCHED HER VAGINA AND HER FACE.

27   SCRATCHED HER.  NOW, THE MEDICAL EVIDENCE PRESENTED BY OUR

28   EXPERT, DR. HAMMERS, SAYS THAT WHAT SHE OBSERVED IS NOT

1  CONSISTENT WITH THE SERIOUSNESS OF THE CLAIMS MADE BY

2  LINDSEY.  WITH THAT SAID, I'M SURE IT WAS PAINFUL AND

3  UNPLEASANT FOR HER.  AND THAT IS UNFORTUNATE.

4        I'M NOT MAKING EXCUSES FOR THAT.  BUT SHE ASKED FOR

5  THESE THINGS.  SHE ASKED FOR IT TO ROUGH.  SHE ASKED TO BE

6  CHOKED OUT.  SHE SAID SHE LIKED IT.  HE ASKED HER, WHAT

7  SHOULDN'T I DO?  SHE DID NOT TELL HIM, DON'T DO THESE THINGS.

8        SHE SAID EXACTLY THE OPPOSITE OF ALL OF THAT.  WHEN

9  SHE SAYS THE SAFE WORD, HE IMMEDIATELY STOPS.  WHEN HE SAW

10  HOW SHAKEN SHE WAS, HE HELD HER.  ASKED HER IF SHE WAS OKAY.

11  HE TOLD HER, "I WOULD NEVER DO THESE THINGS IF IT WASN'T IN A

12  SEXUAL CONTEXT," WHICH I THINK IS BELIEVABLE AND CLEAR GIVEN

13  THAT THIS IS A ROUGH SEX -- THE SECOND OF TWO ROUGH SEX

14  ENCOUNTERS.

15        SHE FINALLY TOLD HIM THE TRUTH, THAT SHE HAD NEVER

16  BEEN HIT BEFORE.  FOR THE FIRST TIME SHE TELLS HIM SOMETHING

17  TRUE ABOUT HER SEXUAL EXPERIENCE WITH RESPECT TO ROUGH SEX.

18  SO SHE TAKES A PICTURE OF HERSELF.  AND SHE SENDS THAT

19  PICTURE TO KYLE.  AND SHE TELLS MELY AND KYLE AND LISA THAT

20  IT WAS CONSENSUAL ROUGH SEX.  BUT SHE WONDERS LAUGHINGLY IF

21  IT WENT TOO FAR.

22        AND SHE WONDERS IF IT'S HER FAULT THAT IT WENT TOO

23  FAR.  AND IT'S SMART TO WONDER THAT.  I UNDERSTAND WHY SHE

24  WONDERED THAT, BECAUSE SHE DID PLAY A PART IN THAT BY NOT

25  SPEAKING UP FOR HERSELF.  SHE TOLD KYLE THAT TREVOR FELT BAD

26  AND SHE BELIEVED THAT.  SHE BELIEVED THAT HE FELT BAD THAT

27  SHE WAS SHAKEN UP, THAT SHE HAD A MARK.  SHE BELIEVED THAT.

28  AT SOME POINT SHE DECIDED SHE DIDN'T BELIEVE THAT ANYMORE.

1    BUT THAT'S, AGAIN, IN HER OWN HEAD.

2            AT THE HOSPITAL SHE SAYS, "I WAS AT HIS HOUSE IN

3    PASADENA.  I WENT OVER AT MIDNIGHT.  WE HUNG OUT AND TALKED

4    JUST AS FRIENDS.  WE WENT UPSTAIRS AND WE STARTED MAKING OUT.

5    WE HAD HOOKED UP ONCE BEFORE.  AND I KNOW HE IS INTO ROUGH

6    SEX."  RIGHT.  CORRECT.

7            SHE SAID -- WELL, FIRST SHE LIES TO MELY, HER BEST

8    FRIEND, ABOUT WHEN IT HAPPENED.  AND SHE IS LYING, I GUESS,

9    TO HER BEST FRIEND AND HER BOSS, BECAUSE SHE'S TAKEN OFF FROM

10   WORK.  SO SHE TELLS MELY THAT IT REALLY HAPPENED THREE NIGHTS

11   AGO, EVEN THOUGH IT JUST HAPPENED 30 MINUTES BEFORE THAT SHE

12   HAS LEFT THE HOUSE.  SHE TELLS LISA, BECAUSE LISA WAS

13   DISAPPROVING, HER SPONSOR -- WHERE HONESTY IS THE CORNERSTONE

14   AND FRAMEWORK OF THE RELATIONSHIP -- SHE LIES TO LISA ABOUT

15   WHERE IT HAPPENS.  SHE SAYS HE CAME DOWN TO SAN DIEGO.  SHE'S

16   LYING ABOUT ALL OF IT.

17           AND THEN SHE GETS MAD WHEN TREVOR DOESN'T REACH OUT

18   TO HER.  SO SHE SENDS A PICTURE FROM THE HOSPITAL TO SHOW HIM

19   HER INJURIES.  BUT THEN LATER SHE SAYS, "I WAS SCARED ABOUT

20   WHAT HE WOULD DO IF HE KNEW I WAS IN THE HOSPITAL."  BUT SHE

21   IS THE ONE WHO TELLS HIM AND SHOWS HIM SHE IS IN THE

22   HOSPITAL.

23           SHE SAYS THAT SHE WANTS TO SHOW HIM HER INJURIES,

24   BUT THERE'S NO PICTURE OF THE SCRATCHES THAT SHE CLAIMS TO

25   HAVE.  AFTER SHE SPEAKS WITH HIM -- AND I THINK THIS IS THE

26   VERY FIRST TIME THEY SPEAK ON THE PHONE.  SHE SEEMS TO FEEL

27   BETTER THAT SHE TALKED TO HIM.  AND SHE SENDS A VERY FLIRTY,

28   SMILEY HAPPY PICTURE OF HERSELF IN THE HOSPITAL.  SHE IS

```
 1    SMILING.  HER HAIR IS UP IN A LITTLE THING.

 2              SHE HAS NICE MESSAGE TO HIM ABOUT PLAYING WITH HER

 3    HAIR.  AND HE CONTINUES TO BE THE NICE GUY THAT HE HAS ALWAYS

 4    BEEN, THAT HE IS ASKING HER WHAT SHE WANTS.  STOPPING WHEN

 5    SHE DOESN'T WANT.  TALKING TO HER AT LENGTH.  DIFFERENT THAN

 6    SHE THOUGHT.  SO HE CALLS HER BECAUSE HE IS A NICE GUY.  HE

 7    IS WORRIED ABOUT HER BECAUSE SHE IS IN THE HOSPITAL.

 8              HE NEVER ONCE SAYS, YOU DIDN'T TELL ANYBODY ABOUT

 9    ME; RIGHT?  YOU DIDN'T TELL ANYBODY ABOUT WHAT HAPPENED WITH

10    US?  HE DOESN'T SAY ANY OF THAT.  THAT'S NOT THE PURPOSE OF

11    HIS CALL TO MAKE SURE THAT HE SAFE.  NOT AT ALL.  HE IS

12    CHECKING ON HER.  HE ASKED, "CAN I SEND YOU SOMETHING?"

13    BECAUSE OBVIOUSLY SHE IS IN THE HOSPITAL.

