1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
2                    SOUTHERN DIVISION - SANTA ANA

3

4    TREVOR BAUER,                )  Case No. SACV 22-868-JVS (ADSx)
                                  )
5          Plaintiff,            )  Santa Ana, California
                                  )  Wednesday, May 24, 2023
6            v.                   )  10:16 A.M. to 11:04 A.M.
                                  )  11:21 A.M. to 11:29 A.M.
7    LINDSEY C. HILL, et al.,     )
                                  )
8          Defendants.           )
     _____  )
9

10

11

12                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE AUTUMN D. SPAETH
13               UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:                 See Page 2

16   Deputy Clerk:                 Kristee Hopkins

17   Court Reporter:               Recorded; CourtSmart

18   Transcription Service:        JAMS Certified Transcription
                                   16000 Ventura Boulevard #1010
19                                 Encino, California  91436
                                   (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:        Zuckerman Spaeder LLP
                               By:  BLAIR G. BROWN
 4                             1800 M Street NW, Suite 1000
                               Washington, D.C.  20036
 5                             (202) 778-1800
                               bbrown@zuckerman.com
 6
                               Zuckerman Spaeder LLP
 7                             By:  NELL Z. PEYSER
                               485 Madison Avenue, 10th Floor
 8                             New York, New York  10022
                               (212) 704-9600
 9                             npeyser@zuckerman.com

10

11   For the Defendant:        Freedman and Taitelman LLP
                               By:  JESSE A. KAPLAN
12                             1801 Century Park West, 5th Floor
                               Los Angeles, California  90067
13                             (310) 201-0005
                               jkaplan@ftllp.com
14
                               Wesierski and Zurek LLP
15                             By:  BRETT A. SMITH
                               29 Orchard Road
16                             Lake Forest, California  92630
                               (949) 975-1000
17                             bsmith@wzllp.com

18

19

20

21

22

23

24

25
```

```
 1    SANTA ANA, CALIFORNIA, WEDNESDAY, MAY 24, 2023, 10:16 A.M.

 2            THE COURT:  Please be seated.

 3            JESSE A. KAPLAN:  Thank you.

 4            THE CLERK:  We're on the record this United States

 5    District Court, The Honorable Autumn D. Spaeth, United States

 6    Magistrate Judge presiding.

 7            Calling Case SACV 22-868-JVS (ADSx), Trevor Bauer

 8    v. Lindsey C. Hill, et al.

 9            And, counsel, please state your appearances

10    starting with plaintiff.

11            NELL Z. PEYSER:  Good morning, Your Honor.

12    Nell Peyser for Plaintiff Trevor Bauer.

13            THE COURT:  Okay.  Good morning.

14            BLAIR G. BROWN:  Good morning, Your Honor.

15    Blair Brown also on behalf of Mr. Bauer.

16            THE COURT:  Good morning.

17            MR. KAPLAN:  Good morning, Your Honor.  Jesse

18    Kaplan on behalf of the Defendant Lindsey Hill, and also with

19    me is my colleague Brett Smith.

20            THE COURT:  Good morning, both of you.  All right.

21            All right.  Moving party, it is your podium,

22    lectern -- (indecipherable).  Here we go.  Right here.  You

23    can just stand in front of everyone.  Let me hear from you.

