1  Christopher P. Wesierski [Bar No. 086736]
       cwesierski@wzllp.com
2  Michelle R. Prescott [Bar No. 262638]
       mprescott@wzllp.com
3  Eileen Spadoni [Bar No. 133259]
       espadoni@wzllp.com
4  Brett A. Smith [Bar No. 322707]
       bsmith@wzllp.com
5  WESIERSKI & ZUREK LLP
   29 Orchard Road
6  Lake Forest, California 92630
   Telephone: (949) 975-1000
7  Facsimile: (949) 756-0517

8  Bryan J. Freedman, Esq. (SBN: 151990)
       bfreedman@ftllp.com
9  Jesse A. Kaplan, Esq. (SBN: 255059)
       jkaplan@ftllp.com
10 FREEDMAN + TAITELMAN, LLP
   1801 Century Park West, 5th Floor
11 Los Angeles, California 90067
   Telephone: (310) 201-0005
12 Facsimile: (310) 201-0045

13
   Attorneys for Defendant and Counterclaimant
14 Lindsey C. Hill

REDACTED VERSION OF
DOCUMENT PROPOSED
TO BE FILED UNDER SEAL

15           UNITED STATES DISTRICT COURT

16   CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

17  TREVOR BAUER,                    Case No. 8:22-cv-00868 JVS (ADSx)

18        Plaintiff,                 [Assigned to Hon. James V. Selna]

19        vs.                        **DEFENDANT AND COUNTERCLAIMANT LINDSEY C. HILL'S OPPOSITION TO PLAINTIFF AND COUNTER-DEFENDANT TREVOR BAUER'S MOTION FOR SANCTIONS**

20  LINDSEY C. HILL AND NIRANJAN
21  FRED THIAGARAJAH,

22        Defendant.

23

24

25

26

27

28

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1  LINDSEY C. HILL,

2          Counterclaimant,

3      vs.

4

5  TREVOR BAUER,

6          Counter-defendant.

7

8

9

[Declarations of Jesse Kaplan and Lindsey Hill filed concurrently]

Hearing Date:    July 31, 2023
Time:            1:30 p.m.
Courtroom:       10C
Action Filed: April 25, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................... 1

II.     HILL HAS NOT ENGAGED IN WITNESS TAMPTERING ........................... 2

     A.      Hill did Not Engage in Witness Tampering with Doe. ................................ 4

     B.      Hill did Not Engage in Witness Tampering with Dawson or De Silva. ...... 7

     C.      Hill did Not Engage in Witness Tampering with Roe. ............................ 10

     D.      Hill did Not Engage in Witness Tampering with Tortorigi. ..................... 12

     E.      Hill did Not Engage in Witness Tampering with Other Witnesses. .......... 15

III.    CASE DISPOSITVE SANCTIONS ARE NOT WARRANTED .................. 15

     A.      Bauer will Not be Prejudiced. .................................................... 16

          1.      Bauer has not been prejudiced by Hill's communication to Tortorigi. ...................................................................... 16

          2.      Bauer has not been prejudiced by Hill's communication to Roe ...... 18

          3.      Bauer has not been prejudiced by Hill's communications with Doe..... ................................................................................. 18

          4.      Bauer has not been prejudiced by Hill's communications with DeSilva. .................................................................. 19

     B.      Less Drastic Sanctions are Available. ......................................... 20

     C.      The Public Policy Favoring Disposition of Cases on their Merits. ........... 23

     D.      The Interest in Expeditious Resolution of Litigation and the Court's Need to Manage its Dockets. .............................................................. 23

IV.     THE ADDITIONAL SANCTIONS REQUESTED BY BAUER ARE NOT WARRANTED ................................................................ 23

i

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Roberts*,
 No. CV 18-148-M-DLC, 2021 WL 1530092 (D. Mont. Apr. 19, 2021) ............... 3

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
 69 F.3d 337 (9th Cir. 1995) ............................................................... 3, 21

*Compass Bank v. Morris Cerullo World Evangelism*,
 104 F. Supp. 3d 1040 (S.D. Cal. 2015) .................................... ................21

*Computer Task Group, Inc. v. Brotby*,
 364 F.3d 1112 (9th Cir.2004) ............................................ ...................21

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
 482 F.3d 1091 (9th Cir. 2007) ................................................ .................16

*Fink v. Gomez*,
 239 F.3d 989 (9th Cir. 2001) ................................... ...................3

*InjuryLoans.com, LLC v. Buenrostro*,
 No. 218CV01926GMNVCF, 2020 WL 9160827 (D. Nev. Sept. 28,
 2020) ................................................................................... ...............3

*Leon v. IDX Sys. Corp.*,
 464 F.3d 951 (9th Cir. 2006) ............................................. .............3, 16

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
 No. SACV1502034JVSJCGX, 2017 WL 10563004 (C.D. Cal. June
 30, 2017) .................................................................. ...................3

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
 944 F.2d 597 (9th Cir. 1991) ................................................ ...................3

*Roadway Exp., Inc. v. Piper*,
 447 U.S. 752 (1980) ............................................. .................16

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

*Tilton v. McGraw-Hill Companies, Inc.*, No. C06-0098RSL, 2007 WL
    777523 (W.D. Wash. Mar. 9, 2007) ................................................. ...........21, 22

*U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, ....... ....................
    857 F .2d 600 (9th Cir. 1988 ) ................................................................23

*Wanderer v. Johnston*, ................................................................. .....................
    910 F.2d 652 (9th Cir. 1990) ......................................... ................16

*Wyle v. R.J. Reynolds Indus., Inc.,* ,................................................ ..................
    709 F.2d 585 (9th Cir. 1983) .................................................... ..................16

**Statutes**

18 U.S.C. § 1512............................................................ ...............2, 3

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Lindsey Hill's Counterclaims against Bauer concern two separate violent batteries and sexually assaults committed by Bauer against Hill that occurred in 2021. During both occurrences, Bauer choked Hill to the point of unconsciousness, and battered and sexually assaulted her while she was unconscious and partially unconscious.  Like most sexual assaults, there were no other eyewitnesses to Bauer's sexual assaults and batteries of Hill.

Hill was not Bauer's only victim.  Four other victims of Bauer's sexual assaults and batteries have come forward.  Bauer's sexual assaults of these victims are strikingly similar to Bauer's sexual assault of Hill.  Almost all of Bauer's sexual assaults of both Hill and the four other victims involve Bauer engaging in non-consensual, hyper-violent, and forceful sexual misconduct and/or rape while his victims were unconscious or partially unconscious, often after Bauer choked them into unconsciousness.  In several instances, the victims have videos evidencing Bauer's sexual assaults. Evidence that Bauer has sexual assaulted other victims by engaging in non-consensual sexual acts with those victims is directly relevant under Fed. R. Evid. 415 ("Rule 415") to prove that Bauer has a propensity to engage in such conduct, and in turn, that he sexual assaulted Hill in a similar manner while Hill was unconscious or partially conscious.

