# EXHIBIT 5

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    TREVOR BAUER,                    CASE NO.:
                                      8:22-cv-00868-JVS-ADS
5                   Plaintiff,

     vs.

6

     LINDSEY C. HILL and NIRANJAN

7    FRED THIAGARAJAH,

                    Defendants.

8

     _____/

9

10

11

12

13              ***CONFIDENTIAL***

14       VIDEOTAPED DEPOSITION OF FRANK TORTORIGI

15          TAKEN AT SAN DIEGO, CALIFORNIA

16                JUNE 30, 2023

17

18

19

20

21

22

23

24

25   REPORTED BY:  JACQUELINE STEARMAN, CSR NO. 9373

CONFIDENTIAL

Page 2

1          On Friday, June 30, 2023, commencing at the hour of

2   9:34 a.m. at 550 West C Street, Suite 800, in the City of

3   San Diego, County of San Diego, State of California,

4   before me, Jacqueline Stearman, Certified Shorthand

5   Reporter in and for the State of California, personally

6   appeared:

7                          FRANK TORTORIGI,

8   called by the Plaintiff, who, being by me first sworn, was

9   thereupon examined as a witness in said cause.

10

11                  A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13          ZUCKERMAN SPAEDER, LLP

            BY:  IVANO VENTRESCA, ESQ. (IN PERSON)

14               BLAIR G. BROWN, ESQ. (VIA ZOOM)

            1800 M STREET, N.W., SUITE 1000

15          WASHINGTON, D.C.  20036

            (202) 778-1800

16          iventresca@zuckerman.com

            bbrown@zuckerman.com

17

18  FOR THE DEFENDANT LINDSEY C. HILL:

19          WESIERSKI & ZUREK, LLP

            BY:  EILEEN SPADONI, ESQ. (VIA ZOOM)

20               BRETT A. SMITH, ESQ. (VIA ZOOM)

            29 ORCHARD ROAD

21          LAKE FOREST, CALIFORNIA  92630

            (949) 975-1000

22          espadoni@wzllp.com

            bsmith@wzllp.com

23

24  THE VIDEOGRAPHER:  MIGUEL MORENO

25

CONFIDENTIAL

Page 64

1      A.  No.

2      Q.  Did you ever talk to the Pasadena Police

3   Department?

4      A.  No.

5      Q.  Did you ever talk to any police with respect to

6   Miss Hill and Mr. Bauer?

7      A.  No.

8      Q.  Have you been contacted in any form, phone, in

9   person, messaging apps, by anyone else about Miss Hill's

10   interactions with Mr. Bauer?

11      A.  No.

12      Q.  Has anyone in the media contacted you in any way?

13      A.  No.

14          MR. VENTRESCA:  I'm going to show you what's been

15   marked, once I mark it, as Exhibit 5.  I'll put that up on

16   the screen.

17          I'm sorry.  Again, on the screen it's confusingly

18   labeled.  It's a different number.  This is Exhibit 5,

19   Bates number FT ending in one.

20          (Plaintiff's Exhibit 5 was marked for

21          identification)

22   BY MR. VENTRESCA:

23      Q.  Mr. Tortorigi, do you recognize Exhibit 5?

24      A.  Yes.

25      Q.  What is Exhibit 5?

CONFIDENTIAL

Page 65

1       A.   Instagram message between me and Lindsey.

2       Q.   When did you receive this Instagram message?

3       A.   I believe it was back in March of 2023.

4       Q.   Had you receive a Subpoena in this case yet?

5       A.   I can't remember if it was before or after, but I

6    feel like it was before.

7       Q.   What was your reaction to receiving this message

8    from Miss Hill?

9       A.   I was shocked.

10      Q.   Why were you shocked?

11      A.   I mean, I didn't -- I didn't think that I would

12   be sitting here today doing this.

13      Q.   Why not?

14      A.   I had -- I just didn't have any contact as much

15   about it with, you know, her side.  And so to just, like,

16   have gotten it from -- like, on that day, I just didn't

17   really know what to expect or what to say.

18      Q.   There are some prior messages.

19           When was the last time that you had been in

20   contact with Miss Hill before receiving this message about

21   the Subpoena in March, 2023?

22      A.   Like the ones that are showing right here?

23      Q.   Yeah.

24      A.   I mean, I don't know the exact date of when it

25   was.

CONFIDENTIAL

Page 66

1    Q.  Would it have been more than a week before this

2    message that you received?

3    A.  I mean, it could have been, like, months or

4    something, or a week.  I don't know.  It's -- we haven't

5    really talked that much.

6    Q.  Before receiving this message about your Subpoena

7    from Miss Hill, had you spoken to her about the case

8    between her and Mr. Bauer?

9    A.  No.

10   Q.  Had you texted or messaged through any other app

11   with her about her case with Mr. Bauer before receiving

12   this message about the Subpoena?

13   A.  Not that I remember.

14   Q.  So were there any prior communications with Miss

15   Hill about this case before you received this message

16   about your Subpoena?

17   A.  No.  Not that I remember.

18   Q.  Okay.  So Miss Hill writes in this message sent

19   at 11:33 a.m. on Exhibit 5, "So Bauer, the guy I'm in a

20   legal battle w."  Does that mean with?

21   A.  Yes.

22   Q.  "Plans on subpoenaing you for our text messages

23   from when it happened.  I'm dying laughing.  If you get

24   one just reply to it with 'I have no access to these

25   materials.'"