14              SHE SAYS ON THE STAND THAT SHE'S ASHAMED AND

15    CONFUSED AS TO WHETHER IT'S HER FAULT OR NOT.  NOW,

16    UNBEKNOWNST TO HIM, AT SOME POINT SHE IS WORKING WITH THE

17    POLICE AND SHE HAS A PRETEXT CALL OR A COLD CALL.  AND

18    THERE'S NOTHING SHE SAYS -- I HAVEN'T HEARD THE CALL -- BUT

19    THERE'S NOTHING SHE SAYS THAT INDICATES HE SAYS ANYTHING

20    INCRIMINATING IN THAT CALL AT ALL DESPITE HER BEST EFFORTS,

21    WITH THE HELP OF THE POLICE, TO GET HIM TO DO SO.  HE DOES

22    NOT.

23              SHE THEN DECIDES AT SOME POINT HE MUST PAY.  HE

24    MUST BE HELD ACCOUNTABLE.  AND SHE ADMITS THAT HER FEAR OF

25    HIM IS BASED ON HIS FINDING OUT THAT SHE FILED FOR A

26    RESTRAINING ORDER.  SHE DOESN'T HAVE ANY FEAR OF HIM BEFORE

27    THEN.  THE FEAR IS BASED ON THE FILING OF THE RESTRAINING

28    ORDER.
```

```
 1          JUST LIKE THE CONCERN AT THE HOSPITAL IS BASED ON
 2   HER OWN TELLING HIM THAT SHE IS IN THE HOSPITAL.  SHE THEN
 3   FILES FOR A DOMESTIC VIOLENCE RESTRAINING ORDER.  AND IN SO
 4   DOING, SHE PRESENTS AN INCREDIBLY MISLEADING ACCOUNT OF WHAT
 5   HAPPENED.  IT IS SO MISLEADING THAT I FIRST ASKED ABOUT A LIE
 6   OF OMISSION, BECAUSE THE WAY SHE DESCRIBES WHAT HAPPENED AND
 7   WHAT SHE LEAVES OUT COMPLETELY CHANGES THE NARRATIVE AND THE
 8   TRUTH.
 9          SHE LEAVES OUT KEY FACTS LIKE THAT SHE SPECIFICALLY
10   TOLD HIM THAT SHE WANTED TO BE TREATED MORE -- WE'LL USE THE
11   WORD "VIOLENTLY" -- THAN THE FIRST TIME THEY WERE TOGETHER.
12   BY LEAVING THAT OUT, THAT PRESENTS A FALSE NARRATIVE ABOUT
13   WHAT HE IS DOING AND WHY HE IS DOING IT.  PART OF WHAT HE IS
14   DOING IT -- PART OF WHAT HE IS DOING AND PART OF WHY HE IS
15   DOING IT IS BECAUSE HE HAS HAD A MATURE ADULT CONVERSATION
16   WITH LINDSEY ABOUT IT.  AND SHE HAS MORE THAN ACQUIESCED.
17   SHE HAS ENCOURAGED IT.
18          NOT ONLY DOES SHE LEAVE THAT OUT COMPLETELY OF HER
19   PETITION, BUT WHEN I ASK HER, "DIDN'T YOU THINK THAT WAS
20   IMPORTANT," SHE SAYS "NO."  THE ONLY THING SHE THINKS IS
21   IMPORTANT IS THAT SHE WENT TO THE HOSPITAL.  NONE OF THE
22   THINGS THAT HAPPENED THAT PRECEDED THAT ARE IMPORTANT TO HER.
23   SHE WENT TO THE HOSPITAL.  AND THAT'S ALL THAT MATTERS.
24          SHE STARTS OFF THE FALSE NARRATIVE.  THIS MAY HAVE
25   SEEMED LIKE A SMALL THING, BUT FROM MY STANDPOINT, IT SETS
26   THE ENTIRE CONTEXT.  BASICALLY THAT HE PURSUED HER, THAT HE
27   IS INVITING HER OVER AND SHE IS SIMPLY ACQUIESCING TO COME
28   OVER, WHICH ISN'T ACCURATE.  IT ISN'T ACCURATE AT ALL.
```

```
 1          AND THE POINT ABOUT THE PHOTOGRAPH IS THAT IT IS
 2   NOT REFLECTIVE, AS SHE ACKNOWLEDGED -- THE EXHIBIT THAT SHE
 3   INCLUDES IN HER RESTRAINING ORDER PETITION -- OF HOW SHE
 4   LOOKED.  SHE HAS A RED FACE.  SHE HAS BLACK EYE IRISES.  I
 5   THINK THAT'S -- AND SO IT LOOKS WORSE.  IT'S JUST PART OF THE
 6   FALSE NARRATIVE PRESENTED TO THE COURT TO CAUSE THE COURT IN
 7   READING THE PETITION AND DECIDING WHETHER OR NOT TO GRANT IT
 8   ON A NARRATIVE IN WHICH SHE IS THE INNOCENT VICTIM WHO HAD
 9   NOTHING TO DO WITH ANY OF THIS.  THIS IS HOW SHE LOOKED.  AND
10   THAT'S NOT RIGHT.
11          ANOTHER THING THAT'S NOT RIGHT IS THE VERY FEW AND
12   SCANT INSTAGRAM MESSAGES THAT SHE INCLUDES WITH THE PETITION.
13   THE MOST EGREGIOUS IS THE ONE WHERE SHE STARTS -- SHE PUTS
14   THE PAGE WHERE HER ANSWER IS "YES YES AND YES."  IT'S THE
15   ANSWER.  WE DON'T GET TO SEE THE QUESTION.  SHE LEFT THE
16   QUESTION OUT.  AND THE QUESTION, OF COURSE, IS DO YOU --
17   SOMETHING, LIKE -- I'M PARAPHRASING -- DO YOU WANT ME TO SLAP
18   YOU HERE OR?  "YES YES AND YES."  SHE LEFT THAT OUT.  BUT
19   STARTS WITH HER ANSWER OUT OF CONTEXT.  AND SHE THINKS ALL OF
20   THAT IS PERFECTLY FINE.
21          SHE CLAIMS THAT ALL OF HER DIRECT MESSAGES HAVE
22   BEEN DELETED.  THAT IT'S THE PASADENA POLICE DEPARTMENT'S
23   FAULT.  SHE THOUGHT THEY HAD IT.  SHE DOESN'T HAVE IT.  AND
24   THEN MIRACULOUSLY SOME OF THE THINGS APPEAR.  AND,
25   INTERESTINGLY, THE THINGS THAT STILL EXIST ARE INCLUDED IN
26   THE PETITION, AGAIN, OUT OF CONTEXT AND WITHOUT ANYTHING AT
27   ALL THAT IS DAMNING TO HER.  NOTHING.  ALL OF THESE MESSAGES
28   MISSING, CRITICAL TIME PERIOD AFTER MAY 16 WITH MELY AND WITH
```