24    The stage is yours.

25            MR. KAPLAN:  Okay.  Thank you, Your Honor.
```

1          Your Honor, there's two issues, and I think that

2    they have been briefed fairly significantly.  So I'm not sure

3    there's much to add other than what's already stated in the

4    papers.

5          To start with what I think is the issue of lesser

6    contention at this point, it's the San Diego Padres subpoena.

7    At this point Mr. Bauer has indicated that he does not intend

8    to pursue it at this time and has not provided any real

9    substantive opposition to the motion.  However, he has not

10   been willing to either withdraw the subpoena to the Padres,

11   in whole or part, in particular to the offending categories

12   in the subpoena, or indicate or agree that he will not pursue

13   it in the future.  So I think that the Padres subpoena is

14   still ripe, and we still believe that we're entitled to

15   relief as to that subpoena, and there hasn't been any

16   substantive reason provided by Mr. Bauer in his portion of

17   the joint stipulation or otherwise as to why that portion of

18   the motion should not be granted.

19         So, Your Honor, I don't know if you have any

20   additional questions for me on that issue.

21         THE COURT:  Not on that issue, no.

22         MR. KAPLAN:  Okay.  Turning to the two other

23   subpoenas, the Decker subpoena and the Rodgers subpoena,

24   which both deal with issues concerning substance abuse and

25   substance abuse treatment.

1            Now, there are certain issues that have been raised

2    in the joint stipulation by both parties, including by

3    Mr. Bauer.  I think I tried to address all of them either in

4    the joint stipulation or in the supplemental memorandum.  In

5    no particular order, there's been an argument -- or there's

6    various arguments made by Mr. Bauer why he needs specific

7    information from these two individuals that's isolated to

8    substance abuse or substance abuse treatment only, so that

9    information in isolation from Ms. Hill's prior AA sponsor and

10   from someone who ran a facility that Ms. Rodgers lived in for

11   some period of time in 2020 while she was recovering.

12            Now, there may be other issues in this case --

13   there's other discovery that has been targeted towards other

14   areas which there may be overlap -- potentially.  I don't

15   know.  I can't say there is or there isn't, but it's

16   potentially possible there could be overlap between those

17   other categories and substance abuse, and I want to make it

18   clear that we're fine and not seeking to prevent the

19   discovery of anything like that.  It's just more very

20   specific in -- with respect to these two subpoenas where you

21   have information in isolation.

22            For example, there's the Ohana lost-wages claim,

23   and Mr. Bauer contends that he would like to take discovery

24   as to the reasons why Ms. Hill's employment -- or

25   contemplated employment, I should say, with the Ohana House

1    in approximately 2021 did not commence.  There's another

2    subpoena that has been issued to that entity, to Ohana, which

3    asks for all sorts of information, including information

4    about her departure or the reasons for her departure or why

5    she didn't start work.  So to the extent there's any

6    information -- or documents, I should say, concerning the

7    reason why Ms. Hill did not commence her employment with

8    Ohana in 2021, they're going to get that information, and if

9    it has to do with substance abuse, they're going to get it.

10             THE COURT:  If you don't -- if you're not objecting

11   to that, why do you object to it here?

12             MR. KAPLAN:  The information is different because

13   the -- and I guess we're really talking about the Rodgers

14   subpoena.  Rodgers, my understanding at least, she's the

15   owner and/or operator of various Ohana house -- I think

16   there's a few of them -- and the information that would be --

17   that is being sought from the Rodgers subpoena is any

18   information about substance abuse or treatment, and that

19   would call for the information -- or documents, I should say,

20   from Ms. Hill's stay at the -- one of the Ohana houses back

21   in 2020, and that information really doesn't have anything to

22   do with the reasons why she did -- didn't commence her

23   employment with another Ohana House in 2021.  She went there

24   for treatment -- or one of the houses in 2020, whatever

25   happened there, it happened, but that doesn't really matter

1  to why she did or didn't start, in 2021, employment.

2          And to the extent there's any reason that Rodgers

3  or Ohana or whoever was making the decisions for the entity

4  decided, "We're not going to go ahead with Lindsey Hill's

5  employment," that information will be provided.

6          All right.  So that's the Ohana lost-wages issues.

7          One other issues was consent, which obviously is a

8  key issue in this case, in particular to Ms. Hill's claims

9  for battery and sexual battery, and to summarize the argument

10 that Mr. Bauer made in his papers was that Ms. Hill was

11 looking for or was interested in having rough sex to fill

12 some alleged void in her life as a result of her being sober,

13 to sort of replace a high she was previously getting from

14 substance abuse, and apparently there was some testimony on

15 this in a prior proceeding and Ms. Hill denies that she made

16 statements to Mr. Bauer that that was why -- or at least one

17 of the reasons why she was interested in having rough sex

18 with him.

19         So Mr. Bauer, in the papers, has claimed that

20 there's an issue as to whether or not Ms. Hill did or did not

21 say those things to Mr. Bauer before they engaged in these

22 activities.  So the question is -- or the issue raised by

23 Mr. Bauer is they want to prove that it's more likely than

24 not that Ms. Hill said those things to him, and they want to

25 show that she had a substance abuse problem in order to

1   support that.

2          Now, Mr. Bauer does not need the documents from

3   Ohana -- I'm sorry -- Ms. Rodgers or Ms. Decker for that.

4   Ms. Hill has stated, and it's not disputed, that she had a

5   substance abuse problem and that she was in recovery and that

6   she was sober for some period of time.  So whatever documents

7   they may get from either Rodgers or from Ms. Decker are not

8   going to help in that matter.

9          To the extent there's any documents that anyone

10  has, whether it's Decker or Rodgers, about Ms. Hill -- on

11  that particular issue that Ms. Hill desires to or is

12  interested in having rough sex as a result of -- any reason,

13  whether it's, you know, substance abuse or otherwise, those

14  documents will also be produced pursuant to subpoenas -- or

15  the same subpoenas at issue here, just other categories in

16  the subpoena that are not at issue and are not being

17  challenged.  So to the extent there's any overlap there

18  between Ms. Hill wanting to have rough sex with anyone and

19  the reasons for that --

20          THE COURT:  Give me an example of where it is also

21  called for in the subpoena that you're now challenging.

22          MR. KAPLAN:  Sure.  Let me just find the subpoenas.

23          All right.  So I'm looking at Exhibit 1.  This is

24  the -- to my declaration.  This is ECF number -- Document No.

25  92-1.  Exhibit 1 is the Decker subpoena.  And, for example:

1   1, All communications with Ms. Hill concerning, a, Mr. Bauer.

2   And I would think No. 8 -- is:  All documents or tangible

3   items in your possession concerning, a, Mr. Bauer.

4         So that should be broad enough to include that.

5   Now, if it's not, we're willing to stipulate here that the --

6   that Ms. Decker and Ms. Rodgers -- if they have anything

7   about -- or have any documents about Ms. Hill's interest in