In May 2023, Hill subpoenaed these four other victims.  Bauer frenetically filed a number of motions to avoid an adjudication of Hill's claims on the merits, and to prevent these victims from testifying about their graphic and disturbing allegations of sexual assault.  On June 7, 2023, Bauer moved to quash the subpoenas to the victims. (ECF No. 110).  Bauer was unsuccessful.[1]

---

[1] On June 28, 2023, Magistrate Judge Spaeth ruled that Hill was entitled to move forward with discovery concerning the four victims.

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

A mere week after filing the Motion to Quash, on June 14, 2023, Bauer rushed to file this highly pretextual Motion for sanctions which seeks drastic and extreme relief -- to dismiss Hill's Counterclaims on the alleged basis that Hill's communications with four individuals constitutes witness tampering under 18 U.S.C. § 1512 ("Section 1512").  In reality, however, Bauer did not file this Motion because Hill engaged in witness tampering or because Bauer has been prejudiced by the communications at issue.  Rather, Bauer seeks to prevent the truth from coming out.

First, while Hill admits that a few of her communications were either inappropriate, wrong or hurtful, as detailed below, Hill did not engage in witness tampering.  Hill did not act with the requisite intent to cause any of the individuals at issue to withhold testimony or documents (or in the case of Doe, to provide false testimony).  With the exception of Hill's communications with Frank Tortorigi, Hill was not even communicating with any of the individuals at issue about this lawsuit.

Second, Bauer has not been prejudiced by Hill's communications.  Indeed, Bauer barely addresses this critical factor.  As will be detailed below, Hill's communications did not actually influence any of the individuals at issue to withhold or destroy documents, or cause any of them to provide false testimony or to not testify. In fact, Bauer does not even contend that Hill's communications to Doe or Roe resulted in any prejudice.

Third, even if Hill did engage in any litigation misconduct, which she did not, lesser sanctions are available.  Bauer has not demonstrated that the drastic remedy of dismissal is warranted, especially under the circumstances.  This case should be decided on the merits.  A jury should decide whether Bauer battered and sexually battered Hill.  This will be supported by Bauer's propensity to commit strikingly similar sexual assaults on other women.

## II.   <u>HILL HAS NOT ENGAGED IN WITNESS TAMPERING</u>

As Hill has not engaged in any witness tampering, no sanctions should be imposed against her.  Courts have inherent power to sanction a party for improper

litigation misconduct.  *See Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). The court may only issue sanctions under its inherent power upon finding "bad faith or conduct tantamount to bad faith." *Id*. at 994.   Bad faith, or conduct tantamount to bad faith, encompasses "a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id*.  That a party allegedly engaged in litigation misconduct in another action is irrelevant to whether that party engaged in misconduct in this lawsuit.  *See Nat.-Immunogenics Corp. v. Newport Trial Grp*., No. SACV1502034JVSJCGX, 2017 WL 10563004, at \*8 (C.D. Cal. June 30, 2017).

Dispositive sanctions are only appropriate when a party has deliberately engaged in deceptive practices that undermine the integrity of judicial proceedings and engaged in conduct utterly inconsistent with the orderly administration of justice.  *See Leon v. IDX Sys. Corp*., 464 F.3d 951, 958 (9th Cir. 2006); *Anheuser-Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995).

Bauer contends that the Court should exercise its inherent powers to impose case dispositive sanctions based on alleged witness tampering under Section 1512.  Critical to whether Hill committed witness tampering under Section 1512 is Hill's intent, and whether she intended her communication to cause any of these witnesses to withhold testimony or documents (or in the case of Doe, to provide false testimony).  *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 602 (9th Cir. 1991); *Adams v. Roberts*, No. CV 18-148-M-DLC, 2021 WL 1530092, at \*2 (D. Mont. Apr. 19, 2021).  When there is a genuine dispute or competing evidence as to the actor's intent, there will not be a finding of witness tampering, and sanctions are not available.  *See id*., at 3; *InjuryLoans.com, LLC v. Buenrostro*, No. 218CV01926GMNVCF, 2020 WL 9160827, at \*3 (D. Nev. Sept. 28, 2020).   As detailed below, Hill did not act with the requisite intent.  Again, with the exception of Hill's communications with Tortorigi, Hill was not even communicating with any of the individuals at issue about this lawsuit.

/ / /

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

### A.    <u>Hill did Not Engage in Witness Tampering with Doe</u>.

Bauer falsely contends that Hill threatened Doe, and did so in order to persuade Doe to provide false testimony in this action.  (Motion, pp. 7-8; Peyer Decl., Ex. F). Bauer is wrong.  Doe's and Hill's text messages had nothing to do with Bauer, this lawsuit or any contemplated testimony in this lawsuit.  (*Id*.).  Indeed, even Bauer's Motion acknowledges that Hill's initial messages to Doe were "**seemingly in connection with a separate matter**." (Motion, p. 7) (Emphasis added).  Moreover, Hill did not intend to persuade Doe to provide any testimony, let alone false testimony.

Some background is required to contextualize Hill's text messages to Doe.  In approximately 2021, Doe reached out to Hill through Instagram.  (Hill Decl., ¶ 2). They subsequently spoke by telephone a few times and Doe continued to "message" Hill over Instagram about personal matters, including Doe's sex life.  (*Id*.).

On or around April 15, 2023, Doe randomly reached out to Hill by text message about Hill's friend Olivia Finestead and Mike Clevinger, a professional baseball player. (Hill Decl., ¶ 3).  Finestead is Clevinger's ex-girlfriend and the mother of Clevinger's son.  (*Id*.).  Finestead had recently accused Clevinger of domestic violence and child abuse.  (*Id*.).  Doe knew that Hill was friendly with Finestead.  (*Id*.).

In Doe's texts to Hill, Doe was very critical of Finestead and Finestead's allegations about one of Clevinger's ex-girlfriends, Monica Ceraolo.  (Hill Decl., ¶ 4). In short, Finestead, who was in a legal dispute with Clevinger, had alleged that Clevinger had abused Ceraolo and serially cheated on Ceraolo with other women.  (*Id*.). As a result, Clevinger had filed a petition for an injunction for protection, which is similar to a restraining order, against Finestead in a Circuit Court in Pinellas County, Florida.  (*Id*.).  Doe's April 15th text messages to Hill were critical of Finestead for exposing Clevinger's alleged cheating and suggested that the Florida court would issue a "restraining order" against Finestead.  (*Id*.; Peyer Decl., Ex. F).