CONFIDENTIAL

Page 67

```
 1          What's your understanding of why Miss Hill was
 2    dying laughing about the Subpoena?
 3          MS. SPADONI: Speculation.  Lacks foundation.
 4          THE WITNESS: I feel like from my understanding,
 5    like, us, even with these text messages and things going
 6    back and forth about everything, was exaggerating or
 7    joking.  And so I felt like she wanted to make it a little
 8    bit lighter.  But, yeah, I was definitely shocked to have
 9    receiving the message.
10    BY MR. VENTRESCA:
11        Q.  Were you shocked by Miss Hill instructing you
12    what to do about the Subpoena?
13        A.  Yes.
14        Q.  Miss Hill continues in the message, "1.) They
15    already have all of our messages idk.  Why are they asking
16    again."  Idk means I don't know, right?
17        A.  Yeah.
18        Q.  She then writes, "2.) Who would have access to
19    messages from two years ago" with two crying laughing
20    emojis.  Did I read that right?
21        A.  Yes.
22        Q.  What did you understand Miss Hill to be asking
23    you to do?
24        A.  Honestly, at that time, I didn't -- I didn't
25    know.  And I wasn't really aware of what was going on
```

CONFIDENTIAL

Page 68

```
 1    until I was served the Subpoenas from you guys.

 2        Q.  So she then says, "But yeah just respond to it

 3    saying I have nothing related to this that I have in my

 4    possession."  Did I read that right?

 5        A.  Yes.

 6        Q.  Did you understand Miss Hill to be telling you to

 7    respond to the Subpoena by saying you had nothing related

 8    to the Subpoena that you had in your possession?

 9        A.  I --

10            MS. SPADONI: Speculation.  Lacks foundation.

11            THE WITNESS: I wasn't aware of what she was

12    essentially referencing to since I've never been

13    subpoenaed in my life.  So...

14    BY MR. VENTRESCA:

15        Q.  She starts at the beginning, right, of this

16    message, "So Bauer plans on subpoenaing you."  Is that

17    right?

18        A.  Right.

19        Q.  Did you understand that this message was about

20    the Subpoena?

21        A.  Yeah.

22            MS. SPADONI: Speculation.  Lacks foundation.

23            THE WITNESS: But I -- I don't think I had

24    received anything yet.

25    / / /
```

CONFIDENTIAL

```
 1   BY MR. VENTRESCA:

 2       Q.  Okay.  She then writes, "So stupid moi I can't.

 3   Just know you don't have to do shit for it."  Did I read

 4   that right?

 5       A.  Yes.

 6       Q.  She --

 7           MS. SPADONI: Can we see that, please?

 8   BY MR. VENTRESCA:

 9       Q.  She then says --

10           MS. SPADONI:  Thank you.

11   BY MR. VENTRESCA:

12       Q.  "Also gonna unsend and delete this once you see

13   it."  Crying and laughing emoji.  Did I read that right?

14       A.  Yes.

15       Q.  What is your understanding of why she was going

16   to unsend and delete the message?

17       A.  I --

18           MS. SPADONI: Speculation.  Lacks foundation.

19           THE WITNESS: I'm -- I -- I wasn't aware of what

20   was going on, so I didn't know what -- I didn't know why

21   she was saying that or why she would do it.

22   BY MR. VENTRESCA:

23       Q.  She then writes, "Call me if you get one and I'll

24   tell you what to do."  Did I read that correctly?

25       A.  Yes.
```

212-267-6868          www.veritext.com          516-608-2400

1     Q.  Did you call Miss Hill upon receiving your
2   Subpoena?
3     A.  No.
4     Q.  Did you communicate with her in any way upon
5   receiving the Subpoena?
6     A.  No.
7     Q.  What did you do when you received the Subpoena?
8     A.  I mean, I was shocked.  I was at work, and it was
9   embarrassing.  And I had to just put it away until I got
10  home.  And then I had to, you know, look at it once I got
11  home.
12          MR. VENTRESCA:  Okay.  I'd like to show you
13  what's been marked as Exhibit 6 which I will put on the
14  screen.
15          (Plaintiff's Exhibit 6 was marked for
16          identification)
17  BY MR. VENTRESCA:
18    Q.  Do you recognize Exhibit 6?
19    A.  Yes.
20    Q.  What is Exhibit 6?
21    A.  The Subpoena.
22    Q.  Is this the Subpoena you received to produce
23  documents in this case?
24    A.  Yes.
25    Q.  And do you see on the first page there's a check

**Page 71**

1    mark next to "production"?  Do you see that?

2        A.  Yes.

3        Q.  And it says, "You are commanded to produce at the

4    time, date and place set forth below the following

5    documents, electronically stored information, or objects,

6    and to permit inspection, copying, testing or sampling of

7    material: See Attachment A."  Did I read that correctly?

8        A.  Yes.

9        Q.  Let's flip to Attachment A.  We don't a page

10   number.  It's just couple pages.  One more page flip over.

11   Okay.  Do you see Attachment A there?

12       A.  Yeah, yes.

13       Q.  Okay.  Do you see it says, "Pursuant to Federal

14   Rule of Procedure 45, Plaintiff Trevor Bauer, by and

15   through his undersigned counsel, serves this Subpoena on

16   Frank Tortorigi, a/k/a Franklin.  No later than

17   April 13th, 2023, you are directed to produce the

18   documents, tangible items and electronically stored

19   information to the following counsel for Mr. Bauer."  Did

20   I read that correctly?

21       A.  Yes.

22       Q.  And a couple lines lower starting around line 20

23   or 21, do you see in all capital letters and bolded it

24   says, "If you have any questions regarding this Subpoena

25   or your obligations, please contact Nell Peyser at

Page 72

1    npeyser@zuckerman.com or (212) 897-3436."  Do you see

2    that?