1  LISA, GONE.

2          SHE LIES AND SAYS THAT HE CALLS HER INCESSANTLY.

3  THE COURT WILL BE ABLE TO LOOK AT THE CALL LOG, THE TEXTS.  I

4  MEAN, IT'S MAYBE TWO A DAY WHERE HE IS CHECKING ON HER TO SEE

5  IF SHE IS OKAY.  AGAIN, NOT ASKING, DIDN'T SAY IT WAS ME;

6  RIGHT?  NONE OF THAT.

7          AND IT IS CLEAR, BASED ON ALL OF THE INFORMATION WE

8  GOT IN THE TEXTS BETWEEN HER FRIENDS, WHAT WE HEARD FROM HER,

9  WHAT WE HEARD FROM MS. MEYER JUST NOW, THAT THIS IS ABOUT THE

10 MEDIA FINDING OUT.  SHE JUST SAID -- MS. MEYER JUST SAID THAT

11 EVEN IF WE LOSE, AT LEAST EVERYBODY KNOWS THAT TREVOR BAUER

12 IS A MONSTER.  THEY HAD PROJECTORS HERE FOR A COURT TRIAL,

13 BECAUSE THAT'S WHAT THIS IS ABOUT.

14         SHE SAID SO.  LINDSEY SAID SO.  SHE TRIED TO SAY

15 THAT SHE DIDN'T CARE ABOUT THE MEDIA UNTIL MR. FETTEROLF'S

16 STATEMENT CAME OUT.  THAT'S NOT TRUE.  SHE IS EXCITEDLY

17 TELLING HER FRIENDS HIS LIFE IS OVER.  HE IS FUCKED.  THIS IS

18 THE LAST TIME HE IS EVER GOING TO PLAY.  THIS IS HIS LAST

19 START.  I CAN'T WAIT.  WE'RE GOING TO CELEBRATE.  WOO HOO.

20         NOTHING ABOUT, WELL, THANK GOD.  I'VE BEEN SO

21 SCARED.  I'VE BEEN LIVING IN FEAR, BECAUSE MY SOUL LEFT MY

22 BODY.  AND NOW I'M SCARED.  AND NOW I DON'T HAVE TO BE SCARED

23 BECAUSE THE COURT INTERFERED.  NONE OF THAT.  WOO HOO.  WE'RE

24 GOING TO CELEBRATE.  HE IS GOING TO BE HELD ACCOUNTABLE.

25 THAT'S NOT WHAT THIS IS FOR.

26         IT'S -- THE LEGAL ANALYSIS HAS BEEN VERY

27 INTERESTING FOR ME TO CONTEMPLATE.  AND THE REASON IS THAT,

28 AS MS. MEYER CORRECTLY POINTS OUT, THE D.V.P.A. AND THE

568

```
 1    PROCEEDINGS CONCERNING THE D.V.R.O., THE "V" STANDS FOR
 2    VIOLENCE.  AND THE VIOLENCE THAT IS CONTEMPLATED IN THE
 3    STATUTE, IN THE PROCEEDING -- IN THESE PROCEEDINGS, IN
 4    D.V.R.O.S, THE RATIONALE, THE LEGISLATIVE HISTORY, IS SOME
 5    ACT OF VIOLENCE PERPETRATED OUT OF MALEVOLENCE, ANGER,
 6    VENGEANCE THAT'S UNILATERALLY UNPREDICTED, FRIGHTENING BY
 7    VIRTUE OF ITS UNPREDICTABILITY, AND ILL INTENT.  THAT'S THE
 8    VIOLENCE THAT IS BEING PROTECTED.  AND THAT'S THE CONCERN OF
 9    THE LEGISLATURE AND THE COURT IS THAT VIOLENCE.
10          AND I -- IT'S DIFFICULT TO USE THE WORD "VIOLENCE"
11    IN TALKING ABOUT ROUGH SEX BECAUSE OF WHAT I JUST SAID.  THAT
12    THE CONNOTATION IS VIOLENCE AS IT RELATES TO DOMESTIC
13    VIOLENCE IN THE CONTEXT IN WHICH WE KNOW IT.  AND THAT'S NOT
14    WHAT'S HERE.  IS ROUGH SEX ARGUABLY BY DEFINITION VIOLENT?
15    I'LL SAY "YES" FOR PURPOSES OF THIS DISCUSSION.  BUT THAT IS
16    NOT WHAT IS CONTEMPLATED BY THE D.V.P.A. OR THE D.V.R.O.
17    PROCEEDINGS.
18          THE PURPOSE IS TO PREVENT ACTS OF DOMESTIC
19    VIOLENCE, ABUSE, AND SEXUAL ABUSE, TO PROVIDE FOR A
20    SEPARATION OF THE PERSONS INVOLVED IN THE DOMESTIC VIOLENCE
21    FOR A PERIOD SUFFICIENT TO ENABLE THESE PERSONS TO SEEK A
22    RESOLUTION OF THE CAUSES OF THE VIOLENCE.  THAT HAS NOTHING
23    TO DO WITH THIS.  NOTHING WHATSOEVER.
24          THERE IS NO ONE ON THE PLANET WHO WOULD BELIEVE
25    THAT THERE IS ANY POSSIBILITY IN THIS LIFE OR THE NEXT ONE,
26    ON THIS PLANET OR ANOTHER, THAT THESE TWO PEOPLE ARE EVER
27    GOING TO BE IN ANY SORT OF SEXUAL ENCOUNTER EVER AGAIN.  AND
28    THAT IS THE CONTEXT IN WHICH THE VIOLENCE (INDICATING) -- I'M
```

569

```
 1   DOING MY FINGERS IN AIR QUOTES, MADAM COURT REPORTER -- THE
 2   ROUGH SEX, IT'S IN THE CONTEXT OF A SEXUAL ENCOUNTER.  TWO.
 3   BOTH OF WHICH INVOLVED MR. BAUER, LIKE AN ADULT, SAYING, HAVE
 4   YOU EVER DONE THIS?  WHAT DO YOU NOT WANT ME TO DO?  I STOP
 5   WHEN YOU TELL ME TO STOP.  TELL ME THE WORD THAT YOU CAN USE
 6   THAT I CAN STOP.
 7            AND LINDSEY'S AMBASSADOR COMES OUT SIGNING UP FOR
 8   DUTY.  JUST DON'T PUT YOUR FINGERS DOWN MY THROAT.  LET'S GO.
 9   CHOKE ME OUT.  I'VE NEVER BEEN MORE TURNED ON.  GIVE IT ALL
10   TO ME.  SHOW ME THE PAIN.  OKAY.  THAT IS NOT WHAT IS
11   CONTEMPLATED BY THE D.V.P.A.  THAT IN NO WAY SERVES ITS
12   FUNCTION.
13            MS. MEYER QUOTED TO A COUPLE OF CASES EXPANDING
14   THE -- IN WHICH THE LEGISLATURE -- THE CASE LAW EXPANDED THE
15   DEFINITION OF A DATING RELATIONSHIP.  AND SHE IS RIGHT.  I
16   MEAN, THERE ARE NOW SAME SEX RELATIONSHIPS.  THERE ARE NOW
17   RELATIONSHIPS WITH SEVERAL DIFFERENT PARTNERS.  THAT'S NOT
18   WHAT WE'RE TALKING ABOUT HERE.  THERE IS ABSOLUTELY NO
19   EVIDENCE OF A DATING RELATIONSHIP.
20            CAN I HAVE ONE MOMENT, YOUR HONOR?
21         THE COURT:  YES.
22         MS. HOLLEY:  KATE IS LOOKING FOR SOMETHING.  AND I LOST
23   IT.
24            MS. MEYER IS CORRECT THAT PEOPLE NOW COMMUNICATE
25   VIA TEXT AND SOCIAL MEDIA.  ALL PEOPLE DO THAT.  IT'S NOT
26   SPECIFIC TO DATING.  AS SHE SAID, EVERYBODY'S TEXTING.
27   EVERYBODY IS TALKING.  THAT IS A MECHANISM, A PLATFORM THAT
28   PEOPLE COMMUNICATE WITH ONE ANOTHER.  THAT'S NOT THE
```

1  EXPANSION OF THE DEFINITION OF DATING WHEN WE'RE NOW TALKING

2  ABOUT SAME SEX COUPLES AND -- YES, OF COURSE, PEOPLE GO GET

3  MARRIED WHEN THEY'RE IN LONG STANDING RELATIONSHIPS.  SHE

4  QUOTED PEOPLE VS. RUCKER FOR THAT PROPOSITION.

5       IN RUCKER, THE PEOPLE WENT OUT ON NUMEROUS DATES,

6  ATTENDED A WEDDING TOGETHER, PLANNED A TRIP TOGETHER, AND

7  DATED FOR A TOTAL OF ABOUT NINE MONTHS.  IN PHILLIPS VS.

8  CAMPBELL, THEY HAD KNOWN EACH OTHER FOR TWO AND A HALF YEARS.

9  THERE WERE NUMEROUS TEXTS ABOUT THE RELATIONSHIP, INCLUDING

10 THAT THEY BOTH INVESTED TO BUILD A RELATIONSHIP OVER THE PAST

11 SEVEN MONTHS STRENGTHENING OUR LOVE AND RESPECT FOR EACH

12 OTHER.  THEY TALKED ABOUT FALLING IN LOVE.  AND THEY

13 DISCUSSED THE POSSIBILITY OF DATING.

14       SO WHEN THEY CAME TO COURT AND SAID WE WEREN'T

15 DATING, THE COURT COULD LOOK TO THESE THINGS AND RECOGNIZE

16 THAT IRRESPECTIVE OF WHAT THEY SAID, ALL OF THIS INFORMATION

17 COULD BETTER INFORM THE COURT AS TO THE NATURE OF THEIR

18 RELATIONSHIP.  THERE IS NOTHING HERE LIKE THAT.

19       I'M VERY SORRY TO REPORT TO MS. HILL THAT THERE WAS

20 NO EMOTIONAL CONNECTION, THAT THERE WAS NO REASON FOR HER TO

21 BELIEVE SO.  AND, ALSO, THAT THERE WAS NOTHING HE EVER DID TO

22 MISLEAD HER.  HE MADE IT VERY CLEAR AS TO WHO HE WAS, WHAT HE

23 WAS ABOUT, AND HE DID HIS BEST TO ASK HER.  DID HIS VERY BEST

24 TO ASK HER.

25       I WAS TALKING TO ONE OF THESE GUYS ON THE TEAM --

26 ON A DIFFERENT TEAM -- ABOUT WHAT MANY GUYS WOULD DO WITH THE

27 INFORMATION THAT THEY HAD FROM HER SAYING, I WANT IT MORE

28 HARD.  AND THEY COME RIGHT -- AS SOON AS SHE GOT THERE, IT

```
1  WOULD BE ON AND POPPIN.  THAT'S NOT HIM.  HE TALKED TO HER
2  FOR HOURS.  HE WAS WITHIN THE CONTEXT AND CONFINES OF THE,
3  QUOTE, "RELATIONSHIP" THAT THEY HAD.  COULD NOT HAVE BEEN
4  MORE RESPECTFUL OF WHAT SHE WANTED AND WHAT SHE DIDN'T WANT.
5          A DATING RELATIONSHIP MEANS FREQUENT, INTIMATE
6  ASSOCIATIONS.  THERE IS NO FREQUENCY.  THERE ARE TWO
7  OCCASIONS OF SEX THAT WERE DISCUSSED WITHIN THE CONTEXT OF
8  SEX AND SEX ONLY, DESPITE WHAT MS. HILL CONCOCTED IN HER
9  HEAD.
10         THE FIRST INCIDENT, APRIL 21ST, IS REALLY
11 IMPORTANT, BECAUSE THINGS HAPPENED THERE THAT -- THE
12 EXPERIENCES THAT THEY BOTH HAD THAT HAPPENED ON APRIL 21ST
13 INFORM WHAT MIGHT HAPPEN ON MAY 15TH, LIKE YOUR HAIR MIGHT BE
14 WRAPPED AROUND YOUR THROAT AND YOU MIGHT BE CHOKED OUT TO
15 UNCONSCIOUSNESS.  AND BECAUSE THAT HAPPENED ON APRIL 21ST,
16 AND NOT ONLY DID YOU SAY YOU WERE OKAY WITH THAT, BUT YOU
17 SAID YOU HAD NEVER BEEN MORE TURNED ON AND YOU WANTED IT TO
18 HAPPEN MORE THE NEXT TIME.  IF THESE THINGS HADN'T HAPPENED
19 ON APRIL 21ST AND HE SPRUNG THEM ON HER ON MAY 15, I WOULD BE
20 LIKE, "OKAY."  BUT THEY ALREADY HAPPENED.  SHE SAID SHE
21 EXPECTED THAT.
22         YOU KNOW -- AND SHE KEPT SAYING ON THE STAND, I
23 SAID "YES" TO THIS AND "YES" TO THIS.  I DIDN'T REALLY MEAN
24 IT.  I DIDN'T MEAN IT.  BUT I SAID "YES" BECAUSE I WANTED HIM
25 TO HEAR WHAT HE WANTED TO HEAR.  I WANTED TO SAY WHAT I KNEW
26 HE WANTED TO HEAR.  BUT I SAID "YES" TO THIS, BUT NOT THAT.
27 WELL, AS I SAID IN OPENING, IT'S A CONTINUUM.  WHEN YOU
28 ENGAGE -- I DON'T KNOW PERSONALLY -- BUT IF --
```