8   or desire to have rough sex, those can be produced as part of

9   the subpoena.

10         THE COURT:  Okay.

11         MR. KAPLAN:  All right.  And the other area of

12   alleged relevance for this particular information is --

13   concerns Ms. Hill's emotional distress damages.  Now, there's

14   not a lot of authority out there that I've seen or found in

15   my research and certainly cited in the briefs on this, and

16   Ms. Hill is not putting in this lawsuit her substance abuse

17   at issue.  There's been claims that in prior proceedings she

18   has, and that may be true, but those were prior proceedings.

19   That's not here.  Ms. Hill does not claim -- she's not

20   claiming in this lawsuit that what happened with Mr. Bauer --

21   the battery and sexual battery -- resulted in substance abuse

22   or any sort of relapse of that.

23         Now, she is claiming emotional distress.  That's

24   true.  Through the discovery process and the meet-and-confer,

25   we've agreed that Mr. Bauer can get medical records

1  concerning her mental health treatment, and we've agreed on a

2  timeframe for that.  I believe it's approximately two years

3  from April 2021, when the first of the two incidents

4  occurred, back to April 2019, if I'm getting my dates right.

5  So Mr. Bauer is free to take discovery -- and he has and

6  issued subpoenas to Ms. Hill's mental health-care providers,

7  and he'll get those documents.  He may have gotten them

8  already.  Now, if there's anything in there that reflects

9  substance abuse or substance abuse treatment in connection

10 with the mental health -- or any mental health issues that

11 were going on, again, we're not saying no to that.  Those

12 documents will be produced.

13        Now, if we focus here on the Rodgers subpoena and

14 the Decker subpoena, to the extent there's anything there

15 that either of those two individuals have in terms of

16 documents concerning Ms. Hill's mental health treatment and

17 there's any overlap with substance abuse, again, they'll get

18 that.  I don't know that there's going to be much there, but

19 I don't know either.  So again, there's -- if there's any

20 overlap there -- and the two subpoenas also specifically

21 request that information, all communications with or all

22 documents concerning Ms. Hill's mental health or mental

23 health treatment.  So again, Mr. Bauer will get those

24 documents.

25        But beyond that, I'm not sure, in isolation, why --

1 especially if you look at, you know, Rodgers or the AA

2 sponsor, what those communications will do to advance this

3 case at all and advance any defenses that Mr. Bauer may have

4 to damages.

5    So, Your Honor, I don't know if you have any

6 further questions for me on any of this or anything that I

7 didn't discuss.

8    THE COURT:  So one of the arguments that you made

9 in your briefing is that these documents are protected by

10 California's right to privacy, and the cases, I believe, that

11 you cited are all based on doctor-patient or therapist-

12 patient privilege.  Do you have any case law that supports a

13 privilege for communications with an AA sponsor or a halfway

14 house or a sober-living home?

15    MR. KAPLAN:  Well, there's -- to answer your

16 question, again, there's not a lot of authority that -- I

17 think I've seen it all -- dealing with these type of

18 relationships.  There -- as far as I've seen, I didn't see

19 any specific privilege as you might see between a physician

20 and a patient, attorney and a client -- the list goes on.

21 However, there are certainly privacy rights in these sort of

22 things.  So the analysis under California law will be the

23 standard privacy analysis of balancing the person-who-has-

24 the-privacy's rights against the need for the discovery in

25 the lawsuit.

1          THE COURT:  All right.  Can you tell me: What kind

2   of services did the sober-living home provide?  Is it simply

3   somewhere to live, or were there therapy -- you know, talk to

4   me about that.

5          MR. KAPLAN:  So I can't, Your Honor, tell you the

6   details of it, not because I don't want to, but I'm not fully

7   familiar with them.  My understanding is -- and I could be

8   wrong about some of this stuff -- it's a house where, I

9   believe, women who are recovering from substance abuse go to

10  live during that recovery process.  Now, I believe there are

11  some activities that go on at the sober-living house to help

12  the residents, such as Ms. Hill, recover from their issues

13  and maintain their sobriety.  So I think it's a little more

14  than just a place to live.  I don't -- you know, I don't know

15  what degree, though, more that it is, but it certainly is --

16         THE COURT:  But Ms. Rodgers was -- if there were

17  other services, Ms. Rodgers wasn't the one providing them; is

18  that right?

19         MR. KAPLAN:  I don't believe so.  I think that

20  there were other employees there.  I think Ms. Rodgers -- she

21  may have been there at points in time, but I think she

22  oversees multiple homes in the San Diego area.

23         THE COURT:  Okay.

24         MR. KAPLAN:  I do think, however, there are some

25  records from the house around the time that Ms. Hill was

1    living there concerning her recovery process.  So I do think

2    there are some records from -- whether it's Ohana -- the

3    house or Rodgers, and, you know, I think Ms. Rodgers probably

4    has access to those given that she owns and operates the

5    various facilities.

6           THE COURT:  Okay.  Can you tell me more about what

7    precisely Ms. Hill is seeking with regard to her emotional-

8    distress damages?

9           MR. KAPLAN:  Yes.  So let me take a look at my

10   declaration and -- there's an interrogatory response that

11   I've attached here that has fairly good degree of detail of

12   that information.  It's Exhibit 10 to my declaration and more

13   specifically -- let's see if I'm getting the number right.  I

14   think it's the response to Interrogatory 21.  So that's on

15   page 18 and 19 of Exhibit 10 in my declaration.  Again,

16   that's ECF 92-1.

17          And I'm happy to read it to the Court if you'd like

18   but this -- to try to summarize them, there's anxiety;

19   depression; humiliation; embarrassment; feeling unmotivated,

20   tired, irritable, alone, and isolated; having trouble being

21   around others; doing things that would draw attention to

22   herself; participating less in social activities and physical

23   activities; sometimes having difficulty with ordinary tasks;

24   loss of appetite and weight; nightmares, bad dreams of the

25   particular batteries and sexual batteries; trouble sleeping;

1  inconsistent sleep; thinking about and having upsetting and

2  unpleasant distressing memories of the batteries and sexual

3  batteries.  She would sometimes relive the batteries and

4  sexual batteries.  Sometimes she would think of things or see

5  things in her life --

6              THE CLERK:  I've got an error.  Hold on.  Let me --

7              THE COURT:  Our recording system just erred --

8  erred -- whatever.

9      (Brief break in recording.)

10             THE CLERK:  Okay.  Go ahead.

11             MR. KAPLAN:  May I continue?

12             THE COURT:  Please.  Thank you.

13             MR. KAPLAN:  And there would be things in her life

14  where she would think of or be reminded of the batteries and

15  sexual batteries and bring back these horrific thoughts.

16             THE COURT:  Is any portion of her emotional-

17  distress damages that she's seeking related to her substance

18  abuse?

19             MR. KAPLAN:  She's not.  And we've made a

20  deliberate decision to limit that in this case.

21             THE COURT:  Okay.  Okay.

22             MR. KAPLAN:  All right.  Thank you, Your Honor.

23             THE COURT:  Good morning.

24             MS. PEYSER:  Good morning, Your Honor.  My name is

25  Nell Peyser, and I am counsel for Mr. Bauer.