Hill was offended by Doe's texts, and did not understand why Doe was advocating for Clevinger, the abuser, and injecting herself into a matter that had

nothing to do with Doe.  (Hill Decl., ¶ 5).  Hill decided to respond.  (*Id*., at ¶ 6).  That Hill was offended by Doe's comments is reflected in Hill's direct response to Doe's commentary about Hill's friend, Finestead.  (Peyser Decl., Ex. F).  In Hill's response, she voiced her disapproval that Doe was taking the side of Clevinger, an abuser, and injecting herself into a matter that did not concern her.  (*Id*.).  That was certainly the intent of Hill's responsive text messages,  (Hill Decl., ¶ 6).

Likewise, in Hill's next and immediate comment to Doe about Doe's sexual relationships with "married men," Hill intended to continue to express her disapproval towards Doe's comments about Clevinger and his victims, and to voice her belief that Doe's comments were especially unjustified and unwarranted coming from Doe due to the fact that Doe had previously disclosed to Hill that she had been in adulterous relationships with married men.  (*Id*.).  Hill did not intend any of her comments to function as a threat to Doe.  (Hill Decl., ¶ 7).  Certainly, Hill did not intend this comment to in anyway concern this litigation or Doe's potential testimony in this litigation, and did not intend her comment to cause or persuade Doe to provide any testimony in this lawsuit.  (*Id*.).  Again, Hill's commentary was in response to Doe's negative comments concerning Clevinger and his abusive relationships with his ex-girlfriends, and Doe's apparent belief that a restraining order against Finestead was warranted.  (*Id*.).

Bauer claims that Doe told his attorneys that she "felt that Hill was attempting to have Doe say things in this matter that were not true." (Peyser Decl., ¶ 4; Motion p. 8).  As an initial matter, there is no competent evidence that Doe felt that way; only inadmissible hearsay.[2]  More importantly, even assuming Doe subjectively felt that way, any such subjective belief is not supported by the objective content of the April 15th text messages between Doe and Hill or any other evidence.  Absent from Hill's

---

[2] To the extent necessary, Hill objects to that portion of the Peyser declaration on hearsay grounds.

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

text messages to Doe is any discussion about this lawsuit, Doe's potential testimony or that Hill desired Doe to say anything if Doe did in fact testify.  Bauer also ignores that Doe reached out to Hill, not the other way around.  It seems incredibly unlikely and implausible that Hill would have the intent to cause Doe to provide false testimony, when it was not even Hill who had reached out to Doe.

Furthermore, Bauer fails to explain what false statements Hill supposedly wanted Doe to make.  Certainly, there is no contention that Hill ever stated or even suggested what that purported false testimony might be.  Absent from the record is any evidence of any reason that Hill would believe that Doe's truthful testimony would be detrimental to Hill.  To the contrary, police reports produced by the Pasadena Police Department ("PPD") reveal that in July 2021, Doe voluntarily made disturbing disclosures to the PPD that evidence Bauer's propensity, intent and plan to sexually assault women while they are unconscious.  (Kaplan Decl., Ex. 4.)  In simple terms, there is no reason that Hill would want Doe to lie.

According to the PPD records obtained through discovery,



LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1 ▌███████████████████████████████████████████▌ Based on

2 this, there would be no reason why Hill would want or need Doe to not tell the truth.

3     **B.    <u>Hill did Not Engage in Witness Tampering with Dawson or De Silva</u>.**

4     Bauer also falsely contends that Hill used discovery from this lawsuit to

5 indirectly threaten Derek Dawson through his girlfriend, Sophie De Silva.  (Motion,

6 pp. 6-7; Peyer Decl., Ex. C).  Bauer also falsely contends that the only possible purpose

7 of Hill's communication to De Silva was to "induce Dawson to either not provide

8 testimony here or provide different testimony than what he previously gave against

9 Hill." (Motion, p. 14).  Again, Bauer's purported interpretation is neither supported by

10 an objective reading of Hill's communication nor the facts and circumstances

11 surrounding that communication, including Hill's prior relationship with De Silva.  The

12 evidence reflects that Hill intended to voice her frustration that De Silva, Hill's former

13 close friend and mentor, would stand by Dawson after what he did to Hill.

14     Again, some background is required to contextualize Hill's messages to De

15 Silva.  Prior to the 2021 Bauer battery and sexual battery, Hill had a social relationship

16 with De Silva.  (Hill Decl., ¶ 8).  Hill considered De Silva to be close and personal

17 friend and mentor, and someone who had always been supportive of Hill and her

18 recovery from alcoholism.  (*Id*.).  At some point prior to 2021, De Silva and Dawson

19 began dating and entered into a romantic relationship.  (*Id*.).

20     In the summer of 2021, after Bauer's battery and sexual battery of Hill were

21 publicized, Dawson provided an online tabloid publication and Bauer with certain

22 information about Hill.  (Hill Decl., ¶ 9, Ex. 1-2).[3]  Some of the information that

23 Dawson disclosed to the tabloid and to Bauer concerned Hill's prior sexual history,

24 namely her sexual/romantic relationship with a professional baseball player other than

25 Bauer.  (*Id*.).  This included the disclosure of private messages wherein Hill described

26 _____

27 [3] Dawson's counsel claimed that "[t]o maintain neutrality, we provided the evidence
to a well-informed news source which intends to make the information public." (Hill

28 Decl., Ex. 1).

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

sex with the professional baseball player other than Bauer. (*Id.*). Again, Dawson leaked this information about Hill to a certain tabloid that publicized Hill's communications with Dawson. (*Id.*, Ex. 1-2). The salacious headline of that tabloid's article focused on Hill's relationship with the other baseball player. (*Id.*, Ex. 2).

Hill correctly perceived that the information disclosed by Dawson about Hill's past sexual relationship was entirely irrelevant to whether she was battered and sexually battered by Bauer, and was designed to be salacious, sensational and drag her through the mud. (*Id.*, at ¶ 10).[4] Hill also correctly perceived that Dawson was "slut shaming" Hill by essentially saying that Bauer's battery and sexual battery was justified because she was allegedly promiscuous, sexually provocative and/or had a history of dating professional athletes. (*Id.*).

Naturally, Hill was upset that, Dawson, someone who she thought was her friend, would do something like that to her. (*Id.*, at ¶ 11). More importantly, Hill was even more upset and disappointed that De Silva, someone who Hill considered to be a close friend and mentor, would continue to stand by Dawson after what he had done to Hill. (*Id.*). Hill felt betrayed by De Silva. (*Id.*).