3         A.  Yes.

4         Q.  Did you understand that you were obligated to

5    produce any responsive documents you had in response to

6    this Subpoena?

7         A.  Yes.

8         Q.  And if you turn to Page 6 of this attachment, do

9    you see the heading that says "Documents Requested"?

10        A.  Yes.

11        Q.  And do you see between Page 6 and Page 8 that

12   there are 11 document requests?

13        A.  Yes.

14             MS. SPADONI: Can we see those, please?

15             MR. VENTRESCA:  Yes, of course.

16             MS. SPADONI: Thank you.

17             MR. VENTRESCA:  No problem.  I'm now going to

18   show you what's been marked as Exhibit 7.

19             (Plaintiff's Exhibit 7 was marked for

20             identification)

21   BY MR. VENTRESCA:

22        Q.  Do you recognize Exhibit 7?

23        A.  Yes.

24        Q.  What is it?

25        A.  Me reaching out to Nell saying that I didn't have

CONFIDENTIAL

Page 73

1    anything in my records.

2        Q.   These are e-mails between you and Miss Peyser

3    copying Stuart Smith?

4        A.   Correct.

5        Q.   Who is Stuart Smith?

6        A.   He's one of our family friends that's a

7    attorney.

8        Q.   Where does -- where does Stuart Smith practice?

9        A.   Alabama.

10       Q.   Do you know his contact information?

11       A.   Yes.

12       Q.   What is his contact information?

13       A.   I mean, I don't have my phone with me, but I have

14   it there.

15       Q.   Turning to the last page here -- I should say,

16   sorry, let's turn to Page 2.

17           Do you see at the bottom of Page 2 there's an

18   e-mail from Frank Tortorigi to Nell Peyser on April 4th,

19   2023 at 12:55 p.m.?

20       A.   Yes.

21       Q.   Okay.  And do you see the contents of that e-mail

22   on Page 3?

23       A.   Yes.

24       Q.   Okay.  And in -- could you read what you write in

25   the second paragraph there?  It starts with, "As a

CONFIDENTIAL

Page 74

1    bystander."

2        A.  Yeah.  I said, "I do not have anything that would

3    help with this matter.  Please let me know if I can

4    schedule a call this week.  I look forward to hearing from

5    you."

6        Q.  You -- did you write this message after receiving

7    the Instagram message from Miss Hill telling you not to

8    comply with the Subpoena?

9        A.  Yes.

10       Q.  Did you tell Miss Peyser that you did not have

11   anything that would help with this matter because Miss

12   Hill had instructed you to respond that way?

13       A.  That wasn't why I said it.  I didn't have it on

14   my phone and so -- and I had spoke with Stuart about it,

15   but I had to go to the Apple Store and have them look into

16   my phone so I could get access to materials.

17       Q.  When you say you did not have it on your phone,

18   what do you mean?

19       A.  I just didn't have it at the time.  Like, it just

20   wasn't in my, like, I guess, memory or --

21       Q.  When you say, "It," what is "it"?

22       A.  The -- the documents that were requested.

23       Q.  Did you have the Instagram message from Miss Hill

24   on your phone at that time?

25       A.  Yes.

Page 75

1     Q.   But you didn't -- you didn't produce it on April

2    4th?

3     A.   That's what I sent to her after she had asked us.

4     Q.   But on April 4th you wrote, "I do not have

5    anything that would help with this matter."  Is that

6    right?

7     A.   Yes.

8     Q.   But at that time, you did have the Instagram

9    message from Miss Hill?

10     A.   That one, yes.

11     Q.   But you didn't produce it at that time?

12     A.   No.  I mean, I didn't know exactly what to -- to

13    do, and that's why I was asking for help.  But...

14     Q.   So you reached out for help.  And on Page 1 of

15    Exhibit 7, you asked to set up a phone call with Miss

16    Peyser; is that right?

17     A.   Correct.

18     Q.   Did you end up having that phone call?

19     A.   Yes.

20     Q.   Around April 6th, 2023?  Does that sound right?

21     A.   Yes.

22     Q.   What did you tell Miss Peyser in that phone call?

23     A.   I mean, I basically had asked her, like, exactly

24    what, you know, you guys were looking for in regards to

25    the Subpoena.  And she had referenced to me about, you

CONFIDENTIAL

Page 76

1   know, specifically the dates that are listed here, and so

2   then I sent them after we had spoken.  Again, she had sent

3   us a letter and an e-mail.

4       Q.  I just want to get the -- the timeline right

5   here.  Because you have the phone call on April 6th.  And

6   then on Exhibit 7, you send an e-mail on April 10th at

7   10:48 a.m.

8           You write, "Hi Nell, I just wanted to follow up

9   with you from our conversation last week.  I have not

10  found anything in my records in relation to the Subpoena.

11  Please let me know if there's anything I need to do

12  further on my end."

13          What searches had you done before sending Miss

14  Peyser this e-mail on April 10th?

15      A.  I mean, I looked in my text messages, but I

16  didn't -- like, it wasn't in my phone.  And so I -- I had

17  to go get access to it, but I didn't really realize

18  exactly, like, what was, like, going on, so that's why I

19  had asked her about it.  But I didn't have anything, so

20  that's why I sent her those messages.

21      Q.  I want to turn back to Exhibit 6, which is the

22  Subpoena, just so I have an understanding.  Okay.  I'd

23  like to go to Page 6 there.