572

1        THE COURT:  DON'T EVEN KNOW WHETHER YOU DO OR DON'T.

2   IT'S ALL THE SAME IN CLOSING ARGUMENT.

3        MS. HOLLEY:  IN THIS MILIEU, YOU ARE ENTERING INTO A

4   DANGER ZONE.  AND THE BEST YOU CAN DO, IF YOU ARE ENTERING

5   INTO SUCH AN ENCOUNTER, IS TO HAVE AS MUCH OF AN

6   UNDERSTANDING WITH THE OTHER PERSON AS POSSIBLE.  WHAT DON'T

7   YOU WANT ME TO DO?  TELL ME WHEN TO STOP.  ALL OF THAT

8   HAPPENED.  SO SHE CAN'T SAY, HAVING ACQUIESCED, ENCOURAGED,

9   DEMANDED MORE, SAY, YEAH, BUT THAT PART WASN'T OKAY.

10        IT IS HARD TO HAVE A MEETING OF THE MINDS -- AND I

11   HAVE TO SAY, THIS IS LIKE AN AGREEMENT -- WHEN ONE OF THE

12   PEOPLE HAS SENT THEIR FAKE AMBASSADOR TO THE NEGOTIATING

13   TABLE WHEN INSIDE THAT PERSON IS SAYING THIS IS NOT WHAT I

14   MEAN, THIS IS NOT WHAT I FELT, THIS IS NOT WHAT I WANTED.

15   BUT THE AMBASSADOR IS SAYING THIS IS WHAT I WANT, I'M GOOD

16   WITH IT.  WE'RE IN AGREEMENT.

17        AND BECAUSE HE DOESN'T KNOW HER AND SHE DOESN'T

18   KNOW HIM, BECAUSE ALL THEY'VE DONE IS TALK ON INSTAGRAM DM

19   FOR MOST OF THEIR COMMUNICATION, ALL HE CAN DO, AS A GROWN-UP

20   TALKING TO ANOTHER GROWN-UP, IS PRESUME THAT WHAT SHE IS

21   SAYING IS WHAT SHE MEANS, AND WHAT SHE WANTS, AND WHAT SHE

22   DOESN'T WANT, SO HE DOESN'T DO WHAT SHE DOESN'T WANT.

23        AND TO GLEEFULLY FILE PAPERS BECAUSE SHE WANTS HIM

24   TO BE HELD ACCOUNTABLE, AND BECAUSE SHE IS UPSET BECAUSE THE

25   PASADENA POLICE, WHO SHE HATES, HASN'T DONE WHAT SHE WANTS,

26   SHE IS GOING TO PUT THIS ON BLAST IS AN ABUSE OF PROCESS.

27   IT'S AN ABUSE OF THIS COURT'S TIME.  AS I SAID IN QUOTING

28   MS. MEYER A FEW MOMENTS AGO, "IF WE LOSE, AT LEAST THE WORLD

1    KNOWS ABOUT TREVOR BAUER."

2             THAT WAS THEIR POINT FROM THE START.  THAT WAS

3    LINDSEY'S POINT FROM THE START.  AND THEY GOT WHAT THEY WANT.

4    AND I WOULD ASK THE COURT TO DENY THE PETITION FOR ALL OF

5    THESE REASONS.

6             IT SHOULD NOT BE IN THE DOMESTIC VIOLENCE COURT.

7    IT SHOULD NOT EXIST AT ALL.  SHE HAS LIED REPEATEDLY.  SHE

8    HAS ADMITTED THAT SHE LIED REPEATEDLY.  SHE HAS MISLED THE

9    COURT, IF NOT LIED IN HER PAPERS.  AND SHE IS -- NOT ONLY IS

10   SHE NOT DESERVING OF A PETITION THAT I THINK WE ALL AGREE IS

11   UNNECESSARY, BUT SHE'S ABUSED THE COURT PROCESS AS WELL.

12             THANK YOU.

13        THE COURT:  THANK YOU.  ANY REBUTTAL?

14        MS. MEYER:  YES, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  AGAIN, WE'RE USING SORT OF THE

16   FUNNEL SYSTEM.  IF YOU SAID IT IN YOUR CLOSING, YOU DON'T

17   NEED TO SAY IT AGAIN OR I REALLY MEAN IT.  ONLY ADDRESS

18   THINGS YOU HAVE TO.

19        MS. MEYER:  YES, YOUR HONOR.  I ONLY WROTE DOWN THE

20   NOTES THAT WERE RAISED AS A RESULT OF WHAT MS. HOLLEY SAID.

21        THE COURT:  THANK YOU.

22        MS. MEYER:  FOR MOST OF MS. HOLLEY'S ARGUMENT I DIDN'T

23   DISAGREE WITH HER.  I THINK A LOT OF OUR FACTS ARE SIMILAR.

24   AND I THINK WHAT THE COURT HAS TO DO IS DECIDE, BASED UPON

25   THOSE FACTS, WHETHER WHAT LINDSEY IS SAYING IS CORRECT OR

26   WHAT TREVOR AND HIS TEAM ARE SAYING IS CORRECT.  ONE OF THE

27   BIG POINTS I THINK OF AGREEMENT IS WHAT MS. HOLLEY JUST SAID.

28             THAT WHEN YOU ENGAGE IN THESE KIND OF ACTS, ROUGH

1   SEX, YOU GOT TO HAVE AN AGREEMENT.  YOU DON'T SPRING IT ON

2   SOMEBODY WHEN YOU HAVE THEIR HAIR AROUND THE FRONT OF THEIR

3   NECK AND YOU'RE APPLYING PRESSURE.  IF YOU'RE GOING TO ENGAGE

4   IN THAT TYPE OF SEX, THEN YOU GOT TO DISCUSS IT BEFOREHAND.

5   SO I ASK THE COURT WHEN TREVOR WAS CHATTING UP LINDSEY AND

6   LINDSEY WAS CHATTING UP TREVOR FOR FOUR TO FIVE HOURS ON

7   APRIL 21, WHY DIDN'T HE TALK ABOUT WHAT HIS INTERESTS WERE,

8   THAT HIS SEXUAL PROCLIVITIES LIE IN HAVING ROUGH SEX?

9        NOT A WORD.  THEY TALKED ABOUT THE THREE RULES OF

10  DATING.  THAT WASN'T ONE OF THE RULES OF DATING.  I LIKE

11  ROUGH SEX.  I GUESS HE COULD HAVE PUT THAT IN THERE, BUT HE

12  DIDN'T.  HE WAITED UNTIL SHE WAS LITERALLY IN HIS BED WHEN HE

13  STARTED TO GET MORE AGGRESSIVE THAT HE INITIATED THE

14  CONVERSATION OF "WHAT DO YOU LIKE?"  AND SHE SAYS, "ROUGH SEX