```
 1              I would like to begin where Mr. Kaplan ended.  In
 2   Ms. Hill's supplemental filing, she refers -- what she refers
 3   to as an "unremarkable proposition" is that when a plaintiff
 4   places her emotional-distress damages and mental health
 5   conditions at issue, the defendant is entitled to discover
 6   whether the plaintiff was truly emotionally distressed from
 7   that conduct or whether there were other causes for that
 8   emotional distress.  Now, as Mr. Kaplan just went through,
 9   Ms. Hill has put her mental health at issue here.  She seeks
10   damages for severe emotional distress, including anxiety,
11   depression, fear, humiliation, loss of enjoyment of life,
12   detachment, feeling disconnected from the world,
13   worthlessness, emotional numbness -- and the list goes on.
14              And this is precisely a primary reason that
15   Mr. Bauer seeks this information.  It goes directly to her
16   mental and emotional state from both before her encounters
17   with Mr. Bauer and after her encounters and whether that
18   emotional state was indeed caused by Mr. Bauer or whether it
19   was caused by something else, such as her alcohol use
20   disorder.  Every single mental health condition or
21   explanation of the type of severe emotional distress that
22   Ms. Hill allegedly suffered from could have also been caused
23   by alcohol use disorder, and Mr. Bauer is clearly allowed to
24   explore whether there were other causes for her emotional and
25   mental state.
```

1          Now, Ms. Hill says that she's not seeking damages

2    based on alcohol use disorder, but her alcohol use and

3    treatment information bears directly on her emotional state

4    and whether she was severely emotionally distressed before

5    she ever met Mr. Bauer.  Substance use disorder is a mental

6    health disorder in the "DSM-5" and the literature, and the

7    treatment necessarily involves addressing the underlying

8    causes or the other mental health conditions that are

9    triggered or exacerbated by the substance use or what have

10   you.  Substance use treatment services are mental health

11   treatment services, and they're not simply provided in a

12   vacuum.

13         And if Ms. Hill's emotional distress wasn't what

14   caused her substance use, her substance use could have caused

15   her emotional distress.  Either way, the discovery bears

16   directly on Ms. Hill's level of emotional distress that

17   existed prior to her encounters with Bauer and after her

18   encounters with Mr. Bauer, and he's entitled to show that he

19   was not the cause of the damages that she seeks.  She --

20         THE COURT:  Can I ask you a question?  How does

21   that argument work -- or rather, how does it interact with

22   the fact that California law says basically that you find,

23   for lack of a better term, her -- a plaintiff -- you know,

24   you take them as you find them.  So how does that -- you

25   know, sort of our traditional eggshell plaintiff concept,

1   right -- how does that -- how do those two legal concepts

2   work together?

3          MS. PEYSER:  Well, here if Mr. Bauer can establish

4   that Ms. Hill's emotional and mental health condition was of

5   a certain way before they met and had their two sexual

6   encounters and that her mental, emotional health was

7   unchanged following the encounters, then the damages that she

8   seeks are simply nonexistent.  So we may take her as we find

9   her, but we compare her state from beforehand and her state

10  afterwards, and to understand that emotional and mental state

11  from both before and after her encounters with Mr. Bauer, we

12  need to understand her mental health condition at large,

13  which, as Ms. Hill admits -- or concedes, her alcohol use

14  disorder and treatment has played a big role in her life and

15  --

16         THE COURT:  How -- it sounds like, though, that you

17  may be getting those records from other sources.  How does

18  the information from Rodgers and Decker -- if you're getting

19  mental health treatment -- or mental health records from the

20  providers, what does this add for you?

21         MS. PEYSER:  We understand that Ms. Hill spoke with

22  both Ms. Rodgers and Ms. Decker at length about her mental

23  health and in conjunction with her treatment for her alcohol

24  use disorder, and her communications with them, they shed

25  light very different than what any sort of records from a

1   treatment provider will shed.  As we know from some of the

2   communications we have, Ms. Rodgers spoke about Ms. Hill's

3   proclivity for rough sex as a relapse of another kind, and

4   that suggests that, as part of Ms. Hill's discussions with

5   Ms. Rodgers and Ms. Decker, they were navigating and

6   exploring Ms. Hill's interest in rough sex as part of her

7   recovery and using that as a means to, perhaps, achieve the

8   same high that she achieved from her alcohol use disorder.

9        THE COURT:  And that wouldn't -- that information

10  wouldn't already be included in the medical records?

11       MS. PEYSER:  I don't believe so, Your Honor.

12       THE COURT:  Okay.  All right.  Go ahead.

13       MS. PEYSER:  I'd also like to quickly mention that

14  Ms. Hill also seeks damages for future emotional pain and

15  suffering all the way through the present, and she has said

16  in her Interrogatory Response No. 21 that these symptoms have

17  continued through the present.  So Mr. Bauer should also be

18  able to discover information about her substance use disorder

19  from the timeframe we're talking about through the present to

20  understand whether whatever emotional distress Ms. Hill

21  alleges she has suffered since her encounters with Mr. Bauer

22  and continues to suffer are indeed caused by him or whether

23  there's anything else going on that could be another cause

24  for that emotional state.

25       And I'd also like to mention that Ms. Hill has

1  already agreed that Mr. Bauer is entitled to fulsome

2  discovery on her mental health history and records from both

3  before and after her encounters with Mr. Bauer for precisely

4  the reason that she's placed her mental health at issue.  And

5  Ms. Hill agrees that Mr. Bauer can discover all information

6  about her mental health history going back to April 2019 for

7  every single mental health condition except alcohol use

8  disorder.

9          THE COURT:  Can I ask you a question?

10         MS. PEYSER:  Sure

11         THE COURT:  You were just talking about dates and

12  timeframes, and I'm looking at the subpoena, and I'm not

13  seeing -- excuse me -- a time limitation for either of these

14  subpoenas.

15         MS. PEYSER:  Your Honor, I believe the time

16  limitation is from the day the witness met Ms. Hill through

17  the present but I --

18         THE COURT:  And do we know what that timeframe is?

19         MS. PEYSER:  -- double-checking.

20         Yes.  That is Instruction No. 1 to the subpoenas:

21  "The date when you first communicated with Ms. Hill through

22  the present."  We --

23         THE COURT:  Okay.  Do we know what that is for

24  these folks?  Yeah.

25         MS. PEYSER:  We believe that to be around, if not

1    later, than the April 2019 timeframe, but I think Mr. Kaplan

2    would know better than I would.  Ms. Hill does say in her

3    declaration that Ms. Decker was her AA sponsor from

4    February 2021 through April 2022 and that she resided at the

5    sober-living house from January 2020 to August 2020.  So