In early 2023, Hill reviewed various materials that were produced by the PPD in response to a subpoena in this lawsuit. (*Id.*, at ¶ 12). Specifically, in early February 2023, Hill viewed portions of a video of the PPD's interview of Dawson. (*Id.*). This was the first time she had seen that video. (*Id.*). After watching the initial portion of the Dawson interview video, Hill stopped watching because the video upset her so much. (*Id.*). In this video, Dawson volunteered seemingly irrelevant information about Hill's relationships with a professional baseball player other than Bauer and Hill's alcoholism. (*Id.*). Again, Hill correctly perceived Dawson to be "slut shaming" her

---

[4] Magistrate Judge Spaeth recently granted Hill's Motion for a protective order and to quash a subpoena issued by Bauer that sought similar irrelevant information related to one of Hill's prior romantic relationships with a professional baseball player other than Bauer. (EFC Nos. 92-93 and 106).

and shaming her for being an alcoholic. (*Id*.). Hill also observed that Dawson told the PPD not to believe Hill. (*Id*.). The Dawson interview video greatly disturbed and upset Hill and reinvigorated Hill's great unhappiness and disappointment that De Silva, someone who was supposedly Hill's close friend and mentor, would continue to stand by Dawson, someone who sided with Hill's abuser. (*Id*., at ¶ 13).

In the first few months of 2023, Hill, who is a recovering alcoholic, struggled significantly with her sobriety, and relapsed and began drinking heavily during that period. (*Id*., at ¶¶ 14 and 34). Hill drank heavily the day she saw the Dawson interview video. (Hill Decl., ¶ 14). Later that day, while Hill was intoxicated, Hill's emotions towards De Silva heightened. (*Id*.). While intoxicated, Hill impulsively decided to contact De Silva through Instagram in order to inform De Silva what Hill had just seen in the Dawson interview video and to express her frustration about De Silva's decision to stand by Dawson, someone who supported Hill's abuser. (*Id*.). That is precisely what Hill said in her Instagram message to De Silva. Hill's Instagram message was critical of Dawson for "defending violent abuse against women." (Peyer Decl., Ex. C). Hill's message was also critical of De Silva for standing by Dawson: "**Pretty pathetic you want to raise children with somebody like that**. He cant [Sic] run from the truth of what he did to me and my family anymore." (*Id*.) (Emphasis added).

Through a tortured and misleading interpretation of Hill's messages, Bauer claims that Hill threatened to "expose" the Dawson interview video to "embarrass" Dawson. (Motion, p. 2). Again, Bauer is wrong. Hill never threatened to expose the video and never intended to express doing so to De Silva or Dawson. (Hill Decl., ¶ 15). A plain reading of Hill's message reveals that Hill was not threatening Dawson or De Silva at all. Why would she? If anything, the video was embarrassing and unflattering towards Hill. (*Id*.) . Rather, Hill stated and believed that <u>Bauer</u> was likely going to use and publicize the video in this lawsuit. (*Id*). Specifically, Hill stated that the video was going to "go public" in the lawsuit when "**Bauers side uses it publicly in their defense**." (Peyer Decl., Ex. C) (Emphasis added). Hill then advised De Silva

9

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1    to have "[Dawson] tell you the truth about what he did before you see the video." (*Id*.).

2        Further, Hill's messages were not intended to dissuade Dawson from testifying

3    or to change the substance his testimony.  (Hill Decl., ¶ 15).  Again, Hill's intent was

4    to express her unhappiness and frustration to her former close friend.  (*Id*.).  Absent

5    from Hill's message was any discussion about Dawson's testimony or suggestion that

6    Hill would do something if Dawson testified or testified in a certain manner.  In fact,

7    Hill's messages to De Silva were made in early February 2023, well before Bauer even

8    issued a subpoena to Dawson in March 2023.  (Kaplan Decl., Ex. 1).  Moreover, Bauer

9    had never previously expressed any intent to pursue Dawson as a witness in this

10   lawsuit.  (Hill Decl., ¶ 15).

11       **C.    Hill did Not Engage in Witness Tampering with Roe.**

12       Bauer contends that Hill threatened and intimidated Roe.  (Motion, p. 5-6, 13-

13   14).  Tellingly, even Bauer does not contend that Hill did so to cause Roe to not testify

14   or to influence her testimony.  In any event, while Hill agrees that her communication

15   to Roe was wrong and hurtful, and regrets that she sent that communication, Hill never

16   did so to influence Roe's testimony.  (Hill Decl., ¶¶ 22-24 ).

17       Again, some background is required to contextualize Hill's text message to Roe.

18   Hill is a recovering alcoholic.  (Hill Decl., ¶ 16).  Between approximately January 2020

19   and August 2020, Hill resided at a sober living home in San Diego County that was

20   owned and operated by Roe.  (*Id*.).  Hill lived at that sober living home as part of her

21   recovery process.  (*Id*.).  Later on, Hill planned on working as a resident life director

22   at another sober living home owned and operated by Roe.  (*Id*.).  Hill planned on

23   beginning such employment in June 2021.  (*Id*.).

24       Following the May 2021 Bauer incident, Hill's relationship with Roe

25   deteriorated significantly.  (*Id*., at ¶ 17).  Hill felt strongly that Roe was overstepping

26   her boundaries and injecting herself into matters that did not concern her, specifically

27   Hill's recovery from being battered and sexually battered by Bauer and how Hill should

28   deal with that situation.  (*Id*.).  For example, following the May 2021 Bauer incident,

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

Roe contacted Hill and provided Hill with unsolicited advice, opinions and recommendations about Hill's situation with Bauer. (*Id.*). Roe would also contact Hill's father about Hill and the Bauer situation, providing Hill's father with unsolicited advice and opinions, including those that concerned Hill's continued sobriety. (*Id.*). Without Hill's permission, Roe had also reached out to attorneys about potentially representing Hill, and disclosed information about Hill to those attorneys. (*Id.*).

Hill did not welcome Roe's unsolicited involvement. (*Id.*, at ¶ 18). Hill did not want Roe communicating with her parents or potential attorneys about her. (*Id.*). Additionally, Hill perceived that Roe's advice was not well taken given some of Roe's prior conduct. (*Id.*). In 2021, Hill tried to let Roe know that Hill did not want her involved. (*Id.*, at ¶ 19). Roe, however, continued her attempts to intrude into Hill's life and the Bauer situation. (*Id.*). This upset Hill. (*Id.*). Accordingly, Hill had been at odds with Roe for a long period of time before the communication at issue.

In early 2023, Hill reviewed various materials that were produced by the PPD. This included a recorded interview of Roe whereby Roe disclosed information to the PPD about Hill's sexual relationship with a professional baseball player other than Bauer. (*Id.*, at ¶ 20). Hill felt Roe's disclosure of that information was irrelevant and hurtful. (*Id.*). This upset Hill. (*Id.*).

In late March 2023, Hill learned from her father that Roe had tried contacting him again. (*Id.*, at ¶ 21). Moreover, on approximately April 10, 2023, Hill also learned that Roe had been trying to reach out to her attorneys. (*Id.*). While in hindsight, Roe was respecting her boundaries when she reached out to Hill's father and attorneys in the Spring of 2023, Roe's outreach triggered Hill's memories of Roe's prior attempts to involve herself in Hill's recovery from the Bauer incidents, and Hill perceived that Roe was once again trying to involve herself in Hill's life. (*Id.*). Hill had a visceral and emotional response to Roe's outreach. (*Id.*). Hill was angered. (*Id.*).