24      A.  Correct.

25      Q.  Which was the documents requested.

CONFIDENTIAL

Page 77

1      A.   Uh-huh.

2      Q.   Before sending Miss Peyser this e-mail on

3  April 10th, 2023, had you searched for, starting with

4  number one, "All communications with Miss Hill concerning

5  Mr. Bauer, legal proceedings between Miss Hill and Mr.

6  Bauer, Miss Hill's claims regarding Mr. Bauer, Miss Hill's

7  substance abuse, Miss Hill's physical condition, Miss

8  Hill's mental condition, medical evaluations or treatment

9  of Miss Hill, mental health evaluations or treatment of

10  Miss Hill, and substance abuse evaluations or treatment of

11  Miss Hill."  Have you searched for those communications?

12      A.   Yes.

13      Q.   Where did you search for those communications?

14      A.   In my phone.

15      Q.   Did you find any of those communications in your

16  phone?

17      A.   Not at the time.

18      Q.   With respect to text messages, do you have

19  deletion settings on your phone?

20      A.   Yes.

21      Q.   What are those settings?

22      A.   I mean, I don't have any, like, settings that I

23  had specifically did.  I mean, I'm wanting to comply,

24  obviously, with this as much as possible.  And whatever I

25  had, I just didn't have anything at the time.

CONFIDENTIAL

Page 78

1          And so when I took it to the Apple Store, which

2    is what I had talked to with Stuart about and he said that

3    he had told Nell about as well, you know, I was able to

4    get access to what I thought you guys were looking for on

5    here which is from April 21st to the 22nd.  Like, in those

6    dates that are listed.

7        Q.  Focusing on Request 1, at the time you sent the

8    e-mail to Nell on April 10th, you had on your phone a

9    communication with Miss Hill about Mr. Bauer in the form

10   of that Instagram message; is that right?

11       A.  Yes.

12          MS. SPADONI: Asked and answered.

13          THE WITNESS:  She sent me that after the fact,

14   not on April 4th.

15   BY MR. VENTRESCA:

16       Q.  Sorry.  Who sent you what after the fact?

17       A.  Like, this part or the --

18       Q.  Sorry.  I mean the Instagram message exhibit

19   about the Subpoena.

20       A.  Right.

21       Q.  You had that in your phone as of April 10th; is

22   that right?

23       A.  I don't exactly remember.  I mean...

24       Q.  You don't remember if you had got this message?

25       A.  I mean, I got the message, but...

CONFIDENTIAL

1      Q.   Did you search your Instagram for messages

2   concerning Mr. Bauer with Miss Hill?

3      A.   Yes.

4      Q.   And if you searched that before April 10th, why

5   didn't you produce that message at the time?

6      A.   Do you mind if I go and get my phone so I can get

7   my attorney?

8      Q.   Well, I'd like you to answer the -- the question.

9      A.   I mean, she sent me this after Nell had sent

10  another e-mail in regards to this.  So that's when I

11  produced everything that I had in -- in regards to the

12  Subpoena.

13  BY MR. VENTRESCA:

14     Q.   Okay.  I just want to get the -- the timeline

15  clear.

16          I think my understanding from your testimony is

17  that Miss Hill's message about the Subpoena came around

18  the same time that you received the Subpoena.

19     A.   This was, yes.  And then the messages I didn't

20  have until after the fact.

21     Q.   Yes.  Yeah, so just focusing on the message from

22  Miss Hill about the Subpoena which has Bates stamp FT01,

23  why didn't you produce that, for example, on April 10th?

24     A.   I was just -- when I had spoken to Nell, she had

25  made it seem like it was more so about, like, text

CONFIDENTIAL

Page 80

1   messages communication that was coming through, like, on

2   my phone.  So, like, actual text messages.  And I just

3   wanted to be able to give her, or give you guys, like,

4   what you were looking for.

5           I just have never had anything like this, and I

6   don't -- I don't -- like, I am not sure, like, exactly,

7   like, what all of it means.  And so it's just kind of

8   confusing reading through it.

9       Q.  So moving on back to Exhibit 6, Document Request

10  2, before sending the e-mail to Nell on April 10th, had

11  you searched for all communications with Miss Hill

12  concerning any subject matter whatsoever from April 21st

13  through April 22nd, 2021, and any subject matter

14  whatsoever from May 13th through May 18th, 2021?

15      A.  Yeah, I looked, but that's when I didn't have it

16  at the time.

17      Q.  And did you search for the communications

18  requested in Request No. 3?

19          MS. SPADONI: May we see that, please?

20          MR. VENTRESCA:  Yes.

21          MS. SPADONI: Thank you.

22  BY MR. VENTRESCA:

23      Q.  Did you search for those before sending the

24  e-mail to Miss Peyser on April 10th?

25      A.  I was in communication with her.  And so, no, I

```
1    didn't send them, but I didn't -- like again, like, it's
2    not that I'm -- wasn't wanting to comply.  I just was
3    unaware of, like, exactly what was needing to be sent.
4        Q.  I'm just asking whether you searched for --
5        A.  Yes, I did.
6        Q.  The communications requested in No. 3.
7        A.  Yes.
8        Q.  Did you search for the communications requested
9    in Request No. 4?
10       A.  Yes.
11       Q.  Turning to the next page, did you search --
12   before sending the e-mail to Miss Peyser on April 10th,
13   the -- did you search for the requests in Request No. 5?
14   I'm sorry.  Let me rephrase that.
15           Before sending an e-mail to Miss Peyser on April
16   10th, did you search for the communications requested in
17   Request No. 5?
18       A.  Yes.
19       Q.  Before sending the e-mail to Miss Peyser on April
20   10th, did you search for the communications requested in
21   Request No. 6?
22       A.  Yes.
23       Q.  Before sending the e-mail to Miss Peyser on April
24   10th, did you search for the requests in Request No. 7?
25   I'm sorry.
```