15  IS OKAY."  AND HE SAYS, "I LIKE IT ROUGHER THAN YOU."

16       HOW IS THAT A MATURE ADULT CONVERSATION?  IT'S NOT.

17  A MATURE ADULT CONVERSATION WOULD HAVE BEEN WHEN THEY WERE

18  SITTING THERE FOR THOSE FOUR TO FIVE HOURS AND HIM SAYING,

19  THIS IS WHAT MY INTERESTS ARE.  DO YOU HAVE INTERESTS IN

20  THIS?  NONE OF THAT WAS SAID.

21       SO THERE WAS NO CONSENT.  THERE WAS A LOT OF

22  DISCUSSION.  AND ON THIS POINT, I DISAGREE WITH MS. HOLLEY

23  ABOUT THE FACT THAT TREVOR DIDN'T KNOW THE REAL LINDSEY.  HE

24  DID KNOW THE REAL LINDSEY, BECAUSE HE TOLD HER HE HAD

25  SEARCHED HER OR INVESTIGATED HER ON INSTAGRAM -- HER PROFILE

26  ON INSTAGRAM AFTER SHE TAGGED HIM ON THAT FIRST OCCASION ON

27  APRIL 18.  SO HE KNEW ABOUT HER PAST.  HE ALSO LEARNED A LOT

28  ABOUT HER WHEN THEY SPOKE FOR THOSE FOUR TO FIVE HOURS.

```
1          SO ANYBODY WITH ANY BRAIN HAD TO HAVE KNOWN THAT A
2    YOUNG WOMAN WHO JUST MEETS YOU WHO LIVES IN SAN DIEGO, THAT
3    IS GOING TO DRIVE TO YOUR HOUSE AT MIDNIGHT, MAY NOT BE THE
4    MOST MATURE OR STABLE PERSON IN THE WORLD.  AND I'M SAYING
5    THAT NOT TO BE CRUEL, BUT THAT'S THE TRUTH.  HE IS NOT A
6    30-YEAR-OLD YOUNG MAN WHO JUST STARTED OUT IN THIS WORLD.  HE
7    IS A FAMOUS BASEBALL PLAYER.  AS WE KNOW, BASEBALL PLAYERS
8    TRAVEL ALL OVER THE COUNTRY MEETING ALL KINDS OF PEOPLE,
9    DOING ALL KINDS OF THINGS.
10         HE IS NOT SOME NAIVE GUY THAT WAS CUCKOLDED BY THIS
11   YOUNG WOMAN.  TO THE CONTRARY, IT WAS EXACTLY THE OPPOSITE.
12   ANOTHER THING THAT MS. HOLLEY FAILS TO MENTION DURING THE
13   ENTIRETY OF HER CLOSING, EXCEPT FOR ONE POINT WHERE SHE SAYS
14   THAT HE DID RENDER HER UNCONSCIOUS BY STRANGULATION, IS HOW
15   DOES SHE CONSENT TO ANYTHING WHEN SHE IS UNCONSCIOUS?  SO
16   MAYBE THAT SHOULD HAVE BEEN A POINT OF DISCUSSION ON APRIL
17   21.
18         YOU KNOW WHAT?  I'M INTO THE STUFF WHERE I STRANGLE
19   YOU.  NOT GOING TO KILL YOU.  BUT I'M GOING TO STRANGLE YOU
20   AND YOU'RE GOING TO BE OUT.  AND I'M GOING TO JUST DO
21   WHATEVER I WANT WITH YOUR BODY.  SO WHEN SHE WOKE UP THE
22   FIRST TIME AND THEY WERE HAVING ANAL SEX, THEY NEVER
23   DISCUSSED THAT.  NOT ONCE DID SHE DISCUSS THAT.  AND THE FACT
24   SHE TOLD HIM NOT TO DO IT AGAIN DOESN'T JUSTIFY DOING IT IN
25   THE FIRST PLACE WITHOUT HER CONSENT.  ANOTHER THING THAT HE
26   SHOULD HAVE DISCUSSED ABOUT IT.
27         AND FOR MS. HOLLEY TO SAY THAT I DON'T BELIEVE HER,
28   IT'S NOT CREDIBLE.  HOW IS IT NOT CREDIBLE?  WE KNOW ABOUT
```

```
1   THE ACTS THAT HE COMMITS SEXUALLY.  WE HEARD THE PANOPLY.  WE

2   READ THE MENU, BECAUSE LINDSEY TOLD US WHAT HE DID.  SO HOW

3   IS ANAL SEX NOT ON HIS PLAYLIST.  IT IS ON HIS PLAYLIST.  HE

4   DID DO IT TO HER.  SHE WAS CREDIBLE WHEN SHE TALKED ABOUT IT,

5   THAT THERE WAS BLOOD IN THE TOILET AND ON HER TOILET PAPER

6   WHEN SHE WIPED HERSELF.  TO ME, THAT'S CREDIBLE.

7            SHE TESTIFIED SHE HAD NEVER HAD ANAL SEX BEFORE.

8   AND SHE ALSO TESTIFIED THE SECOND TIME SHE DIDN'T EVEN HAVE

9   TO ASK HIM, BECAUSE HE HAD DONE IT THE FIRST TIME AND SHE

10  TOLD HIM THAT SHE DIDN'T LIKE IT.  I DON'T THINK THERE IS ONE

11  SCINTILLA OF EVIDENCE TO SUPPORT THE FACT THAT THAT DIDN'T

12  HAPPEN.  IT DID HAPPEN.  IT WAS PART OF WHAT THIS GUY LIKES

13  TO DO.

14           JUST VERY BRIEFLY ABOUT THE TEXT MESSAGES TO THE

15  FRIENDS AND THE COUSIN.  "HE IS AN AMAZING HUMAN."  SHE WAS

16  MAKING FUN OF HIM.  DOESN'T NEGATE ANYTHING.  ALSO, A POINT

17  ABOUT THE THREE RULES OF DATING, WHICH I KNEW NOTHING ABOUT

18  BEFORE.  AND NOW I HAVE TO HEAR IT ALL THE TIME.

19           HE BROKE HIS OWN RULES.  THE SNAPCHAT PHOTO.  THE

20  NO FEELINGS.  HE HAD FEELINGS FOR THIS WOMAN.  SO HE BROKE

21  HIS OWN RULES OF DATING WHEN YOU READ ALL THOSE MESSAGES

22  AFTER THE MAY 15TH INCIDENT WHEN HE IS SAYING TO HER THINGS

23  LIKE, "HOW ARE YOU DOING?  HOW ARE YOU FEELING?  I'M WORRIED

24  ABOUT YOU.  I WANT TO COME SEE YOU."  ET CETERA.  ET CETERA.

25           SO HOW IS THAT NOT PART OF A RELATIONSHIP, WHETHER

26  IT'S MODERN DAY OR WHETHER WE WERE IN THE 1950'S.  AND

27  SPEAKING OF THE 1950'S, I FELT LIKE I WAS SITTING IN A

28  COURTROOM IN THE 1950'S WHEN I WAS LISTENING TO MS. HOLLEY.
```