6    we're -- I -- my understanding is that we're talking about

7    not much earlier than 2019.

8            THE COURT:  They both look like they might have an

9    answer over there.  I'm just curious.

10           Yeah?

11           MR. KAPLAN:  Your Honor, I was going to say the

12   same thing.  So it's certainly possible that these

13   individuals have -- let me back up.

14           It's certainly possible that Ms. Hill has known

15   these individuals, in particular Ms. Decker, earlier, but

16   Ms. Peyser is correct in terms of when those relationships --

17   in terms of when Ms. Hill went to the sober-living home in

18   2020 and when Ms. Decker became Ms. Hill's sponsor.  So those

19   dates are accurate.

20           THE COURT:  Okay.  Thank you.

21           MS. PEYSER:  Beyond Ms. Hill's agreement that

22   Mr. Bauer can discover information about every mental health

23   condition other than alcohol use disorder, she also agrees

24   that if there are alcohol use-disorder records intertwined

25   with her other mental health records, Mr. Bauer can discover

1   those too.  And she further agrees that Mr. Bauer can ask her

2   about her substance use history at a deposition, for example.

3   And she further agrees that Mr. Bauer can discover

4   information about her contemplated employment at Ohana even

5   if that relates to -- or, and the reasons for her not

6   starting that position even if that relates to her alcohol

7   use disorder.

8         At the end of the day, what are the parties really

9   arguing about?  Ms. Hill largely agrees that Mr. Bauer is

10  entitled to mental health records, including substance use

11  records if they are intertwined with those mental health

12  records, and as substance use treatment, it goes to whatever

13  mental health conditions the patient is experiencing at the

14  time to address the underlying concerns, and the treatment is

15  generally holistic.  It seems like a distinction that doesn't

16  really exist in reality.

17        And further, looking at this practically, how can

18  Decker and Rodgers possibly be tasked with making these

19  determinations as they go through the documents that they

20  have and -- to decide what records are solely substance use,

21  what records are intertwined with mental health, what records

22  go to the issues in the case, such as her contemplated

23  employment at Ohana or consent to have rough sex with

24  Mr. Bauer or whatever they were exploring in their -- in the

25  road to sobriety process.  And to ask these witnesses to go

1    through their documents and make these nuanced determinations

2    is really not possible in practice.  So even if the Court

3    were to rule along the lines of Ms. Hill's position, there is

4    really no practical way to effectuate that ruling.

5         THE COURT:  One question I have for you is not this

6    nuanced argument but your argument about the fact that

7    Ms. Hill sort of generally seems to agree; so what are we

8    really fighting about?  That question goes both ways, right.

9    Like, if you can get the documents other ways -- all the

10   other ways that they're agreeing, what's different here that

11   your client needs that it's not getting other places?

12        MS. PEYSER:  Your Honor, Ms. Hill has not produced

13   any communications between her and Ms. Decker or her and

14   Ms. Rodgers, and we do know from the prior proceeding that

15   Ms. Hill does not have, at least, a large handful of

16   communications with Ms. Decker anymore.  And quite frankly,

17   we understand that a significant amount of discoverable

18   information about Ms. Hill's mental state will likely come

19   from her communications with these two witnesses.

20        We do have some of her communications with

21   Ms. Decker from the prior proceeding, and I'll note that

22   Ms. Hill produced those without redacting any substance use

23   information, and she spoke with Ms. Decker about the 12-step

24   program and what step she was on, as well as certain AA

25   mantras that her and Ms. Decker discussed amongst themselves

1  would be particularly helpful for Ms. Hill.  Ms. Hill

2  produced all of that in the prior proceeding without

3  redactions and without even designating it confidential.

4         So, yes, we do have some of these communications,

5  and it's possible that we will get some from Ms. Hill as well

6  in this case, but we don't have a full set, and especially

7  for Ms. Rodgers, the only communication we do have and are

8  aware of is the communication where Ms. Rodgers disqualified

9  Ms. Hill from her position at Ohana.

10         THE COURT:  Okay.  All right.

11         MS. PEYSER:  Now, I've touched on the primary

12  reason -- or a primary reason we seek this information,

13  because of the emotional distress Ms. Hill has placed at

14  issue, but her history of alcoholism also goes to the lost

15  wages she seeks from Ohana.  Ms. Hill alleges she was unable

16  to start that job due to the physical and mental trauma she

17  allegedly suffered from her encounters with Mr. Bauer, and

18  Mr. Bauer's clearly entitled to test whether there were other

19  causes that caused her to not be able to start that job.

20         We know from the one communication we do have with

21  Ms. Rodgers that she was disqualified from the employment

22  because Ms. Rodgers viewed rough sex as a relapse of another

23  kind.  Now, this goes to the lost-wage damages that she

24  seeks, but it also tells us that Ms. Rodgers and Ms. Hill

25  were -- if Ms. Rodgers understood that that was a relapse of

1    another kind, this was more likely than not something that

2    the two had discussed and a component of Ms. Hill's recovery

3    process and path to sobriety and the role that rough sex may

4    have played in that process.  This message from Ms. Decker --

5    or, excuse me -- Ms. Rodgers more likely than not didn't come

6    out of nowhere.  This is very likely something that was part

7    of the process that wouldn't be in any formal substance use

8    or mental health records but something that Ms. Hill and

9    Ms. Rodgers, and likely Ms. Decker, discussed.

10            And if Ms. Rodgers considered it a relapse of

11    another kind, that suggests that there was a lapse before the

12    relapse, perhaps.  It suggests that Ms. Rodgers was familiar

13    with the role that rough sex played in Ms. Hill's recovery

14    process from before she met Bauer.  So it not only goes to

15    the lost wages that she seeks, but it also goes to the next

16    reason that this information is discoverable.

17            It bears directly on whether, why, and how Ms. Hill

18    manifested her consent to have rough sex with Mr. Bauer.

19    Mr. Bauer alleges that Ms. Hill told him that she desired

20    rough sex because, when she started engaging in rough sex,

21    once she became sober, it gave her a high.  And from this

22    conversation, Mr. Bauer understood that Ms. Hill was

23    experienced in rough sex, she desired it because -- and she

24    told him the exact reason that she was at his apartment to

25    engage in this activity.  And Ms. Hill denies that this

1   conversation ever took place.

2          So in the classic "he said, she said" scenario,

3   Decker and Rodgers's potential corroborations of either

4   party's account are especially important.  If they were

5   helping Ms. Hill with her substance use treatment and

6   navigating the role of rough sex in her sobriety process,