To make matters worse, Hill was drinking the day she messaged Roe. (*Id.*, at ¶ 22). While heavily intoxicated, Hill impulsively sent the text message at issue to Roe.

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

(*Id.*).  The sole purpose of Hill's text message to Roe was for Hill to express her raw emotions, namely anger, that Hill was feeling towards Roe based on Hill's perception that Roe was trying to once again involve herself in Hill's life without invitation to do so.  (*Id.*).  Of course, this was amplified by Hill's excessive drinking that day.  (*Id.*).

Hill, however, was not thinking about what testimony or information Roe might provide in this lawsuit.  (*Id.*, at ¶ 23).  Hill was not trying to influence Roe to provide certain testimony or information.  (*Id.*).  Absent from Hill's text message to Roe was anything about Roe's contemplated testimony.  Again, even Bauer's Motion does not contend that Hill intended to do so.

Bauer's Motion also discusses an irrelevant communication from Hill's friend, Finestead, to Roe a few days later asking Roe to speak to a reporter about Hill's interactions with Mike Clevinger, another baseball player.  (Motion, p. 6).[5]  Finestead's communication to Roe clearly had nothing to do with this lawsuit or Roe's testimony or Roe's compliance with any subpoena.  (Peyser Decl., Ex. B).  It is unclear how it could possibly be relevant to whether Hill committed witness tampering.

**D.   <u>Hill did Not Engage in Witness Tampering with Tortorigi</u>.**

Bauer also incorrectly contends that Hill instructed Tortorigi not to produce documents in response to a subpoena.  (Motion, p. 4-5, 12).  While Hill regrets sending Tortorigi the message at issue and communicating with him about a subpoena, and understands that it was not appropriate to so, Hill did not intend for her communication to result in any harm to Bauer or expect that it would result in Tortorigi hiding and not producing responsive documents in this case.  (Hill Decl., ¶¶ 30-32).

Tortorigi was a friend that Hill had met while she was working at Lululemon, Hill's prior employer.  (*Id.*, at ¶ 26).  Since the first Bauer battery and sexual battery, Hill had not spoken to Tortorigi much about anything.  (*Id.*).  Prior to the message to

---

[5] Hill did not tell Finestead to send the text message to Roe.  (Hill Decl., ¶ 25).  Hill did not want to have anything to do with Roe.  (*Id.*).

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

Tortorigi at issue, Hill had not discussed this lawsuit with Tortorigi. (*Id*.). At his recent deposition, Tortorigi confirmed that he had not discussed this case with Hill prior to the message at issue. (Kaplan Decl., Ex. 5 [Tortorigi Transcript, p. 66]). Tortorigi's testimony also confirmed that they did not speak after Tortorigi subsequently received a subpoena from Bauer in this lawsuit. (*Id*., p. 70).

In March 2023, Hill was not mentally well and had lost her sobriety. (Hill Decl., ¶ 27 and 34). This clouded her judgment and led her to believe that she should reach out to Tortorigi. (*Id*.). When Hill learned that Tortorigi would be subpoenaed by Bauer, she thought that Tortorigi might be overwhelmed and panicked by the subpoena, especially since he had such tangential involvement in anything that would be relevant to this lawsuit, in particular Hill's interactions with Bauer. (Hill Decl., ¶ 28).[6] Hill also was concerned that Tortorigi would be embarrassed that he would have to produce text message communications with Hill that were likely to be perceived as raunchy, vulgar or sexually explicit. (*Id*.).

Hill was also frustrated that Bauer was subpoenaing Tortorigi because Hill had reviewed the PPD's document production in this lawsuit, and observed that it appeared that <u>the PPD had already produced all of Hill's relevant communications with Tortorigi</u> and several others.[7] (Hill Decl., ¶ 29). Hill correctly believed that based on the PPD's document production, Bauer already had received all relevant and responsive communications between Hill and Tortorigi. (*Id*.). The PPD's document production included several thousand pages of Hill's communications with multiple persons, including her text messages. (Kaplan Decl., ¶ 8). Specifically, the PPD document production includes almost a year of text messages between Hill and Tortorigi between

---

[6] It appears Hill and Tortorigi exchanged some text messages about the first Bauer incident in April 2021. (Peyser Decl., Ex. A).

[7] In 2021, while the PPD was investigating Bauer, Hill provided the PPD with her phone and computer. (Hill Decl., ¶ 29). PPD made copies of and/or extracted information from those devices, including text messages. (*Id*)

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

May 2020 and May 11, 2021.  (*Id*.).  Indeed, the text messages that Tortorigi produced in response to the subpoena were all included in the PPD's prior document production. (*Id*.).  Hill also assumed and believed that it was unlikely that Tortorigi still had responsive documents to the subpoena from the Spring 2021, and believed that there had been no communications since then that would be relevant.  (Hill Decl., ¶ 29).

While Hill now acknowledges that she exercised extremely poor judgment by messaging Tortorigi about the subpoena, her intent in sending the Instagram message at issue was to give Tortorigi a heads up that he was going to be subpoenaed, to "soften the blow" of the subpoena to Tortorigi, to cause Tortorigi not to worry or be nervous about it, and to emphasize her belief that Bauer already had their text messages.  (*Id*., at ¶ 30).  Hill's message to Tortorigi noted that "**they already have all of our messages idk why they are asking again**".  (Peyser Decl., Ex. A).  This reflects that Hill did not intend to hide any evidence, and that she believed that her relevant communications with Tortorigi had already been produced to Bauer.

Tortorigi seems to have had a similar interpretation.  Tortorigi testified that he interpreted Hill's message to be "exaggerated" and that Hill wanted to make the subpoena "a little bit lighter." (Kaplan Decl., Ex. 5, p. 67).  Tortorigi further testified that he did not know what Hill was asking him to do in her message and that he wasn't really aware of what was going on at the time.  (*Id*., 67-68).

While Hill's message discusses Tortorigi responding to the contemplated subpoena by saying that he no longer has access to responsive text messages, that was based on Hill's subjective belief that Tortorigi probably did not continue to maintain those text messages.  (Hill Decl., ¶ 31).  Although Hill should not have been discussing the contemplated subpoena with Tortorigi in the first instance, she recognizes that she should have at least qualified her statement by making it clear that he should only say that he has no access to the materials if that was in fact true.  (*Id*.).  Given that Bauer already had her messages with Tortorigi, she did not intend to "cover up" documents and cause them to be hidden from Bauer.  (*Id*.).  Hill did not intend for Tortorigi to

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1  withhold responsive documents if he was able to access them.  (*Id.*).  Hill does,

2  however, acknowledge that her communication with Tortorigi was not appropriate and

3  that she should not have been discussing a subpoena with him.  (*Id.*, at ¶ 32).

4          **E.**    **Hill did Not Engage in Witness Tampering with Other Witnesses**.