CONFIDENTIAL

Page 82

```
1            Before sending the e-mail to Miss Peyser on April

2    10th, did you search for the communications requested in

3    Request 7?

4        A.  Yes.

5        Q.  Before sending the e-mail to Miss Peyser on April

6    10th, did you search for the documents and tangible items

7    requested in Request No. 8?

8        A.  Yes.

9            MS. SPADONI: Can we see that, please?

10           MR. VENTRESCA:  Yes.

11           MS. SPADONI:  Thank you.

12   BY MR. VENTRESCA:

13       Q.  Before sending the e-mail to Miss Peyser on April

14   10th, did you search for the photographs from Miss Hill

15   from May 15th to July 17th, 2021?

16       A.  Yes.

17       Q.  Did you search, before sending the e-mail to Miss

18   Peyser on April 10th, for the communications and other

19   documents requested in Request 10?

20       A.  Yes.

21       Q.  Turning to the last page.  Before sending the

22   e-mail to Miss Peyser on April 10th, did you search for

23   the communications and other documents concerning Miss

24   Hill's employment requested in Request No. 11?

25       A.  Yes.
```

CONFIDENTIAL

Page 83

1      Q.   And for those searches, how did you perform the

2    search?

3      A.   I mean, I just went through all of the apps and

4    the text messages on my phone.

5      Q.   And what was the result?

6      A.   I mean, at the time, like, I didn't have anything

7    besides, you know, the message.  But, again, like, that's

8    why, like, I was confused, and that's why I sought out for

9    help, and I asked questions.

10     Q.   You mentioned about going to the Apple Store.

11   When did you decide to go to the Apple Store?

12     A.   I mean, this was when she had reached out in an

13   e-mail.

14     Q.   Could that have been a letter?

15     A.   Yes.

16          MR. VENTRESCA:  I'm going to show you what's been

17   marked as exhibit 8.  I'll put it on the screen here.

18          (Plaintiff's Exhibit 8 was marked for

19          identification)

20   BY MR. VENTRESCA:

21     Q.   Do you recognize Exhibit 8?

22     A.   Yes.

23     Q.   What is Exhibit 8?

24     A.   It's a letter from Nell with me and Stuart

25   talking about just the follow-up statement about me having

Page 84

1    the documentation.  And so when this was sent on April

2    10th is when I went to go look.

3        Q.  The date on this is May 16th, 2023; is that

4    right?

5        A.  Or May 16th, yeah.  Sorry I was reading down

6    there.

7        Q.  After this -- after receiving this letter, you

8    went to the Apple Store; is that -- is that right?

9        A.  Correct.

10       Q.  What did you ask the Apple Store to do?

11       A.  I just asked them if they were able to, like, get

12   my recollection, or get my records for, like, past, like,

13   text messages and things like that.

14       Q.  What were they able to recover?

15       A.  I mean, they recovered everything from up to,

16   like, this, and so that's why I sent what I had.

17       Q.  Were they able to recover more than just what you

18   produced?

19       A.  I mean, this is all that came up on my phone, so

20   that's why I produced it.

21       Q.  When you say it's all that came up on your phone,

22   what does that mean?

23       A.  In regards to the Subpoena.

24       Q.  I just -- can you just walk me through?

25           So you go to that Apple Store.  Did you give them

CONFIDENTIAL

Page 85

```
 1   your phone?

 2       A.  Yes.

 3       Q.  What specifically did you ask them to do?

 4       A.  I just asked to see if they were able to, like,

 5   get more, like, of my text messages and things like that

 6   on my phone.

 7       Q.  When you say, "Things like that," what else would

 8   that include besides text messages?

 9       A.  I mean, text messages, the -- the pictures.

10   Like, everything.  I didn't make it -- I made it more

11   generalized so I had access to all the things that I

12   could.

13       Q.  What were they able to recover?

14       A.  I mean, they basically just recovered back until

15   2021, is what they said.

16       Q.  Okay.

17       A.  But that's why I only have this.  And it took a

18   minute for things to pop up.

19       Q.  After they recovered everything from 2021, how

20   did you search for responsive documents?

21       A.  I mean, I looked in my text messages.  I went

22   through all of my apps again.

23       Q.  What apps did you go through?

24       A.  So Snapchat, Instagram, my messages.

25       Q.  How did you -- did you -- let me rephrase.
```

Page 86

1          How did you search in each of those apps?

2      A.  I mean, I looked in regards to the dates that

3  were -- that she had mentioned to me on the phone and that

4  were on the Subpoena.  So I mainly looked for here, but

5  that was just from my understanding.

6      Q.  Okay.  I'd like to turn back to the Subpoena,

7  Exhibit 6, which is the document requests.

8      A.  Uh-huh.

9      Q.  I want to ask you about Request 2.

10     A.  Yes.

11     Q.  I think you saw we started with Exhibit 1 in this

12  case which had messages about Mr. Bauer that you did not

13  produce.  Do you think you have those messages?

14     A.  I mean, I haven't looked, so I'm not sure, but I

15  would -- I would -- I would say that I do.

16     Q.  Okay.  And do you see that exhibit -- sorry.

17          Do you see that Request 2A?  Talks about, "All

18  communications with Miss Hill concerning any subject

19  matter whatsoever from April 21st to April 22nd."