1    IT'S LIKE WHEN WE WERE IN JUNIOR HIGH SCHOOL AND YOU GOT IN

2    TROUBLE FOR WEARING PATENT LEATHER SHOES BECAUSE IT REFLECTED

3    YOUR UNDERWEAR AND THAT, LIKE MEANT YOU WERE A SLUT.  I MEAN,

4    WE'RE SORT OF BEYOND THAT IN 2021.

5            LINDSEY ISN'T RESPONSIBLE FOR THIS.  IS SHE

6    ACCOUNTABLE?  DID SHE EXERCISE BAD JUDGMENT?  ABSOLUTELY.  IF

7    SHE WERE MY DAUGHTER, I WOULD HAVE SAID, DON'T YOU DARE GO

8    OVER TO THAT CREEP'S HOUSE.  I MEAN, YOU SEE THE RED FLAGS AT

9    THE VERY BEGINNING.  LISA WAS RIGHT.  MELY WAS RIGHT.  HER

10   COUSIN WAS RIGHT.  STAY AWAY FROM THAT GUY.  DANGER.  DANGER.

11   DANGER.  SO SHE IS ACCOUNTABLE FOR THAT.

12           BUT HE IS ACCOUNTABLE FOR WHAT HE DID TO HER.  AND

13   WHAT IS REALLY UNFORTUNATE, AND WHAT THE D.V.P.A. IS DESIGNED

14   TO PROTECT, IS IT IS DESIGNED TO MAKE PERPETRATORS OF

15   DOMESTIC VIOLENCE, WITH A CAPITAL "V," ACCOUNTABLE.  HE IS

16   NOT ACCOUNTABLE FOR HIS ACTIONS.  AND IF LINDSEY HADN'T --

17   HAD NOT BROUGHT THIS ACTION, WE DON'T KNOW WHAT THE END OF

18   THE STORY MIGHT HAVE BEEN.

19           THE COMMENT ABOUT KNOWING THE WORD -- KNOWING WHAT

20   A SAFE WORD WAS.  DADDY ISSUES.  REALLY?  AND LINDSEY

21   TESTIFIED -- AND THIS WAS DURING THE SECOND INCIDENT AND

22   AFTER HE HAD RENDERED HER UNCONSCIOUS THE SECOND TIME BY

23   STRANGULATION, SHE SAID SHE COULD BARELY GET OUT THE WORD

24   "DADDY."  SHE COULDN'T EVEN GET TO THE WORD "ISSUES."  HOW

25   SAD TO BE STRUGGLING IN BED AND HAVING -- I MEAN, COULDN'T --

26   SHE IS -- SHE WAS SHAKING LITERALLY ALL OVER HER BODY.

27           SHE WAS CRYING.  AND SHE WAS TRYING TO STRUGGLE TO

28   GET OUT THE WORD "DADDY."  AND THIS GUY KEPT AT IT AND TRIED

1   TO REINITIATE SEX AFTER THAT.  MS. HOLLEY MADE A COMMENT

2   THAT, YEAH, IT MUST HAVE BEEN PAINFUL AND UNPLEASANT.  THAT,

3   TO ME, IS LIKE, MRS. LINCOLN, HOW DID YOU ENJOY THE PLAY?  I

4   MEAN, REALLY?

5           HER COMMENTS -- MS. HOLLEY'S COMMENTS ABOUT IT NOT

6   BEING -- NOT BEING PART OF THE D.V.P.A., SEXUAL ASSAULT IS

7   DEFINED AS DOMESTIC VIOLENCE AND ABUSE UNDER THE D.V.P.A.

8   AND WE CAN'T CONDONE BEHAVIOR JUST BECAUSE IT'S SEXUAL.  JUST

9   BECAUSE THIS GUY BEAT THE "S" OUT OF HER IN BED DOESN'T

10  CONDONE IT BECAUSE IT'S ROUGH SEX.  IT DOESN'T WORK LIKE

11  THAT.

12          WE KNOW YOU CANNOT CONSENT TO AN ASSAULT AND A

13  BATTERY.  LINDSEY CAME CLEAN AFTER THE INCIDENT BY TELLING

14  HER FRIENDS AND BY GOING TO THE HOSPITAL.  I WOULD SUGGEST --

15  AND I THINK HER TESTIMONY IS CONSISTENT WITH WHAT -- THE FACT

16  THAT SHE WAS SCARED OUT OF HER MIND.  AND SHE WAS SCARED

17  BECAUSE SHE HAD A SPLITTING HEADACHE, THAT SHE WAS -- SHE WAS

18  DISORIENTED.  SHE HAD ACHES AND PAINS ALL OVER HER BODY.

19          I THINK SHE WAS SCARED TO DEATH, BECAUSE I DON'T

20  THINK IN HER WILDEST DREAMS THAT SHE EVER THOUGHT THAT PART

21  OF HAVING ROUGH SEX WAS BEING PUNCHED IN THE VAGINA

22  REPEATEDLY, HIT ON HER BUTT, AND ALL THE OTHER PANOPLY OF

23  WONDERFUL SEX GAMES THAT THIS GUY LIKES TO PLAY.

24          I THINK HER PHOTOGRAPH IN THE HOSPITAL TO HIM --

25  AND I WAS JUST LOOKING AT IT BEFORE I CAME UP HERE -- IS

26  REALLY, REALLY SAD.  THAT SHE -- EVEN AFTER EVERYTHING SHE

27  DID, THAT SHE HAD TO STOOP TO THE LEVEL OF TAKING THAT

28  PHOTOGRAPH.

1     THE COMMENTS ABOUT THE DECLARATION.  I HEAR THIS

2   TIME AND TIME AGAIN WITH DOMESTIC VIOLENCE CASES.  AS THE

3   COURT HAD DESCRIBED THEM, THEY'RE NOT TRUNCATED PROCEEDINGS.

4   BUT THEY HAPPEN VERY QUICKLY.  IT IS NOT UNUSUAL FOR THE

5   TESTIMONY IN A DECLARATION TO BE DIFFERENT FROM WHAT THE

6   WITNESS TESTIFIES TO BECAUSE THEY'RE DONE QUICKLY.  YOU DON'T

7   KNOW ALL THE FACTS.  YOU DON'T NECESSARILY HAVE ALL THE

8   EVIDENCE AT THE TIME THAT THEY'RE FILED.

9     BUT THERE'S NOTHING THAT I FOUND SO COMPELLING

10  ABOUT WHAT WAS ALLEGEDLY MISSING FROM THAT DECLARATION.  IT'S

11  NOT LIKE SHE SAID, YOU KNOW, HE PENETRATED ME ANALLY THE

12  SECOND TIME.  SHE HAS BEEN VERY CONSISTENT IN DESCRIBING THE

13  ONE MAIN ACT OF SEXUAL ABUSE.

14     MS. HOLLEY COMMENTED ON THE TEXT MESSAGES.  I SAID

15  ONE A DAY.  SHE SAID TWO A DAY.  I THINK EITHER OR TOMATOE,

16  TOMATO.  THAT IS STILL A RELATIONSHIP.

17     LINDSEY WENT TO THE MEDIA NOT EXCITEDLY, NOT

18  GLEEFULLY, AS MS. HOLLEY HAS SAID, BUT IN ORDER TO PROTECT

19  HER REPUTATION, IN ORDER TO GET JUSTICE BECAUSE THE POLICE

20  WEREN'T ACTING.  AND SHE IN GOOD FAITH FILED THIS DOMESTIC

21  VIOLENCE RESTRAINING ORDER.

22     A COMMENT ABOUT THE PHILLIPS VS. CAMPBELL CASE,

23  BECAUSE I'M SO WELL VERSED ON THAT CASE.  THE RELATIONSHIP

24  STARTED TWO AND A HALF YEARS -- STRIKE THAT.  THE PARTIES MET

25  TWO AND A HALF YEARS PRIOR.  THEY DIDN'T STRIKE UP WHAT THE

26  COURT CONSIDERED TO BE THE DATING RELATIONSHIP UNTIL ABOUT

27  SEVEN MONTHS.

28     WHAT I THINK IS INTERESTING IN THIS CASE, BECAUSE

1    OF THE NATURE OF WHAT TREVOR DOES FOR A LIVING, THIS WAS A

2    FAST AND FURIOUS RELATIONSHIP AND VERY INTENSE, BY LINDSEY'S

3    ACCOUNT AND HER PERCEPTION OF WHAT TREVOR WAS FEELING,

4    CONDENSED IN A VERY, VERY SHORT PERIOD OF TIME.  AND I THINK

5    THAT STILL FALLS UNDER THE DEFINITION.

6         PART OF EXHIBIT 2, BATES STAMP 89, IS A MAY 15 TEXT

7    MESSAGE FROM TREVOR TO LINDSEY WHERE HE SAYS WE'RE GOING TO

8    HAVE A CASUAL EVENING OR A MODEST EVENING.  WORDS TO THAT

9    EFFECT.  SHE TESTIFIED SHE WAS HOPING THERE WAS NOT GOING TO

10   BE A REPEAT OF WHAT HE DID BEFORE.  AND SHE COULD NOT IMAGINE

11   WHAT WAS YET TO COME.

12        MS. HOLLEY:  THAT MISSTATES THE EVIDENCE.  BUT --

13        THE COURT:  IT DOES MISSTATE THE EVIDENCE.

14        MS. MEYER:  I'M SORRY.  IF I MISSTATED THE EVIDENCE,

15   THEN I APOLOGIZE.  BUT THAT WAS ALL I HAD TO SAY.  I THINK

16   THAT THIS DOMESTIC VIOLENCE RESTRAINING ORDER IS PROPERLY

17   BEFORE THIS COURT.  I THINK THIS COURT HAS JURISDICTION.  AND

18   WE RESPECTFULLY REQUEST THAT THE COURT GRANT THE RESTRAINING

19   ORDER AS WE REQUESTED.

20        THANK YOU, YOUR HONOR.

21        THE COURT:  THANK YOU.  THE COURT IS GOING TO TAKE ABOUT

22   FIVE MINUTES.  AND THEN I WILL COME OUT.

23             (RECESS TAKEN.)