7   which Bauer understands the case to be, that's highly

8   probative evidence of whether or not she consented and what

9   she told Mr. Bauer what the scope of Ms. Hill's consent was.

10          And if that were not enough, Ms. Hill has already

11   disclosed a morass of this information in her DVRO petition,

12   in the DVRO proceeding -- which the transcript is public, and

13   it is -- actually has been filed an exhibit in prior motions

14   in this case -- and then she produced over 200 pages of

15   communications with Decker that include the information about

16   -- or some of the information that we seek here.  So that

17   Ms. Hill now says this same information that she already

18   produced with no redactions or confidentiality designations

19   is deeply private to her is simply not convincing.

20          THE COURT:  Now, are you saying that the documents

21   that you are seeking were produced without a protective order

22   in that other proceeding?

23          MS. PEYSER:  Your Honor, I believe there was a

24   protective order in the other proceeding, but these documents

25   were produced without any confidentiality designations,

1  meaning, if there was a protective order in place, which I do

2  believe there was, the documents would not be subject to it.

3         THE COURT:  Okay.

4         MS. PEYSER:  So given the relevance of the

5  information and Ms. Hill's concession that large swaths of it

6  are in fact discoverable and her public disclosure of much of

7  the same information that she now seeks to protect, we

8  believe -- we strongly believe that the balancing test weighs

9  heavily in favor of permitting discovery on this topic.

10         THE COURT:  All right.  Thank you.

11         MS. PEYSER:  I'm happy to answer any questions you

12  have, or I can say a few words about the Padres subpoena.

13         THE COURT:  Please go on with the Padres.  Yeah.

14         MS. PEYSER:  Sure.  At this time Mr. Bauer

15  understands that there are strong privacy rights associated

16  with employment records and employment disciplinary history,

17  and he does not seek to enforce the Padres subpoena at this

18  time.  If information comes to light in discovery that allows

19  him to have a strong basis to seek the information, then he

20  reserves his right to seek that information in the future,

21  and as we've stated in the joint stipulation, if we do seek

22  that information in the future, we will let Ms. Hill's

23  counsel know with more than enough time to tee up this

24  dispute before the Court.

25         So at this point we think it doesn't make sense for

 1   the Court to expend judicial resources to decide a dispute

 2   that's not ripe and may well never ripen.  So our position is

 3   that we defer it to if and when it does become an issue in

 4   the case, which it may not.

 5          THE COURT:  Can you tell me -- because these are

 6   her employment records; right?

 7          MS. PEYSER:  Correct.

 8          THE COURT:  So how are employment records relevant

 9   to this case at all?  I mean, I know you tried to argue it.

10   I'm just not incredibly convinced from the paperwork.  So

11   help me understand better how they're relevant to defamation

12   claims and sexual battery claims.

13          MS. PEYSER:  At this point we are not arguing that

14   they are relevant and we're not seeking the discovery on

15   those employment records but we --

16          THE COURT:  How then -- and I appreciate your

17   honesty on that.  How then -- why is it a problem if I was to

18   grant the motion to quash/protective order?  Because, if

19   there was, let's say, some subset of these documents that you

20   believed later on were necessary, would there be a burden in

21   just re-serving the subpoena so that these -- the requests

22   would be more tailored to whatever is actually needed at the

23   time in the case?

24          MS. PEYSER:  Your Honor, if and when we do seek

25   documents from the San Diego Padres, we will be more than

1    happy to confer with Ms. Hill's counsel to see if we can

2    reach agreement and narrow the subpoena based on whatever

3    basis that is we're seeking those documents at that time,

4    depending on what discovery looks like, but for us to

5    formally withdraw the subpoena now and re-serve it would give

6    the Padres 30 days to respond -- they've already responded to

7    the subpoena -- and given the close of discovery, which is

8    September 1st, we think we have already gone through the

9    process and teed this up, and we can get this dispute to

10   Your Honor and to this Court expeditiously if it does become

11   something that we are interested in pursuing later on, rather

12   than restarting that whole process that we've already spent

13   time and resources on.

14              THE COURT:  Okay.  Thank you.

15              MS. PEYSER:  Thank you, Your Honor.

16              MR. KAPLAN:  Your Honor, may I approach?

17              THE COURT:  Yes.

18              MR. KAPLAN:  Thank you.

19         So, Your Honor, I'll try to be extremely brief

20   unless you have any additional question because I think we've

21   covered most of the stuff both today and in the papers.

22   There's two things -- or three things, I should say, that I

23   want to just briefly touch on.

24         The first is -- I think you asked a question to

25   Ms. Peyser as to -- for -- given that Mr. Bauer is going to

1   be getting everything he says he wants anyway, what's the

2   need for this other stuff that really, in isolation, deals

3   with Ms. Hill's treatment or substance abuse?  And I didn't

4   really hear any compelling reason for that specific

5   information.  I think Mr. Bauer is getting everything he

6   needs and says he wants.  To the extent Ms. Hill had some

7   sort of treatment or speaking to her sponsor, that just

8   doesn't seem relevant here.  It doesn't have anything to do

9   with her mental health or causation.  She's going to get

10  anything that might exist in the medical records or from

11  these other people.

12          There was also an argument that it would not be

13  practical to tell any of these third parties to look for more

14  specific information or it might impose some sort of burden

15  on them.  I'm not sure I understand that argument either as

16  to why it would be so difficult to craft some sort of,

17  either, specific request or instruction as to what they need

18  to look for, and they could look for it.

19          Now, if there is some burden or they come back and

20  say they don't know how to look for that or they're not

21  capable of doing that, then we could always deal with that at

22  that point in time but certainly -- I guess the most easy --

23  the easiest thing for a nonparty would do is "I'm going to

24  give you everything I have about Lindsey Hill, and you guys

25  could figure out what's relevant and what matters to your

1   case," but that's not how discovery works.  We're supposed to

2   be somewhat targeted and precise with our requests, and

3   that's all that I am proposing here, and there's no reason

4   why these third parties can't look for more specific

5   information if it exists.

6          The final point that I'll make briefly -- and this

7   was addressed in the supplemental memorandum concerning the

8   alleged waiver issue that Ms. Decker previously produced --

9   or someone produced, I guess, documents or communications

10  between Ms. Hill and Ms. Decker in the prior DVRO proceeding.