5          Bauer claims that he has "concern" that Hill has threatened or instructed several

6  other witnesses not to produce documents.  (Motion, pp. 8-9).  Bauer, however, does

7  not actually contend that Hill did anything to tamper with those witnesses or that he

8  has any evidence of any such witness tampering.  Rather, Bauer merely speculates that

9  Hill may have done so.  Bauer's conjecture is unfounded.  Hill never threatened these

10  individuals or said anything to them that would suggest that they should not produce

11  documents in response to a subpoena.  (Hill Decl., ¶ 33).

12  **III.    CASE DISPOSITVE SANCTIONS ARE NOT WARRANTED**

13          Even if the Court were to determine that Hill engaged in witness tampering and

14  acted with the requisite bad faith and intent, case dispositive sanctions, including

15  dismissal of Hill's Counter-Claim, is not warranted under the circumstances.  Notably,

16  that Bauer has not been prejudiced and that less drastic remedies are available weigh

17  heavily against the imposition of case dispositive sanctions.

18          Because dispositive sanctions such as dismissal are such a harsh penalty, it

19  should only be imposed in "extreme circumstances." *Wyle v. R.J. Reynolds Indus*., Inc.,

20  709 F.2d 585, 589 (9th Cir. 1983).  The Court's inherent powers must be exercised

21  with restraint and discretion.  *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764

22  (1980).  If the Court finds bad faith, the Court must consider and weigh five additional

23  factors before imposing the harsh sanction of dismissal: (1) the public's interest in

24  expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the

25  risk of prejudice to the party seeking sanctions; (4) the public policy favoring

26  disposition of cases on their merits; and (5) the availability of less drastic sanctions.

27  *See e.g., Leon*, 464 F.3d at 958.

28          Because the first two of these factors will generally favor the imposition of

15

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

sanctions, and the fourth factor generally cautions against dismissal, "the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). The risk of prejudice is one of the most critical factors in deciding whether to impose drastic case-dispositive sanctions. *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).

A.     **Bauer will Not be Prejudiced.**

Hill's communications at issue have not resulted in any prejudice to Bauer. The element of prejudice is "essential" to the imposition of drastic case-dispositive sanctions. *See Wanderer*, 910 F.2d at 656. "Sanctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *Wyle*, 709 F.2d at 591. Prejudice is determined by evaluating whether Hill's actions impaired Bauer's ability to go to trial or threatened to interfere with the rightful decision of the case. *See e.g., Leon*, 464 F.3d at 959.

Here, in perfunctory fashion, Bauer glosses over the critical prejudice factor. As will be detailed below, Hill's communications did not influence Tortorigi, Doe, Roe or Dawson to withhold or destroy documents, or cause any of them to provide false testimony or to not testify. Again, Bauer does not even contend that Hill's communications to Doe or Roe resulted in any prejudice.

1.     **Bauer has not been prejudiced by Hill's communication to Tortorigi.**

Bauer has not been prejudiced by Hill's communication to Tortorigi. Bauer even seems to acknowledge that Tortorigi ultimately complied with the subpoena and produced responsive documents. (Motion, pp. 5, 18). That is, Bauer contends that Hill's communications to Tortorigi only "initially" worked. (*Id*.).

Bauer's contention that Hill's message "initially" influenced Tortorigi not to comply with the subpoena, however, is unsupported by the record and contradicted by Tortorigi's deposition testimony. At his deposition, Tortorigi confirmed that Hill's

16

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

messages did not cause him to withhold documents that were responsive to the subpoena. To the contrary, Tortorigi's testimony confirms that he diligently searched for and produced documents that be believed might be responsive to the subpoena and cooperated with Bauer's counsel. Tortorigi even went to the Apple Store to recover materials such as text messages messages that were not available on his phone.

After receiving the subpoena, on April 4, 2023, Tortorigi reached out to Bauer's counsel requesting a phone call to discuss the subpoena, indicating that he "do[es] not have anything that would help with this matter." (Kaplan Decl., Ex. 5 [Tortorigi Transcript, pp. 72-74]; Peyser Decl., Ex. M). Critically, Tortorigi testified that did not tell Bauer's counsel that he did not have anything that would help with this matter because Hill instructed him to respond that way. (Kaplan Decl., Ex. 5, p. 74). Rather, he said that because the requested materials were not available on his phone. (*Id*.). Specifically, Tortorigi testified as follows: "**That wasn't why I said it. I didn't have it on my phone** and so -- and I had spoke with Stuart [his counsel] about it, but I had to go to the Apple Store and have them look into my phone so I could get access to materials." (*Id*.) (Emphasis added).

On April 6, 2023, Tortorigi spoke with Bauer's counsel by telephone to help him better understand what Bauer was looking for in the subpoena. (*Id*., pp. 75-76). On April 10, 2023, Tortorigi sent Bauer's counsel and e-mail stating that he had not found anything in his records in relation to the subpoena. (*Id*., p. 76; Peyser Decl., Ex. M). Tortorigi was being truthful and had undertaken a reasonable and diligent search for the requested materials. Notably, he testified that he searched for the communications/documents requested in the subpoena, but could not find them on his phone. (*Id*., pp. 77, 80-82). Tortorigi conducted those searches by going through all of the text messages and apps on his phone. (*Id*., p. 83).

Subsequently, Tortorigi went to the Apple Store for help recovering materials from his phone. (*Id*., pp. 84-85). The Apple Store was able to successfully recover materials going back to 2021. (*Id*., p. 85). After the Apple Store recovered those

materials, Tortorigi conducted another search of the recovered text messages and went through all his social media applications to determine what documents were responsive and should be produced. (*Id*., pp. 85-89). Accordingly, Hill's communication to Tortorigi did not cause him to not to produce responsive documents.

### 2.   Bauer has not been prejudiced by Hill's communication to Roe.

Hill's communication to Roe will not prejudice Bauer. In fact, Bauer neither claims that Hill's communication to Roe was prejudicial nor has he presented any evidence that it was. (Motion, p. 18). The evidence in the record confirms that Hill's communication to Roe was not prejudicial and has not influenced Roe in terms of her subpoena compliance and contemplated testimony.

Roe complied with the subpoenas issued to them. Roe produced 255 pages of bates stamped pdf documents along with several native documents in response to the subpoenas. (Kaplan Decl., ¶ 4). There is no evidence that Hill's communications caused Roe to withhold or not search for any documents. Bauer does not contend that he has any reason to believe that Roe has withheld any documents. Likewise, Bauer does not contend and has not presented any evidence suggesting that Roe will not testify or that Hill's communication to Roe is likely to or even might influence Roe's testimony. In fact, Roe deposition appears to be moving forward in August 2023. (Kaplan Decl., ¶ 5, Ex. 3).