20     A.  Right.

21     Q.  Okay.  Am I correct that you just produced

22  messages about Mr. Bauer that you found during that time?

23     A.  Correct.

24     Q.  And Request 2B asks for, "All communications with

25  Miss Hill concerning any subject matter whatsoever from

CONFIDENTIAL

Page 87

1   May 15th through May 28th, 2021."

2          Do you -- did you search for those

3   communications?

4      A.  Yes.

5      Q.  And do you have communications during that time

6   period about any subject whatsoever?

7      A.  In May?

8      Q.  May, yeah.

9      A.  No.

10     Q.  You -- you don't have any communications?

11     A.  Not that I know of, no.

12     Q.  Okay.  Let's go back to Exhibit 1.  Actually,

13  that's fine, you can put Exhibit 1 away.

14          MR. BROWN:  This is Blair Brown.

15          MR. VENTRESCA:  Yes.

16          MR. BROWN:  Can we take a break?

17          MR. VENTRESCA:  Yeah.  Yeah, we can take a quick

18  break.

19          THE VIDEOGRAPHER: Stand by.  The time is 11:37

20  a.m.  We're off the record.

21          (Recess taken)

22          THE VIDEOGRAPHER:  The time is 11:48 a.m.  We're

23  back on the record.

24  BY MR. VENTRESCA:

25     Q.  Mr. Tortorigi, I first want to pick up where we

Page 88

```
 1    left off.
 2              MS. SPADONI: You're starting without me?  Wait.
 3              MR. VENTRESCA:  Oh, sorry.  I didn't -- my fault.
 4    I'm sorry.  I was not looking.
 5              MS. SPADONI:  Mr. Smith will be joining us in a
 6    minute if you don't mind waiting just a moment.
 7              MR. VENTRESCA:  No, not at all.
 8              MR. SPADONI:  Thank you, sir.
 9              MR. VENTRESCA:  Of course.
10              THE VIDEOGRAPHER:  Want to go off the record?
11              MR. VENTRESCA:  (Counsel shakes head).
12              MS. SPADONI: All right.  Can you let us know when
13    we're back?
14              MR. SMITH:  Yes, I'm back.
15              MS. SPADONI: Thank you.
16    BY MR. VENTRESCA:
17       Q.  Okay.  Mr. Tortorigi, I'll pick up, I believe,
18    where we left off which concerned the searches that you
19    performed after getting the back-up from the Apple Store.
20       A.  Uh-huh.
21       Q.  Did you search for all the communications
22    requested in Request No. 3?
23       A.  I mean, I did the diligent search of what I had,
24    yes.
25       Q.  Can you explain what that diligent search was?
```

CONFIDENTIAL

```
 1        A.   Just what I had access to.

 2        Q.   Is what you had access to the back-up from the

 3   Apple Store?

 4        A.   Yes.

 5        Q.   And how did you search for communications with

 6   any person about Mr. Bauer?

 7        A.   I mean, I did the same.  I looked in my -- my

 8   phone and on all the social media apps.

 9        Q.   Did you search for Mr. Bauer's name when you did

10   that search?

11        A.   No.

12        Q.   How did you decide which messages or apps to

13   search for -- specifically for Request 3 which is about

14   communications with any person.

15        A.   I mean, I just went to see if I could find it.

16   Specifically, I thought it was referencing to the dates,

17   and so that's why I was searching it from there, but I was

18   obviously confused about it.

19        Q.   I understand.  Just so I have it clear, for

20   Request 3, did you only look on April 22nd and April 21st,

21   2021 and May 15th through May 28th, 2021?

22        A.   Yeah.  I mean, I looked through, like, from that

23   time to the end of that time.  And then I also did on the

24   social media apps, but that was all that was, like, on my

25   phone.
```

1      Q.   Okay.  So you limited that search to those two

2   time periods?

3      A.   Yeah.  I mean, that was just my understanding.

4      Q.   Okay.  Is that true also for the remaining

5   requests?  Request 4, 5, 6, 7, 8, 9, 10 and 11?

6      A.   Yes.

7      Q.   I realize my question might not have been clear.

8           For those requests, Requests 4 through 11, you

9   searched only on the dates April 21st to April 22nd and

10   May 15th through May 28th of 2021?

11      A.   Yeah.  I mean, from May to -- to July as well.  I

12   mean, I looked to see, like, exactly, like, what the dates

13   were in terms of, like, what was in relation to the

14   Subpoena.

15      Q.   Okay.  Just so for example for Request 4, "All

16   communications with any attorney advising or representing

17   Miss Hill or the -- or the attorney's agent or employee,"

18   what dates did you search for those communications?

19      A.   The same as, like, two.

20      Q.   Okay.  And for Request 5, what dates did you

21   search for those communications?

22      A.   Also the same.  It's the same for all of it.

23      Q.   It's the same dates, meaning April 21st and 22nd,

24   2021 and May 15th to May 28th, 2021?

25      A.   I mean, like, from April 21 to May 2021.

CONFIDENTIAL

Page 91

1      Q.  And earlier you mentioned July.  Was that

2   specifically for Request 9 because it has that date in it?

3      A.  Yeah.  I mean, I did it for all of them because

4   I -- that was like -- my understanding was that it was for

5   those dates, but --

6      Q.  Right.  I just -- I want to make sure.

7         Did you -- for Requests 2 through 8, did you

8   search April through May?

9      A.  Yes.

10      Q.  Or did you search April through July?

11      A.  April through July for all of it.

12      Q.  Okay.  So for Requests 2 through 11, you searched

13   for communications responsive to each request from April

14   through July, 2021?