24        THE COURT:  LET ME FIRST START BY THANKING THE ATTORNEYS

25   FOR THE QUALITY OF THEIR PRESENTATION.  IT ASSISTS THE COURT

26   TREMENDOUSLY TO HAVE ATTORNEYS OF YOUR CALIBER PRESENTING THE

27   BEST CASE ON BOTH SIDES.

28        I START THE ANALYSIS ADDRESSING FAMILY CODE SECTION

1  6220, WHICH STATES THAT "THE PURPOSE OF THIS DIVISION IS TO

2  PREVENT ACTS OF DOMESTIC VIOLENCE, ABUSE, AND SEXUAL ABUSE

3  AND TO PROVIDE FOR A SEPARATION OF THE PERSONS INVOLVED IN

4  THE DOMESTIC VIOLENCE FOR A PERIOD SUFFICIENT TO ENABLE THESE

5  PERSONS TO SEEK A RESOLUTION OF THE CAUSES OF THE VIOLENCE."

6       I THEN GO TO FAMILY CODE SECTION 6340(1), WHICH

7  STATES, IN PERTINENT PART, "WHEN DETERMINING WHETHER TO MAKE

8  ANY ORDERS UNDER THIS SUBDIVISION, THE COURT SHALL CONSIDER

9  WHETHER FAILURE TO MAKE ANY OF THESE ORDERS MAY JEOPARDIZE

10  THE SAFETY OF THE PETITIONER."  ALTHOUGH, AS POINTED OUT IN

11  NEVAREZ VS. TONNA, NOTES THAT THE TRIAL COURT IS NOT REQUIRED

12  TO FIND A PROBABILITY OF FUTURE ABUSE TO MAKE A DETERMINATION

13  THAT IT'S APPROPRIATE TO HAVE A RESTRAINING ORDER ISSUED.

14       THEN WE GET TO THE ISSUE OF WHAT A DATING

15  RELATIONSHIP IS.  FAMILY CODE SECTION 6210 DEFINES THAT AS

16  "FREQUENT, INTIMATE ASSOCIATIONS PRIMARILY CHARACTERIZED BY

17  THE EXPECTATION OF AFFECTION OR SEXUAL INVOLVEMENT

18  INDEPENDENT OF FINANCIAL CONSIDERATIONS."

19       COUNSEL RAISED THE POINT CORRECTLY THAT THAT

20  STATUTE WAS REVISED IMMEDIATELY BY THE LEGISLATURE AFTER

21  ORIOLA VS. THALER, WHICH REQUIRED, AS A CONDITION OF A DATING

22  RELATIONSHIP, THAT IT BE A "NON-CASUAL, SERIOUS COURTSHIP,

23  CONTINUING AND MUTUALLY COMMITTED EMOTIONAL RELATIONSHIP."

24  SO CLEARLY THE LEGISLATURE INTENDED TO HAVE THE D.V.P.A.

25  ADDRESS ISSUES THAT WERE LESS SERIOUS THAN THAT WHICH WAS

26  FOUND IN ORIOLA.

27       WHAT MY RESEARCH HAS UNCOVERED IS THERE'S VIRTUALLY

28  NO CASE THAT HAS ADDRESSED THE ISSUE OF WHAT IS MEANT UNDER

1  THE STATUTE OR BY THE LEGISLATURE BY THE WORD "FREQUENT."

2  AND WHETHER TWO OCCASIONS OF IN-PERSON CONTACT IS FREQUENT.

3  I FOUND THE SAME CASES THAT COUNSEL RAISED.

4  PEOPLE VS. RUCKER, WHICH ADDRESSES THE STATUTORY

5  DEFINITION AND USES THE LANGUAGE THAT THE LEGISLATURE COULD

6  REASONABLY CONCLUDE DATING RELATIONSHIPS, EVEN WHEN NEW, HAVE

7  UNIQUE EMOTIONAL AND PRIVACY ASPECTS THAT DO NOT EXIST IN

8  OTHER SOCIAL OR BUSINESS RELATIONSHIPS AND THOSE ASPECTS MAY

9  LEAD TO DOMESTIC VIOLENCE EARLY IN A RELATIONSHIP.  AND IN

10 THAT CASE, THE INTERPERSONAL RELATIONSHIP OF THE PARTIES WAS,

11 BY THE FACTS, FAR MORE EXTENSIVE THAN THE RELATIONSHIP

12 BETWEEN THE PARTIES HERE.

13 IN PHILLIPS VS. CAMPBELL, IT WAS IN THE

14 COMMUNICATIONS WITH THE RESPONDENT AFTER SHE HAD REBUFFED HIS

15 ADVANCES THAT APPELLANT MADE CLEAR THAT IT WAS HE WHO

16 CONSIDERED THEIR RELATIONSHIP TO HAVE BEEN MORE THAN A MERE

17 FRIENDSHIP.  IN THAT CASE, THOUGH, THE COURT -- THIS

18 COURT FINDS IT TO BE A STRAINED ANALYSIS AT BEST -- THE COURT

19 FOUND THAT IT WAS THE DEFENDANT WHO IMAGINED THAT A

20 RELATIONSHIP EXISTED WHEN IT DID NOT.  AND THAT THAT WAS

21 SUFFICIENT FOR THE COURT TO DEFINE IT AS A DATING

22 RELATIONSHIP.

23 IN THIS CASE, THE DATING RELATIONSHIP WAS AT MOST

24 TENUOUS.  AT MOST, THE FACTS INDICATE THAT THERE WERE TWO

25 IN-PERSON MEETINGS BETWEEN THE PARTIES HERE AND SOME DIRECT

26 MESSAGES AND TEXTS BETWEEN APRIL 18TH OF THIS YEAR AND MAY

27 30TH OF THIS YEAR.  ONLY A VERY LIBERAL INTERPRETATION OF THE

28 STATUTE, WHICH SEEMS TO BE WHAT THE LEGISLATURE INTENDED,

1    ALLOWS THE COURT TO INCLUDE AMONG "INTIMATE ASSOCIATIONS" THE

2    DIRECT MESSAGES AND TEXTS BETWEEN THE PARTIES, WHICH COULD BE

3    CHARACTERIZED AS HAVING THE EXPECTATION OF AFFECTION OR SEX,

4    AT LEAST AS TO THAT PERIOD BETWEEN APRIL 18 AND MAY 15.

5            SO THE COURT FINDS THAT, WHILE A CLOSE CALL, THIS

6    DOES FALL WITHIN THE AMBIT OF THE LEGISLATIVE INTENT THAT

7    THIS BE INCLUDED -- THE TYPE OF RELATIONSHIP BETWEEN THESE

8    PARTIES BE INCLUDED UNDER THE D.V.P.A.

9            I THEN GO TO THE TESTIMONY AND THE EVIDENCE THAT

10   THE COURT RECEIVED.  PETITIONER MADE CLEAR IN HER TESTIMONY

11   THAT WHAT SHE THOUGHT PRIVATELY AND WHAT SHE COMMUNICATED TO

12   RESPONDENT WERE OFTEN NOT THE SAME THING, SPECIFICALLY WHEN

13   IT CAME TO ROUGH SEXUAL ACTS.  PETITIONER TESTIFIED THAT WHEN

14   SHE SET BOUNDARIES, RESPONDENT RESPECTED THEM.

15           PETITIONER TESTIFIED THAT RESPONDENT ASKED

16   PETITIONER TO SET BOUNDARIES.  ON THEIR SECOND IN-PERSON

17   ENCOUNTER, PETITIONER SET ONE THING AS OFF LIMITS AND ASSUMED

18   THAT ANOTHER WAS OFF LIMITS AFTER THE PARTIES' FIRST

19   ENCOUNTER, WHICH SHE TOLD NURSE VALENCIA DID NOT OCCUR DURING

20   THE SECOND ENCOUNTER.

21           THE EVIDENCE, INCLUDING PETITIONER'S TESTIMONY,

22   SHOW THAT RESPONDENT INVITED PETITIONER TO TALK TO HIM WHEN

23   SHE SEEMED UPSET AND THAT SHE HAD MULTIPLE OPPORTUNITIES TO

24   SET BOUNDARIES.  PETITIONER TESTIFIED THAT RESPONDENT DIDN'T

25   CROSS THE BOUNDARIES WHICH PETITIONER EXPRESSED TO HIM.

26   RESPONDENT COULDN'T KNOW THE BOUNDARIES WHICH PETITIONER

27   DIDN'T EXPRESS TO HIM.

28           PETITIONER TESTIFIED THAT BOTH SEXUAL ENCOUNTERS

1  BEGAN CONSENSUALLY BUT THAT, AT LEAST AS TO THE SECOND
2  ENCOUNTER, IT VENTURED INTO AREAS TO WHICH SHE DID NOT
3  CONSENT.

4          THE PRIMARY QUESTION FOR THIS COURT IS, TO WHAT DID
5  PETITIONER CONSENT?  AND HOW DID SHE MANIFEST THAT CONSENT TO
6  RESPONDENT?

7          IN WRITTEN EXCHANGE PETITIONER SAID THAT "SHE
8  WANTED ALL THE PAIN."  THOSE WERE HER WORDS.  SHOULD
9  RESPONDENT HAVE BELIEVED HER?

10         IN WRITTEN COMMUNICATION PETITIONER SAID SHE WANTED
11 TO BE CHOKED OUT.  RESPONDENT SOUGHT CLARIFICATION AS TO
12 WHETHER SHE MEANT "OUT," AS IN UNCONSCIOUS, AND PETITIONER
13 REPLIED IN THE AFFIRMATIVE.  SHOULD RESPONDENT HAVE BELIEVED
14 HER?