11  To the extent those have been produced, Ms. Peyser's office

12  obviously has those.  They are -- it's our -- the cat's out

13  of the bag on those documents.  So I don't think we're going

14  to -- they're asking Ms. Decker to re-produce those

15  documents.  Those are already out.  They've bene produced.

16  No one's clawing them back.

17         The issue really is if there's other communications

18  that fall into this category that's subject to this motion,

19  whether or not those should be produced, and they shouldn't.

20  To the extent there's been a waiver based on the production

21  of these other communications, that doesn't mean that there's

22  a waiver as to other communications that have not been

23  produced, and there's been no showing of any need for those

24  documents.

25         THE COURT:  All right.  Thank you.

1           MR. KAPLAN:  Thank you, Your Honor.

2           THE COURT:  All right.  Let's take a short break.

3       (Recess from 11:04 a.m. to 11:21 a.m.)

4

5                          AFTER RECESS

6       (Call to Order of the Court.)

7           THE COURT:  All right.  Thank you, everybody.

8           All right.  So here's my ruling:  The Court denies

9   Defendant and Counterclaimant Lindsey Hill's motion to quash

10  or to modify the Decker and the Rodgers subpoenas.  I find

11  that Hill has not met her burden to demonstrate that a

12  privacy right exists to preclude the production of what are

13  otherwise relevant documents.

14          With regard to the Padres subpoena, the Court

15  grants Hill's motion to quash the Padres subpoena.  I find

16  that Hill the -- has established a privacy right and this

17  information -- and the information sought is not relevant.

18          Now, folks, I know this is a motion to quash, not a

19  motion to compel.  Do you need me to issue any deadlines for

20  production, or are you capable and willing and happy to just

21  go on your way and figure it out amongst yourselves?

22          MR. KAPLAN:  Well, Your Honor, I think the

23  production would be directed at the third parties.

24          THE COURT:  Uh-huh.

25          MR. KAPLAN:  So I guess I'll leave that to --

1            THE COURT:  Okay.

2            MR. KAPLAN:  -- Mr. Bauer's --

3            THE COURT:  Yeah.  I mean, they're not here, right.

4    They're not a party to this.  So generally I wouldn't set a

5    deadline but if everyone for some reason wanted me to.

6            MS. PEYSER:  Your Honor, we would appreciate if you

7    could set a deadline so that the third parties will have some

8    guidance as to the timeframe and their obligations given that

9    depositions are quickly approaching and, frankly, the parties

10   have a lot to get done between now and the end of discovery.

11           THE COURT:  And the response deadline is already

12   passed for both subpoenas; is that right?

13           MS. PEYSER:  Correct.

14           MR. KAPLAN:  Yeah.  Though I think there's been

15   writings to an agreement that has been communicated to the

16   parties that -- to hold the documents in abeyance on these

17   particular issues.

18           THE COURT:  Of course.  Of course.

19           MR. KAPLAN:  But you're correct, Your Honor.

20           THE COURT:  Yeah.  So when are depositions

21   starting?

22           MS. PEYSER:  Your Honor, multiple depositions have

23   been noticed in this case, and we would like to start them as

24   soon as possible.  We are still waiting on Ms. Hill's

25   document production, as well as these witnesses.  So we would

 1  like that to occur as quickly as possible so that we can

 2  commence depositions.  We would suggest, perhaps, two weeks

 3  would be --

 4          THE COURT:  When is the first noticed deposition

 5  scheduled for?

 6          MS. PEYSER:  We, Your Honor, noticed a handful of

 7  depositions for early May, and we had since notified the

 8  deponents that the depositions would be postponed until we

 9  had guidance from Your Honor, as well as document

10  productions.  So as of now there are no dates certain.

11          THE COURT:  All right.

12          Mr. Kaplan?

13          MR. KAPLAN:  Well, I thought this might be a good

14  entree into another discovery-related housekeeping issue that

15  we were conferring about during the recess.  It -- if we're

16  discussing, more broadly, discovery.

17          So there's currently a hearing scheduled on a

18  motion to compel against Mr. Bauer for June 14th.

19          THE COURT:  Okay.

20          MR. KAPLAN:  And I don't think I need to summarize

21  the issues there, but I'm happy to if you'd like, Your Honor.

22          THE COURT:  No.  That's okay.

23          MR. KAPLAN:  Okay.  There are some other discovery

24  issues in the case that -- where there's some overlap, and

25  Mr. Bauer, I think, intends to file his own motion as to

1  that.  I'm going to be filing a supplemental brief that's due

2  next Wednesday that will also be raising some, perhaps, new

3  issues and issues that's going to be at issue in Mr. Bauer's

4  motion.

5          So long story short, we were conferring about the

6  possibility of instead of having multiple hearings with

7  overlapping issues, for at least efficiency purposes and

8  probably others, having those hearings -- or the 14th -- the

9  hearing on the 4th [sic] continued to another date and having

10 all these hearings consolidated.  We're going to further

11 confer about that and figure out the logistics, but we wanted

12 to preview that with you to make sure --

13         THE COURT:  Okay.  And you guys are coming out from

14 New York; is that right?

15         MR. BROWN:  New York and D.C.

16         THE COURT:  Oh.  Don't you want multiple trips to

17 Southern California?

18         MR. BROWN:  Not on gloomy days --

19         THE COURT:  In the beautiful summer months?

20         MR. BROWN:  Not on gloomy days like this.

21         THE COURT:  Yeah.  No.  No.  So you don't want to

22 be here in June because that's called "June gloom" and it's

23 just never nice but --

24         MR. BROWN:  Well, the date that we are considering,

25 if the Court's available, and it appears that the Court is,

1    is June 28th.  Is that a date that --

2              THE COURT:  Kristee, are you able to check our

3    calendar?

4              Just so you all know, I don't hold discovery

5    hearings when I'm on criminal duty.  Okay?  And so on my

6    local procedures page, you'll see dates that are blocked out,

7    and that's usually why, because it's a criminal duty week,

8    and it's too hard to handle with civil issues, but let's see.

9              THE CLERK:  (Inaudible.)

10             THE COURT:  Okay.  As of right now, June 28th is

11   open.  All right?  So I don't hold dates.  All right?  So I

12   don't reserve anything, but as of now, it's open, I don't

13   know of any reason why it wouldn't be, and I'm pretty good

14   about getting my dates, you know, if I'm going to be out of

15   town or something on the record.  So I think that's a

16   potential, and I don't have a problem with you guys moving

17   dates.  If you all agree, just do a stipulation.  Okay?

18             MR. BROWN:  We're going to try to nail this down

19   quickly.

20             MR. KAPLAN:  Yeah.  I think we should have an

21   answer to this question --

22             THE COURT:  Okay.  Okay.

23             MR. KAPLAN:  -- probably within the next 24 hours

24   or so.

25             THE COURT:  Okay.  So with regard to the issue of