### 3.   Bauer has not been prejudiced by Hill's communications with Doe.

Hill's communications with Doe will not prejudice Bauer. Again, Bauer neither claims that Hill's communications were prejudicial nor has he presented any evidence that it was. (Motion, p. 18). In fact, Doe will not even be testifying in this lawsuit based on a recent discovery order from Magistrate Judge Spaeth.

On or about May 15, 2023, well after the communications at issue between Doe and Hill, Hill's counsel subpoenaed Doe and four other women who had accused Bauer of sexual assault. (Kaplan Decl., ¶ 7). While Doe did not accuse Bauer of sexual

18

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1  assault, she appeared to have information that would be probative of Bauer's plan and

2  intent to sexually batter women.  (*Id*.).  After Hill issued the five subpoenas to Doe and

3  the Bauer victims, Bauer moved for a protective order and to quash those subpoenas,

4  including the subpoena to Doe.  (*Id*.; ECF No. 110, 111 and 115).

5        On June 28, 2023, Judge Spaeth denied Bauer's motion to quash as to the four

6  Bauer victims, but granted Bauer's motion as to the subpoena to Doe.  (ECF No. 135;

7  Kaplan Decl., ¶ 7).  Because the Court quashed the subpoena to Doe, Doe will not be

8  testifying in this lawsuit.  Accordingly, it is not possible that Hill's communications to

9  Doe could influence her testimony as she will not be a witness in this lawsuit.

10        Even if the subpoena to Doe was not quashed and she was going to testify in this

11  lawsuit, absent from the record is any evidence that Hill would have influenced her

12  contemplated testimony.  As already discussed, a police report produced by the PPD

13  reveals that Doe's testimony would evidence Bauer's propensity, intent and plan to

14  sexually assault women while they are unconscious.  (Kaplan Decl., Ex. 4).

15        **4.**    **<u>Bauer has not been prejudiced by Hill's communications with</u>**

16  **<u>DeSilva</u>.**

17        Bauer has failed to present any evidence that Hill's February communications

18  with De Silva, resulted in any prejudice to Bauer.  At most, Bauer speculates that Hill's

19  communications to De Silva, Dawson's girlfriend, may have caused Dawson not to

20  respond to a subpoena for documents.  (Motion, pp. 7 and 18).

21        Absent from the record, however, is any evidence that Dawson was aware of

22  Hill's February 2023 communications with De Silva, that he was intimidated or scared

23  by Hill's communications, and that those communications caused Dawson not to

24  respond to Bauer's subpoena.[8] For example, Bauer has not presented any evidence of

25

26    [8] Bauer's Motion inaccurately indicates that Bauer subpoenaed Dawson for

27  documents and a deposition.  (Motion, p. 7).  That is not true.  Bauer only subpoenaed
Dawson for documents.  (Kaplan Decl., ¶ 1, Ex. 1).  Bauer never subpoenaed Dawson

28  for a deposition in this lawsuit.  (*Id*.).

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

any meet and confer efforts with Dawson or Dawson's attorneys that would be probative to the reasons that Dawson purportedly did not respond to the subpoena. In fact, in April 2023, Bauer's attorney e-mailed Dawson's attorneys about the subpoena and limitations that had been made to the subpoena. (Kaplan Decl., Ex. 2). It seems highly unlikely that Bauer's counsel would not have further communicated with Dawson's counsel had Dawson not responded.

Moreover, it is unclear what additional documents or information Bauer needs from Dawson. In July 2021, Dawson provided Bauer's counsel with documents that were purportedly helpful to Bauer and detrimental to Hill. (Hill Decl., Ex. 1). In August 2021, Dawson was deposed by the parties, including Bauer, in connection with the prior Los Angeles Superior Court Domestic Violence Restraining Order proceeding. (Peyer Decl. Ex. E). Even if Hill's communications to De Silva caused Dawson to avoid testifying in this lawsuit, Bauer could still use Dawson's prior testimony and the documents previously disclosed by Dawson.

**B.   Less Drastic Sanctions are Available.**

In determining whether less drastic sanctions are available, the Court should consider three sub-factors: (1) the alternative of lesser sanctions and whether such lesser sanction would be inappropriate; (2) whether the court has implemented lesser sanctions before ordering the case dismissed; and (3) whether the court had previously warned the offending party of the possibility of dismissal. *See Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112 (9th Cir.2004); *Anheuser-Busch*, 69 F.3d at 352; *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1059–60 (S.D. Cal. 2015) (declining to impose terminating sanctions even though the risk of prejudice was "great" where the court had not previously imposed sanctions or warned the offending party that terminating sanctions would be available).

Here, this is the first time the issue of alleged witness tampering or any other alleged litigation misconduct has arisen. Accordingly, the Court has not previously imposed lesser sanctions on Hill for similar or any other alleged misconduct. Likewise,

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1    the Court has not previously warned Hill that that dispositive/terminating sanctions
2    were available if she engaged in such misconduct.

3        Critically, assuming the Court determines that Hill has engaged in any
4    misconduct, a lesser sanction would be appropriate.  A stern warning from the Court
5    would be sufficient.  Communications to witnesses by Hill that are similar to the
6    communications at issue are not likely to occur again.  First, Hill has expressed remorse
7    for her communications, especially those to Tortorigi and Roe.  (Hill Decl., ¶¶ 24 and
8    32).  Hill acknowledges that her communication to Tortorigi was not appropriate and
9    that her communication to Roe was wrong.  (*Id*.).

10       Second, Hill's conduct was, at least in part, triggered by a relapse of excessive
11   drinking which Hill sought treatment for. (Hill Decl., ¶ 34).  When evaluating whether
12   a party's conduct warrants sanctions, the Court may also consider whether such
13   conduct was related to or caused by extenuating circumstances such as substance abuse
14   or mental disorders.  *See Tilton v. McGraw-Hill Companies, Inc.*, No. C06-0098RSL,
15   2007 WL 777523, at *7 (W.D. Wash. Mar. 9, 2007).  In *Tilton*, the plaintiff has engaged
16   in "egregious" litigation misconduct including intimidating and threatening
17   defendants' expert, refusing to produce documents in discovery, destroying relevant
18   communications and using the lawsuit to extort monies from his former employer.
19   *Tilton*, 2007 WL 777523, at *6.  *Tilton* found that the plaintiff's actions all supported
20   a finding of bad faith.  *See id.*  Moreover, the plaintiff's lack of remorse created "serious
21   doubt" as to whether he would change his behavior absent sanctions.  *Id.*

22       Despite the overtly egregious nature of the plaintiff's misconduct, *Tilton*
23   determined that dismissal was not warranted.  *See id.* at *7.  Notably, *Tilton* relied
24   significantly on the fact that the plaintiff was suffering from mental disorders and
25   substance abuse and plaintiff's misconduct was partially related to those conditions.
26   *See id.*  Such "emotional difficulties" were a mitigating factor.  *Id.*

27       Here, Hill is a recovering alcoholic.  (Hill Decl., ¶ 34).  In the first few months
28   of 2023, Hill struggled significantly wither her sobriety, and relapsed and began

drinking heavily during that period.  (*Id*.).  This lapse in Hill's sobriety was caused by the stress of this lawsuit, and the continued and lingering memories of the brutal battery and sexual battery that she suffered from Bauer.  (*Id*.).  Hill's heavy drinking earlier this year both clouded her judgment and heightened her emotions.  (*Id*.).  As detailed above, Hill's drinking contributed to her decisions to make the communications at issue, except her response to Doe.