15      A.  Yes.

16      Q.  Okay.  The only documents you found were the ones

17   that you produced; is that --

18      A.  Yeah.

19      Q.  -- right?

20      A.  Yes.

21      Q.  Did there come a time while you were going

22   through the Subpoena request that you understood what Miss

23   Hill was asking you to do on Exhibit 5, the message about

24   the Subpoenas?

25      A.  Can you repeat that?

CONFIDENTIAL

Page 92

1    Q.  Yes.  Did there come a time that you understood

2    what Miss Hill was asking of you in Exhibit 5 about the

3    Subpoenas?

4    A.  I mean, yes, but I didn't -- I didn't take her

5    message to what I was actually looking for.  I hadn't

6    spoke with her in regards to this because I wasn't sure

7    exactly -- I had rather gotten help or taken any legal

8    advice Nell and people from your end and the people like

9    Stuart.

10   Q.  What was your understanding of what Miss Hill

11   wanted to -- wanted you to do?

12   A.  I mean, it sounds like she wanted me to say I

13   didn't have anything.

14   Q.  And just back to the communications, can you just

15   specifically describe how you searched for all the

16   communications with Miss Hill?

17   A.  I mean, the same as we just spoke about on the

18   Subpoena.

19   Q.  Right.  But did you --

20   A.  I --

21   Q.  So for your text messages, can you just describe

22   the process for me, how you went through your -- the text

23   messages to find responsive documents?

24   A.  I mean, I looked in terms of the dates that were

25   on the Subpoena.  I just -- I don't want this to be, like,

CONFIDENTIAL

Page 93

1    confused.  I just did what I thought that was right.

2        Q.  Right.  And I just want to make sure I understand

3    just in case there's a -- a disconnect.

4        A.  I don't know if there was.  And so that's why,

5    honestly, if I am able to go so I can speak with, like,

6    you know, Stuart and my lawyer about it, like, that would

7    be great.  Because I -- I don't want this to be confused,

8    and I don't want it to --

9        Q.  That -- that -- that's fine, and I think, you

10   know, we can -- you know, I think we can keep the

11   deposition open, and you can have that conversation with

12   Stuart, and we can follow up just to make sure that we've

13   gotten all the documents.

14       A.  Correct.

15       Q.  I think that makes -- because I don't want --

16       A.  I don't want to not comply.

17       Q.  Right.  And I'm not trying --

18       A.  I'm -- I'm not trying to not do that, you know.

19       Q.  Thank you.  So I think that that makes the most

20   sense.

21           MS. SPADONI: What do you mean by keep the

22   deposition, Ivano?

23           MR. VENTRESCA:  Well, if Mr. Tortorigi will have

24   a conversation with his counsel, and if there are

25   additional documents that -- that come from that, we may

Page 94

1    have some follow-ups with respect to those documents.

2            MS. SPADONI: I wonder if that's something we can

3    do today so that we can conclude the deposition in one go

4    and not bring Mr. Tort -- Tortorigi back.

5            THE WITNESS: I mean, I'd rather not have to come

6    back, but I just don't want there to be confusion about

7    what I produced.  And I'm just being honest about, like,

8    that's what I searched for because I thought that that's

9    what I was supposed to do.

10           MR. VENTRESCA:  Yeah

11           MS. SPADONI: Could we take a short break so he

12   can confer with his lawyer and we can just sort this out

13   now?  Would that be all right?

14           MR. BROWN: Well, the issue the issue -- the issue

15   is whether there are additional -- one of the issues is

16   whether there are additional documents.  And there may or

17   may not be.

18           If there are additional documents, they're not

19   going to -- they're not going to find them today, I don't

20   think.  That's really the issue that we're talking about

21   here.

22           MS. SPADONI: I don't know why we wouldn't be able

23   to find them today.

24           MR. BROWN:  Well, certainly -- well, I don't

25   understand why you think we could find additional

CONFIDENTIAL

Page 95

1   documents today.

2          MS. SPADONI: Well, Mr. Tortorigi can speak with

3   his attorney and can perform additional searches on his

4   phone.  If you folks would like to give him search terms,

5   he can do that.

6          MR. BROWN:  He's not doing that on the fly, no.

7   Well, let me -- let me -- let me -- let me interject for a

8   second.  If Mr. Tortorigi wants to talk to his lawyer --

9          THE REPORTER:  I'm so sorry.  I can't hear you

10  too well.  So sorry.  If Mr. Tortorigi wants to what?

11         MR. BROWN:  Talk to his lawyer, then he should be

12  permitted to talk to his lawyer.  If he wants to talk to

13  talk to lawyer, he can take a break he can talk to his

14  lawyer.

15         MS. SPADONI: Mr. Brown, I'm sorry, you're very

16  faint.  I, too, am having trouble hearing you.  So, I'm

17  sorry, could you please repeat your last sentence?

18         MR. VENTRESCA:  I believe Mr. Brown said that if

19  Mr. Tortorigi wants to speak with his lawyer now during

20  the break, that that -- that makes sense that Mr.

21  Tortorigi can take a break and can speak with his lawyer

22  and then we can progress from there.  Did I capture that

23  right?