15         WE CONSIDER THAT, IN THE CONTEXT OF A SEXUAL
16 ENCOUNTER, WHEN A WOMAN SAYS "NO," SHE SHOULD BE BELIEVED.
17 SO WHAT ABOUT WHEN SHE SAYS "YES"?

18         PETITIONER TESTIFIED THAT SHE DID NOT CONSENT TO
19 BEING PUNCHED TO THE POINT OF HAVING BLACK EYES AND HAVING TO
20 BE HOSPITALIZED.  HAVING BLACK EYES AND BEING HOSPITALIZED
21 WERE THE POTENTIAL CONSEQUENCES OF THE ACTIVITIES, INCLUDING
22 SOME OF WHICH PETITIONER ACKNOWLEDGED THAT SHE DID CONSENT
23 TO, SUCH AS BEING CHOKED.

24         THE ONLY EVIDENCE OF ANYTHING WHICH HAPPENED WHILE
25 PETITIONER WAS UNCONSCIOUS WAS HAVING BEEN HIT ON THE BUTT IN
26 THE PARTIES' FIRST ENCOUNTER.  OTHER ACTS OCCURRED WHILE
27 PETITIONER WAS CONSCIOUS.  SHE TESTIFIED THAT SHE WASN'T ABLE
28 TO SPEAK PART OF THAT TIME BUT RESPONDENT COULDN'T KNOW THAT.

1   ON AT LEAST ONE OCCASION, WHEN RESPONDENT WAS DOING SOMETHING

2   PETITIONER DIDN'T WANT AND SHE COULDN'T SPEAK, SHE MOTIONED

3   TO HIM AND HE DID STOP.  ON ANOTHER, SHE USED THE FIRST PART

4   OF THEIR AGREED SAFE WORD AND HE DID STOP.

5           RESPONDENT DID NOT PURSUE PETITIONER.  HE DID NOT

6   THREATEN PETITIONER TO COERCE HER INTO SEXUAL ACTIVITY.  AND

7   HE DIDN'T THREATEN HER AFTER THEY HAD ENGAGED IN SEXUAL

8   ACTIVITY.

9           PETITIONER COMPLAINS IN HER TESTIMONY THAT ONE OF

10  HER PROBLEMS HAS BEEN HER DESIRE TO SEEK ATTENTION.

11  COMMUNICATIONS TO HER FRIENDS, WHICH ARE ENTERED INTO

12  EVIDENCE, INDICATE SHE WAS EXCITED FOR THE ATTENTION TO HER

13  AND, EVENTUALLY, THE DAMAGE THAT ATTENTION WOULD HAVE ON

14  RESPONDENT.

15          LET ME BE CLEAR.  THE INJURIES AS SHOWN IN THE

16  PHOTOGRAPHS ARE TERRIBLE.  UNDER MOST CIRCUMSTANCES, MERELY

17  SEEING PHOTOGRAPHS SUCH AS THOSE WOULD SERVE AS A PER SE

18  CONDEMNATION OF THE PERPETRATOR OF SUCH INJURIES.  BUT

19  PETITIONER HAD AND HAS THE RIGHT TO ENGAGE IN ANY KIND OF SEX

20  AS A CONSENTING ADULT THAT SHE WANTS TO WITH ANOTHER

21  CONSENTING ADULT.

22          SHE WAS NOT AMBIGUOUS ABOUT WANTING ROUGH SEX IN

23  THE PARTIES' FIRST ENCOUNTER AND WANTING ROUGHER SEX IN THE

24  SECOND ENCOUNTER.  PETITIONER WAS ASKED BY RESPONDENT TO

25  DECIDE WHATEVER SHE WANTED TO LET RESPONDENT KNOW WAS OFF

26  LIMITS, AND SHE DID.

27          IF SHE HAD SET LIMITS AND HE HAD EXCEEDED THEM,

28  THIS CASE WOULD BE VERY CLEAR.  BUT SHE SET LIMITS WITHOUT

1  FULLY CONSIDERING ALL THE CONSEQUENCES AND RESPONDENT DID NOT

2  EXCEED THE LIMITS THAT PETITIONER SET.

3        GOING BACK TO FAMILY CODE SECTION 6220 AND 6340,

4  THE FUNDAMENTAL PURPOSE OF THE DOMESTIC VIOLENCE PREVENTION

5  ACT, THE COURT FINDS THAT PETITIONER'S INITIAL DECLARATION,

6  WHICH WAS THE BASIS UPON WHICH SHE OBTAINED A TEMPORARY

7  RESTRAINING ORDER, WAS MATERIALLY MISLEADING.  SHE CLAIMED

8  THAT RESPONDENT WAS CALLING AND TEXTING NON-STOP FOR TWO

9  WEEKS.  WHEN THE REALITY WAS THAT RESPONDENT RARELY CALLED

10  AND TEXTED ONLY WHEN SHE HAD TOLD HIM SHE WAS IN THE HOSPITAL

11  TO MAKE SURE THAT SHE WAS STILL OKAY.  EACH OF THOSE TEXTS OR

12  VOICEMAILS WAS OF A SIMILAR SORT, "ARE YOU OKAY?"

13        PETITIONER WAS CLEAR THAT SHE WAS EXTREMELY

14  STRESSED AND HAD EXTREME ANXIETY WHEN RESPONDENT SENT

15  MESSAGES.  SHE ALSO TESTIFIED THAT SHE WAS EXTREMELY STRESSED

16  AND ANXIOUS WHEN HE DIDN'T SEND MESSAGES.  THAT ISN'T

17  RATIONAL.

18        RESPONDENT DID NOT PURSUE PETITIONER.  SHE PURSUED

19  HIM.  PETITIONER'S TESTIMONY MADE CLEAR THAT SHE WAS UPSET

20  THAT RESPONDENT DIDN'T CALL HER WHEN SHE EXPECTED HIM TO AND

21  THAT DURING AND AFTER THEIR FIRST IN-PERSON ENCOUNTER,

22  PETITIONER WANTED MORE OF A RELATIONSHIP WITH RESPONDENT THAN

23  THE FACTS, AS SHE PRESENTED THEM, COULD REALISTICALLY BE

24  EXPECTED.

25        HER FEAR THAT RESPONDENT MIGHT DO SOMETHING IF HE

26  KNEW SHE WENT TO THE HOSPITAL HAD NO FACTUAL BASIS.  HER FEAR

27  THAT RESPONDENT MIGHT DO SOMETHING IF HE KNEW SHE HAD FILED A

28  REQUEST FOR RESTRAINING ORDER DOES NOT APPEAR TO HAVE HAD ANY

1   FACTUAL BASIS.  ALTHOUGH THE NEVAREZ CASE DOES NOT REQUIRE A

2   JUDGE TO CONSIDER WHETHER THERE IS A PROBABILITY OF FUTURE

3   HARM, FAMILY CODE 6340 DOES REQUIRE THAT IT BE PART OF THE

4   COURT'S CONSIDERATION.

5          IN THIS CASE, THE COURT FINDS THERE IS NO

6   SUPPORTABLE EVIDENCE THAT RESPONDENT IS LIKELY TO CAUSE

7   PETITIONER ANY HARM OR EVEN HAVE CONTACT WITH THE PETITIONER.

8   FOR ALL THE REASONS STATED, THE COURT DENIES PETITIONER'S

9   REQUEST FOR A LONG TERM DOMESTIC VIOLENCE RESTRAINING ORDER.

10  AND THE COURT HEREBY DISSOLVES THE TEMPORARY RESTRAINING

11  ORDER.

12      MS. HOLLEY:  THANK YOU, YOUR HONOR.

13      MR. FETTEROLF:  THANK YOU, YOUR HONOR.

14      MS. MEYER:  THANK YOU, YOUR HONOR.

15          (THE PROCEEDINGS WERE CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    FOR THE COUNTY OF LOS ANGELES

3     HON. DIANNA GOULD-SALTMAN, JUDGE        DEPARTMENT 35

4

5    LINDSEY HILL,                    )
                                      )
6                                     )
                        PETITIONER,   ) NO. 21STRO03198
7                                     )
                   VS.                )
8                                     ) REPORTER'S
                                      ) CERTIFICATE
9    TREVOR BAUER,                    )
                                      )
10                                    )
                        RESPONDENT.   )
11   _____)

12

13            I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14   REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15   FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16   FOREGOING PAGES, 521 THROUGH 587, INCLUSIVE, COMPRISE A FULL,

17   TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18   MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 19, 2021.

19            DATED THIS 23RD DAY OF AUGUST, 2021.

20

21

22   _____
     JACQUELINE M. CAIRE, CSR #9599, RPR
23   OFFICIAL REPORTER

24

25

26

27

28
```