```
 1   the production of documents in response to the two subpoenas

 2   that are not being quashed, I'm going to set a two-week

 3   deadline for that subject -- or -- so what is today?  I don't

 4   have my calendar out here.

 5        MR. KAPLAN:  24th.

 6        THE CLERK:  Today (inaudible).

 7        THE COURT:  So what is two weeks?  And then go to

 8   Friday because they're third parties.

 9        MR. BROWN:  June -- it's June 5th or 6th.

10        THE CLERK:  June 7th.

11        THE COURT:  June 7th.  So I'm going to say that the

12   documents should be produced by the third parties by June 7th

13   or a date -- another date mutually agreed to by the parties.

14   Okay?  We all know that these are third parties.  If they

15   already have everything ready, let's just get it produced by

16   the 7th.  If they end up having issues, I expect that you are

17   all good counsel, and communicate with each other.

18        Since there's going to be multiple disputes, I'll

19   let you guys know sort of who I am when it comes to discovery

20   disputes generally.  I come from the bankruptcy world, where

21   everything is incredibly practical, right.  You don't have

22   endless amounts of money and part -- and good lawyers get

23   together and can figure out, to a large degree, whether

24   something should be produced or not.  You may not like it,

25   but, yeah, it's probably relevant.  Maybe it's a little
```

1   broader than I want, but it's not as broad -- right?  So

2   that's sort of where I come from.  I seem to be very

3   practical that way.  I can tell already that you guys did

4   that with regard to these motions because there were a whole

5   bunch of categories that nobody was fighting over.  Okay?

6   But just know that.  I tend to be very practical.

7           And what I really, really hope to have good lawyers

8   provide -- and I see every evidence here that I have a bunch

9   of good lawyers involved -- is that you guys can, you know,

10  try to reduce the need to come to court as much as possible,

11  right.  If reasonable minds can differ, maybe you should just

12  settle it amongst yourselves and only come to me when you

13  truly -- your client will not let you produce something

14  unless you get a judge order or you just truly have polar

15  opposite opinions on something, but then I want the law that

16  supports you for it, you know, not just a guess or a hope or

17  a "in my opinion."  Okay?  So try to be as practical as you

18  can and just come to me with as few issues as possible.

19          And by that, I mean, also, if you come to an

20  agreement after briefing something on a joint stip and you

21  realize, "Hey, maybe I should produce this" or "Maybe these"

22  -- go ahead and come to an agreement and let me know.  I love

23  it when you show up on hearing day and you say, "We have

24  already resolved this, this, and this issue, and it's just

25  these issues that are left."  Okay?

1          MR. BROWN:  Thank you.

2          MR. KAPLAN:  Thank you, Your Honor.

3          THE COURT:  All right.  All right.

4          MS. PEYSER:  Thank you, Your Honor.

5          THE COURT:  All right.  Anything further?

6          MS. PEYSER:  Not from us.

7          MR. KAPLAN:  Not from us.  Thank you, Your Honor.

8          THE COURT:  All right.  Have a good day.  Thank

9   you, everybody.

10          MR. KAPLAN:  Thank you, Your Honor.

11          THE CLERK:  Court is now adjourned.

12      (Proceedings adjourned at 11:29 a.m.)

13   ///

14   ///

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        CERTIFICATE

5        I certify that the foregoing is a correct transcript

6  from the electronic sound recording of the proceedings in the

7  above-entitled matter.

8

9  /s/ Julie Messa_____        June 11, 2023_____
   Julie Messa, CET**D-403        Date
10 Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25