Hill, however, has proactively addressed her problem.  On or about May 8, 2023, Hill voluntarily checked herself into a sobriety treatment center for thirty days.  (*Id*., at ¶ 35).  The purpose of doing so was to regain control of her sobriety.  (*Id*.).  While in treatment, Hill was diagnosed with post-traumatic stress disorder resulting from Bauer. (*Id*.).  While Hill does not contend that her alcoholism and lack of sobriety would be an excuse, it explains her behavior.  Hill is now sober again following such treatment. (*Id*.).  That she is now sober, weighs heavily against repetition of similar communications to fact witnesses.

Third, Hill has voluntarily agreed that while this lawsuit is pending, she will not speak to any witnesses in this lawsuit about any subpoena issued by Bauer, including the witnesses' response to or compliance with that subpoena, or the witness' potential testimony in response to such a subpoena.  (*Id*., at ¶ 36).  Hill has also voluntarily agreed to cease all further communications (on any subject) with either Tortorigi, Roe, Doe, Dawson or De Silva while this case is pending.  (*Id*.).

Finally, as discussed above, Bauer has not been prejudiced.  At most, Bauer suggests that he incurred some unspecified attorneys' fees in connection with his counsel's communications with Tortorigi concerning his subpoena compliance. (Motion, p. 21).  At most, awarding monetary sanctions to compensate Bauer for any such attorneys' fees incurred by Bauer would be appropriate.[9]

---

[9] As discussed below, Bauer failed to provide any information concerning what additional efforts and time, if any Bauer's counsel had to spend concerning Tortorigi's subpoena compliance.

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

## C.    The Public Policy Favoring Disposition of Cases on their Merits.

The public policy favoring disposition of cases on the merits weighs against dismissal.   As discussed, there are four other victims of Bauer's sexual assaults and batteries who have come forward.  On June 28, 2023, Magistrate Judge Spaeth ruled that Hill is entitled to move forward with discovery, including depositions, concerning Bauer's interactions with these four other victims.  A jury should decide whether Bauer battered and sexually battered Hill and whether Bauer's sexual assault of other victim' supports Hill's claims.

## D.    The Interest in Expeditious Resolution of Litigation and the Court's Need to Manage its Dockets.

While the first two factors almost always weigh in favor of dismissal, they should be given little weight as Hill's actions have not resulted in any delay or disruption of the trial schedule in this case.  *See U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co*., 857 F.2d 600, 603–04 (9th Cir. 1988).  Here, Bauer has not pointed to any material delay caused by any of Hill's communications.  He does not contend that it resulted in any delays in the trial schedule.  Likewise, Bauer does not contend that he was required to file any discovery motions based on Hill's communications.  Accordingly, any burden on the Court would be minimal.

## IV.    THE ADDITIONAL SANCTIONS REQUESTED BY BAUER ARE NOT WARRANTED

In the alternative, Bauer requests issue sanctions, an adverse inference and monetary sanctions.  Assuming the Court determines that Hill engaged in witness tampering, Bauer has not demonstrated that these additional sanctions are warranted.

First, without any analysis, Bauer requests that the Court sanction Hill by prohibiting her from contending that anything from her first encounter with Bauer was non-consensual.  Bauer fails to provide any explanation why such an "issue" sanction would be appropriate, especially since Bauer's request is based on a text message actually produced by both Tortorigi and the PPD whereby Hill comments that being

23

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

choked during the first encounter was "SO HOT." (Peyser Decl., Ex. A).  Simply put, because Bauer was obviously not prejudiced and has these messages, such an inference is inappropriate.  The jury should determine whether Hill's comment evidences consent to anything and everything that occurred during the first encounter, including being anally penetrated while she was unconscious.  Notably, in the same text message chain, Hill did not say that being anally penetrated while she was unconscious was "so hot."  In fact, later on in text message chain, Hill voiced her displeasure by stating that, "[h]e put it in my ass and it hurt." (Peyser Decl., Ex. A).

Second, Bauer requests an adverse inference jury instruction that the jury can infer that any witness that Hill tried to intimidate, threaten or improperly influence had information that was harmful to Hill, and that information not produced by any such witness would be harmful to Hill.  Such a sanction also does not make sense because, once again, Bauer has not been prejudiced, and Bauer has documents, namely Hill's communications, with the witnesses that Bauer claims Hill threatened or improperly influenced.  If such documents are relevant and admissible, the jury can consider such evidence and determine what meaning and weight should be given to them.

Third, Bauer requests some unspecified monetary sanctions to compensate him for bringing this motion and corresponding with witnesses regarding Hill's alleged misconduct.  Hill does not dispute that if the Court determines that she engaged in any witness tampering, Bauer would be entitled to monetary sanctions related to any additional time his counsel spent communicating with Tortorigi concerning his subpoena compliance.  Such a monetary sanction would fairly compensate Bauer for attorneys' fees that he unnecessary incurred, if any.  The problem, however, is that Bauer has not provided any information concerning what additional effort and time, if any, Bauer's counsel had to spend concerning Tortorigi's subpoena compliance or any other matter.   In fact, it appears that those efforts are limited to a few short e-mails, a letter and a phone call.  Accordingly, it is extremely difficult, if not impossible, to determine what monetary sanctions would be appropriate.

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS

1  Finally, Bauer requests that the Court order that Hill turn over her various
2  electronic devices so that they can be forensically inspected to uncover evidence of
3  witness tampering.  Such relief also is not appropriate.  Bauer has not presented any
4  evidence that Hill engaged in witness tampering with any other witnesses.[10]  He is
5  merely speculating that Hill might have.  Without more, such an intrusion is not
6  warranted.  If Bauer truly believes that there is a valid basis for inspecting Hill's
7  devices and that discovery concerning discovery is warranted, the proper procedural
8  vehicle would be to issue an inspection demand under F.R.C.P., Rule 34.  Such a Rule
9  34 Request can be addressed like any other written discovery.

12  DATED:  July 10, 2023          FREEDMAN + TAITELMAN, LLP

15  By: _____
16  Jesse A. Kaplan, Esq.
   Attorneys for Lindsey C. Hill

---

[10] As detailed above, Hill does not contend that she tampered with the four individuals that were specifically identified in this Motion: Doe, Roe, Dawson and Tortorigi.

25

LINDSEY HILL'S OPPOSITION TO MOTION FOR SANCTIONS