24         MR. BROWN:  Can you hear me better now?

25         MR. VENTRESCA:  Yes.

CONFIDENTIAL

Page 96

```
 1              MS. SPADONI: Oh, much better. Thank you.

 2              MR. BROWN:  I put in my earphones, so anyway. Mr.

 3      Ventresca got it right.  If he wants to talk to his

 4      lawyer, he can talk to his lawyer.  So we can take a break

 5      for that.  Try to talk to his lawyer.  We'll see what

 6      happens.

 7              MS. SPADONI: Thank you, Counsel.

 8              MR. VENTRESCA:  We can go off the record, take a

 9      break.

10              THE VIDEOGRAPHER:  Stand by.  The time is

11          p.m.  We're off the record.

12          (Recess taken)

13              THE VIDEOGRAPHER:  The time is 12:16 p.m.  We're

14      back on the record.

15      BY MR. VENTRESCA:

16          Q.  Mr. Tortorigi, were you able to get in contact

17      with your attorneys?

18          A.  No, I was not.

19              MR. VENTRESCA:  Miss Spadoni, in light of that,

20      and given, I think at least it appears, it hasn't been an

21      adequate search, would you think it makes sense for Mr.

22      Tortorigi to have time to talk with his counsel if there

23      are any documents?

24              And if it is necessary, we can have -- keep this

25      open and have future remote depositions so Mr. Tortorigi
```

CONFIDENTIAL

Page 97

```
 1    doesn't have to travel.  Again, if necessary, with respect
 2    to anything that may -- that may come up.
 3            MS. SPADONI: I'm not happy about bringing Mr.
 4    Tortorigi back, and I'm certain he is not, too, but if
 5    there are additional documents produced that have not
 6    previously been produced, I think it is a professional
 7    courtesy to agree to do that with respect to those
 8    documents only.
 9            MR. VENTRESCA:  Thank you.
10    BY MR. VENTRESCA:
11        Q.  Mr. Tortorigi, I just have just a few more
12    questions.
13        A.  Okay.
14        Q.  And one of them we talked about, and I think I
15    may not have been clear.
16            Talking about Exhibit 5 which is the Instagram
17    message about the Subpoena.
18        A.  Yes.
19        Q.  When you responded to Miss Peyser on April 10th,
20    had you found that Instagram message?
21        A.  On April 10th?
22        Q.  Yeah.
23        A.  I mean, when we had talked, yes.  Like, I -- but
24    I wasn't, like, aware of, like, when exactly I needed to
25    produce certain things.
```

Page 98

1          And so when she had reached out to me with the

2     letter, that's when I wanted to just give all the

3     documentation there.

4         Q.   Okay.  And another clarifying question about that

5     trip to San Diego you took in May or June of 2021.  You

6     mentioned something about that all -- the interactions

7     with Mr. Bauer going public.

8          Was your trip -- when was your trip in relation

9     to those allegations going public?

10        A.   I mean, I'm not, like, exactly sure at the top of

11    my head.  I mean, it was around that time, but I just have

12    to -- I would have to double-check and see.

13         I don't exactly remember when I went.  I don't

14    know if it -- I can't remember if it was, honestly, before

15    or after, but I need to double-check it and see.

16        Q.   Okay.

17        A.   Because I'm -- I'm not sure at this point.

18        Q.   Okay.  Well, you can -- you can get back to us on

19    that.

20         One point, going back earlier in the deposition,

21    I believe you had mentioned two friends of Miss Hill's

22    that you were friends with.  One was a cousin.  I believe

23    you gave the first name, and I don't think I got the last

24    name.

25        A.   I just don't know her last name.

Page 99

1      Q.   Okay.

2      A.   Yeah.

3      Q.   And the other friend, do you know -- there was

4   a -- another one.

5      A.   Carlia.

6      Q.   Yes.  Do you remember the last name?

7      A.   Not off the top of my head.  I think it's Parisi,

8   but I wouldn't hold me to that.

9      Q.   Could you spell that?

10      A.   I mean, P-a-r-i-s-i.

11          MR. VENTRESCA:  Okay.  That's all the questions I

12   have.  Thank you.

13          THE WITNESS: Thanks.

14

15                      EXAMINATION

16   BY MS. SPADONI:

17      Q.   I have a few brief questions, Mr. Tortorigi.

18          MS. SPADONI:  And, Mr. Ventresca, could I trouble

19   you to put up Exhibit 4 again, please?

20          MR. VENTRESCA:  Yes.  You're going to test my

21   memory as to -- could you describe the Exhibit 4 just to

22   make sure I have it?

23          THE WITNESS: It's these messages.

24          MS. SPADONI: You know, if it --

25          MR. VENTRESCA:  Got it.

CONFIDENTIAL

Page 105

1          CERTIFICATE OF DEPONENT

2

3          I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9


10    _____

          FRANK TORTORIGI

11

12          SUBSCRIBED AND SWORN before and to me

13    this _____ day of _____, 20___.

14

15

16    _____

17          NOTARY PUBLIC

18

19

20    My Commission expires:

21

22

23

24

25

CONFIDENTIAL

Page 106

1    STATE OF CALIFORNIA)SS:

2    COUNTY OF SAN DIEGO)

3            I do hereby certify:

4            That the foregoing deposition was taken before me

5    at the time and place therein set forth at which time the

6    witness was put under oath by me;

7            That the testimony of the witness and all

8    objections made at the time of the examination were

9    recorded stenographically by me were thereafter

10   transcribed under my direction and supervision and that

11   the foregoing is a true record of the same.

12           I further certify that I am neither counsel for nor

13   related to any party to said action, nor anywise

14   interested in the outcome thereof.

15           The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's Certificate

17   null and void.

18   _____Reading and signing was requested.

19   _____Reading and signing was waived.

20   _____Reading and signing was not requested.

21           IN WITNESS WHEREOF, I have subscribed my name this

22   30th day of June, 2023.

23

24

25           JACQUELINE STEARMAN, CSR NO. 9373